**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SAUL HOROWITZ, as Sellers'
Representative,

                              Plaintiff,          No. 17 CV 7742 (JPO)


                    v.


NATIONAL GAS & ELECTRIC, LLC and
SPARK ENERGY, INC.,

                              Defendants.


**DEFENDANTS NATIONAL GAS & ELECTRIC, LLC & SPARK ENERGY, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**
**PLAINTIFF'S AMENDED COMPLAINT**

**MORGAN, LEWIS & BOCKIUS LLP**

Kenneth I. Schacter
101 Park Avenue
New York, NY 10178
(212) 309-6000
kenneth.schacter@morganlewis.com

Troy S. Brown (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
troy.brown@morganlewis.com

Michelle Pector (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5000
michelle.pector@morganlewis.com

*Attorneys for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*

# TABLE OF CONTENTS

PERTINENT ALLEGATIONS IN AMENDED COMPLAINT..................................................... 2

   I.  NGE Purchases Major Energy ............................................................................. 2

   II.  NGE's Transfer of its Major Energy Interests to Spark........................................... 4

   III. Spark's Integration and Operation of Major Energy ............................................ 5

   IV. Plaintiff Files Suit ............................................................................................ 5

LEGAL STANDARD ............................................................................................... 5

ARGUMENT .......................................................................................................... 6

   I.  The Fraudulent Inducement Claim Rests Upon Allegations of a Breach of
      Contract.......................................................................................................... 6

      A.   Entering into a Contract Intending Not to Perform Does Not Constitute
            Fraudulent Inducement ..................................................................... 6

      B.   Plaintiff's Repurposed Fraud Allegations Do Not Save His Claim ...................... 8

      C.   The Fraudulent Inducement Claim Fails to Meet Any of the
            *Bridgestone/Firestone* Exceptions ......................................................... 9

            1.   NGE had no special duty to the Sellers ................................... 10

            2.   Plaintiff's allegations establish no misrepresentations collateral to
                the parties' contracts ............................................................. 11

            3.   Plaintiff seeks no special damages ........................................... 14

   II.  Plaintiff's Tortious Interference Claim Cannot Survive Because He Alleges That
      Spark Breached the Transaction Documents and, in the Same Pleading, Alleges
      That Spark Also Tortiously Interfered with the Transaction Documents ........................ 16

      A.   A Party Cannot Tortiously Interfere With Its Own Contract .............................. 16

      B.   Spark Is Permitted to "Interfere" with NGE's Contracts.................................... 18

            1.   The economic-interest defense broadly applies to affiliated entities........ 18

            2.   Plaintiff fails to adequately allege that Spark acted maliciously,
                fraudulently, or illegally, which is required to defeat the economic-
                interest defense..................................................................... 21

      C.   The Tortious Interference Claim Duplicates the Contract Claim Against
            Spark .............................................................................................. 22

   III. Plaintiff is Not Entitled to Special Damages Under the MIPA ....................................... 23

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allerand, LLC v. 233 E. 18th St. Co.*,
   19 A.D.3d 275 (1st Dep't 2005) ............................................................................................22

*Am. Protein Corp. v. AB Volvo*,
   844 F.2d 56 (2d Cir. 1988) ...................................................................................................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................5

*Atlantis Info. Tech., GmbH v. CA, Inc.*,
   485 F. Supp. 2d 224 (E.D.N.Y. 2007) ..................................................................................16

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*,
   259 F. Supp. 3d 16, 29–30 (S.D.N.Y. 2017)..........................................................18, 19, 20, 21

*Berman v. Sugo LLC*,
   580 F. Supp. 2d 191 (S.D.N.Y. 2008)...................................................................................21

*Bradbury v. Woller Cope-Schwarz*,
   20 A.D.3d 657 (3d Dep't 2005) ............................................................................................16

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
   98 F.3d 13 (2d Cir. 1996)............................................................................................. passim

*Choquette v. Motor Info. Sys., Inc.*,
   No. 15-cv-9338, 2017 WL 3309730 (S.D.N.Y. Aug. 2, 2017)..............................................22

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
   70 N.Y.2d 382 (N.Y. 1987) ..............................................................................................10, 22

*Crabtree v. Tristar Auto. Grp., Inc.*,
   776 F. Supp. 155 (S.D.N.Y. 1991) .......................................................................................14

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,
   68 N.Y.2d 954 (N.Y. 1986) ..............................................................................................8, 9, 14

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010).....................................................................................................3

*DynCorp v. GTE Corp.*,
   215 F. Supp. 2d 308 (S.D.N.Y. 2002)...............................................................................11, 24

*E.F. Hutton Int'l Assocs. Ltd. v. Shearson Lehman Bros. Holdings, Inc.*,
    281 A.D.2d 362 (1st Dep't 2001) ............................................20

*Evans v. Winston & Strawn*,
    757 N.Y.S.2d 532 (1st Dep't 2003) ............................................15

*Felsen v. Sol Cafe Mfg. Corp.*,
    24 N.Y.2d 682 (N.Y. 1969) ............................................20

*Finley v. Giacobbe*,
    79 F.3d 1285 (2d Cir. 1996)............................................16

*Flushing Expo, Inc. v. New World Mall, LLC*,
    116 A.D.3d 826 (2d Dep't 2014) ............................................16

*Gate Techs., LLC v. Delphix Capital Mkts., LLC*,
    No. 12 Civ. 7075, 2013 WL 3455484 (S.D.N.Y. July 9, 2013) ............................................6, 7

*Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*,
    56 F.3d 427 (2d Cir. 1995)............................................6

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996)............................................11

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    679 F. Supp. 2d 395 (S.D.N.Y. 2009)............................................19, 21

*JHH Pictures, Inc. v. Rawkus Entm't LLC*,
    291 A.D.2d 356 (1st Dep't 2002) ............................................22

*Karas v. Katten Muchin Zavis Rosenman*,
    No. 04-cv-9570, 2006 WL 20507 (S.D.N.Y. Jan. 3, 2006) ............................................17

*Kassover v. Prism Venture Partners, LLC*,
    53 A.D.3d 444 (1st Dep't 2008) ............................................19

*Koret, Inc. v. Christian Dior, S.A.*,
    161 A.D.2d 156 (1st Dep't 1990) ............................................16, 17

*Lemus v. Manhattan Car Wash, Inc.*,
    No. 06-cv-15486, 2010 WL 1372705 (S.D.N.Y. Mar. 26, 2010)............................................15

*LHR, Inc. v. T-Mobile USA, Inc.*,
    112 A.D.3d 1293 (4th Dep't 2013)............................................17

*Low v. Robb*,
    No. 11-cv-2321, 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) ............................................5

*Manas v. VMS Assocs., LLC*,
    53 A.D.3d 451 (1st Dep't 2008) ........................................................................16

*Maricultura Del Norte v. World Bus. Capital, Inc.*,
    159 F. Supp. 3d 368 (S.D.N.Y. 2015)..............................................................9, 14

