**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SAUL HOROWITZ, as Sellers'
Representative,

                       Plaintiff,

        v.

NATIONAL GAS & ELECTRIC, LLC and
SPARK ENERGY, INC.,

                    Defendants.

Civ. No. 17-CV-7742 (JPO)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO THE MOTION TO DISMISS OF DEFENDANTS NATIONAL**
**<u>GAS & ELECTRIC, LLC AND SPARK ENERGY, INC.</u>**

Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.:  (212) 556-2114
Email:  idahan@kslaw.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ......................................................................................................5

    A.  NGE's Purchase Of Major Energy From The Sellers .....................................5

    B.  NGE's Fraudulent Conduct .............................................................................7

    C.  Spark's Tortious Conduct ................................................................................8

STANDARD OF REVIEW ...................................................................................................10

ARGUMENT ........................................................................................................................10

  I.   Plaintiff Has Adequately Alleged A Plausible Claim For Fraudulent Inducement
     Against NGE ...........................................................................................................10

  II.  Plaintiff Has Adequately Alleged A Plausible Claim For Tortious Interference
     Against Spark ..........................................................................................................16

    A.  Spark Is Not A Party Or Signatory To The Agreements ...............................16

    B.  The Economic Interest Defense Does Not Apply To Spark ..........................19

    C.  Plaintiff's Tortious Interference Claim Is Not Duplicative Of His Breach Of
       Contract Claim Against Spark .......................................................................22

  III. Plaintiff Can Seek Special Damages From Defendants....................................23

CONCLUSION ....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                           **Page(s)**

*Air China, Ltd. v. Kopf*,
    473 F. App'x 45 (2d Cir. 2012) ........................................................23

*Allhusen v. Caristo Const. Corp.*,
    303 N.Y. 446 (N.Y. 1952) .................................................................17

*Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*,
    No. 14-cv-6640-FPG, 2016 WL 2622013 (W.D.N.Y. May 5, 2016) ....................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................10

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*,
    No. 16-cv-3800, 2017 WL 933111 (S.D.N.Y. 2017) ............................20

*Bradbury v. Woller Cope-Schwarz*,
    20 A.D.3d 657 (3d Dep't 2005) ........................................................18

*C.U. Annuity Serv. Corp. v. Young*,
    281 A.D.2d 292 (1st Dep't 2001) ......................................................17

*CCM Rochester, Inc. v. Federated Investors, Inc.*,
    No. 14-cv-3600 (VEC), 2014 WL 6674480 (S.D.N.Y. Nov. 25, 2014).....................13, 14, 15

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    No. 03-cv-8258 (SAS), 2004 WL 868211 (S.D.N.Y. Apr. 21, 2004) ....................14

*Chosun Int'l v. Chrisha Creations, Ltd.*,
    413 F.3d 324 (2d Cir. 2005)..............................................................10

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ...............................................15

*Cnty. of Suffolk v. Alcorn*,
    266 F.3d 131 (2d Cir. 2001)..............................................................24

*Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc.*,
    68 N.Y.2d 954 (1986) .......................................................................13

*E.F. Hutton Intl. Assoc. v. Shearson Lehman Bros. Holdings*,
    281 A.D.2d 362 (1st Dep't 2001) ...................................................20, 21

*ESI, Inc. v. Coastal Power Prod. Co.*,
    995 F. Supp. 419 (S.D.N.Y. 1998) ....................................................22

*Finley v. Giacobbe*,
  79 F.3d 1285 (2d Cir. 1996)....................................................................................18

*Gold v. 29-15 Queens Plaza Realty, LLC*,
  43 A.D.3d 866 (2d Dep't 2007) ...............................................................................18

*Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*,
  56 F.3d 427 (2d Cir. 1995)........................................................................................13

*Graubard Mollen Dannett & Horowitz v. Moskovitz*,
  86 N.Y.2d 112 (N.Y. 1995) ......................................................................................12

*Greenfield v. Philles Records*,
  98 N.Y.2d 562 (N.Y. 2002) ......................................................................................24

*Henry v. Daytop Vill., Inc.*,
  42 F.3d 89 (2d Cir. 1994)..........................................................................................18

*Howe v. Bank of New York Mellon*,
  783 F. Supp. 2d 466 (S.D.N.Y. 2011).......................................................................20

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
  679 F. Supp. 2d 395 (S.D.N.Y. 2009).......................................................................20

*Kalisch-Jarcho, Inc. v. City of New York*,
  58 N.Y.2d 377 (N.Y. 1983) ......................................................................................23

*Karas v. Katten Muchin Zavis Rosenman*,
  No. 4-cv-9570, 2006 WL 20507 (S.D.N.Y. Jan. 3, 2006) ........................................18

*Kassover v. Prism Venture Partners, LLC*,
  53 A.D.3d 444 (1st Dep't 2008) ...............................................................................20

*Koch v. Christie's Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012)......................................................................................10

*Koret, Inc. v. Christian Dior, S.A.*,
  161 A.D.2d 156 (1st Dep't 1990) .............................................................................18

*LHR v. T-Mobile USA, Inc.*,
  112 A.D.3d 1293 (4th Dep't 2013)............................................................................18

*Loreley Financing (Jersey) No. 3 Limited v. Wells Fargo Securities, LLC*,
  No. 12-cv-3723 (RJS), 2016 WL 5719749 (S.D.N.Y. Sept. 29, 2016) ....................16

*Masefield AG v. Colonial Oil Industries*,
  No. 5-cv-2231, 2006 WL 346178 (S.D.N.Y. Feb. 15, 2006) ..............................20, 21

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007).................................................................................12

*N.Y. Univ. v. Continental Ins. Co.*,
  87 N.Y.2d 308 (N.Y. 1995) ...............................................................................22

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
  273 F. Supp. 2d 436 (S.D.N.Y. 2003)................................................................24

*Osan Ltd. v. Accenture LLP*,
  454 F. Supp. 2d 46 (E.D.N.Y. 2006) ..................................................................13

*Revonate Mfg., LLC v. Acer Am. Corp.*,
  No. 12-cv-6017, 2013 WL 342922 (S.D.N.Y. Jan 18, 2013) .............................13

*S & S Hotel Ventures Ltd. P'ship v. 777 S.H. Corp.*,
  108 A.D.2d 351, 489 N.Y.S.2d 478 (1st Dep't 1985) ........................................22

*Sabo v. Delman*,
  3 N.Y.2d 155 (N.Y. 1957) ..................................................................................13

*Savage v. Galaxy Media & Marketing Corp.*,
  No. 11-cv-6791, 2012 WL 2681423 (S.D.N.Y. July 5, 2012).............................20

