UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAUL HOROWITZ, *as sellers' representative*, <br><br> Plaintiff, <br><br> -v- <br><br> NATIONAL GAS & ELECTRIC, LLC, and SPARK ENERGY, INC., <br> Defendants. | 17-CV-7742 (JPO) <br><br> OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

Plaintiff Saul Horowitz filed this action against Defendant National Gas & Electric, LLC ("NGE") for fraudulent inducement and breach of contract and against Defendant Spark Energy, Inc. ("Spark") for tortious interference with contract and breach of contract. Defendants jointly move to dismiss Horowitz's fraudulent inducement claim against NGE, his tortious interference claim against Spark, and his claims for punitive or consequential damages against both Defendants. For the reasons that follow, the motion to dismiss is granted in part and denied in part.

**I. Background**

In 2016, the former owners of three companies known collectively as Major Energy sold their ownership shares to Defendant NGE. (Dkt. No. 22 ("Am. Compl.") ¶¶ 1–2.) The parties agreed that NGE would pay $80 million for the purchase of Major Energy, partly in cash up front and partly in earnings-based future payouts. (*Id.*) NGE then turned around and sold Major Energy to its affiliate and co-Defendant, Spark. (Am. Compl. ¶¶ 4, 11.) Plaintiff Saul Horowitz, one of the initial owners of Major Energy, alleges that this second sale of Major Energy to Spark was barred by the initial contract of sale and negatively impacted the earnings-based payouts

1

owed under that initial contract. (Am. Compl. ¶ 1.) Horowitz sues as the designated representative of a group of Major Energy's initial owners (collectively, "Sellers"). (Am. Compl. ¶ 8.)

The nub of the Sellers' claim is that NGE was in cahoots with Spark when it purchased Major Energy and that neither party intended to abide by the promises made in the initial contract of sale. The Sellers allege that there was an agreement to keep Major Energy private, but that despite that agreement NGE turned around and sold Major Energy to its affiliate Spark, a public company. (Am. Compl. ¶¶ 59–61.) The Sellers also insist that in basing the purchase payments on future earnings, it was understood and agreed that Major Energy would retain the same structure and business practices as before, but NGE and Spark nevertheless have restructured Major Energy's business for their own gain and at the Sellers' expense. (Am. Compl. ¶¶ 48–50.) Finally, the Sellers also allege that Spark improperly calculated the earnings-based payments due to the Sellers for the year 2016. (Am. Compl. ¶¶ 112–15.)

Plaintiff filed this suit alleging various tort and contract claims against NGE and Spark. Defendants jointly move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Sellers' fraudulent inducement and tortious interference claims. (Dkt. No. 26.) Defendants also move to dismiss the Sellers' claims for punitive or consequential damages and to limit the Sellers to direct compensatory damages on their breach of contract claims. (*Id.*)

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, plaintiffs must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when plaintiffs plead facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The Court must accept as true all well-pleaded factual

allegations in the complaint, and 'draw [ ] all inferences in the plaintiff's favor.'" *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (quoting *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)).

## III. Discussion

The Complaint asserts a mix of tort and contract claims: (1) fraudulent inducement against NGE (Am. Compl. ¶¶ 120–27); (2) breach of contract against NGE (Am. Compl. ¶¶ 128–33); (3) breach of contract against Spark (Am. Compl. ¶¶ 134–42); and (4) tortious interference with a contract against Spark. (Am. Compl. ¶¶ 143–150.)

Defendants move to dismiss the first and fourth claims. Defendants also move to dismiss the Sellers' claims to the extent that they seek punitive and consequential damages.

### A. Fraudulent Inducement

Plaintiff's first cause of action alleges that NGE fraudulently induced the Sellers into entering a deal which it had no intention to keep, including by promising that Major Energy would remain a private company and would continue to run as before. (Am. Compl. ¶¶ 120–27.) NGE argues that this claim should be dismissed as duplicative of Plaintiff's breach of contract cause of action.

