**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative, <br><br>                 Plaintiff, <br><br>        v. <br><br> NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC., <br><br>               Defendants. | Civ. No. 17-cv-7742 <br><br> **ANSWER AND ADDITIONAL** <br> **DEFENSES OF DEFENDANTS** <br> **TO AMENDED COMPLAINT** |

Defendants National Gas & Electric, LLC ("NGE") and Spark Energy, Inc. ("Spark"; collectively "Defendants"), hereby file their Answer and Additional Defenses to the Amended Complaint filed by Plaintiff Saul Horowitz ("Plaintiff") in accordance with the numbered paragraphs thereof as follows:

**NATURE OF ACTION[1]**

1.    This action arises from Defendants' fraudulent, dishonest and tortious conduct, as well as their repeated breaches of their undeniable contractual obligations to the former owners of the membership interest (the "Sellers") in Major Energy Services, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC (collectively, "Major Energy" or the "Company"). The Sellers seek to rescind the fraudulently induced sale of their membership interest in Major Energy to NGE and to recover other significant monetary losses they have sustained as a direct result of Defendants' fraud and other wrongdoing, as described herein.

---

[1]    The section headings from the Amended Complaint are included only for purposes of organization and ease of reference.  Defendants do not admit, but rather specifically deny, any factual or legal averments in the headings used in the Amended Complaint.

**ANSWER:**    The allegations of this paragraph are conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

2.    In or around April 2016, NGE, a private limited liability company, acquired the Sellers' 100% membership interest in Major Energy, also a private limited liability company, for $80 million—$35 million of which was to be paid in the form of an earn out and other installed payments over a few year period. The Sellers agreed to defer and tie a significant portion of the $80 million purchase price to the future financial success of Major Energy only because NGE and its representatives, including W. Keith Maxwell III (sole owner of NGE and Chief Executive Officer), Todd Gibson (Executive Vice President, Chief Financial Officer), Paul Konikowski (Vice President) and David Hennekes (Vice President), promised that Major Energy would continue to be operated as a private entity and to be guided by the same senior management team that led to the historical success and growth of Major Energy, at least during the deferred payment period. Indeed, throughout the negotiation process, NGE and its representatives repeatedly assured the Sellers that Major Energy would remain under the ownership of NGE and run "business-as-usual" during the deferred payment period. The Sellers understood and made clear to NGE and its representatives that the future financial success of Major Energy depended upon its ability to continue operating as a small, cohesive private entity and not be subject to the regulatory and financial burdens and distractions of a large public entity.

**ANSWER:**    It is admitted only that NGE acquired the Sellers' 100% membership interest in Major Energy.  The terms of the sale of Major Energy to NGE are memorialized in certain transactional documents that speak for themselves, and Plaintiff's characterizations of

those documents or the terms of that sale are denied.  The remaining allegations in this paragraph are denied.

3.      Unbeknownst to the Sellers, NGE and its representatives were deceiving them throughout the negotiation period and had no intention whatsoever of keeping Major Energy a private entity during the deferred payment period. Indeed, all along and unbeknownst to the Sellers, NGE's approach was to "say and do anything to get the deal done," even if it was untrue, and NGE had the preconceived and undisclosed intention of selling Major Energy to Defendant Spark, a public entity, immediately after closing the deal.

**ANSWER:**     Denied.

4.      To this end, shortly after the closing, NGE, guided by its CEO, began working with Spark on the transition and integration of Major Energy into Spark. When the Sellers learned of this fact, they immediately voiced their concern to both NGE and Spark and expressed how such action was contrary to the pre-acquisition assurances NGE and its representatives repeatedly made to the Sellers. The Sellers further advised both NGE and Spark that, under the express terms of the transaction documents, Major Energy cannot be sold to Spark without the consent of the Sellers, which the Sellers were unwilling to provide. Nonetheless, NGE and Spark proceeded with the sale of Major Energy to Spark mere months after the closing of the transaction at issue and without the consent of the Sellers.

**ANSWER:**     It is admitted only that NGE sold Major Energy to Spark.  The terms of the sale of Major Energy to NGE are memorialized in certain transactional documents that speak for themselves, and Plaintiff's characterizations of those documents or the terms of that sale are denied.  The remaining allegations in this paragraph are denied.

5.     Defendants' unlawful behavior, however, did not stop with this one event. In the transaction documents, NGE contractually agreed that, among other things, it would: (i) act in good faith; (ii) operate Major Energy consistently, in all material respects, with how Major Energy's existing senior management team operated Major Energy pre-acquisition and how they suggest Major Energy be operated; (iii) consult in advance and collaborate with the senior management team in respect to any NGE-proposed change or modification to the operations of Major Energy that would be materially inconsistent with how Major Energy was operated pre-acquisition; (iv) not take or omit to take any act, directly or indirectly, that would reduce or reasonably result in the reduction of any of the deferred payments due to the Sellers; (v) not permit any affiliate to take or omit to take any act, directly or indirectly, that would reduce or reasonably result in the reduction of any of the deferred payments due to the Sellers; and (vi) not unilaterally make any fundamental changes to the operating overhead of Major Energy or otherwise materially negatively impact the profitability of Major Energy for the benefit of any related or unrelated party.

**ANSWER:**     Admitted in part; denied in part.  It is admitted only that NGE purchased Major Energy.  The terms of the sale of Major Energy to NGE are memorialized in certain transactional documents that speak for themselves, and Plaintiff's characterizations of those documents or the terms of that sale are denied.

6.     As described below in greater detail, NGE and Spark (after its improper acquisition of Major Energy from NGE) failed to comply with the foregoing contractual obligations and operate Major Energy in a "business-as-usual" manner. For example, among other breaches and acts of non-compliance, Defendants changed Major Energy's reporting structure, policies and suppliers; took complete control of Major Energy's bank accounts;

demanded that Major Energy senior management and other employees focus on Spark projects and operations; restricted Major Energy's necessary operating expenditures and customer growth strategies; and breached employment agreements with Major Energy senior management and executives. Moreover, Defendants created an atmosphere of distrust and concern among Major Energy senior management and employees, causing many of them to terminate their employment with Major Energy.

**ANSWER:**   Denied.  By way of further response, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

7.     Indeed, Defendants' unlawful behavior, as described herein, has caused severe harm to Major Energy's business and goodwill and has prevented the Sellers from receiving the sale proceeds they bargained for and are entitled to under the transaction documents.

**ANSWER:**   Denied.  By way of further response, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied. Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

## THE PARTIES

8.     Plaintiff Saul Horowitz is a domiciliary and citizen of the State of New York. Horowitz is one of the Sellers and was designated by the other Sellers to act as Sellers' Representative. As Sellers' Representative, Horowitz was designated by the Sellers as their agent and attorney-in-fact and is permitted to take any and all actions required or necessary with respect to the rights of the Sellers under the transaction documents.

**ANSWER:**    Admitted on information and belief.

9.    The other Sellers are Moshe (Mark) Wiederman, Mark Josefovic, Michael Bauman, Asher Fried and certain personal trusts owned by them.

**ANSWER:**    Admitted on information and belief.

10.    Defendant NGE is a limited liability company organized under the laws of the State of Texas, with its principal place of business located at 12140 Wickchester Lane, Suite 100, Houston, Texas 77079-1211. The sole member of NGE is Retailco, LLC ("Retailco"), which is a limited liability company organized under the laws of the State of Texas, with its principal place of business located at 12140 Wickchester Lane, Suite 100, Houston, Texas 77079-1211. The sole member of Retailco is TxEx Energy Investments, LLC ("TxEx"), which is a limited liability company organized under the laws of the State of Texas, with its principal place of business located at 12140 Wickchester Lane, Suite 100, Houston, Texas 77079-1211. And the sole member of TxEx is Maxwell, an individual who is a citizen and domiciliary of the State of Texas.

**ANSWER:**    Admitted.

11.    Defendant Spark is a Delaware corporation with its principal place of business in Houston, Texas. Spark is a publicly traded company listed on NASDAQ Global under the ticker symbol, "SPKE." Spark is an affiliate of NGE, but has no direct ownership interest in NGE.

**ANSWER:**    Admitted.

12.    Non-party Maxwell is the sole owner of NGE and its President and Chief Executive Officer. Maxwell also is the founder and non-executive Chairman of the Board of Directors of Spark.

