**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SAUL HOROWITZ, as Sellers'
Representative,

                              Plaintiff,

            v.                                    NO. 17 CV 7742 (JPO)

NATIONAL GAS & ELECTRIC, LLC and
SPARK ENERGY, INC.,

                              Defendants.

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MORGAN, LEWIS & BOCKIUS LLP**

Troy S. Brown
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
troy.brown@morganlewis.com

Michelle Pector (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5000
michelle.pector@morganlewis.com

*Attorneys for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................... 1

II.     RELEVANT MATERIAL FACTS ......................................................................... 3

    A.      Major's Initial Acquisition Discussions with Spark Break Down ........................ 3

    B.      NGE Commences Negotiations for the Potential Acquisition of Major ............... 3

    C.      Key Provisions of the Transactional Documents .................................................. 4

    D.      NGE and Spark HoldCo Agree to the Dropdown of Major .................................. 6

    E.      Sellers Prioritize Potential Buyout Over Earnout ................................................. 8

    F.      Sellers Grow Frustrated with Spark's Accommodation of Their Demands .......... 9

    G.      Spark's Ownership Directly Benefits Sellers and Results in Higher
        Contingent Payments .......................................................................................... 10

    H.      Sellers Make a Final Push for an Early Buyout ................................................... 11

III.    APPLICABLE LEGAL STANDARD .................................................................. 13

IV.     THE COURT SHOULD DENY SUMMARY JUDGMENT ON COUNT II ............... 13

    A.      The Motion Fails to Establish an Essential Element of a Breach of
        Contract Claim ..................................................................................................... 14

    B.      NGE Did Not Breach Section 11.7 of the MIPA ................................................ 15

    C.      Sellers Waived and Ratified the Dropdown, and Are Estopped from
        Arguing Otherwise .............................................................................................. 17

    D.      The Court Should Deny Sellers' Demand for Injunctive Relief ......................... 22

V.      THE COURT SHOULD DENY SUMMARY JUDGMENT ON COUNT IV .............. 23

    A.      The Genuine Issues of Material Fact that Bar Summary Judgment on
        Plaintiff's Contract Claim Against NGE Bar Summary Judgment on
        Plaintiff's Tortious Interference Claim Against SEI .......................................... 23

    B.      Section 7.14(c) of the MIPA Expressly Bars Any Claim Against SEI for
        Conduct Prior to the Drop-Down, Including the Tortious Interference
        Claim .................................................................................................................... 23

    C.      SEI Did Not Intentionally Procure Breach Without Justification ....................... 24

VI.     CONCLUSION ...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*757 3rd Ave. Assoc's, LLC v. Patel*,
   117 A.D.3d 451, 985 N.Y.S.2d 57 (2014) ............................................................20

*Banque Nat. de Paris v. 1567 Broadway Own. Assocs.*,
   214 A.D.2d 359, 625 N.Y.S.2d 152 (1995) .........................................................21

*Belge v. Aetna Cas. & Sur. Co.*,
   39 A.D.2d 295, 334 N.Y.S.2d 185 (1972) ...........................................................19

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*,
   448 F.3d 573 (2d Cir. 2006)...............................................................................19

*Broyles v. J.P. Morgan Chase & Co.*,
   No. 08 CIV. 3391, 2010 WL 815123 (S.D.N.Y. Mar. 8, 2010) .............................14

*Citibank, N.A. v. Tele/Res., Inc.*,
   724 F.2d 266 (2d Cir. 1983)................................................................................21

*Fundam. Portf. Adv'rs, Inc. v. Tocqueville Asset Mgmt., L.P.*,
   7 N.Y.3d 96, 850 N.E.2d 653 (2006) ..................................................................18

*Gallegos v. Top RX, Inc.*,
   No. 04-CV-773A, 2008 WL 4279526 (W.D.N.Y. Sept. 15, 2008) ........................20

*Gilman v. Marsh & McLennan Cos., Inc.*,
   85 F. Supp. 3d 757, 760 (S.D.N.Y. 2015), *aff'd*, 826 F.3d 69 (2d Cir. 2016) ........22

*Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*,
   34 F. Supp. 3d 321, 326 (S.D.N.Y. 2014) .....................................................14, 15

*John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Fam. Life Ins.*
*Tr.*,
   No. 16-CV-7071, 2018 WL 6173436 (E.D.N.Y. Nov. 26, 2018) ....................19, 20

*Lee v. Kucker & Bruh, LLP*,
   958 F. Supp. 2d 524 (S.D.N.Y. 2013)..................................................................13

*M'Baye v. World Boxing Ass'n*,
   05 CIV. 9581DC, 2009 WL 2245105 (S.D.N.Y. July 28, 2009)...........................24

*Marvel Entm't Group, Inc. v. ARP Films, Inc.*,
   684 F. Supp. 818 (S.D.N.Y. 1988) ......................................................................22

*N.Y. Racing Ass'n v. Meganews, Inc.*,
    2000 WL 307378 (E.D.N.Y.2000) ........................................................................19

*Nat'l City Comm'l Cap. Co., LLC v. Becker Real Estate Svcs., Inc.*,
    24 Misc. 3d 912, 885 N.Y.S.2d 173 (Sup. Ct. 2009) .............................................21

*Nat'l Westminster Bank, U.S.A. v. Ross*,
    130 B.R. 656 (S.D.N.Y. 1991) ...............................................................................19

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
    19 N.Y.3d 584, 973 N.E.2d 735 (2012) .................................................................23

*Postlewaite v. McGraw–Hill, Inc.*,
    411 F.3d 63 (2d Cir. 2005).....................................................................................17

*Thule AB v. Adv. Accessory Hldgs. Corp.*,
    No. 09 CIV. 00091, 2010 WL 1838894 (S.D.N.Y. May 4, 2010)....................22, 24

*TVT Records v. Isl. Def Jam Music Grp.*,
    412 F.3d 82 (2d Cir. 2005).....................................................................................16

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,
    373 F.3d 241 (2d Cir. 2004)...................................................................................13

*White Plains Coat & Apron Co. v. Cintas Corp.*,
    8 N.Y.3d 422, 835 N.Y.S.2d 530, 867 N.E.2d 381 (2007)....................................24

*Williams v. Buffalo Pub. Sch.*,
    No. 17-3483, 2018 WL 6536051 (2d Cir. Dec. 12, 2018)......................................21

*XXIII Cap. Ltd. v. Decade, S.A.C., LLC*,
    No. 1:17-CV-6910, 2018 WL 4387555 (S.D.N.Y. Sept. 13, 2018) ........................16

