**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative,<br><br>         Plaintiff,<br>   v.<br><br>NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC.,<br><br>         Defendants. | Civ. No. 17-CV-7742 (JPO) |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE**

Pursuant to Civil Rule 56.1 of the Local Rules of the U.S. District Court for the Southern District of New York, Defendants National Gas & Electric, LLC ("NGE") and Spark Energy, Inc. ("SEI"; collectively "Defendants"),[1] hereby submit the following (i) response to Plaintiff Saul Horowitz's ("Plaintiff") Rule 56.1 Statement of Undisputed Facts (the "Statement") in accordance with the numbered paragraphs thereof, and (ii) separate statement of additional material facts as to which there exists a genuine issue. Documents referenced herein are attached to the accompanying Declarations of Robert Lane (Ex. A) and Troy S. Brown (Ex. B) in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment and are referred to as "Ex. A__" or "Ex. B__," respectively.

---

[1] For ease of readability only, SEI and Spark HoldCo, LLC are referenced in Defendants' portions herein as "Spark." Similarly, other capitalized terms not defined in Defendants' portions have the same definitions as given in Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment.

**I.     NGE Enters Into The MIPA And Acquires The Entire Membership Interest In Major Energy From The Sellers[2]**

1.    Major Energy, a private company founded in 2005, is engaged in the business of supplying electricity and natural gas and other related products and services to residential and commercial consumers located in New York and other U.S. states. Answer and Additional Defenses of Defendants to the Amended Complaint ("Ans.") ¶ 15 (ECF No. 45).

**RESPONSE**:     This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment.  As a factual matter, Defendants do not dispute that Major Energy was founded as a private entity in or around 2005.

2.    Under the direction of experienced senior management, Major Energy grew its customer count from 12,000 in 2008 to more than 214,000 in 2015; its annual net income from $380,000 in 2008 to over $12.5 million in 2015; and its EBITDA from $390,000 in 2008 to nearly $24 million in 2015.  Ans. ¶ 18.

**RESPONSE**:     This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment.  In any event, Defendants dispute Plaintiff's characterization of senior management's experience and the accuracy of the accounting methods used by Major Energy to calculate annual net income and EBITDA. *See, e.g.*, Exs. A4, B1, B12, and B15. As a factual matter, Defendants do not dispute that Major Energy reports having grown its customer count from 12,000 in 2008 to more 214,000 in 2015, its annual net income from $380,000 in 2008 to over $12.5 million in 2015, and its EBITDA from $390,000 in 2008 to nearly $24 million in 2015, though Defendants do not admit that Major Energy correctly calculated its annual income or EBITDA.

---

[2] The section headings from the Statement are included only for purposes of organization and for ease of reference. Defendants do not admit, but rather specifically dispute, any factual or legal averments in the headings used in the Statement.

3.      In or about November 2015, NGE, a private entity, approached the owners of Major Energy, *i.e.*, the Sellers, regarding the possible acquisition of the Sellers' combined 100% membership interest in Major Energy. The Sellers informed NGE that they were willing to consider a sale of Major Energy for the right price—4 x EBITDA. Ans. ¶ 19.

**RESPONSE**:      This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. The present dispute concerns a series of agreements memorializing NGE's purchase of Sellers' Membership Interests in Major Energy; when NGE and Sellers began negotiating, which entity started the negotiations, and the price Sellers initially sought is not material to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. As a factual matter, Defendants do not dispute that, in or around November 2015, NGE approached the Sellers regarding the possible acquisition of the Sellers' combined 100% membership interest in Major Energy, and that the Sellers informed NGE that they were willing to consider a sale of Major Energy for a price of 4x EBITDA.

4.      [redacted]

**RESPONSE**:      It is not disputed that, on March 11, 2016, NGE made a proposal to purchase Sellers' Membership Interests in Major Energy; the terms of that proposal are reflected

in a document that speaks for itself, and Defendants dispute Plaintiff's characterizations of those terms. Dahan Ex. 1.

    5.    On or about March 14, 2016, the Sellers accepted NGE's offer and proceeded to finalize the acquisition documents. Ans. ¶ 24; Dahan Ex. 1.

    **RESPONSE**:    Undisputed.

    6.    On or about April 15, 2016, NGE and the Sellers closed the transaction and NGE became the owner of 100% of the membership interest in Major Energy. Ans. ¶ 30.

