**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC., <br><br> Defendants. | Civ. No. 17-CV-7742 (JPO) |

## WRITTEN DIRECT STATEMENT OF DAN ALPER

Plaintiff Saul Horowitz, as Sellers' Representative, by and through his undersigned counsel, hereby attaches the sworn written direct statement of Dan Alper.  Mr. Alper reserves his right to amend or supplement his written direct statement and to rely on additional exhibits not cited therein.  No waiver of privilege is made or intended to be made in these written direct statements.

Plaintiff reserves the right to submit additional written direct statements in advance of trial of additional individuals he may identify as trial witnesses in the Joint Pre-Trial Order.

Dated:  December 13, 2019

Respectfully submitted,

*/s/ Israel Dahan*
Israel Dahan
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.:  (212) 556-2114
idahan@kslaw.com
rgabay@kslaw.com

Chelsea J. Corey
KING & SPALDING LLP
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Telephone No.:  (704) 503-2575
ccorey@kslaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative,<br><br>                     Plaintiff,<br><br>          v.<br><br>NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC.,<br><br>                     Defendants. | Civ. No. 17-CV-7742 (JPO) |

## <u>WITNESS STATEMENT OF DAN ALPER</u>

### I.   Background and Recruitment to Major Energy

1.      My name is Dan Alper.  I currently advise private equity asset managers with respect to opportunities in retail energy and energy management and technology.

2.      Before serving as a strategic advisor in the private equity space, I was the Chief Executive Officer of Major Energy Services, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC (collectively, "Major Energy") from September 2015 to the end of April 2017.

3.      I hold a Juris Doctor degree from American University Washington College of Law.  I also received an LLM degree in Taxation from New York University School of Law.

4.      In early 2015, I had become increasingly intrigued by the retail energy industry. While I had my own law practice, I had begun researching the retail energy industry and was in discussions with one of my mentors, Frank Lewis, regarding potential opportunities in this industry.  Mr. Lewis had built and sold a retail energy company called Energy Service Providers, Inc. to U.S. Gas & Electric, Inc.

5.       I was intrigued with the retail energy space because some retail energy providers were in distress following a "polar vortex" that occurred in early 2014, during which abnormally low temperatures resulted in significant increases in customer demand for gas and electricity, supply shortages, large increases in commodity prices and customer bills.  As a result, Mr. Lewis and I saw unique opportunities were potentially interested in buying retail energy companies at this time.

6.       In late 2014, a New York lawyer recommended to me that I consider purchasing Major Energy, a retail energy company located in Orangeburg, New York.  I followed this recommendation and called Saul Horowitz, who was the CEO of Major Energy at the time, to set up a meeting.  At this meeting, I met Mr. Horowitz for the first time, along with Mark Wiederman (Major Energy's President) and Levi Moeller (Major Energy's Chief Operating Officer).  They made a presentation to me about the company.

7.       After hearing this presentation, and after having looked at several other retail energy companies, I recall being incredibly impressed by how resilient Major Energy's management team was in recovering from the polar vortex and how quickly they were able to make decisions.  While the polar vortex pushed other similar companies to the brink of bankruptcy, Major Energy held steady and appeared to me to have a very close and cohesive team.  I knew then that I wanted to be in business with Mr. Horowitz and Mr. Wiederman.

8.       In or around April 2015, I made an offer to buy out the three silent shareholders of Major Energy—Michael Bauman, Mark Josefovic, and Asher Fried—who were passive investors and did not run the day-to-day operations.  My offer was rejected.

9.       A few months later, I called Mr. Horowitz to check in on whether the owners had sold Major Energy.  He told me that the company had not yet been sold and we agreed to meet for

lunch.  During that lunch and in the weeks that followed, Mr. Horowitz and I discussed whether it

may make sense for me to join Major Energy as the CEO.

10.      I met with the Sellers and we agreed that I would begin working at Major Energy

as the CEO in the fall of 2016.  As the CEO, I was responsible for operating Major Energy to

maximize profits and customers, as well as continuing to build the company's relationships with

residential marketing vendors and commercial brokers.

## II.    Major Energy Pre-Sale Background

11.      As of 2016, Major Energy was a private company located in Orangeburg, New

York.

12.      Major Energy is engaged in the business of supplying electricity, natural gas, and

other related products and services to residential and commercial customers located in New York

and other U.S. states.

13.      Prior to the sale to NGE, Major Energy had about 35 employees.  I observed that

Major Energy had a very tight, focused, and productive operating team in place when I arrived.

14.      For example, Saul Horowitz was CEO of Major Energy from about 2008 until I

took over the CEO position at the end of 2015.  Mr. Horowitz is viewed as a pioneer of the

deregulated energy supply industry in the northeastern United States and built Econnergy Energy

Company, Inc. ("Econnergy"), which was subsequently rebranded as Gateway Energy Services

Corp, from a small startup company to one of the largest independent retail energy providers in

the country at the time.  Prior to joining Major Energy, Mr. Horowitz served as the CEO of

Econnergy for almost ten years.

15.      During my tenure as CEO of Major Energy, Mr. Horowitz functioned like an

executive chairman and had tremendous experiential knowledge of the industry.  Therefore, even

a short conversation with Mr. Horowitz about a high-level business or supply issue was often much

more valuable than speaking with anyone else about the issue.  I would often consult Mr. Horowitz to get his advice on key issues.

16.     Mark Wiederman was a founder of Major Energy and served as its President since shortly after its inception.  Mr. Wiederman was a key decisionmaker and was heavily involved on the sales side of the company.

17.     Levi Moeller was the Chief Operating Officer of Major Energy.  He was responsible for the supply department and was instrumental in managing the company's longstanding supply relationship with Pacific Summit Energy ("PSE").

18.     David Sobel was the Chief Financial Officer of Major Energy.  He was responsible for all financial functions, including payroll, accounts payable and receivable, cash management, and working with PwC on annual audits.

19.     Eliott Wolbrom was the Chief Marketing Officer of Major Energy.  Mr. Wolbrom managed marketing and sales, and he had built important sponsorship relationships with high-visibility sports organizations.

20.     Prior to the sale to NGE, Major Energy had a very active broker business on the commercial customer side of the business.  The company also had a very active residential business.  I recall the two biggest door-to-door residential marketing vendors at the time being ███████████████████████████████.

21.     With respect to residential marketing, prior to the sale, Major Energy began to separate potential customers into income demographics and develop giveaway programs to attract and retain new customers.

