**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SAUL HOROWITZ, as Sellers'
Representative,

                            Plaintiff,

                    v.

NATIONAL GAS & ELECTRIC, LLC and
SPARK ENERGY, INC.,

                            Defendants.

Civ. No. 17-CV-7742 (JPO)

**PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW**

Israel Dahan
Richard T. Marooney
Ryan Gabay
Leah Aaronson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.:  (212) 556-2114
idahan@kslaw.com
rmarooney@kslaw.com
rgabay@kslaw.com
laaronson@kslaw.com

Chelsea J. Corey
KING & SPALDING LLP
300 South Tryon Street
Suite 1700
Charlotte, NC 28202
Telephone No.:  (704) 503-2575
ccorey@kslaw.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION................................................................................................2

ARGUMENT ......................................................................................................5

  I. Plaintiff Is Entitled To Pre-Trial Judgment On His Claim Against NGE For
     Breach Of The Unambiguous Non-Assignment Provision Contained In Section
     11.7 Of The MIPA And His Entitlement To An Award Of Rescissory Damages
     (Count I)......................................................................................................5

     A. Section 11.7 Of The MIPA Is Unambiguous And Expressly Prohibits NGE
        From Assigning The MIPA And All Rights And Obligations Thereunder To
        Anyone Without The Prior Written Consent Of The Sellers .........................7

     B. The Evidentiary Record Conclusively Establishes That NGE Breached
        Section 11.7 Of The MIPA ........................................................................10

     C. Consistent With The Unambiguous Terms Of Section 11.7 Of The MIPA,
        NGE's Sale And Assignment Transaction Is Void......................................14

     D. Rescissory Damages Is An Appropriate Remedy For A Void Transaction
        Where Rescission Itself Is Not Feasible ....................................................15

     E. NGE's Defenses All Lack Merit................................................................18

  II. Plaintiff Is Entitled To Pre-Trial Judgment On His Claim Against Spark For
     Tortious Interference Of Contract With Respect To NGE's Breach Of Section
     11.7 Of The MIPA And Recovery Of Punitive Damages (Count IV)...............26

  III. Plaintiff Is Entitled To Pre-Trial Judgment On His Claim Against Defendants For
      Breach Of Section 2.2 Of The MIPA And Earnout Agreement For Miscalculation
      Of The 2016-2018 Contingent Payment Amounts (Counts II And III)..............31

     A. Plaintiff Can Sue Spark For Breach Of The MIPA Or Earnout Agreement..............33

     B. Defendants' Methodological and Calculation Errors With Respect To The
        2016 Contingent Payment...........................................................................36

     C. Defendants' Methodological and Calculation Errors With Respect To The
        2017 And 2018 Contingent Payments ........................................................67

  IV. Plaintiff Is Entitled To Pre-Trial Judgment Awarding Him And The Sellers
      Reimbursement Of All Of The Reasonable Attorneys' Fees And Expenses They
      Incurred In This Litigation And Statutory Prejudgment Interest.......................69

CONCLUSION .................................................................................................71

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                         **Page(s)**

*Abha Int'l, LLC v. Clover Int'l Corp.*,
  No. 11 Civ. 6841, 2012 WL 569187 (S.D.N.Y. Feb. 16, 2012) ...............................9

*Allhusen v. Caristo Const. Corp.*,
  303 N.Y. 446 (N.Y. 1952) .........................................................................................14

*Aronoff v. Albanese*,
  85 A.D.2d 3 (2d Dep't 1982) .....................................................................................24

*Ashwood Capital, Inc. v. OTG Mgt., Inc.*,
  99 A.D.3d 1 (1st Dep't 2012) ....................................................................................21

*Awards.com, LLC v. Kinko's, Inc.*,
  42 A.D.3d 178 (1st Dep't 2007) ................................................................................25

*Banco De La Republica De Colom. v. Bank of N.Y. Mellon*,
  No. 10-cv-536, 2013 WL 3871419 (S.D.N.Y. July 26, 2013).............................24, 25

*Cruden v. Bank of N.Y.*,
  957 F.2d 961 (2d Cir. 1992).........................................................................................8

*Days Inns Worldwide, Inc. v. Hosp. Corp. of the Carolinas*,
  No. 13-CV-8941 JPO, 2015 WL 5333847 (S.D.N.Y. Sept. 14, 2015)....................70

*Draper v. Georgia Props.*,
  230 A.D.2d 455 (1st Dep't 1997) ..............................................................................25

*Equator Int'l, Inc. v. NH Street Investors, Inc.*,
  978 N.Y.S.2d 817 (N.Y. Sup. Ct. 2014) ...................................................................26

*Gibbs ex rel. Gibbs v. Cigna Corp.*,
  440 F.3d 571 (2d Cir. 2006).......................................................................................34

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (N.Y. 2002) .........................................................................................8

*Holland Loader Co. v. FLSmidth A/S*,
  313 F. Supp. 3d 447 (S.D.N.Y. 2018).............................................................9, 10, 22

*Horsehead Indus. v. Metallgesellschaft AG*,
  239 A.D.2d 171 (1st Dep't 1997) ..............................................................................35

*Jennings v. Hunt Cos.*,
  367 F. Supp. 3d 66 (S.D.N.Y. 2019)..........................................................................35

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010).................................................................8

*LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*,
287 F.R.D. 230 (S.D.N.Y. 2012) .......................................................14

*Liberty Media Corp. v. Vivendi Universal*,
874 F. Supp. 2d 169 (S.D.N.Y. 2012)................................................15

*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*,
34 Misc. 3d 895 (N.Y. Sup. Ct. 2012) ...............................................15

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
842 F. Supp. 2d 682 (S.D.N.Y. 2012)................................................25

*Morse/Diesel, Inc. v. Fidelity & Deposit Co.*,
763 F. Supp. 28 (S.D.N.Y. 1991)........................................................34

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
273 F. Supp. 2d 436 (S.D.N.Y. 2003)................................................21

*Omni Quartz v. CVS Corp.*,
287 F.3d 61 (2d Cir. 2002)...................................................................9

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
152 F. Supp. 3d 127 (S.D.N.Y. 2016)................................................25

*Purgess v. Sharrock*,
33 F.3d 134 (2d Cir. 1994)..................................................................34

*Recticel Foam Corp. v. Bay Indus.*,
128 F. App'x 798 (2d Cir. 2005) .......................................................35

*Richard A. Hutchens CC, L.L.C. v. State*,
59 A.D.3d 766, 872 N.Y.S.2d 734 (2009) ........................................15

*Sardanis v. Sumitomo Corp.*,
282 A.D.2d 322 (1st Dep't 2001) ......................................................24

*SHLD, LLC v. Hall*,
No. 15 Civ. 6225 (LLS), 2016 WL 659109 (S.D.N.Y. Feb. 17, 2016) ................................36

*Silverberg v. SML Acquisition LLC*,
No. 15-CV-7129 (CS), 2017 WL 758520, at *6 (S.D.N.Y. Feb. 27, 2017) ..........................36

*Sporre S.A. de C.V. v. Int'l Paper Co.*,
No. 99-cv-2638, 1999 WL 1277243 (S.D.N.Y. Dec. 30, 1999)................................24

*St. Clair Shores Gen. Empls. Ret. Sys. v. Eibeler*,
    745 F. Supp. 2d 303 (S.D.N.Y. 2010)......................................................................15

*Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*,
    935 N.Y.S.2d 858 (N.Y. Sup. Ct. 2012) ..................................................................15

*TransformaCon, Inc. v. Vista Equity Partners, Inc.*,
    2015 WL 4461769 (S.D.N.Y. July 21, 2015) ..........................................................36

*UMB Bank, Nat'l Ass'n. v. Airplanes Ltd.*,
    260 F. Supp. 3d 384 (S.D.N.Y. 2017).....................................................................59

*W.W.W. Assoc., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (N.Y. 1990) .......................................................................................9

*Warnaco Inc. v. VF Corp.*,
    844 F. Supp. 940 (S.D.N.Y. 1994)...........................................................................35

## Other Authorities

6A N.Y. Jur. 2d Assignments § 42 (2d ed. 2019)........................................................24

57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 40 (2d ed. 2019) ......................24

27 Williston on Contracts § 70:13 (4th ed. 2018).......................................................24

N.Y. C.P.L.R. § 5001(a) (2019) ..................................................................................70

N.Y. C.P.L.R. § 5004 (2019) .......................................................................................70

Plaintiff Saul Horowitz, as Sellers' Representative,[1] by and through his undersigned counsel, respectfully submits this Pre-Trial Memorandum of Law seeking a judgment as a matter of law on (i) Plaintiff's claim against Defendant National Gas & Electric LLC ("NGE") for breach of Section 11.7 of the Membership Interest Purchase Agreement ("MIPA") and recovery of rescissory damages; (ii) Plaintiff's claim against Defendant Spark Energy, Inc. ("Spark") for tortious interference of contract in connection with NGE's breach of Section 11.7 of the MIPA and recovery of damages, including punitive damages; (iii) Plaintiff's claim against NGE and Spark for breach of Section 2.2 of the MIPA and Earnout Agreement and recovery of compensatory damages; and (iv) Plaintiff's right to reimbursement of all the reasonable attorneys' fees and expenses he and the other Sellers have incurred in this litigation pursuant to Section 3.7 of the Earnout Agreement and to an award of statutory pre-judgment interest.

At the case management conference in May 2019, the Court encouraged the parties to include all legal and contractual interpretation issues they believe can and should be decided pre-trial in their respective "big -- hopefully not too big" pre-trial memoranda so that the Court can decide "all the legal issues [it] can . . . before the bench trial." *See* May 8, 2019 Case Management Conference Tr. 34:1-35:16.  To this end, the Court also instructed Plaintiff to "lift everything" from his previously submitted Motion for Partial Summary Judgment[2] (which the Court denied without prejudice to renew before trial) and include it in the Pre-Trial Memorandum. *Id.*; *see also* Nov. 12, 2019 Case Management Conference Tr. 8:22-9:22.

Plaintiff has followed this instruction in this Pre-Trial Memorandum.  Plaintiff recognizes that this Pre-Trial Memorandum is not short, but he is moving for a pre-trial ruling on all the

---

[1] The Sellers are the former owners of the membership interest in Major Energy Services, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC (collectively, "Major Energy"), and include Plaintiff, Mark Wiederman, Asher Fried, Mark Josefovic, and Michael Bauman.

[2] *See* ECF Nos. 52, 76.  Of note, the briefing on Plaintiff's Motion for Partial Summary Judgment alone was more than 30 pages, inclusive of the reply brief.

legal and contractual-interpretation issues he believes can and should be decided in his favor pre-trial and there is no opportunity for a reply brief.  Thus, Plaintiff must address in this Pre-Trial Memorandum both his affirmative arguments and responses to the arguments Defendants are likely to raise in their opposition.  Plaintiff submits that pre-trial resolution of these legal and contractual interpretation issues will significantly streamline the upcoming bench trial.

## <u>INTRODUCTION</u>

Plaintiff filed his initial Complaint in the United States District Court for the Southern District of New York on October 10, 2017 and filed his Amended Complaint on December 11, 2017.  *See* ECF Nos. 1, 22.  The Amended Complaint asserts four causes of action: (i) fraudulent inducement against NGE (Count I); (ii) breach of contract against NGE (Count II); (iii) breach of contract against Spark (Count III); and (iv) tortious interference with contract against Spark (Count IV).  In connection with these claims, Plaintiff seeks rescissory damages, compensatory damages, punitive damages, and reimbursement of all legal fees and costs.

On January 15, 2018, Defendants moved to dismiss the fraudulent inducement and tortious interference claims, as well as Plaintiff's request for punitive damages.  *See* ECF No. 27. On September 24, 2018, the Court granted Defendants' motion to dismiss the fraudulent inducement claim but denied Defendants' motion to dismiss Plaintiff's tortious interference claim and Plaintiff's request for punitive damages.  *See* ECF No. 42.

This action concerns Defendants' breaches of agreements entered into with the Sellers in March and April 2016,[3] as part of NGE's acquisition of Major Energy from the Sellers, and Spark's tortious and bad faith conduct in connection with certain of those breaches of contract. At the time of NGE's acquisition, Major Energy was a privately held natural gas and electricity supplier operating in several deregulated markets in the Northeast and Midwest.  NGE was also a

---

[3] These agreements include a MIPA, an Earnout Agreement, and an Executive Earnout Agreement.

privately held company that held itself out as ███████████████████████████

███████████   The total indicative purchase price for this transaction was $80 million—$35

million of which was to be paid in the form of Earnout Payments and Cash Installments (the

"Contingent Payments") over a period of 33 months (*i.e.*, until December 31, 2018) (the

"Earnout Period") dependent upon Major Energy's satisfaction of certain agreed-upon

performance targets.

More specifically, in Count II of the Amended Complaint, Plaintiff asserts that NGE

breached the unambiguous non-assignment provision contained in Section 11.7 of the MIPA by

assigning or otherwise transferring the Major Energy membership interest it acquired from the

Sellers and all of its rights and obligations under the MIPA to Spark or one of its controlled

subsidiaries, Spark HoldCo, LLC ("Spark HoldCo"), without obtaining the required prior written

consent of the Sellers.  Plaintiff further asserts that, under the unambiguous terms of Section 11.7

this transaction is void.  But because voiding or rescinding this transaction at this point in time is

no longer practical, the Court is permitted under New York law to award Plaintiff an alternative

remedy of rescissory damages.[4]

In connection with this breach claim, and in Count IV of the Amended Complaint,

Plaintiff asserts that Spark is liable for tortious interference with contract because it knowingly

and actively participated in NGE's breach of the non-assignment provision in the MIPA.  Indeed,

Spark worked in concert with NGE to complete the assignment transaction, all while knowing

(and acknowledging) that the Sellers' prior written consent was required, but not obtained.

Spark and NGE even manipulated their assignment transaction documents in a futile effort to

circumvent the express written consent requirement of the MIPA.  And contrary to Spark's

---

[4] As demonstrated below, Plaintiff's expert has valued rescissory damages related to Defendants' breach
at no less than $9.8 million.  Such valuation is not credibly disputed by Defendants.

contention, the exculpatory or limitation of liability provisions in the MIPA do not bar Plaintiff from suing Spark for engaging in tortious and bad faith behavior and recovering punitive damages.  New York law and public policy forbids enforcement of exculpatory or limitation of liability provisions to insulate a party's willful, reckless or even grossly negligent conduct.

