**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative, <br><br> Plaintiff, <br> v. <br><br> NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC., <br><br> Defendants. | Civ. No. 17-CV-7742 (JPO) |

## <u>PROPOSED JOINT PRETRIAL ORDER</u>

Plaintiff Saul Horowitz, as Sellers' Representative[1] ("Plaintiff") and Defendants National

Gas & Electric, LLC ("NGE") and Spark Energy, Inc. ("SEI") (collectively, "Defendants") submit

this Proposed Joint Pretrial Order pursuant to Rules 16 and 26(a)(3) of the Federal Rules of Civil

Procedure and Rule 5.A of the Honorable J. Paul Oetken's Individual Practices in Civil Cases.

---

[1] The Sellers are the former owners of the membership interest in Major Energy Services, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC (collectively, "Major Energy"), and include Plaintiff, Mark Wiederman, Asher Fried, Mark Josefovic, and Michael Bauman. Plaintiff and Wiederman were part of the Senior Management Team of Major Energy during the relevant period of time.

## I.  THE FULL CAPTION OF THE ACTION

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative,<br><br>                              Plaintiff,<br><br>        v.<br><br>NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC.,<br><br>                              Defendants. | Civ. No. 17-CV-7742 (JPO) |

## II.  CONTACT INFORMATION FOR TRIAL COUNSEL

<u>Attorneys for the Plaintiff</u>

**King & Spalding LLP**
Israel Dahan
Richard T. Marooney
Ryan Gabay
Leah Aaronson
1185 Avenue of the Americas
New York, NY 10036
Telephone No.:  (212) 556-2114
idahan@kslaw.com
rmarooney@kslaw.com
rgabay@kslaw.com
laaronson@kslaw.com

Chelsea J. Corey
300 South Tryon Street
Suite 1700
Charlotte, NC 28202
Telephone No.:  (704) 503-2575
ccorey@kslaw.com

<u>Attorneys for the Defendants</u>

**Morgan, Lewis & Bockius LLP**
Troy S. Brown
Dana E. Becker (*pro hac vice*)
Su Jin Kim (to be admitted)
1701 Market Street

Philadelphia, PA 19103
Telephone No.:  (215) 963-5000
troy.brown@morganlewis.com
dana.becker@morganlewis.com
su.kim@morganlewis.com

Michelle Pector (*pro hac vice*)
Jared Wilkerson (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone No.:  (713) 890-5000
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

## III.   BASIS OF SUBJECT MATTER JURISDICTION

**Plaintiff's Statement:**

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendants, as Plaintiff is a resident of New York, Defendant NGE is a limited liability company headquartered in Texas,[2] and Defendant Spark Energy, Inc. ("Spark")[3] is a Delaware corporation with its principal place of business in Texas.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  Moreover, contrary to Defendants' contention, Plaintiff has standing to sue Spark because Spark is a party to the relevant agreements through the Dropdown transaction

---

[2] ECF No. 13-1 contains further support for the existence of subject matter jurisdiction over Defendant NGE.  As described therein, counsel for Defendants has confirmed that (i) the sole member of NGE is Retailco, LLC ("Retailco"), (ii) the sole member of Retailco is TxEx Energy Investments, LLC ("TxEx") and (iii) the sole member of TxEx is W. Keith Maxwell III, an individual who is a citizen and domiciliary of the State of Texas.  Declaration of Israel Dahan in Support of Subject Matter Jurisdiction, ECF No. 13-1, ¶ 7.

[3] While Defendants have chosen to define Spark Energy, Inc. as "SEI," Plaintiff has defined Spark Energy, Inc. herein as "Spark."

(assuming it is not voided by the Court)[4] or, at a minimum, has manifested an intention to be bound

by those agreements through the Dropdown.[5]

**Defendants' Statement:**

While this Court has jurisdiction over the subject matter of this dispute pursuant to 28

U.S.C. § 1332 and in accordance with Section 11.3 of the MIPA, Plaintiff lacks standing to sue

Defendant SEI because it is not the entity that acquired Sellers' Membership Interests in Major

Energy and is not in privity of contract with Sellers.  *Nat'l Stone Warehouse Inc. v. AKG Yahtim*

*Ve Insaat Malzemeiri Sanayi*, 20 Misc. 3d 1143(A), 872 N.Y.S.2d 692 (Sup. Ct. 2008) ("It is well

established that a plaintiff may not maintain a cause of action for breach of contract where it had

no contractual relationship with the defendant, and was not in privity with it."); *cf. Rodeo Family*

*Enterprises, LLC v. Matte*, 99 A.D.3d 781, 783, 952 N.Y.S.2d 581, 583–84 (2012) (dismissing

cross-claims for lack of standing where there was no privity of contract); *see also* ECF No. 117 at

54 ("Without conceding that lack of standing is an affirmative defense as opposed to Plaintiff's

---

[4] Additionally, contrary to Defendants' contention, it is they who in the eleventh hour have changed course and have now taken the position that Spark did not become a party to the relevant agreements through the Dropdown. In fact, Defendants admitted in their initial Answer to the Amended Complaint, filed on October 15, 2018, that "NGE sold Major Energy to ***Spark***." *See* ECF No. 45, para. 4 (emphasis added).  "Spark" is defined in the Amended Complaint as Spark Energy, not Spark HoldCo.  Defendants filed an Amended Answer on May 10, 2019 (see ECF No. 117) and could have sought to amend this part of their Answer, but they did not.  Also, in their motion to dismiss filings, Defendants argued for dismissal of Plaintiff's tortious interference claim against Spark on the grounds that Spark was a party to the MIPA and Earnout Agreement in light of the Dropdown.  *See* ECF Nos. 27, 32.  And the Court entertained this argument from Spark in its motion to dismiss decision.  *See* ECF No. 42 (Oetken Op.) at 9 ("Spark also asserts that it is immune from tortious interference claims as a successor-in-interest to the contract at issue.").

[5] *See Recticel Foam Corp. v. Bay Indus.*, 128 F. App'x 798, 799 (2d Cir. 2005) ("New York law provides that if a party objectively manifests an intent to be bound by a contract, that intent controls, even if the party does not sign the written agreement."); *Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (under New York law, a non-signatory parent corporation, such as Spark, can be held liable for breach of contract "if its conduct manifests an intent to be bound by the contract"); *see also, e.g.*, *Silverberg v. SML Acquisition LLC*, No. 15-CV-7129 (CS), 2017 WL 758520, at *6 (S.D.N.Y. Feb. 27, 2017) (finding manifestation of intent to be bound by PTP where SML was a "wholly-owned, inactive subsidiary of PTP, which possessed full power to act on SML's behalf, thus making PTP a de facto party" to the agreement); *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, 2015 WL 4461769, at *5 (S.D.N.Y. July 21, 2015) (finding parent company manifested an intent to be bound where plaintiff alleged that the subsidiary agreed to the contract under the parent's "watch and control," parent company executives reviewed and approved it, and the parent would benefit from the contract).

jurisdictional burden, Plaintiff lacks standing to sue Spark Energy, Inc. for breach of contract because Spark Energy, Inc. did not enter into a contract with Plaintiff and did not accede to any contractual obligations as to Sellers regarding the MIPA, Earnout Agreement, or Executive Earnout Agreement.").

Further, even Plaintiff has admitted that SEI is not a party to the operative agreements. ECF No. 28 at 9 ("Spark [Energy, Inc.] is not a named party or signatory to any of the executed Agreements").  Plaintiff's assertion above that it has standing to sue SEI because it is allegedly a party to the relevant agreements is not only inconsistent with this prior admission by Plaintiff, but contradicts Plaintiff's argument that the dropdown is void.[6]

Finally, for the first time, Plaintiff now asserts that SEI manifested an intention to be bound by these contracts to which it was not a party.  Plaintiff has never before asserted this legal theory in any pleading or briefing presented to this Court, nor has Plaintiff ever cited to any facts in support of this new legal theory, and as such, Plaintiff is barred from asserting this new theory at the eleventh hour.

