K1S6HORC

UNITED STATES DISTRICT COURTS
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SAUL HOROWITZ, *as Sellers'*
*Representative,*

                Plaintiff,

            v.                                17 CV 7742 (JPO)

NATIONAL GAS & ELECTRIC, LLC,
*et al.,*

                Defendants.

------------------------------x
                                         New York, N.Y.
                                         January 28, 2020
                                         11:15 a.m.

Before:

                    HON. J. PAUL OETKEN,

                                         District Judge

                        APPEARANCES

KING & SPALDING LLP
     Attorneys for Plaintiff
BY:  ISRAEL DAHAN
     CHELSEA J. COREY

     RICHARD T. MAROONEY, JR


MORGAN LEWIS & BOCKIUS LLP
     Attorneys for Defendants
BY:  TROY S. BROWN
     DANA E. BECKER
     MICHELLE PECTOR
     JARED WILKERSON
     SU JIN KIM

K1S6HORC

1    K1S6HORC

2              (Case called)

3              THE COURT:  Good morning, everyone.

4              This is the scheduled final pretrial conference in

5    advance of the bench trial in this case.

6              While I am on the subject, as you can tell this

7    courtroom is acoustically challenged as you have noticed

8    before.  So it is very hard for all the court reporters to

9    record proceedings in this courthouse because they are not well

10   suited to good acoustics.  It is very important that we all

11   speak into the microphones when we speak.  When I do bench

12   trials, I have the person who is examining the witness speak

13   from behind the podium, rather than walking around.  One of the

14   reasons that is important is to make sure you are speaking into

15   the microphone so that the court reporter can take everything

16   down.  So bear that in mind.

17             I saw the parties a couple months ago and we talked

18   about where things stand.  In the interim I received a lot of

19   paper.  I knew I was going to get the direct testimony by

20   declaration or affidavit.  I didn't know it was going to be a

21   thousand pages of witness statements, but that is what I got.

22   I guess I asked for it.

23             I have also received the parties' pretrial memoranda

24   and some motions in limine.  I haven't had a chance, because

25   we're still several weeks out from the trial, to absorb

K1S6HORC

1    everything and do all the research.  So I am not likely to be

2    ruling across the board on issues, including motions in limine.

3    Although, I may have some questions to help tee things up.

4            I do want to go through a few housekeeping matters

5    which I do in advance of any bench trial.  We have talked about

6    opening statements.  Since I have read through the pretrial

7    briefs, at least on an initial quick read, I don't know that we

8    need openings.  I know what the issues are I think.  So I would

9    be fine dispensing with them, unless you all want to do them.

10           Do you have feelings about that?

11           MR. DAHAN:  I could see an advantage to it.  It will

12   be a month from now before we get in front of your Honor.

13   There will be a lot of witnesses.  So it may put some short

14   overview of what we present at trial especially since we're

15   also doing written directs.

16           THE COURT:  So you could want to do it?

17           MR. DAHAN:  Obviously we'll defer to the Court.

18   Again, if we stick with the 20, 25 minutes that we discussed, I

19   would propose maybe just a keep that in mind if that works for

20   the Court.

21           THE COURT:  Mr. Brown, do you want to do them?

22           MR. BROWN:  We're fine with that, your Honor.

23           THE COURT:  We'll say at about 25 minutes for

24   openings.  In a civil case, openings will be plaintiff first

25   and then defendants.  Closing will be defendants and then

K1S6HORC

1    plaintiff.

2          The next thing I wanted to talk about is the number of

3    witnesses and see if there is any disputes about that.

4          How many witnesses do you have?  I know they are

5    listed in the joint pretrial order, but I forget the number.

6          MR. DAHAN:  We have eight written directs.  We have

7    four people that we have identified as hostile witnesses who

8    have written directs.  They have been submitted for defendants

9    that we would call in our chief in case.  There are three other

10   individuals who we have not submitted directs, who are not in

11   our control that are still employees of the defendants.  One is

12   in California and one is just a recent former employee of

13   defendants.  None of them our under our control so we have not

14   submitted written directs for them.  We intend to call them

15   live.  So in total that would be 18.  Eight plus four plus

16   three -- sorry -- 15.

17         THE COURT:  So the four are adverse witnesses.  I

18   don't like the word "hostile."  It is just a loaded term.

19         MR. DAHAN:  That's fine.

20         THE COURT:  So the four adverse witnesses are

21   witnesses that are in the defendants' case so there is written

22   direct?

23         MR. DAHAN:  Yes.  We would just cross-examine them on

24   those things.

25         THE COURT:  Then the other three, there is no written

K1S6HORC

1    direct but you want to call them?

2                MR. DAHAN:  Correct.

3                THE COURT:  Do you object to that?

4                MR. BROWN:  We did assert objections at least to two

5    of them in particular.  Two of the individuals, who are not

6    identified by plaintiffs in their Rule 26 disclosures, were

7    never identified as witnesses, they never relied on, they

8    didn't seek discovery from them, and all of a sudden we got

9    notice that we wanted to call them adversely in their case.  We

10   have noted objections in the pretrial order.

11               THE COURT:  To two of them?

12               MR. BROWN:  To two of them.

13               THE COURT:  Who are they?

14               MR. BROWN:  Bruce Shipper, which is listed as No. 15

15   on page 30 of the pretrial order in plaintiff's lists and No.

16   14 Amir Benisti.

17               THE COURT:  What is your argument, Mr. Dahan?

18               MR. DAHAN:  One of them was identified in our

19   interrogatory responses as a person with relevant information.

20   That was Bruce Shipper.  Another one is through discovery.  The

21   two individuals, your Honor, are people who ran the commercial

22   broker desk at Major Energy during the relevant period and were

23   in fact even still employed -- one of them at least until

24   December of this past year.  And another one is still employed

25   there.  The commercial business is obviously a very relevant

K1S6HORC

1    issue.  Whether we would call them as our rebuttal witnesses as

2    to some of the contentions they are making, but we believe they

3    are relevant witnesses.  It should not be a surprise to

4    defendants.  In fact, they just made a production yesterday of

5    additional documents involving these individuals which will be

6    a separate issue I will discuss with your Honor shortly.  So we

7    don't understand the prejudice sitting this far out of them

8    fielding this issue or these witnesses are in any way a

9    surprise.

10            THE COURT:  Do you plan to call them as rebuttal

11   witnesses?

12            MR. DAHAN:  No.  We plan to call them in our

13   case-in-chief.  I am saying I don't understand what the point

14   there would be because anyhow that issue is whether we then

15   call them as a rebuttal witness to statements that their

16   clients would make.  We believe they are direct witnesses.  The

17   commercial business is a relevant issue to this case as your

18   Honor has read in the papers.  These are the two people who ran

19   the commercial desk.

