**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUL HOROWITZ, as Sellers' Representative,<br><br>             Plaintiff,<br><br>     v.<br><br>NATIONAL GAS & ELECTRIC, LLC and SPARK ENERGY, INC.,<br><br>             Defendants. | Civ. No. 17-CV-7742 (JPO) |

## PLAINTIFF'S POST-TRIAL MEMORANDUM

Israel Dahan
Richard T. Marooney
Ryan Gabay
Leah Aaronson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.: (212) 556-2114
idahan@kslaw.com
rmarooney@kslaw.com
rgabay@kslaw.com
laaronson@kslaw.com

Chelsea J. Corey
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Telephone No.: (704) 503-2575
ccorey@kslaw.com

Kevin J. O'Brien
Gilbert Oladeinbo
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone No: (404) 572-4600
kobrien@kslaw.com
goladeinbo@kslaw.com

*Counsel for Plaintiff*

### TABLE OF CONTENTS

**INTRODUCTION**................................................................................................1

**ARGUMENT**...................................................................................................2

I.   Major Energy's Financial Performance Was Strong Prior to the Sale to NGE...................2

II.  NGE Concealed Its True Intention to Complete a Dropdown of Major Energy to Spark Immediately After the Closing ....................................................................6

III. The Sellers and Major Energy Key Employees Were Contractually Entitled to the Payments They Accepted...............................................................................10

IV.  Spark Miscalculated the 2016 Contingent Payment and Improperly Deducted Millions of Dollars from the 2017 Contingent Payment as an "Overpayment"................11

V.   Defendants Improperly Minimize the Rights Provided to the Sellers in Section 2.7 of the Earnout Agreement and Executive Earnout Agreement.........................................14

VI.  Record Evidence Conclusively Establishes Defendants' Breaches of Section 2.7 of the Earnout Agreement and Executive Earnout Agreement.........................................17

   A. EMS Integration Project ........................................................................18

   B. PSE Supply Relationship Interference.........................................................19

   C. Spark's Restrictions on Aggregation Deals ...................................................22

   D. Key Major Energy Employees Depart the Company .................................................24

**CONCLUSION** .................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                               **Page(s)**

*Awards.com, LLC v. Kinko's, Inc.*,
   42 A.D.3d 178 (1st Dep't 2007) ...........................................................................................11

*Baidu, Inc. v. Register.com, Inc.*,
   760 F. Supp. 2d 312 (S.D.N.Y. 2010).....................................................................................10

*Recticel Foam Corp. v. Bay Indus.*,
   128 F. App'x 798 (2d Cir. 2005) .............................................................................................1

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006).....................................................................................................17

Plaintiff Saul Horowitz, as Sellers' Representative, by and through his undersigned counsel, respectfully submits his Post-Trial Memorandum.  This Post-Trial Memorandum highlights certain factual and legal issues based on Defendants' presentation at trial.  Plaintiff's complete legal arguments are set forth in his Pre-Trial Memorandum (ECF No. 188), Opposition to Defendants' Pretrial Memorandum (ECF No. 205), and Proposed Findings of Fact and Conclusions of Law submitted with this Post-Trial Memorandum.

## INTRODUCTION

In their opening statement, Defendants provided the Court with a "roadmap" of key points that Defendants argued the evidence at trial would prove.[1]  Defendants promised to prove that:

1. "Sellers knew, pre-sale, that Major Energy's business was eroding for reasons having nothing to do with NGE or Spark Holdco"[2];

2. "Sellers knew, pre-sale, that NGE would dropdown Major Energy to a Spark Company Affiliate";

3. "Between 2016-2018, pre- and post-litigation, Sellers and Key Employees accepted more than $13 million of payments and other benefits from Spark Holdco";

4. "Spark Holdco properly calculated the 2016 Target Year Contingent Payment; properly offset 2017 Target Year Contingent Payment by 2016 good faith overpayment made under threat of litigation";

5. "Section 2.7 of the Earnout Agreement and Executive Earnout Agreement Are Express Regarding Buyer's and Sellers' Rights; 'Business As Usual' Is a Fiction"; and

6. "The Four Alleged Acts of Interference / Breach of Section 2.7 Are Contradicted by the Hard Evidence"[3]

As set forth below, Defendants' "roadmap" is based entirely upon Defendants' mischaracterizations and distortions of the evidence.  The evidence adduced during the eight-day

---

[1] Trial Transcript ("Tr.") 24:19-23.

[2] Plaintiff properly sued Spark Energy, Inc., and not Spark Holdco, for breach of contract.  *See* Plaintiff's Pre-Trial Memorandum of Law (ECF No. 188), at 33-36; *Recticel Foam Corp. v. Bay Indus.*, 128 F. App'x 798, 799 (2d Cir. 2005) ("New York law provides that if a party objectively manifests an intent to be bound by a contract, that intent controls, even if the party does not sign the written agreement.").

[3] *See* Ex. 1 to Declaration of Israel Dahan ("Opening Slides"), at 62-63.

bench trial disproved and debunked each of Defendants' points articulated in their opening statement.   As set forth further in Plaintiff's accompanying Proposed Findings of Fact and Conclusions of Law, Plaintiff has proven his liability and damages case.

## ARGUMENT

## I.   Major Energy's Financial Performance Was Strong Prior to the Sale to NGE

During the bench trial, Defendants erroneously asserted that Major Energy's business was "under siege" by regulators and that its performance and customer count were declining leading up to the sale to NGE.[4]   But the evidence proved otherwise.

During the due diligence period, Major Energy provided NGE with a Management Presentation disclosing investigations by regulators in Pennsylvania, Illinois, Maryland, and New York and the nature of those matters.[5]   With full knowledge of these regulatory matters, NGE acquired Major Energy for $80 million—$19 million more than Spark offered to pay for Major Energy just one year earlier.[6]   And the evidence at trial confirmed that those regulatory matters had no material impact on Major Energy's business.[7]

Although New York issued a Resetting Order on February 23, 2016 seeking to set more stringent regulations on ESCOs, the Resetting Order was immediately stayed and never implemented during the Earnout Period.[8]   Nathan Kroeker, Spark's former President and CEO, publicly celebrated the vacatur of the Resetting Order and represented publicly that he believed New York would continue to have a healthy market going forward.[9]

---

[4] *See, e.g.*, Tr. 24:23-25:7; Tr. 27:7-29:1; Opening Slides 4, 62.
[5] PX-55, at 43-44; Wiederman Witness Statement ¶ 54; Horowitz Witness Statement ¶ 74.
[6] DX-2, at SPRK-NGE0031530-531; DX-58.
[7] Tr. 515:14-516:10; Tr. 518:24-522:16; Tr. 669:15-670:12; Tr. 1685:4-12; Tr. 1758:10-14.
[8] PX-298, at 298.0023-24; Wiederman Witness Statement ¶ 60; Alper Witness Statement ¶ 46; Tr. 54:6-17; Tr. 199:3-11; Tr. 297:25-298:12; Tr. 1557:25-1559:13.
[9] PX-256, at 9; Tr. 298:24-299:25; *see also* PX-257, at 9 ("we saw a big victory with the resetting order a few months ago . . . ."); PX-312, at 8; PX-314, at 10; PX-317, at 9.

