**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SAUL HOROWITZ, as Sellers'
Representative,

                     Plaintiff,

       v.

NATIONAL GAS & ELECTRIC, LLC and
SPARK ENERGY, INC.,

                  Defendants.

Civ. No. 17-CV-7742 (JPO)

---

**PLAINTIFF'S PROPOSED**
**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Israel Dahan
Richard T. Marooney
Ryan Gabay
Leah Aaronson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.: (212) 556-2114
idahan@kslaw.com
rmarooney@kslaw.com
rgabay@kslaw.com
laaronson@kslaw.com

Chelsea J. Corey
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Telephone No.: (704) 503-2575
ccorey@kslaw.com

Kevin J. O'Brien
Gilbert Oladeinbo
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone No: (404) 572-4600
kobrien@KSLAW.com
goladeinbo@kslaw.com

*Counsel for Plaintiff*

Pursuant to Fed. R. Civ. P. 52, Plaintiff Saul Horowitz, as Sellers' Representative,[1] by and through his undersigned counsel, respectfully submits his Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.   Background

#### A.   Major Energy

1.     Plaintiff Saul Horowitz ("Horowitz") is the "Sellers' Representative" as defined in the Membership Interest Purchase Agreement ("MIPA") entered into by and among National Gas & Electric, LLC ("NGE"), Major Energy Services, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC (collectively, "Major Energy"), the Members of Major Energy, and Horowitz as Sellers' Representative, dated March 18, 2016.

2.     Major Energy was founded in 2005 as a private limited liability company.[2]

3.     Major Energy is an Energy Services Company ("ESCO") and supplies electricity, natural gas, and other related products and services to residential and commercial consumers located in a number of U.S. states.[3]

4.     In or around 2009, Major Energy hired Horowitz to start the electric business at Major Energy.[4]  Horowitz had founded Econnergy Energy Company (later renamed Gateway Energy) in 1997 and brought his years of experience in the deregulated energy market to Major

---

[1] The Sellers are the former owners of the membership interest in Major Energy: Plaintiff, Mark Wiederman, Asher Fried, Mark Josefovic, and Michael Bauman.
[2] PX-55 at 4, 6; Wiederman Witness Statement ¶ 7.
[3] PX-55 at 4; Wiederman Witness Statement ¶ 9.
[4] PX-55 at 8; Wiederman Witness Statement ¶ 14.

Energy.[5]  The founders of Major Energy viewed him as a pioneer in the industry who could help Major Energy grow.[6]

5.      Over the next few years, Major Energy made additional strategic hires to its management team including Eliott Wolbrom ("Wolbrom"), Chief Marketing Officer; David Sobel ("Sobel"), Chief Financial Officer; and Levi Moeller ("Moeller"), Chief Operating Officer.[7]

6.      In 2013, Major Energy distinguished itself in the ESCO market by forming a marketing partnership with Madison Square Garden, followed by similar partnerships with the New York Knicks, Rangers, and Yankees.[8]  These partnerships allowed Major Energy to grow its customer base and develop deeper relationships with its residential vendors and commercial brokers.[9]

7.      By 2016, Major Energy had a talented and experienced management team composed of Horowitz (Chairman), Dan Alper ("Alper") (Chief Executive Officer), Mark Wiederman ("Wiederman") (Founder and President), Moeller, Sobel, and Wolbrom, most of whom had been working together for many years.[10]  At this time Major Energy had about 35 employees who worked cohesively to produce strong economic results.[11]

---

[5] Horowitz Witness Statement ¶¶ 7-13.
[6] Wiederman Witness Statement ¶ 11; Alper Witness Statement ¶ 14.
[7] PX-55 at 8-9; Wiederman Witness Statement ¶¶ 13-15.
[8] Wiederman Witness Statement ¶¶ 30, 181; Wolbrom Witness Statement ¶¶ 46, 48-50.
[9] Wolbrom Witness Statement ¶¶ 49-56; Wiederman Witness Statement ¶¶ 30-31; Tr. 507:13-23; Tr. 656:18-24; Tr. 738:6-22; Tr. 793:25-796:21; Tr. 863:2-9; Tr. 1501:3-18.
[10] Wiederman Witness Statement ¶¶ 11-16.
[11] Horowitz Witness Statement ¶ 24; Wiederman Witness Statement ¶ 16.

8.     As a small, private ESCO, Major Energy had no board of directors, risk committee, or rigid governance structure.[12]  Decisions were made collaboratively among Major Energy's managers, which allowed them to adapt quickly to new challenges and opportunities.[13]

### B.     National Gas & Electric, LLC

9.     NGE is an operating ESCO founded in 2015 and wholly owned by William Keith Maxwell III ("Maxwell").[14]  NGE and Spark Energy, Inc. ("Spark") are commonly controlled by Maxwell.[15]  Prior to its acquisition of Major Energy, NGE was a competitor of Major Energy and Spark.[16]

10.     NGE is a private limited liability company.  As a private company, NGE is not subject to public company reporting requirements, including SOX compliance.[17]

11.     NGE was not simply a pass-through company formed for the sole purpose of purchasing companies that could later be resold to Spark.[18]

12.     Instead, in acquiring new businesses, NGE "may choose to retain all or a portion of these acquisitions for its own business, or it may operate the businesses it acquires for a period of time before offering them to [Spark]."[19]

### C.     Spark Energy, Inc. and Spark Holdco, LLC

13.     Spark was formed as a Delaware corporation in April 2014.[20]

---

[12] Trial Transcript ("Tr.") 662:5-18; Wiederman Witness Statement ¶ 18; Horowitz Witness Statement ¶¶ 21, 204.

[13] Horowitz Witness Statement ¶¶ 21, 204; Wiederman Witness Statement ¶ 18.

[14] PX-298 at PX-298.0007; PX-756 at PX-756.0003; Tr. 263:19-20.

[15] PX-756 at PX-756.0003, 0031.

[16] Tr. 263:19-25.

[17] Tr. 1318:22-1319:5; Moeller Witness Statement ¶ 65.

[18] *See* Defendants' Pretrial Memorandum of Law at 39; PX-298 at PX-0298.0008 ("[Spark's] Founder and his affiliates are under no obligation to offer [Spark] acquisition opportunities, and [Spark is] under no obligation to buy assets from them.").

[19] PX-756 at PX-756.0011; Tr. 264:1-9.

[20] PX-298 at PX-298.0007.

14.     On August 1, 2014, Spark completed its initial public offering.[21]   Spark's controlling shareholder is Maxwell.[22]

15.     Spark is the sole managing member of Spark Holdco, LLC ("Spark Holdco").[23]

16.     Spark has full and complete charge of all the affairs of Spark Holdco, and the management and control of Spark Holdco's business activities and operations rest exclusively with Spark.[24]   Spark makes all decisions regarding the business, activities and operations of Spark Holdco in its sole discretion without the consent of any other member.[25]

17.     Members other than Spark are not permitted to participate in the control, management, direction or operation of the activities or affairs of Spark Holdco and have no power to act for or bind Spark Holdco.[26]

18.     From August 2014 until March 12, 2020, Nathan Kroeker ("Kroeker") served as Chief Executive Officer of Spark.[27]   Maxwell replaced Kroeker as the interim CEO of Spark on March 12, 2020, the day that trial of this action concluded.[28]

## II.     Negotiations among NGE and the Sellers for the Sale of Major Energy

### A.     Major Energy's Financial Performance Before the Sale to NGE

19.     Prior to its sale to NGE, Major Energy distinguished itself from competitors based on three things: (1) its management team and employees, (2) its Energy Management System ("EMS")—a transaction management billing system built in-house from the ground up after

---

[21] PX-298 at PX-0298.0007.

[22] PX-756 at PX-0756.0003; Maxwell Witness Statement ¶ 12.

[23] PX-251 at PX-0251.0023; Tr. 261:5-7; Maxwell Witness Statement ¶ 8.

[24] PX-251 at PX-0251.0023; Tr. 261:10-17.

[25] PX-251 at PX-0251.0023; Tr. 261:18-262:4.

[26] PX-251 at PX-0251.0023; Tr. 262:5-11.

[27] Kroeker Witness Statement ¶ 10.

[28] Spark Energy, Inc. Form 8-K, filed March 19, 2020, *available at* https://www.sec.gov/Archives/edgar/data/1606268/000160626820000015/a8-kxmgmtchanges.htm.   SEC filings may be judicially noticed at any stage of a proceeding, including as late as on appeal.   *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *U.S. v. Davis*, 726 F.3d 357, 368 (2d Cir. 2013).

years of work, and (3) its relationships with its energy supplier, residential marketing vendors, and commercial brokers, which were key to Major Energy's customer account and earnings growth.[29]

20.     All the foregoing allowed the company to grow its business aggressively and profitably.  Specifically, Major Energy's annual revenues increased from approximately $13.8 million in 2008 to over $189 million in 2015.[30]  Similarly, Adjusted EBITDA increased from approximately $389,000 in 2008 to over $23 million in 2015;[31] and customer accounts increased from approximately 12,000 in 2008 to over 151,000 in 2015.[32]

21.     PricewaterhouseCoopers was Major Energy's auditor prior to the sale and issued unqualified audit opinions every year prior to the sale to NGE.[33]

22.     Major Energy's customer accounts declined during the 2014 and 2015 period as a result of the polar vortex in late 2013 and early 2014 that impacted the entire ESCO industry.[34]

23.     The polar vortex caused many ESCOs with a large number of fixed-rate contracts that were not properly hedged to incur large losses, and many went out of business.[35]

24.     Major Energy, on the other hand, survived this polar vortex and emerged from it well positioned for success.  The decline in customer accounts from 2014-2015 was temporary, and by the end of 2015 Major Energy was once again increasing its customer accounts.[36]

---

[29] Wiederman Witness Statement ¶¶ 17-32.

[30] *See generally* PX-730, PX-7; PX-9; PX-8; PX-2; PX-11; PX-24; PX-49.

[31] PX-377A (showing Adjusted EBITDA of more than $23.5 million for 2015 in "Annual Summary" tab); *see also generally* PX-730, PX-7; PX-9; PX-8; PX-2; PX-11; PX-24; PX-49.

[32] Leathers Witness Statement ¶ 221.

[33] Tr. 1335:18-1336:5; PX-2; PX-7; PX-8; PX-9; PX-11; PX-24; PX-49.

[34] PX-55 at 22-23  In 2013/2014, a large portion of North America experienced a polar vortex (a large area of low pressure and cold air surrounding the North and South Poles), in which temperatures dropped to record lows, resulting in significant increases in customer demand for gas and electricity, and significant percentage increases in commodity prices and customers' bills—especially customers with variable-rate contracts.  PX-753, ¶ 16 (citing PX-233; PX-234); PX-55 at 22; Wiederman Witness Statement ¶ 19.

[35] PX-753, ¶ 17 (citing PX-237); PX-55 at 22-23; Tr. 517:19-24; Tr. 691:10-11.

25.     Major Energy was able to weather the polar vortex in part because it quickly pivoted to place customers on fixed-rate plans instead of variable-rate plans to insulate customers from price swings.[37]   Major Energy benefited from this adjustment because a customer on a fixed-rate plan is less likely to leave, which allowed Major Energy to better manage its customer churn and increase its long-term profitability.[38]

26.     Further, Major Energy's marketing partnerships with Madison Square Garden, the New York Yankees and other key brands were effective in helping Major Energy acquire and retain commercial customers after the polar vortex.[39]

27.     A common measure for the size of an ESCO's electricity business is a residential customer equivalent ("RCE.").[40]   An RCE is unit of measurement equivalent to 1,000 Therms of natural gas on an annual basis or 10 MWh (or 10,000 kWh) of electricity on an annual basis, which represents the approximate amount of gas and electricity used by a standard home.[41]   One commercial customer (*e.g.*, a commercial office building) typically requires electricity equivalent of multiple residential customers.[42]   From 2013-2015, Major Energy increased its RCEs even though its overall customer account number dropped in 2015 because it was attracting and retaining more commercial customers.[43]

28.     Specifically, a 2014 Major Energy Management Presentation indicated that commercial customers comprised 5.8% of Major Energy's electric accounts and 51.3% of Major

---

[36] PX-377A ("Annual Summary" tab).
[37] PX-55 at 22; Wiederman Witness Statement ¶ 19.
[38] Tr. 519:22-520:10; Tr. 1295:7-1296:5.
[39] DX-213 at SPRK-NGE0014489-90; Wolbrom Witness Statement ¶ 50; Tr. 740:1-24.
[40] Wiederman Witness Statement ¶ 28; Kroeker Witness Statement ¶ 37.
[41] Tr. 859:13-16; Tr. 1498:15-24; Wiederman Witness Statement ¶ 28; Kroeker Witness Statement ¶ 37.
[42] Tr. 1498:15-24; Wiederman Witness Statement ¶ 28.
[43] Tr. 740:1-24; PX-414 at PX-414.0003; PX-359 at PX-359.0006.

Energy's electric RCEs.[44]  This presentation also indicated that Major Energy worked with 182 agents and brokers, 115 of which brought in accounts in 2014.[45]

29.    In comparison, Major Energy's January 2016 Management Presentation provided to NGE when NGE was conducting due diligence on Major Energy indicated that commercial customers comprised 10.7% of Major Energy's electric accounts and 52.8% of Major Energy's electric RCEs.[46]  In addition, this presentation indicated that Major Energy worked with 215 agents and brokers who brought in accounts in 2015 and that "Major's Recent Focus has been Growing Commercial Electric."[47]

30.    The owners of Major Energy were looking to sell the company in 2014 and the first part of 2015 and retained Cliff Adams ("Adams") of Coady Diemar to assist in the sale process.[48]  That changed, however, by the summer of 2015.[49]  By the summer of 2015, Major Energy's managers had changed their mind about selling Major Energy and were confident in Major Energy's future based on its current and future growth trajectory, its customer base, and high-profile marketing partnerships.[50]

31.    As noted above, Horowitz was brought in by the founders of Major Energy for his experience in the ESCO industry, his contacts, and his knowledge of how to grow an ESCO.[51] However, in mid-2015, Horowitz stepped back from his role as CEO because Major Energy was focused on growth and management and he felt a CEO who is the "consummate dealmaker" was

---

[44] PX-414 at PX-414.0016.
[45] PX-414 at PX-414.0030.
[46] PX-359 at PX-359.0018.
[47] PX-359 at PX-359.0021, PX-359.0032.
[48] Wiederman Witness Statement ¶ 33; Horowitz Witness Statement ¶ 33.
[49] Alper Witness Statement ¶ 24; Horowitz Witness Statement ¶ 46.
[50] Horowitz Witness Statement ¶¶ 29, 46; *see also* Alper Witness Statement ¶ 24.
[51] Tr. 1496:19-1497:1.

more appropriate to pursue branding deals or other partnerships.[52]  Dan Alper was hired to fill that role.[53]

32.     In mid-2015, before he became CEO of Major Energy, Alper explored acquiring a portion of Major Energy for his own account.[54]  Alper offered to buy a portion of Major Energy because "the way that they recovered in the polar vortex was impressive.  They acted quickly, decisively, and [were] able to a mitigate a lot of the effects that [Alper] had seen in other companies."[55]  Alper further explained that Major Energy had a team that was "cohesive" and that could benefit from new leadership to take Major Energy's "business to the next level."[56]

33.     The company moved forward with Alper as its new CEO to lead Major Energy's growth efforts, and Horowitz took the title of Chairman.[57]  When Alper came on board at Major Energy, he was focused on building the business for the next 12 to 18 months.[58]

34.     Major Energy's growth continued into 2016 and the months leading up to the closing with NGE.  Specifically, Major Energy experienced strong month-to-month growth in residential customer accounts from January through April 2016.[59]

35.     Residential customer growth in the month of April 2016 alone, the month the deal closed with NGE, was greater than the combined residential customer growth during the entire

---

[52] Tr. 1499:11-13.
[53] Tr. 1498:25-1499:20.
[54] Alper Witness Statement ¶ 8; Tr. 1551:16-1552:19.
[55] Tr. 1552:7-10.
[56] Tr. 1552:11-15.
[57] Alper Witness Statement ¶ 10; Horowitz Witness Statement ¶ 28.
[58] Alper Witness Statement ¶ 24; Tr. 1551:23-1553:14.
[59] Leathers Witness Statement ¶ 225; Tr. 117:11-13; Tr. 127:19-22.

last quarter of 2015.[60]  Major Energy's commercial customer accounts had similar strong growth prior to the sale to NGE.[61]

36.     At trial, Gary Lancaster ("Lancaster"), NGE's General Counsel and the primary negotiator of the acquisition, repeatedly characterized Major Energy's financial performance in the first quarter of 2016 as "robust."[62]  And it was.  In addition to significant growth in customer accounts, Major Energy generated adjusted EBITDA for the first quarter of 2016 of approximately $7 million.[63]

**B.     Major Energy's Initial Negotiations with NGE**

37.     In the fall of 2015 Alper informed Major Energy's investment banker, Adams of Coady Diemar, that Major Energy planned to terminate his monthly retainer because it had decided to focus on growing the business instead of selling the company.[64]

38.     Adams understood, but he asked Alper to take one meeting with representatives from NGE who expressed interest in a possible purchase of Major Energy.[65]

39.     NGE was interested in an acquisition of Major Energy at the time because it had independently determined that "the new growth initiatives at the Major Energy Companies had significantly increased the long-term value of the Major Energy Companies."[66]

40.     In early November 2015, Horowitz, Alper, and Wiederman met with Maxwell, Dave Hennekes ("Hennekes"), and Paul Konikowski ("Konikowski") of NGE.[67]  No employee or executive from Spark attended that meeting.[68]

---

[60] Leathers Witness Statement ¶¶ 225-226.
[61] Leathers Witness Statement ¶ 227.
[62] Tr. 117:9-13; Tr. 127:19-22; Tr. 199:9-17; Tr. 127:15-18 (indicating that Major Energy was tracking ahead of projections).
[63] PX-528 at PX-528.0004.
[64] Alper Witness Statement ¶ 24; Tr. 1553:15-25.
[65] Alper Witness Statement ¶ 25; Tr. 1553:15-1554:9.
[66] PX-756 at PX-076.0012.

41.     This meeting ultimately led to a purchase offer by NGE in January 2016 in the amount of $80 million, comprised of $60 million cash at closing and $20 million in a two-year earnout subject to Major Energy hitting certain agreed-upon customer account and adjusted EBITDA performance targets.[69]

42.     The parties then began drafting the sale documentation, including the MIPA, the only agreement that controlled the actual sale of Major Energy to NGE and governed which entity owned Major Energy post-sale.[70]

43.     The negotiators of the transaction on NGE's behalf were Lancaster, Hennekes, and Konikowski.[71]   The negotiators of the transaction on the Sellers' behalf were Horowitz, Wiederman, Alper, and Larry Studnicky ("Studnicky"), Sellers' deal counsel.[72]   No one from Spark was involved in the negotiation of NGE's acquisition of Major Energy.[73]

44.     NGE conducted due diligence, and the parties met with NGE's investment banker Stifel on February 4, 2016.[74]   The purpose of the meeting was to provide Stifel with financial

---

[67] Horowitz Witness Statement ¶ 44; Wiederman Witness Statement ¶ 36; Alper Witness Statement ¶ 25; Tr. 1505:10-17.

[68] Horowitz Witness Statement ¶ 44; Wiederman Witness Statement ¶ 36; Alper Witness Statement ¶ 25; Tr. 1505:23-24.

[69] PX-69; Tr. 53:5-11; Tr. 1503:25-1504:17. This offer price was consistent with the four times Adjusted EBITDA multiple the Sellers expressed to NGE that they were looking for in a purchase price.  Horowitz Witness Statement ¶¶ 35, 53.  Notably, Nathan Kroeker, the CEO of Spark, recently commented on M&A activity in the industry and agreed that a 5 or 6 times EBITDA multiple is a reasonable acquisition purchase price indicating that the market for ESCOs has become even more favorable than when the parties completed the transaction in this case.  *See* PX-729 at PX-0729.0008.

[70] Alper Witness Statement ¶ 31; Tr. 1514:8-11; DX-2, § 2.1.

[71] Alper Witness Statement ¶ 54; Horowitz Witness Statement ¶ 44; Wiederman Witness Statement ¶¶ 36, 62; Tr. 66:2-10.

[72] Alper Witness Statement ¶¶ 54-55; Horowitz Witness Statement ¶ 101; Wiederman Witness Statement ¶¶ 46, 61, 71-72; Tr. 1415:3-1416:2.

[73] Alper Witness Statement ¶ 54; Kroeker Witness Statement ¶¶ 61, 63; Tr. 264:12-265:10; Tr. 276:7-9; Tr. 1314:24-1315:4; Tr. 1505:10-1506:2.

[74] Wiederman Witness Statement ¶¶ 40-41; Alper Witness Statement ¶¶ 32-34; Moeller Witness Statement ¶¶ 36-37; Horowitz Witness Statement ¶ 49; Tr. 1555:4-1556:22; PX-27.

information about Major Energy for the purpose of NGE potentially obtaining financing for the acquisition of Major Energy.[75]

45.     For the meeting with Stifel, NGE executives requested that Major Energy prepare a presentation with slightly higher Adjusted EBITDA and Customer Account projections than the parties had been using for the purpose of negotiating the transaction agreements.[76]   Major Energy complied, and its presentation to Stifel was well received by Stifel.[77]   No Spark employees were present at the meeting with Stifel.[78]

46.     Despite these slightly higher projections, Major Energy management believed the projections provided to Stifel were achievable.[79]

47.     At no point during the Stifel presentation did either Stifel or NGE question the reasonableness or achievability of the proposed projections.[80]   Likewise, at no point prior to closing did NGE question the reasonableness or achievability of any of the projections provided by Major Energy, including the final agreed-upon projections.[81]

### C.     Passage of the Resetting Order and Restructuring of the Deal

48.     In late February 2016, during the negotiations of the MIPA, the New York State Public Service Commission ("NY PSC") issued a proposed "Resetting Order" that, if passed, would have limited the types of competitive products that ESCOs could offer in New York.[82]

---

[75] Tr. 1555:4-13; Wiederman Witness Statement ¶ 46; Alper Witness Statement ¶¶ 32-34; Horowitz Witness Statement ¶ 56.

[76] Tr. 1555:4-1556:22; Alper Witness Statement ¶¶ 36-40; Wiederman Witness Statement ¶ 57.

[77] Alper Witness Statement ¶¶ 41-42; Wiederman Witness Statement ¶ 59; PX-46; Tr. 1557:12-24.

[78] Alper Witness Statement ¶ 41; Tr. 80:22-81:2.

[79] Alper Witness Statement ¶ 40; Tr. 1556:15-22.

[80] Wiederman Witness Statement ¶ 59; Alper Witness Statement ¶ 41-42; Tr. 1555:4-1557:24; PX-46.

[81] Alper Witness Statement 42; Tr. 1556:23-1557:6.

[82] Horowitz Witness Statement ¶ 79; Alper Witness Statement ¶ 46; Wiederman Witness Statement ¶ 60; Tr. 53:12-14.

49.     The Resetting Order, which was immediately stayed and then vacated,[83] created regulatory and financial risk for Major Energy in New York.[84]  As a result, NGE withdrew the initial agreed-upon terms and began renegotiating new deal terms.[85]

50.     NGE expressed a desire to keep the total $80 million purchase price in place, but it requested that both parties share the risk that had been created by the proposed Resetting Order.[86]

51.     To this end, NGE proposed certain deal changes, including increasing the deferred payment amount from $20 million to $35 million (in the form of a $15 million cash installment paid out over three years), and an extension of the earnout period through the end of 2018 (*i.e.*, 33 total months).[87]

52.     On March 11, 2016, NGE made a final offer to purchase the Sellers' 100% membership interest in Major Energy for a total purchase price of $80 million to be paid as follows: $45 million in cash at closing (less $5 million for litigation credit); $15 million in cash installments to be paid over three years, subject to achieving certain Adjusted EBITDA targets (the "Cash Installments"); and $20 million in an earnout to be paid over 33 months (the "Earnout Period"), subject to achieving certain Adjusted EBITDA and Customer Accounts targets (the "Earnout Payments," together with the Cash Installments, the "Contingent Payments").[88]

---

[83] PX-298 at PX-298.0023-24; Wiederman Witness Statement ¶ 60; Alper Witness Statement ¶ 46; Tr. 54:6-17; Tr. 199:3-10; Tr. 297:25-298:12; Tr. 1557:25-1559:13.

[84] Wiederman Witness Statement ¶ 60; PX-104.

[85] Wiederman Witness Statement ¶ 60; Alper Witness Statement ¶ 47; PX-104.

[86] PX-104; Wiederman Witness Statement ¶ 62; Alper Witness Statement ¶¶ 48-50; Tr. 53:24-54:5.

[87] Wiederman Witness Statement ¶ 64; PX-104; Tr. 53:15-23.

[88] PX-106; Alper Witness Statement ¶ 51; Wiederman Witness Statement ¶ 65; Tr. 817:1-24; Tr. 1510:4-11.

53.     On March 14, 2016, Wiederman accepted NGE's offer on behalf of the Sellers, and the parties proceeded to finalize the acquisition documents.[89]

54.     Despite the increased Earnout Period and contingent portion of the purchase price, the Sellers remained confident that they would achieve the full purchase price of $80 million if Major Energy's existing management team was allowed to continue running Major Energy the way it had been operated prior to the sale.[90]

55.     After the Sellers accepted NGE's offer, the parties continued to negotiate and finalize the terms of the MIPA and also began negotiating the terms of the Earnout Agreement, Executive Earnout Agreement, new employment agreements for Major Energy's senior managers, and other related agreements.[91]

56.     All of the negotiations of these agreements were between representatives of NGE, the Sellers, and Major Energy—no employee of Spark was involved in the negotiations of these agreements.[92]

### D.     Relevant Terms of the MIPA

57.     The MIPA was negotiated for several weeks and became the first agreement executed between the Sellers and NGE on March 18, 2016.[93]   The MIPA governed the sale of the Sellers' collective 100% membership interest in Major Energy and what entity will be the future owner of Major Energy.[94]   NGE is identified as the "Buyer" and future owner of Major

---

[89] PX-106; Wiederman Witness Statement ¶ 66.
[90] Tr. 549:7-20.
[91] Alper Witness Statement ¶¶ 53-55, 63, 74; Wiederman Witness Statement ¶¶ 67-68, 80; Horowitz Witness Statement ¶¶ 114-115.
[92] Alper Witness Statement ¶ 54; Tr. 264:12-265:10, Tr. 276:7-9; Tr. 1314:24-1315:4.
[93] PX-632; Wiederman Witness Statement ¶ 68.
[94] PX-632, § 2.1; Tr. 473:4-12; Tr. 1514:8-11.

Energy under the MIPA.[95]   Similar to Major Energy, NGE was a private limited liability company at the time of sale—a fact that NGE represented and warranted in the MIPA.[96]

58.    The MIPA sets forth the purchase price for Major Energy.[97]   The purchase price was comprised of $45 million in cash, less a "Litigation Credit" of $5 million, plus three annual Cash Installments of $5 million, plus the working capital of Major Energy, net of a $2.225 escrow amount.[98]   In addition to this, Section 2.2(c) provides that "Sellers shall be entitled to receive (subject to the Target Year Earnout Ceiling and the Aggregate Earnout Ceiling), the applicable Earnout Percentage of the Adjusted EBITDA (the 'Earnout') earned by the Companies, on a consolidated basis, for each Target Year (as defined in the below-referenced Earnout Agreement)."[99]

59.    Under Section 2.2(a) of the MIPA, annual Cash Installments of $5 million were payable on or before March 31 of 2017, 2018, and 2019, and subject to the following potential reductions (and potential make-up payments):

- If the Adjusted EBITDA for the Target Year exceeds $20 million, but is less than the Adjusted EBITDA Plan, then the Cash Installments shall be multiplied by the ratio of the Adjusted EBITDA and Adjusted EBITDA Plan for the Target Year; and

- If the Adjusted EBITDA for such Target Year is less than $20 million, then the Cash Installment shall be "further reduced" on a dollar-for-dollar basis for every dollar less than $20 million.[100]

60.    In Section 6.3 of the MIPA, NGE represented and warranted that it was "acquiring the [membership interest] solely for its own account for investment purposes and not with a view to, or for the offer or sale in connection with, any distribution thereof."[101]

---

[95] PX-632, § 6.1; Tr. 1514:19-20.
[96] PX-632, § 6.1.
[97] PX-632, § 2.2.
[98] PX-632, § 2.2(a).
[99] PX-632, § 2.2(c).
[100] PX-632, § 2.2(a).

61.     Consistent with this representation, the MIPA contains a non-assignment provision in Section 11.7 that provides, in relevant part, as follows:

> No assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly . . ., without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void.[102]

62.     Lancaster reviewed and commented on Section 11.7 before execution and did not modify the non-assignment language in this provision.[103]

63.     Sections 6.3 and 11.7 were consistent with the representations NGE made during the negotiations that NGE wanted to keep Major Energy "away as long as possible from the Spark vortex," a term Hennekes and Konikowski of NGE used to describe Spark's negative corporate culture.[104]

64.     NGE's continued ownership was a premise of the deal and Lancaster "would tell us on a regular basis, you know, you guys have something that's different" and "let's try to keep it unbroken from being – or rather not ripped apart in the Spark vortex."[105]

65.     Sections 6.3 and 11.7 also were consistent with the Sellers' view of the transaction.   Alper testified that "we were always concerned, especially in light of all the information that NG&E gave us about how dysfunctional Spark was, that we didn't want to be part of it. . . . So I know that the Sellers and myself were very concerned about really being left alone and not being pulled into this."[106]

---

[101] PX-632, § 6.3.
[102] PX-632, § 11.7.
[103] DX-229 at CDP00003577; *see, e.g.*, Konikowski Witness Statement ¶ 59; Tr. 1514:21-1515:5.
[104] Tr. 1554:10-1555:3; Alper Witness Statement ¶¶ 57, 131.
[105] Tr. 1554:10-1555:3; 1560:6-1561:13.
[106] Tr. 1562:4-21.

66.     In addition to these provisions governing ownership, purchase price, and transfer of ownership, the MIPA includes a general non-waiver provision that provides in relevant part:

> No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.[107]

### E.     Relevant Terms of the Earnout Agreement and Executive Earnout Agreement

67.     In addition to the MIPA, NGE and the Sellers also entered into an Earnout Agreement and Executive Earnout Agreement.[108]

68.     The Earnout Agreement set forth the terms under which Major Energy was to be operated, at least during the Earnout Period.[109]   The Earnout Agreement did not discuss or concern the ownership of Major Energy during the Earnout Period.   That issue was governed solely by the MIPA.

69.     The Executive Earnout Agreement also sets forth how Major Energy was to be operated subsequent to the sale, and the terms under which certain Major Energy managers could participate in the upside if Major Energy achieved and exceeded the Adjusted EBITDA and Customer Account targets set forth in the Earnout Agreement.[110]

70.     The parties executed the Executive Earnout Agreement in anticipation that Major Energy would perform even better than projected.[111]

---

[107] PX-632, § 11.4.
[108] PX-634; PX-658.
[109] PX-634, § 2.7.
[110] PX-658.
[111] Tr. 60:9-15; Tr. 1290:23-1291:7; Tr. 1512:12-22; Wiederman Witness Statement ¶ 79; Alper Witness Statement ¶ 81.

71.     Unlike the MIPA, which could not be assigned without the written consent of the Sellers, NGE was free to assign the Earnout Agreement to any affiliate without the written consent of the Sellers.[112]

            i.     Section 2.7

72.     Because a significant portion of the purchase price was dependent on the future performance of Major Energy during the Earnout Period, the Sellers bargained for the right that Major Energy be allowed to continue to operate as it had in the past and under the direction of the existing Major Energy Senior Management Team.[113]  "Senior Management Team" is defined in the Earnout Agreement as Horowitz, Wiederman, and Alper.[114]

73.     In particular, it was imperative to the Sellers that all material decisions made with respect to the operations of Major Energy during the Earnout Period be consistent with how the Senior Management Team operated pre-closing and how they suggested operating Major Energy going forward to address new business opportunities; that NGE consult in advance and collaborate with the Senior Management Team with respect to any proposed change or modification to the operations of any company; and that NGE not take or permit another to take any actions that would be reasonably likely to have the effect of avoiding or reducing the Contingent Payments to the Sellers.[115]

---

[112] PX-634, § 3.1.

