**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SAUL HOROWITZ, as Sellers'
Representative,

                              Plaintiff,

                    v.                                   NO. 17 CV 7742 (JPO)

NATIONAL GAS & ELECTRIC, LLC and
SPARK ENERGY, INC.,

                              Defendants.

---

### DEFENDANTS' POST-TRIAL BRIEF

**MORGAN, LEWIS & BOCKIUS LLP**

Troy S. Brown
Dana E. Becker (*pro hac vice*)
Su Jin Kim
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
troy.brown@morganlewis.com
dana.becker@morganlewis.com
su.kim@morganlewis.com

Michelle Pector (*pro hac vice*)
Jared Wilkerson (*pro hac vice*)
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5000
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

*Attorneys for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*

**Table of Contents**

I.      **INTRODUCTION**............................................................................................... 1

II.     **PLAINTIFF HAS NOT PROVEN THAT NON-PARTY SPARK HOLDCO BREACHED SECTION 2.2 OF THE EARNOUT AGREEMENT BECAUSE SPARK HOLDCO COMPLIED WITH THE EXPRESS LANGUAGE OF THE EARNOUT AGREEMENT AND ITS CALCULATIONS WERE CORRECT**............................................................................................ 8**

      A.    **Section 2.2(b) of the Earnout Agreement Is Express, Unambiguous and Requires the Deduction of 1Q 2016 from Adjusted EBITDA in Target Year 2016.**........................................................... 9

            1.    **The Simple Exercise of Walking Through Section 2.2 for Target Year 2016 Results in a Contingent Payment of $5.16 Million, Consistent with Spark Holdco's Calculation.** ...................... 11

            2.    **Section 2.2(b) of the Earnout Agreement Expressly Mandates Exclusion of 1Q 2016 from Adjusted EBITDA Calculation.** ............. 14

      B.    **Even If The Court Finds Section 2.2 of the Earnout Agreement Is Ambiguous and Requires Parol Evidence to Resolve Competing Interpretations, Defendants Still Prevail.** ......................................... 17

      C.    **Spark Holdco Is Not Bound By Its $2.2 Million Overpayment Made in Target Year 2016 to Facilitate Compromise, While Under Express Threat of Immediate Litigation, and Made Under a Full Written Reservation of Rights.**.......................................................................... 19

            1.    **The April 11, 2017 Lancaster Memo and April 12, 2017 Kroeker Email Were Good Faith Efforts to Reach a Compromise with Sellers.**.................................................. 20

            2.    **The Parties Did Not Reach Final Agreement on Resolution, with Plaintiff Declaring a "Stalemate" in June 2016.** ........................ 22

            3.    **Spark Holdco's Next Contractual Opportunity to Address the Overpayment Was Not Until March 2018, When the Target Year 2017 Calculation Came Due and Sellers Unquestionably Were Entitled to Receive Only Contingent Payments Actually Earned.**............................................................................... 23

      D.    **Plaintiff Is Not Entitled to Attorneys' Fees Based on the Parties' Section 2.2 Dispute.** .................................................................... 25

            1.    **Even If Plaintiff Were Entitled to Any Damages, And He Is Not, He Is Not Entitled to Any Attorneys' Fees Under Section 3.7 of the Earnout Agreement or For Any Alleged Breach of the MIPA, Which Does Not Provide for Attorneys' Fees At All.** ...... 26

            2.    **If the Court Nonetheless Awards Plaintiff Attorneys' Fees, They Should Be Substantially Limited.** ................................. 29

**III.  PLAINTIFF HAS FAILED TO SATISFY HIS BURDEN TO PREVAIL ON HIS BREACH-OF-CONTRACT CLAIMS UNDER SECTION 2.7 OF THE EARNOUT AGREEMENT.** ........................................................................ 30

    **A.  Section 2.7 of the Earnout and Executive Earnout Agreements, Including Their Bilateral Duties of Good Faith and Fair Dealing, Must Be Strictly Construed** ......................................................... 31

        1.  The Provisions Addressing the Operation of Major Energy During the Earnout Period Were Heavily Negotiated ........................ 31

        2.  Section 2.7 Resulted from Extensive Negotiations and Should Be Strictly Enforced ................................................................. 32

    **B.  Every Alleged Breach of Section 2.7 Must Be Independently Analyzed, and Plaintiff Must Satisfy His Burden of Proof For Every Element of Every Claimed Breach.** ............................................. 35

    **C.  Each of Plaintiff's Section 2.7 Theories Fails Out of the Gate Because Plaintiff Has Failed to Sustain His Burden to Establish Causation and Damages.** ..................................................................... 36

        1.  Leathers' Constantly Evolving Damages Opinions Should Be Rejected ................................................................................ 37

        2.  Leathers' Damages Opinions and Testimony Are Impermissibly Speculative, Blindly Adopt Sellers' Positions, and Are Not Reliable. ............................................................... 39

        3.  Plaintiff's Own Concessions at Trial Destroy Sellers' Causation Theory ............................................................................ 44

    **D.  In Any Event, Each of Plaintiff's Claimed Breaches of Section 2.7 Independently Fails on the Merits as a Matter of Fact and Law.** ................. 47

        1.  The Single Aggregation Deal Proposed By Major Energy and Deemed Too Risky by Both Moeller and Spark Cannot Support a Claim for Breach of Section 2.7. ......................................... 48

        2.  Major Energy's Senior Management Team Ultimately Chose Not to Renew the PSE Credit and Supply Agreement, and Major Energy Ultimately Benefitted from Replacing PSE with Spark Energy, LLC. .............................................................. 52

        3.  The EMS Integration Project Was a Short-Lived, Joint Initiative that Was Halted Seven Weeks After It Started, and for Which Sellers Received an Outsized $250,000 Addback ............. 57

        4.  Defendants Did Not Interfere With or Harm Major Energy's Commercial Broker Relationships, and Those Relationships Actually Grew During the Earnout Period. ......................................... 59

5.	Defendants Did Not Interfere With or Harm Major Energy's Mass Marketing Vendor Relationships During the Earnout Period, and Any Decrease in Those Relationships Resulted From Strategic Choices Made by Major Energy's Management Team. ........................................................................... 62

6.	Defendants Did Not Breach Section 2.7 in Connection with the Voluntary Departures of Wolbrom, Schorr, or Esther Moeller. ........ 65

E.	Plaintiff Cannot Prevail on His Rescissory Damages Theory Where Plaintiff Admitted the Dropdown Itself Caused No Harm and Where His Expert's Rescissory Damages Calculation Is Unsupportable. ................ 67

1.	Rescissory Damages Are Improper Where the Complained-Of Conduct Was Expressly Permitted. ...................................... 67

2.	Rescissory Damages Are Improper Where, as Here, an Adequate Remedy Exists at Law. ............................................ 68

3.	Leathers' Model to Calculate Rescissory Damages Is Utterly Unreliable and Must Be Rejected. ...................................... 70

IV.	PLAINTIFF'S CLAIM FOR BREACH OF SECTION 11.7 OF THE MIPA FAILS. ................................................................................ 72

A.	The Dropdown Transaction Cannot Give Rise to a Breach of Section 11.7 of the MIPA, Because Both the Operation of Major Energy During the Earnout Period and the Calculation of Contingent Payments Were Freely Assignable to an NGE Affiliate. ................................ 74

B.	Even If Some Technical Breach of Section 11.7 Occurred, Plaintiff Waived, Ratified, or Is Otherwise Estopped from Raising It. ...................... 77

1.	The Evidence Shows that Sellers Strategically Acknowledged, Accepted, Leveraged, and Benefitted from the Dropdown. ............... 77

2.	Sellers Waived the Right to Enforce Section 11.7. ............................. 80

3.	Sellers Repeatedly Ratified the Dropdown. ......................................... 82

4.	Sellers Are Estopped from Challenging the Dropdown At this Late Date. ................................................................................ 83

C.	Even If Plaintiff Had Established Breach of Section 11.7, For the Reasons Set Forth Above, It Could Not Recover Damages Based on the Dropdown. ..................................................................................... 84

V.	PLAINTIFF ELECTED TO SUE SEI RATHER THAN SPARK HOLDCO, THE PARTY WITH WHICH SELLERS HAD PRIVITY, AND MUST BEAR THE CONSEQUENCES OF THAT STRATEGIC DECISION. .................. 85

A.	Section 7.14(c) of the MIPA Bars Contract and Tort Claims Against SEI, and Would Similarly Bar Contract and Tort Claims Against Spark Holdco Had It Been Named. ................................................................. 85

          1.      **Section 7.14(c) Bars Plaintiff's Tortious Interference Claim Against SEI.** .......................................................................... 87

          2.      **In Any Event, There Is No Viable Contract Claim Against SEI.** ...... 90

          3.      **In Any Event, Plaintiff's Request for Special Damages from SEI Fails.** ............................................................................... 95

     **B.**    **The Only Remaining Claim Is Breach of Contract Against NGE for Conduct Prior to August 23, 2016, Which Likewise Fails** ............................. 97

**VI.**    **CONCLUSION** ........................................................................................ 99

**CERTIFICATE OF SERVICE** .......................................................................... 101

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1711 LLC v. 231 W. 54th Corp.*,
  7 A.D.3d 261 (N.Y. App. Div. 2004) ...................................................................27

*333 E. 49th Partners, L.P. v. Flamm*,
  107 A.D.3d 584 (N.Y. App. Div. 2013) ..........................................................29, 30

*757 3rd Ave. Assoc's, LLC v. Patel*,
  117 A.D.3d 451, 985 N.Y.S.2d 57 (2014) .............................................................86

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
  341 F. Supp. 3d 339, 350–51 (S.D.N.Y. 2018)................................................26, 53

*Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*,
  580 F. Supp. 2d 285 (S.D.N.Y. 2008)................................................................90, 91

*In re Application of Erie Blvd. Hydropower L.P. v. Town of Ephratah Bd. of
  Assessors*,
  No. 17–1–2000–0331, 2003 WL 21172636 (N.Y. Sup. Ct. Apr. 11, 2003)...........73

*Aramony v. United Way of America*,
  254 F.3d 403 (2d Cir. 2001)...................................................................................76

*Arista Records LLC v. Usenet.com, Inc.*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009).....................................................................41

*Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*,
  117 A.D.3d 450 (N.Y. App. Div. 2014) ............................................................18, 28

*Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp.*,
  04CIV.3854LAKAJP, 2008 WL 4833025 (S.D.N.Y. Nov. 3, 2008) ....................30

*Bank of Am., N.A. v. Bear Stearns Asset Management*,
  969 F. Supp. 2d 339 (S.D.N.Y. 2013).....................................................................37

*Banque Nat. de Paris v. 1567 Broadway Own. Assocs.*,
  214 A.D.2d 359, 625 N.Y.S.2d 152 (1995) ...........................................................86

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*,
  448 F.3d 573 (2d Cir. 2006)....................................................................................82

*Biotronik A.G. v. Conor Medsystems Ir., Ltd.*,
  22 N.Y.3d 799, 988 N.Y.S.2d 527, 11 N.E.3d 676 (2014).....................................38

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Broyles v. J.P. Morgan Chase & Co.*,
   No. 08 CIV. 3391, 2010 WL 815123 (S.D.N.Y. Mar. 8, 2010) .............................................37

*Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*,
   537 F. Supp. 2d 546 (S.D.N.Y. 2008)..............................................................................11, 15

*Capricorn Inv'rs III, L.P. v. Coolbrands Int'l, Inc.*,
   897 N.Y.S.2d 668 (Sup. Ct. 2009), *aff'd*, 66 A.D.3d 409, 886 N.Y.S.2d 158
   (2009).....................................................................................................................................95

*Cary Oil Co. v. MG Refining & Marketing, Inc.*,
   230 F. Supp. 2d 439 (S.D.N.Y. 2002)..................................................................................96

*Chefs' Warehouse, Inc. v. Wiley*,
   No. 18-CV-11263 (JPO), 2019 WL 4640208 (S.D.N.Y. Sept. 24, 2019)
   (Oetken, J.)............................................................................................................................15

*CIT Group/Business Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*,
   815 F. Supp. 2d 673 (S.D.N.Y. 2011)..................................................................................41

*Citibank, N.A. v. Tele/Res., Inc.*,
   724 F.2d 266 (2d Cir. 1983).................................................................................................82

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
   631 F.3d 42 (2d Cir. 2011)...................................................................................................37

*Duffey v. Twentieth Century Fox Film Corp.*,
   14 F. Supp. 3d 120, 130 (S.D.N.Y. Mar. 27, 2014) (Oetken, J.) .....................................11, 12

*Dujardin v. Liberty Media Corp.*,
   359 F. Supp. 2d 337 (S.D.N.Y. 2005)..................................................................................10

*DynCorp v. GTE Corp.*,
   215 F. Supp. 2d 308 (S.D.N.Y. 2002)..................................................................................98

*Electron Trading, LLC v. Morgan Stanley & Co. LLC*,
   157 A.D.3d 579, 69 N.Y.S.3d 633 (N.Y. App. Div. 2018) ................................................99

*Fundam. Portf. Adv'rs, Inc. v. Tocqueville Asset Mgmt., L.P.*,
   7 N.Y.3d 96, 850 N.E.2d 653 (2006)...................................................................................81

*Gallegos v. Top RX, Inc.*,
   No. 04-CV-773A, 2008 WL 4279526 (W.D.N.Y. Sept. 15, 2008) ........................................85

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
   243 F. Supp. 500 (S.D.N.Y. 1965) ......................................................................................40

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*Gilman v. Marsh & McLennan Cos., Inc.*,
    85 F. Supp. 3d 757, 760 (S.D.N.Y. 2015), *aff'd*, 826 F.3d 69 (2d Cir. 2016) ........................87

*Gitseg v. Herbst*,
    220 A.D.2d 380 (N.Y. App. Div. 1995) ................................................................................93

*Goshen v. Mut. Life Ins. Co. of New York*,
    No. 600466, 1997 WL 710669 (N.Y. Sup. Ct. Oct. 21, 1997), *aff'd*, 259
    A.D.2d 360, 684 N.Y.S.2d 791 (N.Y. App. Div. 1999), *aff'd as modified sub
    nom. Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 725 N.E.2d
    598 (1999) ..............................................................................................................................18

*Green v. Torres*,
    361 F.3d 96 (2d Cir. 2004) .....................................................................................................29

*Holland Loader Co., LLC v. FLSmidth A/S*,
    313 F. Supp. 3d 447, 468 (S.D.N.Y. 2018), *aff'd*, 769 Fed. Appx. 40 (2d Cir.
    2019) .......................................................................................................................................83

*Holland Loader Co., LLC v. FLSmidth A/S*,
    769 F. App'x. 40 (2d Cir. 2019) ......................................................................................38, 83

*Hotel Aquarius B.V. v. PRT Corp.*,
    No. 92 CIV 4498, 1992 WL 391264 (S.D.N.Y. Dec. 22, 1992) .............................................93

*IGT v. High 5 Games, LLC*,
    380 F. Supp. 3d 390, 397 (S.D.N.Y. 2019) ...........................................................................36

*Jamie Sec. Co. v. The Limited, Inc.*,
    880 F.2d 1572 (2d Cir. 1989) .................................................................................................76

*John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Fam. Life Ins.
    Tr.*,
    No. 16-CV-7071, 2018 WL 6173436 (E.D.N.Y. Nov. 26, 2018) ...........................................85

*Kadosh v. Kadosh*,
    No. 651834, 2013 WL 3389348 (N.Y. Sup. 2013) .................................................................97

*Kalisch-Jarcho, Inc. v. City of New York*,
    58 N.Y.S.2d 746 (1983) ....................................................................................................91, 99

*Kenford Co., Inc. v. Erie County*,
    67 N.Y.2d 257 (1986) .............................................................................................................38

*Kousnsky v. Amazon.com, Inc.*,
    No. CIV. 9176 (AKH), 2014 WL 11350674 (S.D.N.Y. May 14, 2014), *aff'd
    and remanded*, 631 F. App'x 22 (2d Cir. 2015) ....................................................................78

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Kralik v. 239 E. 79th St. Owners Corp.*,
    93 A.D.3d 569 (N.Y. App. Div. 2012) ................................................................28, 30

*Lanmark Grp., Inc. v. New York City Sch. Const. Auth.*,
    148 A.D.3d 603 (N.Y. App. Div. 2017) .........................................................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430, 504 (S.D.N.Y. 2018)................................................72

*Marvel Entm't Group, Inc. v. ARP Films, Inc.*,
    684 F. Supp. 818 (S.D.N.Y. 1988) ..............................................................83

*Mastrocovo v. Capizzi*,
    87 A.D.3d 1296 (N.Y. App. Div. 2011) ................................................18, 28

*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*,
    34 Misc. 3d 895 (N.Y. Sup. Ct. 2012) ..................................................69, 70

*N.Y. Racing Ass'n v. Meganews, Inc.*,
    2000 WL 307378 (E.D.N.Y. 2000)..............................................................82

*Nat'l City Comm'l Cap. Co., LLC v. Becker Real Estate Svcs., Inc.*,
    885 N.Y.S.2d 173 (Sup. Ct. 2009)................................................................87

*Nat'l Westminster Bank, U.S.A. v. Ross*,
    130 B.R. 656 (S.D.N.Y. 1991)......................................................................82

*Nielsen Co. (U.S.), LLC v. Success Systems, Inc.*,
    112 F. Supp. 3d 83 (S.D.N.Y. 2015)............................................................37

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
    19 N.Y.3d 584, 973 N.E.2d 735 (2012)........................................................90

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    839 F.3d 125 (2d Cir. 2016)..........................................................................98

*Raymond Weil, S.A. v. Theron*,
    585 F. Supp. 473 (S.D.N.Y. 2008) ..............................................................70

*In re Refco Inc. Securities Litig.*,
    826 F. Supp. 2d 478 (S.D.N.Y. 2011)........................................................101

*Republic Corp. v. Procedyne Corp.*,
    401 F. Supp. 1061 (S.D.N.Y. 1975)............................................................37

*In re Rezulin Prod. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)..........................................................41

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*Rodeo Family Enterprises, LLC v. Matte*,
  99 A.D.3d 781, 952 N.Y.S.2d 581 (2012) ...........................................................94

*Ross v. Sherman*,
  95 A.D.3d 1100 (N.Y. App. Div. 2012) .............................................................29

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013).................................................................41

*Sadler v. Moran Towing Corp.*,
  204 F. Supp. 2d 695 (S.D.N.Y. 2002).................................................................40

*Schron v. Troutman Sanders LLP*,
  986 N.E.2d 430 (N.Y. Ct. App. 2013) ................................................................10

***Sellers****. Nat. Stone Warehouse Inc. v. AKG Yahtim Ve Insaat Malzemeiri Sanayi*,
  20 Misc. 3d 1143(A), 872 N.Y.S.2d 692 (Sup. Ct. 2008) ........................................94

*Separ v. Nassau County Dept. of Soc. Services*,
  327 F. Supp. 2d 187 (E.D.N.Y. 2004) ................................................................29

*Septembertide Pub., B.V. v. Stein & Day, Inc.*,
  884 F.2d 675 (2d Cir. 1989)............................................................................70

*Shantou Real Lingerie Manufacturing Co., Ltd. v. Native Group Int'l, Ltd.*,
  401 F. Supp. 3d 433, 439 (S.D.N.Y. 2018)...........................................................96

*Shred-It USA, Inc. v. Mobile Data Shred, Inc.*,
  228 F. Supp. 2d 455 (S.D.N.Y. 2002).................................................................70

*Singer v. Xipto Inc.*,
  852 F. Supp. 2d 416 (S.D.N.Y. 2012).................................................................26

*Smith v. Robson*,
  148 N.Y. 252, 42 N.E. 677 ............................................................................36

*Sykes v. RFD Third Ave. I Assocs., LLC*,
  39 A.D.3d 279 (N.Y. App. Div. 2007) ..........................................................27, 95

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*,
  874 F. Supp. 2d 328 (S.D.N.Y 2012).................................................................70

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000)............................................................................15

*Thule AB v. Adv. Accessory Hldgs. Corp.*,
  No. 09 CIV. 00091, 2010 WL 1838894 (S.D.N.Y. May 4, 2010)...............................87

## Table of Authorities

**Page(s)**

**Cases**

*Townley v. Emerson Elec. Co.*,
    681 N.Y.S. 2d 741 (N.Y. Sup. 1998) .......................................................................97

*TVT Records v. Isl. Def Jam Music Grp.*,
    412 F.3d 82 (2d Cir. 2005) ......................................................................................77

*U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*,
    No. 650369/2013, 2013 WL 6997183 (N.Y. Sup. Ct. Jan. 15, 2014) .....................71

*Vermont Mut. Ins. Co. v. Ciccone*,
    No. 3:09-CV-00445-VAB, 2015 WL 4999894 (D. Conn. Aug. 21, 2015) .............96

*Williams v. Buffalo Pub. Sch.*,
    758 Fed. App'x 59 (2d Cir. 2018) ..........................................................................82

*Wm. Passalaqua Builders, Inc. v. Resnick Developers South, Inc.*,
    933 F.2d 131 (2d Cir. 1991) ...................................................................................96

*Xerox Corp. v. Graphic Mgmt. Servs. Inc.*,
    959 F. Supp. 2d 311 (W.D.N.Y. 2013) ...................................................................98

Defendants National Gas & Electric, LLC ("NGE") and Spark Energy, Inc. ("SEI") respectfully submit their Post-Trial Brief following the March 2-11, 2020 bench trial held in the this action.  Defendants also incorporate by reference their Pretrial Memorandum, their Opposition to Plaintiff's Pretrial Memorandum, the Witness Statements submitted to the Court as direct testimony, Defendants' Motion *in Limine* to Preclude New Opinions, Opinions Based on Speculation, and Rescissory Damages Opinions from David Leathers (ECF No. 178, 179), the evidence adduced at trial, and their Proposed Findings of Fact and Conclusions of Law ("FOF/COL") submitted herewith.[1]

## I.   INTRODUCTION

This case is an earnout dispute stemming from the April 2016 sale of 100% of the Membership Interests in Major Energy,[2] a New York-based energy service company ("ESCO"), to NGE, and NGE's subsequent dropdown of Major Energy to its affiliate, non-party Spark HoldCo, LLC ("Spark Holdco").  Almost immediately after the sale of Major Energy, Sellers,[3] through Plaintiff Saul Horowitz as Sellers' Representative ("Plaintiff"), sought to avoid the risk and performance obligations inherent in an earnout that the trial record demonstrates they already knew would be difficult to achieve, and instead began prioritizing their efforts to secure an early buyout over their legal obligations to run Major Energy's business to maximize its performance.

---

[1] Unless otherwise noted, citations to docket entries refer to the page number reflected in the CM/ECF system-generated endorsement at the top of the page.

[2] The term "Major Energy" refers to Major Energy, LLC, Major Energy Electric Services, LLC, and Respond Power, LLC.

[3] The term "Sellers" refers to Saul Horowitz, Mark Wiederman, Asher Fried, Mark Josefovic, and Michael Bauman.

Sellers' tactics failed to produce an early buyout.  Not surprisingly, because Sellers had been focused on an accelerated monetization of their Contingent Payment rights rather than on growing Major Energy's business, and because the overwhelming evidence in the trial record reflects that regulatory and industry challenges wholly unrelated to and independent of Defendants negatively impacted the business post-closing, Major Energy's performance during the earnout period – under the stewardship of Major Energy's Senior Management Team[4] – was underwhelming.  As a result, when buyout discussions broke down, Sellers embarked on a campaign to blame NGE or SEI, the holding company that is the corporate parent of Spark Holdco, for Major Energy's underperformance and resulting failure to earn the maximum potential Contingent Payments over the 33-month earnout period.

That campaign continued through trial in this case, with Sellers seeking to (i) recast the dropdown transaction from the known and celebrated eventuality it was to an alleged unanticipated and fundamental change; (ii) avoid the plain language of the Parties' agreement with respect to the calculation of potential Contingent Payments; and (iii) blame NGE or SEI for Major Energy's post-closing underperformance under the Senior Management Team's leadership.  But the evidence presented at trial conclusively undermines all of Sellers' claims and themes, and instead establishes that (i) the dropdown was neither a surprise to Sellers, nor an impediment to Major Energy's success, nor a breach of the Earnout Agreement that is at the core of the legal claims and alleged damages at issue in this case, which was freely assignable by NGE to Spark Holdco; (ii) Major Energy's performance targets for purposes of the earnout were set by Sellers and Major

_____

[4] The "Senior Management Team" was comprised of Saul Horowitz, Mark Wiederman, and Dan Alper.

Energy's executive team, not by Defendants, and were unrealistic, as the evidence shows Sellers and the Senior Management Team repeatedly admitted in contemporaneous, pre-litigation communications; (iii) Managers of Major Energy[5] operated Major Energy to maximize short-term gains at the expense of long-term success, thereby undermining Major Energy's ability to achieve the earnout targets across the entire 33-month earnout period; (iv) non-party assignee Spark Holdco was faithful to the unambiguous language of the Parties' agreements in calculating Contingent Payments, and (v) non-party assignee Spark Holdco acted in good faith in connection with the post-closing operation of the Major Energy business, collaborated with Sellers and the Senior Management Team, and provided material financial and operational accommodations to Major Energy throughout the entire earnout period (including for more than one year *after* Sellers filed this lawsuit), all while the Spark side was unaware of some of the highly questionable activities being engaged in by Sellers, members of the Senior Management Team, Key Employees and other brokers and vendors associated with Major Energy (all of which was established with compelling evidence at trial).

In other words, the record simply does not permit Plaintiff to satisfy his burden on any of his remaining claims, as set forth below.