*Masefield AG v. Colonial Oil Indus.*,
    No. 05-cv-2231, 2006 WL 346178 (S.D.N.Y. Feb. 15, 2006) .........................19, 21

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)...............................................................................9

*Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
    No. 15-cv-293, 2017 WL 570929 (S.D.N.Y. Feb. 13, 2017) ............................22

*MTI/The Image Group, Inc. v. Fox Studios East, Inc.*,
    262 A.D.2d 20 (1st Dep't 1999) ......................................................................19, 20

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
    273 F. Supp. 2d 436 (S.D.N.Y. 2003)..............................................................24

*Osan Ltd. v. Accenture LLP*,
    454 F. Supp. 2d 46 (E.D.N.Y. 2006) ....................................................7, 10, 13, 16

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017)...............................................................6

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
    507 F.3d 117 (2d Cir. 2007)...............................................................................8

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    839 F.3d 125 (2d Cir. 2016)...............................................................................24

*Rather v. CBS Corp.*,
    68 A.D.3d 49 (1st Dep't 2009) ........................................................................21

*Revonate Mfg., LLC v. Acer Am. Corp.*,
    No. 12-cv-6017, 2013 WL 342922 (S.D.N.Y. Jan. 18, 2013) .................................7

*Ruha v. Guior*,
    277 A.D.2d 116 (1st Dep't 2000) ....................................................................21

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*,
    84 F.3d 629 (2d Cir. 1996)...............................................................................6

*Savage v. Galaxy Media & Mktg. Corp.*,
    No. 11-cv-6791, 2012 WL 2681423 (S.D.N.Y. July 5, 2012)................................19

iv

*Stewart v. Jackson & Nash*,
    976 F.2d 86 (2d Cir. 1992)......................................................................................9

*TN Metro Holdings I, LLC v. Commonwealth Ins. Co.*,
    51 F. Supp. 3d 405 (S.D.N.Y. 2014).....................................................................10

*Uitz v. Lustigman Firm, P.C.*,
    No. 13-cv-6040, 2014 WL 3767056 (S.D.N.Y. July 28, 2014)............................22

*W.B. David & Co. v. DWA Commc'ns, Inc.*,
    No. 02-cv-8479, 2004 WL 369147 (S.D.N.Y. Feb. 26, 2004) .............................11

*Wiedis v. Dreambuilder Investments, LLC*,
    No. 16-cv-9254, 2017 WL 3055237 (S.D.N.Y. July 18, 2017)..............................9

*Wyle Inc. v. ITT Corp.*,
    130 A.D.3d 438 (1st Dep't 2015) ..........................................................................6

*Wyly v. CA, Inc.*,
    No. 05-cv-4430, 2009 WL 3128034 (E.D.N.Y. Sept. 29, 2009) ..........................15

*Xerox Corp. v. Graphic Mgmt. Servs. Inc.*,
    959 F. Supp. 2d 311 (W.D.N.Y. 2013) .................................................................24

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) .....................................................................................................6

Fed. R. Civ. P. 11 ...................................................................................................9, 21

Fed. R. Civ. P. 12(b)(6)............................................................................................3, 5

## INTRODUCTION

Plaintiff Saul Horowitz's second bite at the apple fares no better than his first.  His amended complaint cures none of the defects that plagued his original complaint.  Indeed, because there was no way Plaintiff could substantively address the points Defendants made in their first motion to dismiss, Plaintiff has instead amended his complaint by resorting to wordplay and semantics—invoking certain buzzwords and phrases and deleting others—in a transparent effort to rephrase his tort claims in tort-law language, to try to avoid dismissal.  But regardless of the new labels he now applies to his still-flawed tort claims, one fact remains inescapable: Plaintiff's allegations actually sound in contract, not tort.  Under bedrock principles of New York law, an alleged breach of contract cannot give rise to tort claims that are founded on the same allegations supporting the contract claim.  Plaintiff's amendments, though imaginative, cannot transform his obvious contract claims into actionable tort claims that can withstand a motion to dismiss.

*First*, Plaintiff's fraudulent inducement claim rests solely upon allegations that National Gas & Electric ("NGE") entered into three enforceable contracts when it bought Major Energy,[1] even though NGE never intended to perform the obligations memorialized in those contracts. (*See*, *e.g.*, Am. Compl. ¶¶ 3, 7.)  Plaintiff expressly alleges that every one of these obligations were tied directly to provisions in one or more of the three contracts.  Although his assertions may state a claim for a contract breach that, while unmeritorious, would survive a motion to dismiss, those assertions, as a matter of law, are inescapably insufficient to state a fraudulent inducement claim under even the most liberal interpretation of the required pleading standard.  The Court therefore should dismiss Count I with prejudice.

---

[1] "Major Energy" means Major Energy Services, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC, collectively.

*Second*, Plaintiff's own allegations likewise foreclose his tortious interference claim. Even setting aside the reality that his interference claim merely duplicates his contract claim—which alone is reason to dismiss it—the interference claim emanates only from the core contention that Defendant Spark Energy ("Spark") interfered with *its own* contracts. Indeed, Plaintiff asserts a direct contract claim against Spark for breaching the very contracts with which he claims Spark interfered. As a matter of sound New York law, Spark cannot be held liable for allegedly tortiously interfering with its own contract(s). And notwithstanding that legal bar, Plaintiff's own allegations establish that Spark had an economic interest legally sufficient to justify any interference as a matter of law. Plaintiff's tortious interference claim therefore is irredeemably infirm, and the Court should dismiss Count IV with prejudice.

## PERTINENT ALLEGATIONS IN AMENDED COMPLAINT

Plaintiff Horowitz, acting as the Sellers' Representative, along with Moshe Wiederman, Mark Josefovic, Michael Bauman, and Asher Fried (collectively, "the Sellers"), are all former owners of Major Energy—a residential supplier of electricity and natural gas. (Am. Compl. ¶¶ 1, 8–9, 15.) Defendant NGE is a Houston-based company that similarly supplies electricity and natural gas to residential customers. (*Id.* ¶¶ 2, 10.) NGE and Spark are affiliates. (*Id.* ¶ 11.) Plaintiff alleges that, during the relevant period, Spark controlled NGE. (*See*, *e.g.*, *id.* ¶¶ 74, 80–81, 104–06.)