*Shaker Loudon Assocs. v. Burlington Coat Factory Warehouse Corp.*,
  No. 94-cv-0801, 1996 WL 189504 (S.D.N.Y. Apr. 16, 1996) ...........................21

*Stewart v. Jackson & Nash*,
  976 F.2d 86 (2d Cir. 1992)..................................................................................12

*Trend & Style Asia HK Co. v. Pac. Worldwide, Inc.*,
  No. 14-cv-9992 (SAS), 2015 WL 4190746 (S.D.N.Y. July 10, 2015).................15

*VR Optics, LLC v. Peloton Interactive, Inc.*,
  No. 16-CV-6392 (JPO), 2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017)
  (Oetken, J.).........................................................................................................19

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
  867 N.E.2d 381 (N.Y. 2007)...............................................................................21

*White v. Davidson*,
  150 A.D.3d 610 (1st Dep't 2017) .......................................................................13

*William Kaufman Org., Ltd. v. Graham & James LLP*,
  269 A.D.2d 171 (1st Dep't 2000) .......................................................................21

Plaintiff Saul Horowitz, as Sellers' Representative, by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to the *partial* Motion to Dismiss (ECF No. 27, "Motion" or "Mot.") the Amended Complaint (ECF No. 22, "Amended Complaint" or "AC") filed by Defendants National Gas & Electric, LLC ("NGE") and Spark Energy, Inc. ("Spark").[1]  For the reasons discussed below, the Court should deny Defendants' Motion in its entirety and all the claims in the Amended Complaint should proceed.

## PRELIMINARY STATEMENT

Plaintiff is one of the former owners of Major Energy, a private company engaged in the supply of energy services to U.S. residential and commercial consumers.[2]  As the appointed legal representative of the Sellers, Plaintiff filed this action in his effort to unwind a fraudulently induced sale of Major Energy to NGE, another private company, and to recover monetary losses the Sellers have sustained as a direct result of Defendants' unlawful conduct as described in the Amended Complaint.

In or around April 2016, the Sellers agreed to sell their combined 100% membership interest in Major Energy to NGE for $80 million—$35 million of which was to be paid in the form of an earnout and other installed payments over a three-year period.  The Sellers agreed to defer and tie a significant portion of the purchase price to the future financial success of Major Energy only because NGE and its representatives repeatedly promised that Major Energy would continue to be operated as a private entity and be directed by the same senior management team that led to the pre-sale historical success and growth of Major Energy, at least during the three-

---

[1]  Defendants are only moving to dismiss Plaintiff's fraudulent inducement claim against NGE (Count I) and tortious interference with contract claim against Spark (Count IV), but not the breach of contract claims asserted against each of them (Counts II and III).

[2]  The other former owners of Major Energy are Moshe (Mark) Wiederman, Mark Josefovic, Michael Bauman, Asher Fried and certain personal trusts owned by them (collectively, with Plaintiff, the "Sellers").

year earnout period.  Unbeknownst to the Sellers, however, NGE and its representatives were deceiving them throughout the negotiation period and had no intention whatsoever of keeping Major Energy a private entity during the deferred payment period.  Indeed, all along, NGE had the preconceived intention of selling Major Energy to Spark, a public entity, immediately after closing the deal—which it did, despite strong objection from the Sellers.  This is evident by the undisputed fact that NGE began to work on the sale of Major Energy to Spark only a few weeks after closing the transaction with the Sellers, and completed the sale of Major Energy to Spark mere months after closing.  Importantly, when Spark negotiated and completed its purchase of Major Energy from NGE, it knew that such transaction was not permitted without the written consent of the Sellers and constituted a clear breach of NGE's contractual obligations to the Sellers.

Defendants' wrongdoing, however, did not stop there.  In the transaction documents, NGE contractually agreed that it would, among other things:  (i) operate Major Energy in the manner that was consistent with how Major Energy's existing senior management team operated Major Energy pre-acquisition and suggest Major Energy be operated post-acquisition; (ii) consult and collaborate with the Major Energy senior management team with respect to any NGE-proposed change or modification to the operations of Major Energy; (iii) not engage in any act that would reasonably result in the reduction of the deferred payments due to the Sellers; (iv) not permit any affiliate to engage in any act that would reasonably result in the reduction of any of the deferred payments due to the Sellers; and (v) not unilaterally make any fundamental changes to the operating overhead of Major Energy or otherwise materially negatively impact the profitability of Major Energy for the benefit of any related or unrelated party.  The purpose of

this agreement was to ensure that Major Energy was in fact run "business-as-usual" during the deferred payment period.

As described in detail in the Amended Complaint, however, since the closing of the transaction with the Sellers in April 2016 and continuing even to the present, Defendants have engaged in conduct that has led to anything but "business-as-usual" at Major Energy. Among other things, Spark has improperly taken complete control of Major Energy's human resources, payroll systems, bank accounts, and supply functions, and instituted sweeping changes to longstanding Major Energy policies. In fact, Spark has created an atmosphere of chaos and confusion at Major Energy that has led several key employees to terminate their employment. As a result, Major Energy has sustained severe harm to its business and stellar reputation, and the Sellers in turn have been prevented from receiving the sale proceeds they bargained for under the transaction documents.

In light of the foregoing, Plaintiff, as Sellers' Representative, instituted this action alleging claims against NGE for fraudulent inducement and breach of contract and claims against Spark for tortious interference with contract and breach of contract (assuming Spark's purchase of Major Energy without the requisite consent of the Sellers is deemed valid). Unable to dispute Plaintiff's well-pleaded factual allegations, Defendants have sought to avoid liability for their fraudulent and tortious misconduct by mischaracterizing the nature of Plaintiff's claims and misstating applicable New York law.

Specifically, NGE argues that Plaintiff's fraudulent inducement claim should be dismissed because (i) entering into a contract with no intent to perform does not constitute fraud and (ii) the Amended Complaint does not allege facts sufficient to satisfy any of the so-called *Bridgestone* factors permitting a party to simultaneously assert claims for fraud and breach of

contract.  Plaintiff's fraudulent inducement claim, however, is not about NGE's intent not to perform its contractual obligations.  It is about NGE's knowingly false representations and failure to keep promises it made to the Sellers during the negotiations of the transaction.  As described below, New York courts permit parallel fraud and contract claims where, as here, a party alleges it was induced to enter into a contract based on false representations and promises. Moreover, the Amended Complaint does allege facts sufficient to satisfy the *Bridgestone* factors, specifically the existence of a false representation collateral to the contract.  Both New York federal and state courts have consistently held that where, as here, a defendant is alleged to have made representations and promises with a preconceived and undisclosed intention of not performing them, such representations and promises are deemed collateral to the contract and can form a basis for a separate fraudulent inducement claim.  *See* Section I, *infra*.