"[U]nder New York law, 'where a fraud claim arises out of the same facts as [a] breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, . . . plaintiff's sole remedy is for breach of contract.'" *Telecom Intern. America, Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quoting *Sudul v. Comput. Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994). While allegations that a party entered into a contract with no intention of performing usually will not support an action for fraud, "[a] fraud action *is* permitted . . . where the plaintiff alleges that the defendant engaged in other fraudulent conduct besides entering the

3

contract with no intention to perform." *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995) (emphasis in original). The operative distinction is between "a promissory statement of what will be done in the future" and "a misrepresentation of a present fact." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). While the former does not give rise to a separate fraudulent inducement claim, the latter does.

In an apparent blurring of this distinction, the New York Court of Appeals has held that "a promise made with a preconceived and undisclosed intention of not performing it constitutes a misrepresentation" that may be sufficient to support a parallel claim of fraud. *Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (quoting *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957)). *See also Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122 (1995) ("A false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties."). "While these decisions would seem to contradict the broader rule that a fraud claim cannot be pleaded based on a failure to fulfill contractual promises, courts have reconciled the two principles by requiring an additional showing in order to maintain the fraud action." *Low v. Robb*, No. 11 Civ. 2321, 2012 WL 173472, at *5 (S.D.N.Y. Jan. 20, 2012). Specifically, parallel fraud and contract claims may be brought:

> if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages.

*Merrill Lynch & Co.*, 500 F.3d at 183–84 (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996)).

Here, the Sellers rely on the exception for fraudulent misrepresentations that are "collateral or extraneous to the contract." (Dkt. No. 28 ("Pl. Opp.") at 12.) "For a fraudulent

4

misrepresentation to be collateral or extraneous to a contract, it must be a promise to do something other than what is expressly required by the contract." *W.B. David & Co., Inc. v. DWA Communications, Inc.*, No. 02 Civ. 8479, 2004 WL 369147, at *5 (S.D.N.Y. Feb.26, 2004). In other words, the Sellers must show that their "fraud claim [is] based on an oral assertion going beyond the four corners of—and therefore collateral to—the contract." *Trend & Style Asia HK Co. Ltd. v. Pac. Worldwide, Inc.*, No. 14 Civ. 992, 2015 WL 4190746, at *8 (S.D.N.Y. July 10, 2015).

The Sellers specifically contend that NGE's "repeated representation that Major Energy would continue operating as a private entity and not become part of Spark (a public entity)" was "collateral to the contract and independent of its breach of contract claim against NGE." (Pl. Opp. at 15.) But far from being "something other than what is expressly required by the contract," *W.B. David & Co.*, 2004 WL 369147, at *5, the transfer of Major Energy from a private to a public entity was, in the Sellers' own words, "a blatant breach of NGE's 'business-as-usual' obligations under the [relevant contracts]." (Am. Compl. ¶ 67.) Indeed, the Sellers point to numerous provisions in their contracts with NGE that they construe to have "expressly" integrated NGE's promise to keep Major Energy private.[1] (Am. Compl. ¶¶ 41, 48, 62, 67.) New

---

[1] The most relevant provisions of the contracts, and the most damning for purposes of the Sellers' parallel fraud claims, include:

> (1) Section 11.7 of the Membership Interest Purchase Agreement, which codified the parties' agreement that "[n]o assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Parties"; and

> (2) Section 2.7 of the Earnout Agreement, which codifies NGE's promise to "operate the Business of [Major Energy], in all material respects, throughout the Target Years such that [Major Energy is] operated consistently with how the Senior Management Team

5

York law does not allow the Sellers to assert separate fraud and contract claims on the grounds that this conduct was both an express breach of the parties' contracts *and* a breach of a promise collateral to that contract. Because the Sellers' "fraud claim arises out of the same facts as [their] breach of contract claim, . . . the fraud claim is redundant and [Sellers'] sole remedy is for breach of contract." *Telecom Intern. America*, 280 F.3d at 196 (quoting *Sudul*, 868 F. Supp. at 62).