**ANSWER:**   It is admitted only that Keith Maxwell is the sole ultimate owner and President and Chief Executive Officer of NGE, and that Mr. Maxwell is the founder and non-executive Chairman of the Board of Directors for Defendant Spark.  The remaining allegations and characterizations are denied.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:**   The allegations of this paragraph are conclusions of law to which no response is required and they are, therefore, denied.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. In addition, the parties contractually consented to the exclusive jurisdiction and venue of this Court.

**ANSWER:**   The allegations of this paragraph are conclusions of law to which no response is required and they are, therefore, denied.

## FACTUAL BACKGROUND

A.     **Major Energy Pre-Sale To NGE**

15.     Major Energy is engaged in the business of supplying electricity and natural gas and other related products and services to residential and commercial consumers located in New York and other U.S. states.

**ANSWER:**   Admitted.

16.     Major Energy was founded in 2005 by three individuals. Until 2007, Major Energy was a small self-funding company relying on founders' money to keep it going. In 2007,

Major Energy signed a long term credit and supply agreement with Pacific Summit Energy ("PSE"), a subsidiary of Sumitomo Corporation of America.

> **ANSWER:**   Admitted on information and belief.

17.   From the beginning, Major Energy was able to provide service at a fraction of its competitors' cost. This was accomplished mostly by hiring talented and knowledgeable key personnel with many years of experience in the industry. The atmosphere at Major Energy was extremely cohesive and key staff worked very well together. Most senior staff had worked together in previous years at other Energy Service Companies ("ESCOs"). This cohesive atmosphere, coupled with the excellent supply relationship with PSE, allowed Major Energy to grow its business aggressively and profitably.

> **ANSWER:**   It is admitted only that Major Energy was profitable and that certain members of its staff had experience in the industry, including at other ESCOs.  Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations of this paragraph and they are therefore denied.

18.   In particular, Major Energy grew its customer count from 12,000 in 2008 to over 214,000 in 2015. Major Energy also grew its annual net income from approximately $380,000 in 2008 to over $12.5 million in 2015 and its EBITDA from approximately $390,000 in 2008 to almost $24 million in 2015. In fact, for the three year period of 2013-2015, Major Energy averaged a customer count of 210,000, net income of $12.7 million and EBITDA of $22.6 million.

> **ANSWER:**   Admitted on information and belief.

**B.**  **NGE Seeks To Purchase Major Energy From The Sellers**

19.     In or about November 2015, NGE, a private entity, approached the owners of Major Energy, *i.e.*, the Sellers, regarding the possible acquisition of the Sellers' combined 100% membership interest in Major Energy. The Sellers informed NGE that they were willing to consider a sale of Major Energy for the right price—4 x EBITDA.

**ANSWER:**     Admitted.

20.     By letter dated November 18, 2015, NGE, or an affiliate of NGE, made its initial written proposal to the Sellers, offering to purchase all of the membership interest in Major Energy for $80 million—$60 million in cash and $20 million as an "Earnout" to be paid over two years based on the success of Major Energy's operations during that period. When this proposal was made, it was understood by the parties that the Earnout would be based on Major Energy's projected EBITDA as historically performed by Major Energy, which at the time showed projected adjusted EBITDA of approximately $23 million for 2016 and 2017.

**ANSWER:**     It is admitted only that, on November 18, 2015, NuDevco Partners Holdings, LLC made a nonbinding proposal to Major Energy.  The correspondence referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document is denied.  The remaining allegations in this paragraph are denied.

21.     Two months later, by letter dated January 14, 2016, NGE sent an amended proposal. This proposal kept the $80 million total purchase price and the structure of $60 million in cash at closing and $20 million in a two-year Earnout. With respect to the Earnout, NGE proposed that the Earnout would be based on Major Energy's adjusted EBITDA during the two-year period, as projected in Major Energy's plan, and the mutually agreed upon customer count targets. NGE also proposed that it would enter into new employment

agreements with the existing management team (Saul Horowitz, Mark Wiederman, and Daniel Alper) and, among other things, pay them fifty percent (50%) of the EBITDA in excess of the projected EBITDA during the two-year Earnout period.

**ANSWER:**    It is admitted only that, on January 14, 2016, NGE sent a nonbinding proposal to Major Energy.  The correspondence referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document is denied.  The remaining allegations in this paragraph are denied.

22.    Sometime prior to March 2016, New York State proposed certain regulations that were potentially harmful to ESCOs, such as Major Energy. While these regulations ultimately never came to fruition, NGE was concerned about these proposed regulations and amended the acquisition structure to contain a larger deferred payment amount. To this end, NGE proposed an acquisition structure as follows: $45 million in cash at closing; $15 million in Cash Installments to be paid over three years ($5 million each year, subject to an adjusted EBITDA target) and $20 million in an Earnout to be paid over 33 months (subject to meeting certain adjusted EBITDA and customer count targets). Critically, the revised offer kept the $80 million purchase price target in place. As NGE represented to the Sellers, "the overriding intent is that Major and NGE share the risks of the uncertain regulatory environment *without diminishing the original target purchase price of $80MM*."

**ANSWER:**    It is admitted only that, at some point prior to March 2016, New York state proposed certain regulations relating to ESCOs that did not become law, and that, in March 2016, NGE sent a nonbinding proposal to Major Energy.  The proposed regulations and the NGE proposal referenced in this paragraph are documents that speak for themselves, and Plaintiff's

characterizations of those documents are denied.  The remaining allegations in this paragraph are denied.

23.     On or about March 11, 2016, just days before the parties executed the acquisition documents, NGE made its final offer to the Sellers. This final offer consisted of, among other things, the following: $40 million in cash at closing (less $5 million for litigation credit); $15 million in cash installments to be paid over three years, subject to achieving EBITDA targets; $20 million in an Earnout to be paid over 33 months (approximately $5.5 million in 2016, $7.3 million in 2017 and $7.3 million in 2018), subject to hitting adjusted EBITDA and customer count targets. In making this final offer, NGE again represented to and assured the Sellers that "[t]his proposal still results in the same gross offer of $80MM" and that the deferred amount of $35 million would be "*based on performance in accordance with Major's Adjusted EBITDA's Plans*."

**ANSWER:**   It is admitted only that, on or about March 11, 2016, NGE made a proposal to Major Energy.  The proposal referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document is denied.  The remaining allegations in this paragraph are denied.

24.     On or about March 14, 2016, the Sellers accepted NGE's final offer and proceeded to finalize the acquisition documents.

**ANSWER:**   Admitted.

25.     At all times during the negotiations of the proposed sale of Major Energy to NGE, the Sellers negotiated only with executives and employees of NGE. No executives or employees of Spark were involved at any point during the negotiations; indeed, the Sellers did

not receive a single communication from Spark executives or employees during the negotiation process.

**ANSWER:**   It is admitted only that Sellers negotiated directly with executives and employees of NGE.  The remaining allegations in this paragraph are denied.

26.     Moreover, throughout the negotiation period, the Sellers made clear to NGE that they were willing to proceed with the sale and defer a significant portion of the $80 million purchase price if, and only if, Major Energy remained a private entity.

**ANSWER:**   Denied.

27.     The Sellers knew and understood that having Major Energy operated as part of a public entity and subject to the many financial and reporting regulations of a public entity would make it extremely difficult, if not impossible, for Major Energy to truly operate "business-as-usual" and meet the contemplated adjusted EBITDA and customer count targets during the Earnout period—which unfortunately has turned out to be the case. NGE agreed to this demand by the Sellers and repeatedly assured the Sellers that Major Energy would remain a private entity and the "DNA" of NGE would be unchanged during the deferred payment period.

**ANSWER:**   Denied.

28.     The Sellers also made clear to NGE during the negotiation period that in determining the adjusted EBITDA for purposes of assessing the Earnout and Cash Installment amounts, the parties would use the same structure and methodology Major Energy historically used in preparing its EBITDA projections. NGE agreed to this demand of the Sellers as well.

**ANSWER:**   It is admitted only that NGE and Sellers discussed the methodology for calculating adjusted EBITDA.  Plaintiff's characterizations of those discussions are denied.

29.     Had NGE not agreed to these essential conditions of the Sellers, the Sellers would never have proceeded with the transaction and agreed to defer nearly half of the $80 million purchase price. And had the Sellers known that NGE was lying to them throughout the negotiation process and had no intention whatsoever of keeping Major Energy a private entity, they certainly would never have agreed to defer nearly half of the $80 million purchase price and tie it to the future financial success of Major Energy.