**Other Authorities**

Fed. R. Civ. P. 56(a) .......................................................................................................13

Fed. R. Civ. P. 56(c) .......................................................................................................13

Fed. R. Civ. P. 56(c)(1).....................................................................................................15

Black's Law Dictionary (10th ed. 2014).........................................................................24

## EXHIBIT LIST

| Number | Description |
|--------|-------------|
| *A* | *Declaration of Robert Lane with Exhibits A1-A13* |
| A1 | December 10, 2014 email chain regarding ██████████████████ |
| A2 | Excerpt from SEI's 2015 10-K |
| A3 | June 2016 email chain showing ██████████████████████ |
| A4 | August-September 2016 email chain explaining ████████████ |
| A5 | December 2016 email chain showing ████████████████████ |
| A6 | May 24, 2017 presentation by Wiederman to Kroeker |
| A7 | August 2017 email chain in which ████████████████████ |
| A8 | February 2017 email chain regarding ██████████████████ |
| A9 | Consulting agreement signed by Spark and Sobel |
| A10 | Consulting agreement signed by Spark and Moeller |
| A11 | Consulting agreement signed by Spark and Alper |
| A12 | April 2017 letter from Wiederman to Kroeker asking ██████ |
| A13 | April 2018 email chain in which Sellers accept Spark's help ████████ |
| *B* | *Declaration of Troy S. Brown with Exhibits B1-B20* |
| B1 | March 2016 email chain regarding "████████████████████ |
| B2 | April 2016 email chain notifying Sellers of dropdown before sale to NGE closed |
| B3 | May 3, 2016 email chain regarding ████████████████████ |
| B4 | May 3-4, 2016 email chain regarding ████████████████████ |
| B5 | May 4, 2016 email chain regarding ████████████████████ |
| B6 | June 2016 email chain regarding ████████████████ |
| B7 | September 1, 2016 letter from Sellers' counsel seeking ██████ |
| B8 | September 23, 2016 email and letter from NGE's counsel responding to September 1 letter |
| B9 | WhatsApp chats between Horowitz and Wiederman |
| B10 | September 26, 2016 email Horowitz that ████████████████ |
| B11 | Reserved |
| B12 | November 10, 2016 email chain in which ████████████████ |
| B13 | December 2016 email chain demanding ██████████████████ |
| B14 | December 2016-January 2017 email chain reiterating ██████████████████████ ████████████████████████████████████████████" |
| B15 | December 2016-January 2017 continued email chain with Sellers stating ████████ ████████████████ |
| B16 | June 9, 2017 transcription, and accompanying WhatsApp messages, between Josefovic and Fried |
| B17 | March 31, 2016 email chain showing earnout wires to Sellers |
| B18 | June 9, 2017 WhatsApp messages between Fried and Wiederman |
| B19 | WhatsApp messages between Horowitz and Josefovic |
| B20 | January 19, 2017 email chain as to Sellers' demand ████████████████ |

**<u>Key Individuals and Entities Mentioned in this Opposition</u>**

| "Major" | "Sellers" and Other Major Employees in the Executive Earnout Agreement[1] | Spark and NGE entities and personnel |
|---|---|---|
| Major Energy Services LLC | *Saul Horowitz*: Seller, named plaintiff, Sellers' Representative,[2] and Major's Senior Advisor | National Gas & Electric, LLC ("NGE") |
| Major Energy Electric Services LLC | *Moshe "Mark" Wiederman*: Seller and Major's President and current CEO | Spark HoldCo, LLC ("Spark HoldCo") |
| Respond Power LLC | *Mark "Mendy" Josefovic*: Seller | Spark Energy, Inc. ("SEI")[3] |
| | *Asher Fried*: Seller | *Nathan Kroeker*: CEO of Spark Energy, Inc. and Spark HoldCo |
| | *Michael Bauman*: Seller | *Robert Lane*: CFO of Spark Energy, Inc. and Spark HoldCo |
| | *Dan Alper*: Major's CEO until mid-2017 | *Keith Maxwell*: founder and ultimate owner of at least a majority of SEI, Spark HoldCo, and NGE |
| | *David Sobel*: Major's CFO | |
| | *Levi Moeller*: Major's COO | |

---

[1] This list does not include trusts, controlled by Sellers, that owned minority interests in Major.

[2] Dkt. 54-2 (Membership Interest Purchase Agreement between Major, Sellers, and NGE ("MIPA")) at Section 11.1(a).

[3] Spark HoldCo, the entity to which NGE sold Major, is not a party to this lawsuit. For ease of readability only, SEI and Spark HoldCo are referred to collectively herein as "Spark."

## I.      INTRODUCTION

In this earnout dispute, Sellers, through Sellers' Representative Saul Horowitz, attempt to rewrite history concerning the sale of Major to NGE and dropdown to Spark HoldCo, to recast their acquiescence to the dropdown transaction, and to blame Defendants for Sellers' failure to effectively operate the business during the post-closing earnout period to maximize their potential earnout payments. Sellers' attempt will ultimately fail, and it certainly fails at the partial summary judgment stage. First, Sellers' *no-damages* Motion for Partial Summary Judgment ("Motion") seeks judgment on "certain claims in Counts II and IV of the Amended Complaint," but it does not meet Sellers' burden to prove all required elements, including their own performance or any breach by Defendants caused by the dropdown. Second, Sellers cannot avoid the consequences of their own pre-litigation acquiescence in and leverage of the dropdown, which bars their breach of contract and tort claims. Third, Sellers fail to disclose that the Earnout Agreement, which controls the rights and obligations underlying this dispute, is expressly assignable to Affiliates,[4] which is what NGE did by assigning it to its Affiliate (Spark HoldCo).

More specifically, through early document discovery (no depositions have yet occurred), the empirical evidence demonstrates that after closing of the dropdown transaction, Sellers not only recognized and acquiesced to Spark's ownership of Major, but they expressly leveraged Spark's ownership for more than one year in an attempt to either force Spark into an early buyout of the earnout, executive earnout, and Cash Installment payments (collectively "Contingent Payments") or to boost Major's chances to meet the earnout targets by demanding accommodations from Spark. Sellers' operation of the business, combined with the negative implications of New York's governance of energy sales to consumers, prevented them from hitting

---

[4] Unless stated otherwise, capitalized terms used herein have the same meaning as in the MIPA, the Earnout Agreement, and/or the Executive Earnout Agreement.

the maximum earnout and customer-count targets on which their Contingent Payments depended. The evidence adduced thus far demonstrates that Sellers increasingly sought to blame Spark for their earnout miss, including by repeatedly threatening expensive and protracted litigation, all in an admitted effort to force Spark to offer Sellers an early buyout of the Contingent Payments.