    **RESPONSE**:    Undisputed.

    7.    In connection with the closing of the transaction, NGE, Major Energy, the Sellers, and Saul Horowitz, as Sellers' Representative, entered into certain agreements, including the Membership Interest Purchase Agreement dated as of March 18, 2016 ("MIPA"), an Earnout Agreement dated as of March 18, 2016 and effective as of April 1, 2016 ("Earnout Agreement"), and an Executive Earnout Agreement effective as of April 1, 2016 ("Executive Earnout Agreement"). Ans. ¶ 31; Dahan Exs. 2 (MIPA), 3 (Earnout Agreement), 4 (Executive Earnout Agreement).

    **RESPONSE**:    Undisputed. As a factual matter, the MIPA, the Earnout Agreement, and the Executive Earnout Agreement are documents that speak for themselves. *See* MIPA § 11.4 (Dkt. 54-2); Earnout Agreement § 3.2 (Dkt. 54-3); Executive Earnout Agreement § 3.2 (Dkt. 54-4).

    8.    Section 11.7 of the MIPA states as follows:

> 11.7  <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly (by operation of

Law or otherwise), without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void."

Dahan Ex. 2.

**RESPONSE**: It is undisputed that the quotation reflected in Paragraph 8 reflects the language of Section 11.7 of the MIPA, but Defendants note that the final quotation mark appearing above does not appear in the contractual language.  In any event, Section 11.7 does not impair NGE's ability to sell the Membership Interests in Major Energy to a successor or assign its rights or obligations with respect to the earnout.  Dkt. 54-2 § 11.7; Response at Part IV(B).

9.  NGE is the only entity listed as the "Buyer" in the MIPA. Ans. ¶ 31; Dahan Ex. 2.

**RESPONSE**: Undisputed.

## II. NGE Sells Its Membership Interest In Major Energy And Assigns The MIPA To Spark Without The Sellers' Required Consent

10.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**RESPONSE**: This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment.  As a factual matter, the unanimous written consent submitted to the Court as Exhibit 5 to the Declaration of Israel Dahan speaks for itself.

11.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**RESPONSE**: This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. As a factual matter, the Offer Letter submitted to the Court as Exhibit 6 to the Declaration of Israel Dahan speaks for itself.

12. Thereafter, Spark began diligence discussions with NGE for the contemplated sale of Major Energy and assignment of the MIPA to Spark (or a Spark subsidiary). To this end, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**RESPONSE**: This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. As a factual matter, the email submitted to the Court as Exhibit 7 to the Declaration of Israel Dahan speaks for itself.

13. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**RESPONSE**: This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. As a factual matter, the email submitted to the Court as Exhibit 8 to the Declaration of Israel Dahan speaks for itself.

14. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**RESPONSE**:   This is not a material fact that is relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment.  Further, the purported fact that ████████ ████████████████████████████████████████████████████ ████████████████████ is not supported by Plaintiff's cited evidence.

15. On May 3, 2016, NGE and Spark entered into a Membership Interest Purchase Agreement governing the sale of Major Energy and assignment of NGE's rights and obligations under the MIPA to Spark (the "Spark MIPA").  The other parties to the Spark MIPA were Retailco, LLC, who is the sole member of NGE, and Spark HoldCo, LLC ("Spark HoldCo"), identified as the "Buyer" in the Spark MIPA.  Spark is the parent of Spark HoldCo.  Dahan Ex. 10.

**RESPONSE**:   Defendants do not dispute that NGE and Spark HoldCo entered into a Membership Interest Purchase Agreement ("Spark MIPA") governing the sale of NGE's Membership Interests in Major Energy to Spark HoldCo.  Defendants dispute Sellers' characterization of SEI agreeing to purchase Major Membership Interests from NGE.  Defendants further dispute that the Spark MIPA governs the assignment of all of NGE's rights and obligations under the MIPA to Spark.  As a factual matter, the Spark MIPA speaks for itself.  *See* Dkt 54-2 (Spark MIPA § 11.4).

16. Pursuant to the terms of the Spark MIPA, NGE agreed to sell its 100% membership interest in Major Energy to Spark HoldCo and assign all of its rights and obligations under the MIPA (and related transaction documents with the Sellers) to Spark HoldCo. Dahan Ex. 10.