22.     For example, for the upper income demographics, Major Energy did a deal with Ring doorbells, which was later sold to Amazon, where we would give new customers Ring

doorbells if they signed up with us.  For medium demographics, we branded our own LED lightbulbs and would give these lightbulbs to new customers at the door when they signed up and again several months later if they were still customers.  For lower demographics, we did a deal with Papa John's where customers would get a free pizza from Papa John's every month or so if they remained customers.

23.     This giveaway program, which we executed through door-to-door marketing as well as direct mailings, was successful in attracting and retaining new customers.

**III.     Negotiation of The Sale To NGE**

24.     In or about September 2015, after I came on board at Major Energy, I determined that I would focus on building the business for the next 12 to 18 months.  I called our investment banker, Cliff Adams of Coady Diemar Partners, and told him that I was planning to terminate Coady Diemar's monthly retainer because we wanted to focus on growing the business instead of looking to sell the company at this time.

25.     Mr. Adams informed me that he thought it was a good idea for me to focus on the growth of Major Energy, but that I should take one meeting with a potential buyer before doing so.  I agreed to take that meeting, which occurred with representatives from National Gas & Electric, LLC ("NGE") and NuDevco Partners, including W. Keith Maxwell III (CEO of NGE), Paul Konikowski (NGE Vice President), Dave Hennekes (NGE Vice President), and Michael Tsang (NGE Vice President, Finance), in Major Energy's Orangeburg, New York office.  No one from Spark was at that meeting.

26.     During this meeting, we told NGE that Major Energy was not necessarily for sale anymore.  Instead, we were pursuing a strategy to grow the company, although we were willing to listen to offers and would consider selling for the right price.  Mr. Horowitz (on behalf of the

selling shareholders) and I (on behalf of Major Energy) led the meeting.  Mr. Maxwell informed us that NGE was interested in acquiring Major Energy and that he would send us a proposal.

27.     On November 18, 2015, Mr. Hennekes sent ███████████████████████



28.     After receiving this offer, I discussed it with Mr. Horowitz and Mr. Wiederman, and we felt that it was attractive.  The parties then began exchanging information in a data room that was managed by Mr. Adams.

29.     As part of the discussions of an earnout, we understood that it was necessary to set certain achievement targets.  To this end, Major Energy management set about creating projections for the following two years, which would be used to set the earnout targets.  On January 5 and 6, 2016, I had exchanges ████████████████████████████████████ ██████████████████████████████████████████.[2]  While I do not recall being actively involved in the buildup of the original projections, I asked Mr. Sobel to create the projections and send them to me so I could review the final product.  I recall that Mark Wiederman and Levi Moeller were also involved in creating and reviewing the projections.

30.     On January 14, 2016, Mr. Hennekes sent ██████████████████████ █████████████████████.[3] ███████████████████████████████

---

[1] PX-367 (SPRK-NGE0003746-49).
[2] PX-42 (CDP00022734-39).
[3] PX-69 (MESELLERS_0000726-32).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████.

31.     After learning that the Sellers were comfortable with this offer and deal structure, the letter of interest was executed with NGE and the Major Energy senior management team began to negotiate the deal documentation and agreements with NGE.  At the same time, NGE continued its due diligence of Major Energy, including financial due diligence.

32.     As part of the due diligence, we set up a data room that contained a significant amount of information concerning Major Energy's historical business and financials and other information specifically requested by NGE.

33.     At that time, NGE was contemplating obtaining financing for the transaction through Stifel Financial Corp. ("Stifel"), and Stifel had specific information that it wanted to see regarding Major Energy.

34.     To this end, NGE asked us to update a Major Energy Management Presentation dated August 2015 that we had previously provided to them.  NGE wanted this in advance of a meeting it had scheduled with Stifel for early February 2016.

35.     On or about January 27, 2016, Mr. Adams sent Mr. Hennekes and Mr. Konikowski

████████████████████████████████████████████████████████████████

████████████████████████.[4]

36.     A few days later, February 3, 2016, Levi Moeller sent an email to Cliff Adams and

me, attaching ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██[5]

37.     Both the management presentations dated January 2016 and February 2016

contained ████████████████████████████████████████████████████████

██████████████████████████████.

38.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████     It's my understanding that we arrived at these slightly higher numbers by increasing

the per unit margin to support the increases.

39.     It is my recollection that we included these slightly higher targets in this

management presentation at the request of Mr. Tsang because he wanted to provide a little more

aggressive numbers to Stifel in connection with NGE's efforts to obtain financing for the deal.

40.     I did not view these slightly higher figures provided to Stifel as unreasonable or

unrealistic.  However, ultimately, as part of the final deal with NGE, the Sellers agreed on targets

that were lower than the numbers in these presentations and presented to Stifel.

---

[4] PX-403 (SPRK-NGE0014455-516).
[5] PX-27 (CDP00008523-25)

41.     I attended the meeting with Stifel in early February 2016.  Mr. Horowitz and Mr. Wiederman also attended for Major Energy.  I recall that Mr. Tsang from NGE attended the meeting and that no individuals from Spark attended.  During the meeting, we walked Stifel through the February 2016 management presentation, including Major Energy's finances, and Stifel asked questions about the business and the industry.  I thought the meeting went well.

42.     I will note that I am not aware of NGE or Stifel ever informing us that they felt the adjusted EBITDA projections we provided in this management presentation were unreasonable or unrealistic.  To the contrary, it is my view that NGE felt comfortable with these projections; otherwise, they would not have been provided to Stifel.

43.     On February 9, 2016, Gary Lancaster (General Counsel of NGE) ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

44.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. ██

████████████████████████████████████████████████████████████

█████████████████████████

---

6 PX-99 (MESELLERS_0002453-651).

45.     On February 19, 2016, Larry Studnicky, deal counsel for Major Energy and the Sellers, ██████████████████████████████  ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████

46.     A few days later, around February 23, 2016, the New York State Public Service Commission issued a proposed "Resetting Order" that created uncertainty in the marketplace because it contained a series of much more stringent regulatory rules concerning the offering of electric and gas products to customers in New York.  However, the proposed resetting order never passed.

47.     As a result of the proposed Resetting Order, NGE withdrew the initial agreed-upon deal with the Sellers and began to negotiate new terms.

48.     On March 3, 2016, Gary Lancaster sent Larry Studnicky, Mark Wiederman, Saul Horowitz and me ██████████████████████████  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████.

49.     On March 10, 2016, Mr. Lancaster sent an email to me and others at Major Energy

████████████████████████████████████████████████████████

---

[7] PX-101 (MESELLERS_0003269-374).
[8] PX-102 (MESELLERS_0004191-92).