Plaintiff also asserts, in Counts II and III of the Amended Complaint, that NGE and/or Spark (dependent upon which entity is obligated under the agreements post-assignment) breached Section 2.2 of the MIPA and Section 2.2 of the Earnout Agreement by improperly calculating the Contingent Payment amounts due and owed to the Sellers during the Earnout Period.  These calculation errors have led to an underpayment to the Sellers of more than $4.8 million for 2016 and more than $1.5 million for the 2017 and 2018 period, combined.[5]

In Counts II and III, Plaintiff further asserts that NGE and/or Spark (dependent upon which entity is obligated under the agreements post-assignment) breached Section 2.7 of the Earnout Agreement and Executive Earnout Agreement by, among other things, failing to comply with their express "good faith and fair dealing" obligation and allowing the Major Energy Senior Management Team to operate Major Energy "in all material respects" throughout the Earnout Period, "consistently with how the Senior Management Team operated [Major Energy] before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities."  Plaintiff contends that Defendants' misconduct and breaches of Section 2.7 of the Earnout Agreement and Executive Earnout Agreement prevented the Sellers from achieving the full $35 million Contingent Payment during the Earnout Period. Indeed, the Sellers received only about 25% ($9 million) of the $35 million Contingent Payment because of Defendants' misconduct.

---

[5] For purposes of this Pre-Trial Memorandum, Plaintiff is seeking a judgment with respect to only certain of the calculation errors relating to the 2016-2018 Contingent Payments.  The remainder will be pursued by Plaintiff at trial.

In this Pre-Trial Memorandum, Plaintiff moves for a pre-trial judgment as a matter of law on certain of his remaining claims, specifically his claims for:  (i) breach of Section 11.7 of the MIPA against NGE and recovery of rescissory damages in the amount of at least $9.8 million (Count II); (ii) tortious interference with a contract against Spark with respect to NGE's breach of Section 11.7 of the MIPA and recovery of compensatory and punitive damages (Count IV); and (iii) breach of Section 2.2 of the MIPA and Earnout Agreement against both NGE and Spark with respect to certain miscalculations they made with respect to the 2016-2018 Contingent Payment amounts[6] and pre-trial recovery of a minimum of $2.1 million to as much as $4.4 million in underpayments of such Contingent Payments (Counts II and III).[7]  As demonstrated below, and supported by the evidentiary record and New York law, there are no genuine disputed issues of fact with respect to these claims and Plaintiff is entitled to judgment as a matter of law.

Plaintiff also moves for pre-trial judgment on his contractual right to reimbursement of all the legal fees and expenses he and the other Sellers incurred in connection with this litigation and in pursuit of Contingent Payment funds owed to Plaintiff, and his right to an award of statutory pre-judgment interest.

## ARGUMENT

**I.      Plaintiff Is Entitled To Pre-Trial Judgment On His Claim Against NGE For Breach Of The Unambiguous Non-Assignment Provision Contained In Section 11.7 Of The MIPA And His Entitlement To An Award Of Rescissory Damages (Count I)**

To establish a breach of contract claim, a plaintiff must prove the following: (1) the existence of an enforceable agreement; (2) performance by plaintiff; (3) the defendant breached the agreement; and, (4) the plaintiff sustained damages as a result of the defendant's

---

[6] Certain of the alleged miscalculations for the 2016-2018 Contingent Payments involve disputed issues of fact and, therefore, will be addressed and established by Plaintiff at trial.

[7] Plaintiff is not moving for pre-trial judgment on his claim against NGE and Spark for breach of Section 2.7 of the Earnout Agreement and Executive Earnout agreement, but is confident that the trial record will support a ruling in his favor on this claim and sustained damages in the amount of at least $26 million.

breach. *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 378 (S.D.N.Y. 2014).  Judgment pre-trial

is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986). "There is no genuine issue of material fact where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party." *Fabrikant v. French*, 691

F.3d 193, 205 (2d Cir. 2012) (internal quotation marks and citation omitted).

As demonstrated below, Plaintiff has met his burden and established that there is no

genuine issue of material fact with respect to all the elements of his claim against NGE for

breach of the unambiguous non-assignment provision contained in Section 11.7 of the MIPA.

Specifically, there is no dispute that the MIPA is a binding and enforceable agreement between

the Sellers and NGE.  Moreover, it cannot be genuinely disputed that Plaintiff and the other

Sellers performed their obligation under the MIPA to transfer their 100% membership interest in

Major Energy to NGE at closing and that NGE did not claim any breach of the MIPA by Plaintiff

or the other Sellers prior to NGE's alleged breach of Section 11.7 of the MIPA or even prior to

the filing of this lawsuit.[8]   As for the last two elements, the evidentiary record conclusively

establishes NGE's breach of the unambiguous terms of Section 11.7 of the MIPA and Plaintiff's

damages.  *See* Sections I.A-I.D, *infra*.

While Defendants have asserted various defenses to this breach claim, as demonstrated

below, each of these defenses fails as a matter of law.  In fact, several of the defenses rely on

impermissible parol evidence.  *See* Section I.E, *infra*.  Accordingly, this Court should grant pre-

trial judgment in favor of Plaintiff on his claim against NGE for breach of Section 11.7 of the

MIPA and award Plaintiff rescissory damages in an amount no less than $9.8 million.

---

[8] In fact, nowhere in their Amended Answer to the Amended Complaint do Defendants allege that
Plaintiff's breach of contract claim fails because Plaintiff and the other Sellers engaged in a prior breach
of the MIPA.  *See* First Amended Answer (ECF No. 117).

A.    **Section 11.7 Of The MIPA Is Unambiguous And Expressly Prohibits NGE From Assigning The MIPA And All Rights And Obligations Thereunder To Anyone Without The Prior Written Consent Of The Sellers**

The record is clear that the MIPA was the first agreement executed between the Sellers and NGE—executed on March 18, 2016—and is the only agreement between the parties that controlled the sale of the Sellers' collective 100% membership interest in Major Energy to NGE.[9]   In the "RECITALS" to the MIPA, it states that the Sellers own all the outstanding membership interest in Major Energy and that the "Sellers desire to sell to Buyer, and Buyer desires to purchase from the Sellers" all of their membership interest in Major Energy "upon the terms and conditions hereinafter set forth."[10]

NGE is the only entity identified as the "Buyer" under the MIPA.[11]   Similar to Major Energy, NGE was a private limited liability company at the time of sale.   Indeed, in the MIPA, NGE represented and warranted that it was a limited liability company.[12]

In Section 6.3 of the MIPA, NGE represented and warranted that it was "acquiring the [membership interest] solely for ***its own account*** for investment purposes ***and not with a view to, or for the offer or sale in connection with, any distribution thereof***."[13]   Consistent with the foregoing, the MIPA contains a strict and unambiguous non-assignment provision.   Specifically, in Section 11.7 of the MIPA, captioned "Binding Effect; Assignment," the parties agreed that:

> ***This Agreement shall be binding upon and inure to the benefit of the Parties*** and their respective successors and permitted assigns.   ***No assignment of this Agreement or of any rights or obligations hereunder*** may be made by any Company, ***any Seller or Buyer***, directly or indirectly . . ., ***without the prior***

---

[9] The MIPA also is the only agreement that controlled the nature and terms of the up to $15 million NGE could be obligated to pay the Sellers in Cash Installment payments.

[10] PX-632 (SPRK-NGE0044751-821) at 1.

[11] *Id.* at § 6.1.

[12] *Id.*

[13] *Id.* at § 6.3 (emphases added).

*written consent of the other Parties* and any attempted assignment without the required consents *shall be void*.[14]

The foregoing language constitutes a clear and straightforward bar to assignment of the MIPA or "any" rights or obligations thereunder by NGE without the prior "written consent" of the Sellers. Section 11.7 does not contain a carve-out or exception for an assignment to an affiliated entity of NGE.  In fact, it does not contain a carve-out or exception for an assignment to *any* third party. Section 11.7 also does not contain any reference to some other provision or agreement that may contain a lesser non-assignment restriction.

The MIPA is governed by New York law.[15]  "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992).  "The best evidence of what parties to a written agreement intend *is what they say in their writing*." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002) (emphasis added).  Thus, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).  Moreover, extrinsic evidence of the parties' intent "is *not admissible* to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1990) (emphasis added); *see also Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("It is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous

---

[14] *Id.* at § 11.7 (emphases added).
[15] PX-632 (SPRK-NGE0044751-821) at § 11.3.

contract.").  Extrinsic evidence is also inadmissible where, as here, the agreement contains a merger clause.[16]

These well-settled rules of contract construction apply with equal force in interpreting and enforcing an unambiguous anti-assignment provision.  *See, e.g.*, *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 467 (S.D.N.Y. 2018); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 CIV. 6876 LMM, 2000 WL 1876915, at *2 (S.D.N.Y. Dec. 22, 2000) (holding that oral consent to assignment of rights under a contract that requires prior written consent is void).  Judge Wood's decision in *Holland Loader* is particularly noteworthy.  In that case, which also involved an earnout, the court addressed the interpretation of an anti-assignment provision.  Defendant argued that the assignment clause must have contained a scrivener's error because it would be nonsensical that the parties would have intended to require consent for an assignment to an affiliate, but not a non-affiliate.  In support, defendant submitted redline versions of the agreement from its drafting stage.  *Id.*  The court, however, rejected defendant's argument and attempt to introduce any extrinsic evidence:  "While the clause allows for assignment or delegation to a non-affiliate without prior written consent, and this may indeed be nonsensical in light of the requirement of consent for an assignment or delegation to an affiliate, *the unusual language does not render the provision ambiguous*."  *Id.* (emphasis added).

Here, there is no scrivener's error or unusual language in Section 11.7 of the MIPA.  The non-consensual assignment bar in Section 11.7 of the MIPA is clear and applies the prior written consent requirement to *all* third parties, affiliate or non-affiliate.  Thus, as in *Holland Loader*,

---

[16] *See id.* § 11.4 ("This Agreement . . . and the other Transaction Documents represent the entire understanding and agreement among the Parties with respect to the subject matter hereof and thereof."); *see also Abha Int'l, LLC v. Clover Int'l Corp.*, No. 11 Civ. 6841, 2012 WL 569187, at *3 (S.D.N.Y. Feb. 16, 2012).

Section 11.7 of the MIPA must be construed as written and the introduction of extrinsic evidence should be barred.

### B.    The Evidentiary Record Conclusively Establishes That NGE Breached Section 11.7 Of The MIPA

NGE's breach of the unambiguous non-assignment provision in the MIPA cannot be genuinely disputed.   Indeed, NGE's breach is confirmed by NGE's own statements and documents and the terms of the various agreements NGE executed in connection with the challenged transaction.

On August 23, 2016, just months after closing the transaction with the Sellers, NGE sold, assigned, or otherwise transferred all of its rights and obligations under the MIPA, including the Major Energy membership interest it acquired from the Sellers, to Spark and/or Spark HoldCo, a Spark-controlled subsidiary (the "Dropdown").  This fact is undisputed.  Indeed, on August 23, 2016, Spark issued a press release in which it told the public the following:  "*Spark Energy, Inc. . .* announced today that the Company [Spark Energy] has completed *its* acquisition of the Major Companies."[17]  Additionally, Keith Maxwell, the owner of NGE and Chairman of the Board of Spark, ███████████████████████████████████████████████ ███████████████████████████████████████████████████

In connection with the Dropdown transaction, NGE entered into a Membership Interest Purchase Agreement with Spark and Spark HoldCo ("the Spark MIPA").[19]  The Spark MIPA is dated May 3, 2016, mere weeks after NGE closed its transaction with the Sellers.  In the Spark MIPA, Spark HoldCo is identified as the "Buyer" and Spark is identified as the parent of the

---

[17] Of note, there is no mention of Spark HoldCo in that Spark press release.
[18] *See* Maxwell Deposition Transcript at 5:8-6:2.
[19] *See* PX-650 (SPRK-NGE0050380-50444).

Buyer.[20]  Spark is not only the parent of Spark HoldCo, but also the sole managing member of Spark HoldCo.[21]  In that context, Spark has had total and exclusive control over *all* the business affairs, operations and decision-making of Spark HoldCo.

Pursuant to Section 2.1 of the Spark MIPA, NGE explicitly agreed to sell, assign or otherwise transfer its 100% membership interest in Major Energy along with all of its other rights and obligations under the MIPA (and related transaction documents with the Sellers) to Spark HoldCo.[22]  Additionally, Section 8.2(y)(iii) of the Spark MIPA provides that "Buyer [Spark HoldCo] shall have assumed all rights and obligations of Seller [NGE] pursuant to the Assignment."[23]  "Assignment" is defined as the "Omnibus Assignment and Assumption Agreement" to be separately executed between NGE and Spark HoldCo.[24]

NGE and Spark HoldCo entered into this



---

[20] *Id.*

[21] *See infra* Section III.A, for a more fulsome discussion of the relationship between Spark and Spark HoldCo.

[22] PX-650 (SPRK-NGE0050380-50444) at § 2.1.

[23] *Id.* at § 8.2(y)(iii).

[24] *Id.* at § 1.1.

[25] *See* PX-656 (SPRK-NGE0050565-69).

[26] *Id.* (emphases added).

To this end, under Section 1 of the Omnibus Assignment and Assumption Agreement,

NGE agreed  Thus, the plain terms of the Spark

MIPA and associated Omnibus Assignment and Assumption Agreement conclusively establish

that NGE sold, assigned, or otherwise transferred all of its membership interest in Major Energy

and all of its rights and obligations under the MIPA to another entity.

Importantly, under Section 3.2(a)(ix) of the Spark MIPA, NGE required Spark HoldCo to

obtain and provide "the written consent of the Prior Sellers' Representative to the Assignment"

prior to closing the Dropdown.[29]  Likewise, Section 11.1 of the Spark MIPA explicitly provides:

> For purposes of this Agreement, Seller has advised Buyer that: (i) notices of
> certain matters arising under the Prior Purchase Agreement must be provided to
> Saul Horowitz, as Prior Sellers' Representative; (ii) *the prior written consent of
> said Prior Sellers' Representative is required for the assignment of certain
> Transaction Agreements* . . . ; and (iii) Seller will assume responsibility for
> providing any such notices to, *and securing any such consents of, Prior Sellers'
> Representative as necessary under such Prior Purchase Agreement* and of the
> Escrow Agent under the Escrow Agreement to facilitate and *effectuate the
> Transaction* contemplated hereunder.[30]

---

[27] *Id.* at § 1.