## IV.   BRIEF SUMMARY OF CLAIMS AND DEFENSES

**Plaintiff's Summary:**[7]

Plaintiff filed his initial Complaint with this Court on October 10, 2017 and filed his Amended Complaint on December 11, 2017.  *See* ECF Nos. 1, 22.  The Amended Complaint

---

[6] *See* case law cited by Plaintiff in footnote 11.

[7] In the Court's Individual Practices in Civil Cases, the Court makes clear that the parties' Joint Pretrial Order "shall" include "a brief summary by each party of the claims and defenses that the party asserts remain to be tried" and that the "summaries should not cite any evidentiary matter."  Individual Rule 5.A.iv.  This brief summary of claims and defenses should not be a lengthy legal brief.  Accordingly, Plaintiff has kept his summary narrowly focused on a description of his claims and will address Defendants' legal brief-style arguments contained below in Plaintiff's Pretrial Memorandum and other submissions to the Court.

asserts four causes of action, three of which remain:[8] (i) breach of contract against NGE (Count II);[9] (ii) breach of contract against Spark (Count III); and (iii) tortious interference with contract against Spark (Count IV).[10]  In connection with these claims, Plaintiff seeks rescissory damages, compensatory damages, punitive damages, reimbursement of legal fees and costs, and statutory pre-judgment interest.

This action concerns Defendants' breaches of agreements entered into with the Sellers in March and April 2016, as part of NGE's acquisition of Major Energy from the Sellers, and Spark's tortious and bad faith conduct in connection with certain of those breaches of contract.  Those agreements are the Membership Interest Purchase Agreement ("MIPA") Earnout Agreement, and Executive Earnout Agreement.  At the time of NGE's acquisition, Major Energy was a privately held natural gas and electricity supplier operating in several deregulated markets in the Northeast and Midwest.  NGE was also a privately held company.  The total indicative purchase price for this transaction was $80 million—$35 million of which was to be paid in the form of Earnout Payments and Cash Installments (together, the "Contingent Payments") over a period of 33 months

---

[8] On January 15, 2018, Defendants moved to dismiss Plaintiff's fraudulent inducement (Count I) and tortious interference (Count IV) claims, as well as Plaintiff's request for punitive damages.  *See* ECF No. 27.  On September 24, 2018, the Court granted Defendants' motion to dismiss the fraudulent inducement claim but denied Defendants' motion to dismiss Plaintiff's tortious interference claim and Plaintiff's request for punitive damages.  *See* ECF No. 42.

[9] To establish a breach of contract claim, a plaintiff must prove, by a preponderance of the evidence, the following: (1) the existence of an enforceable agreement; (2) performance by plaintiff; (3) the defendant breached the agreement; and, (4) the plaintiff sustained damages as a result of the defendant's breach.  *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 378 (S.D.N.Y. 2014).  A preponderance of the evidence exists where "the scales tip, however slightly, in favor of the party with the burden of proof."  *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992).

[10] Under New York law, the elements of tortious interference with contract are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff."  *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 253 (S.D.N.Y. 2002) (quoting *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001)).  Like the breach of contract claim, the he standard of proof for such tort claim is preponderance of evidence.  *Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-CV-2949 (PKC), 2018 WL 3636700, at *7 (E.D.N.Y. Feb. 24, 2018).

(from April 1, 2016 until December 31, 2018) (the "Earnout Period"), dependent upon Major Energy's satisfaction of certain agreed-upon performance targets.

More specifically, in Count II of the Amended Complaint, Plaintiff asserts that NGE breached the unambiguous non-assignment provision in Section 11.7 of the MIPA by assigning or otherwise transferring the Major Energy membership interest it acquired from the Sellers and all of its rights and obligations under the MIPA to Spark or one of its controlled subsidiaries, Spark HoldCo, LLC, without obtaining the required prior written consent of the Sellers. Plaintiff further asserts that, under the unambiguous terms of Section 11.7, the improper assignment transaction is void. But because voiding or rescinding this improper transaction at this point in time is no longer practical, the Court is permitted under applicable New York law to award Plaintiff an alternative remedy of rescissory damages.[11] Additionally, contrary to NGE's contention, waiver, ratification, and estoppel are not viable defenses to Plaintiff's claim for breach of Section 11.7 under applicable New York law,[12] especially considering the express No-Waiver Clause contained in Section 11.4 of the MIPA.[13]

---

[11] *See Richard A. Hutchens CC, L.L.C. v. State*, 59 A.D.3d 766, 771, 872 N.Y.S.2d 734, 739 (2009) (finding rescission was remedy for breach of anti-assignment provision that declared assignment without consent to be void); *MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 34 Misc. 3d 895 (N.Y. Sup. Ct. 2012) ("Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable. A solid body of case law so holds."); *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869 (N.Y. Sup. Ct. 2012) (same).

[12] *See* 6A N.Y. Jur. 2d Assignments § 42 (2d ed. 2019) ("[A] void assignment may not be subsequently ratified.") (citing *Knight v. Knight*, 182 A.D.2d 342, 345 (3d Dep't 1992)); 27 Williston on Contracts § 70:13 (4th ed. 2018) ("A void contract cannot be ratified; it binds no one and is a nullity."); *Banco De La Republica De Colom. v. Bank of N.Y. Mellon*, No. 10-cv-536, 2013 WL 3871419, at *10 n.7 (S.D.N.Y. July 26, 2013) (rejecting argument that "waiver and ratification are different propositions"); *see also Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001) ("equitable defenses are unavailable when the rights being pressed by a party are based upon a void document"); *Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99-cv-2638, 1999 WL 1277243, at *4-5 (S.D.N.Y. Dec. 30, 1999) (defendant who breached an anti-assignment clause requiring prior written consent could not establish estoppel because defendant "*brought the instant scenario upon itself*") (emphasis added); *Draper v. Georgia Props.*, 230 A.D.2d 455, 460 (1st Dep't 1997) (equitable estoppel defense cannot be based on void provision of agreement).

[13] Section 11.4 of the MIPA provides in part that "[n]o failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof . . . ." New York courts "uniformly" enforce no-waiver clauses such as the one contained in Section 11.4 of the MIPA and bar parties from asserting waiver

In connection with this breach claim, and in Count IV of the Amended Complaint, Plaintiff asserts that Spark is liable for tortious interference with contract and punitive damages because it knowingly and actively participated in NGE's breach of the non-assignment provision in the MIPA.[14]   Indeed, Spark worked in concert with NGE to complete the sale and assignment transaction, all while knowing (and acknowledging) that the Sellers' prior written consent was required, but not obtained.  And contrary to Spark's contention, the exculpatory or limitation of liability provisions in the MIPA do not bar Plaintiff from suing Spark for engaging in tortious misconduct and recovering punitive damages.  Indeed, applicable New York law and public policy forbids enforcement of exculpatory or limitation of liability provisions to insulate a party's willful, reckless, or even grossly negligent conduct.[15]

Plaintiff also asserts, in Counts II and III of the Amended Complaint, that NGE or Spark[16] (in the alternative, dependent upon which entity is obligated under the agreements post-assignment) breached Section 2.2 of the MIPA and Section 2.2 of the Earnout Agreement by improperly calculating the Contingent Payments due and owed to the Sellers during the Earnout

---

and ratification defenses.  *See Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (1st Dep't 2007); *Banco De La Republica*, 2013 WL 3871419, at *9-10; *see also Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016) (refusing to wade into factual dispute regarding defendant's purported waiver because the contract contained a no-waiver clause).

[14] Under New York law, "an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights."  *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986).

[15] *See Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (N.Y. 1983) ("[A]n exculpatory agreement . . . will not exonerate a party from liability under all circumstances . . . . [I]t will not apply to exemption of willful or grossly negligent acts . . . [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing."); *see also Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (quoting *Kalisch-Jarcho*, 58 N.Y.2d at 385); *Gold Connection Disc. Jewelers, Inc. v. Am. Dist. Tel. Co.*, 212 A.D.2d 577, 578 (2d Dep't 1995) ("Although such clauses in commercial contracts are enforceable to limit recovery for claims based on ordinary negligence, they will not preclude recovery in tort or breach of contract where the losses are the result of gross negligence.").