20            THE COURT:  Are there two or three?

21            MR. DAHAN:  So that's the two that they are talking

22   about.  The third that we're not objecting to is a former is

23   PSE employee, the Pacific Summit, the prior supplier, who is in

24   California, James Chung.  I guess they are saying they are not

25   objecting to that.  He was identified in our disclosures.

K1S6HORC

1          MR. BROWN:  Your Honor, I guess a couple points.

2     First, to the extent that these witnesses were just identified

3     as potential trial witnesses, we produced documents as a

4     supplementation just now because this is the first we've heard

5     they are coming to testify at trial.  They were not custodians

6     who hit for search terms that the parties agreed to.  Now that

7     we see they are being called to testify about information

8     before knowing if your Honor would allow it, we produced and

9     ran their names through certain custodial files and produced

10    additional documents that we may use to examine them at trial

11    if your Honor permits it.  We didn't object to Mr. Chung

12    because he is a third-party witness from Pacific Summit and he

13    was identified.

14          Frankly, your Honor, the two individuals, Benisti and

15    Shipper, are cumulative of information your Honor has already

16    seen in I think the 450 plus pages of submissions from

17    plaintiff witnesses talking about the commercial piece of this

18    case; but obviously we need to protect the record.  We think

19    this is overkill.

20          MR. DAHAN:  Your Honor, those are the two individuals

21    who will have the direct interactions with the broker.  So to

22    extent there would have been objections at trial of our

23    witnesses as to hearsay, these are the witnesses who dealt

24    directly -- directly -- with the brokers.  They ran the broker

25    desk.  So it would be therefore no potential issues for hearsay

K1S6HORC

```
 1    and they have direct knowledge and relevance.  We don't believe
 2    they will be long witnesses.  Our examinations will not be long
 3    with them.  We'll not make it cumulative.  If your Honor feels
 4    it is cumulative in a bench trial, I am sure you can cut us
 5    off.  We do believe that they are very direct and relevant to
 6    this case.
 7               THE COURT:  I am not going to preclude them
 8    categorically, but I am thinking about doing a time limit.  It
 9    is sort of a chess clock situation where each side gets
10    whatever the breakdown would be to result in about a five-day
11    bench trial and give each side equal time.  I have done this
12    once or twice before.
13               Here is what the rules will be:  When counsel for
14    plaintiff is standing up questioning a witness, that time would
15    be counted against the plaintiff.  When defense counsel is
16    standing up questioning a witness, that would be counted
17    against defendant.  Objections sort of work out in the wash
18    unless I find someone is unreasonably objecting and wasting
19    time in which I decide to count it against them.  Similarly
20    with side bars.  There will not be real side bars, but they
21    will be open court side bars.  Generally if there is an
22    argument about an issue, I will divide it equally between the
23    two like an admissibility issue or some other legal issue.  If
24    I decide that one side is unreasonably delaying things, I will
25    count it against that side.
```

K1S6HORC

1          We assumed five hours of testimony a day.  Five times

2     five is 25.  Let's say 26.  I would give each side 13 total

3     hours.

4          What do you think?

5          MR. DAHAN:  Can I be heard on that, your Honor?

6          THE COURT:  Sure.

7          MR. DAHAN:  So obviously it is your Honor's court and

8     your Honor will run how he sees fit.  We have added the

9     witnesses.  So your Honor asked about witness numbers.  There

10     are 11 directs.  That means we have to do cross-examination on

11     11 witnesses.  We'll have to do redirects on the eight

12     witnesses we've submitted.  Assuming we have those three

13     witnesses we added, those are three live directs and redirects.

14     They have also named four additional individuals who they

15     intend to call live who were not submitted as written directs

16     by other parties in their case.  Therefore, we will have to do

17     cross-examination on those witness.  In total that is 26

18     witnesses we will have to address -- we, plaintiffs alone -- in

19     this case either through crosses, directs, redirects.

20          THE COURT:  Well, the point of having a time limit is

21     to make it fewer than that.

22          MR. BROWN:  That is on average a half hour a witness.

23     Your Honor, some of these witnesses are a lot longer.  There

24     were over 2,000 exhibits submitted in this case.  All we were

25     saying is even if we average an hour witness, which is not long

K1S6HORC

1     given some witnesses in this case, our case alone would be 25

2     hours.

3              THE COURT:  So you think this will be a month-long

4     trial?

5              MR. DAHAN:  No.  We weren't predicting five-hour days

6     either.

7              THE COURT:  Wait.  You are predicting how long for the

8     days?

9              MR. DAHAN:  Again, I don't know your Honor's schedule;

10    but if it was 9:00 to 5:00 or if your Honor wanted to stay

11    longer, I don't know.

12             THE COURT:  I go 9:30 to 5:00.  There is an hour for

13    lunch and a 15-minute break in the morning and afternoon.

14    There is evidentiary issues.  So I think the time ended up

15    being closer to five hours a day.

16             MR. DAHAN:  We had envisioned a couple extra days of

17    trial.  Also Friday, your Honor, so your Honor is aware, myself

18    as well as the plaintiff himself as well as several clients are

19    Orthodox Jews.  And given the month we're in now, 3:00 is the

20    latest we could stay.  That itself is a shortened day.  There

21    will be openings on Monday.  Again, we'll do what we have to

22    do, but we're not looking for a month.  We are looking to

23    suggest it may bleed into the second week a day or two.  That

24    is all we're suggesting.

25             THE COURT:  I am open to going more than a week.  I am

K1S6HORC

1    trying to prevent it from being two or three weeks.

2              MR. DAHAN:  That's fine, your Honor.  We were

3    envisioning -- again, if every witness in this case testifies,

4    it adds up just on our case alone because we have to address

5    their witnesses, too, to 26 witnesses.

6              THE COURT:  That's not cumulative, that number of

7    witnesses?

8              MR. DAHAN:  Again, they submitted 11 directs.  I don't

9    know if they will go forward with them.  If they do, we have to

10   examine 11 witnesses.  We have presented eight.  I assume they

11   want to cross-examine eight witnesses.  They have four

12   additional witnesses.  We don't know who they will call live.

13   The numbers are the numbers.  I am not trying to give the Court

14   a hard time in any way.

15             THE COURT:  I understand.

16             MR. DAHAN:  We did the math last night and even if we

17   average a hour -- again, some will be shorter and some will be

18   longer.  We have experts, documents, complicated formulas that

19   are complex here.  25 hours just on our case alone and I

20   presume they will want the same for their case.  That is 50

21   hours.  I guess if it is only five hours a day, then 50 hours

22   would be two full weeks.  All we're suggesting is we believe,

23   especially with Friday being a shorter day, it is likely going

24   to bleed into a second week if it works into the Court's

25   schedule.  Our client doesn't want to pay us for a month's

K1S6HORC

1   trial.  That is for sure.  So we're not looking to do that

2   anyway.

3           THE COURT:  Mr. Brown, do you want to address the

4   issue of witnesses, slash, timing?