Moreover, even if the proposed Resetting Order had come to fruition, Major Energy was well-positioned to adapt and continue to grow.[10]  Indeed, Major Energy anticipated the Resetting Order and shifted its variable rate customers to fixed rate contracts, thus making significantly more money by locking those customers into rates for a longer period of time and reducing the churn rate with respect to those customers.[11]  In January 2016, during due diligence, Major Energy disclosed to NGE in a Management Presentation that Major Energy had "emphasized fixed-rate plans to better insulate customers from price swings" following the polar vortex.[12]

To support their position that Major Energy's business was "under siege" and in decline, Defendants rely on a March 15, 2016 email from Mark Wiederman stating that it was "sickening" that the Sellers had not properly structured their ownership allocation of Major Energy between the gas and electric side, and that New York was "potentially killing the gas market completely."[13] As Wiederman testified at trial, however, his email was referring to the ownership allocation of Major Energy among the Sellers.  He was not "sickened" by the potential for the gas market to be killed; instead, he was sickened because he and the other non-management Sellers had no leverage to try to adjust Major Energy's value allocation of gas versus electric to be 50/50, resulting in a lower valuation for the shareholders who held more of the gas business.[14]  Further, Wiederman confirmed that while he had concerns about the potential impact of the Resetting Order, the Resetting Order never came into effect or adversely impacted Major Energy's business.[15]  Any

---

[10] PX-15; Alper Witness Statement ¶ 50; Horowitz Witness Statement ¶ 80; Wiederman Witness Statement ¶ 62; Tr. 53:12-54:5; Tr. 1506:9-1510:8; Tr. 1542:2-20; Tr. 1557:25-1559:13.
[11] Tr. 1295:7-1296:5; DX-379.
[12] PX-55, at 22.
[13] DX-250; Opening Slide 7.
[14] Tr. 545:18-546:23.
[15] Tr. 540:23-541:1; Tr. 670:13-671:3.

concerns articulated in an email on March 15, 2016—three days before the MIPA was signed—about the Resetting Order "potentially killing the gas market" never came to fruition.

Defendants also point to a July 2016 email from Saul Horowitz to Mark Josefovic stating that an additional proposed regulation in New York—the Low-Income Order—could "potentially" be an issue.[16]  However, as the evidence showed, the Low-Income Order had a "very, very minimal to really no impact" on Major Energy's business, including because many Major Energy customers were on fixed-rate contracts through the middle of 2018.[17]  Furthermore, Kroeker admitted that, as of November 2017, the Low-Income Order was stayed,[18] and Spark acknowledged to investors that the Low-Income Order had a "relatively insignificant" impact on its business, as low-income customers comprised a very small proportion of Spark's and Major Energy's customer base.[19]

Indeed, in March 2017, Kroeker publicly stated that he "fully expect[ed]" that New York would be a "healthy market beyond 2016 and -- or beyond '17 and '18 and going forward."[20] Ultimately, as a result of the Low-Income Order, Major Energy dropped *zero* Customer Accounts in 2016, 155 Customer Accounts in 2017, and 6,776 Customer Accounts in 2018.[21]

To further support their erroneous argument that Major Energy's business was in decline, Defendants rely on emails in which David Sobel, Major Energy's CFO, and Josefovic noted that Major Energy's customer count was decreasing *in 2015*.[22]  The evidence proved that while Major Energy's customer count *temporarily* decreased in 2015 due to the polar vortex, it *increased* in the

---

[16] DX-349; Opening Slide 8.

[17] Tr. 576:24-577:25; Tr. 541:8-15; Tr. 543:14-25.

[18] PX-314, at 10 ("The first one is the low-income moratorium, there's currently a stay on that and the courts are going to revisit that here in November."); Tr. 308:14-309:18.

[19] PX-314, at 9-10; PX-313, at 10; PX-312, at 8.

[20] PX-316, at 9.

[21] DX-866; Tr. 439:13-440:3.

[22] DX-206; DX-180; Opening Slides 5, 6; Tr. 25:5-7.

first quarter of 2016 and throughout 2016.[23]  Major Energy was one of the few ESCOs to withstand the polar vortex, and it became significantly more profitable as it continued to distance itself from that event.[24]  In fact, Major Energy was bringing in "a lot of customers" in 2015 and had "tremendous momentum," Major Energy had an "extremely robust" first quarter of 2016, and its customer count for 2016 was 173,901.[25]  NGE's General Counsel, Gary Lancaster, testified that Major Energy had a "very robust first quarter" in 2016.[26]  In addition, in 2015, Major Energy had an Adjusted EBITDA of $23.5 million,[27] and the commercial business was growing rapidly.[28]

While Defendants promised to establish that the parties increased the portion of the purchase price to be paid in Contingent Payments because Major Energy's customer count was declining,[29] Defendants failed to make such a showing.  Instead, the evidence established that the parties increased the contingent portion of the consideration to $35 million to share the risk of the Resetting Order without diminishing the original target purchase price of $80 million.[30]  It had nothing to do with a diminishing customer count.  NGE itself stated how optimistic it was about Major Energy's growth prospects and repeatedly noted how well Major Energy performed during most of 2016—*before* Defendants' unrelenting interference with Major Energy's business began to take its toll on Major's performance.[31]

---

[23] Leathers Witness Statement ¶¶ 225-228; PX-58; PX-359; PX-257, at PX-0257.0005 (November 10, 2016 statement from Kroeker:  "we are very encouraged by the results we're seeing thus far, both in terms of customer count and profitability"); PX-716.

[24] Tr. 691:5-18.

[25] Tr. 690:14-24; Tr. 117:9-13; Tr. 127:10-22; Wiederman Witness Statement ¶ 222.

[26] Tr. 117:9-13.

[27] PX-377.

[28] Wiederman Witness Statement ¶ 181.

[29] Tr. 25:23-26:7.

[30] PX-104 ("the overriding intent is that Major and NGE share the risks of the uncertain regulatory environment without diminishing the original target purchase price of $80 MM"); DX-240; Wiederman Witness Statement ¶¶ 62, 64.

[31] PX-756, at PX-076.0012; Tr. 117:9-13; Tr. 127:10-22.

Finally, Defendants mischaracterized a June 2017 audio message from Wiederman to Josefovic in which he stated that Major Energy was "coming up very short on customer count because of a lot, a lot of new regulatory restrictions."[32]  As Wiederman testified at trial, he used the phrase "regulatory restrictions" in reference to new restrictions placed on Major Energy by Spark and Spark's Risk Committee including compliance with Sarbanes-Oxley requirements, quarterly meetings, and restrictions on Major Energy's ability to pursue aggregation deals, none of which were imposed on Major Energy as a private company before NGE's sale of Major Energy to Spark (the "Dropdown").[33]  The timing of the message illustrates the point.  The message was sent when Wiederman was in Houston attempting to negotiate a buy-out with Spark and following the Spark Risk Committee's decision to reject the aggregation deal Wiederman and Horowitz wanted to pursue.[34]  And, again, as described above, the evidence proved that Major Energy's business was not in any way adversely impacted by any regulatory restrictions or actions.