[113] Alper Witness Statement ¶¶ 55, 60, 64, 66; Wiederman Witness Statement ¶¶ 75, 76, 82, 92; Horowitz Witness Statement ¶¶ 94, 97, 98; PX-634; PX-658.

[114] PX-634, § 1.1.

[115] Alper Witness Statement ¶¶ 55, 64, 66; Wiederman Witness Statement ¶¶ 76, 82, 92; Horowitz Witness Statement ¶ 103; Tr. 1515:6-1517:3.

74.    To achieve these important protections, the Sellers negotiated for the inclusion of the language set forth in Section 2.7 of the Earnout Agreement and Executive Earnout Agreement.[116]

75.    NGE initially proposed an entirely different version of Section 2.7 that was rejected by the Sellers.[117]

76.    Specifically, NGE's original draft of Section 2.7 had "Disclaimers as to Operation of Business" and provided that:

> Each of the Sellers acknowledges that (i) upon Closing of the Transactions contemplated by the Purchase Agreement and, except as expressly provided to the contrary in this agreement, Buyer has the right to operate the Business of the Companies and Buyer's other businesses in any way that Buyer deems appropriate in Buyer's sole business discretion; (ii) Buyer has no obligation to operate the Companies in order to achieve any targeted Earnout Pool nor to maximize the amount of any Earnout Pool in a given Target Year . . . .[118]

Moreover, NGE's draft Section 2.7 disclaimed any duty of good faith and fair dealing.[119]

77.    In contrast, the final, agreed-upon version of Section 2.7 of the Earnout Agreement provides that, although NGE has "the discretion to operate" Major Energy as it "deems appropriate" during the Earnout Period, such operation is subject to the following important restrictions:

> [NGE] agrees, for the benefit of the Sellers, that: (i) [NGE] has a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities; (ii) [NGE] accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies

---

[116] PX-634, § 2.7; PX-658, § 2.7.
[117] PX-107 at PX-107.0127-128; PX-392; PX-111; Tr. 57:22-58:2.
[118] PX-107 at PX-107.0127-128.
[119] PX-107 at PX-107.0127-128.

before the Closing or proposes to operate the Companies; and (iii) [NGE] shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to the Sellers hereunder. In furtherance of the foregoing (and not by way of limitation), [NGE] during the Target Years shall not unilaterally, directly or indirectly, and whether in one transaction or series of related transactions of any kind, make fundamental changes to the operating overhead or otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party.[120]

78.     Section 2.7 of the Executive Earnout Agreement is similar but adds that during the Earnout Period:

[T]he day-to-day management of the operations of [Major Energy] are delegated to the Senior Management Team which shall be vested with all general and specific rights and powers required for or appropriate to the management of the business of [Major Energy] under law and under the Operating Agreement of [Major Energy].[121]

ii.     Section 2.2 and Exhibit B

79.     Section 2.2 provides terms for calculating the Earnout Payment under the Earnout Agreement.[122]

80.     Earnout Percentages are defined in the Earnout Agreement as 27.27%, 36.36%, and 36.36% for 2016, 2017, and 2018, respectively, with each year representing the proportionate share of a consecutive 33-month period of 9 months, 12 months, and 12 months, respectively.[123]

81.     The Earnout Percentage for 2016 of approximately 27.27% is equivalent to 9/33, or 9 months of the 33-month Earnout Period, to account for the exclusion of the first quarter of

---

[120] PX-634, § 2.7.
[121] PX-658, § 2.7 (emphasis added).
[122] Tr. 169:5-10.
[123] PX-634, § 1.1.

2016, while the Earnout Percentage for 2017 and 2018 is equivalent to 12/33, for a full 12 months of the Earnout Period.[124]

82.    In addition, if the Year End Customer Accounts for any Target Year fell below the agreed-upon Customer Account Targets for a Target Year, then the Earnout Payment would be reduced by the difference between the projected Year End Customer Accounts and the actual Target Year End Customer Accounts multiplied by the projected Adjusted EBITDA per customer (the "Customer Account Adjustment" or "CAA").[125]

83.    The Adjusted EBITDA Plan for each year as defined in the Earnout Agreement was $20,749,213 for 2016; $25,003,343 for 2017; and $27,831,052 for 2018.[126]   There is no dispute that these Adjusted EBITDA Plan targets are all 12-month figures.[127]

84.    The Year End Customer Accounts for each year as defined in the Earnout Agreement were 178,031 for 2016; 209,909 for 2017; and 231,919 for 2018.[128]

85.    Wiederman, Lancaster, and Hennekes were the primary negotiators of the Contingent Payment formulas under the MIPA and Earnout Agreement.[129]

86.    Because the formulas for calculating the Cash Installment and Earnout Payments are more easily understood by setting them forth in an Excel spreadsheet rather than trying to use words to explain them, between March 11, 2016 and March 18, 2016, Wiederman, Lancaster,

---

[124] Leathers Witness Statement ¶ 34.  At trial, Lancaster confirmed that the Earnout Percentages in the Earnout Agreement reflect the proportionate share of the months within each Target Year compared to the months in the entire Earnout Period—9 months for 2016 and 12 months apiece for 2017 and 2018.  Tr. 107:6-14.  Similarly, Lancaster admitted that the Earnout Payment Ceiling of $5.45 million for 2016 is a lower ceiling than is used for 2017 and 2018 because the first quarter of 2016 is excluded.  Tr. 153:10-13.
[125] PX-634, § 2.2(d).
[126] PX-634, § 1.1; Leathers Witness Statement ¶ 15, Table 1.
[127] Tr. 112:11-14, 114:13-21; 115:12-20; Wiederman Witness Statement ¶¶ 70, 72, 238; Lancaster Witness Statement ¶¶ 36-40; Horowitz Witness Statement ¶ 110; PX-377A.
[128] PX-634, § 2.2(d); Leathers Witness Statement ¶ 15, Table 1.
[129] Tr. 1421:3-6; Wiederman Witness Statement ¶¶ 71-72.

and Hennekes created an Excel spreadsheet to demonstrate how the agreed-upon calculations of the Cash Installment and Earnout Payment calculation would work.[130]

87.     On March 11, 2016, Wiederman emailed Lancaster, Hennekes, Konikowski, Alper, and Horowitz in response to a call the parties had to discuss the calculation of the Contingent Payments and attached a spreadsheet calculating the Earnout Payment.[131]  Lancaster responded in general agreement with the spreadsheet calculation.[132]  Wiederman responded with an updated spreadsheet calculation that included a calculation of Cash Installments.[133]

88.     In response to Wiederman's email, on March 11, 2016, Hennekes sent Wiederman and others an email summarizing NGE's "FINAL OFFER" and attaching a spreadsheet.[134]  Hennekes wrote: "We evaluated your revised proposal and reviewed the deal status with Keith [Maxwell]. We can accept your modifications with one change, as reflected in the attached sheet, which Gary modified your spreadsheet (see rows 52-82)."[135]

89.     The only change NGE made to the Excel spreadsheet that Wiederman had sent to NGE was to rows 52-82.  Rows 52-82 were placed within a gray box and a written description was included in column L.  Neither the formulas, the figures, nor the substantive calculations contained in the Excel spreadsheet that Wiederman had sent to NGE were changed.[136]  That attached spreadsheet became Exhibit B to the Earnout Agreement.[137]

90.     In this spreadsheet, as in Exhibit B, rows 52-82 display a number of achievement scenarios.  For example, row 59 displays a 2016 achievement of 95% of the Adjusted EBITDA

---

[130] Tr. 123:9-20.
[131] PX-736; Wiederman Rebuttal Statement ¶ 3.
[132] PX-584; Wiederman Rebuttal Statement ¶ 4.
[133] PX-584; Wiederman Rebuttal Statement ¶ 5.
[134] PX-105; Wiederman Rebuttal Statement ¶ 6.
[135] PX-105.
[136] Wiederman Rebuttal Statement ¶ 7.
[137] Wiederman Rebuttal Statement ¶¶ 8-10.  *Compare* PX-105A *with* PX-634 and PX-658.

Plan, or 5% under target.  Accordingly, in cell G59, the Adjusted EBITDA Plan for 2016 of $20,749,213 is multiplied by 95% to arrive at $19,711,752.  That figure is then multiplied by 9/33, which is the Earnout Percentage for 2016, to arrive at an Earnout Payment of $5,375,932.  In this achievement scenario, because the 2016 Earnout Ceiling of $5,454,545 had not been achieved, there is no Executive Earnout Payment to the managers.[138]

91.    Wiederman focused his "efforts on creating an excel spreadsheet with embedded formulas that could be used to calculate the potential Contingent Payments" and he "spent significant time and effort honing [a] Contingent Payment model spreadsheet" and "going over this spreadsheet in Houston with Gary Lancaster and Dave Hennekes."[139]

92.    Wiederman testified that "[t]his spreadsheet calculation was the driving force behind the [Earnout] agreement, and it was very important to me that it was right.  I specifically remember requesting that this analysis be an exhibit to the Earnout Agreement and Executive Earnout Agreement because it precisely calculated the deal we had struck.  Gary Lancaster agreed that this spreadsheet would become part of the Earnout Agreement and Executive Earnout Agreement."[140]

93.    Lancaster even used a version of this spreadsheet on April 13, 2016, as the closing of the transaction was being negotiated in person in Houston.[141]

94.    Accordingly, this spreadsheet became Exhibit B to the Earnout Agreement and Exhibit B-1 to the Executive Earnout Agreement.  Exhibit B is a static image of a dynamic

---

[138] PX-105A.  Note, Lancaster explained that the analysis in the gray cells of PX-105A are dated with the payment dates and not the Target Years.  Tr. 133:8-11.
[139] Wiederman Witness Statement ¶¶ 71-72; *see also* Tr. 1421:3-6; Tr. 599:23-25; 619:17-19.
[140] Wiederman Witness Statement ¶ 73.  At trial, Lancaster admitted that Exhibit B was intended to be a comparison of "the use of Adjusted EBITDA in the context of how that formula is used in the earnout versus how it's used in the cash installment."  Tr. 124:6-9.
[141] DX-278; DX-278A.  At trial, Lancaster confirmed that the analysis he now avers is the proper calculation of the 2016 Earnout Payment was not contained in DX-278.  Tr. 141:14-142:13.

spreadsheet.  Applying the Exhibit B Formula (as in PX-105A) upon 95% achievement of the

Adjusted EBITDA Plan for 2016 the Earnout Payment is $5,375,932.[142]

## EXHIBIT B

### Comparison of Earnout Payments to Cash Installments Example

| MAJOR SH EARNOUT PAYMENTS | 0% | To Major | SH Earn-Out | |
|---|---|---|---|---|
| Assuming all targets are hit exact | $20,749,213 | 5,658,876 | 5,454,545 | UNDER EARNOUT AGREEMENT |
| 2016 ADJUSTED EBITDA | $25,003,343 | 9,092,125 | 7,272,727 | |
| 2017 ADJUSTED EBITDA | $27,831,052 | 10,120,383 | 7,272,727 | The Earnout payments payable to Major Shareholders |
| 2018 ADJUSTED EBITDA | | 24,871,384 | 20,000,000 | are (i) multiplied by a fraction, the numerator of which |
| | | | | is the actual Adjusted EBITDA and the denominator of which is the |
| Assuming targets are under by: 5% | | To Major | SH Earn-Out | Adjusted EBITDA Plan Target (with no make-up option) |
| 2016 ADJUSTED EBITDA | $19,711,752 | 5,375,932 | 5,375,932 | and (ii) subject to a possible further reduction for any |
| 2017 ADJUSTED EBITDA | $23,753,176 | 8,637,518 | 7,272,727 | annual Customer Count shortfalls. |
| 2018 ADJUSTED EBITDA | $26,439,499 | 9,614,363 | 7,272,727 | If actual Adjusted EBITDA > $20 MM in a Target Year, the |
| | | 23,627,814 | 19,921,387 | $5 MM Cash Installments to Major Shareholders |
| | | | | are multiplied by a fraction, the numerator of which |
| Assuming targets are under by: 20% | | To Major | SH Earn-Out | is the actual Adjusted EBITDA and the denominator of which is the |
| 2016 ADJUSTED EBITDA | $16,599,370 | 4,527,101 | 4,527,101 | Adjusted EBITDA Plan Target. If the fraction is > 100%, |
| 2017 ADJUSTED EBITDA | $20,002,674 | 7,273,700 | 7,272,727 | then any monies > $5MM will be credited to make-up |
| 2018 ADJUSTED EBITDA | $22,264,842 | 8,096,306 | 7,272,727 | any reduction(s) from prior calendar year(s).  If the |
| | | 19,897,107 | 19,072,556 | fraction is < 100%, the $5 MM will be proportionally |
| MAJOR SH CASH INSTALLMENTS | | CASH INSTALLMENTS | | reduced. If actual Adjusted EBITDA < $20 MM, there will be a |
| | $5,000,000 | | | dollar-for-dollar reduction* for every dollar shortfall in |
| Assuming all targets are hit exact | | Cash Installment | Carry-forward | the Adjusted EBITDA below $20 MM*, but reductions for |
| 2016 ADJUSTED EBITDA | $20,749,213 | 5,000,000 | | either or both reasons may be made-up in future years. |
| 2017 ADJUSTED EBITDA | $25,003,343 | 5,000,000 | | The rationale for these Adjusted EBITDA deductions is |
| 2018 ADJUSTED EBITDA | $27,831,052 | 5,000,000 | | that Major SH share in every dollar from $1 to $20 MM* |
| | | 15,000,000 | | and these Adjusted EBITDA deductions balance the |
| | | | | risk between Major SH and NGE in a downside scenario. |

95.     Exhibit B-1 differs from Exhibit B only in that Exhibit B-1 includes an additional

column calculating the Executive Earnout Payment under various achievement scenarios.[143]

### iii.     Section 3.7

96.     In addition to the foregoing provisions, the parties to the Earnout Agreement and

Executive Earnout Agreement bargained for a "Legal Costs" provision in Section 3.7.  Section

3.7 provides:

> The prevailing party in any action or proceeding arising out of or relating to this
> Agreement or instituted hereunder (including proceedings in any bankruptcy
> court) shall be entitled to recover from the other party all reasonable attorneys'
> fees incurred and all disbursements incurred by such prevailing party in
> connection with such action or proceeding.   A party will be deemed the

---

[142] PX-634 at PX-634.0012.
[143] *Compare* PX-634 *with* PX-658.

'prevailing party' for purposes of this paragraph if, as shown in the resulting award, order or judgment, such party shall have established that it was underpaid by at least fifteen percent (15%).[144]

97.     The Sellers are the only party with a right to payment under the Earnout Agreement.[145]

### F.     Employment Agreement Negotiation and Terms

98.     In connection with the execution of the MIPA and Earnout Agreement, Horowitz, Wiederman, Alper, Moeller, and Sobel each negotiated and executed with Major Energy new employment agreements.[146]

99.     Each of those new employment agreements provided that if there was a change in 50% of the corporate ownership of Major Energy during the Earnout Period, the contracted employee would be entitled to terminate his employment contract for cause and receive severance payments of twice the value of the prior year's annual compensation, which collectively totaled $7 to $10 million.[147]

100.     Additionally, Alper's employment agreement provided that he would report only to Maxwell during the Earnout Period and any change in this reporting structure without Alper's consent would also give him grounds to terminate the employment agreement for cause and entitle him to a seven-figure severance payment.[148]

101.     Alper specifically negotiated this right because he did not want to deal with Spark, particularly Kroeker, based on strong criticisms of him repeatedly relayed by Hennekes

---

[144] PX-634, § 3.7; PX-658, § 3.7.
[145] PX-634, § 2.1.
[146] PX-667; PX-668; PX-669; PX-670; PX-671.
[147] PX-667, § 3.2(c); PX-668, § 3.2(c); PX-669, § 3.2(c); PX-670, § 3.2(c); PX-671, § 3.2(c); *see also* Tr. 69:12-17.
[148] PX-667, § 1.1; Tr. 1563:22-1564:2; Tr. 1566:14-22; Alper Witness Statement ¶¶ 75-76.

and Konikowski during the negotiations and the impression Alper drew of Kroeker from an encounter Alper had with Kroeker before closing.[149]

102.    These new employment agreements entered into in connection with this transaction provided further assurance to the Sellers that Major Energy would remain in the hands of NGE at least during the Earnout Period.[150]

### G.    Lancaster's Closing Day Email

103.    The transaction between NGE and the Sellers closed on April 15, 2016.[151]

104.    On the days prior to closing, the Sellers proposed to NGE that Major Energy execute new operating agreements to give the Sellers further assurances that Major Energy would be allowed to operate its business as it had prior to the sale to NGE.[152]

105.    In rejecting the proposed new operating agreements, on the day of closing, NGE reaffirmed to the Sellers that Major Energy was being sold to NGE and only NGE.  Specifically, on April 15, 2016, Lancaster sent an email to Plaintiff, Alper, and Wiederman expressly stating that the new owner of Major Energy is NGE, "a sole member LLC with simple corporate governance."[153]

106.    Lancaster further stated in his email that the Sellers and Major Energy management should feel comfortable and protected during the Earnout Period given that NGE has also "agreed to a very stringent Section 2.7" in the Earnout Agreement and Executive Earnout Agreement, as well as the other "protections" negotiated into the new employment agreements.[154]

---

[149] Alper Witness Statement ¶¶ 58-59; Tr. 1564:1-1565:22; Tr. 1566:6-10.
[150] PX-667; PX-668; PX-669; PX-670; PX-671.
[151] Tr. 265:14-16; Tr. 1422:3-5; Wiederman Witness Statement ¶ 83; Horowitz Witness Statement ¶ 106.
[152] PX-551; PX-117; Horowitz Witness Statement ¶ 95-99; Alper Witness Statement ¶¶ 83-85.
[153] PX-117; Tr. 82:2-13, 83:8-17.
[154] PX-117; Tr. 61:14-17.

107.   At trial, Lancaster agreed that his description of Section 2.7 of the Earnout Agreement as "very stringent" was truthful and accurate.[155]  Further, Lancaster testified that in his April 15, 2016 email, his reference to the new owner being a "sole member LLC with simple corporate governance" referred to NGE.[156]  Moreover, nowhere in his April 15, 2016 email did he reference Spark or an imminent sale to Spark.[157]

108.   Based on Lancaster's representations at closing and the protections provided in the MIPA, Earnout Agreement, Executive Earnout Agreement, and employment agreements, the Sellers and Major Energy management believed that Major Energy would remain under the ownership of NGE at least during the Earnout Period absent their consent and approval otherwise.[158]

## III.   Defendants Negotiate and Approve the Dropdown Without Informing the Sellers

109.   Contrary to NGE's representations to the Sellers during negotiations, NGE and Spark were preparing for a sale of Major Energy from NGE to Spark (the "Dropdown") that would occur immediately following closing of NGE's transaction with the Sellers.

110.   NGE's and Spark's Dropdown preparations are detailed in a Schedule 14C filed by Spark on August 3, 2016, months after the closing of the transaction between the Sellers and NGE.[159]

111.   In that filing, Spark represented that it "did not have sufficient cash on hand or availability under its credit facility to close on an acquisition of the size anticipated for the Major

---

[155] Tr. 61:13-23.
[156] PX-117; Tr. 83:12-15.
[157] Tr. 83:8-17.
[158] Alper Witness Statement ¶¶ 87-88; Alper Witness Statement ¶¶ 90-92; Horowitz Witness Statement ¶¶ 102-103.  Horowitz testified that Lancaster's email gave him comfort about the deal because he took Lancaster at his word when he acknowledged the importance of Section 2.7 and the protections in the managers' employment agreements.  Tr. 1522:12-20.
[159] PX-756.

Energy Companies at that time," and therefore both NGE and Spark determined "that it would be in the best interest of the Company [defined as Spark Energy, Inc.] and its equity investors for NG&E to acquire the Major Energy Companies and then sell the Major Energy Companies to the Company at a later date."[160]

112.    NGE's intent to acquire Major Energy and then sell Major Energy to Spark contradicts Section 6.3 of the MIPA that provides NGE was purchasing Major Energy "solely for its own account."[161]

113.    The Schedule 14C and other trial exhibits detail the meetings, diligence and other preparations that NGE and Spark were undertaking, without informing the Sellers, while simultaneously negotiating a transaction with the Sellers:

- On March 21, 2016, just days after the execution of the MIPA with the Sellers, Maxwell met with Spark's CEO, Kroeker, to formally discuss NGE's sale of Major Energy to Spark.[162] Kroeker and Maxwell confirmed the existence of a prior agreement between NGE and Spark that, if Spark agreed to purchase Major Energy from NGE, the purchase price payable by Spark would equal the initial purchase price that NGE paid to acquire Major Energy, and the purchase agreement's terms would be substantially the same terms used in the NGE purchase from the Sellers.[163]

- In March and April of 2016, Spark conducted its standard acquisition due diligence of Major Energy through its acquisitions and due diligence team.[164] "Spark and NGE met several times to discuss financial projections, RCE counts, [and] infrastructure resources at Major Energy," and to "review other key financial and operational performance indicators.  From those meetings, and subsequent analysis, [Spark] developed its own financial models and [Spark] Board presentations for the potential consideration of the transaction by the [Spark] Board[.][165]  Maxwell was Chairman of the Spark Board.[166]

---

[160] PX-756, at PX-0756.0012.

[161] PX-632, § 6.3.

[162] PX-756 at PX-0756.0012.

[163] PX-756 at PX-0756.0012.

[164] PX-756 at PX-0756.0012.

[165] PX-756 at PX-0756.0012.

[166] PX-756 at PX-0756.0011.

- On April 6, 2016, Spark's Board formed a special committee to review, evaluate, and negotiate the terms and conditions of the Dropdown of Major Energy from NGE.[167]

- On April 7, 2016, Konikowski emailed Kroeker, copying Lancaster, Hennekes, and Todd Gibson ("Gibson"), an offer letter from NGE to sell the membership interest of Major Energy to Spark.[168]  The offer letter states that NGE and Spark "intend to sign a definitive PSA [purchase and sale agreement] within thirty (30) days from the date of this Offer Letter, but in any event no later than May 20, 2016."[169]  At trial Kroeker testified that NGE sent offer letters to Spark for the sale of Major Energy on April 7, April 8, and April 15, 2016.[170]  Kroeker never shared any of the offer letters from NGE with the Sellers.[171]

- On April 11, 2016, four days before NGE's closing with the Sellers, the Spark Board's Special Committee held a meeting, along with the Committee's separate outside legal counsel and representatives from Stout Risius Ross ("SRR"), which had been engaged by the Special Committee to evaluate the fairness of the proposed dropdown of Major Energy from NGE to Spark.  The Special Committee discussed the proposed transaction consideration.  The Special Committee further discussed due diligence of the Major Energy, including litigation and regulatory risks facing Major Energy at the time. Spark's senior management joined by telephone to provide management's views on the proposed transaction.[172]

114.    None of the events and facts discussed in this Schedule 14C were disclosed to the Sellers prior to closing.[173]   Kroeker, the CEO of Spark, admitted that he had no direct communications with any of the Sellers between November 2015 and April 15, 2016.[174]

### A.    Pre-Sale Discussion of the Dropdown

115.    At trial, the only document Defendants relied upon to support their position that Defendants notified the Sellers during negotiations that the Dropdown was going to occur shortly after closing is an April 8, 2016 email from Brandon Hoover, NGE's controller, to Major

---

[167] PX-756 at PX-0756.0012; Tr. 273:12-25.

[168] PX-640; Tr. 77:5-8.

[169] PX-640 at PX-0640.0006.  The purchase price in this offer letter was $85 million, which was higher than the amount NGE paid to the Sellers.  *See* PX-640 at PX-0640.0004.

[170] Tr. 275:10-20.

[171] Tr. 276:2-3; *see also* Tr. 81:18-20.

[172] PX-756 at PX-0756.0012-13.

[173] Alper Witness Statement ¶¶ 90-94; Wiederman Witness Statement ¶ 93; Tr. 71:14-76:10; Tr. 81:3-20; Tr. 275:10-276:3; Horowitz Written Rebuttal ¶¶ 6, 8.

[174] Tr. 264:16-20.

Energy's CFO David Sobel, that references a "tentative plan" for a subsequent sale of Major Energy to Spark on July 1, 2016.[175]

116.    Neither Hoover nor Sobel was involved in the negotiations of the transaction documents or deal terms.[176]  Sobel forwarded Hoover's email to Alper and Wiederman only one minute after receiving it and expressed confusion, stating "7/1/16 transfer to Spark?"[177]

117.    Alper testified that this email "was the first time I had ever even fathomed that the dropdown would happen in this type of period of time" and Alper immediately asked Hennekes and Lancaster about Dropdown plans.[178]  Hennekes and Lancaster assured Alper that the Dropdown was tentative and not going to happen for a "much longer period of time" and "don't worry about it."[179]  Hennekes' and Lancaster's assurances were consistent with Alper's belief that the protections in the MIPA and his employment agreement precluded a Dropdown from occurring immediately or without Seller's consent.[180]  In explaining why he believed a Dropdown would not occur in the near term, Alper testified "why would anybody, you know, do that?  Like, why would you sign all – why would you put forth all those agreements . . . and then do a dropdown.  It just never computed in my brain that that would happen in that type of time frame."[181]

118.    Both Wiederman and Horowitz also testified that they were not informed that a sale of Major Energy to Spark was set to occur immediately after the sale to NGE.[182]  Further,

---

[175] DX-272; Tr. 29:2-18.  When asked to identify any document besides the single April 8, 2016 email in which any of the Sellers were informed of a potential imminent Dropdown to Spark, Lancaster could not name any such document.  Tr. 77:9-20.
[176] Tr. 78:21-79:16.
[177] DX-272.
[178] Tr. 1560:6-14.
[179] Tr. 1560:6-20.
[180] Tr. 1116:16-1117:7.
[181] Tr. 1561:1-13; *see also* Alper Witness Statement ¶ 60.
[182] Tr. 1463:24-1464:15; Wiederman Witness Statement ¶¶ 93-95; Horowitz Witness Statement ¶ 139.

Horowitz testified that he did not view Hoover's April 8, 2016 email at the time of the sale and was not informed about the substance of the email at the time.[183]

119.    In a later, April 14, 2016 email, Sobel wrote to Major Energy's auditor, PricewaterhouseCoopers, that "[t]he buyers are affiliates of a public company and my understanding is that one day Major will be folded into the public company, but who really knows."[184]

120.    And as described in Sect. II.G, above, on April 15, the day of closing, Lancaster confirmed to the Sellers in writing that the Buyer was NGE, a limited liability company with "simple corporate governance" and made no mention of a Dropdown to Spark at any time, let alone in the near future.[185]

### B.    Defendants Disclose an Immediate Dropdown Only Weeks After Closing

121.    On April 29, 2016, two weeks after the closing of the sale of Major Energy to NGE, Alper received an email from Lancaster attaching a draft Omnibus Assignment and Assumption Agreement that would have Spark Holdco acquire all the membership interest in Major Energy and assume all the obligations of NGE under the deal documents NGE had just entered into with the Sellers.[186]   This is the first time that the Sellers were informed that NGE and Spark had reached an agreement for a Dropdown that would happen immediately.[187]

122.    This draft agreement stated that Plaintiff, as Sellers' Representative, would have to be a party to the agreement and consent to the proposed assignment on behalf of the Sellers, and Alper would also approve the assignment on behalf of Major Energy.[188]

---

[183] Tr. 1463:24-1464:15; DX-272.
[184] PX-114; Tr. 95:5-96:2.
[185] PX-117.
[186] PX-121; Tr. 93:8-12.
[187] Alper Witness Statement ¶¶ 124-125; Tr. 1573:14-18, 1595:2-18.
[188] PX-121 at PX-121.0002, PX-121.0006.

123.     This requirement of the Sellers' Representative's consent is consistent with the written consent requirement set forth in Section 11.7 of the MIPA, which requires that "[n]o assignment of this Agreement or of any rights or obligations hereunder may be made by any . . . Buyer . . . without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void."[189]

124.     At trial Lancaster admitted that the Spark Board's special committee's independent legal counsel, Strasburger & Price ("Strasburger"), believed that the Sellers' Representative's consent was required to assign the MIPA and that Strasburger had reviewed and revised the original Omnibus Assignment and Assumption Agreement.[190]

125.     Consistent with Section 11.7 and Strasburger's advice, NGE requested Horowitz's consent to the Dropdown on various occasions and never once suggested that consent was being requested as a mere formality.[191]   At no time did the Sellers or Major Energy provide their consent to the Dropdown.[192]

126.     On May 3, 2016, the Spark Board, acting on the recommendation of the Spark Special Committee, formally approved the proposed dropdown transaction.[193]

127.     The Spark Board approved a purchase price of $80 million to be paid by Spark— the same purchase price paid by NGE, with the addition of a 200,000 share earnout payable to NGE upon achievement of certain performance targets.[194]

---

[189] PX-632, § 11.7.
[190] Tr. 98:17-19 ("the efforts from the independent counsel were to say, go get that consent"); 100:10-15 (admitting that the draft requiring the consent of Sellers' Representative reflects Strasburger's comments); PX-754 at PX-0754.0005.
[191] Tr. 1529:24-1530:3; Alper Witness Statement ¶ 127.
[192] Horowitz Witness Statement ¶¶ 146-47, 150-51, 153, 180; Alper Witness Statement ¶¶ 127, 147, 151; Tr. 102:3-6.
[193] PX-756 at PX-756.0014; see also Tr. 272:15-23.
[194] PX-756 at PX-756.0015.

128.    As Spark later represented to investors, it was comfortable completing the Dropdown because, among other things:

- "Members of our internal due diligence team and senior management were able to gain substantial knowledge and comfort from the depth of the work performed by the NG&E due diligence team and their senior management during NG&E's acquisition of Major, as well our ability to learn more about the hands on day-to-day operations through NG&E's ownership of the Major Energy Companies for the last few months."[195]

- "Members of our internal due diligence team and senior management were also able to glean additional insight into comparative operations, finances and performance metrics of the Major Energy Companies, through comparisons of recent due diligence with the due diligence conducted a couple of years ago, when the Company nearly consummated an acquisition of the Major Energy Companies in 2014."[196]

129.    Spark further informed investors that "[b]oth NG&E and the Company believed that the new growth initiatives at the Major Energy Companies had significantly increased the long-term value of the Major Energy Companies.  It was further the belief of both the Company and NG&E that the acquisition of the Major Energy Companies by the Company would add significant long-term value to the Company's equity investors."[197]

130.    On an earnings call with Spark investors after due diligence had been completed, but prior to the closing of the Dropdown, Kroeker characterized Major Energy's business as efficient and profitable.[198]

131.    At trial, Kroeker testified that he thought "Major was a good business that we acquired" and that Spark "wouldn't have bought them if we didn't think they were a good business."[199]

---

[195] PX-756 at PX-756.0014.
[196] PX-756 at PX-756.0014.
[197] PX-756 at PX-756.0012.
[198] PX-256 at PX-256.0005; Tr. 291:22-292:9.
[199] Tr. 387:14-16.

132.    On May 3, 2016, consistent with the Spark Board's approval of the Dropdown, NGE entered into a Membership Interest Purchase Agreement with Spark and Spark HoldCo (the "Spark MIPA").[200]

133.    The Sellers did not participate in the drafting of the Spark MIPA.[201]

134.    In the Spark MIPA, Spark Holdco is identified as the "Buyer" and Spark is identified as the parent of the Buyer.[202]

135.    Pursuant to Section 2.1 of the Spark MIPA, NGE agreed to sell, assign or otherwise transfer its 100% membership interest in Major Energy along with all of its other rights and obligations under the MIPA (and related transaction documents with the Sellers) to Spark Holdco.[203]

136.    Additionally, Section 8.2(y)(iii) of the Spark MIPA provides that "Buyer [Spark Holdco] shall have assumed all rights and obligations of Seller [NGE] pursuant to the Assignment."[204]

137.    "Assignment" is defined as the "Omnibus Assignment and Assumption Agreement" to be separately executed between NGE and Spark Holdco.[205]

138.    Under Section 3.2(a)(ix) of the Spark MIPA, NGE required Spark Holdco to obtain and provide "the written consent of the Prior Sellers' Representative to the Assignment" prior to closing the Dropdown.[206]

---

[200] *See* PX-650.
[201] Tr. 327:7-12; 328:10-12.
[202] PX-650 at PX-650.0006.
[203] PX-650, § 2.1.
[204] PX-650, § 8.2(c)(iii).
[205] PX-650, § 1.1.
[206] PX-650, § 3.2(a)(ix).