***The Section 2.2 Dispute.*** Sellers have not met their burden to prove that Defendants breached Section 2.2 of the Earnout Agreement in connection with the calculation of Earnout Payments. Nor could they. Logic, law, and the overwhelming weight of the evidence show that while Sellers now ask this Court to rewrite the Earnout Agreement, SEI was never a party to the Earnout Agreement, NGE lawfully assigned the Earnout Agreement to its affiliate Spark Holdco,

---

[5] DX-5, at 1 (defining Managers of Major Energy).

and Spark Holdco has been faithful to the express language of the Earnout Agreement – all of it. The text of Section 2.2 is clear, and it expressly and unambiguously requires – through Section 2.2(b), 2.2(c), and the definition of "Target Year" – the exclusion of the first quarter of 2016 Adjusted EBITDA from the earnout component of the Contingent Payment for Target Year 2016 to ensure that Sellers do not receive the benefit of Major Energy's 1Q 2016 Adjusted EBITDA twice.  Under New York law and the evidence of record here, Sellers cannot re-write the Earnout Agreement based on what its proffered damages expert considers to be "the economics of the transaction," especially when doing so would lead to absurd results.

In any event, even if the Court determined that Section 2.2 of the Earnout Agreement was ambiguous and that resort to parol evidence were warranted, which Defendants respectfully submit it is not, Defendants still prevail because the Sellers' counter-textual interpretation is premised on Exhibit B to the Earnout Agreement, which is unincorporated (unlike Exhibit A thereto, as reflected in Section 2.1), incomplete, and simply illustrative.

Moreover, Spark Holdco's overpayment of the Target Year 2016 Contingent Payment as an offer to resolve the parties' impasse concerning the application of Section 2.2 and refocus Major Energy's executive team on growing the business, especially while under the threat of immediate litigation and when Spark Holdco provided Sellers with an unambiguous written full reservation of rights, does not change this calculus or otherwise alter the correct interpretation of Section 2.2 of the Earnout Agreement.  Put simply, Defendants' interpretation and application of the express language of Section 2.2 has been correct all along, and their efforts to reach compromise and avoid protracted litigation do not suggest otherwise.

***The Section 2.7 Dispute Over the Operation of Major Energy.***  After extensive discovery and an eight day trial, the evidentiary record has exposed Plaintiff's recurring battle cry – that

Defendants prevented Major Energy from operating in a "business as usual" manner – as empty bluster.  The provision that actually governs the operation of Major Energy during the Earnout Agreement – Section 2.7 of the Earnout Agreement and its analogue in the Executive Earnout Agreement – does not require NGE or its Affiliate to operate Major Energy in precisely the manner requested by Plaintiff.  To the contrary, it vests NGE or its Affiliate with discretion to operate the business in the manner it sees fit, subject to certain good faith obligations.  Plaintiff has failed to establish by a preponderance of evidence that, with respect to any claimed interference with Major Energy's operations, Defendants fell short of their good faith obligations or caused any discernible harm to Major Energy.

Indeed, the record is completely devoid of credible evidence – through fact witnesses or Sellers' damages expert – that Sellers were harmed as a result of *any* conduct by Defendants.  This failure is fatal, and it defeats each of Sellers' remaining claims.  But even if Sellers had been able to adduce evidence of damages resulting from Defendants' acts or omissions, the evidentiary record undermines each of Sellers' six claimed instances of interference by Defendants:

- Sellers' aggregation deal theory fails because even if Managers of Major Energy could not endorse the single aggregation deal it proposed during the earnout period, and there is not a shred of evidence to suggest that Major Energy would have won the deal had it actually bid on it;

- The non-renewal of the Pacific Summit Energy ("PSE") agreement does not amount to a breach of Section 2.7 where Major Energy (including Plaintiff himself) expressly agreed to replace PSE with Spark Energy, LLC and, in any event, Major Energy saved thousands if not millions of dollars by using Spark as its replacement credit and supply provider;

- Any harm from the brief, seven week EMS integration project championed by Major Energy's CEO was more than offset by the $250,000 addback, which was not contractually required, provided by Spark Holdco after the EMS initiative was terminated;

- There is no competent evidence that either of the Defendants or Spark Holdco interfered with Major Energy's broker relationships where the record demonstrates

that Major Energy **actually grew** its commercial broker relationships during the earnout period, including after the dropdown;

- There is no competent evidence that either of the Defendants or Spark Holdco interfered with Major Energy's vendor relationship with PTM Consulting ("PTM") where the record demonstrates that Major Energy continued to use PTM throughout the earnout period and paid PTM more than $9 million dollars during that time;

- The weight of the trial evidence shows that any alleged harm to Major Energy's mass marketing vendors was self-inflicted based on the Senior Management Team's unilateral decision to slash Major Energy's customer acquisition spending well below pre-closing projected levels and highly unrealistic projections of customer growth to begin with; and

- The voluntary departure of three Major Energy employees cannot possibly support a Section 2.7 breach claim where those employees left of their own accord, for reasons entirely or mostly unrelated to Defendants or their alleged conduct, and where the Senior Management Team made no efforts to retain those employees.

Further, Plaintiff cannot avoid the consequences of his inability to establish causation of harm through his belated demand for rescissory damages based on the dropdown. Plaintiff cannot recover rescissory damages purportedly resulting from the dropdown when (i) he admits that he had no contractual right to contest the assignment of the Earnout Agreement and Executive Earnout Agreement by NGE to Spark Holdco, and (ii) he conceded at trial that the "real question" was whether Spark Holdco, as NGE's proper assignee, complied with Section 2.7 during the earnout period. Rescission is an extraordinary remedy not available in circumstances like these, where another remedy exists under law, and in any event, the rescissory damages theory advanced by Plaintiff's proffered damages expert, David Leathers, is fundamentally flawed and impermissibly speculative.

**The Section 11.7 Dispute Over the Dropdown.** Sellers' claim that the dropdown of Major Energy to Spark Holdco amounted to a breach of Section 11.7 of the MIPA – the so-called "non-assignment" provision – fares no better. The Earnout Agreement, which was incorporated into the MIPA, and the Executive Earnout Agreement both **expressly permitted** NGE to assign them to

6

Spark Holdco, an Affiliate.  There is no legitimate question that the Earnout Agreement and the Executive Earnout Agreement, not the MIPA, govern the two issues in dispute in this case: (i) the operation of Major Energy during the 33-month earnout period that ended on December 31, 2018, and (ii) the calculation and payment of Contingent Payments, if any, owed to Sellers.  Put simply, because these Agreements were freely assignable, ***Sellers never had any assurance that NGE would operate Major Energy throughout the earnout period***.  That is fatal to Plaintiff's breach-via-dropdown theory.  In other words, where Plaintiff's only theory of harm caused by the dropdown is that Major Energy could not be operated by NGE during the earnout period, his claim necessarily fails.

The totality of evidence adduced at trial – including the May 2016 acknowledgement of Sellers' deal counsel that "NGE was never blocked from moving the Major companies around within the Spark/Keith Maxwell universe of companies" – shows that the dropdown does not violate Section 11.7 of the MIPA.  But even if some technical breach had occurred, which Defendants deny, the overwhelming evidence shows that Sellers celebrated, welcomed, recognized, and accepted millions of dollars in benefits due to the dropdown.  In other words, Plaintiff waived his right to enforce Section 11.7, and alternatively repeatedly ratified the dropdown such that the doctrine of estoppel plainly forecloses judgment in Sellers' favor on Plaintiff's Section 11.7 contract claim.

***Plaintiff's Decision to Sue SEI Rather Than Spark Holdco Has Consequences***.  Plaintiff's claims against SEI fail because Plaintiff sued the wrong party and intentionally did nothing to timely seek leave to amend his pleadings.  Plaintiff elected to sue NGE and SEI, and knowingly elected not to assert any claims against Spark Holdco.  But Plaintiff knows and has

known throughout (and even prior to) this litigation that it was Spark Holdco, not SEI, that acquired Major Energy from NGE and that assumed NGE's obligations to Sellers.

Section 7.14(c) of the MIPA expressly limits Sellers' right to assert claims against NGE Affiliates, whether in contract or in tort.  Through this provision, Plaintiff explicitly "waive[d]" any right to sue non-party Affiliate SEI – or Spark Holdco, for that matter – with regard to the MIPA.  Plaintiff's claims against SEI – a breach of contract claim (Count III), a tortious interference claim (Count IV), and a demand for special damages – fall squarely within the scope of Section 7.14(c) and, as a result, are barred by contract.  Moreover, there is not a shred of evidence to justify non-enforcement of the exculpatory provision in Section 7.14(c) that was the product of negotiations between sophisticated commercial players.

In sum, Plaintiff has failed to sustain his burden of proof as to each of his remaining claims, and judgment in Defendants' favor on all claims is warranted.[6]

## II.    PLAINTIFF HAS NOT PROVEN THAT NON-PARTY SPARK HOLDCO BREACHED SECTION 2.2 OF THE EARNOUT AGREEMENT BECAUSE SPARK HOLDCO COMPLIED WITH THE EXPRESS LANGUAGE OF THE EARNOUT AGREEMENT AND ITS CALCULATIONS WERE CORRECT.

Section 2.1 of the Earnout Agreement addresses the Earnout Payments that form part of the Contingent Payment consideration for NGE's purchase of Major Energy.[7]  It makes clear that

---

[6] Plaintiff originally asserted four claims for relief: (i) Fraudulent Inducement (as to NGE) (Count I); (ii) Breach of Contract (as to NGE) (Count II); (iii) Breach of Contract (as to SEI) (Count III); and (iv) Tortious Interference with Contract (as to SEI) (Count IV).  On September 24, 2018, the Court granted Defendants' motion to dismiss Plaintiff's fraudulent inducement claim and invited Defendants to reassert their challenges to Plaintiff's claims against SEI at a later date.  ECF No. 42, at 8, 17 & n.3.

[7] The Executive Earnout Agreement also contemplated potential additional payments to Sellers (or Major Energy's executive team) during the earnout period.  DX-5.  Because Major Energy's performance fell well below the performance goals in each of the Target Years, Sellers were not entitled to any Executive Earnout Payments under the Executive Earnout Agreement.

8

the Earnout Payments "*shall be calculated in accordance*" with the language of the Earnout Agreement and Exhibit A thereto.[8]   As set forth below, and as comprehensively addressed in Defendants' FOF/COL, while SEI is not a party to the Earnout Agreement and non-party Spark Holdco's calculation of Earnout Payments has been faithful to the precise language of the Earnout Agreement, Plaintiff has instead asked this Court to his enforce some of the contract's language, ignore other portions of the contract, and essentially judicially modify what is (and is not) included in Section 2.2 thereof.

> **A.      Section 2.2(b) of the Earnout Agreement Is Express, Unambiguous and Requires the Deduction of 1Q 2016 from Adjusted EBITDA in Target Year 2016.**

Section 2.2 of the Earnout Agreement sets forth the formula for calculating the Earnout Payments in each Target Year.   Section 2.2(b) provides as follows:

> (b) For purposes of benchmarking EBITDA achievement against Adjusted EBITDA Plan in the calculation of the percentages as detailed immediately above, the Adjusted EBITDA Plan amount of $20,749,213 for the 2016 Target Year shall be utilized; provided, however, that **only the actual Adjusted EBITDA generated during the last three (3) calendar quarters in calendar year 2016 commencing as of the Effective Date shall be used to determine the Earnout Pool for the 2016 Target Year** from which Earnout Payments and, if applicable, excess EBITDA payments earned hereunder shall be made.[9]

The text of Section 2.2(b) is express, unambiguous, and strictly requires the exclusion of the first quarter of 2016 Adjusted EBITDA from the calculation of the earnout component of the Contingent Payment in Target Year 2016.   Section 2.2(c) further provides "*to ensure that there is*

---

[8] DX-1, § 2.1 ("The Earnout Payment for each Target Year shall be calculated in accordance with the terms and conditions of this Agreement, an illustration of which is demonstrated in the example show on Exhibit A attached hereto and made a part hereof.").

[9] DX-1, § 2.2(b).

*no duplicative payment of the same Adjusted EBITDA*, the term 'EBITDA' as used in Exhibit A and Exhibit B hereto shall mean, as the context indicates for a given Target Year, (i) Adjusted EBITDA *for the initial Target Year . . . .*"  "Target Year" is a defined term, "consisting of the *nine (9)*, twelve (12), and twelve (12) *month periods in, respectively, the 2016*, 2017, and 2018 *calendar years*."[10]  This was no accident, as Sellers had already received the benefit of the first quarter of 2016 before closing;[11] as a result, the Earnout Agreement was structured to avoid duplicative Earnout Payments to Sellers based on that portion of 2016 Adjusted EBITDA from which Sellers already benefited through receipt of the cash portion of the purchase price.  Finally, Section 3.2 specifies that the Earnout Agreement "contains the entire understanding of the Parties with respect to the subject matter therein and supersedes all prior agreements and understandings between the Parties with respect thereto,"[12] making resort to extrinsic evidence unnecessary.  *See Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 356 (S.D.N.Y. 2005) ("It is generally understood that the purpose of an integration clause 'is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'"); *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433–34 (N.Y. Ct. App. 2013) (same).

After extensive discovery, submission of voluminous written witness statements, and eight days of trial testimony, Plaintiff has never once explained why Section 2.2(b) should not be strictly construed according to its plain text, other than arguing through his proffered damages expert,

---

[10] DX-1, § 1.1 (emphases added).

[11] Tr. at 177:3-12 ("they got the money once, you don't have to share it again. . . . Essentially they already received the full benefit of a hundred percent of that, and there was no sense giving them another portion of that again.") (Lancaster Testimony); *see also* Lancaster Witness Stmt. (ECF No. 159) ¶ 54 (referring to approximately $10 million of working capital adjustments already paid to Sellers for 1Q 2016).

[12] DX-1, § 3.2.

David Leathers, that the "economics of the transaction" should govern instead of the actual contractual terms.  Such an assertion flies in the face of well-established New York law governing the interpretation of contracts:  "It is a fundamental contracts principle that a 'court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.'"  *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 537 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (quoting *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992)), *aff'd*, 572 F.3d 76 (2d Cir. 2009).  Instead, contract terms are to be construed with the primary aim of ascertaining *the intent of the parties as expressed in the contract*, known as their objective intent.  *Duffey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 3d 120, 130 (S.D.N.Y. Mar. 27, 2014) (Oetken, J.).  Accordingly, the Court should follow the express and unambiguous text of the contract that the parties, each represented by sophisticated counsel, agreed to during extended arm's-length negotiations.

1.  The Simple Exercise of Walking Through Section 2.2 for Target Year 2016 Results in a Contingent Payment of $5.16 Million, Consistent with Spark Holdco's Calculation.

Defendants outlined the proper Contingent Payment calculation in DDX-1 at trial; for the Court's convenience, each step of that calculation is set forth below and expressly linked to the corresponding contractual provision.  Using the inputs below (denoted in red text), the resulting Contingent Payment calculation is $5,158,917 for Target Year 2016, which faithfully adheres to the express terms of the MIPA, which governs the Cash Installment Payment calculations, and the Earnout Agreement, which governs the Earnout Payment calculations:

|  | **2016 Target** | **2016 Actual** |
|---|---|---|
| Adjusted EBITDA | $20,749,213 | $19,171,499 |
| Year-End Customer Account | 178,031 | 164,767 |
| Projected EBITDA per customer | $116.55 |  |

| 2016 Earnout Percentage | 27.272727% (9/33) | |

Section 2.2(a) of the MIPA sets forth the precise methodology for calculating potential Cash Installment Payments for each Target Year of the earnout period:

> (i) if the Adjusted EBITDA for the Target Year exceeds $20,000,000, but is less than the Adjusted EBITDA Plan for said Target Year, then the Cash Installment shall be multiplied by a fraction, the numerator of which is the actual dollar amount of Adjusted EBITDA achieved in such Target Year and the denominator of which is the dollar amount of the Adjusted EBITDA Plan for such Target Year; and (ii) if the Adjusted EBITDA for such Target Year is less than $20,000,000, then the Cash Installment **shall be further reduced** on a dollar-for-dollar basis for every dollar less than $20,000,000; . . .[13]

Because Major Energy's 2016 Adjusted EBITDA was below both $20,000,000 and the Adjusted EBITDA Plan of $20,749,213, the maximum possible Cash Installment Payment ($5,000,000) was (i) multiplied by the Achievement Ratio,[14] and (ii) then "further reduced" on a dollar-for-dollar basis for every dollar less than $20,000,000 (*i.e.*, $20,000,000-$19,171,499 = $828,501).  This two-step calculation is illustrated below:[15]

| **Cash Installment Payment Calculations Under MIPA** | | | | | |
|---|---|---|---|---|---|
| 2.2(a)(i) | $5,000,000 | x | $19,171,499 / $20,749,213 | = | $4,619,814 |
| 2.2(a)(ii) | $4,619,814 | - | $828,501 | = | $3,791,312 |

As Leathers admitted at trial, the parties do not dispute the Cash Installment Payment methodology, although they disagree about what the correct Adjusted EBITDA and customer count inputs into that methodology (and the Earnout Payment methodology) should be.[16]  Plaintiff

---

[13] DX-2, § 2.2(a).

[14] The Achievement Ratio is a fraction, the numerator of which is the actual dollar amount of Adjusted EBITDA achieved in such Target Year and the denominator of which is the dollar amount of the Adjusted EBITDA Plan for such Target Year. *See id.* at 2.2(a)(i).

[15] DX-2, § 2.2(a).

[16] Tr. at 1620:10-12 ("Will you agree with me that the methodology for cash installment calculation is not in dispute between the parties?  A. Yes, I would agree with that.") (Leathers Testimony); *see also* DX-758.

does dispute, however, whether Section 2.2(b) of the Earnout Agreement actually means what it

says when it requires that the first quarter of 2016 Adjusted EBITDA be excluded for purposes of

Contingent Payment calculations.  Section 2.2's earnout calculation formula is quoted below:

> 2.2 <u>Calculation of Earnout</u>. The Earnout Payment for a Target Year shall be calculated by multiplying the Target Year's Adjusted EBITDA (***as modified below***) by the Earnout Percentage applicable to that year.
>
> (a) For purposes of calculating the portion of the Adjusted EBITDA . . . that is to be utilized in the preceding calculation, the Adjusted EBITDA . . . shall be multiplied by a percentage (subject to a maximum of 100%), the numerator of which is the actual Adjusted EBITDA . . . and the denominator of which is the Adjusted EBITDA Plan . . . .
>
> (b) For purposes of benchmarking EBITDA achievement against Adjusted EBITDA Plan in the calculation of the percentages as detailed immediately above, the Adjusted EBITDA Plan amount of $20,749,213 for the 2016 Target Year shall be utilized; provided, however, that only the actual Adjusted EBITDA generated during the last three (3) calendar quarters in calendar year 2016 commencing as of the Effective Date shall be used to determine the Earnout Pool for the 2016 Target Year from which Earnout Payments . . . .
>
> (d) If the Year End Customer Accounts for any Target Year falls below the agreed upon customer count numbers for such Target Year (being the year end total customer account numbers of 178,031, [209,909], and 231,717 for calendar years 2016, 2017, and 2018, respectively), then the Final Earnout Amount would be reduced by a monetary amount that is calculated as (i) the difference between the projected Year End Customer Account numbers and the actual Target Year End Customer Account numbers multiplied by (ii) the projected Adjusted EBITDA per customer (such calculated amount, the "Customer Account Reduction"), as illustrated by the example set forth in exhibit A attached hereto.

Defendants have applied the language in the Earnout Agreement to illustrate (once again)

that Spark Holdco's $5.16 million Contingent Payment calculation was correct.  As set forth

below, Adjusted EBITDA was modified by deducting the first quarter of 2016 Adjusted EBITDA

from the total Adjusted EBITDA for the year, and then multiplying by the Achievement Ratio.

Spark Holdco then applied the Earnout Percentage.

13

| Adjusted EBITDA Modifications Under Sections 2.2, 2.2(a), and 2.2(b) of Earnout Agreement | | | |
|---|---|---|---|
| § 2.2(b):[17] Deduction of 1Q AEBITDA | $19,171,499 - $7,609,518 | = | $11,561,981 |
| § 2.2(a):[18] Achievement Ratio ("AR") | $\dfrac{\$19,171,499}{\$20,749,213}$ | = | 92.396271% |
| § 2.2:[19] Reduced AEBITDA x AR | $11,561,981 x 92.396271% | = | $10,682,839 |
| § 2.2:[20] Modified AEBITDA x Earnout % | $10,682,839 x 27.272727% | = | $2,913,502 |

This $2,913,502 represents the potential Earnout Payment before any Customer Account Reduction is applied under Section 2.2(d).  Because the shortfall between actual Year-End Customer Count and the target was 13,264 customers, that shortfall was multiplied by $116.55 Adjusted EBITDA per customer, and the resulting product of $1,545,897 was deducted from $2,913,502.  Thus, the correct Earnout Payment for 2016 was $1,367,605.  Adding $1,367,605 to the Cash Installment Payment of $3,791,312, totaled $5,158,917 in Contingent Payments for 2016.

| | Calculation |
|---|---|
| Earnout Payment Before Customer Account Reduction | $2,913,502 |
| Less Customer Account Reduction ($116.55 x 13,264) | - $1,545,897 |
| **2016 Earnout Payment** | **$1,367,605** |
| Plus 2016 Cash Installment Payment | + $3,791,312 |
| **2016 Contingent Payment** | **$5,158,917** |

> 2.  Section 2.2(b) of the Earnout Agreement Expressly Mandates Exclusion of 1Q 2016 from Adjusted EBITDA Calculation.

---

[17] DX-1, § 2.2(b) ("only the actual Adjusted EBITDA generated during the last three (3) calendar quarters in calendar year 2016 commencing as of the Effective Date shall be used to determine the Earnout Pool for the 2016 Target Year from which Earnout Payments . . . .").

[18] DX-1, § 2.2(a) ("the Adjusted EBITDA . . . shall be multiplied by a percentage (subject to a maximum of 100%), the numerator of which is the actual Adjusted EBITDA . . . and the denominator of which is the Adjusted EBITDA Plan . . . .").

[19] DX-1, § 2.2 ("The Earnout Payment for a Target Year shall be calculated by multiplying the Target Year's Adjusted EBITDA (as modified below) . . . .").

[20] DX-1, § 2.2 ("The Earnout Payment for a Target Year shall be calculated by multiplying the Target Year's Adjusted EBITDA (as modified below) by the Earnout Percentage applicable to that year.").

As stated above, the language of Section 2.2(b) expressly requires that 1Q 2016 of Adjusted EBITDA be excluded from the calculation of the Earnout Payment.  This is what the Parties, each of whom were represented by sophisticated counsel, agreed to, and a court should not disturb the agreement to fit what Plaintiff, his expert, or a trier-of-fact feels should be the "economics of the transaction."  *See Burke*, 537 F. Supp. 2d at 552 ("It is a fundamental contracts principle that a 'court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.'").

Adopting Plaintiff's position that Exhibit B (which makes no reference to, or accommodation for, Section 2.2(b)) control the calculation of Earnout Payments would render Section 2.2(b) entirely meaningless, a result this Court should take pains to avoid under New York's canons of construction.  *See Chefs' Warehouse, Inc. v. Wiley*, No. 18-CV-11263 (JPO), 2019 WL 4640208, at *4 (S.D.N.Y. Sept. 24, 2019) (Oetken, J.) ("[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)); *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (under New York law, "the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency").

Indeed, if the Court were to adopt Plaintiff's position that Exhibit B controls the calculation of Earnout Payments, it would lead to absurd results.  *See Lanmark Grp., Inc. v. New York City Sch. Const. Auth.*, 148 A.D.3d 603, 604 (N.Y. App. Div. 2017) ("contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties").  Specifically, as set forth in the unrebutted Witness Statement of

Defendants' damages expert, Louis Dudney,[21] and as Leathers conceded at trial,[22] if Major Energy had hit the entire Adjusted EBITDA target of $20,749,213 in the first quarter of 2016 alone and had earned $0 Adjusted EBITDA for the rest of 2016, then assuming target customer count was met, according to Plaintiff's position *Sellers would have still been entitled to the full $5.45 million in Earnout Payments, even though not a single dollar of Adjusted EBITDA had been earned during the actual earnout period* for 2016 (*i.e.*, the last nine months).  Such an absurd result – under which NGE or Spark Holdco (its assignee) would be obligated to pay Sellers $5.45 million as a Target Year 2016 Earnout Payment when the Buyer did not get the benefit of even a single dollar of EBITDA – was not only never contemplated by the parties during negotiations (and there is no trial evidence of record suggesting otherwise), but the parties expressly provided 1Q 2016 should be excluded *and* agreed in Section 2.2(c) of the Earnout Agreement that Buyer was not obligated to make *any* double payments.  While Plaintiff bemoans what he characterizes as an "extreme" scenario under Defendants' "interpretation" (more precisely, under the express language of the Earnout Agreement) (*i.e.*, Major Energy would have to go "gangbusters" in the last nine months of 2016 to hit the maximum Earnout Payment), such a scenario is *much more plausible* than the absurd result that could occur under Sellers' extreme, counter-factual position

---

[21] Dudney Witness Stmt. (ECF No. 167) ¶ 69.  Plaintiff made the strategic decision not to cross-examine Louis Dudney, Defendants' damages rebuttal expert.  As a result, his testimony is unrebutted.

[22] Tr. at 1717:10-15 ("Q. Well, let's take your example. If everything was zero in Q2, 3, and 4, and you hit the entire amount of your adjusted EBITDA target in Q1, and you hit your customer account target in Q1, under your methodology, Major Energy would be entitled to the max earnout for that year one period; correct? A. The math is correct.") (Leathers Testimony).

(*i.e.*, that Major Energy could achieve the maximum Earnout Payment in 2016 without any Adjusted EBITDA earned in the last nine months of 2016).[23]

To prevent such an absurd result and to avoid rendering both Sections 2.2(b) and (c) superfluous and meaningless, the Court should reject Plaintiff's position that the unincorporated Exhibit B is the standard by which to calculate Earnout Payments, particularly since Plaintiff did not use this methodology in Sellers' contemporaneous calculations during the earnout period. Instead, this Court should follow the actual, express language of the Earnout Agreement.