## I.   NGE Purchases Major Energy

In November 2015, NGE approached the Sellers about possibly acquiring Major Energy from them. (*Id.* ¶¶ 19–20.) NGE and the Sellers negotiated for several months, and NGE ultimately made a final offer in March 2016, which consisted of, among other things, a cash payment of $40 million at closing (net of a $5 million litigation credit), and two different

2

contingent earnout payments: (i) a potential maximum of $15 million of cash installments paid over three years, subject to proportionate reduction and other deductions based on the level of Major Energy's achievement of certain EBITDA[2] targets; and (ii) a potential maximum $20 million earnout paid over 33 months, subject to achieving certain EBITDA and customer count targets. (*Id.* ¶ 21–24.) The parties agreed on the final terms of the sale and memorialized their agreements in three contracts: (1) a Membership Interest Purchase Agreement ("MIPA"); (2) an "Earnout Agreement"; and (3) an "Executive Earnout Agreement" (collectively, the "MIPA and Earnout Agreements" or the "transaction documents"). (*Id.* ¶ 31.) The Parties closed the transaction on April 15, 2016, under the terms of the MIPA and Earnout Agreements. (*Id.* ¶ 30.) By their terms, those documents are fully integrated contracts that contain "the entire understanding and agreement among the Parties." (*Id.*, Ex. A ¶ 11.4.)[3]

The Sellers allege that during the negotiations, they "made clear" that certain conditions of the deal were important to them. (*Id.* ¶¶ 2, 26, 28, 36.) Every one of those alleged important conditions was incorporated into, and became an express term of, one or more of the transaction documents, as Plaintiff repeatedly alleges. (*E.g.*, *id.* ¶¶ 48–50.)[4] These allegedly important terms include the following:

---

[2] "EBITDA" means earnings before interest, taxes, depreciation, and amortization, and is a common measure of a company's ability to generate cash flows for its owners.

[3] "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[4] *See also*, *e.g.*, *id.* ¶ 4 (explaining that Major Energy could not be sold "under the express terms of the transaction documents"); ¶ 5 (detailing "contractual" promises contained "[i]n the transaction documents"); ¶ 41 ("NGE, with the full knowledge and participation of Spark, blatantly breached this unambiguous [no assignment] provision of the MIPA when it sold Major Energy to Spark."); ¶ 48 ("In memorializing this understanding and agreement . . . that NGE would not take any actions that would . . . reduce[e] the payments due to the Sellers. . . , the parties included the following unambiguous provision in the Earnout Agreement."); ¶ 61 ("NGE's agreement to keep Major Energy operating as a private company . . . is evident from the acquisition documents. . . ."); ¶ 62 ("[I]n Section 2.7 of the . . . [Earnout Agreements] NGE expressly agreed that it would operate Major Energy . . . consistently with how the Major Energy Senior Management Team suggest Major Energy be operated . . . as a private company . . . and not make any change or modification to the operations of Major Energy . . . .");

- In determining the adjusted EBITDA for the Earnout and Cash Installments, the parties would use the same structure and methodology Major Energy historically used in preparing its EBITDA projections.  (Am. Compl. ¶¶ 28–29.)  This concept was memorialized in Section 2.2 of the MIPA, in Sections 2.2, 2.7 and Exhibit B of the Earnout Agreement, and in the Executive Earnout Agreement.  (*Id.* ¶¶ 34–38, 44–49, 53–56.)

- It was "essential" for Major Energy to operate according to "business-as-usual" and retain its senior management team and key employees. (*Id.* ¶ 38.)  This concept was memorialized in Sections 7.1 and 11.7 of the MIPA, Section 2.7 of the Earnout Agreement, and in the Executive Earnout Agreement. (*Id.* ¶¶ 38–41, 42–51.)

- Major Energy would continue operating as a private company during the three-year deferred payment period.  (*Id.* ¶¶ 61–63.)  This concept was memorialized in Sections 7.1 and 11.7 of the MIPA, Section 2.7 of the Earnout Agreement, and in the Executive Earnout Agreement.  (*Id.* ¶¶ 39–42, 43–50, 59, 61–63.)

- NGE would not assign the rights and obligations under the MIPA.  (*Id.* ¶ 68.)  This concept was memorialized in Section 11.7 of the MIPA.  (*Id.* ¶¶ 49, 68.)

## II.   NGE's Transfer of its Major Energy Interests to Spark

According to Plaintiff, NGE "began to work on the drop-down and sale of Major Energy to Spark" shortly after NGE purchased Major Energy.  (*Id.* ¶ 66.)  On May 3, 2016, NGE and Spark entered into a purchase agreement by which Spark would acquire NGE's interests in Major Energy, and that transaction closed in August 2016.  (*Id.* ¶¶ 66, 70.)  Plaintiff alleges that

---

*id.* ¶ 63 ("NGE's agreement to keep Major Energy operating as a private company . . . is also evident from the nature and terms of the new employment agreements…"); *id.* ¶ 68 ("NGE contractually agreed that it would not engage in any direct or indirect assignment"); *id.* p. 19, Hdg. E (explaining that drop-down "Violates The Express Terms Of The Agreements."); *id.* at p. 21, Hdg. F (same); *id.* ¶ 76 ("Defendants have behaved in bad faith and breached their contractual obligations to the Sellers under the Agreements."); *id.* ¶ 91 ("The foregoing actions by Defendants have prevented the Company from operating business-as-usual, as contemplated and agreed upon by the parties."); *id.* ¶ 101 ("Such conduct is a blatant violation of Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement."); *id.* ¶ 119 (describing the Earnout "calculation methodology and approach that was agreed upon and memorialized in the Agreements").

NGE's sale of its interests to Spark constitutes a breach of the "express terms" of the MIPA, the Earnout Agreement, and the Executive Earnout Agreement.  (*Id.* ¶¶ 59–75.)

## III.    Spark's Integration and Operation of Major Energy

Plaintiff also alleges that after Spark acquired Major Energy from NGE, Spark failed to operate it on a "business-as-usual" basis, which Plaintiff contends was one of the important conditions of NGE's original purchase of Major Energy, and thus he claims that Spark has breached Section 7.1 of the MIPA and Section 2.7 of the Earnout Agreement.  (*Id.* ¶¶ 77–102.) He also claims that Defendants incorrectly calculated Major Energy's adjusted EBITDA because they failed to "use the same methodology and approach that Major Energy had historically used," thereby breaching the MIPA and Earnout Agreements.  (*Id.* ¶¶ 112–19.)

## IV.    Plaintiff Files Suit

Premised on these allegations, Plaintiff filed a four-count suit on October 10, 2017, and Defendants moved to dismiss the two tort claims because they could not, as pleaded, coexist with the contract claims as a matter of law.  (Mot. to Dismiss, ECF No. 19.)  Plaintiff responded by amending his complaint, futilely recasting his flawed tort claims to avoid dismissal.  Plaintiff's new characterizations, however, still don't suffice as a matter of law, and Defendants therefore again move to dismiss the two tort-based causes of action.

## <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *accord Low v. Robb*, No. 11-cv-2321, 2012 WL 173472, at *4 (S.D.N.Y. Jan. 20, 2012) (Oetken, J.).  A court is not required to accept legal conclusions, and threadbare recitals of a cause of action supported by only conclusory statements do not suffice.  *Low*, 2012 WL 173472,

at *4.  Where, as here, a plaintiff asserts a cause of action sounding in fraud, the plaintiff's

allegations must also satisfy the heightened pleading requirement of Rule 9(b) of the Federal

Rules of Civil Procedure, which requires that a party: (1) allege facts to show that defendant had

both motive and opportunity to commit fraud, or (2) allege facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness.  *S.Q.K.F.C., Inc. v. Bell Atl.

TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996); *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d

477, 490–91 (S.D.N.Y. 2017).

## ARGUMENT

I.     **The Fraudulent Inducement Claim Rests upon Allegations of a Breach of Contract**

    A.  **Entering into a Contract Intending not to Perform Does Not Constitute
Fraudulent Inducement**

To state a fraudulent inducement claim, a plaintiff must allege a "knowing

misrepresentation of material present fact, which is intended to deceive another party and induce

that party to act on it, resulting in injury."  *Wyle Inc. v. ITT Corp.*, 130 A.D.3d 438, 438–39

(1st Dep't 2015).  It is not enough to allege the defendant entered into a contract with no intent to

perform: "A cause of action for fraud does not generally lie where the plaintiff alleges only that

the defendant entered into a contract with no intention of performing."  *Grappo v. Alitalia Linee

Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995); *Gate Techs., LLC v. Delphix Capital

Mkts., LLC*, No. 12-cv-7075, 2013 WL 3455484, at *6 (S.D.N.Y. July 9, 2013) (Oetken, J.)

(noting that plaintiffs cannot transform contract claims unto fraud claims merely by alleging

defendant entered the contract intending never to perform).  While potentially actionable as a

breach of contract, a party's false representations about its intention to fulfill its contractual

promises do not give rise to a fraudulent inducement claim.  *Bridgestone/Firestone, Inc. v.

Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (vacating finding of fraud because

defendant's "intentionally-false statements . . . indicating his intent to perform under the contract. . . . [were] not sufficient to support a claim for fraud under New York law"); *see also Gate Techs.*, 2013 WL 3455484, at *6 (dismissing fraud claim because "a plaintiff cannot transform a contract claim into a fraud claim simply by alleging that the defendant entered the . . . agreement while intending not to perform it"). Indeed, "[a] fraud claim that merely alleges that intentionally false statements were made by a party indicating his intent to perform under [a particular] contract is duplicative of the underlying breach of contract claim . . . and must be dismissed as a matter of law." *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12-cv-6017, 2013 WL 342922, at *3 (S.D.N.Y. Jan. 18, 2013) (internal citation and quotation omitted). Courts should vigilantly ensure that "contract actions are not improperly converted into fraud actions by mere allegations that a contracting party did not intend to meet its contractual obligations." *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 52 (E.D.N.Y. 2006).

Here, Plaintiff undeniably grounds his fraudulent inducement claim entirely upon the premise that NGE allegedly promised to perform under the MIPA and Earnout Agreements, but "never had any intention of doing so." (Am. Compl. ¶ 124.) He claims that the Sellers demanded certain "vital" conditions during negotiations with NGE, and that the parties memorialized every one of those conditions in "provisions in the transaction documents." (*Id.* ¶ 5; *see also id.* ¶ 49.) His fraudulent inducement claim emanates from his allegation that NGE agreed to these contractual provisions, but never intended to be bound by them. Distilled to its essence, Plaintiff's fraudulent inducement allegation is founded upon the notion that NGE entered into a contract not intending to perform—which is insufficient to state an actionable claim for fraudulent inducement. *See Bridgestone/Firestone*, 98 F.3d at 19.

**B.  Plaintiff's Repurposed Fraud Allegations Do Not Save His Claim**

In an attempt to end-run the holdings in cases like *Bridgestone/Firestone* and *Gate Technologies* (which Defendants addressed in detail in their original motion to dismiss), Plaintiff changes the labels he attaches to his allegations and tries to recast NGE's alleged misconduct as supporting a fraud claim.  Despite these semantic tricks, Plaintiff has not changed the ***essence*** of what he alleges Defendants did.  Deleting sentences like "the Sellers made sure to memorialize these representations and assurances in the executed transaction documents," (Redlined Compl., ECF No. 23-1, at p. 37), does not change that Plaintiff's amended complaint pleads that every "essential" term he complains NGE never intended to perform was indeed incorporated into the transaction documents.[5]  Nor does Plaintiff's changing phrases like "material representations and agreements" to "promises" or "assurances" (ECF No. 23-1, at 38) alter the true substance of what Plaintiff actually alleges: a breach of contract.

Plaintiff's new characterization of Defendants as having some "preconceived and undisclosed intention of not performing" does not save his fraud claim because simply re-characterizing the alleged conduct in this way adds no substance to the fraud allegations.  *First*, this new characterization about preconceived, undisclosed intentions is but a legal conclusion taken, verbatim, ***straight from the case law***, but passed off as a factual allegation.  *See*, *e.g.*, *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (N.Y. 1986) ("[A] promise made with a preconceived and undisclosed intention of not performing it, constitutes a misrepresentation." (alterations omitted)).  Courts, though, give "no effect to legal conclusions couched as factual allegations." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).

---

[5] *See supra* note 4.

*Second*, the same case law setting out the "preconceived and undisclosed" language unambiguously holds that "a mere promissory statement as to what will be done in the future" is not actionable as a fraudulent misrepresentation. *Deerfield Commc'ns Corp.*, 68 N.Y.2d at 956. Indeed, courts draw a distinction between *present statements*, such as whether a company is "presently in a position . . . to repay its investors," and *future statements*, such as assertions about future "liquidity, security, and payment of interest." *Wiedis v. Dreambuilder Invs., LLC*, No. 16-cv-9254, 2017 WL 3055237, at *8 (S.D.N.Y. July 18, 2017). Only present statements— those that do not involve "contractual promises regarding prospective performance"—are actionable under a fraud theory. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007); *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) ("A promissory statement, in a contract, as to what will be done in the future gives rise to a breach of contract claim, whereas a false representation of present fact gives rise to an independent claim for fraudulent inducement.").

Here, the amended complaint repeatedly underscores all of the contractual obligations Plaintiff claims NGE promised, but never intended, to perform. These allegations cannot sustain an independent fraudulent inducement claim, and that claim should be dismissed with prejudice.

### C.  The Fraudulent Inducement Claim Fails to Meet Any of the *Bridgestone/Firestone* Exceptions

As Defendants have shown, it is "axiomatic that a plaintiff cannot plead a fraud claim based on the same facts that underlie her breach of contract claim . . . ." *Maricultura Del Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 377 (S.D.N.Y. 2015). There are, however, three limited exceptions to this rule that, if properly pleaded consistent with Rule 11, can transform a claim based on a breach of contract into a viable fraudulent inducement claim. These exceptions

are narrow and specific, and generally require allegations of fraud that are distinct from, and extraneous to, the underlying contract.

To qualify for one of these exceptions, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone*, 98 F.3d at 20 (internal citations omitted).  Plaintiff's amended complaint reveals no allegations that could remotely support any of these three exceptions.