Spark's effort to dismiss Plaintiff's tortious interference claim is likewise unfounded. Spark contends that this claim fails because:  (i) it is a party or successor in interest to the agreements alleged to have been breached; (ii) the "economic interest" defense bars such claim; and (iii) the claim is duplicative of the breach of contract claims asserted against it.  As demonstrated below, however, Spark is not a named party or signatory to any of the agreements at issue, or a legally recognized successor in interest to the agreements under New York law.  In fact, pursuant to the express terms of the agreements, any purported assignment of the agreements by NGE to Spark—made without the requisite written consent of the Sellers—is void as a matter of law.  *See* Section II.A., *infra*.  Moreover, the economic interest defense is not available to Spark because its alleged interference was done to benefit *its own business interest* (not NGE's business interest).  *See* Section II.B., *infra*.  Finally, Plaintiff's tortious interference claim is not duplicative of the breach of contract claim because it is based upon tortious

wrongdoing committed by Spark *prior to* NGE's assignment and sale of Major Energy to Spark—a time when Spark had no possible contractual obligations. Indeed, Plaintiff's breach of contract claim against Spark is an alternative claim, asserted in the event the assignment and sale to Spark is deemed valid. Only then would Spark's post-assignment wrongdoing be grounds for breach of contract instead of tortious interference. New York courts permit alternative pleading at this stage of a case. *See* Section II.C., *infra*.

Accordingly, the Court should deny Defendants' Motion in its entirety.

## STATEMENT OF FACTS[3]

### A.    NGE's Purchase Of Major Energy From The Sellers

Major Energy was founded in 2005. AC ¶ 16. As of 2015, Major Energy was a small, cohesive private entity with approximately 35 employees. *Id.* ¶¶ 17, 38. Under the direction of experienced senior management, Major Energy grew its customer count from 12,000 in 2008 to more than 214,000 in 2015; its annual net income from $380,000 in 2008 to over $12.5 million in 2015; and its EBITDA from $390,000 in 2008 to nearly $24 million in 2015.

In or about November 2015, NGE approached the owners of Major Energy, *i.e.*, the Sellers, regarding the possible acquisition of the Sellers' combined 100% membership interest in Major Energy. The Sellers informed NGE that they were willing to consider a sale of Major Energy for four times EBITDA. *Id.* ¶ 19. In response, NGE offered to purchase all of the Sellers' membership interest in Major Energy for $80 million—$60 million in cash and $20 million as an earnout to be paid over two years based on the success of Major Energy's operations during that period. *Id.* ¶¶ 20-21.

---

[3] The Amended Complaint alleges in great detail facts supporting Plaintiff's claims for fraudulent inducement, tortious interference, and breach of contract. Because Defendants only move to dismiss the claims for fraudulent inducement and tortious interference (not breach of contract), this Section focuses primarily on the alleged facts relevant to these two challenged claims.

Sometime prior to March 2016, in light of certain New York State proposed regulations that were potentially harmful to energy service companies, NGE amended its offer to contain a larger and longer deferred payment. Specifically, NGE offered the following: $45 million in cash at closing; $15 million in cash installments to be paid over three years ($5 million each year, subject to an adjusted EBITDA target) and $20 million in an earnout to be paid over 33 months (subject to meeting certain adjusted EBITDA and customer count targets). Critically, NGE's revised offer kept the $80 million purchase price target in place. *Id.* ¶ 22.

On or about March 11, 2016, NGE made its final offer as follows: $45 million in cash at closing (less $5 million for litigation credit); $15 million in cash installments to be paid over three years, subject to achieving EBITDA targets; and $20 million in an earnout to be paid over 33 months (approximately $5.5 million in 2016, $7.3 million in 2017, and $7.3 million in 2018), subject to achieving adjusted EBITDA and customer count targets. In making this final offer, NGE assured the Sellers that "[t]his proposal still results in the same gross offer of $80MM" and that the deferred amount of $35 million would be "based on performance in accordance with Major's Adjusted EBITDA's Plans." *Id.* ¶ 23.

On or about March 14, 2016, the Sellers accepted NGE's offer and proceeded to finalize the acquisition documents. *Id.* ¶ 24. To this end, NGE, Major Energy, the Sellers and Saul Horowitz, as Sellers' Representative, entered into a Membership Interest Purchase Agreement dated as of March 18, 2016 ("MIPA"), an Earnout Agreement dated as of March 18, 2016 and effective as of April 1, 2016 (the "Earnout Agreement"), and an Executive Earnout Agreement effective as of April 1, 2016 (the "Executive Earnout Agreement") (collectively, the "Agreements"). Notably, NGE is the *only* entity listed as the "Buyer" in these Agreements. *Id.* ¶ 31; *see also* AC, Ex. A-C.

6

**B.     NGE's Fraudulent Conduct**

Throughout the almost five-month negotiation process, the Sellers negotiated only with executives and employees of NGE.  No executives or employees of Spark were involved at any point during the negotiations.  AC ¶ 25.  Moreover, throughout the negotiation period, the Sellers made it abundantly clear to NGE and its representatives that they were willing to proceed with the sale and tie nearly half of the $80 million purchase price to the future financial success of Major Energy ***only if*** Major Energy remained a private entity and was led by the same successful senior management team during the three-year deferred payment period.  The Sellers knew and understood that having Major Energy operated as part of a large public entity and subject to many financial and reporting regulations would make it extremely difficult, if not impossible, for Major Energy to meet the contemplated adjusted EBITDA and customer count targets during the deferred payment period—a result that unfortunately has come to fruition.  *Id.* ¶¶ 26-27.

NGE agreed to the Sellers' demand and promised the Sellers that Major Energy would remain a private entity and the "DNA" of NGE during the three-year deferred payment period. *Id.* ¶ 27.  Even at the closing table, NGE representatives again assured the Sellers that Major Energy would remain private during this three-year period.  *Id.* ¶ 59.  In reasonable reliance on such promises and assurances by NGE and its representatives, the Sellers agreed to proceed with the sale and the three-year deferred payment structure.  *Id.* ¶ 60.

It turns out, however, that NGE and its representatives were deceiving the Sellers throughout the negotiation period and had no intention of keeping Major Energy a private company during the three-year deferred payment period.  Instead, unbeknownst to the Sellers, NGE intended to sell Major Energy to Spark, a public entity, shortly after the closing of the transaction.  *Id.* ¶ 65.  NGE's undisclosed fraudulent scheme came to light when, on or about

7

May 3, 2016—just three weeks after the closing of the transaction—Spark and NGE entered into a purchase agreement under which Spark would purchase Major Energy from NGE.  *Id.* ¶ 66.