Seeking to evade this outcome, the Sellers appear to argue that *any* promises made with a preconceived and undisclosed intention of being broken are *necessarily* collateral to a related contract. (Pl. Opp. at 12–13 ("New York courts have repeatedly held that where a defendant made promises with a preconceived and undisclosed intention of not performing them, those representations "***are collateral to the agreement, and can form the basis of a fraudulent inducement claim***.") (emphasis in original).) It is true that New York law might in *some* circumstances allow for a "false statement of intention . . . to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard*, 86 N.Y.2d at 122. But again, these types of false statements can support related fraud and contract claims only when "the fraud claim [is] based on an oral assertion going beyond the four corners of—and therefore collateral to—the contract." *See Trend & Style*, 2015 WL 4190746, at *8 (discussing *Graubard*). *See also Telecom Intern. America*, 280 F.3d at 196. In other words, while the mere relation of an extraneous promise to a contract may not doom a parallel fraudulent inducement

---

operated [Major Energy] before the Closing and/or how the Senior Management Team suggests operating [Major Energy] going forward . . . ."

(Dkt. No. 22-1 at 67; Dkt. No. 22-2 at 6–7.) According to the Sellers, NGE "blatantly breached" the former provision when it sold Major Energy to Spark (Am. Compl. ¶ 41), and in the latter provision "NGE expressly agreed that it would operate Major Energy . . . *as a private company*" (Am. Compl. ¶ 62 (emphasis in original)).

6

claim, the explicit incorporation of such promises into the plain text of the contract will.[2]  Here, the Sellers assert that "NGE's agreement to keep Major Energy operating as a private company at least during the almost year deferred payment period is evident from the acquisition documents executed by the Sellers and NGE." (Am. Compl. ¶ 61.)  Their doing so belies their attempt to also construe NGE's promise to keep Major Energy private as "something other than what is expressly required by the contract." *W.B. David & Co.*, 2004 WL 369147, at *5.

In short, in relying on the same facts and allegations to support both their fraud and breach of contract claims, the Sellers are "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder," which as a matter of New York law "is insufficient to state an independent tort claim." *See Telecom Intern. America*, 280 F.3d at 196 (quoting *Best Western Int'l, Inc. v. CSI Int'l Corp.*, No. 94 Civ. 360, 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994).  Accordingly, the fraudulent inducement claim against NGE must be dismissed.

## B. Tortious Interference

The Sellers allege that Spark tortiously interfered with the Sellers' and NGE's contract "when it negotiated and executed the purchase of Major Energy from NGE" despite being "fully

---

[2] In support of their broader understanding of "collateral," the Sellers cite cases involving promises of performance that extended beyond the relevant contract's plain bargained-for terms.  *See, e.g.*, *Deerfield Commc'ns Corp.*, 68 N.Y.2d at 956 (permitting fraudulent inducement claim premised on representations "not contained in the written contract"); *CCM Rochester, Inc. v. Federated Investors, Inc.*, No. 14 Civ. 3600, 2014 WL 6674480, at *6 (S.D.N.Y. Nov. 25, 2014) (allowing fraudulent inducement claim where "the terms of the [contract] do not impose any obligation on [defendant]" with respect to the alleged false promises); *White v. Davidson*, 55 N.Y.S.3d 223, 611–612 (App. Div. 1st Dep't 2017) ("[The] misrepresentations are collateral to the agreement, and can form the basis of a fraudulent inducement claim . . . since [the agreement] makes no reference to the particular misrepresentations allegedly made here." (quoting *Laduzinski v. Alvarez & Marsal Taxand* LLC, 16 N.Y.S.3d 229, 233 (App. Div. 1st Dep't 2015)).

aware of the foregoing Agreements and NGE's contractual obligations" not to sell Major Energy to a private entity. (Am. Compl. ¶ 145.) Spark raises three challenges to the Sellers' tortious interference claim: (1) that Spark was not a third party to the contract of sale of Major Energy, a requirement for tortious interference claims; (2) that Spark's interference with the Sellers' and NGE's contract was privileged because of Spark's economic interest in NGE's affairs; and (3) that the Sellers' tortious interference claims against Spark are duplicative of their breach of contract claims.[3] (Dkt. No. 27 ("Def. Mem.") at 16–23.) The Court addresses each of these arguments in turn.