**ANSWER:**   Denied.

C.     **NGE And The Sellers Execute The MIPA, Earnout Agreement And Executive Earnout Agreement**

30.     On or about April 15, 2016, NGE and the Sellers closed the transaction and NGE became the owner of 100% of the membership interest in Major Energy.

**ANSWER:**   Admitted.

31.     In connection with the transaction, NGE, Major Energy, the Sellers and the Sellers' Representative entered into, among other things, a Membership Interest Purchase Agreement dated as of March 18, 2016 ("MIPA"), an Earnout Agreement dated as of March 18, 2016 and effective as of April 1, 2016 (the "Earnout Agreement"), and an Executive Earnout Agreement effective as of April 1, 2016 (the "Executive Earnout Agreement") (collectively, the "Agreements"). NGE is the only entity listed as the "Buyer" in these Agreements. *See* Exhibits A-C attached hereto.

**ANSWER:**   Admitted.   Further answering, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

The MIPA

32.     Pursuant to Section 2.1 of the MIPA, the Sellers agreed to sell to NGE (not Spark), and NGE agreed to purchase from the Sellers, all of the Sellers' issued and outstanding membership interest in Major Energy. The Sellers, and various trusts owned by each of the Sellers, owned all 100% of the membership interest in Major Energy.

**ANSWER:**   It is admitted only that NGE purchased Sellers' membership interests in Major Energy, and that Sellers owned 100% of the membership interests in Major Energy. Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

33.     As provided in the MIPA, Spark is not a Party to the MIPA.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

34.     Pursuant to Section 2.2 of the MIPA, NGE agreed to pay the Sellers the Purchase Price of $80 million, consisting of the following: (i) $45 million in gross cash payable at Closing, less a litigation credit of $5 million, which served as a ceiling amount covering the first dollar exposure of any claims with respect to certain litigation and regulatory matters; (ii) three annual Cash Installments of $5 million each, subject to certain potential EBITDA adjustments; (iii) targeted Working Capital of Major Energy of $0.00, subject to certain adjustments; and (iv) an Earnout of $20 million, subject to the terms and conditions set forth in the Earnout Agreement.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

35.     With respect to the Cash Installments, Section 2.2(a) provides that it shall be payable on or before March 31, 2017, March 31, 2018, and March 31, 2019; it cannot exceed $5

million per year; it is subject to potential reduction in a calendar year if the Adjusted EBITDA for the Target Year is less than the Adjusted EBITDA Plan for said Target Year; and is subject to potential make-up in future Target Years if the Adjusted EBITDA for a Target Year exceeds the Adjusted EBITDA Plain for said Target Year. The Adjusted EBITDA Plan is defined in the MIPA as $20,749,213 for the 2016 Target Year, $25,003,343 for the 2017 Target Year and $27,831,052 for the 2018 Target Year.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

36.    As for the calculation of Adjusted EBITDA for each Target Year, the MIPA sets forth the calculation methodology in the definition of said term. Critically, the parties made clear in the definition of Adjusted EBITDA that it will include "*accounting principles actually applied in accounting for the operations of [Major Energy] in periods **prior to the Closing Date**.*" Ex. A at 5 (emphasis added).

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

37.    With respect to the Earnout, Section 2.2(c) of the MIPA provides that it "shall be calculated in accordance with the terms and conditions of the Earnout Agreement in substantially the form attached hereto as <u>Exhibit B</u>, an illustration of which is demonstrated in the example shown in said <u>Exhibit B</u>."

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

38.    Pursuant to Section 7.1(a) of the MIPA, NGE agreed to make sure that, during the first twelve (12) months following the acquisition, Major Energy would continue paying the

existing salaries, target bonuses and benefits of Major Energy employees who remain post-closing. In addition, pursuant to Section 7.1(d), NGE agreed to ensure that Major Energy enters into new employment agreements with each of the members of the Senior Management Team, *i.e.*, Horowitz, Wiederman and Alper, as well as with certain employees designated as Key Employees, including but not limited to Levi Moeller and David Sobel. The reason for these material provisions in the MIPA was that the parties understood and agreed that it was essential for Major Energy to keep its existing senior management and employees in order to operate "business-as-usual" and ultimately meet the projected EBITDA and customer count targets. At the time, Major Energy had approximately 35 employees.

**ANSWER:**   It is admitted only that, at the time of NGE's acquisition, Major Energy had approximately 35 employees.  Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied. The remaining allegations in this paragraph are denied.

39.    In accordance with Section 7.1(d), members of the Senior Management Team and the Key Employees executed new employment agreements with Major Energy after the closing of the transaction. As will be detailed below, however, the bad faith and unlawful misconduct of Defendants caused Major Energy to breach the terms of these employment agreements and many employees, including several Key Employees, terminated or threaten to terminate their employment with Major Energy to the detriment of the Sellers.

**ANSWER:**   Denied.  Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

40.    Pursuant to Section 9.3 of the MIPA, NGE agreed to indemnify and hold harmless the Sellers and the Seller Indemnified Parties (as defined), from and after March 18,

2016, against all losses incurred by the Sellers and the Seller Indemnified Parties to the extent caused by NGE's breach of any of its representations in or obligations under the MIPA.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

41.   Pursuant to Section 11.7 of the MIPA, the parties agreed that there is to be no assignment of the MIPA, "or any of the rights or obligations hereunder," by any party to the MIPA, including NGE, "without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void." As will be detailed below, NGE, with the full knowledge and participation of Spark, blatantly breached this unambiguous provision of the MIPA when it sold Major Energy to Spark and thereby assigned, directly or indirectly, its obligations under the MIPA to Spark, without the consent of the Sellers. Hence, such assignment was improper and void.

**ANSWER:**   Denied.  Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

The Earnout Agreement

42.   As described above, one of the Purchase Price components was a $20 million Earnout to the Sellers. The terms and conditions of this Earnout Payment were governed by both the MIPA and the Earnout Agreement.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

43.   The Earnout Payment was to be paid over a 33 month period commencing as of April 1, 2016—nine (9) month period in 2016; twelve (12) month period of 2017 and twelve (12) month period of 2018.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

44.   The Earnout Payment had a ceiling per Target Year consisting of $5,454,545.45 for 2016; $7,272,727.27 for 2017 and $7,272,727.27 for 2018. In other words, approximately 27.2% of the total Earnout was to be paid in 2016 and approximately 36.3% was to be paid in each of 2017 and 2018 (the "Earnout Percentage").

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

45.   Pursuant to Section 2.2 of the Earnout Agreement, the Earnout Payment was to be calculated by multiplying the Target Year's Adjusted EBITDA (as modified in this provision) by the Earnout Percentage applied to that Target Year. An illustration of such calculation was shown in Exhibit A to the Earnout Agreement.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

46.   Another component of the Earnout Payment amount, in addition to the Target Year's Adjusted EBITDA, was whether Major Energy met the Year End Customer Accounts for that Target Year. The parties agreed that the Year End Customer Accounts for the Target Years would be 178,031 for 2016; 203,578 for 2017; and 231,717 for 2018. *See* Section 2.1(d).

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

47.   Pursuant to Section 2.2(e) of the Earnout Agreement, NGE was the party responsible for preparing and delivering to the Sellers an "Earnout Statement" setting forth

the Adjusted EBITDA amount, the Earnout Payment amount, and the Year End Customer Accounts figure.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

48.   As previously described, a material condition to this transaction was NGE's promise to operate Major Energy during the Target Years in the same manner that Major Energy and its Senior Management Team operated the business prior to the transaction, and that NGE would not take any actions that would have the inevitable effect of reducing the significant deferred payments due to the Sellers. In memorializing this understanding and agreement, the parties included the following unambiguous provision in the Earnout Agreement:

> 2.7   Operation of Business. Following the Closing of the Transaction contemplated in the Purchase Agreement, Buyer shall have the discretion to operate the Business of the Companies as Buyer deems appropriate; provided that **Buyer agrees, for the benefit of the Sellers**, that: (i) Buyer has a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities; (ii) Buyer accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies; and (iii) Buyer shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to the Sellers hereunder. In furtherance of the foregoing (and not by way of limitation), Buyer during the Target Years shall not unilaterally, directly or indirectly, and whether in one transaction or series of related transactions of any kind, make fundamental changes to the operating overhead or otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party.