As it relates to Count II (breach of the MIPA against NGE), the Motion fails because (i) genuine issues of material fact exist as to the second breach of contract element (Sellers' alleged performance of the MIPA), because Sellers do not attempt to prove that element; (ii) genuine issues of material fact exist as to whether the dropdown was a breach, particularly where the MIPA assignment clause does not restrict the mere sale of ownership of Major ("Membership Interests"), and the operative "rights and obligations" at issue in this case (*i.e.*, control of Major's operations) are all expressly assignable in the Earnout Agreement; (iii) Sellers repeatedly waived, ratified, and are estopped from now arguing that the dropdown constitutes a breach of the MIPA;[5] and (iv) no final relief, such as "voiding" the dropdown transaction, can be granted without Sellers conclusively proving all breach of contract elements, which they do not even attempt.

As it relates to Count IV (tortious interference against SEI), the Motion fails because (i) breach of contract is an element of tortious interference, and therefore all of the reasons above apply to preclude summary judgment for Plaintiff; (ii) the MIPA expressly provides that NGE's affiliates, including Spark, "shall have [no] liability" related to the MIPA;[6] and (iii) no "intentional procurement" of a breach can be shown, as Spark encouraged NGE's compliance with any contractual conditions to assignment.

---

[5] Contemporaneously with this Opposition, Defendants filed a Motion for Leave to Amend Their Answer and Affirmative Defenses (Dkts. 63-64) to add the affirmative defenses of waiver, ratification, estoppel and ambiguity. The factual record developed to date, including the Sellers' internal communications expressing knowledge of the dropdown transaction and seeking to leverage Spark's ownership for buyout with the threat of litigation, provides Defendants with a fulsome Rule 11 basis to now assert and support those defenses with hard evidence.
[6] Dkt. 54-2 (MIPA) § 7.14(c).

## II.    RELEVANT MATERIAL FACTS

### A.    Major's Initial Acquisition Discussions with Spark Break Down.

Spark, not NGE, initially sought to buy Major. In August 2014, Spark and Sellers entered a confidentiality agreement, and Spark sent a bid to purchase 100% of Sellers' Membership Interests in Major.[7] By mid-2015, however, the negotiations broke down.

### B.    NGE Commences Negotiations for the Potential Acquisition of Major.

Months later, in November 2015, NGE approached Sellers about the potential acquisition of their Membership Interests in Major. Throughout these negotiations, NGE was transparent about its ultimate plans for a dropdown of Major to Spark; it was public knowledge that NGE was created "for the purpose of purchasing retail energy companies and retail customer books that could ultimately be resold to the Company."[8]

NGE and Sellers initially discussed ████████████████████████████ ████████ but in early 2016, New York proposed regulations that the parties agreed could meaningfully decrease Major's customer count and Adjusted EBITDA[9] for Major's core market. As Seller Wiederman put it at the time, █████████████████████████████[10] The parties therefore re-structured the terms of NGE's contemplated purchase of the Sellers' Membership Interests in Major so that Sellers would share more risk of negative impact from New York's regulatory changes, and to that end, deferred approximately half of the sales price in the form of Contingent Payments over a 33-month period following the anticipated closing. This structure sought to "balance the risk between Major [Sellers] and NGE in a downside scenario."[11]

---

[7] Ex. A1 (December 10, 2014 email chain including Spark, Sellers' representative, and Sellers).

[8] Ex. A2 (excerpt from SEI's 2015 10-K). NGE has since expanded its role.

[9] "EBITDA" means earnings before interest, taxes, depreciation, and amortization, and is a common measure of a company's ability to generate cash flows for its owners.

[10] Ex. B1 (March 15, 2016 email chain among Sellers).

[11] Dkt. 54-3 (Earnout Agreement) at 12.

Thereafter, Sellers and NGE signed the MIPA on March 18, 2016, and NGE's purchase of Sellers' Membership Interests was set to close on April 15, 2016. Before the closing, NGE ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████[12] In response, David Sobel, the CFO of Major and a Key Employee under the transactional documents, confirmed that he would ███████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████[13] Thus, prior to closing, Sellers knew that NGE would drop down the Major Membership Interests to Spark as early as July 1, 2016.

## C.    Key Provisions of the Transactional Documents.

The MIPA conveys ownership of all of Sellers' Membership Interests in Major in exchange for a maximum of $75 million if certain conditions are satisfied and all the earnout targets are achieved.[14] Sellers would receive a net payment of $40 million at closing, with three Contingent Payments that could potentially be made on March 31 of each of the following three years, based on Major's performance (as measured by Adjusted EBITDA and customer counts), of up to a total of $35 million.[15]

The MIPA, which provides for NGE's purchase of Major's Membership Interests *expressly contemplates both successors and assigns*: "[t]his Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns."[16] It further

---

[12] Ex. B2 (April 8, 2016 email chain including Brandon Hoover (NGE's Controller) and Major executives and Sellers) ("████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████")
[13] *Id*. at April 8, 2016 email from Sobel to Hoover.
[14] Dkt. 54-2 §§ 2.1, 2.2.
[15] *Id.* § 2.2(a), (c).
[16] *Id.* § 11.7 (Binding Effect; Assignment).

provides that "[n]o assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Parties and any attempted without the required consents shall be void."[17] In other words, the MIPA assignment clause ***does not*** restrict the mere sale of title to Membership Interests—which makes sense since Sellers were expressly told pre-closing that NGE was going to sell the Membership Interests to Spark, with a projected completion of that dropdown transaction by July 1, 2016.

Section 7.14(c) of the MIPA expressly bars all liability for any non-party to the MIPA for any obligations thereunder:

> No Person who is not a named party to this Agreement, including any Affiliate, agent, attorney, or representative of any Party (such Persons, "Non-Party Affiliates"), shall have any liability (whether in contract or tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with, or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution, and each Party waives and releases all such liabilities, claims, and obligations against any such Non-Party Affiliates.[18]

The Earnout Agreement, in turn, is Exhibit B to and expressly incorporated in the MIPA.[19] It is ***expressly assignable to Affiliates***.[20] It further contains the provision at the heart of this case, which the Motion remarkably does not even mention: NGE or NGE's Affiliate "shall have the discretion to operate the Business of the Companies as [NGE or Affiliate] deems appropriate,"

---

[17] *Id.*

[18] *Id.* § 7.14.