**RESPONSE**:   It is not disputed that, pursuant to the Spark MIPA, NGE agreed to sell its Membership Interests in Major Energy to Spark HoldCo.  Defendants dispute Plaintiff's purported fact that, through the Spark MIPA alone, NGE agreed to "assign all of its rights and obligations under the MIPA (and related transactional documents with the Sellers) to Spark

HoldCo." As a factual matter, the Spark MIPA speaks for itself. *See* Dkt. 54-2 (Spark MIPA § 11.4).

17. Section 2.1 of the Spark MIPA states as follows:

> Upon the terms contained herein, on the Closing Date, Seller [NGE] agrees to sell to Buyer [Spark HoldCo], and Buyer [Spark HoldCo] agrees to purchase from Seller [NGE], all of Seller's [NGE's] issued and outstanding membership interests in each of the Companies [Major Energy], which are set forth on Schedule 2.1 hereto (collectively, the "Interests") and which Seller [NGE] represents to collectively constitute all of the issued and outstanding Equity Interests in each of the Companies [Major Energy] as of the date of execution of this Agreement, the Effective Date, and Closing.

Dahan Ex. 10.

**RESPONSE**: It is undisputed that the quotation set forth in Paragraph 17 reflects the language of Section 2.1 of the Spark MIPA, but Defendants note that Paragraph 17 omits certain formatting reflected in the original Spark MIPA. As a factual matter, Section 2.1 of the Spark MIPA speaks for itself.

18. Moreover, pursuant to Section 2.2(a) of the Spark MIPA, Spark HoldCo agreed to assume NGE's obligations with respect to the Cash Installment to be paid to the Sellers under the MIPA. Dahan Ex. 10.

**RESPONSE**: As a factual matter, the Spark MIPA is a fully integrated contract that speaks for itself. *See* Spark MIPA § 11.4 (Dkt. 54-2).

19. Pursuant to Section 2.2(c) of the Spark MIPA, Spark HoldCo also agreed "to assume the obligation of Seller [NGE] to pay the Prior Members [Sellers] (subject to the <u>Target Year Earnout Ceiling</u> and the '<u>Aggregate Earnout Ceiling</u>'), the applicable Earnout Percentage of the Adjusted EBITDA (the '<u>Earnout</u>') earned by the Companies [Major Energy], on a consolidated basis, for each Target Year subject to the credits in Section 2.2(a)." Dahan Ex. 10.

**RESPONSE**: It is undisputed that the quotation reflected in Paragraph 19 reflects the language of Section 2.2(c) of the Spark MIPA, but Defendants note that Paragraph 19 omits certain formatting reflected in the original Spark MIPA. As a factual matter, Section 2.2(c) of the Spark MIPA speaks for itself.

20. Additionally, Section 2.4 of the Spark MIPA states as follows:

> At Closing under the terms set forth in the Escrow Assignment and Assumption Agreement, Seller [NGE] shall assign to Buyer [Spark HoldCo] all of its rights and obligations with respect to the Escrow Amount, which shall be held in escrow by the Escrow Agent on behalf of Buyer [Spark HoldCo] and the Prior Members [Sellers] in accordance with the Escrow Agreement. The Escrow Amount shall be held and released by the Escrow Agent to the Prior Members [Sellers] or Buyer [Spark HoldCo] in accordance with the directions provided to the Escrow Agent or as otherwise provided in the Escrow Agreement in accordance with the terms and conditions of the Escrow Disbursement Agreement.

Dahan Ex. 10

**RESPONSE**: It is undisputed that the quotation set forth in Paragraph 20 reflects the language of Section 2.4 of the Spark MIPA. As a factual matter, Section 2.4 of the Spark MIPA speaks for itself.

21. Section 8.2(y)(iii) of the Spark MIPA states that "Buyer [Spark HoldCo] shall have assumed all rights and obligations of Seller [NGE] pursuant to the Assignment." Dahan Ex. 10. "Assignment" is defined as the "Omnibus Assignment and Assumption Agreement" to be separately executed between NGE and Spark HoldCo. *Id*.

**RESPONSE**: It is undisputed that the quotations set forth in Paragraph 21 reflect the language of Section 8.2(y)(iii) and the definition of "Assignment" in the Spark MIPA, but Defendants dispute Plaintiff's characterizations of the definition of Assignment. As a factual matter, Section 8.2(y)(iii) speaks for itself.