███████████████████████████████████████████████████████

██████████████████████████████████████[9]

50.     I recall that the $80 million target purchase price did not change at this point in the negotiations, even despite the news of the proposed Resetting Order.  The parties continued to negotiate and agreed to increase the contingent portion of the purchase price from $20 million to $35 million to share the potential risks of the uncertain regulatory environment.

51.     On March 11, 2016, Mr. Hennekes of NGE sent an email to me, Mr. Wiederman, Mr. Horowitz, and others ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ █████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

52.     On March 14, 2016, ███████████████████████████████████

██████████████████████████████████████[11]

53.     The parties then began finalizing the deal documents, including, among others, the MIPA, the Earnout Agreement, and the Executive Earnout Agreement.

---

[9] PX-104 (MESELLERS_0004199-200).
[10] PX-106 (MESELLERS_0004298-301).
[11] *Id.*

54.     With deal counsel by my side, I led the process of finalizing the deal documents for Major Energy.  To that end, I went on several trips to NGE's Houston, Texas office to negotiate the deal documents in person.  During the negotiation period, I only dealt with people from NGE, including Mr. Maxwell, Mr. Lancaster, Mr. Hennekes, Mr. Konikowski, and Mr. Gibson.  I did not negotiate with anyone from Spark.

55.     Over the next few days, I, along with deal counsel, Mr. Studnicky, spent a considerable amount of time negotiating the provisions of the Earnout Agreement with NGE, particularly Section 2.7.  This was an extremely important provision, especially now that a significant portion of the purchase price, nearly half, was going to be in the form of an earnout.  In speaking with Mr. Horowitz and Mr. Wiederman, I understood that it was very important to them to have provisions in place to make sure that Major Energy could achieve the projected earnout targets so that, in turn, the Sellers could obtain their cash installment and earnout payments, which were directly tied to the future performance of Major Energy.

56.     I recall vividly that during the negotiation period, Mr. Konikowski and Mr. Hennekes told me that NGE wanted to keep Major Energy intact during the earnout period and that NGE would leave the senior management team alone to operate Major Energy independently.

57.     In fact, Mr. Konikowski and Mr. Hennekes specifically told me that they wanted to protect Major Energy for as long as possible to ensure that it would not be ripped apart and destroyed in the "Spark vortex" after the sale to NGE.  Mr. Konikowski and Mr. Hennekes informed our senior management team that Spark had a negative culture and that therefore a transfer of Major Energy to Spark would occur well into the future, *i.e.*, years, rather than months, after the sale to NGE.  Mr. Konikowski and Mr. Hennekes further informed us that what we had built at Major Energy was special and that they did not want Spark to destroy it.

58.     Moreover, Mr. Hennekes told me that Nathan Kroeker (CEO of Spark) was not a good CEO or leader, and that he did not have people skills or much emotional intelligence. Mr. Hennekes informed me that Mr. Kroeker had a hard time keeping talented executives at Spark and the turnover rate among executives was high. Accordingly, Mr. Hennekes warned me that I should be careful with Mr. Kroeker, who did not know how to inspire or build teams and had created a negative culture at Spark. In fact, Mr. Konikowski told me that he had worked for Spark and left after Mr. Kroeker and he clashed and then was hired by NGE.

59.     I would note that during this time I happened to meet Mr. Kroeker for the first time totally unrelated to the negotiations. Sometime after the Resetting Order, I met Mr. Kroeker at an industry conference in Park City, Utah. I introduced myself to him and recall him telling me that he had heard that I was involved in negotiations with NGE regarding the sale of Major Energy, and that he had nothing to do with these negotiations. During my brief discussion with him, I understood better what Mr. Hennekes and Mr. Konikowski were describing about Mr. Kroeker and why he is someone I probably would not choose to work with.

60.     As a result of my discussions with Mr. Konikowski and Mr. Hennekes, I believed that NGE structured the deal to keep Major Energy away from Spark for as long as possible and to provide the Major Energy senior management team with the discretion to operate the business as we saw fit.

61.     On February 12, 2016, Mr. Lancaster █████████████████████
███████████████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ [2]

62.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

63.   Accordingly, over the next few weeks, the parties spent time revising Section 2.7 of the Earnout Agreement.

64.   To that end, on March 15, 2016, Mr. Studnicky wrote me ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

---

[12] PX-399 (SPRK-NGE0014221-37).
[13] PX-109 (MESELLERS_0004667-70).

65.     Later that same day, March 15, 2016, I ████████████████████████

████████████████████████████████████████████████████████████████████

██████████   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████[14]

66.     Also on March 15, 2016, I emailed all the Sellers to provide an update on the

negotiations with NGE.  I stated that ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████   ██████████████████████████████████████████

███████████████████████████████████[16]  In using this term, I was

referring generically to the NGE representatives we were negotiating with and not to anyone who

worked for Spark.

67.     In a separate email that same night, I informed some of the Sellers that ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████.[17]  In the end, NGE agreed with our methodology for

calculating Adjusted EBITDA, as was outlined in the projections provided to NGE.[18]

---

[14] PX-71 (MESELLERS_0000897-914) (emphasis in original).
[15] PX-79 (MESELLERS_0001339-42).
[16] PX-72 (MESELLERS_0001051-52).
[17] PX-73 (MESELLERS_0001053-59).
[18] PX-66 (MESELLERS_0000318-22).

68.     The next morning, March 16, 2016, ████████████████████████████
████████████████████████████████.[19]  It was a completely new Section 2.7.  This
version of Section 2.7 is the same as the one ultimately agreed to by the parties.

69.     Later that same day, March 16, 2016, I ████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████.[20]

70.     The following day, March 17, 2016, Mr. Studnicky emailed Mr. Lancaster and me
to provide a revised draft Earnout Agreement.  ██████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████ ████████████████████████████████████
██████████████████████████████████

71.     Under Section 2.7 of the Earnout Agreement, NGE agreed that Major Energy's
Senior Management Team would be permitted to operate "business as usual" at Major Energy
during the 33-month earnout period.

72.     The final agreed-upon version of Section 2.7 of the Executive Earnout Agreement
is substantially similar to Section 2.7 of the Earnout Agreement in all key respects, although it also
provides that "Buyer shall have the discretion to operate the Business of the Companies as Buyer
deems appropriate as owner of the Interests while the details of the day-to-day management of the
operations of each of the Companies are delegated to the Senior Management Team which shall

---

[19] PX-392 (SPRK-NGE0012219-21).
[20] PX-76 (MESELLERS_0001107-111).
[21] PX-111 (MESELLERS_0005365-77).

be vested with all general and specific rights and powers required for or appropriate to the management of the business of the Companies under law and under the Operating Agreement of each Company."[22]

73.     The term "Senior Management Team" included me, Mr. Horowitz, and Mr. Wiederman.  We remained in our senior management roles at Major Energy at the start of the earnout period.