[28] *Id.* at § 2.

[29] PX-650 (SPRK-NGE0050380-50444) at § 3.2(a)(ix).

[30] PX-650 (SPRK-NGE0050380-50444) at § 11.1 (emphases added).

Thus, in the Spark MIPA, NGE (and Spark and Spark HoldCo) acknowledged what Section 11.7 of the MIPA makes clear:  that the prior consent of the Sellers' Representative is required "for the assignment of certain Transaction Agreements" and in order to "effectuate the Transaction," which included the sale of the membership interest of Major Energy and the assignment of the MIPA and NGE's rights and obligations thereunder.

The evidentiary record further demonstrates that as of August 23, 2016, the closing date of the Dropdown, neither NGE nor Spark (nor Spark HoldCo) had obtained the prior written consent of Plaintiff to the Dropdown.   This is confirmed by an ███████████████

---

[31] PX-652 (SPRK-NGE0050555-06).
[32] *Id.* (emphases added).

Thus, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Indeed, the evidentiary record is devoid of a single document showing Plaintiff's or the other Sellers' prior written consent to the Dropdown. And in its Answer to the Amended Complaint, NGE admits that "Plaintiff objected to NGE's contemplated drop-down of Major Energy into Spark," but, yet, "in or around August 2016 NGE completed a drop down of Major Energy into Spark," in violation of Section 11.7 of the MIPA.[33] Thus, NGE's breach of the unambiguous anti-assignment provision in Section 11.7 is clear as a matter of law and fact.

### C. Consistent With The Unambiguous Terms Of Section 11.7 Of The MIPA, NGE's Sale And Assignment Transaction Is Void

New York law provides that assignments "made in contravention of a prohibition clause in a contract are void if the contract contains clear, definite and appropriate language declaring the invalidity of such assignments." *LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*, 287 F.R.D. 230, 235 (S.D.N.Y. 2012) (quoting *Macklowe v. 42nd St. Dev. Corp.*, 566 N.Y.S.2d 606, 606 (1st Dep't 1991)). New York courts have voided assignments where the contract contains clear language prohibiting assignment. *See Allhusen v. Caristo Const. Corp.*, 303 N.Y. 446, 452 (N.Y. 1952) (voiding an assignment where the non-assignment clause stated that "assignment by the second party . . . without the written consent of the first party shall be void"); *see also Bank Brussels Lambert,* 2000 WL 1876915, at *2.

As described above, the anti-assignment clause in Section 11.7 of the MIPA unequivocally provides that ***any*** assignment by NGE of the MIPA and any rights and obligations

---

[33] *See* ECF No. 117 (Amended Answer) ¶ 70.

thereunder to **any** third party without obtaining the **prior written consent** of the Sellers "**shall be void**."[34]   Thus, in accordance with well-settled New York precedent and the express language of Section 11.7, NGE's assignment of the MIPA and its rights and obligations thereunder without the prior written consent of the Sellers is void.

### D.   Rescissory Damages Is An Appropriate Remedy For A Void Transaction Where Rescission Itself Is Not Feasible

Rescission is the usual remedy for a void assignment.  *See Richard A. Hutchens CC, L.L.C. v. State*, 59 A.D.3d 766, 771, 872 N.Y.S.2d 734, 739 (2009) (finding rescission was remedy for breach of anti-assignment provision that declared assignment without consent to be void).  However, where rescission is not practicable, rescissory damages may be awarded.  *See MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 34 Misc. 3d 895 (N.Y. Sup. Ct. 2012) ("Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable.  *A solid body of case law so holds.*") (emphasis added); *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869 (N.Y. Sup. Ct. 2012) (same).

Rescissory damages "restore a plaintiff to the position occupied before the defendant's wrongful acts."  *St. Clair Shores Gen. Empls. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 315 (S.D.N.Y. 2010); *Liberty Media Corp. v. Vivendi Universal*, 874 F. Supp. 2d 169 (S.D.N.Y. 2012) ("The purpose of rescissory damages is to restore the plaintiff to the position it would have occupied had the transaction not occurred."); *see also Yu v. GSM Nation, LLC*, No. CV N17C-07-200 JRJ, 2018 WL 2272708, at *17 (Del. Super. Ct. Apr. 24, 2018) (rescissory damages remedy is premised upon the idea that "the nature of the wrong perpetrated is such that plaintiff is entitled to more than his 'out-of-pocket' harm, as measured by the market value of the asset at

---

[34] PX-632 (SPRK-NGE0044751-821) at § 11.7.

or around the time of the wrong."). Because rescission of the Dropdown is no longer practical, rescissory damages is an appropriate and warranted remedy.

Rescissory damages in this context should restore the Sellers to their status as of the breach date, August 23, 2016. As of that date, the Sellers had the right and should have had the opportunity to earn their full $35 million Contingent Payment with NGE as the owner and operator of Major Energy, not the public entity Spark. Indeed, this was a bargained-for right of the Sellers as evident from the express terms in Sections 6.3 and 11.7 of the MIPA. However, because of NGE's misconduct in completing the Dropdown without the prior written consent of the Sellers, that did not turn out to be the case from August 23, 2016 through December 31, 2018—the overwhelming majority of the Earnout Period (28 months of the 33-month Earnout Period). The Sellers should not be penalized for NGE's breach that prevented them from having this bargained-for right and opportunity.

In light of the foregoing and consistent with how courts have approached valuing rescissory damages, as detailed above, Plaintiff submits that an appropriate way to restore the Sellers to their pre-breach status (as rescissory damages are meant to do), is to allow them to recover the benefit of their bargain with NGE per the terms of the MIPA, *i.e.*, the difference between the fair market value of the $35 million Contingent Payment as of the breach date and the Contingent Payment amount they ultimately received. To this end, Plaintiff has retained a qualified and experienced damages expert, David M. Leathers, who has assessed the fair market value of the $35 million Contingent Payment as of the date of the breach (*i.e.*, August 23, 2016) at no less than $18.8 million. Mr. Leathers' analysis is detailed in his sworn witness statement dated December 13, 2019, as well as his Expert Report submitted in this matter.[35]

---

[35] *See* ECF No. 155 at ¶ 460; PX-753.

Notably, Mr. Leathers' valuation is more than reasonable in consideration of the fact that,



Spark, however, ultimately withdrew that early buyout offer and nonetheless proceeded with the Dropdown, without the required written consent of the Sellers.

In any event, as the record reflects, the Sellers only ended up receiving Contingent Payments totaling approximately $9 million, about 25% of the $35 million Contingent Payment, and less than half of the fair market value as of the breach date.[38]   Thus, recovery of an additional $9.8 million in Contingent Payments would put the Sellers in the same fair market value position they would have been in with respect to the Contingent Payments prior to NGE's breach of Section 11.7 of the MIPA.[39]   Accordingly, Plaintiff requests that the Court enter a pre-

---

[36] PX-141 (MESELLERS_0006984-88).

[37] Id.

[38] PX-224 (MESELLERS_0013258-63).

[39] Critically, Defendants' expert does not credibly challenge the actual valuation performed by Plaintiff's expert and did not perform his own rescissory damages valuation.

trial judgment awarding him and the other Sellers $9.8 million in rescissory damages in connection with their claim against NGE for breach of Section 11.7 of the MIPA.

### E.    NGE's Defenses All Lack Merit

NGE has posited a number of defenses to Plaintiff's breach claim, each of which lacks merit and cannot overcome the unambiguous language of Section 11.7 and NGE's breaching conduct.  Of note, it is NGE's burden to establish these defenses, which it has not and cannot.

#### 1)    The Assignment Provision In The MIPA Was Not An Oversight

Recognizing the existence of the clear non-assignment bar in Section 11.7 of the MIPA, NGE attempts to circumvent this provision by claiming that the MIPA "was part of a preexisting form agreement" and the non-assignment language in Section 11.7 "was an oversight."[40]  This argument is belied by the evidence and unsupportable as a matter of law.  Under generally accepted principles of contract law in New York, a party "who signs or accepts a written contract . . . *is conclusively presumed* to know its contents and to assent to them . . . ."  *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (emphasis added); *see also Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013).  This is especially the case where the contracting party is a sophisticated party represented by competent counsel.  *See MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 646 (2009); *see also Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 CIV. 3956, 2014 WL 837050, at *9-10 (S.D.N.Y. Mar. 3, 2014) (a corporation represented by counsel is a sophisticated party in the eyes of the law).

Here, NGE is a sophisticated party and was represented by competent counsel throughout the negotiations of the MIPA.  The MIPA was negotiated for many weeks and there were

---

[40] Lancaster Witness Statement (ECF No. 159) ¶ 95.

numerous drafts exchanged between the parties during this period.[41]   It was NGE's obligation and responsibility to read the contract before executing and they must live with *all* the terms of the MIPA they freely negotiated and executed.   Notably, ███████████████

██████████████████████████████████████████████

██████████████████████████ ██████████████████████

███████████████████████████████████

Additionally, the MIPA is not the only transaction document containing an absolute non-assignment bar, even to affiliated entities.   Two other agreements drafted and executed by the parties in connection with the transaction contain non-assignment language that is nearly identical to Section 11.7—the Escrow Agreement and Escrow Disbursement Agreement.[43] Thus, NGE's purported "oversight" defense rings hollow.

> 2)   *The Assignment Provision In The Earnout Agreement Is Irrelevant*

NGE next asserts that Section 3.1 of the Earnout Agreement permits a non-consensual assignment to Affiliates and that provision should somehow control the question of whether NGE's sale and assignment of the Major Energy membership interest and the rights and obligations under the MIPA to Spark and Spark HoldCo required the prior written consent of the Sellers.[44]   While it is true that the Earnout Agreement has a separate anti-assignment clause allowing for the *Earnout Agreement* to be assigned to Affiliates without the prior written consent of the Sellers, that provision has nothing to do with an assignment of the *MIPA* or the rights and obligations thereunder.   Plaintiff's claim here is specific to breach of the assignment clause in the MIPA, not the Earnout Agreement.

---

[41] *See, e.g.,* DX-229 (CDP00003505-3793), DX-261 (MESELLERS_0005365)
[42] DX-229 (CDP00003505-3793), at CDP00003577.
[43] PX-633 (SPRK-NGE0044884-99) § 7.10; PX-657 (SPRK-NGE0050570-80) § 4.8.
[44] Lancaster Witness Statement (ECF No. 159) ¶¶ 94, 96.

Indeed, Section 3.1 of the Earnout Agreement makes clear that said provision relates only to an assignment of the *Earnout Agreement*, not any other agreement: "***This Agreement*** [the Earnout Agreement] shall not be assignable by either Party without the prior written consent of the other Parties, except as to Affiliates . . . ."[45]  At the same time, the separate anti-assignment provision in Section 11.7 of the MIPA makes clear that its restriction applies strictly to the *MIPA*: "No assignment of ***this Agreement*** [the MIPA] or of any of the rights or obligations hereunder . . . ."[46]  Thus, there is no conflict between these two agreements and the anti-assignment provisions in each stand alone and govern only their respective agreements.

Equally without merit is NGE's unsupported contention that the Earnout Agreement should be viewed as the main transaction agreement.  The main transaction agreement is the MIPA, which was the first agreement executed by the parties.  The MIPA is the only agreement that controlled the actual sale of Major Energy to NGE and the only agreement that dictated the execution of the other transaction agreements, such as the Earnout Agreement.

The MIPA, in fact, incorporates the Earnout Agreement (and Executive Earnout Agreement, and Escrow Agreements), not the other way around.[47]  And it is the other transaction documents, such as the Earnout Agreement (and Executive Earnout Agreement, and Escrow Agreements), that repeatedly reference the MIPA.  For example, the WHEREAS clauses of the Earnout Agreement state that the Earnout Agreement is one of the agreements "contemplated" in the MIPA.[48]  In other words, without the MIPA, there is no Earnout Agreement.  Thus, NGE's

---

[45] PX-634 (SPRK-NGE0044911-28) at § 3.1 (emphasis added).

[46] PX-632 (SPRK-NGE0044751-821) at § 11.7 (emphasis added).  Even Mr. Lancaster agrees that Section 11.7 of the MIPA "does not apply to the Earnout Agreement or Executive Earnout Agreement." Lancaster Witness Statement (ECF No. 159) ¶ 93.

[47] PX-632 (SPRK-NGE0044751-821) at § 1.2.

[48] PX-634 (SPRK-NGE0044911-28); *see also* PX-633 (SPRK-NGE0044884-99); PX-657 (SPRK-NGE0050570-80).

contention that the Earnout Agreement should be viewed as the main or controlling document here is baseless.

Moreover, NGE's argument is entirely contrary to well-settled New York rules of contract interpretation that require a court to give effect to the written terms of a contract and "not accept an interpretation that ignores the interplay of the terms, renders certain terms 'inoperable,' and creates a conflict where one need not exist." *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 445 (S.D.N.Y. 2003). New York courts also are "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," especially an agreement negotiated at arms-length by sophisticated parties and with the assistance of counsel. *Ashwood Capital, Inc. v. OTG Mgt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (citation and internal quotation marks omitted).

NGE's argument also flies in the face of their own internal documents and agreements, as described above, in which they acknowledge that Section 11.7 prohibits the assignment of the MIPA (and other related agreements NGE entered into with the Sellers) without the Sellers' prior written consent.[49] If NGE truly believed that the prior written consent of the Sellers was not required for the Dropdown transaction then it presumably would not have made obtaining and providing such consent a pre-condition to the closing of the Dropdown.

Recognizing the obvious legal flaw with their argument, NGE has relied on an email dated May 1, 2016, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[49] *See* PX-650 (SPRK-NGE0050380-50444) at §11.1 ("[NGE] has advised [Spark] that . . . the prior written consent of . . . Sellers' Representative is required for the assignment of certain Transaction Agreements . . . ."); August 2016 Letter Agreement (stating that "the prior written consent of Saul Horowitz, as Prior Seller's Representative, is required for the assignment of certain agreements related to the transaction contemplated by the [Spark] MIPA . . . and continuing obligations under the [MIPA] between Major Sellers and NGE").