[16] Contrary to Defendants' contention, Plaintiff can sue Spark for breach of the MIPA or Earnout Agreements, even if it is not a signatory to those agreements, because Spark is a party to those agreements through the Dropdown or, at a minimum, Spark manifested an intention to be bound by those agreements.  *See supra* note 5.

Period.  These calculation errors have led to an underpayment to the Sellers of more than $4.8 million for 2016 and more than $1.5 million for the 2017 and 2018 combined period.

Plaintiff further asserts, in Counts II and III of the Amended Complaint, that NGE or Spark (in the alternative, dependent upon which entity is obligated under the agreements post-assignment) breached Section 2.7 of the Earnout Agreement and Executive Earnout Agreement by, among other things, failing to comply with their express "good faith and fair dealing" obligation under these agreements and allowing the Major Energy Senior Management Team (as defined in these agreements) to operate Major Energy "in all material respects" throughout the Earnout Period, "consistently with how the Senior Management Team operated [Major Energy] before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities."  Additionally, Defendants failed to "consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of [Major Energy] which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies," but to the contrary, engaged in actions that were "reasonably likely to have the inevitable effect of avoiding or reducing, any of the Contingent Payments] becoming due to the Sellers hereunder."[17]  Plaintiff contends that Defendants' misconduct prevented the Sellers from achieving the full $35 million Contingent Payment during the Earnout Period and additional amounts under the Executive Earnout Agreement.  Indeed, as a result of Defendants' misconduct, the Sellers received only about 25% ($9 million) of the $35 million Contingent Payment.

**Defendants' Summary:**

---

[17] With respect to these latter two breach of contract theories, to the extent Spark cannot be held liable from a contractual perspective because it is not a party to the agreements post-assignment or the assignment is rendered void, then its wrongful and bad faith conduct is sufficient to create liability on a tortious interference with contract theory. Plaintiff has pleaded this alternative liability against Spark in Count IV of the Amended Complaint.

On September 24, 2018, the Court granted Defendants' motion to dismiss Plaintiff's fraudulent inducement claim; as a result, only Counts II, III, and IV remain at this time. ECF No. 42, at 17. As referenced above, Defendants maintain that Plaintiff's remaining claims should all be dismissed as a matter of law as detailed in Defendants' Pretrial Memorandum.

**Counts II and III (Breach of Contract).**  Counts II and III assert that NGE and SEI, respectively, breached their purported contractual obligations to Sellers under the MIPA, Earnout Agreement, and Executive Earnout Agreement. In particular, Counts II and III of the Amended Complaint allege that NGE and SEI breached (i) Sections 2.2(c), 7.1, and 11.7 of the MIPA, (ii) Sections 2.2 and 2.7 of the Earnout Agreement, and (iii) Section 2.7 of the Executive Earnout Agreement. These claims challenge the permissibility of the dropdown, the calculation of potential Contingent Payments, and the operation of Major Energy during the Earnout Period.

Defendants maintain this case should be dismissed as a matter of law based on the facts and evidence before this Court. As pled in Defendants' Amended Answer, Plaintiff lacks standing to assert any claims against SEI as SEI is not a party to any of the contracts in dispute including the MIPA, the Earnout Agreement and the Executive Earnout Agreement. ECF No. 117. As Plaintiff has been aware throughout this case, Spark Holdco, LLC ("Spark") was the entity that acquired Major Energy from NGE, not SEI.[18] Even Plaintiff admits that SEI is not a party to any of the operative Agreements in Plaintiff's Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss. ECF No. 28 at 9. Spark was never sued as defendant in this matter. Further Section 7.14(c) of the MIPA precludes Plaintiff from asserting claims against any non-parties to the MIPA, which includes SEI. Accordingly, SEI should be dismissed from this matter.

---

[18] In general, if an entity is not a party to a contract, no valid breach of contract claim exists against that entity. *Hotel Aquarius B.V. v. PRT Corp.*, No. 92 CIV 4498, 1992 WL 391264, at *6 (S.D.N.Y. Dec. 22, 1992) (citing *Stratton Group, Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978) ("Before defendant may be held accountable for the breach of a contract, it must be demonstrated that he was a party thereto.").

Further, Defendants maintain that Plaintiff's breach of contract claim against NGE should be dismissed because the alleged breach attributed to NGE was a purported violation of the non-assignment provision in Section 11.17 of the MIPA, when NGE dropped Major Energy down to Spark on August 23, 2016.  Sellers knew before closing that NGE intended to drop Major Energy down to Spark and after the dropdown occurred, Sellers willingly accepted and retained Earnout Payments and other benefits that they received from Spark.  The MIPA also incorporated the Earnout Agreement, which expressly permitted the assignment to an affiliate without consent,[19] and Sellers knew Spark and NGE were affiliates before filing this suit.  But setting aside whether Plaintiff performed his obligations under the MIPA and that Plaintiff was aware of the planned drop down before the closing of the sale to NGE, Plaintiff can demonstrate no damages causally related to the dropdown itself.[20]  And following the dropdown, NGE did not undertake any action on which Plaintiff bases any of his claims, as Spark (not NGE) performed the Contingent Payment calculations.  Therefore, Plaintiff's breach of contract claim against NGE cannot stand.

---

[19] When interpreting a contract, the specific controls over the general.  *See Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" (quoting Restatement (Second) of Contracts § 203(c) (1981))); *id.* (concluding that provision's "broad language is limited by the specific operative language" of another related provision); *see also Jamie Sec. Co. v. The Limited, Inc.*, 880 F.2d 1572, 1576-77 (2d Cir. 1989) ("Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinary qualify the meaning of the general provisions.").

[20] Under New York law, to prevail on a claim for breach of contract, a plaintiff must prove by a preponderance of the evidence (i) the existence of a valid contract between itself and the defendant, (ii) plaintiff's performance of its obligations under the contract, (iii) defendant's material breach of the contract, and (iv) damages to the plaintiff caused by that defendants' breach.  *Broyles v. J.P. Morgan Chase & Co.*, No. 08 CIV. 3391, 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010); *Nielsen Co. (U.S.), LLC v. Success Systems, Inc.*, 112 F. Supp. 3d 83 (S.D.N.Y. 2015).  Under New York law, causation is an essential element of damages in a breach of contract action.  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."); *accord Bank of America, N.A. v. Bear Stearns Asset Management*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013).  Recovery is not allowed if the claimed losses are 'the result of other intervening causes.'" *Diesel Props*, 631 F.3d at 52-53.

Sellers also knew the $35 million in Contingent Payments were not guaranteed and only represented potential payments they might receive if the agreed Adjusted EBITDA and customer count targets were met in each target year, which did not occur.  Therefore, Defendants contest Plaintiff's inaccurate earnout calculations and speculative damage theories.

**Count IV (Tortious Interference).**  In Count IV of the Amended Complaint, Plaintiff asserts a claim for tortious interference against SEI, alleging that SEI caused NGE to breach Section 11.7 of the MIPA in connection with the dropdown and Section 2.7 of the Earnout Agreement and Executive Earnout Agreement in connection with the operation of Major Energy during the earnout period.[21]

**Defendants' Defenses**.  Defendants summarize their non-exhaustive defenses to Plaintiff's claims below.

**1.     Plaintiff Has Failed to Establish Claimed Damages, and the Testimony of His Proffered Damages Expert Falls Short of Standards for Expert Testimony.**  Through Defendants' Motion in Limine and Pretrial Memorandum, Defendants have briefed in detail how Plaintiff has failed to satisfy their burden of proof as to damages, including with respect to the lack of evidence to establish causation or damages resulting from purported conduct by Defendants. To prove general damages under New York law, the plaintiff must show (i) the fact or existence of damages to a "reasonable certainty" and, if the fact or existence of damages is proven, (ii) "a 'stable foundation for a reasonable estimate' [of damages] incurred as a result of the breach."