5           MR. BROWN:  Yes, your Honor.

6           THE COURT:  You have 11 written directs?

7           MR. BROWN:  Yes.  Some of which are fairly short and

8   address narrow issues, your Honor, which would likely yield

9   short cross-examination.  Four of the live witnesses who we

10  would call potentially by trial subpoena are three of

11  Mr. Dahan's clients -- the silent or minority investor

12  shareholders and Mr. Stud Mickey, the former deal lawyer who

13  did the deal who has been deposed in this case, all of whom I

14  believe are in this jurisdiction.  So, yes, there are a lot of

15  witnesses.

16          What I will say, your Honor, not that each case is not

17  different and rises on its own, but two weeks ago I had a

18  one-week trial in the International Trade Commission and there

19  were a similar number of witnesses, an incredibly complex and

20  highly technical expert-driven trade secrets case where we did

21  life directs, live crosses, and also had to set aside time for

22  the Untied States staff to question, along with the judge.  We

23  did it on a clock on a similar schedule.  It was about six

24  hours and 20 minutes a day based on similar time breaks that

25  your Honor has identified without written directs.  We got

K1S6HORC

 1   through.  The way that both sides got through a complex case
 2   was instead of the one-hour cross, we did 20 minutes crosses
 3   and focused in on the issues that were really pertinent and not
 4   nonpertinent issues.  The cases finished up in five full days
 5          Now, there was no closing at the end.  One the things
 6   we raised in the pretrial order was the potential to maximize
 7   -- particularly now that Mr. Dahan has noted the early
 8   departure Friday needs, which I was not aware specifically,
 9   though, I did know that Mr. Dahan and others are observant, we
10   could schedule a closing argument, slash, oral argument as your
11   Honor indicated at the last status conference from the bench
12   some time after the posttrial submissions.  So we're still of
13   the view that five days should be more than sufficient.  And
14   the point of putting us on a clock to make sure that if you
15   only need a 20-minute cross, you don't do a 40-minute cross.
16   If you do, you have to take away time from other witnesses.
17   We're all sophisticated and we can certainly get through it in
18   five days.
19          THE COURT:  So you have 11 written directs and four
20   other witnesses?
21          MR. BROWN:  Four witnesses that we have identified to
22   call, three of whom are controlled by plaintiffs and one of
23   whom is their former lawyer, who they presented at deposition
24   who we would call all on narrow issues.  We also have the
25   benefit generally, your Honor, with the exception of counsel

K1S6HORC

discussing any out-of-order needs based on timing, because this
is a bench trial and because we have written directs, we have a
fairly straightforward presentation of the witnesses.
Plaintiffs will be presenting their witnesses.  We'll be
crossing them and there will be narrow redirects I assume and
vice versa, including the adverse witnesses which they will
cross-examine off of their written directs in our case.  In my
view, your Honor, this can be a fairly efficient five-day
trial.  Counsel is always held to clocks when they need to be
held to clocks.

           MR. DAHAN:  Your Honor, I have done enough trials on
the clock.  I have done them the other way, too.  Again, I am
being realistic.  We're the plaintiff with the burden.  There
are a lot of issues here.  Obviously subject to whatever your
Honor might decide at pretrial and assuming everything goes
forward at this point, there is a lot to cover.  Again, we're
not even suggesting that it would be the full two weeks, but I
don't think it is unreasonable to assume that you may need a
couple extra days than essentially the four and a half days for
trial.

           THE COURT:  I will take that under advisement and
think about it.  I am open to the idea of having closings
later.  Especially if they are posttrial briefs.  It might make
sense to have closing following the filing those.  So we'll
think about that.

K1S6HORC

1        I will think about the clock.  I am sensitive to the

2    fact that there are a lot of witnesses.  There are factual

3    issues and legal issues that are informed by background facts.

4    So I don't want to impose a time limit that is unreasonable.

5    In any event, I will not set that this minute.  I will let you

6    in advance if I do.  I might just not actually impose a clock

7    but just be an activist judge in the sense of moving you along

8    when I feel like things are getting cumulative.

9        As I said, counsel will question from the podium.

10        One issue that I wanted to flag is technology for the

11    courtroom.  I don't know if you all have used the technology in

12    these courtrooms.  If you talk to Mr. Hampton, my courtroom

13    deputy, you can arrange a time to come in if you haven't yet

14    and figure out how to plug into our system basically.  We don't

15    have a jury here so it is even less complicated.

16        With respect to documents, exhibits and witness

17    testimony, you can show the witness their written direct and

18    have them adopt it.  Or if you want we can dispense with that

19    and agree that that is technically done since it is under oath

20    and just start with the cross.  You can show the witness

21    exhibit and you can move for its admission and we'll just keep

22    track of what is admitted.

23        So if you want to arrange to come in some time and

24    check out our system and how you get documents on the system,

25    that will be great.

K1S6HORC

1          MR. DAHAN:  We actually have our vendor here and I

2     think they have spoken before, your Honor.

3          THE COURT:  Great.  Feel free to arrange a time to do

4     that before the trial.

5          The other thing is I used to have the parties bring in

6     a whole bunch of exhibit binders and you will probably need

7     exhibit binders to show witnesses things and to show counsel,

8     etc.  I would be fine with dispensing with paper exhibits.  If

9     you are able to put all the exhibits and potential exhibits on

10    thumb drives -- what is better thumb drives or disc?

11         THE DEPUTY CLERK:  Thumb drives.

12         THE COURT:  If you can put them on thumb drives at

13    least maybe a week before the trial, Mr. Hampton can get our IT

14    people to put it on our system.  So that when you call up an

15    exhibit, I can put it up on my computer and then we don't have

16    a bunch of paper flying around.  That will save the trees.  So

17    if you can do that, that will be great.

18         As long as you are doing that, you might as well take

19    all the written directs and also have a thumb drive that has

20    all the written directs on it so we can put it in a place that

21    I can easily find.  Later when I am working on findings and

22    conclusions, I can have it accessible without having a bunch of

23    binders.

24         So as I said, I read through but only fairly cursorily

25    the pretrial memoranda and the motions in limine briefing.  I

K1S6HORC

don't think I am going to be issuing rulings in the nature of
summary judgment before the trial.  I think I am going to let
all the evidence come in.  But having read the legal arguments
in the briefing, I think there are some broader legal issues.
One of the most important of which I think we've talked about
and is prominent in the briefing is the relationship between
the MIPA master agreement and specifically its non-assignment
provision and the earn-out agreement with its non-assignment
provision except for affiliates.  I think I may spend a little
bit of time looking at New York law at how you apply the canons
of contract interpretations in that situation.  If I come up
with an answer, even a provisional answer, I will let you know
before or during the bench trial.