## II.     NGE Concealed Its True Intention to Complete a Dropdown of Major Energy to Spark Immediately After the Closing

A key point of contention among the parties is whether and to what extent the Sellers were aware of Defendants' plan to immediately transfer ownership of Major Energy from NGE to Spark after the closing of the sale to NGE.  In their opening statement, Defendants promised the Court "a wealth of evidence" showing that the planned Dropdown to Spark was known before closing.[35]  Yet, the *only* document Defendants rely on that allegedly shows that NGE notified the Sellers of an immediate Dropdown is ***one single email*** from Brandon Hoover, NGE Controller, to Sobel— neither of whom negotiated the sale of Major Energy.[36]  Lancaster admitted that this is the ***only***

---

[32] DX-494; Opening Slide 10; Tr. 28:10-29:1.
[33] Tr. 528:15-21; Tr. 529:9-14.
[34] Tr. 528:15-530:9; PX-585.
[35] Tr. 29:9-13.
[36] Tr. 29:2-25, DX-272; Tr. 79:14-16.

*document* he was aware of that indicates that the Sellers received any notice of the Dropdown before the sale.[37]  In other words, *none* of the negotiators for NGE – Lancaster, Konikowski, or Hennekes – ever sent anything to the Sellers in writing about the Dropdown.  And even Hoover's email refers only to a "tentative plan" for a transfer to Spark on July 1.[38]

With respect to this single email, the evidence showed that the news of a potential immediate Dropdown was received with confusion, doubt, and promises of delay.  Specifically:

- Sobel expressed confusion in the very same April 8 email, stating:  "7/1/16 transfer to Spark?" and adding "Wasn't sure if you knew or if Brandon was talking too much."[39]

- Dan Alper, Major Energy's CEO, testified that after he received the April 8 email from Sobel, he "immediately got on a call with Dave Hennekes and said, 'What the heck is going on?' I remember also talking to Gary Lancaster as well in a separate conversation, saying, 'What is this about?'"[40]  Hennekes and Lancaster told Alper that the Dropdown was tentative, that "it's just preliminary work that they are doing. But this isn't going to happen for a much longer period of time."[41]

- About a week later, on April 14, 2016, Sobel wrote to Major Energy's auditor, PricewaterhouseCoopers, that "[t]he buyers are affiliates of a public company and my understanding is that one day Major will be folded into the public company, but who really knows."[42]

- Both Wiederman and Horowitz testified that they were not told that Major Energy would be sold to Spark immediately after the sale to NGE.[43]  Horowitz further testified that he never saw or heard about Hoover's April 8 email prior to this litigation.[44]

Contrary to Defendants' manufactured narrative that an immediate Dropdown was disclosed to the Sellers, the evidence at trial demonstrated that:

---

[37] Tr. 77:15-20.
[38] DX-272.
[39] DX-272.
[40] Tr. 1560:6-14.
[41] Tr. 1560:15-25.
[42] PX-114.
[43] Wiederman Witness Statement ¶ 89; Tr. 1506:3-8.
[44] Tr. 1463:24-1464:15.

- No one from Spark participated in the transaction negotiations.[45]

- No one from Spark was present at the meeting with Stifel Financial Corp.,[46] which was engaged to help secure financing for the transaction.[47]

- Neither Kroeker, Lancaster, Konikowski, nor Hennekes disclosed the negotiation of the Dropdown between NGE and Spark that was happening simultaneously with the negotiations with the Sellers, including the creation of a special committee of the Spark Board of Directors, the hiring of outside counsel and outside financial advisors, and the negotiation of the Dropdown transaction agreements.[48]

Consistent with these inescapable truths, Alper, Wiederman, and Horowitz all testified that they were unaware of NGE's plan to immediately sell Major Energy to Spark.[49]   Indeed, they consistently and credibly testified that they did not believe an immediate transfer would occur because of ***NGE's own representations*** in written agreements, emails, and meetings during the negotiations.[50]   Specifically:

- In Section 6.3 of the MIPA, NGE represented and warranted that it was "acquiring the [membership interest] *solely for its own account* for investment purposes and *not with a view to, or for the offer or sale in connection with, any distribution thereof*."[51]

- In Section 11.7 of the MIPA, NGE agreed that "*[n]o assignment of this Agreement or of any rights or obligations hereunder may be made* by any Company, any Seller or Buyer, directly or indirectly . . ., *without the prior written consent of the other Parties* and any attempted assignment without the required consents shall be void."[52]

- Each of the new employment agreements entered into among Major Energy and Horowitz, Wiederman, Alper, Moeller, and Sobel provided that if there were a change in 50% of the corporate ownership of Major Energy during the Earnout Period, the contracted employee would be entitled to terminate his employment contract for cause

---

[45] Wiederman Rebuttal Statement ¶ 5; Kroeker Witness Statement ¶¶ 61, 63; Tr. 264:12-265:2, Tr. 265:3-10, Tr. 276:7-9; Tr. 1314:24-1315:4; Tr. 1505:10-1506:8.

[46] Alper Witness Statement ¶ 41; Tr. 80:22-81:2.

[47] Horowitz Witness Statement ¶ 78; Tr. 1555:9-13.

[48] Alper Witness Statement ¶¶ 90-94; Wiederman Witness Statement ¶ 93; Tr. 71:14-76:10; Tr. 81:3-20; Tr. 275:10-276:3; Horowitz Rebuttal Statement ¶¶ 6, 8.

[49] Tr. 1506:3-8, 1522:23-1523:9, 1560:6-1561:13; Wiederman Witness Statement ¶ 93; Alper Witness Statement ¶ 123.

[50] Tr. 1506:3-8, 1560:6-1563:2; Wiederman Witness Statement ¶ 92; Alper Witness Statement ¶ 123.

[51] PX-632, § 6.3 (emphases added).

[52] PX-632, § 11.7 (emphases added).

and receive severance payments of twice the value of the prior year's annual compensation, which collectively totaled approximately $7 to $10 million.[53]

- Alper testified that the "narrative that was told to us throughout most of the acquisition process was, You guys have something special . . . and Dave [Hennekes] used the term 'the Spark vortex.' We want to keep you away as long as possible from the Spark vortex. . . . And that was always the premise of the deal. And, you know, Gary [Lancaster] would tell us on a regular basis, you know, You guys have something that's different. And let's try to keep it unbroken from being -- or rather not ripped apart in the Spark vortex."[54]

- On April 15, 2016, Lancaster sent an email to Plaintiff, Alper, and Wiederman expressly stating that the new owner of Major Energy is NGE, "a sole member LLC with simple corporate governance."[55]   Lancaster added that the Sellers and Major Energy management should feel comfortable and protected during the Earnout Period given the fact that NGE has also "agreed to a very stringent Section 2.7" in the Earnout Agreement and Executive Earnout Agreement, as well as the other "protections" negotiated into the new employment agreements.[56]

What is most incredible about NGE's narrative concerning the negotiations is that it would willingly saddle itself with a $10 million severance liability due to a change of control it claims everyone knew would happen.[57]  As Alper correctly pointed out in his testimony, it is incredible that anyone, let alone a sophisticated company like NGE, would strike such a deal.[58]  Thus, any logical person signing these agreements would take comfort that a change of control was not on the horizon.