139.     Likewise, Section 11.1 of the Spark MIPA explicitly provides NGE advised Spark Holdco that "the prior written consent of [the] Prior Sellers' Representative is required for the assignment of certain Transaction Agreements" and that NGE would assume responsibility for "securing [the consent of] Prior Sellers' Representative as necessary under such Prior Purchase Agreement[.]"[207]

140.     Under the terms of the Spark MIPA, the Dropdown was to close by July 15, 2016.[208]

## IV.     Defendants' Pre-Dropdown Interference with Major Energy's Business Operations

### A.     NGE and Spark Unilaterally Terminate Major Energy's Supply Relationship with PSE

141.     In 2006, Major Energy signed a long-term credit and supply agreement with Pacific Summit Energy ("PSE"), which was subsequently and consistently renewed upon expiration.[209]

142.     When NGE acquired Major Energy from the Sellers in April 2016, the supply agreement between Major Energy and PSE was set to expire in March 2017.[210]  While PSE was not always the cheapest option for Major Energy in terms of price, Major Energy consistently renewed its supply contract with PSE prior to the sale to NGE because PSE provided Major Energy with many advantages that outweighed the difference in price.[211]

143.     The PSE supply relationship was beneficial to Major Energy for many reasons, including because Major Energy had transparency and visibility into pricing decisions when it

---

[207] PX-650, § 11.1.

[208] PX-650, § 3.1.

[209] PX-55 at 37; PX-51 at CDP00030835 (referring to a Base Contract for Sale and Purchase of Natural Gas dated November 16, 2006 between PSE and Major Energy); Horowitz Witness Statement ¶ 70; Wiederman Witness Statement ¶ 10.

[210] Alper Witness Statement ¶ 117; Wiederman Witness Statement ¶ 52; Moeller Witness Statement ¶ 85.

[211] Tr. 648:6-650:1; Tr. 1134:6-11; Tr. 1502:3-16; Wiederman Witness Statement ¶ 116; Horowitz Witness Statement ¶ 73; Moeller Witness Statement ¶¶ 26-32.

would purchase gas from PSE, PSE provided strong service and quick turnaround times to Major Energy, PSE sent Major Energy detailed invoices containing backup information, Major Energy had a favorable deal with PSE on hedging, and PSE did not restrict Major Energy from operating as it so chose, including pursuing aggregation deals.[212]

144.   As of closing, Major Energy management anticipated renewing its contract with PSE in order to extend the PSE supply relationship through the Earnout Period.[213]  NGE had given Major Energy's managers the impression that the PSE supply relationship would be allowed to continue through the Earnout Period.[214]  NGE had given the same impression to PSE representatives.[215]

145.   But unbeknownst to the Sellers and Major Energy management, NGE and Spark planned all along to terminate the PSE supply relationship shortly after closing.[216]

146.   Kroeker admitted at trial that, from day one, Spark's plan was to take over Major Energy's supply contract with PSE.[217]  Chris Leonard, Spark's Vice President of Structuring and Supply, likewise testified that Spark determined as of at least March or April 2016 that it would replace PSE as Major Energy's supplier.[218]

147.   Consistent with this undisclosed plan, just weeks after closing, NGE and Spark took steps to terminate Major Energy's longstanding relationship with PSE.[219]

---

[212]  Tr. 647:24-650:1; Tr. 1134:12-1135:17; Tr. 1136:4-20; Moeller Witness Statement ¶¶ 22, 27-33; Moeller Rebuttal Witness Statement ¶ 9; Wiederman Witness Statement ¶¶ 23, 113.

[213]  Tr. 649:17-650:1; Wiederman Witness Statement ¶ 113; Horowitz Witness Statement ¶ 127; Alper Witness Statement ¶ 99; Moeller Witness Statement ¶ 22.

[214]  Horowitz Witness Statement ¶¶ 127-128; Alper Witness Statement ¶¶ 99, 176.

[215]  Tr. 1144:3-1146:24, Tr. 1148:3-12.

[216]  Tr. 333:8-10; Tr. 841:13-842:6; Tr. 1148:21-1150:17; PX-680; Horowitz Witness Statement ¶¶ 127-128; Alper Witness Statement ¶¶ 99, 176.

[217]  Tr. 333:8-10.

[218]  Tr. 1864:18-21; Tr. 1867:3-7.

[219]  Alper Witness Statement ¶¶ 118-122; Wiederman Witness Statement ¶¶ 115-119; Horowitz Witness Statement ¶¶ 127-133; Moeller Witness Statement ¶¶ 86-87.

148.    Specifically, on March 16, 2016, two days prior to the execution of the MIPA, PSE made a proposal to extend its existing supply agreement with Major Energy at least through the end of the Earnout Period.[220]   PSE offered to reduce its credit fee on power sales from $1.00/MWh to $0.85/MWh effective upon closing of the sale to NGE.[221]

149.    Alper forwarded this PSE extension proposal to Hennekes, who responded that NGE was impressed with the offer.[222]   Hennekes also stated to Alper that NGE would commit to continuing the PSE agreement so long as NGE owned Major Energy and that NGE was open to considering PSE's offer either before or shortly after closing.[223]

150.    On March 17, 2016, despite the recognition that PSE's extension offer was one of the cheapest offers NGE had seen for a credit sleeve, Hennekes and Gibson discussed forcing PSE's hand to no longer serve as Major Energy's supplier by the end of the then-current contract term.[224]   Neither the Sellers nor Major Energy management were on this communication.[225]

151.    In advance of the April 15, 2016 closing, Major Energy communicated with PSE about waiving PSE's contractual right of first refusal, which gave PSE the option to purchase Major Energy upon a sale of the company.[226]   In exchange, PSE asked for novation fee language to be added to its contract with Major Energy.[227]   While this negotiation process caused some friction between Major Energy and PSE, the relationship recovered and returned to normal by the time of the closing.[228]

---

[220] PX-374; Tr. 1139:17-1140:6.
[221] PX-374.
[222] PX-374.
[223] PX-374.
[224] PX-380; Tr. 839:9-840:22.
[225] PX-380.
[226] Tr. 1141:5-19.
[227] Tr. 1141:5-19; Tr. 1051:9-13.
[228] Tr. 650:2-18; Tr. 1141:20-1142:9; Tr. 1146:25-1148:12; PX-219; Tr. 675:4-22.

152.    Around the time of the April 15, 2016 closing of the sale of Major Energy to NGE, Gibson of NGE met with Mark Depew and James Chung of PSE and informed them that NGE was looking to acquire additional ESCOs other than Major Energy.[229]  Gibson told Depew and Chung that there was an opportunity for PSE to possibly serve as the credit facility provider for NGE's other acquisitions in the future.[230]

153.    Depew and Chung informed PSE management of this potential opportunity to serve NGE's other brands.[231]

154.    On April 21, 2016, less than one week after closing, Maxwell contacted Gibson, Hennekes, and Konikowski asking for an update on when Major Energy's relationship with PSE would be terminated.[232]  Neither the Sellers nor Major Energy management were included in this communication.[233]

155.    That same day, Hennekes emailed Gibson requesting a call to discuss the plans for PSE at the time of the dropdown.[234]  Neither the Sellers nor Major Energy management were included in this communication.[235]

156.    Also on April 21, 2016, Leonard completed a Due Diligence Signoff Memorandum in connection with Spark's due diligence of its purchase of Major Energy from NGE.[236]  The memorandum stated, "From a Supply perspective, [u]pon drop down, Spark will replace PacSummit to Major. . . .  Instead of [p]aying PacSummit, Major will pay Spark."[237]

---

[229] Tr. 1144:3-14.
[230] Tr. 1144:3-14; Tr. 1146:16-24.
[231] Tr. 1146:16-24.
[232] PX-680.
[233] PX-680.
[234] PX-376.
[235] PX-376.
[236] PX-472 at PX-472.0013-14.
[237] PX-472 at PX-472.0014; Tr. 1867:8-1868:5.

157.    Within two weeks of the closing of the sale of Major Energy to NGE, and without any advance notice to anyone at Major Energy, Gibson contacted PSE directly to communicate NGE's intention to terminate the relationship at the end of the then-current contract term.[238]

158.    As Gibson testified, on or about April 29, 2016, he called PSE to discuss terminating its supply relationship with Major Energy.[239]  No Major Energy employees were included on this call.[240]

159.    Shortly thereafter, Gibson met with Depew and Chung at PSE's office to further discuss terminating Major Energy's supply relationship with PSE.[241]  No Major Energy employees attended this meeting.[242]

160.    Chung testified that during this meeting, Gibson told Chung and Depew that NGE would be terminating PSE's contract with Major Energy and that there would be no larger deal to serve NGE's other brands, which surprised Chung because he expected that PSE would continue the relationship with Major Energy through the entire Earnout Period and potentially serve as the credit facility provider for NGE's other brands as well.[243]

161.    Chung further testified that Gibson informed Chung and Depew during this meeting that Gibson had to say whatever needed to be said to close NGE's deal with the Sellers for Major Energy, even if that meant misleading Chung and Depew about a potential opportunity for PSE to serve as the credit facility provider for NGE's other brands.[244]

---

[238] PX-361; Tr. 1048:25-1049:12; Alper Witness Statement ¶ 118; Tr. 1042:7-10; Tr. 1042:19-1043:2; Tr. 1567:9-1568:4.
[239] Tr. 842:11-843:10.
[240] Tr. 842:24-843:10.
[241] Tr. 842:24-843:16.
[242] Tr. 842:24-843:16.
[243] Tr. 1148:21-1149:5; Tr. 1149:22-1151:10.
[244] Tr. 1150:9-13.

162.    Spark realized significant economic benefits by terminating Major Energy's supply relationship with PSE and taking over as Major Energy's supplier once the PSE contract expired.[245]  When asked whether Major Energy paid $3 million to Spark in supply fees in 2017, Leonard testified that "[i]t was probably a large number."[246]  Leonard also testified that Spark did not want to pay fees to a third party when those fees could be paid to Spark within the same family of companies.[247]

163.    Gibson's unilateral decision to terminate Major Energy's relationship with PSE caused significant harm to the PSE relationship, which Major Energy still needed at the time and desired to extend through the Earnout Period.[248]

164.    As Chung testified, PSE's business relationship with Major Energy was never the same after the meeting with Gibson.[249]  Chung testified that the meeting with Gibson made it clear that Major Energy was not going to continue to grow with PSE and that, therefore, "the flexibility that we had before, it just wasn't there anymore, because the trust, we lost trust during that meeting."[250]

165.    In addition, Gibson's early termination put Major Energy's Senior Management Team in a highly unfavorable bargaining position to seek to negotiate a renewal of the PSE contract because PSE understood that Spark had already made the decision not to renew the PSE contract.[251]

---

[245] Tr. 333:5-7; Tr. 333:22-24; Tr. 400:25-403:24; Tr. 1888:13-1889:4; Tr. 1889:17-20.
[246] Tr. 1888:15-1889:4.
[247] Tr. 1920:3-12.
[248] Alper Witness Statement ¶¶ 118-122; Wiederman Witness Statement ¶¶ 113, 116.
[249] Tr. 1151:11-25.
[250] Tr. 1151:11-25.
[251] Tr. 1151:11-25; Alper Witness Statement ¶¶ 118-122; Wiederman Witness Statement ¶ 116; Horowitz Witness Statement ¶ 130.

166.    Major Energy executives made several attempts to repair the relationship with PSE but were unsuccessful.[252]

**B.    NGE and Spark Divert Major Energy Employees' Focus and Attention to the EMS Integration Project**

167.    Prior to the Dropdown, at the request of Spark and NGE, Major Energy employees spent significant time analyzing and strategizing about how to integrate Major Energy's transaction management billing system, EMS, into Spark's IT systems.[253]

168.    When NGE acquired Major Energy, Spark had numerous billing and transaction management systems, including legacy systems and systems it had acquired in connection with other acquisitions.[254]

169.    Spark pursued the EMS integration project in an attempt to consolidate its various systems into one system—Major Energy's EMS—and make Spark's operational and IT environment less complex.[255]

170.    Mike Kuznar ("Kuznar"), the President of Retailco, who co-chaired the EMS integration project, believed that EMS could allow Spark to achieve IT and operational scale.[256] Kuznar admitted that certain Major Energy employees were the "single source of skills and knowledge with respect to EMS" at the time,[257] including with respect to the design and technical operation of EMS.[258] Spark needed Major Energy's employees to effectuate the EMS

---

[252] Tr.  650:19-651:20; Tr.  1152:1-14; Tr.  1048:25-1049:12; Tr.  1300:12-1301:7; Alper Witness Statement ¶¶ 119-122; Wiederman Witness Statement ¶¶ 116-119; Horowitz Witness Statement ¶¶ 131-132; PX-613 at 17.
[253] PX-169; PX-181; PX-613 at 17; PX-129; PX-132 at PX-132.0007; PX-135; Tr. 664:7-8.
[254] Tr. 1789:21-1790:5.
[255] Tr. 1792:22-1793:5; Tr. 1790:6-20; Alper Witness Statement ¶ 101.
[256] Tr. 1792:5-21.
[257] Kuznar Deposition Transcript ("Dep. Tr.") 95:16-19; Tr. 1793:6-11.
[258] Kuznar Dep. Tr. 95:20-23.

integration project.[259]   Shortly after the closing of the NGE deal, Maxwell and Konikowski recruited Alper to work on the EMS integration project.[260]

171.    For four months from April to July 2016, Major Energy and Spark employees participated in the planning, conceptual implementation, and information gathering stages of a potential integration of EMS into Spark's operations.[261]

172.    By June 2016, Major Energy employees had already engaged in extensive planning discussions concerning the EMS integration, traveled to Houston to participate in meetings to discuss the implementation of the integration project, and worked on and completed tasks relating to the EMS integration.[262]

173.    The EMS project created significant distraction and complaints within Major Energy.[263]   Some Major Energy employees were spending 50% of their working time on this project.[264]

174.    The workload on the EMS project was so onerous that Major Energy had to hire additional personnel to work on the project, including Raphi Levine, who served as the Team Leader of the EMS integration project.[265]

175.    On July 27, 2016, Kuznar contacted Major Energy and Spark employees, informing them that the EMS integration project "at times will conflict with what's ideal for a single entity."[266]

---

[259] Tr. 1793:6-23.

[260] Tr. 1568:15-1569:5; Tr. 1577:14-1578:5; Tr. 1128:3-1129:3; Alper Witness Statement ¶¶ 103-105; Alper Rebuttal Witness Statement ¶ 2.

[261] Kuznar Witness Statement ¶ 22; Tr. 1806:7-11; Tr. 1090:8-15.

[262] Alper Witness Statement ¶ 110; PX-169; PX-181; PX-613 at 17; PX-129; Tr. 1797:19-1800:3; PX-384 at PX-384.0007 ("Week of 6/30/16, Levi, Saul, Raphi along with Dan and Mark, spent the week in Houston to work on the EMS integration.").

[263] Tr. 1127:15-1128:2; Tr. 1296:12-1297:18; Tr. 1523:20-1524:12; PX-169; PX-181; PX-135; PX-142; Alper Witness Statement ¶ 107; Moeller Witness Statement ¶¶ 53, 56-64.

[264] Alper Witness Statement ¶ 107; Moeller Witness Statement ¶¶ 60-62; Tr. 1296:12-1297:18.

[265] Alper Witness Statement ¶ 111; PX-384 at PX-384.0007; PX-135; Tr. 1802:11-1804:11.

176.    After months of planning meetings, tasks, and discussions, Major Energy began integrating EMS into Spark during the first week of August 2016 with the kickoff of a Leadership Workshop.[267]

177.    The attempted integration of EMS into Spark's operations continued until September 13, 2016, when it was shut down by Spark after receiving complaints that the EMS project was distracting Major Energy employees from growing the business.[268]

### C.    Spark Immediately Implements Financial and Accounting Changes at Major Energy

178.    Prior to the Dropdown, Major Energy employees also spent time assisting Spark with financial and risk reporting tasks.[269]

179.    In June 2016, Misti Day of Spark emailed Sobel attaching an agenda concerning accounting integration and how to integrate Major Energy employees' tax and accounting responsibilities into Spark's operations.[270]  Alper, Wiederman, and Horowitz later received this email.[271]

180.    As discussed in more detail *infra*, Spark implemented financial and accounting changes with respect to Major Energy's operations after the Dropdown.[272]

### D.    NGE and Spark Interfere with Residential Marketing Vendors and Commercial Brokers

181.    Residential marketing vendors were critical to the success of Major Energy's business.[273]  Major Energy did not have an internal sales staff and relied on external residential marketing vendors to generate residential customer growth.[274]

---

[266] PX-138; Tr. 1804:12-1805:25.
[267] Kuznar Witness Statement ¶ 30.
[268] Kuznar Witness Statement ¶ 33; Tr. 1832:7-16; Tr. 1807:4-25.
[269] PX-613 at 17.
[270] PX-127.
[271] PX-127.
[272] Tr. 1319:23-1320:8; Tr. 1323:11-22.

182.   Prior to the sale to NGE, Major Energy had strong relationships with its residential marketing vendors because it had built a trusted brand and never told its marketers to stop or slow down their marketing activities.[275]

183.   Residential marketing vendors have a lot of choices and can refer new customers to many different ESCOs.[276]   Because of this, Major Energy treated its residential marketing vendors with the utmost respect and went out of its way to make sure its relationships with its vendors were very strong.[277]   Major Energy was constantly fostering and developing these relationships through sporting events, meals, and monetary rewards for new customer growth.[278] As a result, Major Energy's residential marketing vendors trusted and preferred working with Major Energy over other ESCOs in the marketplace.[279]

184.   After NGE acquired Major Energy, Spark's Channel Manager, Javier Garcia, traveled to Major Energy's office to meet with Wolbrom to learn the identity of Major Energy's residential marketing vendors and how Major Energy interacted with them.[280]

185.   During that meeting, Wolbrom informed Garcia for the first time that PTM— Major Energy's "most prized vendor"—was one of Major Energy's marketers and that Sunil Gadtaula owned PTM.[281]   Spark only learned of PTM and its relationship with Major Energy post-closing of the sale to NGE.[282]   In response, Garcia asked Wolbrom who Gadtaula was,

---

[273] Wiederman Witness Statement ¶ 22; Alper Witness Statement ¶ 177; Tr. 339:20-23; Tr. 341:6-11; Tr. 470:10-14.
[274] Wolbrom Witness Statement ¶ 24, 31; Wiederman Witness Statement ¶ 25; Tr. 651:25-652:16.
[275] Tr. 651:25-652:16; Wiederman Witness Statement ¶¶ 170-171.
[276] Tr. 653:5-8; Tr. 494:9-10.
[277] Tr. 651:25-652:13.
[278] Wiederman Witness Statement ¶ 31; Tr. 505:10-506:4; Tr. 1501:4-14.
[279] Wiederman Witness Statement ¶ 24-25; Wolbrom Witness Statement ¶¶ 37, 40; Tr. 651:25-652:16.
[280] Tr. 785:13-786:7.
[281] Tr. 785:13-786:7.
[282] PX-166 ("Javier clearly went after Sunil which is wrong considering he never knew who Sunil was until I told him (because I had to).").

where he lived, what Gadtaula's contact information was, how much Major Energy was paying to PTM, where PTM marketed for Major Energy, and the reasons why PTM was successful in marketing for Major Energy.[283]

186.   During the pre-Dropdown period, Major Energy received complaints from its existing residential marketing vendors and commercial brokers about Spark.[284]

187.   In May 2016, Major Energy personnel were informed by PTM that its sales representatives were being solicited to sell for Spark in New York City and that PTM's representatives were being offered higher commissions to sell for Spark.[285]

188.   As a result, Gadtaula of PTM attempted to renegotiate PTM's agreement with Major Energy to match the higher commissions being offered by Spark.[286]

189.   In addition, in May 2016, Spark attempted to poach Bill Siveter of Platinum Advertising LLC, another of Major Energy's vendors at the time.[287]

190.   Major Energy's residential marketing vendors decreased their business with Major Energy because Spark began making key decisions about the pace of Major Energy's marketing efforts, pricing, the nature of the customers Major Energy was able to take on, and was also poaching the sales representatives of Major Energy's marketing vendors.[288]  Residential marketing vendors found it easier to work with other ESCOs rather than Major Energy because they perceived that Spark had taken over and was controlling Major Energy.[289]  This severely

---

[283] Tr. 785:12-24.

[284] *See, e.g.*, PX-215; PX-567; PX-184; PX-185.

[285] PX-215; Wiederman Witness Statement ¶¶ 126-127; Wolbrom Witness Statement ¶¶ 68-73; Tr. 653:9-657:10; Tr. 786:15-790:15; Tr. 1570:25-1572:20.

[286] Wolbrom Witness Statement ¶ 72; PX-185.

[287] PX-221; Tr. 655:16-22.

[288] Tr. 652:17-653:8; Tr. 655:23-657:10; Tr. 786:15-790:15; Wiederman Witness Statement ¶¶ 161-170.

[289] Wiederman Witness Statement ¶¶ 121, 127; Tr. 652:17-653:4; Tr. 656:25-657:10; Tr. 789:13-790:15.

impacted Major Energy's ability to maintain and grow its residential customers and related EBITDA.[290]

191.    On the commercial side, Major Energy relied on commercial brokers to identify and refer new commercial customer relationships to Major Energy.[291]

192.    Major Energy's relationships with commercial brokers and its turnaround time in providing pricing to its brokers were important factors in Major Energy's ability to grow its commercial business.[292]

193.    Starting as early as May 2016, with the mere announcement of NGE's upcoming dropdown of Major Energy to Spark, commercial brokers started contacting Major Energy's internal broker team, including Amir Benisti ("Benisti") and Bruce Shipper, requesting assurances that they would continue to be dealing with Major Energy and not Spark given Spark's poor reputation in the commercial space.[293]   Benisti, who worked directly with Major Energy's commercial brokers, testified that "[a] lot of the brokers were very concerned" and that those brokers "had previous interaction with Spark, and they were not very excited about the sale, and were concerned that Major was eventually just going to become Spark."[294]

194.    Major Energy employees attempted to assure brokers that it would be business as usual at the company, but that did not turn out to be the case.[295]

195.    After the sale to NGE, commercial brokers cut back on the amount of business they provided to Major Energy because Spark had a poor reputation in the industry, pricing was

---

[290] Tr. 659:17-660:7; Wiederman Witness Statement ¶ 170, Wolbrom Witness Statement ¶ 80.
[291] Tr. 855:24-856:14; Horowitz Witness Statement ¶ 64; Wolbrom Witness Statement ¶ 25.
[292] Tr. 657:11-658:1; Wiederman Witness Statement ¶¶ 27, 29.
[293] Wiederman Witness Statement ¶¶ 128-129; Moeller Witness Statement ¶¶ 82-84; PX-567.
[294] Tr. 867:2-868:13.
[295] Wiederman Witness Statement ¶ 129; Moeller Witness Statement ¶¶ 82-84; PX-567; Tr. 867:2-868:19; DX-312.

being done out of Spark's office in Houston, Texas rather than Major Energy's New York office, and Major Energy's turnaround time in providing pricing to brokers was severely delayed.[296]

196.    For example, on August 10, 2016, Wiederman forwarded Alper a complaint regarding delayed broker pricing from Spark, stating that "[t]he lack of response from [Spark] is extremely frustrating.  This is a very large gas account[] that I have a very close personal relationship with.  Due to PSE gas constraints we have never been able to get gas accounts from this client, however we have over 25MM KWH from him.  He called me that he would like to give us the gas business but due to the lack of response from spark, he's going to take his business elsewhere."[297]

### E.    NGE's and Spark's Interference Prompts Early Buyout Discussions

197.    In light of these disruptions and interference with Major Energy's key relationships, and in light of their receipt of the draft Omnibus Assignment and Assumption Agreement on April 29, 2016 indicating NGE and Spark's intent to dropdown Major Energy from NGE to Spark, Horowitz, Alper, and Wiederman determined that a meeting with Maxwell was necessary to discuss these events and put a stop to any further disruption.[298]

198.    To this end, Horowitz met with Maxwell in Florida on May 11, 2016.[299]

199.    The primary objective of Horowitz's meeting with Maxwell was to ensure autonomy for Major Energy, not to negotiate a buyout.[300]  Alper sent talking points to Horowitz in advance of the meeting outlining that "Plan A" was to let Major Energy Senior Management

---

[296] Tr. 659:1-12; Tr. 678:11-21; Tr. 867:2-870:5; Tr. 871:2-12; Tr. 881:21-882:17; Tr. 906:17-907:17.
[297] PX-750; Wiederman Rebuttal Statement ¶ 63.
[298] Horowitz Witness Statement ¶ 141; Wiederman Witness Statement ¶ 130; Alper Witness Statement ¶ 130; Tr. 1568:9-1569:5.
[299] Horowitz Witness Statement ¶¶ 141-43; PX-217; PX-169.
[300] PX-85 ("Plan A: Let us run Major as stand alone as contemplated in the existing agreement.  We report once [a] week and focus on maximizing Major EBITDA."); PX-169 ("We can't let them take us off task.  We need to hit EBITDA targets."); Tr. 1484:4-10; Tr. 1525:1-1527:12; Tr. 1568:9-1569:23.

run the company as a stand-alone company as contemplated in the deal documents, while "Plan B" was for NGE to complete an early buyout of the Contingent Payments at a discount.[301]

200.    According to Horowitz's sworn testimony, at his meeting with Maxwell, he expressed his concerns about the changes being made by NGE/Spark, including the PSE termination and EMS project.[302]

201.    Ultimately, Maxwell suggested that NGE buy out the non-management Sellers' share of the Contingent Payments.[303]

202.    Maxwell testified that he does not recall discussing anything of substance with Horowitz during the May 11, 2016 meeting.[304]

203.    At this time, Alper and Wiederman were also in Florida attending an industry conference.[305]

204.    According to Alper, on May 12, 2016, he met with Maxwell in a hotel lobby and Maxwell expressed his anger about his meeting with Horowitz the prior day.[306]  Alper reiterated to Maxwell the concerns Horowitz had raised about Major Energy being allowed to run its business as it had prior to the sale to NGE.[307]

205.    In response, Maxwell told Alper that he needed more "leadership" from him as CEO of Major Energy, that he needed to "play a bigger game" and think more like a Spark

---

[301] PX-85; Alper Witness Statement ¶ 133; Tr. 1482:22-1483:21; Tr. 1525:1-1527:12; Tr. 1568:9-1569:23.
[302] Horowitz Witness Statement ¶¶ 142-143; Tr. 1484:4-10.
[303] Horowitz Witness Statement ¶ 143; Tr. 1483:22-1484:3; DX-1043 ("When we discussed this matter at lunch, you suggested that we halt this negative energy by buying them out.").
[304] Maxwell Witness Statement ¶ 37.
[305] Alper Witness Statement ¶ 135; Wiederman Witness Statement ¶ 131.
[306] Alper Witness Statement ¶ 136; Tr. 1071:4-1072:10 ("I know as sure as I'm sitting here today that I sat in a chair next to Keith Maxwell in the hotel lobby during the NYMA conference, yes, that's my position.  That's what I testified to, and that is the truth,").
[307] Alper Witness Statement ¶ 136.

person, and not to worry about the Contingent Payments because there would be a buyout.[308]
Maxwell testified that he does not recall having this conversation with Alper.[309]

206.    That evening, Alper and Wiederman had dinner with Maxwell and other NGE
executives.[310]  At that dinner Maxwell reiterated the same sentiments he had shared with Alper
earlier, and told Alper and Wiederman that if they thought and acted like Spark employees he
would "spray love all over" them and take care of them financially.[311]  Maxwell testified that he
does not recall this discussion.[312]

207.    In early June 2016, Horowitz sent an email to Maxwell as a follow up to their
earlier lunch meeting in Florida.[313]

208.    In the email, Horowitz reiterated the misalignment of interests related to the Spark
integration project and how Major Energy employees had been intensely involved on the project
and, in turn, distracted from business as usual at Major Energy.  Horowitz confirmed that
Maxwell had offered to buy out the non-management Sellers, who had been complaining about
the interference with Major Energy's business operations, and informed Maxwell that the Sellers
would only agree to a complete buyout of all Sellers.[314]

209.    Maxwell asked Alper to assist in brokering the early buyout between NGE and
the Sellers and promised Alper a $500,000 bonus if he could broker a buyout in the range of $20
million to $25 million, although Maxwell disputes that he offered this bonus to Alper.[315]

---

308 Alper Witness Statement ¶ 137; Tr. 1094:11-1095:17; Tr. 1577:14-1578:5.
309 Maxwell Witness Statement ¶¶ 39-41.
310 Alper Witness Statement ¶ 138; Wiederman Witness Statement ¶¶ 131-132.
311 Alper Witness Statement ¶ 138; Wiederman Witness Statement ¶¶ 131-132; Tr. 1128:3-1129:3.
312 Maxwell Witness Statement ¶ 42.
313 PX-354.
314 PX-354.
315 Alper Witness Statement ¶ 142; Tr. 1577:14-1578:5; Maxwell Witness Statement ¶ 48.

210.    During the following months, the parties negotiated an early buyout of the Contingent Payments.[316]

## V.    NGE Seeks the Sellers' Written Consent for the Dropdown and the Parties Reach an Agreement in Principle for an Early Buyout of $25 million

211.    Section 11.7 of the MIPA obligated NGE to obtain the Sellers' written consent for the Dropdown.[317]

212.    On April 29, 2016, Alper received an email from Lancaster attaching a draft Omnibus Assignment and Assumption Agreement in which Horowitz, the Sellers' Representative, would provide written consent for the Dropdown that was contemplated between NGE and Spark.[318]  Horowitz was listed as a party to the April 29, 2016 draft agreement, and Alper was to execute the draft agreement on behalf of Major Energy.[319]  Neither the Sellers nor Major Energy were involved in the drafting of the Omnibus Assignment and Assumption Agreement.[320]

213.    Upon receipt of this draft Omnibus Assignment and Assumption Agreement, Studnicky, the Sellers' deal counsel, erroneously stated in a May 1, 2016 email that NGE could freely transfer Major Energy within the Spark/Keith Maxwell universe of companies.[321] Studnicky, however, subsequently clarified that the Sellers' consent was required for the Dropdown.[322]  Studnicky even referred the Sellers to litigation counsel within his firm when he

---

[316] Alper Witness Statement ¶ 142.
[317] PX-632, § 11.7.
[318] PX-121.
[319] PX-121.
[320] Tr. 90:24-91:10; Tr. 99:24-100:24; Tr. 104:7-22; Tr. 1528:18-25; Tr. 1532:1-5.
[321] PX-151.
[322] Tr: 1573:24-1574:20.

was informed that NGE completed the Dropdown without obtaining Horowitz's prior written consent.[323]

214.    The Spark MIPA was executed shortly after the transmission of this draft Omnibus Assignment and Assumption Agreement.[324]   An identical draft Omnibus Assignment and Assumption Agreement was attached to the Spark MIPA as Exhibit A.[325]

215.    Similar to the requirement in Section 11.7 of the MIPA, under Section 3.2(a)(ix) of the Spark MIPA, NGE required Spark Holdco to obtain and provide "the written consent of the Prior Sellers' Representative to the Assignment" prior to closing the Dropdown.[326]

216.    Further, Section 11.1 of the Spark MIPA explicitly provides NGE advised Spark Holdco that "the prior written consent of [the] Prior Sellers' Representative is required for the assignment of certain Transaction Agreements" and that NGE would assume responsibility for "securing [the consent of] Prior Sellers' Representative as necessary under such Prior Purchase Agreement."[327]

217.    As part of the ongoing discussions between the parties about an early buyout, NGE and Spark continued their efforts to obtain Horowitz's written consent to the Dropdown by repeatedly asking Horowitz to sign the Omnibus Assignment and Assumption Agreement.[328]

218.    In early August 2016, the parties came to a tentative agreement in principle on a $25 million early buyout amount.[329]   But Horowitz made clear that he would not provide his consent to the Dropdown until the early buyout had been finalized.[330]

---

[323] PX-163; Alper Witness Statement ¶¶ 126-127.
[324] PX-650.
[325] PX-651.
[326] PX-650, § 3.2(a)(ix).
[327] PX-650, § 11.1.
[328] DX-297; PX-754; Alper Witness Statement ¶ 125; Horowitz Witness Statement ¶ 146.
[329] Alper Witness Statement ¶ 143; Tr. 1577:14-1578:5.