### B.   Even If The Court Finds Section 2.2 of the Earnout Agreement Is Ambiguous and Requires Parol Evidence to Resolve Competing Interpretations, Defendants Still Prevail.

Even if the Court concluded that Section 2.2 of the Earnout Agreement were ambiguous such that resort to extrinsic evidence were warranted, which Defendants deny, Defendants' interpretation (and resulting calculations) still should prevail because Defendants' position is further supported by the Parties' extrinsic evidence.

***First***, only Exhibit A to the Earnout Agreement was expressly incorporated into the Earnout Agreement. Section 2.1 of the Earnout Agreement explicitly provides that "[t]he Earnout Payment for each Target Year shall be calculated in accordance with the terms and conditions of this Agreement, an illustration of which is demonstrated in the example shown on ***Exhibit A attached hereto and made a part hereof***."[24]   There is no such incorporating language for Exhibit

---

[23] In any event, it is undisputed that if Major Energy achieved Adjusted EBITDA of $20,000,000 in the last three quarters of 2016 (Adjusted EBITDA for the first quarter was over $7.6 million), Sellers could have obtained the full $5,454,545 Earnout Payment for Target Year 2016 (subject to Customer Count Reduction). *See* DX-518, at Tab 3 (Actual Target Year 2016 Results) (reflecting first quarter Adjusted EBITDA of over $7.6 million); DX-609 at SPRK-NGE0025068; *see also* Leathers Witness Stmt. (ECF No. 155) ¶ 110; Tr. at 205:19-206:11 (Lancaster Testimony).

[24] DX-1, § 2.1.

B, in Section 2.1 or otherwise.  This differing treatment of Exhibits A and B to the Earnout Agreement clearly demonstrates that, when the parties wanted to incorporate a document into the Earnout Agreement, they knew how to do so.  *See, e.g.*, *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 117 A.D.3d 450, 450–51 (N.Y. App. Div. 2014) ("Where, as here, a contract is the result of negotiations between sophisticated business entities assisted by experienced counsel, failure to include a particular party, here the certificate insurer, among those governed by a contract provision can only be construed as the intentional exclusion of that party from its application"); *Mastrocovo v. Capizzi*, 87 A.D.3d 1296, 1298 (N.Y. App. Div. 2011) ("Under the standard canon of contract construction *expressio unius est exclusio alterius*, that is, that the expression of one thing implies the exclusion of the other" and concluding the exclusion of a term was intentional).

    *Second*, Exhibit B is incomplete on its face because it does not account for Section 2.2(b) at all, does not apply the Achievement Ratio to actual Adjusted EBITDA, and expressly notes that the Customer Account Reduction has not been captured.  Plainly, Exhibit B was intended to be used purely for incomplete but partially illustrative purposes, as the trial testimony demonstrated.[25] Such unincorporated illustrations do not form a part of a contract's terms under New York law. *See Goshen v. Mut. Life Ins. Co. of New York*, No. 600466, 1997 WL 710669, at *4 (N.Y. Sup. Ct. Oct. 21, 1997) (rejecting plaintiffs' arguments that "the illustrations, and the promises they allegedly contained concerning the length of time cash premiums would be due, are enforceable provisions of the insurance policies which were issued to the plaintiffs," because "under the parol

---

[25] Tr. at 124:2-14 ("Q. Now, you don't mention Exhibit B in your witness statement at all, do you? A. I do not, and the reason for that is the exhibit was not incorporated into the agreement; it was an illustration and it wasn't complete. It demonstrated that it was a comparison on the use of adjusted EBITDA in the context of how that formula is used in the earnout versus how it's used in the cash installment.") (Lancaster Testimony).

evidence rule, evidence extrinsic to the writing between the parties will not be employed to vary or add to the terms of the writing, especially where the contract contains a merger clause."), *aff'd*, 259 A.D.2d 360, 684 N.Y.S.2d 791 (N.Y. App. Div. 1999), *aff'd as modified sub nom. Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 725 N.E.2d 598 (1999).

Sellers' insistence that Exhibit B prevails over the express language of Section 2.2(b) of the Earnout Agreement generates nonsensical results and runs counter to the weight of New York law.  Thus, by following the plain text of Section 2.2 of the Earnout Agreement, Spark Holdco correctly calculated $5,158,917 was the Contingent Payment due and owing to Sellers for Target Year 2016, which Sellers were paid and retained.

### C.   Spark Holdco Is Not Bound By Its $2.2 Million Overpayment Made in Target Year 2016 to Facilitate Compromise, While Under Express Threat of Immediate Litigation, and Made Under a Full Written Reservation of Rights.

On March 31, 2017, Spark Holdco paid Sellers the correct amount of $5.16 million in Contingent Payments for Target Year 2016, plus an overpayment of approximately $2.24 million to which Sellers were not contractually entitled.[26]  ***Why?***  Because on March 30, 2017, Sellers had threatened immediate litigation against NGE, SEI, and Keith Maxwell, personally, unless Spark Holdco wired $7.4 million to Sellers the following day.  Along with that demand, Plaintiff attached what he characterized as "the spreadsheet we all know to be correct," which showed Sellers' calculation of $7,403,147.97.[27]  To avoid immediate litigation and distraction to the business, Spark Holdco notified Sellers that same day that it would wire approximately $7.4 million to Sellers, even though it disagreed with Sellers' $7.4 million demand, under an express, written

---

[26] DX-523.

[27] DX-517.

reservation of rights.[28]  Spark Holdco thus made the $2.24 million overpayment on March 31, 2017

solely for the purposes of attempting to reach a resolution without the need for protracted litigation.

        1.      The April 11, 2017 Lancaster Memo and April 12, 2017 Kroeker Email
                Were Good Faith Efforts to Reach a Compromise with Sellers.

     After Spark Holdco wired, under a full reservation of rights, the $7.4 million that Sellers

had demanded under threat of litigation, Nathan Kroeker followed up with Sellers on April 12,

2017 by providing an offer with revised earnout calculation to match the payment actually made,

which Plaintiff rejected.[29]  Kroeker's April 12 email demonstrates Spark Holdco's continuing good

faith efforts to resolve the differences between the parties without the need for litigation.  At the

time this communication was sent, Spark Holdco was *still* under a threat of litigation by Sellers,

and Kroeker's email was sent after multiple calls between Spark Holdco personnel and Sellers in

which the parties were negotiating the various issues in dispute.[30]  Lancaster's April 11, 2017

memorandum attached to Kroeker's April 12 email references such negotiations.[31]  ***Nothing*** in the

April 11 memorandum states that the calculation submitted by Lancaster to Sellers on March 30,

2017 was inaccurate or superseded by his later memorandum.[32]

     To the contrary, Lancaster's April 11 memorandum attached to the April 12, 2017 email

was prepared for negotiation purposes only using Sellers' March 30, 2017 spreadsheet ***as a starting***

---

[28] DX-516 ("Please note that we view this amount payable as preliminary and subject to further discussion and confirmation. . . . You and the other sellers should not view these wires as final agreement on the earnout and we reserve all rights under the governing contracts."); *see also* DX-523 (March 31, 2017 wires).

[29] DX-537.

[30] DX-551.

[31] DX-537, at paragraph 2 on pg. 1 of the Memorandum.

[32] DX-537.

*point*, even though the spreadsheet (which Sellers claimed was the one "we all know to be correct") contained numerous errors: (1) it failed to exclude 1Q 2016 Adjusted EBITDA from the Earnout Payment calculations; (2) instead of applying the actual Achievement Ratio ($19,171,599 / $20,749,213), Sellers had introduced a rounding error by using 92.4% instead, and (3) instead of using the contractually agreed-upon $116.55 Projected Adjusted EBITDA per customer (as set forth in Exhibit A when making the Customer Account Reduction), Sellers had used $107.69 instead.[33]

In his compromise memorandum, Lancaster corrected Sellers' rounding error and used the correct Projected Adjusted EBITDA per customer ($116.55). He also increased the customer count from 164,767 to 167,152 for the sole purpose of attempting to reach a resolution. Additionally, he included 1Q 2016 Adjusted EBITDA to calculate the Earnout Payment, not because he or Spark Holdco agreed with Sellers that it was appropriate to do so, but instead as part of Spark Holdco's broader good faith effort to resolve the dispute between the parties. The trial testimony on these issues from Lancaster and Kroeker was, Defendants submit, truthful, genuine, and credible.[34]

---

[33] DX-517a.

[34] *See, e.g.*, Tr. at 150:9-14 ("I indicated in conversations with Mr. Kroeker that I'm laying out the scenario used in the document as sellers appear to be interpreting it, and to get to their number plus 160,000 it was necessary for me to not use 2.2(b) and (c). I come up with an explanation as to what I think they must have done to not use that first-quarter result.") (Lancaster Testimony); *id.* at 152:18-20 ("What I'm trying to do here, consistent with the mission or mandate that Mr. Kroeker gave me to explore this from sellers' perspective, is, how must seller be reading 2.2(b) and 2.2(c) to come up with their numbers.") (Lancaster Testimony); *id.* at 361:11-362:16 ("I'm doing everything I can to avoid getting into litigation with these guys, so I instruct my Treasury Department to wire over $7.403 million before deadline that Saul has introduced even though there is really no basis for that number. I don't understand the calculation that he attached, but that's the number we wired over. I then spend the next two weeks in discussion with Major, with Gary, going back and forth, we agreed if we take the sellers' position that you do not deduct Q1 in 2.2(b), what would that calculation yield? And that calculation would yield 7.563. Then I go back to the

Although Kroeker's April 12, 2017 email offered to resolve the Year 1 Contingent Payment dispute with Sellers for a total payment of $7,563,180, Horowitz rejected that offer on Sellers' behalf on April 13, 2017.[35]  The parties' correspondence in the weeks after Spark Holdco offered this compromise confirms that it paid Sellers more than $7 million in an effort to compromise and resolve the parties' dispute, under the litigation gun and while reserving all rights, including that Sellers were entitled *only* to the total amount of Contingent Payments for Target Year 2016 that the MIPA and Earnout Agreement mandate, and not a dollar more.  For example, on April 24, 2017, Kroeker expressed his frustration to Horowitz and Wiederman about Sellers' refusal to make similar compromises:

> We communicated with Mark on a number of occasions to get agreement on methodology, however there is no recognition of that in your last 2 emails. In an attempt to get this resolved and settled, you will see that we adjusted the Earn-Out by more than $2 million. Through the last several communications, I've not seen any attempts on the Seller's side to get to a reasonable outcome here.[36]

 2.  The Parties Did Not Reach Final Agreement on Resolution, with Plaintiff Declaring a "Stalemate" in June 2016.

After Sellers rejected Spark Holdco's April 12, 2017 offer to resolve the parties' dispute as to the calculation of the Target Year 2016 Contingent Payments, Spark Holdco nevertheless continued to work with Sellers in good faith to evaluate whether a resolution could be reached regarding the additional set of disputed addbacks to 2016 Adjusted EBITDA.

---

sellers with this e-mail and say, you know what, it's actually $160,000 more than what you calculated; we're willing to send you the additional 160 grand if we can put the first year behind us and go back to running the business.") (Kroeker Testimony).

[35] DX-540.

[36] DX-551.

Between April 23, 2017 and June 21, 2017, Sellers and Spark Holdco exchanged numerous emails and communications regarding their respective addback positions, with Spark Holdco continuously grounding its positions in the contractual language of the MIPA, Earnout Agreement, and Executive Earnout Agreement, and Sellers lacking any such basis or hard data to support their positions.[37]  Leathers ultimately admitted as much at trial.[38]

On June 21, 2017, Plaintiff declared the parties were at a stalemate and further negotiation efforts would be futile.[39]  In other words, Plaintiff halted negotiations and confirmed that Sellers were not expecting any further communications from Spark Holdco regarding the Target Year 2016 Contingent Payments; instead, Sellers expected the matter to be litigated.[40]

> 3.   Spark Holdco's Next Contractual Opportunity to Address the Overpayment Was Not Until March 2018, When the Target Year 2017 Calculation Came Due and Sellers Unquestionably Were Entitled to Receive Only Contingent Payments Actually Earned.

Like Target Year 2016, Major Energy missed the Adjusted EBITDA and customer count targets for Target Year 2017.[41]  While the Adjusted EBITDA Target for 2017 was $23,670,343, Major Energy's actual Adjusted EBITDA for 2017 was $19,685,544, which represented almost a $4 million dollar shortfall.[42]  Moreover, while the Year-End Customer Count Target for 2017 was

---

[37] DX-551; Holloway Witness Stmt. (ECF No. 164) ¶¶ 139-157; DX-609; PX-617.

[38] FOF/COL ¶¶ 857-868; *see also* Tr. at 1619:17-1620:15, 1772:24-1773:11, 1773:12-1174:4, 1774:8-20, 1776:20-1777:18, 1619:17-1620:15 (Leathers Testimony).

[39] PX-617.

[40] *Id.*

[41] DX-698.

[42] *Id.*

209,909,[43] the actual Year End Customer Count for 2017 was approximately 159,000, a shortfall of 50,000 customers.[44]

As a result of this customer shortfall, Section 2.2(d) of the Earnout Agreement required the Earnout Payment to be reduced[45] by $6,604,280.08,[46] calculated as ((209,909 – 159,000) x $119.12).[47]   Indeed, the customer count shortfall was so significant that the Customer Account Reduction completely eliminated any Earnout Payment for Target Year 2017.   Thus, the only payment Sellers were eligible for in Target Year 2017 was a Cash Installment Payment of $3,851,321.[48]

On March 29, 2018, Kroeker sent Horowitz Spark Holdco's Earnout Statement for Target Year 2017, which contained the supporting documentation for Spark Holdco's Target Year 2017 calculation, as well as confirmation that Sellers would be paid $1,607,091 after adjusting for the Target Year 2016 overpayment, which Sellers were not entitled to retain.[49]   This amount was calculated by taking the actual amount that was owed for Year 1 of $5,158,917,[50] adding the calculated Cash Installment Payment for Target Year 2017 of $3,851,321,[51] and subtracting the

---

[43] DX-1 at Exhibit A.

[44] DX-698.

[45] DX-1 at §2.2(d)

[46] DX-698 at MSELLERS_0010295.

[47] DX-1 at Exhibit A.

[48] DX-698 at MSELLERS_0010295.

[49] *Id.*

[50] DX-518.

[51] DX-698.

$7,403,147.97 already paid to Sellers on March 31, 2017.[52]  Stated another way, the $2,244,230.97

overpayment was the difference between what Spark Holdco ultimately paid ($7,403,147.97) and

what Spark Holdco had calculated, consistent with the proper application of the express language

of Section 2.2 of the Earnout Agreement, was actually due to Sellers ($5,158,917) in Target Year

2016.  Because Spark Holdco overpaid Sellers for Target Year 2016 under threat of litigation and

a written reservation of rights, Sellers already had a credit of $2,244,230 from Spark Holdco, which

Spark Holdco was entitled to apply to the Target Year 2017 Cash Installment Payment of

$3,851,321, resulting in only $1,607,091 paid to Sellers for Target Year 2017.[53]

> **D.**    **Plaintiff Is Not Entitled to Attorneys' Fees Based on the Parties' Section 2.2 Dispute.**

"New York follows the 'American Rule' regarding attorneys' fees, under which 'it is well

established that attorney's fees are not ordinarily recoverable in the absence of a statute or

enforceable contract providing therefor.'"  *Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 427 (S.D.N.Y.

2012) (internal citations omitted).  Under New York law, a contract that provides for an award of

reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable

only if, among other things, the contractual language is "sufficiently clear."  *Adar Bays, LLC v.

GeneSYS ID, Inc.*, 341 F. Supp. 3d 339, 350–51 (S.D.N.Y. 2018).

---

[52] DX-523.

[53] DX-698; Holloway Witness Stmt. (ECF No. 164) at ¶¶ 36-37,174-175; Tr. at 1375:23-1376:18 (Holloway Testimony).

1.     Even If Plaintiff Were Entitled to Any Damages, And He Is Not, He Is
       Not Entitled to Any Attorneys' Fees Under Section 3.7 of the Earnout
       Agreement or For Any Alleged Breach of the MIPA, Which Does Not
       Provide for Attorneys' Fees At All.

Section 3.7 of the Earnout Agreement provides for attorneys' fees in certain narrow and

limited circumstances, none of which Plaintiff has proven by a preponderance of the evidence:

> The prevailing party in any action or proceeding arising out of or relating to this
> Agreement or instituted hereunder . . . shall be entitled to recover from the other
> party all reasonable attorneys' fees incurred and all disbursements incurred by such
> prevailing party in connection with such action or proceeding. A party will be
> deemed the "prevailing party" for purposes of this paragraph if, as shown in the
> resulting award, order or judgment, ***such party shall have established that it was
> underpaid by at least fifteen percent (15%)***.[54]

As a threshold matter, Defendant SEI is not a party/signatory to the Earnout Agreement

and, thus, cannot be liable for any attorneys' fees based on Section 3.7.  In addition, although NGE

is a party/signatory to the Earnout Agreement, its obligations under the Earnout Agreement ended

following the dropdown to Spark Holdco on August 23, 2016, as it lawfully assigned its rights and

obligations thereunder to Spark Holdco, which it was expressly permitted to do under Section 3.1

of the Earnout Agreement (and about which there is no genuine dispute in this case).[55]  Thus, as a

matter of law, neither NGE nor SEI can be liable for Plaintiff's attorneys' fees for claims based on

post-dropdown conduct.

Critically, Plaintiff has not proven that non-party Spark Holdco ever "underpaid" Sellers

under the Earnout Agreement, which is the only potential basis for an award of attorneys' fees to

Plaintiff.  In fact, the only scenario in which Sellers could be deemed "underpaid" is in the context

of the Earnout Payment portion of the Contingent Payments, because Cash Installment Payments

---

[54] DX-1, § 3.7 (emphasis added).

[55] DX-1, § 3.1; DX-5, § 3.1.

are governed by the MIPA, ***not*** the Earnout Agreement, and there is no attorneys' fee provision in the MIPA.  In addition, even if Plaintiff could prove Defendants breached Section 2.7 of the Earnout Agreement, and as set forth below he cannot, no damages resulting from such a breach could fairly be characterized as an "underpayment."  Thus, only in the narrow circumstances where Sellers are underpaid on the Earnout Payments would they be potentially eligible for some amount of attorneys' fees, which is not the case here.  Because Plaintiff has so clearly failed to meet his burden of proof to establish a Section 2.2 underpayment (*i.e.*, because Spark Holdco is not a defendant and because it correctly calculated the Earnout Payments), both NGE and SEI should be considered the prevailing parties and be awarded their attorneys' fees, pursuant to the Earnout Agreement and Executive Earnout Agreement.

"To determine whether a party has 'prevailed' for the purpose of awarding attorneys' fees, the court must consider the 'true scope' of the dispute litigated and what was achieved within that scope."  To be considered a prevailing party, a party must prevail on the central claims advanced and receive substantial relief as a result.  *Sykes v. RFD Third Ave. I Assocs., LLC*, 39 A.D.3d 279, 279 (N.Y. App. Div. 2007).  Even where the parties agree to a prevailing party fee-shifting provision, it is not always appropriate to award attorneys' fees if neither side substantially prevails. *1711 LLC v. 231 W. 54th Corp.*, 7 A.D.3d 261, 262 (N.Y. App. Div. 2004) ("although the governing agreements provided that 'the Court in its discretion, may award the prevailing party reasonable attorneys' fees and costs,' the court properly exercised its discretion in declining to make such an award, particularly since neither side prevailed in all, or substantially all, respects.").

To the extent the Court determines that Sellers are entitled to the $2.24 million that Spark Holdco ***over***paid Sellers in Target Year 2016 and subsequently offset as a credit from the Target Year 2017 payment, after the Parties were already in litigation, such a decision by the Court would

represent a finding that Spark Holdco was bound by its overpayment; it would not represent a finding that Spark Holdco underpaid Sellers for Target Year 2016, because Spark Holdco's Target Year 2016 calculation of $5.16 million was correct under Section 2.2 of the Earnout Agreement. There is no other "sufficiently clear" basis for Plaintiff to recover attorneys' fees under the Earnout Agreement, and the MIPA does not contain a prevailing party provision at all, meaning that Plaintiff cannot recover any attorneys' fees for any purported breaches of the MIPA (including, for example, for a purported breach of Section 11.7 of the MIPA based on the dropdown). This drafting was intentional, as the Parties provided for fee-shifting in only narrow and very particular circumstances. *See, e.g.*, *Assured Guar. Mun. Corp.*, 117 A.D.3d at 450–51; *Mastrocovo*, 87 A.D.3d at 1298.

Moreover, Plaintiff is not entitled to attorneys' fees because there was clearly a good faith dispute between the Parties as to the methodology to calculate the Earnout Payments for each Target Year, even though Spark Holdco maintains its position that Section 2.2 is unambiguous and Spark Holdco correctly followed the formula set forth therein. At all times, Spark Holdco acted in good faith, and the equities dictate that Sellers should not be rewarded for their overly litigious conduct with any recovery of attorneys' fees even if the Court finds that Sellers are entitled to any recovery against either Defendant on their Section 2.2 claim. *See Kralik v. 239 E. 79th St. Owners Corp.*, 93 A.D.3d 569, 570 (N.Y. App. Div. 2012) ("courts have discretion to deny such fees based on equitable considerations and fairness"); *333 E. 49th Partners, L.P. v. Flamm*, 107 A.D.3d 584, 584 (N.Y. App. Div. 2013) ("equitable considerations and fairness militate against an award of attorneys' fees in [defendant's] favor" in light of defendant's "misconduct in signing false affidavits of primary residency and entering into a subtenancy without the consent of the landlord").

2.    <u>If the Court Nonetheless Awards Plaintiff Attorneys' Fees, They Should Be</u>
      <u>Substantially Limited.</u>

In the event this Court concludes that Plaintiff's interpretation of Section 2.2 of the Earnout

Agreement is correct (and it is not), any corresponding award of attorneys' fees should be limited

to Plaintiff's Section 2.2 contract claim and substantially reduced from there because Plaintiff

wildly over-litigated his contract claims, never sued the proper party (Spark Holdco), pursued

claims that were dismissed, and there is no basis to award attorneys' fees for Plaintiff's remaining

tort claim or his contract claims based on provisions other than Section 2.2.  To the extent a contract

expressly provides for an award of attorneys' fees to a prevailing party, such claimed fees must be

reasonable and tied to the particular issue or claim on which the party prevailed.  *See Ross v.*

*Sherman*, 95 A.D.3d 1100, 1101 (N.Y. App. Div. 2012) ("as the plaintiffs prevailed on the issue

of liability for breach of contract, they were entitled to a reasonable attorneys' fee.").

The Second Circuit has affirmed that a district court "ha[s] discretion to take into account

the fact that plaintiff pled 'an overbroad case that he had no realistic expectation of ultimately

proving' in measuring the plaintiff's degree of success and adjusting the lodestar to award a

reasonable fee."  *Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004) (reducing fees to exclude time

spent pursuing claims that were dropped and against defendants who were dropped); *Separ v.*

*Nassau County Dept. of Soc. Services*, 327 F. Supp. 2d 187, 191 (E.D.N.Y. 2004) (same); *see*

*Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp.*, 04CIV.3854LAKAJP, 2008

WL 4833025, at *7 (S.D.N.Y. Nov. 3, 2008) (confirming courts will reduce attorneys' fee awards

for tactics that require unnecessary motion practice).

Here, there is no prevailing party fees provision in the MIPA or for any dispute arising

from anything other than the calculation under Section 2.2 of the Earnout Payment component of

a Target Year's calculation (*i.e.*, no fees awarded for alleged breaches of Section 2.7 of the Earnout

Agreement or for an alleged breach of Section 11.7 of the MIPA).  This is significant because the bulk of damages Plaintiff has sought in this case – ***more than 75% of his demand*** – relate to allegations of breach of Section 2.7 of the Earnout Agreement.[56]

In sum, even in the event Plaintiff were to prevail on one or more of his contract claims, the equities require either no award of attorneys' fees in Plaintiff's favor, or an award of nothing more than a nominal amount because Plaintiff converted a $2.24 million contractual dispute into a multi-year, entrenched warfare litigation, seeking to recover more than $25 million of Contingent Payments, plus $9.8 million of duplicative and unwarranted rescissory damages, plus punitive damages that are expressly barred from recovery[57] (not to mention Plaintiff's failed and dismissed claim for rescission).  *See Kralik*, 93 A.D.3d at 570 ("courts have discretion to deny such fees based on equitable considerations and fairness"); *333 E. 49th Partners*, 107 A.D.3d at 584 ("equitable considerations and fairness militate against an award of attorneys' fees in [defendant's] favor").

## III.   PLAINTIFF HAS FAILED TO SATISFY HIS BURDEN TO PREVAIL ON HIS BREACH-OF-CONTRACT CLAIMS UNDER SECTION 2.7 OF THE EARNOUT AGREEMENT.

Throughout this litigation, Sellers have repeatedly asserted that NGE and SEI breached their contractual obligations to run Major Energy in a "business as usual" manner during the

---

[56] Leathers testified in his Witness Statement that $19.4 million of Plaintiff's $25.7 million in damages resulted from Defendants' so-called interference with Major Energy, in purported violation of Section 2.7 of the Earnout Agreement (*i.e.*, $2.8 mm in lost aggregation deals + $3.7 mm of lost revenue from impaired commercial broker relationships + $12.9 mm of lost revenue from impaired residential vendor relationships).

[57] DX-2, § 9.9

earnout period (Count II and III, respectively).[58]   As an initial matter, there is no dispute that the phrase "business as usual" does not appear anywhere in the MIPA, Earnout Agreement, or Executive Earnout Agreement.[59]  Instead, the provisions that govern the operation of Major Energy make clear that NGE or its Affiliate maintains discretion to operate the acquired business during the earnout period and beyond, and subject only to specifically delineated obligations to either act in good faith or not act in bad faith, as set forth in the express language of Section 2.7.