### 1.  NGE had no special duty to the Sellers

Plaintiff has not alleged (and cannot allege) that NGE owed any special duty to the Sellers beyond what is set out in the parties' contracts.  *See TN Metro Holdings I, LLC v. Commonwealth Ins. Co.*, 51 F. Supp. 3d 405, 410 (S.D.N.Y. 2014) (denying as futile plaintiffs' motion to amend, where defendant was not alleged to owe a duty "separate from [its] duty to perform under the contract").  To qualify for this exception, the alleged separate legal duty "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389–90 (N.Y. 1987) (affirming dismissal of tort claims where the tort allegations were "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract").  Typically, sophisticated parties negotiating arm's-length deals owe no special duties to one another, outside of those they decide to put into their contract.  *Osan*, 454 F. Supp. 2d at 55 (finding no separate duty distinct from those under the contract because "parties dealing in an arms-length transaction are not necessarily placed in positions of confidence or trust, that is, of fiduciaries, with respect to other contracting parties, unless extraordinary circumstances indicate (or dictate) otherwise").

Here, as a potential buyer negotiating with the Sellers in a commercial setting at arm's length, NGE was not, as a matter of law, in a special position of confidence or trust with the Sellers.  To the contrary, the parties (i) were sophisticated, (ii) were represented by sophisticated deal counsel, and (iii) negotiated a complex set of acquisition documents at arm's length in a commercial setting.  NGE and the Sellers owed each other only the duties that they secured through negotiations at the bargaining table.  Plaintiff alleges nothing to the contrary, and he certainly has not identified grounds for any legal duty separate from those in the parties' contracts.  Nor could he.

### 2.  Plaintiff pleads no misrepresentations collateral to the parties' contracts

Plaintiff also has not alleged—and could never allege—a fraudulent misrepresentation collateral to the contracts.  "For a fraudulent misrepresentation to be collateral or extraneous to a contract, it must be a promise to do something *other than* what is expressly required by the contract."  *W.B. David & Co. v. DWA Commc'ns, Inc.*, No. 02-cv-8479, 2004 WL 369147, at *5 (S.D.N.Y. Feb. 26, 2004) (emphasis added).

Here, Plaintiff has expressly pleaded that the parties' agreements fully incorporate all of NGE's alleged pre-contractual representations and assurances.  (Am. Compl. ¶ 49.)[6]  He repeatedly contends that NGE's promises and assurances were memorialized in the parties' agreements, and then he alleges that NGE breached those same promises and assurances. For example:

---

[6] And even if the parties' contracts did not incorporate all of the alleged misrepresentations and assurances, a party to fully integrated contracts, like those here, cannot claim that it reasonably relied on parol representations. *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996) ("[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319 (S.D.N.Y. 2002) ("A party to a contract cannot allege that it reasonably relied on a parol representation when, in the same contract, it 'specifically disclaims reliance upon [that] particular representation.'").

- "NGE, with the full knowledge and participation of Spark, blatantly ***breached this unambiguous provision of the MIPA*** when it sold Energy to Spark and thereby assigned . . . its obligations under the MIPA to Spark without the consent of the Sellers." (*Id.* ¶ 41) (emphasis added);

- "In memorializing this understanding and agreement . . . that NGE would not take any actions that would . . . reduce[e] the payments due to the Sellers . . . , ***the parties included the following unambiguous provision in the Earnout Agreement***." (*Id.* ¶ 48) (emphasis added);

- "NGE's agreement to keep Major Energy operating as a private company . . . is ***evident from the acquisition documents executed by the Sellers and NGE***." (*Id.* ¶ 61) (emphasis added);

- In "Section 2.7 of the [Earnout Agreements], NGE expressly agreed that it would operate Major Energy, in all material respects, consistently with how the Major Energy Senior Management Team operated Major Energy prior to the acquisition—*as a private company*; with how Major Energy Senior Management Team suggest Major Energy be operated during the Target Years—*as a private company*; and not make any change or modification to the operations of Major Energy that would be materially inconsistent with how the Senior Management Team operated Major Energy prior to the acquisition." (*Id.* ¶ 62) (emphasis in original);

- "NGE contractually agreed that it would not engage in any direct or indirect assignment . . . ." (*Id.* ¶ 68);

- NGE's sale of Major Energy to Spark "Violates The ***Express Terms Of The Agreements***." (*Id.* at 19–20 (Hdgs. E, F) (emphasis added));

- "Defendants have behaved in bad faith and breached their contractual obligations to the Sellers under the Agreements." (*Id.* ¶ 76);

- "The foregoing actions by Defendants have prevented the Company from operating business-as-usual, as contemplated and ***agreed upon*** by the parties." (*Id.* ¶ 91) (emphasis added);

- "Such conduct is a blatant violation of Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement." (*Id.* ¶ 101); and

- Describing the Earnout "calculation methodology and approach that was ***agreed upon and memorialized in the Agreements***." (*Id.* ¶ 119) (emphasis added).

Plaintiff's allegations are strikingly similar to those in *Osan Limited v. Accenture, LLP*, 454 F. Supp. 2d 46 (E.D.N.Y. 2006).  In that case, a plaintiff brought claims for fraudulent inducement and breach of contract stemming from an alleged breach of an asset purchase agreement.  The plaintiff premised its fraud claim on promises the defendants had supposedly made about the purchase price and earnout provisions, but actually had no intention of keeping. *Id.* at 53–55.  There, as here, the plaintiff pointed to defendants' pre-closing representations that were later made provisions of the parties' transaction documents, and the plaintiff repeatedly stressed that the deal had been conditioned upon the defendants' agreement with those provisions.  *Id.*  The court dismissed the fraudulent inducement claim *with prejudice*, noting that even though the plaintiff had drafted the complaint "with language usually reserved for tort claims, the Court finds that Plaintiff's Complaint does not allege any misrepresentations made by Defendants that are collateral or extraneous to the contract at issue . . . ."  *Id.* at 53.  To the contrary, all of the representations the plaintiff alleged formed the basis of his fraudulent inducement claim had been memorialized in the parties' asset purchase agreement:

> Plaintiff states repeatedly that its approval of the transaction was premised expressly upon a purchase price of two million dollars in cash, plus millions of dollars in potential future earn-out.  This purchase amount is the same as that presented in the Final APA, and whose calculation is expressly set forth in that same document. . . . [A]ll other statements upon which Plaintiff purports to have relied were all set forth in the text of the Final APA and related documents.  Thus, Plaintiff's allegations implicate Defendants failure to fulfill *future* promises and not Plaintiff's reliance upon misrepresentations as to *present facts* during negotiations, making a tort claim inapposite.

*Id.* at 54 (emphasis in original).

Here, as in *Osan*, the allegedly "false promises" giving rise to Plaintiff's inducement claim are the very same promises he alleges were incorporated into the parties' contracts.  Thus, the same result in *Osan* is warranted here: dismissal of the fraudulent inducement claim with

prejudice.  *See id.* at 54–55; *see also Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 162–63 (S.D.N.Y. 1991) (dismissing fraudulent inducement claim associated with stock purchase agreement dispute where defendants' alleged misrepresentations were not collateral to the contract but instead "simply underscore[d] the defendant's purported intention and ability to perform the contract.  Thus, these representations are simply part and parcel of the intention to perform [the contract]," which "could not be separated from the breach of contract claim").