Upon discovering that NGE intended to sell Major Energy to Spark, Plaintiff (as Sellers' Representative) immediately voiced his strong objection to the contemplated sale and demanded that NGE and Spark not proceed with the sale.  To this end, Plaintiff informed NGE that this sale was contrary to the representations and promises it repeatedly made to the Sellers during the negotiation process.  *Id.* ¶ 67.  Moreover, NGE was contractually prohibited from proceeding with such sale without the written consent of the Sellers, which they were unwilling to provide. *Id.* ¶ 68.  Indeed, any sale would be "void" per the express terms of the MIPA.  AC, Ex. A, Section 11.7.  Nonetheless, in August 2016—mere months after closing the transaction with the Sellers—NGE completed the sale of Major Energy to Spark, a public company, without the written consent of the Sellers.  AC ¶¶ 70-71.

### C.      Spark's Tortious Conduct

Throughout the negotiation of its purchase of Major Energy from NGE, Spark was fully aware of the terms of the Agreements between the Sellers and NGE and the Sellers' strong objection to such purchase.  Spark's knowledge of the Agreements between NGE and the Sellers is evidenced by the discussion of those Agreements in the Membership Interest Purchase Agreement by and among NGE, Spark, and other affiliates, dated as of May 3, 2016 and filed publicly as Exhibit 2.2 to Spark's SEC Form 10-Q, filed on May 5, 2016 (the "Spark MIPA"). Nonetheless, Spark proceeded with its improper purchase of Major Energy and thereby knowingly caused NGE to breach the unambiguous terms of the Agreements.  *Id.* ¶¶ 72-73.

Spark's tortious conduct, however, did not end with its unlawful purchase of Major Energy.  In order to ensure that Major Energy was run "business-as-usual" and under the same

successful leadership during the earnout period, NGE agreed under Section 2.7 of the Earnout

Agreement that it would do the following:

- act in good faith;

- operate Major Energy, in all material respects, consistently with how the Major Energy Senior Management Team (*i.e.*, Horowitz, Wiederman and Alper) operated Major Energy prior to the acquisition;

- operate Major Energy, in all material respects, consistently with how the Major Energy Senior Management Team suggest Major Energy be operated during the Target Years;

- consult in advance and collaborate with the Senior Management Team in respect to *any* NGE-proposed change or modification to the operations of Major Energy that would be materially inconsistent with how the Senior Management Team operated Major Energy prior to the acquisition;

- not take or omit to take *any* act, directly or indirectly, that would reduce or reasonably result in the reduction of any of the Earnout Payments due to the Sellers;

- not permit any Affiliate to take or omit to take *any* act, directly or indirectly, that would reduce or reasonably result in the reduction of any of the Earnout Payments due to the Sellers; and

- not unilaterally make fundamental changes to the operating overhead of Major Energy or otherwise materially negatively impact the profitability of Major Energy for the benefit of any related or unrelated party.

*Id.* ¶¶ 48-49.  Spark was fully aware of this provision in the Earnout Agreement.  *Id.* ¶ 73.

However, *prior to* and continuing even after its legally defective purchase of Major

Energy, Spark engaged in conduct that caused NGE to breach such contractual obligations under

the Earnout Agreement by, among other things, taking complete control of Major Energy's

human resources, payroll systems, bank accounts, and supply functions; and changing

longstanding Major Energy policies.  Spark's actions created an atmosphere of chaos and

confusion at Major Energy that caused key Major Energy employees to terminate their

employment.  *Id.* ¶¶ 78-83.  Even worse, Spark required that Major Energy employees focus on

Spark-related business and projects instead of Major Energy-related business and projects. *Id.* ¶¶ 87-91. Spark also took steps to destroy Major Energy's important and historical supply relationship with PSE, and prohibited Major Energy from entering into profitable aggregation deals that allowed Major Energy to increase its customer base. *Id.* ¶¶ 92-102. Such egregious and tortious conduct by Spark has caused severe harm to Major Energy's business and prevented the Sellers from receiving the sale proceeds they bargained for under the Agreements.

## STANDARD OF REVIEW

In deciding this Motion, the allegations in the Amended Complaint must be accepted as true, and with all reasonable inferences drawn in Plaintiff's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). To survive a motion to dismiss, a plaintiff must only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To state a plausible claim to relief, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. The Court's function on a motion to dismiss is not to "weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Holloway v. King*, 161 F. App'x 122, 124 (2d Cir. 2005) (citation omitted).

As described below, the Amended Complaint alleges facts sufficient to state a plausible and legally cognizable claim for fraudulent inducement as against NGE and tortious interference of contract as against Spark. Accordingly, the Motion should be denied in its entirety.

## ARGUMENT

### I.   Plaintiff Has Adequately Alleged A Plausible Claim For Fraudulent Inducement Against NGE

NGE contends that Plaintiff's fraudulent inducement claim rests "entirely upon the premise that NGE allegedly promised to perform under the MIPA and Earnout Agreements, but

'never had any intention of doing so.'"  Mot. at 7.  And while such allegations may give rise to an actionable claim for breach of contract, "a party's false representations about its intention to fulfill its contractual promises do not give rise to a fraudulent inducement claim."  *Id.* at 6.  NGE misstates the nature of Plaintiff's fraud claim and New York law.

As described above, Plaintiff's fraudulent inducement claim is premised on far more than NGE's intent not to perform its contractual obligations under the Agreements.  It is premised on NGE's undisclosed fraudulent scheme and inducement of the Sellers to sell Major Energy and defer a significant portion of the $80 million purchase price by means of knowingly false representations and promises.  Specifically, throughout the negotiation period, the Sellers made clear to NGE and its representatives that they were willing to proceed with the sale of Major Energy and the proposed three-year deferred payment structure only if Major Energy remained a private entity during the deferred payment period and was directed by the same senior management team.  The Sellers knew that the future financial success of Major Energy depended upon its ability to continue operating as a small private entity and not part of a public company subject to significant regulatory and financial burdens.  NGE agreed to this demand and promised the Sellers that Major Energy would remain a private entity, at least during the three-year deferred payment period.  ***NGE does not dispute that it made such promises to the Sellers.***

Unbeknownst to the Sellers, however, NGE was lying to them and had no intention whatsoever of keeping Major Energy a private entity as promised.  Indeed, all along, NGE had the preconceived intention of transitioning and selling Major Energy to Spark, a public entity, shortly after closing.  This is evident from the indisputable fact that NGE began working on the sale of Major Energy to Spark just weeks after closing and completed the sale within a mere few

months of closing, despite the Sellers' strong objection and lack of written consent.  *See* AC ¶¶ 4, 66, 67, 70.