### 1. Whether Spark Was a Party to the Contract Between Sellers and NGE

"Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 82 (1996)). "It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." *Koret, Inc. v. Christian Dior, S.A.*, 554 N.Y.S.2d 867, 869 (App.

---

[3] In its reply brief, Spark argues for the first time that the Sellers cannot hold Spark liable in connection with the initial contract of sale between Sellers and NGE because of a provision in that contract barring "all claims or causes of action (whether in contract or in tort, in law or in equity) . . . [against any] Person who is not a named party to this Agreement, including any Affiliate, agent, attorney, or representative of any Party . . . arising under, in connection with, or related to this Agreement." (Dkt. No 32 ("Def. Rep.") at 6–7; Dkt. No. 22-1 at 51.) As a general rule, courts "ordinarily will not consider issues raised for the first time in a reply brief." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Accordingly, the Court declines to address the enforceability of this provision on this motion to dismiss. Spark is not precluded from raising this argument at a different stage of the litigation.

8

Div. 1st Dep't 1990). Thus, "a plaintiff bringing a tortious interference claim must show that the defendants were *not parties to the contract*." *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (collecting cases) (emphasis in original).

Spark argues that the Sellers' allegations regarding Spark's role in the negotiations between the Sellers and NGE establish that Spark was not a third party to the contract for purposes of the Sellers' tortious interference claim. It points to *Koret*, which held that a parent company is not liable for tortious interference with its subsidiary's contract where the same corporate executive employed by both the parent and subsidiary "played a role in negotiation of the joint venture agreement, and executed [the] same." *Koret*, 554 N.Y.S.2d at 857. It is true that the Sellers' allegations are similar in that an executive common to NGE and Spark played a role in the negotiation of the contract at issue. (*See* Am. Compl. at ¶¶ 12, 73–74.) But unlike in *Koret*, here the Sellers explicitly disclaim that Spark and NGE share a parent-subsidiary relationship. (Am. Compl. at ¶ 11 ("Spark is an affiliate of NGE, but has no direct ownership interest in NGE.").) Spark points to no case establishing that affiliates of contracting parties do not qualify as "third parties" for purposes of a tortious interference claim. The mere fact that Spark is "affiliated" with NGE does not establish that Spark was a party to the contract, signed only by NGE, for purposes of the tortious interference claim.

Spark also asserts that it is immune from tortious interference claims as a successor-in-interest to the contract at issue. (Def. Mem. at 17–18.) "[A] successor in interest . . . cannot be liable for interfering with its own contract." *LHR, Inc. v. T-Mobile USA, Inc.*, 977 N.Y.S.2d 816, 821 (App. Div. 4th Dep't 2013). Therefore, it may be true that if Spark is ultimately liable to the Sellers for breach of contract as a successor-in-interest to the Sellers' contract with NGE, then the Sellers' tortious interference claim against Spark must fail. But the Sellers do not concede

that Spark is a successor-in-interest to the contact. Instead, the Sellers explicitly call into question the validity of NGE's assignment to Spark of its contractual interests in Major Energy. (*See, e.g.*, Am. Compl. ¶¶ 41, 138.) In fact, the Sellers seek a declaratory judgment voiding that assignment, which, if granted, would moot Spark's successor-in-interest argument entirely. (Am. Compl. at 150.) In simultaneously seeking relief under these mutually exclusive theories, the Sellers are validly pleading alternative bases for Spark's liability in connection with their role in the two sales of Major Energy. *See* Fed. R. Civ. P. 8(d). *See also Henry v. Daytop Village*, 42 F.3d 89, 91 (2d Cir. 1994) ("[T]he Federal Rules of Civil Procedure explicitly authorize pleading in the alternative."). The outcome of these claims may ultimately turn on whether Spark validly assumed NGE's obligations under the contract with the Sellers as a successor-in-interest. But until that question is answered, the Sellers' tortious interference claim against non-party Spark remains viable.