**ANSWER:**    The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

49.    Thus, Section 2.7 makes clear that throughout the Target Years, NGE will do the following:

- act in good faith;

- operate Major Energy, *in all material respects*, consistently with how the Major Energy Senior Management Team (*i.e.*, Horowitz, Wiederman and Alper) operated Major Energy prior to the acquisition;

- operate Major Energy, *in all material respects*, consistently with how the Major Energy Senior Management Team suggest Major Energy be operated during the Target Years;

- consult in advance and collaborate with the Senior Management Team in respect to *any* NGE-proposed change or modification to the operations of Major Energy that would be materially inconsistent with how the Senior Management Team operated Major Energy prior to the acquisition;

- not take or omit to take *any* act, directly or indirectly, that would reduce or reasonably result in the reduction of any of the Earnout Payments due to the Sellers;

- not permit any Affiliate to take or omit to take *any* act, directly or indirectly, that would reduce or reasonably result in the reduction of any of the Earnout Payments due to the Sellers; and

- not unilaterally make fundamental changes to the operating overhead of Major Energy or otherwise materially negatively impact the profitability of Major Energy for the benefit of any related or unrelated party.

**ANSWER:**    The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

50.    As described in detail below, from the very outset of the closing of the transaction and continuing to the present, NGE, led by Maxwell (CEO), and Spark, led by Nathan Kroeker (CEO), engaged in conduct constituting clear breaches of the unambiguous terms of Section 2.7 and have caused serious harm to Major Energy's business and to the

Earnout and other payment due and owing to the Sellers under the MIPA and Earnout Agreement.

**ANSWER:**   Denied.  Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

51.   Pursuant to Section 3.7 of the Earnout Agreement, the prevailing party in any action or proceeding arising out of or relating to the Earnout Agreement, or instituted under the Earnout Agreement, "shall be entitled to recover from the other party all reasonable attorneys' fees incurred and all disbursements incurred by such prevailing party in connection with such action or proceeding."

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

52.   As defined in the Earnout Agreement, Spark is not a Party to the Earnout Agreement.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

The Executive Earnout Agreement

53.   Although the Earnout under the Earnout Agreement was capped at $20 million, the parties agreed that if the Adjusted EBITDA *exceeded* the Adjusted EBITDA Plan amount for a Target Year, the Sellers, who were either part of the Senior Management Team or a Key Employee, would be entitled to receive a portion of that excess EBITDA. The specific terms and conditions of this additional payment were set forth in an Executive Earnout Agreement effective as of April 1, 2016, and the exhibits attached thereto.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

54.   The Executive Earnout amount was conceptually the excess EBITDA payments contemplated in Section 2.2 of the Earnout Agreement that exceed the Earnout Ceiling amount for that Target Year.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

55.   The Executive Earnout Agreement contained an "Operation of Business" provision that was exactly the same as the one in Section 2.7 of the Earnout Agreement.

**ANSWER:**   The agreements referenced in this paragraph are documents that speaks for themselves, and Plaintiff's characterizations of those documents are denied.

56.   Thus, Defendants' misconduct as described herein also has prevented the Sellers, who were either part of the Senior Management Team or a Key Employee, from receiving the additional payments contemplated under the Executive Earnout Agreement.

**ANSWER:**   Denied.  Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

57.   As defined in the Executive Earnout Agreement, Spark is not a Party to the Executive Earnout Agreement.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

**D.    NGE's Fraud And Deception Comes To Light Immediately After The Closing**

58.   As described above, throughout the negotiations of the acquisition, the Sellers made it abundantly clear to NGE and its representatives, including Maxwell, Gibson,

Konikowski, and Hennekes, that they wanted Major Energy to remain a private company and not be subject to the increased regulatory and operational burdens of a public company, such as Spark.

**ANSWER:**   Denied.

59.    In negotiating the deal, NGE and its representatives repeatedly promised the Sellers that Major Energy would remain the "DNA" of NGE and separate from Spark, at least during the deferred payment period. Even at the closing table, NGE representatives again assured the Sellers that Major Energy would remain private and not be sold to Spark.

**ANSWER:**   Denied.

60.    In reasonable reliance on such representations by NGE, among others, the Sellers agreed to proceed with the sale and to defer a significant portion of the $80 million Purchase Price in the form of Cash Installments and Earnout Payments, which are dependent on the ultimate success and financial performance of Major Energy.

**ANSWER:**   The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

61.    NGE's agreement to keep Major Energy operating as a private company at least during the almost three year deferred payment period is evident from the acquisition documents executed by the Sellers and NGE.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

62.    Specifically, in Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement, NGE expressly agreed that it would operate Major Energy, in all material respects,

consistently with how the Major Energy Senior Management Team operated Major Energy prior to the acquisition—*as a private company*; with how Major Energy Senior Management Team suggest Major Energy be operated during the Target Years—*as a private company*; and not make any change or modification to the operations of Major Energy that would be materially inconsistent with how the Senior Management Team operated Major Energy prior to the acquisition—*such as, from a private company to a public company*.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

63.   NGE's agreement to keep Major Energy operating as a private company at least during the deferred payment period is also evident from the nature and terms of the new employment agreements NGE entered into with Major Energy's executives. Notably, the term of these new employment agreements was from April 1, 2016 – December 31, 2018, which coincidently overlaps with the deferred payment period. Moreover, these agreements required that, during the entire term of the agreement, the senior executives report directly to Maxwell, the CEO of NGE; not to anyone at Spark.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

64.   But even more telling, NGE agreed in these new employment agreements that if there is a "Change of Control," *i.e.*, the sale of 50% or more of the ownership interest in Major Energy, the executives shall have the right to terminate the employment agreement. In other words, any sale of Major Energy to Spark would trigger a breach of the employment agreement and enable the executive to terminate and entitle them to significant severance payments, including but not limited to an amount equal to 200% of their annual compensation.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

65.   Unbeknownst to the Sellers, Major Energy and its representatives were deceiving them on this critical fact and had no intention of keeping Major Energy a private company during the deferred payment period. To the contrary, NGE and its representatives all along had the preconceived and undisclosed intention of integrating and transitioning Major Energy into Spark, a public entity, immediately after the closing of the transaction.

**ANSWER:**   Denied.

66.   Indeed, NGE began to work on the drop-down and sale of Major Energy to Spark just a few weeks after the closing of the transaction. Specifically, on or about May 3, 2016—just three weeks after the closing of the transactions—NGE and Spark entered into a purchase agreement under which Spark would purchase Major Energy from NGE.

**ANSWER:**   The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

67.   Upon discovering that NGE intended to drop Major Energy into Spark so soon after the transaction, Horowitz, as Sellers' Representative and a member of the Senior Management Team, immediately voiced his strong objection to the contemplated drop-down and demanded that NGE and Spark not proceed with the drop-down. Horowitz stated that the drop-down and integration was contrary to the representations made by NGE to keep Major Energy a private company and a blatant breach of NGE's "business-as-usual" obligations under the Escrow Agreement and Executive Escrow Agreement. Indeed, dropping and integrating Major Energy into Spark, a public company subject to the extensive financial and reporting requirements of the Sarbanes-Oxley Act of 2002, is entirely inconsistent with the

stated goal of operating Major Energy in a "business-as-usual" manner and this post-acquisition breach goes to the root of the contract.

**ANSWER:**   It is admitted only that Plaintiff objected to NGE's contemplated drop down of Major Energy into Spark.   To the extent they are in writing, the communications referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  The remaining allegations in this paragraph are denied.

68.    Horowitz further informed NGE that such a drop-down was a direct or indirect assignment of NGE's obligations under the MIPA and, therefore, required the consent of the Sellers—which the Sellers were unwilling to give to NGE. Specifically, in Section 11.7 of the MIPA, NGE contractually agreed that it would not engage in any direct or indirect assignment of the rights and obligation under the MIPA to a third party, including an affiliated entity, without the prior written consent and approval of the Sellers.

**ANSWER:**    It is admitted only that Plaintiff objected to NGE's contemplated drop down of Major Energy into Spark.   To the extent they are in writing, the communications referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  The remaining allegations in this paragraph are denied.