[19] *Id.* p.3 and § 1.2(a)(ii).

[20] *Id.* § 3.1; *see also* Dkt. 54-4 § 3.1 (Executive Earnout Agreement). Section 3.1 of the Earnout Agreement provides that "[a]ll of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective and permitted successors and assigns. This Agreement shall not be assignable without the prior written consent of the other Parties, except as to Affiliates or in the event of a Buyer Change of Control." The Earnout Agreement defines Affiliate to include "any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person." *Id.* § 1.1. Spark HoldCo is an Affiliate of NGE. Ex. A (decl. of Robert Lane).

subject to certain good-faith obligations.[21] Accordingly, the provisions at the center of this lawsuit were freely assignable between NGE and Spark HoldCo.

### D.     NGE and Spark HoldCo Agree to the Dropdown of Major.

When the transfer of ownership from NGE to Spark was announced within weeks after the closing of the sale of Major to NGE, Sellers █████████████████████████████████████ ████████████████████████████████████ █ ████████████████████████████████ ████████████████████[23]

In May 2016, Plaintiff Horowitz, as Sellers' Representative, met with Keith Maxwell to discuss the dropdown. By email dated June 9, 2016, Horowitz ████████████████████████ █████████████████████████████████████████████████████████████████" between Major and Spark and assured Maxwell that Major was "████████████████████ ████████ █ █████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████[25] and that ███████████████████████████████████████████[26] Accordingly, in the same email Horowitz ██████████████████████████████████████████████████ ██████████████"[27]

---

[21] *Id.* § 2.7.
[22] Ex. B3 (May 3, 2016 email from Alper to Horowitz and Wiederman asking ██████████████████████);
Ex. B4 (email chain including Spark, NGE, and Major representative██████████████████; Ex. B5
(May 4, 2016 email from Major's CMO to Wiederman, Alper, and Horowitz with ███████████████
████████).
[23] *See, e.g.,* Ex. A3 (June 2016 email chain between Moeller and Spark regarding ███████████████); Ex. B6 (June 9,
2016 email from Horowitz to Maxwell stating "████████████████████████████████████████
████████████████████").
[24] Ex. B6 at June 9, 2016 email from Horowitz to Maxwell.
[25] Ex. B1 (March 15, 2016 email among Sellers).
[26] In fact, this was not the first time Horowitz proposed an early buyout.
[27] Ex. B6 at June 9, 2016 email from Horowitz to Maxwell.

Although ██████████████████████████████, by August 22, 2016 (the day before the dropdown closed) Sellers apparently decided that ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████[28]

After NGE and Spark completed the dropdown transaction, ██████████████

████████████████████████ Sellers made no contemporaneous demand to unwind the dropdown, much less convey their purported view to NGE or Spark that the dropdown was "void" or that it allegedly breached a transactional agreement. Instead, on September 1, 2016, Sellers' outside counsel ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████[30]

Notably, the evidence indicates that Sellers never mentioned their strategy of claiming that the dropdown was somehow void until they filed this lawsuit in October 2017, 18 months into the 33-month earnout period. And it was not until December 2017 that Sellers articulated in their

---

[28] Ex. A4 (August-September email chain) at August 22, 2016 email from Moeller.
[29] Ex. B7 (September 1, 2016 letter from Sellers' counsel to NGE) at n.2 ("████████████████████████

██████████").
[30] *Id.*

Amended Complaint their first demand to reverse the dropdown.[31] Contrary to this newly manufactured position, following the closing of the dropdown Sellers focused on making the dropdown work to their benefit, by demanding other concessions and accommodations (beyond buyout) from Spark, ostensibly for the purpose of shifting costs to Spark in order to increase Major's Adjusted EBITDA.[32]

### E.      Sellers Prioritize Potential Buyout Over Earnout.

On September 23, 2016, NGE responded to Sellers' September 1, 2016 demand letter



[33] Three days later, Horowitz doubled down on Sellers' strategy to extract a buyout of the maximum Contingent Payments regardless of Major's performance by targeting Alper, then Major's CEO,

Horowitz's invention of a controversy contrary to Major's interests controverted the MIPA, the Earnout Agreement, the Executive Earnout Agreement, and any notion of good faith and fair dealing. Indeed,

---

[31] *See* ECF No. 22, ¶¶ 126-127.
[32] Ex. A4 (August-September 2016 email chain) at September 9 email from Kroeker.
[33] Ex. B8 (September 23, 2016 letter from NGE to Sellers' counsel).
[34] Ex. B9 (September 26, 2016 WhatsApp chat between Horowitz and Wiederman) at 3.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ █ ███

███████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████
████████[36]

**F.      Sellers Grow Frustrated with Spark's Accommodation of Their Demands.**

Over time, while Sellers continued to manufacture controversies and plant the seeds for an argument that Spark had somehow impaired their ability to earn the full Contingent Payments, Spark time and again accommodated Sellers' demands, █████████████████████

███████████████████████████████████████████████

███████████████████████████████████ █ ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████[8]

[35] Ex. B10 (September 26, 2016 email between Alper and Horowitz) ("█████████████████████████████
████████████████████████").
[36] *Id*. (emphases added).
[37] Ex. A5 (December 14, 2016 email chain including Wiederman, others from Major, and Spark).
[38] Ex. B12 (November 10, 2016 email from Horowitz to Fried and Josefovic). █████████████████████████
███████████████████████████

As a result, in December of 2016, ████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████" [39]

But Spark showed continuous good faith and extreme patience with Sellers' obstructive behavior. As Kroeker, Spark's CEO, stated on December 21, 2016: ████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████ ████████████████████████
███████████████████████████████████████████████████████████
██████████ ████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████" [42]

In sum, rather than alleging the dropdown was "void" and a breach of the MIPA, Sellers embraced it, tried to profit from it, sought cost savings under it, represented that they were aligned with Spark, and agreed in writing to the Major/Spark integration.

### G.   Spark's Ownership Directly Benefits Sellers and Results in Higher Contingent Payments.

The first Contingent Payment was due on March 31, 2017. Despite Sellers' feigned indignation at Spark's calculation of the first earnout payment, Sellers ████████████████
███████████████████████████████████████████████████████ Indeed, on

---

[39] Ex. B13 (December 21, 2016 forwarded email chain between Spark and Sellers).