22. Under the terms of the Spark MIPA, both NGE and Spark HoldCo were required to obtain the consent of Plaintiff prior to completion of the sale and assignment transaction

contemplated by the Spark MIPA. Specifically, Section 3.2(e) of the Spark MIPA states that Spark HoldCo was required to provide to NGE at closing "the written consent of the Prior Sellers' Representative to the Assignment." Dahan Ex. 10.

**RESPONSE**: It is undisputed that the quotation set forth in Paragraph 22 reflects the language of Section 3.2(e) of the Spark MIPA. Defendants dispute the purported fact that NGE and SparkHoldCo were "required" under Section 11.7 of the MIPA to obtain consent of Plaintiff prior to completion of the transaction contemplated by the Spark MIPA. This paragraph states a legal conclusion, which is impermissible for a Rule 56.1 statement and no response is required.

23. Moreover, Section 11.1 of the Spark MIPA states as follows:

11.1 <u>Prior Sellers' Representative</u>. For purposes of this Agreement, Seller has advised Buyer that: (i) notices of certain matters arising under the Prior Purchase Agreement must be provided to Saul Horowitz, as Prior Sellers' Representative; (ii) the prior written consent of said Prior Sellers' Representative is required for the assignment of certain Transaction Agreements, including without limitation the Escrow Agreement and the Escrow Disbursement Agreement; and (iii) Seller will assume responsibility for providing any such notices to, and securing any such consents of, Prior Sellers' Representative as necessary under such Prior Purchase Agreement and of the Escrow Agent under the Escrow Agreement to facilitate and effectuate the Transaction contemplated hereunder.

Dahan Ex. 10.

**RESPONSE**: It is undisputed that the quotation set forth in Paragraph 23 reflects the language of Section 11.1 of the Spark MIPA. As a factual matter, Section 11.1 of the Spark MIPA speaks for itself.

24. When the Sellers learned of NGE's intention to sell Major Energy and assign the MIPA and other related transaction documents to Spark (or a Spark subsidiary), Plaintiff, as Sellers' Representative, objected and refused to consent to the contemplated sale and assignment. Ans. ¶¶ 67-70.

**RESPONSE**: Defendants do not dispute that Plaintiff objected at some point to the contemplated sale of the Membership Interests in Major Energy by NGE to Spark HoldCo. It is disputed that Plaintiff refused to consent to the contemplated sale of the Membership Interests in Major Energy to Spark HoldCo and any related assignment, including because Plaintiff expressed excitement for the dropdown, Sellers helped announce and move the dropdown along, and Sellers (including Plaintiff) took extensive steps to acknowledge, and demand and accept benefits from, the dropdown. *See, e.g.*, Exs. A4, A5, A6, A8, A9, A10, A11, A12, B3, B4, B5, B6, B7, B13, B14, B15, B17, B20.

25. Nonetheless, on August 23, 2016, Spark announced that it had completed its acquisition of Major Energy from NGE. Dahan Ex. 11.

**RESPONSE**: Defendants do not dispute that, on August 23, 2016, Spark HoldCo's purchase from NGE of the Membership Interests in Major Energy closed.

26. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**RESPONSE**: Disputed. This purported fact is not supported by Plaintiff's cited evidence.

27. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**RESPONSE**: It is undisputed that the quotation set forth in Paragraph 27 reflects the language appearing in the Omnibus Assignment and Assumption Agreement appearing as Exhibit 12 to the Declaration of Israel Dahan.

28. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**RESPONSE**: It is undisputed that the quotations set forth in Paragraph 28 reflect the language appearing in the Omnibus Assignment and Assumption Agreement appearing as Exhibit 12 to the Declaration of Israel Dahan. As a factual matter, the Omnibus Assignment and Assumption Agreement appearing as Exhibit 12 to the Declaration of Israel Dahan speaks for itself.

29. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**RESPONSE**: Undisputed.

30. ████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████



Dahan Ex. 13.

**RESPONSE**:         Undisputed that Exhibit 13 to the Declaration of Israel Dahan contained this language and speaks for itself.

31.

**RESPONSE**:         It is undisputed that the quotation set forth in Paragraph 31 reflects the language appearing in Plaintiff's August 25, 2016 e-mail to Sellers and Mr. Alper appearing as Exhibit 14 to the Declaration of Israel Dahan.  Defendants deny that NGE was not allowed to drop Major into Spark without Sellers' consent and deny that the dropdown breached the MIPA.