74.     In addition to the protections in Section 2.7 of the Earnout and Executive Earnout Agreements, under Section 7.1(d) of the MIPA, NGE agreed that Major Energy would enter into new employment agreements with its existing Senior Management Team and Key Employees within ten days of closing.  I entered into a new employment agreement with Major Energy in April 2016 towards the end of the closing process.

75.     Under my new employment agreement with Major Energy, effective as of April 1, 2016, ████████████████████████████████████████████████████████████

██████████████████████████████████████ ███████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████

76.     Under my employment agreement, █████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████.[24]

77.     Additionally, under my employment agreement, ████████████████████████

█████████████████████████████████████████████████████████████████████

---

[22] PX-658 (SPRK-NGE0050581-97).

[23] PX-667 (SPRK-NGE0050734-45).

[24] *Id.* § 3.2(c).

██████████████████████████████████████████

██████████████████████████████████████████

████████████.[25]

78.     Before the deal closed with NGE, Major Energy's Senior Management Team extensively discussed with NGE how to calculate the Cash Installment and Earnout Payments (collectively, the "Contingent Payments") that would be owed to the Sellers for the 33-month earnout period from April 2016 to December 2018.  In order for the Sellers to receive the full amount of the Contingent Payments, Major Energy needed to hit certain agreed-upon Adjusted EBITDA and Customer Accounts targets.

79.     The Senior Management Team and NGE negotiated and agreed that these Adjusted EBITDA and Customer Accounts figures would be calculated the same way that Major Energy historically performed these calculations.  This was made clear in the deal documents themselves.

80.     In connection with the deal, Major Energy prepared final projections with respect to the Adjusted EBITDA and Customer Accounts targets that the company needed to hit during the earnout period to receive the full amount of the Contingent Payments.  I reviewed these final projections and felt comfortable that they were reasonable and achievable, especially if Major Energy was permitted to be operated in accordance with the terms of Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement.

81.     In fact, I felt comfortable that Major Energy could possibly surpass these projections.  As part of the deal, I was a party to the Executive Earnout Agreement.[26]  Under the Executive Earnout Agreement, I would receive additional funds if Major Energy performed in

---

[25] *Id.* § 1.2.
[26] PX-658 (SPRK-NGE0050581-97).

excess of the projected Adjusted EBITDA targets.  When I executed this agreement, I believed that it was a realistic possibility that I would receive payment under the Executive Earnout Agreement.

82.      On April 13, 2016, I █████████████████████████████████████████████ ███████████████████████████████████  ████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████. 

83.      On that same day, Mr. Studnicky sent Mr. Lancaster an email, copying me and others, regarding ████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████. 

84.      Mr. Lancaster responded that ████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ 

27 PX-381 (SPRK-NGE0004473-75).
28 PX-551 (SPRK-NGE0033434-39).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[29]

85.     ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[30]

86.     On April 15, 2016, the day of the closing of the transaction between NGE and the

Sellers, Mr. Lancaster responded that ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.[31]

87.     That same day, Mr. Lancaster ████████████████████████

████████████████████████████████████████████████

---

[29] *Id.*

[30] *Id.*

[31] PX-117 (MESELLERS_0006297-315).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████[32] I was also aware

that NGE was required under the MIPA to obtain the written consent of Mr. Horowitz prior to

transferring Major Energy to any other company.

88.     Based on these written representations by Mr. Lancaster on the day of closing and

the non-assignment provision in the MIPA, I felt a strong level of comfort and security that Major

Energy would in fact remain a private company under NGE during the earnout period.  I also

believed that there would not be any change of corporate control immediately after the closing and

that the Senior Management Team would retain the necessary control to make all important

business and operational decisions for the company.  I took Mr. Lancaster at his word.

89.     However, that apparently was not the truth.

90.     It appears from the documents produced in this case by Defendants, and hidden

from the Sellers and Major Energy Senior Management before closing, that ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

91.     Specifically, ██████████████████████████████████████

███████████████████████████████████████████████████

---

[32] *Id.*

██████████████████████████████████████████.[33]  No one from NGE told me this fact before the closing.

92.   ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ █ ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████.  Again, no one from NGE told me any of these facts before the closing.

93.   Had I known that a sale of Major Energy to Spark shortly after the closing was a foregone conclusion and that I would be reporting to Mr. Kroeker, I would not have proceeded with the deal as constituted.

94.   Nonetheless, the transaction closed on April 15, 2016, without anyone from NGE apprising me of these significant facts and NGE's true intentions with respect to Major Energy.

95.   At the time of the sale, I signed a letter terminating my prior employment agreement with Major Energy.  This termination agreement ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████.[35]

---

[33] PX-655 (SPRK-NGE0050559-64).
[34] PX-640 (SPRK-NGE0045152-57).
[35] PX-546 (SPRK-NGE0032600-04).

**IV.     Operations of Major Energy Under NGE:  Immediate Changes To Business As Usual**

96.     Immediately after the closing with NGE, it became incredibly clear to me that the world Major Energy stepped into after the NGE deal was vastly different from what we were promised by NGE during the negotiation period.

97.     In my experience, small changes can make a big difference over time to a business such as Major Energy.  If you are one degree off course, that can have a huge effect.  For example, if I take a trip from New York to San Francisco, but the flight is off course by one degree, I could end up somewhere near San Diego.  And that is ultimately what happened with Major Energy after the sale to NGE and then Spark.

98.     Each time we had a conversation with NGE or Spark, they kept slicing away at key aspects of our business until Major Energy was a shell of the company it used to be.  NGE, and later Spark, deconstructed Major Energy's various components one at a time.

99.     Indeed, as discussed below, many key changes to Major Energy were sprung on us by NGE shortly after the closing.  For example, prior to the closing, I had no reason to believe that NGE or Spark would unilaterally terminate Major Energy's longstanding supply relationship with PSE two weeks after the closing.  I also had no reason to believe that a sale of Major Energy to Spark was a foregone conclusion during the earnout period and would occur only a few months after the closing in August 2016, especially after the assurances we were given by Mr. Lancaster at closing (as I described above) and the final terms of my employment agreement that gave me the ability to terminate for cause if there was any change in my reporting to Mr. Maxwell or a change of control transaction.