██████████████████████████████████████████████████████████

████████████████████████████████████████    To begin with, such extrinsic

evidence is not admissible given the clear and unambiguous terms of Section 11.7 of the MIPA.

*See Holland Loader Co.,* 313 F. Supp. 3d at 467.  In fact, at a prior status conference on this

matter, the Court itself recognized the limited probative value of this email and whether this

email would even be admissible to interpret an unambiguous contract provision. *See* Transcript

of May 8, 2019 Status Conference, at 30.

But even if this email is admissible, NGE totally misconstrues the email and conveniently

ignores the uncontroverted sworn deposition testimony of Mr. Studnicky concerning the email.

At his deposition, ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████    ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████    Thus, NGE's reliance on the May 1, 2016 email

from Mr. Studnicky to Mr. Alper as a basis to undo the explicit language of Section 11.7 of the

MIPA is misguided.

---

50 *See* DX-298 (MESELLERS_0006400-02).
51 *See* Studnicky Deposition Transcript at 29:1-8; 30:4-15.
52 *Id.* at 31:11-18.
53 *See* PX-163 (MESELLERS_0010036).

NGE may also point to an email dated April 8, 2016, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████  Again,

such parol evidence is not admissible.  But even if admitted, nowhere in this email are the Sellers

consenting to any such transfer, let alone providing their *written consent* to such transfer.  In fact,

the document shows that Mr. Sobel was actually surprised by this information.[55]  Also, the

record shows ████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ █████████████████████████

██████████████████████████████████████████████████

█████████████

3)    *Equitable Defenses Of Ratification, Waiver, And Estoppel Are Impermissible And Baseless*

In their Amended Answer, Defendants raise affirmative defenses of ratification, waiver,

and estoppel to Plaintiff's claim for breach of Section 11.7 of the MIPA.  Defendants seemingly

contend that the Sellers ratified or waived any claim for breach of Section 11.7 of the MIPA, or

are estopped from asserting such breach claim, in light of a few positive statements regarding the

Dropdown.[57]    Putting aside the fact that Plaintiff strongly disagrees with Defendants'

---

[54] *See* PX-112 (MESELLERS_0005912-13).

[55] *Id.* at MESELLERS_0005912.

[56] PX-117 (MESELLERS_0006297-315).

[57] For example, Defendants will likely point to press releases in which Mr. Alper, former CEO of Major Energy and *not a Seller*, is quoted as being supportive of the Dropdown. ████████████

████████████████████████████████████████████████████████

████████████████████████████    Moreover, Mr. Alper's verbal statements are not binding on the Sellers and do not constitute prior *written consent* of the Sellers.  His verbal statements also do not overcome the law and No-Waiver Clause discussed below.

characterization of the Sellers' purported acceptance of the Dropdown, Defendants are not entitled to assert these equitable defenses as a matter of New York law.

Specifically, New York law is clear that a party cannot assert a ratification defense as a means of overcoming a claim for breach of a non-assignment provision that expressly declares the assignment void. *See* 6A N.Y. Jur. 2d Assignments § 42 (2d ed. 2019) ("[A] void assignment may not be subsequently ratified.") (citing *Knight v. Knight*, 182 A.D.2d 342, 345 (3d Dep't 1992)); 27 Williston on Contracts § 70:13 (4th ed. 2018) ("A void contract cannot be ratified; it binds no one and is a nullity."); *see also Aronoff v. Albanese*, 85 A.D.2d 3, 4 (2d Dep't 1982). Thus, consistent with New York law, NGE's Dropdown to Spark and Spark HoldCo in violation of Section 11.7 is a legal nullity and cannot be subsequently ratified.

New York law also instructs that Defendants likewise cannot claim waiver, a legal theory similar to ratification. *See Banco De La Republica De Colom. v. Bank of N.Y. Mellon*, No. 10-cv-536, 2013 WL 3871419, at *10 n.7 (S.D.N.Y. July 26, 2013) (rejecting argument that "waiver and ratification are different propositions"); *see also Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001) ("equitable defenses are unavailable when the rights being pressed by a party are based upon a void document").

Nor can Defendants establish their estoppel defense as a matter of applicable New York law.  "No estoppel may arise in any case where the party claiming the estoppel had no right to change position." 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 40 (2d ed. 2019); *Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99-cv-2638, 1999 WL 1277243, at *4-5 (S.D.N.Y. Dec. 30, 1999) (defendant who breached an anti-assignment clause requiring prior written consent could not establish estoppel because defendant "*brought the instant scenario upon itself*") (emphasis added); *Draper v. Georgia Props.*, 230 A.D.2d 455, 460 (1st Dep't 1997) (equitable estoppel

defense cannot be based on void provision of agreement).  Defendants—with full knowledge of the terms of Section 11.7 of the MIPA and the Sellers' lack of consent to the Dropdown—had no right to change their position and complete the Dropdown.  Therefore, they cannot rely on an estoppel defense.

Additionally, Defendants' ratification, waiver, and estoppel defenses are independently precluded by the explicit and unambiguous no-waiver clause in Section 11.4 of the MIPA (the "No-Waiver Clause").  The No-Waiver Clause states as follows:

> The waiver by any Party of a breach of any provision of this Agreement shall not operate as, or be construed as, a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  ***No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof,*** nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.[58]

New York courts "uniformly" enforce no-waiver clauses such as the one contained in Section 11.4 of the MIPA and bar parties from asserting waiver and ratification defenses.  *See Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (1st Dep't 2007); *Banco De La Republica*, 2013 WL 3871419, at *9-10; *see also Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016) (refusing to wade into factual dispute regarding defendant's purported waiver because the contract contained a no-waiver clause); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) ("When a contract contains a 'no waiver' clause . . . a non-breaching party can continue his contract instead of terminating it based on breaches that previously occurred and yet not waive any of his rights under the contract.").

Similarly, the No-Waiver Clause bars Defendants' estoppel defense.  Indeed, in *Equator International*, the parties' contract contained a no-waiver clause that is nearly identical to the

---

[58] PX-632 (SPRK-NGE0044751-821) at § 11.4 (emphasis added).

No-Waiver Clause in this case, stating that "[n]o failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder will operate as a waiver thereof; nor will any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right." *Equator Int'l, Inc. v. NH Street Investors, Inc.*, 978 N.Y.S.2d 817, 824 (N.Y. Sup. Ct. 2014).  Noting that no-waiver clauses "have been routinely upheld as being enforceable," the court held that defendant failed to raise triable issues of fact with respect to its estoppel defense, even though defendant alleged that plaintiff failed to act *for more than five years*.  *Id.* at 824-25.  Thus, all of Defendants' equitable defenses fail as a matter of law.

Accordingly, based on all the foregoing, the Court should grant Plaintiff a pre-trial judgment finding that NGE breached Section 11.7 of the MIPA through its completion of the Dropdown transaction with Spark and/or Spark HoldCo without obtaining the required prior written consent of the Sellers, and Plaintiff (and the other Sellers) are entitled to an award of rescissory damages in the amount of at least $9.8 million.

**II.    Plaintiff Is Entitled To Pre-Trial Judgment On His Claim Against Spark For Tortious Interference Of Contract With Respect To NGE's Breach Of Section 11.7 Of The MIPA And Recovery Of Punitive Damages (Count IV)**

In Count IV of the Amended Complaint, Plaintiff alleges that Spark is liable for tortious interference with contract because it knowingly and actively participated in NGE's breach of the non-assignment provision in Section 11.7 of the MIPA.  Indeed, Spark worked in concert with NGE to complete the sale and assignment transaction, all while knowing (and acknowledging) that the Sellers' prior written consent was required, but not obtained.

Under New York law, the elements of tortious interference with contract are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 253

(S.D.N.Y. 2002) (quoting *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001)).  Plaintiff has met its burden to establish that there is no genuine issue of material fact with respect to these elements and, therefore, is entitled to a judgment as a matter of law on his tortious interference claim against Spark.  Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322-23 (1986).

First, there is no dispute that the MIPA is a valid contract.  Second, there is no dispute that Spark was fully aware of the MIPA and its terms at the time of the Dropdown transaction. As evident from Defendants' internal documents and agreements between themselves, throughout the negotiation of the Dropdown transaction, Spark was fully aware of the terms of the MIPA, including the prohibition of an assignment of the MIPA and NGE's rights and obligations thereunder without the Sellers' prior written consent.[59]  And the Spark MIPA, to which Spark was a party, explicitly required that Spark HoldCo obtain and provide the written consent of Plaintiff at the closing of the Dropdown transaction.[60]  Spark was also aware at the time the Dropdown transaction closed that the Sellers were unwilling to consent to the Dropdown, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Defendants' Amended Answer.[61]

Third, there is no dispute that NGE breached Section 11.7 of the MIPA as described above, and the evidence is clear that Spark knowingly and improperly assisted NGE in this breach.  Spark's tortious conduct is self-evident from the very terms of the August 2016 Letter Agreement, which Spark signed.  In that Letter Agreement, Spark and NGE acknowledged that the prior written consent of Plaintiff was required for any Dropdown transaction and that the Sellers' Representative had not provided any such written consent.[62]  Nonetheless, Spark and

---

[59] PX-652 (SPRK-NGE0050555-06); PX-650 (SPRK-NGE0050380-50444).
[60] PX-650 (SPRK-NGE0050380-50444).
[61] *See* ECF No. 117 ¶ 70 ("Plaintiff objected to NGE's contemplated drop-down of Major Energy into Spark," but, yet, "in or around August 2016 NGE completed a drop down of Major Energy into Spark.").
[62] PX-652 (SPRK-NGE0050555-06).

NGE proceeded with the Dropdown. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

Defendants' bad faith conduct is also evident from the last-minute changes they made to the Omnibus Assignment Assumption Agreement. The record is clear that, █████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████ This is the height of deception and bad faith conduct by Defendants.

Lastly, Plaintiff and the Sellers have been damaged by Spark's tortious behavior. As noted above, as a result of Spark's actions (and NGE's), the Sellers were deprived of the

---

[63] *Id.* (emphasis added).
[64] PX-754 (MESELLERS_0002276-84) at MESELLERS_0002280.
[65] *Id.* at MESELLERS_0002284.

opportunity to earn the $35 million Contingent Payment with NGE, not Spark, as the owner and operator of Major Energy. As Plaintiff's damages expert determined, the fair market value of the $35 million Contingent Payment as of the date of the void Dropdown was at least $18.8 million, *more than double the amount of Contingent Payments the Sellers ultimately received.* The Sellers should not be penalized for Spark's willful misconduct and bad faith actions that prevented the Sellers from pursuing their Contingent Payment opportunity in the manner they expressly bargained for under the MIPA.

The Sellers also are entitled to recover punitive damages from Spark, in an amount to be set by the Court. Under New York law, "an injured party can recover punitive damages when the tortious act complained of involved a wanton *or* reckless disregard of the plaintiff's rights." *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986) (emphasis added). Here, Spark's willingness to complete the Dropdown without the Sellers' written consent "involved a wanton *or* reckless disregard of the [Sellers'] rights," as demonstrated by the August 2016 Letter Agreement. Indeed, there can be no genuine dispute that Spark knew that Plaintiff had a consent right, acknowledged that consent right, then ignored that consent right and attempted to create an agreement with NGE to obtain all the benefits of the MIPA, as if there had been no violation of that consent right. Put simply, this can *only* be described as wanton and reckless disregard for Plaintiff's rights.

In the Amended Answer, Spark attempts to avoid liability for its tortious misconduct by relying on purported exculpatory language in Section 7.14(c) of the MIPA. This defense lacks merit. To begin with, when read in its entirety it is clear that this provision is meant to apply to contract or tort claims involving a breach of a representation or warranty under the MIPA, not for tortious interference with NGE's contractual obligations under the contract. Indeed, the

exculpatory language is contained in Article 7, entitled "Covenants," and the particular subsection is called "No Additional Representations and Warranties."

But more significantly, Spark cannot use the purported exculpatory language in Section 7.14(c) to avoid liability resulting from its willful, reckless, or at a minimum, grossly negligent conduct, as described above.  Indeed, New York courts and public policy forbid enforcement of exculpation clauses where, as here, the defendant acted willfully, recklessly, or with gross negligence.  *See Gold Connection Disc. Jewelers, Inc. v. Am. Dist. Tel. Co.*, 212 A.D.2d 577, 578 (2d Dep't 1995) ("Although such clauses in commercial contracts are enforceable to limit recovery for claims based on ordinary negligence, they will not preclude recovery in tort or breach of contract where the losses are the result of gross negligence.").  As the New York Court of Appeals has specifically instructed:

> [A]n exculpatory agreement . . . will not exonerate a party from liability under all circumstances . . . . [I]t will not apply to exemption of willful or grossly negligent acts . . . [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing.  This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.  Or when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

*Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (N.Y. 1983).

Equally without merit is Spark's attempt to avoid punitive damages liability based on the limitation of liability provision in Section 9.9 of the MIPA.  That provision does not preclude Plaintiff from seeking special damages, such as punitive damages, in connection with Spark's willful or, at a minimum, grossly negligent conduct, as described above.[66]  *See Baidu, Inc. v. Register.com*, Inc., 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) ("New York courts will decline to

---

[66] PX-632 (SPRK-NGE0044751-821) at § 9.9.

enforce a contractual limitation or waiver of liability clause when there is willful or grossly negligent or recklessly indifferent conduct.").

**III.    Plaintiff Is Entitled To Pre-Trial Judgment On His Claim Against Defendants For Breach Of Section 2.2 Of The MIPA And Earnout Agreement For Miscalculation Of The 2016-2018 Contingent Payment Amounts (Counts II And III)**

In Count II of the Amended Complaint, Plaintiff alleges that NGE breached Section 2.2 of the MIPA and Earnout Agreement through the manner in which it calculated (or miscalculated) the 2016 Contingent Payment amounts.  In Count III of the Amended Complaint, Plaintiff asserts a similar breach claim against Spark given that, after the Dropdown, Spark took over the responsibility for calculating and paying the Contingent Payments, including the 2016 Contingent Payment.  At the time of the filing of the Amended Complaint, Defendants had not yet calculated the Contingent Payment amounts for 2017 and 2018; indeed, payment of such Contingent Payments were not yet due.  Since the filing, however, Defendants have calculated the Contingent Payment amounts for 2017 and 2018 and Plaintiff has been able to determine several calculation errors with respect to these amounts in further breach of Section 2.2 of the MIPA and Earnout Agreement.