---

[21] Under New York law, tortious interference requires "the existence of a valid contract . . . , [defendant's] knowledge of that contract, and [defendant's] intentional procurement of [the third party's] breach of the contract without justification, actual breach of the contract, and [] damages resulting from the breach." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 594, 973 N.E.2d 735, 742 (2012).  To find tortious interference under New York law, "procurement of a breach must not only be intentional but also improper." *M'Baye v. World Boxing Ass'n*, 05 CIV. 9581DC, 2009 WL 2245105, at *9 (S.D.N.Y. July 28, 2009) (citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426–27, 835 N.Y.S.2d 530, 867 N.E.2d 381 (2007)).  Such a finding requires that even a competitor engage in conduct that "exceeded a minimum level of ethical behavior in the marketplace." *Cintas*, 8 N.Y.3d at 427.

*Holland Loader Co., LLC v. FLSmidth A/S*, 769 F. App'x. 40, 42 (2d Cir. 2019). "The first prong concerns causation, while the second prong speaks to the amount of damages." *Id.* Plaintiff must prove by a preponderance of the evidence that it suffered damages as a result of Defendant's breach. *Holland Loader Company, LLC v. FLSmidth A/S, 3*13 F. Supp. 3d 447, 480 (S.D.N.Y. 2018).

General damages "are the natural and probable consequence of the breach" of a contract. *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 22 N.Y.3d 799, 805–06, 988 N.Y.S.2d 527, 11 N.E.3d 676 (2014) (quoting *Am. List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43, 550 N.Y.S.2d 590, 549 N.E.2d 1161 (1989) ). They include "money that the breaching party agreed to pay under the contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 109 (2d Cir. 2007) (citing *Am. List Corp.*, 75 N.Y.2d at 44). "[D]amages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986). Expert "[t]estimony based on guesswork, speculation, or conjecture is inadmissible." *Sadler v. Moran Towing Corp.*, 204 F. Supp. 2d 695, 698 (S.D.N.Y. 2002) ("Here, Captain Reid's supposition that hauling the cable '***may have***' contributed to plaintiff's injury is unsupported by anything suggesting a view on his part that it more likely than not did so.") (emphasis added); *see also Kenford Co.*, 67 N.Y.2d at 261; *cf. Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 243 F. Supp. 500, 512 (S.D.N.Y. 1965) ("Actual damages must be actually proved, and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact. . . . The question is not what speculatively he ***may have*** lost, but what actually he did lose.") (emphasis added) (internal citations omitted).

**2.      Plaintiff's Demand for Rescissory Relief Fails.**   Plaintiff contends that the dropdown constituted a breach of Section 11.7 of the MIPA and has sought, alternatively, to void the dropdown and for rescissory damages. Under New York law, rescission is an "extraordinary remedy" that is only appropriate "when a breach may be said to go to the root of the agreement between the parties." *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (citing *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980)); *see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 413 (App. Div. 1st Dep't 2013) (rescission is a "very rarely used equitable tool").  "It may be invoked 'only when there is lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored.'" *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 340 (S.D.N.Y 2012) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (N.Y. Ct. App. 1972)).  A demand for rescissory relief fails when an alternative remedy is available. *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, No. 650369/2013, 2013 WL 6997183 (N.Y. Sup. Ct. Jan. 15, 2014) ("Plaintiff's claim for rescissory damages also fails. . . . While Plaintiff maintains that rescission would be impracticable, Plaintiff's claim for rescissory damages lacks merit, since Plaintiff has an alternative remedy-repurchase.").

Courts do not permit double recovery.  *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 228 F. Supp. 2d 455, 462 n.2 (S.D.N.Y. 2002) ("The Court will not rescind the Asset Purchase Agreement and enforce its terms at the same time. Shred–It must elect between alternative remedies, so as to prevent double recovery for the same harm."), *aff'd*, 92 F. App'x 812 (2d Cir. 2004).  Moreover, "[i]n order to justify equitable rescission (or, in this case, its equivalent), a party must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof." *Syncora Guarantee*, 874 F. Supp. 2d at 34 (internal citations omitted).

**3.     The MIPA's Exculpatory Provision Bars Plaintiff's Claim Against SEI.**

Defendants argue that Plaintiff's tortious interference claim as to SEI is barred by Section 7.14(c)

of the MIPA.  Section 7.14(c) provides that Sellers may only bring claims arising out of or relating

to the MIPA against the "Persons that are Parties" to the MIPA:

> All claims or causes of action (whether in contract or in tort, in law
> or in equity) that may be based upon, arise out of, or relate to this
> Agreement, or the negotiation, execution or performance of this
> Agreement (including any representation or warranty made in
> connection with this Agreement or as an inducement to enter into
> this Agreement), may be made only against the Persons that are
> Parties hereto. No Person who is not a named party to this
> Agreement, including any Affiliate, agent, attorney, or
> representative of any Party (such Persons, "Non-Party Affiliates"),
> shall have any liability (whether in contract or tort, in law or in
> equity, or based upon any theory that seeks to impose liability of an
> entity party against its owners or Affiliates) for any obligations or
> liabilities arising under, in connection with, or related to this
> Agreement or for any claim based on, in respect of, or by reason of
> this Agreement or its negotiation or execution, and each Party
> waives and releases all such liabilities, claims, and obligations
> against any such Non-Party Affiliates. Non-Party Affiliates are
> expressly intended as third party beneficiaries of this provision of
> this Agreement.

Plaintiff seeks to avoid enforcement of this provision.  Courts in New York generally

enforce clear and unequivocal exculpatory provisions.  Indeed, in a contract between sophisticated

parties, to avoid enforcement of a limitation of liability provision, the evidence must approach

reckless indifference or intentional wrongdoing.  *Alitalia Linee Aeree Italiane, S.p.A. v. Airline

Tariff Pub. Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) (applying Virginia law, and explaining

that New York law would call for the same result (citing *Kalisch-Jarcho, Inc. v. City of New York*,

58 N.Y.S.2d 746 (1983); Restatement (Second) of Contracts § 195))).

**4.     The MIPA's Limitation of Liability Bars Plaintiff's Claim for Special

Damages.**  Defendants assert that Plaintiff's claim for special damages fails under Section 9.9 of

the MIPA.  Section 9.9 expressly limits the type of relief available to Sellers: Notwithstanding any other term herein, no Party will be obligated to any other Party or Person for any consequential, incidental, indirect, special, exemplary or punitive damages or Losses based thereon, including damages or Losses with respect to loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity, and no Party will be obligated to any other Party or Person for any Losses or damages determined as a multiple of income, revenue or the like, relating to the breach of any representation, warranty, covenant or agreement herein (except and to the extent that the Indemnified Party has been required to pay such damages to any third Person).[22]

Plaintiff has tried to avoid this bar on recovery of special damages but New York courts "routinely" enforce these kinds of liability-limitation provisions, particularly "when contracted by sophisticated parties" like the Sellers and NGE.  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016); *accord DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) (holding that "sophisticated parties represented by sophisticated counsel, unambiguously provided the limit of recovery in the event of breach, and [the court] may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery"); *accord Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F. Supp. 2d 311, 321 (W.D.N.Y. 2013).  This is because courts recognize that "[a] limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . . [The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made."  *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l,*

---

[22] DX-2, ¶ 9.9.

*Inc.*, 84 N.Y.2d 430, 436 (N.Y. 1994)).    Such clauses are unenforceable only when "in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing."  *Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 157 A.D.3d 579, 581, 69 N.Y.S.3d 633, 636 (N.Y. App. Div. 2018); *Kalisch-Jarcho*, 58 N.Y.S.2d 377, 384-85 (1983).  The "type of intentional wrongdoing that could render a limitation in [a contract] unenforceable is that which is 'unrelated to any legitimate economic self-interest."  *Electron Trading*, 69 N.Y.S.3d at 636 (quoting reference omitted).

  **5.**  **Plaintiff Sued the Wrong Party.**  Here, Plaintiff sued SEI, rather than Spark and is bound by its deliberate choice.  Plaintiff now seeks at the eleventh hour to argue for the first time that SEI manifested an intent to be bound by the contracts that Spark entered into, but the record shows exactly the opposite. "In general, if an entity is not a party to a contract, no valid breach of contract claim exists against that entity.  *Hotel Aquarius B.V. v. PRT Corp.*, No. 92 CIV 4498, 1992 WL 391264, at *6 (S.D.N.Y. Dec. 22, 1992) (citing *Stratton Group, Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978) ("Before defendant may be held accountable for the breach of a contract, it must be demonstrated that he was a party thereto."); *Gitseg v. Herbst*, 220 A.D.2d 380 (N.Y. App. Div. 1995) ("It is axiomatic that "[a] claim for breach of contract . . . only can be brought against a party to the contract.").