         I think there are a few legal issues like that that
you have ably briefed in our pretrial memoranda.  I have
started thinking about them.  It is possible that I won't rule
on any of that until the end partly because the legal answer
may depend in part on the relationship of the contracts and the
timing of the contracts, the intent parties, etc., which is
information I will be getting a sense of from the witnesses'
testimony.  So that's just to say don't expect summary judgment
rulings in advance of the trial.  Most likely I will be
bringing everything in and doing one set of findings and
conclusions, which will include the legal rulings that you've
essentially asked for.

K1S6HORC

1          On that question since I have been puzzling it over

2     this morning, were the MIPA and earn-out agreement executed at

3     the same time together?

4          MR. DAHAN:  No.  The MIPA was first signed.  The

5     earn-out agreement was thereafter signed.  Again, your Honor

6     has read our position.  We believe that they have two different

7     functions and they have two different provisions and each one

8     says what they say as this agreement can be assigned or this

9     agreement can be assigned in their own way and they can be

10    treated independently.

11         THE COURT:  So the MIPA says you cannot assign this

12    agreement and probably was assigned and it seemed to be

13    assigned; but the earn-out agreement has the calculation for

14    the earn-out and the targets and everything.  That says, let's

15    assume, you can assign that to an affiliate.  Why wouldn't the

16    remedy for assigning of the MIPA be the same as the measure

17    that would resolve from assigning the earn-out agreement?

18    Because the earn-out is exactly the thing that has the

19    calculation that is the delta that plaintiff is claiming is the

20    damages here.  In other words, why is it a no harm, no foul

21    assignment of the MIPA?

22         MR. DAHAN:  Right.  So our position on that, your

23    Honor, is that again the MIPA had its own separate issues.

24    First of all, the earn-out agreement doesn't discuss the cash

25    installment payment issue.  That is not in the earn-out

K1S6HORC

1   agreement.  That is only in the MIPA.  That is first.

2          Second of all, the MIPA controls an ownership.  Now,

3   our position is that you can have ownership of a company and

4   you can have an obligation of an earn-out agreement.  The fact

5   that you want to give away the assignment of the earn-out

6   agreement and who will have to pay that earn-out portion and

7   not the cash installment portion is irrespective of whether or

8   not who will be the owner of this company, who owns the

9   membership interests.  Our position is again we're not

10  suggesting they didn't have the right.  If they want to

11  corporate-wise assign who will have to pay out the earn-out

12  portion, the $20 million portion, if they want to figure out

13  how they want to do that, they can go do that without our

14  consent.

15          What they cannot do without our consent is change what

16  we agreed to as who will be the owner, right.  I think it is

17  important, your Honor, to also focus on 6.3 of their agreement

18  where they make the representation, right, that we are buying

19  this for our asset, for our own investment purposes with no

20  intent to sell or offer it for sale, right, in Section 6.3 of

21  the MIPA, which we identified before we discuss 11.7.  So now

22  it is on top of that you cannot assign this without our

23  consent, which they obviously knew that because that is why

24  they went into their Spark MIPA and had to put a provisional to

25  get consent and an omnibus agreement draft said we have to get

K1S6HORC

1    the consent from the plaintiffs.  They understood that that is

2    what they needed to do that.

3           They didn't have to do a drop-down and a sale of the

4    ownership to an earn-out.  You want to assign the earn-out, who

5    owns it, go do that.  We're not stopping you from that; but you

6    don't have the right to do this.  And if you want, you can but

7    just get our consent.  We're not saying it is unlawful; just

8    get our consent.  You need our consent.  You didn't get our

9    consent so you cannot now do that and you definitely cannot do

10   as we outlined in our papers all the shenanigans that they did

11   to get around that that we only learned after the fact.

12           THE COURT:  Okay.

13           MR. DAHAN:  So that's the difference.  So we're not

14   suggesting -- it is two different agreements.  We are not

15   saying they breached the earn-out agreement.  They didn't

16   breach the earn-out that we.  Obviously we think they breached

17   it under 2.7.  They didn't breach the assignment clause in that

18   provision, but that doesn't mean we can't say that you breached

19   this assignment clause.

20           THE COURT:  Do you want to respond briefly, Mr. Brown?

21           MR. BROWN:  Yes, your Honor.  Thank you.  A couple

22   points.

23           First, I don't think Mr. Dahan was technically

24   incorrect when he answered that the MIPA was signed first, but

25   the MIPA and the earn-out agreement were signed on the same

K1S6HORC

1    day.  The earn-out agreement is incorporated by reference into

2    the MIPA so they are transactional documents signed in

3    connection with the same transaction on the same day.

4             The real dispute, as your Honor identified in this

5    case, is not about cash installment payments, which are not

6    contained there and are contained elsewhere; but there is not a

7    real dispute over cash installment payments.  The dispute in

8    this case is twofold.  One, were there breaches of the control

9    of the business provision after closing, which is all set forth

10   in the earn-out agreement such that it damaged sellers' ability

11   to make their earn-outs at a maximum amount; and alternatively

12   were there calculation errors in the earn-out based on how each

13   year's earn-out should be calculated.  Those, as your Honor

14   observed, the drivers of damages, the drivers of the dispute

15   over the earn-out comes from the earn-out agreement, which was

16   freely assignable.

17            Your Honor has seen the factual dispute between the

18   parties about what sellers knew and didn't know, what they

19   ratified, waived or estopped or didn't.  Those are in the

20   pretrial memos and both sides have argued them.  What is

21   relatively important in our view and has been briefed is the

22   fact that the payments made to the sellers were paid under the

23   earn-out agreement.  They were paid and they were retained and

24   they secured the benefit of the disputed earn-out payments all

25   paid after the earn-out agreement was assigned.

K1S6HORC

```
 1              THE COURT:  This is your waiver, estoppel,

 2    ratification set of arguments; right?

 3              MR. BROWN:  Well, it is a combination.  That is one

 4    piece of the argument with respect to how it impacts whether or

 5    not there is a breach or an impact from a breach of 11.7 of the

 6    MIPA; but it is particularly critical on the causation and

 7    damages front, which is what I think your Honor's question was

 8    introducing originally, which is what is the causal connection

 9    between an alleged drop-down in violation of 11.7 of the MIPA

10    and the damages sought by sellers here for failure to properly

11    calculate an earn-out or to deprive them of the ability to make

12    a maximum earn-out because of alleged operational control

13    issues that defendants obviously vigorously dispute.  So it is

14    both a causation damages issue from an elemental standpoint and

15    also if necessary and the Court needs to reach it the

16    ratification, estoppel, waiver issues.

17              THE COURT:  That is helpful general background.  What

18    I haven't done yet is what I would like to do when I deal with

19    these interesting puzzle contract issues, which is basically my

20    staring at the agreements and trying to get a sense of how they

21    are interpreted.  As I suggested at the conference earlier this

22    year, I think there is a limited value to each side's

23    unexpressed subjective interpretation of a lawyer said

24    something or somebody else said something but not to the other

25    side.  That is limited value in a situation where I can apply
```

K1S6HORC

1    contract principles.  I think I need to spend some time before

2    the bench trial staring at the contracts and figuring out the

3    right way to interpret particularly that provision but other

4    provisions as well.