The reality is that Defendants have attempted to manufacture their counter-factual narrative because the truth, evinced in testimony and evident from trial exhibits, is that NGE concealed its true purpose in purchasing Major Energy from the Sellers, and Spark acted in bad faith in orchestrating the entire transaction behind the scenes.   Accordingly, as detailed in the

---

[53] PX-667, §§ 3.2(c), 3.3; PX-668, §§ 3.2(c), 3.3; PX-669, §§ 3.2(c), 3.3; PX-670, §§ 3.2(c), 3.3; PX-671, §§ 3.2(c), 3.3; *see also* Tr. 69:12-17.
[54] Tr. 1554:10-25; Alper Witness Statement ¶¶ 57, 131.
[55] PX-117; Tr. 83:12-17.
[56] PX-117; Tr. 61:14-17.
[57] Tr. 53:15-20; Tr. 69:3-70:4.
[58] Tr. 1561:1-13; Tr. 1566:14-22.

accompanying Proposed Findings of Fact and Conclusions of Law, Spark cannot use the purported exculpatory language in Section 7.14(c) of the MIPA to avoid liability resulting from its willful, reckless, or at a minimum, grossly negligent conduct in connection with Plaintiff's tortious interference claim.[59]   Likewise, Spark cannot avoid punitive damages liability based on the limitation of liability provision in Section 9.9 of the MIPA, which does not preclude Plaintiff from seeking special damages, such as punitive damages, in connection with Spark's willful or, at a minimum, grossly negligent conduct.[60]

## III.   The Sellers and Major Energy Key Employees Were Contractually Entitled to the Payments They Accepted

At trial, Defendants repeatedly pointed to certain Major Energy employees' acceptance of agreed-upon consideration apparently to suggest that the Sellers are not entitled to any further recovery.   In their opening statement, Defendants went so far as to characterize the severance payments made to Alper, Sobel, and Moeller (none of whom are "Sellers") as a "windfall."[61] Defendants' characterization of bargained-for consideration as a "windfall" is entirely at odds with law and logic.   Contrary to Defendants' trial posturing, it is undisputed that:

- If Major Energy achieved certain Adjusted EBITDA and Customer Account targets during the Earnout Period, the Sellers were entitled to $20 million in Earnout Payments and $15 million in Cash Installments.[62]   The Sellers received only a fraction of these payments due to Defendants' misconduct.

- If a "Change in Control," as defined in Section 3.2(c) of the relevant employment contracts, occurred during the term of the employment agreement, then the executives were entitled to the severance, compensation, and benefits outlined in Section 3.3.[63] Spark and NGE's pre-orchestrated Dropdown caused Alper, Moeller, and Sobel to

---

[59] Plaintiff's Pre-Trial Memorandum of Law (ECF No. 188), at 29-30.
[60] *Id.* at 30-31; *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) ("New York courts will decline to enforce a contractual limitation or waiver of liability clause when there is willful or grossly negligent or recklessly indifferent conduct.").
[61] Opening Slide 27; Tr. 47:17-20; Tr. 49:18-19.
[62] PX-634; Tr. 106:18-25; Tr. 167:12-17.
[63] PX-667, §§ 3.2(c), 3.3, PX-668, §§ 3.2(c), 3.3; PX-669, §§ 3.2(c), 3.3; PX-670, §§ 3.2(c), 3.3; PX-671, 3.2(c), 3.3; Tr. 1007:25-1008:8; Tr. 1200:4-18.

exercise their contractual rights.  Horowitz and Wiederman chose not to exercise their contractual rights.

- The MIPA contains a non-waiver provision that states:  "No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy."[64]

Defendants' transparent use of the atmospheric fact that the Sellers, Senior Management Team, and Key Employees accepted consideration that was owed to them is nothing more than an attempt to imply that Plaintiff is seeking consideration to which he and the Sellers are not entitled. Not so.  In bringing this litigation, Plaintiff only requests, on behalf of the Sellers, the benefit of their bargain, which Defendants have filched through their breaches and bad faith.

## IV. Spark Miscalculated the 2016 Contingent Payment and Improperly Deducted Millions of Dollars from the 2017 Contingent Payment as an "Overpayment"

One of the more brazen of Defendants' positions is that they properly calculated the 2016 Contingent Payment and properly deducted a purported "overpayment" from the 2017 Contingent Payment.[65]  The fatal flaw of Defendants' position is easily demonstrated by the simple fact that, as Defendants admit, if their calculation of the Contingent Payments is to be believed, it is *mathematically impossible* for the Sellers to achieve the maximum Earnout Payment for 2016 (and, accordingly, the total purchase price of $80 million) even upon achievement of the agreed-upon Adjusted EBITDA and Customer Account targets for 2016.[66]  Instead, Defendants have suggested that Major Energy would have had to achieve $28 million in Adjusted EBITDA in 2016

---

[64] PX-632, § 11.4.  New York courts "uniformly" enforce no-waiver clauses such as the one contained in Section 11.4 of the MIPA and bar parties from asserting waiver and ratification defenses. *See Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (1st Dep't 2007); *see also* Plaintiff's Pre-Trial Memorandum of Law (ECF No. 188), at 25.  Further, the Sellers reserved their rights on September 1, 2016.  *See* DX-390.

[65] Opening Slide 36; Tr. 49:23-50:2.

[66] PX-557A; Tr. 121:5-9; Tr. 121:21-25; 206:10-16; 252:4-17; Tr. 1387:14-20.

in order to receive the maximum Earnout Payment[67]—an Adjusted EBITDA even larger than the 2018 Adjusted EBITDA Plan ($27,831,052), that assumes **53,686 more customers** than in 2016.[68] In the face of such an obviously illogical position, it can only be surmised that Defendants are acting in bad faith in an attempt to minimize their liability to the Sellers.