219.     On August 22, 2016, Gil Melman ("Melman"), the Vice President and General Counsel of Spark at the time, sent Alper a draft letter of intent for the buyout that had been discussed that day.[331]  Alper forwarded this draft to Horowitz for his review.[332]

220.     The draft letter of intent for buyout stated that Spark would make cash payments in the aggregate amount of $25 million, or $21.25 million if paid before the end of the 2016 calendar year, which was consistent with the parties' handshake agreement.[333]

221.     The following day, August 23, 2016, Alper informed Horowitz that Spark wanted him to sign the consent to the Dropdown before the early buyout was approved by the Spark board.[334]  Horowitz was unwilling to provide his consent under those conditions because he was concerned that after giving his consent that Spark would not go through with the early buyout as promised.[335]

222.     Alper conveyed Horowitz's position to Melman of Spark and asked if it were possible for Spark to get Board approval that day.[336]

223.     Melman responded that there was not enough time for that and that Spark had figured out a "workaround" to the situation without Horowitz's consent.[337]

## VI.     NGE and Spark Effectuate the Dropdown Without Sellers' Consent

224.     The sale of Major Energy from NGE to Spark closed on August 23, 2016.[338]

---

330 Horowitz Witness Statement ¶¶ 146-47; Alper Witness Statement ¶ 147.
331 PX-140; Alper Witness Statement ¶ 145.
332 PX-140; Alper Witness Statement ¶ 146.
333 PX-140; Horowitz Witness Statement ¶¶ 148-149.
334 Alper Witness Statement ¶ 147; Horowitz Witness Statement ¶ 150.
335 Alper Witness Statement ¶ 147; Horowitz Witness Statement ¶ 150.
336 Alper Witness Statement ¶ 147.
337 Alper Witness Statement ¶ 147; Tr. 1574:21-1576:2.
338 Lancaster Witness Statement ¶ 102; Kroeker Witness Statement ¶ 116.

225.    Maxwell, as owner of NGE, controlling shareholder of Spark, and Chairman of the Board of Directors of Spark, made the decision to sell Major Energy to Spark.[339]

226.    Following NGE's sale of Major Energy to Spark, Major Energy's financial results were consolidated into Spark's financial statements, increasing Spark's adjusted EBITDA and RCE count.[340]   If NGE had continued to own Major Energy, then Major Energy's financial results would not have been included as part of Spark's financial statements.[341]

227.    Ownership by Spark Holdco subjected Major Energy to the obligations and requirements of being owned by a public company, including SOX compliance requirements.[342] If NGE had continued to own Major Energy, then Major Energy would not have been subject to the obligations and requirements of being owned by a public company, including SOX compliance requirements.[343]

228.    On August 23, 2016, NGE and Spark executed a letter agreement (the "August 2016 Letter Agreement") that encompassed the "workaround" Melman had previously described to Alper.[344]

229.    The August 2016 Letter Agreement provides that "the prior written consent of Saul Horowitz, as Prior Seller's Representative, is required for the assignment of certain agreements" and acknowledges that "the consent of Prior Seller's Representative has not been obtained by the Closing Date" of the Dropdown.[345]

---

[339] Tr. 1341:9-22; Maxwell Witness Statement ¶¶ 29-31.
[340] Tr. 1316:21-23; Tr. 1318:16-18; PX 256 at 5, PX 257 at 8.
[341] Tr. 1317:14-1318:21.
[342] Tr. 1316:21-1317:17; Tr. 1338:16-1339:12.
[343] Tr. 1318:22-1319:5.
[344] PX-652.
[345] PX-652.

230.    Consistent with the plain language of the August 2016 Letter Agreement, Lancaster testified that the Sellers refused to consent to assignment of the MIPA.[346]

231.    Kroeker confirmed that, contrary to Defendants' litigation position that the Sellers' Representative's consent to assignment of the MIPA was not required,[347] the August 2016 Letter Agreement indicates that the parties believed that such consent was required.[348]

232.    NGE and Spark made last-minute changes to the named parties and signature blocks of the Omnibus Assignment and Assumption Agreement.[349]

233.    Specifically, at least as of August 16, 2016, a week before the Dropdown, the draft Omnibus Assignment and Assumption Agreement provided for the consent of Plaintiff on behalf of the Sellers.[350]    Horowitz, as Sellers' Representative, was identified as a party and signatory to that draft Omnibus Assignment and Assumption Agreement.[351]    The Omnibus Assignment and Assumption Agreement at that time also included Major Energy as a party and listed Alper, the then-CEO of Major Energy, as the signatory for Major Energy.[352]

234.    However, without Horowitz's or Alper's knowledge, Defendants removed Horowitz as a party and signatory to the Omnibus Assignment and Assumption Agreement and replaced Alper as signatory for Major Energy with NGE's CFO, Gibson.[353]    Gibson signed as "CFO" of Major Energy, yet, at the time, the CFO of Major Energy was Sobel.[354]

---

[346] Tr. 100:23-24.

[347] *See* Kroeker Witness Statement ¶ 109.

[348] Tr. 332:1-3; PX-652 ("Pursuant to the terms of the Agreements . . ., the prior written consent of Saul Horowitz, as Prior Seller's Representative, is required for the assignment of certain agreements related to the transaction contemplated by the MIPA . . . .").

[349] *Compare* PX-754.005-009 *with* PX-656.001-005.

[350] PX-754 at PX-754.0009.

[351] PX-754 at PX-754.0009.

[352] PX-754 at PX-754.0005, 0009.

[353] PX-656; Tr. 1531:19-1532:5.

[354] PX 656; Tr. 329:13-330:11; *compare* Tr. 834:2-23 *with* Tr. 224:25-225:5 and PX-426.    At trial, Gibson testified that he was the CFO of Major Energy, which is why his title was indicated as CFO on the

235.    Through this Dropdown and the other pre-Dropdown conduct, it was the Sellers' view that NGE had breached the MIPA and the Earnout Agreement.[355]

236.    The Sellers immediately retained legal counsel and considered legal action against NGE and Spark.  On September 1, 2016, the Sellers' litigation counsel sent a letter to NGE outlining certain of the breaches and expressly reserving the Sellers' rights to bring suit at a later date.[356]  Yet, the Sellers were willing to defer legal action given Defendants' representations that (1) the business interference would stop and (2) an early buyout would occur.[357]

## VII.    Continued Interference with Major Energy's Business Operations Post-Dropdown

237.    During NGE's due diligence of Major Energy, Major Energy disclosed the general business risks it faced, including "the failure to retain its current management team or other key employees; a disruption of the relationship with its largest D2D [door-to-door] marketing provider; a disruption in the favorable relationship with its commodity provider or the financial impairment of its commodity provider or other commodity hedge counterparty," among other risks.[358]  All of these business risks were realized as a result of NGE's pre-Dropdown actions as well as Spark's involvement in the business and operations of Major Energy both pre- and post-Dropdown.

---

executed Omnibus Assignment and Assumption Agreement.  Tr. 833:19-23; 834:10-20.  Gibson even went on to testify that he spent a "quite significant" portion of his time acting as CFO of Major Energy, during which he "would monitor like balances, monitor their receipts and collections, the receivable balances, typical stuff that I would do as a chief financial officer."  Tr. 835:7-17.  It was only after Gibson's counsel reminded him that he was not the CFO of Major Energy (despite having signed the Omnibus Assignment and Assumption Agreement as such), that Gibson recalled that he was not the CFO of Major Energy.  Tr. 847:21-23.

[355] PX-62.

[356] PX-60.

[357] Tr. 1534:1-15, 1535:7-10.

[358] PX-359 at PX-359.0062.

### A.       Financial and Accounting Changes at Major Energy Post-Dropdown

238.     As a result of the Dropdown, Major Energy went from being a private company with simple corporate governance to being part of a large, publicly traded company, subject to extensive regulatory oversight and reporting requirements.[359]

239.     Horowitz testified that at the time of the sale to NGE, Major Energy did not believe that its new owner would be Spark.[360]   Alper testified that it was important to Major Energy that its new owner also have simple corporate governance because "we were always concerned, especially in light of all the information that NG&E gave us about how dysfunctional Spark was, that we didn't want to be part of it."[361]

240.     Immediately after the Dropdown, Spark took over Major Energy's critical functions that are required from a SOX perspective, including cash distributions and preparing the financial statements.[362]

241.     As a result of the Dropdown, Major Energy employees had to spend considerable time understanding and implementing Spark's financial and accounting requirements in order to comply with SOX.[363]

242.     Specifically, under Spark's ownership, Major Energy's financial approvals, cash disbursements, accounting and financial reporting were required to comply with SOX requirements.[364]

---

[359] Wiederman Witness Statement ¶ 146; Moeller Witness Statement ¶¶ 65-71.
[360] Tr. 1521:20-1522:6.
[361] Tr. 1562:4-16.
[362] Tr. 333:11-334:4.
[363] Horowitz Witness Statement ¶ 183; Moeller Witness Statement ¶¶ 65-71; Wiederman Witness Statement ¶¶ 146-150; Alper Witness Statement ¶¶ 162-164; Tr. 1220:14-1221:24; Tr. 1319:23-1320:8; PX-477.
[364] Tr. 1319:14-1320:5; Moeller Witness Statement ¶¶ 65-71; Wiederman Witness Statement ¶¶ 146-150; Alper Witness Statement ¶¶ 162-164.

243.    On August 26, 2016, three days after the Dropdown, Melman sent an email to Alper, Moeller, and Sobel, copying Adam Small (Major Energy's General Counsel) and Kroeker, stating, "Welcome to Spark. . . . We have a few controls in place for the Spark family that we need you to follow."[365]

244.    Following the Dropdown, Alper regularly handled accounting integration issues raised to him by Sobel, including that Major Energy's accounts at Citibank would be moved to Spark's bank (Compass Bank), Major Energy's check writing operations would be moved to Spark's Houston office, Spark executives were requesting phone calls and in-person visits to discuss integration planning, and that Spark had revoked Major Energy management's ability to approve wire transfers.[366]

245.    Spark removed Wiederman's ability to approve wires to marketers without consulting him about the change, and Spark was sometimes late in approving wires, which was problematic in terms of retaining vendors.[367]

246.    Spark's changes in finance and accounting required the time and resources of the Major Energy management team, who now had to work with Spark employees to approve various management, trading, and financial requests and who lost their ability to act quickly and opportunistically while running Major Energy.[368]

---

[365] PX-86 at PX-86.0001-2; Wiederman Witness Statement ¶ 147; Moeller Witness Statement ¶¶ 66-67.
[366] PX-127; PX-145; PX-146; PX-147; Lane Dep. Tr. 75:4-20 ("We were very explicit that . . . Mr. Wiederman and Mr. Alper would no longer be able to approve wires, and then Mr. Sobel would not be able to approve wires.  . . . But because of the need for SOX 404A compliance and other issues with maintaining secure controls, that they would not be able to approve wires once we acquired the company.").
[367] Wiederman Witness Statement ¶¶ 148-150; PX-477.
[368] Alper Witness Statement ¶ 164.

247.    In the IT and Supply departments, additional work was required to comply with Spark's SOX requirements, further distracting Major Energy's employees from focusing on the company's business.[369]

248.    Because NGE is a private company that is not consolidated into Spark's financial statements, Major Energy would not have needed to comply with SOX if NGE had not completed the Dropdown to Spark.[370]

### B.    Damage to Major Energy's Workforce Cohesion

249.    Major Energy had a cohesive work environment prior to the sale to NGE.[371] Prior to the Dropdown, Major Energy had a low turnover rate and its employees enjoyed coming to work.[372]

250.    Shortly after the Dropdown, Major Energy lost its Chief Marketing Officer, Eliott Wolbrom, who had been with Major Energy since April 2012.[373]  Wolbrom testified that he departed from Major Energy "because the interference between Spark and what we did have was, was too much for me to handle.  It wasn't what I was told was going to happen."[374]

251.    Wolbrom was critical to Major Energy's marketing, branding, and sales, and he was instrumental in building and maintaining the company's vendor relationships.[375]

252.    Major Energy also lost two key members of its three-person supply team, Nechemia Schorr and Esther Moeller, who were the number one and two employees on Moeller's pricing team.[376]

---

[369] Moeller Witness Statement ¶¶ 68-69, 71.
[370] Tr. 1317:14-1319:5.
[371] Tr. 800:15-801:18; Tr. 1552:5-19.
[372] Wiederman Witness Statement ¶ 18; Horowitz Witness Statement ¶¶ 21-25; Wolbrom Witness Statement ¶¶ 14-16; Moeller Witness Statement ¶ 9.
[373] Wolbrom Witness Statement ¶¶ 6, 99; Wiederman Witness Statement ¶¶ 15, 156; Tr. 802:7-8.
[374] Tr. 780:16-19.
[375] Horowitz Witness Statement ¶ 163; Wiederman Witness Statement ¶¶ 157-58; Tr. 800:15-801:18.

253.    Alper testified that Schorr was a "brilliant guy" who was "very talented," that Schorr was "very unhappy with the merger," and that "[t]here were definitely implications if – when he left." [377] Moeller testified that Schorr left because "he wasn't sure that the supply team was going to stay in Orangeburg but rather move to Houston; and he had questions about whether or not his job was secure there . . . ."[378]   Moeller also testified that Esther Moeller's departure was detrimental to the company.[379]

254.    Additionally, the Dropdown allowed all of Major Energy's Senior Management Team and Key Employees—Alper (CEO), Wiederman (President), Moeller (COO), Sobel (CFO), and Horowitz (Senior Advisor)—to terminate their employment contracts for cause due to a Change in Control of Major Energy as defined in their employment contracts.   Alper, Moeller, and Sobel did terminate their contracts for cause.[380]

255.    Lancaster admitted that when NGE sold Major Energy to Spark, NGE triggered the Major Energy management team's right to terminate their employment contracts for cause and receive severance payments.[381]

256.    Although Major Energy and Spark were ultimately able to secure new at-will employment contracts for these three individuals, the formal termination and negotiation process created unrest at Major Energy.[382]   Wiederman testified that the termination of the employment contracts of Alper, Moeller, and Sobel "had a huge impact on the company" because Major

---

[376] Horowitz Witness Statement ¶ 164; Wiederman Witness Statement ¶¶ 155, 159; Moeller Witness Statement ¶¶ 80-81; Tr. 340:3-17; Tr. 1260:16-18.

[377] Tr. 1033:18-21; Tr. 1033:25-1034:3; Tr. 1035:23.

[378] Tr. 1302:16-1303:3.

[379] Tr. 1303:19-20.

[380] Moeller Witness Statement ¶ 74-75; Alper Witness Statement ¶¶ 155-57; Wiederman Witness Statement ¶ 144-145, 152-154; Horowitz Witness Statement ¶ 162; Tr. 429:25-430:2; Tr. 665:16-666:3; Tr. 1340:15-22.

[381] Tr. 69:7-16.

[382] Alper Witness Statement ¶¶ 155-57; Moeller Witness Statement ¶¶ 72-76; Wiederman Witness Statement ¶¶ 152-54; Horowitz Witness Statement ¶¶ 162, 166-67.

Energy's employees worked closely together and "[t]here were two months of chaos in the office and two months of unknowns and instability that definitely affected the morale and mindset of all the employees."[383]

257.    Kroeker testified that it would be normal for a company to experience fallout from resignations of its senior management,[384] and testified about the specific risk of these terminations: "I have three senior executives leave. I was going through a process of trying to figure out if I could rehire them. I had two other sellers that are still executives that I don't know if I'm going to stay or leave. I mean I've got a very large asset that I've just paid a lot of money for where I've got five senior executives either out the door, maybe out the door, or at risk in some way, shape or form. I briefed my board on that. My board said you've got to find a way to de-risk that asset; I don't care if you have to go up to New York, or you find somebody from your team to go up to New York, but you need to de-risk that in case those guys leave."[385]

### C.    Spark's Continued Interference with Major Energy's Residential Marketing Vendors

258.    After the Dropdown, Major Energy's residential marketing vendors continued to voice their complaints about whether Major Energy was still a stand-alone entity that was separate from Spark.[386]   Major Energy's vendors panicked and lost trust in Major Energy's residential vendor department following the Dropdown because they were "getting mixed messages" and were "not fans of Spark's name in the industry."[387]   When Gadtaula, the

---

[383] Tr. 665:23-666:12.
[384] Tr. 339:8-11.
[385] Tr. 430:3-13.
[386] Tr. 789:4-790:15; PX-184.
[387] Tr. 789:4-790:2.

President of PTM, learned that Major Energy was being purchased by Spark—a public company—he became confused and panicked.[388]

259.    To that end, after the Dropdown, Spark continued to poach the sales representatives of Major Energy's key vendors and tried to have PTM enter into a new exclusive sales arrangement with Spark.[389]

260.    On September 14, 2016, Bensinger emailed Wolbrom, stating that Bensinger "spoke to Sunil [Gadtaula] yesterday and he told me that Javier [Garcia] from Spark called him and offered him a deal $90 electric and $90 gas no usage to sell for Oasis in NYC."[390]

261.    After this poaching attempt by Spark, Wiederman made several attempts to continue to foster a relationship with Gadtaula as a vendor for Major Energy, including by speaking with him on numerous occasions on the phone and during in-person meetings.[391]  As a result of Spark's attempts to poach Gadtaula and his PTM employees, Gadtaula grew increasingly nervous about PTM's relationship with Major Energy, and Wiederman was ultimately unable to alleviate Gadtaula's concerns and frustrations with Spark.[392]

262.    Wiederman testified that after the Dropdown to Spark, Spark had ultimate decision-making authority over marketing and sales strategies.[393]

263.    Spark directed Major Energy to inform its residential marketing vendors that they must slow down or completely stop their efforts to acquire new customers in order to reduce

---

[388] Tr. 789:4-790:15; PX-184.
[389] Wiederman Witness Statement ¶¶ 162-65; Wolbrom Witness Statement ¶¶ 741-75; Tr. 652:17-653:8; Tr. 784:24-790:15; Tr. 1571:19-1572:20; PX-166; PX-195.
[390] PX-166 at PX-166.0003; PX-195 at PX-195.0001; Wiederman Witness Statement ¶¶ 163-164.
[391] Wiederman Witness Statement ¶ 165.
[392] Wiederman Witness Statement ¶¶ 165-166.
[393] Tr. 662:2-4.

Major Energy's customer acquisition costs.[394]  Wiederman testified that Major Energy was told "by Spark, throughout the years, either slow down on customer acquisition costs or stop completely any marketing."[395]

264.    Wiederman further testified that "as early as 2016 I remember Sam Bensinger walked into my office and told me that he was told by somebody at Spark to slow down marketing . . . .  He even walked in my office a couple of times and told me that he heard – that word on the street – and he heard that directly from Javier [Garcia] – was that Major Energy was being shut down tomorrow.  And this was as early as 2016."[396]

265.    Prior to the Dropdown, Major Energy had never told vendors to stop or slow down their sales unless a vendor was in breach of contract or causing marketing concerns.[397]  As Wiederman testified, informing a marketer to slow down its marketing is a "huge no-no in this industry because they can go anywhere and sell for anybody, and it's very hard to get door-to-door vendors.  So if you tell them that you want them to slow down, they're not going to be happy."[398]

266.    To the contrary, prior to the Dropdown, Major Energy consistently asked its vendors to sell as much as they could, even if that meant more customer acquisition expenses for Major Energy.[399]

267.    By 2018, Spark had effectively destroyed Major Energy's residential customer business and its relationships with its residential marketing vendors.[400]   In January 2018,

---

[394] Wiederman Witness Statement ¶¶ 167-171.
[395] Tr. 486:6-18.
[396] Tr. 661:7-14.
[397] Wiederman Witness Statement ¶¶ 170-171; Wolbrom Witness Statement ¶ 44.
[398] Tr. 486:19-24; *see also* Tr. 502:5-12.
[399] Wiederman Witness Statement ¶ 171.
[400] Wiederman Witness Statement ¶ 174.

Kroeker approached Wiederman about completely stopping Major Energy's residential door-to-door marketing and instead focusing on growing its EBITDA by saving on the capital expenditure associated with residential marketing.[401]  Given the state of the residential business at that time, Wiederman and Horowitz agreed to shift gears and stop further residential door-to-door marketing to try as best as possible to save expenses and grow EBITDA.[402]

268.    In May 2018, despite the parties' agreement to stop residential marketing and focus on growth of EBITDA, Spark reinitiated residential marketing for Major Energy, even though any gain from residential marketing at that point in the year would not bear fruit until the following year and after the Earnout Period.[403]

269.    While Wiederman and Horowitz voiced their disagreement with this change in marketing strategy, because it would result only in increased expenses for Major Energy without resulting benefits in 2018, Kroeker demanded that the company re-initiate residential mass marketing, threatening that "[a]ny communication with a vendor directed by you or anyone at Major inconsistent with the current plan will result in disciplinary action up to and including termination."[404]

### D.    Spark's Continued Interference with Major Energy's Commercial Brokers

270.    After the Dropdown, Major Energy's brokers continued to raise concerns about having to deal with Spark because it had a weak reputation in the ESCO industry.[405]

271.    Wiederman testified that "[w]e had been told by many brokers that Spark does not have a good name in the industry."[406] Benisti, a Major Energy employee whose primary

---

[401] Wiederman Witness Statement ¶ 174.
[402] Wiederman Witness Statement ¶ 174.
[403] Wiederman Witness Statement ¶ 175; PX-703.
[404] Wiederman Witness Statement ¶ 177; PX-486 at PX-486.0001.
[405] Wiederman Witness Statement ¶ 184; Wiederman Rebuttal Statement ¶ 62; PX-752; Tr. 907:12-17.
[406] Tr. 659:7-9.

responsibility was to work directly with commercial brokers, testified that because of Spark's changes in Major Energy's margin requirements and response times, Benisti's relationships with Major Energy's commercial brokers suffered because "[t]hey did not want to be stuck working with someone else . . . that they don't know, especially knowing that the company had a bad reputation of not being responsive and just not being . . . good to brokers."[407]

272.    On August 29, 2016, Bruce Shipper received an email from a Major Energy broker stating, "What's going on with this solicitation from Spark?  Is there any reason for us to sign with them?  We enjoy working with you."[408]  This email was forwarded to Wiederman, who responded, "Wtf?  Now they're stealing our brokers too."[409]

273.    While Major Energy attempted to eliminate these concerns by advising brokers that it would continue to be business-as-usual, Spark was advising Major Energy's brokers that all pricing should go through Spark's matrix because it would be handling pricing for Major Energy going forward.[410]

274.    Additionally, Spark hindered Major Energy's commercial business and broker relationships by imposing margin levels that were significantly higher than the margin levels that Major Energy set pre-sale.[411]  For example, Benisti testified that Spark's margin requirement changes negatively affected Major Energy's relationship with Arcadia Energy, a broker that would sell large blocks of residential customers to be priced as a commercial deal with a

---

[407] Tr. 881:21-882:17.

[408] PX-752; Wiederman Rebuttal Statement ¶ 62.

[409] PX-752; Wiederman Rebuttal Statement ¶ 62.

[410] Wiederman Witness Statement ¶¶ 183-186; PX-160 ("As another example, a larger broker of ours was recently told by Spark that all pricing should go through Spark's matrix as they will be handling the pricing for all companies.").

[411] Wiederman Witness Statement ¶¶ 187-91; Tr. 657:18-658:1; Tr. 659:6-12; Tr. 661:20-662:1; Tr. 871:22-877:8; Tr. 881:21-882:17.

commercial sized margin.[412]  Spark put in rules requiring high margins of 11 or 12 mils for those accounts and, as a result, Arcadia Energy could not contract the deal and Major Energy lost out on the business.[413]

275.    In accordance with these higher margin requirements, Kroeker testified that Spark's "stated effort" was to reduce exposure to large commercial accounts with low margins.[414]

276.    Wiederman testified that prior to the sale, Major Energy had the flexibility to set lower margins, which helped generate future business at higher margins.[415]  Benisti similarly testified that Major Energy's margin policy was not "set in stone" and Major Energy would be flexible on its margins.[416]  Sometimes Major Energy would bring in commercial deals with lower margins to "get that deal done, because it also showed the broker we got this deal, it gets the broker in the rhythm of sending us deals."[417]  Under Spark's control, however, Major Energy no longer had the freedom to pursue commercial deals at lower margin levels.[418]  Indeed, under Spark, if Major Energy wanted to do a commercial deal with a margin that was lower than the set margin levels, it needed to get approval from Spark.[419]

E.    **Spark's Interference with Major Energy's Supply Operations**

277.    After the Dropdown, Spark continued to act to terminate and replace PSE as Major Energy's supplier.[420]

---

[412] Tr. 874:13-877:8.
[413] Tr. 875:25-877:8.
[414] Tr. 341:12-22; *see also* Tr. 872:9-15.
[415] Tr. 657:18-23.
[416] Tr. 864:8-13.
[417] Tr. 864:8-15.
[418] Wiederman Witness Statement ¶¶ 187-90; Tr. 657:24-658:1; Tr. 872:9-873:1.
[419] Moeller Witness Statement ¶ 105.
[420] Moeller Witness Statement ¶¶ 89-96; Horowitz Witness Statement ¶ 133; Alper Witness Statement ¶¶ 170-176; Wiederman Witness Statement ¶¶ 193-195.

278.    In September 2016, Kroeker—not Alper, who was Major Energy's CEO at the time—signed three letters on behalf of Major Energy to PSE terminating Major Energy's supply agreement with PSE.[421]

279.    In November 2016, during an earnings call, Kroeker represented to investors and analysts that "[o]ne of the things that we're working on early in the next year is taking over all of the supply function for Major, which is a significant synergy to us, and will result in us adding several million dollars to the bottom line when we step into that position."[422]

280.    Over the next few months, Major Energy's Senior Management Team continued their attempts to negotiate an extension of the supply relationship with PSE, but Major Energy was in an unfavorable bargaining position to secure an extension as a result of Gibson's notifying PSE in April 2016 that PSE would be terminated, and Kroeker's formal termination of the PSE relationship in September 2016.[423]

281.    To that end, in January 2017, PSE sent a term sheet to Major Energy for a renewal of the PSE supply relationship containing terms that were far less favorable than the terms that the parties already had in place.[424]  Among other things, the January 2017 proposed term sheet contained supply fees of $2.50/MWh, which was higher than the $1.00/MWh PSE was charging to Major Energy at the time and the $0.85/MWh PSE had offered to charge in March 2016 in connection with its offer to extend the PSE relationship through the entire Earnout Period.[425]

---

[421] PX-506; Tr. 443:18-444:9; Tr. 1299:21-1300:3; Tr. 1579:6-1580:3.
[422] PX-257 at PX-0257.0007.
[423] PX-506; PX-361; Tr. 842:24-843:16; Tr. 1148:21-1149:5; Tr. 1149:19-1151:25.
[424] DX-981.
[425] DX-981; PX-380 at PX-0380.0002 ("In order to make this a 'win-win' for Major, PSE would be willing to reduce our credit fee on the power sales from $1.00/MWhr to $0.85/MWhr effective upon closing of your sale.").

PSE's new term sheet also drastically shrank the credit facility and contained less favorable hedging policies.[426]

282.    Left with no real choice, on February 8, 2017, Horowitz informed Kroeker that "the PSE negotiations did not proceed the way we would have wanted and we are in agreement to give Spark Supply a try as Major's supplier.  We will also be looking at what else is out there in the market but do not believe any other arrangement could be in place by April 1."[427]  As Alper testified, at this point, "our backs were to the wall" and "Major Energy had no choice but to reluctantly agree to give Spark a try as its new supplier" because Major Energy's key contacts at PSE—Depew and Chung—were fired by PSE once it realized that it had no legitimate chance to extend the Major Energy relationship.[428]

283.    From a supply perspective, Major Energy was disadvantaged by having Spark take over for PSE as Major Energy's supplier.[429]  With Spark as the supplier, Major Energy had little to no visibility into Spark's purchasing of gas.[430]  Spark provided Major Energy with little, if any, advance notice regarding its pricing of gas for the following month and instead told Major Energy about Spark's gas pricing decisions after the fact, providing Major Energy with no legitimate way to challenge the pricing decisions before the purchases were actually made.[431]

---

[426] Horowitz Witness Statement ¶ 193.

[427] DX-483.

[428] Alper Witness Statement ¶¶ 174-175; *see also* Horowitz Witness Statement ¶¶ 189-198; Wiederman Witness Statement ¶ 119.

[429] Tr. 1298:23-1299:9; Moeller Witness Statement ¶¶ 96-105; Wiederman Witness Statement ¶¶ 196-198.

[430] Moeller Witness Statement ¶ 100; Wiederman Witness Statement ¶ 197; DX-1018 at SPRK-NGE0023308 – 23309.

[431] Moeller Witness Statement ¶ 100; Wiederman Witness Statement ¶ 197; DX-1018 at SPRK-NGE0023308 – 23309.

284.    With PSE, however, Major Energy had transparency and visibility into PSE's pricing in advance of the start of the next month.[432]   In addition, PSE would collaborate with Moeller before making its purchases, which Spark did not do.[433]

285.    PSE's early involvement of Major Energy before purchasing decisions were made also allowed the supply department to accurately forecast its costs in advance of each month, providing Moeller with a clear picture of how much money Major Energy would be making on its fixed and variable rate contracts in the following month.[434]

286.    Major Energy also received detailed invoices from PSE, which Major Energy could tie back because PSE provided Major Energy with all the information directly associated with Major Energy's flow.[435]   Spark, however, was never able to break out its pricing analysis for Major Energy in a way that was helpful to Moeller.[436]

287.    Major Energy also had a favorable deal with PSE on hedging, where PSE did not require Major Energy to hedge with respect to its variable book, while Spark, on the other hand, on numerous occasions, asked Major Energy to hedge Major Energy's variable book because Major Energy was outside the allowable number required by the risk policy established by Spark's Risk Committee.[437]   As a result of Spark's hedging practices, Major Energy lost out on profitability from its variable book that it could have achieved with PSE.[438]

---

[432] Moeller Witness Statement ¶¶ 28-29, 99; Wiederman Witness Statement ¶ 197; Tr. 648:18-649:7.
[433] Wiederman Witness Statement ¶ 197; Moeller Witness Statement ¶¶ 28-31, 99-102; Tr. 1136:4-20.
[434] Moeller Witness Statement ¶ 29.
[435] Moeller Witness Statement ¶ 29.
[436] Moeller Witness Statement ¶ 102.
[437] Moeller Witness Statement ¶ 104; DX-1014 at SPRK-NGE0059117.
[438] Moeller Witness Statement ¶ 104.

288.     Additionally, unlike PSE, Spark did not allow Major Energy to pursue "aggregation deals"—a method of acquiring large quantities of lower-margin customers at once—to obtain additional customers.[439]

**F.     Spark Restricts Major Energy's Ability to Pursue Aggregation Deals**

289.     Prior to the acquisition, Major Energy had pursued aggregation deals and completed a deal that was similar to an aggregation deal.[440]

290.     During the negotiation period, the Senior Management Team discussed at length with NGE that Major Energy may pursue aggregation deals during the Earnout Period to increase its Customer Accounts if it felt those aggregation opportunities would be beneficial for the company, and NGE representatives, including Lancaster, agreed that Major Energy could pursue aggregation deals if it thought they were in Major Energy's best interest.[441]

291.     Section 2.7 of the Earnout Agreement and Executive Earnout Agreement required NGE (and later Spark) to operate Major Energy "consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities."[442]   Section 2.7 also required Spark to "in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies."[443]

---

[439] Wiederman Witness Statement ¶¶ 198-205; Moeller Witness Statement ¶¶ 32, 111-117; Alper Witness Statement ¶ 187; Tr. 648:18-649:7.
[440] Wiederman Witness Statement ¶ 199; Moeller Witness Statement ¶ 111; Horowitz Witness Statement ¶ 203; PX-12.
[441] Alper Witness Statement ¶ 186; Wiederman Witness Statement ¶¶ 200-202; Horowitz Witness Statement ¶¶ 201-202.
[442] DX-1, § 2.7; DX-5, § 2.7.
[443] DX-1, § 2.7; DX-5, § 2.7.