   A.   **Section 2.7 of the Earnout and Executive Earnout Agreements, Including Their Bilateral Duties of Good Faith and Fair Dealing, Must Be Strictly Construed.**

      1.   The Provisions Addressing the Operation of Major Energy During the Earnout Period Were Heavily Negotiated.

The provisions that govern the operation of Major Energy during the earnout period reside not in the MIPA, but in Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement.  Sellers admit that the provisions governing Major Energy's operations during the earnout period were the product of extensive negotiations.[60]  In fact, on March 15, 2016, just three days before the Parties executed the Earnout Agreement, Lawrence J. Studnicky III, Sellers' deal counsel, sent Sellers an e-mail with the following subject line: "Addressing the biggest problem (still) with Earnout Agreement."[61]  Studnicky stated that "the issues raised by [NGE's] version of Sec. 2.7 remain the crux of the matter," prompting him to propose "three levels of increasingly more aggressive 'asks' that we could make to protect the Sellers' Earnout Payments."[62]  Those

---

[58] *E.g.*, ECF No. 22, ¶¶ 3, 6, 27, 38, 67, 69, 77, 78, 80, 87, 91, 103, 121, 124, 149.

[59] FOF/COL ¶¶ 375, 431.

[60] Tr. at 1429:12-14 ("Q.  Would you agree with me that the earnout agreement between NGE and the Sellers was a heavily negotiated document?  A.  Yes.") (Horowitz Testimony).

[61] DX-253.

[62] DX-253.

three "asks" ranged from revisions to Section 2.7, to a series of negative covenants, to – as the most aggressive ask – execution of an Operating Agreement that would "fully empower" Major Energy's Senior Management Team "to continue to run the day-to-day operations of the Companies in their discretion and largely without Buyer interference."   As to this final, most aggressive "ask," Studnicky admitted that he "d[id]n't see this flying" and that he "c[ould]n't imagine this being acceptable to Buyer."[63]

Sellers ultimately proposed to NGE certain of the changes suggested by their deal counsel, including proposing to NGE – on the eve of closing – a draft Operating Agreement contemplated by Studnicky's most aggressive "ask."[64]  As Studnicky anticipated, NGE rejected these proposals for additional Section 2.7 protections.[65]   Even though Horowitz characterized the proposed Operating Agreement as a "weighty document" that was "probably the most important governing document" negotiated in the days leading up to closing, Sellers agreed to close the transaction without it.

        2.      <u>Section 2.7 Resulted from Extensive Negotiations and Should Be Strictly Enforced.</u>

The ultimate product of the Parties' negotiations was, of course, Section 2.7 of the executed Earnout Agreement and Executive Earnout Agreement.  Section 2.7 of the Earnout Agreement is titled "Operation of Business" and makes clear that NGE or its Affiliate "shall have the discretion to operate the Business of the Companies as [NGE or Affiliate] deems appropriate," subject to certain good-faith obligations.[66]  It states in full:

---

[63] DX-253.

[64] DX-263.

[65] DX-253.

[66] DX-1, § 2.7.

Operation of Business.   Following the Closing of the Transaction contemplated in the Purchase Agreement, **Buyer shall have the discretion to operate the Business of the Companies as Buyer deems appropriate**; **provided that** Buyer agrees, for the benefit of Sellers, that: (i) **Buyer has a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities**; (ii) Buyer accordingly shall, **in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change** or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before Closing or proposes to operate the Companies; and (iii) Buyer **shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing**, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to the Sellers hereunder.  In furtherance of the foregoing (and not by way of limitation), Buyer during the Target Years **shall not unilaterally, directly, or indirectly, and whether in one transaction or in a series of related transactions of any kind, make fundamental changes to the operating overhead or otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party**.[67]

The provisions of Section 2.7 of the Earnout Agreement are mirrored by Section 2.7 of the Executive Earnout Agreement, which also is titled "Operation of Business."  That provision makes clear that NGE or its Affiliate "shall have the discretion to operate the Business of the Companies as [NGE or Affiliate] deems appropriate" and further states that **the Senior Management Team has a duty of good faith and fair dealing to operate the business for the benefit of the Companies**, among others.  Specifically, Section 2.7 of the Executive Earnout Agreement states as follows:

Operation of Business.   Following the Closing of the Transaction contemplated in the Purchase Agreement, Buyer shall have the discretion to operate the Business of the Companies as Buyer deems appropriate as owner of the Interests while the details of the day-to-day management of

---

[67] *Id.*

the operations of each of the Companies are delegated to the Senior Management Team which shall be vested with all general and specific rights and powers required for or appropriate to the management of the business of the Companies under law and under Operating Agreement of each Company; provided that Buyer agrees, for the benefit of the Companies, the Sellers, and the Senior Management Team, that: (i) Buyer and the Senior Management team jointly and severally have a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities; (ii) Buyer accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before Closing or proposes to operate the Companies; (iii) Buyer shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to Sellers under the Earnout Agreement and/or to Managers under this Executive Earnout Agreement; and (iv) during the Target Years, Buyer shall not take or omit to take (or permit any of its Affiliates to take or omit to take), unilaterally, directly or indirectly, and whether in one transaction or a series of related transactions of any kind, any act that would (A) make fundamental changes to the operating overhead in a negative manner or (B) otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party.[68]

To be clear, these provisions do not require NGE or its Affiliate to operate the business precisely how Major Energy was run prior to the sale or how Major Energy's Senior Management Team dictates the business should be run during the earnout period; they simply provide that NGE or its Affiliate's discretion to operate the business must be exercised in good faith. Section 2.7 likewise does not prevent NGE or its Affiliate from making changes to the business; instead, it requires NGE or its Affiliate to act in good faith by consulting in advance and collaborating with

---

[68] DX-5, § 2.7.

Major Energy's executive team about such changes.  Further, Section 2.7 bars NGE or its Affiliate from taking actions **in bad faith** (i) for the purpose of, or that are reasonably likely to have the inevitable effect, reducing Sellers' Contingent Payments, or (ii) that make fundamental changes to business or that would materially negatively affect its profitability for the benefit of some third party.

Where, as here, good faith is an express condition of a contract that contemplates a wide scope of discretion on the part of one party, there is no breach if the discretionary act performed is "not arbitrary and capricious."  *Smith v. Robson*, 148 N.Y. 252, 255, 42 N.E. 677; *see also* 3A Corbin, Contracts § 647, at 104–106.  Stated differently, a duty to act in good faith "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lesson the other party's anticipated fruits from the contract." *IGT v. High 5 Games, LLC*, 380 F. Supp. 3d 390, 397 (S.D.N.Y. 2019).  Accordingly, for Plaintiff to prevail on his breach of Section 2.7 claim, he had to prove by a preponderance of the evidence that NGE or non-party Spark Holdco fell short of their duty of good faith by acting arbitrarily or for the purpose of harming Sellers, which Plaintiff failed to do.  Anything more is contrary to the parties' negotiated agreement and applicable case law.

### B. Every Alleged Breach of Section 2.7 Must Be Independently Analyzed, and Plaintiff Must Satisfy His Burden of Proof For Every Element of Every Claimed Breach.

Under New York law, to prevail on a claim for breach of contract, a plaintiff must prove by a preponderance of the evidence (i) the existence of a valid contract between itself and the defendant, (ii) plaintiff's performance of its obligations under the contract, (iii) defendant's material breach of the contract, and (iv) damages to the plaintiff caused by that defendants' breach. *Broyles v. J.P. Morgan Chase & Co.*, No. 08 CIV. 3391, 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010); *Nielsen Co. (U.S.), LLC v. Success Systems, Inc.*, 112 F. Supp. 3d 83 (S.D.N.Y. 2015).

For Plaintiff to succeed on his claim that NGE or SEI breached Section 2.7 of the Earnout Agreement (Count II and III, respectively), each alleged breach of Section 2.7 must be independently analyzed.  Further, for each such claimed breach, Plaintiff must satisfy his burden of proof on every element of a breach of contract claim under New York law.

###### C.      Each of Plaintiff's Section 2.7 Theories Fails Out of the Gate Because Plaintiff Has Failed to Sustain His Burden to Establish Causation and Damages.

A party asserting a breach of contract claim must prove each element, including damages, by a preponderance of the evidence. *Republic Corp. v. Procedyne Corp.*, 401 F. Supp. 1061, 1068 (S.D.N.Y. 1975).  Under New York law, causation is an essential element of damages in a breach of contract action.  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."); *accord Bank of Am., N.A. v. Bear Stearns Asset Management*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013).  General damages "are the natural and probable consequence of the breach" of a contract.  *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 22 N.Y.3d 799, 805-06, 988 N.Y.S.2d 527, 11 N.E.3d 676 (2014).

To prove general damages under New York law, the plaintiff must show (i) the fact or existence of damages to a "reasonable certainty" and, if the fact or existence of damages is proven, (ii) "a 'stable foundation for a reasonable estimate' [of damages] incurred as a result of the breach." *Holland Loader Co., LLC v. FLSmidth A/S*, 769 F. App'x. 40, 42 (2d Cir. 2019).  "The first prong concerns causation, while the second prong speaks to the amount of damages."  *Id*.  In other words, "damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986).

1.      Leathers' Constantly Evolving Damages Opinions Should Be Rejected.

As a threshold matter, Leathers' damages opinions, all of which are impermissibly speculative (*see infra*), materially changed between his June 2019 Expert Report and his December 2019 Witness Statement, and the Court should strike any new opinions as untimely.[69]  Although Leathers erroneously testified at trial that his opinions had not changed between his Expert Report and Witness Statement, a comparison of the text of the two documents belies that testimony.  For instance, although at trial Leathers testified that Exhibit 10.2 of his Expert Report was merely an illustration of a ***possible*** calculation methodology,[70] the text of his report demonstrates that he sponsored this methodology as the correct one.[71]  Leathers' Exhibit 10's Earnout Payment calculation is set forth in Exhibit 10.2 to his Expert Report.  A graphical representation of what Leathers described as the "correct" 2016 Contingent Payment calculation is below:

$$\text{Earnout Ceiling (\$20 Million)} \quad \times \quad \left[ \frac{\text{2016 Adjusted EBITDA (Actual)}}{\text{2016 Adjusted EBITDA Plan}} \right] \quad \times \quad \text{2016 Earnout Percentage (approx. 27.27\%)}$$

---

[69] *See* ECF Nos. 178, 179 (Defendants' Motion *in Limine* to Exclude New Leathers' Opinions).

[70] Tr. at 1624:18-25 ("Q. All right. Well, let's look at -- let's look at Exhibit 10.2 of your expert report. . . . Will you agree with me that this is the methodology that you adopted six months before you signed your witness statement? A. . . . this is a methodology that's included in that.") (Leathers Testimony); *id.* at 1625:6-12 ("Q. Well, Mr. Leathers, is it your position that the formula that you used in Exhibit 10.2 of your expert report, is it a correct formula or is it an incorrect formula? A. It is a -- it represents -- it is the correct formula to represent what would be a minimum earnout payment. It is incorrect in the fact that it does not account for an executive earnout.") (Leathers Testimony).  Tellingly, Leathers' Expert Report clearly shows calculations resulting in $0 in Executive Earnout Payments, yet in his Witness Statement, Leathers now concludes Executive Earnout Payments are due to Sellers.  *Compare* Exhibits 10.2 and 11.2 of Leathers' Expert Report to paragraph 7 of Leathers' Witness Stmt. (ECF No. 155).

[71] *See* PX-753, Section V.C.iv, entitled "The ***Correct*** 2016 Contingent Payment," and paragraph 187, which cited "Exhibit 10."

Yet, in his Witness Statement, Leathers adopted a wholly different formulation as the "correct" methodology:[72]

$$\text{2016 Adjusted EBITDA Plan} \quad \times \quad \left[ \frac{\text{2016 Adjusted EBITDA (Actual)}}{\text{2016 Adjusted EBITDA Plan}} \right] \quad \times \quad \begin{array}{c}\text{2016 Earnout Percentage} \\ \text{(approx. 27.27\%)}\end{array}$$

In his Witness Statement, to support his abandonment of his prior reliance on Exhibit 10.2 of his Expert Report, Leathers also mislabeled his own prior Exhibit 10.2 methodology the "Lancaster (April 2017)" and "Defendants' Pre-Litigation Formula."[73]  Of course, the "evolution" in Leathers' opinions is wholly improper and untimely:  (1) Leathers' attempt to distance himself from the formulation he previously adopted as "correct" is misleading and disingenuous, insofar as he now attempts to attribute that formulation to *Defendants*; (2) by calling his prior Exhibit 10.2 formulation "Defendants' Pre-Litigation Formula," Leathers is engaging in revisionist history by ignoring Lancaster's original March 30, 2017 calculation, which faithfully adhered to the plain language of Section 2.2 of the Earnout Agreement and preceded Lancaster's April 11, 2017 memorandum; and (3) although Leathers is correct that the Exhibit 10.2 methodology is what Lancaster used in his April 11, 2017 memorandum, Leathers fails to acknowledge that Lancaster did so *only after* Plaintiff sent Defendants an email on March 30, 2017 attaching the "spreadsheet we all know to be correct," which actually failed to follow the text of Section 2.2 of the Earnout

---

[72] Leathers Witness Stmt. (ECF No. 155) ¶ 42.

[73] Leathers Witness Stmt. (ECF No. 155) ¶ 81.

Agreement, and demanded payment of $7.4 million the following day, or else he would sue NGE, SEI, and Keith Maxwell.[74]

        2.    <u>Leathers' Damages Opinions and Testimony Are Impermissibly Speculative, Blindly Adopt Sellers' Positions, and Are Not Reliable.</u>

Notwithstanding the substantial flaws in each of Leathers' theories, Plaintiff relies entirely on Leathers' testimony and opinions to support his damages case even though Leathers' Adjusted EBITDA and customer count calculations were not supported by any fact witness in this case, nor by Sellers' contemporaneous earnout calculations. But expert "[t]estimony based on guesswork, speculation, or conjecture is inadmissible." *Sadler v. Moran Towing Corp.*, 204 F. Supp. 2d 695, 698 (S.D.N.Y. 2002) ("Here, Captain Reid's supposition that hauling the cable 'may have' contributed to plaintiff's injury is unsupported by anything suggesting a view on his part that it more likely than not did so."). "Actual damages must be actually proved, and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 243 F. Supp. 500, 512 (S.D.N.Y. 1965) ("The question is not what speculatively he may have lost, but what actually he did lose.").

In addition, "[t]he law is clear that mere *ipse dixit* is not appropriate expert testimony because it is not based on reliable methodology, as *Daubert* requires." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) ("nothing . . . requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there

---

[74] Yet another example of this "evolution" is reflected in Leathers' opinions relating to the Executive Earnout Agreement. In his Expert Report, Leathers agreed that Sellers were not entitled to any Executive Earnout Payments (see Exs. 10.2 and 11.2 of his Expert Report, showing $0 in Executive Earnout Payments), until he reversed course and came up with a new damages methodology that resulted in Sellers receiving millions of dollars in Executive Earnout Payment. Leathers Witness Stmt. (ECF No. 155) ¶ 7.

simply is too great an analytical gap between the data and the opinion proffered." (internal citations omitted)).  "An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge." *See Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) ("Professor Farber has offered opinions about the capacity and capabilities of Defendants' servers and software, . . . by simply accepting what Defendant Reynolds told him. . . ."); *see also CIT Group/Business Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677–678 (S.D.N.Y. 2011) (excluding expert testimony because "[i]n each case Kilbourne's opinion is based on his client's unrealistic assumptions as to purchase price and not on his own independent evaluation.").

As set forth in Section II.D.2 above, ***more than 75%*** of Plaintiff's claimed damages relate to alleged breaches of Section 2.7 of the Earnout Agreement.  Leathers testified in his Witness Statement that ***$19.4*** million of Plaintiff's $25.7 million in claimed damages resulted from Defendants' so-called interference with Major Energy, in purported violation of Section 2.7 of the Earnout Agreement (*i.e.*, $2.8 mm in lost aggregation deals + $3.7 mm of lost revenue from impaired commercial broker relationships + $12.9 mm of lost revenue from impaired residential vendor relationships).[75]  As detailed in the table below, these claimed damages are unsupported and entirely speculative.  Such an expert opinion cannot survive *Daubert* scrutiny.

| Category of Damages | Reasons Leathers' Calculations Are Speculative |
| --- | --- |

---

[75] Leathers Witness Stmt. (ECF No. 155) ¶ 7 (excluding any Executive Earnout Payments).

| Residential Vendors ($12.9 mm) | • Assumed growth from 5Linx,[76] even though it was no longer a vendor for Major Energy pre-closing and instead was involved in litigation with Major Energy.[77] |
| | • Assumed without any support that Platinum, a brand-new vendor, would bring in almost 60% more electric customers from the get-go than PTM,[78] an established vendor.[79] |
| | • Had not read unrebutted Witness Statement of Heather McGuinness,[80] which stated that up to 90% of audited PTM sales were bad sales between February 2017 and December 2018, which were during the earnout period.[81] |
| | • Attributed all "lost" customers, up to 60,000 per year based on no disclosed criteria, to Defendants alone.[82] |
| Commercial Brokers ($3.7 mm) | • No quantification of such damages in expert report.[83] |
| | • Did not identify a single commercial broker Major Energy lost during the earnout period or who altered their relationship with Major Energy because of SEI, NGE or the dropdown.[84] |

---

[76] According to Table 13 of Leathers' Witness Statement, 5Linx, which was Channel 3, would have added 15,000 customers in 2016 (9,900 electric + 5,100 gas) and 18,000 customers in 2017 (11,880 electric + 6,120 gas).

[77] Tr. at 1654:24-1655:4 ("Q. All right. Mr. Leathers, so when we look at your table, your table assumed that 5Linx would continue to provide customers in '16 and '17, even though there was litigation between 5Linx and Major and they were no longer actively working together, right? A. Yes, that is what is included in the projection model.") (Leathers Testimony).

[78] According to Table 13 of Leathers' Witness Statement, Platinum (Channel 4) was projected to add 52,999 electric customers each year compared to 33,254 electric customers each year for PTM (Channel 1). In gas, Platinum was projected to add 9,353 customers each year, which was *higher* than the 8,314 customers PTM was projected to add.

[79] Tr. at 1655:22-1656:16 (Leathers Testimony).

[80] Tr. at 1670:18-20 ("Q. Mr. Leathers, did you review Ms. McGuinness's witness statement in this case? A. I don't believe I did.") (Leathers Testimony).

[81] McGuinness Witness Stmt. (ECF No. 158) ¶ 14.

[82] Leathers Witness Stmt. (ECF No. 155) ¶ 379.

[83] Tr. at 1647:25-1648:3 ("Q. Well, you don't quantify any alleged damages for loss of commercial brokers in your expert report, right? A. I don't provide a number, a specific number, in my expert report.") (Leathers Testimony).

[84] Tr. at 1648:20-24 ("Q. And you did not identify a single commercial broker in your expert report or your witness statement that was allegedly interfered with by either defendants, right? A. I don't recall referencing the name of a specific commercial broker, that's correct.") (Leathers Testimony).

| Aggregation Deals ($2.8 mm) | • Assumed without basis that Major Energy would have won both aggregation deals had it submitted bids, even though Major Energy had never won an aggregation deal before in its entire corporate history, despite bidding on them.[85]<br>• Did not evaluate what competition existed for the two aggregation deals.[86]<br>• Did not consider that Levi Moeller, the COO of Major Energy, advised against pursuing the first aggregation deal and Major Energy did not even bring the second potential deal to Spark Holdco's attention. |
|---|---|
| Earnout Payments ($6.3 mm) | |
| Adjusted EBITDA | • Improperly substituted own judgment about "economics of the transaction"[87] for the actual text of the contracts. |
| Addbacks | • Admitted he ignored contractual bases for Defendants' addback positions and adopted Sellers' positions based on model that was not incorporated into Earnout Agreement.[88] |
| Customer Count | • Used a methodology that was not supported by any fact witness at trial and relied, in part, on the witness statement of David Sobel, which was voluntarily withdrawn by Plaintiff and can no longer serve as a basis for his customer count opinions.[89] |

---

[85] Tr. at 1276:24-1277:8 ("Q. You would agree with it?  So if the one transaction that you have referred to as similar to an aggregation deal was not in fact an aggregation deal, then would you agree with me that prior to the sale of Major Energy to NGE, Major Energy had not done any large aggregation deals preclosing? A. *Correct, they didn't close on any aggregation deals prior*. Q. You didn't get any of them done. You *might have looked for them, but you never got them done, correct? A. Correct*.") (Leathers Testimony) (emphases added)).

[86] Leathers Witness Stmt. (ECF No. 155) ¶¶ 412-417 (no discussion of any competition for aggregation deals).

[87] Tr. at 1626:23-25 ("A. I believe that the formula that is depicted on the left-hand side of this screen and *Exhibit B best represents the economics of the transaction*."); 1628:6-12 ("A. I believe that there is a dispute between the parties in terms of how the earnout should be calculated and, therefore, it's my role as an independent expert to take the agreement, *to take the negotiation*, and to take other parts of that agreement that align to one another and in some ways contradict one another and *come to a conclusion based on the economics of the business*.") (Leathers Testimony).

[88] Tr. at 1772:10-1775:6 (admitting reliance on PX-377A for addback positions, even though it was not incorporated in or attached to any of the operative contracts, rather than relying on the text of Section 7.1 of the MIPA, definitions section of the MIPA, and Section 2.2(c) of the Executive Earnout Agreement) (Leathers Testimony).

[89] *See, e.g.*, Leathers Witness Stmt. (ECF No. 155) ¶¶ 136-37 (citing to David Sobel deposition testimony as basis for rejecting 167,152 as upper limit on 2016 customer count).

| Complete Failure to Consider Other Factors | • Ignored impact from New York, Illinois, and Pennsylvania regulatory actions.[90] |
| | • Failed to evaluate competitive impacts on Major Energy.[91] |
| | • Failed to consider market contraction in key states of projected growth.[92] |
| | • Did not factor in Sellers' and Key Employees' self-dealing.[93] |

The foregoing table identifies just some of the most glaring deficiencies in Leathers' opinions and testimony. Many of these failures are established by Leathers' own trial testimony, and they are damning. By unquestioningly adopting nearly all of Sellers' positions despite the existence of substantial, empirical, contradictory evidence, and by ignoring any alternative causes of Sellers' so-called damages, including Sellers' own misconduct, Leathers concludes Sellers would have achieved the full $35 million of Contingent Payments, *plus* Executive Earnout Payments, *plus* $9.8 million of rescissory damages. The absurdity of these opinions is palpable.

---

[90] Tr. at 1685:13-1686:2; 1693:5-1695:6; 1697:8-12 ("I don't fully agree with your interpretation that those are restrictions and something new and different and, therefore, would have had an impact on the residential vendors for Major at the time."); 1752:13-25 ("I independently looked at information from the market; looked at what Wall Street was saying, what other industry experts were saying during the entire time period to be able to assess to the extent, for example, that the New York resetting order or low-income order or other regulatory issues that have been discussed in this case had an impact on Major Energy's ability to achieve its earnout projections. Q. So did you see any evidence of increased regulatory risk for ESCOs in Major's three markets? A. I did not see an increase in risk; I saw generally a consistent risk throughout -- before, during, and after the time period. But it's important to separate between risk and actual impact.") (Leathers Testimony).

[91] Tr. at 1616:19-1617:6 ("Q. What specific competitors did you consider, Mr. Leathers, when analyzing the impact to Major Energy in this case? A. Well, certainly I looked at Spark and the history of Spark. There is another company, a public company called Just Energy. I could refer to my report and give you a couple other names, if you'd like, as well.") (Leathers Testimony). Setting aside whether Spark Energy and Major Energy actually were competitors, Just Energy is not mentioned in Leathers' Witness Statement at all, and it is mentioned only in the section on calculating rescissory damages in his Expert Report at ¶ 270.

[92] *See* Dudney Witness Stmt. (ECF No. 167), Ex. 8 & 9 (showing market declines in demand for retail energy in New York and Illinois, two of Major Energy's key markets for projected growth).

[93] *See, e.g.*, Tr. at 1675:11-1681:15 (discussing time spent by Major Energy executives on other side businesses during working hours, corporate credit card spending on entertainment unrelated to Major Energy business, etc.) (Leathers Testimony).

Finally, in both his Expert Report and Witness Statement, Leathers took the position that Sellers suffered damages due to (i) loss of key employees, (ii) the EMS integration project, and (iii) the PSE contract termination, though he did not quantify damages from any of those events. At trial, Leathers admitted that the damages he had not quantified "flows into the profits or impact on profitability associated with the impaired residential vendors and commercial brokers."[94]  To be clear, Leathers' "catchall" theory of harm does not pass muster; to prevail on a claim for damages, a party must credibly tie claimed harm to particular conduct, rather than lump all theories of harm together and assign a damages number.[95]  Like his other categories of claimed damages, Leathers' "catchall" category of damages is pure speculation and therefore unreliable.

3.     <u>Plaintiff's Own Concessions at Trial Destroy Sellers' Causation Theory.</u>

Sellers claim they were harmed because the "sale and assignment to Spark . . . enabled Spark [Holdco] to take control of Major Energy's business operations during the three-year Earnout period to the detriment of the Sellers."[96] ***This argument rests on a premise that Plaintiff himself has now admitted was faulty***; namely, that the transactional agreements prevented (they did not) NGE from freely assigning to its Affiliate Spark Holdco its rights and obligations relating to the core disputed issues: (i) the operation of Major Energy during the 33-month earnout period,

---

[94] Tr. at 1760:16-22 ("Q. So, we just talked about quantifying damages for the EMS integration project, PSE termination. You also mentioned employee turnover. Would you explain why there is no particular damages number associated with that. A. So again the impact of that flows into the profits or impact on profitability associated with the impaired residential vendors and commercial brokers.") (Leathers Testimony).