### 3.  Plaintiff seeks no special damages

Finally, the third *Bridgestone/Firestone* exception encompasses special (non-contractual) damages.  Plaintiff has not pleaded that the Sellers suffered any special damages "caused by the [alleged] misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone*, 98 F.3d at 20; *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (N.Y. 1986).  "For a claim of 'special damages' to permit assertion of both fraud and contract claims premised on similar facts, the plaintiff must show not that his damages were merely atypical, but that they were 'a special consequence of the fraud and can be separated from the damages they can claim because of the alleged breach of contract.'"  *Maricultura Del Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 378–79 (S.D.N.Y. 2015) (dismissing fraud claim, finding that plaintiffs had pleaded only those damages that "appear to be part and parcel of the damages that flow from the alleged breach of contract") (citation omitted).

Here, Plaintiff doesn't assert that the Sellers sustained any damages other than those flowing from an alleged contract breach.  Instead, responding to an argument that Defendants made in their first motion to dismiss—where they pointed out that rescission is a more appropriate remedy for fraudulent inducement—Plaintiff now purports to seek rescission of the parties' agreements, even though he offers no explanation for how rescission could be tied to his fraud claim.  (Am. Compl. ¶¶1, 126.)  He alleges that the "Sellers have no other adequate remedy

of law because Major Energy . . . has been substantially altered as a result of NGE's fraudulent conduct," but he does not explain how the "substantial alter[ation]" stems from the alleged fraud, as opposed to the alleged breach of contract.  (*Id.* ¶ 127.)

His pleading maneuver is transparent: Plaintiff simultaneously asks the Court to enforce ***and*** rescind the same contract, in effort to save his fraud-based claim.  (*See*, *e.g.*, *id.* ¶ 119 (asking Court to force Defendants to "comply with the calculation methodology and approach that was agreed upon and memorialized in the Agreements"); *id.* ¶ 7 ("Defendants' unlawful behavior . . . has prevented the Sellers from receiving the sale proceeds they . . . are entitled to under the transaction documents."); *id.* ¶ 76 ("Such unlawful conduct has caused significant financial harm to the Sellers and prevented [them] from receiving the amounts due and owing under the Agreements.").)  Contrary to what Plaintiff is trying to do here, it is "black-letter law that one cannot simultaneously rescind and enforce a compromise."  *Lemus v. Manhattan Car Wash, Inc.*, No. 06-cv-15486, 2010 WL 1372705, at *11 (S.D.N.Y. Mar. 26, 2010); *Evans v. Winston & Strawn*, 757 N.Y.S.2d 532, 534 (1st Dep't 2003) (dismissing fraud claim because "one cannot simultaneously rescind an agreement and seek to enforce it").  Using words like "rescission" in an amended pleading in response to a motion to dismiss does not transform the contract claim into one sounding in fraud, because "where a party is in essence seeking the enforcement of a contractual bargain, the claim is to be premised upon a breach of contract theory rather than a tort claim."  *Wyly v. CA, Inc.*, No. 05-cv-4430, 2009 WL 3128034, at *11 (E.D.N.Y. Sept. 29, 2009) (citation omitted), *aff'd sub nom. Wyly v. Computer Assocs. Int'l, Inc.*, 384 F. App'x 46 (2d Cir. 2010).

Accordingly, Plaintiff has pleaded no special damages that could bring his fraudulent inducement claim into the *Bridgestone/Firestone* special-damages exception, because "the only

15

fraud alleged relate[s] to the cause of action to recover damages for breach of contract." *Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 232 (E.D.N.Y. 2007) (dismissing fraud and concealment claims); *accord Manas v. VMS Assocs., LLC*, 53 A.D.3d 451, 454 (1st Dep't 2008).

In sum, Plaintiff's fraudulent inducement claim is nothing more than a repurposed contract claim. Although he has amended his complaint, recasting it with "language usually reserved for tort claims," those semantic ploys cannot transform his contract action into one for fraud. *Osan*, 454 F. Supp. 2d at 53. Neither has Plaintiff alleged any facts that would demonstrate that he meets any of the three *Bridgestone/Firestone* exceptions. The Court should decline Plaintiff's invitation to improperly convert his contract action into one for tort, and instead should dismiss the fraudulent inducement claim with prejudice.

## II.   Plaintiff's Tortious Interference Claim Cannot Survive Because He Alleges That Spark Breached the Transaction Documents and, in the Same Pleading, Alleges That Spark Also Tortiously Interfered with Those Same Transaction Documents

### A.   A Party Cannot Tortiously Interfere with Its Own Contract

To state a claim for tortious interference, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a ***third party***, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the ***third party's*** breach of that contract, and (4) damages." *Flushing Expo, Inc. v. New World Mall, LLC*, 116 A.D.3d 826, 826 (2d Dep't 2014) (emphasis added). "It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (1st Dep't 1990) (vacating judgment on tortious interference claim, finding that defendant "was no stranger to the joint venture agreement"). Put another way, under New York law, a party cannot interfere with its own contract. *Bradbury v. Woller Cope-Schwarz*, 20 A.D.3d 657, 660 (3d Dep't 2005); *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996).

Here, Plaintiff's allegations do not state a claim for tortious interference for two inescapable reasons. *First*, Plaintiff alleges that Spark and NGE were essentially operated as one company, and that Spark in fact controlled NGE.  (Am. Compl. ¶¶ 74, 80–81, 104–06.)  For example, he pleads that "Spark was secretly using NGE to complete" the original purchase transaction with the Sellers, (*id.* ¶ 74), and that—even before the drop-down occurred—Spark was calling the shots in operating and controlling Major Energy, (*id.* ¶¶ 104–07).  These alleged facts belie any assertion that Spark was a legal stranger to the contracts between Major Energy and NGE.  To the contrary, Plaintiff alleges that Spark was interested in, and in fact *directing*, the very negotiation of those contracts.  (*Id.* ¶ 74); *see also Koret*, 161 A.D.2d at 157 (defendant parent company was no stranger to its subsidiary's contract, where parent company's managing director, who was also subsidiary's chairman, "played a role in negotiation of the joint venture agreement" at issue).

*Second*, successors in interest to a contract similarly cannot be said to have tortiously interfered with those contracts.  *LHR, Inc. v. T-Mobile USA, Inc.*, 112 A.D.3d 1293, 1298 (4th Dep't 2013) ("[W]e conclude that the court properly dismissed the cause of action for tortious interference with contract against T-Mobile.  As SunCom's successor in interest to the purchase agreements, T-Mobile cannot be liable for interfering with its own contract."); *Karas v. Katten Muchin Zavis Rosenman*, No. 04-cv-9570, 2006 WL 20507, at *6 (S.D.N.Y. Jan. 3, 2006) (dismissing tortious interference claim against successor-in-interest defendant because such defendant is not a stranger to the contract and therefore cannot be liable for interfering with it).