Under well-settled New York law, "parallel fraud and contract claims may be brought" where, as here, a party was induced to enter into a contract by false representations.  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183-84 (2d Cir. 2007) ("[A] claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim under New York law."); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 88-89 (2d Cir. 1992) ("'[I]t is elementary that where a contract or transaction was induced by false representations, the representations and the contract are distinct and separable. . . .  Thus, fraud in the inducement of a written contract is not merged therein so as to preclude an action for fraud.'") (citing 60 N.Y. Jur. 2d Fraud & Deceit § 206, at 740 (1987)) (emphasis added); *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122 (N.Y. 1995) ("A false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties.").[4]

Moreover, fraudulent inducement allegations similar to those alleged here by Plaintiff are sufficient to satisfy the *Bridgestone* factors, specifically the existence of a false representation "collateral or extraneous to the contract."   Mot. at 9-10 (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).  New York courts have repeatedly

---

4   NGE asserts that Plaintiff added the words "promises" and "assurances" in the Amended Complaint as a "transparent effort to rephrase his tort claims in tort-law language."  Mot. at 1, 8.  A cursory review of the initial Complaint filed by Plaintiff, however, shows that this contention is false.  *See, e.g.*, ECF No. 1, Complaint ("Compl.") ¶ 2 ("[NGE] was deceiving the Sellers throughout the negotiations of the transactions  and had no intention whatsoever of keeping the *promises* made . . . ."); ¶ 3 (NGE and its representatives "*promised* that Major Energy would continue to operate . . . as a private entity . . . ."); ¶ 49 (NGE "*promise[d]* to operate Major Energy during the Target Years in the same manner that Major Energy and its Senior Management Team operated the business prior to the transaction."); ¶ 71 ("NGE never intended to keep its *promises* . . . .") (emphases added); *see also* Compl. ¶¶ 4, 7, and 119 for the use of the term "assurances" in describing NGE's fraudulent conduct.

held that where a defendant made promises with a preconceived and undisclosed intention of not performing them, those representations "*are collateral to the agreement, and can form the basis of a fraudulent inducement claim*."   *White v. Davidson*, 150 A.D.3d 610, 611-12 (1st Dep't 2017) (emphasis added).   As the New York Court of Appeals explained:

> while mere promissory statements as to what will be done in the future are not actionable, . . . it is settled that, *if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact upon which an action for rescission [based on fraudulent inducement] may be predicated*.

*Sabo v. Delman*, 3 N.Y.2d 155, 160 (N.Y. 1957) (emphasis added).   Even cases relied upon by NGE (Mot. at 9) confirm that "a promise made with a preconceived and undisclosed intention of not performing it" constitutes "a representation of present fact, not of future intent" and, therefore, the fraudulent inducement claim is not duplicative of the separate breach of contract claim.   *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (internal citations omitted).[5]

---

[5]   Plaintiff's reliance on *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46 (E.D.N.Y. 2006), is misplaced. In *Osan*, the majority shareholder of a corporation alleged that defendants fraudulently induced it into approving a final asset purchase agreement by misrepresenting the purchase price and calculations used to determine that price.   The Court found that such allegations sounded in contract, not in tort.   *Id.* at 52-55.   Plaintiff's fraudulent inducement claim here is not about NGE's failure to pay or properly calculate the earnout, but rather the fraudulent scheme NGE engaged in to cause the Sellers to agree to the three-year earnout in the first place.   Also, in *Osan,* plaintiff did not allege facts demonstrating that defendants had the preconceived and undisclosed intention of never keeping its representations that induced the agreement to an earnout.   Plaintiff here alleges such facts and, therefore, has alleged a misrepresentation collateral to the contract in satisfaction of *Bridgestone*.

The other cases relied upon by NGE are likewise distinguishable and do not support dismissal of Plaintiff's fraudulent inducement claim.   Mot. at 6-7.   In *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427 (2d Cir. 1995), for example, the Second Circuit Court of Appeals actually reversed the lower court's dismissal of plaintiff's fraud claim, finding that the claim involved more than defendant never intending to perform the terms of the contract.   Like here, plaintiff in *Grappo* alleged that defendant made a representation that it knew was untrue when made.   *Id.* at 434.   In *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12-cv-6017, 2013 WL 342922, at *3 (S.D.N.Y. Jan. 18, 2013), the court dismissed the fraud claim because plaintiff failed to satisfy any of the *Bridgestone* factors.   Here, as described above, Plaintiff has alleged facts sufficient to satisfy *Bridgestone*, particularly the existence of a knowingly false representation by NGE collateral to the contracts at issue.

The decision by The Honorable Valerie Caproni in *CCM Rochester, Inc. v. Federated Investors, Inc.*, No. 14-cv-3600 (VEC), 2014 WL 6674480 (S.D.N.Y. Nov. 25, 2014), is particularly instructive.  There, plaintiff asserted claims for both fraudulent inducement and breach of contract arising out of an asset purchase agreement with defendant.  *See id.* at *1.  The parties structured the purchase so that plaintiff received an upfront cash payment at closing of $30 million and contingent earnout payments of $18 million over the following five years.  *See id.* at *2.  Plaintiff alleged that in agreeing to the earnout payments it relied on defendant's representations that it would make immediate and significant efforts to distribute plaintiff's products and would use its resources to "fuel the growth" of the assets under plaintiff's management and to promote plaintiff's funds.  *Id.* at *3.  Such representations, however, were untrue, as defendant never intended to "fuel the growth" of plaintiff until after the earnout period had substantially passed, thereby minimizing the amount of contingent payments.  Plaintiff further alleged that defendant created these false expectations to "induce [plaintiff] to accept a greater portion of its consideration in the form of future payments contingent upon post-acquisition growth so that [defendant] could minimize its acquisition costs."  *Id.*

In denying defendant's motion to dismiss plaintiff's fraudulent inducement claim, Judge Caproni found that plaintiff's allegations were sufficient to state a separate claim for fraudulent inducement and could plausibly be read to show a motive for committing fraud (*i.e.*, the desire to minimize the cost of acquiring plaintiff).  *See id.* at *4.  The Court concluded that "CCM has adequately alleged that Federated never intended to follow through on its representations that if its acquisition offer was accepted Federated would support the growth and expansion of the

14

Clover products and that Federated made those misrepresentations to induce CCM to agree to backload a portion of the consideration through future payments tied to growth." *Id.* at *7.[6]

Here, too, the Amended Complaint alleges that in agreeing to the deferred payment structure the Sellers reasonably relied upon NGE's repeated representation that Major Energy would continue operating as a private entity and not become part of Spark (a public entity); that NGE made such representation in order to induce the Sellers to agree to the deferred payment structure and, in turn, significantly minimize NGE's upfront acquisition costs; and that NGE knew such representation was false because it never intended to keep Major Energy private, but instead intended to make Major Energy part of Spark soon after closing, which it did.  AC ¶¶ 2-4, 59, 60, 65, 66, 70, 121, 123, 124.  Thus, as in *CCM Rochester* and the other cases cited above, Plaintiff has adequately alleged a fraudulent inducement claim that is collateral to the contract and independent of its breach of contract claim against NGE.