### 2. Whether Spark's Interference with Sellers' and NGE's Contract was Privileged as a Matter of Law

When faced with claims of tortious interference with contract, New York courts seek "to strike a balance between two valued interests: protection of enforceable contracts, which lends stability and predictability to parties' dealings, and promotion of free and robust competition in the marketplace." *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16 Civ. 6392, 2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017) (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 425(N.Y. 2007)). To serve these two interests, "New York courts have . . . developed an 'economic interest defense' to claims of tortious interference with contract." *Id.* This defense is available where: (1) defendant sought to protect an economic interest in the breaching party's business, and (2) plaintiff makes no showing that defendant acted maliciously, fraudulently, or illegally. *See Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F.

Supp. 3d 16, 29–30 (S.D.N.Y. 2017). "[T]he defense . . . only applies when the alleged interfering parties have acted to protect their interest in the breaching party's business . . . [and] not their own." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 484 (E.D.N.Y. 2012). For purposes of Rule 12(b)(6) motions, all of the elements of a defendant's economic interest defense must be discernable on the face of the complaint in order to warrant dismissal of the underlying tortious interference claim. *Benihana of Tokyo*, 259 F. Supp. 3d at 30.

It is a close question whether the Amended Complaint's description of the relationship between NGE and Spark is sufficient to establish an economic interest defense. The New York Court of Appeals has noted the wide array of circumstances in which "the defense has been applied, for example, where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *White Plains Coat & Apron*, 8 N.Y.3d at 426. At its broadest, the defense has also been upheld in cases involving "tightly interrelated affiliates," where evidence of common ownership and a closely knit relationship was fully developed in the record. *Masefield AG v. Colonial Oil Indus.*, No. 05 Civ. 2231, 2006 WL 346178, at *2, *8 (S.D.N.Y. Feb. 15, 2006).

Though the Amended Complaint describes an executive common to both Spark and NGE and uses the word "affiliate" to describe their relationship, it does not provide any specifics regarding the nature of the parties' economic relationship (beyond explicitly disclaiming any direct ownership interest between the two). (Am. Compl. ¶¶ 11–12 ("Spark is an affiliate of NGE, but has no direct ownership interest in NGE."); *see also id.* ¶¶ 73–74.) In scenarios like

this, courts commonly "refuse[] to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense." *Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832, 2012 WL 3542196, at *9 (S.D.N.Y. Aug. 15, 2012) (collecting cases).

In any event, the economic interest defense is not yet available to Spark because the Sellers have not alleged that Spark's interference with the contract between the Sellers and NGE was for anyone's benefit other than Spark's own. *See V.R. Optics*, 2017 WL 3600427 at *5 ("The defense of economic interest does not apply, however, where the allegedly interfering parties acted to protect their own interest instead of their interest in the breaching party's business.") The Sellers do not assert that Spark acted to protect NGE's economic interests, but in fact allege just the opposite. (Am. Compl. ¶ 74 ("Spark was secretly using NGE to complete the transaction with the Sellers *for the benefit of Spark's business*.") (emphasis added).) Spark fails to identify any allegations describing its conduct as motivated by NGE's economic interests, and instead falls back on the Amended Complaint's ambiguous description of Spark and NGE as "affiliates." (Def. Rep. at 9 & n.7.) Absent more concrete allegations regarding Spark's economic interest in NGE and the motives behind Spark's interference with NGE's obligations to Sellers, the economic interest defense is not yet available to Spark.