69.    Moreover, Horowitz informed NGE that the drop-down to Spark would result in Major Energy's breach of the new employment agreements entered into with the Major Energy executives and risk their choosing to terminate their employment, which several did. And without the continued employment of these key executives, there was no way Major Energy could operate business-as-usual.

**ANSWER:**   It is admitted only that Plaintiff objected to NGE's contemplated drop down of Major Energy into Spark.   To the extent they are in writing, the communications referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.   The remaining allegations in this paragraph are denied.

70.   Ignoring all of these legitimate concerns voiced by Horowitz and its contractual obligations to the Sellers, NGE, led by Maxwell, proceeded with the drop-down and integration of Major Energy into Spark, a public company with no direct ownership or economic interest in NGE, without the written consent of the Sellers. The drop-down was completed in August 2016, mere months after the closing of the transaction between NGE and the Sellers.

**ANSWER:**   It is admitted only that Plaintiff objected to NGE's contemplated drop down of Major Energy into Spark, and that in or around August 2016 NGE completed a drop down of Major Energy into Spark.   The remaining allegations of this paragraph are denied.

71.   To date, NGE has never obtained the written consent of the Sellers for the improper drop-down and integration of Major Energy into Spark as contractually required. Thus, its drop-down and sale of Major Energy to Spark is void.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

**E.   Spark Negotiates And Completes The Purchase Of Major Energy From NGE Knowing It Violates The Express Terms Of The Agreements**

72.   Throughout the negotiation of the improper drop-down, Spark was fully aware of the terms of the Agreements between the Sellers and NGE and the Sellers' strong objection to the drop-down of Major Energy into Spark. Nonetheless, Spark proceeded with the improper drop-down thereby causing NGE to breach the unambiguous terms of the Agreements.

**ANSWER:**   Denied.   Further answering, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

73.     Spark's knowledge of the Agreements between NGE and the Sellers is evidenced by the discussion of those Agreements in the Membership Interest Purchase Agreement by and among NGE, Spark, and other affiliates, dated as of May 3, 2016 and filed publicly as Exhibit 2.2 to Spark's SEC Form 10-Q, filed on May 5, 2016 (the "Spark MIPA"). Specifically, the Spark MIPA explicitly refers to and defines the MIPA as the "Prior Purchase Agreement." *See* Spark MIPA at 1. Likewise, the Spark MIPA refers to and defines the Earnout Agreement as the "Earnout Agreement dated March 18, 2016 by and among" NGE, Major Energy, and the Sellers' Representative and the Executive Earnout Agreement as the agreement dated April 1, 2016 between NGE and executives of Major Energy. *Id.* at 5-6.

**ANSWER:**   The agreements and public filings referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

74.     Spark's tortious conduct, however, does not end with its unlawful interference in the Sellers' contracts with NGE. Unbeknownst to the Sellers, Spark was secretly using NGE to complete the transaction with the Sellers for the benefit of Spark's business knowing it could not complete the transaction itself—not only because Major Energy would not have agreed to sell to a public company, but also because this type of acquisition was only available to Spark through a drop-down strategy in light of its size and access to capital. As Spark admitted in its second quarter 2016 Form 10-Q filing, in a section entitled "Drivers of our Business," the "drop-down strategy [it employed in acquiring Major Energy] affords us access to opportunities

that might not otherwise be available to us due to our size and availability of capital." *See* Spark Energy, Inc. SEC Form 10-Q, filed on August 11, 2016 at 33. Again, the Sellers has no knowledge of this fact and secret plan between NGE and Spark.

**ANSWER:**   Denied.  The agreements and public filings referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

75.   But not only have the Sellers been misled by the unlawful drop-down and integration of Major Energy into Spark, Spark's investors also have been misled by this event. On or about August 10, 2016, Nathan Kroeker, the CEO of Spark, represented to investors and analysts on its earning conference call for the second quarter of fiscal 2016 that its purchase of Major Energy from NGE was part of a "back-to-back transaction" of the initial purchase by NGE from the Sellers. This statement was false and misleading. The initial transaction between the Sellers and NGE in April 2016 and the later transaction between Spark and NGE in August 2016 were not part of a back-to-back transaction. In fact, upon information and belief, Maxwell pocketed all the accumulated working capital between the closing of the initial transaction in April 2016 and the drop-down in August 2016, an amount approximating $5 million.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  The investor and analyst calls referenced in this paragraph are reflected in transcribed documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  The remaining allegations of this paragraph are denied.

F.   **Defendants' Additional Misconduct And Breaches Of The Express Terms Of The Agreements**

76.     In addition to the fraudulent and tortious conduct described above, since the closing of the transaction between the Sellers and NGE in April 2016, and continuing to the present, Defendants have behaved in bad faith and breached their contractual obligations to the Sellers under the Agreements. Such unlawful conduct has caused significant financial harm to the Sellers and prevented the Sellers from achieving the amounts due and owing under the Agreements. Defendants' misconduct also has caused serious harm to Major Energy's business, reputation, and goodwill. The following are just some examples of Defendants' egregious and unlawful conduct.

**ANSWER:**     Denied.

Defendants Create Chaos At Major Energy

77.     One of the essential aspects of Major Energy's ability to continue operating "business-as-usual" post-transaction was its ability to retain its Senior Management Team and employees. To this end, the parties agreed to the employee retention provisions set forth in Section 7.1 of the MIPA, as described above.

**ANSWER:**     Denied.  Further answering, the agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

78.     Nonetheless, shortly after the closing of the transaction and continuing to the present, Defendants engaged in conduct that created an atmosphere of chaos and confusion at Major Energy and prevented the Company from operating business-as-usual.

**ANSWER:**     Denied.

79.     Specifically, after the closing of the transaction and more so after the unlawful drop-down, Defendants took complete control of all Human Resource functions at Major Energy, including the Company's payroll systems, and instituted sweeping changes to

longstanding Company policies. For example, Defendants converted all employees of Major Energy into Spark employees. Indeed, employees of Major Energy began receiving paychecks and W-2 forms from Spark or a Spark affiliate, rather than from Major Energy. This caused Major Energy's employees to question who they worked for and whether their jobs would be kept in the future.

**ANSWER:**   It is admitted only that, following the closing of the transaction, certain human resource and payroll functions were consolidated within the Spark family of companies. Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  The remaining allegations in this paragraph are denied.

80.    Even prior to the unlawful drop-down of Major Energy, Spark interfered with and prevented the "business-as-usual" running of Major Energy. For example, prior to the drop-down, Kroeker, the CEO of Spark, visited Major Energy's New York offices and strongly implied to Major Energy's supply department that all supply functions would soon take place out of Spark's offices in Texas, not New York. This caused significant concern and confusion among Major Energy's employees. In fact, as a direct result of Kroeker's statement, at least one of the most significant employees in Major Energy's supply department left the Company.

**ANSWER:**   It is admitted only that, Nathan Kroeker visited Major Energy's New York office.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  The remaining allegations in this paragraph are denied.

81.    Additionally, Spark informed Major Energy's brokers that all future pricing was required to go through Spark, and not Major Energy, which resulted in further confusion among

Major Energy's brokers concerning their reporting obligations. The brokers, however, only wished to work for Major Energy, not Spark.

**ANSWER:**   Denied.

82.   Spark also instructed Major Energy executives in writing that new hires were required to be approved by Spark senior management, not Major Energy Senior Management.

**ANSWER:**   The communication referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

83.   Spark further informed Major Energy employees that their vacation time was subject to the approval of Spark executives, not Major Energy Senior Management. In fact, on at least one occasion, a Major Energy employee was threatened that her vacation request would not be granted unless she cooperated with certain demands of Spark executives.

**ANSWER:**   Denied.

84.   Immediately after the unlawful drop-down, Spark took complete control of Major Energy's bank accounts and froze out the Senior Management Team from said accounts. Specifically, without any prior warning or notice to Major Energy's Senior Management Team, Spark contacted Major Energy's bank and removed all Major Energy personnel who were signatories on Major Energy operating accounts. As a result, Major Energy personnel were unable to make any wire transfers or operational payments without Spark.

**ANSWER:**   It is admitted only that, following its acquisition of Major Energy, Spark assumed control over certain Major Energy bank accounts.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

85.    Notably, on or about September 2, 2016, in attempting to explain their ceasing operational and financial control over Major Energy, Robert Lane, the CFO of Spark, told David Sobel, the CFO of Major Energy, that "this is how we do things at Spark."