[40] Ex. B14 (December 2016-January 2017 email chain) at December 21, 2016 email from Kroeker. ████████
██████████████████████████████████████████████████████"

[41] Ex. B15 (continued December 2016-January 2017 email chain) at January 4, 2017 email from Kroeker ██████
██████████████.

[42] *Id*. at Horowitz response to Kroeker's January 4, 2017 email.

10

or about June 9, 2017, ███████████████████████████████████████



████████████████████████████████████[45] Sellers' allegation that they were underpaid in Year 1 of the Earnout is flat wrong.

Shortly after this payment, Seller Wiederman acknowledged ██████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████[47]

## H.    Sellers Make a Final Push for an Early Buyout.

By summer 2017, Sellers knew their window of opportunity was closing. The earnout

period was halfway gone, their Adjusted EBITDA and customer counts were dismal, and their

manufactured controversies and repeated threats of litigation had failed to force Spark to agree to

---

[43] Ex. B16 (transcription of June 9, 2017 audio recording between Josefovic and Fried referenced as "AUD-20170609-WA0009.opus" at page MESELLERS_0008502 of accompanying WhatsApp messages between Josefovic and Fried).
[44] Ex. *Id.* at page MESELLERS_0008502.
[45] *See* Ex. B17 (email chain between Spark and Sellers showing ███████████████████████████████.
[46] Ex. A6 (May 24, 2017 Major Energy Management Report presentation by Wiederman) at 4.
[47] *Id.* at 31.

an early buyout. Increasingly, it appeared to Sellers that litigation would be their best bet; indeed,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████[48]

   At this point, Sellers' focus was on bolstering their litigation position even if doing so harmed Major. For example, in connection with Spark's mid-August 2017 request for input on cost-saving integration initiatives, ████████████████████████████████

████████████████████████████████████████████████████████

██████████████ █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[50]

Sellers thus continued to take bad-faith actions to elevate their own personal financial interests over the shared interest in boosting Major's business, notwithstanding their stated allegiance "100% to Spark."

   Even during these late-stage forced buyout discussions, when litigation strategy was at the forefront, Sellers made no claim that the dropdown transaction was "void" or that negotiations should occur with NGE, not Spark. The talks failed,[51] and Sellers filed suit. Significantly, in their original Complaint, Sellers did not seek to void the dropdown transaction. That request for relief

---

[48] Ex. B18 (June 9, 2017 WhatsApp messages between Fried and Wiederman).
[49] Ex. B9 (WhatsApp messages between Horowitz and Wiederman) at 6 (August 15, 2017); Ex. A7 (August 15, 2017 email including Lane and Wiederman).
[50] Ex. A7 (August 15, 2017 email including Lane and Wiederman).
[51] Ex. B19 (WhatsApp messages between Horowitz and Josefovic) ██████████████████████████████████████████████████████████████ ").

only emerged in the Amended Complaint *after* briefing on Defendants' motion to dismiss the original complaint.

## III.  APPLICABLE LEGAL STANDARD

If a genuine issue of material fact exists for any element of a claim on which Plaintiff seeks affirmative summary judgment, summary judgment cannot be granted as to that claim. Fed. R. Civ. P. 56(a). Similarly, if a genuine issue of material fact exists as to every element of an affirmative defense, an affirmative motion for summary judgment must be denied. Fed. R. Civ. P. 56(c); *Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 529 (S.D.N.Y. 2013). Finally, "if the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citations omitted).

## IV.  THE COURT SHOULD DENY SUMMARY JUDGMENT ON COUNT II

The Motion is Sellers' latest in a series of attempts to posture while ignoring mounting evidence of, at best, their own underperformance or, at worst, their own self-dealing and malfeasance. But Sellers' theory is both too early and too late: the factual record is not yet fully developed, but the record that exists plainly demonstrates, at minimum, their waiver and ratification of the dropdown.

With respect to Sellers' contract claim, (i) the Motion is missing an element entirely as it fails to prove up or even reference Seller's performance of the MIPA; (ii) the transaction at the heart of this dispute—the dropdown—does not violate Section 11.7 of the MIPA (*i.e.*, no breach); and (iii) even if some technical breach had occurred, which Defendants dispute, ratification, waiver, and estoppel plainly apply to defeat Plaintiff's Motion.

13

### A.     The Motion Fails to Establish an Essential Element of a Breach of Contract Claim.

The elements of a breach of contract claim are: "(1) the existence of a valid contract, (2) plaintiff's performance of the contract, (3) defendant's material breach of the contract, and (4) resulting damages." *Broyles v. J.P. Morgan Chase & Co.*, No. 08 CIV. 3391, 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010) (citations omitted).

To conclude that NGE allegedly breached Section 11.7 of the MIPA, the Court must find that Sellers have proven all elements as a matter of law. *Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*, 34 F. Supp. 3d 321, 326 (S.D.N.Y. 2014). Plaintiff makes no attempt to establish Sellers' purported damages; instead, the Motion seeks to void the dropdown and promises that, "at the appropriate time, Plaintiff will be seeking an award of damages against NGE for its breach of Section 11.7 of the MIPA."[52] Critically, the Motion fails to mention, much less establish, the second element of a claim for breach: Sellers' alleged performance of their obligations under the MIPA.  Indeed, the word "perform," in any variation, is not even found in Sellers' memorandum of law or statement of facts, and no evidence is presented to prove that Sellers performed their obligations under the MIPA.[53] As this Court has recognized:

> On a motion for summary judgment, the party bearing the burden of proof at trial must come forward with evidence on each element of its claim or defense illustrating its entitlement to relief. It cannot rely upon mere conclusory statements, conjecture, or speculation to meet its burden. If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts creating a genuine issue for trial, i.e., evidence creating a factual issue about which reasonable minds could disagree. The facts must be truly specific—it is not enough to speculate or to vaguely assert the existence of some unspecified disputed material facts.

---

[52] Dkt. 52 at 3 n.5.
[53] Dkts. 52 & 53.

*Greenlight*, 34 F. Supp. 3d at 326 (citations omitted). The Motion does not reference Sellers'
performance at all, let alone submit "truly specific facts" to establish such performance. *See* Fed.
R. Civ. P. 56(c)(1) (stating that "party asserting that a fact cannot be or is genuinely disputed must
support the assertion . . . .").