13

**III.   Spark's Knowing And Active Participation In NGE's Breach Of The Non-Assignment Provision In The MIPA**

32.   Throughout the negotiation of the contemplated sale and assignment with NGE, Spark was fully aware of the terms of the MIPA, including the prohibition of an assignment of the MIPA and NGE's rights and obligations thereunder without the Sellers' prior written consent. Dahan Exs. 10, 13.

**RESPONSE:**   Disputed.   This paragraph states a legal conclusion, which is impermissible for a Rule 56.1 statement and no response is required.  In any event, the purported fact that, "[t]hroughout the negotiation of the contemplated sale and assignment with NGE, Spark was fully aware of the terms of the MIPA" is not supported by Plaintiff's cited evidence.

33.   ███████████████████████████████████████████████████████████

**RESPONSE:**   Disputed.   This paragraph states a legal conclusion, which is impermissible for a Rule 56.1 statement and no response is required.  In any event, it is undisputed that Spark was aware that ███████████████████████████████████████

34.   Nonetheless, Spark proceeded with the sale and assignment transaction with NGE. Ans. ¶ 70; Dahan Exs. 11, 12, 13.

**RESPONSE:**   Defendants do not dispute that, on August 23, 2016, Spark Holdco's purchase from NGE of the Membership Interests in Major Energy closed.

35.   ███████████████████████████████████████████████████████████

**RESPONSE:** This paragraph states a legal conclusion, which is impermissible for a Rule 56.1 statement and no response is required. In any event, Defendants dispute Plaintiff's characterization that SEI entered into a sale and assignment transaction with NGE. It is undisputed that SEI, through its subsidiary Spark Holdco, acknowledged indirectly owning Major, that Spark Holdco assumed certain rights and obligations of NGE under the Sellers' MIPA (as shown in that document), and that earnout payments were made to Sellers. The remainder of this paragraph is disputed, as the day-to-day operations of Major remained in the hands of Sellers and Sellers' chosen managers both before and after Sellers asked for Dan Alper, CEO of Major, to be fired in April 2017. *See, e.g.*, Exs. A5, A6, A9, A10, A11, A12, A13, B9, B12, B10, B15, and B20.

36. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████

**RESPONSE:** This is not a material fact relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. In any event, Defendants dispute Plaintiff's characterization to the extent it suggests SEI entered into a sale and assignment transaction with NGE. It is undisputed that the quotation set forth in Paragraph 36 reflects the language appearing as Exhibit 15 to the Declaration of Israel Dahan and that at the time of this email Mr. Melman was Vice President and General Counsel of SEI and General Counsel of Spark Holdco.

37. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█

**RESPONSE:** This is not a material fact relevant to the Court's disposition of Plaintiff's Motion for Partial Summary Judgment. It is undisputed that the quotation set forth in Paragraph 37 reflects the language appearing as Exhibit 16 to the Declaration of Israel Dahan.

### DEFENDANTS' CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE REMAINS A GENUINE ISSUE TO BE TRIED

38. In December 2014, Spark sent Sellers a bid to purchase 100% of Sellers' Membership Interests in Major. Ex. A1 (December 10, 2014 email chain).

39. After talks between Spark and Sellers were tabled, in November 2015 NGE approached Sellers about the potential acquisition of their Membership Interests in Major. Plaintiff's Statement of Undisputed Facts, ¶ 3.

40. In early 2016, New York proposed regulations that would govern energy sales to consumers, which NGE and Sellers agreed could negatively affect Major's customer count and Adjusted EBITDA for Major's core market. Ex. B1 (March 15, 2016 email chain among Sellers).

41. Consequently, the parties agreed to defer $35 million of the sales price in the form of Contingent Payments over a 33-month period following the anticipated closing, in a contingent structure that "balance[d] the risk between Major [Sellers] and NGE in a downside scenario." Dkt. 54-3 (Earnout Agreement) at 12.

42. On or about April 15, 2016, NGE and the Sellers closed the transaction and NGE became the owner of 100% of the Membership Interests of Major Energy. Am. Compl. ¶ 30.

43. Section 7.14(c) of the MIPA states as follows:

All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Persons that are Parties hereto. No

>Person who is not a named party to this Agreement, including any Affiliate, agent, attorney, or representative of any Party (such Persons, "Non-Party Affiliates"), shall have any liability (whether in contract or tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with, or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution, and each Party waives and releases all such liabilities, claims, and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.