100.     To my surprise, however, NGE quickly and unilaterally began implementing all of these significant changes right after the closing.  In my view, these changes had an immediate and

devastating impact on Major Energy's culture, morale, and overall business operations and ultimately our ability to meet the earnout thresholds.

### A.    EMS Integration Project

101.    At the time when NGE acquired Major Energy, Spark had done five or six acquisitions and had five or six different management technology platforms.  Therefore, I observed that Spark's operations were highly disorganized.  To solve this issue, Spark asked us to implement Major Energy's EMS as the fundamental system to run Spark going forward.

102.    EMS, which was Major Energy's transaction management billing system, was a key driver of Major Energy's success.  In fact, Major Energy's operations centered around EMS.  Thus, Spark informed the Senior Management Team that it found EMS attractive and, in my view, EMS was the centerpiece of what NGE really wanted to buy from Major Energy.

103.    On April 19, 2016, immediately after the closing, ███████████████████

████████████████████████████████████████████████████████████

██████████████████  ████████████████████████████████████████

████████████████████████████

104.    In or around early May 2016, I received pressure directly from Mr. Maxwell to find a way to integrate EMS into Spark's operations.  Mr. Maxwell told me to think like a Spark person and that the EMS integration project would be good for the combined company of Major Energy and Spark.  There was a subtle threat that I needed to go along to get along, and I was constantly reminded by Mr. Maxwell to think bigger and think like a Spark person.  He also told me not to be concerned about the earnout because he could solve that issue by just buying out the earnout early.

---

[36] PX-167 (MESELLERS_0010948-49).

105.     Based on the forgoing representations by Mr. Maxwell, I agreed to co-sponsor the EMS integration project with Mr. Mike Kuznar of Spark.

106.     In the early stages, Mr. Kuznar and I explored the scope of what the EMS integration project might entail.  I wanted to know whether the project would be easy or whether it would instead take up a lot of time and energy.

107.     At first, the EMS integration project was a relatively small project.  However, it was a slippery slope, and it quickly became a full project with an increasingly larger scope of work. Indeed, the EMS project became an enormous distraction and was incredibly disruptive for me and many other key employees at the company, including Mark Wiederman, Levi Moeller, Saul Taub (Chief Technology Officer).  EMS integration committees were soon formed, and then much of the Major Energy team was spending significant time on EMS integration tasks.  At times, half my day was spent working on this integration project.

108.     By the middle of May 2016, I had already seen how disruptive the EMS integration project was for Major Energy's employees.  In fact, on May 11, 2016, ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████.[37]

109.     Similarly, on May 12, 2016, Mr. Hennekes emailed me ████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████   ████████████████████████████████████████ ████████████████████████████

---

[37] PX-181 (MESELLERS_0012396-98).
[38] PX-169 (MESELLERS_0011134-36).

110.     Since NGE became the owner of Major Energy, I had prepared weekly reports. ██

███████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██████████

███████████████████████████████████████████████████████████

████████████████████████████████████

111.     With Spark's approval, Major Energy even hired Raphi Levine as the Project

Leader for the EMS integration.

112.     On June 24, 2016, ████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████ █████████████████████████████████████████

███████████████████████████████.

113.     On July 1, 2016, I████████████████████████████████████

██████████████████████████ ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

114.     By July 2016, I was receiving complaints from Major Energy employees about how

disruptive the EMS integration project was for them. ██████████████████████████

███████████████████████████████████████████████████████████

[39] PX-613 (SPRK-NGE0043211).
[40] PX-129 (MESELLERS_0006842-44).
[41] PX-132 (MESELLERS_0006894-900).

██████████████████████████████████████████████████████████

████████████.[42]

### B.      PSE Relationship Interference

115.    Major Energy's longstanding supply relationship with PSE was significant to the company's success.  After NGE acquired Major Energy, however, NGE and Spark unilaterally and without notice immediately took actions to destroy this beneficial and fundamental operational relationship.

116.    On March 17, 2016, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ █ ████

████████████████████████████████████████████████████████

██████████████████████████████████████████

117.    On March 22, 2016, I ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[42] PX-135 (MESELLERS_0006917-20).
[43] PX-374 (SPRK-NGE0003902-04).
[44] PX-368 (SPRK-NGE0003774-78).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

118.    To my surprise, on or about April 29, 2016, just two weeks after closing, Mr. Gibson unilaterally destroyed and obliterated Major Energy's relationship with PSE well before we were able to even engage in serious renegotiation talks with PSE.  This amazed me and made me very upset as it was a clear breach of the MIPA.  As importantly, it gave me insight and concern about the integrity of the promises that were made to us at the closing table.  Without first advising or consulting me or anyone else from the Senior Management Team, Mr. Gibson made the decision to terminate the PSE relationship.  In my view, Mr. Gibson's unilateral actions, which he took without even consulting me or any of Major Energy's Senior Management Team, ran completely counter to Section 2.7 of the Earnout Agreement and took this key operational decision out of the hands of Major Energy's Senior Management Team.

119.    Because of the way Mr. Gibson terminated the PSE relationship, Major Energy could not realistically go back to PSE to try to renegotiate a new deal.  It would have been like shooting a dog in the leg and then asking it to run again.

120.    Nonetheless, the Senior Management Team tried its best to rehabilitate the relationship with PSE.  Indeed, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[45]

121.    During this timeframe, I have one specific recollection of meeting with PSE's CEO, Kazutoshi Hayashi, to discuss whether Major Energy could continue the relationship even after

---

[45] PX-613 (SPRK-NGE0043211).

Mr. Gibson's statements that NGE would be terminating the relationship.  I recall Mr. Hayashi responding that the damage had already been done and that there was no way PSE would want to be in business with Mr. Maxwell and Mr. Gibson.  He further stated that Mr. Maxwell and Mr. Gibson were liars and were bad guys.

122.    Despite our best efforts, Mr. Gibson's actions irreparably spoiled the relationship with PSE.  It was my belief at the time that every ounce of trust Major Energy had built up with PSE went out the window at this time because what Mr. Gibson said to PSE and what Major Energy had been telling PSE were two diametrically opposed positions.