As already noted, to establish a breach of contract claim, a plaintiff must prove the following: (1) the existence of an enforceable agreement; (2) performance by plaintiff; (3) the defendant breached the agreement; and, (4) the plaintiff sustained damages as a result of the defendant's breach.  *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803 (2d Dept. 2010).  The first two elements cannot be genuinely disputed.  Indeed, nowhere in their Amended Answer do Defendants' seek to avoid liability for this breach claim based on a prior breach of the MIPA or Earnout Agreement by Plaintiff or the other Sellers.  As for the last two elements, the evidentiary record confirms Defendants' breach and Plaintiff's damages.

Specifically, the evidentiary record shows that Defendants did not calculate the 2016 Contingent Payment consistent with the methodology and formula agreed to by the parties in the MIPA and Earnout Agreement.  To this end,

i.   Defendants did not calculate the 2016 Contingent Payment consistent with the methodology and formula that was agreed to by the parties and illustrated in Exhibit B to the Earnout Agreement;

ii.  Defendants wrongly excluded Major Energy's first-quarter 2016 actual Adjusted EBITDA in calculating the 2016 Contingent Payment;

iii. Defendants understated Major Energy's Year-End Customer Accounts for 2016 by at least 9,134; and

iv.  Defendants also understated Major Energy's actual Adjusted EBITDA for 2016 by at least $1.8 million due to their failure to credit Major Energy for various expenses incurred in 2016.

Adjusting for all these methodological and calculation errors, the Sellers have been underpaid by at least $4.8 million for their 2016 Contingent Payment.

Likewise, the evidentiary record shows that Defendants did not calculate the 2017 and 2018 Contingent Payment consistent with the methodology and formula agreed to by the parties in Exhibit B to the Earnout Agreement.  Defendants also understated Major Energy's total Adjusted EBITDA by at least $1 million for each of 2017 and 2018 due to their failure to credit Major Energy for various expenses incurred in 2017 and 2018. Adjusting for these methodological and calculation errors, the Sellers have been underpaid by at least $1.5 million for their 2017 and 2018 Contingent Payments combined.

For purposes of this Pre-Trial Memorandum, however, Plaintiff is only seeking a pre-trial judgment with respect to certain of the methodological and calculation errors identified above. Specifically, Plaintiff is seeking pre-trial resolution of the first three methodological and calculation errors described above with respect to the 2016 Contingent Payment and resolution

of the first methodological and calculation error described above with respect to the 2017 and 2018 Contingent Payment.  As for the other methodological and calculation errors identified above with respect to the 2016-2018 Contingent Payments (*i.e.*, understating the Adjusted EBITDA totals for 2016-2018), Plaintiff will address those errors at trial given the existence of certain disputed facts.

Importantly, the methodological and calculation errors Plaintiff addresses below establish a significant underpayment by Defendants to the Sellers—more than $3.3 million with respect to the 2016 Contingent Payment and more than $1.1 million with respect to the 2017 and 2018 Contingent Payments combined.  And pursuant to Section 3.7 of the Earnout Agreement, such underpayment by Defendants entitles Plaintiff and the other Sellers to reimbursement of all the reasonable legal fees and expenses they incurred in connection with this action.[67]

### A.    Plaintiff Can Sue Spark For Breach Of The MIPA Or Earnout Agreement

As an initial matter, Plaintiff can sue Spark for breach of the MIPA or Earnout Agreement.  In their Amended Answer filed on May 10, 2019, seven months after filing their initial answer to the Amended Complaint, Defendants added a defense for lack of standing to sue Spark for breach of contract, claiming that Spark "did not enter into a contract with Plaintiff and did not accede to any contractual obligations as to Sellers regarding the MIPA, Earnout Agreement, or Executive Earnout Agreement."  This defense lacks merit as a matter of law and should be dismissed outright.

To begin with, Defendants should be estopped from even asserting such a defense in light of the admissions and sworn statements they made in their initial Answer, motion to dismiss briefing, and deposition testimony.  "It is axiomatic that '[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the

---

[67] *See infra* Section IV.

proceeding.'" *Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 763 F. Supp. 28, 32 (S.D.N.Y. 1991) (citation omitted) ("[Defendant] chose to make an admission [in its answer] and is now bound by it."); *Gibbs ex rel. Gibbs v. Cigna Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) (same). A court can also "appropriately treat statements in briefs as binding judicial admissions." *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994).

Here, Defendants admitted in their initial Answer to the Amended Complaint, filed on October 15, 2018, that "NGE sold Major Energy to **Spark**." *See* ECF No. 45, para. 4 (emphasis added). "Spark" is defined in the Amended Complaint as Spark Energy, not Spark HoldCo. Defendants filed an Amended Answer on May 10, 2019 (*see* ECF No. 117) and could have sought to amend this part of their Answer, but they did not. Also, in their motion to dismiss filings, Defendants argued for dismissal of Plaintiff's tortious interference claim against Spark on the grounds that **Spark** was a party to the MIPA and Earnout Agreement in light of the Dropdown. *See* ECF Nos. 27, 32. And the Court entertained this argument from Spark in its motion to dismiss decision. *See* ECF No. 42 (Oetken Op.) at 9 ("Spark also asserts that it is immune from tortious interference claims as a successor-in-interest to the contract at issue.").[68] Yet, Spark now improperly attempts to take the position that it did not acquire Major Energy from NGE and is not a party to the MIPA or Earnout Agreement.

But even if Spark is not estopped from making this argument, it still fails as a matter of law. Under applicable New York law, while a breach of contract claim can generally only be brought against a party to the contract, a non-signatory parent corporation, such as Spark, can be held liable "if its conduct manifests an intent to be bound by the contract." *Jennings v. Hunt*

---

[68] Additionally, Keith Maxwell, the owner of NGE and Chairman of the Board of Spark Energy, ███████████████████████████████████████████████████████ Spark also stated in a public filing that on May 3, 2016 *the Company* and Spark Holdco entered into the [Spark MIPA] . . . ." PX-756. In that filing, Spark defined the Spark Energy, Inc. to be the "Company." *Id.*

*Cos.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019); *see also Recticel Foam Corp. v. Bay Indus.*, 128 F. App'x 798, 799 (2d Cir. 2005) ("New York law provides that if a party objectively manifests an intent to be bound by a contract, that intent controls, even if the party does not sign the written agreement."); *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994) (holding that "[a] parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract").  A manifest intent to be bound can be inferred "from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes." *Horsehead Indus. v. Metallgesellschaft AG*, 239 A.D.2d 171, 172 (1st Dep't 1997) (citing *Warnaco*, 844 F. Supp. at 946).  Spark has shown such manifest intent with respect to the MIPA and Earnout Agreements.

Spark was undeniably involved in the drafting of the agreements that led to the Dropdown transaction, including the Spark MIPA and the Omnibus Assignment and Assumption Agreement.  Spark (not Spark HoldCo) also is the entity that "assumed liabilities and earn out obligations" with respect to Major Energy.[69]  Indeed, Spark (not Spark HoldCo) was the party that calculated and made the Contingent Payments due to the Sellers under the MIPA and Earnout Agreement.[70]  And it was Spark (not Spark HoldCo) that issued a press release concerning the completion of the Dropdown and informed the public that it had "completed *its* acquisition of the Major Energy Companies and expect[ed] the acquisition to be immediately accretive to earnings."

---

[69] *See* PX-256 (Spark Energy, Inc. Q2 2016 Earnings Call Transcript) ("If we shift to Major Energy as you know, that is a related-party transaction. . . .  We are paying $40 million upfront . . . [a]nd then we've also assumed liabilities and earn out obligations . . . .").

[70] *See* PX-623 (SPRK-NGE0043588-99) (revised 2016 earnout statement and memorandum from Gary Lancaster sent by Nathan Kroeker, CEO of Spark); PX-450 (SPRK-NGE0021839-44) (March 29, 2018 letter attaching 2017 earnout statement on "Spark Energy" letterhead); PX-224 (MESELLERS_0013258-63) (May 31, 2019 letter attaching 2018 earnout statement on "Spark Energy" letterhead).

Moreover, Spark is not only the parent of Spark HoldCo, but also its sole managing member.[71] As sole managing member, Spark had "full and complete charge of all affairs of [Spark HoldCo]," exclusive control over the business activities and operations of Spark HoldCo, and the right to make "all decisions regarding the business, activities and operations of [Spark HoldCo]."[72] Such facts are more than enough to establish a manifest intent by Spark to be bound by the MIPA and Earnout Agreements (even if not a signatory).[73]

## B. Defendants' Methodological and Calculation Errors With Respect To The 2016 Contingent Payment

In connection with the transaction between the Sellers and NGE, the parties agreed to a total indicative purchase price of $80 million, $35 million of which was to be paid in the form of up to $20 million in Earnout Payments and up to $15 million in Cash Installments over a period of 33 months (from April 2016 through December 2018) dependent upon Major Energy achieving certain agreed-upon performance targets.[74]

Specifically, in the Earnout Agreement the parties agreed to a Cash Installment cap of $5,000,000 per year (2016 - 2018) and Earnout Payment caps of $5,454,545, $7,272,727, and $7,272,727 for 2016, 2017, and 2018, respectively.[75] Therefore, the Sellers total potential

---

[71] *See* PX-251 (Second Amended and Restated LLC Agreement of Spark HoldCo) at § 6.1 ("SEI [Spark Energy, Inc.] shall be the sole Managing Member of the [Spark HoldCo].").

[72] *Id.*

[73] *See, e.g.*, *Silverberg v. SML Acquisition LLC*, No. 15-CV-7129 (CS), 2017 WL 758520, at *6 (S.D.N.Y. Feb. 27, 2017) (finding manifestation of intent to be bound by PTP where SML was a "wholly-owned, inactive subsidiary of PTP, which possessed full power to act on SML's behalf, thus making PTP a de facto party" to the agreement); *SHLD, LLC v. Hall*, No. 15 Civ. 6225 (LLS), 2016 WL 659109, at *8 (S.D.N.Y. Feb. 17, 2016) (finding parent company manifested an intent to be bound where the parent company's ownership and management—which was common with the subsidiary—used the parent entity to negotiate a contract with the plaintiffs); *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, 2015 WL 4461769, at *5 (S.D.N.Y. July 21, 2015) (finding parent company manifested an intent to be bound where plaintiff alleged that the subsidiary agreed to the contract under the parent's "watch and control," parent company executives reviewed and approved it, and the parent would benefit from the contract).

[74] PX-632 (SPRK-NGE0044751-821).

[75] PX-634 (SPRK-NGE0044911-28).

Contingent Payments were $10,454,545, $12,272,727, and $12,272,727 for 2016, 2017, and 2018, respectively, or total payments of $35,000,000.[76]   The parties also agreed that the Sellers could achieve additional sums under the separate Executive Earnout Agreement depending on the Adjusted EBITDA and Customer Account performance during 2016, 2017, and 2018.[77]

With respect to the performance targets for the Contingent Payments, the parties agreed to an Adjusted EBITDA performance target for 2016, 2017 and 2018 and a Customer Accounts target for 2016, 2017 and 2018.   The final agreed-upon Adjusted EBITDA targets were:   (1) $20,749,213 for 2016; (2) $25,003,343 for 2017; and (3) $27,831,052 for 2018.   The final agreed-upon Customer Account targets were:   (1) 178,031 for 2016; (2) 209,909 for 2017; and (3) 231,717 for 2018.[78]

Defendants currently take the position that ███████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████

As demonstrated below, Defendants' current position as to the 2016 Contingent Payment amount is wrong in several respects.   *First*, Defendants are employing a calculation methodology

---

[76] *See* PX-634 (SPRK-NGE0044911-28); PX-632 (SPRK-NGE0044751-821).
[77] PX-658 (SPRK-NGE0050581-97).
[78] PX-634 (SPRK-NGE0044911-28).
[79] PX-450 (SPRK-NGE0021830-44).
[80] *Id.*
[81] *Id.*

and formula that is inconsistent with the calculation methodology and formula set forth in the Earnout Agreement, particularly the calculation methodology and formula illustrated in Exhibit B to the Earnout Agreement. Notably, prior to the Dropdown, Defendants themselves acknowledged that the formula illustrated in Exhibit B to the Earnout Agreement was the correct formula to use in calculating the Contingent Payments. *Second*, Defendants are employing a calculation methodology and formula that is even inconsistent with the calculation methodology and formula they employed when they ultimately determined and paid the 2016 Contingent Payment to the Sellers in April 2017, and months before the filing of this litigation. *Third*, Defendants are understating Major Energy's Year-End Customer Accounts total for 2016 by approximately 9,134 customers. Adjusting for these calculation errors results in an underpayment to the Sellers for the 2016 Contingent Payment by more than $3.3 million.[82]

Moreover, as demonstrated below, even if the Court were to accept Defendants' proposed Adjusted EBITDA and Year-End Customer Accounts totals for 2016, the Sellers have still been underpaid for the 2016 Contingent Payment by at least $2.3 million (using the formula set forth in Exhibit B to the Earnout Agreement) or by at least $2.1 million (using Defendants' pre-litigation formula). Thus, the Court can make a pre-judgment finding that Defendants breached the MIPA and Earnout Agreement in the manner they calculated (or miscalculated), and ultimately underpaid the Sellers for, the 2016 Contingent Payment.

---

[82] As noted above, the Sellers also dispute Defendants' Adjusted EBITDA total for 2016 and contend that such total is understated by at least $1.8 million due to Defendants' failure to credit Major Energy for various expenses incurred in 2016, including expenses related to executive compensation and bonuses. This additional calculation error results in an additional underpayment of approximately $1.4 million for the 2016 Contingent Payment. However, Plaintiff is not seeking a pre-trial resolution of this additional calculation error, but instead will address and establish this additional calculation error at trial.