  Section 7.17 of the MIPA between NGE and Spark ("Spark MIPA") and the signature page of the Spark MIPA expressly provide that SEI is bound ***only*** to the guarantee portion of that contract—not any portions related to obligations under the original MIPA or Earnout Agreement. This contractual language demonstrates SEI's manifest intent ***not*** to be bound to the original MIPA and Earnout Agreement.  *See, e.g.*, *Capricorn Inv'rs III, L.P. v. Coolbrands Int'l, Inc.*, 24 Misc. 3d 1224(A), 897 N.Y.S.2d 668 (Sup. Ct. 2009), *aff'd*, 66 A.D.3d 409, 886 N.Y.S.2d 158 (2009)

("***the documentary evidence***, including the Partnership Agreement itself, negates plaintiff's allegation that CoolBrands manifested an intent to be bound to the Partnership Agreement") (emphasis added).

> The objective expectations of a contracting party are generally dispositive of contract issues. Farnsworth on Contracts § 7.16 (2d ed. 1998) ("first basis for implication [from contract] is the actual expectations of the parties."). Thus, AT&T, by choosing to contract with TIA and not TI, did not have an objective expectation that TI would be bound to answer for TIA's liabilities to AT&T. *Warnaco, Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994) (parent corporation becomes a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound). In the absence of such an intent to be bound, the "distinction between corporate entities" is preserved. *Maltz v. Union Carbide Chems. & Plastic Co.*, 992 F. Supp 286, 300 (S.D.N.Y. 1998) ("[g]enerally, parent and subsidiary corporations are treated as separate legal entities, and a contract by one does not legally bind the other."); *Int'l Customs Assoc. v. Ford Motor Co.*, 893 F. Supp. 1251 (S.D.N.Y. 1995) (refusing to pierce corporate veil in suit for breach of services contract between plaintiff and subsidiary corporation where the parent was not a party to the contract and contract did not indicate that subsidiary signed as agent for parent); *State of New Jersey, Dep't of Environmental Protection v. Ventron Corp.*, 468 A.2d 150, 164 (1983) (parent corporation may be liable when parent abused incorporation to enable subsidiary to perpetrate fraud or injustice).

*Telecom Intern. Am., Ltd. v. AT&T Corp.*, 96 CIV. 1366 (AKH), 2000 WL 224108, at *1 (S.D.N.Y. Feb. 28, 2000) (dismissing complaint against parent), aff'd in part, dismissed in part sub nom. Telecom Intern. Am., Ltd. v. AT & T Corp., 280 F.3d 175 (2d Cir. 2001)

Plaintiff has never pled facts to show that SEI manifested intent to be bound nor pled this legal theory. To the contrary, it pled facts that SEI signed the Spark MIPA (as guarantor) and that SEI paid a portion of the Earnout Payments (which the record has disproven). Here, Sellers manifested an intent to be bound only to NGE and to NGE's successors and assigns, not SEI. There is simply no objective basis to suggest that Sellers intended to have a contract with SEI or any expectation that SEI would be bound to any contractual obligations to Sellers.

6.      **Plaintiff Has Not Sought to Pierce the Corporate Veil.**   Plaintiff has never pled veil piercing in this case and such a theory would not have been viable had it been asserted as Plaintiff lacks the requisite evidence to support such a theory.

7.      **Plaintiff Has Waived Any Objection to the Dropdown.**   Defendants have demonstrated through their briefing that Sellers waived any objection to the dropdown transaction, including by accepting and retaining Contingent Payments and other benefits from Spark  during the earnout period.   Waiver is the voluntary relinquishment of a known right and "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundam. Portf. Adv'rs, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 850 N.E.2d 653, 658 (2006) (holding that issues of material fact existed as to whether plaintiff waived and was estopped from asserting breach of contract); *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 585–86 (2d Cir. 2006) ("breach of contract may be waived by the non-breaching party"); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (citing New York cases) ("where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."), *aff'd*, 962 F.2d 1 (2d Cir. 1992); *see N.Y. Racing Ass'n v. Meganews, Inc*., 2000 WL 307378, at * 7 (E.D.N.Y. 2000) (plaintiff waived its breach of contract claim "by continuing performance under the contract and accepting the benefits of the contract despite allegedly unauthorized deductions").

Even non-assignment provisions stating any assignment without the other parties' written consent "shall be void" may be waived.  *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 CIV. 6876 LMM, 94 CIV. 2713 LMM, 2000 WL 1876915, at *2 (S.D.N.Y. Dec. 22, 2000).  In *Bank Brussels Lambert*, the non-assignment provision at issue stated: "NEITHER

PARTY MAY ASSIGN ITS RIGHT OR DELEGATE ITS PERFORMANCE UNDER THIS AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY. ANY ATTEMPTED ASSIGNMENT OR DELEGATION WITHOUT SUCH CONSENT SHALL BE VOID." *Id.* Notwithstanding this language, the court went on to state that "[i]t is true that '[e]ven a specific prohibition against assignments made without written consent may be waived in favor of an assignee,' but Credit Lyonnais has not shown any such waiver by J. Aron Company." *Id.* (quoting *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) ("Tele/Resources had no objection to the alleged assignments or subordination agreements; indeed they were made for Tele/Resources' benefit. Under the circumstances, application of the equitable doctrines of waiver and estoppel seems most appropriate.")); *see also One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*, 386 F. Supp. 2d 394, (S.D.N.Y. 2005) (involving non-assignment provision stating that an insurance policy "shall be void if assigned or transferred without the written consent of [One Beacon]," but finding that equitable estoppel precluded insurer from voiding the policy because "One Beacon renewed the Policy while it was chargeable with knowledge that the Policy had been assigned notwithstanding the anti-assignment clause. It thus created the impression that the Policy was in force, an impression that it intended the insured to rely upon when making premium payments.").

8.    **Plaintiff Has Ratified the Dropdown**.  Defendants have also argued that Sellers have ratified the dropdown transaction, including by accepting and retaining Contingent Payments and other benefits from Spark during the earnout period.  Ratification is "a waiver of existing rights." *John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Fam. Life Ins. Tr.*, No. 16-CV-7071, 2018 WL 6173436, at *6 (E.D.N.Y. Nov. 26, 2018) (citing *In re Levy*, 69 A.D.3d 630, 632 (2d Dep't 2010)). Put another way, "[w]hen a party with full knowledge, or with sufficient

notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Id.* (quoting *Rothschild v. Title Guarantee & Tr. Co.*, 204 N.Y. 458, 464 (N.Y. 1912)). Even "acquiescence or silence can give rise to the inference of ratification." *Id.* (citing *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017)); *Gallegos v. Top RX, Inc.*, No. 04-CV-773A, 2008 WL 4279526, at *13 (W.D.N.Y. Sept. 15, 2008) ("a plaintiff is estopped from pursuing a breach of contract claim when such plaintiff has accepted the benefits of the agreement, despite knowledge of a breach of the agreement interposed in a subsequent breach of contract action.") (quoting *Chapin v. Chapin*, 744 N.Y.S.2d 181, 183 (2d Dep't 2002)).