5            MR. DAHAN:  If I could add, your Honor?

6            THE COURT:  Sure.

7            MR. DAHAN:  Another point, as we make in our papers,

8    is again if you look at -- I am sure your Honor will look at

9    the cases on rescissory damages, which nobody thinks is an

10   appropriate form of relief -- now, whether we're entitled to

11   that relief or not, but it is not like it is a made-up form of

12   relieve employed in assignment contracts.  Specifically, again

13   in a contract construction when you have a contract that is

14   automatically voided, it is not the plaintiff that is

15   penalized.  In other words, it is not -- the fact that there

16   may be a separate contract that we have other rights against,

17   don't mean we don't have rights against this contract.  And

18   this contract gave us rights.  One of them was to be able to

19   have a company owned by NGE during the earn-out period.

20           THE COURT:  Right.  The rescissory damages ultimately

21   is what would life be in the counterfactual world where the

22   drop-down hadn't been done.

23           MR. DAHAN:  But you look then to your Honor's point.

24   2.7 says, I want to look at how the next two and a half years

25   look.  Rescissory damage is no different than typical

K1S6HORC

rescission is.  You don't look into the future.  You look then.
What is the value now versus what the value ultimately was, it
turned out.  So that is how we get harmed.

When a company does a merger and it is now being
rescinded they all say, *Well, how do you know you would have
been a successful merger*?  The answer is look at the case law.
It says the damage measure is at that point in time.  What our
expert did say was, *What was the fair market value of the
earn-out at that time*?  We don't say it was 35 million.  He
says it was 18.8.  We did get 9 million.  You can't double
recover.  So the difference is on the rescissory damages -- if
your Honor says our only damage in this case is rescissory
damages, we would not get 26 million.  We would only get 9.8
million.  That is the point

So it is two separate forms of relief.  For 11.7 what
we're seeking and why we're seeking only 9.8 is because at that
point in time on a fair market value when that breach occurred
and we got infringed on our bargained for right, right, the
value according to our expert -- they can disputed that is a
proper analysis.  It wasn't worth 18.8.  What was the value --
but on that value that is what it was.  Deduct what we got,
that is your damage at that point.

THE COURT:  I understand.

MR. DAHAN:  I think it is important for your Honor to
keep that in mind.

K1S6HORC

1          THE COURT:  Right.  Since I was thinking about that

2     issue, I just asked about it.

3          MR. BROWN:  I assume your Honor there is no need for

4     me to surreply on the rescissory damages, which we briefed

5     comprehensively and our expert has addressed.

6          THE COURT:  Yes, you have.

7          That brings us to motions in limine.  Plaintiff has

8     moved to preclude the testimony of Gary Lancaster and certain

9     evidence and argument in light of an alleged privilege waiver.

10    Again, I just looked at that briefly.  I am not prepared to

11    rule right now.  You guys briefed it I believe adequately.

12    Defendants have Mr. Lancaster.  He is one of your witnesses on

13    direct; is that correct?

14         MR. BROWN:  Correct.  Submitted a full direct

15    examination.

16         THE COURT:  Right.  You are alleging that privilege

17    has not been waived and you are still asserting your privilege,

18    but there is certain factual testimony that Mr. Lancaster can

19    still give.  Is that your position?

20         MR. BROWN:  Slightly different, your Honor.  Certainly

21    the testimony he has offered in his written direct is not

22    privileged and therefore we're not voluntarily waiving

23    privilege and putting certain matters at issue.

24         Secondly, to the extent that there was any argument of

25    sword and shield, which we don't think there is validly,

K1S6HORC

plaintiffs elected not to depose Mr. Lancaster.  They didn't

question him.  They didn't establish a record of what was or

wasn't privileged.  In fact, they never raised and never

brought to your Honor's attention or engaged in any motion

practice alleging that we were somehow using privilege as a

sword and shield.

        What I believe they think is the witness statement is

the sword and it is factual, and their witnesses have raised

issue in their witness submissions about things that Mr.

Lancaster did or didn't say, told them or didn't tell them,

believed or didn't believe based on intent.  In fact, some of

the trial exhibits have Mr. Horowitz and Mr. Peterman, *Go ask

Gary Lancaster.  He negotiated on behalf of the defendants.  He

knows what everybody intended.*  So we have a dispute in the

record that both parties will be able to cross-examine

witnesses on with respect to that

        Finally, your Honor, just to make the record, we

addressed pretty comprehensively in the opposition to the

motion in limine the serial identified portions of witness

statements and deposition testimony that plaintiffs identified

in their motion suggesting that they created the sword after

which the shield was enacted and we serially identified why

none of them hold water in the reply brief.  They were not

serially addressed in rebuttal.  That is because it is not a

sword and it is not a shield, and Mr. Lancaster will be

K1S6HORC

1   cross-examined adequately by Mr. Dahan or one of his colleagues

2   on factual issues.

3         THE COURT:  Lancaster, what was his title?  What was

4   his position?

5         MR. BROWN:  He was in-house counsel to NGE who was the

6   kind of the lead deal lawyer like Mr. Studnicky.  He was the

7   lead deal lawyer for plaintiffs in connectin with the and MIPA

8   and the earn-out and the other ancillary documents.

9         THE COURT:  Studnicky was outside counsel; right?

10        MR. BROWN:  Yes.  NGE did not have outside counsel

11   working on the deal.  Mr. Lancaster was working on the deal

12   from a deal-lawyer perspective.  Mr. Studnicky was outside

13   counsel as his deal counterpart.

14        THE COURT:  One of the questions in the back of my

15   mind is who are the lawyers on this deal.  It was neither of

16   your firms?

17        MR. BROWN:  It was not our firm.  I don't believe it

18   was or firm.

19        MR. DAHAN:  No.

20        THE COURT:  That's good for your firms.

21        Do you want to respond briefly to what Mr. Brown just

22   said?

23        MR. DAHAN:  I will let Mr. Marooney respond.

24        MR. MAROONEY:  Your Honor, briefly.

25        It is important to focus on the witness statement

K1S6HORC

1   obviously of Mr. Lancaster.  If you look at Mr. Lancaster's

2   witness statement, who as we say and is the in-house lawyer and

3   the lawyer on the deal, he is offering his own opinions as to

4   what the contractual provisions at issue here mean.  He says in

5   paragraph 71, "NGE always intended to use only the last nine

6   months". . . and I will stop there and so and and so forth.  He

7   says if you look at paragraphs 95 through 103 in describing --

8   remember, there is an April 11th, 2017, memorandum, your Honor,

9   that has been well briefed and talked about.  In that memo Mr.

10  Lancaster lays out what we believe to be not entirely accurate

11  but closer to the number that is owed to us for 2016 and that

12  was sent to us and the payment was wired.