Defendants' bad faith is further laid bare by their decision to first, take back $2,244,230 of the 2016 Contingent Payment by offsetting it against the 2017 Contingent Payment,[69] and second, to characterize the 2016 Contingent Payment as an "overpayment" that was part of some "contingent compromise offer" or "olive branch"[70]—all while **none** of the contemporaneous correspondence suggests that Defendants paid the 2016 Contingent Payment as a negotiated compromise offer and the Sellers were not notified for a full year that Spark believed that there was an "overpayment."[71] When confronted with their April 12, 2017 email and April 11, 2017 memorandum, neither Kroeker nor Lancaster could point to any indication that the 2016 Contingent Payment was intended to be some sort of negotiated compromise offer.[72]

With respect to Lancaster's memorandum, Defendants would have the Court believe that Lancaster, an attorney with 40 years of experience, drafted a detailed, nine-page memorandum analyzing the relevant contractual terms that is purportedly: (1) a negotiated compromise offer[73] and (2) his analysis of the "Sellers' position" (with which Spark disagreed),[74] but that Lancaster

---

[67] Tr. 121:5-9; Tr. 121:21-25; 206:10-16; 252:4-17; Tr. 1387:8-13.
[68] PX-634, §§ 1.1, 2.2(d).
[69] PX-165, at PX-0165.0003; Horowitz Witness Statement ¶¶ 247-248.
[70] Kroeker Witness Statement ¶¶ 267-271; Lancaster Witness Statement ¶¶ 77-78, 82-87; Lane Witness Statement ¶¶ 32-33, 35-36; Holloway Witness Statement ¶¶ 131-132, 137; Tr. 38:2-7, 49:23-50:2, 157:8-158:3, 365:5-9, 1380:15-21.
[71] Tr. 1493:5-9, Tr. 364:4-365:9.
[72] Tr. 146:12-149:21, 359:13-363:10.
[73] Tr. 146:12-147:12, 359:13-16.
[74] Tr. 148:22-149:6, 150:1-19, 152:6-11, 359:2-12, 362:8-16.

did **not state either of those purposes in the memorandum**.[75]  This logical inconsistency is not credible.  No sophisticated business lawyer with Lancaster's commercial experience would draft a legal analysis that was intended to accompany a compromise offer for millions of dollars, with full knowledge that the analysis would be shared with an opposing party, and *not* indicate the true purpose of that analysis.  Lancaster *did* indicate the true purpose of his memorandum in the memorandum itself, stating:  "This Memorandum is my analysis of the pertinent contractual provisions pertaining to the methodology to be utilized in the determination of the calculation of Earnout and Cash Installment payments payable under the [MIPA] . . . ."[76]  Lancaster and Defendants now disavow that purpose years later in an attempt to gain an advantage in litigation.

The true purpose of Lancaster's memorandum is further bolstered by Kroeker's April 12 email, which states: "I asked Gary to go back to the MIPA and the Earnout Agreement and spell out, step by step, how those numbers should be calculated in order to best fit both the spirit and the letter of the agreement.  Our goal was to make sure we are all on the same page regarding the exact calculation that covers not only the partial 2016 year, but also 2017 and 2018."[77]  Again, despite the fact that Defendants now contend this email was intended to be a "compromise offer," Kroeker—who, as CEO of a public company, must carefully choose his words to ensure their accuracy—does not use the words "compromise," or "offer," or any analog that would allow the reader to believe that this email and memorandum was anything more than it says it is:  a calculation of the "proper number."[78]  Defendants' complete divergence from their own admissions reveals their bad faith and the extent to which they will venture to avoid the truth.

---

[75] Tr. 146:12-149:21; Tr. 359:13-363:10.
[76] DX-539.
[77] DX-539.
[78] DX-539.

V.     **Defendants Improperly Minimize the Rights Provided to the Sellers in Section 2.7 of the Earnout Agreement and Executive Earnout Agreement**

At trial, Plaintiff established that on April 15, 2016—the day NGE closed on its purchase of Major Energy—Lancaster represented to Major Energy's Senior Management Team that the Sellers should feel comfortable and protected during the Earnout Period because NGE had "agreed to a *very stringent* Section 2.7" in the Earnout Agreement and Executive Earnout Agreement.[79] But now, several years after the filing of this litigation, Defendants have reversed course and seek to minimize the rights provided to the Sellers in Section 2.7 while overstating the rights that section provides to NGE.

Defendants asserted at trial that "'Business as Usual' Is a Fiction."[80]  But Section 2.7 of the Earnout Agreement and Executive Earnout Agreement explicitly required NGE (and later Spark) to operate Major Energy "consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities."[81]  Thus, Section 2.7 obligated NGE and Spark to operate Major Energy in a "business as usual" manner *and* consistent with how Major Energy's Senior Management Team suggested operating the company going forward to adapt to new opportunities, among other protections.[82]

Instead of adhering to Section 2.7 of the Earnout Agreement and Executive Earnout Agreement, Defendants have chosen to emphasize the initial portion of Section 2.7, which they

---

[79] PX-117 (emphasis added); Tr. 61:14-17; Tr. 61:21-23.

[80] Opening Slide 38.

[81] Opening Slide 38 (quoting DX-1, § 2.7).

[82] Consistent with the requirements of Section 2.7, all the employment agreements executed in connection with the sale provide that the Senior Management Team and Key Employees "shall operate the Company's business in the ordinary course of business consistent with historical practices." PX-667, § 1.2, PX-668, § 1.2; PX-669, § 1.2; PX-670, § 1.2; PX-671, § 1.2.

have termed its "gating predicate proviso."[83]  That portion of Section 2.7 states that "Buyer shall have the discretion to operate the Business of the Companies as Buyer deems appropriate," but it is followed by four very significant conditions and limitations after the words "<u>provided</u> that."[84]

By emphasizing this "gating proviso" provision and attempting to minimize the limitations that follow the "provided that" language in Section 2.7, Defendants attempt to downplay the importance of the bargained-for protections afforded to the Sellers in Section 2.7 of the Earnout Agreement and Executive Earnout Agreement.  But the evidence at trial established that Wiederman, Horowitz, and Alper all found Lancaster's representations in his April 15, 2016 email at closing and the protections in Section 2.7 of the Earnout Agreement and Executive Earnout Agreement to be critical in their decision to move forward with the sale of Major Energy to NGE.[85]

Finally, while Defendants assert that the Sellers "tried to get more Seller-protective language in Section 2.7 and failed,"[86] they overstate the point and ignore the reality that the Sellers negotiated for and obtained "very stringent" protections in Section 2.7.[87]  In February 2016, Lancaster initially proposed a Section 2.7 titled "Disclaimers as to Operation of Business," which stated, among other things, that the Buyer had the right to operate Major Energy "in any way that Buyer deems appropriate in Buyer's sole business discretion" and that Buyer owed "no fiduciary duty or express or implied duty to the Sellers with respect to the Earnout, except as expressly set forth herein, including any implied duty of good faith and fair dealing."[88]  Because this version was completely unacceptable to the Senior Management Team, the Sellers rejected this provision

---

[83] Tr. 39:2-7.
[84] DX-1, § 2.7 (emphasis in original).
[85] Wiederman Witness Statement ¶¶ 76, 82, 90-92; Horowitz Witness Statement ¶¶ 97-98; Alper Witness Statement ¶¶ 87-88, 103; Tr. 1515:16-1517:3.
[86] Opening Slides 40-42; Tr. 41:3-23.
[87] PX-117.
[88] PX-399, at PX-0399.0009-10; Tr. 56:19-57:5.

in its entirety and replaced it with an entirely new version favoring the Sellers, which NGE accepted.[89]