292.   In May 2017, the Major Energy Senior Management Team determined that it was in the company's best interest to bid on an aggregation deal in Illinois for 16,700 customer accounts.[444]

293.   Moeller informed Spark of the Major Energy Senior Management Team's intent to bid on the Illinois aggregation deal.[445]  Spark told Moeller that he was required to make a presentation to Spark's Risk Committee and that Spark's Risk Committee, rather than Major Energy's Senior Management Team, would have to approve the proposed deal.[446]

294.   Spark's three-member Risk Committee was comprised solely of Spark employees:  Kroeker, Murthy Rao, and Robert Lane.[447]

295.   Moeller presented the Illinois aggregation deal opportunity to the Spark Risk Committee; in response, the Spark Risk Committee refused to allow Major Energy to bid on the proposed Illinois aggregation deal and imposed a 5,000-customer cap on future aggregation deal opportunities for Major Energy.[448]

296.   In rejecting the proposed Illinois aggregation opportunity and imposing a 5,000-customer cap on aggregation deals going forward, Spark did not consult in advance or collaborate with Major Energy's Senior Management Team.[449]  While Moeller believed that the Illinois aggregation deal presented some risk on a margin level,[450] Moeller was not a part of the

---

[444] Wiederman Witness Statement ¶ 203.

[445] PX-500 at PX-500.0003; PX-585; Wiederman Witness Statement ¶ 203; Moeller Witness Statement ¶ 113.

[446] Moeller Witness Statement ¶ 113; Horowitz Witness Statement ¶ 204; Tr. 346:15-22; PX-500; PX-585.

[447] Tr. 345:6-12.

[448] Horowitz Witness Statement ¶¶ 204-205; Wiederman Witness Statement ¶¶ 204-205; Moeller Witness Statement ¶¶ 114-115; Tr. 1279:23-1280:2.

[449] Tr. 346:15-348:1; Tr. 1279:13-1280:15; Tr. 1306:16-1307:8.

[450] Moeller Witness Statement ¶ 115.

Senior Management Team,[451] and the decision of whether to bid on the Illinois aggregation deal rested exclusively with Horowitz and Wiederman (not with Moeller).[452]

297.    As Kroeker admitted at trial, under Spark's control, the Spark Risk Committee had the final say on whether Major Energy could proceed with aggregation deals.[453]  Spark's implementation of a cap on future aggregation deals effectively made it impossible for Major Energy to pursue any aggregation opportunities going forward.[454]

298.    In August 2017, after Alper had departed from Major Energy, he came across an aggregation deal for 7,000 customers that he felt would be beneficial for Major Energy.[455]  Alper presented this aggregation opportunity for 7,000 customers to Moeller and Wiederman, stating, "As discussed, please see available approx. 7,000 aggregation customers.  They have a lot more and I think I can convince them to sell many more."[456]

299.    In response, Moeller informed Alper that Spark had blocked Major Energy from bidding on these types of aggregation opportunities because Spark had set a 5,000-customer cap on aggregation deals.[457]

## VIII.    Miscalculation of the 2016 Contingent Payment

### A.    The Formula for Calculating the Contingent Payments

300.    Using a demonstrative at trial, Plaintiff's expert, David Leathers ("Leathers"), explained that there are three Earnout Payment formulas that have been used by the parties in the

---

[451] DX-1 at SPRK-NGE0044913 ("'Senior Management Team' means Saul Horowitz, Moshe (Mark) Wiederman, and Daniel Alper.").

[452] Tr. 662:21-663:11; Tr. 1279:23-1280:9; Tr. 1306:16-24; Wiederman Witness Statement ¶ 204; Moeller Witness Statement ¶ 115.

[453] Tr. 346:19-22; *see also* Wiederman Witness Statement ¶ 204; Moeller Witness Statement ¶ 115.

[454] Wiederman Witness Statement ¶ 205; Moeller Witness Statement ¶ 116.

[455] Alper Witness Statement ¶ 188; PX-254 at PX-254.0030-31.

[456] PX-254 at PX-254.0031; Alper Witness Statement ¶ 189; Moeller Witness Statement ¶ 117; Tr. 1124:2-1126:7; Tr. 1280:21-1284:18.

[457] PX-254 at PX-254.0030; Alper Witness Statement ¶ 189; Moeller Witness Statement ¶ 117; Tr. 1284:8-1285:1.

case: (1) the formula used in Exhibit B to the Earnout Agreement ("Exhibit B Formula"); (2) the formula that Defendants aver is the correct formula in this litigation ("Defendants' Formula"); and (3) a formula used in an April 11, 2017 memorandum drafted by Lancaster ("Lancaster Memo Formula").[458]

301.    Leathers explained that the calculation dispute in this case generally centers around the first variable of the Earnout Payment formula—specifically, whether the first variable should be Adjusted EBITDA Plan (as in the Exhibit B Formula); actual Adjusted EBITDA minus the first quarter 2016 Adjusted EBITDA (as in Defendants' Formula); or the Earnout Ceiling (as in the Lancaster Memo Formula).[459]

302.    Leathers further explained that, in his opinion, the Exhibit B Formula is the proper formula to calculate Earnout Payments because it is the only formula that takes into consideration the economics of the transaction, meaning that it is the only formula that allows the Sellers to receive the maximum Earnout Payment if the Adjusted EBITDA and Customer Account targets are achieved, and also allows for a potential Executive Earnout Payment.[460]

303.    Leathers testified that in Exhibit B, the Adjusted EBITDA Plan for each Target Year is multiplied by the achievement percentage (*i.e.*, the actual Adjusted EBITDA/Adjusted EBITDA Plan), which is indicated by the percentages in the three different scenarios on Exhibit B.[461]  That amount is then multiplied by the Earnout Percentage for the year (9/33 or 12/33), to arrive at the Earnout Payment to the Sellers (which is capped at the Earnout Ceiling) and the

---

[458] Tr. 1725:6-25.
[459] Tr. 1726:1-12.
[460] Tr. 1726:13-1727:16.
[461] Tr. 1729:14-1730:14.

Executive Earnout Payment (any amount exceeding the Earnout Ceiling). Below is a graphical representation of the Exhibit B Formula, before a CAA:[462]

$$\text{Earnout Payment (Before CAA)} \quad = \quad \text{2016 Adjusted EBITDA Plan} \quad x \quad \left[ \frac{\text{2016 Adjusted EBITDA (Actual)}}{\text{2016 Adjusted EBITDA Plan}} \right] \quad x \quad \text{2016 Earnout Percentage (approx. 27.27\%)}$$

304.    Leathers explained that removing the first quarter Adjusted EBITDA does not serve the economics of the transaction because it does not enable the Sellers to receive the full Earnout Payment for 2016 upon achievement of the targets.[463]  The exclusion of first quarter 2016 Adjusted EBITDA is accounted for in the Exhibit B Formula through a lower Earnout Percentage of 9/33 (versus 12/33).[464]

305.    Defendants used the Exhibit B Formula in 2016 when discussing their internal understanding of the economics of the acquisition of Major Energy.  For example:

- In a April 8, 2016 email Kroeker refers to the attached spreadsheet as "the interactive model to show how the earnout works."[465]  The gray cells beginning on row 52 of the attached spreadsheet reflect the same calculation that is used in Exhibit B, though differing achievement percentages are used.[466]

- In a September 6, 2016 email from Hennekes to Kroeker and Konikowski, Hennekes attaches a spreadsheet that he refers to as the "earnout model."[467]  In the attached spreadsheet, in the gray cells starting on row 48, is the same Earnout Payment calculation contained in Exhibit B.  Different achievement percentages are assumed, but the same formulas are used.[468]

---

[462] Leathers Witness Statement ¶ 42.

[463] Tr. 1737:13-20.

[464] Tr. 1737:13-1738:6.  Further, Wiederman testified that Section 2.2 is "ambiguous in the way it's written up . . . [b]ut that's why, in the spreadsheet, where it takes out the first quarter, it says 9 of 33" and that is why the Earnout Ceiling for 2016 is $5.45 million rather than $7.27 million.  That is where "the Sellers are not getting their share of the first quarter."  Tr. 602:21-603:4.

[465] PX-641.

[466] PX-641A; Tr. 1732:16-25.

[467] PX-357.

[468] PX-357A; Tr. 1731:12-19.

- In a September 19, 2016 email from Andy Davis, Senior Director, Finance and Treasurer for Spark, to Houlihan Lokey, Davis provided a copy of the Executive Earnout Agreement and explained that it "goes hand-in-hand [with] the Earnout Agreement," and indicated that they should "[s]ee Exhibit B-1 for a good example…in the top case, assuming all targets are met…you can see that $24.8MM is paid out…$20MM (capped) to the shareholders, and $4.8MM to the execs."[469]

306.    After the Earnout Payment is calculated based on the Adjusted EBITDA, the CAA is applied.[470]   The CAA is calculated by multiplying the difference between the actual Year End Customer Accounts and the target Year End Customer Accounts by the projected Adjusted EBITDA per customer for that particular Target Year (*i.e.*, Adjusted EBITDA Plan/Year End Customer Account Target).[471]

307.    In addition to disputing the Earnout Payment methodology, the parties also dispute the calculation of Year End Customer Accounts and the actual Adjusted EBITDA.

308.    "Year End Customer Accounts" is defined in the Earnout Agreement to be the actual number of Customer Accounts at the end of each Target Year "computed in a manner consistent with the procedures, practices, methodologies, and standards used by the Companies in calculating their customer accounts before the Closing."[472]   Further, "Adjusted EBITDA" is defined to mean EBITDA, subject to, among other items, "any deviations from GAAP as to accounting principles actually applied in accounting for the operations of [Major Energy] in periods prior to the Closing Date."[473]   In accordance with this language, Wiederman and Horowitz both testified that it was their understanding that Adjusted EBITDA and Year End

---

[469] PX-439.
[470] PX-634, § 2.2(d).
[471] PX-634, § 2.2(d).
[472] PX-634, § 1.1.
[473] PX-632, § 1.1.

Customer Accounts should be calculated the same way during the Earnout Period as they had been calculated previously.[474]

309.    Major Energy's historical method of counting Customer Accounts is to count active customers and pending active customers, less pending dropped customers and cancelled customers.[475]  Leathers ascertained this from interviews with Major Energy management, review of deposition testimony, and the customer account calculation that was done for the final projection model (which employs this methodology).[476]

310.    Major Energy's historical method of calculating Adjusted EBITDA, in accordance with prior Adjusted EBITDA calculations and the final projections that formed the basis of the deal, was to not deduct expenses for executive compensation, extraordinary legal expenses, and certain other extraordinary expenses not incurred in the ordinary course of business in the calculation of Adjusted EBITDA.[477]  As such, Leathers testified that it is his opinion these same types of  expenses should be accounted for as "addbacks" to Adjusted EBITDA for purposes of the Contingent Payments in order to maintain the agreed-upon economics of the transaction.[478]

311.    Of note, as a function of the formulas for calculating both the Earnout Payment and the Cash Installment in a given Target Year (both of which use Adjusted EBITDA as a variable determining the ultimate payment), if the Adjusted EBITDA is altered, both the Earnout Payment and the Cash Installment will change.[479]

---

[474] Wiederman Witness Statement ¶¶ 77-78; Horowitz Witness Statement ¶ 237.
[475] Tr. 1733:16-24; Wiederman Witness Statement ¶ 213; PX-717.
[476] Tr. 1734:5-18; Tr. 1702:18-24; PX-377A; Leathers Witness Statement ¶¶ 125-127.
[477] Tr. 1739:7-12; PX-377A; PX-573; PX-359.
[478] Tr. 1739:7-12; 1741:4-12.
[479] *See supra* ¶¶ 59, 303.

### B.      Spark's Initial 2016 Contingent Payment and Dispute Among the Parties

312.    On March 24, 2017, Horowitz received the Earnout Statement detailing the calculation of the Earnout Payment for 2016.[480]  According to Spark, Major Energy's total 2016 Adjusted EBITDA was $19,171,499 and total 2016 Customer Accounts were 164,767.[481]

313.    In this Customer Account calculation Spark reconciled this amount to Major's EMS by taking the "EMS Count" total of 175,135, less "Pending active" customers of 9,182, and less "Pending drop dated prior to 12/31/16" of 1,234.[482]  This calculation resulted in 164,719 customer accounts.[483]

314.    Wiederman testified that Spark's Customer Account total in this Earnout Statement was inconsistent with Major Energy's historical method for calculating Year End Customer Accounts.[484]

315.    This Customer Account calculation is inconsistent with Wiederman's explanation of Major Energy's Customer Account calculation in an email sent only hours before this Earnout Statement on March 24, 2017.[485]  In that email, Wiederman wrote to Murthy Rao of Spark, and stated that "it comes down to the way Major has historically run its numbers and projections. We have always included pending active accounts and excluded pending cancels.  This is the foundation of what the projections were built off of."[486]  Other record evidence confirms Wiederman's March 2017 explanation that Major Energy's historical method of counting

---

[480] Wiederman Witness Statement ¶ 207; Horowitz Witness Statement ¶ 219; PX-528.
[481] PX-528.
[482] PX-528.
[483] PX-528.
[484] Wiederman Witness Statement ¶¶ 210-214; *see also* PX-717.
[485] PX-717.
[486] PX-717.

customer accounts was to include active customers and pending active customers, less pending dropped customers and cancelled customers.[487]

316.    Spark's calculation of 2016 Customer Accounts is inconsistent with the contractual requirement in the Earnout Agreement that customer accounts be "computed in a manner consistent with the procedures, practices, methodologies, and standards used by the Companies in calculating their customer accounts before the Closing."[488]

317.    With respect to this 2016 Customer Account calculation, Kroeker admitted that Spark "did not understand how Major's past practices and methodology were applied. . . .  So, we just used the industry approach, which was to count those customers that are on flow as of December 31."[489]

318.    Additionally, Spark's Earnout Statement indicated that Major Energy's first quarter 2016 Adjusted EBITDA ($7,609,518) was ineligible to be included in the Earnout Payment calculation.[490]

319.    Exclusion of first quarter Adjusted EBITDA is inconsistent with the economics of the transaction and the Exhibit B Formula that the parties had agreed upon during negotiations.[491]

320.    Finally, Spark's calculated Adjusted EBITDA did not include addbacks for executive compensation, extraordinary legal expenses, or other extraordinary costs not incurred

---

[487] Tr. 1733:16-24; Wiederman Witness Statement ¶ 213.
[488] PX-634, § 1.1.
[489] Tr. 423:19-424:2; Tr. 424:25-425:1.
[490] PX-528.
[491] Tr. 1737:13-1738:6; Tr. 602:21-603:4; PX-634.

in the ordinary course of business, which did not comport with Major Energy's historical calculation of Adjusted EBITDA or the projections underlying the transaction.[492]

321.   Spark's 2016 Earnout Statement began a discussion among Spark and the Sellers regarding the proper calculation methodology and inputs.  Wiederman and Lancaster both testified that they had a telephone call to discuss the dispute, though their recollections of that discussion differ.[493]

322.   On March 27, 2017 Horowitz sent an email to Melman, Kroeker, and Lancaster disputing Spark's Earnout Statement.[494]  Attached to this email is a spreadsheet calculation that input the Sellers' calculation of Adjusted EBITDA and Customer Accounts into the Exhibit B spreadsheet.[495]  At trial, Wiederman explained that the $23 million Adjusted EBITDA figure that was provided in the Sellers' initial calculation of the 2016 Earnout Payment was received from Sobel, but that Wiederman had been tracking Major Energy's Adjusted EBITDA throughout the year and Wiederman had reviewed backup for that calculation.[496]  Because under this calculation, the Earnout Agreement targets had been achieved, the Sellers would have received the maximum Earnout Payment for 2016—$5,454,545.[497]

323.   Also, on March 27, 2017, Horowitz forwarded an email exchange between Alper and Lancaster from June 2016.[498]  At the bottom of the email chain, Alper asked Lancaster for the color-coded earnout model.  Lancaster responded and attached a spreadsheet: "The first tab is the spreadsheet that both sides relied upon to confirm our mutual understanding of the business

---

[492] Tr. 1739:7-12; PX-377A; PX-573; PX-359.

[493] Wiederman Witness Statement ¶ 220; Lancaster Witness Statement ¶ 66.

[494] PX-698; Horowitz Witness Statement ¶ 221.

[495] PX-698A; Wiederman Witness Statement ¶ 222; Tr. 597:22-598:2; Tr. 603:21-604:6; Horowitz Witness Statement ¶ 222.

[496] Tr. 597:7-18; PX-698A; *see also* Wiederman Witness Statement ¶ 222.

[497] Tr. 598:8-17; PX-698A; *see also* Wiederman Witness Statement ¶ 223.

[498] PX-473; Horowitz Witness Statement ¶ 223.

drivers and resulting calculations of the Earnout, the Executive Earnout, and the Cash Installments prior to the execution of the Membership Interest Purchase Agreement."[499]  This first tab of the spreadsheet is substantially similar to Exhibit B and the other spreadsheets exchanged among the parties.[500]

324.    On March 28, 2017, Wiederman, Horowitz, and Spark had a call to discuss the Earnout Payment calculation and inputs.[501]

325.    On March 30, 2017, Lancaster replied providing another spreadsheet that he prepared.[502]  This calculation again removes first quarter Adjusted EBITDA from the calculation, making it mathematically impossible to achieve the maximum Earnout Payment even upon 100% achievement of the Earnout targets, as indicated on the fourth tab of this calculation.[503]

326.    Lancaster admitted that if the Earnout Payment formula for 2016 that he and the Defendants characterize as the correct formula is used, Major Energy would have had to achieve somewhere between $27 and $28 million in Adjusted EBITDA to achieve the maximum 2016 Earnout Payment.[504]  In other words, Major Energy's Adjusted EBITDA in 2016 would have to

---

[499] PX-473.
[500] PX-473A; Tr. 607:5-9.  At trial, Lancaster agreed that the first tab of the spreadsheet attached to PX-473, without any of the green cells that Lancaster added post-sale, was the spreadsheet agreed upon among the parties.  Tr. 127:3-9; Tr. 128:11-13.  Similarly, Wiederman did not recall Lancaster creating the spreadsheet calculation contained in the green cells of PX-473A while being in Major Energy's offices (Tr. 608:20-22) and Wiederman confirmed that this was not created until months after the deal closed (Tr. 609:3-6).  Wiederman confirmed that the spreadsheet calculation in the second tab of PX-473A was not part of any negotiation of the deal.  Tr. 608:25-609:15; Wiederman Rebuttal Statement ¶ 20.  Lancaster also confirmed that using the calculation that he added post-sale in the green cells on the second tab of PX-473A if the targets set forth in the Earnout Agreement are hit 100%, only approximately $3.68 million is received, which is less than the full potential 2016 Earnout Payment.  Tr. 128:22-25.
[501] Horowitz Witness Statement ¶ 224; PX-63.
[502] PX-557; Horowitz Witness Statement ¶ 225.
[503] PX-557A.
[504] Tr. 121:5-9; Tr. 206:10-16; Tr. 252:4-17.

have been roughly equivalent to the 2018 Adjusted EBITDA Plan in order to achieve the full

Earnout Payment.[505]

327.    This same day, which was also the date that the 2016 Contingent Payment was

due under the terms of the Earnout Agreement,[506] Horowitz sent an alternate calculation using

Spark's calculated Adjusted EBITDA and Customer Accounts and indicating a total 2016

Contingent Payment of approximately $7.4 million.[507]   Horowitz demanded payment of this

amount.  Spark paid this amount the same day.[508]

328.    Horowitz and Wiederman believed that this amount was still far too low because

Spark's Customer Account total and Adjusted EBITDA calculations were incorrect.[509]

Specifically, Spark was using a Customer Account total that did not reflect the methodology

historically used by Major Energy to calculate total Customer Accounts, and Spark did not apply

the correct addbacks.[510]   Horowitz and Wiederman intended to continue to work with Spark to

make sure the entire and correct amount was paid.[511]

329.    Melman responded on the same day to indicate that Spark was "processing the

wire transfers in the aggregate amount of approximately $7.4 million" and noted that Spark

viewed "this amount as preliminary and subject to further discussion and confirmation."

Melman added that "Mark [Wiederman] and Nathan [Kroeker] worked through the calculation

earlier this evening and there remains a difference of approx. $300,000-$350,000.  You and the

---

[505] Tr. 121:21-25.
[506] PX-634; Tr. 358:18-359:1; Tr. 144:21-24.
[507] PX-524, § 2.2(e); PX-524A; Horowitz Witness Statement ¶ 227.
[508] Wiederman Witness Statement ¶ 233; Horowitz Witness Statement ¶ 229.
[509] Horowitz Witness Statement ¶ 232; Wiederman Witness Statement ¶¶ 210-211, 213, 218.
[510] Horowitz Witness Statement ¶¶ 232, 234; Wiederman Witness Statement ¶¶ 211, 213, 223; Tr. 444:22-445:12.
[511] Horowitz Witness Statement ¶ 232; Wiederman Witness Statement ¶ 240.

other sellers should not view these wires as final agreement on the earnout and we reserve all rights under the governing contracts."[512]

### C.    Kroeker's April 12, 2017 Email and Lancaster's Memo

330.    Wiederman testified that he discussed the Earnout Payment calculation at length with Kroeker, and it was Wiederman's understanding that Kroeker "went back to Mr. Lancaster, who I was very involved with at the time we created the spreadsheet, and Mr. Lancaster, ultimately they came around and they agreed to structure the deal, and then it was just a matter of understanding . . . what addbacks and what the adjusted EBITDA number was."[513]

331.    Consistent with this recollection, on April 12, 2017, Kroeker emailed Wiederman and Horowitz, and attached a spreadsheet and a memorandum from Lancaster dated April 11, 2017.[514]  In that email, Kroeker stated:

> I wanted to follow up on our conversations over the past few weeks regarding the cash installment and Earnout, both in general and specifically for the 2016 calculation. I asked Gary [Lancaster] to go back to the MIPA and the Earnout Agreement and spell out, step by step, how those numbers should be calculated in order to best fit both the spirit and the letter of the agreement. Our goal was to make sure we are all on the same page regarding the exact calculation that covers not only the partial 2016 year, but also 2017 and 2018. After reviewing Gary's memo and the notes from our conversation, we believe that the proper number is $7,563,180 for 2016, which is $160,033 more than the good faith payment that Spark made at the end of March. This amount uses Spark's Adjusted EBITDA of $19,171,499 and Major's Year End Customer Count of 167,152, which we now agree is correct and consistent with the way Major has always counted its customers.[515]

---

[512] DX-516.
[513] Tr. 603:8-14; Tr. 616:18-20.
[514] PX-623.
[515] PX-623.

332.    At trial, Kroeker testified that in asking Lancaster to create his memorandum analysis he wanted to determine how the Contingent Payment should be calculated in order to best fit the spirit and the letter of the Earnout Agreement.[516]

333.    Kroeker has characterized this email as a "contingent compromise offer" sent for "negotiation purposes,"[517] however the actual words Kroeker used in his email and the impression provided to the reader do not accord with this purpose or message.   Kroeker confirmed that nowhere in his email or Lancaster's memorandum does he indicate that certain provisions of the Earnout Agreement are being ignored.[518]

334.    In the memorandum, attached to Kroeker's April 12, 2017 email, Lancaster wrote that to properly calculate the Contingent Payment for 2016 under the Earnout Agreement, the total potential Earnout Payment of $20,000,000 should be multiplied by the 2016 Earnout Percentage of 27.272727% to arrive at an Earnout Ceiling of $5,454,545.   Thereafter, the Earnout Ceiling should be multiplied by the percentage of achievement of the Adjusted EBITDA goal, which Spark calculated to be 92.4% (actual 2016 Adjusted EBITDA/Adjusted EBITDA Plan).   Nowhere in Lancaster's analysis does he suggest that the Adjusted EBITDA for the first quarter of 2016 should be excluded from the Earnout Payment or that the 2016 Adjusted EBITDA target of $20,749,213 was not a full year target.[519]

335.    Also in the memorandum, Lancaster provided a detailed analysis of the provisions of Section 2.2 of the Earnout Agreement.[520]   Nowhere in this analysis does he suggest that Section 2.2(b) should be read to exclude first quarter 2016 Adjusted EBITDA.[521]

---

[516] Tr. 361:1-6.
[517] Kroeker Witness Statement ¶ 267.
[518] Tr. 363:7-10.
[519] PX-623.
[520] PX-623.

336.    At trial, Lancaster testified that, despite the language in the memorandum he drafted which states that "[t]his memorandum is my analysis of the pertinent contractual provisions pertaining to the methodology to be utilized in the determination of the calculation of earnout and cash installment payments payable under the [MIPA]," that this memorandum was "intended to be my putting [S]ellers' hat on and coming up with the methodology that Major must have used to come up with their numbers."[522]   While Lancaster characterized this memorandum as "[S]ellers' interpretation," Lancaster also admitted that nowhere in the memorandum does it indicate this analysis is intended to be Sellers' interpretation.[523]   Lancaster maintained this position despite the fact that he knew this memorandum would be shared with the Sellers.[524]

337.    Similarly, Lancaster admitted that Kroeker's April 12 email and attached memorandum reflected in DX-539 that Defendants now claim to be a "compromise" offer for "negotiation" purposes do not indicate that the statements in the email or analysis in the memorandum are any sort of negotiated compromise.[525]

338.    In light of Lancaster's legal experience and position at NGE, and in consideration of the words that Lancaster used in his memorandum, Lancaster's characterization of his April 11 memorandum as his interpretation of the Sellers' position and/or a negotiated compromise offer is not credible.

---

[521] PX-623.
[522] Tr. 148:21-149:17.
[523] Tr. 150:1-19.
[524] Tr. 190:9-11.
[525] Tr. 146:5-149:21.

### D.      Continuing Addback Discussions

339.      On April 23, 2017, Horowitz wrote to Kroeker to detail certain items the Sellers believed should be included as Adjusted EBITDA addbacks.[526]  Kroeker responded in agreement with certain addbacks but rejecting others.[527]

340.      On June 2, 2017, Horowitz again wrote to Kroeker regarding addbacks and explained that: "When this deal was done, it revolved around projections produced by Major, which NG&E and Major used to consummate the deal. We are being held accountable to these projections for purposes of the earn out. Those projections had EBITDA built up the way Major historically did it and therefore that same methodology needs to be followed through for purposes of determining present and future earn out payments. There were built in add-backs in those projections and therefore the same addbacks need to be applied now. This seems obvious to us."[528]  Horowitz sent another email providing additional addback detail on June 5, 2017.[529]

341.      On June 19, 2017, Kroeker emailed Wiederman and Horowitz and attached a memorandum responding to the Sellers' addback items.[530]  Horowitz responded on June 21 and expressed the Sellers' view that a stalemate had been reached and there was nothing more to discuss.[531]

342.      Despite the existence of addback negotiations,[532] many intervening disputes regarding operation of the business, and the filing of this litigation, at no point between payment

---

[526] PX-702, Horowitz Witness Statement ¶ 234.
[527] PX-702, Horowitz Witness Statement ¶ 235.
[528] PX-513; Horowitz Witness Statement ¶ 237.
[529] PX-514; Horowitz Witness Statement ¶ 239.
[530] PX-476; Horowitz Witness Statement ¶ 240.
[531] PX-617; Horowitz Witness Statement ¶ 244.
[532] *See, e.g.*, Wiederman Witness Statement ¶¶ 240-241; Horowitz Witness Statement ¶¶ 234-244; PX-702; PX-513; PX-514; PX-476; PX-617.

of the $7.4 million on March 30, 2017 and March 2018 did Spark ever request a refund of the purported "overpayment" from the Sellers.[533]

343.    At trial, Horowitz testified that "I don't believe that Spark ever thought we were overpaid.  I thought they recognized the error of their initial calculation."[534]  Horowitz confirmed that from the time it was paid until the following year he was never notified that Spark believed there was an "overpayment" of the 2016 Contingent Payment.[535]

## IX.    Miscalculation of the 2017 and 2018 Contingent Payments

344.    On March 29, 2018, Spark sent the Sellers the 2017 Earnout Statement, which included a $2,244,230 reduction to the 2017 Earnout Payment to adjust for Spark's claimed "overpayment" of the 2016 Earnout Payment.[536]  Spark thus took back $2,244,230 that it had paid to Sellers previously for the 2016 Earnout Payment.[537]

345.    Spark did not use the Exhibit B Formula to calculate the 2016 or 2017 Earnout Payment.[538]  Instead, Spark again excluded Major Energy's first quarter 2016 Adjusted EBITDA from the calculation and reverted to a lower calculation of Year End Customer Accounts.[539]

346.    On April 10, 2018, Horowitz forwarded Kroeker's April 12, 2017 email to Kroeker and Melman and stated that this email was evidence of agreement in writing to the inclusion of first quarter 2016 Adjusted EBITDA.[540]  Also, that same day, Horowitz emailed Kroeker and Melman and explained the structure of the deal and summarized some of the

---

[533] Tr. 364:4-365:9.
[534] Tr. 1492:8-13.
[535] Tr. 1493:5-9; Tr. 1493:20-1494:3.
[536] PX-165; Horowitz Witness Statement ¶¶ 247, 248.
[537] PX-165 at PX-165.0003.
[538] PX-165; Wiederman Witness Statement ¶ 244.
[539] PX-165; Wiederman Witness Statement ¶¶ 244-245.
[540] PX-648.

discussions from the previous year.[541]   The parties did not further discuss the 2017 Earnout

Statement due to the pendency of this action.[542]

347.    On March 29, 2019, Spark sent the Sellers a letter regarding the 2018 Contingent

Payment.[543]   The letter stated, "Pursuant to Section 2.3 of the Earnout Agreement, this letter

serves as Buyer's official notice to Sellers that the adjusted 2018 Earnout Payment is $0.00."[544]

Spark sent a calculation of the 2018 Contingent Payment on May 31, 2019.[545]

348.    The Exhibit B Formula was not used to calculate the 2018 Earnout Payment.[546]

## X.    Plaintiff Files This Action

349.    On September 1, 2016, the Sellers' counsel sent a letter on their behalf to NGE

outlining "some examples" of the breaches of the MIPA and Earnout Agreement that had

occurred and stating that "Major Energy and Sellers' Representative reserve all their rights under

the MIPA and Earnout Agreement."[547]

350.    Further, the MIPA contains a non-waiver provision that states:  "No failure on the

part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder

shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or

remedy by such Party preclude any other or further exercise thereof or the exercise of any other

right, power or remedy."[548]

---

[541] PX-647.
[542] Horowitz Witness Statement ¶¶ 254-255; PX-647.
[543] PX-708.
[544] PX-708.
[545] PX-224.
[546] PX-224.
[547] DX-390.
[548] PX-632, § 11.4.

351.     With this reservation of rights and non-waiver language, the Sellers attempted to resolve their disputes with NGE and Spark in good faith outside of court, but those attempts proved futile.[549]

352.     Specifically, throughout 2016 and 2017 the Sellers continued to attempt to negotiate a buyout of the Contingent Payments.[550]

353.     After buyout negotiations stalled and negotiations regarding the 2016 Contingent Payment reached a stalemate,[551] the Sellers ultimately decided to file this lawsuit because they "just didn't know any other way to go.  There was just no other way to solve this issue other than to have to go to court."[552]

354.     As a result, the Sellers, with Horowitz serving as Plaintiff and Sellers' Representative, filed this lawsuit on October 10, 2017.[553]

355.     The Sellers are personally paying their legal fees in this action.[554]

## XI.    Damages Arising from Defendants' Interference with Business Operations and Miscalculation Errors

356.     Defendants' breaches of the MIPA and Earnout Agreement proximately caused the Sellers not to receive the Contingent Payments under the Earnout Agreement.  Plaintiff has incurred damages in the amount of $26 million.[555]  That amount is comprised of the full amount

---

[549] Tr. 1542:23-1543:11 ("I was at a point where I just didn't know any other way to go.  There was just no other way to solve this issue other than to have to go to court.  We tried to settle it numerous times in good faith.  We had a couple of buyout discussions, and nothing.  Just nothing.").