[95] Dudney Witness Stmt. (ECF No. 167) ¶ 125 ("[A] viable damages claim must establish the nexus or link between the alleged actions or inactions of the defendant and the claimed amount, which is commonly referred to as damages causation.").

[96] ECF No. 52, at 3 n.5.

and (ii) the calculation of potential Contingent Payments, if any, during that earnout period.  But the transactional documents provide the exact opposite, as Plaintiff himself conceded at trial; namely, not only do they not bar such assignment, Section 3.1 of the Earnout Agreement and the Executive Earnout Agreement expressly permit such assignment without consent from Sellers, as detailed further in Section IV.[97]

Again, Horowitz himself admitted at trial that the operation of Major Energy could be assigned to Spark Holdco, testifying that, "if they wanted to assign the earnout, then that's their business."[98]  He further admitted that the "real question" was whether the assignee complied with Section 2.7 of the Earnout Agreement or Executive Earnout Agreement:

> Q. Okay. So then you understood the Section 2.7 operation of business obligations that NGE had could be assigned over to even, let's call it, Spark Energy, Inc., the publicly traded company, without seller's ability to contest that, and that it would be Spark Energy, Inc.'s obligation to comply with Section 2.7, as opposed to NGE. Did you understand that?
>
> A. Yes. But to the extent that it interfered, it wasn't okay.  If Spark was able to comply with 2.7, yes. If they are not able to comply, no.
>
> Q. Right. So the real question then in your mind, if I understand your testimony, is not whether or not there was an assignment or whether or not it was Spark Energy or Spark HoldCo, it was will the assignee, Spark Energy or Spark HoldCo, actually comply with their obligations in 2.7 owed to the sellers, right?
>
> A. Under the earnout, yes.

---

[97] ECF No. 76, at 11 (referring to the "anti-assignment provision in the Earnout Agreement (Section 3.1) that permits assignments to Affiliates, such as Spark HoldCo, without prior written consent of the Sellers"); *see also* May 2, 2019 Studnicky Dep. Tr. at 37:12-18 ("Q.  So the provisions of the Earnout Agreement can be assigned to an Affiliate pursuant to section 3.1 of the Earnout Agreement? A.  The Earnout Agreement can be assigned based on 3.1 to some one who is an Affiliate of a Party.  Q.  And that can be done without consent?  A.  That is correct, under 3.1."); *accord id.* at 39:4-17 (Executive Earnout Agreement). These deposition excerpts, and the other deposition excerpts cited herein, were included in Defendants' deposition excerpts submitted to the Court, not filed, on January 13, 2020 in connection with the parties' Joint Pretrial Order.

[98] Tr. at 1425:14-1426:2 (Horowitz Testimony).

Q. Or the executive earnout?

A. Or the executive earnout.

Q. So we have 2.7, which is the operation of the business, and that can go to Spark Energy, Inc. or Spark HoldCo; correct?

A. Yes.

Q. And then we have Section 2.2 of the earnout agreement, which is the provision we've talked a lot about in this case, which is how to go about calculating the earnout that might come due under the earnout agreement under certain circumstances; correct?

A. Whatever is in the agreement.

Q. You understand Section 2.2 is in the agreement?

A. Yes.

Q. Okay. So that's another thing that's in the agreement that can get assigned over, in your view, to Spark Energy, Inc. or Spark HoldCo; and so long as they comply with the agreement, it's not an issue, from your perspective. I think that's what I understood. Fair?

A. Fair.[99]

Put differently, Sellers admitted at trial, through the empirical evidence and Horowitz's concession, that they can no longer tie their claim of damages under Section 2.7 of the Earnout Agreement to the dropdown transaction (which has been their fundamental case theme from inception through trial).[100]   Instead, the relevant inquiry is whether the specific actions or omissions of NGE or non-party assignee Spark Holdco in operating Major Energy during the

---

[99] Tr. at 1426:10-1427:5 (Horowitz Testimony).

[100] *See* Dudney Witness Stmt. (ECF No. 167) ¶ 127 ("[Leathers] does not explicitly opine on any damages specifically and solely resulting from the Dropdown.  Instead, he attempts to calculate damages based on events that occurred subsequent to the Dropdown.").

earnout period, pre- and post-assignment, constituted breaches of Section 2.7's Operation of Business provision.

### D. In Any Event, Each of Plaintiff's Claimed Breaches of Section 2.7 Independently Fails on the Merits as a Matter of Fact and Law.

To support their claim of a breach of Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement, Sellers identify six instances of purported interference by Defendants with Major Energy's operations during the earnout period: (i) SEI's adoption of Moeller's recommendation to not bid on the single aggregation deal proposed by Major Energy during the earnout period; (ii) Spark's and Major Energy's agreement to not renew the PSE supply agreement and to replace it with an objectively more favorable supply agreement with Spark, (iii) the short-lived EMS integration project, which Spark terminated after seven weeks once it learned of concerns from Alper and addbacks sought for same, and for which Spark Holdco ultimately gave Major Energy an addback of $250,000; (iv) the so-called interference with Major Energy's broker relationships notwithstanding the weight of trial evidence demonstrating the growth in commercial broker relationships during the earnout period; (v) the so-called interference with Major Energy's mass marketing vendor relationships notwithstanding the weight of trial evidence demonstrating that Major Energy's Senior Management Team unilaterally decided, during the earnout period, to slash its customer acquisition spending well below pre-closing projected levels; and (vi) the voluntary departure of certain Major Energy employees when the weight of trial evidence demonstrates that those employees left of their own accord, for reason entirely or mostly unrelated to Defendants or their alleged conduct, and where the Senior Management Team made no efforts to retain those identified employees.

1.      The Single Aggregation Deal Proposed By Major Energy and Deemed
Too Risky by Both Moeller and Spark Cannot Support a Claim for Breach
of Section 2.7.

Plaintiff contends that SEI's rejection of the single aggregation deal Major Energy's executive team proposed during the earnout period constituted a breach of Section 2.7 of the Earnout Agreement and Executive Earnout Agreement.[101]  As an initial matter, this claim cannot be asserted against SEI because it did not assume any obligations under the Earnout Agreement. Further, it is not disputed that Major Energy had ***never*** won an aggregation deal prior to the sale to NGE; in other words, aggregation deals were not "business as usual" for Major Energy or, more precisely, "consistent[] with how the Senior Management team operated the Companies before the Closing."[102]  In fact, according to Moeller, had Major Energy pursued this aggregation deal, it would have been its "first time to the rodeo."[103]

As a result, to establish a breach of Section 2.7 based on the rejection of this aggregation deal, at a minimum, Plaintiff needed to establish with credible evidence that (i) SEI's conduct with respect to this deal fell short of a  duty of good faith and fair dealing, (ii) pursuit of this aggregation deal was "consistent[] with how the Senior Management team suggest[ed] operating the [Major

---

[101] An aggregation deal is a bidding process in which retail energy companies bid to service an entire block of customers (*e.g.*, all customers in a township) at as low a retail price as possible, with no upfront cost to the retail energy company.   *See* Kroeker Witness Stmt. (ECF No. 166) at ¶ 226; Tr. at 420:21-421:6 (Kroeker Testimony); Wiederman Dep. Tr. at 151:18-22 ("Aggregation is a company or a village or a municipality that aggregates a bunch of customers, and then they bid it out.  And then you get the customers based on your bid, and you don't pay for that.").

[102] DX-1, § 2.7; *see also* DX-577, at SPRK-NGE0041048 ("This would be majors [sic] first time to the rodeo"); Kroeker Witness Stmt. (ECF No. 166) at ¶¶ 226-235; Dudney Witness Stmt. (ECF No. 167) ¶ 162 ("[T]estimony from Major's management indicates that aggregation deals were not 'business as usual' for Major prior to the sale to NGE."); Tr. at 418:2-422:15 (Kroeker Testimony); 1275:4-1277:8 (Moeller Testimony).

[103] DX-577, at SPRK-NGE0041048.

Energy] going forward to adapt to new opportunities," and (iii) Major Energy would have been the winning bidder on the deal had it bid.[104]  He has not met his burden on any of those three issues, and certainly not on all three, as required.

The undisputed evidence shows that, in May 2017, Major Energy made its first – and only – proposal to SEI's risk committee during the earnout period to pursue an aggregation deal.[105]  The proposed aggregation deal would have required Green-E certification (a certification Major Energy did not possess),[106] substantially reduced margins, and locked Major Energy into a 24-month commitment that would require hedging.[107]  Moeller, Major Energy's Chief Operating Officer, presented this aggregation deal to SEI's risk committee.  He admitted under oath – both at deposition and at trial – that he did not believe that aggregation deal made sense:

> Q. And you told the Spark risk committee that you thought the deal was too risky, correct?
>
> A. Correct, on the supply side I felt it was risky, yes.
>
> Q. And you thought it was too risky to do, and that in your opinion as the chief operating officer of Major Energy you didn't think it should be done.

---

[104] DX-1, § 2.7.

[105] Kroeker Witness Stmt. (ECF No. 166) at ¶ 226; Tr. at 418:2-422:15 (Kroeker Testimony).

[106] Tr. at 1308:8-18 ("You recognize, sir, that the Illinois aggregation load require green E certification and Major Energy didn't have that? A. Correct. That's, I believe, how the whole thing started with me and Mr. Levitt, is I asked him if we could price it out, how much it would cost to Green e load so we become Green E certified. Q. Right. So at the time that the requirement was Green E certification, Major Energy didn't even have that certification, correct? A. Correct.") (Moeller Testimony).

[107] DX-580, at SPRK-NGE0040376 ("In order to stay competitive in this bid process Major would have to price these residential accounts at a two mil margin. Well below our normal especially for residential."); *id*. ("Major would have to offer a 24 month term which would require hedges for that time frame and tying up credit."); *id*. ("they have asked for 'Green E' certification. I know that currently neither Major nor Spark are 'Green E' certified but we are hoping that we can present an offer . . . they are requesting without being 'Green E' certified."); *see also* Tr. at 1308:2-18 (Moeller Testimony).

A. Correct.

Q. And Spark's risk committee agreed with you and said we agree we shouldn't do the deal. Correct?

A. Correct.[108]

In other words, according to Major Energy's Chief Operating Officer, pursuit of this aggregation deal was not "consistent[] with how the Senior Management team suggest[ed] operating the [Major Energy] going forward to adapt to new opportunities."[109]

Not surprisingly, SEI's risk committee agreed with Moeller's assessment that the aggregation deal was too risky.[110] Spark's Chief Risk Officer, Murthy Rao, nevertheless followed up with Moeller after the risk committee meeting to invite Major Energy to propose more suitable aggregation deals in the future.[111] It is undisputed that Major Energy never presented another aggregation deal to Spark during the earnout period.[112] To be clear, there is no credible argument

---

[108] Tr. at 418:2-420:20 (Kroeker Testimony), 1279:13-22 (Moeller Testimony); *accord* Moeller Dep. Tr. at 176:5-18 ("A. . . . . They asked me my opinion. My opinion of this specific deal was that it was a little bit risky to do it and, you know, I don't think I would have done it on my own on this specific deal. And I believe I made myself clear on that call that this specific deal I wouldn't do. And they said, okay, you know, yeah, we were -- with agree with you this deal is not for us. And that was the end of the phone call. Q. Okay. So that specific deal you were, I guess, in agreement with Spark's Risk Committee as far as the aggregation, correct? A. Correct.").

[109] DX-1, § 2.7.

[110] Tr. at 1279:13-22 ("Q. And Spark's risk committee agreed with you and said we agree we shouldn't do the deal. Correct? A. Correct.") (Moeller Testimony).

[111] Tr. at 418:2-420:20 (Kroeker Testimony), 1279:13-22 (Moeller Testimony); DX-580 ("As discussed, the Risk Committee would be happy to look at the aggregation deals that are party of your ongoing business with a customer count of 5,000 or less and with no Green-E certification requirement.").

[112] Dudney Witness Stmt. (ECF No. 167) ¶ 166 & n.345 ("The only other example presented in the Leathers report is of a potential 7,000-customer aggregation deal, apparently brought to Major by Dan Alper after he had left the company. However, it does not appear that the potential deal was even proposed by Major to Spark.").

that SEI's adoption of the recommendation of Major Energy's COO and invitation to Major Energy to propose suitable aggregation deals in the future constituted a breach of any good faith obligations under Section 2.7 of the Earnout Agreement, including since SEI was not a party to that agreement.

Moreover, there is not a scintilla of evidence in the record to suggest that, had Major Energy pursued this aggregation deal, it would have won.[113]  In fact, given Major Energy's non-existent track record on aggregation deals, Plaintiff's tacit assumption that Major Energy would have won this aggregation deal had it actually bid on it is pure fantasy.  In sum, Plaintiff has not adduced credible evidence that (i) SEI's conduct with respect to the single aggregation deal Moeller proposed, but suggested was not in Major Energy's best interests and conceded he would not have pursued it for Major Energy, fell short of any applicable duty of good faith and fair dealing, (ii) that pursuit of this aggregation deal was somehow consistent with how Major Energy's Senior Management team "suggest[ed] operating the business going forward to adapt to new opportunities" when Major Energy's own COO thought it was too risky, or (iii) Major Energy would have been the winning bidder on an aggregation deal in its "first time to the rodeo."[114]

---

[113] Tr. at 1280 ("Q.  Sitting here today, sir, you have no idea one way or the other whether Major Energy would have succeeded in winning the bid for that Illinois aggregation deal even if Spark's risk committee had allowed Major Energy to go forward?  A.  Correct.") (Moeller Testimony); *see also* Dudney Witness Stmt. (ECF No. 167) ¶ 166 ("Likewise, Mr. Leathers has not presented evidence that that Major would have won the Illinois (16,700 customer accounts) aggregation deal . . . .").

[114] DX-577 at SPRK-NGE0041048 ("This would be majors [sic] first time to the rodeo"); *see also* DX-1, § 2.7.

2.      Major Energy's Senior Management Team Ultimately Chose Not to Renew
the PSE Credit and Supply Agreement, and Major Energy Ultimately
Benefitted from Replacing PSE with Spark Energy, LLC.

Plaintiff also contends that the non-renewal of Major Energy's credit and supply agreement

with PSE during the earnout period constituted a breach of Section 2.7 of the Earnout Agreement

and the Executive Earnout Agreement, notwithstanding the involvement of Major Energy's Senior

Management Team in deciding to replace PSE with Spark and the vastly superior pricing offered

by Spark.[115]  But Section 2.7 is clear:  for a "Buyer proposed change or modification of the

operations" of Major Energy, such as a change to its existing credit and supply relationship, all

that was required was for NGE or its Affiliate to, "in good faith, consult in advance and collaborate

with the Senior Management Team."   The overwhelming trial evidence proves far beyond a

preponderance of the evidence that Defendants did exactly that.

It is undisputed that PSE and Major Energy had, at times, a contentious relationship, and

the evidence demonstrates that their relationship soured sharply in the spring of 2016 – wholly

unrelated to NGE, SEI or Spark Holdco.[116]  Most notably, in March 2016, Sellers disclosed to PSE

that they had executed transactional documents (but not yet closed on the deal) to sell their

---

[115] ECF No. 22, ¶ 95.  PSE was Major Energy's credit sleeve provider until March 17, 2017, which was the date on which the credit sleeve agreement between Major Energy and PSE expired by its own terms.  In that capacity, PSE provided credit support for Major Energy's purchase of wholesale electricity and natural gas, which Major Energy then resold to retail customers.

[116] Tr. at 1185:10-22 ("Q.  [Y]ou also acknowledged that, at various times, PSE had some contentious relationships, contentious times with Major.  A.  Yeah, that's true.") (Chung Testimony).  In the Amended Complaint, Sellers acknowledge that Major Energy's relationship with PSE eroded "to the point where PSE no longer desired to continue the relationship with Major Energy," although they contend that NGE and/or Spark Holdco were responsible for this erosion.  ECF No. 22, ¶ 95; see DX-431 ("PSE screws us plenty on other parts of the business ☺  Believe we once calculated how they are making 20% return on their money between interest and adders being charged.").

Membership Interests in Major Energy to NGE; this disclosure was required because PSE had a contractual right of first refusal to purchase Major Energy.  In response, on March 16, 2016, PSE informed Major Energy that it would not waive the right of first refusal without certain concessions from Major Energy, such as an extension of the credit sleeve agreement to 2019 and the addition of novation fees on termination prior to 2019.[117]  Sellers characterized PSE's attempt to secure additional concessions "extortion" and "nuts."[118]  PSE persisted in its demands, and ultimately both PSE and Major Energy threatened litigation against one another.[119]

Although formal litigation never materialized, the relationship between PSE and Major Energy remained strained. By September 2016, Major Energy was required to give contractual notice to PSE about whether it would renew its credit and supply agreement, or let it expire by its terms in March 2017.  Alper approached Kroeker and asked for "some assurance from Spark that Major will obtain a better deal going forward under the Spark [credit] facility," if the Senior Management Team decided to replace PSE with Spark, to which Kroeker responded:

> [Y]ou have my assurance that Major Energy will not be disadvantaged if we replace PSE with Spark's energy supply function in 2017. The total cost (ie. Interest, credit, structuring, sleeve, etc.) will be equal to or lower than Major could obtain from

---

[117] DX-962 ("As I mentioned in our meeting this afternoon, one requirement for PSE waiving the ROFR language and providing our approval on the change of control clause in our contract . . . is to add novation language to our existing agreement.").

[118] DX-962 ("When you read the email below, it connotes that they will waive the ROFR provided that we agree to their extortion!!"); *see also* DX-959 ("What the blank is this?  Since when is PSE interested in buying us?  When we discussed this on the phone, you told me most definitely there is no way in the world PSE would buy us for this money.  What is Jikja doing out of nowhere?").

[119] DX-959, at SPRK-NGE0032142 ("PSE may at anytime exercise any and all rights and remedies it may have under the Major Agreements at law or in equity with respect to any breach of or deviation from any covenant, condition, or duty by Major Entities . . . ."); DX-966; DX-967; Tr. at 1165:19-1166:05, 1167:20-1168:01 (Chung Testimony); *see also* DX-965.

other 3rd parties, and the list of counterparty options is substantially the same as we currently do business with all of them.[120]

On September 27, 2016, Major Energy sent PSE notices of intent to allow the existing PSE agreement to expire by its terms six months later; it is undisputed that the Major Energy Senior Management team had prior notice of, and did not object to, those notices being sent.[121] Notwithstanding this renewal, over the months that followed, Kroeker encouraged Major Energy's Senior Management Team "to look at all options for energy supply in-house and external and see how can you can get the best quality supply at the lowest price possible."[122] On January 4, 2017, Kroeker again made clear by email that Major Energy could select its own credit sleeve provider as of April 1, 2017.[123]

In fact, in January 2017, Major Energy engaged in discussions with PSE about a possible extension.[124]  PSE provided Major Energy with a term sheet that required, among other things, a fee of $1.00 per megawatt-hour and $0.125 per dekatherm, *i.e.*, effectively offering to match the pricing under the expiring agreement, and imposed certain additional requirements, including novation fees upon expiration of a new term, and limitations on risk (exposure).[125]  Major Energy, on its own and without any "interference" by SEI or Spark Holdco, rejected that proposal, and

---

[120] PX-470.

[121] DX-414.

[122] DX-904 (transcript of January 3 call) at 14-16.

[123] DX-449.

[124] DX-457; DX-458; Tr. at 1186:18-1187:07 (Chung Testimony).

[125] DX-457.

countered with a proposal of $0.75 per megawatt-hour, among other changes.[126]  By January 31,

2017, PSE countered Major Energy's last counter, and presented Major Energy with a month-to-

month term sheet that contemplated charges of $2.50 per megawatt-hour and $0.15 per

dekatherm.[127]

Following receipt of PSE's proposal of sharply increased fees, on February 7, 2017,

Horowitz sent an email to Kroeker and others stating, in part, that: "After going back and forth

with PSE for the last week or so, I don't think we will get a term sheet as per our liking."[128]  The

next day, Plaintiff confirmed that "we are in agreement to give Spark Supply a try as Major's

supplier. . . . We would be pleased if a supply relationship with Spark would work out."[129]  In the

end, Spark agreed to charge Major Energy a fee of $0.80 per megawatt-hour and $0.125 per

dekatherm; those fees were not only significantly lower than PSE's final proposal, but they were

even more favorable than the best pricing ever offered by PSE.[130]  In fact, Spark's pricing was

$0.20/MWh less than PSE had been charging Major Energy and $1.70/MWh less than PSE's final

offer to Major Energy.  This difference in fees alone created savings for Major Energy of at least

$543,762.79 (based on PSE's previous pricing) and as much as $4,576,227.23 (based on PSE's

most recent pricing proposal).[131]  Sellers were able to procure such favorable pricing from Spark

---

[126] DX-458; Tr. at 1188:01-18 (Chung Testimony).

[127] DX-471; Tr. at 1078:07-1078:19 (Alper Testimony).

[128] DX-481.

[129] DX-483.

[130] DX-1008; Tr. at 1899:21-1900:07 (Leonard Testimony).

[131] DX-1008; Leonard Witness Stmt. (ECF 160) ¶ 41; Tr. at 1900:02-13 (Leonard Testimony).

only by misrepresenting that PSE's actual offers had been equally low.[132]  The evidence presented at trial confirms that PSE never made such an offer to Major Energy, and thus the representations were false. ***No witness for Plaintiff attempted to rebut this—not even Moeller***.[133]

The evidence makes crystal clear that (i) Spark Holdco consulted and collaborated with Major Energy's Senior Management Team in advance about its proposal to move the credit and supply relationship to Spark, (ii) Spark Holdco nevertheless made clear that Major Energy could pursue the best deal it could find, (iii) PSE's proposed pricing was worse than Spark's proposed pricing, and vastly worse than PSE's "last best offer" in late January 2017 after Major Energy's Senior Management Team unilaterally rejected PSE's prior offer, and (iv) Plaintiff himself ultimately agreed that Major Energy should move forward with Spark.  In short, there is no evidence whatsoever to support a conclusion that NGE, SEI or non-party Spark Holdco breached Section 2.7 based the ultimate non-renewal of the PSE relationship, much less that that non-renewal harmed Major Energy in any way.[134]  To the contrary, the undisputed record evidence establishes that Major Energy directly and financially benefited, substantially, from the replacement of PSE.  Plaintiff's PSE theory fails.

---

[132] Leonard Witness Stmt. (ECF No. 160) ¶ 26 ("[D]uring a related meeting in Houston, Moeller, Alper, and Horowitz told us that Spark should be willing to move forward at $0.80 per MWh because PSE was willing to price at that level.  That was false based on the two draft term sheets we have now seen from PSE to Major Energy . . . . We did not know we were being given false information at the time, so we agreed to $0.80 per MWH."); Tr. at 1904:6-1905:15 (Leonard Testimony).

[133] Tr. at 1240:14-17 (Moeller Testimony).

[134] Dudney Witness Stmt. (ECF No. 167) ¶ 159 ("Leathers makes no claims as to pricing differences between Spark and PSE (or any other supplier), ***nor does he claim that Major's costs increased as a result of working with Spark*** (as opposed to PSE or any other supplier)." (emphasis added)).

3.     The EMS Integration Project Was a Short-Lived, Joint Initiative that Was Halted Seven Weeks After It Started, and for Which Sellers Received an Outsized $250,000 Addback.

Sellers also contend that a short-lived project to integrate Major Energy's Energy Management System ("EMS") IT platform constituted a breach of Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement.  This theory essentially boils down to Sellers' contention that they were harmed to some unquantified degree when Spark moved forward with a project proposed and championed by Major Energy's own CEO, even though that project lasted only seven weeks from start to termination when Spark learned of complaints, and even though Spark Holdco gave Major Energy an addback of $250,000 to compensate it for any "distraction" caused by the fleeting initiative.  In other words, it is nonsense.

The record shows that, during negotiations for a possible sale of Major Energy, Sellers touted the EMS system as a key selling point and proposed an EMS integration project to increase the functionality of, and integrate, EMS for the benefit of Major Energy and the rest of the Spark family of companies.[135]  Shortly after NGE acquired Major Energy and with the encouragement of Alper[136] and Sellers, Major Energy and Spark undertook preliminary efforts to integrate Major Energy's EMS system.[137]  Alper and Kuznar jointly sponsored the EMS integration project, which began with a teambuilding workshop (paid for by Retailco, not Major Energy) in Houston in early

---

[135] DX-1042a at 2; Kuznar Witness Stmt. (ECF No. 161) at ¶¶ 11-19, 35-36; Tr. at 1793:19-23, 1815:22-1816:20 (Kuznar Testimony); DX-346 at SPRK-NGE0004765 (stating "There is significant functionality here that Spark can take advantage of"); Konikowski Witness Stmt. (ECF No. 157) at ¶ 19.

[136] In fact, on June 6, 2016, Mr. Alper sent Mr. Leonard an unsolicited draft proposal concerning strategy for the EMS system integration to Mr. Leonard.  DX-1042; *see also* Kuznar Witness Stmt. (ECF No. 161) ¶ 19 & n.7; *see also* DX-1025 ("Very ex[c]ited by the possibilities we will be creating.").

[137] Kuznar Witness Stmt. (ECF No. 161) ¶¶ 17, 23, 24; Alper Witness Stmt. (ECF No. 150) ¶ 105.