Here, Plaintiff contends that Spark, by virtue of its later purchase of the Major Energy interests from NGE, is NGE's successor under the MIPA and Earnout Agreements. (Am. Compl. ¶ 138 ("Through its purchase of Major Energy from NGE, Spark inherited the

obligations of NGE under the Agreements.").)  In fact, Plaintiff has chosen to assert an express

contract claim against Spark for allegedly breaching those same agreements.  (*Id.* ¶ 140.)  These

allegations sound the death knell for the tortious interference claim, and the Court therefore

should dismiss it with prejudice.

### B.  Spark Is Permitted to "Interfere" with NGE's Contracts

Even if Spark were a legal stranger to the transaction documents, it nevertheless was

privileged to "interfere" with those contracts because of its economic interest in NGE's business

affairs.  Under New York law, one who has "an economic stake in the business of another may

interfere with a contract that the other business has with a third person if the purpose is to protect

the individual's own stake."  *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988)

(reversing verdict in favor of plaintiff on tortious interference claim because defendant's

interference with a contract was for a "legitimate business reason").  "Unless there is a showing

of malice or illegality, a defendant's economic interest in the breaching party's affairs bars an

action for tortious interference with contract.  Thus, when a complaint supports a defendant's

economic interest in the breaching party's business, it is insufficient for a complaint merely to

allege the elements of tortious interference; rather, the plaintiff must also adequately allege that

the defendant either acted maliciously, fraudulently, or illegally."  *Benihana of Tokyo, LLC v.*

*Angelo, Gordon & Co.*, 259 F. Supp. 3d 16, 29–30 (S.D.N.Y. 2017) (citations and internal

quotation marks omitted) (dismissing tortious interference claim on basis of economic-interest

doctrine), *appeal filed* No. 17-966 (2d Cir. Apr. 6, 2017).

### 1.  The economic-interest defense broadly applies to affiliated entities

The scope of the economic-interest defense is broad.  It has been applied, for instance,

"where defendants were significant stockholders in the breaching party's business; where

defendant and the breaching party had a parent-subsidiary relationship; where defendant was the

18

breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *Id.* at 30 (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (N.Y. 2007)).

In particular, courts have readily applied the defense and dismissed tortious interference claims in circumstances involving, as here, affiliated entities. *Masefield AG v. Colonial Oil Indus.*, No. 05-cv-2231, 2006 WL 346178, at *8 (S.D.N.Y. Feb. 15, 2006) (dismissing tortious interference counterclaims on application of economic-interest doctrine to "tightly interrelated affiliates"); *accord Benihana*, 259 F. Supp. 3d at 30. That's because closely related affiliates share an "obvious" economic interest sufficient to justify any interference. *Savage v. Galaxy Media & Mktg. Corp.*, No. 11-cv-6791, 2012 WL 2681423, at *10 (S.D.N.Y. July 5, 2012) (dismissing tortious interference claim where plaintiff's pleadings demonstrated defendants had an "obvious economic interest" in the lead defendant's contractual performance); *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009) (dismissing interference claim because allegations that private equity funds had significant stake in parent company rendered them privileged to interfere with contract); *MTI/The Image Group, Inc. v. Fox Studios East, Inc.*, 262 A.D.2d 20, 23–24 (1st Dep't 1999) (tortious interference claim should have been dismissed under the economic-interest doctrine where (1) the companies accused of interference were affiliates of the signatory "either as parent or sister companies," (2) the claimant "failed to demonstrate malice," and (3) the "corporate agents who allegedly committed the tort were simultaneously acting as agents (in negotiating and executing the contracts) of . . . the signatory to the contracts"); *see also Kassover v. Prism Venture Partners, LLC*, 53 A.D.3d 444, 449–50 (1st Dep't 2008) (affirming dismissal of tortious interference claim where defendants "were not strangers to the Merger Agreement").

Importantly, direct ownership is not the test for the economic-interest defense, and courts have specifically rejected attempts to confine the defense to such limited circumstances. *E.g.*, *E.F. Hutton Int'l Assocs. Ltd. v. Shearson Lehman Bros. Holdings, Inc.*, 281 A.D.2d 362, 362 (1st Dep't 2001) (ruling that "a strict ownership interest was not required"). As Judge Engelmayer explained, "[f]ar from adopting mechanistic or technical qualifications for the defense to apply, . . . the touchstone of the defense is that the defendant acted to protect its own legal or financial stake in the breaching party's business; . . . the defense accordingly ha[s] been applied in a range of situations, including when the defendant had a managerial contract with the breaching party at the time of the breach." *Benihana*, 259 F. Supp. 3d at 32 (citations omitted).

Here, Plaintiff expressly alleges that Spark and NGE are affiliated entities that coexist within the same corporate family. (Am. Compl. ¶¶ 11, 73, 118 (describing Spark and NGE as affiliates); *id.* ¶ 68 (explaining that MIPA prevented NGE from assigning its rights to "an affiliated entity" and thus assignment to Spark constituted a contract breach).) While Plaintiff goes to great lengths to allege that Spark does not directly own NGE, that is of no importance because the economic-interest defense is not so limited. As Plaintiff's own allegations establish, Spark was entitled as a matter of law to interfere with NGE's contracts because, as a close-knit affiliate of NGE, Spark was privileged to try to protect its economic interests. No tortious interference claim can therefore survive. *E.g.*, *MTI/The Image Grp.*, 262 A.D.2d at 23–24; *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 686–87 (N.Y. 1969) (motion to dismiss interference claim should have been granted in stockholder's favor because stockholder "had an existing economic interest in the affairs" of the subject corporation, and stockholder thus "was privileged to attempt to protect" that economic interest "when it 'interfered' with plaintiff's contract of employment with [the corporation]").

### 2. Plaintiff fails to adequately allege that Spark acted maliciously, fraudulently, or illegally, which is required to defeat the economic-interest defense

Because Plaintiff's own allegations demonstrate that Spark had an economic interest in NGE's contracts, pleading the elements of a tortious interference claim is insufficient to avoid dismissal. He must also adequately allege, within the strict confines of Rule 11, "that [Spark] either acted maliciously, fraudulently, or illegally" when it purportedly interfered with NGE's contracts with the Sellers. *Benihana*, 259 F. Supp. 3d at 30; *IMG Fragrance Brands*, 679 F. Supp. 2d at 406. Bare allegations of malice, however, do not suffice. *IMG Fragrance Brands*, 679 F. Supp. 2d at 406 (dismissing tortious interference claim because bare allegations of malice do not demonstrate that an exception to the economic-interest defense might exist); *Masefield AG*, 2006 WL 346178, at *6 (dismissing tortious interference counterclaim that lacked any "factual assertions" to support conclusory allegation that party "acted with dishonesty and unfair means when it interfered with the Contract").[7] In particular, bare allegations of malice do not suffice where, as here, they "are contradicted by plaintiffs' own claims that defendants' actions were financially motivated." *Ruha v. Guior*, 277 A.D.2d 116, 116 (1st Dep't 2000).