Ignoring all of the foregoing law, NGE contends that the fraudulent inducement claim does not allege a representation collateral to the contract because "Plaintiff has expressly pleaded that the parties' agreements fully incorporate all of NGE's alleged pre-contractual representations and assurances."  Mot. at 11.  In other words, according to NGE, New York law permits a company to knowingly defraud another entity and avoid liability for such fraudulent conduct by merely inserting language into a contract that concerns the alleged fraudulent representation.  Clearly, that is not the law.  "It simply cannot be the case that any statement, no

---

[6]  Notably, Judge Caproni also rejected defendant's argument that the merger clause in the contract precluded plaintiff's fraudulent inducement claim or prevented plaintiff from introducing parol evidence of fraud at the appropriate time.  *Id.* at *4.  *See also Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03-cv-8258 (SAS), 2004 WL 868211, at *7 (S.D.N.Y. Apr. 21, 2004) ("Under New York law, a general merger clause precludes neither an action for fraud in the inducement nor parol evidence concerning fraudulent representations.").  Thus, contrary to NGE's contention, the merger clause in the Agreements do not bar Plaintiff's fraudulent inducement claim or prevent it from introducing parol evidence to support such claim.

matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract." *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 303 (E.D.N.Y. 2002); *see also Trend & Style Asia HK Co. v. Pac. Worldwide, Inc.*, No. 14-cv-9992 (SAS), 2015 WL 4190746, at *8 n.103 (S.D.N.Y. July 10, 2015) ("[I]t does not seem to matter that the alleged fraudulent representation is virtually identical to the promise contained in the contract as long as it is made at a different time and place.").[7]

Accordingly, consistent with well-settled New York law, Plaintiff's distinct and separable claim against NGE for fraudulent inducement should not be dismissed.

## II.    Plaintiff Has Adequately Alleged A Plausible Claim For Tortious Interference Against Spark

### A.    Spark Is Not A Party Or Signatory To The Agreements

Spark argues that it cannot be held liable for tortious interference because "a ***party*** cannot interfere with its own contract." Mot. at 16 (emphasis added).  The fundamental flaw with this argument is that Spark is ***not*** a named party or signatory to any of the executed Agreements; the only named parties and signatories are NGE, Major Energy, the Sellers and Plaintiff, as Sellers' Representative.  AC ¶¶ 33, 52, 57.  Recognizing this inescapable problem, Spark next argues that it cannot be liable for tortious inference because it is a successor in interest to the Agreements by virtue of its August 2016 purchase of Major Energy from NGE.  Mot. at 16-17.  This argument likewise fails.

First, Plaintiff's tortious interference claim concerns Spark's misconduct ***prior to*** its purchase of Major Energy from NGE and any resulting assignment of the Agreements.  Indeed,

---

7  Contrary to NGE's assertion that Plaintiff cannot simultaneously seek to rescind and enforce a compromise, *see* Mot. at 15, courts applying New York law in this district "routinely allow rescission claims 'to survive in the alternative at the pleading stage,'" as Plaintiff has alleged here.  *Loreley Financing (Jersey) No. 3 Limited v. Wells Fargo Securities, LLC*, No. 12-cv-3723 (RJS), 2016 WL 5719749, at *3 (S.D.N.Y. Sept. 29, 2016).

Spark's completion of this transaction and assignment constitutes tortious interference with the unambiguous terms of the Agreements.  As described above, the MIPA expressly prohibits NGE from assigning any of its rights and obligations thereunder to anyone without the prior written consent of the Sellers.  AC ¶¶ 41, 68, 146.  Spark was fully aware of this express prohibition in the MIPA and the Sellers' strong objection to this contemplated transaction between Spark and NGE.  *Id.* ¶¶ 41, 73, 145.  Nonetheless, Spark proceeded with the transaction and purported assignment, causing NGE to breach the express terms of the MIPA.  *Id.* ¶¶ 41, 147.  Spark also was fully aware of NGE's "business-as-usual" contractual obligations under Section 2.7 of the Earnout Agreement; yet, as detailed above, even ***prior to*** its improper acquisition of Major Energy from NGE, Spark engaged in egregious behavior that caused NGE to breach its "business-as-usual" obligations under the Earnout Agreement.  *Id.* ¶¶ 77-83.  Thus, Plaintiff's tortious interference claim against Spark is appropriate because it is based on tortious wrongdoing by Spark ***before*** it potentially became an assignee or successor in interest to the Agreements.

Second, Spark's successor in interest argument hinges on the Court eventually finding that NGE's purported assignment—affected without the requisite written consent of the Sellers—is legally valid.  As described above, the MIPA unambiguously provides that any assignment without the prior written consent of the Sellers "shall be void."  AC ¶ 146, Ex. A at Section 11.7.  New York courts routinely enforce provisions with such clear and unambiguous language and, therefore, void any assignment that takes place without the requisite consent.  *See, e.g.*, *Allhusen v. Caristo Const. Corp.*, 303 N.Y. 446, 452 (N.Y. 1952); *C.U. Annuity Serv. Corp. v. Young*, 281 A.D.2d 292, 293 (1st Dep't 2001).  Thus, if the assignment is deemed void—a likely outcome—Spark cannot be a valid successor in interest to the Agreements and escape

liability for tortious interference.  In fact, if the assignment is deemed void, all the alleged misconduct by Spark during the period after its improper purchase of Major Energy, which now forms the basis of the Sellers' *alternative* claim for breach of contract, would be additional allegations of tortious misconduct by Spark.[8]

The cases relied upon by Spark are easily distinguishable.  In *LHR v. T-Mobile USA, Inc.*, 112 A.D.3d 1293 (4th Dep't 2013), the parties had *stipulated* that the third party (and defendant to the tortious interference claim) was a successor to the contract at issue.  *See LHR v. T-Mobile USA, Inc.*, Brief for Defendants-Respondents SunCom Wireless Operating Company, LLC and T-Mobile USA, Inc., 2013 WL 12235036 (4th Dep't May 31, 2013), 4.  Likewise, in *Karas v. Katten Muchin Zavis Rosenman*, No. 4-cv-9570, 2006 WL 20507, at *6 (S.D.N.Y. Jan. 3, 2006), plaintiff *conceded* that the third party to the contract was the signing party's successor.  *See also Bradbury v. Woller Cope-Schwarz*, 20 A.D.3d 657, 660 (3d Dep't 2005) (dismissing tortious interference claim where it was not contested that seller defendant was a party to the contract); *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (finding that employee acting within the scope of his employment authority was not a third party to a contract with his employer).  In contrast to these cases, from the very moment Spark sought to become an assignee of the

---

[8]  Despite Spark's disingenuous arguments (Mot. at 17-18, citing allegations in support of breach of contract action against Spark), the fact that Plaintiff has asserted a breach of contract claim in the alternative to his tortious interference claim is of no moment.  Plaintiff is permitted to assert claims in the alternative, and neither claim should be dismissed until the facts underlying those claims are judicially determined.  *See Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) ("[A] plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency[.]"); *Gold v. 29-15 Queens Plaza Realty, LLC*, 43 A.D.3d 866, 867 (2d Dep't 2007).  Even the Amended Complaint paragraph that Defendants' refer to as a "death knell" states that Plaintiff's allegation of Spark's inheritance of NGE's obligations under the agreements is made "[w]ithout conceding the validity of such direct or indirect assignment[.]"  AC ¶ 138.