### 3. Whether Sellers' Tortious Interference Claim is Duplicative of their Contract Claim

Finally, Spark urges that the Sellers' "tortious interference claim should be dismissed for the additional and independent reason that it is based on the same set of facts as [their] breach of contract claim against Spark." (Def. Mem. at 22.) "As a general rule, tortious interference claims that are duplicative of contract claims are precluded." *Choquette v. Motor Info. Sys., Inc.*,

15 Civ. 9338, 2017 WL 3309730, at *6 (S.D.N.Y. Aug. 2, 2017) (collecting cases). That general rule, however, does not categorically prohibit parallel tortious interference and breach of contract claims; instead, it requires that plaintiffs show that their tort claim is based on "a duty that 'spring[s] from circumstances extraneous to and not constituting elements of, the [parties'] contract.'" *Id.* (alterations in original) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)).

The Sellers have met that burden here. Their tortious interference claim can stand entirely on Spark's alleged interference with NGE's obligations to the Sellers under a contract to which Spark was a third party. (Am. Compl. ¶¶ 144–149; Pl. Opp. at 22.) Regardless of whether Spark later assumed separate contractual duties to the Sellers when it purchased Major Energy from NGE, its alleged tortious conduct prior to executing that purchase was a breach of its independent legal duty not to interfere with the Sellers' and NGE's contract. *Cf. S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 489 N.Y.S.2d 478, 481 (App. Div. 1st Dep't 1985) (vacating dismissal of claim for tortious interference with contract where plaintiff "allege[d] a breach of duty by defendant to refrain from interfering with plaintiff's contracts of sale [with third-parties], separate and distinct from [defendant's] breaches of duty" under contracts with plaintiff). The mere fact that Spark may have later assumed separate and independent contractual obligations to the Sellers does not establish that its earlier conduct was not a breach of its preexisting legal duty not to interfere with the Sellers' contract with NGE.

It should also be noted that where tortious interference claims are dismissed as duplicative of breach of contract claims, courts often look to whether it is "undisputed that the relationship between the parties [is] defined by a written contract." *See Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 389. *See also Allerand, LLC v. 233 E. 18th St. Co., L.L.C.*, 798 N.Y.S.2d 399, 402

(App. Div. 1st Dep't 2005) (dismissing tortious interference claim after first finding that "[t]he parties' rights and obligations respecting the matter in dispute are governed by their contract"). But in this case, the Sellers have not conceded "the validity of [the] direct or indirect assignment" to Spark of NGE's obligations to the Sellers. (Am. Compl. ¶ 138.) If, as the Sellers urge, NGE's sale of Major Energy to Spark is deemed void, then this case will become readily distinguishable from those cases involving duplicative tortious interference and breach of contract claims, because the Sellers would have no contract claims at all against Spark. Thus at this stage of the litigation, the Sellers may plead in the alternative both breach of contract and tortious interference claims.

### C. Special Damages

Defendants move to dismiss the Sellers' claims to punitive and consequential damages pursuant to a limitation of liability clause in the initial contract of sale between the Sellers and NGE. The relevant provision of the contract states that "no Party will be obligated to any other Party or Person for any consequential, incidental, indirect, special, exemplary or punitive damages."[4] (Dkt. 22-1 at 61.) The Sellers do not dispute Defendants' interpretation of the scope

---

[4] The relevant provision, Section 9.9 of the Membership Interest Purchase Agreement between NGE and Sellers, states in full:

> Notwithstanding any other term herein, no Party will be obligated to any other Party or Person for any consequential, incidental, indirect, special, exemplary or punitive damages or Losses based thereon, including damages or Losses with respect to loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity, and no Party will be obligated to any other Party or Person for any Losses or damages determined as a multiple of income, revenue or the like, relating to the breach of any representation, warranty, covenant or agreement herein (except and to the extent that the Indemnified Party has been required to pay such damages to any third Person).

14

of the limitation of liability clause, but instead argue that: (1) Defendants cannot avail themselves of the clause because their fraudulent conduct "smacks of intentional wrongdoing"; and (2) Spark cannot avail itself of the clause because Spark is not a party to the contract between Sellers and NGE. (Pl. Opp. at 23–24.)