**ANSWER:**    Denied.

86.    The foregoing actions by Defendants have caused bedlam at the Company and caused many employees, including some of Major Energy's crucial employees, to no longer want to work at Major Energy and therefore terminate their employment with the Company. The loss of these employees has had a significant negative impact on Major Energy's business, and has resulted in the Sellers not receiving the deferred payments due and owing under the Agreements.

**ANSWER:**    Denied.  Further answering, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.

> Defendants Demand That Major Energy Employees Focus On
> Spark-Related Business And Projects

87.    Major Energy's inability to operate "business-as-usual" was further exasperated by Defendants' repeated demand that Major Energy employees, including its CEO, Alper, spend considerable time focusing on work related to Spark business and projects, thus distracting these employees from focusing on important Major-Energy business and projects.

**ANSWER:**    Denied.

88.    An example of such improper conduct by Defendants is when Maxwell desired to integrate Major Energy's customer IT application called "Energy Management Systems" into Spark's poor IT systems. This integration project was a major project and required a number of Major Energy employees to devote considerable time to the project. On several occasions, Horowitz expressed his concern to Maxwell that this IT integration project was an enormous

distraction and was preventing Major Energy employees from focusing on Major Energy specific projects and business. Such concerns, however, again fell on deaf ears.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  Further answering, it is admitted only that Spark sought to integrate Major Energy's IT systems into Spark's systems.  The remaining allegations of this paragraph are denied.

89.   Another example is when Alper informed Kroeker, the CEO of Spark, that two Major Energy executives would be delayed in resolving a complex modeling issue for Spark because they were juggling other projects and prioritizing Major Energy's business operations. In response, Kroeker told Alper that "this cannot wait" and they need to immediately resolve the modeling issue.

**ANSWER:**   Denied.

90.   In addition, on many occasions, Spark demanded that the CFO of Major Energy devote significant time dealing with Spark's outside auditors, rather than devote his time to Major Energy's financial matters.

**ANSWER:**   Denied.

91.   The foregoing actions by Defendants have prevented the Company from operating business-as-usual, as contemplated and agreed upon by the parties.

**ANSWER:**   Denied.

Defendants Destroy Major Energy's Historical And Important Relationship With PSE

92.   Prior to the acquisition, Major Energy had a longstanding and excellent supply relationship with PSE. In fact, PSE was the only supplier of gas and power that Major Energy had ever used since its founding and, in many ways, was Major Energy's lifeline.

**ANSWER:**   It is admitted only that, prior to NGE's acquisition of Major Energy, Major Energy had a supply relationship with PSE.  Defendants lack knowledge and information sufficient to form a belief about the remaining allegations in this paragraph and they are therefore denied.

93.     During the negotiations of the transaction, the Sellers expressed the importance of the PSE relationship and the strong desire to keep that relationship at least during the deferred payment period. NGE represented to the Sellers and PSE that such relationship would likely continue post-closing.

**ANSWER:**   Admitted only that NGE and Sellers discussed continuation of the PSE contract after closing.  All other allegations in this paragraph are denied.

94.     After the closing of the transaction, however, it became clear that NGE never had a desire to continue the Major Energy/PSE relationship, but instead wanted such relationship to be taken over by Spark. In fact, an NGE executive acknowledged to PSE that NGE never intended to keep the PSE relationship and it was just part of the "say and do anything to get the deal done" attitude.

**ANSWER:**   Denied.

95.     Defendants' conduct toward PSE after the closing and the drop-down to Spark was so bad that they eroded the longstanding relationship between Major Energy and PSE to the point where PSE no longer desired to continue the relationship with Major Energy, especially with Spark as its owner. Specifically, PSE had relied on Major Energy's assurances that everything would continue as usual only to be told shortly thereafter that NGE/Spark was going to terminate its supply relationship with Major Energy. This cast Major Energy in a

very deceptive light in PSE's eyes and eroded the honest and straightforward business relationship that PSE and Major Energy had built and enjoyed for so many years.

**ANSWER:**   Denied.

96.    Sometime at the end of 2016, Spark provided PSE with notice of termination of the agreement with Major Energy. Critically, no one from NGE or Spark informed any of the Sellers or members of Major Energy's Senior Management Team that Spark was providing such notice of termination.

**ANSWER:**   It is admitted only that Spark provided notice of termination to PSE regarding the agreement with Major Energy.  The remaining allegations of this paragraph are denied.

97.    The termination of Major Energy's agreement with PSE became effective on or about March 31, 2017, and Spark itself replaced the services historically provided by PSE.

**ANSWER:**   Admitted.

98.    In taking over for PSE, Spark represented to the Sellers that its supply and credit services would be just as effective as PSE's, if not better. But this was just another lie and broken promise by Spark.

**ANSWER:**   It is admitted only that Spark represented to Sellers that Spark's supply and credit services would be at least as effective as PSE's.  The remaining allegations of this paragraph are denied.

99.    For example, Spark has mandated that Major Energy comply with Spark's hedging policies, which are materially different from PSE's hedging policies. And compliance with Spark's hedging policies has had a material adverse effect on Major Energy's cost structure, margins, and profitability.

**ANSWER:**   It is admitted that Spark's hedging policies apply to Major Energy.  The remaining allegations in this paragraph are denied.

100.    Moreover, with PSE, Major Energy was permitted to enter into aggregation deals as a means of acquiring large volumes of customers. Spark, however, has unreasonably restricted Major Energy's ability to enter into aggregation deals, which, in turn, has negatively impacted the Company's customer growth. Spark also has prevented Major Energy from achieving customer growth by unreasonably restricting the amount of money that the Company spends on customer acquisitions. In fact, Spark recently informed Major Energy that it could not spend more money on customer acquisitions because the Company had exceeded Spark's proposed budget for such spending.

**ANSWER:**   Denied.

101.    Such conduct is a blatant violation of Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement. Indeed, neither Spark nor NGE should be restricting Major Energy's ability to grow its customer count, a critical component of the Earnout due to the Sellers.

**ANSWER:**   Denied.

102. Defendants' unlawful actions as described above have negatively impacted the financial success of Major Energy and have prevented the Sellers from obtaining the full amount due and owed to them under the Agreements.

**ANSWER:**   Denied.

**G.     Defendants Mislead The Sellers About An Early Buyout Of The Deferred Payments And Breach Their Handshake Agreement Of Such Early Buyout**

103.    As described above, immediately after the closing of the transaction, Defendants systematically interfered with and prevented Major Energy and its employees from operating the Company in a "business-as-usual" manner.

**ANSWER:**    Denied.

104.    On or about May 11, 2016, *just one month into the transaction*, Horowitz met with Maxwell in Florida to express his serious concerns with respect to the misbehavior demonstrated by NGE and Spark. In particular, Horowitz raised his concern with the major IT integration project NGE and Spark was pursuing and how it was time consuming and preventing Major Energy employees from devoting the necessary time to Major Energy specific business.

**ANSWER:**    It is admitted only that, on or about May 11, 2016, Plaintiff met with Mr. Maxwell in Florida and voiced concerns about Major Energy's operations.  The remaining allegations in this paragraph are denied.

105.    The following day, Maxwell met with Alper, the CEO of Major Energy, to discuss the so-called "troubling" meeting he had with Horowitz. Maxwell told Alper that "I need you to be a leader, to think like a Spark executive and to do what is best for Spark." Notably, at this time, the improper drop-down of Major Energy into Spark had not yet occurred. Maxwell further stated to Alper that if he acts accordingly, he will be taken care of and he and the Sellers need not worry about the deferred payments; if necessary, Spark can and will do an early buyout.

**ANSWER:**    It is admitted only that, on or about May 12, 2016, Mr. Maxwell met with Mr. Alper.  The remaining allegations in this paragraph are denied.

106.    Later that same day, Maxwell met for dinner with Alper and Wiederman of Major Energy. This dinner meeting was also attended by Konikowski, Hennekes and Michael

Tsang of NGE. During the meeting, Maxwell again stressed his need for the Major Energy senior executives to "think bigger and like Spark executives" and that if they help Spark through this IT integration plan he will "spray love" all over them. To this end, Maxwell stated that he wanted them to hire more employees, if needed, to get the Spark integration plan completed. "Just do what you have to do to make this integration plan happen." Maxwell also reiterated that they should not worry about the deferred payments as he would be prepared to do an early buyout if necessary.

**ANSWER:**   It is admitted only that, on or about May 12, 2016, Messrs. Maxwell, Alper, Wiederman, Konikowski, Hennekes, and Tsang had dinner together, during which they discussed Major Energy's business.  The remaining allegations in this paragraph are denied.

107.   After these meetings in Florida, Horowitz and others from Major Energy's Senior Management Team continued to express their serious concerns with the way NGE/Spark were operating and controlling Major Energy and demanded that NGE/Spark proceed with an early buyout of the deferred payments due to the Sellers, or the Sellers would have no choice but to pursue legal remedies.

**ANSWER:**   It is admitted only that, at various times, Plaintiff and certain other members of Major Energy's Management team complained and sought an early buyout.  The remaining allegations in this paragraph are denied.

108.   Over the course of the next couple months and prior to the unlawful drop-down of Major Energy into Spark, the parties negotiated in earnest an early buyout of the deferred payments due and owing to the Sellers under the MIPA and Earnout Agreements.

**ANSWER:**   It is admitted only that Plaintiff and NGE engaged in negotiations regarding an early buyout. The allegations of this paragraph contain conclusions of law to which

no response is required and they are, therefore, denied.  The remaining allegations in this paragraph are denied.

109.    The parties ultimately reached a handshake agreement of an early buyout in the lump-sum amount of $25 million.

**ANSWER:**    Denied.

110.    On or about August 23, 2016, Spark sent the Sellers a letter of intent with respect to an early buyout in a lump-sum amount of $25 million. The Sellers sent back certain comments to the letter of intent, but agreed to the $25 million lump sum amount.

**ANSWER:**    It is admitted only that, on or about August 23, 2016, Spark sent the Sellers a letter proposing an early buyout, to which Sellers responded in writing.    The correspondence referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  The remaining allegations of this paragraph are denied.

111.    Nonetheless, consistent with the prior pattern of lies and broken promises, Defendants have not carried through on their handshake agreement of a $25 million early buyout and instead have continued to act in bad faith and inconsistent with their contractual obligations to the Sellers under the Agreements.

**ANSWER:**    Denied.

**H.    Defendants' Improper Calculation Of The Earnout And Cash Installment Payments Owed To The Sellers For Target Year 2016**

112.    Adding to the long list of improper conduct by Defendants since the closing of the transaction is Defendants' recent calculation of the Earnout and Cash Installment payments owed to the Sellers for 2016.

**ANSWER:**    Denied.

113.    As described above, the parties understood and agreed that in determining the adjusted EBITDA for purposes of calculating the Earnout and Cash Installments amounts, the parties would use the same methodology and approach that Major Energy had historically used in preparing its EBITDA projections.

**ANSWER:**    The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

114.    Nonetheless, in performing the adjusted EBITDA calculation for the 2016 Target Year, Defendants have refused to utilize Major Energy's historical projections and methodology and have instead used a different approach, advocated by Spark, to calculate Major Energy's adjusted EBITDA.

**ANSWER:**    It is admitted only that the parties disagree regarding the appropriate approach to calculating adjusted EBITDA.   The remaining allegations of this paragraph are denied.

115.    As a result, Defendants have intentionally caused the adjusted EBITDA figure for Target Year 2016 to be several millions of dollars lower than it would have been had Defendants utilized Major Energy's historical projections and methodology, as the parties agreed. In turn, Defendants have agreed to pay the Sellers a significantly lower Earnout and Cash Installment payment than they are entitled to and owed for Target Year 2016.

**ANSWER:**    It is admitted only that the parties disagree regarding the appropriate approach to calculating adjusted EBITDA. The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

116.    Not only are the Sellers unwilling to use and accept Spark's methodology for calculating Major Energy's adjusted EBITDA because it is contrary to the approach agreed upon

by the parties, but the Sellers simply do not trust Spark's accounting given some of Spark's questionable accounting practices in other respects. Indeed, the Sellers have uncovered several accounting issues that raise serious concerns regarding the credibility of Spark's accounting practices in general, let alone with respect to Spark's calculation of Major Energy's adjusted EBITDA.

**ANSWER:**    It is admitted only that the parties disagree regarding the appropriate approach to calculating adjusted EBITDA. The agreement referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

117.    For example, for the second quarter of 2016, Spark has publicly reported margins of $4 per Dekatherm, which seems highly improbable. In fact, Major Energy has never reported margins close to that amount for a second quarter period, or even a third quarter period.

**ANSWER:**    The publicly reported information referenced in this paragraph is a document that speaks for itself, and Plaintiff's characterizations of that document are denied.

118.    Moreover, Spark utilizes Retailco Services, LLC ("Retailco") to provide several operational services to Spark and other affiliated entities owned by Maxwell. Upon information and belief, in order to offset costs to Spark and enable Spark to show less expenses and greater profitability, Maxwell personally subsidizes a significant portion of the services provided by Retailco to Spark. Moreover, upon information and belief, in or around June 2016, Spark customers did not get billed for certain services because of a technical glitch and, rather than incurring this loss on behalf of Spark, Maxwell charged the loss to Retailco, along with a penalty.

**ANSWER:**    It is admitted only that Spark uses Retailco Services, LLC to provide certain services and that in or around June 2016, certain customers were not billed for certain Spark services.  The remaining allegations in this paragraph are denied.

119.     The reality is that Spark has every incentive to make the Earnout and Cash Installment payments lower than contractually agreed to with the Sellers, as it enables Spark to reflect in its publicly filed financial statements lower expenses and inflated earnings and profits. Spark should not be able to engage in such misleading and improper behavior, and it should be required to comply with the calculation methodology and approach that was agreed upon and memorialized in the Agreements.

**ANSWER:**     Denied.

## CLAIMS FOR RELIEF

## COUNT I

## FRAUDULENT INDUCEMENT AGAINST NGE

120.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 119 above as if fully set forth herein.

**ANSWER:**     Defendants incorporate by reference the responses to paragraphs 1-119 above as if fully set forth herein.

121.     As described above in great detail, throughout the negotiations of the transaction and even at the closing of the transaction, NGE repeatedly represented and assured the Sellers that, at least during the deferred payment period, it would operate Major Energy as a private entity and in a "business-as-usual" manner.

**ANSWER:**     The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

122.    These representations and assurances by NGE were an essential prerequisite to the Sellers' willingness to proceed with the transaction and to defer a significant portion of the Purchase Price in the form of an Earnout and Cash Installments.

**ANSWER:**    The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

123.    The Sellers were justified in relying upon the foregoing representations by NGE and believing that NGE was being honest and truthful when it made these representations and assurances.

**ANSWER:**    The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

124.    However, as described above in great detail, not only did NGE not keep its promise to operate Major Energy as a private company and in a "business-as-usual" manner, it never had any intention of doing so. Indeed, throughout the negotiation period, but unbeknownst to the Sellers, NGE had the preconceived and undisclosed intention of selling Major Energy to Defendant Spark, a public entity, immediately after closing the deal—which it did.

**ANSWER:**    The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

125.    Had the Sellers known that NGE was lying to them and was planning to sell Major Energy to Spark shortly after the closing and during the deferred payment period, the

Sellers would never have proceeded with the transaction, let alone agreed to defer and tie nearly half of the $80 million purchase price to the future financial success of Major Energy.

**ANSWER:** The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

126. As a result of NGE's fraudulent conduct and deceit of the Sellers, the Sellers seek to rescind the sale of their membership interest in Major Energy to NGE and to recover damages and losses they have sustained as a result of NGE's fraudulent behavior.

**ANSWER:** The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

127. The Sellers have no other adequate remedy of law because Major Energy—the company they founded, expanded, and planned to continue operating in the same manner as before the transaction—has been substantially altered as a result of NGE's fraudulent conduct.

**ANSWER:** The allegations of this paragraph pertain to a claim that has been dismissed by the Court's September 24, 2018 Order [ECF No. 42]; as a result, no response is required and the allegations of this paragraph are, therefore, denied.

## COUNT II

## BREACH OF CONTRACT AGAINST NGE

128. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 127 above as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference the responses to paragraphs 1-127 above as if fully set forth herein.

129.    The MIPA, the Earnout Agreement, and the Executive Earnout Agreement are valid and enforceable agreements.

**ANSWER:**    The agreements referenced in this paragraph are documents that speak for themselves, and the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

130.    The Sellers have performed all of their obligations under the MIPA, the Earnout Agreement, and the Executive Earnout Agreement.

**ANSWER:**    The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

131.    In contrast, as detailed above, NGE has repeatedly breached its contractual obligations to the Sellers under the MIPA, the Earnout Agreement, and the Executive Earnout Agreement, including but not limited to (i) Section 2.2(c) of the MIPA; (ii) Section 7.1 of the MIPA; (iii) Section 11.7 of the MIPA; (iv) Section 2.2 of the Earnout Agreement; (v) Section 2.7 of the Earnout Agreement; and (vi) Section 2.7 of the Executive Earnout Agreement.

**ANSWER:**    Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

132.    In addition, as described above in detail, NGE has breached its explicit obligation to "act in good faith" under the Earnout Agreement and the Executive Earnout Agreement.

**ANSWER:**   Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

133.   As a result of NGE's misconduct and breaches of the Agreements, the Sellers have sustained significant financial harm in an amount to be determined at trial.

**ANSWER:**   Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

## COUNT III

## BREACH OF CONTRACT AGAINST SPARK

134.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 133 above as if fully set forth herein.

**ANSWER:**   Defendants incorporate by reference the responses to paragraphs 1-133 above as if fully set forth herein.

135.   The MIPA, the Earnout Agreement, and the Executive Earnout Agreement are valid and enforceable agreements.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

136.   As described above, in or about August 2016, NGE sold all of its ownership interest in Major Energy to Spark without the consent of the Sellers. Through such sale, NGE

has attempted to directly or indirectly assign its obligations under the MIPA, the Earnout Agreement, and the Executive Earnout Agreement to Spark. As a result of this purported assignment, Spark, not NGE, has been the one to pay a portion of the deferred payments due to the Sellers under the MIPA and Earnout Agreement.

**ANSWER:**   It is admitted only that NGE sold its ownership interests in Major Energy to Spark.   By way of further response, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

137.   The Agreements expressly provide that all of its terms are binding on any successor or assignee.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

138.   Without conceding the validity of such direct or indirect assignment, through its purchase of Major Energy from NGE, Spark inherited the obligations of NGE under the Agreements.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and

they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

139.    The Sellers have performed all of their obligations under the MIPA, the Earnout Agreement, and the Executive Earnout Agreement.

**ANSWER:**    The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

140.    In contrast, as detailed above, Spark has repeatedly breached its contractual obligations to the Sellers under the MIPA, the Earnout Agreement, and the Executive Earnout Agreement, including but not limited to (i) Section 2.2(c) of the MIPA; (ii) Section 7.1 of the MIPA; (iii) Section 2.2 of the Earnout Agreement; (iv) Section 2.7 of the Earnout Agreement; and (v) Section 2.7 of the Executive Earnout Agreement.

**ANSWER:**    Denied.  By way of further response, the agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

141.    In addition, as described above in detail, Spark has breached its explicit obligation to "act in good faith" under the Earnout Agreement and the Executive Earnout Agreement.

**ANSWER:**    Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further

answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

142.    As a result of Spark's misconduct and breaches of the Agreements, the Sellers have sustained significant financial harm in an amount to be determined at trial.

**ANSWER:**    Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

**COUNT IV**

**TORTIOUS INTERFERENCE WITH CONTRACT AGAINST SPARK**

143.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 142 above as if fully set forth herein.

**ANSWER:**    Defendants incorporate by reference the responses to paragraphs 1-142 above as if fully set forth herein.

144.    The MIPA, the Earnout Agreement, and the Executive Earnout Agreement are valid and enforceable agreements between the Sellers and NGE.

 **ANSWER:**    The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

145.    Spark was fully aware of the foregoing Agreements and NGE's contractual obligations under these Agreements to the Sellers when it negotiated and executed the purchase of Major Energy from NGE, as memorialized in the Spark MIPA.

**ANSWER:**    The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

146.    Specifically, Spark was aware that under Section 11.7 of the MIPA, NGE agreed that it would not assign "any of the rights or obligations hereunder," to any third party "without the prior written consent of [the Sellers] and any attempted assignment without the required consents shall be void." To this end, NGE could not sell its ownership interest to any third party without the consent of the Sellers as such sale would constitute a direct or indirect assignment of NGE's obligations under the MIPA.

**ANSWER:**    The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

147.    Nonetheless, Spark knowingly and maliciously caused NGE to breach Section 11.7 of the MIPA by negotiating and completing the drop-down of Major Energy into Spark without the consent of the Sellers.

**ANSWER:**   Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

148.   In addition, Spark was fully aware of NGE's contractual obligations to the Sellers under Section 2.7 of the Earnout Agreement and Executive Earnout Agreement.

**ANSWER:**   The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent an additional response is required, the allegations of this paragraph are denied.

149.   Nonetheless, as described above, Spark and its employees knowingly caused and directed NGE to breach contractual obligations to the Sellers. In fact, even prior to Spark's improper purchase of Major Energy from NGE, Spark and its officers and employees systematically interfered in NGE's agreement to operate Major Energy "business-as-usual" and engaged in conduct that created extreme chaos and business disruption at Major Energy, causing breaches of NGE's contractual obligations.

**ANSWER:**   Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

150.   As a direct result of Spark's tortious misconduct, the Sellers have sustained significant financial harm in an amount to be determined at trial.

**ANSWER:**    Denied.  The agreements referenced in this paragraph are documents that speak for themselves, and Plaintiff's characterizations of those documents are denied.  Further answering, the allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

## ADDITIONAL DEFENSES

In further response to the Amended Complaint, Defendants plead the following additional defenses:

1.      The Amended Complaint fails to state a claim upon which relief may be granted.

2.      Plaintiff's claims are barred, in whole or in part, by the provisions of the MIPA, Earnout Agreement, and/or Executive Earnout Agreement.

3.      Plaintiff's claims are barred, in whole or in part, because Plaintiff has sustained no damages as result of Defendants' conduct.

4.      Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of estoppel and/or unclean hands.

5.      Plaintiff's claims are barred, in whole or in part, due to a failure to mitigate the Sellers' alleged damages.

6.      Plaintiff's claims are barred, in whole or in part, because Plaintiff has not sufficiently alleged, and cannot prove, that the Sellers have suffered "significant financial harm" on account of Defendants' alleged wrongdoing.

7.      Plaintiff's claims are barred, in whole or in part, because Plaintiff has not sufficiently alleged, and cannot prove, that the purported injuries were directly or proximately caused by any alleged wrongdoing by Defendants.

8.     Plaintiff's claims are barred, in whole or in part, because Plaintiff knew or reasonably should have known of the acts and omissions complained of, including without limitation, Defendants' alleged wrongdoing.

9.     Plaintiff's claims are barred, in whole or in part, because Defendants have acted at all times in good faith, with reasonable care, and with due diligence in carrying out their responsibilities and did not directly or indirectly control or induce any wrongful acts or omissions.

10.     Plaintiff's claims are barred, in whole or in part, because they are speculative, uncertain, and/or contingent, in violation of applicable law

11.     Plaintiff's claims are barred against Defendant Spark, in whole or in part, based on Section 7.14(c) of the MIPA.

12.     Without admitting that Plaintiff has suffered damages, or that Defendants should be liable for any such damages, the Defendants assert that Plaintiff is precluded from recovering special damages, based on Section 9.9 of the MIPA.

13.     Defendants reserve the right to amend their Answer to assert additional affirmative defenses as may be revealed through further investigation or discovery.

WHEREFORE, the Defendants respectfully request that the Amended Complaint be dismissed with prejudice, and that the Court enter judgment in favor of Defendants and against the Plaintiff, together with costs, attorneys' fees and expenses, and such other relief as the Court may deem proper.

Dated:  October 15, 2018

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

 */s/   Troy S. Brown*
Troy S. Brown
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
troy.brown@morganlewis.com

Kenneth I. Schacter
101 Park Avenue
New York, NY 10178
(212) 309-6000
kenneth.schacter@morganlewis.com

Michelle Pector (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
 (713) 890-5000
michelle.pector@morganlewis.com

*Attorneys for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of October, 2018, the undersigned caused to be filed the foregoing via the Court's CM/ECF system, which sent notice to all counsel of record in this action.

_/s/ Troy S. Brown_____
*Counsel for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*