Accordingly, with an element of Sellers' breach claim absent, the Motion must be denied
in its entirety without further analysis.[54]

### B.    NGE Did Not Breach Section 11.7 of the MIPA.

Even if Sellers had presented summary judgment evidence and argument satisfying their
burden to establish their own performance, which Defendants deny, they still could not prove a
breach. Section 11.7 of the MIPA separates (i) mere sale of title to the Membership Interests to a
successor (which is not restricted in any way) from (ii) assignment of the MIPA itself or "rights
and obligations" thereunder (which involves consent but is superseded by the earnout Agreement's
assignment provision). This distinction is meaningful and must not be ignored. Sellers' failure to
recognize it creates the illusion of a breach—but one that, even if it existed (and it does not), could
not possibly result in any damages.

Section 11.7 only prohibits "assignment of this Agreement or of any rights or obligations
hereunder" without prior written consent.[55] It does not impair NGE's ability to sell Membership
Interests in Major to a successor. Indeed, Section 11.7 expressly recognizes and distinguishes
between the parties' "successors ***and*** permitted assigns":[56] successors in interest to title of
Membership Interests on one hand, and assignees of rights and obligations on the other.

---

[54] Because Plaintiffs fail to satisfy their burden, NGE need not now present evidence of Plaintiffs' numerous failures
to perform the MIPA before and after the dropdown. NGE notes, however, that much of the evidence attached hereto
and discussed above demonstrates, among other things, Plaintiffs' breach of the implied duty of good faith and fair
dealing—indeed, they actively sabotaged Major ████████████████████
[55] Dkt. 54-2 § 11.7.
[56] *Id.* (emphasis added).

Accordingly, under the plain language of the MIPA, NGE's sale of Major's Membership Interests to Spark was not a breach of Section 11.7.[57]

The question then becomes what "rights and obligations" are implicated by the dropdown transaction that could possibly amount to a breach of Section 11.7. Sellers contend they were harmed because the "sale and assignment to Spark . . . enabled Spark to take control of Major Energy's business operations during the three-year Earnout period to the detriment of the Sellers."[58] This argument falls flat. The Earnout Agreement, which is "incorporated and made a part hereof as if set forth in full herein and [is] considered to be an integral part of this Agreement,"[59] is ***expressly assignable*** to Spark HoldCo[60] and ***expressly allows*** Spark HoldCo, as an NGE Affiliate, to operate Major: "Following the Closing of the Transaction contemplated in the Purchase Agreement, [NGE or Affiliate] ***shall have the discretion to operate the Business of the Companies as [NGE or Affiliate] deems appropriate*** [subject to certain good-faith-and-fair-dealing obligations during the Earnout period]."[61] Spark HoldCo, as the uncontestably legitimate successor to the Earnout Agreement, was given the clear right to "take control" of and operate Major as it "deems appropriate." The Executive Earnout Agreement, which is part of the same transaction and must therefore be read together with the MIPA, has similar assignment and operation and control provisions.[62] *See TVT Records v. Isl. Def Jam Music Grp.*, 412 F.3d 82, 89

---

[57] Sellers cannot use extrinsic evidence to change this unambiguous distinction. *XXIII Cap. Ltd. v. Decade, S.A.C., LLC*, No. 1:17-CV-6910, 2018 WL 4387555, at *8 (S.D.N.Y. Sept. 13, 2018) ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).

[58] Dkt. 52 at 3 n.5.

[59] Dkt. 54-2 § 1.2(a)(ii).

[60] "This Agreement shall not be assignable by either Party without the prior written consent of the other Parties, except as to Affiliates or in the event of a Buyer Change of Control." Dkt. 54-3 (Earnout Agreement) § 3.1; Ex. A (Decl. of Robert Lane) (confirming that Spark is an Affiliate of NGE under the Earnout Agreement).

[61] Dkt. 54-3 (Earnout Agreement) § 3.1

[62] Dkt. 54-4 (Executive Earnout Agreement) at §§ 2.7 and 3.1.

(2d Cir. 2005) ("Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together") (citation omitted).

Consequently, as a straightforward matter of contract construction, Sellers cannot show a breach of Section 11.7 because (i) that section does not preclude the mere sale of Membership Interests to Spark, and (ii) NGE was expressly allowed to convey to Spark HoldCo, its Affiliate within the meaning of the Earnout Agreement, its rights and obligations under the Earnout Agreement and the ability to "take control of Major Energy's business operations."

Defendants believe these matters are clear on the face of the MIPA, Earnout Agreement, and Executive Earnout Agreement. Alternatively, at most, Sellers' Motion raises ambiguities (and, therefore, fact issues) as to whether Section 11.7 of the MIPA restricts the mere sale of Membership Interests to a successor as opposed to "permitted assigns," and whether the assignment provisions of the Earnout and Executive Earnout Agreements control over Section 11.7 of the MIPA, given that the Earnout and Executive Earnout Agreements expressly allow assignment by NGE to its Affiliate, Spark HoldCo, of the very "rights and obligations" for which Sellers allege harm. To the extent such ambiguities exist, summary judgment is plainly inappropriate. *See Postlewaite v. McGraw–Hill, Inc*., 411 F.3d 63, 67 (2d Cir. 2005) ("when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment").

### C.    Sellers Waived and Ratified the Dropdown, and Are Estopped from Arguing Otherwise.

Separately, the Motion must be denied because Sellers knowingly and strategically took affirmative steps to acknowledge, and demand and accept benefits from, the dropdown. Following is a non-exhaustive list of examples already uncovered through limited fact discovery and no depositions to date, which evidences that Sellers:



- Never asserted that their acceptance of millions of dollars, integration services, employment services, expansion of Major's territory, use of Spark as Major's energy supplier, or any other accepted demand for action after the fall of 2016 was subject to any reservation of rights to seek breach remedies, including the unwarranted injunctive relief they now seek, based on conveyance of ownership to Spark

These indisputable facts establish waiver, ratification, and estoppel as a matter of law.

Waiver is the voluntary relinquishment of a known right and "may be established by affirmative

conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundam.*

---

63 Ex. B17 (email chain between Spark and Sellers showing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
64 Exs. B3, B4, and B5.
65 Ex. B6 (June 9, 2016 email from Horowitz to Maxwell stating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").
66 Ex. B7 (September 1, 2016 letter from Sellers' counsel to NGE) at n.2 ("▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮"); Ex. A4 (August-September 2016 email chain); Ex. B13 (December 21, 2016 forwarded email chain between Spark and Sellers); Ex. B14 (December 2016-January 2017 email chain); Ex. B15 (continued December 2016-January 2017 email chain) at January 4, 2017 email from Kroeker; Ex. B20 (January 19, 2017 email from Horowitz); Ex. A8 (February 2017 email chain) at February 8 email from Horowitz.
67 Ex. A5 (December 14, 2016 email chain); Ex. A6 (May 24, 2017 Major presentation by Wiederman) at 4.
68 Ex. B15 (continued December 2016-January 2017 email chain) at January 4, 2017 email from Horowitz; Ex. A8 (February 2017 email chain) at February 8, 2017 email from Horowitz.
69 Ex. B20 (January 19, 2017 email from Horowitz); Exs. A9-A11 (consulting agreements signed by Spark and Alper, Moeller, and Sobel, respectively).
70 Ex. A12 (April 27, 2017 letter from Wiederman to Kroeker).
71 Ex. A6 (May 24, 2017 Major Energy Management Report presentation by Kroeker) at 4.
72 Ex. B15 (continued December 2016-January 2017 email chain) at January 4, 2017 email from Horowitz.
73 Ex. A8 (February 2017 email chain) at February 8, 2017 email from Horowitz.
74 Ex. A13 (April 2018 email chain).

*Portf. Adv'rs, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 850 N.E.2d 653, 658 (2006) (holding that issues of material fact existed as to whether plaintiff waived and was estopped from asserting breach of contract). The concept plainly applies here. *See, e.g.*, *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 585–86 (2d Cir. 2006) ("breach of contract may be waived by the non-breaching party"); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (citing New York cases) ("where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."), *aff'd*, 962 F.2d 1 (2d Cir. 1992); *see N.Y. Racing Ass'n v. Meganews, Inc*., 2000 WL 307378, at * 7 (E.D.N.Y.2000) (plaintiff waived its breach of contract claim "by continuing performance under the contract and accepting the benefits of the contract despite allegedly unauthorized deductions"); *Belge v. Aetna Cas. & Sur. Co*., 39 A.D.2d 295, 334 N.Y.S.2d 185 (1972) (party waived nonassignment provision by taking no timely action to vacate assignment).

Sellers relinquished any right they could possibly have to seek to invalidate the dropdown or punish NGE for it. They relied on the dropdown, used it to extract millions of dollars in benefits and accommodations from the Spark family (to say nothing of the earnout payments made by Spark), and induced NGE and Spark to take numerous actions for Sellers' gain under it. Indeed, after their outside counsel sent a demand letter, ███████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████[75]

For the same reasons, the facts establish ratification, which is "a waiver of existing rights." *John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Fam. Life Ins. Tr*., No. 16-CV-

---

[75] Ex. B12 (November 10, 2016 email from Horowitz to Fried and Josefovic).

7071, 2018 WL 6173436, at *6 (E.D.N.Y. Nov. 26, 2018) (citing *In re Levy*, 69 A.D.3d 630, 632 (2d Dep't 2010)). Put another way, "[w]hen a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Id.* (quoting *Rothschild v. Title Guarantee & Tr. Co.*, 204 N.Y. 458, 464 (N.Y. 1912)). Even "acquiescence or silence can give rise to the inference of ratification." *Id.* (citing *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017)); *Gallegos v. Top RX, Inc.*, No. 04-CV-773A, 2008 WL 4279526, at *13 (W.D.N.Y. Sept. 15, 2008) ("a plaintiff is estopped from pursuing a breach of contract claim when such plaintiff has accepted the benefits of the agreement, despite knowledge of a breach of the agreement interposed in a subsequent breach of contract action.") (quoting *Chapin v. Chapin*, 744 N.Y.S.2d 181, 183 (2d Dep't 2002)).

Here, Sellers did much more than merely acquiesce or remain silent. They actively exploited the dropdown and its benefits for more than half of the 33-month earnout period. Ratification is manifest.

Similarly, estoppel "preclude[s] a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." *757 3rd Ave. Assoc's, LLC v. Patel*, 117 A.D.3d 451, 453, 985 N.Y.S.2d 57, 59 (2014) (finding equitable estoppel as matter of law). Sellers took numerous actions before and after the alleged breach, some of which have yet to be discovered, to intentionally induce NGE to reasonably believe that Sellers did not view the dropdown as void— indeed, as explained above, they expressed their excitement for the dropdown in writing,

recognized Major as part of the Spark family for more than one year, obtained millions of dollars through Spark (not NGE) pursuant to the dropdown, and obtained numerous concessions and accommodations regarding integration, employment, and geographical expansion from Spark (not NGE). NGE reasonably relied on these actions to fully complete the transition of Major to Spark before and after the dropdown closed and, as shown in the purchase agreement between NGE and Spark HoldCo, receive compensation in return.[76]

In contractual contexts such as this, courts often apply two or more of these defenses. *See, e.g.*, *Banque Nat. de Paris v. 1567 Broadway Own. Assocs.*, 214 A.D.2d 359, 361, 625 N.Y.S.2d 152, 154 (1995) ("the equitable doctrines of estoppel, waiver and ratification bar appellants from withdrawing their assent to the 1992 mortgage modification, where, as here, appellants waited two years before seeking to repudiate their contractual commitments to the plaintiff bank, after the appellants had enjoyed the financial benefits of the modification"); *Nat'l City Comm'l Cap. Co., LLC v. Becker Real Estate Svcs., Inc*., 24 Misc. 3d 912, 917, 885 N.Y.S.2d 173, 177 (Sup. Ct. 2009) ("Where a party has accepted the benefits of an agreement and then seeks to repudiate the agreement, it must do so timely or their objection is waived"; finding waiver and ratification as matter of law where "defendant accepted the equipment and made payments on same for a period of eight months and did not raise the issue of the invalidity of the lease when notified of its default thereunder on at least two occasions") (citations omitted).

Finally, it is well-established that a non-waiver clause does not preclude a waiver of contractual rights. *Williams v. Buffalo Pub. Sch.*, No. 17-3483, 2018 WL 6536051, at *2 (2d Cir. Dec. 12, 2018) (reversing because it was plausible "that Defendants waived their right to enforce" contractual requirement); *Citibank, N.A. v. Tele/Res., Inc*., 724 F.2d 266, 269 (2d Cir. 1983)

---

[76] Dkt. 54-10 (NGE/Spark HoldCo MIPA) § 2.2.

(assignee is not "precluded from relying on the doctrine of waiver and estoppel because it is not a party to the underlying contract. Even a specific prohibition against assignments made without written consent may be waived in favor of an assignee"); *Marvel Entm't Group, Inc. v. ARP Films, Inc.*, 684 F. Supp. 818, 821 (S.D.N.Y. 1988) (denying motion for summary judgment on alleged violation of assignment provision; "a stipulation against assignment may be waived or modified by a course of business dealings") (quoting *Univ. Mews Assocs. v. Jeanmarie*, 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (Sup. Ct. N.Y. Cty. 1983)).

In sum, waiver, ratification, and estoppel are established as a matter of law based on the evidence available, with more to emerge as fact discovery continues. At minimum, questions of material fact presently exist on these issues and bar summary judgment as to Count II.

### D. The Court Should Deny Sellers' Demand for Injunctive Relief.

Sellers seek a form of final relief, asking the Court to "void" the dropdown and force Spark to unwind its August 2016 purchase of Major. But Sellers make no effort to establish the second and fourth elements of Count II, they cannot establish the breach element, and they cannot evade waiver, ratification, and estoppel. Missing even one element precludes judgment—let alone summary judgment—so Sellers' request for the Court to "void" the dropdown as part of a partial motion for summary judgment must be denied as a matter of law. *See Gilman v. Marsh & McLennan Cos., Inc.*, 85 F. Supp. 3d 757, 760 (S.D.N.Y. 2015), *aff'd*, 826 F.3d 69 (2d Cir. 2016) ("The initial burden of a movant on summary judgment is to provide evidence on each element of her claim or defense illustrating her entitlement to relief."); *Thule AB v. Adv. Accessory Hldgs. Corp.*, No. 09 CIV. 00091, 2010 WL 1838894, at *11 (S.D.N.Y. May 4, 2010) ("the movant must establish its entitlement to judgment as a matter of law on all elements of its claim."). In any event, reversing the sale at this late date and forcing Major to become an NGE subsidiary would be

extremely costly[77] and make no practical sense, as the 33-month earnout period ended more than two months ago, with the final earnout payment, if any, to be made in March 2019.[78]

For all of the foregoing reasons, genuine issues of material fact preclude Sellers' request for summary judgment on Count II.

## V.      THE COURT SHOULD DENY SUMMARY JUDGMENT ON COUNT IV

### A.      The Genuine Issues of Material Fact that Bar Summary Judgment on Plaintiff's Contract Claim Against NGE Bar Summary Judgment on Plaintiff's Tortious Interference Claim Against SEI.

Tortious interference requires "the existence of a valid contract . . . , [defendant's] knowledge of that contract, and [defendant's] intentional procurement of [the third party's] breach of the contract without justification, actual breach of the contract, and [] damages resulting from the breach." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 594, 973 N.E.2d 735, 742 (2012). Because NGE's alleged breach of the MIPA is an element of Sellers' tortious interference claim against SEI, and because, as described above, Sellers do not and cannot establish breach (let alone causation and damages) or avoid the defenses of waiver, ratification, and estoppel, Sellers' tortious interference claim necessarily fails as a matter of law. As with NGE, these defenses and failures to establish breach elements protect Spark in light of the payments, concessions, and accommodations that Sellers extracted from Spark following the dropdown.[79]

### B.      Section 7.14(c) of the MIPA Expressly Bars *Any* Claim Against SEI for Conduct Prior to the Drop-Down, Including the Tortious Interference Claim.

Summary judgment on Seller's tortious interference claim against SEI also is barred because Section 7.14(c) of the MIPA makes clear that Sellers may only bring claims arising out of or relating to the MIPA against the "Persons that are Parties" to the MIPA:

---

[77] Ex. A (Decl. of Robert Lane).
[78] Dkt. 54-3 (Earnout Agreement) §§ 2.1 and 2.2 (earnout is for Target Years only), p.3 (defining "Target Year").
[79] Ex. A (Decl. of Robert Lane).

All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Persons that are Parties hereto. ***No Person who is not a named party to this Agreement, including any Affiliate, agent, attorney, or representative of any Party (such Persons, "Non-Party Affiliates"), shall have any liability (whether in contract or tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with, or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution***, and each Party waives and releases all such liabilities, claims, and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.[80]

This provision expressly bars Sellers from asserting any claim arising out of or relating to the MIPA against anyone not a Party thereto,[81] including Affiliates of the Parties, such as SEI.[82] Indeed, Sellers explicitly "waive[d]" any right to sue SEI with regard to the MIPA.

### C.     SEI Did Not Intentionally Procure Breach Without Justification.

As detailed above, NGE did not breach Section 11.7 of the MIPA. But even if it did, which NGE denies, SEI did not intentionally procure that breach. "Procure" means to "obtain (something), esp. by special effort or means." Black's Law Dictionary (10th ed. 2014). Consequently, to find tortious interference under New York law, "procurement of a breach must not only be intentional but also improper." *M'Baye v. World Boxing Ass'n*, 05 CIV. 9581DC, 2009 WL 2245105, at *9 (S.D.N.Y. July 28, 2009) (citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426–27, 835 N.Y.S.2d 530, 867 N.E.2d 381 (2007)). Such a finding requires that even a competitor (and SEI is obviously not a competitor of Sellers) engage in conduct that "exceeded a minimum level of ethical behavior in the marketplace." *Cintas*, 8 N.Y.3d at 427.

---

[80] Dkt. 54-2 at 7.14(c).
[81] *Id*. p.5 (defining Parties).
[82] *See* Ex. A (Decl. of Robert Lane) (NGE is a Spark Affiliate); Ex. A2 (NGE's founder is likewise SEI's founder and majority shareholder); Dkt. 22 ¶ 11 ("Spark is an affiliate of NGE").

Sellers' own evidence shows the opposite: after Sellers decided not to provide written consent to the dropdown at the last minute to create leverage for themselves,[83] NGE stated in writing that NGE accepted responsibility to obtain Sellers' consent to the extent consent was required.[84] Accordingly, Plaintiff cannot show that SEI intentionally procured a breach a breach.

## VI.   CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court deny the Motion for Partial Summary Judgment in its entirety.

Dated:  February 12, 2019                    Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Troy S. Brown*
Troy S. Brown
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
troy.brown@morganlewis.com

Michelle Pector (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5000
michelle.pector@morganlewis.com

*Attorneys for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*

---

[83] *See* Ex. B8 (September 23, 2016 letter from NGE to Sellers' counsel) at 3.
[84] Dkt. 54-13.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of February, 2019, the undersigned caused to be filed the foregoing via the Court's CM/ECF system, which sent notice to all counsel of record in this action.

*/s/ Troy S. Brown*
*Counsel for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*