Dkt. 54-2 (MIPA) § 7.14(c).

44. The MIPA expressly contemplates assignment and applies to both successors and assigns of the parties. *Id*. § 11.7.

45. The MIPA expressly incorporates the Earnout Agreement. *Id*. p.3 and § 1.2(a)(ii).

46. The Earnout Agreement is expressly assignable to Affiliates, and other parties need not consent in such assignment. Dkt. 54-3 § 3.1 (Executive Earnout Agreement).

47. Section 3.1 of the Earnout Agreement provides that "[a]ll of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective and permitted successors and assigns. This Agreement shall not be assignable without the prior written consent of the other Parties, except as to Affiliates or in the event of a Buyer Change of Control." Dkt. 54-3 § 3.1 (Executive Earnout Agreement).

48. The Earnout Agreement defines Affiliate to include "any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person." *Id.* § 1.1.

49. Spark Holdco is an Affiliate of NGE. Ex. A (Decl. of Robert Lane); Am. Compl. (Dkt. 22) ¶¶ 11-12.

50. The Earnout Agreement provides that NGE or NGE's Affiliate "shall have the discretion to operate the Business of the Companies as [NGE or Affiliate] deems appropriate," subject to certain good-faith obligations.  Dkt. 54-3 § 2.7.

51. During NGE's negotiations with Sellers, NGE was transparent about its ultimate plans for a dropdown of Major Energy to Spark Holdco.  Indeed, it was public knowledge that, at that time, NGE's purpose was to purchase companies and drop them into Spark. Ex. A2 (excerpt from SEI's 2015 10-K).

52. Sellers chose to close the sale of Seller's Membership Interests in Major Energy to NGE on April 15, 2016, even though they were aware that the dropdown to Spark would occur shortly after closing. Ex. B2 (April 8, 2016 email chain including Brandon Hoover (NGE's Controller) and Major executives and Sellers) ███████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████████.

53. When the transfer of ownership from NGE to SEI's subsidiary, Spark Holdco, was announced within weeks after the closing of the sale of Major to NGE, Sellers participated in creating, revising, and issuing press releases for Spark and Major.  Sellers helped steward the dropdown through closing. Exs. A3, B3, B4, B5, and B6.

54. By email dated June 9, 2016, Horowitz informed Keith Maxwell that ████████
███████████████████████████████████████████████████████████████████████████
████████████████████████████████████████ Ex. B6.

55. That same e-mail ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*.

56. On August 22, 2016, Levi Moeller (Major's COO) admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A4 (August 22, 2016 email from Moeller).

57. On August 23, 2016, Spark HoldCo's purchase from NGE of the Membership Interests in Major Energy closed. Plaintiff's Statement of Undisputed Facts, ¶ 25.

58. On or about June 9, 2017, Sellers acknowledged that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

59. Sellers repeatedly pursued from Spark an early buyout of the Contingent Payments and during that time sought and accepted numerous benefits from Spark, including, but not limited to the following examples:

   a. Millions of dollars in Contingent Payments (Ex. B17)

   b. Assistance toward expanding Major's sales territory (Exs. A5 and A6)

   c. Provision of new customers for Major (Ex. A13)

   d. Retention of executives for Major (Ex. B20)

  e. Provision of a favorably-priced energy supply agreement (Ex. A8)

38. Sellers' first request to unwind or rescind the dropdown was made in its First Amended Complaint filed in this action in December 2017.  Dkt. 22.

Dated:  February 12, 2019        Respectfully submitted,

                **MORGAN, LEWIS & BOCKIUS LLP**

                */s/   Troy S. Brown*
                Troy S. Brown
                1701 Market Street
                Philadelphia, PA 19103
                (215) 963-5000
                troy.brown@morganlewis.com

                Kenneth I. Schacter
                101 Park Avenue
                New York, NY 10178
                (212) 309-6000
                kenneth.schacter@morganlewis.com

                Michelle Pector (*pro hac vice*)
                1000 Louisiana St., Suite 4000
                Houston, TX 77002
                (713) 890-5000
                michelle.pector@morganlewis.com

                *Attorneys for Defendants National Gas & Electric, LLC and Spark Energy, Inc.*