### C.    NGE Comes Clean on the Dropdown

123.    As I testified above, prior to closing, NGE never told us that a sale of Major Energy from NGE to Spark (the "Dropdown") was going to in fact happen during the earnout period, let alone just a couple months after closing.  While the conversation of a Dropdown may have come up during negotiations, there was nothing definitive decided on this front.  In fact, I recall that by the date of the closing, NGE informed us that it was probable that any Dropdown would not occur until after the end of the earnout period.  Additionally, given the assurances provided by Mr. Lancaster on the date of closing and the language of my employment agreement, I had even more reason to believe that a Dropdown, which would be a change of control, was not going to happen until the end of my employment term (*i.e.*, after the earnout period).

124.    A couple weeks after the closing, however, I learned that Major Energy was in fact being prepared as a Dropdown to Spark.  I was shocked by the timing and felt misled and confused as to why NGE would have agreed to terms in my employment agreement and other documents that they knew they would be breaching within weeks of execution.  It was just two weeks after closing and the execution of the deal and my new employment agreement.  At this point, it became obvious to me that Major Energy was just another piece on Mr. Maxwell's chessboard.

125.     Specifically, on April 29, 2016, I ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

126.     A couple days later, on May 1, 2016, ████████████████████████

███████████████████████████████████████████████████████████████████

████████████████ ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████

127.     After this initial email exchange with Mr. Studnicky, we had subsequent
conversations about this draft agreement and the consent issue, in particular the language in
Section 11.7 of the MIPA that requires consent of Mr. Horowitz and the Sellers to any assignment
of the MIPA and the rights and obligations of NGE in the MIPA to any third party, including

---

[46] PX-121 (MESELLERS_0006394-99).
[47] *Id.*

Spark.  And by the time of the Dropdown, Mr. Studnicky had informed me that the consent of the Sellers' Representative was in fact required for any Dropdown transaction and assignment of the MIPA to Spark.  In fact, ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███.[48]

128.     On May 4, 2016, Major Energy issued a press release to announce the sale to NGE. In the press release, it stated that Spark and NGE had agreed on terms for Major Energy to be transferred to Spark.  The press release attributes a statement to me about the sale to NGE and contemplated transfer to Spark.  I did not draft that statement and it was shown to me shortly before its release.

129.     On May 4, 2016, I reviewed a copy of the Membership Interest Purchase Agreement between NGE and Spark, which governed a contemplated sale of Major Energy from NGE to Spark (the "Spark MIPA").  That same day, I ████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.[49]

**D.     Meeting with Mr. Maxwell in Florida**

130.     Given the many changes that NGE and Spark were already making to Major Energy's business by this date, and now the contemplated takeover by Spark through the Dropdown, the Senior Management Team determined that it was important that we immediately meet with Keith Maxwell to discuss our concerns on the lack of business as usual so far at Major Energy and the need to resolve these concerns quickly.

---

[48] PX-163 (MESELLERS_0010036).
[49] PX-93 (MESELLERS_0002262).

131.    In fact, by this point in time, the "Spark vortex" that Mr. Hennekes and Mr. Konikowski had warned me about was already starting to rip apart Major Energy one piece at a time.

132.    Mr. Horowitz ████████████████████████████████████████████████
████████████████████████████,[50]

133.    On May 11, 2016, ███████████████████████████████████████
████████████████████████  ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

---

[50] PX-217 (MESELLERS_0012578-82).
[51] PX-85 (MESELLERS_0001908-09).

134.     I understand that Mr. Horowitz ultimately met with Mr. Maxwell in Florida for lunch on May 11, 2016 and discussed the business as usual concerns reflected in my talking points, as well as the need to get things back on track.

135.     At that time in May 2016, I was also in Florida with Mr. Wiederman for a KEMA industry conference.  Mr. Maxwell, his wife, Mr. Hennekes, Mr. Konikowski and Michael Tsang of NGE were also at that same conference.

136.     At the conference, on May 12, 2016, I vividly recall sitting with Mr. Maxwell in two chairs in the hotel lobby.  Mr. Maxwell started by telling me that he was surprised by his previous meeting with Mr. Horowitz the day before and he was obviously angered by it.  I expressed my concerns to him that there is a fundamental misalignment between EMS systems integration and achieving the Contingent Payments and that it may be impossible for it to ever be truly "business as usual" in the context of Major Energy's EMS system (and its IT support group) being used as the centerpiece of Spark's enterprise billing system for all of Spark's brands. Moreover, I expressed some of the additional concerns reflected above in my May 11 talking points.  It was just the two of us.

137.     In response, Mr. Maxwell told me that he needed more "leadership" from me as the CEO of Major Energy.  He further told me that I needed to "play a bigger game" and not worry about the earnout as NGE or Spark would take care of the earnout and buy out the silent shareholders.  Mr. Maxwell insisted that he needed me to think like a Spark person and just do what is good for Spark and complete the EMS integration project because it was important to Spark for solving its multiple enterprise system issues.

138.     That evening, Mark Wiederman and I had dinner with Mr. Maxwell, his wife, Mr. Konikowski, Mr. Hennekes, and Mr. Tsang.  Mr. Maxwell reiterated the same things to me and

Mr. Wiederman during this dinner, telling us that he needed us to be leaders at Spark and that we should not worry about the earnout as he would make it go away.  He also told us that if we thought and acted like Spark employees, he would "spray love all over us" and take care of us financially.

139.    Thereafter, I tried my best to walk the fine line between his request to think like a Spark person and running Major Energy in as much a "business as usual" way as possible in the face of increasing pressure by Spark and NGE people to make the Spark/EMS systems integration a win for Spark.

### E.    Early Buyout Discussions

140.    On June 9, 2016, Mr. Maxwell ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

141.   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████[52]

142.   During the weeks that followed, I attempted to broker a deal between the Sellers and Mr. Maxwell for an early buyout of the Contingent Payments.  In fact, Mr. Maxwell promised me a $500,000 bonus if I brokered an early buyout between Spark and the Sellers in the range of $20 million to $25 million.  We shook hands at his conference room table on this deal.

143.   I do not recall the exact dates, but sometime in early August, I was able to broker a deal for an early buyout.  We had a handshake agreement of $25 million, meaning that I had direct conversations with each of Mr. Maxwell, Mr. Horowitz, and Mr. Kroeker where each affirmed verbally to me that they wanted to proceed with the buyout of the Contingent Payments for $25 million.

144.   The plan was for Spark to provide an agreement for the early buyout and that as part of that agreement, Mr. Horowitz would consent to the early Dropdown.  To help with the execution of that deal, Mr. Wiederman and I flew down to Houston on or about August 21st or 22nd with Mr. Horowitz's executed consent to be delivered as part of a fully executed agreement for the buy-out.

145.   On August 22, 2016 I ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████.

---

[52] PX-354 (SPRK-NGE0000001-04).
[53] PX-140 (MESELLERS_0006974-78).

146. ████████████████████████████████████████████████

████████████████████████████

147.     The next morning, I spoke with Mr. Wiederman, Mr. Horowitz, and Mr. Studnicky and was told that Mr. Horowitz would not agree to release his consent to the Dropdown until there was a binding agreement with Spark, as the proposed Board approval provision left open the possibility that the buyout may not occur as agreed.   Mr. Horowitz's view was that there was no reason Spark could not first get approval from the Board (especially because Mr. Maxwell effectively controls the Board) and then the parties could finalize the early buyout.  Only under those terms would Mr. Horowitz provide his consent to the Dropdown.  I conveyed that position to Gil Melman of Spark and asked if it were possible for Spark to get Board approval that day.  Mr. Melman, clearly under the stress of having to do the Dropdown that day, told me that there was not enough time for that and that Spark had figured out a "work-around" to the situation without Mr. Horowitz's consent.

148.     From my perspective, nothing was going to stop NGE and Spark from completing the Dropdown on August 23, 2016, regardless of whether they got Mr. Horowitz's consent to the Dropdown or not.

149.     In fact, as a way to mitigate the various breaches of my employment agreement as a result of the Dropdown, Mr. Kroeker in a meeting in his office on August 23, 2016 told me that I needed to sign a tolling agreement sent to me by Gary Lancaster from NGE the day before.  The proposed tolling agreement effectively terminated my employment agreement as part of a plan for me to now work for NGE (or an affiliate thereof) in some undefined role.  These requests made me feel as though they were treating me like a piece of furniture that was being moved from one room to another.  I told Mr. Kroeker in that meeting that I had just received the draft tolling

agreement the day before, had no time to consider it with counsel and asked him what they were now proposing my role would be at NGE.  He told me to talk to Mr. Maxwell about what my role would be at NGE.  In that meeting with Mr. Kroeker, I rejected the proposed tolling agreement as I saw it as a continuation of the demise of the integrity of the MIPA and employment agreement structure we had just agreed to only months before.

150.     Despite not agreeing to the terms of the proposed tolling agreement, Mr. Kroeker told me that the handshake buyout of the earnout was still very much proceeding and led me to believe that nothing had changed in that regard.   In fact, soon after the Dropdown I recall Mr. Kroeker requesting updated financial information from us to take the earnout buyout to the Board for approval.

151.     The early buyout ultimately fell apart slowly in the months after the Dropdown as Mr. Kroeker's story began to change and he slowly backed out of the handshake deal.  In my view, one of the major reasons it fell apart was because Spark could not get the Board approval in time to finalize the deal with the Sellers at the Dropdown with the Sellers' consent, and once Spark utilized a "work-around" to the Dropdown without the required consent, the pressure was off Mr. Maxwell and NGE as Major Energy now was in the Spark vortex.

**F.     NGE And Spark Complete The Dropdown Of Major Energy Without The Sellers' Consent**

152.     Ultimately, in my view, Spark determined that it could get what it wanted, *i.e.*, Major Energy's systems and control over Major Energy, by consummating the Dropdown with NGE without the Sellers' consent.  Accordingly, on August 23, 2016, NGE completed the Dropdown of Major Energy into Spark without obtaining the Sellers' written consent.

153.    On August 23, 2016, in connection with the Dropdown, Spark issued a press release where I am quoted as being "thrilled to join the Spark family."[54]  While I did not draft this press release, I did review its substance while under extreme pressure in Mr. Kroeker's office.  I do not recall making any changes to this press release because I was still under the belief at the time that the early buyout deal would get done based upon what Mr. Kroeker had told me.

154.    On August 25, 2016, Mr. Horowitz ███████████████████████ ████████████████████████████████████████████████ ███████████████.[55]

155.    By completing the Dropdown without consent, it was my view that Spark breached my employment agreement and the employment agreements of many other key Major Energy employees.  In fact, Mr. Melman directly confirmed for me that my employment agreement had been breached because the Dropdown constituted a change-in-control transaction.  Accordingly, following the Dropdown, I terminated my employment agreement for cause under Section 3.2(c) because the Dropdown was a change-in-control transaction.

156.    After terminating my employment agreement for cause, I did not come into the office to work at Major Energy for two to three weeks.

157.    I understand that other key executives at Major Energy, namely, David Sobel and Levi Moeller, also terminated their employment agreements for cause following the Dropdown and change in control.  Thus, three of Major Energy's top executives terminated their employment agreements for cause around the same time.

---

[54] PX-457 (SPRK-NGE0023333).
[55] PX-62 (MESELLERS_0000179).

158.     I recall hearing from Rob Lane (former CFO of Spark) after the fact that Spark viewed all of the severance payments it had to make to me and the various other Major Energy employees who also terminated their employment agreements for cause after the Dropdown as a "cost of the transaction."  After that conversation, it became apparent to me that they factored those severance payments into the purchase price and on balance it made economic sense to do so as the amount of the severance payments they made was a fraction of what they could save in avoided earnout payments by such interference.

159.     Therefore, after the closing of the deal with NGE, it became clear to me that NGE executives had planned and structured a deal with the Sellers that contained many key provisions that they never had any intention of honoring.

160.     In my view, NGE enticed me to go along with the deal and new employment by promising me that I would only have to report to Mr. Maxwell and they knew that was not going to be the case for long.

161.     Only four months after closing, NGE completed a deal with Spark that breached the employment contracts of all key Major Energy executives and then required me to report to Mr. Kroeker if I wanted to stay on at Major Energy, who NGE management had told me months before to stay away from for as long as possible.

## V.     Operations of Major Energy Under Spark:  Complete Changes to Major Energy's Business Practices

### A.     Finance and Accounting Changes

162.     Almost immediately after the Dropdown, Spark began integrating Major Energy's accounting functions with Spark's accounting functions.  As CEO of Major Energy, I was regularly made aware of issues regarding accounting changes that Spark made to Major Energy by our CFO, David Sobel.

163.    Mr. Sobel brought many accounting integration issues to my attention after the Dropdown, including that ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████.[56]

164.    All of these changes in finance and accounting required the time and resources of the Major Energy management team, who now had numerous Spark people to approve various management, trading, and financial requests.  With the limited time and resources of the Major Energy management team, we all became distracted with these new processes and procedures and approvals and lost our ability to act quickly and opportunistically while running Major Energy.

**B.    The EMS Project Continued to Distract Key Major Energy Employees**

165.    On August 24, 2016, the day after the Dropdown to Spark, Mr. Moeller emailed me stating ████████████████████████████████████████ ████████████████████████    ██████████████████ ████████████████████████████████████████ ██████████████████████████████████.

166.    Ultimately, I told Mr. Maxwell and Mr. Kroeker that the EMS integration project was very different from what we all had discussed originally and agreed to sign up for.  Mr. Maxwell responded that I should think like a Spark person and "think big, not small."  I told Mr. Maxwell that I was not comfortable knowingly breaching the Earnout Agreement's business as

---

[56] *See, e.g.*, PX-587 (SPRK-NGE0040398-99); PX-127 (MESELLERS_0006778-81); PX-145 (MESELLERS_0007014); PX-146 (MESELLERS_0007052); PX-147 (MESELLERS_0007053-54).
[57] PX-142 (MESELLERS_0006995).

usual provision.  He responded that he would just buy the silent shareholders of Major Energy out if they were making too much noise about the operation of Major Energy post-closing.  Mr. Maxwell told me that I needed to keep to the Spark mission.

167.    Therefore, I tried to be a good and helpful corporate citizen to Spark, but Spark preyed on that to incentivize me to do things, including the EMS integration project, that distracted me from growing Major Energy business.

168.    After months of disruption, Spark finally shut down the EMS integration project in September 2016 after the Dropdown.  But the EMS integration project, which was never brought up to me prior to the closing with NGE, diverted the attention of key Major Energy employees for months and negatively affected our ability to grow the business.

169.    Afterwards, Spark gave Major Energy a $250,000 add-back associated with the EMS integration project.  But that add-back was not meant to compensate for time lost by Major Energy employees working on the EMS integration project.  Instead, it was meant to reflect the added employees that Major Energy hired as a result of working on the project.  There was no way to reset for the time and energy lost due to the EMS integration project.

### C.    Supply Negotiations

170.    As described above, in April 2016, Mr. Gibson irreparably and unilaterally destroyed Major Energy's supply relationship with PSE.

171.    On September 23, 2016, Alexis Keane (Deputy General Counsel of Spark) .[58]

172.    I responded by

---

[58] PX-469 (SPRK-NGE0024644-47).
[59] PX-470 (SPRK-NGE0024648-49).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

173.     In January 2017, Major Energy's head of supply, Mr. Moeller, regularly voiced his concerns to me about a potential change in supplier from PSE to Spark.  Among other concerns, on January 4, 2017, ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████.[60]

174.     Ultimately, our backs were to the wall and we did not have a choice.  At this point in time, Major Energy's key contacts at PSE—Mark Depew and James Chung—had already been fired because of Mr. Gibson's decision to terminate Major Energy's relationship with PSE. Moreover, in my experience, it typically takes three to six months to do a supply transfer.

175.     Therefore, Major Energy had no choice but to reluctantly agree to give Spark a try as its new supplier.

176.     The termination of Major Energy's key supply relationship with PSE and replacement of PSE with Spark is yet another example of something that I was not informed of during the negotiation and closing period and in my view was highly disruptive to Major Energy's business, at least during my tenure.

**D.     Spark Negatively Affected Major Energy's Relationships with Residential Marketing Vendors**

177.     As discussed above, Major Energy's relationships with its residential marketing vendors were key to the company's success prior to the closing of the sale to NGE.

---

[60] PX-560 (SPRK-NGE0034311-17).

178.   After the Dropdown, many of the company's marketing vendors informed us that they did not like Spark and felt that Spark had a negative reputation.  Our vendors therefore did not want to work with Spark and simply did not trust them.

179.   In my experience with Spark during the earnout period, Spark exercised somewhere between influence and interference with Major Energy's vendors.

180.   Significantly, on September 14, 2016, I learned that  .[61]  Mr. Wolbrom forwarded this email to me and Mr. Wiederman shortly after receiving this email.

181.   I responded ████████████████████████████████████████████████████████████████████████████████████████████████████

### E.   Key Major Energy Employees Depart the Company

182.   Shortly after the Dropdown, Mr. Kroeker visited Major Energy's office in New York and met with Major Energy employees.  I recall Major Energy employees leaving that meeting with a sense of fear about their job security.

183.   Mr. Wolbrom, Major Energy's CMO, left the company soon after the Dropdown. As CEO of Major Energy, I observed a sharp decline in morale at the company after Mr. Kroeker's

---

[61] PX-166 (MESELLERS_0010941-44).

visit as his message was inconsistent with the business as usual message the Major Energy management team espoused.

184.    Nechemia Schorr, an important member of Major Energy's supply and pricing group, also left Major Energy shortly after the Dropdown.

185.    In my view and based on discussions I had with Major Energy employees before their departure, many of our employees left the company in the months following the Dropdown because they were not comfortable with the way Spark ran its business.  While I and the rest of the Senior Management Team promised our employees that Major Energy would be left alone to operate as a stand-alone entity, our employees saw that this did not turn out to be true.  This uncertainty caused great fear among Major Energy's employees, many of whom chose to seek more stable employment elsewhere following the Dropdown.

### F.    Aggregation Opportunities

186.    During the negotiation period, the Senior Management Team discussed at length with NGE that we may pursue aggregation deals during the earnout period as a means of increasing Major Energy's Customer Accounts if we felt those aggregation opportunities would be beneficial for the company.  NGE representatives agreed that we could pursue aggregation deals if we thought they were in Major Energy's best interest.

187.    Under PSE, Major Energy had the freedom to pursue aggregation deals to acquire large volumes of customers if the Senior Management Team decided to pursue these opportunities.

188.    After leaving Major Energy in or about April 2017, I came across an aggregation deal for 7,000 customers that I thought would be great for Major Energy.

189.    I presented this aggregation opportunity to Mr. Moeller.  However, Mr. Moeller informed me that Spark had blocked Major Energy from bidding on these types of opportunities because Spark had set a 5,000-customer cap on aggregation deals.

190.    Given all the fundamental changes described above by Spark to Major Energy's business from the date of closing, it is no surprise that Major Energy ended up off course.

## VI.    Termination

191.    On January 30, 2017, I



192.    I was terminated as the CEO of Major Energy at the end of April 2017.  After speaking to Mr. Kroeker, my understanding was that I was terminated because Mr. Wiederman and Mr. Horowitz felt that having me as CEO was unnecessary and an added cost given the way things played out after the Dropdown.

---

62 PX-643 (SPRK-NGE0049442-43).
63 PX-644 (SPRK-NGE0049444-50).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: New York, New York
       December 13, 2019

_____
Dan Alper