1)   *The Agreed-Upon Methodology And Formula For Calculating The Contingent Payments As Set Forth In Exhibit B To The Earnout Agreement*

Section 2.2 of the MIPA and Earnout Agreement, and the illustration in Exhibit B of the Earnout Agreement, sets forth the methodology for calculating the Contingent Payments, including the up to $15 million in Cash Installment payments for 2016, 2017, and 2018 and the up to $20 million in Earnout Payments for 2016, 2017, and 2018.[83]

Specifically, under Section 2.2 (a) of the MIPA, annual Cash Installments of $5 million were payable on or before March 31 of 2017, 2018, and 2019, and subject to two potential reductions:  (1) a proportional reduction if the Adjusted EBITDA Plan is not achieved in a given Target Year and (2) a dollar-for-dollar reduction if the Adjusted EBITDA in a given Target Year is less than $20 million.[84]

With respect to the Earnout Payment, Section 2.2 of the Earnout Agreement provides that the Earnout Payment shall be calculated by multiplying the **Target Year's Adjusted EBITDA** by the **Earnout Percentage** applicable to that year.[85]  The Earnout Percentages are defined in the Earnout Agreement as approximately 27.27%, 36.36%, and 36.36% for 2016, 2017, and 2018, respectively, with each year representing the proportionate share of a consecutive 33-month period of 9 months, 12 months, and 12 months, respectively.[86]  The Earnout Percentage for 2016 of approximately 27.27% is equivalent to 9/33, or 9 months of the 33-month Earnout Period, to account for the exclusion of the first quarter of 2016, while the Earnout Percentage for 2017 and 2018 is equivalent to 12/33, for a full 12 months of the Earnout Period.[87]

---

[83] PX-632 (SPRK-NGE0044751-821); PX-634 (SPRK-NGE0044911-28).
[84] PX-632 (SPRK-NGE0044751-821).
[85] PX-634 (SPRK-NGE0044911-28).
[86] *Id.*
[87] *Id.*

In addition, if the Year-End Customer Accounts for any Target Year fell below the agreed upon customer account numbers for such Target Year, then the Earnout amount would be reduced by the difference between the projected Year-End Customer Accounts and the actual Target Year-End Customer Accounts multiplied by the projected Adjusted EBITDA per customer (the "Customer Account Adjustment" or "CAA").[88]   The parties agreed that the projected Adjusted EBITDA Per Customer was approximately $116.55, $119.35, and $120.11 for the Target Years 2016, 2017, and 2018, respectively.[89]

To avoid any doubt as to how to calculate the Contingent Payments, the parties created an Excel spreadsheet that illustrated Cash Installment and Earnout Payment amounts for 2016, 2017, and 2018, based on different levels of financial performance.[90]   This spreadsheet was a collaborative effort between the Sellers, primarily Mark Wiederman, and NGE, primarily Gary Lancaster and Dave Hennekes.[91]

To this end, on March 11, 2016, at



---

[88] *Id.*  The Earnout Agreement defines "Year End Customer Accounts" as "the actual number of customer accounts calculated as of the end of each Target Year.  The actual number of customer accounts shall be computed in a manner consistent with the procedures, practices, methodologies, and standards used by [Major Energy] in calculating their customer accounts before the Closing."  *Id.*

[89] *Id.*   These figures are arrived at by dividing the Adjusted EBITDA Plan in any given year by the Customer Account target in that same year.

[90] PX-105 (MESELLERS_0004207-11).

[91] *See* Wiederman Witness Statement (ECF No. 149) at ¶ 72; PX-105 (MESELLERS_0004207-11).

[92] PX-736 (SPRK-NGE0040246-48).

---

93 PX-584 (SPRK-NGE0040249-52).

94 PX-105 (MESELLERS_0004207-11).

95 *Compare* PX-584 (SPRK-NGE0040252) with PX-105 (MESELLERS_0004211).

96 PX-105 (MESELLERS_0004211).

97 *Id.*

98 *Id.*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████   Exhibit B illustrates the Cash

Installment and Earnout Payment amount for 2016, 2017, and 2018 assuming Major Energy hits

the projected Adjusted EBITDA targets each year and misses the Adjusted EBITDA targets for

each year by 5%.[99]   Exhibit B-1 to the Executive Earnout Agreement also includes a calculation

to adjust for an Earnout Payment cap.[100]   For example, if Major Energy achieved its Earnout

target in any of the years during the Earnout Period, it would have exceeded the Earnout

Payment cap.   The difference between the calculated Earnout "To Major" and Earnout Payment

Cap, if any, is used to calculate additional amounts payable to the Managers of Major Energy

under the Executive Earnout Agreement.[101]

The following is a complete copy of Exhibit B and Exhibit B-1:

---

[99] *Compare* PX-105 (MESELLERS_0004207-11) with PX-658 (SPRK-NGE0050581-97).
[100] PX-658 (SPRK-NGE0050581-97).
[101] *Id.*

## EXHIBIT B

### Comparison of Earnout Payments to Cash Installments Example

| MAJOR SH EARNOUT PAYMENTS | 0% | To Major | SH Earn-Out | | |
|---|---|---|---|---|---|
| Assuming all targets are hit exact | | 5,658,876 | 5,454,545 | | UNDER EARNOUT AGREEMENT |
| 2016 ADJUSTED EBITDA | $20,749,213 | 5,658,876 | 5,454,545 | | |
| 2017 ADJUSTED EBITDA | $25,003,343 | 9,092,125 | 7,272,727 | | |
| 2018 ADJUSTED EBITDA | $27,831,052 | 10,120,383 | 7,272,727 | | The Earnout payments payable to Major Shareholders |
| | | 24,871,384 | 20,000,000 | | are (i) multiplied by a fraction, the numerator of which |
| | | | | | is the actual Adjusted EBITDA and the denominator of which is the |
| Assuming targets are under by: | 5% | To Major | SH Earn-Out | | Adjusted EBITDA Plan Target (with no make-up option) |
| 2016 ADJUSTED EBITDA | $19,711,752 | 5,375,932 | 5,375,932 | | and (ii) subject to a possible further reduction for any |
| 2017 ADJUSTED EBITDA | $23,753,176 | 8,637,518 | 7,272,727 | | annual Customer Count shortfalls. |
| 2018 ADJUSTED EBITDA | $26,439,499 | 9,614,363 | 7,272,727 | | If actual Adjusted EBITDA > $20 MM in a Target Year, the |
| | | 23,627,814 | 19,921,387 | | $5 MM Cash Installments to Major Shareholders |
| | | | | | are multiplied by a fraction, the numerator of which |
| Assuming targets are under by: | 20% | To Major | SH Earn-Out | | is the actual Adjusted EBITDA and the denominator of which is the |
| 2016 ADJUSTED EBITDA | $16,599,370 | 4,527,101 | 4,527,101 | | Adjusted EBITDA Plan Target. If the fraction is > 100%, |
| 2017 ADJUSTED EBITDA | $20,002,674 | 7,273,700 | 7,272,727 | | then any monies > $5MM will be credited to make-up |
| 2018 ADJUSTED EBITDA | $22,264,842 | 8,096,306 | 7,272,727 | | any reduction(s) from prior calendar year(s). If the |
| | | 19,897,107 | 19,072,556 | | fraction is < 100%, the $5 MM will be proportionately |
| | | | | | reduced. If actual Adjusted EBITDA < $20 MM, there will be a |
| MAJOR SH CASH INSTALLMENTS | | CASH INSTALLMENTS | | | dollar-for-dollar reduction* for every dollar shortfall in |
| | $5,000,000 | | | | the Adjusted EBITDA below $20 MM*, but reductions for |
| Assuming all targets are hit exact | | Cash Installment | Carry-forward | | either or both reasons may be made-up in future years. |
| 2016 ADJUSTED EBITDA | $20,749,213 | 5,000,000 | – | | The rationale for these Adjusted EBITDA deductions is |
| 2017 ADJUSTED EBITDA | $25,003,343 | 5,000,000 | – | | that Major SH share in every dollar from $1 to $20 MM* |
| 2018 ADJUSTED EBITDA | $27,831,052 | 5,000,000 | – | | and these Adjusted EBITDA deductions balance the |
| | | 15,000,000 | | | risk between Major SH and NGE in a downside scenario. |

## EXHIBIT B-1

### Comparison of Earnout Payments to Cash Installments Example

| MAJOR SH EARNOUT PAYMENTS | 0% | To Major | SH Earn-Out | Exec Earn-out | |
|---|---|---|---|---|---|
| Assuming all targets are hit exact | | | | | |
| 2016 ADJUSTED EBITDA | $20,749,213 | 5,658,876 | 5,454,545 | 204,331 | UNDER EARNOUT AGREEMENT |
| 2017 ADJUSTED EBITDA | $25,003,343 | 9,092,125 | 7,272,727 | 1,819,397 | |
| 2018 ADJUSTED EBITDA | $27,831,052 | 10,120,383 | 7,272,727 | 2,847,655 | The Earnout payments payable to Major Shareholders |
| | | 24,871,384 | 20,000,000 | 4,871,384 | are (i) multiplied by a fraction, the numerator of which |
| | | | | | is the actual Adjusted EBITDA and the denominator of which is the |
| Assuming targets are under by: | 5% | To Major | SH Earn-Out | Exec Earn-out | Adjusted EBITDA Plan Target (with no make-up option) |
| 2016 ADJUSTED EBITDA | $19,711,752 | 5,375,932 | 5,375,932 | – | and (ii) subject to a possible further reduction for any |
| 2017 ADJUSTED EBITDA | $23,753,176 | 8,637,518 | 7,272,727 | 1,364,791 | annual Customer Count shortfalls. |
| 2018 ADJUSTED EBITDA | $26,439,499 | 9,614,363 | 7,272,727 | 2,341,636 | If actual Adjusted EBITDA > $20 MM in a Target Year, the |
| | | 23,627,814 | 19,921,387 | 3,706,427 | $5 MM Cash Installments to Major Shareholders |
| | | | | | are multiplied by a fraction, the numerator of which |
| Assuming targets are under by: | 20% | To Major | SH Earn-Out | Exec Earn-out | is the actual Adjusted EBITDA and the denominator of which is the |
| 2016 ADJUSTED EBITDA | $16,599,370 | 4,527,101 | 4,527,101 | – | Adjusted EBITDA Plan Target. If the fraction is > 100%, |
| 2017 ADJUSTED EBITDA | $20,002,674 | 7,273,700 | 7,272,727 | 973 | then any monies > $5MM will be credited to make-up |
| 2018 ADJUSTED EBITDA | $22,264,842 | 8,096,306 | 7,272,727 | 823,579 | any reduction(s) from prior calendar year(s). If the |
| | | 19,897,107 | 19,072,556 | 824,551 | fraction is < 100%, the $5 MM will be proportionately |
| | | | | | reduced. If actual Adjusted EBITDA < $20 MM, there will be a |
| MAJOR SH CASH INSTALLMENTS | | CASH INSTALLMENTS | | | dollar-for-dollar reduction* for every dollar shortfall in |
| | $5,000,000 | | | | the Adjusted EBITDA below $20 MM*, but reductions for |
| Assuming all targets are hit exact | | Cash Installment | Carry-forward | | either or both reasons may be made-up in future years. |
| 2016 ADJUSTED EBITDA | $20,749,213 | 5,000,000 | – | | The rationale for these Adjusted EBITDA deductions is |
| 2017 ADJUSTED EBITDA | $25,003,343 | 5,000,000 | – | | that Major SH share in every dollar from $1 to $20 MM* |
| 2018 ADJUSTED EBITDA | $27,831,052 | 5,000,000 | – | | and these Adjusted EBITDA deductions balance the |
| | | 15,000,000 | – | | risk between Major SH and NGE in a downside scenario. |

In the top right corner of Exhibit B (and Exhibit B-1) it describes the calculation formula for the Earnout Payment.  It provides as follows:

> The Earnout payments payable to Major Shareholders are (i) multiplied by a fraction, the numerator of which is the actual Adjusted EBITDA and the denominator of which is the Adjusted EBITDA Plan Target (with no make-up option) and (ii) subject to a possible further reduction for any annual Customer Count shortfalls.[102]

Simply put, the Earnout Payments formula as depicted in the agreed-upon spreadsheet and Exhibit B to the Earnout Agreement is as follows:

$$\text{Earnout Payment (Before Customer Account Adjustment)} = \text{2016 Adjusted EBITDA Plan} \times \frac{\text{2016 Adjusted EBITDA (Actual)}}{\text{2016 Adjusted EBITDA Plan}} \times \text{2016 Earnout Percentage (approx. 27.27\%)}$$

Critically, only through the above formula can you recreate and achieve the Earnout amounts identified in Exhibit B and Exhibit B-1 for 2016-2018.  For example, in Exhibit B-1, it states that "Assuming targets are hit exact for 2016," meaning Adjusted EBITDA of $20,747,213 and Year-End Customer Accounts of 178,031, then the amount to Major Energy is $5,658,876 and the Earnout amount hits the cap of $5,454,545, and the different between the two is used to calculate the additional Executive Earnout amount paid to the Managers of Major Energy.[103]

$$\$5,658,876 = \$20,749,213 \times \left[\frac{\$20,749,213}{\$20,749,213}\right] \times 27.27\%$$

As noted above, Defendants currently take the position that the total Contingent Payment owed to the Sellers for 2016 is ███████████████████████

---

[102] PX-658 (SPRK-NGE0050581-97).
[103] PX-658 (SPRK-NGE0050581-97).

███████████████████████  ███████████████████████████████

███████████████████████████████████████████████████████

███████████████   For purposes of this Pre-Trial Memorandum, however, even if the Court were to accept the 2016 totals for Adjusted EBITDA and Customer Accounts as claimed by Defendants but calculate the 2016 Earnout Payment consistent with the methodology and formula agreed to by the parties in the "FINAL OFFER" spreadsheet and incorporated into Exhibit B to the Earnout Agreement (and Exhibit B-1 to the Executive Earnout Agreement), the total 2016 Contingent Payment amount would be $7,474,007—*$2,315,089 higher than the amount claimed by Defendants*.

The following is a breakdown of how this higher 2016 Contingent Payment amount is determined using the formula embedded in the agreed-upon spreadsheet and Exhibit B to the Earnout Agreement. ██████████████████████████████████████



---

[104] PX-450 (SPRK-NGE0021830-44).
[105] *Id.*  Plaintiff disputes all of the foregoing amounts claimed by Defendants.

████████████████████████████████████████

████████████████████████████████████████

████████████████████

Simply put, the Sellers were underpaid for the 2016 Contingent Payment by at least $2,315,089.   And again, this is even if the Court assumes that the 2016 totals for Adjusted EBITDA and Customer Accounts as determined by Defendants are correct.   However, as will be demonstrated below in Section III.B.5, *infra*, Defendants' calculation of the Year End Customer Accounts is <u>not</u> correct and, therefore, the underpayment amount is even larger.[106]

> 2)   *Defendants Acknowledged And Used The Contingent Payment Calculation Methodology And Formula Set Forth In Exhibit B In Connection With Their Dropdown*

Record evidence, including Defendants' own internal documents, conclusively establishes that the formula set forth in Exhibit B to the Earnout Agreement, as described above, is the true and correct way to calculate the Contingent Payments.   In fact, record evidence shows that, in connection with the Dropdown, Spark understood the methodology and formula NGE and the Sellers agreed to for purposes of calculating the Contingent Payment and it is consistent with the formula illustrated in Exhibit B to the Earnout Agreement and above.

Specifically, on or about April 6, 2016, NGE and Spark were discussing deal terms for the Dropdown and were analyzing different Contingent Payment amounts assuming the Major Energy performance targets agreed to between NGE and the Sellers were achieved per plan or were 35% above or below plan.   In performing this analysis, NGE and Spark used the interactive model contained in the agreed-upon spreadsheet that eventually became Exhibit B to the Earnout Agreement.   Indeed, on April 6, 2016, ████████████████████████████

---

[106] And as will be demonstrated at trial, the 2016 underpayment is even larger when also factoring in Defendants' miscalculation of the actual 2016 Adjusted EBITDA amount.

46



Later, on May 17, 2016,

Thus, these documents confirm that, at or around the time of closing, both NGE and Spark understood that the proper way to calculate the Contingent Payments was the methodology and formula illustrated in Exhibit B to the Earnout Agreement, the same position the Sellers are advocating in this litigation and Pre-Trial Memorandum.

---

107 PX-641 (SPRK-NGE0045159-64).
108 PX-489 (SPRK-NGE0026371-73).
109 *Id.*
110 *Id.*
111 Lane Deposition Transcript at 32:6-33:10.

> 3)   *The Contingent Payment Calculation Methodology And Formula Used By Defendants When They Actually Paid The 2016 Contingent Payment To The Sellers Prior To The Filing Of This Litigation*

In April 2017, several months *before* the filing of this litigation, Defendants' paid the Sellers a 2016 Contingent Payment in the amount of $7,403,198, not the $5,158,917 they are claiming now as the correct 2016 Contingent Payment amount.[112]  In determining and paying the 2016 Contingent Payment to the Sellers, Defendants used a methodology and formula that was different than the one used in the agreed-upon "FINAL OFFER" spreadsheet and Exhibit B to the Earnout Agreement.  This alone constituted a breach of the Earnout Agreement.  But even worse, one year *after* paying the 2016 Contingent Payment to the Sellers and several months *after* the filing of this litigation, Defendants decided to recalculate the 2016 Contingent Payment using a formula that was now inconsistent with both Exhibit B and the formula they used pre-litigation and, without any prior warning or notice, unilaterally took back $2.2 million of the 2016 Contingent Payment they paid to the Sellers in April 2017.[113]

Before addressing the many flaws with the Defendants' new post-litigation methodology and formula (*see* Section III.B.4, *infra*), Plaintiff will first address the methodology and formula Defendants used pre-litigation and when they actually paid the 2016 Contingent Payment to the Sellers in April 2017.  Importantly, as will be explained below, even if the Court were to accept Defendants' pre-litigation formula as the correct formula (instead of using the formula illustrated in Exhibit B to the Earnout Agreement) and even if it were to accept Defendants' claimed 2016 totals for Adjusted EBITDA and Year-End Customer Accounts, Plaintiff and the Sellers still have been underpaid for the 2016 Contingent Payment by more than $2.1 million.

---

[112] PX-623 (SPRK-NGE0043588-99).  Defendants in fact actually calculated and determined a higher amount of $7,563,180, although they never paid that $160,033 difference.
[113] PX-450 (SPRK-NGE0021839-44).

On March 24, 2017, ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

A few days later, on March 27, 2017, ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████  ███████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████  ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[114] PX-483 (SPRK-NGE0025618-21).
[115] *Id.*
[116] *Id.*
[117] PX-698 (SPRK-NGE0051749-51).
[118] PX-698 (SPRK-NGE0051749-51).



On March 30, 2017, ████████████████████████████████████████

After wiring that sum to the Sellers, the Defendants apparently made a further internal effort to understand the correct methodology for calculating the 2016 Contingent Payment. To this end, sometime prior to April 11, 2017, ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ In other words, Mr. Kroeker wanted to understand how Mr. Lancaster, who was the leading negotiator

---

119 *Id.*
120 *Id.*
121 PX-524 (SPRK-NGE0031481-85).
122 *Id.*
123 PX-623 (SPRK-NGE0043588-99) (emphasis added).
124 *Id.* (emphasis added).

and draftsmen of the MIPA and NGE on behalf of NGE, interpreted these agreements in regard

to the calculation of the Contingent payments, including for 2016.

In response to Mr. Kroeker's request, Mr. Lancaster reviewed and analyzed the ████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████     ████████████████████████████████████████████████████████████

██████████████████████████     ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████

Significantly,   ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

---

[125] *Id.*
[126] *Id.*  (emphasis added)
[127] *Id.*
[128] *Id.* ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████





In his April 11, 2017 memorandum,

---



In other words, according to Mr. Lancaster, who was the lead draftsman of the Earnout

Agreement on behalf of NGE,

Based on this

The following day,

The parties spent the next few months disputing Spark's calculation

of the 2016 Adjusted EBITDA amount and the inclusion and exclusion of certain credits or add-

backs to Major Energy's 2016 Adjusted EBITDA.

---

134 *Id.* (emphasis added).
135 *Id.*
136 *Id.*
137 PX-438 (SPRK-NGE0019892-94).

The record is devoid of a single document showing that, during the parties' negotiations, Defendants ever informed the Sellers that ████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████ The record is also devoid of any documents showing that at any point prior to the filing of this action in October 2017, or any time before March 2018, Defendants claimed that it "overpaid" the Sellers with respect to the 2016 Contingent Payment or that Spark demanded a return of any of the monies it wired to the Sellers for the 2016 Contingent Payment.

Nonetheless, Defendants apparently now seek to avoid the ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ by claiming that they merely reflect Defendants' "settlement" position at the time, not true belief.[138]  Such post-filing contention is irrational.  Indeed, it strains credulity to believe that Defendants paid $2.2 million they believed they were not contractually obligated to pay even while the parties were continuing to dispute the total Adjusted EBITDA figure for 2016.  Also, if Defendants truly believed they had "overpaid" by $2.2 million then why did they not seek to claw back such a large overpayment beginning in July 2017 and well before the filing of this action, when it was clear that the parties were at a stalemate as to the total 2016 Adjusted EBITDA amount.

Additionally, Defendants' post-filing position requires the Court to ignore the words used by Mr. Lancaster in his memorandum and by Mr. Kroeker in his email.  For example, ███████ ████████████████████████████████████████████████████████████ ███ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[138] Lancaster Witness Statement (ECF No. 159) ¶¶ 75, 77, 82-84; Kroeker Witness Statement (ECF No. 166) ¶¶ 254-58.



In any event, while it is Plaintiff's position, as described above, that the correct formula for calculating the Contingent Payment is the one embedded in Exhibit B to the Earnout Agreement, even if the Court were to accept the pre-litigation formula used by Mr. Lancaster in his memorandum and endorsed by Mr. Kroeker, and even if the Court were to accept Spark's view as to the Adjusted EBITDA and Year-End Customer Accounts totals for 2016[142] (which the Sellers dispute), the 2016 Contingent Payment would be $7,285,213; thus, the Sellers still would have been underpaid by at least $2,126,295 for 2016. And as already described above in Section III.B.1, *supra*, even accepting Spark's view as to the Adjusted EBITDA and Year-End Customer Accounts totals for 2016 (which the Sellers dispute), but using the formula illustrated in Exhibit B (which the Sellers contend is the correct formula), the 2016 Contingent Payment would be $7,474,007 and the underpayment amount to the Sellers would be at least $2,315,089.

---

[139] PX-623 (SPRK-NGE0043588-99).

[140] PX-623 (SPRK-NGE0043588-99). ██████████████████████████████████
████████████████████████████████████████████████████████████████

[141] *Id.*

[142] As noted above, Spark's current view of the total Customer Accounts for 2016 is even different than the amount they used when they paid the 2016 Contingent Payment back in April 2017.

Thus, either way, whether the Court uses the formula in Exhibit B or the formula Defendants themselves used pre-litigation, the Sellers have been underpaid for the 2016 Contingent Payment by either $2.1 million or $2.3 million, and likely larger when the Court also corrects for Defendants' use of an understated Year-End Customer Accounts total for 2016, as addressed below in Section III.B.5, *infra*, and an understated Adjusted EBITDA total for 2016, as will be addressed at trial.

4) *Defendants New Post-Litigation Methodology And Formula For Calculating The Contingent Payment Is Unfounded And Flawed*

In March 2018, almost one year after Spark's payment of the 2016 Contingent Payment and several months after the filing of this litigation, Spark reverted to its initial March 24, 2017 methodology for calculating the 2016 Contingent Payment and, without any advance notice or warning, took back over $2.2 million it paid to the Sellers for the 2016 Contingent Payment. Specifically, on March 29, 2018,



---

[143] PX-450 (SPRK-NGE0021839-44).
[144] *Id.*
[145] *Compare* PX-450 (SPRK-NGE0021839-44) with PX-623 (SPRK-NGE0043588-99).

The following day, March 30, 2018, █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Importantly, Defendants now ignore Mr. Lancaster's annotated interpretation of Section

2.2 as set forth in his April 2017 memo, and apparently rely on a purported ambiguity created by

Section 2.2(b) of the Earnout Agreement. Defendants ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

This proposed methodology and formula is inconsistent with the agreed-upon spreadsheet

and Exhibit B to the Earnout Agreement and also inconsistent with the Defendants' pre-litigation

formula. But more fundamentally, Defendants current position and deduction of Major Energy's

actual first quarter Adjusted EBITDA *before* applying the 2016 Earnout Percentage of

approximately 27.27% essentially double counts the deduction meant to reflect that 2016

accounted for 9/33 of the Earnout Period. The 27.27% Earnout Percentage for 2016 already

accounts for 9 months of a year (as opposed to the higher Earnout Percentages of approximately

36.36% used in the full years of 2017 and 2018). New York law is clear that courts must reject

interpretations of agreement provisions that are commercially unreasonable or illogical. *See*

*UMB Bank, Nat'l Ass'n. v. Airplanes Ltd.*, 260 F. Supp. 3d 384, 393 (S.D.N.Y. 2017).

---

146 PX-511 (SPRK-NGE0030246-47).

To further illustrate the flaw with Defendants' position and proposed formula, it is instructive to determine the amount of actual Adjusted EBITDA that would have to be generated by Major Energy in the last 3 calendar quarters of 2016 in order for the Seller to achieve the 2016 Target Year Earnout Ceiling of $5,454,545.  According to Defendants' proposed formula, Major Energy would have to achieve $20,000,000 in Adjusted EBITDA, more than 96% of its Adjusted EBITDA Plan ($20,000,000/$20,749,213) for all of 2016, in just the last 3 quarters of 2016 in order to achieve the full Target Year Earnout Ceiling.  This is obviously at odds with the projections that formed the basis of the transaction as will be shown below.

Moreover, in the first quarter of 2016 Major Energy had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Therefore, in order to achieve the full Earnout Payment under Defendants' calculation, Major Energy would have had to achieve ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when it projected approximately 232,000 Customer Accounts, or approximately 54,000 more Customer Accounts than in 2016.  It would be nonsensical to require Major Energy exceed its 2016 Adjusted EBITDA Plan by almost $7 million for it to achieve the 2016 Earnout Ceiling.

Defendants' post-litigation method also implies that the 2016 Adjusted EBITDA target of $20,749,213 was a 9-month amount.  However, the documents in the record, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[147] PX-566 (SPRK-NGE0035202-05).
[148] PX-377 (SPRK-NGE0003917-23) at SPRK-NGE0003922.

█████████████ These 12-month projections were provided to NGE in connection with the original sale to NGE, and NGE and Spark again considered these projections in connection with their Dropdown transaction.

In fact, in correspondence immediately following the Dropdown, Nathan Kroeker, CEO of Spark, requested ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████ ███████████████████
███████████████████████████████████

Other contemporaneous documents confirm Defendants' understanding that the $20,749,213 Adjusted EBITDA target was for all 12 months of 2016, not the last 9 months. Examples include:

- As part of the Dropdown, NGE and Spark entered into their own Membership Interest Purchase Agreement dated May 3, 2016 (the "Spark MIPA"). In the Spark MIPA, Defendants use the same Adjusted EBITDA and Customer Account targets agreed to by the Sellers and NGE in the MIPA and Earnout Agreement for the 2016, 2016, and 2018 Target Years. Defendants go on to define the term "Adjusted EBITDA Plan" to mean "$20,749,213 for the 2016 Target Year <u>for the twelve (12) months</u> ended December 31, 2016."[151]

- 

---

[149] *Id.*

[150] PX-377 (SPRK-NGE0003917-23).

[151] PX-650 (SPRK-NGE0050380-444).

[152] PX-642 (SPRK-NGE0046550-87); *see also* PX-642 (SPRK-NGE0046550-87).

Also, Tom Holloway, Spark's former Chief Accounting Officer, was asked at his deposition in this matter the following: ████████████████████

████████████████████████████████████████████████

███████████████████████████████

Based on testimony provided by Defendants in the written direct trial testimony of Mr. Lancaster, Mr. Kroeker, and Mr. Holloway, it seems that Defendants will attempt to support their illogical position by relying upon an email Mr. Lancaster sent to Dan Alper of Major Energy in June 2016.[154]  In that email, to which Mr. Alper did not respond, Mr. Lancaster purportedly depicted a Contingent Payment scenario using the formula now being argued by Defendants.[155] Defendants' reliance on this June 2016 email by Mr, Lancaster is misguided for multiple reasons.

First, the formula used by Mr. Lancaster at that time is obviously incorrect given that, by his own admission, the Sellers could never achieve the contemplated full Earnout Payment amount of $5,454,545 for 2016, even if Major Energy hit the Adjusted EBITDA and Year-End Customer Accounts targets for 2016.  Specifically, ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

---

[153] Holloway Deposition Transcript at 61:4-8.
[154] PX-737 (MESELLERS_0001957-59).
[155] *Id.*
[156] *Id.*
[157]  PX-737  (MESELLERS_0001957-59);  PX-105  (MESELLERS_0004207-11);  PX-632  (SPRK-NGE0044751-44821).

Second, Mr. Lancaster makes no mention 

If Mr. Lancaster truly believed that

Third, the record shows that Defendants did not use Mr. Lancaster's June 2016 formula and calculation methodology in calculating the Contingent Payment amount for 2017 and 2018.  Instead, Defendants used the formula and methodology depicted in Mr. Lancaster's April 2017 memo, as described above.[159]

In sum, Defendants' new post-litigation methodology and formula is contrary to Exhibit B to the Earnout Agreement, contrary to Defendants' pre-litigation formula, contrary to logic and contrary to the underlying projections and other record evidence described above.  Accordingly, it should be rejected outright.

> 5)   *Defendants' Also Underpaid The Sellers Due To Their Wrong 2016 Customer Accounts Total*

As described above, even if the Court accepts the 2016 Adjusted EBITDA and Customer Accounts totals claimed by Defendants, the Court can conclude now and before trial that the Sellers were underpaid by at least $2.3 million (if the formula in Exhibit B is used) or at least $2.1 million (if Defendants' pre-litigation formula is used).  However, as demonstrated below, the Court can also determine now and before trial an additional calculation error by Defendants with respect to the 2016 Contingent Payment that would add an additional approximately $1

---

[158] *See* PX-623 (SPRK-NGE0043588-99).
[159] *See* PX-224 (MESELLERS_0013258-63).

million in underpayment to the Sellers.  This calculation error relates to Defendants' use of a

Year End Customer Accounts total for 2016 that was understated by at least 9,182 customers.

There is no dispute that the Year-End Customer Accounts target for 2016 was 178,031, and

the Adjusted EBITDA reduction per Customer Account below the target was $116.55.[160]  There

is no dispute that the term "Year End Customer Accounts" is defined in the Earnout Agreement:

> [T]he actual number of customer accounts calculated as of the end of each Target
> Year. The actual number of customer accounts shall be computed in a manner
> consistent with the procedures, practices, methodologies, and standards used by
> the Companies in calculating their customer accounts before the Closing.[161]

Record evidence confirms that the customer life cycle at Major Energy includes four

stages based on the acceptance or termination of a customer's electronic data interchange

("EDI").  ███████████████████████████████████████████████████████

█████████████████████████████████████  █████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

This approach to calculating Year End Customer Accounts is consistent with ████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████  EMS was an IT system

Major Energy used to track Customer Accounts and other information.  ████████████████

---

[160] PX-634 (SPRK-NGE0044911-28).

[161] *Id.*

[162] Leathers Witness Statement (ECF No. 155) ¶ 124; Sobel Witness Statement (ECF No. 152) ¶¶ 122-23; Wiederman Witness Statement (ECF No. 149) ¶ 213.

[163] *See, e.g.*, PX-573 (SPRK-NGE0037019); Wiederman Deposition Transcript at 343:6-345:19; Sobel Deposition Transcript at 133:2-135:6; 420:9-421:3.

[164] PX-17 (CDP00003794-95).

████████████████████████████████████████████████████████████████████

████████████████ This EMS report was used as the starting point in the projections to determine each Year End Customer Accounts target referenced in the Earnout Agreement.

In March 2017, ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████   ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

In an email dated March 24, 2017, ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████  ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ Nonetheless, Defendants proceeded to calculate the 2016 Year-End Customer Accounts different than Major Energy historically calculated Year-End Customer Accounts, including how Year-End Customer Accounts were calculated for 2015 that set the starting point for the agreed-upon Customer Accounts targets.

---

[165] *Id.*
[166] PX-483 (SPRK-NGE0025618-21).
[167] *Id.*
[168] *Id.* ██████████████████████████████████████████████████████████

[169] PX-717 (SPRK-NGE0057431-39).
[170] *Compare* PX-717 (SPRK-NGE0057431-39) with PX-483 (SPRK-NGE0025618-21).

In any event, if Defendants used the "methodologies, and standards used by [Major Energy] in calculating their customer accounts before the Closing" as required under the Earnout Agreement (*i.e.*, to include Active and Pending Active and exclude Cancelled and Pending Drops as of year-end), and using the Customer Account figures that Defendants reported in their initial 2016 Earnout Calculation,[171] the 2016 Year End Customer Accounts should have totaled 173,901, not 164,767 as claimed by Defendants.[172]

Consistent with the terms of the Earnout Agreement and the definition of "Year End Customer Accounts," the Earnout adjustment for such Customer Accounts Adjustment would then have been $481,345:



In Defendants' initial 2016 Earnout Payment calculation in March 2017, however, Defendants imposed a ███████████████████████████████████████████████
███████████████████████        ████████████████████████████████████

---

[171] PX-483 (SPRK-NGE0025618-21).

[172] To the extent Defendants point to an email in which ████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[173] PX-483 (SPRK-NGE0025618-21).

███████████████████████████████████████████

███████████

Accordingly, were the Court to accept Plaintiff's position that Defendants' erred in its calculation of the Year-End Customer Accounts total for 2016 and apply the correct amount of 173,901 to either the formula embedded in Exhibit B or the formula used by Defendants' pre-litigation, the 2016 Contingent Payment amount would be either $8,538,599 (using Exhibit B formula) or $8,349,765 (using Defendants' pre-litigation formula).  Therefore, Plaintiff and the other Sellers were underpaid for 2016 by at least $3,379,641 (using Exhibit B formula) or $3,190,847 (using Defendants' pre-litigation formula).[175]

*     *     *     *

In sum, Defendants have breached Section 2.2 of the MIPA and Earnout Agreement through their miscalculation and underpayment of the 2016 Contingent Payment.  Specifically, as demonstrated above and in the chart below, Plaintiff and the other Sellers have been underpaid with respect to the 2016 Contingent Payment, whether the Court uses the formula embedded in Exhibit B to the Earnout Agreement; whether the Court uses the formula Defendants themselves used prior to the filing of this litigation and when they actually paid the 2016 Contingent Payment to the Sellers in April 2017; whether the Court accepts Spark's view as to the Adjusted EBITDA and Year-End Customer Accounts totals for 2016; or whether the Court accepts Plaintiff's view as to the Year-End Customer Accounts totals for 2016.  Such underpayment ranges from a low of $2.1 million to a high of $3.37 million.

---

[174] ██████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████

[175] Again, these 2016 Contingent Payment amounts and underpayment amounts do not account for the additional calculation error claimed by Plaintiff and the Sellers in this case with respect to the Adjusted EBITDA total for 2016, which will be further demonstrated at trial.



|  | Correcting for 2016 Year-End Customer Accounts | | Accepting Spark's 2016 Year-End Customer Accounts | |
| Earnout Component | Exhibit B Formula | Defendants' Pre-Litigation Formula | Exhibit B Formula | Defendants' Pre-Litigation Formula |
|---|---|---|---|---|
| Cash Installments | $   3,791,313 | $   3,791,313 | $   3,791,313 | $   3,791,313 |
| Earnout Payments | 4,747,246 | 4,558,452 | 3,682,694 | 3,493,900 |
| Total Contingent Payments | $   8,538,559 | $   8,349,765 | $   7,474,007 | $   7,285,213 |
| Actually Paid by Spark | $   5,158,918 | $   5,158,918 | $   5,158,918 | $   5,158,918 |
| Underpayment to Sellers | $   3,379,641 | $   3,190,847 | $   2,315,089 | $   2,126,295 |

## C. Defendants' Methodological and Calculation Errors With Respect To The 2017 And 2018 Contingent Payments

Defendants also have breached the MIPA and Earnout Agreement due to their miscalculation and underpayment of the 2017 and 2018 Contingent Payments.

On March 29, 2018, █████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

On May 31, 2019, █████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[176] PX-450 (SPRK-NGE0021839-44).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

     According to the documents provided by Defendants along with their 2017 and 2018 Contingent Payment statements, Defendants calculated the 2017 and 2018 Contingent Payments



     While Plaintiff and the other Sellers dispute at least the Adjusted EBITDA totals claimed by Defendants for 2017 and 2018, and will address such dispute at trial,[178] had Defendants utilized the agreed-upon methodology and formula embedded in Exhibit B to the Earnout Agreement, Major Energy's Contingent Payment for 2017 and 2018 <u>combined</u> would be $5,015,122, or $1,163,801 greater than the amounts paid to the Sellers for 2017 and 2018.[179] The $1,163,801 greater amount results from the 2017 Earnout Payment which was $0 utilizing

---

[177] PX-224 (MESELLERS_0013258-63).

[178] Defendants have not produced the necessary documents, including Customer Accounts information from the Major Energy's EMS, for Plaintiff to ascertain whether the Year-End Customer Accounts totals claimed by Defendants for 2017 and 2018 are correct or understated like for 2016.

[179] At trial, Plaintiff will demonstrate that the underpayment for 2017 and 2018 combined is even greater (*i.e.*, $1,532,124) due to Defendants' miscalculation of the Adjusted EBITDA totals for those years.

the Defendants' pre-litigation formula.  A graphical representation of the 2017 Earnout Payment

(including Customer Account Adjustment) is as follows:



Accordingly, Plaintiff submits that the Court should enter a judgment pre-trial that the

agreed-upon formula embedded in Exhibit B to the Earnout Agreement is the proper way to

calculate the Contingent Payments and even accepting Defendants' proposed Adjusted EBITDA

and Year-End Customer Accounts totals for 2017 and 2018, the Sellers have been underpaid for

these years by at least $1,163,801, and possibly more depending on what Plaintiff establishes at

trial with respect to additional calculation errors by Defendants for 2017 and 2018.

**IV.**     **Plaintiff Is Entitled To Pre-Trial Judgment Awarding Him And The Sellers Reimbursement Of All Of The Reasonable Attorneys' Fees And Expenses They Incurred In This Litigation And Statutory Prejudgment Interest**

Section 3.7 of the Earnout Agreement provides:

> The ***prevailing party*** in any action or proceeding arising out of or relating to this Agreement or instituted hereunder (including proceedings in any bankruptcy court) ***shall be entitled to recover from the other party all reasonable attorneys' fees incurred and all disbursements incurred by such prevailing party in connection with such action or proceeding***. A party will be deemed the ***'prevailing party'*** for purposes of this paragraph if, as shown in the resulting award, order or judgment, ***such party shall have established that it was underpaid by at least fifteen percent (15%)***.[180]

A plain reading of this provision indicates that if Plaintiff and the Sellers are able to establish

that the Contingent Payments they have received during the Earnout Period have been

"underpaid by at least fifteen percent," they will be a "prevailing party" and, as such, are entitled

to recover from Defendants *all* of their reasonably incurred legal fees and expenses in this case.

---

[180] PX-634 (SPRK-NGE0044911-28) at § 3.7 (emphases added).

To date, Spark has paid the Sellers a total of approximately $9 million in Contingent Payments. Thus, pursuant to Section 3.7 of the MIPA, if Plaintiff and the Sellers are able to establish that they have been underpaid by just $1.6 million ($9 million is 85% of $10.6 million), they will be a "prevailing party" and entitled to recover fees and expenses they incur in connection with this litigation.

As demonstrated above, Plaintiff has already established that the Sellers have been underpaid by more than 15%, *i.e.*, more than $1.6 million. Indeed, just a few of the calculation errors relating to the 2016 Contingent Payment, as described above, alone surpass the 15% threshold. Thus, while Plaintiff will show at trial significantly more calculation errors with respect to the 2016 Contingent Payment and the 2017 and 2018 Contingent Payments, as well as the Sellers entitlement to the full $35 million Contingent Payment, the Court can now find that there is sufficient underpayment for Plaintiff and the other Sellers to be entitled to reimbursement of all their reasonable attorneys' fees and expenses incurred in this litigation under the express terms of Section 3.7 of the Earnout Agreement.[181]

Additionally, Plaintiff and the Sellers are entitled to recover from Defendants statutory prejudgment interest with respect to their successful breach of contract claims. *See* N.Y. C.P.L.R. § 5001(a) (2019) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ."); N.Y. C.P.L.R. § 5004 (2019) (providing that New York prejudgment interest rate is 9% per annum); *Days Inns Worldwide, Inc. v. Hosp. Corp. of the Carolinas*, No. 13-CV-8941 JPO, 2015 WL 5333847, at *1 (S.D.N.Y. Sept. 14, 2015) (Oetken, J.). The amount of prejudgment interest is dependent on the determined date of breach and sum awarded by the Court.

---

[181] The specific amount of such reimbursed fees and costs can be determined later upon submission by Plaintiff of the incurred attorneys' fees and costs.

## CONCLUSION

Accordingly, for the foregoing reasons, the Court should grant pre-trial judgment as a matter of law on: (i) Plaintiff's claim against NGE for breach of Section 11.7 of the MIPA and recovery of rescissory damages; (ii) Plaintiff's claim against Spark for tortious interference of contract in connection with NGE's breach of Section 11.7 of the MIPA and recovery of damages, including punitive damages; (iii) Plaintiff's claim against NGE and Spark for breach of Section 2.2 of the MIPA and Earnout Agreement and recovery of compensatory damages; and (iv) Plaintiff's right to reimbursement of all the reasonable attorneys' fees and expenses incurred in this litigation pursuant to Section 3.7 of the Earnout Agreement and to an award of statutory pre-judgment interest.

Dated: January 13, 2020                    KING & SPALDING LLP
New York, New York


                                           */s/ Israel Dahan*
                                           Israel Dahan
                                           Richard T. Marooney
                                           Ryan Gabay
                                           Leah Aaronson
                                           KING & SPALDING LLP
                                           1185 Avenue of the Americas
                                           New York, NY 10036
                                           Telephone No.: (212) 556-2114
                                           idahan@kslaw.com
                                           rmarooney@kslaw.com
                                           rgabay@kslaw.com
                                           laaronson@kslaw.com

                                           Chelsea J. Corey
                                           KING & SPALDING LLP
                                           300 South Tryon Street
                                           Suite 1700
                                           Charlotte, NC 28202
                                           Telephone No.: (704) 503-2575
                                           ccorey@kslaw.com

                                           *Counsel for Plaintiff*

71