9.     **Plaintiff Should Be Estopped from Challenging the Dropdown**.   Defendants have argued that the doctrine of estoppel bars Plaintiff from challenging the dropdown transaction, including because Sellers accepted and retained Contingent Payments and other benefits from Spark  during the Earnout Period.   Estoppel "preclude[s] a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." *757 3rd Ave. Assoc's, LLC v. Patel*, 117 A.D.3d 451, 453, 985 N.Y.S.2d 57, 59 (2014) (finding equitable estoppel as matter of law). The doctrine of equitable estoppel requires 'three elements on the part of the party estopped: (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true

facts.  The elements pertaining to the party asserting estoppel are (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position.'"  *Rich v. Orlando*, 128 A.D.3d 1330, 1331, 7 N.Y.S.3d 754, 755 (N.Y. App. Div. 2015) (quoting *Holm v. C.M.P. Sheet Metal*, 89 A.D.2d 229, 234–235, 455 N.Y.S.2d 429 (N.Y. App. Dic. 1982)); *see also Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05 Civ. 10528(CSH)(DFE), 2008 WL 4579758, at *13 (S.D.N.Y. Oct. 14, 2008); *see also Gen. Elec. Capital Corp. v. Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994) (quoting *Special Event Entm't v. Rockefeller Ctr.*, 458 F. Supp. 72, 76 (S.D.N.Y. 1978)).

"Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result. The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct."  *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 93 (2d Cir. 2003) (internal citations and quotation marks omitted).

Finally, it is well-established that a non-waiver clause does not preclude a waiver of contractual rights. *Williams v. Buffalo Pub. Sch.*, No. 17-3483, 2018 WL 6536051, at *2 (2d Cir. Dec. 12, 2018) (reversing because it was plausible "that Defendants waived their right to enforce" contractual requirement); *Citibank, N.A. v. Tele/Res., Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) (assignee is not "precluded from relying on the doctrine of waiver and estoppel because it is not a party to the underlying contract. Even a specific prohibition against assignments made without written consent may be waived in favor of an assignee"); *Marvel Entm't Group, Inc. v. ARP Films, Inc.*, 684 F. Supp. 818, 821 (S.D.N.Y. 1988) (denying motion for summary judgment on alleged violation of assignment provision; "a stipulation against assignment may be waived or modified

by a course of business dealings") (quoting *Univ. Mews Assocs. v. Jeanmarie*, 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (Sup. Ct. N.Y. Cty. 1983)).

   **10.    Plaintiff Has Unclean Hands.**   Defendants assert  that Plaintiff's demands for equitable relief should fail because Sellers have unclean hands.  A party "who comes into equity must come with clean hands" if relief is to be granted.   *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999).    "The defendant who invokes the doctrine of unclean hands has the burden of proof."  *Id.* (quoting 4 Rudolf Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 22.18 (4th ed. 1997)).   A court may decline to exercise its equitable powers in favor of a party whose "unconscionable act ... has immediate and necessary relation to the matter that he seeks in respect of the matter in litigation."  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). Application of the "unclean hands" doctrine rests with the discretion of the court, which is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."  *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 969–70 (S.D.N.Y. 1992), *aff'd sub nom. Aris-Isotoner Gloves v. Berkshire Fashions*, 983 F.2d 1048 (2d Cir. 1992) (quoting *Keystone*, 290 U.S. at 245, 54 S.Ct. at 148).

   "It is undisputed that an unclean hands defense requires a finding of bad faith ... [and] to assert a defense of unclean hands, a party must have been injured by the allegedly inequitable conduct." *Obabueki v. Int'l Bus. Machs. Corp.*, 145 F. Supp. 2d 371, 401 (S.D.N.Y. 2001).  "The doctrine of unclean hands is an equitable defense that is unavailable in an action exclusively for damages."  *Manshion Joho Ctr. Co. v. Manshion Joho Ctr., Inc.*, 24 A.D.3d 189, 190, 806 N.Y.S.2d 480, 482 (N.Y. App. Div. 2005) (citing *Hasbro Bradley v. Coopers & Lybrand,* 128 A.D.2d 218, 220, 515 N.Y.S.2d 461 [N.Y. App. Div, 1987).

11.     **Plaintiff Failed to Establish Proximate Causation**.  Plaintiff's claims are fatally flawed because Plaintiff has failed to establish that Sellers suffered harm that was proximately caused by Defendants.  "In order to prove a breach of contract cause of action, the plaintiff must prove that a defendant's breach was the proximate cause of its damages." *Fed. Hous. Fin. Agency for Fed. Home Loan Mortg. Corp. v. Morgan Stanley ABS Capital I Inc.*, 59 Misc. 3d 754, 783, 73 N.Y.S.3d 374, 397 (N.Y. Sup. Ct. 2018) (citing *Fruition, Inc. v. Rhoda Lee, Inc.*, 1 A.D.3d 124, 125, 766 N.Y.S.2d 437 (N.Y. App. Div. 2003).  "In the law of contracts, as in torts, causation in fact is established if the defendant's breach of duty was a substantial factor in producing the damage." *Coastal Power Intl., Ltd. v. Transcontinental Capital Corp.*, 10 F. Supp. 2d 345, 366 (S.D.N.Y. 1998), *aff'd,* 182 F.3d 163 (1999); *see also* 28A NY Prac., Contract Law, § 22:7.  This "test is satisfied if the defendant's actions would be thought of by people generally as having operated to an important extent in producing the harmful result."  *Coastal*, 10 F.Supp.2d at 366 (internal quotation marks and citation omitted).  The breaches need not be "the exclusive cause" or the "sole cause" of the damages. *Id.*  "To break the legal chain, the intervening act must have been of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them."  *NAF Holdings, LLC v. Li & Fung [Trading] Ltd.*, No. 10 Civ. 5762, 2016 WL 3098842, * 6(S.D.N.Y., June 1, 2016). "[D]amages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986).

12.     **Plaintiff Has Failed to Mitigate His Claimed Damages.**  Defendants have pled that Plaintiff has failed to establish that Plaintiff made diligent efforts to mitigate damages, and that such efforts would have diminished any complained-of harm.  "A party seeking to avail itself

of the affirmative defense of failure to mitigate damages must establish that the injured party failed to make diligent efforts to mitigate its damages, and the extent to which such efforts would have diminished those damages." *Eskenazi v. Mackoul*, 72 A.D.3d 1012, 1014, 905 N.Y.S.2d 169, 171 (N.Y. App. Div. 2010) (citing *Cornell v. T.V. Development Corp.*, 17 N.Y.2d 69, 74, 215 N.E.2d 349 (N.Y. 1966). While the injured party must make "reasonable exertions to render the injury as light as possible," *Wilmot v. State of New York*, 32 N.Y.2d 164, 168, 297 N.E.2d 90 (N.Y. 1973), this duty does not extend so far as to require that the party expose itself to "unreasonable risk or expense." *Janowitz Bros. Venture v. 25–30 120th St. Queens Corp.*, 75 A.D.2d 203, 213, 429 N.Y.S.2d 215 (N.Y. App. Div. 1980). "A plaintiff in a contract case is required to take reasonable actions to minimize its damages." *Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.,* 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 163 (2d Cir. 1999) (citing *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985)).

## V.    LENGTH OF TRIAL AND TRIER OF FACT

**Plaintiff's Response:**

The Court has set trial to last five days, from March 2 through March 6, 2020. The parties have submitted 19 written direct statements, several of which are lengthy, and have each identified additional trial witnesses for which written direct statements were not submitted. Given the volume of witnesses and testimony, Plaintiff believes that examinations of all witnesses may likely exceed five trial days. Plaintiff therefore reserves the right to continue the trial beyond five days, if necessary. Pursuant to the operative agreements at issue, the parties have agreed that this case is to be tried without a jury.

**Defendants' Response:**

To the extent any of Plaintiff's claims survive as to one or both of the Defendants, Defendants continue to believe that this case should be tried within a week, particularly in light of

the parties' submission of direct testimony in the form of written witness statements. Plaintiff has served 8 written direct statements totaling 405 pages and 4 rebuttal statements totaling 35 pages for a cumulative total of 440 pages of testimony, and Defendants have served 11 written direct statements totaling 351 pages. Defendants respectfully submit that the parties can efficiently conduct cross-examinations of these witnesses in the course of one week through active "clock management." Plaintiff has not identified any other witnesses that are necessary to call for the trial of this matter, including the three witnesses Plaintiff identified for the first time in this Joint Pre-Trial Order, Amir Benisti, Bruce Shipper, and James Chung, for which Plaintiff provides no basis for the need for them to testify. Further, as set forth in Defendants' Pretrial Memorandum, Defendants respectfully submit that judgment in their favor is warranted on all claims; even if the Court declines to dispose of all claims, its resolution of the parties' pretrial memoranda should result in the dismissal of either NGE or SEI, thereby further streamlining the anticipated evidence to be heard at trial. To the extent any of Plaintiff's claims survive, Defendants respectfully request that the Court allocate a set amount of time for each side for their total trial time and hold the parties to their allocated time to ensure an efficient trial of this matter. While Defendants maintain that five days is sufficient for the full trial of this matter, Defendants are amenable to scheduling closing argument at a time convenient to the Court after the parties have submitted their post-trial briefing.

## VI.    TRIAL BY A MAGISTRATE JUDGE

Plaintiff and Defendants have not consented to trial by a Magistrate Judge.

## VII.   STIPULATIONS OR AGREED-UPON STATEMENTS OF FACT OR LAW

Per the Court's instruction at the pre-trial conference on November 12, 2019, the Court will instruct the parties post-trial whether it requires proposed findings of fact and conclusions of law.  *See* Transcript of November 12, 2019 Pre-Trial Conference at 11:13-12:4.

## VIII.   LIST OF TRIAL WITNESSES[23]

**Plaintiff's Witnesses:**

Plaintiff has submitted written direct testimony of eight witnesses, identified below in Nos. 1-8.  Plaintiff also intends to call at trial in his case-in-chief five hostile witnesses, identified below in Nos. 9-13.  Plaintiff also intends to call in his case-in-chief three additional witnesses, identified below in Nos. 14-16.

The below list does not include witnesses to be called for rebuttal and/or impeachment. Plaintiff reserves the right to call custodian(s) of record, if necessary, with respect to exhibits. Plaintiff also reserves the right to amend this list to call additional witnesses at trial.

**1.    Saul Horowitz**: Mr. Horowitz, Plaintiff and Sellers' Representative, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 148.  Mr. Horowitz also submitted a sworn rebuttal witness statement on behalf of Plaintiff in which he addressed certain inaccuracies in Defendants' written direct statements.  *See* ECF No. 173.

**2.    Mark Wiederman**: Mr. Wiederman, a Seller and former President of Major Energy, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 149.  Mr. Wiederman also submitted a sworn

---

[23] This list is not indicative of the order in which witnesses shall be called at trial.

rebuttal witness statement on behalf of Plaintiff in which he addressed certain inaccuracies in Defendants' written direct statements.  *See* ECF No. 171.

3.      **Daniel Alper**: Mr. Alper, Major Energy's former Chief Executive Officer, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 150.  Mr. Alper also submitted a sworn rebuttal witness statement on behalf of Plaintiff in which he addressed certain inaccuracies in Defendants' written direct statements.  *See* ECF No. 174.

4.      **Levi Moeller**: Mr. Moeller, Major Energy's former Chief Operating Officer, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 151.  Mr. Moeller also submitted a sworn rebuttal witness statement on behalf of Plaintiff in which he addressed certain inaccuracies in Defendants' written direct statements.  *See* ECF No. 172.

5.      **David Sobel**: Mr. Sobel, Major Energy's former Chief Financial Officer, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 152.

6.      **Eliott Wolbrom**: Mr. Wolbrom, Major Energy's former Chief Marketing Officer, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 153.

7.      **Sunil Gadtaula**: Mr. Gadtaula, President and owner of PTM Marketing & Consulting Inc., submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein.  *See* ECF No. 154.

8. **David Leathers**: Mr. Leathers, Plaintiff's damages expert witness, submitted a sworn written direct statement on behalf of Plaintiff and intends to testify live about the topics discussed therein. *See* ECF No. 155.

9. **Paul Konikowski**: Plaintiff intends to call Mr. Konikowski, Senior Vice President and General Manager of NGE, as a hostile witness in Plaintiff's case-in-chief. Mr. Konikowski submitted a sworn written direct statement on behalf of Defendants offering testimony about the topics discussed therein. *See* ECF No. 157.

10. **Nathan Kroeker**: Plaintiff intends to call Mr. Kroeker, President and Chief Executive Officer of Spark, as a hostile witness in Plaintiff's case-in-chief. Mr. Kroeker submitted a sworn written direct statement on behalf of Defendants offering testimony about the topics discussed therein. *See* ECF No. 166.

11. **W. Keith Maxwell III**: Plaintiff intends to call Mr. Maxwell, Chief Executive Officer of NGE and holder of a majority of the voting power of Spark's common stock, as a hostile witness in Plaintiff's case-in-chief. Mr. Maxwell submitted a sworn written direct statement on behalf of Defendants offering testimony about the topics discussed therein. *See* ECF No. 163.

12. **Gary Lancaster**: Plaintiff intends to call Mr. Lancaster, Executive Vice President and General Counsel of NGE, as a hostile witness in Plaintiff's case-in-chief. Mr. Lancaster submitted a sworn written direct statement on behalf of Defendants offering testimony about the topics discussed therein. *See* ECF No. 159.

13. **Todd Gibson**: Plaintiff intends to call Mr. Gibson, Chief Financial Officer and Executive Vice President of NGE, as a hostile witness in Plaintiff's case-in-chief. Mr. Gibson submitted a sworn written direct statement on behalf of Defendants offering testimony about the topics discussed therein. *See* ECF No. 162.

14.     **Amir Benisti**:  Plaintiff intends to call Mr. Benisti, a former Commercial Broker Network Development employee at Major Energy, in Plaintiff's case-in-chief.  Plaintiff will seek live testimony from Mr. Benisti concerning Major Energy's commercial energy business and relationship with brokers prior to and after the sale to NGE; Spark's involvement and role in the running of Major Energy's commercial energy business during the Earnout Period; complaints and concerns raised by commercial brokers about Spark prior to and after the Dropdown.

15.     **Bruce Shipper**:  Plaintiff intends to call Mr. Shipper, Director of Commercial Broker Sales at Major Energy, in Plaintiff's case-in-chief.  Plaintiff will seek live testimony from Mr. Shipper concerning Major Energy's commercial energy business and relationship with brokers prior to and after the sale to NGE; Spark's involvement and role in the running of Major Energy's commercial energy business during the Earnout Period; complaints and concerns raised by commercial brokers about Spark prior to and after the Dropdown.

16.     **James Chung**:  Plaintiff intends to call Mr. Chung, former Business Development Manager at Pacific Summit Energy, LLC ("PSE") and former Supply Group Consultant of Major Energy, in Plaintiff's case-in-chief.  Plaintiff will seek live testimony from Mr. Chung concerning Major Energy's historical supply relationship with PSE; Major Energy's efforts to extend PSE's supply contract beyond March 2017; and Defendants' termination of or interference in Major Energy's supply relationship with PSE.

**Defendants' Witnesses:**

Preliminarily, Defendants object to Plaintiff's designation of Amir Benisti, Bruce Shipper, and James Chung for the first time on January 13, 2020, particularly to the extent any of those witnesses are cooperating with Plaintiff, but for whom Plaintiff did not submit written direct examinations.  Defendants further object to the late identification of these witnesses and Plaintiff's failure to identify why they are necessary for the trial of this matter.

The fact and expert witnesses Defendants presently intend to call to testify in their case-in-defense are listed below, including hostile witnesses. This list does not include witnesses to be called for rebuttal and/or impeachment. Although most authentication issues have been stipulated by the parties, Defendants reserve the right to call custodian(s) of record, if necessary, with respect to exhibits. Plaintiff also reserves the right to amend this list and to call additional witnesses at trial as needed.

1.      **Louis Dudney, Defendants' Damages Rebuttal Expert**. Mr. Dudney submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein. ECF No. 167.

2.      **L. Todd Gibson, Chief Financial Officer, NGE**. Mr. Gibson submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein. ECF No. 162.

3.      **Tom Holloway, former Chief Accounting Officer of Spark.** Mr. Holloway submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein. ECF No. 164.

4.      **Paul Konikowski, Senior Vice President and General Manager of NGE**. Mr. Konikowski submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein. ECF No. 157.

5.      **Nathan Kroeker, President and CEO, Spark and SEI**. Mr. Kroeker submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein. ECF No. 166.

6. **Michael Kuznar, prior President of Retailco Services, Inc**.   Mr. Kuznar submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein.   ECF No. 161.

7. **Gary Lancaster, Senior Vice President & Assistant General Counsel at NGE**.   Mr. Lancaster submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein.   ECF No. 159.

8. **Robert Lane, former Chief Financial Officer at Spark and SEI.**   Mr. Lane submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein.   ECF No. 165.

9. **Christopher Leonard, Vice President of Restructuring and Supply at Spark Energy, LLC**.   Mr. Leonard submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein.   ECF No. 160.

10. **Keith Maxwell, Chief Executive Officer, NGE, and non-executive Chairman of the Board of Directors of SEI**.   Mr. Maxwell submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein.   ECF No. 163.

11. **Heather McGuinness, Sales Support Analyst at Spark Energy, LLC; prior employee of Major Energy**.   Ms. McGuinness submitted a sworn written direct statement on behalf of Defendants and intends to testify live about the topics discussed therein.   ECF No. 169.

12. **Michael Bauman, Seller (Via Trial Subpoena)**.   Excerpts of Mr. Bauman's deposition are attached hereto in Appendix D.   However, Defendants may issue a trial subpoena to Mr. Bauman to cross-examine him live regarding, among other things, the issues contained in his deposition and regarding his ownership, involvement, oversight, and knowledge regarding Major Energy.

13.     **Asher Fried, Seller (Via Trial Subpoena).**  Excerpts of Mr. Fried's deposition are attached hereto in Appendix D.  However, Defendants may issue a trial subpoena to Mr. Fried to cross-examine him live regarding, among other things, the issues contained in his deposition and further regarding his ownership, involvement, oversight, and knowledge regarding Major Energy.

14.     **Mark Josefovic, Seller (Via Trial Subpoena)**.  Excerpts of Mr. Josefovic's deposition are attached hereto in Appendix D.  However, Defendants may issue a trial subpoena to Mr. Josefovic to cross-examine him live regarding, among other things, the issues contained in his deposition and regarding his ownership, involvement, oversight, and knowledge regarding Major Energy.

15.     **Larry Studnicky, Attorney, Winslett Studnicky McCormick & Bomser LLP (Via Trial Subpoena)**.  Excerpts of Mr. Studnicky's deposition are attached hereto in Appendix D.  However, Defendants may issue a trial subpoena to Mr. Studnicky to cross-examine him live regarding, among other things, the issues contained in his deposition.

## IX.     PARTIES' DESIGNATION OF DEPOSITION TESTIMONY AND OBJECTIONS[24]

Plaintiff's designation of deposition testimony, with Defendants' counter-designations and objections, is annexed hereto as **Appendix A**.[25]  Defendants' designation of deposition testimony,

---

[24] The parties have not yet exchanged objections or rebuttals to Counter-Designations; therefore, none are indicated on Appendices A or B.  The parties will exchange objections and rebuttals to Counter-Designations on January 17, 2020 and will submit revised versions of Appendices A and B on January 20, 2020.

[25] Plaintiff objects to any attempt by Defendants to designate the deposition testimony of Mr. Bauman, Mr. Fried, Mr. Josefovic, or Mr. Studnicky in lieu of seeking live testimony because all four deponents reside within the jurisdiction of the Court and are otherwise available for trial.  *See* Fed. R. Civ. P. 32(a)(4); *United States v. Int'l Bus. Machines Corp.*, 90 F.R.D. 377, 382 (S.D.N.Y. 1981).

Defendants challenge the merit of this objection.  Notably, Plaintiff did not make this objection when the parties exchanged objections to the opposing deposition designations three days ago.  Defendants maintain that they are within their rights to designate deposition testimony for witnesses who may or may not (i) be in the country (let alone within the jurisdiction of the Court) at the time of trial; (ii) be ill and unable to attend; or (ii) choose to appear.  Of course, if they do appear, their depositions will at least in part not be necessary under Fed. R. Civ. P. 32(a)(4), which is what Defendants prefer.  Thus, Plaintiff's objection lacks any legal or logical basis.  Additionally, the case cited by

with Plaintiff's counter-designations and objections, is annexed hereto as **Appendix B.**  The parties will separately submit to the Court, but not file, deposition excerpts corresponding to the designations in Appendix A, as well as one-page synopses of each set of affirmative designations.

## X.    LIST OF EXHIBITS

Plaintiff's exhibit list is annexed hereto as **Appendix C**.  Defendants' exhibit list is annexed hereto as **Appendix D**.  The objections found in the exhibit lists in Appendices C and D contain objections that the parties have sought to resolve pretrial to the extent feasible.  The parties have agreed that other objections, aside from authenticity and completeness objections, may be raised at trial.

## XI.    STATEMENT OF DAMAGES CLAIMED AND OTHER RELIEF SOUGHT[26]

**Damages and Relief**

As noted above, in connection with his three remaining claims, Plaintiff seeks rescissory damages, compensatory damages, punitive damages, reimbursement of legal fees and costs, and statutory prejudgment interest.

Specifically, in connection with Count II against NGE and Count IV against Spark, Plaintiff seeks rescissory damages in the amount of at least $9.8 million, as detailed in the expert report of David M. Leathers.  Plaintiff believes that these damages are the appropriate remedy for this misconduct.  Also, in connection with Count IV against Spark, Plaintiff seeks an award of punitive damages in an amount to be determined by the Court.

---

Plaintiff *United States v. Int'l Bus. Machines Corp*., 90 F.R.D. 377 (S.D.N.Y. 1981), excludes Plaintiff's deposition designations; not Defendants' deposition designations.  That case held, among other things, that depositions of witnesses who testify at trial are not admissible when offered after the witness appears.  *Id*. at 382 ("this court sees no reason why the deposition of a trial witness should be admissible when offered after the witness' appearance").  All of the deposition designations that Plaintiff has created (and they are numerous and lengthy) are for Defendants' witnesses who have already appeared via direct witness statement.  Unlike Plaintiff, Defendants made that objection timely, and it is included on the first page of Appendix A to this Pretrial Order.  That objection should be sustained, and the Court should disregard all of Plaintiff's deposition designations.

[26] Defendants deny that Plaintiff is entitled to any damages in this case.

In connection with Count II against NGE and Count III against Spark, but not duplicative of Plaintiff's rescissory damages (if awarded), Plaintiff seeks at least $26 million with respect to Defendants' breach of Section 2.7 of the Earnout Agreement and Executive Earnout Agreement, as detailed in the expert report of Mr. Leathers.  Additionally, but not duplicative of any Section 2.7 damages award, Plaintiff seeks at least $6.3 million ($4.8 million in connection with Defendants' errors in calculating the 2016 Contingent Payment and $1.5 million in connection with Defendants' errors in calculating the 2017 and 2018 Contingent Payments) with respect to Defendants' breach of Section 2.2 of the MIPA and Earnout Agreement.

Moreover, pursuant to Section 3.7 of the Earnout Agreement and Executive Earnout Agreement, Plaintiff seeks reimbursement of all the legal fees and expenses he and the other Sellers incurred in connection with this litigation.  And pursuant to N.Y. C.P.L.R. § 5001(a), Plaintiff seeks recovery from Defendants of statutory prejudgment interest with respect to their successful breach of contract claims.

Dated: New York, New York
      January 13, 2020

KING & SPALDING LLP               MORGAN, LEWIS & BOCKIUS LLP

By: _/s/ Israel Dahan_____    By: __/s/ Troy S. Brown_____
      Israel Dahan, Esq.                    Troy S. Brown, Esq.

1185 Avenue of the Americas        1701 Market Street
New York, New York 10036-4003    Philadelphia, PA 19103
Telephone: (212) 556-2114         Telephone: (215) 963-5000

*Attorneys for Saul Horowitz, as Sellers'*   *Attorneys for Defendants National Gas &*
*Representative*                           *Electric, LLC and Spark Energy, Inc.*

Dated:  January _____, 2020

SO ORDERED:

_____|
Hon. J. Paul Oetken, U.S.D.J.