13          In his witness statement, Mr. Lancaster tries now to

14  put that in context.  He says, *Well, that was only for*

15  *compromise and settlement.  That was just done in good faith.*

16  *We were trying to reach a resolution.*  He is opining on what

17  that is.  What you see on their privilege log simultaneously is

18  emails around that time in communications between Mr. Lancaster

19  on the one hand and business folks on the other hand where he

20  is giving his advice about this very subject.

21          So our only point is when we see here is a lawyer as a

22  witness here giving testimony as to what these contractual

23  provisions mean and what was intended, it is only fair to us to

24  have the underlying advice that he was giving at the same time

25  and that is what we mean by sword and shield.  We're by no

K1S6HORC

1    means trying to preclude them from putting on their case and

2    all the other histrionics I read in the opposition brief.  It

3    is just a matter of basic fairness.

4            If you also look at Mr. Kroeker's witness statement,

5    Mr. Kroeker when you look at paragraphs 75 to 79 he'll say, *I*

6    *believe what I believed about what the contract said and what*

7    *the earn-out percentage was based upon what Mr. Lancaster told*

8    *me and other things.*  They hedge a bit.  He flatout says, *I*

9    *believed what I believed based upon what Mr. Lancaster told me,*

10   *both about the earn-out payments and the consent issue*, which

11   your Honor just raised before.  So if they are going to have

12   witnesses, including the general counsel and including their

13   own executives giving testimony about their understandings and

14   contractual provisions that are at issue, then we're entitled

15   to the documents they withheld on their own privilege log.

16   That is our basis.

17           THE COURT:  Right.  I understand the positions.  We

18   don't need to go back and forth on this.  You have briefed it

19   fully and ably.  I don't think this is something where I am

20   going to take the time to go through the witness statement and

21   sort of parse out what I think is excluded and what isn't.  The

22   answer is going to be that the motion is granted in part.  And

23   to the extent that something could be interpreted as a legal

24   conclusion, it is not going to be admissible.  To the extent it

25   can be interpreted as not based on the witness's personal

K1S6HORC

knowledge as witnesses, I am going to disregard it.  But I am

not going to go through it and parse it.

          MR. DAHAN:  Your Honor, so I know for trial an example

our concern is so we know for our preparation of cross, I took

the deposition of Mr. Kroeker.  When I would ask him, What did

you discuss with Mr. Lancaster, as we highlight in our papers,

we would get an objection that it was privileged.  Will I now

be able -- our concern is will I now -- now that they put him

in this case -- right, we didn't know they were going to submit

his written direct, right.  So now we are raising it that now

we see he is a witness, Mr. Lancaster, and so now it becomes an

issue to us.  Our question is:  Are we going to be permitted to

now at least -- I mean, even if we are not getting the

documents in advance of trial that they withheld, but will we

be allowed to examine the witness now on the very conversations

that they were having among -- with Mr. Lancaster and Mr.

Lancaster with him about the very topics that he is saying I

relied on Mr. Lancaster and Mr. Lancaster is now offering his

opinion?

          THE COURT:  I am not admitting the opinion as an

opinion so there is no need to.

          MR. DAHAN:  I meant not his opinion.  For example:

Mr. Kroeker, what did you discuss with Mr. Lancaster that told

you this.  At depositions I was objected to and he was not

permitted to answer that question.

K1S6HORC

1             THE COURT:  Mr. Brown.

2             MR. BROWN:  If I can briefly, your Honor.

3             What I understand you are saying both sides have

4    submitted a wealth of direct statements that have the

5    respective parties' views on the intent of the agreement and

6    the intent of the parties.  Plaintiffs witness statements say,

7    Here is what we all intended; and defendants witness statements

8    say in part, Here is what we intended.  Your Honor is going to

9    decide when parol evidence is admissible and when parol

10   evidence is not admissible.  When your Honor decides I presume

11   at trial that these contracts are unambiguous and we need no

12   parol evidence form either side, you will sustaining objections

13   in realtime addressing those issues.  It sounds like you will

14   be doing the same thing with respect to Mr. Horowitz,

15   Mr.Wiederman, Mr. Studnicky, Mr. Lancaster, and Mr. Kroeker

16   with respect to whether or not something does or doesn't invoke

17   an opinion or a privileged issue.

18            Again, your Honor, these issues have been in this case

19   since fact discovery.  Mr. Lancaster wasn't deposed at

20   plaintiff's election and nobody on plaintiff's side ever raised

21   in motion practice issues alleging that Mr. Kroeker at

22   deposition said X, said Y, or was precluded by privilege

23   assertions from saying Z, which was the appropriate time long

24   before trial to raise any concerns they had about the

25   inappropriate nature of any alleged instructions and whether or

K1S6HORC

1    not that did or did not invoke intent evidence.

2            THE COURT:  Mr. Dahan said you instructed him not to

3    answer certain things.

4            MR. BROWN:  As we briefed pretty comprehensively there

5    were certain times where there were instructions given about

6    particular questions about privilege.  Mr. Dahan is blending

7    certain general instructions from a lengthy deposition with

8    some overarching theme that he was precluded from answering any

9    questions about any issue and that we briefed pretty

10   comprehensively.  Again, we laid it out issue by issue, cite by

11   cite that they put in their motion and explained exactly what

12   was going on and we believe have identified and debunked that

13   entire theory.  You cannot talk about this with high contextual

14   executive bullet points.  We went through serially and

15   identified each one in the opposition brief.

16           THE COURT:  Mr. Dahan.

17           MR. DAHAN:  Again, your Honor, when I am sitting at a

18   deposition and someone instructs the witness not to answer

19   communications with their lawyers, I don't really have an

20   objection at that point.  There is a privilege.  What all of a

21   sudden makes that now improper -- at that time there would be

22   no motion I could file.  If Mr. Kroeker doesn't want to reveal

23   the communications he had with the lawyers, I understand that.

24   Now that the lawyer is being put into the case and the lawyer

25   is being a witness in this case and now Mr. Kroeker is going to

K1S6HORC

be saying what he relied on based on my communications with

that lawyer who is now a witness in this cases, yeah, now I do

have a concern that wait now things are a little different.

Now the playing field is different.  The playing field

wasn't that way at the deposition.  I probably would have lost

that motion at that point.  Our issue is that now that we find

out that Mr. Lancaster is in fact a witness, is in fact going

to be providing testimony on these issues, Mr. Kroeker is going

be relying on conversations he had with Mr. Lancaster, I would

like to ask him, So now tell me about those conversations.

THE COURT:  What is your point?

MR. DAHAN:  To his point that I would ask my question

of whether or not we will be entitled at trial to makes those

and as to his point that I should have made an objection back

at the deposition when they asserted privilege before I even

knew that Mr. Lancaster was going to submit a witness statement

at trial.  It was not a ripe issue for us to argue sword and

shield back then.

THE COURT:  Understood.  I haven't read it closely

enough to rule on this, but I will before the trial.  I am

going to be deciding these in realtime.

MR. DAHAN:  Yes.

THE COURT:  Similarly, number two, plaintiff moves to

prelude evidence and argument about unrelated disputes.  I am

not sure there is a dispute here.  There are these

K1S6HORC

1      indemnifications and escrow and other disputes which are not

2      directly at issue.

3              Mr. Brown, what is your position as to why they become

4      part of the trial?

5              MR. BROWN:  We've comprehensively briefed that as

6      well, your Honor.  They fall into several buckets.  So with

7      respect to indemnification claims and the indemnification

8      lawsuit and issues relating to that, they are relative to at

9      least to two topics.  One, there is an issue about what was

10     driving a business's success or lack thereof leading into the

11     closing and for the 33 months post-closing and issues

12     pertaining to regulatory challenges within certain

13     jurisdictions, including lawsuits asserted by states against

14     the Major Energy business before, during and after the earn-out

15     period is relevant to what was happening within that 33-month

16     period concerning why the business performed or did not

17     perform.

18             THE COURT:  So, yes, that's relevant unless I accept

19     Mr. Dahan's view of rescissory damages being a snapshot at the

20     moment of drop-down.

21             MR. BROWN:  Well, the interesting part about

22     rescissory damages as a snapshot, and that is both addressed in

23     our pretrial memorandum but also in our motion in limine to

24     exclude certain of Mr. Leathers' new opinions and otherwise.

25     The rescissory damage snapshot in time would be a snapshot in

K1S6HORC

| | |
|---|---|
| 1 | time at time of the drop-down that then has to adjust for the |
| 2 | fact that plaintiffs actually received millions and millions of |
| 3 | dollars in earn-out payments.  So it is not supplemental to |
| 4 | that.  It is at the time if there was a rescissory damage in |
| 5 | the but for world and we would have gone back and not have this |
| 6 | entire event occur, then their damages experts argues it is 8.8 |
| 7 | or 9.8 -- I don't have it open in front of me -- and they |
| 8 | received $9 million in actually earn-out payments thereafter. |
| 9 | So it is essentially a wash.  We've addressed that issue. |
| 10 | With respect to some of the other activities, it goes |
| 11 | both to unclean hands defense, which we have raised.  There is |
| 12 | a tort claim in this action.  We briefed it comprehensively in |
| 13 | opposition to the motion in limine.  Frankly, your Honor, with |
| 14 | respect to one of the issues we were talking about on the |
| 15 | pretrial memorandum and whether or not there was a material |
| 16 | breach in connection with the 11.7 of the MIPA through the |
| 17 | dropdown, while it is not binding on your Honor, one of the |
| 18 | things we have in this record is when your Honor sent us all to |
| 19 | arbitration in Texas to deal with the money that plaintiff took |
| 20 | out of the escrow early when it should have been in escrow, the |
| 21 | arbitrator actually considered that issue and found in a |
| 22 | bilateral action between the parties who are parties to this |
| 23 | case that there was no material breach in connection with the |
| 24 | drop-down.  No material breach of 11.7 in connection with the |
| 25 | MIPA. |

K1S6HORC

1           THE COURT:  Did the arbitrator issue an opinion?

2           MR. BROWN:  He did.

3           THE COURT:  It is confidential?  Can I see it?  Did

4   anyone submit it?  Is it a trial exhibit?

5           MS. PECTOR:  Yes, your Honor.

6           MR. DAHAN:  Your Honor can feel free to read it and

7   see that it does not say that.  If it does, your Honor will

8   take it for what it was.

9           THE COURT:  That will be a trial exhibit?

10          MR. BROWN:  That is a trial exhibit, your Honor, yes.

11          THE COURT:  And you stipulated to that?

12          MR. DAHAN:  Well, no, we object.  We don't think the

13  arbitration is a relevant issue.  So we object to the issue as

14  an exhibit that is not relevant.  Your Honor can decide that

15  when he sees it.  That breach, again, first of all happened in

16  2019 after the earn-out period.  So I am not sure how that

17  breach would undermine in any way a breach that occurs on

18  August 23rd, 2016, under 11.7 or any breach that occurs in the

19  earn-out period.

20          Your Honor, I think the arbitrator made very clear

21  that he was not making findings with respect to the MIPA and

22  only focusing on the earn-out.  What he did say -- I am sorry,

23  escrow.  What he did say was that the -- we argued that he

24  should not find a breach of the escrow because there was a

25  prior breach of the drop-down.  It was an argument we made

K1S6HORC

1    that, you know, therefor it was a prior breach in August and so

2    if we breached the escrow now, a breach in party doesn't get to

3    claim breach for the first breach.  What he found was again

4    making clear he is not making any findings under the MIPA

5    because he is only there to deal with the escrow, but he didn't

6    believe that that breach was material to the escrow agreement

7    and the issue of whether or not the escrow agreement should

8    stay.  So we tried to combine the drop-down into the escrow and

9    he is like, well, I don't find that; but that has nothing to do

10   with whether the drop-down and the MIPA, which is central to

11   this case, would be a material breach of the MIPA itself.

12           THE COURT:  I understand.  This is the kind of thing

13   if it were a jury trial, I would be spending a lot of time on

14   this stuff; but because it is a bench trial, I will be making a

15   lot of these judgments essentially during the trial.  Sorry

16   that I am not able to give you answers on all this today.

17   Again, the answer can be to what I decide is extraneous doesn't

18   come in and if I hear it I will put it in the part of my brain

19   and disregard it.  In the days before the bench trial starts, I

20   will be doing a thorough review of all this stuff.  So I think

21   at the beginning of the trial, I will have something but

22   probably before that.

23           Then the defendants' motion is to preclude certain

24   opinions of plaintiff's expert David Leathers.  Again, I

25   haven't had a chance to dig into that.  That is trickier than

K1S6HORC

the others and I haven't focused on it.

        Mr. Leathers' report, is it attached to something?

        MR. DAHAN:  It is attached to their motion and it is also a trial exhibit.

        THE COURT:  Anything else?

        MR. DAHAN:  Yes, your Honor.  I want to understand your Honor's preference for trial.  Given the number of witnesses and the number of witness statements, as your Honor is deciding how many days trial will be and the order, will it be beneficial to your Honor to know at some point before trial which witnesses will be coming up likely that day so that if your Honor knows which witness -- I presume your Honor doesn't want to have to keep in his mind 20 witness statements.

        THE COURT:  Exactly.  That's a great point.  I should have raised that.  I would like to know which witness statements I have to read the night before.  I don't know that I will read all 1,000 pages the weekend before.  So, yes, I would like to know in advance what is on tap if possible.

        MR. DAHAN:  Okay.  Another issue would be to ask for your Honor's consideration.  One of the things that were discussed at the last conference was order of witnesses and the concern for witnesses potentially being called twice.  Therefore, let's say, for example, if there was a Spark employee witness that defendants would call in their case and we would also identify as a witness in our case, therefore

K1S6HORC

maybe that witness will be called right when defendants start
their case to avoid that witness being called twice.

Now that we're dealing with anyhow -- well, let's just
use a hypothetical.  We have identified Mr. Kroeker as a
witness that we want to -- that we think is important to our
case and our burden.  We're going to be having to go through
all our witnesses as well.  We might feel that it is important
for us to have Mr. Kroeker's testimony earlier on in the case,
especially if the Court is concerned about duplication or
certain things in foundation things we might want to set up in
our burden for tortious interference claims or other claims in
this case, given that anyhow when it is defendant's turn they
wouldn't really do anything with Mr. Kroeker other than put him
on the stand and say, *Okay, Mr. Dahan, do your
cross-examination,* we would ask that we should have the ability
to therefore call from the four witnesses we've identified of
the defendants that we are calling in our case-in-chief to take
them earlier than before we first go through all our eight
witnesses that we have submitted and the three additional
witnesses and then all of a sudden call Mr. Kroeker in the
case.  We're not sure what the prejudice will be because again
defendants when it is their turn, they can do whatever redirect
or whatever they would do with Mr. Kroeker when they would call
him over and turn him over to me to cross-examine.

THE COURT:  Are you saying for Mr. Kroeker when you

K1S6HORC

1    call him as witness number two, you want him to put in his

2    witness statement in?

3         MR. DAHAN:  Yeah.  I presume that's -- we'll be

4    cross-examining him on his witness statement anyhow.  Again, he

5    is our witness.

6         THE COURT:  That makes sense to me.

7         Do you have a problem with that?

8         MR. BROWN:  Well, no, not necessarily.  I believe when

9    we had our a last status conference, my understanding from a

10   witness travel and planning standpoint was for witnesses who

11   are submitting written statements, plaintiff would be calling

12   theirs in their case-in-chief and we would be calling ours in

13   our case-in-chief and the cross-examinations would go in that

14   order.  This is unlikely to be, and I suspect highly unlikely

15   to be, a directed verdict case at the close of plaintiff's

16   case-in-chief.  So we don't have the typical concern that if

17   they don't get Mr. Kroeker or somebody else in their

18   case-in-chief, they risk not establishing some element or some

19   key facts that they are exposed to a directed verdict.

20        So from a planning standpoint considering most of my

21   witnesses are in Texas, I was under the assumption and have

22   told my witnesses plaintiff has X number of witnesses and we

23   will be crossing them and then our witnesses will be presented

24   and then we'll finished.  That is at least my plan.  Mr. Dahan

25   is now suggesting maybe he will call some of witnesses to cross

K1S6HORC

1    in their case-in-chief so to speak which creates traveling

2    ordering issues that we haven't planned for and frankly I think

3    is really unnecessary in a bench trial.

4            THE COURT:  I don't care about the order.  I know you

5    are looking for a strategic advantage.  I will hear all

6    witnesses that will come in.  Look, I think you should call

7    witnesses whenever.  The order is not going to matter.  I guess

8    you have the right to call a witness.

9            MR. DAHAN:  Right.

10           THE COURT:  You can ask Mr. Brown to try to make

11   someone available.

12           MR. DAHAN:  Okay.

13           THE COURT:  Look, if it is not doable, they will have

14   to come later.  Try to work it out.

15           MR. DAHAN:  Understood.

16           THE COURT:  Just try to be reasonable.

17           MR. BROWN:  On the first point, your Honor, certainly

18   pre-disclosure of the witness expected for the next day makes

19   sense.  Typically I would have a preference to exchange that by

20   6:30 the night after -- so 6:30 Sunday night, Monday night,

21   Tuesday night -- so that we at least in the early stages who

22   we're preparing to cross and who we are not.

23           THE COURT:  Is that okay?

24           MR. DAHAN:  Definitely.  I would hope that maybe we

25   would come to an agreement for the first day of trial before

K1S6HORC

1   Monday night.  We'll give adequate notice in advance.

2         MR. BROWN:  Can I raise another housekeeping?  This is

3   a true housekeeping.  Because many of us are out of state and I

4   am the only with a service pass, we do have an electronic

5   devices order, your Honor, for each of our five lawyers taking

6   a role in the case that would allow a cell phone and a lap top.

7   I have it if I can approach and hand the order up if that is

8   acceptable.

9         THE COURT:  Sure.  Give that to Mr. Hampton.

10         MR. DAHAN:  Your Honor, will we be able to submit a

11   similar one?

12         THE COURT:  Yes.

13         MR. DAHAN:  Thank you.

14         THE COURT:  Mr. Hampton will take care of that.

15         Anything else?

16         MR. DAHAN:  Again, your Honor, I mentioned this early.

17   I am not here obviously reserving my objections to the fact

18   that we received 200 pages of documents last night two weeks

19   after the joint pretrial order, but what we would ask is at

20   some point this has to stop with continually going into

21   producing additional documents as they do more searches that we

22   have no idea what these searches are.  We are trying to get

23   ready for trial.

24         THE COURT:  Oh, you don't want anymore documents?

25         MR. DAHAN:  I think the Court probably doesn't want

K1S6HORC

1    anymore documents either.

2              MR. BROWN:  Your Honor, in fairness we didn't know

3    that Mr. Shipper and Mr. Benisti, who they didn't identify in

4    their Rule 26s were going to be witnesses in this case.  They

5    didn't hit for search terms that the parties agreed to.  So

6    once I found out they are calling them for their case, we went

7    through and found documents that we might need for

8    cross-examination and produced them promptly.

9              THE COURT:  Understood.  Do you expect anymore?

10             MR. BROWN:  Unless they identify new witnesses late I

11   don't anticipate anymore, your Honor.

12             MR. DAHAN:  We do not.

13             MR. BROWN:  One other issue, your Honor.  We didn't

14   raise the sequestration of fact witnesses.  We have an

15   individual plaintiff and two corporate defendants.  Other than

16   a rep for each of the individual corporate defendants and

17   obviously Mr. Horowitz, who is the plaintiff himself, we would

18   ask for sequestration of all the witnesses in the case with the

19   exception of the experts for the length of the case.

20             THE COURT:  Are you okay with that?

21             MR. DAHAN:  If he can just identify for me on your end

22   who you are referring to?

23             MR. BROWN:  So every fact witness would be sequestered

24   except for the two experts.  I assume Mr. Horowitz is your rep

25   and will be here in the courtroom.  I presume he is testifying

K1S6HORC

first anyway so it is probably not an issue.  And then we would

have a corporate rep from NG and Spark who I will identify for

you in advance.

                MR. DAHAN:  Sure.

                THE COURT:  Fair enough.

                Thank you everyone.  Have a good day.

                              o0o