On March 15, 2016, the Sellers' deal counsel, Larry Studnicky, sent the Sellers and Alper an email identifying three levels of "asks" to protect the Sellers' Earnout Payments.[90]  Ultimately, Section 2.7 of the Earnout Agreement implemented Studnicky's "Level 1" version of Section 2.7 (which entirely replaced NGE's initial proposed version), but with important additions, including that the Buyer had a duty of good faith and fair dealing to operate Major Energy, in all material respects, consistently with how the Senior Management Team "suggests operating [Major Energy] going forward to adapt to new opportunities," among other differences reflected in the final version of Section 2.7.[91]

The parties also implemented portions of Studnicky's "Level 2" suggestions, including a "really aggressive ask" to have Major Energy's Senior Management Team and other Key Employees enter into new employment agreements with employee-friendly termination provisions to ensure that they would not be terminated during the Earnout Period.[92]  Additionally, the parties incorporated in Section 2.7 of the Executive Earnout Agreement some of the more "aggressive" protections Studnicky outlined in his "Level 3" suggestions.[93]  Thus, as demonstrated by both the negotiation of Section 2.7 and the actual terms of Section 2.7, Defendants' characterization of business as usual as a "fiction" is entirely unfounded.

---

[89] PX-71; PX-392; Alper Witness Statement ¶¶ 61-63, 65, 68, 70.
[90] DX-253.
[91] DX-1, § 2.7; PX-658, § 2.7; Alper Witness Statement ¶ 64; Tr. 1515:17-1517:20.
[92] DX-253; Tr. 1517:21-1518:24.
[93] PX-658, § 2.7; Alper Witness Statement ¶ 64.

**VI.    Record Evidence Conclusively Establishes Defendants' Breaches of Section 2.7 of the Earnout Agreement and Executive Earnout Agreement**

According to Defendants, the Sellers have alleged only the following four breaches of Section 2.7, each of which is "Contradicted by the Hard Evidence": (1) Defendants' EMS integration project interference; (2) Defendants' termination of Major Energy's supply relationship with PSE; (3) Spark's restrictions on Major Energy's ability to enter into aggregation deals; and (4) Spark's role in the departure of key Major Energy employees.[94]   Defendants inaccurately characterize Plaintiff's claims.  Notably, Defendants failed to mention Sellers' additional Section 2.7 breach allegations, including: (1) Defendants' decision to complete the Dropdown itself; (2) Defendants' interference with Major Energy's residential marketing vendors and commercial brokers; (3) Spark's control over the pace of Major Energy's residential marketing activities and imposition of margin requirements on Major Energy with respect to commercial deals; and (4) Spark's imposition of financial and accounting changes before and after the Dropdown.

Each of these examples individually is a breach of Section 2.7.  In their totality they devastated Major Energy's business and destroyed Sellers' rights under Section 2.7.

The Second Circuit has instructed that good faith requires, at a minimum, that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (citation omitted).  The evidence at trial has confirmed that Defendants breached this contractual duty.  In the sections below, Plaintiff addresses the "hard evidence" establishing that Defendants committed each of the four breaches they chose to address in their opening slides in connection with Plaintiff's claim for breach of Section 2.7.

---

[94] Opening Slides 43, 63.

A.      **EMS Integration Project**

Defendants distort and mischaracterize Major Energy's communications with Spark concerning the EMS integration project.[95]   Starting as early as May 2016, Major Energy management had already recognized that the EMS integration project was interfering with Major Energy's business and distracting key employees from continuing to grow the business.[96]  Indeed, on May 11, 2016, Horowitz traveled to Miami to meet with Spark's Chairman and founder, W. Keith Maxwell III, to discuss among other things how the EMS integration project was interfering in Major Energy's operations.[97]  The next day, in response to an email from Dave Hennekes of NGE concerning an Operations and IT trip to Major Energy's office, Alper stated to Horowitz that "[t]hese guys are really not allowing business as usual" and "[h]opefully your conversation with Keith yesterday sunk in and got transmitted to these guys."[98]

For sure, Major Energy tried its best to help with the integration and sent emails to Spark expressing interest in helping Spark integrate EMS into Spark's operations.   Those communications exemplify the good faith of Major Energy's leaders.   Defendants take those emails out of context to suggest that Sellers had no issues with Defendants' conduct.   Not so. While Major Energy tried its best to help integrate, the Sellers already had raised with Maxwell the obvious and flagrant interference with Major Energy's business.[99]  Major Energy's employees

---

[95] *See, e.g.*, Opening Slides 46-47 (citing DX-332, DX-1022, DX-1023); Tr. 42:18-43:8.

[96] PX-169; PX-181; PX-217; PX-85; DX-1043; Horowitz Witness Statement ¶¶ 141-144; Alper Witness Statement ¶¶ 107-110; Wiederman Witness Statement ¶¶ 102-103.

[97] PX-217; Tr. 1484:4-10 ("My focus really was on the interference on the EMS integration, which is really what drove me to go down to Miami and talk to him."); Tr. 1523:22-1524:2; Horowitz Witness Statement ¶¶ 141, 143.

[98] PX-169.

[99] Tr. 685:15-686:8; DX-1043 ("I'm not aware we are causing any issues with major, but I do think we should discuss buying out the other partners."); Alper Witness Statement ¶¶ 104, 142; Wiederman Witness Statement ¶¶ 132-135; Horowitz Witness Statement ¶¶ 145-146.

were attempting to be "team players" and help the combined company succeed despite Defendants' obvious interference which led to the early buyout negotiations.[100]

Defendants represented to the Court that "actual integration efforts" lasted for "three weeks or so,"[101] but that is misleading in two ways. First, Michael Kuznar, President of Spark's affiliate RetailCo and co-sponsor of the EMS integration project, testified that the EMS integration occurred over a seven-week period from the first week of August 2016 to September 13, 2016.[102] Second, that integration work followed *four months* of intense planning and preparation work by Major Energy and Spark from April to July 2016 that required a significant amount of Major Energy's time and resources.[103]

Ultimately, on September 13, 2016, Kuznar stopped the EMS integration project after receiving complaints from Alper that the project was distracting Major Energy's employees from growing the company.[104] Thereafter, the Sellers received a $250,000 add-back to reimburse them for certain expenses incurred by Major Energy from the EMS project.[105] Contrary to Defendants' assertions,[106] this payment did not come close to compensating Major Energy for its costs or the harm caused by the EMS project.[107]

B.     PSE Supply Relationship Interference

Another fiction advanced by Defendants in their opening statement and throughout the trial is that the relationship between Major Energy and PSE had "soured" by the April 15, 2016 closing

---

[100] Tr. 685:15-686:8 ("I'm a team player and was doing what was best for the company.").
[101] Tr. 43:19-23.
[102] Kuznar Witness Statement ¶ 33; Tr. 1807:4-25.
[103] Tr. 1806:7-11.
[104] Alper Witness Statement ¶ 168; Tr. 1100:9-1101:1.
[105] Alper Rebuttal Statement ¶ 2; Alper Witness Statement ¶ 169.
[106] Tr. 43:19-23; Opening Slide 48 ("Sellers Accept $250,000 Earnout Add-Back to Compensate for Any Alleged Distraction Over A Few Weeks").
[107] Alper Rebuttal Statement ¶ 2; Alper Witness Statement ¶ 169.

of the sale to NGE.[108]  The evidence at trial, however, established that Major Energy had a

longstanding relationship with NGE that was essential to Major Energy's success, and Major

Energy's Senior Management Team wanted to maintain that relationship throughout the Earnout

Period because it believed that relationship was essential to allowing Major Energy to achieve the

full amount of the Contingent Payments.[109]  PSE, in fact, made a very favorable offer in March

2016 to extend its supply contract through the Earnout Period, which NGE chose to reject.[110]

The evidence also showed that friction arose between PSE and Major Energy in connection

with the NGE transaction because PSE had a right of first refusal under its supply contract with

Major Energy and tried to use that right to extract an economic advantage in the weeks leading up

to the sale of Major Energy to PSE.[111]  That friction was only temporary, however, and Major

Energy's relationship with PSE had returned to normal by the closing.[112]

Thereafter, in late April 2016, NGE unilaterally destroyed Major Energy's relationship

with PSE when NGE's CFO, Todd Gibson, contacted and met with Mark Depew and James Chung

of PSE to inform them that Major Energy would be terminating its supply agreement with PSE at

the end of the existing term.[113]  As Chung (a disinterested, former employee of PSE) testified,

when Gibson terminated Major Energy's relationship with PSE, Gibson stated that he had

previously said and done whatever was necessary to get the deal done at the time, including

---

[108] Opening Slide 50; Tr. 44:2-19.

[109] Tr. 648:6-649:22; Tr. 1134:6-11; Tr. 1502:3-16; Wiederman Witness Statement ¶¶ 23, 52, 113, 116; Horowitz Witness Statement ¶¶ 73, 127; Moeller Witness Statement ¶¶ 22, 26; Alper Witness Statement ¶ 99.

[110] PX-380 ("As discussed, we still think we can force their hand . . . .").

[111] Tr. 650:2-12.

[112] Tr. 650:2-18; Tr. 675:4-22; Tr. 1141:20-1142:9; Tr. 1146:25-1148:12; PX-219.

[113] PX-361; Tr. 1048:25-1049:12; Alper Witness Statement ¶¶ 118-122; Wiederman Witness Statement ¶¶ 115-116; Horowitz Witness Statement ¶¶ 129-130; Tr. 842:24-843:16; Tr. 1042:7-10; Tr. 1042:19-1043:2; Tr. 1148:21-1149:5; Tr. 1149:22-1151:25; Tr. 1567:9-1568:4.

misleading PSE to believe that NGE would extend the relationship when, in fact, it had no intention of doing so.[114]

Moreover, while Defendants assert that Kroeker honored his promise that Major Energy would "not be disadvantaged" if Spark replaced PSE as Major Energy's supplier,[115] the evidence adduced at trial shows otherwise. Major Energy was disadvantaged by having Spark take over for PSE as Major Energy's supplier, including because Spark provided Major Energy with significantly less visibility into gas pricing decisions as compared to PSE;[116] Spark, unlike PSE, was never able to break out its pricing analysis for Major Energy in a way that was helpful to Levi Moeller, Major Energy's Chief Operating Officer and Head of Supply;[117] Major Energy had a less favorable deal with Spark on hedging in comparison to its deal with PSE;[118] and Spark, unlike PSE, prevented Major Energy from entering into large aggregation deals.[119]

Defendants argue that the Sellers conceded that their "PSE negotiations failed,"[120] and point to a February 2017 email from Horowitz to that effect.[121] Defendants, however, ignore the reality that by the time Horowitz prepared that email, NGE and Spark already had destroyed the PSE relationship and it was not possible for Major Energy to repair it. Gibson had already informed PSE that Spark would be taking over the supply role in April 2016, and Kroeker had sent formal notices of termination to PSE on Major Energy's behalf in September 2016.[122] Defendants

---

[114] Tr. 1150:9-13.

[115] PX-470; Opening Slide 51; Tr. 44:20-45:3.

[116] *Compare* Moeller Witness Statement ¶ 100; Wiederman Witness Statement ¶ 197; DX-1018 at SPRK-NGE0023308, *with* Moeller Witness Statement ¶¶ 28-30, 99-101; Tr. 648:18-649:7; Tr. 1136:4-20.

[117] *Compare* Moeller Witness Statement ¶ 102, *with* Moeller Witness Statement ¶ 29.

[118] *Compare* Moeller Witness Statement ¶ 104; DX-1014 at SPRK-NGE0059117, *with* Moeller Witness Statement ¶ 31.

[119] *Compare* Wiederman Witness Statement ¶¶ 198-205; Moeller Witness Statement ¶¶ 112-117, *with* Moeller Witness Statement ¶¶ 32, 111; Alper Witness Statement ¶ 187; Tr. 648:18-649:7.

[120] Opening Slide 52.

[121] DX-483.

[122] PX-506; PX-361; Tr. 842:24-843:16; Tr. 1148:19-1149:5; Tr. 1149:22-1151:25.

also exaggerate Major Energy's cost savings, if any, with Spark as its supplier, using offers made by PSE well after NGE and Spark had already sabotaged Major Energy's relationship with PSE, rather than using the $0.85/MWh renewal offer made by PSE in March 2016 prior to NGE and Spark's interference.[123]

### C.    Spark's Restrictions on Aggregation Deals

As an initial matter, while Defendants assert that Major Energy had never completed an aggregation deal prior to closing the NGE deal,[124] Major Energy had pursued aggregation deals and completed a deal that was similar to an aggregation deal pre-closing.[125]  But even if Major Energy had never completed an aggregation deal prior to the sale to NGE, Section 2.7 required NGE (and later Spark) to operate Major Energy "consistently with how the Senior Management Team operated the Companies before the Closing *and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities*."[126] Accordingly, the Senior Management Team was to make the decisions on potential new aggregation deals, not Spark or Spark's Risk Committee.

Additionally, despite Defendants' contention that "it's really only one aggregation deal that we're talking about" in this case,[127] the evidence at trial established that Major Energy lost out on multiple aggregation deals because of the unilateral actions of Spark's Risk Committee.  Indeed, in May 2017, Spark's Risk Committee rejected an aggregation opportunity for 16,700 customers

---

[123] *Compare* PX-380, at PX-0380.0002 ("In order to make this a 'win-win' for Major, PSE would be willing to reduce our credit fee on the power sales from $1.00/MWhr to $0.85/MWhr effective upon closing of your sale."), *with* Opening Slide 53; DX-981 (January 31, 2017 PSE renewal offer for $2.50/MWhr); Tr. 45:4-25.
[124] Opening Slide 55; Tr. 46:25-47:4.
[125] Wiederman Witness Statement ¶ 199; Moeller Witness Statement ¶ 111; Horowitz Witness Statement ¶ 203; PX-12; Tr. 1275:7-14.
[126] DX-1, § 2.7 (emphasis added).
[127] Tr. 46:1-7.

in Illinois even though the Major Energy Senior Management Team determined that it was in the company's best interest to bid on that opportunity.[128]

In refusing to allow Major Energy to bid on the Illinois aggregation deal, Spark's Risk Committee also imposed a cap of 5,000 customers on all future aggregation opportunities.[129]  As a result of this cap, in August 2017, Major Energy was not permitted to bid on an additional aggregation opportunity presented by Alper for 7,000 customers.[130]  Spark's 5,000-customer cap also prevented Major Energy from bidding on additional aggregation opportunities that Alper intended to present to Major Energy,[131] especially because aggregation deals for fewer than 5,000 customers are rarely, if ever, available.[132]

Defendants' assertion that Moeller was not in favor of the Illinois aggregation deal[133] has no bearing on whether Spark breached Section 2.7 by unilaterally rejecting the Illinois aggregation deal and imposing a 5,000-customer cap on future aggregation opportunities.  Moeller is neither a Seller nor a member of the Senior Management Team authorized by Section 2.7 to decide whether or not to pursue an aggregation deal.[134]  The Senior Management Team was in favor of that deal and would have pursued it but for Spark preventing it from doing so.[135]

Not only did Section 2.7 require Spark to operate Major Energy in a manner that is consistent with "how the Senior Management Team suggests operating the Companies going

---

[128] Horowitz Witness Statement ¶¶ 204-05; Wiederman Witness Statement ¶¶ 203-05; Moeller Witness Statement ¶¶ 114-115; Tr. 1279:23-1280:5.
[129] PX-585; Moeller Witness Statement ¶ 114.
[130] PX-254, at PX-0254.0030-31; Alper Witness Statement ¶¶ 188-189; Moeller Witness Statement ¶ 117; Tr. 1280:21-1284:18.
[131] PX-254, at PX-0254.0031 ("As discussed, please see available approx. 7,000 aggregation customers. *They have a lot more and I think I can convince them to sell many more*.") (emphasis added).
[132] Wiederman Witness Statement ¶ 205; Moeller Witness Statement ¶ 116.
[133] Opening Slide 56; Tr. 46:13-24.
[134] DX-1, at SPRK-NGE0044913.
[135] Tr. 662:21-663:11; Tr. 1279:23-1280:9; Tr. 1306:16-24; Wiederman Witness Statement ¶ 204; Moeller Witness Statement ¶ 115.

forward to adapt to new opportunities," but it also required Spark to "*in good faith, consult in advance and collaborate with the Senior Management Team* in respect of any Buyer-proposed change or modification to the operations of any Company *which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies*."[136]   Nonetheless, the Spark Risk Committee rejected the Illinois aggregation opportunity and imposed the 5,000 customer cap without consulting in advance or collaborating with the Senior Management Team.[137]   Indeed, while Horowitz and Wiederman were the only ones who had final say in deciding whether Major Energy would bid on an aggregation deal prior to the sale to NGE,[138] as Kroeker testified, under Spark's control, Spark's Risk Committee had the final say on whether Major Energy could bid on aggregation deals.[139]

### D.   Key Major Energy Employees Depart the Company

Finally, with respect to Major Energy's employee departures, Spark claims there is "[n]o breach because (i) Alper was fired by Sellers, not by Spark Holdco, (ii) Wolbrom left for reasons admittedly untethered to Spark Holdco, and (iii) others who left or were terminated all reconvened at Alpha, which is Major Energy 2.0."[140]   With respect to Alper's termination, Spark has manufactured a breach that the Sellers have not alleged (that Alper's termination in April 2017 was a breach) as a strawman so that they have something to knock down in argument.   Sellers have never claimed that Alper's termination in April 2017 was a breach of contract.

Rather, the breach concerning Alper's, Sobel's, and Moeller's December 2016 terminations is the unauthorized Dropdown.   It is undisputed that these managers' decisions to terminate their

---

[136] DX-1, § 2.7 (emphasis added).
[137] Tr. 346:15-348:1; Tr. 1279:13-1280:15; Tr. 1306:25-1307:8.
[138] Tr. 1279:23-1280:9; Tr. 1306:16-24; Wiederman Witness Statement ¶ 204; Moeller Witness Statement ¶ 115.
[139] Tr. 346:19-22.
[140] Opening Slide 63.

employment contracts for cause were a source of unrest and business risk throughout the fall and winter of 2016 at Major Energy, and it was Defendants' unilateral action to consummate the Dropdown that triggered these employees' rights to terminate and receive severances.[141]   If Defendants had not proceeded with the unauthorized Dropdown in breach of the MIPA, Alper, Moeller, and Sobel would not have had the right to terminate their employment contracts.

Defendants also assert that Eliott Wolbrom, Major Energy's former Chief Marketing Officer, departed Major Energy because he did not trust Alper.[142]   As Wolbrom testified, however, in his mind, Alper and Spark were essentially one in the same following the Dropdown and at the time Wolbrom resigned.[143]   While Defendants heavily rely on an incomplete WhatsApp chain to decipher Wolbrom's state of mind when he left,[144] Wolbrom sent those messages after his departure and "was very frustrated when [he] left Major Energy due to Spark's involvement" because "Spark's involvement was largely executed by Dan.  Dan was the face of Spark to me in Major after the sale."[145]   And despite Defendants' assertion that others at Major Energy, including Nechemia Schorr and Esther Moeller, left to form "Major Energy 2.0" at Alpha Gas,[146] the evidence established that those employees left Major Energy as a result of Spark.[147]

## CONCLUSION

In light of the foregoing, Defendants' opening statement "roadmap" of the evidence leads to a series of wrong turns and dead ends.  Defendants' attempts to avoid their liability to the Sellers by relying on unsupported and illogical positions must be rejected.

---

[141] Tr. 339:8-11; Tr. 430:3-13; Horowitz Witness Statement ¶¶ 165-167.
[142] Opening Slide 60; Tr. 48:15-49:2.
[143] Tr. 736:18-22.
[144] *See* DX-813.
[145] Tr. 772:9-12; Wolbrom Witness Statement ¶¶ 82-83, 96.
[146] Opening Slide 61; Tr. 49:3-10.
[147] Wiederman Witness Statement ¶ 159; Moeller Witness Statement ¶¶ 76, 79-80.

Dated: April 17, 2020
New York, New York

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Richard T. Marooney
Ryan Gabay
Leah Aaronson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.: (212) 556-2114
idahan@kslaw.com
rmarooney@kslaw.com
rgabay@kslaw.com
laaronson@kslaw.com

Chelsea J. Corey
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Telephone No.: (704) 503-2575
ccorey@kslaw.com

Kevin J. O'Brien
Gilbert Oladeinbo
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone No: (404) 572-4600
kobrien@kslaw.com
goladeinbo@kslaw.com

*Counsel for Plaintiff*