[550] Horowitz Witness Statement ¶ 139-149, 155-158, 180, 245; Tr. 537:13-538:4; Tr. 1531:14-15; Tr. 1534:1-15.

[551] PX-617; Tr. 1534:1-15; Tr. 1575:8-18.

[552] Tr. 1543:7-11.

[553] ECF No. 1.

[554] Tr. 1542:25-1543:3.

[555] Tr. 1721:23-1722:8; Tr. 1757:25-1758:14; Tr. 1760:23-1764:22; Leathers Witness Statement ¶¶ 7, 418-422.

of the potential Contingent Payments, $35 million, less the Contingent Payments that Sellers have already received, $9 million.[556]

357.    Plaintiff's expert, Leathers, performed both a "top down" and "bottom up" analysis in reaching his opinion that Defendants' actions were the proximate cause of Plaintiff's damages. [557]  The "top down" analysis is an analysis of the reasonableness of the projections and events that logically might have affected Major Energy's performance but actually did not.[558] The "bottom up" analysis is an analysis of events that actually did adversely impact Major Energy's performance.[559]

358.    With respect to what did not cause Major Energy to fall short of its projected Adjusted EBITDA and Customer Account targets, as discussed in Section XI.A *infra*, Leathers analyzed whether the initial projections contained in the Earnout Agreement were reasonable and achievable.  The evidence demonstrates that the parties' projections, upon which the Contingent Payments were based, were reasonable and achievable.[560]  In addition, as discussed in Section XI.B *infra*, factors outside of Defendants' conduct did not adversely impact Major Energy's performance, including regulatory actions, a general ESCO market downturn, or the actions of Major Energy management.[561]

359.    Conversely, with respect to what did occur, as discussed in Section XI.C *infra*, the Dropdown and other post-acquisition events and circumstances at Major Energy caused by Defendants and described above caused Major Energy not to achieve its Adjusted EBITDA and Customer Account targets and, in turn, caused the Sellers' not to receive the full $35 million

---

[556] Tr. 1721:23-1722:8.
[557] Tr. 1722:12-1723:1.
[558] Tr. 1722:14-17.
[559] Tr. 1723:6-15.
[560] *See infra* Sect. XI.A.
[561] *See infra* Sect. XI.B.

Contingent Payment.[562]   Likewise, Defendants' miscalculation of the Contingent Payments during the Earnout Period caused the Sellers damage.

A.      **The Projections Were Reasonable and Achievable**

360.    In connection with the Contingent Payments, the Sellers and NGE agreed on certain performance targets based on Adjusted EBITDA and Customer Accounts to be achieved during the Earnout Period.[563]

361.    The final agreed-upon Adjusted EBITDA targets were: (1) $20,749,213 for 2016; (2) $25,003,343 for 2017; and (3) $27,831,052 for 2018.[564]

362.    The final agreed-upon Customer Account targets were: (1) 178,031 for 2016; (2) 209,909 for 2017; and (3) 231,717 for 2018.[565]

363.    The final projections prepared and agreed to by the parties as to how Major Energy would perform during the Earnout Period (as measured by its year-end Adjusted EBITDA and Customer Accounts) were reasonable and achievable.[566]

364.    In Spark's Schedule 14C filed in August 2016, Spark stated that as of November 2015, NGE and Spark believed that "the new growth initiatives at the Major Energy Companies had significantly increased the long-term value of the Major Energy Companies" and that "the acquisition of the Major Energy Companies by the Company would add significant long-term value to the Company's equity investors."[567]

365.    NGE agreed that Major Energy's projections were reasonable and achievable because NGE provided even higher projections to Stifel in connection with NGE's attempt to

---

562 Leathers Witness Statement ¶¶ 7, 353.
563 Leathers Witness Statement ¶¶ 210, 352.
564 PX-377; DX-1, at 44911; DX-2 at 31516.
565 PX-377.
566 Leathers Witness Statement ¶¶ 7, 210-261; Tr. 1722:12-21; Tr. 1743:5-1746:10; Tr. 1758:10-14.
567 PX-756, at 12; Tr. 269:6-271:7.

obtain financing for the deal.[568]   After NGE and Major Energy met with Stifel to present the projections, NGE informed Major Energy that it received "great feedback" from Stifel.[569]

366.    Major Energy's projections were also reasonable and achievable because the company had stable and consistent growth in the seven years prior to the sale to NGE, including growth in Customer Accounts from about 12,000 in 2008 to over 151,000 in 2015 and growth in Adjusted EBITDA from approximately $389,000 in 2008 to over $23 million in 2015.[570]

367.    Indeed, Major Energy had an Adjusted EBITDA of $23.5 million in 2015,[571] and, as Lancaster testified, Major Energy had a "very robust first quarter" and "a pretty good second quarter as well" in 2016.[572]

368.    Major Energy's projections were also reasonable and achievable because the ESCO industry remained stable during the Earnout Period.  This is shown by robust merger and acquisition activity in the ESCO market and the fact that ESCOs were being priced in 2018 at a multiple of 5 or 6 times EBITDA as opposed to approximately 4 times EBITDA in 2016 when NGE purchased Major Energy.[573]   To that end, on March 4, 2019, during Spark's fourth quarter 2018 earnings call, Kroeker stated that a 5 or 6 times adjusted EBITDA multiple was a reasonable acquisition target purchase price.[574]

369.    In addition, internal presentations prepared by Spark prior to the Dropdown demonstrate Spark's belief that Major Energy would average Adjusted EBITDA of more than

---

[568] Tr. 1555:4-1557:8; Alper Witness Statement ¶¶ 33-42; Wiederman Witness Statement ¶¶ 46, 57-59.
[569] PX-46; Tr. 1557:12-24.
[570] Leathers Witness Statement ¶¶ 220-221, 224-227; PX-7; PX-9; PX-8; PX-2; PX-11; PX-24; PX-49; PX-730.
[571] PX-377.
[572] Tr. 117:9-13; Tr. 127:10-22.
[573] Leathers Witness Statement ¶¶ 229-233.
[574] PX-729.

$20 million during each of the three years of the Earnout Period, resulting in a Contingent Payment obligation of $29.6 million.[575]

370.   Spark also made positive statements to investors shortly before and several months after the Dropdown indicating that they believed Major Energy's projections were reasonable.  On August 11, 2016, Spark held an earnings call with investors and Kroeker stated that Spark "intend[s] to continue to leverage Major's management team's retail energy expertise and knowledge in addition to their 210,000 RCEs and strong market position in the Northeast POR markets to further enhance the efficient and profitable business model they have built."[576]

371.   On November 10, 2016, seven months after NGE's purchase of Major Energy from the Sellers and a few months after the Dropdown, Spark held an earnings call with investors and Kroeker told investors with respect to the Major Energy acquisition that "we are very encouraged by the results we're seeing thus far, both in terms of customer count and profitability."[577]  With respect to Major Energy, Kroeker also stated that "we're seeing strong profitability better than we anticipated" and "the overall profitability is better than we had expected."[578]

372.   Major Energy's projections were also reasonable and achievable because they were in line with growth projections for the ESCO industry more generally.[579]

## B.    Defendants' Other Proposed Causes Had No Material Effect on Major Energy's Business

373.   External factors, such as general market downturn or adverse weather conditions, can affect an ESCO's performance.[580]  Plaintiff's expert considered both these potential market

---

[575] PX-472.
[576] PX-256 at PX-0256.0005.
[577] PX-257 at PX-0257.0005.
[578] PX-257 at PX-0257.0007.
[579] Tr. 1743:22-1744 10; Tr. 1744:21-24.

factors and credibly opined that, as indicated by merger and acquisition activity, the ESCO industry remained stable during the Earnout Period and there were no extraordinary weather events that would have affected pricing or margins.[581]

374.  Defendants have also suggested that the regulatory environment for ESCOs generally and Major Energy specifically affected Major Energy's performance.

375.  The evidence proves that the regulatory environment during the Earnout Period did not contribute to Major Energy's failure to meet the Adjusted EBITDA and Customer Accounts targets.[582]

376.  On February 23, 2016, the NY PSC issued a Resetting Order that, if passed, would have limited the types of competitive products ESCOs, such as Major Energy, could offer in New York.[583]

377.  The Resetting Order initially created regulatory and financial risk for Major Energy in New York.[584]

378.  Nonetheless, the parties did not change the $80 million target purchase price, and Major Energy senior management believed that Major Energy was well-positioned to succeed even if the proposed Resetting Order was passed.[585]  Indeed, Major Energy anticipated the Resetting Order and shifted its variable rate customers to fixed rate contracts, thus making

---

[580] PX-753, ¶ 16; PX-55 at 59; Tr. 1698:25-1699:3.
[581] Leathers Witness Statement ¶¶ 229-233; Tr. 1616:8-10.
[582] Leathers Witness Statement ¶¶ 425-434; Tr. 1752:7-25; Tr. 1757:25-1758:14.
[583] Wiederman Witness Statement ¶ 60; Horowitz Witness Statement ¶ 79; Alper Witness Statement ¶ 46.
[584] Wiederman Witness Statement ¶ 60; Alper Witness Statement ¶ 46.
[585] PX-15; Alper Witness Statement ¶ 50; Horowitz Witness Statement ¶ 80; Wiederman Witness Statement ¶ 62; Tr. 53:12-54:5; Tr. 1506:9-1510:8; Tr. 1542:2-20; Tr. 1557:25-1559:13.

significantly more money by locking those customers into rates for a longer period of time and significantly reducing the churn rate with respect to those customers.[586]

379.     The Resetting Order ultimately did not come to fruition and was not implemented during the Earnout Period.[587]

380.     As Kroeker stated during an August 11, 2016 earnings call, when the Resetting Order was vacated by a New York court, he saw that as a "huge win both for Spark and for the industry."[588]   In March 2017, Kroeker stated, "[U]ltimately, I think we end up with a healthy business in New York going forward long-term."[589]

381.     During a subsequent earnings call in November 2017, Kroeker informed investors that he was not concerned about New York's proposed Resetting Order and "at the end of the day, my position on this really hasn't changed from where it was nearly 2 years ago."[590]   On March 9, 2018, during a fourth quarter 2017 earnings call, Kroeker told investors that "our view hasn't changed in New York in 2 years . . . by the end of the year, maybe early 2019, I anticipate a set of rule changes or disclosure requirements or other things that we're familiar with from other markets, and well adapt to it and we'll continue to operate our business."[591]

---

[586] Tr. 1295:7-1296:5; DX-379.
[587] PX-298, at 298.0023-24; Wiederman Witness Statement ¶ 60; Alper Witness Statement ¶ 46; Tr. 54:6-17; Tr. 199:3-11; Tr. 297:25-298:12; Tr. 1557:25-1559:13.
[588] PX-256, at 9; Tr. 298:24-299:25; *see also* PX-257, at 9 ("we saw a big victory with the resetting order a few months ago . . . ."); PX-316 at 9 ("We're very happy that the courts have sided with us earlier in 2016.").
[589] PX-312 at 8.
[590] PX-314 at 10.
[591] PX-317 at 9.

382.    In or around December 2016, New York proposed a Low-Income Order requiring ESCOs to return existing low-income customers to utility service and stop enrolling new low-income customers, which was stayed as of November 2017.[592]

383.    Spark acknowledged in its statements to investors that the impact of the Low-Income Order on its business was "relatively insignificant," as low-income customers comprised a very small proportion of Spark's and Major Energy's customer base.[593]

384.    As Kroeker stated in March 2017, he "fully expect[ed]" that New York would be a "healthy market beyond 2016 and -- or beyond '17 and '18 and going forward."[594]  In August 2017, Kroeker publicly stated that a "relatively small number" of customers in the Spark family of companies was affected by the Low-Income Order, noting that "[i]t's somewhere in the range of 10,000 to 12,000 RCEs across all of our brands."[595]

385.    As a result of the Low-Income Order, in 2016, Major Energy dropped zero Customer Accounts, in 2017, Major Energy dropped 155 Customer Accounts, and in 2018, Major Energy dropped 6,776 Customer Accounts.[596]  Wiederman testified that the Low-Income Order had a "very, very minimal to really no impact" on Major Energy's business.[597]

386.    Likewise, Defendants have not established that regulatory investigations, actions, or fines that were levied against Major Energy in certain jurisdictions in which it was operating

---

[592] PX-314 at 10 ("The first one is the low-income moratorium, there's currently a stay on that and the courts are going to revisit that here in November."); Tr. 308:14-309:18.
[593] PX-314 at 9-10; PX-313, at 10.
[594] PX-316 at 9.
[595] PX-312 at 8.
[596] DX-866; Tr. 439:13-440:3.
[597] Tr. 576:24-577:25.

had any effect on Major Energy's ability to hit its Customer Account and Adjusted EBITDA targets.[598]

387.    Prior to the sale to NGE, Major Energy fully disclosed to NGE that a regulatory action had been instituted against Major Energy in Pennsylvania.[599]   In August 2016, Major Energy settled with the Pennsylvania Public Utility Commission in connection with accusations that Respond Power engaged in deceptive marketing practices during the polar vortex.[600]   As Wiederman testified, the settlement did not contain any restrictions that had a tangible impact on Major Energy's marketing efforts in Pennsylvania; to the contrary, they were "all standard marketing practices" and "[n]othing of this [was] prohibitive or onerous."[601]

388.    Major Energy also fully disclosed to NGE pre-sale that a regulatory action had been instituted against Major Energy by the Illinois Commerce Commission, which Major Energy settled.[602]   In 2018, towards the end of the Earnout Period, Major Energy received a regulatory inquiry from the Illinois AG and eventually stopped marketing in Illinois for a few months in 2018.[603]   The 2018 Illinois AG action, however, had no material impact on Major Energy's business.[604]

389.    Defendants have also failed to establish that Major Energy employees' alleged diversion of business opportunities, failure to focus on Major Energy business, or pursuit of other business opportunities had any effect on Major Energy's ability to hit its Customer Account and

---

[598] Leathers Witness Statement ¶ 434.
[599] PX-55 at 43.
[600] Tr. 516:11-24.
[601] Tr. 515:14-516:10; Tr. 518:24-522:16.
[602] PX-55 at 43; Tr. 322:12-323:6.
[603] Tr. 555:14-556:12.
[604] Tr. 1685:4-12; Tr. 669:15-670:12

Adjusted EBITDA targets, nor have Defendants quantified the effect of such alleged activity on Major Energy's business.

390.    Prior to the sale to NGE, Major Energy's executives were permitted to participate in other business interests and investments.[605]

391.    In their new employment agreements, Major Energy's executives were allowed to "participate fully in social, charitable and civic activities, and such other personal affairs and personal business interests of Executive, as do not interfere with the performance of Executive's duties" under their employment contracts.[606]

392.    Consistent with this provision, Wiederman testified that he engaged in other personal business interests during the Earnout Period, although serving as President of Major Energy was his primary focus and took a majority of his time throughout the duration of his employment.[607]   In fact, Wiederman recalled spending more hours working for Major Energy during the Earnout Period than he did pre-sale,[608] he consistently received "stellar" performance reviews from Spark during the Earnout Period, he received bonuses in 2017 and 2018, and Spark never criticized Wiederman for spending time on other business interests.[609]

393.    Benisti testified that he considered other business opportunities as well, but those ideas were never put into action.[610]   Major Energy's business with certain vendors and brokers increased during the Earnout Period, and Benisti stated that he "was committed and worked hard

---

[605] Wiederman Witness Statement ¶ 81; Horowitz Witness Statement ¶¶ 117-118; Alper Witness Statement ¶ 77.
[606] PX-667, § 1.2; PX-668, § 1.2; PX-669, § 1.2; PX-670, § 1.2; PX-671, § 1.2.
[607] Wiederman Witness Statement ¶ 81; Tr. 588:3-21.
[608] Wiederman Witness Statement ¶ 81.
[609] Tr. 666:14-667:1; Wiederman Witness Statement ¶¶ 262-263.
[610] Tr. 991:3-20.

to get there."[611]   Benisti also testified that he did not steer business away from Major Energy during the Earnout Period.[612]

### C.   Defendants' Breaches of the Earnout Agreement and Executive Earnout Agreement Proximately Caused the Sellers Damage

394.   Plaintiff's expert has quantified the effect of five distinct actions by Defendants, each of which caused damages to the Sellers: (1) Defendants' erroneous calculation of the 2016 Contingent Payment; (2) Defendants' erroneous calculation of the 2017 and 2018 Contingent Payment; (3) the loss of Customer Accounts and Adjusted EBITDA from Defendants' interference with Major Energy's relationships with residential vendors; (4) the loss of Customer Accounts and Adjusted EBITDA from Defendants' interference with Major Energy's relationships with commercial brokers; and (5) the loss of Customer Accounts from Defendants' prevention of Major Energy from pursuing aggregation deals.[613]

395.   Other post-acquisition events and circumstances, including (1) Defendants' unilateral termination of Major Energy's relationship with PSE, (2) diversion of Major Energy employees' time and effort towards the EMS integration project, and (3) Defendants' actions that caused management resignations and employee turnover, also contributed to the failure of Major Energy to achieve the Year-End Customer Account and Adjusted EBITDA targets.[614]   Because these events and circumstances relate to the loss of customers and earnings generated from Major Energy's residential vendors and commercial brokers, they are properly quantified as part of the residential vendor and commercial broker damages analysis (categories 3 and 4).[615]

---

[611] Tr. 991:21-992:3.
[612] Tr. 992:15-20; Tr. 993:13-19.
[613] Leathers Witness Statement ¶¶ 418-412 & Table 25.
[614] Leathers Witness Statement ¶¶ 360-365, 421.
[615] Tr. 1758:15-1759:23; Tr. 1760:16-22.

i.      Damages from 2016 Contingent Payment Calculation Errors

396.    Defendants made three errors in their calculation of the Contingent Payment for 2016.  First, Defendants used the incorrect methodology by (i) using the Adjusted EBITDA number as the first figure in the numerical computation of the Earnout Payment rather than using the Adjusted EBITDA Plan, and (ii) deducting the Adjusted EBITDA for the first quarter of 2016 from the calculation.  Second, Defendants use the wrong Customer Account figure because it was not based upon how Major Energy calculated that number prior to its sale to NGE.  Third, Defendants failed to add back into the Adjusted EBITDA total certain expenses that Major Energy had added back into its Adjusted EBITDA calculation prior to its sale to NGE.

397.    First, for the reasons noted above in paragraphs 301-306, the Exhibit B Formula is the correct formula for calculating the Earnout Payments as it was agreed upon by the parties at the time of the transaction and is the only Earnout Payment formula that allows for achievement of the goals of the transaction, *i.e.*, the potential for a total $80 million purchase price and the potential for an Executive Earnout Payment.[616]  Using that correct formula (but still using the incorrect Customer Account and Adjusted EBITDA figures proposed by Spark) results in a damages figure of $2,315,089.[617]

398.    Second, the correct Customer Account figure for 2016 is 173,901, arrived at by using the reported Customer Account figures on Spark's 2016 Earnout Statement and excluding only the reported "Pending Drop" customer accounts[618] as is consistent with Major Energy's historical method of determining Customer Accounts.[619]  Correcting for only this error would

---

[616] Tr. 1726:13-1727:16; Wiederman Witness Statement ¶ 220.
[617] Leathers Witness Statement ¶ 28, Table 3.
[618] Leathers Witness Statement ¶ 131, Table 4; PX-483.
[619] Leathers Witness Statement ¶¶ 125-127.

decrease the Customer Account Adjustment for 2016 by $1,064,552.[620] Accordingly, using the correct Exhibit B Formula as set forth in paragraph 398, and using the correct Customer Account figure, the damages to Sellers are $3,379,641.[621]

399. Third, certain Adjusted EBITDA addbacks relating to executive compensation and management bonuses, accounting fees, consulting fees, and travel and entertainment should have been incorporated into Major Energy's 2016 Adjusted EBITDA, bringing the total year's Adjusted EBITDA to $21,031,44.[622]

400. Inclusion of these addbacks is in line with what Major Energy historically added back to Adjusted EBITDA and also the projections that formed the basis for the transaction.[623] Specifically, an executive compensation and management bonus addback was explicitly included in Major Energy's final projection model that formed the basis of the Contingent Payment targets.[624] Further, certain accounting fees, consulting fees, and travel expenses would historically be considered by Major Energy to be extraordinary expenses not incurred in the ordinary course of business, and therefore should have been added back to Adjusted EBITDA.[625] These addbacks cause the 2016 Contingent Payment to be understated by approximately $1.4 million, if the Exhibit B Formula and proper Adjusted EBITDA of $21,031,44 is used.[626]

---

[620] Leathers Witness Statement ¶ 134, Table 5.
[621] Leathers Witness Statement ¶¶ 28, 134, Tables 3, 5.
[622] Leathers Witness Statement ¶¶ 155-169, Table 7.
[623] Leathers Witness Statement ¶¶ 162, 165-169.
[624] Leathers Witness Statement ¶¶ 162, 164-165; PX-377A.
[625] Leathers Witness Statement ¶¶ 166-169; 191.
[626] Leathers Witness Statement ¶¶ 156, 158-159, Table 7.

401.   In total, correcting for Customer Account and Adjusted EBITDA errors, and using the Exhibit B Formula, the Sellers have been underpaid $4,814,283 for the 2016 Contingent Payment.[627]

ii.   Damages from 2017 and 2018 Contingent Payment Calculation Errors

402.   In addition to the 2016 Target Year calculation errors, Spark also understated Major Energy's 2017 Adjusted EBITDA by more than $1 million due to costs that were not added back to Spark's Adjusted EBITDA calculation.[628]   These costs include certain short term incentive costs and employee 401K costs that would not have been incurred absent Spark's ownership and, therefore, are extraordinary expenses that Major Energy would have historically added back to Adjusted EBITDA.[629]

403.   Combining the impact of the 2017 Adjusted EBITDA calculation errors and using the Exhibit B Formula, the combined Target Year 2017 and 2018 Contingent Payment amount is $5,383,445; thus, the Sellers have been underpaid by at least $1,532,124 for 2017 and 2018 combined.[630]

404.   The total amount of damages owed to Plaintiff as a result of Defendants' miscalculation of the Contingent Payments for years 2016, 2017, and 2018 (categories 1 and 2) is $6,346,407.[631]

---

[627] Leathers Witness Statement ¶ 28, Table 3, 47-48.   Alternately, if Spark's calculated Customer Account figure and Adjusted EBITDA are accepted, but the Exhibit B Formula is used, the Sellers have been underpaid $2,315,089.  Leathers Witness Statement ¶ 28, Table 3.

[628] Leathers Witness Statement ¶¶ 189-196.

[629] Leathers Witness Statement ¶¶ 191, 195.

[630] Leathers Witness Statement ¶ 205, Table 9.  Alternately, if Spark's Customer Account and Adjusted EBITDA calculations for 2017 and 2018 are accepted, but the Exhibit B Formula is used, the 2017 and 2018 Contingent Payments were collectively underpaid by $1,163,801.  Leathers Witness Statement ¶ 186, Table 9.

[631] *See supra* ¶¶ 401, 403.

### iii.   Residential Vendor Damages

405.   By using a modified version of the projection model that formed the basis of the acquisition projections for Major Energy and applying certain assumptions based upon record evidence regarding Defendants' interference with Major Energy's residential vendor relationships (*see supra* Sects. IV.D and VII.C), Plaintiff's expert has quantified certain of the damages the Sellers suffered as a result of Defendants' interference with Major Energy's residential vendors.[632]

406.   Using a modified version of Major Energy's projection model and applying assumptions regarding the relative impairment of Major Energy's residential vendor relationships, Plaintiff's expert opined that the loss or impairment of Major Energy's residential vendor relationships after the Dropdown accounted for an independent impact of at least $19.3 million in lost Contingent Payments.[633]

### iv.   Commercial Broker Damages

407.   With respect to the damages associated with Defendants' impairment of Major Energy's commercial broker relationships (discussed *supra* Sects. IV.D and VII.D), Plaintiff's expert once again used Major Energy's projection model and adjusted the assumptions therein to remove the anticipated growth in Major Energy's commercial business during the Earnout Period.[634]   This analysis indicates that Defendants' impairment of Major Energy's commercial broker relationships after the Dropdown resulted in an independent impact of approximately $12.6 million in additional lost Contingent Payments.[635]

---

[632] Leathers Witness Statement ¶¶ 379-389.
[633] Leathers Witness Statement ¶¶ 378-392, 418-420, Tables 15, 18; Tr. 1723:6-1724:18; Tr. 1760:23-1762:21.
[634] Leathers Witness Statement ¶¶ 399-400.
[635] Leathers Witness Statement ¶¶ 395-408, 418-420, Tables 23, 24; Tr. 1762:22-1763:14.

v.      Aggregation Deal Damages

408.    Following the Dropdown, Major Energy was presented with at least two aggregation deals with the number of potential customer accounts ranging from between approximately 7,000 and 16,700.[636]  Evidence indicates that Spark's restrictions on aggregation deals impaired Major Energy's ability to pursue these opportunities.[637]  Had Major Energy been able to acquire these customers in 2017, it would have reduced the Customer Account Adjustment included in its 2017 Earnout Payment calculation by at least $2.8 million.[638]

409.    This aggregation deal damages figure is conservative because it does not account for the accretive impact that those additional customers likely would have had on Adjusted EBITDA.[639]

vi.      Earnout Agreement Damages Conclusion

410.    As Plaintiff's expert testified, while the calculated residential vendor and commercial broker damages each have an independent impact on Major Energy's projected financial position, due to how the formulas for the Earnout Payment and Cash Installment function, the damages impact for each of these two categories of damages overlap with other categories of damages.  Therefore, while the residential vendor damage and the commercial broker damage each have an "independent" impact, the "incremental" impact of these damages removes the overlap that might otherwise be doubled counted.[640]  Plaintiff's expert has opined that the incremental damages impact of the impaired residential vendor relationships is $12.9 million (discounted from a calculated $19.3 million independent impact), and the incremental

---

[636] PX-585; PX-254 at PX-254.0030-31.
[637] *See supra* Sect. VII.F.
[638] Leathers Witness Statement ¶¶ 414-416, 418-420; Tr. 1763:15-1764:12.
[639] Leathers Witness Statement ¶ 417; Tr. 1764:8-12.
[640] Tr. 1723:2-1724:18; Tr. 1761:14-1762:12; Leathers Witness Statement ¶ 419, Table 25.

damages impact of the impaired commercial broker relationships is $3.7 million (discounted from a calculated $12.6 million independent impact).[641]

411.    Accordingly, accounting for the Contingent Payments already paid to the Sellers, and the calculation errors during the Earnout Period addressed in damages categories 1 and 2 above, and using his calculated damages analysis for the impairment of residential vendor and commercial broker relationships and lost aggregation deals, Plaintiff's expert's "but-for" Contingent Payment to the Sellers is approximately $34.7 million.[642]  This is comprised of $9 million in already-paid Contingent Payments, $4.8 million in 2016 calculation errors, $1.5 million in 2017/2018 calculation errors, incremental damages of $12.9 million for the impairment of residential vendor relationships, incremental damages of $3.7 million for the impairment of commercial broker relationships, and $2.8 million in damages for lost aggregation deals.[643]  Accordingly, using Leathers' "bottoms up" analysis, Leathers has demonstrated that Plaintiff is entitled to damages in the amount of $25.7 million consisting of the difference between the Contingent Payments they would have received but for Defendants' actions ($34.7 million) and $9 million they already received.[644]  Leathers testified that this "bottoms up" analysis along with his "top down" analysis, which concluded that the projections were reasonable and achievable and there were no other intervening causes, forms the basis of Leathers ultimate opinion that Major Energy would have achieved its Earnout targets and the Sellers would have been paid the full $35 million in Contingent Payments and, therefore, Sellers are entitled to $26 million.[645]

---

[641] Leathers Witness Statement ¶¶ 418-412, Table 25.
[642] Leathers Witness Statement ¶¶ 418-420, Table 25.
[643] Leathers Witness Statement ¶¶ 418-420; Table 25.
[644] Leathers Witness Statement ¶¶ 418-420; Table 25; Tr. 1723:11-1724:22.
[645] Leathers Witness Statement ¶¶ 7.e, 422; Tr. 1723:11-1724:22.

412.     Due to these same classes of damages, Plaintiff's expert has also calculated that the managers of Major Energy, pursuant to the Executive Earnout Agreement, would have received Earnout Payments in the amount of approximately $41 thousand due to calculation errors, $1.2 million due to impairment of residential vendor relationships, and $857 thousand due to impairment of the commercial broker relationships.[646]

## XII.   Rescissory Damages

413.     As an alternate form of damages to the expectation damages described in Section XI, Sellers are entitled to rescissory damages as a result of the Dropdown that was effectuated without Sellers' consent in breach of Section 11.7 of the MIPA.[647]

414.     Plaintiff's expert, David Leathers, has performed a valuation analysis to arrive at a fair market value of the $35 million Contingent Payments as of August 22, 2016, the day before the Dropdown occurred and the MIPA was assigned.[648]

415.     Leathers' fair market value analysis of the Contingent Payments takes into consideration the risk associated with Major Energy achieving the Adjusted EBITDA and Customer Account targets and discounts to present value the future cash flows.[649]

416.     In order to arrive at his fair market value analysis, Leathers valued the Contingent Payments as part of a going concern entity and considered three industry-accepted approaches (the income approach, asset approach, and market approach) to valuation, as explained in more detail in his witness statement.   In considering these approaches, Leathers considered Spark's

---

[646] Tr. 1721:23-1722:8; Tr. 1724:19-25; Leathers Witness Statement ¶¶ 7, 25, 389, 406.
[647] Leathers Witness Statement ¶¶ 7.f, 435-470.
[648] Leathers Witness Statement ¶¶ 7.f, 438.
[649] Leathers Witness Statement ¶ 437.

own valuations of the Contingent Payments as well as valuations from outside financial advisors.[650]

417.    Leathers opined that for non-linear payout structures such as the Contingent Payments, a Monte Carlo simulation is generally used to arrive at a valuation.  "A Monte Carlo simulation is a modeling technique in which an uncertain variable, or variables, are identified and assigned an expected distribution (*e.g.*, uniform, binomial, triangular, normal, lognormal, etc.).   The Monte Carlo simulation randomly changes the uncertain variable, or variables, numerous times based on the specified distribution to return a set of projected results from which a forecast value can be derived."[651]

418.    In performing this Monte Carlo simulation Leathers makes certain assumptions regarding the risk-free rate, risk-adjusted discount rate, and volatility of both the Adjusted EBITDA and Customer Accounts.[652]

419.    In doing this analysis, Leathers has concluded that the fair market value of the Contingent Payments as of August 22, 2016 was approximately $18.8 million.[653]   Thus, total rescissory damages, net of amounts paid to date by the Defendants are approximately $9.8 million.[654]

420.    Defendants' expert has not performed any independent fair market value analysis of the Contingent Payments or challenged the methodology that Leathers employed.[655]

---

[650] Leathers Witness Statement ¶¶ 443-451.
[651] Leathers Witness Statement ¶ 457.
[652] Leathers Witness Statement ¶¶ 459, 461.  Leathers' assumptions are explained more fully in PX-726 and PX-727.
[653] Leathers Witness Statement ¶ 460.
[654] Leathers Witness Statement ¶¶ 7.f, 438.
[655] Leathers Witness Statement ¶ 467.

421.     Defendants' expert does aver that the Houlihan Lokey valuations should be relied upon to determine fair market value.[656]   However, Leathers opines that reliance on Houlihan Lokey's valuations is misplaced because they are valuations on incorrect dates—April 2016 and December 2016.[657]

422.     As Leathers' fair market value analysis is credible, arrived at by using generally accepted valuation principles, and is largely uncontested by Defendants, an August 22, 2016 fair market value conclusion for the Contingent Payments of $18.8 million is both reasonable and reliable.

## CONCLUSIONS OF LAW

### I.     Jurisdiction

423.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of New York, NGE is a citizen of Texas, and Spark is a citizen of Texas and Delaware.  The amount in controversy exceeds $75,000.[658]

### II.     Breach of Contract Against Defendants

424.     Plaintiff asserts a claim against NGE for breach of Section 11.7 of the MIPA (the "Assignment" provision).  Plaintiff also asserts, against both NGE and Spark, claims for breach of Section 2.2 of the Earnout Agreement (the "Calculation of Earnout" provision) and Section 2.7 of the Earnout Agreement (the "Operation of Business" provision), as well as Sections 2.2 and 2.7 of the Executive Earnout Agreement.

425.     As provided in the MIPA, the Earnout Agreement, and the Executive Earnout Agreement, New York law governs Major Energy's breach-of-contract claims.[659]  "In order to

---

[656] Dudney Witness Statement ¶¶ 15, 94, 174-176, 178.
[657] Leathers Witness Statement ¶¶ 470-472.
[658] Am. Compl. (ECF No. 22) ¶¶ 8, 10-11, 13; First Am. Answer (ECF No. 117) ¶¶ 8, 10-11.
[659] PX-632, § 11.3; PX-634, § 3.6; PX-658, § 3.6.

recover from a defendant for breach of contract" under New York law, "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guaranty Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

426.    Based on the Findings of Fact set forth above, the Court concludes that Plaintiff has proven, by a preponderance of the evidence, these elements with respect to all of their breach-of-contract claims: Defendants breached Section 2.2 and 2.7 of the Earnout Agreement and Sections 2.2 and 2.7 of the Executive Earnout Agreement, and NGE breached Section 11.7 of the MIPA, and the Sellers were thereby damaged.

### A.    The MIPA, the Earnout Agreement, and the Executive Earnout Agreement Are Contracts Existing Between the Sellers and Defendants.

427.    There is no dispute that the MIPA is a valid contract existing between the Sellers and NGE.[660]

428.    There is also no genuine dispute that the Earnout Agreement and Executive Earnout Agreement are valid contracts existing between the Sellers and NGE.[661]

429.    Because NGE assigned its rights and obligations under the Earnout Agreement and the Executive Earnout Agreement to Spark,[662] Spark also is obligated under the Agreements, and is a proper party to Plaintiff's breach-of-contract claims based on the Agreements. *See, e.g.*, *Stout St. Fund I, L.P. v. Halifax Grp., LLC*, 48 N.Y.S.3d 438, 441 (App. Div. 2017) ("An

---

[660] *See* PX-632.
[661] Am. Compl. (ECF No. 22) ¶ 31; First Am. Answer (ECF No. 117) ¶ 31.
[662] *See supra* § VI.

assignee stands in the shoes of the assignor and takes the assignment subject to any preexisting liabilities" (quoting *Arena Constr. Co. v. Sackaris & Sons*, 722 N.Y.S.2d 884 (App Div. 2001))).[663]

430.     While the assignments of the Earnout Agreement and the Executive Earnout Agreement were to "Spark Holdco" as opposed to "Spark Energy, Inc.,"[664] Spark is liable for breaches of the Earnout Agreement and the Executive Earnout Agreement because Spark manifested its intent to be bound by the Earnout Agreement and the Executive Earnout Agreement.

431.     As a threshold matter, Defendants admitted in their First Amended Answer that "NGE sold Major Energy to Spark."[665]  "Spark" is defined in the Amended Complaint as Spark Energy, Inc., not Spark Holdco.[666]  Defendants are thus estopped from now denying that Spark was the assignee of the Earnout Agreement and the Executive Earnout Agreement.  *See Morse/Diesel, Inc. v. Fid. & Deposit Co.*, 763 F. Supp. 28, 32 (S.D.N.Y. 1991) ("[Defendant] chose to make an admission [in its answer] and is now bound by it."); *Gibbs ex rel. Gibbs v. Cigna Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) (same).

432.     Moreover, while a breach of contract claim can generally only be brought against a party to the contract, a non-signatory parent corporation can be held liable "if its conduct manifests an intent to be bound by the contract."  *Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019); *see also Recticel Foam Corp. v. Bay Indus.*, 128 F. App'x 798, 799 (2d Cir. 2005) ("New York law provides that if a party objectively manifests an intent to be bound by a

---

[663] Because, as the Court explains below, NGE's attempt to assign the MIPA to Spark is void, the Court concludes that Spark is not a party to the MIPA.  Accordingly, the Court does not reach Plaintiff's alternative contention that, if the MIPA assignment had been valid, Spark would be a party to it.
[664] *See supra* ¶¶ 135, 136.
[665] First Am. Answer (ECF No. 117) ¶ 4.
[666] Am. Compl. (ECF No. 22) preamble, at 1.

contract, that intent controls, even if the party does not sign the written agreement."); *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994) (holding that "[a] parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract"). An intent to be bound can be inferred "from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes." *Horsehead Indus. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (App. Div. 1997) (citing *Warnaco*, 844 F. Supp. at 946).

433.    As discussed above, Spark is the parent of Spark Holdco and exercises full control over all of Spark Holdco's business activities and operations. The management and control of Spark Holdco's business activities and operations rest exclusively with Spark; Spark makes all decisions regarding the business, activities and operations of Spark Holdco in its sole discretion without the consent of any other member; and members other than Spark are not permitted to participate in the control, management, direction or operation of the activities or affairs of Spark Holdco and have no power to act for or bind Spark Holdco.[667]

434.    Moreover, as shown in Spark's August 3, 2016 Schedule 14C, Spark's plan from the outset was for it ultimately to acquire Major Energy.[668] To that end, Spark's board approved the Dropdown transaction and authorized the consideration to be paid for the transaction—

---

[667] *See supra* ¶¶ 15-17; *see also* PX-251, at PX-251.0023 (Spark Holdco LLC Agreement outlining powers of Spark over Spark Holdco); Tr. 261:5-262:11 (Spark CEO Kroeker testifying as to Spark's authority over Spark Holdco).
[668] *See supra* ¶¶ 110-13.

including Spark stock.[669]   And it was Spark (not Spark Holdco) that issued the press release

informing the public that *it* was the acquiring party in the Dropdown.[670]

435.    The Court thus concludes that Spark has manifested an intent to be bound to the

MIPA, Earnout Agreement, and the Executive Earnout Agreement and is thus liable for breaches

of the MIPA, Earnout Agreement, and the Executive Earnout Agreement.

**B.    The Sellers Performed Their Obligations Under the MIPA, the Earnout Agreement, and the Executive Earnout Agreement.**

436.    There is no real dispute that the Sellers performed their obligations under the

MIPA: they conveyed their membership interests in Major Energy to NGE.[671]   Likewise, the

Sellers have performed their obligations under the Earnout Agreement and the Executive Earnout

Agreement.   Of note, neither NGE nor Spark has asserted any counterclaims against the Sellers

for breach of the MIPA, Earnout Agreement, or the Executive Earnout Agreement.

437.    In their pretrial brief, Defendants argued that the evidence would show that the

Sellers failed to perform because they breached a representation and warranty contained in the

MIPA concerning liabilities of Major Energy.[672]   The evidence does not support such a finding.

At most, the evidence is that the parties have an active dispute, subject to different litigation, as

to  whether  the  liabilities  at  issue  existed  and,  if  so,  whether  the  Sellers  must  indemnify

---

[669] *See supra* ¶¶ 126-27.

[670] *See* PX-457 (Aug. 23, 2016 Spark Press Release) ("Spark Energy, Inc. (NASDAQ:SPKE), a Delaware corporation ('Spark' or the 'Company'), announced today that the Company has completed ***its acquisition*** of the Major Energy Companies . . . ." (emphasis added)); PX-276 (May 4, 2016 Spark Press Release appended to Form 8-K) ("Spark Energy, Inc. (NASDAQ:SPKE), a Delaware corporation ('Spark'), today reported financial results . . . .   Spark announced today that ***Spark*** and National Gas & Electric, LLC ("NGE"), an affiliate, have entered into a purchase and sale agreement for the acquisition of Major Energy, a retail energy business with approximately 210,000 RCEs.   NGE closed on the acquisition of Major Energy on April 15, 2016 and has since been preparing the company as a ***dropdown to Spark***." (emphases added)).

[671] *See supra* ¶ 103.

[672] Defs.' Pretrial Mem. (ECF No. 190) at 23 n.65.

Defendants with respect to the liabilities.[673]  There is no evidence sufficient to allow the Court to resolve that dispute in Defendants' favor here.[674]

438.    Moreover, the MIPA specifically provides that "the sole and exclusive remedies of the Parties arising out of or resulting from any breach of any representation, warranty, covenant or agreement in this Agreement will be strictly limited to those contained in" the MIPA's indemnification provisions.[675]

### C.    Defendants Breached Section 2.2 of the Earnout Agreement.

439.    Section 2.2 of the Earnout Agreement sets forth how to calculate the Earnout Payments due for each year of the Earnout Period.[676]

440.    Plaintiff claims, and the Court finds, that NGE breached Section 2.2 in three ways: (i) by applying the incorrect calculation formula in each year, including, most significantly, erroneously deducting Major Energy's first-quarter Adjusted EBITDA from the 2016 Earnout Payment calculation; (ii) by applying the incorrect number of Customer Accounts to the Customer Account Adjustment for 2016; and (iii) by failing to include certain contractual "addbacks" in the Adjusted EBITDA used in the calculations for each year.

---

[673] *See generally Major Energy Elec. Servs., LLC v. Horowitz*, No. 1:19-cv-10431 (S.D.N.Y.).

[674] To the extent Defendants claim that they may set off the Sellers' alleged indemnification obligation from their liability here, the Court concludes that they may not.  First, Defendants never pleaded, and Plaintiff never consented to trial of, a setoff defense or a setoff counterclaim.  *See generally* First Am. Answer (ECF No. 117) at 52-54; *see also Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 42 (2d Cir. 2009) ("[I]rrespective of whether a setoff claim is properly characterized as an affirmative defense or a compulsory or permissive counterclaim, it must be set forth in the pleadings to provide a basis for relief." (internal citation omitted)); *Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 606 (S.D.N.Y. 2007) ("[I]t would be unfair to consider the unpleaded claim when [respondent] has neither consented to nor defended against it").  Second, any claim for a setoff would fail for the same reason Defendants cannot show that the Sellers' failed to perform: the indemnification issue is, at most, an issue in dispute in other litigation, and there is no evidence sufficient to establish the Sellers' liability for a setoff here.  *See Ferguson v. Lion Holdings, Inc.*, 312 F. Supp. 2d 484, 504-05 (S.D.N.Y. 2004) (holding that a claim for setoff, based on plaintiff's breach of a representation and warranty, could not preclude summary judgment where the rep and warranty violation was not conclusively established and the dispute over it was being actively litigated elsewhere).

[675] PX-632, § 9.8.

[676] PX-634, § 2.2.

i.     Calculation Formula

441.    The relevant provisions of Section 2.2 of the Earnout Agreement are as follows:

2.2    Calculation of Earnout. The Earnout Payment for a Target Year shall be calculated by multiplying the Target Year's Adjusted EBITDA (as modified below) by the Earnout Percentage applicable to that year.

(a)     For purposes of calculating the portion of the Adjusted EBITDA (or, if applicable as discussed in the next sentence, the Net Adjusted EBITDA) that is to be utilized in the preceding calculation, the Adjusted EBITDA (or Net Adjusted EBITDA) shall be multiplied by a percentage (subject to a maximum of 100%), the numerator of which is the actual Adjusted EBITDA (or Net Adjusted EBITDA) and the denominator of which is the Adjusted EBITDA Plan (or Net Adjusted EBITDA Plan).

(b)     For purposes of benchmarking EBITDA achievement against Adjusted EBITDA Plan in the calculation of the percentages as detailed immediately above, the Adjusted EBITDA Plan amount of $20,749,213 for the 2016 Target Year shall be utilized; provided, however, that only the actual Adjusted EBITDA generated during the last three (3) calendar quarters in calendar year 2016 commencing as of the Effective Date shall be used to determine the Earnout Pool for the 2016 Target Year from which Earnout Payments and, if applicable, excess EBITDA payments earned hereunder shall be made.

(c)     In order to ensure that there is no duplicative payment of the same Adjusted EBITDA, the term "EBITDA" as used in Exhibit A and Exhibit B hereto shall mean, as the context indicates for a given Target Year, (i) Adjusted EBITDA for the initial Target Year and (ii) assuming distributions were made of Adjusted EBITDA hereunder (and, if applicable, were made also for the initial Target Year to any employees having written contractual rights, if any, relating thereto), Net Adjusted EBITDA for each successive Target Year.[677]

442.    In addition to this text, Exhibit B of the Earnout Agreement—which is expressly referenced in subsection (c) of Section 2.2 and is included on page 12 of the Earnout Agreement itself—provides specific examples of Earnout Payments payable under different performance scenarios (e.g., if the performance targets for each year are met or if they are under by 5% or 20%).[678]

---

[677] PX-634, § 2.2.
[678] PX-634 at PX-634.0012; see supra ¶ 90.

443.   Plaintiff contends that Exhibit B accurately illustrates how the calculations set forth in Exhibit 2.2 were intended to work.[679]

444.   Defendants contend that the examples set forth on Exhibit B are derived from a formula different than the formula described in the text of Section 2.2 and that the text of Section 2.2 (as Defendants construe it) controls.   Specifically, Defendants assert two differences: (1) while the first variable in the Exhibit B Formula is "Adjusted EBITDA Plan" for the relevant year, the first sentence of Section 2.2 requires that the variable be the year's actual "Adjusted EBITDA"; and (2) for 2016 (but not for 2017 or 2018), subsection (b) of Section 2.2. requires that that first variable be reduced by the amount of Adjusted EBITDA generated in the first quarter of 2016.

445.   "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."   *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)); *see also Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990) ("A term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" (quoting *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987))).   Under this standard, the Court concludes that, on its face, the Earnout Agreement's calculation formula for calculating the Earnout Payment is as set forth on Exhibit B or, at a minimum, is ambiguous.

---

[679] *See supra* ¶ 92.

446.     As for the issue of whether or how to account for first-quarter Adjusted EBITDA

in calculating the 2016 Earnout Payment, the relevant text of Section 2.2(b) provides:

> only the actual Adjusted EBITDA generated during the last three (3) calendar
> quarters in calendar year 2016 commencing as of the Effective Date shall be used
> to determine the Earnout Pool for the 2016 Target Year from which Earnout
> Payments and, if applicable, excess EBITDA payments earned hereunder shall be
> made. [680]

This language does not state that first-quarter Adjusted EBITDA must be subtracted.  On its face,

the language appears to prescribe the *source* of the funds for the "Earnout Pool."  Indeed, that is

how NGE's General Counsel Gary Lancaster, the lead draftsman of the Earnout Agreement for

NGE, described this language in his April 2017 memorandum: "The second part of Section

2.2(b) prescribes the source of funds in the Earnout Pool by using the Adjustment EBITDA

achievement percentage calculated in Section 2.2(a) to determine the Earnout Pool . . . ."[681]

Moreover, the Earnout Percentage for 2016, 27.27% or 9/33, already is lower than the Earnout

Percentage for 2017 and 2018, 36.36% or 12/33, and accounts for the fact that the 2016 portion

of the 33-month Earnout Period excludes the first quarter and thus had only 9 months.[682]

Reading this provision with the Earnout Agreement as a whole, including in conjunction with

Exhibit B, the Court concludes that the Earnout Agreement does not provide for the subtraction

of the first-quarter from the 2016 Adjusted EBITDA.  At the very least, however, the Court

concludes that the language in Section 2.2(b) is ambiguous.

447.     As for whether the first variable is actual Adjusted EBITDA as Defendants

contend or Adjusted EBITDA Plan as Plaintiff contends, the first sentence of Section 2.2 refers

---

[680] PX-634, § 2.2(b).
[681] PX-623 at 623.0006.  Consistent with Plaintiff's interpretation, nowhere in Lancaster's memo does he suggest that Section 2.2(b) requires reducing the 2016 Adjusted EBITDA by the first-quarter earnings. *See supra* ¶ 336.
[682] *See supra* ¶ 81.

simply to "the Target Year's Adjusted EBITDA."[683]  It does not refer to the "*actual* Adjusted EBITDA"—even though "actual Adjusted EBITDA" is a term expressly used elsewhere in Section 2.2 when *actual* Adjusted EBITDA is intended.  Accordingly, "Target Year's Adjusted EBITDA" could be read to mean Adjusted EBITDA Plan as Plaintiff contends, or as "actual Adjusted EBITDA" as Defendants contend.  Reading the Earnout Agreement as a whole, including in conjunction with Exhibit B, the Court finds that the more natural construction is that the variable should be Adjusted EBITDA Plan.  For these reasons, the Court concludes that Section 2.2, on its face, does not support Defendants' position and either does support Plaintiff's interpretation or is ambiguous as to the first variable and the reduction of first-quarter Adjusted EBITDA.

448.   Exhibit B to the Earnout Agreement indisputably supports Plaintiff's interpretation that (i) first quarter Adjusted EBITDA for 2016 already is accounted for by using the 9/33 Earnout Percentage and, therefore, no further adjustment is needed to account for first quarter earnings[684] and (ii) Adjusted EBITDA Plan rather than actual Adjusted EBITDA is the correct first component of the Earnout Payment calculation formula.[685]

449.   Moreover, even assuming Section 2.2 and Exhibit B conflict, as Defendants contend, then the Earnout Agreement is also ambiguous for that very reason—that is, because the Earnout Agreement is internally inconsistent.  *See, e.g.*, *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) ("Apparent internal inconsistencies within a contract can suggest ambiguity . . . .").

---

[683] PX-634, § 2.2.
[684] *See supra* ¶ 304.
[685] *See supra* ¶ 301-03.

450.    Defendants argue that Exhibit B is not part of the Earnout Agreement because the text of the Earnout Agreement does not explicitly state that Exhibit B is "incorporated."  As noted, however, Exhibit B is both expressly referred to in Section 2.2 and included within the four corners of the Earnout Agreement, on page 12.[686]  This is more than sufficient to show that Exhibit B is a part of the Earnout Agreement.  *See Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 341 (S.D.N.Y. 2019) ("To incorporate a document by reference, '[n]o particular mode of reference is necessary for that purpose; any language which indicates the intent that the two shall make one instrument, or a physical annexing of the one to the other, in a manner or under circumstances showing clearly such intent, is sufficient.'" (quoting *In re Bd. of Comm'rs of Wash. Park*, 52 N.Y. 131, 131 (1873))).

451.    To the extent that the Earnout Agreement is ambiguous as to the correct formula for the Earnout Payments, the Court may rely on extrinsic evidence to construe the agreement.  *See Luitpold*, 784 F.3d at 95 ("[I]nternal inconsistencies within a contract . . . can then be addressed through extrinsic evidence"); *Collins*, 303 F.3d at 433-34 ("[W]here . . . there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent." (quoting *Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S.2d 508, 512 (App. Div. 1999))).  That evidence is detailed above and includes:

- the emails and spreadsheets exchanged by the parties before and after the closing;[687]

- the witnesses' testimony;[688]

- Lancaster's April 11, 2017 memo;[689]

- Kroeker's April 12, 2017 email forwarding Lancaster's memo and noting Spark's determination of the 2016 payment;[690]

---

[686] PX-634, § 2.2; PX-634 at PX-634.0012.
[687] *See supra* ¶¶ 86-90, 93.
[688] *See supra* ¶¶ 91-92, 337.
[689] *See supra* ¶¶ 334-35.

- Section 2.2(c) of the MIPA;[691] and

- Leathers' testimony regarding the economics of the parties' transaction.[692]

This evidence overwhelmingly demonstrates that the parties intended for the Earnout Payments to be calculated under the Exhibit B Formula and that first-quarter earnings were not intended to be reduced from the 2016 Adjusted EBITDA.

452.   The Court thus concludes that the Exhibit B Formula is the correct formula for calculating the Earnout Payments.  The Court further concludes, based on the Findings of Fact discussed above, that NGE breached the Earnout Agreement by not applying, and by not making Earnout Payments based on, the Exhibit B Formula—resulting in underpayments to the Sellers as detailed further below.

ii.      2016 Customer Account Adjustment

453.   Section 2.2(d) provides for an adjustment to the Earnout Payment based on the number of "Year End Customer Accounts" held by Major Energy at the end of Earnout year:

> If the Year End Customer Accounts for any Target Year falls below the agreed upon customer count numbers for such Target Year (being the year end total customer account numbers of 178,031, 203,578, and 231,717 for calendar years 2016, 2017, and 2018, respectively), then the Final Earnout Amount would be reduced by a monetary amount that is calculated as (i) the difference between the projected Year End Customer Account numbers and the actual Target Year End Customer Account numbers multiplied by (ii) the projected Adjusted EBITDA per customer (such calculated amount, the "Customer Account Reduction"), as illustrated by the example set forth in Exhibit A attached hereto.[693]

454.   The Earnout Agreement defines "Year End Customer Accounts," as used in the adjustment, as "the actual number of customer accounts calculated as of the end of each Target

---

[690] *See supra* ¶¶ 331-33.
[691] *See supra* ¶ 58.
[692] *See supra* ¶ 302.
[693] PX-634, § 2.2(d).

Year."[694]   The Earnout Agreement specifies how to determine that "actual number" in the definition:

> The actual number of customer accounts shall be computed in a manner consistent with the procedures, practices, methodologies, and standards used by the Companies in calculating their customer accounts before the Closing.[695]

455.    This definition unambiguously requires the Year End Customer Accounts to be determined based on Major Energy's historical procedures, practices, methodologies and standards, not on industry standards and not on any external determination of how the number *should* be determined.

456.    Major Energy's historical practice and methodology of counting Customer Accounts is to count active customers and pending active customers, less pending dropped customers and cancelled customers.[696]

457.    Applying Major Energy's historical practice and methodology, the Court concludes that, for 2016, the correct Year End Customer Accounts number was 173,901.[697] Defendants, however, calculated the 2016 Earnout Payment based on Year End Customer Accounts of 164,767.[698]   This difference resulted from Defendants' erroneous deduction of pending active customers rather than including pending active customers in the Year End Customer Account number.  This was a breach of Section 2.2 and resulted in an underpayment to the Sellers of $1,064,552.[699]

---

[694] PX 634 at PX-634.0004.

[695] *Id.*

[696] Tr. 1733:16-24; Wiederman Witness Statement ¶ 213; PX-717.

[697] *See supra* ¶ 398.

[698] *See supra* ¶ 312.

[699] *See supra* ¶ 398

iii.        Addbacks

458.    For purposes of calculating the Earnout Payments under Section 2.2 of the

Earnout Agreement, the "Adjusted EBITDA" is as "set forth in the Purchase Agreement [*i.e.*, the

MIPA]."[700]

459.    The MIPA defines "Adjusted EBITDA," in relevant part, as:

> EBITDA subject to (i) *any deviations from GAAP as to accounting principles*
> *actually applied in accounting for the operations of the Business in periods*
> *prior to the Closing Date* . . . .  For the purpose of determining Adjusted EBITDA
> during any Target Year, (i) the base salary (but not any incentive based
> compensation) for the management employees of the Companies constituting the
> Senior Management Team (but not Key Employees) earned during any Target
> Year shall be included as a deduction in determining the earnings of the
> Companies to the extent not already deducted therefrom, (ii) any expenses
> incurred for customer acquisition shall be expensed for such Target Year,
> notwithstanding any election or mandate under GAAP to amortize such expenses
> over a longer time period, and (iii) mark-to-market hedging transactions shall not
> be taken into account in any manner.  For purposes of further clarification: (i) no
> sum that is paid out of the Escrow Account or from ( or in reduction of) the
> Litigation Credit shall be taken into account in any manner for the purpose of any
> determination of Adjusted EBITDA (subject, however, to the next sentence
> below); and (ii) no charges or fees of any kind (however characterized or
> accounted for) imposed by Buyer (or any of its Affiliates) on the Companies on
> account of or in connection with Buyer's (or any such Affiliate's) provision
> thereto of any management, administration, capital raising, lending, banking,
> investment banking, consulting, advisory, overhead or like services, or of any
> office or other facilities or premises of any kind, shall be taken into account in any
> manner for the purpose of any determination of Adjusted EBITDA.[701]

460.    Accordingly, the MIPA defines "Adjusted EBITDA" to include "any deviations"

from GAAP that Major Energy applied in the operation of its business prior to its sale to NGE.

461.    Prior to its sale to NGE, Major Energy's practice was to add back and include in

its annual adjusted EBITDA calculation certain expenses that had initially been subtracted out

from the adjusted EBITDA calculation, including components of executive compensation, one-

---

[700] PX-634 at PX-634.0001.
[701] PX-632 at PX-632.0005-6 (emphasis added).

time extraordinary expenses, legal, accounting and consulting fees, and certain travel and entertainment expenses.[702]

462.    In calculating the Adjusted EBITDA for the 2016 Earnout Payment, Defendants subtracted from the Adjusted EBITDA calculation expenses—but did not add back in—expenses that Major Energy historically initially subtracted from Adjusted EBITDA but added back in to reach an annual adjusted EBITDA figure.[703]  Defendants' failure to add these expenses back into the Adjusted EBITDA figure resulted in an Adjusted EBITDA calculation for 2016 that understated the Adjusted EBITDA figure Defendants used in the Earnout Payment calculation for 2016.   Under the MIPA, these expenses should have been added back to the Adjusted EBITDA calculation.[704]

463.    The expenses that should have been added back to the Adjusted EBITDA figure for 2016 included expenses relating to executive compensation, accounting and consulting fees, and travel and entertainment.[705]  These expenses total approximately $1.9 million.[706]  If they had been included as addbacks to the 2016 Adjusted EBITDA figures the Earnout Payment for 2016 would have been $1.4 million higher.[707]

464.    In calculating the Adjusted EBITDA for the 2017 and 2018 Earnout Payments, Defendants also did not include certain expenses incurred by Major Energy as addbacks—including, as detailed above, certain expenses relating to executive compensation and other one-time, extraordinary expenses.[708]  Leathers testified that these expenses were in excess of $1

---

[702] *See supra* ¶¶ 310, 400.

[703] *See supra* ¶ 320.

[704] *See supra* ¶¶ 310, 399-400.

[705] *See supra* ¶¶ 399.

[706] Leathers Witness Statement ¶¶ 158-159 & table 7.

[707] *See supra* ¶ 400; Leathers Witness Statement ¶¶ 158-159 & table 7.

[708]  *See supra* § XI.C.ii.

million in each year. [709]  If they had been included as addbacks to the 2017 and 2018 Adjusted

EBITDA figures, the Earnout Payments for 2017 and 2018 would have been $369,000 higher.[710]

465.    Each of the expenses that Defendants failed to add back in calculating Adjusted

EBITDA for 2016, 2017 and 2018 are expenses that Major Energy "actually applied in

accounting for the operations of the Business in periods prior to the Closing Date"[711]—indeed,

Major Energy historically included them in its Adjusted EBITDA calculations, and even

included such expenses as addbacks for the projections forming the Earnout targets

themselves.[712]   The Court thus concludes that Defendants breached Section 2.2 by failing to

account for those amounts in calculating the Adjusted EBITDA.

iv.    <u>Damages from Breaches of Section 2.2</u>

466.    As detailed above and as set forth in Leathers' testimony, if Defendants had

calculated the 2016 Contingent Payments correctly—that is, by using the Exhibit B formula in

calculating the Earnout Payment, by determining the Earnout Payment's Customer Account

Adjustment using the correct number of customer accounts, and applying all necessary addbacks

to the Adjusted EBITDA for 2016—the Contingent Payments would have been $4,814,283 more

than what Defendants actually paid for 2016.[713]

467.    If Defendants had calculated the 2017 and 2018 Contingent Payments correctly—

by using the Exhibit B formula in calculating the Earnout Payment and applying all necessary

---

[709] Leathers Witness Statement ¶¶ 196, 204.

[710] Leathers Witness Statement ¶ 186 & table 9 (difference between "correcting" and "accepting" underpayment amounts reflected under Exhibit B columns).

[711] PX-632 at PX-632.0005-6.

[712] *See supra* ¶¶ 320, 400.

[713] *See supra* ¶ 401.

addbacks to the Adjusted EBITDA for 2017 and 2018—the Contingent Payments would have been $1,532,124 more than what Defendants actually paid for 2017 and 2018.[714]

468.    The Court thus concludes that the Sellers were damaged in the total amount of these underpayments—$6,346,407.  *See, e.g.*, *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.").

### D.    Defendants Breached Section 2.7 of the Earnout Agreement.

#### i.    Defendants' violations of Section 2.7

469.    Section 2.7 of the Earnout Agreement provides that NGE "shall have the discretion to operate the Business of the Companies as [NGE] deems appropriate"—subject to the following limitations:

> (i) Buyer has a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities; (ii) Buyer accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies; and (iii) Buyer shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to the Sellers hereunder.  In furtherance of the foregoing ( and not by way of limitation), Buyer during the Target Years shall not unilaterally, directly or indirectly, and whether in one transaction or series of related transactions of any kind, make fundamental changes to the operating overhead or otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party.

---

[714] *See supra* ¶ 403.

470.     Based on the Findings of Fact described above, the Court finds that both NGE and Spark breached Section 2.7 during the Earnout Period.[715]  Defendants failed in good faith to consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of the Company.  Defendants failed in good faith to operate Major Energy consistently with how the Senior Management Team operated the Company before the closing or proposed to operate the Company during the Earnout Period. Defendants took actions they knew or should have known was reasonably likely to have the inevitable effect of avoiding or reducing the Earnout Payment amounts.  Defendants acted unilaterally and materially negatively impacted the profitability of the Company for the benefit of related and unrelated parties.

471.     The evidence overwhelmingly supports a finding that Defendants breached Section 2.7.  Specific examples of Defendants' breaches of 2.7, both before and after the Dropdown as detailed above, include:

- the Dropdown;[716]

- the termination of PSE as Major Energy's supplier and Spark taking over the supply function for Major Energy;[717]

- the repeated interference with vendor and broker relationships;[718]

- the instructions and directions to Major Energy to start and stop marketing efforts through Major's residential vendors and commercial brokers;[719]

- the instructions and directions to Major Energy to accept only certain commercial customers that met specific margin thresholds;[720]

---

[715] *See supra* ¶¶ 141-196, 211-299.

[716] *See supra* ¶¶ 211-236.

[717] *See supra* ¶¶ 141-166, 277-288.

[718] *See supra* ¶¶ 181-196, 258-276.

[719] *See supra* ¶¶ 182, 263, 265.

[720] *See supra* ¶¶ 271, 274-276.

- the instructions and directions that governed Major Energy's marketing and sales strategies;[721]

- the significant changes to Major Energy's accounting practices, systems, and controls;[722]

- the cumulative effect on Major Energy's management team and employees of Defendants' control that resulted in management resignations, destabilization and a loss of employees;[723]

- the EMS integration project;[724] and

- the refusal to permit aggregation deals for more than 5,000 customers.[725]

472.    Defendants repeatedly and consistently showed a disregard for their contractual obligations under Section 2.7.  The entire transaction was premised upon allowing the Senior Management Team to continue to operate Major Energy as it had been operated in the past.  This would allow Major Energy to continue to grow its business and would give it the best chance to achieve the Contingent Payments as contemplated in the Earnout Agreement.  The totality of Defendants' actions, however, effectively destroyed Plaintiff's contractual rights under Section 2.7 that Major Energy continue to be operated in a manner consistent with how the Senior Management Team operated Major Energy prior to the sale to NGE.

473.    Defendants do not seriously contend that these events did not occur, and the evidence does not show otherwise.  Defendants nevertheless assert that their actions did not breach Section 2.7 because they did not fail to act in "good faith" (or did not act in "bad faith"), as required under Section 2.7.

474.    The Court disagrees.  "Whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case,

---

[721] *See supra* ¶ 262.
[722] *See supra* ¶¶ 238-248.
[723] *See supra* ¶¶ 249-257.
[724] *See supra* ¶¶ 167-177.
[725] *See supra* ¶¶ 289-299.

and is ordinarily a question of fact to be determined by the . . . finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).   What "good faith" requires varies on a case-by-case basis: "the boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Prop. Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989); *accord L-7 Designs, Inc. v. Old Navy, LLC*, 964 F. Supp. 2d 299, 307 (S.D.N.Y. 2013).   At a minimum, however, good faith requires that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).   Good faith also "'includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.'" *Kader v. Paper Software Inc.*, 111 F.3d 337, 342 (2d Cir. 1997) (quoting *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir. 1991)); *see also Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) ("A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.").

475.   Under these standards, the Court finds that Defendants' interference with Major Energy's business was not in good faith because it destroyed Sellers' contractual rights set forth in Section 2.7 to have Major Energy operated as it was before the sale.  *See Thyroff*, 460 F.3d at 407.

476.   In addition to the specific instances of conduct described above that destroyed Plaintiff's rights under Section 2.7, the evidence also established that:

- before the closing of the sale of Major Energy to NGE, Defendants misled Sellers about their plan to effect the Dropdown immediately after acquiring Major Energy (as shown by, among other things, the representation and warranty in Section 6.3 of the MIPA, Lancaster's email to the Sellers on the day of the closing, the lack of any written documentation from any of NGE's negotiators informing Sellers of NGE's and Spark's intent to effectuate a dropdown immediately after the sale, and Hennekes' and Konikowski's incomplete communications with Alper when Alper inquired about a potential Dropdown);[726]

- Defendants planned, at the outset of their acquisition of Major Energy and without regard to Section 2.7, to replace PSE with Spark itself;[727]

- for months, Defendants led the Sellers to believe that there would be an early buyout of the Earnout Payments as part of Defendants' attempts to obtain the Sellers' consent to the Dropdown (which never was given);[728]

- Defendants reneged on an agreement in principle to buy out the Sellers in August 2016, and altered deal documents in a way to effectuate the Dropdown without the Sellers' consent even though the Sellers' consent was required;[729] and

- in May 2018, Defendants reneged on an agreement for Major Energy to halt its customer acquisition spend in a decision that, by that point in the Earnout Period, could have benefited only Defendants at the Sellers' expense.[730]

477.    This totality of Defendants' conduct overwhelmingly shows that Defendants destroyed Plaintiff's contractual rights under Section 2.7, and that Defendants did not act in good faith in their dealings with the Sellers.

ii.    Plaintiff's damages

478.    The Second Circuit has recognized that the damages attributable to a breach reducing the available payments under an earnout agreement are akin to lost profits.  *See Holland Loader Co. LLC v. FLSmidth A/S*, 769 F. App'x 40, 42 (2d Cir. 2019) (citing *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007)).  Because the lost profits in this context are what the parties bargained for, as opposed to being suffered as a consequence

---

[726] *See supra* ¶¶ 60-66, 103-140.
[727] *See supra* ¶¶ 145-147, 150, 152-155.
[728] *See supra* ¶¶ 210, 217-223.
[729] *See supra* ¶¶ 218-223, 228-234.
[730] *See supra* ¶¶ 268-269.

of the failure to perform a separate obligation, the damages are characterized as "general damages," not "consequential damages." *Id.*; *see also Tractebel*, 487 F.3d at 109.

479. Damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract." *Tractebel*, 487 F.3d at 110 (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886)). However, "'[c]ertainty,' as it pertains to ***general damages***, refers to the ***fact*** of damage, not the amount." *Id.* (quoting *Wakeman*, 4 N.E. at 266) (first emphasis added). This is because "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain." *Id.* (quoting *Wakeman*, 4 N.E. at 266). "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer . . . ." *Id.* (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)) (alternation and omission in original).

480. Accordingly, to establish the amount of damages, "'[t]he plaintiff need only show a 'stable foundation for a reasonable estimate'' of the damage incurred as a result of the breach." *Id.* (quoting *Contemporary Mission*, 557 F.2d at 926). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Id.* (quoting *Entis v. Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964)). In sum, "[t]he law of New York is clear that once the fact of damage is established, the non-breaching party need only provide a 'stable foundation for a reasonable estimate [of damages]' before an award of general damages can be made." *Id.* at 111 (quoting *Freund v. Wash. Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974)).

481. In this case, the record is more than sufficient to establish "the fact of damage" incurred by the Sellers as a result of Defendants' breach of Section 2.7. The evidence establishes

that both Major Energy and NGE believed that Major Energy's business was on an upward trajectory and that Major Energy had numerous growth initiatives in place that would allow the business to succeed during the Earnout Period, and achieve and even exceed the projected Adjusted EBITDA and customer account targets. During 2016, after NGE bought Major Energy and even in the period immediately after the Dropdown, Major Energy's financial performance was strong.[731] Kroeker, Spark's CEO, made public statements to Spark's investors on earnings calls noting that Major Energy's business was performing very well.[732] In fact, Major Energy had a very strong first quarter and its customer count increased significantly in 2016 from 2015.[733]

482. Major Energy's strong financial performance, however, abruptly stopped in the latter half of 2016 as the actions of NGE and Spark took effect. Numerous fact witnesses testified, credibly, that Defendants' interference significantly and materially damaged Major Energy's business and precluded Major Energy from achieving the customer account targets and Adjusted EBITDA targets in the Earnout Agreement.[734] And Plaintiff's expert Leathers itemized the damages associated with Defendants' interference actions and opined, persuasively, that the Sellers were damaged.

483. The Court concludes that Plaintiff has put forth a "stable foundation for a reasonable estimate" of the damages. Leathers' opinion, that the Sellers would have obtained the full earnout if Defendants had not breached Section 2.7 (and the Earnout Payment had been calculated correctly under Section 2.2), is supported by the evidence, including the testimony of

---

[731] *See supra* ¶¶ 371-372.
[732] *See supra* ¶ 371.
[733] *See supra* ¶ 34.
[734] *See supra* ¶¶ 193, 271, 274 ,276, 356-357.

Major Energy's witnesses, the trial exhibits and Leathers' detailed analysis the economic impact of Defendants' breaches.[735]

484.    The Court further concludes that, had Defendants not breached Section 2.7 of the Earnout Agreement, and had the Contingent Payments been calculated correctly, the Sellers would have achieved the maximum Contingent Payments of $35 million.  Because the Sellers were paid $9 million, their damages are $26 million.

**E.    Defendants Breached Sections 2.2 and 2.7 of the Executive Earnout Agreement.**

485.    Section 2.2 of the Executive Earnout Agreement, which sets forth how to calculate the Executive Earnout Payments, is substantively identical to Section 2.2 of the Earnout Agreement.[736]

486.    Section 2.7 of the Executive Earnout Agreement, which pertains to the post-closing operation of Major Energy, is nearly identical to Section 2.7 of the Earnout Agreement, except that it additionally provides that:

> the details of the day-to-day management of the operations of each of the Companies are delegated to the Senior Management Team which shall be vested with all general and specific rights and powers required for or appropriate to the management of the business of the Companies under law and under the Operating Agreement of each Company . . . .[737]

487.    For the same reasons that the Court concludes Defendants breached Sections 2.2 and 2.7 of the Earnout Agreement, the Court concludes that Defendants breached Sections 2.2 and 2.7 of the Executive Earnout Agreement.

---

[735] *See supra* ¶¶ 163, 177, 193, 237, 246-247, 274, 287, 356-359.
[736] PX-658, § 2.2.
[737] PX-658, § 2.7.

488.    As set forth above, but for these breaches of the Executive Earnout Agreement, the Managers (as defined in the Executive Earnout Agreement) would have been paid, and were thus damaged in the amount of, $2.098 million.[738]

**F.    Defendants Breached Section 11.7 of the MIPA.**

i.    <u>Breach of Section 11.7</u>

489.    Section 11.7 of the MIPA states:

No assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void.

490.    "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992).  "The best evidence of what parties to a written agreement intend is what they say in their writing."  *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (quoting *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992)).  Thus, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."  *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).  Moreover, extrinsic evidence of the parties' intent "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 580 (N.Y. 1969)); *see also Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("It is well established that a court

---

[738] *See supra* ¶ 412.

may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract.").

491.   These well-settled rules of contract construction apply with equal force in interpreting and enforcing an unambiguous anti-assignment provision.  *See, e.g.*, *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 467 (S.D.N.Y. 2018); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 CIV. 6876 LMM, 2000 WL 1876915, at *2 (S.D.N.Y. Dec. 22, 2000) (holding that oral consent to assignment of rights under a contract that requires prior written consent is void).   In *Holland Loader*, for example, the court addressed the interpretation of an anti-assignment provision.  313 F. Supp. 3d at 467.  The defendant argued that the assignment clause must have contained a scrivener's error because it would be nonsensical that the parties would have intended to require consent for an assignment to an affiliate, but not a non-affiliate.  The court, however, rejected defendant's argument and attempt to introduce any extrinsic evidence: "While the clause allows for assignment or delegation to a non-affiliate without prior written consent, and this may indeed be nonsensical in light of the requirement of consent for an assignment or delegation to an affiliate, the unusual language does not render the provision ambiguous."  *Id.*

492.   Section 11.7 of the MIPA plainly and unambiguously prohibited the Dropdown— which included the assignment from NGE to Spark of the MIPA and of the rights NGE acquired under the MIPA, including the membership interests in Major Energy[739]—without the Sellers' written consent.

---

[739] *See supra* ¶¶ 61, 211.

493.    The evidence at trial proved that Sellers never provided their written consent to the Dropdown.[740]   Despite that fact, Defendants' proceeded and effectuated the Dropdown.[741] Accordingly, Defendants breached Section 11.7 of the MIPA.

494.    Contrary to Defendants' argument, the fact that the Earnout Agreement's assignment provision permits assignments, without consent, to certain "Affiliates," does not mean that Defendants were free to do the Dropdown without Sellers' consent or otherwise ignore Section 11.7.   The Earnout Agreement's provision permitting assignments without Seller's consent applies solely to "This Agreement"—that is, the Earnout Agreement itself, not the MIPA.[742]   Similarly, the MIPA's assignment provision applies to "this Agreement"—that is, the MIPA, not the Earnout Agreement.[743]   The two assignment provisions thus in no way conflict and can easily both be given effect.   *See, e.g.*, *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) ("General canons of contract construction require that 'where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect.'   'This [doctrine] applies with equal force . . . where one [document] incorporates the terms of the other.'" (quoting *Proyecfin de Venez., S.A. v. Banco Indus. de Venez., S.A.*, 760 F.2d 390, 395-96 (2d Cir.1985) (first alteration in original)).[744]

495.    Defendants' argument would render meaningless Section 11.7 of the MIPA. Further, Defendants' actions in 2016 leading up to the Dropdown demonstrate that Defendants themselves knew and understood that Sellers' written consent was required for the Dropdown, as Defendants repeatedly tried to obtain Sellers' consent and admitted in the Spark MIPA that

---

[740] *See supra* ¶ 125
[741] *See supra* ¶¶ 224, 228-234.
[742] *See supra* ¶ 68; PX-634 at PX-634.0007.
[743] *See supra* ¶ 61; PX-632 at PX-632.0068.
[744] For the same reason, the Sellers' execution of the Earnout Agreement did not constitute "consent" to the Dropdown or any other assignment of the MIPA not permitted by Section 11.7 of the MIPA.

Sellers' written consent was required for the Dropdown.  There is simply no basis on which to conclude that the assignment provision of the Earnout Agreement displaces or supersedes the MIPA's assignment provision.[745]

496.     The Court thus finds that, in addition to a breach of Section 2.7, the Dropdown also constituted a breach by NGE of Section 11.7 of the MIPA.

ii.     <u>Rescissory Damages as Remedy for Breach of Section 11.7</u>

497.     Assignments "made in contravention of a prohibition clause in a contract are void if the contract contains clear, definite and appropriate language declaring the invalidity of such assignments."  *LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*, 287 F.R.D. 230, 235 (S.D.N.Y. 2012) (quoting *Macklowe v. 42nd St. Dev. Corp.*, 566 N.Y.S.2d 606, 606 (App. Div. 1991)); *see also, e.g.*, *Allhusen v. Caristo Constr. Corp.*, 103 N.E.2d 891, 893 (N.Y. 1952) (finding void an assignment where the non-assignment clause stated that "assignment by the second party . . . without the written consent of the first party shall be void").

498.     While rescission is the usual remedy for a void assignment, *see, e.g.*, *Richard A. Hutchens CC, L.L.C. v. State*, 872 N.Y.S.2d 734, 739 (App. Div. 2009), where rescission is not practicable, rescissory damages may be awarded as a substitute.  *See MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 936 N.Y.S.2d 513, 523 (Sup. Ct. 2012) ("Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable. A solid body of case law so holds."); *Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869 (Sup. Ct. 2012) (same).

499.     Rescissory damages "restore a plaintiff to the position occupied before the defendant's wrongful acts."  *St. Clair Shores Gen. Empls. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d

---

[745] Indeed, Defendants themselves plainly understood at the time of the Dropdown that the MIPA's assignment provision applied.  As noted above, they made obtaining the Sellers' consent a condition of the closing of the Dropdown, and they attempted multiple times (unsuccessfully) to obtain that consent.

303, 315 (S.D.N.Y. 2010); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 178 (S.D.N.Y. 2012) ("The purpose of rescissory damages is to restore the plaintiff to the position it would have occupied had the transaction not occurred."); *see also Yu v. GSM Nation, LLC*, No. CV N17C-07-200 JRJ, 2018 WL 2272708, at *17 (Del. Super. Ct. Apr. 24, 2018) (rescissory damages remedy is premised upon the idea that "the nature of the wrong perpetrated is such that plaintiff is entitled to more than his 'out-of-pocket' harm, as measured by the market value of the asset at or around the time of the wrong").

500.    Here, the Court concludes that rescission of the MIPA and/or of the assignment from NGE to Spark—four years after the closing and nearly four years after the subsequent Dropdown—is not at all practicable.  Rescissory damages are thus the appropriate remedy for Defendants' breach of the non-assignment provision.  As the "wrong" giving rise to this remedy was the Dropdown, the Sellers are thus entitled to be restored to the position they occupied just before the Dropdown.

501.    As discussed above, the day before the Dropdown, the Sellers were the beneficiaries of Contingent Payments with a then-present value of approximately $18.8 million.[746]  Because the Sellers already received $9 million from Defendants, their rescissory damages are thus $9.8 million.[747]

iii.    Unviability of Defendants' Affirmative Defenses

a)    Inclusion of Section 11.7 as an "oversight"

502.    At trial, Defendants attempted to justify NGE's breach of Section 11.7 by claiming that the MIPA "was part of a preexisting form agreement" and the non-assignment language in Section 11.7 "was an oversight."  This argument is belied by the trial evidence and

---

[746] *See supra* ¶¶ 419, 422.

[747] As the Court also concludes that the Sellers are entitled to the full Earnout Payments because of Defendants' breaches of the Earnout Agreement, the judgment will reflect only that higher amount.

unsupportable as a matter of law.   A party "who signs or accepts a written contract . . . is **conclusively presumed** to know its contents and to assent to them . . . ."   *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (emphasis added); *see also Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013). This is especially the case where the contracting party is a sophisticated party represented by competent counsel.   *See MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 646 (2009); *see also Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13-cv-3956, 2014 WL 837050, at *9-10 (S.D.N.Y. Mar. 3, 2014) (a corporation represented by counsel is considered a sophisticated party in the eyes of the law).

503.    NGE is a sophisticated party and was represented by competent counsel throughout the negotiations of the MIPA.[748]   The MIPA was negotiated for many weeks and there were numerous drafts exchanged between the parties during this period.[749]   It was NGE's obligation and responsibility to read the contract before executing it, and it must live with all the terms of the MIPA that it freely negotiated and executed.

504.    Moreover, the trial evidence shows that Lancaster, counsel for NGE, did in fact review Section 11.7 during the negotiation of the MIPA and even made changes to the provision.[750]   Yet, Lancaster did not change the language barring any assignment of the MIPA without the prior written consent of the Sellers.   Thus, this argument fails.

b)      *Ratification, waiver, and estoppel*

505.    Defendants raise the affirmative defenses of ratification, waiver, and estoppel in response to Plaintiff's claim for breach of Section 11.7.   Defendants contend that Plaintiff is estopped from invalidating the Dropdown because the Sellers accepted benefits and

---

[748] *See supra* ¶ 36.
[749] *See supra* ¶ 57.
[750] *See supra* ¶ 62.

accommodations from Spark during the Earnout Period, and, consequently, ratified or waived any objection to the Dropdown.[751]

506.    Defendants' ratification, waiver, and estoppel defenses are unavailable as a matter of law.  First, a party may not assert a ratification, waiver, or estoppel defense as a means of overcoming a breach of a non-assignment provision that expressly declares the assignment void. *See* 6A N.Y. Jur. 2d Assignments § 42 (2d ed. 2019) ("[A] void assignment may not be subsequently ratified.") (citing *Knight v. Knight*, 182 A.D.2d 342, 345 (3d Dep't 1992)); *see also Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001) ("equitable defenses are unavailable when the rights being pressed by a party are based upon a void document"); *Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99-cv-2638, 1999 WL 1277243, at *4-5 (S.D.N.Y. Dec. 30, 1999).  The Dropdown to Spark and Spark Holdco, in violation of Section 11.7, created an incurable legal nullity.

507.    Second, Defendants' ratification, waiver, and estoppel defenses are precluded by the unambiguous no-waiver clause in Section 11.4 of the MIPA.[752]  In relevant part, that clause states that "[t]he waiver by any Party of a breach of any provision of this Agreement shall not operate as, or be construed as, a further or continuing waiver of such breach . . . . No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof . . ."[753]  Such waiver provisions are enforced.  *Park Irmat Drug Corp. v. Optumrx, In*c., 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016) (finding no-waiver clause in agreement precluded necessity to wade into factual dispute); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) ("When a contract

---

[751] *See* Defs.' Pretrial Mem. (ECF No. 190).
[752] PX-632, § 11.4.
[753] *Id.*

contains a 'no waiver' clause . . . a non-breaching party can continue his contract instead of terminating it based on breaches that previously occurred and yet not waive any of his rights under the contract."); *Equator Int'l, Inc. v. NH Street Investors, Inc*., 978 N.Y.S.2d 817, 824 (N.Y. Sup. Ct. 2014) (barring estoppel defense pursuant to no-waiver clause).

508.    Finally, the evidence does not support a ratification, waiver, or estoppel defense:

- Waiver: "To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intent to relinquish it." *Christian Dior-N.Y., Inc. v. Koret, Inc.*, 792 F.2d 34, 40 (2d Cir. 1986).

- Estoppel: The party alleging equitable estoppel must demonstrate: "(a) an act constituting a concealment of facts or misrepresentation; (b) an intention or expectation that such acts will be relied upon; (c) actual or constructive knowledge of the true facts by the wrongdoers; (d) reliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013).

- Ratification: "It is black letter law, that ratification requires (1) acceptance by the principal of the benefits of his agent's acts; (2) with full knowledge of the material facts; and (3) circumstances indicating an intention to affirm or adopt the otherwise-unauthorized arrangement." *Davis v. Carroll*, 937 F. Supp. 2d 390, 436 (S.D.N.Y. 2013).

509.    Defendants have not proven any of these elements with respect to the Sellers' rights under Section 11.7 of the MIPA.[754]

### c)    *Unclean hands*

510.    Defendants also assert the equitable defense of "unclean hands."

511.    "The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation.'" *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp.

---

[754] To the extent Defendants intend to assert their ratification, waiver, and estoppel defenses to Plaintiff's claims under the Escrow Agreement, the defenses fail for similar reasons.  There is no evidence from which the Court could conclude that the Sellers' had any "intention" to accept Defendants' breaches of Sections 2.2 or 2.7 or of any other elements of these defenses.

2d 109, 112 (S.D.N.Y. 2005) (finding that defendants' unclean hands defense is "legally insufficient because the misconduct that forms the basis for the defense is not 'immediate[ly] and necessar[ily]' related to the right in suit" (alteration in original, emphases added) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933))).   Indeed, "[t]he Second Circuit has repeatedly emphasized the narrowness of the doctrine's application."   *Id.* at 112 (citing *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983)); *see also Maatschappij Tot Exploitatie Van Rademaker's Koninklijke Cacao & Chocoladefadrieken v. Kosloff*, 45 F.2d 94, 96 (2d Cir. 1930) (stating proposition that unclean hands doctrine applies only to "wrongdoing directly connected with the right sought" and does not leave a wrongdoer "without protection in the vindication of other[,] though closely connected, rights."); *Gidatex S.r.L. v. Campeniello Imps., Ltd.*, 82 F. Supp. 2d 126, 130-31 (S.D.N.Y. 1999).

512.    The claim relevant to Defendants' unclean hands defense is Defendants' breach of Section 11.7 of the MIPA through the Dropdown.   There is no evidence of wrongdoing, misconduct, or other "unclean hands" on the part of the Sellers that has any relation to the Dropdown.

## III.    Tortious Interference with Contract by Spark

### A.    Tortious Interference with the MIPA

513.    Plaintiff also asserts that Spark tortiously interfered with the MIPA by procuring NGE's breach of the Section 11.7 non-assignment provision.   Under New York law, the elements of tortious interference with contract are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 253 (S.D.N.Y. 2002) (quoting *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001)).

514.     As discussed above, there is no dispute that the MIPA was a valid contract of which Spark had knowledge and that the Dropdown without Sellers' written consent breached Section 11.7 of the MIPA and caused damage to the Sellers.[755]

515.     The Court also concludes that Spark intentionally and improperly procured the breach of the MIPA through the Dropdown.  As detailed above, Spark intended all along to own Major Energy but lacked the liquidity at the time to purchase Major Energy.[756]  Spark instead arranged to have NGE buy Major Energy for Spark, but NGE and Spark concealed these facts and their planned Dropdown from the Sellers before the closing.  In March and April 2016, as detailed in Spark's public filings made after the closing, Spark's Board of Directors created a Special Committee to assess the Dropdown transaction with NGE; Spark conducted due diligence on Major Energy; Spark and NGE had pre-arranged agreement to conduct the Dropdown including a negotiated price; and Spark created a team to begin integrating Major Energy into Spark.  All of this was concealed from the Sellers during negotiations.[757]

516.     After NGE acquired Major Energy, Spark and NGE tried to obtain the Sellers' written consent to consummate the Dropdown.  When Sellers would not consent, Spark and NGE altered the signatories on the Omnibus Assignment Assumption Agreement to proceed with the transaction.  All of these actions by Spark demonstrate that Spark purposefully and intentionally procured the breach of the MIPA by NGE.[758]

517.     Spark seeks to avoid liability for tortious interference through Section 7.14(c) of the MIPA.  Section 7.14(c) is an exculpation clause for Affiliates that applies only to contract or tort claims involving a breach of a representation or warranty under the MIPA, as shown by the

---

[755] *See supra* Conclusions of Law §§ II.A, II.F.

[756] *See supra* ¶ 111.

[757] *See supra* ¶¶ 112-114.

[758] *See supra* ¶¶ 212-234.

title of the section, "No Additional Representations or Warranties."[759]   The clause does not exculpate Affiliates for tortious interference with NGE's other contractual obligations under the contract.   However, even if Section 7.14(c) had application here, public policy forbids its enforcement because Spark's deliberate conduct in taking multiple concerted efforts to develop a "work-around" to solidify the Dropdown without Plaintiff's consent was a willful action by Spark to deprive Plaintiff and the Sellers of a bargained-for contractual right, and at minimum, was a grossly negligent action evidencing Spark's indifference toward Plaintiff's contractual rights.   *See Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) ("New York courts will decline to enforce a contractual limitation or waiver of liability clause when there is willful or grossly negligent or recklessly indifferent conduct."); *see also Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416-17 (N.Y. 1983).   Section 7.14(c) therefore does not shield Spark from liability.

### B.     Pre-Dropdown Tortious Interference with the Earnout Agreement

518.     Plaintiff asserts that, before the Dropdown and NGE's assignment of the Earnout Agreement to Spark, Spark also tortiously interfered with the Earnout Agreement by procuring NGE's pre-assignment breaches of Section 2.7.

519.     The pre-Dropdown, pre-assignment interference with Major Energy's business included the termination of PSE as Major Energy's supplier, the imposition of the EMS integration project, the imposition of burdensome financial reporting requirements, and the beginning of the interference with vendor and broker relationships.[760]

---

[759] PX-632, § 7.14(c).
[760] *See supra* ¶¶ 141-196.

520.    As detailed above, Spark itself played a significant role in each of these events—participating in and procuring them for its own benefit.[761]

521.    The Court thus concludes that Spark is liable for tortious interference with respect to these breaches of Section 2.7.[762]

## IV.    Additional Relief to Which Plaintiff Is Entitled

### A.    Plaintiff Is Entitled to Punitive Damages.

522.    Under New York law, "an injured party can recover punitive damages when the tortious act complained of involved a wanton *or* reckless disregard of the plaintiff's rights." *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986) (emphasis added); *see also, e.g.*, *Int'l Minerals & Res., S.A. v. Bomar Res., Inc.*, 5 F. App'x 5, 9 (2d Cir. 2001) (explaining that punitive damages are available for tortious interference with contract).

523.    Here, Spark's willingness to complete the Dropdown without the Sellers' written consent "involved a wanton or reckless disregard of the [Sellers'] rights," as demonstrated by, among other things, the deliberate doctoring of the transactional documents to effectuate the Dropdown without the Sellers' consent.[763]   Indeed, there can be no genuine dispute that Spark knew that Plaintiff had a consent right, acknowledged that consent right, then ignored that consent right and attempted to create an agreement with NGE to obtain all the benefits of the MIPA, as if there had been no violation of that consent right.   Put simply, this can only be described as wanton and reckless disregard for Plaintiff's rights.

---

[761] *See supra* ¶¶ 146-147, 150, 162, 169-170, 175, 186-190.

[762] As discussed above, the Court concludes that Spark itself became liable under the Escrow Agreement *after* the assignment.   Even if Spark were not directly liable for the breaches of the Escrow Agreement, the Court nevertheless would find that Spark is liable for tortious interference for procuring those breaches.

[763] *See supra* ¶¶ 232-234; *see also* PX-656.

524.     Defendants call upon Section 9.9 of the MIPA, which precludes certain "special" losses, to bar liability for punitive damages.[764]   But Section 9.9 does not apply here.   First, Section 9.9 is a limitation of liability provision that only applies to the parties to the contract.   In its pretrial brief, Spark has unambiguously denied its status as a party to the MIPA,[765] and as the Court has concluded, NGE's attempted assignment of the MIPA was void.   Spark cannot have it both ways.   Second, Section 9.9 is housed in the Survival and Indemnification section of the MIPA and is meant to serve as a limitation on liability in connection with indemnification obligations provided in that section.   Such a reading is confirmed by the fact that every provision within the section involves indemnification in some capacity.   Finally, regardless of the specific language in Section 9.9, limitation on liability provisions will not apply to breach of contract claims involving intentional wrongdoing and bad faith conduct.   *See, e.g.*, *Kalisch-Jarcho*, 448 N.E.2d at 416-17; *Net2Globe*, 273 F. Supp. 2d at 450.

525.     Here, both NGE and Spark actively misled the Sellers into thinking that any transfer to Spark would not occur for an extended period of time after the sale.   And substantial evidence showed that Spark, with the help of NGE, was conducting internal due diligence to purchase Major Energy from NGE and otherwise taking steps internally to effectuate the purchase without any knowledge or input by the Sellers.[766]   Simply put, the record evinces Defendants' intentional actions to complete the Dropdown no matter the consequence.

526.     "Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of" the trier of fact—here, the Court.   *Feldman v. Knack*, 95 N.Y.S.3d 306, 310 (App. Div. 2019) (quoting

---

[764] *See* PX-632, § 9.9.
[765] *See* Defs.' Pretrial Mem. (ECF No. 190) at 4.
[766] *See, e.g.*, *supra* ¶ 113.

*Nardelli v. Stamberg*, 377 N.E.2d 975, 977 (N.Y. 1978)).   Based on the deceptive nature of Defendants' conduct, the Court concludes that an award of punitive damages is appropriate here—in the amount of $_____.

### B.     Plaintiff Is Entitled to Pre-Judgment Interest Under New York Law.

527.     Under New York law, the award of pre-judgment interest, at the statutory annual rate of 9% from the date of breach, is mandatory for breach-of-contract claims.   *See* N.Y. C.P.L.R. § 5001(a) (2019) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ."); *id.* § 5004 (2019) ("Interest shall be at the rate of nine per centum per annum . . . ."); *Days Inns Worldwide, Inc. v. Hosp. Corp. of the Carolinas*, No. 13-CV-8941 JPO, 2015 WL 5333847, at *1 (S.D.N.Y. Sept. 14, 2015) (Oetken, J.).

528.     Plaintiff is thus entitled to pre-judgment interest on the sums due to Sellers but not paid on the Contingent Payment due dates (for each year, March 31st of the following year). Because the Court has concluded that, but for Defendants' actions, the Sellers would have achieved the maximum Contingent Payments, Plaintiff is entitled to pre-judgment interest as follows:

| Due Date | Amount Due (Maximum)[767] | Amount Paid[768] | Damages[769] | Interest as of 3/31/20[770] | Interest Per Day[771] |
|---|---|---|---|---|---|
| 3/31/17 | $10,454,545 | 7,403,000 | 3,051,545 | 823,917 | 752 |
| 3/31/18 | $12,272,727 | 1,607,000 | 10,665,727 | 1,919,831 | 2,630 |
| 3/31/19 | $12,272,727 | 0 | 12,272,727 | 1,104,545 | 3,026 |
| **TOTAL** | | | | **$3,848,293** | **$6,408** |

---

[767] PX-632, § 2.2(a) (describing "Cash Installments"); PX-634 at 4 ("Target Year Earnout Ceiling")

[768] *See supra* ¶¶ 329, 344, 347; PX-165, at PX-0165.0005; PX-224, at PX-0224.0003.

[769] The "Amount Due (Maximum)" minus the "Amount Paid."

[770] The statutory rate of 9% multiplied by the "Damages" and then multiplied by the number of years since the "Due Date."

[771] The statutory rate of 9% multiplied by the "Damages" and then divided by 365.

529.    The Court thus concludes that Plaintiff is due, in pre-judgment interest, $3,848,293 plus $6,408 per day from April 1, 2020 through the date of the judgment in this action.

### C.    Plaintiff Is Entitled to Attorneys' Fees Under the Earnout Agreement.

530.    Section 3.7 of the Earnout Agreement provides:

The ***prevailing party*** in any action or proceeding arising out of or relating to this Agreement or instituted hereunder (including proceedings in any bankruptcy court) ***shall be entitled to recover from the other party all reasonable attorneys' fees incurred and all disbursements incurred by such prevailing party in connection with such action or proceeding***. A party will be deemed the ***'prevailing party'*** for purposes of this paragraph if, as shown in the resulting award, order or judgment, ***such party shall have established that it was underpaid by at least fifteen percent (15%)***.[772]

531.    A plain reading of this provision shows Plaintiff is entitled to recover all reasonably incurred legal fees and expenses in this case if the Sellers were "underpaid by at least fifteen percent."

532.    Defendants paid the Sellers a total of approximately $9 million—nearly 75% less than the $35 million to which the Court has concluded the Sellers were entitled.

533.    Plaintiff is thus entitled to recover all of his reasonable litigation fees and expenses in connection with this action.  The Court will enter an order setting a schedule under which Plaintiff may submit evidence of Plaintiff's attorneys' fees, and Defendants may respond.

---

[772] PX-634, § 3.7 (emphases added).

Dated: April 17, 2020                    KING & SPALDING LLP
New York, New York


                                         */s/ Israel Dahan*
                                         Israel Dahan
                                         Richard T. Marooney
                                         Ryan Gabay
                                         Leah Aaronson
                                         KING & SPALDING LLP
                                         1185 Avenue of the Americas
                                         New York, NY 10036
                                         Telephone No.:  (212) 556-2114
                                         idahan@kslaw.com
                                         rmarooney@kslaw.com
                                         rgabay@kslaw.com
                                         laaronson@kslaw.com

                                         Chelsea J. Corey
                                         300 South Tryon Street, Suite 1700
                                         Charlotte, NC 28202
                                         Telephone No.:  (704) 503-2575
                                         ccorey@kslaw.com

                                         Kevin J. O'Brien
                                         Gilbert Oladeinbo
                                         1180 Peachtree Street, NE, Suite 1600
                                         Atlanta, GA 30309
                                         Telephone No: (404) 572-4600
                                         kobrien@KSLAW.com
                                         goladeinbo@kslaw.com