August 2016.[138]  Major Energy participated voluntarily in the EMS project, and several Major

Energy executives conveyed their support and appreciation for the initiative to Kuznar.[139]  The

record is clear that, prior to late August 2016, no one at Major Energy expressed to Kuznar or

Kroeker that Sellers or Major Energy viewed the project as a distraction to achieving the earnout

targets or expected Adjusted EBITDA addbacks related to the EMS project.[140]

In late August or early September 2016, Alper expressed to Kroeker for the first time that

the EMS project was a purported distraction to Major Energy's business.[141]  Immediately upon

learning of Alper's complaint on September 13, 2016, Kuznar terminated the project:

> It has come to our attention that some of the employees of Major are spending time
> on the EMS conversion project that may be interfering with their day to day
> responsibilities at the Major Companies. ***Spark management has no intention of
> diverting Major's employees onto this project at the expense of Major's
> operations.*** We want to reiterate that the achievement of Major's business
> objectives should be the priority of all Major personnel. ***To avoid confusion, we
> are asking Major employees not to engage in any work on the Spark legacy
> conversion project, including any work in progress. . . .***
>
> Retailco and Spark personnel, please direct questions to either Mike Kuznar or
> Nathan Kroeker. Major personnel, please direct any questions to Dan Alper.[142]

Accordingly, the EMS project lasted just seven weeks from kickoff to termination.[143] In obvious

continuing good faith, and to compensate for any fleeting distraction, Spark Holdco gave Major

---

[138] DX-1002; Kuznar Witness Stmt. (ECF No. 161) at ¶¶ 23, 29; Tr. at 1793:19-23, 1795:14-22, 1819:8-18 (Kuznar Testimony).

[139] *See, e.g.*, DX-1022, DX-1023, DX-1024, and DX-1025; Tr. at 1820:19-1821:10 (Kuznar Testimony).

[140] Kuznar Witness Stmt. (ECF No. 161) at ¶ 34-43; Tr. at 1820:19-1821:10 (Kuznar Testimony).

[141] Kroeker Witness Stmt. (ECF No. 166) ¶¶ 29-35, 41.

[142] DX-403 (emphases added); Kuznar Witness Stmt. (ECF No. 161) at ¶¶ 32-33; Tr. at 1824:2-16 (Kuznar Testimony).

[143] Kuznar Witness Stmt. (ECF No. 161) at ¶ 33; Tr. at 1807:6-25 (Kuznar Testimony).

Energy a $250,000 addback to the Adjusted EBITDA calculation for earnout purposes for Target Year 2016 to cover consultant fees, travel costs and any other direct costs, as well as the purported "distraction" value, which Alper gladly accepted.[144]  Indeed, the evidence reflects that this addback was greater than any arguable costs to Major Energy.[145]

The record belies Sellers' attempt to recast the short-lived EMS integration as a breach of Section 2.7 that somehow caused Major Energy harm.  There is no evidence that NGE, SEI or non-party Spark Holdco acted in anything other than good faith with respect to the Major Energy-proposed initiative, including by immediately shutting the project down when Major Energy / Sellers first raised concerns.  And there is not a shred of evidence to suggest that Major Energy's costs relating to the EMS project approached, much less exceeded, the $250,000 addback provided. In other words, any costs associated with Major Energy's involvement with the aborted EMS project were more than offset by the addback.[146]  This theory of Section 2.7 breach, like the others, falls flat.

4.   Defendants Did Not Interfere With or Harm Major Energy's Commercial Broker Relationships, and Those Relationships Actually Grew During the Earnout Period.

Sellers also contend that NGE and SEI breached Section 2.7 of the Earnout Agreement and the Executive Earnout Agreement by interfering with Major Energy's commercial broker relationships.  Although neither Sellers nor Leathers quantified their claimed damages from such

---

[144] DX-509, at SPRK-NGE0025621 ($250,000 addback line item); Kroeker Witness Stmt. (ECF No. 166) ¶ 148; Kuznar Witness Stmt. (ECF No. 161) at ¶ 34; Tr. at 432:2-433:7 (Kroeker Testimony), 1824:20-1825:16 (Kuznar Testimony).

[145] Tr. at 1824:20-1825:14 (Kuznar Testimony).

[146] Dudney Witness Stmt. (ECF No. 167) ¶ 135.

"interference" prior to trial, Leathers' written direct testimony submitted at trial concluded that

this so-called alleged broker interference caused $12.6 million in damages:

> Q. First time we see a number from you ever with respect to commercial broker alleged damages is on December 13th, 2019 in your witness statement, right?
>
> A. That's correct.
>
> Q. And you did not identify a single commercial broker in your expert report or your witness statement that was allegedly interfered with by either defendants, right?
>
> A. I don't recall referencing the name of a specific commercial broker, that's correct. . . .[147]
>
> Q. Well, you were present for Mr. Benisti's testimony, were you not?
>
> A. That's correct.
>
> Q. And you were present when Mr. Benisti was asked the direct question could he identify a single broker that stopped doing business with Major Energy because of Spark or NGE, you recall that?
>
> A. Yes, I do recall that.
>
> Q. And do you recall that Mr. Benisti was not able to identify a single broker, Mr. Leathers?
>
> A. That's correct. I remember his testimony.
>
> Q. And you're also aware that when Mr. Moeller was asked the same question, his testimony was he didn't recall losing any commercial brokers during the earnout period; correct?
>
> A. That's correct.
>
> Q. Yet for the first time in your witness statement, you are advancing that $12.6 million should be paid to the sellers based upon alleged broker interference; is that right?
>
> A. Yes. . . .[148]

---

[147] Tr. at 1648:16-24 (Leathers Testimony).

[148] Tr. at 1649:15-1650:8 (Leathers Testimony).

To put it mildly, the record is utterly devoid of evidence that could support Sellers' breach-via-unspecified-commercial-broker-interference.  Indeed, at trial, none of Sellers' witnesses could conclusively identify (i) a single commercial broker who stopped doing business with Major Energy, or (ii) any brokered deals lost during the earnout period as a result of NGE, SEI or the dropdown.[149]  That failure alone is fatal.  Further, Leathers himself admitted that he was "unable to analyze the relationship between which commercial brokers may have nor have not been impacted by the Dropdown and the resulting lack of growth in commercial customer accounts."[150]  He also admitted at trial he "cannot tell you that 1,000 customer accounts were lost from XYZ broker."[151]

To be clear, the evidence shows that SEI and Spark Holdco did not take over the relationships between Major Energy and its brokers, and Major Energy was able to preserve those relationships during the earnout period.[152]  In fact, the record demonstrates that Major Energy had more commercial brokers at the end of the earnout period than at the beginning;[153] Major Energy's commercial customer count was 11,387 as of the beginning of January 2016, and by the end of May 2018, it had grown to 13,477.[154]  In short, there is no credible evidence in the record to suggest that Spark Holdco even affected Major Energy's commercial broker relationships during the

---

[149] Tr. at 907:2-22 (Benisti Testimony).

[150] Dudney Witness Stmt. (ECF No. 167) ¶ 149 (quoting Leathers Witness Stmt. (ECF No. 155) p. 105).

[151] Tr. at 1651:3-7 (Leathers Testimony).

[152] Dudney Witness Stmt. (ECF No. 167) ¶ 150.

[153] PX-758; Tr. at 1902:22-1903:15 (Leonard Testimony).

[154] DX-914a; Kroeker Witness Stmt. (ECF No. 166) ¶ 276 (confirming the data in DX-914a comes from EMS).

earnout period, much less that it impaired any such relationships through conduct that fell short of good faith in breach of Section 2.7.

        5.      <u>Defendants Did Not Interfere With or Harm Major Energy's Mass Marketing Vendor Relationships During the Earnout Period, and Any Decrease in Those Relationships Resulted From Strategic Choices Made by Major Energy's Management Team.</u>

Like Sellers' broker interference theory, Sellers' contention that NGE and Spark Holdco breached Section 2.7 by interfering with Major Energy's "mass marketing" vendor relationships – and particularly its relationships with PTM, Platinum, 5Linx, and DSS – is completely contradicted by the record.  In fact, as to each of these vendor relationships, Plaintiff appears to simply assume that, because these vendors did not achieve Sellers' pre-closing projections, those failures must be attributable to some unspecified conduct by Defendants.[155]  At best, the record evidence does not support Sellers' theory and, at worst, it directly undermines it.

*PTM.*  Sellers' lost-vendor theory was based principally on the now-withdrawn testimony of Sunil Gadtuala of PTM.  After six days of trial, Plaintiff made the strategic decision not to call Gadtuala as a witness, thereby rendering his written statement stricken.  Even without the testimony of Gadtuala, the admitted evidence concerning PTM guts Sellers' lost-vendor theory: during the earnout period, PTM brought in far more accounts, and was paid millions of dollars more by Major Energy, in 2016 and 2017, than in 2015.[156]  In fact, Major Energy paid PTM at

---

[155] Dudney Witness Stmt. (ECF No. 167) ¶ 141 (Leathers had "not established a nexus between the Dropdown and Spark Energy, Inc.'s subsequent actions and the damages he calculates allegedly due to the loss of vendors"); *id.* ("Leathers fails to reliably explain why vendors would not have wanted to work with Spark and why they were troubled by Spark allegedly taking on more of the marketing management function, particularly in light of the fact that the business had plans to spend on more on customer acquisition than it did historically.").

[156] DX-182a; Tr. at 1249:21-1250:20 (Moeller Testimony).

least $9 million during the earnout period at the direction of Sellers' executive team.[157]  PTM was Major Energy's largest mass marketer before the earnout period, and remained Major Energy's largest mass marketer throughout the earnout period.[158]  There is nothing to see here.

     **Platinum.**  There is likewise not a shred of evidence in the record suggesting that Platinum stopped doing business with Major Energy because of the dropdown or any conduct by Defendants; instead, the record demonstrates that the Platinum relationship was a new one that simply did not pan out.[159]  While Platinum generated a small number of accounts for Major Energy early in the earnout period,[160] it was "***not a large revenue-generating vendor***."[161]  According to Leathers, Platinum "***allowed the relationship to languish*** and never achieved its targets for Major Energy post-Dropdown."[162]  Leathers conceded he could not identify any causal connection between the Defendants' conduct and Platinum's performance:

> Q. If we look in the record, Mr. Leathers, can you identify a single document in the record evidence in this case that shows an e-mail from Platinum that says we have stopped doing business with Major Energy because of the dropdown to Spark?
>
> A. No.[163]

---

[157] DX-944a (Row 218); Tr. at 1667:18-25 (Leathers Testimony).

[158] DX-944a (Row 218); DX-182a; Tr. at 1841:16-18 (McGuinness Testimony).

[159] Tr. at 1667:2-15 (Leathers Testimony).

[160] *See* PX-128, at PX-0128.0001.

[161] Wolbrom Witness Stmt. (ECF No. 153) ¶ 41 (emphasis added).

[162] Leathers Witness Stmt. (ECF No. 155) ¶ 315 (emphasis added); Tr. at 1665:12-1666:3 (Leathers Testimony).

[163] Tr. at 1666:4-8 (Leathers Testimony).

*5Linx.*   The record also is devoid of any credible evidence that NGE or SEI breached Section 2.7 of the Earnout Agreement by interfering with Major Energy's relationship with 5Linx. In fact, as Wiederman admitted at trial, 5Linx's failure to attract customers for Major Energy was completely unrelated to Defendants: "5Linx went out of business and the three partners ended up in jail."[164]  5Linx also ended up in litigation with Major Energy.[165]  Given that 5Linx exited the business and Major Energy ultimately sued 5Linx in 2016, Sellers' contention that Defendants somehow impaired the 5Linx relationship is absurd.

*DSS*.   There is similarly no evidence suggesting that Defendants negatively affected Major Energy's relationship with door-to-door vendor DSS; DSS was Major Energy's largest mass marketer in 2014 and its second-largest mass marketing in 2015 (behind PTM).[166]  Alper himself characterized Major Energy's relationship with DSS as "good" and actually expressed concern that Major Energy was too reliant on DSS."[167]

In any event, to the extent Major Energy's relationships with its mass marketing vendors were impaired during the earnout period, which Defendants deny, the evidence leads to the inevitable conclusion that they were impaired by the decision of Major Energy executive team to slash customer account spending to artificially boost Adjusted EBITDA,[168] by diversion efforts of Major Energy's Managers, or otherwise, and most certainly not due to any actions of Defendants.

---

[164] Tr. at 533:14-15 (Wiederman Testimony).

[165] DX-609, ¶ 5(c), at SPRK-NGE0025066.

[166] DX-213, at slides 27 and 29.

[167] DX-1047.

[168] Dudney Witness Stmt. (ECF No. 167) ¶¶ 141-147.

6.      Defendants Did Not Breach Section 2.7 in Connection with the Voluntary
        Departures of Wolbrom, Schorr, or Esther Moeller.

Sellers also contend that NGE and SEI breached Section 2.7 of the Earnout Agreement based on the departures of (i) Eliott Wolbrom, (ii) Nechemia Schorr, and (iii) Esther Moeller, none of whom were designated by Sellers as part of the Senior Management Team or as Key Employees within the meaning of the MIPA, Earnout Agreement, or Executive Earnout Agreement.  Once again, Sellers' Section 2.7 theory on this issue is wholly unsupported; none of NGE, SEI, or Spark Holdco interfered with these employees or prevented Major Energy's executive team from attempting to retain them (Major Energy made no such attempt).

Wolbrom's own explanation of his October 2016 resignation from his position as Chief Marketing Officer at Major Energy speaks volumes.[169]  In WhatsApp messages exchanged with Sobel on October 31, 2016, *i.e.*, the very month he resigned, Wolbrom admitted that "50% why I left was DA [Dan Alper]."[170]  Nearly a year later, on October 24, 2017, Wolbrom reiterated to Sobel that his distrust of Alper, among other things, prompted his departure:

> I left bec I didn't trust Alper or think he had MES's [Major Energy's] best interests in Mind and because he was divisive, homewrecker, was dramatically hurt by MW [Mark Wiederman] that my *only* thank you for the $80M sale was in the form of a pathetic $60K gross signing bonus (which locked me out of leaving to competitor) from Spark, did not like the working environment of a public company and the BS reporting AND didn't have faith the industry would last.[171]

In short, he left because he was unhappy at Major Energy for a host of reasons, almost completely unrelated to NGE or Spark Holdco.  In any event, Sellers' claim that Wolbrom's departure was

---

[169] Tr. at 732:11-13 (Wolbrom Testimony).

[170] DX-813, at SPRK-NGE0057562; Tr. at 770:7-10 (Wolbrom Testimony).

[171] DX-813, at SPRK-NGE0057568; Tr. at 781:7-18 (Wolbrom Testimony).

"enormously detrimental to the company" is belied by the complete lack of evidence of efforts by Major Energy to retain him or by any specific effort to quantify any alleged damages attributable to Wolbrom's departure, which is equally fatal.[172]

The evidence likewise shows that Schorr's November 2016 resignation was unrelated to NGE, SEI, or Spark Holdco; indeed, Major Energy executives observed in pre-litigation communications that Schorr "resigned every 2 weeks."[173]  In fact, on May 20, 2016, Levi Moeller, Schorr's direct supervisor, informed Horowitz that "Nechemia sent an email he is resigning (I forwarded to you) – based on him 'needing' money and all we do for him not sure what to say."[174] The record reveals that Major Energy did nothing to accommodate Schorr's request for more money or otherwise retain him.  Six months later, in November 2016, Schorr left "for good."[175] Major Energy's Senior Management Team likewise made no efforts to stop Esther Moeller, Levi Moeller's sister-in-law and a pricing analyst who had no pricing experience when she joined Major Energy, from resigning in September 2016.[176]

Critically, as with Wolbrom, Leathers did not attempt to quantify any damages attributable to the voluntary resignations of Schorr or Esther Moeller.[177]  In other words, even if the evidence

---

[172] *Compare* Dudney Witness Stmt. (ECF No. 167) ¶ 138 (p. 65) ("I note that Mr. Alper does not recall that he, Mr. Wiederman, or Mr. Horowitz did anything to try an retain Mr. Wolbrom."), *with* Wiederman Witness Stmt. (ECF No. 149) ¶ 157.

[173] DX-813, at SPRK-NGE0057563 ("Nechemia quit every 2 weeks.  Finally, couple of weeks ago, it was for good.  Silly of him if you ask me, as he doesn't have a/t lined up.  But he was never a rational one.").

[174] DX-650, at MESELLERS_0008943; Tr. at 1257:10-1258:3 (Moeller Testimony).

[175] Tr. at 1257:10-1258:3 (Moeller Testimony).

[176] Tr. at 1260:16-1261:21 (Moeller Testimony).

[177] Dudney Witness Stmt. (ECF No. 167) ¶ 139 ("[W]ith regard to the 'loss of key employees,' Mr. Leathers makes certain assumptions and makes various unsupported statements, but he ultimately does not establish a causal link between a number of Major employees voluntarily resigning their positions and any specific damages to Major.").

could prove that Wolbrom, Schorr, or Moeller left due to conduct by NGE, SEI, or Spark Holdco that fell short of the good faith obligations imposed by Section 2.7, and it plainly does not, there is no competent evidence of harm caused by those departures or damages attributable to same. That also dooms Plaintiff's "departure of key personnel" theory.

### E. Plaintiff Cannot Prevail on His Rescissory Damages Theory Where Plaintiff Admitted the Dropdown Itself Caused No Harm and Where His Expert's Rescissory Damages Calculation Is Unsupportable.

Whether Plaintiff's request for rescissory damages is intended an alternative to his other damages theories or in addition to them, it is inescapably flawed and fails for several reasons.

### 1. Rescissory Damages Are Improper Where the Complained-Of Conduct Was Expressly Permitted.

First, and most fundamentally, Plaintiff cannot recover rescissory damages purportedly resulting from the dropdown when (i) he admits that he had no contractual right to contest the assignment of the Earnout Agreement and the Executive Earnout Agreement by NGE to Spark Holdco, and (ii) he conceded at trial that the "real question" was whether Spark Holdco, as proper assignee, complied with Section 2.7 during the earnout period.[178]   In other words, his claim for damages must be considered through the lens of Section 2.7 of the Earnout Agreement, not Section 11.7 of the MIPA, and Plaintiff does not seek rescissory damages in connection with his Section 2.7 claim.

---

[178] Tr. at 1426:10-1427:5.

2.      Rescissory Damages Are Improper Where, as Here, an Adequate Remedy Exists at Law.

In addition, rescissory damages are "not often used in New York."  *MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 34 Misc. 3d 895 (N.Y. Sup. Ct. 2012).  Indeed, under New York law, rescission is an "extraordinary remedy" that is only appropriate "when a breach may be said to go to the root of the agreement between the parties."  *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (citing *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980)); *see also Raymond Weil, S.A. v. Theron*, 585 F. Supp. 473, 487 (S.D.N.Y. 2008) (absent fraud or mistake, rescission may be granted only when the breach goes to the root of the contract and defeats its very purpose); *MBIA Ins. Corp.*, 105 A.D.3d 412, 413 (rescission is a "very rarely used equitable tool").  "It may be invoked 'only when there is lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored.'"  *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 340 (S.D.N.Y 2012) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (N.Y. Ct. App. 1972)); *cf. Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 228 F. Supp. 2d 455, 462 n.2 (S.D.N.Y. 2002) ("The Court will not rescind the Asset Purchase Agreement and enforce its terms at the same time. Shred–It must elect between alternative remedies, so as to prevent double recovery for the same harm.").  In other words, rescission must return the parties to the same position they would have occupied had there been no contract. *Raymond Weil, S.A.*, 585 F. Supp. at 487 (citing *In re Ivan F. Boesky Sec. Litig.*, 825 F. Supp. 623, 637 (S.D.N.Y. 1993) (rejecting demand for rescission where "there are no obvious means to undo the entire restructure transaction")).

Moreover, "[i]n order to justify equitable rescission (or, in this case, its equivalent), a party must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose

thereof." *Syncora Guarantee*, 874 F. Supp. 2d at 34 (internal citations omitted).  Plaintiff has

neither alleged nor marshalled evidence to support any such argument.  Nor could he: any supposed

breach of the anti-assignment provision in Section 11.7 of the MIPA most certainly did not

substantially defeat the purpose of the MIPA, much less the Earnout Agreement on which this

litigation is substantially based, and which expressly permitted the dropdown from NGE to Spark

Holdco without Sellers' consent.[179]  Indeed, the Court dismissed Plaintiff's fraudulent inducement

claim in its September 24, 2018 Order.[180]

Plaintiff contends that that Sellers "had the right and should have had the opportunity to

earn their full $35 million Contingent Payments with NGE as the owner and operator of Major

Energy, not the public entity Spark."[181]  Put differently, the opportunity he claims he was denied

relates to Sellers' ability to achieve the maximum Contingent Payments under the Earnout

Agreement.  Should the Court find any legal liability on the part of Defendants for the manner in

which Major Energy was operated during the earnout period or the calculation of Contingent

Payments, and Defendants submit that it should not, Plaintiff has pleaded that Sellers have an

adequate remedy at law, namely compensatory damages.  *See U.S. Bank Nat'l Ass'n v. DLJ Mortg.*

*Cap., Inc.*, No. 650369/2013, 2013 WL 6997183 (N.Y. Sup. Ct. Jan. 15, 2014) ("Plaintiff's claim

for rescissory damages also fails. . . .  While Plaintiff maintains that rescission would be

impracticable, Plaintiff's claim for rescissory damages lacks merit, since Plaintiff has an

alternative remedy-repurchase.").  Thus, Plaintiff's claim for rescissory damages fails because

---

[179] *See* DX-1, § 3.1; DX-2, at 3 & § 1.2(a)(ii).

[180] ECF No. 42.

[181] ECF No. 188, at 21.  Of course, Spark Holdco is not a public entity, and its publicly owned parent company, SEI, did not acquire Major Energy.

there is no legal or evidentiary basis on which Plaintiff can prevail on a ***separate*** rescissory damages theory, whether it is an alternative to or in addition to compensatory damages.

> 3.    <u>Leathers' Model to Calculate Rescissory Damages Is Utterly Unreliable and Must Be Rejected.</u>

Plaintiff's demand for rescissory damages fails for the additional reason that Leathers' rescissory damages calculations are wholly speculative and unreliable.  As discussed in the unrebutted testimony of Defendants' damages rebuttal expert, Louis Dudney, Leathers used a Monte Carlo simulation to conclude that Sellers were entitled to rescissory damages of $9.8 million as of August 22, 2016, the day before the dropdown.  The $9.8 million figure purportedly represented the net present value of the Contingent Payments as of the date of the dropdown, less the $9 million that Spark Holdco already paid to Sellers in Contingent Payments.

"Monte Carlo simulation involves repeated random sampling of various potential scenarios to compute an average result [and is] a technique which obtains a probabilistic approximation to the solution of a problem by using statistical sampling techniques."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 504 (S.D.N.Y. 2018).  "The advantage of Monte Carlo is its ability to factor in a range of values for various inputs; ***this is also its greatest disadvantage in the sense that assumptions need to be fair because the output is only as good as the inputs***."  Kushal Agarwal, *The Monte Carlo Simulation: Understanding the Basics* (Investopedia.com 2019), *available at* https://www.investopedia.com/articles/investing/112514/monte-carlo-simulation-basics.asp (last visited Apr. 14, 2020) (emphasis added).

Leathers' use of Monte Carlo simulations is not problematic in and of itself; but his unreasonable assumptions regarding his inputs render the simulation indefensible.  As the old adage goes, "garbage in, garbage out," which is what happened in Leathers' rescissory damages analysis.  "While Monte Carlo simulation is a generally accepted technique, general acceptance

does not end the reliability inquiry. ***Problems in implementing the technique may nonetheless render it unreliable as applied***, . . .” *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 505–06 (concluding the expert’s “assumption that each bank’s directionality must be independent of all other banks’ directionalities is not only unsupported, but demonstrably false”) (emphasis added); *In re Application of Erie Blvd. Hydropower L.P. v. Town of Ephratah Bd. of Assessors*, No. 17–1–2000–0331, 2003 WL 21172636, at *4 (N.Y. Sup. Ct. Apr. 11, 2003) (“[A]ll you are doing in a Monte Carlo simulation is coming back to your own assumptions, so whatever went in comes out. Stated differently, ***if you make bad assumptions, you obtain bad outputs***.” (emphasis added)).

As Dudney points out, “Leathers claims to have used the estimated Year-End Customer Accounts and Adjusted EBITDA from the ‘Final Projection Model,’”[182] meaning his inputs assumed that Sellers would hit 100% of the Year-End Customer Accounts and Adjusted EBITDA targets in each Target Year.  But Leathers did not explain why such assumptions were reasonable.  Indeed, they were not.  The record makes clear that, by August 22, 2016, Major Energy was already substantially off track, and its executive team knew it could not meet the projections on which the Contingent Payments were based.  For example, by July 2016, Sobel admitted that both Customer Accounts and Adjusted EBITDA were below projections but “[o]ne of the major things saving us in terms of A-Ebitda YTD has been our CAC spend of $3.5M vs $6M projected. That is hiding the miss in Ebitda for now.”[183]  Despite objective and undisputed evidence to the contrary, Leathers unreasonably assumes inputs that are 100% of targets when running his Monte Carlo simulation.

---

[182] Dudney Witness Stmt. (ECF No. 167) ¶ 170.

[183] DX-353.

Leathers' Monte Carlo simulation also did not factor in events that could impact whether the targets were attainable, such as Sellers' decisions to underspend on CAC in each of the three Target Years, and to unilaterally change Major Energy's business model upon which the projections were based in the first place (*e.g.*, residential vs. commercial, variable rate vs. fixed rate, etc.), nor do the simulations factor in regulatory impacts on Major Energy's business independent of any conduct by Defendants.[184]  Thus, Leathers' use of the Monte Carlo simulation to estimate so-called rescissory damages was unreliable,[185] and his assumption that the targets would be hit was counter-factual, unreasonable, and speculative.

## IV.   PLAINTIFF'S CLAIM FOR BREACH OF SECTION 11.7 OF THE MIPA FAILS.

One of Sellers' breach of contract theories against NGE in Count II is premised on NGE's purported breach of Section 11.7 of the MIPA[186] in connection with the dropdown transaction.[187] In particular, Sellers contend that the dropdown transaction, whereby Spark Holdco acquired from NGE all of the Membership Interests in Major Energy, breached Section 11.7's so-called "non-

---

[184] *See* Dudney Witness Stmt. (ECF No. 167) ¶ 172.

[185] Dudney further criticizes Leathers' use of the simulation essentially for failing to show his work in the form of histograms, value distributions, and other detail that would have allowed Dudney to test Leathers' actual calculations.  Dudney Witness Stmt. (ECF No. 167) ¶ 173.

[186] Although the Amended Complaint alleges that NGE breached Sections 2.2(c) and 7.1 of the MIPA, Sellers have not advanced their arguments under these other provisions of the MIPA since the pleading stage.  ECF No. 22, ¶ 131.  This is not surprising; Section 2.2(c) of the MIPA simply refers to and incorporates the Earnout Agreement's terms, and Section 7.1 addresses, among other things, the employment agreements NGE would (or would cause Major Energy to) execute with the Senior Management team (Messrs. Horowitz, Wiederman, and Alper) and Key Employees (Messrs. Moeller and Sobel) following the acquisition.  DX-2, § 7.1; *see also* DX-5, at 4 (defining "Key Employee" and "Senior Management Team").

[187] Horowitz Witness Stmt. (ECF No. 148) at p. 27 & ¶ 153; *see also* ECF No. 52, at 16.

assignment" provision because Sellers withheld their written consent to the sale of the MIPA interests.  This argument fails as a matter of law, logic, and evidence.

As set forth in Sections III.C and III.E above, Sellers cannot establish, and have not established, damages purportedly caused by the alleged breach of Section 11.7, and that alone is fatal.  But Plaintiff's dropdown-as-breach theory fails for another, more fundamental reason:  the evidence demonstrates that the transaction at the heart of this dispute – the dropdown – does not violate Section 11.7 of the MIPA (*i.e.*, no breach),[188] and that even if some technical breach had occurred, which Defendants dispute, ratification, waiver, and estoppel plainly foreclose judgment in Sellers' favor on their breach of contract claim against NGE.[189]

---

[188] Indeed, on May 1, 2016, just two weeks after closing on Major Energy's sale to NGE, Sellers' own deal counsel, Lawrence Studnicky, confirmed that NGE was never prohibited from moving Major Energy around within the Spark family of companies, noting that he therefore did not understand why Horowitz should have to decide to give his consent for the dropdown transaction at all.  DX-298.  The argument that the dropdown transaction was somehow a seminal breach that created liability for NGE is a *post hoc* litigation invention belied by the deal documents and the admissions of Sellers and their deal counsel.

[189] *See, e.g.*, ECF No. 66, at 23-28.  There also is extensive evidence in the record that undermines any possible finding that Sellers themselves performed under the MIPA and its incorporated agreements, including by refusing to act in good faith and in the best interests of Major Energy during the earnout period and by breaching their obligations to disclose to NGE certain indemnifiable litigation or regulatory matters, among other things.  *See* DX-2, at §§ 9.4, 4.7 (providing that representations and warranties in Section 4.7 of the MIPA, which relates to "Litigation and Regulatory Matters," are Fundamental Representations that survive closing "forever").

**A.     The Dropdown Transaction Cannot Give Rise to a Breach of Section 11.7 of the MIPA, Because Both the Operation of Major Energy During the Earnout Period and the Calculation of Contingent Payments Were Freely Assignable to an NGE Affiliate.**

There is no evidentiary or logical support for the claim that the dropdown constituted a breach of Section 11.7 of the MIPA, much less a breach that somehow caused Sellers harm.[190] The record conclusively establishes that the parties' dispute – the manner in which Major Energy was operated during the earnout period and the calculation of Contingent Payments – is governed by the Earnout Agreement and the Executive Earnout Agreement, not the MIPA.

Section 11.7 of the MIPA does not restrict in any way the sale of title to the Membership Interests to a successor.[191]  While the MIPA contains a provision that arguably limits NGE's rights to assign portions that agreement to an Affiliate without written consent, the Earnout Agreement and Executive Earnout Agreement – the agreements that specifically govern this dispute – expressly rejected such a limitation.  *See Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" (quoting Restatement (Second) of Contracts § 203(c) (1981))); *id.* (concluding that provision's "broad language is limited by the specific operative language" of another related provision); *see also Jamie Sec. Co. v. The Limited, Inc.*, 880 F.2d 1572, 1576-77 (2d Cir. 1989) ("Where there is an inconsistency between general

---

[190] In a July 2019 Arbitration between the Parties involving the MIPA and the Escrow Agreements, the Arbitrator rejected this argument and found that "the assignment of the Escrow Agreements without the Respondents' written consent is not a material breach of the Escrow Agreements."  DX-932 at 5.

[191] DX-2, § 11.7.  Section 11.7 expressly recognizes and distinguishes between the parties' "successors **and** permitted assigns," *i.e.*, successors in interest to title of Membership Interests on one hand and permitted assignees of rights and obligations on the other hand.  *Id.* (emphasis added).

provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.").

In fact, the Earnout Agreement – which is "incorporated and made a part hereof as if set forth in full herein and [is] considered to be an integral part of [the MIPA]"[192] – was freely assignable to Spark Holdco, an NGE affiliate,[193] and ***expressly permitted*** the assignee (here, Spark Holdco) to operate Major Energy: "Following the Closing of the Transaction contemplated in the Purchase Agreement, [NGE or Affiliate] ***shall have the discretion to operate the Business of the Companies as [NGE or Affiliate] deems appropriate***," subject to certain good faith obligations during the earnout period.[194]  Spark Holdco, as the uncontestably legitimate assignee of the Earnout Agreement, was thus given the clear right to "take control" of and operate Major Energy as it "deem[ed] appropriate."  The Executive Earnout Agreement, which is part of the same transaction and must therefore be read together with the MIPA, has similar assignment, operation, and control provisions.[195]  *See TVT Records v. Isl. Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) ("Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together").

---

[192] DX-2, § 1.2(a)(ii).

[193] "This Agreement shall not be assignable by either Party without the prior written consent of the other Parties, ***except as to Affiliates*** or in the event of a Buyer Change of Control."  DX-1, § 3.1.  The Earnout Agreement defines an Affiliate to include "any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person." *Id.* § 1.1. Spark is an Affiliate of NGE.  May 2, 2019 Studnicky Dep. Tr. at 11:4-7; Lane Witness Stmt. (ECF No. 165) ¶ 22; Kroeker Witness Stmt. (ECF No. 166) ¶ 17 (confirming that Spark is an Affiliate of NGE under the Earnout Agreement); Mar. 5, 2019 Fried Dep. Tr. at 142:21-24, 178:16-179:5 ("Q.  So, you don't dispute that Major Energy knew they were affiliates before this lawsuit was filed, right?  A.  Yes. Okay. Yes.").

[194] DX-1, § 3.1

[195] DX-5, §§ 2.7 and 3.1.

Sellers' internal discussions with their deal counsel just two weeks after the NGE acquisition closed made clear that they viewed Sellers' consent to the anticipated dropdown as unnecessary because the parties understood that the acquired company, Major Energy, was freely assignable within the Spark family of companies.  According to Studnicky, Sellers' deal counsel:

> NGE was never blocked from moving the Major companies around within the Spark/Keith Maxwell universe of companies, which is what's happening here.  As NGE was not so blocked, I do not see WHY Saul should have to consent at all.  I don't believe NGE needs his consent . . . If they think they need it or gain something from having it, then I'd think that would give you and Saul some leverage to extract something in return.[196]

Studnicky's recollection two weeks after the deal closed comports with the objective fact borne out by the transactional documents that Sellers ***never had any assurance that NGE, rather than one of its Affiliates, would operate Major Energy during the Earnout Period***.  Horowitz conceded the same thing at trial.[197]

In short, Sellers' dropdown-as-breach theory is premised on the occurrence of an event, *i.e.*, the dropdown, that the parties expressly contemplated and agreed to be permissible in transactional documents specifically incorporated into the MIPA.  As a matter of law and of logic, conduct that was expressly permitted by agreement of the parties cannot constitute a breach of contract that could give rise to a recovery.  *Cf. Kousnsky v. Amazon.com, Inc.*, No. CIV. 9176 (AKH), 2014 WL 11350674, at *1 (S.D.N.Y. May 14, 2014), *aff'd and remanded*, 631 F. App'x 22 (2d Cir. 2015) ("Here the contract expressly permits the acts undertaken by defendants which form the basis of plaintiff's copyright infringement claim. 'It is axiomatic that a party cannot seek damages for [a violation] of copyright law if the use was authorized by the copyright owner.'"

---

[196] DX-298; *see also* DX-297.

[197] Tr. at 1426:10-1427:5 (Horowitz Testimony).

(quoting *Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 306 (S.D.N.Y. 2001))).

The totality of evidence shows that the dropdown does not violate Section 11.7 of the MIPA (*i.e.*, no breach),[198] and that even if some technical breach had occurred, which Defendants dispute, Plaintiff waived his right to enforce it, and alternatively repeatedly ratified it such that the doctrine of estoppel plainly forecloses judgment in Sellers' favor on their contract claim against NGE.[199]

### B.   Even If Some Technical Breach of Section 11.7 Occurred, Plaintiff Waived, Ratified, or Is Otherwise Estopped from Raising It.

    1.   The Evidence Shows that Sellers Strategically Acknowledged, Accepted, Leveraged, and Benefitted from the Dropdown.

The evidentiary record demonstrates that Sellers knowingly and strategically took affirmative steps to acknowledge, demand benefits under, and accept benefits resulting from the dropdown. Sellers and Major Energy's Senior Executive Team:

- Accepted – and have retained to this day – financial benefits of more than $9.01 million in Contingent Payments from Spark Holdco in connection with the 2016 and 2017 Target Years;[200]

- Understood that Major Energy's Key Employees (Moeller and Sobel) and members of its Senior Management Team (Alper) accepted approximately $4.5 million in change-in-control "severance" payments based on the dropdown;[201]

---

[198] DX-298.

[199] *See, e.g.*, ECF No. 66, at 23-28.

[200] DX-523 (March 31, 2016 wires of Contingent Payment for Target Year 2016 totaling $7,403,147.97); PX-450 (Contingent Payment for Target Year 2017 totaling $1,607,091).

[201] DX-468 (payment of $2,030,000 in change-in-control severance benefits to Alper); DX-470 (payment of $1,203,050 in change-in-control severance benefits to Moeller); DX-469 (payment of more than $1.2 million in change-in-control severance benefits to Sobel).

- Knew that Major Energy would be dropped down to Spark **prior to** the closing of the sale to NGE;[202]

- Prepared and issued a May 4, 2016 Major Energy press release that announced the sale to NGE, trumpeted the dropdown and financial integration as a "win-win," and stated that dropdown preparations had been underway since April 15, 2016;[203]

- Expressed their "excitement" for the dropdown in writing;[204]

- Announced that Major Energy was "thrilled to join the Spark family" in another press release issued the day the dropdown closed;[205]

- Accepted benefits of $3,967,500 in administrative support services from Spark, at no cost to Major Energy, during the earnout period;[206]

- Sought and retained Spark as Major's energy supplier, at more favorable terms than what they would have received from PSE, resulting in significant savings to Major Energy;[207]

- Obtained thousands of new customers solely as a result of Spark's generosity;[208]

---

[202] DX-272 (April 8, 2016 e-mail from B. Hoover to Sobel, stating that "the tentative plan now is that **NG&E will transfer Major to Spark on July 1, 2016**, so as long as the audit opinion is dated before that time, it should be fine" (emphasis added); DX-872, at MESELLERS_0001340 (on March 15, 2016, Alper informs Sellers that he was going to dinner "with the Spark guys").

[203] DX-1021 ("We see the acquisition by Spark Energy and their financial integration as a win-win for our customers, employees, vendors and our marketing partners. While we will continue to run our business as usual, the financial integration with Spark brings us additional opportunities to bring enhanced value to the customer marketplace as part of a much larger platform.").

[204] DX-1043 ("we are excited by this accelerated integration").

[205] PX-457.

[206] Kroeker Witness Stmt. (ECF No. 166) ("[F]ollowing the dropdown, Spark's assumption of various administrative functions enabled Major Energy to reduce certain of its costs and focus its efforts on business generation.  The corresponding reduction in costs had the direct effect of boosting Major Energy's EBITDA, inasmuch as Major Energy's expenses for purposes of the earnout calculations did not reflect these costs."); *see also* DX-923; DX-923a.

[207] DX-483 ("[W]e are in agreement to give Spark Supply a try as Major's supplier. . . . We would be pleased if a supply relationship with Spark would work out.").

[208] DX-703 ("[D]ue to the NY resetting order . . . it's an opportune time to switch HIKO and some of the other Spark family of companies to Major."); *see also* Kroeker Witness Stmt. (ECF No. 166) ¶¶ 134-135 ("Spark also generously provided other opportunities to support Major Energy's business growth.  For

- Sought and accepted Spark's retention of Major Energy executives;[209]

- Sought and obtained Spark's support on their decision to terminate Mr. Alper's employment;[210]

- Confirmed in writing that "management's allegiance is 100% to Spark";[211]

- Confirmed in writing that Sellers' "interests are aligned" with Spark's;[212]

- Sent letters, demands, and litigation threats to Spark for more than one year without arguing the dropdown was a breach or void, never filed suit seeking to enjoin or stop the dropdown, and never filed suit in 2016 seeking to rescind or unwind the sale of Major Energy to NGE;[213] and

- Never asserted that their acceptance of millions of dollars in payments and in administrative support services to Major Energy, employment services, use of Spark as Major Energy's energy supplier, or any other accepted demand for action after the Fall of 2016 was subject to any reservation of rights to pursue breach remedies, including the unwarranted relief they now seek, based on conveyance of ownership to Spark Holdco.

Put differently, the evidence conclusively shows that Sellers were aware of the eventuality of the dropdown, did not view it as prohibited even in the weeks following the sale to NGE, welcomed and celebrated the dropdown, accepted and retained millions of dollars' worth of benefits as a result of the dropdown, and only challenged it for the first time months after this

---

example, in March 2018, Spark acquired the membership interests of HIKO Energy, LLC ("HIKO"), an ESCO with approximately 29,000 RCEs.").

[209] DX-460; DX-469; DX-474; DX-468.

[210] DX-559.

[211] DX-586, at SPRK-NGE0040349.

[212] DX-1055, at MESELLERS_0000032.

[213] *E.g.*, DX-390, at MESELLERS_0000008 n.2 ("Presumptively, Spark Energy, Inc. ('Spark Energy') through an assignment of rights has assumed the obligations of National Gas under the Earnout Agreement."); DX-400 (August-September 2016 email chain); DX-444; DX-1031 ("Cutting back on mass marketing would have the effect of increasing Major's EBITDA significantly . . . ."); DX-451; DX-460; DX-483.

litigation began.  As a result, Sellers waived any right to enforce Section 11.7, ratified the dropdown, and are estopped from seeking damages relating to the dropdown in this case.

>2.    <u>Sellers Waived the Right to Enforce Section 11.7.</u>

Waiver is the voluntary relinquishment of a known right and "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundam. Portf. Adv'rs, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 850 N.E.2d 653, 658 (2006) (holding that issues of material fact existed as to whether plaintiff waived and was estopped from asserting breach of contract).  The concept plainly applies here. *See, e.g.*, *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 585–86 (2d Cir. 2006) ("breach of contract may be waived by the non-breaching party"); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (citing New York cases) ("where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."), *aff'd*, 962 F.2d 1 (2d Cir. 1992); *see N.Y. Racing Ass'n v. Meganews, Inc.*, 2000 WL 307378, at * 7 (E.D.N.Y. 2000) (plaintiff waived its breach of contract claim "by continuing performance under the contract and accepting the benefits of the contract despite allegedly unauthorized deductions").

Sellers relinquished any right they could possibly have to seek to invalidate the dropdown or seek recovery from NGE for it.  They relied on the dropdown, used it to extract millions of dollars in benefits and accommodations from the Spark family of companies (to say nothing of the earnout payments made by Spark Holdco), and induced NGE, SEI, and Spark Holdco to take numerous actions for Sellers' gain under it.  Indeed, after their outside litigation counsel sent a demand letter, Horowitz himself acknowledged that Spark Holdco had "cured" any alleged breach

and that they needed to "play this out a little" before they could further exploit Spark Holdco's ownership sufficiently to extract a buyout.[214]

Further, it is well-established that a non-waiver clause like Section 11.4 of the MIPA does not preclude a waiver of contractual rights under circumstances at issue here. *Williams v. Buffalo Pub. Sch.*, 758 Fed. App'x 59, 64 (2d Cir. 2018) (reversing because it was plausible "that Defendants waived their right to enforce" contractual requirement); *Citibank, N.A. v. Tele/Res., Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) (assignee is not "precluded from relying on the doctrine of waiver and estoppel because it is not a party to the underlying contract. Even a specific prohibition against assignments made without written consent may be waived in favor of an assignee"); *Marvel Entm't Group, Inc. v. ARP Films, Inc.*, 684 F. Supp. 818, 821 (S.D.N.Y. 1988) (denying motion for summary judgment on alleged violation of assignment provision; "a stipulation against assignment may be waived or modified by a course of business dealings") (quoting *Univ. Mews Assocs. v. Jeanmarie*, 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (Sup. Ct. N.Y. Cty. 1983)).

Indeed, a court within this District recently found waiver of an anti-assignment provision when confronted with a so-called no-waiver clause similar to the one at issue here. In the *Holland Loader* case, Judge Woods addressed an alleged breach of a purported anti-assignment clause in the context of an earnout dispute where the defendants asserted waiver of the anti-assignment provision. That court concluded that the plaintiff waived the assignment-as-breach argument, notwithstanding a provision stating that "any assignment made without such consent shall be void." *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 468 (S.D.N.Y. 2018), *aff'd*, 769 Fed. Appx. 40 (2d Cir. 2019). In doing so, that court found instructive the fact that

---

[214] DX-430.

plaintiff demonstrated, through conduct and testimony, that he did not care what entity performed the obligations of the agreement, was aware of and participated in the efforts being taken by defendant's subsidiaries, and repeatedly expressed his concern that defendant's subsidiaries were not providing enough support. *Id.* ("Therefore, in light of Svatek's course of conduct during his employment at FLS Spokane, the Court concludes that Svatek effectively waived HLC's right to provide written consent prior to the delegation of any duties by Defendant to its subsidiaries."). So too here.[215]

### 3.   Sellers Repeatedly Ratified the Dropdown.

The evidence of Sellers' repeated acceptance of benefits as well as their acknowledgment, recognition, and even celebration of Spark Holdco as NGE's assignee also establishes ratification, which is "a waiver of existing rights." *John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Fam. Life Ins. Tr.*, No. 16-CV-7071, 2018 WL 6173436, at *6 (E.D.N.Y. Nov. 26, 2018) (citing *In re Levy*, 69 A.D.3d 630, 632 (2d Dep't 2010)).  Put another way, "[w]hen a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Id.* (quoting *Rothschild v. Title Guarantee & Tr. Co.*, 204 N.Y. 458, 464 (N.Y. 1912)).  Even "acquiescence or silence can give

---

[215] Tr. at 809:15-17 ("Q. You didn't care who bought Major Energy just as long as the dollars and cents were acceptable to you?  A.  Correct.") (Josefovic Testimony); Apr. 10, 2019 Josefovic Dep. Tr. at 188:11-189:25 (testifying that he "could care less who took over our company. . .");  *see also* Horowitz Witness Stmt. (ECF No. 148) ¶ 37 ("I personally had no affinity for any particular buyer for Major Energy, provided that the purchase price and terms were acceptable.").

rise to the inference of ratification." *Id.* (citing *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017)); *Gallegos v. Top RX, Inc.*, No. 04-CV-773A, 2008 WL 4279526, at *13 (W.D.N.Y. Sept. 15, 2008) ("a plaintiff is estopped from pursuing a breach of contract claim when such plaintiff has accepted the benefits of the agreement, despite knowledge of a breach of the agreement interposed in a subsequent breach of contract action.") (quoting *Chapin v. Chapin*, 744 N.Y.S.2d 181, 183 (2d Dep't 2002)).  Sellers did much more than merely acquiesce or remain silent; they actively exploited the dropdown and its benefits for more than half of the 33-month earnout period before they strategically decided to sue.  That conduct has consequences.

4.       <u>Sellers Are Estopped from Challenging the Dropdown At this Late Date.</u>

Similarly, estoppel "preclude[s] a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." *757 3rd Ave. Assoc's, LLC v. Patel*, 117 A.D.3d 451, 453, 985 N.Y.S.2d 57, 59 (2014) (finding equitable estoppel as matter of law).  Sellers took numerous actions before and after the alleged breach, to intentionally induce NGE and Spark Holdco to reasonably believe that Sellers did not view or, at minimum, no longer viewed the dropdown as void—indeed, as explained above, they expressed their excitement for the dropdown in writing, recognized Major Energy as part of the Spark family for more than one year, obtained millions of dollars through Spark Holdco (not NGE) pursuant to the dropdown, and obtained numerous concessions and accommodations regarding integration, employment, and geographical expansion from Spark Holdco (not NGE).  NGE and Spark Holdco reasonably relied on these actions to fully complete the transition of Major Energy to Spark Holdco before and after the dropdown closed,

and as shown in the purchase agreement between NGE and Spark Holdco, receive compensation in return.[216]

       \*   \*   \*

In sum, waiver, ratification, and estoppel are conclusively established by the evidentiary record submitted to this Court at trial.  In contractual contexts such as this, courts often apply two or more of these defenses.  *See, e.g.*, *Banque Nat. de Paris v. 1567 Broadway Own. Assocs.*, 214 A.D.2d 359, 361, 625 N.Y.S.2d 152, 154 (1995) ("the equitable doctrines of estoppel, waiver and ratification bar appellants from withdrawing their assent to the 1992 mortgage modification, where, as here, appellants waited two years before seeking to repudiate their contractual commitments to the plaintiff bank, after the appellants had enjoyed the financial benefits of the modification"); *Nat'l City Comm'l Cap. Co., LLC v. Becker Real Estate Svcs., Inc*., 885 N.Y.S.2d 173, 177 (Sup. Ct. 2009) ("Where a party has accepted the benefits of an agreement and then seeks to repudiate the agreement, it must do so timely or their objection is waived"; finding waiver and ratification as matter of law where "defendant accepted the equipment and made payments on same for a period of eight months and did not raise the issue of the invalidity of the lease when notified of its default thereunder on at least two occasions" (citations omitted)).   All three conclusively apply here, and any one defeats Plaintiff's claim of breach of Section 11.7 of the MIPA as a result of the dropdown.

     **C.**    **Even If Plaintiff Had Established Breach of Section 11.7, For the Reasons Set Forth Above, It Could Not Recover Damages Based on the Dropdown.**

As set forth in Sections III.C through III.E above, Plaintiff has failed to adduce competent evidence of damages actually suffered as a result of the dropdown (or as a result of any other

---

[216] DX-980, § 2.2.

claimed misconduct).  Acknowledging, as he must, the impracticality of unwinding a transaction more than a full year *after* the end of the 33-month post-closing earnout period, Plaintiff instead seeks an award of $9.8 million in purported rescissory damages.  But as set forth above, Plaintiff has failed to demonstrate (among other things) that Sellers were actually injured from the dropdown itself.  In other words, Plaintiff has failed to establish a necessary element of his breach of contract claim as to NGE; for that reason, and as discussed in Section III.E, his demand for rescissory relief is doomed.  *See Gilman v. Marsh & McLennan Cos., Inc*., 85 F. Supp. 3d 757, 760 (S.D.N.Y. 2015), *aff'd*, 826 F.3d 69 (2d Cir. 2016); *Thule AB v. Adv. Accessory Hldgs. Corp*., No. 09 CIV. 00091, 2010 WL 1838894, at *11 (S.D.N.Y. May 4, 2010).

## V. PLAINTIFF ELECTED TO SUE SEI RATHER THAN SPARK HOLDCO, THE PARTY WITH WHICH SELLERS HAD PRIVITY, AND MUST BEAR THE CONSEQUENCES OF THAT STRATEGIC DECISION.

Despite awareness since May 2016 of the identity of the parties to the dropdown transaction, Plaintiff elected to sue SEI rather than Spark Holdco, the entity that acquired NGE's interests in Major Energy.   In December 2017, Plaintiff doubled-down on that strategy when he filed the Amended Complaint.  And in the years that have passed since then, Plaintiff has never sought to further amend his pleading to substitute or add Spark Holdco as a defendant.  Plaintiff's strategy, whatever it was, has consequences.

### A. Section 7.14(c) of the MIPA Bars Contract and Tort Claims Against SEI, and Would Similarly Bar Contract and Tort Claims Against Spark Holdco Had It Been Named.

As an initial matter, whether Plaintiff sued SEI or Spark Holdco, Section 7.14(c) of the MIPA expressly limits Sellers' right to assert claims against NGE Affiliates, whether in contract or in tort.  That provision makes clear that Sellers may only bring claims arising out of or relating to the MIPA against the "Persons that are Parties" to the MIPA:

> All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Persons that are Parties hereto. *No Person who is not a named party to this Agreement, including any Affiliate, agent, attorney, or representative of any Party (such Persons, "*Non-Party Affiliates*"), shall have any liability (whether in contract or tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with, or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution*, and each Party waives and releases all such liabilities, claims, and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.[217]

This provision is expressly intended to preclude exactly what Plaintiff has done here, *i.e.*, sue NGE's Affiliates for contract and tort claims "based upon, aris[ing] out of, or relat[ing] to [the MIPA]." It **expressly bars** Sellers from asserting any claim arising out of or relating to the MIPA against anyone not a Party thereto,[218] including Affiliates of the Parties, such as SEI or Spark Holdco.[219] And it makes clear that Non-Party Affiliates, like SEI and Spark Holdco, "are expressly intended as third party beneficiaries" of the provision.[220] Put differently, Sellers explicitly "waive[d]" any right to sue Non-Party Affiliate SEI (or Spark Holdco, for that matter)[221] with regard to the MIPA.

---

[217] DX-2, § 7.14(c).

[218] DX-2, at SPRK-NGE-0031515 (defining Parties to include **only** NGE, Major Energy, Sellers, and Sellers' Representative).

[219] *See* ECF No. 22 ¶ 11 ("Spark is an affiliate of NGE"); DX-112 (NGE's founder is likewise SEI's founder and majority shareholder).

[220] DX-2, § 7.14(c).

[221] DX-2, § 7.14(c).

Plaintiff's claims against SEI – a breach of contract claim (Count III), a tortious interference claim (Count IV), and a demand for special damages – fall squarely within the scope of Section 7.14(c) and, as a result, are barred by contract.

      1.    Section 7.14(c) Bars Plaintiff's Tortious Interference Claim Against SEI.

Count IV is a claim for tortious interference against SEI based on SEI's purported misconduct prior to the dropdown.[222]  Tortious interference requires "the existence of a valid contract . . . , [defendant's] knowledge of that contract, and [defendant's] intentional procurement of [the third party's] breach of the contract without justification, actual breach of the contract, and [] damages resulting from the breach." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 594, 973 N.E.2d 735, 742 (2012).

Plaintiff's tortious interference claim fails as a matter of law for at least three reasons.  First, for the reasons set forth in Section V.B, Plaintiff's breach of contract claim against NGE for conduct prior to the dropdown fails as a matter of law; because that claim is a predicate to Sellers' tortious interference claim against SEI, Count IV necessarily fails for the same reason.  Second, Plaintiff's tortious interference claim is foreclosed as a matter of law by Section 7.14(c).  Indeed, even if it had been asserted against Spark Holdco, the entity that ultimately acquired Major Energy, it would be barred by Section 7.14(c).  Third, as detailed in Section III.C, Plaintiff has failed to prove with credible evidence that SEI's purported misconduct prior to the dropdown harmed him.

Courts in New York generally enforce clear and unequivocal exculpatory provisions like Section 7.14(c).  Indeed, in a contract between sophisticated parties, to avoid enforcement of a limitation of liability provision, the evidence must approach reckless indifference or intentional

---

[222] ECF No. 28, at 27 ("Plaintiff's tortious interference claim against Spark covers a period of time . . . prior to NGE's improper sale of Major Energy to Spark in August 2016.")

wrongdoing. *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) (applying Virginia law, and explaining that New York law would also call for enforcement of limitation of liability provision: "in a contract between sophisticated parties, not implicating public health or safety, New York applies a more exacting standard of gross negligence than it would in other contexts. The New York Court of Appeals has held that, to avoid enforcement of a limitation of liability provision, the evidence must approach reckless indifference or intentional wrongdoing: 'Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing' . . . It is conduct that evinces a reckless indifference to the rights of others . . . .'" (internal citations omitted) (citing *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992))); *see also Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.S.2d 746 (1983); Restatement (Second) of Contracts § 195).

Here, the trial record cannot possibly support a conclusion that, in the four months between NGE's purchase of the Membership Interests in Major Energy and the closing of the dropdown to Spark Holdco, SEI, which was ***not*** the acquiring entity, engaged in gross negligence akin to intentional wrongdoing or reckless indifference to the rights of others. *See Alitalia Linee Aeree Italiane*, 580 F. Supp. 2d at 294. As an initial matter, there is no evidence whatsoever about any purported conduct by SEI to interfere with Sellers' and NGE's contractual relationship. Even as to Spark Holdco, the record is devoid of credible evidence that Spark Holdco engaged in intentional misconduct with respect to the relationship between Sellers and NGE.[223]

---

[223] Spark employees were not involved in the negotiation of the MIPA, Earnout Agreement, or Executive Earnout Agreement. Kroeker Witness Stmt. (ECF No. 166) ¶ 63.

In fact, Sellers' only arguable theory of purported interference prior to the dropdown relate to (i) the dropdown itself, and (ii) preliminary discussions about the EMS integration project.[224] But as to the dropdown, the undisputed evidence shows that Spark Holdco never had a question in its mind about NGE's ability to conduct a dropdown of Major Energy to Spark Holdco.[225]  Further, despite Sellers' manufactured surprise and attempt to cast aspersions about the dropdown, it was publicly known that NGE was formed "for the purpose of purchasing retail energy companies and retail customer books that could ultimately be resold to [the Spark family]."[226]  The record also makes clear that NGE had "numerous discussions with Sellers regarding the intended post-acquisition dropdown," including at closing.[227]  Indeed, the dropdown was signed and announced several weeks after NGE's purchase of the Membership Interests in Major Energy closed, and Sellers touted the news in their own press release.[228]

Similarly, Sellers' theory that Spark Holdco's conduct in connection with the EMS integration project amounted to reckless indifference or intentional wrongdoing is nonsense.  The undisputed evidence shows that the EMS project was promoted by Alper and other Sellers and was a joint effort led primarily by Retailco with input from Major Energy employees.[229]  As detailed

---

[224] DX-1042; *see also* Kuznar Witness Stmt. (ECF No. 161) ¶ 19 & n.7.

[225] Kroeker Witness Stmt. (ECF No. 166) ¶ 49.  Indeed, the record evidence shows that Sellers' deal counsel shared this view.  DX-298 ("NGE was never blocked from moving the Major companies around within the Spark/Keith Maxwell universe of companies, which is what's happening here.").

[226] DX-112, at 5.

[227] *E.g.*, Konikowski Witness Stmt. (ECF No. 157) ¶ 19; Gibson Witness Stmt. (ECF No. 162) ¶¶ 40-42; *see also* May 2, 2019 Studnicky Dep. Tr. at 25:17-26:3, 31:23-32:1, 40:11-19, 43:3-10.

[228] DX-305; DX-310, at SPRK-NGE0054289-90; DX-306.

[229]  Kuznar Witness Stmt. (ECF No. 161) ¶ 24; Alper Witness Stmt. (ECF No. 150) ¶ 105.

in Section III.D.3, that initiative was fleeting; it was promptly terminated by Michael Kuznar on September 13, 2016 to avoid even a possible question of interference with the earnout agreement.[230]  Further, Spark Holdco, through Kroeker, agreed to give Major Energy a $250,000 addback to the Adjusted EBITDA calculation for earnout purposes to cover consultant fees, travel costs, and any other direct costs, as well as the alleged "distraction" value, which Alper gladly accepted.[231]  Such conduct does rise to the level of reckless indifference or intentional wrongdoing that would justify non-enforcement of Section 7.14(c) of the MIPA.  In short, the evidentiary record requires judgment in SEI's favor on Sellers' tortious interference claim.

2.   <u>In Any Event, There Is No Viable Contract Claim Against SEI.</u>

Plaintiff's breach of contract claim against SEI (Count III) fails because Sellers sued the wrong party.  Both the original Complaint and the Amended Complaint name the same two defendants: NGE and SEI.[232]  Plaintiff intentionally elected not to name Spark Holdco as a defendant, notwithstanding Plaintiff's long-held knowledge that Spark Holdco was the ultimate purchaser of Sellers' Membership Interests in Major Energy through the dropdown transaction. And Plaintiff never attempted to seek leave amend the Amended Complaint to add or substitute parties.  This intentional decision by Plaintiff is fatal to Plaintiff's claims for several reasons.

*First,* as Plaintiff has known since early 2016, SEI was not a party to the MIPA, the Earnout Agreement, or the Executive Earnout Agreement.  Plaintiff has likewise known, since at least August 2016, that SEI was not the contractual purchaser of the Membership Interests in Major Energy and did not agree to assume NGE's obligations to Sellers in connection with the dropdown

---

[230]  Kuznar Witness Stmt. (ECF No. 161) ¶¶ 29-35.

[231]  Kroeker Witness Stmt. (ECF No. 166) ¶ 148.

[232]  ECF Nos. 1, 22.

(or at any other time).  *Cf. Gitseg v. Herbst*, 220 A.D.2d 380 (N.Y. App. Div. 1995) ("It is axiomatic that "[a] claim for breach of contract . . . only can be brought against a party to the contract."); *Hotel Aquarius B.V. v. PRT Corp.*, No. 92 CIV 4498, 1992 WL 391264, at *6 (S.D.N.Y. Dec. 22, 1992) ("In general, if an entity is not a party to a contract, no valid breach of contract claim exists against that entity.") (citing *Stratton Group, Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978) ("Before defendant may be held accountable for the breach of a contract, it must be demonstrated that he was a party thereto.")).

NGE's counterparty to the Spark MIPA was Spark Holdco, not SEI.[233]  It was Spark Holdco, not SEI, that agreed in the Omnibus Assignment and Assumption Agreement to "assum[e] the burdens, obligations, and liabilities of Assignor under the Prior MIPA, the Current MIPA, and the Transaction Documents."[234]  Indeed, Section 8.2(c)(iii) of the Spark MIPA made clear that Spark Holdco "assumed all rights and obligations of Seller pursuant to the Assignment."[235] *Ferring B.V. v. Allergan,* Inc., 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract.").  While SEI was a party to the Spark MIPA, it was only in its capacity as the parent of Spark Holdco and only to serve as financial guarantor

---

[233] DX-980.

[234] DX-999 (defining Transaction Documents as "the Escrow Agreement, the Escrow Disbursement Agreement, the Earnout Agreement, and the Executive Earnout Agreement").  SEI was not a party to the Omnibus Assignment and Assumption Agreement.  *Id.*

[235] DX-980, § 8.2(c)(iii).

of Spark Holdco's obligations.[236]   Plaintiff has known all of these facts since long before this

litigation began and for years before trial.[237]

      The upshot is that SEI has ***never been in privity of contract with Sellers***.   *Nat. Stone

Warehouse Inc. v. AKG Yahtim Ve Insaat Malzemeiri Sanayi*, 20 Misc. 3d 1143(A), 872 N.Y.S.2d

692 (Sup. Ct. 2008) ("It is well established that a plaintiff may not maintain a cause of action for

breach of contract where it had no contractual relationship with the defendant, and was not in

privity with it."); *cf. Rodeo Family Enterprises, LLC v. Matte*, 99 A.D.3d 781, 783, 952 N.Y.S.2d

581, 583–84 (2012) (dismissing cross-claims for lack of standing where there was no privity of

contract).   Indeed, in attacking Plaintiff's standing to sue SEI, Defendants' Amended Answer and

Additional Defenses to Amended Complaint made clear that SEI did not execute any contract with

Sellers, accede to any contractual obligations as to Sellers, or adopt Sellers' characterizations of

the transactional documents.[238]   Absent contractual language demonstrating a manifest intent to be

bound, courts will decline to bind a non-party to a contract.   *See, e.g.*, *Capricorn Inv'rs III, L.P. v.

Coolbrands Int'l, Inc.*, 897 N.Y.S.2d 668 (Sup. Ct. 2009), *aff'd*, 66 A.D.3d 409, 886 N.Y.S.2d 158

---

[236] DX-980, § 2.2(a), (c); *see also id.* § 7.17 ("SEI Guaranty").

[237] ECF No. 28, at 21 (asserting that SEI "is ***not*** a named party or signatory to any of the executed Agreements"); Mar. 5, 2019 Fried Dep. Tr. at 281:10-18, 283:5-11 ("Q.   Now, you knew at the time when the lawsuit was filed that Spark Energy, Inc. was not a party to the MIPA, correct?   A.   Correct.   Q.   But a breach of contract claim has been asserted against Spark Energy, Inc. in this case.   Are you aware of that? A.   Yes.").

[238] *See generally* ECF No. 117; *id.* at p. 54 ("Without conceding that lack of standing is an affirmative defense as opposed to Plaintiff's jurisdictional burden, Plaintiff lacks standing to sue Spark Energy, Inc. for breach of contract because Spark Energy, Inc. did not enter into a contract with Plaintiff and did not accede to any contractual obligations as to Sellers regarding the MIPA, Earnout Agreement, or Executive Earnout Agreement.").

(2009) ("the documentary evidence, including the Partnership Agreement itself, negates plaintiff's allegation that CoolBrands manifested an intent to be bound to the Partnership Agreement").

**Second,** SEI is a holding company, the sole material asset of which is its equity interest in Spark Holdco and its subsidiaries.[239]  Put differently, SEI is not an operations entity; it does not provide goods or services to energy customers, or execute contracts with vendors, among other things.  As a result, it was not involved in the operations of Major Energy's business under Section 2.7 of the Earnout Agreement or the alleged conduct at issue in this litigation.  Moreover, the mere fact that SEI reported on Spark Holdco's acquisition of Major Energy in its public filings is not surprising, given that SEI consolidates the financials of Spark and its subsidiaries.

**Third,** as a practical matter, there is no allegation – much less evidence – to suggest that, if Sellers had asserted claims against Spark Holdco and for argument's sake only Spark Holdco had been found liable, they could not have recovered.  In other words, Plaintiff's pleading strategy does not appear to be guided by any effort to identify the corporate family member with adequate resources to satisfy a judgment.  Veil piercing is a device that disregards corporate form, whether as a matter of equity and in the interests of justice or as a legal avenue to give a remedy to a creditor with an unsatisfied judgment.  *See Wm. Passalaqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 135 (2d Cir. 1991) (discussing origin of piercing doctrine and addressing veil piercing in context of individual owners rather than a corporate parent).  Those justifications are not in play here.  Instead, Plaintiff made a strategic choice, the consequences of which Plaintiff must bear, not to name or subsequently add Spark Holdco.  That decision is fatal to Plaintiff's claims against SEI.

---

[239]   Kroeker Witness Stmt. (ECF No. 166) ¶¶ 11-12 (SEI is the sole managing member of Spark and consolidates the financial results of Spark and its subsidiaries).

In any event, Sellers have not pleaded a veil piercing theory, much less adduced credible evidence to support holding SEI liable for the alleged conduct of its subsidiary. *Vermont Mut. Ins. Co. v. Ciccone*, No. 3:09-CV-00445-VAB, 2015 WL 4999894, at *2 (D. Conn. Aug. 21, 2015) (refusing to allow plaintiff to amend complaint to add a claim for veil-piercing in the days leading up to trial, where plaintiff had been on notice for months, if not more than a year, of potential grounds for adding a veil piercing claim).   Moreover, even if Sellers had asserted and adduced evidence to support a veil piercing theory, and they have not, veil piercing is done with "extreme[] reluctan[ce]."   *Shantou Real Lingerie Manufacturing Co., Ltd. v. Native Group Int'l, Ltd.*, 401 F. Supp. 3d 433, 439 (S.D.N.Y. 2018).

Under New York law, a parent corporation and its subsidiary are generally regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both. To pierce the corporate veil, this Court must find that (i) the parent exercised complete domination over the corporation; *and* (ii) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.   *Shantou Real Lingerie*, 401 F. Supp. 3d at 439; *accord Cary Oil Co. v. MG Refining & Marketing, Inc.*, 230 F. Supp. 2d 439, 458 (S.D.N.Y. 2002); *see also Townley v. Emerson Elec. Co.*, 681 N.Y.S. 2d 741, 745 (N.Y. Sup. 1998) ("Stock control, interlocking directors and interlocking officers are in and of themselves insufficient facts to justify the imposition of such a liability on the parent corporation.").   That "complete dominion and control" must take the form of control over the subsidiary's everyday operations.   *Id.* ("[T]he 'day-to-day' control that is required to pierce the corporate veil is not present.   [Parent] does not market [subsidiary's] products.   There is no evidence of direct control in marketing or production decisions, and none in personnel. . . .The essence of the test is the parent's complete dominion . . . ."); *cf. Kadosh v. Kadosh*, No. 651834, 2013 WL 3389348, at *5 (N.Y. Sup. 2013) (dismissing

breach of contract claim as to co-owner of signatory because a "non-party cannot be liable for breach of a contract").

Because SEI (i) was not a party to the MIPA, the Earnout Agreement, or the Executive Earnout Agreement; (ii) was not a party to the challenged dropdown transaction; (iii) is instead a holding company that did not assume any of the obligations of NGE in connection with the dropdown, and (iv) cannot be the subject of any un-pleaded and factually insupportable veil piercing claim, all of Sellers' claims against SEI fail as a matter of law.

3.    In Any Event, Plaintiff's Request for Special Damages from SEI Fails.

Plaintiff has asserted that "Sellers also are entitled to recover punitive damages from Spark [SEI]."[240] For the reasons outlined in greater detail in Defendants' Pretrial Memorandum, Section 9.9 of the MIPA bars Plaintiff's request for punitive relief as a matter of law.  Section 9.9 expressly limits the type of relief available to Sellers:

> Notwithstanding any other term herein, no Party will be obligated to any other Party or Person for any consequential, incidental, indirect, special, exemplary or punitive damages or Losses based thereon, including damages or Losses with respect to loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity, and no Party will be obligated to any other Party or Person for any Losses or damages determined as a multiple of income, revenue or the like, relating to the breach of any representation, warranty, covenant or agreement herein (except and to the extent that the Indemnified Party has been required to pay such damages to any third Person).[241]

This provision broadly applies to all claims stemming from the transaction documents.  Indeed, Section 9.9 distinguishes between a Party (defined in the MIPA as a party to the agreement) and an Indemnified Party (defined in Sections 9.2 and 9.3 of the MIPA), prohibiting all special losses

---

[240] ECF No. 188, at 34.

[241] DX-2, ¶ 9.9.

for Parties, but allowing some special losses for Indemnified Parties.  This distinction, coupled with Section 9.9's expansive language, reflects an unambiguous intention for the terms to apply to *all* claims arising out of the transaction documents.

New York courts "routinely" enforce these kinds of liability-limitation provisions, particularly "when contracted by sophisticated parties" like the Sellers and NGE.  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016); *accord DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) (holding that "sophisticated parties represented by sophisticated counsel, unambiguously provided the limit of recovery in the event of breach, and [the court] may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery"); *accord Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F. Supp. 2d 311, 321 (W.D.N.Y. 2013).  This is because courts recognize that "[a] limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . . [The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made."  *Net2Globe Int'l*, 273 F. Supp. 2d at 450 (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (N.Y. 1994)).  Such clauses are unenforceable only when "in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing."  *Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 157 A.D.3d 579, 581, 69 N.Y.S.3d 633, 636 (N.Y. App. Div. 2018); *Kalisch-Jarcho*, 58 N.Y.S.2d 377, 384-85.  To be clear, the "type of intentional wrongdoing that could render a limitation in [a contract] unenforceable is that which is 'unrelated to any legitimate economic self-interest."  *Electron Trading*, 69 N.Y.S.3d at 636 (quoting reference omitted).

As this Court has previously observed, there is a "high[] mark at which New York courts place the bar . . . [for] wrongful conduct sufficient as a matter of law to nullify a limitation of liability clause in a contract."[242]  Here, any demand for special damages – or any damages, for that matter – from SEI for alleged tortious interference is foreclosed by (among other things) Paragraph 7.14(c) of the MIPA.  Even if Section 7.14(c) were not dispositive, and it is, the evidence presented at trial makes clear that there was no egregious behavior or deception by SEI in connection with the dropdown: the fact and process of the dropdown were openly disclosed, and Sellers embraced it.[243]  In sum, there is not a scintilla of evidence that SEI's conduct amounted to "egregious intentional misbehavior" that could justify disregarding Section 9.9's limitation of liability, if it could even be held liable in the first place.

**B.      The Only Remaining Claim Is Breach of Contract Against NGE for Conduct Prior to August 23, 2016, Which Likewise Fails.**

Because Plaintiff's claims against SEI fail, and because Plaintiff's dropdown theory fails, the only remaining claim Plaintiff has asserted in this matter is a claim for breach of contract against NGE for conduct predating the dropdown.  To the extent Plaintiff asserts a breach of contract claim against NGE under some contractual provision other than Section 11.7 of the MIPA, including for example under Sections 2.7 or 2.2 of the Earnout Agreement, such claim fails.  For all of the reasons comprehensively addressed above, Plaintiff's contract claim based on Sections 2.2 and 2.7 fails for myriad legal and factual reasons.  Moreover, there is no credible evidence

---

[242] ECF No. 42, at 16 (quoting *Net2Globe Int'l, Inc.*, 273 F. Supp. 2d at 454).

[243] DX-298 ("NGE was never blocked from moving the Major companies around within the Spark/Keith Maxwell universe of companies, which is what's happening here.  As NGE was not so blocked, I do not see WHY Saul should have to consent at all.  I don't believe NGE needs his consent . . . *If they think they need it or gain something from having it, then I'd think that would give you and Saul some leverage to extract something in return*." (emphasis added)).

submitted to this Court that suggests that NGE's purported breach of those provisions **caused** Sellers any harm based on the simple fact that the claimed damages suffered by Sellers **post-date** the dropdown.

NGE's contractual obligations to Sellers ended when the dropdown closed on August 23, 2016, and Sellers acknowledged and accepted that by subsequently accepting payments from Spark Holdco and dealing directly with Spark Holdco about the operations of Major Energy for the duration of the earnout period.[244]   As a result, NGE could not have breached any contractual obligation to Sellers following the dropdown.   Indeed, the termination of NGE's contractual obligations both (i) predated the purported harm suffered by Sellers based on claimed changes in the operation of Major Energy's business during the earnout period, and (ii) occurred well before the Contingent Payments, if any, due to Sellers were required to be calculated and paid for Target Year 2016 under the Earnout Agreement, which was not until March 2017.

While New York courts generally hold that the mere assignment of a contract only has the effect of assigning the rights in the contract, not the assignor's duties and liabilities, that general rule is inapplicable where, as here, the assignee (Spark Holdco) affirmatively assumed the assignor's (NGE) duties under the assigned contracts.   Sellers do not dispute that, in connection with the dropdown transaction, Spark Holdco assumed NGE's obligations to them and in fact proceeded to interact directly with Spark Holdco representatives about the earnout.[245]   Indeed, through the Omnibus Assignment and Assumption Agreement, Spark Holdco agreed to "assum[e]

---

[244]  Kroeker Witness Stmt. (ECF No. 166) ¶ 116.

[245]  DX-390, at MESELLERS_0000008 n.2 (affirming that Spark had "[p]resumptively . . .  through an assignment of rights  . . . assumed the obligations of [NGE] under the Earnout Agreement").

the burdens, obligations, and liabilities of Assignor under the Prior MIPA, the Current MIPA, and the Transaction Documents."[246]  *See In re Refco Inc. Securities Litig.*, 826 F. Supp. 2d 478, 494 (S.D.N.Y. 2011) ("New York courts hold that even if an agreement purports to bind successors and assigns of the parties to the agreement, an assignee or successor will not be bound to the terms of a contract *absent an affirmative assumption of the duties under the contract*." (emphasis added)).

Because Spark Holdco affirmatively assumed NGE's duties to Sellers through the Spark MIPA and the Omnibus Assignment and Assumption Agreement, as a matter of law NGE cannot be liable to Sellers for breach of contract for any conduct that post-dates the August 23, 2016 closing of the dropdown.[247]  Further, like their failure to show harm caused by the dropdown, Sellers have failed to identify a shred of evidence of actionable harm caused by NGE prior to the dropdown.[248]  For these reasons, regardless of the contractual basis for Plaintiff's breach of contract claim, judgment in NGE's favor on Count II is warranted.

## VI.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter a final judgment in their favor and against Plaintiff on each of Plaintiff's claims, and order Plaintiff to

---

[246] DX-999.  The Spark MIPA confirmed this assumption, as Section 8.2(c)(iii) of the Spark MIPA states that Spark "shall have assumed all rights and obligations of [NGE] pursuant to the Assignment," which was defined as the Omnibus Assignment and Assumption Agreement separately executed between NGE and Spark and attached as Exhibit A to the Spark MIPA.  DX-980, § 8.2(c)(iii) & p. 3 (defining "Assignment").

[247] Indeed, despite having no continuing contractual obligations directly to Sellers, NGE nonetheless, in good faith, continued to support Spark Holdco in the performance of its obligations and the success of the Major Energy business.  *See* Lancaster Witness Stmt. (ECF No. 159) ¶ 103.

[248] *See, e.g.*, PX-753, Leathers Expert Report at pp. ii-iii ("Post-Acquisition – Not Business as Usual at Major"; "Additional Damages Sustained by the Sellers As a Result of Spark's Post-Acquisition Actions").

pay Defendants the total amount of recoverable costs they incurred in connection with the defense

of this action, including attorneys' fees as a matter of equity and pursuant to Section 3.7 of the

Earnout Agreement.[249]


Dated:  April 17, 2020                              Respectfully submitted,


                                                   **MORGAN, LEWIS & BOCKIUS LLP**

                                                    */s/ Troy S. Brown*
                                                   Troy S. Brown a
                                                   Dana E. Becker (*pro hac vice*)
                                                   Su Jin Kim
                                                   1701 Market Street
                                                   Philadelphia, PA 19103
                                                   (215) 963-5000
                                                   troy.brown@morganlewis.com
                                                   dana.becker@morganlewis.com
                                                   su.kim@morganlewis.com

                                                   Michelle Pector (*pro hac vice*)
                                                   Jared Wilkerson (*pro hac vice*)
                                                   1000 Louisiana St., Suite 4000
                                                   Houston, TX 77002
                                                   (713) 890-5000
                                                   michelle.pector@morganlewis.com
                                                   jared.wilkerson@morganlewis.com

                                                   *Attorneys for Defendants National Gas &*
                                                   *Electric, LLC and Spark Energy, Inc.*

---

[249] DX-1, § 3.7.

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2020, the undersigned caused to be filed

the foregoing via the Court's CM/ECF system, which sent notice to all counsel of record in this

action.

/s/ Troy S. Brown
*Counsel for Defendants National Gas &*
*Electric, LLC and Spark Energy, Inc.*