Here, Plaintiff offers only formulaic, conclusory allegations that Spark "knowingly and maliciously caused NGE to breach" the transaction documents. (Am. Compl. ¶ 147.) He offers no factual allegations that could support his unadorned allegation of malice. And in any case, Plaintiff undermines even his own conclusory allegations of malice by, in the same breath, pleading that Spark was motivated by its own financial self-interest. (*Id.* ¶ 4; *id.* ¶ 74 (alleging Spark engaged in the drop-down transaction to tap financial opportunities otherwise unavailable

---

[7] *Accord Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008) (allegations that defendants "deliberately interfered with such advantageous relationship[s]" and that by "improper, deceptive, illegal or fraudulent conduct induced" the contract breach were conclusory and insufficient to plead tortious interference); *IMG Fragrance Brands*, 679 F. Supp. 2d at 406 (bare characterizations of defendants' conduct as "malicious" and "without justification" were insufficient to plead around economic-interest defense); *see also Rather v. CBS Corp.*, 68 A.D.3d 49, 60 (1st Dep't 2009) (affirming dismissal because plaintiff made only "bare allegations of malice").

to Spark).)  Even having had the chance to amend his complaint, Plaintiff hasn't overcome the

flaws that plague his tortious interference claim, and the Court should therefore dismiss that

claim with prejudice.

### C.  The Tortious Interference Claim Duplicates the Contract Claim Against Spark

Finally, Plaintiff's tortious interference claim should be dismissed for the additional and

independent reason that it is based on the same set of facts as his breach of contract claim against

Spark.  A "breach of contract is not to be considered a tort unless a legal duty independent of the

contract itself has been violated."  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d

382, 389 (N.Y. 1987).  A tortious interference claim that does nothing more than restate the same

facts as a breach of contract claim should be dismissed as duplicative.  *Mortg. Resolution*

*Servicing, LLC v. JPMorgan Chase Bank, N.A.*, No. 15-cv-293, 2017 WL 570929, at *3

(S.D.N.Y. Feb. 13, 2017); *JHH Pictures, Inc. v. Rawkus Entm't LLC*, 291 A.D.2d 356, 357

(1st Dep't 2002) ("[I]nasmuch as plaintiff's fraud and tortious interference claims are grounded

in defendant's failure to . . . [comply with certain agreements], they should be dismissed as

duplicative of the contract based claims"); *Allerand, LLC v. 233 E. 18th St. Co.*, 19 A.D.3d 275,

277–78 (1st Dep't 2005) ("The parties' rights and obligations respecting the matter in dispute are

governed by their contract and the purported claim for tortious interference with contract does no

more than restate plaintiffs' claim for the contract's breach").  Instead, the plaintiff must allege

that the defendant breached a duty arising out of "circumstances extraneous to and not

constituting elements of, the [parties'] contract."  *Choquette v. Motor Info. Sys., Inc.*, No. 15-cv-

9338, 2017 WL 3309730, at *6 (S.D.N.Y. Aug. 2, 2017) (alteration in original); *Uitz v.*

*Lustigman Firm, P.C.*, No. 13-cv-6040, 2014 WL 3767056, at *3 (S.D.N.Y. July 28, 2014)

(granting motion to dismiss where "claims for conversion and tortious interference rely upon the

same factual premise as [plaintiff's] breach of contract claim").

Here, the crux of Plaintiff's tortious interference claim is that Spark "knowingly caused and directed" NGE to breach the non-assignment and "business-as usual" provisions of the MIPA and Earnout Agreements.  (Am. Compl. ¶¶ 143–50.)  These claims do not arise out of any circumstance extraneous to the contracts, and instead merely duplicate Plaintiff's contract claim. Indeed, Plaintiff has not alleged a single fact in support of his tortious interference claim that exists independently, or that is not an element, of his contract claim.  (*See id.* ¶¶ 125–38.)  His tortious interference claim, as pleaded, therefore cannot stand.

### III.    Plaintiff is Not Entitled to Special Damages Under the MIPA

In the amended complaint, Plaintiff seeks, among other things, punitive damages and relief for the "significant financial harm" that NGE and Spark's "misconduct" purportedly caused.  (*Id.* ¶ 138 and Prayer for Relief.)  But the MIPA contains a provision that expressly limits the type of relief available to Plaintiff:

> Notwithstanding any other term herein, no Party will be obligated to any other Party or Person for any consequential, incidental, indirect, special, exemplary or punitive damages or Losses based thereon, including damages or Losses with respect to loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity, and no Party will be obligated to any other Party or Person for any Losses or damages determined as a multiple of income, revenue or the like, relating to the breach of any representation, warranty, covenant or agreement herein (except and to the extent that the Indemnified Party has been required to pay such damages to any third Person).

(*Id.*, Ex. A ¶ 9.9.)  While housed in the MIPA's "Survival and Indemnification" section, this provision broadly applies to all claims stemming from the transaction documents.  Indeed, Section 9.9 distinguishes between a Party (defined in Section 1 of the MIPA as a party to the agreement) and an Indemnified Party (defined in Sections 9.2 and 9.3), prohibiting all special losses for Parties, but allowing some special losses for Indemnified Parties.  This distinction,

coupled with Section 9.9's expansive language, evinces an unambiguous intention for the terms to apply to all claims arising out of the transaction documents.

New York courts "routinely" enforce these kinds of liability-limitation provisions, particularly "when contracted by sophisticated parties" like the Sellers and NGE. *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016); *accord DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) (holding that "sophisticated parties represented by sophisticated counsel, unambiguously provided the limit of recovery in the event of breach, and [the court] may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery"); *accord Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F. Supp. 2d 311, 321 (W.D.N.Y. 2013). This is because courts recognize that "[a] limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . . [The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made." *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (alteration in original) (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (N.Y. 1994)).

Here, the MIPA and Earnout Agreements are contracts between sophisticated parties, who were represented by sophisticated counsel, who negotiated a complex acquisition transaction in a commercial setting. Section 9.9 is therefore unquestionably enforceable and Plaintiff is limited to recovering only actual, compensatory damages, if any. Thus, Defendants respectfully request that the Court strike and dismiss Plaintiff's request for damages other than direct compensatory damages under the breach of contract claims (Counts II and III).

## CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that this Court grant Defendants' motion and dismiss Counts I and IV of Plaintiff's Amended Complaint with prejudice, and strike or dismiss Plaintiff's request for damages beyond those direct compensatory damages permitted by the MIPA and Earnout Agreements.

Dated:   January 15, 2018
      New York, New York

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/  Kenneth Schacter*

Kenneth I. Schacter
101 Park Avenue
New York, NY 10178
(212) 309-6000
kenneth.schacter@morganlewis.com

Troy S. Brown (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
troy.brown@morganlewis.com

Michelle Pector (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5000
michelle.pector@morganlewis.com

*Attorneys for Defendants National Gas & Electric, LLC and Spark Energy, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of January, 2018, the undersigned caused to be filed the foregoing via the Court's CM/ECF system, which sent notice to all counsel of record in this action.

*/s/  Kenneth Schacter*

*Attorney for Defendants National Gas & Electric, LLC and Spark Energy, Inc.*