Agreements, the Sellers strongly opposed and, to date, have never stipulated or consented to the assignment. AC ¶¶ 4, 41, 68, 70-71.[9]

### B.     The Economic Interest Defense Does Not Apply To Spark

The "economic interest" defense to a tortious interference claim is inapplicable here. First, "the economic interest defense only applies if the alleged interferer acted to protect its interest in the breaching party's business; *an interferer acting to protect its own direct interests, rather than its interest in the breaching party, may not raise the economic interest defense*." *Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*, No. 14-cv-6640-FPG, 2016 WL 2622013, at *11 (W.D.N.Y. May 5, 2016) (emphasis added) (citing *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 484 (E.D.N.Y. 2012)); *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2017 WL 3600427, at *5 (S.D.N.Y. Aug. 18, 2017) (Oetken, J.) (refusing to dismiss tortious interference claim on the basis of the economic interest defense). Here, as alleged in the Amended Complaint, in pursuing the purchase of Major Energy from NGE, Spark was seeking to benefit *its own business interest*, not NGE's. AC ¶ 74. In fact, by consummating the sale, NGE was stripped of a valuable asset that it had only recently acquired. Moreover, Spark further sought to benefit its own business interests by, among other things, demanding that Major Energy's senior management and other key employees focus their time and attention to Spark business and projects and by taking over the supply and credit relationship Major Energy historically had with PSE. *Id.* ¶¶ 6, 87-102.

---

[9]   Spark's reliance on *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (1st Dep't 1990), is also misplaced. In that case, neither the jury nor the First Department on appeal found that the parent corporation was a party to the contract at issue. Instead, the court found that the parent corporation "had a right to interfere with the contract of its subsidiary in order to protect its economic interests" (*id.*)—a defense not available to Spark (who is not even the parent to NGE), as discussed in Section II.B.

Second, though NGE and Spark are affiliates, neither has any direct ownership interest in the other.  Spark's corporate disclosure statement indicates that it is "a publicly traded company and that, to the best of its knowledge no other publicly traded company owns 10% or more of its stock."  ECF No. 9.  NGE's corporate disclosure statement indicates that it is "wholly owned by Retailco LLC and that no publicly held company owns 10% or more of its stock."  ECF No. 10.  Specifically, NGE's counsel has stated that the sole member of NGE is Retailco, LLC; the sole member of Retailco is TxEx Energy Investments, LLC; and the sole member of TxEx is W. Keith Maxwell III.  *See* ECF No. 13-1.  Thus, the relationship between these two entities is markedly different from the relationships of the parties in Spark's cited precedent.  *See Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, No. 16-cv-3800, 2017 WL 933111, at **11-12 (S.D.N.Y. 2017) (finding that the third party to the contracts at issue, AGC, as owner of Benihana Inc., had an economic interest); *Savage v. Galaxy Media & Mkting. Corp.*, No. 11-cv-6791, 2012 WL 2681423, at *10 (S.D.N.Y. July 5, 2012) (finding that a shareholder had an economic interest sufficient to justify interference); *E.F. Hutton Intl. Assoc. v. Shearson Lehman Bros. Holdings*, 281 A.D.2d 362, 362-63 (1st Dep't 2001) (finding that the third party to the contract at issue, Shearson, had acquired an interest in the contracting party, E.F. Hutton, through a merger agreement).[10]

Additionally, whether an affiliated company can, in some circumstances, have an economic interest sufficient to assert the economic interest defense is a fact-specific inquiry.

_____

[10] Spark also misleading relies on precedent where the plaintiff affirmatively acknowledged the third party's economic interest.  *See IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009) (reasoning that plaintiff "*acknowledges* that the Zohar Funds and Patriarch have an economic interest in IMG Holdings-the parent of IMG Brands") (emphasis added); *Kassover v. Prism Venture Partners, LLC*, 53 A.D.3d 444, 449 (1st Dep't 2008) ("as plaintiffs readily *admit*" defendants were not "strangers" to the agreement at issue) (emphasis added).  Such is not the case here as Plaintiff affirmatively alleges that Spark is "a public company with *no direct ownership or economic interest in NGE* . . . ."  AC ¶ 70 (emphasis added).

*See, e.g.*, *Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 482-83 (S.D.N.Y. 2011) (denying summary judgment on tortious interference claim, reasoning that a factual dispute regarding the defendant's economic interest had not been resolved); *compare Masefield AG v. Colonial Oil Industries*, No. 5-cv-2231, 2006 WL 346178, at *6 (S.D.N.Y. Feb. 15, 2006) (allowing defendant to assert economic interest defense when the pleadings explicitly asserted that the party who had procured the breach had an economic interest in procuring such a breach).[11]  Spark's economic interest in NGE is far from "obvious" on the face of the Amended Complaint and should not be decided at this early pleading stage.

Finally, although malice is *not* a required element absent an economic interest defense (*MDC Corp.*, 228 F. Supp. 2d 387, 397 (S.D.N.Y. 2002)), Plaintiff has adequately pleaded Spark's malice in intentionally procuring NGE's breach of the agreements.  Courts have repeatedly found that "the allegation that a defendant acted maliciously in procuring a breach of contract is sufficient."  *Id.* at 398; *see also Shaker Loudon Assocs. v. Burlington Coat Factory Warehouse Corp.*, No. 94-cv-0801, 1996 WL 189504, at *1 (S.D.N.Y. Apr. 16, 1996) (finding that a complaint properly alleged malice on the part of a corporate parent by claiming that "[d]efendant's interference with the Lease was without legal or moral justification . . . and an outrage warranting the imposition of punitive damages"); *William Kaufman Org., Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 174 (1st Dep't 2000) (finding "a claim for tortious interference with contract is stated" based upon a single paragraph).

---

[11] Further, while the *Masefield* court did not feel compelled to limit the economic interest defense to claims involving parties with a direct ownership interest, the reasoning of the precedent it relied upon in reaching its conclusion has since been rejected.  *See Masefield AG*, 2006 WL 346178, at *8 n.5 (citing *Night Hawk Ltd. v. Briarpatch, L.P.*, No. 03-cv-1382, 2003 WL 23018833 (S.D.N.Y. 2003) (finding that a competitor may assert the economic interest defense)); *cf. White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 385 (N.Y. 2007) (finding that a competitor may not assert the economic interest defense).

Here, Plaintiff alleges that Spark "maliciously caused NGE to breach" the Agreements by negotiating and completing the sale of Major Energy with NGE knowing full-well that the Sellers were not willing to provide the requisite written consent.  AC ¶¶ 74, 147, 149.  Spark also engaged in a systematic pattern of misconduct that prevented NGE from operating Major Energy in a "business-as-usual" manner as contractually required under the Agreements.  *Id.* ¶¶ 77-86. These allegations are more than enough to state a claim for tortious interference, even if an economic interest defense were available to Spark.

### C.      Plaintiff's Tortious Interference Claim Is Not Duplicative Of His Breach Of Contract Claim Against Spark

A "defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (N.Y. 1995).  As established above, Plaintiff's tortious interference claim against Spark covers a period of time *prior to* when Spark could potentially have become a party to the Agreements and liable for breach of contract, *i.e.*, prior to NGE's improper sale of Major Energy to Spark in August 2016.  Indeed, in procuring NGE's breach of the Agreements through such sale, Spark did not breach any contractual duty of its own.

Moreover, New York courts have refused to dismiss tortious interference claims when a plaintiff alleges additional affirmative action on the part of the third party who is alleged to have tortiously interfered with the contract.  *See, e.g.*, *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 433 (S.D.N.Y. 1998) (noting that "tortious interference claims may be maintained alongside underlying contract claims" and denying motion to dismiss tortious interference claim); *S & S Hotel Ventures Ltd. P'ship v. 777 S.H. Corp.*, 108 A.D.2d 351, 354 (1st Dep't 1985) ("Although the same acts which constitute the basis for the first cause of action for breach

of contract are re-alleged, the additional allegations that defendant maliciously withheld its consent or delayed such consent for its own benefit are sufficient affirmative action.").

Plaintiff has alleged such facts here, including that: Spark improperly took control of Major Energy before its actual purchase of Major Energy from NGE (AC ¶¶ 77-83); Spark caused NGE to proceed with the sale without the written consent of the Sellers in violation of the MIPA's anti-assignment provision (*id.* ¶ 147); Spark employed improper accounting practices to decrease Major Energy's EBITDA facilitating a breach of the Agreements (*id.* ¶¶ 114-117); Spark terminated Major Energy's profitable and longstanding relationship with PSE so that Spark could become Major Energy's supplier (*id.* ¶¶ 96-97); and Spark precluded Major Energy from building its customer roster by prohibiting aggregation agreements, hindering payout under the Agreements (*id.* ¶¶ 100-101). Thus, granting Plaintiff the inferences he is accorded on a motion to dismiss, Plaintiff's allegations in support of his tortious interference claim are not wholly duplicative of the breach of contract claims.

## III.    Plaintiff Can Seek Special Damages From Defendants

Defendants assert that Plaintiff is precluded from seeking special damages, such as punitive damages, as a result of the limitation of liability language in Section 9.9 of the MIPA. *See* Mot. at 22-23. Defendants are mistaken. First, Plaintiff seeks special damages in connection with its fraudulent inducement and tortious interference claims against Defendants. New York Courts routinely recognize that even an agreed-upon limitation on liability does not apply to claims for fraudulent inducement or tortious interference. *See, e.g.*, *Air China, Ltd. v. Kopf*, 473 F. App'x 45, 49 (2d Cir. 2012) (reasoning that jury's finding of fraudulent inducement nullified the contractual limitation on damages); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (N.Y. 1983). As Defendants' own precedent states:

> an exculpatory agreement . . . will not exonerate a party from liability under all circumstances . . . . *[I]t will not apply to exemption of willful or grossly negligent acts . . . [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing.* This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (emphasis added) (quoting *Kalisch-Jarcho*, 58 N.Y.2d at 385 (internal citations omitted)).[12] Here, in asserting his fraudulent inducement and tortious interference claims, Plaintiff has alleged conduct on the part of both NGE and Spark that "smacks of intentional wrongdoing." Thus, Section 9.9's limitation on liability does not apply.

Second, as Defendants correctly point out, Section 9.9 states that "no *Party* will be obligated to any other Party or person for any consequential, incidental, indirect, special, exemplary or punitive damages or Losses based thereon . . . ." AC, Ex. A, Sect. 9.9 (emphasis added); Mot. at 22. The MIPA defines a Party to include: NGE, Major Energy, the Seller and Saul Horowitz, as Sellers' Representative. *See* AC, Ex. A, at 1. Thus, by the terms of the MIPA, Spark is *not* a Party as defined in the MIPA and cannot avail itself of the liability limitation in Section 9.9.[13] Further, as pleaded and argued above, Spark has not become a Party (indemnified

---

[12] The additional precedent Defendants rely upon (Mot. at 24) does not find differently—standing only for the proposition that special damages clauses such as Section 9.9 are enforced to limit damages awarded on *breach of contract* claims.

[13] Defendants highlight the distinction in the MIPA between Indemnified Party and Party, asserting that "Section 9.9's expansive language, evinces an unambiguous intention for the terms to apply to all claims arising out of the transaction documents." Mot. at 24. To the contrary, the sophisticated parties to the MIPA intentionally chose to limit the provisions of Section 9.9 to apply to Parties—a substantially narrower and specific subset of entities and persons than Indemnified Parties. This unambiguous, specific language should be accorded necessary deference and the limitation of liability discussed in Section 9.9 should be applied to damages sought against *Parties*, as memorialized in the MIPA. *See Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) ("[C]ourts construing contracts must give specific terms and exact terms . . . greater weight than general language.") (citation omitted); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms").

or otherwise) to the Agreements through the later assignment and sale that occurred without the requisite written consent of the Sellers.  Accordingly, at a minimum, the limitation on liability in Section 9.9 does not apply to the special damages Plaintiff seeks from non-party Spark.

## **CONCLUSION**

For all the reasons stated above, the Defendants' Motion should be denied in its entirety.

Dated: February 15, 2018
       New York, New York

KING & SPALDING LLP


/s/ *Israel Dahan*
Israel Dahan
1185 Avenue of the Americas
New York, NY 10036
Telephone No.:  (212) 556-2114
Email:  idahan@kslaw.com

*Counsel for Plaintiff*