"New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed." *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016). "But the [New York] Court of Appeals has also explained that 'an exculpatory agreement . . . will not exonerate a party from liability under all circumstances. . . . [I]t will not apply to exemption of willful or grossly negligent acts . . . [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing.'" *Net2Globe Intern., Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (alterations in original) (quoting *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85 (1983).

Conduct that "smacks of intentional wrongdoing . . . is conduct that evinces a reckless indifference to the rights of others." *Id.* (quoting *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554 (1992)). To pierce a limitation-of-liability clause under this standard, a plaintiff must at least establish that the defendant's breaching conduct was performed "in bad faith," which "connotes a dishonest purpose." *Kalisch-Jarcho*, 58 N.Y.2d at 385 & n.5. While a plaintiff may pierce such a clause "even absent any evidence of malice," *id.* at 385, courts have refused to void such clauses where a party's intentional breach "is motivated exclusively by its own economic self-interest," *see Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 84 N.Y.2d 430, 439

---

(Dkt. No. 22-1 at 61.)

15

(1994), or when the breach follows an unforeseen change in circumstances that "render[s] performance economically unfeasible for" the breaching party. *Net2Globe Intern.*, 273 F. Supp. 2d at 452 ("[The breaching party] did not anticipate the [changed circumstances] at the time the parties' contracts were negotiated and executed . . . . Accordingly, the conclusion by the New York Court of Appeals that such behavior does not constitute intentional misrepresentation, willfulness, or gross negligence extends to the present dispute.").

The Sellers have alleged facts sufficient to show that Defendants NGE and Spark may have been acting intentionally and in bad faith. The Sellers allege that NGE "deceiv[ed]" the Sellers throughout the period of contract negotiations, and that "[u]nbeknownst to the Sellers, NGE . . . had no intention whatsoever" of fulfilling its contractual obligations. (Am. Compl. ¶¶ 3, 65.) The Sellers also allege that Spark intentionally sowed an atmosphere of "chaos and confusion" at Major Energy, and that Spark has both failed to "act in good faith" and has even acted "maliciously." (Am. Compl. ¶¶ 78, 141, 147.)

These allegations distinguish this case from those involving intentional breaches motivated only by unanticipated "changed circumstances at the time the parties' contracts were negotiated and executed," which "do[] not constitute intentional misrepresentation, willfulness, or gross negligence." *Net2Globe Intern.*, 273 F. Supp. 2d at 452. Instead, the Sellers' Amended Complaint alleges facts that Defendants anticipated their breach at the time they negotiated this limitation of liability clause, which "betokens [NGE's and Spark's] reckless indifference to the rights of" the Sellers. To be sure, there is a "high[] mark at which New York courts place the bar . . . [for] wrongful conduct sufficient as a matter of law to nullify a limitations of liability clause in contract," *Net2Globe Intern.*, 273 F. Supp. 2d at 454. But if proven, these allegations of

16

deception could be sufficient to establish that NGE entered into and eventually breached its contract with Sellers in bad faith.

Finally, whether Spark can avail itself of the limitation on liability clause in the contract will ultimately turn on whether Spark can establish that it is in fact a party to that contract. To the extent that the assignment of NGE's contractual obligations and benefits to Spark is voided or deemed invalid, Spark cannot avail itself of the limitation of liability clause. Accordingly, dismissal of the Sellers' claims to punitive and consequential damages against Spark would be inappropriate at this stage of the litigation, regardless of whether Spark's alleged conduct smacks of intentional wrongdoing sufficient to pierce the clause.

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to the claim for fraudulent inducement against NGE and DENIED as to the claims for tortious interference and for punitive or consequential damages.

Defendants shall file answers to the remaining claims within 21 days of the date of this order.

The Clerk of Court is directed to close the motion at Docket Number 26.

SO ORDERED.

Dated: September 24, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge