K337HOR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

SAUL HOROWITZ,

                    Plaintiff,

          v.                              17-cv-7742 (JPO)

NATIONAL GAS & ELECTRIC, LLC, et al.,

                    Defendants.           Trial

------------------------------------x

                                          New York, N.Y.
                                          March 3, 2020
                                          9:15 a.m.


Before:

                         HON. J. PAUL OETKEN

                                          District Judge


                         APPEARANCES

KING & SPALDING LLP
        Attorneys for Plaintiff
BY:   RICHARD T. MAROONEY, JR., ESQ.
        ISRAEL DAHAN, ESQ.
        RYAN GABAY, ESQ.

MORGAN, LEWIS & BOCKIUS LLP
        Attorneys for Defendants
BY:   TROY S. BROWN, ESQ.
        MICHELLE PECTOR, ESQ.
        DANA E. BECKER, ESQ.
        JARED WILKERSON, ESQ.
        SU JIN KIM, ESQ.

1              (Trial resumed)

2              THE COURT:  Good morning, everyone.  We're continuing

3     with -- I don't know if I call it a direct examination.  I

4     guess technically it's a cross-examination.

5              MS. PECTOR:  Redirect.

6              THE COURT:  Redirect examination of the witness.

7     Ms. Pector, you may proceed.

8      GARY LANCASTER, resumed.

9     REDIRECT EXAMINATION (Continued)

10    BY MS. PECTOR:

11    Q.  Mr. Lancaster, yesterday when we left the record we were

12    talking about the September 1, 2016 letter that you received

13    from Mr. Dahan.  Do you remember talking about that with me?

14    A.  I do.

15    Q.  Mr. Lancaster, did you prepare a response to that letter?

16    A.  I did.

17             THE COURT:  Could you pull the mic closer.

18             MS. PECTOR:  James, please pull up DX 408.

19    Q.  Mr. Lancaster, what we're looking at on the screen is a

20    September 23, 2016 e-mail from you to Mr. Dahan with a copy to

21    Dan Alper and Gil Melman, and the subject is "Response to

22    Letter on Behalf of Former Major Energy shareholders."

23             Do you see that?

24    A.  I do.

25    Q.  "Dear Mr. Dahan, this letter is written to you in response

K337HOR1                         Lancaster - redirect

1   to your letter dated September 2, 2016, which was written on

2   behalf of the former shareholders of Major Energy who are

3   represented by sellers' representative Saul Horowitz."

4              Is that the letter that you were referring to?

5   A.  Yes, it is.

6   Q.  James, if we could go to the next page.  If you will just

7   pan through so Mr. Lancaster can see it.

8              Mr. Lancaster, was this letter responding to the

9   substance of Mr. Dahan's letter?

10  A.  Yes, it was.

11  Q.  And did this letter respond to Mr. Horowitz's assertions at

12  that time?

13  A.  It did.

14             MS. PECTOR:  Your Honor, we're not going to go into

15  the content of this letter, but we will tender into evidence in

16  the event the Court is interested in it.  From a timing

17  perspective, we are just going to move to introduce into

18  evidence all the exhibits.

19             THE COURT:  Remind me this last one, the number.

20             MS. PECTOR:  DX 408.  The date of it is September 23,

21  2016.

22             And I'm happy to take him through the letter.  We just

23  wanted to streamline our time.

24             THE COURT:  That's great.  You want to move all the

25  exhibits?

K337HOR1                            Lancaster – redirect

1          MS. PECTOR:  Yes, your Honor, so just for the record,

2     if I could call them out.

3          THE COURT:  Yes.

4          MS. PECTOR:  DX 1, DX 272.

5          THE COURT:  Hold on.

6          MS. PECTOR:  DX 298.

7          THE COURT:  These are in a different order; you did

8     them in numerical order.

9          MS. PECTOR:  Yes, your Honor.

10         THE COURT:  OK.

11         MS. PECTOR:  DX 390, DX 503, DX 516, DX 518, DX 698,

12    DX 962, DX 1033.

13         THE COURT:  OK.

14         MS. PECTOR:  DX 408, which is the one we just

15    introduced.

16         THE COURT:  Yes.

17         MS. PECTOR:  Then we had PX 161 and PX 524.

18         THE COURT:  OK.

19         MS. PECTOR:  Then, your Honor, on several of these

20    exhibits we had spreadsheets, and the spreadsheets have the

21    letter native file attached that we use.  Like for 1033, for

22    example, we use 1033A.  Do you need us to identify for the

23    Court all the ones that have an A?

24         THE COURT:  I don't think so, unless the parties feel

25    otherwise, but I think if you have admitted 1033, I assume that

1   unless I ruled otherwise that 1033A is admitted.

2              MS. PECTOR:  Perfect, yes.

3              Your Honor, we pass the witness.

4              I'm sorry, I apologize, there was one other

5   housekeeping matter my colleague informed me of.  We would like

6   to introduce the two demonstratives -- or mark the two

7   demonstratives for the record as evidence.  The first is the

8   PowerPoint that we provided to the Court.  We had tendered that

9   to the other side and worked through any objections before we

10  used it in court, so we would like to mark that.

11             THE COURT:  Mark it as a demonstrative.

12             MS. PECTOR:  Yes, your Honor.  And then we would also

13  like, if it's OK with the Court, for our trial tech to take a

14  picture of this write-up and just mark it for the court record

15  to show that it was a demonstrative that was created while in

16  court.

17             THE COURT:  OK, that's fine.

18             Any objection to that?

19             MR. MAROONEY:  No objection to marking it as a

20  demonstrative.

21             THE COURT:  OK.

22             MR. BROWN:  Your Honor, just for housekeeping so going

23  forward, would it help your Honor if we just mark this as

24  Defendant's Demonstrative 1, Defendant's Demonstrative 2 and

25  then we will track it that way?

1          THE COURT:  That's fine.  So, we have Demonstrative 1,

2     which is the PowerPoint.

3          MS. PECTOR:  This would be Demonstrative 2.

4          MR. BROWN:  We will take a picture, submit it to

5     Bruce.

6          THE COURT:  That's fine.

7          (Defendant's Exhibits DX 1, DX 272, DX 298, DX 390, DX

8     503, DX 516 received in evidence)

9          (Defendant's Exhibits DX 518, DX 698, DX 962, DX 1033,

10    DX 408 received in evidence)

11         (Plaintiff's Exhibits PX 161 and PX 524 received in

12    evidence)

13         MS. PECTOR:  With that, your Honor, we tender the

14    witness.

15         THE COURT:  Thank you.

16         Mr. Marooney.

17    RECROSS EXAMINATION

18    BY MR. MAROONEY:

19    Q.  Counsel asked you a few questions about PX 473, and I'd

20    like to pull that exhibit up, please.

21         Now, to reorient us, the bottom part of this exhibit

22    is the June 27, 2016 e-mail from you to Mr. Alper.  Do you see

23    that, sir?

24    A.  I do.

25    Q.  And then the top part is an e-mail from Mr. Horowitz back

K337HOR1                          Lancaster - recross

1   to Mr. Melman.  Do you see that, sir?

2   A.  I do.

3   Q.  And Mr. Horowitz's e-mail again is in the context of

4   addressing what the earnout payment should be for 2016, right?

5   A.  Yes, I understand that.

6   Q.  All right.  And when Mr. Horowitz sends this e-mail to

7   Mr. Melman and you he writes in the first sentence "This is

8   Exhibit B of the executed earnout agreement.  Please use the

9   attached template for our discussions tomorrow."  Do you see

10  that, sir?

11  A.  I see that language.

12  Q.  Now, let's go to 473A.  We see at the bottom there are two

13  tabs, and the first tab is labeled "NGE Major Earnout and Cash

14  Installment."  Do you see that, sir?

15  A.  I do.

16  Q.  That's the tab that does not have your green boxes,

17  correct?

18  A.  That is correct.

19  Q.  We can put that aside.  Counsel asked you a few questions

20  yesterday about PX 105.

21          Pull that up, please.

22          This is the e-mail from Mr. Hennekes to Mr. Wiederman

23  and you.  Now, you obviously did not author this e-mail,

24  correct.

25  A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Mr. Hennekes did, right?

2    A.  Yes, he authored it.

3    Q.  And if we look down at the four bullet points in

4    Mr. Hennekes' e-mail, the second bullet point is addressing the

5    $15 million in cash installment payments, correct?

6    A.  So, the second bullet point actually combines the cash

7    installments, and it also has language that applies to the

8    earnout but not to the cash installments.

9    Q.  Well, the third bullet point says "Earnout of up to $20

10   million max (5.5, 7.3, 7.3 million is attached)."  Do you see

11   that, sir?

12   A.  I see it.

13   Q.  And the second bullet point above it says up to $15 million

14   cash installments of five million each payable over three years

15   subject to achieving EBITDA profits in your plan.  Do you see

16   that, sir?

17   A.  I do read that, that's correctly recited.

18   Q.  And then counsel directed your attention to the last

19   sentence of the second bullet point, which reads "For the

20   adjusted EBITDA target for 2016 we are using the entire 2016

21   plan year for purposes of calculating whether the adjusted

22   target is met, however, for distribution purposes we would be

23   using only the actual adjusted EBITDA for April through

24   December."  Do you see that, sir?

25   A.  I do see that sentence.

K337HOR1                    Lancaster - recross

1    Q.  And that sentence is in the second bullet point regarding

2    the $15 million cash installments, correct?

3    A.  It is correct.

4    Q.  All right.  And if we go over now --

5    A.  Can I finish -- excuse me, counsel.  May I finish my

6    answer?  Yes, you read that correctly, that is the language.

7    And what I've said before is that particular language you've

8    highlighted in the second bullet point belongs in the third

9    bullet point because it applies to the earnout; it does not

10   apply to the cash installment.

11   Q.  Even though you didn't author the e-mail, right?

12   A.  I did not author the e-mail.  I'm just looking at it; it's

13   erroneous, it belongs in the third bullet point.

14   Q.  Let's go to PX105A.  Now, 105A is the spreadsheet annexed

15   to an e-mail we just looked at, and if we go down to the gray

16   boxes you see the Mark's analysis within the gray box.  Do you

17   see that?

18   A.  I do.

19   Q.  And if we see down toward the bottom, in Row 70 through 82,

20   that's the piece that talks about the cash installment

21   component of the contingent fees, correct?

22   A.  Counsel, can you direct me to which rows and columns?

23   Q.  Sure.  Well, there is a big boldfaced word that says

24   "installments" in row 71.  Do you see that?

25   A.  Yes, I do.

K337HOR1                         Lancaster - recross

1    Q.   And underneath that heading we see the cash installment

2    component of the contingent payments, do we not?

3    A.   I do.

4    Q.   And if we go down to the right side, when we see a

5    description of the installments, that reads "The rationale for

6    this is that Major SHs are sharing in every dollar from $1 to

7    $20 million, and this dollar-for-dollar deduct balances the

8    risk between us in a downside scenario.  Asterisk, subject to a

9    proportionate reduction for 2016."  Do you see that, sir?

10   A.   Yes, I do see that.

11   Q.   And that's exactly what Mr. Hennekes just was talking about

12   in his e-mail.

13            MS. PECTOR:  Objection, mischaracterizes the evidence.

14            THE COURT:  Sustained.

15            You can testify to your understanding.

16   A.   So I see the asterisk, but let me break that into two

17   parts.  So you highlighted the rows in column L that are 72

18   through 77, so this is Mark's analysis; and the box above the

19   asterisked phrase, I agree that is correct in that it does

20   apply to the cash installments.  I just testified the language

21   that Mr. Hennekes has put in the second bullet point belongs

22   properly to the earnout; it did not belong to the cash

23   installments.  So, if I look at that asterisked phrase here, it

24   modified the cash installment portion.

25            THE COURT:  Go ahead.

K337HOR1                    Lancaster - recross

1   Q.  Can we pull up PX 634, this is the earnout agreement.

2            Eric I'm going to test you because I would like to go

3   to Exhibit B, but I don't have the page number in my notes.

4            THE COURT:  Is your screen working?  I think I turned

5   everything off.  We got it.

6            Did your screen come back?

7            MR. MAROONEY:  Yes.

8            THE COURT:  OK, go ahead.  Sorry about that.

9   Q.  All right.  We may have lost the thread here, but you're

10   looking at Exhibit B of the earnout agreement.  Do you see

11   that, sir?

12   A.  I do see that.

13   Q.  And do you see the notes on the right side?

14   A.  I do see the note.  And I would point out that the phrase,

15   the asterisk, does not appear in the last line in the southeast

16   corner, so in this particular case that language in Exhibit B

17   without the asterisk indicates there is a proportionate

18   reduction for cash installments which is the same achievement

19   ratio we talked about yesterday that is the actual adjusted

20   EBITDA divided by the plan EBITDA.  So it is in your client's,

21   frankly, there is no three quarters adjustment.  The only

22   proportionate adjustment is the achievement ratio.  And this

23   particular omission of the last line on that far right third of

24   the document in this far southeast corner now makes that read

25   properly.

K337HOR1                          Lancaster - recross

1              THE COURT:  Are you saying for the cash installments

2     the achievement ratio was calculated differently than for the

3     earnout?

4              THE WITNESS:  No, the achievement ratio is the same

5     achievement ratio where you take the numerator as the actual

6     adjusted EBITDA divided by the denominator which is the plan

7     adjusted EBITDA.  So that's the proportional reduction piece

8     that applies to both the earnout and to the cash installments.

9              THE COURT:  What about for 2016?

10             THE WITNESS:  So the 2016, three quarters only applies

11    to the earnout; that's in section 2.2(b).

12             THE COURT:  OK, that's only the earnout.

13             THE WITNESS:  Only in the earnouts.

14             THE COURT:  So for the cash for 2016 it's 12 months

15    over 12 months.

16             THE WITNESS:  That's correct, for the cash

17    installments.  And that again is to the benefit of Major.

18    We're not considering the three quarters.  They got the entire

19    $5 million -- no forfeiture for reduction -- for the nine

20    months versus that, and they only had that achievement ratio

21    that applies both to the earnout, and they have a

22    dollar-for-dollar below $20 million.

23             THE COURT:  Both of them use the $20 million as the

24    plan for 2016.

25             THE WITNESS:  The plan for 2016 is exactly

K337HOR1                    Lancaster - recross

1    $20,749,213.  So the denominator never changes; it's always the

2    plan.

3              MR. MAROONEY:  We can put that away.

4    Q.  Yesterday you I think testified that to hit the earnout

5    max -- assuming the customer count was at the customer count

6    number -- that Major Energy would have to earn something in the

7    range of $28 million.  Do you remember that, sir?

8    A.  So to be precise, if you look at that Demonstrative Exhibit

9    2 from the defendants, I used the example yesterday if you took

10   the first quarter and added exactly $20 million you would get

11   exactly the $5,454,545 number.

12   Q.  Right, we added 20 million to the over $7 million that was

13   earned in the first quarter to get to that number.

14   A.  Right.  In other words, if you say assuming all targets

15   hit, you took into consideration that you satisfied 2.2(b), you

16   satisfied 2.2(c), and you took into consideration 2.2(d),

17   meaning there was no customer count reduction.

18   Q.  And you testified yesterday to the effect that the first

19   quarter in the energy business -- unless it's a polar vortex --

20   is a very profitable quarter but the second and third quarters

21   not so much.  Do you remember that?

22   A.  That's a typical year in-year out assumption in energy.

23   Q.  Why is that?

24   A.  Because winter months tend to be better margin months, and

25   the only exception would be typically with that polar vortex

K337HOR1                        Lancaster - recross

1   where you have variable rate customers and you were not able to

2   fully calculate the supply necessary for those customers, you

3   would have to go buy supplies in a next day or spot market.

4   Q.  So in your view to hit the earnout Major would have to go

5   gang busters in the very two quarters that are typically not

6   the most profitable quarters, right?

7   A.  Well, I think you would have to consider all three

8   quarters.  So the last quarter of the year also has winter

9   months, and every year is different, so the last quarter of the

10  year is also a pretty robust quarter; it could be fairly

11  comparable.  And then the third quarter would typically be

12  weak.  The second quarter, depending on the summer, if you're

13  in the Northeast states and you have an extremely hot summer,

14  those could be a little more profitable.  So those are

15  extrapolations made from years of experience in the energy

16  industry.

17  Q.  So you were hoping for a really really cold October,

18  November, December of 2016.

19  A.  Well, if we're taking a scenario that would give you the

20  $20 million, I would say you would have to have a pretty cold

21  winter and a hot summer.

22  Q.  OK.  By the way, when NGE bought -- when the MIPA and

23  earnout were signed on March 18, 2016, the first quarter wasn't

24  even over, right?

25  A.  That's correct.

K337HOR1                          Lancaster - recross

1   Q.  All right.  You testified yesterday about a low income

2   order.  Do you remember that?

3   A.  I do.

4   Q.  And, first, you know that the low income order -- I think

5   you testified yesterday it wasn't even passed until July 2016.

6   A.  That's correct, in July.

7   Q.  And that it actually didn't even come into effect until

8   sometime later in 2017.  Are you aware of that, sir?

9   A.  I am aware of that.

10  Q.  All right.  And I think you may have testified to the

11  effect that the low income order had some kind of -- strike

12  that.

13          Let's just pull up PX 196.

14          So Plaintiff's Exhibit 196 is an e-mail from Mr.

15  Alper.  You know who he is, right, sir?

16  A.  I do.  He's the CEO of Major.

17  Q.  And that's to Mr. Wiederman on top.  But looking at the --

18          I'm sorry, Eric, I'm confusing you.  Let's go to Mr.

19  Alper's e-mail below.

20          This is an e-mail from Mr. Alper to Mr. Kroeker and

21  Mr. Maxwell.  Do you see that, sir?

22  A.  I do see that.

23  Q.  And you are not on this e-mail.

24  A.  That's correct, I have not seen it before today.

25  Q.  And he is attaching a weekly report for Major Energy.  Do

1    you see that?

2    A.  I do.

3    Q.  OK.  And you were not included in these weekly reports that

4    were provided by Mr. Alper, were you?

5    A.  I was included in those reports or reviewed them every week

6    while National Gas & Electric was the owner of Major.  After

7    Spark's dropdown, I did not review those reports any further.

8    Q.  So this one, the date of this e-mail is September 16, 2016,

9    which is after the dropdown.

10   A.  That's correct.

11   Q.  So you did not view this one, did you?

12   A.  I did not.

13   Q.  Let's go to page 6.  If we could look at box 6, Mr. Alper

14   is providing a regulatory update as developments occur,

15   especially in New York and Pennsylvania.  Do you see that, sir?

16   A.  I do see that.

17   Q.  And the update is "We have compiled an analysis of New York

18   low income order, and I have shared with Spark.  The data

19   provided by the utilities of customers needed to be dropped are

20   showing a small impact on Major's New York book especially

21   through the 2018 calendar year.  Supply estimates that the

22   total margin effect will be less than $1 million."

23          Did I read that correctly?

24   A.  You did.

25   Q.  And have you reviewed or got to see Mr. Kroeker's own

K337HOR1                         Lancaster - recross

1    statements about the impact of the low impact order on the

2    regulatory environment that he made on earnings calls?

3    A.  I have not reviewed those.

4              MR. MAROONEY:  No further questions.

5              THE COURT:  Anything further?

6              MS. PECTOR:  No redirect, your Honor.

7              THE COURT:  Thank you, sir.  You may step down.

8              MR. MAROONEY:  Oh, as a housekeeping can we offer PX

9    196?

10             THE COURT:  Yes, PX 196 is received.

11             (Plaintiff's Exhibit PX 196 received in evidence)

12             THE COURT:  Plaintiff may call your next witness.

13             MR. DAHAN:  Plaintiff calls Nathan Kroeker.

14             THE COURT:  All right.

15    NATHAN KROEKER,

16         called as a witness by the plaintiff,

17         having been duly sworn, testified as follows:

18             THE COURT:  The witness has been sworn.  Mr. Dahan,

19    you will start with the document witness's direct?

20             MR. DAHAN:  If we could do like we did yesterday, we

21    would like to introduce -- hand up plaintiff's objections to

22    the witness.

23             THE COURT:  All right, thank you.

24             Do you have a paper copy of the witness's statement

25    too?  Or is it in one of the binders?  Thank you.

K337HOR1                          Kroeker - cross

1              MR. DAHAN:  We do.

2    DIRECT EXAMINATION

3    BY MR. DAHAN:

4    Q.   Good morning, Mr. Kroeker.

5    A.   Good morning.

6    Q.   In front of you I think is your written direct statement.

7    Do you see that?

8    A.   Yes.

9    Q.   And if you could turn to the last page, it's page 867, is

10   that your signature?

11   A.   Yes.

12   Q.   Dated December 23, 2019?

13   A.   Yes.

14   Q.   And do you adopt the statements made in this statement?

15   A.   Yes.

16              MR. DAHAN:  Your Honor, we would like to submit it and

17   proceed.

18              THE COURT:  I'm receiving the written direct statement

19   as the direct testimony of Mr. Kroeker, subject to the

20   objections which I am reserving and will rule on at the time I

21   issue my findings and conclusions.  And you may proceed with

22   cross.

23   CROSS EXAMINATION

24   BY MR. DAHAN:

25   Q.   Mr. Kroeker, you currently serve as the president and CEO

K337HOR1                        Kroeker - cross

1    of defendant's Spark Energy, Inc., correct?

2    A.  Yes.

3    Q.  For purposes of my examination I will refer to Spark

4    Energy, Inc. as Spark, OK?

5    A.  OK.

6    Q.  You have been the CEO of Spark since April 2014, correct?

7    A.  Yes.

8    Q.  So you served in this position throughout the entire

9    earnout period; isn't that correct?

10   A.  Yes.

11   Q.  Now, Spark is headquartered in Houston, Texas; is that

12   correct?

13   A.  Yes.

14   Q.  And as CEO of Spark you oversee the day-to-day operations

15   of the company, correct?

16   A.  Yes.

17   Q.  You also helped shaped overall strategy of the company,

18   correct?

19   A.  Yes.

20   Q.  You report to the board of Spark; isn't that correct?

21   A.  That's correct.

22   Q.  And you are one of the board members of Spark, correct?

23   A.  That is correct.

24   Q.  And you have been a board member since August 2014,

25   correct?

K337HOR1                          Kroeker - cross

1    A.  Correct.

2    Q.  Now, Mr. Maxwell, Keith Maxwell, is the nonexecutive

3    chairman of the Spark board; is that correct?

4    A.  That's correct.

5    Q.  Now, as CEO of Spark you review and sign Spark's form 10Ks,

6    is that correct?

7    A.  Yes.

8    Q.  The annual reports?

9    A.  Yes.

10   Q.  And with Spark's public filings with the SEC Spark

11   endeavors to be as truthful and accurate as possible; is that

12   right?

13   A.  Yes.

14   Q.  And as CEO of Spark you also participate on company

15   earnings calls, correct?

16   A.  Yes.

17   Q.  And on these earnings calls you make statements about

18   Spark's financial conditions and operations at the time,

19   correct?

20   A.  Yes.

21   Q.  And at times you will also answer questions from analysts?

22   A.  Correct.

23   Q.  And on earnings calls you endeavor to be as truthful and

24   accurate as possible, right?

25   A.  Yes.  And keep in mind I'm tailoring my comments on the

K337HOR1                          Kroeker - cross

1    earnings calls to the audience which are public investors.

2    Q.  Right, but you want to be truthful, right?

3    A.  Absolutely.  Absolutely.

4    Q.  Now, Spark is the parent of Spark HoldCo LLC, right?

5    A.  Yes.

6    Q.  And Spark HoldCo was formed as a Delaware LLC around April

7    of 2014; is that correct?

8    A.  I believe that's correct.

9    Q.  Let's show Plaintiff's Exhibit 251.

10            Have you seen this document before?

11   A.  I don't recall specifically.

12   Q.  All right.  So this is the second amended and restated

13   limited liability company agreement of Spark HoldCo LLC dated

14   as of August 1, 2014.  Do you see that?

15   A.  I do see that.

16   Q.  OK.  Let's go to PX 251, the same exhibit but page 35.  Is

17   that your signature on that page?

18   A.  Yes, that's an electronic signature.

19   Q.  OK.  And you're signing there on as president and chief

20   executive officer of Spark HoldCo LLC?

21   A.  That's correct.

22   Q.  And if we go to the next page, did you sign as the

23   president and chief executive officer of Spark Energy, Inc.?

24   Correct?

25   A.  Yes.

K337HOR1                      Kroeker - cross

1   Q.  And it's identified as the managing member of HoldCo LLC,
2   correct?
3   A.  Yes.
4   Q.  Now, if we could go to --
5        Now, Spark is in fact the sole managing member of
6   Spark HoldCo; is that correct?
7   A.  I believe that's correct.
8   Q.  OK.  If we could go to page 23.  And if we could blow up
9   section 6.1, please.
10       Now, as the managing member, Spark has full and
11  complete charge of all affairs of Spark HoldCo; is that
12  correct?
13  A.  That is my understanding, yes.
14  Q.  And as the managing member, Spark has exclusive charge of
15  the management and control of Spark HoldCo's business
16  activities and operations; is that correct?
17  A.  Again, that's my understanding, yes.
18  Q.  And as the managing member, Spark makes all decisions
19  regarding the business activities and operations of Spark
20  HoldCo in its sole discretion without the consent of any other
21  member; isn't that correct?
22  A.  I mean are you just -- are you reading this?  Should I be
23  following along?
24  Q.  I'm right now it would be number (ii).
25  A.  OK, I agree you read that correctly.

K337HOR1                         Kroeker - cross

1    Q.  Any reason to doubt that that's accurate?

2    A.  No.

3    Q.  And you are the CEO of Spark HoldCo, correct?

4    A.  Yes.

5    Q.  And as we see in item 3, members other than the managing

6    member -- in other words, members other than Spark -- are not

7    permitted to participate in the control, management, direction

8    or operation of the activities and affairs of the company and

9    shall have no power to act for or bind the company; isn't that

10   true?

11   A.  That is correct.

12   Q.  Now, Spark HoldCo cannot make an acquisition without the

13   approval of Spark; is that correct?

14   A.  I don't know that to be the case.

15   Q.  You think Spark HoldCo can make an acquisition without the

16   approval of its managing members?  Is that your testimony?

17   A.  I believe so, within the delegation of authority limits

18   that are approved by the board.

19   Q.  Now, as the managing member of Spark HoldCo, Spark also

20   appoints the officers and employees of Spark HoldCo; isn't that

21   true?

22   A.  Can you repeat that, please.

23   Q.  Sure.  Why don't we go to 6.2.  You see in A, "The managing

24   member may appoint, employ or otherwise contract with any

25   person for the transaction of the business of the company ..."

K337HOR1                          Kroeker - cross

1              Do you see that?

2   A.  I do see that.

3   Q.  If we go to C, the managing member may appoint officers at

4   any time; is that correct?

5   A.  Yes.

6   Q.  And if you go down to the next sentence, "The officers will

7   serve at the pleasure of the managing member."  Is that

8   correct?

9   A.  Yes.

10  Q.  Let's talk about National Gas & Electric, NGE, OK?

11  A.  OK.

12  Q.  In your witness statement, if you go to paragraph 18, you

13  state that NGE was formed in 2015 for the purpose of purchasing

14  retail energy companies and retail customer books that could

15  ultimately be resold to the Spark family.  Is that correct?

16  A.  Yes.

17  Q.  And you cite DX 112 at 5, right?

18  A.  Yes.

19  Q.  Now, NGE is itself an operating ESCO; is that right?

20  A.  Correct.

21  Q.  Before that, the acquisition of Major Energy, NGE, was a

22  competitor of Major Energy; is that correct?

23  A.  Yes.

24  Q.  And NGE was also a competitor of Spark; is that correct?

25  A.  Yes.

K337HOR1                              Kroeker - cross

1    Q.   And if NGE acquires another ESCO, it's not obligated to

2    subsequently drop down that escrow to Spark.

3    A.   Not obligated, correct.

4    Q.   In fact, NGE could choose to operate an ESCO it purchases

5    for as long as it wanted; isn't that true?

6    A.   Yes.

7    Q.   And Spark itself could even choose to reject a dropdown

8    offer from NGE; isn't that correct?

9    A.   That's correct.

10   Q.   Now, NGE purchased Major Energy in April 2016, right?

11   A.   Yes.

12   Q.   And you were not involved in the sale negotiations between

13   NGE, Major Energy and the sellers; is that correct?

14   A.   I was not directly involved in the negotiations, that's

15   right.

16   Q.   And in fact do you recall at your deposition you testified

17   that you didn't have any direct communications with any of the

18   sellers between November 2015 and April 15, 2016; isn't that

19   correct?

20   A.   Correct.

21   Q.   And just for the record, it's November 15, 2015 to April

22   15, 2016, correct?

23   A.   Correct.

24   Q.   And in your witness statement you discuss in some length

25   the transaction documents executed between NGE, Major Energy

K337HOR1                    Kroeker - cross

1    and the sellers, correct?

2    A.   Yes.

3    Q.   But you did not participate in the negotiation or drafting

4    of, for example, the membership interest purchase agreement

5    between NGE, Major Energy and the sellers; is that correct?

6    A.   That's correct.

7    Q.   And you did not participate in the negotiation or drafting

8    of the earnout agreement, or executive earnout agreement,

9    between NGE, Major Energy and the sellers; correct?

10   A.   That's correct.

11   Q.   Now, you are aware that the negotiations between NGE, Major

12   Energy and the sellers began sometime in late 2015, correct?

13   A.   Yes.

14   Q.   And the closing of the transaction between NGE, Major

15   Energy and the sellers occurred on April 15, 2016, correct?

16   A.   Yes.

17   Q.   And on August 23, 2016 NGE sold Major Energy to Spark;

18   isn't that true?

19   A.   Yes.

20            MR. BROWN:  Objection.  He is using Spark as --

21            MR. DAHAN:  I think the witness understood my

22   question, but let's look at the document.

23            THE COURT:  Clarify.

24   Q.   So let's show PX 457, Plaintiff Exhibit 457.  Have you seen

25   this before, Mr. Kroeker?

K337HOR1                         Kroeker - cross

1    A.  Yes.

2    Q.  And this is an August 23, 2016 Spark Energy press release?

3    A.  Yes.

4    Q.  And the title is "Spark Energy, Inc. Announces Closing of

5    Major Energy acquisition," correct?

6    A.  Correct.

7    Q.  And if you look at the first sentence it says "Spark

8    Energy, Inc., a Delaware corportation, announces today that the

9    company" -- which is identified as Spark Energy, Inc. -- "has

10   completed its acquisition of the Major Energy Companies."  Do

11   you see that?

12   A.  I do see that.

13   Q.  There is no mention of Spark HoldCo in this press release,

14   is there?

15   A.  No.  The public entity is Spark Energy, Inc. so anytime we

16   are speaking to investors we do it through Spark Energy, Inc.

17   Q.  Again, but to my question, do you see Spark HoldCo on this

18   press release?

19   A.  No.

20   Q.  So just four months into the 33 month earnout period NGE

21   has already sold its ownership interest in Major Energy,

22   correct?

23   A.  Yes.

24   Q.  Now this transaction is referred to in this case as the

25   dropdown transaction, correct?

K337HOR1                          Kroeker - cross

1    A.  Yes.

2    Q.  If we could show Plaintiff's Exhibit 756.

3             Have you seen this filing before, or schedule 14C, in

4    August of 2016?

5    A.  I'm sure I have, but I don't recall the specifics of it.

6    Q.  And this was filed in August 2016.  That's about four

7    months after the closing of the deal between NGE and the

8    sellers, correct?

9    A.  I don't see a date on here.

10   Q.  OK.  If we go to that cover page, do you see on the top it

11   says attached form, and it has a date received in the

12   Commission on 8/3/2016?

13   A.  I see that, yes.

14   Q.  Under the name Spark Energy, Inc.?

15   A.  Yes.

16   Q.  And you were the CEO of Spark at the time of this filing,

17   right?

18   A.  Yes.

19   Q.  And this filing, this 14C, was the to inform Spark

20   stockholders of Spark board's decision to approve the entry of

21   the membership interest purchase agreement between NGE, Spark,

22   Spark HoldCo and RetailCo, what has been referred to as the

23   Spark MIPA?

24   A.  You would have to walk me through the pages.

25   Q.  Sure.  Why don't we do that.  Why don't we just go to

K337HOR1                      Kroeker - cross

1   the -- there.

2            Do you see that?  And it starts "This information

3   statement is being circulated to the stockholders of record of

4   Spark Energy, Inc., identified as the company."  Do you see

5   that?

6   A.  I do see that.

7   Q.  "And the purpose of this" -- the next sentence -- "The

8   purpose of this information statement is to inform our

9   stockholders of actions taken by written consent of the holders

10  of a majority of outstanding voting stock of the company."  Do

11  you see that?

12  A.  Yes.

13  Q.  And then if you go to number 1, it talks about how on May

14  3 -- that's the membership interest purchase agreement I was

15  referring to before?

16  A.  Yes.

17  Q.  And in fact this Spark MIPA is attached as an annex to this

18  filing.

19           If you go to 225, Eric.  Sorry, page 225 of that

20  exhibit.  Sorry.

21           So this was attached to the filing as Annex A, and

22  it's a membership interest purchase agreement by and among

23  National Gas & Electric LLC, RetailCo LLC, Spark HoldCo LLC and

24  Spark Energy LLC dated as of May 3, 2016?

25  A.  Yeah.  I think you misstated one of the names, but, yes,

1   that's what it says.

2   Q.  So just about two weeks after the closing of the

3   transaction between NGE and the sellers, the Spark board

4   already approved the entry of this Spark MIPA; is that correct?

5   A.  Yes.

6   Q.  Eric, again this same exhibit, if we go down to I guess

7   003 -- I'm sorry -- well, I'm sorry, the page before.  I'm

8   sorry.

9          So in this filing there is a description of the

10  transaction, background of the transaction.  Do you see that?

11  A.  I do.

12  Q.  Now if we can go to the next page which is part of this

13  section.  And in the second paragraph it says that "In November

14  2015, NG&E recommenced discussions with the Major Energy

15  Companies."  Do you see that?

16  A.  Yes.

17  Q.  And it says "Both NGE and the company"-- and the company is

18  Spark Energy, Inc., isn't that correct?

19  A.  Yes.

20  Q.  -- "believed that the new growth initiatives at the Major

21  Energy Companies have significantly increased the long-term

22  value of the Major Energy Companies."

23          Did I read that correctly?

24  A.  You read that correctly.

25  Q.  And that was a true statement in this filing, wasn't it?

K337HOR1                         Kroeker - cross

1   A.  Yes, as of May of 2016 what I had in front of me was the

2   projections that were incorporated into the NG&E and Major

3   MIPA.  Based on those projections, this is an accurate

4   statement.

5   Q.  This says that in November 2015 both NGE and the company

6   believed what it says in this sentence.

7            MR. BROWN:  Objection.  Mischaracterization.  It's the

8   second sentence.

9   A.  Yeah, I think those are two separate sentences.

10           THE COURT:  You can clarify.

11  Q.  So it's your testimony that this statement is as of August

12  2016?

13  A.  I believe this statement is as of the date this document

14  was filed.  I believe that the discussions were recommenced in

15  November of '15.

16  Q.  OK.  So therefore this belief is even as of August 2016?

17  That's your testimony?

18           MR. BROWN:  Objection.  Mischaracterization.  The

19  document is dated.

20           THE COURT:  What's the date of the document?

21           MR. DAHAN:  August 2016.

22           MR. BROWN:  August 3, 2016.

23           MR. DAHAN:  August 3, 2016, sorry.

24  Q.  It says in the next sentence, "it was further the belief of

25  both the company and NG&E that the acquisition of the Major

1    Energy Companies by the company would add significantly

2    long-term value to the company's equity investors."

3              Did I read that correctly?

4    A.  You read that correctly.

5    Q.  And that was a true statement again as of the date of this

6    filing, correct?

7    A.  Yes.

8    Q.  It then says, "However, as the company did not have

9    sufficient cash on hand or availability under its credit

10   facility to close on an acquisition of the size anticipated for

11   the Major Energy Companies at that time, both the company and

12   NGE reached the conclusion that it would be in the best

13   interest of the company and its equity investors for NGE to

14   acquire the Major Energy Companies and then sell the Major

15   Energy Companies to the company at a later date."  Do you see

16   that?

17   A.  I see that.

18   Q.  And that was a true statement at the time too, right?

19   A.  Yes.

20   Q.  Now, if we expand this page, Eric, if you go to the fourth

21   paragraph starting on March 21, 2016.

22             Do you see that?

23   A.  Yes.

24   Q.  It says, "On March 21, 2016, Mr. Maxwell met with the

25   company's chief executive officer, Nathan Kroeker, to formally

K337HOR1                          Kroeker - cross

1    discuss the purchase from NG&E and dropdown of the Major Energy

2    Companies to the company."

3              Do you see that?

4    A.  Yes.

5    Q.  And that was a true statement, correct?

6    A.  Yes.

7    Q.  And it says that the meeting was to formally discuss the

8    dropdown of Major Energy to the company.  And again the company

9    in this filing is identified as Spark Energy, Inc.  Isn't that

10   true?

11   A.  Yes.

12   Q.  And this meeting is three days after the MIPA was executed

13   between NGE and the sellers; isn't that true?

14   A.  I don't recall that date, but it sounds reasonable to me.

15   Q.  In the last sentence of this paragraph it says, "Following

16   the conclusion of due diligence and analysis by the company,

17   Mr. Kroeker recommended to the board that the company should

18   acquire the Major Energy Companies from NG&E on the terms

19   described above."

20             Do you see that?

21   A.  I see that.

22   Q.  And that was a true statement, correct?

23   A.  Yes.  Yes.

24             Can we go back to the definition of company for a

25   minute?

K337HOR1                          Kroeker - cross

1   Q.   Sure.

2   A.   Because there seems to be a lot of focus on that word.

3   Q.   If we can go to the first page of this document.

4          "So, Spark Energy, Inc., a Delaware corporation..."

5   And then it says "References in this statement to the company

6   and Spark are Spark Energy, Inc."  Do you see that?

7   A.   I do.  Because there's a lot of times we define Spark

8   Energy, Inc. and its affiliates as the company in our public

9   filings.

10  Q.   But not in this one, correct?

11  A.   That's why I wanted to come back to this.  Correct.

12  Q.   We go on the same page that we were looking at, the next

13  paragraph talks about on April 6, 2016.  Do you see that?  It

14  says that the Spark board on that day by unanimous written

15  consent created a special committee to evaluate and negotiate

16  the terms of a potential dropdown transaction.  Do you see

17  that?

18          MR. BROWN:  Objection.  Mischaracterization.

19          MR. DAHAN:  I am paraphrasing.  I could read the whole

20  thing.

21          THE COURT:  That's fine.

22          MR. BROWN:  Withdrawn.

23  A.   Yes.

24  Q.   And that was a true statement, correct?

25  A.   Yes.

K337HOR1                          Kroeker - cross

1   Q.  If we could go to Plaintiff's Exhibit 655.  Have you seen

2   this document before, Mr. Kroeker?

3   A.  Yes.

4   Q.  And this is the unanimous written consent of the board of

5   directors of Spark Energy, Inc. to create, authorize and

6   delegate certain duties to a special committee?

7   A.  Correct.

8   Q.  And it's dated April 6, 2016?

9   A.  Yes.

10  Q.  And if we go to the last page, I think it's pdf page 6,

11  there are electronic signatures there?

12  A.  Yes.

13  Q.  And one of them is for you?

14  A.  Yes.

15  Q.  One of them is for Keith Maxwell?

16  A.  Yes.

17  Q.  And the others are the other members of the Spark board at

18  the time?

19  A.  Yes.

20  Q.  Eric, if we could go back to that description of the

21  transaction section.

22          THE COURT:  Are you back on 756 now?

23          MR. DAHAN:  Yes.

24  Q.  So, on page 6 there is additional description of different

25  events and actions on April 6, 2016, and then April 11, 2016.

K337HOR1                              Kroeker - cross

1            Eric, if you could go to the next page.

2            And then April 11, 2016; April 19, 2016; April 21,

3   2016; April 22, 2016; April 24, 2016; April 25, 2016.  Do you

4   see all that?

5   A.  Yes.

6   Q.  Without having to go through each one, any reason to

7   believe any of the statements of those dates would be

8   inaccurate in this filing?

9   A.  No.

10  Q.  Now, you are aware that prior to the closing of the

11  transaction between NGE and the sellers on April 15, 2016, NGE

12  had already sent several offer letters to Spark about this

13  dropdown, correct?

14  A.  Yes.

15  Q.  One on April 7; do you recall that?

16  A.  Yes.

17  Q.  One on April 8?

18  A.  Yes.

19  Q.  And one on April 15, correct?

20  A.  I believe so.

21  Q.  And to your knowledge were any of those offer letters

22  shared with the sellers prior to closing?

23  A.  Not to my knowledge.  I'm sorry, the sellers, you mean the

24  sellers of Major Energy.

25  Q.  That's correct.

K337HOR1                        Kroeker - cross

1   A.  Not to my knowledge.

2   Q.  And you definitely didn't share it with them, correct?

3   A.  I did not.

4   Q.  Now, you have seen the MIPA that was entered into between

5   NGE, Major Energy and the sellers, correct?

6   A.  Yes.

7   Q.  You weren't involved in the drafting or negotiations, but

8   you have seen it, correct?

9   A.  That's correct.

10  Q.  Why don't we look at Defendant's Exhibit 2.

11          THE COURT:  Did you say Defendant's 2?

12          MR. DAHAN:  Yes.

13  Q.  That is the MIPA dated March 18, 2016.  Do you see that?

14  A.  Yes.

15  Q.  Does that also now refresh your memory about how many days

16  from this to that meeting we saw on March 21 with you and

17  Mr. Maxwell that we talked about in the 14C?

18  A.  Yes, it does.

19  Q.  And if I could draw your attention to page 6 of this

20  document, Spark is not a buyer in this agreement, is it?

21  A.  No, it's not.

22  Q.  Spark Holdco is not a buyer to this agreement, is it?

23  A.  No.

24  Q.  In fact, is Spark even mentioned in this agreement?

25  A.  No.

K337HOR1                          Kroeker – cross

1    Q.   Is Spark Holdco mentioned in this agreement?

2    A.   No.

3              (Continued on next page)

K33AHOR2ps                    Kroeker - Cross

1   Q.  Turn to article 6 of this agreement.  That's page 40, I

2   believe?

3        THE COURT:  Counsel, can I clarify?  It's not

4   mentioned on this page.

5   Q.  It's your understanding that Spark is mentioned somewhere

6   in this agreement?

7   A.  I don't know.

8   Q.  Now, in connection with the dropdown, NGE and Spark, and

9   Spark HoldCo entered into what's been referred to as the Spark

10  MIPA, correct?

11  A.  Yes.

12  Q.  In that agreement, the parties made representations and

13  warranties, correct?

14  A.  Yes.

15  Q.  And so in this MIPA there were representations and

16  warranties of the buyer.  You see that?

17  A.  Yes.

18  Q.  And that was NGE, correct?

19  A.  Yes.

20  Q.  And if we go to the next page, one of those representations

21  was, "Buyer NGE is acquiring the interest, which is the Major

22  Energy membership interest, solely for its own account for

23  investment purposes and not with a view to, or for offer or

24  sale in connection with, any distribution thereof."  You see

25  that?

K33AHOR2ps                    Kroeker - Cross

1   A.  I do see that.

2   Q.  Do you see anything in this provision that says if NGE is

3   acquiring Major Energy, it would then sell it to Spark at a

4   later date?

5   A.  I don't see that in here.  But that was generally

6   understood between the parties dating back to 2015.

7   Q.  But it wasn't put in this agreement, correct?

8   A.  I don't see it in this agreement.

9   Q.  And in fact NGE was an initial drafter of this agreement;

10  isn't that true?

11  A.  I was not involved in that.  I believe Mr. Lancaster

12  testified related to that yesterday.

13  Q.  And it doesn't say in this provision that NGE is buying

14  Major Energy with a view to do a back-to-back transaction with

15  Spark, does it?

16  A.  It does not say that.

17  Q.  Now, in your witness statement, in paragraphs 98 through

18  100, we can focus first on 98.

19  A.  OK.

20  Q.  I'm just paraphrasing.  Correct me if I'm misstating your

21  testimony.  You say that part of Spark's dropdown due diligence

22  efforts are to develop certain projection in Major Energy's

23  financials.  Correct?

24  A.  Yes.

25  Q.  And you talk in your witness statement about projections

K33AHOR2ps                    Kroeker - Cross

1   done in late April 2016, correct?

2   A.  Yes.

3   Q.  Let's look at that projection.  That would be Defendant's

4   Exhibit 1028.

5            THE COURT:  1028?

6   Q.  So before we get to the projection, there was a cover

7   e-mail from Andrea Gregory to you, April 22, 2016.  Do you see

8   that?

9   A.  I do.

10  Q.  And she says --

11  A.  He.  Andrei.

12  Q.  He said -- I apologize -- says "requested documents as of

13  this morning," and identifies the due diligence overview deck

14  and sign-off memos.  Do you see that?

15  A.  Yes.

16  Q.  Do you remember getting those?

17  A.  Yes.

18  Q.  And these were documents relating to a contemplated

19  dropdown at the time, correct?

20  A.  Yes.

21  Q.  So let's look at the due diligence overview deck, which is

22  1028A.

23           This is a Spark Energy, Major Energy due diligence

24  overview.  Do you see that?

25  A.  Yes.

1   Q.  And on the bottom left it says April 25, 2016, correct?

2   A.  Yes.

3   Q.  Do you have any idea why it's dated April 25th, it's being

4   sent to you on April 22nd?

5   A.  I believe we would have had some meeting on the calendar

6   for the 25th and this would have been a draft, prepared in

7   anticipation of an April 25th meeting.

8   Q.  OK.  Thank you.

9        Now, to your knowledge, this due diligence deck was

10  not shared with the sellers at this time, was it?

11  A.  I don't believe so.

12  Q.  Let's go to the fourth page of the presentation but it's

13  slide 3.  You've seen that page before?

14  A.  Yes.

15  Q.  And this says "Spark preliminary KFI three-year

16  projections."  Do you see that?

17  A.  Yes.

18  Q.  And that was for Major Energy, correct?

19  A.  Yes.

20  Q.  And this is Spark's preliminary projections for Major

21  Energy for 2016, 2017, 2018.  Do you see that?

22  A.  Yes.  2016 is a partial year.

23  Q.  I understand.

24  A.  OK.

25            THE COURT:  What's KFI?

K33AHOR2ps                    Kroeker - Cross

1                THE WITNESS:  Key financial indicators.

2                THE COURT:  Thank you.

3    Q.  And this projection, at least as of April 22, 2016,

4    correct, is after the New York resetting order in February came

5    out, right?

6    A.  Yes.

7    Q.  And this says Spark was projecting a three-year average

8    adjusted EBITDA of $20,158,000.  Did I read that correctly?

9    A.  Yes, based on customer acquisition costs of 12 to 13

10   million dollars a year.

11   Q.  OK.  But that's the average, correct?

12   A.  That's the average.

13   Q.  And it says that associated with that, if you look to the

14   right, it says base purchase price 45 million, projected

15   earnout 29.5 million.  Do you see that?

16   A.  I do.

17   Q.  And that's about 20 million more than the sellers

18   ultimately got in this case; isn't that true?

19   A.  I believe that's correct.

20   Q.  And that's after Spark's diligence; isn't that correct?

21   A.  This, like I said, this was before we signed our MIPA, but

22   this was during our due diligence.  This is an update that I

23   received from my financial team.

24                Keep in mind, you're looking at financial projections

25   here, not the due diligence work that we did.  Right?

1    Q.  I understand.  But this is your document, correct?

2    A.  This is our document, yes.

3    Q.  Now, just to clarify, in coming up with the 20,158,000

4    number, what are you assuming at this point is going to be the

5    total adjusted EBITDA for Major Energy for the entire 2016?

6    A.  I believe that's 15.7 million.

7    Q.  And this is as of April 2016, correct?

8    A.  Correct.

9    Q.  You weren't projecting 28 million, were you?

10   A.  No.

11   Q.  And by the way, what was the final amount, according to

12   Spark, for 2016 for Major Energy?

13   A.  19.17.

14   Q.  So about 4 million higher than this, correct?

15   A.  Well, we didn't -- we didn't -- for purposes of the earnout

16   calculation, we didn't put the integration costs on the

17   sellers.  That's 4.25 million.  So I would say these

18   projections proved to be pretty accurate at the end of the

19   year.

20   Q.  And you also didn't count the fact, for adjustments, that

21   you have pretty much zero amounts for '17, '18 when the

22   projections the sellers gave, as you know, had amounts for

23   adjustments; is that correct?

24   A.  Yes, correct.  But like I said, we looked at the

25   adjustments that we were aware of and put those in here, which

K33AHOR2ps                         Kroeker - Cross

1    would have been 1067.

2    Q.  For example, you're aware that for 2017, in the projections

3    the sellers gave NGE, you had $1.3 million in adjustments for

4    2017.  Are you aware of that?

5    A.  That sounds familiar, but if we want to get into

6    adjustments, I'd like to see those documents.

7              THE COURT:  But just to be clear, the 15.7 million was

8    assuming full year 2016?

9              THE WITNESS:  Correct.

10   Q.  And let's look at now, so for 2016, resetting order is out,

11   you're projecting full year 15.6 million.  Correct?

12   A.  No.  You're mischaracterizing what I said, counsel.  So

13   this projection is a Spark internal view, in which case we're

14   spending $4.25 million on integration costs, which would have

15   been relevant when I'm showing this to my board, or internal

16   management, for deal approval.  That would not have been

17   relevant for purposes of any earnout calculation.  So you're

18   comparing apples and oranges.

19   Q.  I'm not asking about earnout.

20   A.  OK.

21   Q.  I'm just asking a simple question.

22   A.  So to Spark's shareholders, our view would have been $15.7

23   million.

24   Q.  That's right.  And what was your view of how Major Energy

25   would do between '16 and '17?  They would go from 15.6 to 22

K33AHOR2ps                        Kroeker - Cross

1   million, 22.3 million.  Isn't that true?

2   A.  Yes.  3.75 plus 667, so $4 1/2 million of that improvement

3   is strictly the integration costs and the adjustment.

4   Q.  And for 2018 you're projecting 22.4 million approximately,

5   correct?

6   A.  Correct?

7   Q.  You weren't projecting 16 million, correct?

8   A.  I was not.

9   Q.  But that's what happened, right?

10  A.  Well, fundamental difference, and you look at customer

11  acquisition costs.  We expected that they would continue to

12  spend 12 to 13 million dollars a year acquiring customers and

13  replenishing the book.

14        The other very relevant line here is the electric

15  volumes, which you can see the volumes going from 2 terawatt

16  hours up to 2.8 terawatt hours over the three-year period.

17  This shows a business that's growing.  In reality that's not

18  what happened.  What happened was the business shrunk over that

19  period of time.

20  Q.  Right, after Spark came in, correct?

21        MR. BROWN:  Objection, Judge.

22        THE COURT:  Sustained.

23  A.  I don't think --

24        THE COURT:  You don't have to answer.

25  Q.  You also in your witness statement, if we can go back to

K33AHOR2ps                    Kroeker - Cross

1    your witness statement, paragraph 101, you discuss in this

2    paragraph a Houlihan Lokey valuation done in early 2017.  Do

3    you see that?

4    A.  Yes.

5    Q.  And you cite, in footnote 61, to a DX 541.  Right?

6    A.  Yes.

7    Q.  Let's look at that exhibit.  Have you seen that before?

8    A.  Yes.

9    Q.  That's the document you're referring to, correct?

10   A.  Yes.

11   Q.  And the purpose of this valuation by Houlihan in 2017 was

12   to determine the fair value of Major Energy under ASC 820,

13   correct?

14   A.  Is ASC 820 the purchase accounting pronouncement?

15   Q.  Yes.  And allow me to just -- let's go to --

16   A.  This document was done for the purposes of purchase

17   accounting.

18   Q.  That's right.  I want to go to PDF, page 5, first bullet.

19            So it says "Houlihan Lokey Financial Advisors, Inc.

20   was retained by Spark Energy Inc.," identified as Spark or the

21   acquirer, "to express our conclusions regarding the fair value

22   of certain identifiable intangible assets of Major Energy, the

23   Major Energy companies, as of April 15, 2016."  Do you see

24   that?

25   A.  Yes.

K33AHOR2ps                        Kroeker - Cross

1  Q.  And again, the identified acquirer here is Spark Energy

2  Inc., correct?

3  A.  Yes.

4         Keep in mind Spark Energy Inc. is the public entity

5  that has to file the 10-K for which this -- which is why we

6  hired Houlihan.

7  Q.  Now, isn't it true that, for purposes of this valuation,

8  Houlihan made certain projections for Major Energy for 2016,

9  2017, and 2018 as of April 15, 2016, correct?

10 A.  Yes.

11 Q.  And in doing that, it made certain projections with respect

12 to customer count as well as adjusted EBITDA for those years,

13 correct?

14 A.  I believe so.

15 Q.  And with respect to customer count, Houlihan actually

16 projected a higher customer count figure than projected and

17 agreed upon in the earnout agreement target, isn't that true?

18 A.  You would have to show me that page.

19 Q.  OK, we'll do that.  Why don't we go to 214 of this

20 document, page 214.

21        So do you see there's a line that says on top

22 "expected EBITDA," and there's a line "expected customer

23 count."  Do you see that?

24 A.  I do see that.

25 Q.  And I'll read you from your witness statement in 101.

K33AHOR2ps                    Kroeker - Cross

1   A.  So I have a hard time reading those numbers.  Can you just

2   help me out.  Across the top is 33117, 33118, 33119?

3   Q.  That's correct.

4   A.  And then the customer account numbers are, is it 180, 190?

5

6   Q.  Yes, 180, 195, 213.

7            So for 2016, it was projecting 180,000 customers,

8   correct?

9   A.  Yes.

10  Q.  And you're aware from your witness statement that the

11  targets for 2016 in the earnout agreement projected only

12  178,000 customers; isn't that true?

13  A.  Yes.

14  Q.  In fact in your witness statement, you say, in 101, when

15  you're talking about this, you say, "In doing so, it used lower

16  projected adjustment EBITDA amounts for each target year of

17  earnout and projected lower customer counts for target years

18  2017 and 2018 than those reflected in the earnout agreement."

19  You don't say 2016, '17, and '18.  Correct?

20  A.  Do you want to point me to where you're reading?

21  Q.  Yes.  It's paragraph 101 of your witness statement, the

22  last sentence.  You only identified target years '17 and '18 on

23  customer count, right?

24  A.  Yes.

25  Q.  And then Houlihan is obviously projecting year-over-year

1    growth as higher, up to 213 customers for 2018.  Do you see

2    that?

3    A.  I do see that.

4    Q.  And for adjusted EBITDA, it's also projecting

5    year-over-year growth; isn't that true?

6    A.  I just lost my screen, so --

7    Q.  I'm sorry.

8           THE COURT:  You have to hold your breath and it will

9    come back.

10   A.  OK.  Counsel, I'm having a hard time reading the top-line

11   numbers.

12   Q.  Sure.  It's 18,277,000 for the first column, 21,376,000 for

13   the second column, and then 24 million something.

14   A.  So 18, 21, and 24?

15   Q.  That's correct.

16   A.  So that would be growth, yes.

17   Q.  That's correct.  It was not projecting 16 million in

18   adjusted EBITDA for 2018, was it?

19   A.  No.  I mean, it's projecting the 12 months ended March 31st

20   of '19, but, yes, there's nothing in here that says 16 million

21   for calendar year '18.

22          MR. DAHAN:  Now we can cover this up.

23   Q.  Now in paragraph 102 of your witness statement, if you have

24   that in front of you, you say, "These due diligence efforts and

25   analyses further reinforced my prior belief that the earnout

K33AHOR2ps                     Kroeker - Cross

1    targets reflected in the earnout agreement between NGE and the

2    sellers were quite high and it would be difficult for Major

3    Energy to achieve."  Do you see that?

4    A.  Yes.

5    Q.  I want to look at some earnings calls for Spark.  OK?

6    A.  OK.

7    Q.  Let's look at Plaintiff's Exhibit 256.  This is an earnings

8    call for the second quarter of 2016 for Spark Energy, correct?

9    A.  Yes.

10   Q.  And the earnings call is taking place on Thursday, August

11   11, 2016, correct?

12   A.  Yes.

13   Q.  That's about two weeks before the dropdown, correct?

14   A.  Yes.

15   Q.  And this is after Spark's due diligence and the board's

16   approval to proceed with the dropdown, correct?

17   A.  Yes.

18   Q.  And this is after the New York resetting order is out,

19   correct?

20   A.  I believe the resetting order has been stayed or vacated at

21   this point.

22   Q.  Yes.  And we will get to that.

23        And you participated on this call, correct?

24   A.  Yes.

25   Q.  And you made presentations to the shareholders and analysts

K33AHOR2ps                     Kroeker - Cross

1   on this call, correct?

2   A.   When you say "presentations," what do you mean?

3        There's no, there's no PowerPoint --

4   Q.   An oral presentation.

5   A.   Oral presentation, yes.

6   Q.   And you answered questions from analysts on this call,

7   correct?

8   A.   Yes.

9   Q.   Let's turn to page 5 of the transcript, PDF at 5.  So in

10  the fourth full paragraph, "we expect," do you see that?

11  A.   Yes.

12  Q.   So you are first telling them that you expect the Major

13  Energy transaction to be completed in the coming weeks.  Do you

14  see that?

15  A.   Yes.

16  Q.   You then talk about the May 3rd purchase agreement with

17  NGE?

18  A.   Yes.

19  Q.   And that you've now received all the necessary regulatory

20  approval.  Do you see that?

21  A.   Yes.

22  Q.   Let's go to the next paragraph.  You say, "We intend to

23  continue to leverage Major's management team's retail energy

24  expertise and knowledge in addition to their 210,000 RCEs and

25  strong market position in the Northeast POR markets to further

1    enhance the efficient and profitable business model they have

2    built."  Do you see that?

3    A.  I see that.

4    Q.  Did I read that correctly?

5    A.  You read that correctly.

6    Q.  And that was a truthful statement you made on that day,

7    correct?

8    A.  As of August the 11th, 2016, I believed that was a true

9    statement, yes.

10   Q.  Let's go to the next earnings call.  That's Plaintiff's

11   Exhibit 257.  So we are now in November 2016, correct?

12   A.  Yes.

13   Q.  And now this is a transcript of the third quarter of 2016

14   earnings call for Spark Energy Inc., correct?

15   A.  Yes.

16   Q.  And this is a few months after the dropdown, correct?

17   A.  Yes.

18   Q.  And it's in fact even after the low-income order came out,

19   correct?

20   A.  I believe so.

21   Q.  And you participated on this call, correct?

22   A.  Yes.

23   Q.  And you made an oral presentation to shareholders and

24   analysts on this call, correct?

25   A.  Yes.

K33AHOR2ps                    Kroeker - Cross

1   Q.  And you answered questions from analysts on this call as

2   well, correct?

3   A.  Yes.

4   Q.  Let's go to page 5 of the transcript.  And you say the

5   following: "Turning to M&A, I would like to give you an update

6   on our two acquisitions, Provider Power and Major Energy.  We

7   closed Provider on August 1, and Major was closed as a dropdown

8   from our affiliate National Gas & Electric on August 23.

9   Although we have held those two acquisitions for a short time,

10  we are very encouraged by the results we're seeing thus far,

11  both in terms of customer counts as well as profitability."

12  See that?

13  A.  I do see that.

14  Q.  I read that correctly?

15  A.  Yes.

16  Q.  And that was a true statement at that time, November 2016,

17  correct?

18  A.  Yes.

19          I would like to call your attention to the fact that

20  we are lumping together Provider and Major.  Provider was

21  poised to renew their entire customer portfolio in margins that

22  were going to double in size starting in January of the

23  upcoming year, and we were very, very excited about that

24  opportunity.

25  Q.  And so did you say in here, but that's only with respect to

K33AHOR2ps                    Kroeker - Cross

1    Provider Power?

2    A.  I did not say that.  But I did call up Maine and Hampshire

3    in the following sentence, which is all Provider.  Major wasn't

4    doing business in those markets.

5    Q.  Let's go to page 7.  So in the middle, you were asked a

6    question -- on top, sorry -- by Mr. Driscoll, from FBR.  See

7    that?

8    A.  Yes.

9    Q.  And he says, "Maybe we can just talk about how Major and

10   Provider are performing."  A little more specificity to your

11   expectation.  Do you see that?

12   A.  Yes.

13   Q.  And you can compare and contrast the positives and, if at

14   all, any negatives.  Do you see that?

15   A.  Yes.

16   Q.  And then you first talk about Provider.

17   A.  Yes.

18   Q.  And then -- now you do separate Major.  Do you see that?

19   A.  Yes.

20   Q.  So let's see what you said about Major.  "For Major --

21   Major again, we're seeing strong profitability, better than we

22   had anticipated.  Volumes are a little bit less than what we

23   had anticipated, but I think they're very short term in nature.

24   And we're seeing increased customer acquisitions.  We're seeing

25   a lot of growth in that space coming online, particularly on

1    the commercial side of that business.  And the unit margins are

2    very strong.  And the overall profitability is better than we

3    had expected.  So very pleased with those two businesses."  Do

4    you see that?

5    A.  I do see that.

6    Q.  And did I read that correctly?

7    A.  You read that correctly.

8    Q.  And you were being truthful when you made those statements

9    to Mr. Driscoll, correct?

10   A.  Yes.  Those are very carefully chosen words that we used in

11   addressing his specific question.  And I believe every bit of

12   that was true in November of 2016.

13   Q.  And then you say, "One of the things that we're working on

14   early in the next year is taking over all of the supply

15   function for Major, which is a significant synergy to us and

16   will result in us adding several million dollars to the bottom

17   line when we step into that position."  Do you see that?

18   A.  Yes.

19   Q.  And that's as of November 2016, correct?

20   A.  Yes.

21   Q.  That was a truthful statement, right?

22   A.  Yes.

23   Q.  Let's look at Spark's next earnings call.  PX 316.  We are

24   now into March 2017, correct?

25   A.  Correct.

K33AHOR2ps                        Kroeker - Cross

1   Q.  We're a year, about a year into the earnout, right?

2   A.  Yes.  Keep in mind everything I'm saying in this call may

3   be as of December 31st.

4   Q.  I understand.

5          And this is a transcript of the earnings call on March

6   3, 2016 regarding Spark's fourth quarter 26 financial results,

7   correct?

8   A.  It's March 3, 2017.

9   Q.  I apologize.  March 3, 2017, correct?

10  A.  Yes.

11  Q.  And you participated on this call, correct?

12  A.  Yes.

13  Q.  And you made an oral presentation to shareholders and

14  analysts on this call, correct?

15  A.  Yes.

16  Q.  And you answered questions from analysts on this call,

17  correct?

18  A.  Yes.

19  Q.  Let's go to page 4, the PDF page 4.  And so after Mr. Davis

20  speaks, you start to talk, right?  See that?

21  A.  Yes.

22  Q.  And you say, "Thanks, Andy.  First of all, welcome to

23  Spark's fourth quarter 2016 earnings call.  We had a phenomenal

24  fourth quarter and full year 2016, where we again saw Spark

25  produce record earnings."  See that?

K33AHOR2ps                       Kroeker - Cross

1    A.  Yes.

2    Q.  And we could get out of that blow-up, Eric.  If you go down

3    to -- sorry.  Go back to the page.  If you go to the last

4    paragraph, see that?

5    A.  I see that.

6              MR. DAHAN:  If you could get out of the blow-up.

7    Q.  I'll have to come back because I'm not sure what page I'm

8    looking for here.  So I apologize.  We'll come back to that

9    exhibit again.

10             Now, in your witness statement, in paragraph 21, you

11   state that regulatory risk is one of the two significant risks,

12   and that's growth basis, correct?

13   A.  Yes.

14   Q.  And then in paragraph 25, you say -- now just

15   paraphrasing -- that the resetting order and low-income order

16   in New York are particularly significant in Major Energy's

17   failures to achieve earnout targets, right?

18   A.  Yes.

19   Q.  And then you say, in paragraph 29, that New York was always

20   Major Energy's largest customer base, however, that market has

21   since been dramatically affected by regulatory changes, which

22   is even more so given the latest resetting order in New York.

23   Correct?

24   A.  Yes.

25   Q.  Now, the New York resetting order -- I think you mentioned

K33AHOR2ps                     Kroeker - Cross

1    this earlier -- was vacated by the New York State Supreme Court

2    in July 2016, correct?

3    A.   Yes.

4    Q.   And the New York Appellate Court upheld that lower court

5    vacatur a year later in July 2017.  Isn't that correct?

6    A.   I believe that's correct.

7              THE WITNESS:  The screen is gone.

8              MR. BROWN:  I think it goes off.

9              THE WITNESS:  OK.

10   Q.   And the New York resetting order remained vacated in fact

11   throughout the entire earnout period.  Isn't that correct?

12   A.   Yes.

13   Q.   So that vacatur impacted the entire earnout period; isn't

14   that correct?

15   A.   The order never came into effect, but the impacts of the

16   order were definitely impacting the business during that period

17   of time.  Major was making decisions based on the anticipation

18   of that order or a similar order taking effect at some point.

19   So it definitely would have had a impact on Major's business.

20   Had an impact on the entire Spark business.

21   Q.   Well, let's see what you said on the earnings call about

22   that.

23   A.   OK.

24   Q.   Let's go back to PX 256.  Right.  This was the second

25   quarter of 2016 earnings call in August 11, 2016 we saw

1   earlier?

2   A.  Yes.

3   Q.  Let's go to -- so on the bottom of page 8, you see it's

4   Mr Driscoll from FBR again?

5   A.  Yes.

6   Q.  And let's go to the top of 9.  He asks you, "Now let's

7   shift gears.  Obviously the closing of the upcoming Major

8   Energy transaction will incrementally add to some of your RCEs

9   in New York State and obviously there's been a high-profile

10  court case kind of overturning the reset order.  Talk about

11  your thoughts about potential impact, the timing of the

12  resolution, and what form do you think that resolution might

13  have in New York?"  Do you see that?

14  A.  I do.

15  Q.  "And if it were to turn negative, how you would potentially

16  mitigate that?"  Do you see that?

17  A.  I do.

18  Q.  So in the middle of your response, you identified that, in

19  late July, the court issued an order that vacated the first

20  three clauses of that order.  Do you see that?

21  A.  Yes.

22  Q.  You say, "We see that as a huge win both for Spark and for

23  the industry.  We're very, very happy about that."  You see

24  that?

25  A.  Yes.

K33AHOR2ps                    Kroeker - Cross

1  Q.  Now, let's go to PX 257.

2  A.  Keep in mind, I say I don't think the issue is dead, I

3  think the commission is going to continue to do something, but

4  we're very happy that we've got some breathing room and want to

5  be proactive about it.

6  Q.  OK.  And we'll look at other earnings calls throughout the

7  entire period.  It will be changed over the next few years.

8         So here again we're back to that third quarter of 2016

9  call.  We're now on November 10, 2016.  Correct?  And at this

10 point there's both the New York low-income order and the New

11 York resetting order, correct?

12 A.  Yes.  Remind me, the previous one we looked at was second

13 quarter?

14 Q.  That's correct.

15 A.  OK.

16 Q.  If we go to page 8 of the transcript, towards the bottom,

17 so there is Mr. Driscoll again, from FBR.  And he says,

18 "There's been a little bit of movement in the nearly

19 contentious behavior between the energy retailers and New York

20 State.  Can you just update us on where the latest stance is?

21 I know there's an injunction on the low-income order.  Give us

22 your expectations with the timings, potential resolution, and

23 why the impact is relatively muted on your financials."  Do you

24 see that?

25 A.  Yes.

K33AHOR2ps                    Kroeker - Cross

1    Q.  He's talking about Spark financials, correct?

2    A.  Yes.

3    Q.  And he notes that the low-income order has been enjoined at

4    this point, correct?

5    A.  Yes.

6    Q.  And the response is, "Yes.  I mean, we saw a big victory

7    with the resetting order a few months ago, another one on the

8    low-income injunction order."  Do you see that?

9    A.  Yes.

10   Q.  "We're going to work very closely with the commission to

11   come up with a set of ranges that we think will be good for the

12   retailers in the market, but also good for the commission and

13   ultimately drive out the bad actors.  So I don't have -- I

14   can't tell you what the timing of that is.  I think it's longer

15   term.  I don't think it's imminent.  And I will tell you that

16   we're working very proactively with the commission in order to

17   come up with something that works well for everybody."  You see

18   that?

19   A.  I do.

20   Q.  And did I read that correctly?

21   A.  Yes.  There's a tran -- you know, when they transcribed

22   this, they misstated what I said.  I said "rule changes", not

23   "ranges," but you read it correctly.

24   Q.  Thank you for the clarification.  Let's look at PX 316.

25   So, again, we saw this before.  We're at March 3rd, 2017.  And

K33AHOR2ps                    Kroeker - Cross

1    this is the fourth quarter 2016 earnings call.  Correct?

2    A.  Yes.

3    Q.  So this is now several months after the New York low-income

4    order is out, correct?

5    A.  I believe the New York income order came into effect in

6    December of '16.  Is that correct?

7    Q.  Well, we'll let the record speak for itself.  The

8    low-income order was --

9    A.  You're asking me questions.  I guess my answer is I don't

10   recall.

11   Q.  That's fair.  But the low-income order was still enjoined

12   at this time, correct?

13   A.  I don't believe so, but that's why I'm saying I don't

14   recall.

15   Q.  OK.  So we'll see --

16   A.  I thought it went into effect in December of '16, but I

17   could be mistaken.

18   Q.  But the New York resetting order, that was still a vacatur,

19   right?

20   A.  Correct.

21   Q.  So let's go to page 9 of this transcript.  And in the

22   middle, there is Mr. Driscoll again, from FBR, and he's talking

23   about his favorite topic.  He says, "Just last question.

24   Nathan, maybe you could characterize, obviously, very public

25   ongoing dispute with the State of New York, not just yourself,

K33AHOR2ps                        Kroeker - Cross

1    with other energy retailers.  Just give us an update where that

2    stands and the characterization of what you envision the

3    potential couple of outcomes could be from what's going on in

4    the State of New York."  Do you see that?

5    A.  Yes.

6    Q.  And you tell him the following.  You say, "I mean, as you

7    pointed out, it's an interesting time in the industry in New

8    York.  We're very happy that the courts have sided with us

9    earlier in 2016."  Do you see that?

10   A.  Yes.

11   Q.  And you then talk about different things that -- well,

12   rather than read the whole thing, let's go to the last

13   sentence.  You say, "and I'm not anticipating -- I'm fully

14   expecting that we're going to have a healthy market beyond 2016

15   and -- or beyond 2017 and '18 and going forward.  And we'll be

16   able to comply with whatever changes we collectively determine

17   we need to make in that market."  Do you see that?

18   A.  I do.  I believe I'm speaking to the resetting order here,

19   not the low-income order.  I don't mention the low-income

20   order.  I believe that was already in effect at this point.

21   Q.  OK.  Well, we'll look it up.  Another earnings call soon.

22   But -- and you talk about helping market in New York, correct?

23   A.  Yes.

24   Q.  That was a true statement to Mr. Driscoll?

25   A.  Yes.

Q.  And you're making the statement already now as of March
2017, correct?
A.   Correct.  And when I say "healthy market," that's in the
context of the part that was skipped where we talked about rule
changes and other things that we're going to have to do
collectively as an industry to address the issues that the New
York commission is concerned about.
Q.  You're not saying in here that you're concerned that Major
Energy is not going to be able to perform in New York, are you?
A.  No.  What I'm saying is, we're going to have to make some
changes to our business and rule changes in conjunction with
the commission.  After that process, I believe we're still
going to be having a healthy market.

         Keep in mind, part of Driscoll's concern at this point
was that New York was going to zero.  Right.  Because the
resetting order would have done that.  And so every quarter
he's there thinking, hey, you guys have a massive amount of
value tied up in New York.  You doubled down on that value when
you bought Major.  I think you guys just made a bad investment,
you know, put my fears at ease.  And so every quarter he asks
me almost the exact same question.  And I'm trying to explain
to him, look, it's not good but it's playing out reasonably
well, all things considered.  We're going to have to make some
changes.  Ultimately I think we will have a healthy market
going forward.

K33AHOR2ps                    Kroeker - Cross

1   Q.  I'm sorry.  Could you show me in this paragraph where you

2   said "it's not good"?

3   A.  What's that?  I didn't state that in this paragraph.

4   Q.  OK.

5   A.  Carter, Carter's view was, it's not good.

6   Q.  But you don't say, "I share your view, Mr. Carter," did

7   you?

8   A.  No.  I'm explaining to investors that I think we can make,

9   you know, a good situation out of this very negative resetting

10  order, by working proactively with the commission to address

11  their concerns and to drive the bad actors out of the market.

12  Q.  Let's go to PX 312.  Do you see on Plaintiff's Exhibit 312,

13  so we're now August 2017.  Do you see that?

14  A.  Yes.

15  Q.  So this is a transcript of Spark Energy Inc.'s second

16  quarter 2017 earnings call.  Do you see that?

17  A.  Yes.

18  Q.  So we're about halfway through the earnout period, correct?

19  A.  Yes.

20  Q.  And you were on this call, correct?

21  A.  Yes.

22  Q.  And you made an oral presentation and answered questions

23  from analysts on this call?

24  A.  I believe so.

25  Q.  All right.  Let's go to page 8 of the transcript at the

1    top.  There we have Mr. Driscoll.  And he asks you for an

2    update on the New York regulatory environment, particularly the

3    low-income order that went into effect, correct?

4    A.  Yes.

5    Q.  And he asks who has the broader initiative as to whether

6    ESCOs are going to be able to continue to operate in New York

7    and your view could be -- sorry -- if you could kind of

8    quantify your exposure to low-income either in New York or

9    across portfolio.  Do you see that?

10   A.  I do.

11   Q.  And you respond, "Thanks, Carter.  Really three different

12   components when you look at New York.  The first one" -- you

13   mention to him a specific show cause order that related to the

14   Spark business.  That had been resolved and was behind Spark

15   and there was no financial impact on that, correct?

16   A.  Correct.

17   Q.  You then say, "The second piece, as you alluded to, is the

18   low-income."  Do you see that?

19   A.  Yes.

20   Q.  And you say, "All retailers in the state received listings

21   of their low-income customers several weeks ago.  And with the

22   expectation that if those low-income customers are not on

23   compliant products, they have to be turned back over to the

24   state.  So we are working through that.  I will tell you, it's

25   a relatively small number for us.  It's somewhere in the range

1    of 10,000 to 12,000 RCEs across all of our brands."  You see

2    that?

3    A.  Yes.

4    Q.  And then you say, "a lot of those customers are on

5    fixed-price contracts today that roll off in the next 12 to 18

6    months."  Correct?

7    A.  Yes.

8    Q.  And that was a truthful statement to Mr. Driscoll at the

9    time?

10   A.  Yes.

11   Q.  And then you talk about the third component, the broader

12   resetting order."

13   A.  Can we go back to your question, though?

14   Q.  Sure.

15   A.  I say that this is a relatively small number for us, 10 to

16   12 thousand RCEs relative to my overall business, which was at

17   or above a million RCEs at that point.  That's where I'm coming

18   from.

19   Q.  I understand.  So 10 to 12 thousand over a million RCEs,

20   correct?

21   A.  Yes.

22   Q.  So then you discuss the resetting order.  "We have been

23   working very closely with other ESCOs in this space through a

24   couple of industry organizations, working very cooperatively

25   with the commission to come up with a set of rule changes that

1   I think ultimately improves the overall quality of the market."

2   See that?

3   A.   Yes.

4   Q.   "It's too early for us to know what those rule changes are

5   going to be.  I'm anticipating they're going to be things that

6   we've seen before in other markets in which we operate.  And

7   I'm anticipating it's going to require us to either change some

8   of our sales practices, our disclosures, maybe our product

9   suite.  But ultimately, I think we end up with a healthy

10  business in New York going forward longterm."  You see that?

11  A.   Yes.

12  Q.   Now, again, this is about halfway through earnout period?

13  A.   Yes.

14  Q.   Let's go to Plaintiff's Exhibit 314.  All right.  Now we

15  are at November 3, 2017, the third quarter 2017 earnings call

16  transcript.  So we're about 20 months into the 33-month earnout

17  period, correct?

18  A.   OK.  Yes.

19  Q.   And you participated on this call?

20  A.   Yes.

21  Q.   And you answered questions from analysts on this call?

22  A.   I believe so.

23  Q.   So let's look at page 9, towards the bottom.  It is not

24  Mr. Driscoll.  It is Sophie Karp.  Do you see that?

25  A.   Yes.

K33AHOR2ps                    Kroeker - Cross

1    Q.  From Guggenheim.  She says, "First, could you tell us, what

2    are you thinking at these levels on share buybacks potentially?

3    Secondly, is there any update on the regulatory proceeding in

4    New York that you think is meaningful that you'd like to

5    share?"  See that?

6    A.  Yes.

7    Q.  Let's go to page 10.  In the first part you're answering

8    her first question.  And you say, at the top, "On the

9    regulatory front, there's two pieces there.  The first one is

10   the low-income moratorium.  There's currently a stay on that."

11   Do you see that?

12   A.  Yes.

13   Q.  So as of November 2017 -- right?  20 months into the

14   earnout, the low-income order at this point is still stayed,

15   correct?

16   A.  So this refreshes my memory.  I'd like to clarify something

17   I said earlier.  I said I believed that came into effect

18   December of '16.  I'd like to change that to December of '17.

19   Q.  Thank you.

20         "And the courts are going to revisit that here in

21   November."  You see that?

22   A.  Yes.

23   Q.  And then you say, "Whatever the outcome of that is, and I'm

24   fully anticipating that we're going to have to turn a few

25   low-income customers back over to the utility over the next six

K33AHOR2ps                    Kroeker - Cross

1   to eight months, but that's less than 2 percent of our overall

2   business, so relatively insignificant to us."  Remember saying

3   that?

4   A.  Yes.

5   Q.  And that was a truthful statement, right?

6   A.  Yes.

7   Q.  And that's about the low-income order; isn't that true?

8   A.  Yes.

9   Q.  Then you say, "the bigger piece of this is the broader

10  resetting order, and there's currently hearings scheduled for

11  late November on that piece."  And again at this point that's

12  still vacated, correct?

13  A.  Yes.

14  Q.  And you talk about some motion practice going on there,

15  right?

16          And you say, "and at the end of the day, my position

17  on this really hasn't changed from where it was nearly two

18  years ago."  Do you see that?

19  A.  Yes.

20  Q.  And that was a truthful statement.

21  A.  Yes.

22  Q.  "I think what you're going to end up with is, you're going

23  to have ESCOs, ourselves included, that are going to work

24  proactively with the commission and get a set of rule changes

25  or disclosure requirements or financial commitments overall

K33AHOR2ps                    Kroeker - Cross

1   that will improve the health of the market but will allow

2   retailers to continue to have healthy ongoing businesses in

3   that marketplace."  Do you see that?

4   A.  Yes, I do.

5   Q.  And that was a truthful statement, correct?

6   A.  Yes.

7   Q.  And that was made as of November 2017, right?

8   A.  Yes.

9   Q.  Let's look at PX 299.  This, just to refresh your

10  recollection, this is a 10-K for 2017 filed on 3/9/2018 by

11  Spark.  Do you see that?

12  A.  I do.

13  Q.  And you obviously reviewed and signed this, correct?

14  A.  Yes.

15  Q.  So this is filed two years into the earnout, approximately.

16  Right?

17  A.  Yes.

18  Q.  Let's go to page 20 of this 10-K, second paragraph.  On the

19  bottom you say, "The company and its subsidiaries are dropping

20  low-income customers to the applicable utilities in the next 12

21  months as they roll off their contracts.  These customers

22  represent approximately less than 1 percent of our total

23  customers as of December 31, 2017."  Do you see that?

24  A.  Yes.

25  Q.  And that was a statement to shareholders, right?

K33AHOR2ps                         Kroeker - Cross

1   A.  Yes.

2   Q.  And that was made in March 2017.

3   A.  Yes.

4   Q.  I'm sorry.  March 2018.  Sorry.

5   A.  Correct.

6   Q.  Two years into the earnout.  Correct?

7   A.  Yes.

8   Q.  Let's go to -- it will be the last one.  OK.  Let's go to

9   PX 313.  So we are now August 3rd, 2018.  Do you see that?

10  A.  I do.

11  Q.  That's a few months before the end of the earnout period,

12  right?

13  A.  Yes.

14  Q.  And you recall being on this call?

15  A.  Yes.

16  Q.  And this is the second quarter 2018 earning call?

17  A.  Yes.

18  Q.  And you recall being asked questions from analysts on this

19  call?

20  A.  Generally yes.

21  Q.  Let's go to the top of page 10.  So I guess we need to go

22  to the bottom of 9.  Excuse me.  So this is not Mr. Driscoll

23  either, is it?

24  A.  It's Michael Gyure.

25  Q.  OK.  And he asks, "Are you seeing anything, I guess, new or

1   different that changed your thought process on what's going on

2   in New York?  And I guess what are you hearing there from that

3   perspective?"

4          And your answer is, "New York, no."  You see that?

5   A.  I do see that.

6          MR. DAHAN:  I don't know if your Honor wanted to take

7   a few-minute break.  Let me know.  I have a new topic.  It's up

8   to you.

9          THE COURT:  Yes.  I'd like to take about ten minutes,

10  since it's about midmorning for us.  Again, we'll go till about

11  1 o'clock and then break for an hour for lunch.  Let's take ten

12  minutes now.

13         (Recess)

14         THE COURT:  Good morning.  Welcome back.

15         Mr. Dahan, you may proceed.

16         MR. DAHAN:  Thank you, your Honor.

17  BY MR. DAHAN:

18  Q.  So in your witness statement, you have a section that

19  starts on page 67, and it's, "During the earnout period,

20  regulatory developments prompted Major Energy to modify its

21  business plan."  Do you see that?

22         THE COURT:  Could you refer to paragraph numbers,

23  because the pages are sometimes off.

24         MR. DAHAN:  Sure.  It's the heading right before

25  paragraph 237.  Sorry.

 1   A.  I see that.

 2          And just to correct, you said "business plan."  It's a

 3   business model.

 4   Q.  Thank you.  I'll just for the record read it again.

 5   "During the earnout period, regulatory developments prompted

 6   Major Energy to modify its business model."  Do you see that?

 7   A.  Yes.

 8   Q.  And you go on to talk about the low-income order.  Do you

 9   see that?

10   A.  Yes.

11   Q.  You talk about Illinois.  Right?

12   A.  Yes.

13   Q.  And you claim, in paragraph 238, "One such change was the

14   shift in focus from residential customers to commercial

15   customers, particularly in the New York market."  Do you see

16   that?

17   A.  Yes.

18   Q.  And then you go on to discuss the low-income order.  Right?

19   A.  Yes.

20   Q.  Which, again, didn't even come out till sometime second

21   half of 2016.  Correct?  It wasn't even announced.

22          Seven -- no.

23   A.  No.  I believe it was announced in '16, went into effect in

24   '17.

25   Q.  That's right.  I understand.

1          So I want to show Plaintiff's Exhibit 481.  So

2     sometime late 2014, Spark looked at a potential purchase of

3     Major Energy, correct?

4     A.  Yes.

5     Q.  And in connection with that it received a management

6     presentation from Major Energy?

7     A.  Yes.

8     Q.  And that management presentation was dated November 2014.

9     If we go to the slide, that would be page 43.  If we go to

10    slide 43, to "agent sales."  Do you see that?

11    A.  Yes -- sorry.  My screen just went blank.  OK.  I'm with

12    you.

13    Q.  You have it there?

14    A.  Yes.

15    Q.  OK.  Great.  And the "agents/brokers," that refers to part

16    of the commercial business of Major Energy, right?

17    A.  I don't know that this is specific to commercial.  I

18    believe this could also be residential.

19    Q.  OK.  So we'll look at the bullets here.

20          So it first says, "Major works with 182

21    agents/brokers."  You see that?

22    A.  Yes.

23    Q.  It says, "115 of these have brought in accounts in 2014."

24    A.  I see that.

25    Q.  Then it says, "Total RCEs acquired in 2014 is 25,204

K33AHOR2ps                    Kroeker - Cross

1   through September 2014."  You see that?

2   A.  Yes.

3   Q.  And then the third bullet says "65 percent of sales are to

4   commercial accounts."  Do you see that?

5   A.  Yes.

6        THE COURT:  Remind me, RCEs, again, is what?

7        THE WITNESS:  Residential customer equivalents.

8        THE COURT:  Thank you.

9   Q.  If you go to slide 15, which is PDF page 29.  This says

10  "residential and commercial customer breakdown."  Do you see

11  that?

12  A.  I do see that.

13  Q.  And in the different circles, there's a portion that's

14  residential and a portion that's commercial, correct?

15  A.  Yes.

16  Q.  And for the customers, electric, it says 5.8 percent

17  commercial.  Do you see that?

18  A.  I do.

19  Q.  This is as of the November 2014 presentation, right?

20  A.  It says as of October 2014.

21  Q.  Right.  I'm sorry.  This is in the November 2014

22  presentation, right?

23  A.  Yes.

24  Q.  If we could go to PX Plaintiff's Exhibit 359.  So now when

25  NGE is, in early 2016, looking to buy Major Energy, it received

K33AHOR2ps                      Kroeker - Cross

1    an updated management presentation from Major Energy.  And this

2    e-mail is, on the bottom you can see it's Cliff Adams at Coady

3    Diemar sending it on January 27, 2016 to Dave Hennekes, Paul

4    Konikowski.  Do you see that?

5    A.  I see that.

6    Q.  And at this point in time, there's no New York resetting

7    order.  Correct?

8    A.  That's correct.

9    Q.  It wasn't even announced at this point, right?

10   A.  Correct.

11   Q.  There's no New York low-income order, is there?

12   A.  No.

13   Q.  If you go to slide 16 of this presentation, it's the PDF

14   page 18.  So sometime between -- we saw this slide on the prior

15   one, right?  And remember we saw, in that top left corner

16   before, we saw 5.8 percent?

17   A.  Yes.

18   Q.  But sometime between that November 2014 presentation and

19   now the January 26 presentation, before the resetting order,

20   before the low-income order, customer electric now represents,

21   in the commercial, 10.7 percent.  Right?

22   A.  Yes.

23   Q.  It went from 5.8 percent to 10.7 percent, right?

24   A.  Yes.

25           Can you go back to the other slide for me for a

K33AHOR2ps                        Kroeker – Cross

1    second?

2    Q.  Sure.

3    A.  The equivalent pie charts from the November '14

4    presentation.

5    Q.  Yes.  So that was in PX 481, and that would have been slide

6    PDF page 29.

7               THE COURT:  And, Mr. Dahan, you said January 26.  I

8    think you meant January 2016.  Right?

9               MR. DAHAN:  Thank you so much, your Honor.

10   Q.  So the one on the right, as you point out, the one on the

11   right was, as you pointed out, I think, as of October 2014.

12   And this on the bottom, I noticed it said as of December 2015.

13   A.  I'm not sure where you're going with this, counsel, but

14   commercial customer accounts is kind of irrelevant.  If you're

15   dealing with commercial accounts, you really need to be looking

16   at RCEs, which is a volumetric measure.  So I think any

17   conclusion you're trying to draw on commercial electric counts

18   is irrelevant.

19   Q.  All right.  So how about if we look at RCEs.

20   A.  OK.  Sure.

21   Q.  First of all, let's first go to slide 19, PDF page 21.

22   This would be the one on the left.  You could put down 481,

23   Eric.

24               First of all -- and, again, this is before the

25   resetting order, before the low-income order.

K33AHOR2ps                    Kroeker - Cross

1   A.  This is back to the November 14 --

2   Q.  This is January of 2016 presentation.

3   A.  OK.

4   Q.  No low-income order, no resetting order.  Right?

5   A.  OK.  Correct.

6   Q.  Heading: "Major's Recent Focus Has Been Growing Commercial

7   Electric."  Do you see that?

8   A.  Yes.

9   Q.  Now, let's go to your RCE point.  Let's go to slide 30,

10  which is 359-32.  So this says, now there's 215 agents/brokers

11  brought in accounts in 2015 year to date.  Do you see that?

12  A.  Yes.  Is this still the January 2016?

13  Q.  That's correct.  Because the prior one we saw was about 114

14  that brought in.  You remember that?

15  A.  Correct.

16  Q.  Now it's 2015.  That's about a hundred more agents,

17  correct, slash brokers, correct?

18  A.  Yes.

19  Q.  What does it say in the heading of the second bullet?  Can

20  you read that.

21  A.  "Total of 71,000 RCEs acquired in 2015."

22          MR. DAHAN:  And then, Eric, if you put up the other

23  exhibit.

24  Q.  What was the RCE count in the prior year?

25          If we go to slide 43, PDF 43.

1              That's at 25,000 through September 2014.  Do you see

2      that?

3      A.   I do.

4      Q.   That's 50,000 more RCEs?

5      A.   If you -- yes.  If you're asking me just to do the math, I

6      agree with that.

7      Q.   About three times the number we saw in the prior slide?

8      A.   Yes.  One is nine months.  And keep in mind that was coming

9      off the back of the polar vortex.  And the other one is 12

10     months in a year where you didn't have a significant impact.

11     Q.   Did you prepare these presentations?

12     A.   No.

13     Q.   Do you know what is being held in this presentation?

14     A.   I'm just reading the numbers off the page and doing the

15     simple math that you ask me to.

16     Q.   OK.  Now, in your witness statement, you also, again, talk

17     about regulatory issues in Illinois.  Right?

18     A.   Yes.

19     Q.   And you mentioned also regulatory issues occurred in

20     Pennsylvania at some point?

21     A.   Yes.

22     Q.   So let's stick on the January 26 presentation, 2016

23     presentation.  And let's go to the slide of 43 and 44.  That's

24     PDF 45, I think.

25     A.   I think we're on the wrong presentation.

K33AHOR2ps                    Kroeker - Cross

1   Q.  Yes.  So PX 359, Eric, and slide 45.

2            So here's the slide being provided to NGE in January

3   2016.  Before the deal closed, right?

4   A.  Yes.

5   Q.  And are you aware that at this time in January, end of

6   January 2017, the deal terms are 60 million cash at closing, 20

7   million earnout.  Correct?

8   A.  I believe that's correct.

9   Q.  Right, because it didn't change until sometime after

10  February, when the resetting order was announced, right?

11  A.  I believe that's correct.

12  Q.  So at this time NGE is still willing to pay 60 million cash

13  at closing and 20 million earnout, correct?

14  A.  Again, I don't -- I'm looking at the same documents you are

15  because I was not part of that negotiation.

16  Q.  And it's disclosed, "As fallout from the polar vortex,

17  Pennsylvania, Illinois, Maryland, and New York initiated

18  investigations into the company's marketing and sales

19  practices."  Do you see that?

20  A.  Yes.

21  Q.  And it discusses the Pennsylvania regulatory matter.  You

22  see that?

23  A.  Yes.

24  Q.  And it says, "Major intends to execute a settlement

25  agreement by mid February 2016 for 5.1 million."  You see that?

K33AHOR2ps                        Kroeker - Cross

1    A.  Yes.

2    Q.  "Major will agree not to market variable rates through

3    August 2017, but will be able to market door to door with

4    revised policies."  Do you see that?

5    A.  Yes.

6    Q.  And, again, being told, NGE is still proceeding with the

7    deal, correct?

8    A.  Yes.

9    Q.  NGE is still proceeding with the 60 million cash at closing

10   deal, correct?

11   A.  Correct.

12   Q.  It then talks about Illinois.  "In August 2014, the ICC

13   completed its investigations and initiated a show-cause order

14   that claimed deceptive sales practices, language-barrier

15   exploitation, and lack of disclosure statements."  See that?

16   A.  I see that.

17   Q.  It said, "An agreement of $262,500 was reached, and was

18   approved by ICC and CUB in April 2015."  You see that?

19   A.  I see that.

20   Q.  And that's the ICC matter you discussed in your report --

21   in your witness statement, correct?

22   A.  Can I go back to my witness statement?

23   Q.  Sure.

24   A.  Yes.  My witness statement references, in addition to the

25   ICC issue, references the Illinois AG matter as well.

1   Q.  Yes, we'll get to that.  But for purposes of the ICC

2   matter, that was an existing matter.  An agreement was reached

3   on settlement, NGE is being told about it, and NGE is still

4   offering 60 million in cash at closing.  Correct?

5   A.  Correct.  The ICC matter is very small relative to the AG

6   matter.

7   Q.  And that AG matter didn't come out until March 2018.  Isn't

8   that correct?

9   A.  I don't know the exact date of when that came out.

10  Q.  You don't know if it was -- you think it came out in 2017?

11          MR. BROWN:  Objection, argumentive.

12          THE COURT:  Sustained.

13  Q.  And if you go to the next slide, NGE is told about a

14  Maryland matter.  You see that?

15  A.  Yes.

16  Q.  It's told about a New York AG matter in February 2015.  You

17  see that?

18  A.  I do.

19  Q.  And, again, at this point, NGE is still offering $60

20  million in cash at closing.  Correct?

21  A.  That's my understanding, yes.

22  Q.  Now, so we established before that the dropdown transaction

23  occurred on August 23, 2016, correct?

24  A.  Yes.

25  Q.  Now, in your witness statement, in paragraph 122 -- we can

K33AHOR2ps                    Kroeker - Cross

1   go to that -- you state that you can "see from the terms of the

2   earnout agreement and the executive earnout agreement, which

3   were specifically incorporated into the MIPA, that consent was

4   not technically necessary for a dropdown among affiliates.

5   This letter agreement was signed for belt-and-suspenders

6   purposes to account for the position that sellers maintained,

7   which was that consent was required."  Right?

8   A.  Yes.

9   Q.  And the letter agreement you're referring to is an August

10  23, 2016 letter agreement, correct?

11  A.  I believe so.

12  Q.  So let's unpack that paragraph.  First, I want to show you

13  the Spark MIPA, Plaintiff Exhibit 650.  You've seen that

14  before, right?

15  A.  Yes.

16  Q.  And that's the Spark MIPA?

17  A.  Yes.

18  Q.  You signed the Spark MIPA?

19  A.  I believe so.

20  Q.  If we could turn to 07 of this document.  So there is a

21  definition for "adjusted EBITDA plan."  Do you see that?

22  A.  Yes.

23  Q.  Can you read what it says for the target year 2016 into the

24  record.

25  A.  "$20,749,213 for the 2016 target year for the 12 months

K33AHOR2ps                    Kroeker - Cross

1   ended December 31, 2016."

2   Q.   Thank you.  And that $20.7 million number is the same

3   number that we saw in the MIPA, correct?

4   A.   Yes.

5   Q.   Now if you to turn to Section 3.2, which would be page 20

6   of this agreement.

7           MR. DAHAN:   25 for you, Eric.

8   Q.   And you see article 3?

9   A.   Yes.

10  Q.   And you had a chance to review this before you signed it,

11  correct?

12  A.   Yes.

13  Q.   And it says, in (a), "At closing, buyer shall deliver the

14  following documentation or shall take the following action."

15  Right?

16  A.   Yes.

17  Q.   And we go to the next page, (ix).  One of the things that

18  the parties to this agreement agreed to was that one of the

19  things that was to be delivered to the seller was "the written

20  consent of the prior sellers' representative to the

21  assignment."  Right?

22  A.   Yes.

23  Q.   And the sellers' representative is Saul Horowitz, correct?

24  A.   Yes.

25  Q.   And the assignment at the bottom of this agreement is the

K33AHOR2ps                    Kroeker - Cross

1    omnibus assumption assignment agreement, correct?

2    A.  I have to look at the definition.

3          THE COURT:  He can look at the definition.

4    Q.  OK.  We'll go to 08.  You see the definition on top,

5    "assignment," saying it's "the omnibus assignment and

6    assumption agreement executed by the parties in the form

7    provided until Exhibit A"?

8    A.  OK.  Yes.

9    Q.  And if you go to Section 11.1 of this agreement, which

10   would be 061, Eric, "for purposes of this agreement, seller,"

11   which is NGE, "has advised buyer that: notices of certain

12   matters arising under the prior purchase agreement" -- you

13   understand that "prior purchase agreement" is the MIPA that was

14   executed on March 18, 2016?

15   A.  Yes.

16   Q.  -- "must be provided to Saul Horowitz, as sellers'

17   representative."  You see that?

18   A.  Yes.

19   Q.  And then it says, (ii) the prior written consent of said

20   prior sellers' representative is required for the assignment of

21   certain transaction agreements."  You see that?

22   A.  Yes.

23          (Continued on next page)

24

25

K337HOR3                          Kroeker - cross

BY MR. DAHAN:

Q.   And then it says, 3, "Seller will assume responsibility for
providing any such notices to, and securing any such consents,
of buyer's seller's representatives as necessary under such
prior purchase agreement."  Do you see that?

A.   Yes.

Q.   And you had a chance to read that before you signed the
agreement, right?

A.   Yes.

Q.   And so we're clear, the sellers did not participate in the
drafting of this agreement, did they?

A.   Not to my knowledge.

Q.   The sellers didn't have this provision in this agreement,
did they?

A.   Not to my knowledge.

Q.   They didn't have the one we saw in 3.1 before, did they?

A.   Refresh my memory.  What was 3.1?

Q.   The closing requirements.

A.   Yes, I don't believe so.

Q.   And if we go to what was Exhibit A to this agreement, that
would be PX 651.  Exhibit A is the omnibus assumption
agreement.  Do you see that?

A.   Yes.

Q.   And you were going to be a signatory to this agreement,
right?

K337HOR3                          Kroeker - cross

1    A.   Yes.

2    Q.   And if we go to 02, Eric.

3         You see that one of the parties that's being made a

4    party to this agreement is Saul Horowitz.

5    A.   Yes.

6    Q.   Acting on behalf of, and to confer the consent of, all of

7    the prior members and prior sellers of interests in Major

8    Energy.  Do you see that?

9    A.   Yes.

10   Q.   And again the sellers did not participate in the drafting

11   of this agreement, did they?

12   A.   I don't believe so.

13   Q.   They didn't say please put this in the agreement, did they?

14   A.   Again, I don't recall the specifics of who was involved and

15   what was shared in this.

16   Q.   And if you go to 06, Eric.

17        You see Mr. Gibson, he would be signing for National

18   Gas & Electric?

19   A.   Yes.

20   Q.   As executive vice president and CFO of NGE, right?

21   A.   Yes.

22   Q.   And, by the way, that's the only time you see Mr. Gibson's

23   name on that page, right?

24   A.   Correct.

25   Q.   And then there are three signature blocks for Major Energy;

K337HOR3                         Kroeker - cross

1   do you see that?

2   A.   Yes.

3   Q.   And each one was going to be signed by Dan Alper, the CEO

4   of Major Energy, right?

5   A.   Yes.

6   Q.   And then there is the block for sellers' representative

7   Mr. Horowitz.

8   A.   Yes.

9   Q.   And then there is your signature block, right, by Spark

10  Energy, Inc., its managing member Spark HoldCo.  Do you see

11  that?

12  A.   Yes.

13  Q.   Eric, if you could move this to the side but keep it up,

14  and let's go to the final executed version which is PX 656.

15           THE COURT:  Mr. Dahan, what was the date of the draft

16  650?

17           MR. DAHAN:  It was attached to the May 3, 2016, so we

18  would assume as of that date.

19  Q.   So this is August 23, 2016, right?

20  A.   Yes.

21  Q.   And, Eric, if you could go on PX 651 on the left and turn

22  to the similar page, it would be 02.

23           Mr. Horowitz is no longer there, correct?

24  A.   Correct.

25  Q.   He is no longer there to be joined acting on behalf of the

K337HOR3                    Kroeker - cross

1   prior sellers, right?

2   A.  Correct.

3   Q.  And if we go to the signature block of this one, Eric, and

4   of the prior one.

5            Do those two look the same to you, Mr. Kroeker?

6            MR. BROWN:  Objection.  Argumentative.

7            THE COURT:  I will allow it.  Fine.

8   Q.  Do you notice Mr. Gibson is signing four times?

9   A.  Yes.

10  Q.  There is no Mr. Horowitz on there?

11  A.  Correct.

12  Q.  So, we talked before about that August 23, 2016 letter

13  agreement, right?

14  A.  Yes.

15  Q.  Let's go look at that.  That's DX 998, Defendant's Exhibit

16  998.

17           And again in your witness statement in paragraph 122

18  you say "This letter agreement was signed for belt and

19  suspender purposes to account for the position that sellers

20  maintained which was that consent was required."  Right?  Do

21  you remember that testimony?

22  A.  Yes.

23  Q.  So now this letter is sent to you, right?

24  A.  Yes.

25  Q.  And I think if we go to the next page it's sent from

K337HOR3                    Kroeker - cross

1    Mr. Gibson?

2    A.  Yes.

3    Q.  Now, you have seen this -- you have read this letter

4    agreement?

5    A.  Yes.

6    Q.  In its entirety?

7    A.  Yes.

8    Q.  More than once?

9    A.  At least once.

10   Q.  Can you point to me the words "belt and suspender"?

11   A.  No.

12   Q.  You say also in paragraph 122 from your witness statement,

13   in the last sentence, "Indeed, even though they knew that the

14   earnout agreement and the executive earnout agreement were

15   freely assignable by NGE to Spark without the need for consent,

16   Horowitz and Wiederman still pushed this issue, which is why

17   the letter agreement was signed as a formality to account for

18   the contingent risks associated with their behavior."

19          Do you see that?

20   A.  Yes.

21   Q.  Can you point in this letter where it says this is entered

22   into as a formality to account for the contingent risks

23   associated with Mr. Horowitz or Mr. Wiederman's behavior?

24   A.  I said it in my direct statement.  I didn't say it was in

25   the letter.

K337HOR3                        Kroeker - cross

1   Q.  Can you show me where in this letter it says that Spark

2   believes that consent is not required?

3   A.  No, that's not in the letter.

4   Q.  In fact --

5   A.  I think the facts and the timeline will indicate that we

6   had conversations about the dropdown since 2015 as a form of

7   bridge financing.  It was always the intention, the sellers

8   knew that, they issued their own press release to that effect.

9           This refusal to provide consent came up very close to

10  the time of the dropdown, and so this letter was put in place

11  as "belt and suspenders" and a formality to execute this

12  transaction.

13  Q.  Mr. Kroeker, do you remember your testimony early on today

14  I asked you did you have any conversations with any of the

15  sellers between November 2015 and April 15, 2016, and your

16  answer was no, right?

17  A.  Correct, but I did have conversations with them in early

18  2015, which is what I'm referring to here.

19  Q.  OK, let's change gears.  I think we heard Mr. Driscoll say

20  that before, right?

21          Isn't it true that when Spark acquires a company, the

22  first thing it does -- the first thing -- is take out the

23  supply agreement or the credit sleeve it's acquiring?

24  A.  We did that in most of our acquisitions.  We did not do

25  that on Major Energy.

1   Q.  Isn't that the first thing Spark normally does?

2           MR. BROWN:  Objection.  Asked and answered.

3   A.  Yes, with the exception of this Major Energy transaction.

4   We left it in place until the end of March 2017.

5   Q.  And in fact taking out a supply agreement is an instant

6   synergy that's Spark then realized; isn't that right?

7   A.  Yes.

8   Q.  And isn't it true that from day one Spark's plan all along

9   was to take over the PSE supply contract; isn't that true?

10  A.  Yes.

11  Q.  Now isn't it true that when Spark acquired a company, the

12  next thing it does -- and pretty quickly -- is to take over the

13  treasury and accounting functions of that company?

14  A.  Yes.

15  Q.  And Spark also seeks to realize synergies by shutting down

16  office locations, making head count reductions and

17  consolidating all of operations on decision making to Spark's

18  headquarters in Houston?  Isn't that right?

19  A.  No, what we do in the play book that you're referencing is

20  we take over the critical functions that are required from a

21  SOX perspective, Sarbanes Oxley perspective, which would be

22  cash distributions and preparing the financial statements.  We

23  also take over the supply, because that is a significant

24  synergy.  All of the sales, marketing operations, day-to-day

25  decision making, any of that we don't integrate that until

K337HOR3                          Kroeker - cross

1    after the earning period, and that's been consistent since Star

2    Provider, Verde, any of the acquisitions we had earnouts.  I

3    believe we disclosed that in our investor relations material as

4    well.

5    Q.  Now, in your witness statement, in paragraph 132, you say

6    "Over the course of the earnout period, Spark allocated

7    approximately $14 million in costs to Major Energy, meaning it

8    provided $4 million in support to Major Energy but did not

9    charge that allocation to Major Energy for the purposes of the

10   contingent payment assessment."

11           Do you see that?

12   A.  Yes.

13   Q.  And then you give some examples.  Do you see that?

14   A.  Yes.

15   Q.  You did not cite any document to support that statement,

16   did you?

17   A.  No.

18   Q.  Now --

19   A.  And that may have been an oversight.  There is a detailed

20   calculation that I reviewed this week in preparation for this

21   trial that shows that calculation.

22   Q.  OK.  Now, in your witness statement, in the heading above

23   paragraph 134, you say "Spark affirmatively boosted Major

24   Energy's customer counts."

25           Do you see that?

K337HOR3                          Kroeker - cross

1    A.  Yes.

2    Q.  And you talk about how in March of 2018, right?  Do you see

3    March 2018?

4    A.  Yes.

5    Q.  That is two years into the earnout, right?

6    A.  Yes.

7    Q.  So two years into the earnout Spark boosted Major Energy's

8    customer counts by transferring about 9600 customers it

9    acquired to Major Energy including about 4500 customers from

10   HIKO energy, correct?

11   A.  Yes.

12   Q.  And in fact the transfer of HIKO customers in the next

13   paragraph wasn't until April 2018, right?

14   A.  That's correct.

15   Q.  So that didn't happen in 2016 or 2017, right?

16   A.  Did not.

17   Q.  And in your witness statement you estimate that such

18   customer transfer two years into the earnout added $100,000 in

19   adjusted EBITDA to Major Energy, correct?

20   A.  Yes.

21   Q.  What was the total adjusted EBITDA for Major Energy in

22   2018, do you recall?

23   A.  I don't recall off the top of my head.

24   Q.  If you look at paragraph 244 of your witness statement you

25   have a break-down of sort of projected versus actual.  Do you

1    see that?

2    A.   Yes.

3    Q.   Maybe just keep that open because we may go back to it.

4    A.   Sure.  The answer to your question $15,952,497.

5    Q.   OK.  And what was the target for that year?

6    A.   27,831,052.

7    Q.   OK.  So if I understand your testimony, you boosted through

8    that transfer Major Energy's adjusted EBITDA $100,000 and its

9    total was $15.9 million, correct?

10   A.   Not quite.  We boosted it $200,000.  There was $100,000 we

11   gave them credit for to cover their additional G&A costs

12   associated with that.

13   Q.   So they would have gotten to like 16 million?

14   A.   Correct, $200,000.

15   Q.   11 million under budget still, right?

16   A.   Yeah.  Let me back up.  It's 11 million below the adjusted

17   EBITDA plan number in the MIPA.

18   Q.   Right.  And it's your position that the sellers -- or is it

19   your position -- sorry.  Is it your position that the sellers

20   benefited from this customer transfer an addition of $100,000

21   in adjusted EBITDA to Major Energy in 2018?

22   A.   In hindsight they did not benefit from it.  At the time

23   they could have.  If they had been within the range of the

24   customer count, those additional customers would have been.  As

25   it turns out, they were below the range to where that was

1   relevant.

2   Q.  So you made this transfer sometime in 2018, right?

3   A.  Right.

4   Q.  What was the total customer count with this transfer --

5   A.  I don't recall.

6   Q.  Let's look at your paragraph 244.  What is 2018's actual

7   customer count?

8   A.  You asked me at the time of the transfer which was in

9   April.  I don't know what their customer count was in April.

10  Q.  I understand.  I understand.  Let me rephrase that.  What

11  was the total 2018 customer count including this transfer for

12  Major Energy in 2018?

13  A.  $120,965.

14  Q.  What was the projected for the year?

15  A.  231,717.

16  Q.  So that's 110,000 customers below projection, right?

17  A.  Correct.

18  Q.  So when you made this transfer, it's possible you think

19  they may have still gotten another 110,000 customers?

20  A.  That's not what I said.  I said at the time we made the

21  transfer do I think they would have had the ability to get back

22  within the range where it would have increased their earnout

23  payment or their cash installments.  I believe that is yes.

24  Q.  What is the total earnout payment to the sellers for 2018?

25  A.  Zero.

K337HOR3                                Kroeker - cross

1    Q.  How much earnout payment was there even in 2017?  Earnout

2    payment, not cash installment.

3    A.  I would have to look at some documents to see that.

4    Q.  In paragraphs 151 through 175 -- we're not going to

5    obviously go through all of that -- but in those paragraphs you

6    talk about Major Energy employee departures, correct?  You can

7    take a look.?

8    A.  OK.

9    Q.  You say in the first sentence "As an initial matter, Major

10   Energy did not suffer any harm because three employees, Sobel,

11   Moeller and Alper, resigned shortly follow the dropdown."  Do

12   you see that?

13   A.  I see that.

14   Q.  That's David Sobel the CFO, Levi Moeller the COO, and Dan

15   Alper the CEO; isn't that correct?

16   A.  Correct.

17   Q.  They are not part of the IT staff, are they?

18   A.  I don't believe so, though I do know that Sobel and Moeller

19   are involved in the operational side of the business.

20   Q.  They are executives of the company; they are not your

21   average employee, right?

22   A.  One of the things that Major has repeatedly reminded us of

23   is they are a very small team, very nimble, even the executives

24   are involved in the day-to-day operations.

25   Q.  I understand that, but they are more than just regular

1   employees; they are key employees, correct?

2   A.  Yes, yes.

3   Q.  And even some of them senior management members -- part of

4   the senior management team?

5   A.  I believe Dan Alper was defined as a senior management team

6   member in the MIPA, and I believe Sobel and Moeller were

7   defined as key employees in the MIPA.

8   Q.  Now, you would agree that it would be normal for a company

9   to experience fall-out from resignations of its senior

10  management, correct?

11  A.  Yes.

12  Q.  And in fact you testified as such at your deposition; do

13  you remember that?

14  A.  Yes.

15  Q.  Now, as a CEO of an ESCO that has been involved in many

16  acquisitions, you would agree that a company can experience

17  substantial business risk if it were to lose members of senior

18  management or other key employees, correct?

19  A.  Yes.

20  Q.  And you would agree that a company could experience

21  significant business risks if it was to experience disruption

22  from its key door-to-door vendors and brokers, correct?

23  A.  I would agree with that.

24  Q.  Now, without getting into why, you are aware that Major

25  Energy lost several key employees shortly after the dropdown,

1    aren't you?

2    A.  I'm not aware of that.

3    Q.  You're not aware -- you're not aware of whether -- are you

4    aware of how large Major Energy's supply and pricing team was

5    at the time of the dropdown?

6    A.  Approximately three people.

7    Q.  Three people?

8    A.  Four people maybe.

9    Q.  How many of those three people left shortly after the

10   dropdown?

11   A.  I don't know.

12   Q.  Have you ever heard the name Nahemi Shore?

13   A.  Yes.

14   Q.  Ever hear the name Esther Moeller?

15   A.  Yes.

16   Q.  Do you know if they were in that group?

17   A.  I believe they were.

18   Q.  And did they leave shortly after the dropdown?

19   A.  I don't know.

20   Q.  You don't know.  You have heard of Elliot Wolbrom?

21   A.  Yes.

22   Q.  Who was he?

23   A.  The chief marketing officer I believe.

24   Q.  And again without getting into why, did he leave shortly

25   after the dropdown?

1   A.  He left at some point during the earnout period.

2   Q.  You don't know if he left in 2016.

3   A.  I mean I could go back to my witness statement and look at

4   the specifics to refresh my memory if you want, but I believe

5   it's in there.

6   Q.  You would agree that marketing vendors and commercial

7   brokers are important relationships for an ESCO, correct?

8   A.  Yes.

9   Q.  And they were important for an ESCO like Major Electric;

10  isn't that correct?

11  A.  Yes.

12  Q.  Isn't it true that at some point during the earnout period

13  Spark's focus was to reduce the amount of large commercial

14  accounts at lower margins, particularly in the Northeast where

15  Major Energy primarily operated?

16  A.  I agree with the first half of your statement.  I do not

17  agree with the second half of your statement.

18  Q.  I don't know what the first or the second half is.

19  A.  Split it into two questions.  You asked was it a focus of

20  Spark Energy to reduce its exposure to the low-margin large CNI

21  customers.  That is a true statement.  Coming out of the winter

22  of 2018 that was a stated effort of ours.

23          Your second part of that statement -- and again you're

24  correct it was up in the Northeast, primarily in New England;

25  it was all Maine and New Hampshire for the most part -- the

1   second part of your statement was is that where Major Energy's

2   business was concentrated.  That's the part I would disagree

3   with.  Their business was concentrated in New York.

4            And just to be clear, the large CNI that we were

5   looking to shed was almost exclusively on the brand/provider

6   brand platform.

7   Q.  Now isn't it true that during the earnout period Spark

8   imposed certain margin policies on Major Energy?

9   A.  That is not true.

10  Q.  Not true, OK.

11           It's your testimony that Spark did not require Major

12  Energy to have certain margin thresholds than it had prior to

13  resale?

14  A.  I do not believe we ever did that.  If that were

15  communicated by a lower level employee, I would quickly pull

16  that back as soon as it came to my attention.

17  Q.  OK.  Forget about communicate.  It's your testimony that

18  did not happen.  Is that your testimony?

19           MR. BROWN:  Objection.  Asked and answered.

20  Mischaracterizes.

21  A.  I would just restate the answer I already gave you.

22  Q.  You've heard -- presale, to your knowledge, did Major

23  Energy need to get approval from its risk committee to do an

24  aggregation deal?

25  A.  I don't know what their internal governance would have

1   been.  I assume there would have been some sort of approval

2   process but I have no idea.

3             MR. BROWN:  I'm sorry.  I object to the last question.

4   It doesn't lay a foundation that Major Energy had a risk

5   committee, which there is no evidence of.

6   Q.  That's my next question.  Do you know if Major Energy even

7   had a risk committee?

8   A.  I don't know.

9   Q.  Let's look at PX 458.

10            So this is an e-mail from Andy Davis to Murthy Rao and

11  Chris Leonard, July 6, 2017, updated risk policy.

12  A.  Yes.

13  Q.  And attaching a risk management policy updated June 2016 -

14  final.  Do you see that?

15  A.  Yes.

16  Q.  And I guess Andy at e-mail says "Can you please send me the

17  current risk policy?"  Do you see that?

18  A.  Yes.

19  Q.  So let's look at that policy.  So here is the cover of the

20  policy, it lists a lot of entities on it.  Do you see that?

21  A.  Yes.

22  Q.  And you see the Major Energy entities are in this policy,

23  do you see that?

24  A.  Yes, this is all of the Spark Energy, Inc. subsidiaries.

25  Q.  I understand that.  Do you see the Major Energy three

1  entities in there?

2  A.  Yes.

3  Q.  And it's titled Energy Commodity Risk Management Policy.

4  Tell me the date on this policy.

5  A.  June 2016.

6  Q.  So there is no dropdown yet, is there?

7  A.  Correct.

8  Q.  In fact this is about a couple months before the dropdown,

9  right?

10  A.  Correct.

11  Q.  Now, you were one of three members on this risk committee;

12  isn't that correct?

13  A.  Yes.  Do you know if this risk policy was approved by the

14  board or approved by the banks, or is this just a draft?

15  Q.  I can only tell what the e-mail says it is.  It's not our

16  document and it says final, so...

17  A.  We would have to go back and look, but I believe Murthy Rao

18  who updates this document was probably being proactive in

19  putting these names on here.  This policy would not have

20  applied to the three major entities prior to the dropdown.

21  Q.  But you're speculating right now, right?

22  A.  Correct.

23  Q.  And it does say "final" on the attachment, right?

24  A.  Yes.

25            THE COURT:  What's the date of the e-mail?

1   Q.  It even says updated June 2016.  Do you see that?

2   A.  Yes.

3   Q.  I don't know if your answer got on the record.  You were

4   one of the three members on the risk committee, correct?

5   A.  Yes.

6   Q.  In fact let's go to 05 of this document.  It lists the

7   three members of the risk committee, correct?

8   A.  Yes.

9   Q.  Yourself, Robert Lane, Murthey Rao.  Do you see that?

10  A.  Yes.

11  Q.  No member of Major Energy was on this committee, right?

12  A.  Correct.

13  Q.  And anybody who is listed on this policy, the entities

14  identified on the policy have to comply with the policy,

15  correct?

16  A.  It is my testimony that these legal entities would not have

17  had to comply with this policy prior to the dropdown.

18  Post-dropdown, yes.  I can't explain the date on there for you,

19  but they would not have been subject to this policy prior to

20  the dropdown.

21  Q.  And if we could go to 04, Eric.

22          I'm on the bottom, you see it says -- first of all, on

23  top, right?  Now we're inside this document, right?  And do you

24  see the Major Energy entities listed in there?

25  A.  Yes.

1    Q.  It's not a black line, is it?  Do you see if this is a red

2    line?  A black line?  Or is it the final document?

3    A.  No.

4    Q.  And they are all identified collectively as the companies

5    or Spark, right?

6    A.  Correct.

7    Q.  So let's go out of the blow-up and go to the bottom,

8    unauthorized transactions.  "Neither Spark" -- which again

9    includes any of the entities identified above -- "nor any of

10   its personnel will engage in transactions outside of the

11   guidelines and transaction limits established in accordance

12   with the policy."

13          Did I read that correctly?

14   A.  Yes.

15   Q.  Now, it's true that Major Energy was required to obtain

16   approval from Spark's risk committee in order to proceed with

17   an aggregation opportunity, right?

18   A.  Yes.

19   Q.  And Spark's risk committee had the final say on whether

20   Major Energy could proceed with a potential aggregation deal,

21   correct?

22   A.  Yes.

23   Q.  And isn't it true that in May 2017 Spark informed Major

24   Energy management that Spark's risk committee would only be

25   willing to entertain aggregation deals that are below 5,000

1    customers?

2    A.   Correct.  Moeller was presenting at that risk committee

3    meeting, and the risk committee adopted his recommendation.

4    His personal recommendation was he would not proceed with that

5    aggregation because of the risks associated with that

6    transaction.

7    Q.   And that transaction -- that proposal was not a less than

8    5,000 aggregation opportunity, was it?

9    A.   No, the note that came out following that decision was

10   where we implemented the 5,000.  And the 5,000 was a guideline;

11   it was not part of the risk policy.

12   Q.   So I understand your testimony, your testimony -- or is it

13   your testimony that Mr. Moeller told the risk committee that we

14   agree that there should be no aggregation deals that are above

15   5,000 customers?  That's what he said to the risk committee?

16   A.   No, that's not what he said to the risk committee.  You can

17   go read it in his deposition.  He recommended to the risk

18   committee that given the risks associated with that transaction

19   he would not recommend going forward with that deal if it were

20   up to him personally.

21   Q.   And I'm not asking about that transaction.  I understand

22   the decision made on that transaction.  Future transactions.

23   A.   Yes.

24   Q.   He didn't say for future transactions anything above 5,000

25   should not be presented to the risk committee, did he?

K337HOR3                         Kroeker - cross

```
 1    A.  No.

 2    Q.  Now, in your witness statement, paragraph --

 3    A.  I'm sorry.  I want to elaborate on my answer before you

 4    move on to something else.

 5         We had a discussion at risk committee about continuing

 6    to do smaller aggregation deals, and we agreed that if they

 7    were smaller aggregation deals that did not require green fee

 8    certification, we would be willing to go ahead and do those,

 9    but we didn't specifically talk about what the definition of

10    "smaller" would be.

11    Q.  But you are aware that the communication in the response to

12    Mr. Moeller said not more than 5,000.

13    A.  Yes, I am aware of that.

14         Sir, you said witness statement.  Which paragraph?

15    Q.  263.  You say, "This culminated in Horowitz taking a new

16    approach which appeared coordinated between the senior

17    management team and the key employees of Major Energy to send

18    e-mails to Spark personnel for the purposes of manufacturing a

19    paper trail to create the misimpression that Spark was

20    interfering with the sellers' ability to run the business of

21    Major Energy, which was not accurate."

22         Do you see that?

23    A.  Yes.

24    Q.  Now, you don't cite any document in this paragraph, do you?

25    A.  No.
```

1  Q.  Now, you testify in paragraph 64 of your witness

2  statement -- so in the last sentence you say "Throughout my

3  involvement with the sellers I routinely went out of my way to

4  accommodate them and help the Major Energy business succeed,

5  but time and again, they advanced their personal financial

6  interests rather than the interests of Major Energy."

7          Correct, do you see that?

8  A.  Yes.

9  Q.  Now, you are aware that after the dropdown Mr. Sobel,

10  Mr. Moeller and Mr. Alper terminated their employment

11  agreements for cause and received severance payments, correct?

12  A.  Yes.

13  Q.  I think we saw a slide put up in opening about a total to

14  $4 million and Mr. Alper was able to get $2 million; you saw

15  that?

16  A.  Yes.

17  Q.  And are you aware that Mr. Horowitz and Mr. Wiederman would

18  have had that same right, right?

19  A.  Yes.

20  Q.  They too could have received millions of dollars in

21  severance payments, correct?

22  A.  Correct.

23  Q.  But they stayed on at Major Energy through their earnout

24  period and didn't collect on their severance; isn't that true?

25  A.  That is true.  They are also the only two out of the five

K337HOR3                        Kroeker – cross

1   that were shareholders, which I believe is a significant

2   difference in why -- or at least that's what they explained to

3   me at the time why they didn't exercise their right while the

4   other three did.

5   Q.  Right, they wanted to see it through; isn't that true?

6   A.  They had more money to gain by staying on as shareholders

7   than by resigning.

8   Q.  Well, apparently that didn't happen, right?

9               MR. BROWN:  Objection.

10              THE COURT:  Sustained.

11  Q.  Let's talk about the earnout calculation.  Now, we

12  established before that you had no involvement in the drafting

13  of the earnout agreement, correct?

14  A.  Correct.

15  Q.  You had no involvement in the earnout calculation

16  spreadsheets NGE and Major Energy were working on prior to

17  closing, did you?

18  A.  Correct.

19  Q.  And you had no involvement in the creation of the earnout

20  illustrations that were set forth in Exhibit A or B of the

21  earnout agreement, did you?

22  A.  Correct.

23  Q.  And you testified in your witness statement that you had

24  discussions with Gary Lancaster to determine how the

25  calculation of the earnout payment would work, correct?

K337HOR3                        Kroeker - cross

1   A.  Correct.

2   Q.  And you testified that Mr. Lancaster emphasized section

3   2.2(b) of the earnout agreement with you multiple times.  Do

4   you remember that?

5   A.  Yes.

6   Q.  And that that was an important point to you prior to the

7   dropdown, correct?

8   A.  Yes.

9   Q.  Now, prior to the dropdown you requested and reviewed some

10  Excel models of how to calculate the earnout; isn't that right?

11  A.  Correct.

12  Q.  And you were using this earnout model to better understand

13  the calculation so you could present -- better present the

14  proposed transaction to the Spark board; isn't that correct?

15  A.  I believe that's correct.

16  Q.  So let's look at Plaintiff's Exhibit 641.  So here is an

17  e-mail -- why don't we just go to the early part of the e-mail,

18  the earliest -- all right.  Let's go to the pdf page 2.

19          So on April 6 Mr. Hennekes of NGE sends you and Mr.

20  Konikowski the e-mail, correct?

21  A.  Yes.

22  Q.  And this is before the dropdown, right?

23  A.  Yes.

24  Q.  There is no sellers on this e-mail, are there?

25  A.  No.

K337HOR3                           Kroeker - cross

1    Q.  There is no Major Energy employee on this e-mail, is there?

2    A.  No.

3    Q.  It says "Major deal sheet.  Nathan:  We also did an earnout

4    example showing 35 percent below and 35 above plan and the

5    corresponding impact to the purchase price multiple of

6    projected EBITDA."

7           Do you see that?

8    A.  Yes.

9    Q.  "This can be backup or if you like incorporated into memo.

10   See the table below.  Also attached the spreadsheet where you

11   can adjust the percentage variances if you like by changing the

12   yellow shaded cells."  Right?

13   A.  OK.

14   Q.  And then he has a chart here, right?  Let's go up an

15   e-mail.  Same day, a little later, Mr. Hennekes reaches out to

16   you again, again no sellers on this e-mail, right?

17   A.  Correct.

18   Q.  No Major Energy person on this e-mail?

19   A.  Correct.

20   Q.  And he says "Nathan, use this spreadsheet instead if you

21   want to play around with it.  I found and corrected a small

22   error in the way cash installments were calculating at lower

23   variances.  Any questions, please call me."   Then he has his

24   card there.  Do you see that?

25   A.  Yes.

K337HOR3                        Kroeker - cross

1    Q.  Now let's go to the top e-mail.  You a couple days later

2    send it to Georganne Hodges and Andy Davis at Spark, right?

3    A.  Yes.

4    Q.  It says "Attachments:  Final-earnout example"

5    A.  Yes.

6    Q.  You say "Here is the interactive model to show how the

7    earnout works."  Do you see that?

8    A.  Yes.

9    Q.  So let's look at that spreadsheet, which is 641A.

10            Now, first of all, you see there is a file folder?  Do

11   you see that on the bottom, the spreadsheet has a file folder

12   "Mark's analysis"?

13   A.  OK.

14   Q.  And you have an understanding that referred to Mark

15   Wiederman?

16   A.  Yes.

17   Q.  You see a folder that says "Gary Lancaster analysis"?

18   A.  No.  Are you referring to the tabs at the bottom?

19   Q.  Yes.

20   A.  All right, I'm with you.

21   Q.  So if we could make it a little bit -- like that I guess.

22            So you see there is a gray box area and it says

23   "Mark's analysis" within the gray box?  Do you see that?

24   A.  Yes.

25   Q.  And then it says in the box to the right of that "Example

1    of earnout scenarios for 2016 and 2018."  Do you see that?

2    A.  I do.

3    Q.  And it says "Below plan by 35 percent; plan achieved; above

4    plan by 35 percent."  Do you see that?

5    A.  Yes.

6    Q.  And underneath it will say amounts for below plan by 35

7    percent; 100 percent of plan achieved; and above plan of 35

8    percent," with different results with cash installments.  Do

9    You see that?

10   A.  Yes.

11   Q.  Now, plan achieved column in the main box here, do you see

12   that?  No, in the example, the plan achieved in the middle

13   there.  Now, it says cumulative three year adjusted EBITDA; do

14   you see that?

15   A.  I do.

16   Q.  And that the cumulative three year adjusted EBITDA is 73.6

17   million.  Do you see that?

18   A.  Yes.

19   Q.  Now, 73.6 million, isn't that essentially 20.7 million plus

20   25 million plus 27.8 million, the numbers that were in the

21   earnout targets?

22   A.  That looks out correct, yes.

23   Q.  And it says if that happens -- can you tell me what it says

24   the total earnout is?

25   A.  I mean this is an overly simplified model that I think is

1   being taken out of context.  The whole point of Hennekes

2   sharing this with me was to demonstrate that the purchase

3   multiple stays in the three times EBITDA range even when you

4   stretch the model.  This was not including any customer count

5   adjustments.  It obviously doesn't include 2.2(b), and there

6   are other simplifications here.

7   Q.  So, did he tell you don't use this because it doesn't

8   include 2.2(b)?

9   A.  No.  If you go back to his e-mail he said go play around

10  with this model so you can see the purchase multiple.  OK?

11  This wasn't part of the main core of the spreadsheet that

12  either Gary or Mark created.  This is something that Hennekes

13  stuck in here strictly for purposes of helping me draft a memo

14  to my board, to demonstrate to me that the purchase multiple --

15  if the business did extremely well, the purchase multiple still

16  stayed around 3, and if the business crashed the purchase

17  multiple stayed in 3.  Which was very important to me because

18  we were trading north of five at the time.

19  Q.  Do you see any deduction for the first quarter in this

20  spreadsheet?

21  A.  No, that's not --

22  Q.  For 2016.

23  A.  That's not what the point of this was is what I'm saying.

24  Q.  Let's look at -- now again the timing is this is April

25  2016, correct?

K337HOR3                         Kroeker - cross

1   A.  Yes.

2   Q.  OK.  Let's look at DX 395.

3           So we go to the bottom e-mail.  We are now in

4   September 6, 2016, right?

5   A.  Yes.

6   Q.  Now, this is after June 2016, right?

7   A.  Yes.

8   Q.  And it's an e-mail from you to David Hennekes and Paul

9   Konikowski; subject, major three year model.  And you ask "Can

10  one of you send me the 3 year model that supports the full $35

11  million pay-out on the earnout?  Thanks."  Right, that's your

12  e-mail.  Yes?

13  A.  Yes.

14  Q.  Let's go to the e-mail, the top e-mail, and Hennekes

15  responds to you same day, "Here is the earnout model.  Is this

16  what you're looking for?  Also attached Major's 3 year forecast

17  that forms the basis of targets for 2016 through 18."

18          Do you see that?

19  A.  Yes, I see that.

20  Q.  And this is September?

21  A.  Yes.

22  Q.  After June 2016, right?

23  A.  Yes.

24  Q.  Let's see what he sends you.  395A.  He sends you a model

25  that says in the tab -- file folder, sorry -- "Major earnout

K337HOR3                        Kroeker - cross

1   and cash installment."  Do you see that?

2   A.  I see that.

3   Q.  Now, that is the only attachment in A, correct?  There is

4   nothing on sheet 2, correct?  We will look at that to make

5   sure.  Nothing on sheet 3.

6   A.  Correct.

7   Q.  There is nothing saying here is Gary Lancaster's projected

8   model, correct?

9   A.  Right.

10  Q.  Let's go back to NGE's projected earnout.

11          If we could just pan a little bit smaller.

12          There you go again with the gray box, Mark's analysis

13  in the gray box, right?  There is no green boxes above the

14  yellow, right?

15  A.  Correct.  It does point out that all of this is subject to

16  2.2(b) for the first year.

17  Q.  Where is that?

18  A.  Bottom right-hand corner.

19  Q.  Where?  "Subject to a proportional reduction for 2016"?

20  A.  Yes.

21  Q.  It says, "The rationale for these adjusted EBITDA

22  deductions is that Major shareholders shall share in every

23  dollar from one dollar and these adjusted EBITDA deductions

24  balance the risk between Major" --

25  A.  Below that it says subject to proportionate reduction for

1    2016.

2    Q.  Right.  And the every dollar you believe was not for cash

3    installment.  That's your testimony.

4              MR. BROWN:  Objection.  Mischaracterizes.

5    Q.  Are you aware for the dollar-for-dollar reduction with

6    respect to the earnout portion?

7    A.  So if I could I would like to see the exhibit that shows

8    the earnout calculation that we sent to the sellers every year,

9    the one that's the portrait orientation, because with that I

10   will be able to answer your questions a lot better, because I

11   don't know if there is a version of that in one of these

12   binders I have in front of me.  That's the one I am most

13   familiar with.

14   Q.  Now, you testified in your witness statement at length

15   about the dispute among the parties concerning the 2016 earnout

16   payment, correct?

17   A.  Yes.

18   Q.  Now, Spark made a payment of $7.4 million around March 30,

19   2017 to the seller, forwarded in 2016 to Japan, right?

20   A.  Correct.

21   Q.  And under the terms of the earnout agreement I think you

22   saw yesterday payment was due essentially that day, correct?

23   A.  Yes.

24   Q.  So you would agree that the sellers are in their rights to

25   ask for a payment on the due date, right?

K337HOR3                          Kroeker - cross

1   A.  Yes.

2   Q.  Now, you testified that after that payment you -- and if we

3   go to paragraph 255 -- you say after you sent the $7.4 million

4   wire Mr. Horowitz continued to communicate aggressively and

5   "that while I disagreed with him, for the purpose of putting

6   Major Energy first, I engaged Lancaster to prepare another

7   calculation for negotiation purposes only that could help

8   bridge the gap between sellers' positions and Spark's positions

9   to help the parties find a reasonable resolution, which he

10  did."

11          Do you see that?

12  A.  Yes.

13  Q.  And you further testified in your witness statement that

14  that was for negotiation purposes only, a contingent compromise

15  offer?  Right?  You say that repeatedly, right?

16  A.  Yes.

17  Q.  Well, let's look at what you actually told the sellers on

18  April 12, 2017.  Let's go to Defendant's Exhibit 539.

19          You have seen this e-mail before?

20  A.  Yes.

21  Q.  This is April 12, 2017 from you to Mr. Wiederman and

22  Mr. Horowitz.  There are other cc's, right?

23  A.  Yes.

24  Q.  Major cash installment and earnout, right?  You say "The

25  attached spreadsheet constitutes the earnout statement under

1   section 2.2(e) of the earnout agreement, right?

2   A.  Yes.

3   Q.  And you say "I wanted to follow up on our conversations

4   other over the past few weeks regarding the cash installment

5   and earnout, both in general and specifically for the 2016

6   calculation.  I asked Gary to go back to the MIPA and the

7   earnout agreement and spell out, step by step, how those

8   numbers should be calculated in order to best fit both the

9   spirit and the letter of the agreement.  Our goal was to make

10  sure we are all on the same page regarding the exact

11  calculation that covers not only the partial 2016 year but also

12  2017 and 2018."

13          Did I read that correctly?

14  A.  Yes.

15  Q.  You don't say in this e-mail I ask Gary to go back and do a

16  step-by-step analysis how I think you the sellers are

17  calculating the earnout, do you?

18  A.  That's not in the e-mail.  Keep in mind this e-mail is

19  nearly two weeks after the $7.4 million was wired to the

20  sellers that we were talking about two minutes ago.  In that

21  two week period there were extensive conversations both within

22  NGE and Spark as well as with the sellers discussing this

23  topic.

24  Q.  But the answer to my question was no, right?

25  A.  Correct.

K337HOR3                        Kroeker - cross

1    Q.  And the reality is you wanted to know Mr. Lancaster who was

2    involved in the negotiations of this agreement -- not you --

3    how do you think it should be calculated in order to best fit

4    both the spirit and the letter of the agreement?  Isn't that

5    true?

6    A.  Correct.

7    Q.  Because you wanted to get to the truth.

8    A.  I wanted to get to the right answer.

9    Q.  That's correct.  And so he prepared a memo so you could get

10   to the right answer; isn't that true?

11   A.  Keep in mind I'm sitting in a situation where we're trying

12   to make the best of this acquisition.  I think we concede it

13   was complicated.  I had put forth my best faith effort into

14   what that calculation for the first year earnout was.

15   Initially it was 5.5 million.  We then realized that we had

16   made a mistake; we had misunderstood a couple of key words

17   which were further reduced by.  We then recalculated the

18   earnout, got the $5.1 million.  We sent that over.  We got the

19   response from Saul that you just referenced.  Saul does his own

20   calculation, and he gets to 7.403, sends it to me, copies his

21   deal counsel and says -- I'm sorry, I'm not sure if he copied

22   his deal counsel.  Strike that.  He sends it to me and copies

23   several others, and says you would be advised to wire this

24   transfer -- wire this money to us or we will proceed with legal

25   action.  So now I'm under threat of litigation.  I don't want

1    to go into litigation.  We have a good business, we have a good

2    working relationship.  I'm doing everything I can to avoid

3    getting into litigation with these guys, so I instruct my

4    Treasury Department to wire over $7.403 million before deadline

5    that Saul has introduced even though there is really no basis

6    for that number.  I don't understand the calculation that he

7    attached, but that's the number we wired over.

8               I then spend the next two weeks in discussion with

9    Major, with Gary, going back and forth, we agreed if we take

10   the sellers' position that you do not deduct Q1 in 2.2(b), what

11   would that calculation yield?  And that calculation would yield

12   7.563.  Then I go back to the sellers with this e-mail and say,

13   you know what, it's actually $160,000 more than what you

14   calculated; we're willing to send you the additional 160 grand

15   if we can put the first year behind us and go back to running

16   the business.

17   Q.  Again to my question.  You don't say in here we believe

18   it's still 5.1 million but to avoid litigation here is 7.5

19   million.  Do you say that?

20   A.  I do not say that in this e-mail.

21   Q.  Instead what you say is "After reviewing Gary's memo and

22   the notes from our conversation, we believe ..."  Who is the

23   we?

24   A.  I don't remember who I was referring to.  Myself, my

25   management team, the people involved in doing the calculation.

K337HOR3                         Kroeker - cross

1  Q.  "We believe the proper number is 7.5 million for 2016."  Do

2  you see that?

3  A.  I see that.  And my testimony today is the proper

4  calculation if you include 2.2(a), (b) and (c) in that

5  calculation.  OK?  I'm sorry.  If you would ignore (b).  This

6  is 2.2 ignoring 2.2(b).

7  Q.  Where in your e-mail do you say to Mr. Horowitz, Saul, I

8  wanted to update you, if you ignore those provisions then we

9  believe the proper number is 7.5 million?

10  A.  I didn't say that in this e-mail.

11  Q.  You state in paragraph 269 of your witness statement -- in

12  269 you say that, Despite my good faith efforts no agreement

13  was reached between the parties for the year 1 contingent

14  payment and instead sellers had been overpaid for year 1

15  because of Horowitz's litigation threats.  Right?

16  A.  Yes.

17  Q.  And there you're using litigation threats, right?

18  A.  Yes.

19  Q.  Then you say in 282 -- you recall the parties were going

20  back and forth between April and June on issues, disputes?

21  A.  Yes.

22  Q.  Then you say on June 21, 2017 Horowitz sent a response that

23  failed to address each of the detailed line items in the

24  memorandum and instead only focused on a handful of the add

25  back points in dispute and noting that "I do not think we will

1    make any progress at this point and we are at a stalemate."

2              Do you see that?

3    A.  I do.

4    Q.  And so at that point a stalemate existed, correct?

5    A.  Correct.

6    Q.  Now, at that point you didn't send a letter to the sellers

7    saying can you please return the 2 million over payment that we

8    made in good faith to you, did you?

9    A.  No.

10   Q.  And you didn't do that in August or September of 2017, did

11   you?

12   A.  No.

13   Q.  Then the sellers sued Spark in October of 2017; do you

14   recall that?

15   A.  Yes.

16   Q.  No more litigation threat; now it's actually a lawsuit,

17   right?

18   A.  Correct.

19   Q.  You didn't send a letter to them saying, well, give us back

20   our $2 million overpayment, did you?

21   A.  No.

22   Q.  You didn't do that in November 2017, correct?

23   A.  No.

24   Q.  Not December 2017, correct?

25   A.  No.

K337HOR3                          Kroeker - cross

1   Q.  Not January 2018, correct?

2   A.  No.

3   Q.  Not February 2018.

4   A.  No.

5   Q.  Instead, when you send them notice of what their payment

6   should be for 2017, without any notice to them -- or advanced

7   notice to them -- you just deducted it from what they deserved

8   for 2017.  Isn't that true?

9   A.  Yes, we deducted the overpayment from the prior year.

10              MR. DAHAN:  I have nothing further, your Honor.

11              THE COURT:  Thank you.  It's about one o'clock.  We

12  will break for lunch now for an hour.  See you at 2 o'clock.

13              MR. DAHAN:  Your Honor, can we move the exhibits in

14  after that?

15              THE COURT:  Yes.

16              (Luncheon recess)

17              (Continued on next page)

18

19

20

21

22

23

24

25

K33AHOR4ps                    Kroeker

 1              A F T E R N O O N   S E S S I O N

 2                          2:15 p.m.

 3   NATHAN KROEKER, resumed.

 4              THE COURT:  Good afternoon.  Before we continue, just

 5   in terms of schedule, I have a few other things going on.  At 3

 6   o'clock I actually have to do a sentencing hearing, which will

 7   be at 3 and probably be over at 3:30, and we'll just break

 8   then.  Sorry.  It starts at 3:30.  So it will be about 3:30 to

 9   4, but then we can continue on after that.  So when we get to

10   the 3:30 point, you don't need to take everything off your

11   desks, but if you just move your things to the back table so

12   that the lawyers can have some space, that would be great.

13              Did you want to move in documents?

14              MR. DAHAN:  Yes, your Honor.  If it's OK if I can do

15   it from here.

16              THE COURT:  Sure.  Hold on one second.  All right.

17              MR. MAROONEY:  It's PX 251, PX 457, PX 756, PX 655.

18   Defendant's Exhibit 2, Defendant's Exhibit 1028 and 1028A,

19   Defendant's Exhibit 541.  PX 256, PX 257, PX 316, PX 312, PX

20   314, PX 299, PX 313, PX 481, PX 359, PX 650, and PX 651, PX

21   656.  Defendant's Exhibit 998.  PX 458.

22              THE COURT:  458?

23              MR. DAHAN:  Yes.

24              THE COURT:  Yes.

25              MR. DAHAN:  PX 641 and 641A.  Defendant's Exhibit 395

K33AHOR4ps                    Kroeker - Redirect

1    and 395A, and Defendant's Exhibit 539.

2                    THE COURT:  Got it.

3                    MR. DAHAN:  Thank you, your Honor.

4                    (Plaintiff's Exhibits 251, 457, 756, 655, 256, 257,

5    316, 312, 314, 299, 313, 481, 359, 650, 651, 656, 458, 641, and

6    641A received in evidence)

7                    (Defendant's Exhibits 2, 1028, 1028A, 541, 998, 395,

8    395A, and 539 received in evidence)

9                    THE COURT:  OK.  Mr. Brown.

10                   MR. BROWN:  Thank you, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. BROWN:

13   Q.  Good afternoon, Mr. Kroeker.

14   A.  Good afternoon.

15   Q.  I want to start with one of the documents Mr. Dahan focused

16   your attention on earlier, which is PX 756.  And you'll recall,

17   I take it, that this is a document we spent some time on, which

18   is Spark Energy's Inc.'s report to the SEC and to its public

19   shareholders about the dropdown transaction.

20   A.  Yes.

21   Q.  And Mr. Dahan asked you various questions about certain

22   parts of this, and certain other parts he didn't ask about, so

23   I'd like to focus your attention on a few of the parts he

24   didn't ask about.

25                    If we turn to page 3, which is the front page of the

1   document.

2            MR. BROWN:  And you can below the whole thing up.

3   Thank you.

4   Q.  Mr. Dahan asked you some questions about the top of this.

5   When you go down, under the number 1 on this page --

6            THE COURT:  Is it showing up on your screens?

7            MR. BROWN:  It's on our screens, your Honor.

8            THE COURT:  I'm having a little technical problem.

9            MR. BROWN:  Yes, I know what problem.  Off the record

10  perhaps.

11           (Discussion held off the record)

12           THE COURT:  Go ahead.  Back on the record.

13  Q.  So, again, we're referencing Plaintiff's Exhibit 756.  And

14  on page 3, do you see that you, as president, CEO of Spark

15  Energy Inc. are reporting to the shareholders in that first

16  sentence that the dropdown MIPA was actually signed several

17  months earlier on May 3rd, correct?

18  A.  Correct.

19  Q.  And is it fair to say you're also identifying publicly that

20  Spark HoldCo was the acquirer of the business?

21           MR. DAHAN:  Objection, your Honor.  Misstates what is

22  said in the first sentence.  It says "the company and Spark

23  HoldCo."

24           THE COURT:  Yes.  Spark HoldCo was the acquiring name.

25  Q.  And then it actually attaches, as an annex, if we jump

1    forward to 225 of the document, the actual MIPA itself.

2    Correct?

3    A.  Yes.

4    Q.  And then, if we turn forward in the actual MIPA that was

5    attached to the file in annex A and we turn to page 316, we see

6    the signature page of the MIPA.  Correct?

7    A.  Yes.

8    Q.  And who is identified as the seller?

9    A.  National Gas & Electric, LLC.

10   Q.  And who is identified as the buyer?

11   A.  Spark HoldCo, LLC.

12   Q.  And is that you who signed as Spark HoldCo, LLC's chief

13   executive officer?

14   A.  Yes.

15   Q.  And you sign as Spark HoldCo's chief executive officer but

16   also as the managing member of Spark HoldCo, which is a

17   publicly traded company, SEI, correct?

18   A.  Correct.

19   Q.  And then if we scroll down, this also identifies on the

20   right side the role being played by SEI in connection with the

21   following MIPA, correct?

22   A.  Yes.

23   Q.  And would you read above "Spark Energy, Inc." what it says

24   that Spark Energy, Inc. is.

25   A.  As?

1   Q.   In relation to the MIPA.   What is Spark Energy signing as?

2   You can read starting with "as signatory."

3   A.   So you just wanted the right-hand side.   "As signatory for

4   the limited purposes of agreeing to issue the shares and to

5   grant registration rights as set forth in Section 8.2(c) and

6   Section 2.2(c), if applicable, and agreeing to issue the SEI

7   guaranty pursuant to Section 7.17."

8   Q.   And as the CEO of Spark HoldCo at the time as well as the

9   CEO of Spark Energy at the time, did you believe this to be a

10  true statement to the public as reflected in the signature page

11  of the MIPA signed on May 3rd?

12  A.   Yes.

13  Q.   Let's jump to another document Mr. Dahan spent some time

14  on, DX 1028.   This was the document that attached to it, at

15  1028A, the -- if we jump ahead, James, to A, the attachment.

16        So you recall Mr. Dahan asking you some questions

17  about the Spark Energy Major Energy due diligence overview that

18  Mr. Gregory sent to you on April 22, 2016.   Do you recall those

19  questions?

20  A.   Yes.

21  Q.   And if we turn to slide 3, which is the slide that

22  Mr. Dahan spent some time with you on, I have some other

23  questions.

24        So with respect, first, to the three-year projections

25  that Mr. Dahan asked you about, I take it, sir, it's fair to

K33AHOR4ps                    Kroeker - Redirect

1    say that the projections as of April 2016 were all predicated

2    on the projections that Major Energy sellers provided NGE?

3                MR. DAHAN:  Objection to form, your Honor.

4                THE COURT:  What was the objection?

5                MR. DAHAN:  First of all it's leading, and second of

6    all he has no foundation for that yet.  So he should be asking

7    what were they based upon?

8                THE COURT:  Well, you can set a foundation if you'd

9    like.

10               MR. BROWN:  Sure.

11   Q.  Mr. Kroeker, the transaction between NGE and the sellers

12   closed on April 15, 2016, correct?

13   A.  Correct.

14   Q.  Seven days later, you received this from Mr. Gregory,

15   correct?

16   A.  Correct.

17   Q.  So seven days of performance by Major had occurred between

18   the closing of the MIPA between NGE and sellers and these

19   three-year projections that looked out to the end of 2018,

20   correct?

21   A.  That's correct.

22   Q.  So could you tell the Court on what these projections were

23   based?

24   A.  These projections were based on inputs that were provided

25   by NG&E in consultation with employees of Major.

K33AHOR4ps                    Kroeker - Redirect

1   Q.  And did you have an understanding of where --

2              MR. BROWN:  Should we stop, your Honor?

3              THE COURT:  Yes.  Let's take a break.

4              Off the record.

5              (Discussion held off the record)

6              (Pause)

7              THE COURT:  All right.  Back on the record.

8              Mr. Brown?

9              MR. BROWN:  Thank you, your Honor.

10  BY MR. BROWN:

11  Q.  And so I believe, having set the foundation, Mr. Kroeker,

12  do you have an understanding that NGE's inputs that you made

13  reference to before we took our short break were predicated on

14  the projections that were provided to them by the sellers

15  looking forward to the three years during the earnout period

16  from the end of 2016 to the end of 2018?

17  A.  Yes.

18  Q.  And I take it, just to make sure the record is clear, that

19  was your understanding at the time you were reviewing this

20  document in April of 2016, correct?

21  A.  That's correct.

22  Q.  So one line that we only briefly touched on during

23  Mr. Dahan's examination was the "cost to acquire" line.  Do you

24  see that line there?

25  A.  Yes.

K33AHOR4ps                    Kroeker - Redirect

Q.  Can you first just describe for the Court what is meant by
that line.  What is meant by "cost to acquire"?
A.  Well, you generally spend money in two different ways when
you're acquiring customers.  You spend money in the form of
residual commission payments, which would flow through the G&A
line.  That's typically on the commercial accounts.  And when
you acquire residential customers, you pay up front commissions
to either door-to-door vendors or telemarketing vendors.  Those
up-front commissions get capitalized for accounting purposes,
get tracked on a separate line for financial reporting
purposes, and so this line, "cost to acquire," would have been
up-front commissions paid for door-to-door and telemarketing
sales channels.
Q.  And you understood, again, that these were the three-year
projections, the cost to acquire customers, that sellers were
providing to NGE prior to closing on the MIPA.
A.  I think the actual projections that were provided to NG&E
before the NG&E deal closed actually had an elevated level of
cost to acquire.  These would have been the numbers that would
have been current as of April 22nd based on conversations
between the Major management team and the NG&E management team.
Q.  Understood.  So now could you describe for the Court a
little bit about the difference between Spark's experience in
cost to acquire customers and what you would observe Major's
cost to acquire customers were as we proceeded through the

1   earning period.

2   A.   Yes.  So what we saw going forward is that Spark, you know,

3   having made some changes with the way we managed our vendors

4   over time, we were getting larger customers at a lower price

5   than what Major was getting, during the earnout period,

6   speaking specifically about residential.

7   Q.   And from the standpoint of cost to acquire and RCEs and the

8   use of brokers or vendors versus not, can you describe the

9   difference you were observing between the way Spark

10  historically had RCE counts versus costs relative to the way

11  Major had RCEs compared to costs.  Do you understand the

12  question?

13  A.   I think so.  So Spark historically has been focused on cost

14  to acquire per RCE, which is a volumetric measure, which is a

15  measure that we report on externally.  Major has historically

16  been focused on cost to acquire a customer.  And so when you

17  compare -- and I did this with Dan in 2017 -- when you compared

18  the cost to acquire per customer, between Spark and Major, they

19  were actually fairly similar.  When you took that over to be

20  the cost to acquire per RCE, which is now a volumetric measure,

21  Spark was significantly more efficient in acquiring residential

22  volumes, or RCEs, than Major was.

23  Q.   And can you unpack for the Court a little bit, from your

24  perspective as the CEO of Spark HoldCo, why it was there was

25  such a difference between Spark and Major in respect of that.

1    A.  So one of the things that we did very distinctively in '15,

2    '16 time frame was go to all of our major -- all of our

3    significant vendors and introduce volumetric thresholds into

4    the commission accounting structure.  So if customers were

5    below a certain size, we didn't pay them at all.  If they were

6    between another range of size, they would get a reduced

7    commission and they would get an incentivized commission if

8    they were above a certain size.  So trying to drive our vendors

9    to go into higher-value neighborhoods, to make it real simple,

10   which our larger customers consumed more energy and therefore

11   were more valuable to us.  Major was just paying on a per-meter

12   or per-customer basis at this time.

13   Q.  I want to talk for a second about what Major --

14   A.  Sorry.  Can I finish that thought real quick.

15          When you pay per meter and per account, door-to-door

16   agents naturally go to low-income neighborhoods where you have

17   low usage and just maximize the number of meters that you can

18   sign up, because it's a lot quicker to go in neighborhoods

19   where the homes are close together.

20   Q.  So let's talk about one of Major's brokers.  Do you know

21   who PTM is?

22   A.  Yes.

23   Q.  Who is PTM?

24   A.  PTM was a significant vendor for Major at this time.  I

25   don't remember what it stands for, but the principal behind it

K33AHOR4ps                          Kroeker - Redirect

1    was a gentleman named Sunil.

2             THE COURT:  How do you spell Sunil?

3             THE WITNESS:  S-u-n-i-l.

4             THE COURT:  Thank you.

5             THE WITNESS:  His last name starts with a G.

6    Q.  And you understand that Sunil has submitted a witness

7    statement and is intending to appear on plaintiff's behalf in

8    this case?

9    A.  I'm aware of that.

10   Q.  Have you had a chance to review -- strike that.

11            With respect to PTM, do you know off the top of your

12   head -- and I, in part, don't want to ask this question -- do

13   you know off the top of your head how much approximately Major

14   paid PTM over the course of the earning period?

15   A.  I don't.  I know at the peak it was in hundreds of

16   thousands of dollars a month.

17   Q.  Does approximately $9 million for a portion of the earnout

18   period sound right to you?

19   A.  Yes.

20            MR. DAHAN:  Objection to form, lack of evidence for

21   that, your Honor.

22            MR. BROWN:  OK.  Can we pull up DX 944A.

23            MR. DAHAN:  And also for the record, it is beyond the

24   scope.  This was not covered.  And this is a redirect.  It's

25   not his direct.

1         THE COURT:  Understood.  I'm going to give a little

2    bit of leeway, as I did yesterday.

3         MR. BROWN:  And just if I might create a quick record

4    on that issue, your Honor.  Mr. Dahan asked questions about the

5    import of the relationship between brokers and vendors, and

6    it's a 2.7 issue, and now I'm exploring one of the largest

7    vendors, the amount spent.

8         MR. DAHAN:  I didn't cover 2.7 with him, but --

9         THE COURT:  It's OK.

10        944A?

11        MR. BROWN:  944A.

12   Q.  And this is a really lengthy spreadsheet, Mr. Kroeker, but

13   I'll represent for the Court and for Mr. Dahan that if you add

14   up the columns B218 through AC218, which is the payments made

15   from Major to PTM between November 2016 and December 2018, it

16   equals $15,000 less than $9 million.  Does that surprise you

17   based on your testimony about what you understood they were

18   paying?

19   A.  Does not surprise me.

20        THE COURT:  This is what major paid to PTM, total?

21        MR. BROWN:  Correct.

22        Now, that's between November 2016 and December 2018,

23   so that does not include the April through October 2016 portion

24   of the earnout.

25   Q.  And, Mr. Kroeker, I recognize you didn't know off the top

1    of your head it's a $9 million number, but as the earnout

2    period was progressing, what was your reaction from the

3    standpoint of the buyer, Spark HoldCo, under the MIPA dropdown,

4    to the amount of money that sellers were paying to PTM?

5    A.  We were paying them an extreme amount of money.  I had

6    conversations with Dan in 2017 --

7    Q.  And again, for the record, when you say Dan, you're

8    referring to Mr. Alper.

9    A.  Mr. Alper, the CEO.

10            So Dan and I spoke on a weekly basis.  He would

11   provide updates for me on how the business is going.  And one

12   of those updates, or one of the items that he provided updates

13   on was the amount of money being spent on residential customer

14   acquisitions.  And so that triggered conversations between he

15   and I on the efficiency of that cost-to-acquire spend,

16   specifically on how much we were paying per customer.  I was

17   always encouraging him to add as many customers as possible,

18   encouraging him to add larger customers whenever possible, but

19   shared information with him on ways to maybe be more efficient

20   with that spend, given it's a, you know, several-million-

21   dollar-a-year line item in Major's financials.

22   Q.  And I take it the fact that the spend continued through the

23   end of the earnout period leads us to conclude that they didn't

24   stop Mr. Alper from continuing to PTM?

25   A.  Did not stop him from continuing with PTM.

1   Q.  You gave him your observations about deficiencies and

2   Mr. Alper continued to do as CEO until he was fired what he

3   wanted to do; is that correct?

4   A.  Yes.  I think that Dan, Mr. Alper, did not appear to change

5   the commission structure with PTM or with any vendors based on

6   that conversation, that I noticed.

7   Q.  Let's turn to DX 541, which is the Houlihan Lokey valuation

8   that Mr. Dahan asked you some questions about.

9   A.  OK.

10  Q.  Now, we see, and we know that the Houlihan Lokey valuation

11  is performed later in time, an evaluation of the acquisition of

12  Major and the interest as of the date of the closing of the

13  first MIPA, correct?

14  A.  Correct.

15  Q.  And similar to the questions that we went through on the

16  April three-year projection document we looked at moments ago,

17  is it your understanding, one way or the other, that Houlihan

18  Lokey's valuation, looking at April 15th, is predicated on the

19  projections provided by the sellers to NGE?

20  A.  Yes, because they would have had to do this with

21  information that would have been available as of April 15,

22  2016.

23  Q.  And I take it it's fair to state the obvious, that if the

24  projections provided by sellers are incorrect, so would be the

25  valuation?

1    A.  Yes.

2    Q.  Let's turn to another document Mr. Dahan spent some time

3    with you on, which is one of the many earnings call

4    transcripts, PX 256.  You recall Mr. Dahan had some questions

5    about this document, which is the earnings call transcripts for

6    quarter 2, 2016?

7    A.  Yes.

8    Q.  And this is on August 11, 2016, so it's several months

9    after the dropdown is signed.  Correct?

10   A.  Yes.

11   Q.  And it's recording out, just to mental set again, I think

12   this is clear in the record, but these earnings call are for

13   the entire Spark family of companies, of which Major is one

14   part.  Is that fair?

15   A.  For all of Spark Energy, Inc. and its subsidiaries.

16   Q.  So you're reporting to the public on the entirety of the

17   family of companies which, after the transaction with Major

18   Energy and the dropdown, includes Major as one of many

19   subsidiaries.  Fair?

20   A.  Yes.

21   Q.  And so in this transcript, as of August 11, 2016, when

22   you're talking to the market about Spark's overall performance,

23   I take it, like any CEO of a publicly traded company, you're

24   doing two things.  One, you're talking about actual financials

25   for the prior quarter.

1    A.  Correct.

2    Q.  And then you're making forward-looking statements to the

3    market about what might or might not happen in the future based

4    on your estimations.  Is that fair?

5    A.  Yes.

6    Q.  And what Mr. Dahan was asked you about were both the prior

7    and the future-looking issues in these transcripts; is that

8    correct?

9    A.  I believe so, yes.

10   Q.  As of this point in time, August 11, 2016, you were only

11   aware of Major's actual performance for April, May, and June,

12   the second quarter of 2016.  Is that fair?

13   A.  Yes.

14   Q.  So you had only seen, at the time of talking about Major,

15   those three months of actual --

16   A.  I would have seen financial information as part of the due

17   diligence exercise, but in terms of what was going to be

18   included in our financials, it would have only been from April

19   of '16 forward.

20   Q.  Correct.  And I'm only talking about -- so this earnings

21   call is to tell the market about Spark's overall second quarter

22   2016 performance, which would include, as you are recording

23   generally, Major's performance in April, May, and June, part of

24   which is post signing of the dropdown or closing.

25   A.  I'm not sure.  I know that ultimately we included April

1    through August financials, but I don't know that we included

2    that in the second quarter Q or did that come in the third

3    quarter Q.

4    Q.  In any event, if you turn to page 5 of the earnings call

5    and you look at the fourth paragraph down -- Mr. Dahan went

6    over some of this with you.  Do you recall him asking you?

7    A.  Yes.

8    Q.  And you're making reference in here to the May 3rd dropdown

9    transaction that was signed but which didn't close until the

10   end of August.  Correct?

11   A.  Yes.

12   Q.  And that's the dropdown signing, if we pull up, James, DX

13   1021, so the signing occurs on May 3rd.  And I think we've seen

14   this document before.  The day after the signing, which is

15   months before this earnings call, Major Energy itself is

16   announcing the acquisition through the dropdown by Spark

17   HoldCo, correct?

18   A.  Yes.

19              MR. DAHAN:  Objection to form.

20              THE COURT:  Noted.  I understand.

21              MR. DAHAN:  Thank you.

22   Q.  And I won't go through Mr. Alper's comments because we've

23   seen it before, so you can move on from that.

24              So if we go back to the Q and A on page 9 -- oh, I'm

25   sorry.  We're back to PX 256.  Page 9, Mr. Dahan asked you some

1    questions about questions and answers you were providing, many

2    of which were from response to FBR Capital, Mr. Driscoll, and

3    he focused your attention in your answer at the top of page 9

4    to one of Mr. Driscoll's questions.  But he only focused you on

5    the first sentence of that paragraph.  So after we get to that

6    first sentence that he focused you on, will you read in what

7    you then said to the market through about line 6.

8    A.   "And if you look at the timing of the Major transaction and

9    how that New York issue played out, that was why it was

10   structured the way it was.  It was to protect us on the

11   downside in the event that the New York order had a material

12   impact on the business.  If you look at what's really going on

13   in New York, I mean, in late July, the court issued an order

14   that vacated the first three clauses of that order.  We see

15   that as a huge win both for Spark and for the industry."

16   Q.   And then you go on to say you don't think the issue is dead

17   and there's uncertainties out there.

18   A.   Correct.

19   Q.   So Mr. Dahan asked you a couple, I would say probably

20   several or a few questions about the New York resetting order,

21   the New York low-income order, when they were issued, when they

22   were vacated, things of that sort.  Do you recall those

23   questions?

24   A.   Yes.

25   Q.   And you were trying to give an answer, I believe, about the

K33AHOR4ps                    Kroeker - Redirect

1    distinction between planning for the impact of potential

2    regulatory action in New York and what in retrospect, looking

3    here today at trial, actually happened.  So for the former part

4    of that, can you describe for the Court what Major and other --

5    let's start with Major -- what Major was doing from your

6    perspective to adjust its business in the event things went

7    poorer than --

8            MR. DAHAN:  Objection, your Honor.

9    A.  So I can speak for Major and I can speak -- sorry.

10           THE COURT:  What's the objection?

11           MR. DAHAN:  What's the foundation?

12           THE COURT:  Can you describe for the Court what Major

13    was doing from your perspective to adjust its business in the

14    event things went --

15           MR. DAHAN:  When?  When?

16           THE COURT:  What period?

17    Q.  Well, let's start with -- Mr. Dahan was asking you about

18    what you were trying to market on August 11, 2016.  So from

19    August 11, 2016 let's start.  What was your perspective as of

20    that period of time about what Major was doing to adjust its

21    business to plan for what could be the downside associated with

22    both the resetting order in New York and the low-income order?

23    A.  OK.  So I believe there's two things in 2016.  The first

24    one was, Major had a significant percentage of their customers

25    that were on variable month-to-month contracts in New York.

1    Variable month-to-month contracts tend to be more valuable.

2    They tend to have higher unit margins.  And there's more

3    flexibility in pricing.  Major took a step to lock in those

4    customers' contracts.  And I'm being careful with my word

5    choice because they didn't actually get affirmative consent

6    from those customers to renew them onto two-year fixed price

7    contracts.  What they did was sent communications to those

8    customers, as I understand it, saying, your price will not

9    exceed X for the next 24 months.  And so in doing that took

10   away a lot of the pricing flexibility of the business, but did

11   that in anticipation of this resetting order or similar order

12   or modified order going into effect, so that they would be able

13   to argue that these customers, with these 24-month price

14   commitments, were in effect fixed-price contracts and therefore

15   did not have to be turned over to the utility.

16        And so that was one of the significant ones that they

17   did.  I believe they did that both for the low-income

18   customers, as well as the non-low-income customers.

19        The second thing that was going on, as I understand

20   it, was increasing their focus on commercial accounts as

21   opposed to residential accounts.  And commercial accounts tend

22   to have lower unit margins than residential customers do.  But

23   Major was showing the business to be more focused on

24   commercial, and we did see some data on that this morning.

25   Q.  And you as the CEO of Spark HoldCo, the buyer through the

1    MIPA through August 23, 2016 through the end of the earnout

2    period on December 31, 2018, were getting weekly reports from

3    Mr. Alper, at least until he was terminated, about the

4    performance of Major?

5    A.   Yes.  And then Mr. Wiederman continued that practice after

6    Mr. Alper was gone.

7    Q.   Right.  And we'll talk about Mr. Alper being fired in a few

8    moments.  But you got things from Mr. Alper until he was

9    terminated and from Mr. Wiederman until the end of the earnout

10   period.  Is that fair?

11   A.   Yes.

12   Q.   And so you were seeing, as the CEO of Spark HoldCo, how

13   Major was performing on both monthly, weekly, and quarterly

14   basis throughout the earnout period after the dropdown closes.

15   Is that right?

16   A.   Yes.

17   Q.   Can we turn to the next transcript, PX 257, that Mr. Dahan

18   asked you some questions about.  So now this one is November

19   10, 2016.  So at that point, we have six months of actuals for

20   Major Energy, quarter two and quarter three, correct?

21   A.   Yes.

22   Q.   And this is now six weeks after the dropdown transaction

23   closed?

24   A.   Yes.

25   Q.   And Mr. Dahan asked you a couple questions on some of these

1    pages, but I want to direct your attention to page 7, where

2    you're answering a list of questions.  And Mr. Dahan asked you

3    some questions about this, but if we look at the sentence

4    towards the bottom, James, that starts with "so very, very

5    pleased with the two businesses."  You've talked about the two

6    acquisitions, Provider and Major, and you say essentially

7    you're very pleased with those two businesses as of this point

8    in time.  Correct?

9    A.  Yes.

10   Q.  Was that a truthful statement?

11   A.  Yes.

12   Q.  Why was it that, as of November of 2016, looking at quarter

13   two, quarter three, you were pleased with Major.

14   A.  Yes.  I think Major was a good business that we acquired.

15   We wouldn't have bought them if we didn't think they were a

16   good business.  They had good strong unit margins.  Their

17   volumes were below what we had anticipated.  I was hoping we

18   could work together to increase the volumes over the next

19   couple of years.  But when you take the Provider acquisition

20   and the Major acquisition as of November 2016, I think these

21   were very good businesses that we were excited about and we had

22   high expectations for going forward.

23   Q.  Do you recall, as of November -- as of this earnings call,

24   November 10, 2016 -- this is about six weeks after Major Energy

25   has given notice of intent to terminate the PSE contract as of

1   March 2017?

2   A.  Yes, that's correct.

3   Q.  When you were talking to the market in these Q2 and Q3 2016

4   earnings transcripts, as it relates to New York, you're talking

5   about the impact, I take it, of New York regulatory decisions

6   on all of Spark's companies, not just on Major.

7   A.  All of Spark's companies, correct.

8   Q.  And do you recall at the time, in let's call it Q2 2016,

9   how large a part of Spark family of companies overall New York

10  business was represented by Major?

11  A.  I don't recall that.  I believe what we disclosed to the

12  market at that time was that -- let me rephrase.

13          I think we disclosed to the market in total what the

14  New York business represented.  I don't think we ever disclosed

15  to the market what the Major component of that was.

16  Q.  Do you recall the Major component of that being

17  approximately a third?

18          MR. DAHAN:  Objection.

19  A.  Sorry, a third of?

20          THE COURT:  Sustained.

21  Q.  So sitting here today, Mr. Kroeker, you don't recall back

22  in 2016 what portion of Spark's overall New York business was

23  represented by Major; is that right?

24  A.  No.  I had eight different companies activated in New York.

25  Major would have been one of those eight.

K33AHOR4ps                    Kroeker - Redirect

1   Q.  Let's move to PX 312, which is the earnings call transcript

2   from August 4, 2017.  You recall there were some questions from

3   Mr. Dahan about this document, Mr. Kroeker?

4   A.  Yes.

5   Q.  If you turn to page 8, there's a Q and A, and, again, you

6   answer Mr. Driscoll.  Mr. Dahan asked you about some portion of

7   this and not others.  Again, this is August 4, 2017.  So it's

8   reporting on Q2 2017.  We're now five quarters into the 11

9   quarters of the earnout period.  Fair?

10  A.  Correct.

11  Q.  And Mr. Dahan focused on the top part.  You were also

12  telling the market at the bottom, to short-cite this, that,

13  quote, it's too early for us to know what those rule changes

14  are going to be.  I'm anticipating they're going to be things

15  that we've seen before in other markets in which we operate.

16  And I'm anticipating it's going to require us to either change

17  some of our sales practices, our disclosures, maybe our product

18  suite.  But ultimately I think we end up with a healthy

19  business in New York going forward longterm."  And then you

20  advise, "It's going to be well into the third quarter, maybe

21  the fourth quarter, as late as the first part of 2018."

22  Correct?

23  A.  Yes.

24  Q.  And did you believe that also to be true in the follow-up

25  statement at the time?

K33AHOR4ps                    Kroeker - Redirect

1    A.  Yes.

2    Q.  With respect to the questions Mr. Dahan asked you about the

3    impact about, let's talk about the low-income order, do you

4    have a general understanding, sitting here without being

5    refreshed, how many customers Major believed that it lost as a

6    result of the low-income order?

7    A.  The most recent number that I've seen is around 10,000

8    customers.

9    Q.  So let's look at one of the documents that talks about

10   this, which is DX 866, and then as an attachment 866A.  But 866

11   is Mr. Taub, the chief technology officer at Major.  It's

12   Mr. Taub and Mr. Horowitz having an exchange about low-income

13   drops.  And this is in March of 2019.  So it's looking back,

14   and this is after the earnout period has completed, correct?

15   A.  Yes.

16   Q.  And if you scroll up to the top, James, Mr. Horowitz is

17   then forwarding that from Major Energy to his Gmail -- this is

18   in 2019, well into this litigation.  You see that?

19   A.  Yes.

20   Q.  And the attachment is A.  James, if you could pull that up.

21   And so what Mr. Taub was sending Mr. Horowitz -- you can back

22   it out so they see the whole thing.  Thank you.  So if you just

23   add the accounts dropped that Mr. Taub and Mr. Horowitz were

24   discussing just from October 2017 through the end of the

25   earnout period in 12/28, you get -- and again I'll represent to

K33AHOR4ps                        Kroeker - Redirect

1   the Court I've done the math -- 6,931 customer accounts dropped

2   in just that period that Mr. Horowitz called low-income drops.

3   Without doubting my numbers, have you seen this document before

4   and does that look familiar to you?

5   A.   I have not seen this document before, or at least not that

6   I recall.   The 10,000 that I'm referencing was the calculation

7   that I did with Wiederman and Moeller, presumably, about a

8   year, a year prior to this.   I mean, it was something we had

9   regular discussions on in trying to quantify what's the impact

10  to Major, what's the impact to Spark.   There were conversations

11  and data dumps at that time, and that's how we got to the

12  10,000 customer impact.

13  Q.   But you'd never seen, before I just showed it to you,

14  Mr. Horowitz and Mr. Taub's exchange calculating 7,000 accounts

15  dropped just in those 15 months between October and --

16  A.   Not that I recall, no.

17  Q.   Let's go to PX 481.   So this is another document that --

18          MR. BROWN:   You don't have to blow it up.

19  Q.   This is another document Mr. Dahan showed you.   And if we

20  jump forward to page 14, it's the November 2014 management

21  presentation that Major provided to Spark Energy back when it

22  was exploring a possible acquisition by Spark.   Do you recall

23  those questions?

24  A.   That's correct, yes?

25  Q.   And Mr. Dahan focused you on certain parts of this,

1   including regulatory risks and financial projections.  Do you

2   recall those questions?

3   A.  Yes.

4   Q.  All of these, all of the statements in this management

5   presentation, I take it you understood were representations

6   that Major Energy was making to Spark at the time about how

7   Major Energy wanted to present itself.

8   A.  Yes.

9   Q.  You didn't, I take it at the time, you took -- strike that.

10          Did you take these as being truthful statements?

11  A.  Yes.  I would have taken this as a management presentation

12  that would have been subject to due diligence before

13  consummating a transaction.

14  Q.  I take it it's fair to say by accepting receipt of this

15  November 2014 presentation from Major you weren't validating or

16  accepting that all of Major's projections were true?

17  A.  No.  Again, this was the start of a deal process, and this

18  was before we would have done any due diligence.

19          And it's very common in management presentations to

20  have what we call a sell-side view to the projections and then

21  for the buyer to make modifications to those projections and

22  base our valuation based on the buy-side projections.

23  Q.  Let's also talk about something else you saw back in this

24  time frame.  Can we look at DX 70.

25          So DX 70 is an e-mail exchange -- can we jump out to

1    the full document, James.  This is an e-mail from -- an e-mail

2    thread, that starts with Ms. Hodges, who, back in February

3    2015, is the chief -- who is the CFO of Spark Energy at the

4    time, correct?

5    A.   Yes.

6    Q.   And you see that she is writing back -- she writes to Cliff

7    Adams at Coady Diemar, who is ultimately the investment banker

8    who worked with Major on the sale to NGE, correct?

9    A.   Yes.

10   Q.   And were you familiar with these discussions at the time?

11   I think Mr. Dahan talked with you about the early 2015 possible

12   acquisition of Major by Spark.

13   A.   Yes.

14   Q.   And do you see Ms. Hodges is talking to Mr. Adams about

15   that possible acquisition, and she says, "Hi Cliff, I circled

16   up with my folks this afternoon for an update.  We are still

17   interested in pursuing a transaction pending our feasibility

18   analysis on this 'dropdown' structure that we spoke of."  Do

19   you see that?

20   A.   Yes.

21   Q.   And then do you see that Mr. Adams sends that along with an

22   FYI to Mr. Horowitz and Mr. Wiederman.  Do you see that?

23   A.   Yes.

24   Q.   And Mr. Horowitz responds, "Wow.  Surprisingly positive."

25        Do you see that?

1    A.   Yes.

2    Q.   You were, I take it, having discussions with Ms. Hodges as

3    your CFO at the time in late February 2015.  Is that fair?

4    A.   Yes.

5    Q.   And do you have an understanding of the dropdown

6    transaction --

7    A.   Yes.

8    Q.   -- that she was discussing with Mr. Adams, Mr. Horowitz,

9    and Mr. Wiederman at that time?

10   A.   Yes.

11   Q.   What do you understand it to be?

12   A.   So we had gone to the equity markets prior to this on

13   another acquisition and, in going to issue equity, saw our

14   stock price drop significantly, so realized we were not going

15   to be able to go to the equity markets to finance this deal.

16   An alternative structure was for us to issue equity to NG&E or

17   RetailCo, one of Keith Maxwell's other companies, and have NG&E

18   buy Major, turn around, do the back-to-back dropdown that we

19   spoke of, but that would give us the ability to buy Major using

20   equity as opposed to cash.

21        And so essentially using NG&E's for bridge financing,

22   which she's referring to here as a quote/unquote dropdown

23   structure.

24   Q.   So is it fair to, for the sake of time and efficiency, just

25   say, to summarize that, you were discussing with the sellers,

1    back in February of 2015, the concept of an acquisition with

2    back-to-back MIPAs and a dropdown transaction?

3    A.  Yes.

4    Q.  Without going back to the document -- I don't think we'll

5    need it -- but Mr. Dahan asked you some questions about the

6    Illinois regulatory action that was referenced in the January

7    2016 presentation.  Do you recall those questions?

8    A.  I do.

9    Q.  And he was asking you about that one particular disclosed

10   issue from January.  You started to answer a question about a

11   later Illinois issue.  But I don't think Mr. Dahan talked about

12   that.

13   A.  Correct.

14          MR. DAHAN:  Objection, your Honor, misleading.  He

15   just didn't know it was in -- I asked him if it was in March

16   2018.

17          MR. BROWN:  I'll rephrase.

18   Q.  You're familiar with a second attorney general Illinois

19   action that's been impacting Major Energy, correct?

20   A.  Yes.

21   Q.  Will you describe for the Court what you understand is the

22   second Illinois attorney general action that is impacting

23   Major.

24   A.  So the second action in Illinois was the AG matter, which

25   we ultimately got settled, after several years of going back

1   and forth with the AG.  The settlement involves paying $2

2   million and basically having to stop any and all sales and

3   marketing activities in Illinois under the Major Energy entity.

4   Q.  And from your perspective as CEO of Spark HoldCo, have you

5   seen an impact that the Illinois AG action and resolution had

6   on the Major Energy business?

7   A.  Absolutely.  If you go look at the projections that

8   underpin the EBITDA targets in the MIPA, Illinois was a

9   significant -- Illinois was the largest growth assumption in

10  those projections that underpin the 20.7, 25 million to 27.8

11  million.  Shortly into that earnout period, Major was precluded

12  from doing any sales and marketing activity in Illinois.  And

13  so the biggest piece of the growth wedge, if you will, changed

14  dramatically at that point in time.

15  Q.  And do you have an understanding that Spark is involved in

16  litigation as a plaintiff in this court before a different

17  judge against the sellers of Major Energy --

18  A.  Yes, I am aware of it.

19  Q.  Let me just finish the question so we have a clear record.

20         -- in connection with indemnification claims over

21  losses suffered in connection with the Illinois AG action?

22  A.  Yes.

23  Q.  With respect to the 2015 possible acquisition by Spark of

24  Major Energy, that eventually didn't go forward --

25  A.  Correct.

1   Q.  -- since we're all here.  And that related -- the reason it

2   didn't go forward relates to a Pennsylvania issue.  Is that

3   fair?

4   A.  That's my understanding, yes.

5   Q.  And could you describe for the Court what was the

6   Pennsylvania issue that led to the acquisition not going

7   forward.

8   A.  As you saw in the November 2014 management presentation,

9   there were a number of regulatory issues that were disclosed at

10  that time.  As part of our due diligence, we had looked at each

11  of those matters.  We had determined that we could get

12  comfortable with proper escrows and protections in a purchase

13  agreement.  We had completed our due diligence.  We had

14  negotiated a purchase agreement.  The sellers were in Houston

15  for a meeting in the early part of 2015.  What I recall is that

16  deal was substantially complete, meaning the MIPA was

17  negotiated, the terms were negotiated, the earnout was

18  negotiated, but had not yet been consummated.  The sellers left

19  Houston, went back to New York.  And the next day we got a

20  phone call from Cliff at Coady Diemar.  He called Georganne

21  Hodges and said that when the sellers returned to New York,

22  there was a letter on their desk.  And I don't know if that was

23  literal or figurative, but what he said was there was a letter

24  on their desk when they arrived back in New York from the

25  Pennsylvania commission and they had a significant regulatory

1    matter, that it had a headline number of $15 million on it and

2    was going to require some changes to the business, and his

3    words were, as I heard it, was, "So I assume the deal is off."

4    And, you know, we agreed; that was a significant matter.

5    Unless the sellers were willing to put up an additional $15

6    million of protection in an escrow, which they were not willing

7    to do, that deal was off, or certainly on hold until those

8    regulatory matters got sorted out.

9          It's those same regulatory matters that ultimately

10   ended up in a 3.8 or 3.9 million dollar item in the litigation

11   credit, in the deal that NG&E did.

12   Q.  If we turn just for a moment -- there is a housekeeping

13   issue, but I don't think you and Mr. Dahan had completed your

14   discussion on this.  Could you turn to DX 2, which is the NGE

15   MIPA with sellers.  You made a reference to the earnout

16   agreement being incorporated by reference in the MIPA.  Do you

17   recall that?

18   A.  Yes.

19   Q.  Just to make sure we're all on the same page, if we turn to

20   page 19 of the MIPA, Section 1.2(a)(ii), so we see the exhibits

21   and schedules annexed hereto and referred to herein are hereby

22   incorporated and made a part hereof and set forth in full

23   herein and are considered to be an integral part of this

24   agreement."  Do you see that?

25   A.  I do.

1   Q.  And if you turn to the table 2, the end of the table of

2   contents, it lists all the exhibits and schedules that are

3   incorporated expressly by reference, and Exhibit A is the

4   escrow agreement, Exhibit B is the earnout agreement.  Do you

5   see that?

6   A.  Yes.

7   Q.  Is that what you were referring to earlier?

8   A.  Yes.

9   Q.  And is that what you were referring to in your witness

10  statement?

11  A.  Yes.

12  Q.  Back to the PSE issue for a moment, could you explain to

13  the Court -- Mr. Dahan asked you some questions about PSE?  And

14  intentions -- could you explain to the Court in your own words

15  what benefits Spark provided to Major when it took over for PSE

16  after the PSE contract expired in March 2017?

17  A.  They --

18              THE COURT:  First remind me just what PSE again is.

19              THE WITNESS:  Pacific Summit.  It's a subsidiary of a

20  large bank that provides credit support and sleeving services

21  to retail energy providers.  And so they leveraged their large

22  balance sheet to retailers like Major.  Major was paying them a

23  fee per megawatt hour or for a dekatherm of gas in order for

24  Pacific Summit to step in with their balance sheet and provide

25  the credit support, typically in the form of either cash

K33AHOR4ps                    Kroeker - Redirect

1    postings or LC postings with ISOs and/or physical supply

2    counterparties.

3            It's a very common structure in this space, and a lot

4    of small retailers use this structure.

5            Spark does not have a sleeve structure like that.

6    Spark has a standalone.

7            MR. BROWN:  Sleeve structure.

8            THE COURT:  Explain to me what you mean by "credit

9    support" versus "sleeve structure."

10           THE WITNESS:  OK.  So I sort of use the terms

11   interchangeably and I apologize for that.  "Sleeve" means that

12   the -- let's use Major Energy.  Major Energy can still buy gas

13   or power from Shell or BP or EDF.  But they sleeve that

14   transaction through Pacific Summit so that, when Shell is

15   looking for credit support, they're looking at Pacific Summit's

16   balance sheet, not Major Energy's balance sheet.  OK.  So

17   that's the sleeve component.  Major Energy pays a fee for

18   Pacific Summit sleeving those transactions.

19           That's one form of credit support.  The other form of

20   credit support is, Pacific Summit would actually post the LCs

21   with the ISOs -- and those are performance LCs -- to ensure

22   that Major Energy will in fact deliver electricity or gas, as

23   the case may be.

24           THE COURT:  Thank you.

25           THE WITNESS:  And again it's a very common structure.

1   We have looked at dozens and dozens of retail energy

2   acquisition structures over the years, closed 15 of those.  I

3   would say, of those, four or five had sleeve provider

4   mechanisms very similar to this.  And we had previously done a

5   deal that had Pacific Summit as the sleeve provider, so we were

6   familiar with the people and the counterparties and the

7   structure, before we got into this.

8           When we acquire a retail energy company like Major, we

9   go and immediately look and see how much are they paying for

10  sleeving fees, or for credit support.  And we know that we get

11  about 90 percent of that as a synergy as soon as we replace

12  that sleeve provider.  And the reason is we have our own

13  balance sheet and our own credit support, and there is

14  virtually no incremental cost for us to take that over.

15          So unless there is some reason why we wouldn't do

16  that, as in this case, normally, we take out that sleeve

17  provider the day after closing.

18  Q.  And the reason you didn't do that in this case is because

19  Major had --

20          THE COURT:  Ask a non-leading question.

21          MR. DAHAN:  Thank you, your Honor.

22  Q.  Why didn't you do that in this case?

23  A.  There was a significant -- as I recall, there was a

24  significant termination fee or novation fee on this one, and

25  there was an earnout, and Major management had expressed to us,

1    or Major sellers -- I guess there is some overlap there -- that

2    they wanted to continue with Pacific Summit in place as the

3    sleeve provider.  And so we honored that and said, fine, we'll

4    leave that in place, but, when it comes up for renewal in March

5    of '17, we'd like to explore taking that out because we know

6    there's 2 or 3 million dollars worth of synergies for other

7    shareholders by replacing that sleeve.

8    Q.  And did you ultimately provide, "you" being Spark, did

9    Spark ultimately provide, in March 2017, better pricing to

10   Major than what they had?

11   A.  We did.  We essentially shared that benefit with the Major

12   sellers.  And so when I say we would -- 2 to 3 million dollars

13   worth of synergies, that was off of the old sleeve price, which

14   I recall was a dollar a megawatt hour and 12 1/2 cents a

15   dekatherm.  What we did -- and there was a lot of iterations,

16   but what we landed on was, our internal pricing was going to be

17   80 cents a megawatt hour and 12 1/2 cents a dekatherm.  A

18   majority of this is around electricity.  So we provided a

19   benefit on the electricity side.

20         So we dropped the price by 20 cents a megawatt hour,

21   which translates into half a million dollars over the remaining

22   term of the earnout.  Spark's true cost would have maybe been

23   20 cents, so there's a benefit to Spark of that, but we shared

24   some of that benefit with Major at the same time.

25   Q.  Thank you.  Can we pull up DX 483.  So DX 483 --

1    A.  Sorry.  Counsel, I don't think I answered your full

2    question.  You said what other benefits.

3              In terms of what we did day to day, who was doing the

4    scheduling, who was making the hedging decisions, who was

5    executing the trades, who was like the day-to-day operations of

6    that, we didn't change anything.  We literally put Spark in

7    place of Pacific Summit.  But in terms of any of the

8    operational activities around energy supply, we didn't change

9    any of that, just stepped in financially to their position.

10   Q.  Thank you.

11             Do you recall receiving this February 8, 2017 e-mail

12   from Mr. Horowitz?

13   A.  Yes, I did.

14   Q.  And so Mr. Horowitz is writing to you on February 8, 2017,

15   to you, Mr. Wiederman, Mr. Alper, copying Mr. Moeller of Major,

16   and Mr. Leonard of Spark Energy, and he says, "Nathan: yes --

17   the PSE negotiations did not proceed the way we would have

18   wanted and we are in agreement to give Spark supply a try as

19   Major's supplier."  See that?

20   A.  Yes.

21   Q.  And then he says, "We will also be looking at what else is

22   out there in the market but do not believe any other

23   arrangement could be in place by April 1."  Do you see that?

24   A.  Yes.

25   Q.  And do you recall that the notice of intent to terminate

1   PSE was sent in late September 2016?

2   A.  Yes.  It takes months to make a transition like this.  So

3   even though we're sitting here on February the 8th -- and

4   that's the day that Horowitz sends this e-mail -- we're already

5   anticipating it, because if we're sitting here February the 8th

6   and we have to have somebody else in place by March 31st, we

7   need to be further along than, you know, struggling to find a

8   draft term sheet.

9   Q.  Going back to PX 470, if you look at your top e-mail to

10  Mr. Alper on September 26, 2016 -- this is to Mr. Alper,

11  Mr. Leonard, copy to counsel and Mr. Moeller -- you were

12  talking about the notice of termination letters that Major was

13  going to sent to PSE the next day or two.  Is that correct?

14  A.  Yes.

15  Q.  And you tell Mr. Alper, "Dan, as you and I discussed, it's

16  not practical to draft a term sheet at this stage."  Stop

17  there.  You were talking about a formal term sheet between

18  Spark and Major with the exact terms of pricing.  Is that fair?

19  A.  Correct.

20  Q.  You say, "However, you have my assurance that Major Energy

21  will not be disadvantaged if we replace PSE with Spark's energy

22  supply function in 2017."  Do you see that?

23  A.  Yes.

24  Q.  And then if we fast-forward to DX 607.  DX 607 is your June

25  12, 2017 e-mail to Mr. Wiederman and Mr. Moeller.  Do you see

K33AHOR4ps                    Kroeker - Redirect

1    that?

2    A.  Yes.

3    Q.  And in line 1, the number 1, you are referring to fees that

4    Spark is going to be charging Major for energy and gas.  Is

5    that correct?

6    A.  Yes.

7    Q.  Do you know why the fees for energy went from a dollar to

8    80 cents?

9    A.  No.  That's the concession we made at the time of

10   negotiating the pricing, if you will, on the new term sheet.

11   Q.  And if we look at DX 981, this is a term sheet -- this is

12   an e-mail between Pacific Summit and forwarded to Mr. Wiederman

13   with respect to a term sheet being provided by PSE at the end

14   of January 2017, which is six weeks before the termination.

15   And if we forward that to the Bates number ending 58, what

16   energy fee was Pacific Summit offering to Major as of January

17   31, 2017?

18   A.  2.50 a megawatt hour and 15 cents a dekatherm, both of

19   which were higher than what Major was getting on their existing

20   deal.

21        So to me what Pacific Summit said is, we do not want

22   to do another sleeving deal with you guys.  And I happen to

23   know, because we have dealt with Pacific Summit a lot in the

24   energy industry space, they made the strategic decision to get

25   out of the rep supply business.  So this was, this, rather than

K33AHOR4ps                    Kroeker - Redirect

just say, hey, we're not going to do it, they sent the term

sheet back that had these increased prices in it so that Major

would go somewhere else.

This term sheet, by the way, was never turned over to

us in the entire negotiation of a Spark internal term sheet.

This only came to light after the fact during discovery.

Q.  So my next question was going to be, did you ever hear

directly from the sellers what exactly was the best offer, the

real best offer?

A.  No.  What they told us verbally in the conference room in

Houston was that it was going to be about a dollar.  And rather

than argue about whether it was going to be slightly more than

a dollar or slightly less than a dollar, I said, fine, if you

think a dollar is where it's going to be, how about we go with

80 cents so we can move on to other issues.

Q.  And their actual last best offer was 2:50.

A.  Correct.

And I wasn't -- they were not constrained to using

Pacific Summit.  I had given them free license to go look for

any other sleeve provider at this time.

Q.  Let's transition to a different topic that Mr. Dahan

discussed with you in -- he asked a question about paragraph

132 of your witness statement.  And he said here, in respect --

he asked a question about -- he referenced Spark's allocation

of approximately 4 million and said you don't cite any evidence

1    specifically in a written statement.  Do you recall that

2    question?

3    A.  Yes.

4    Q.  And I know your witness statement is 300 paragraphs' long.

5    I'd like to show you DX 923A.  Generally speaking, do you

6    recognize what DX 923A is?

7    A.  Can you scroll down a little bit.

8    Q.  Do you build it out?

9    A.  Yes, I do.  These are internal -- sorry.  Now go back up.

10   Yes.  These are legal entity financials that we've used as part

11   of our consolidation.  And on the bottom section, which is

12   where I think you're going, is where these cost allocations are

13   that I was referring to when I was being asked the question.

14   Q.  And there are three down at the bottom, consolidated year

15   '16, '17, and '18, correct?

16   A.  Correct.

17   Q.  And Major is one of the entities identified in the

18   functional group.  Is that fair?

19   A.  Yes.  And Major would have been our internal name for all

20   three of the legal entities.

21   Q.  Right.  So the corporate allocation for Major in year

22   2018 -- that's highlighted -- is about 1.7 million.  Is that

23   correct?

24   A.  Yes.

25   Q.  And then, James, if you click on the tab for '17, go down

K33AHOR4ps                        Kroeker – Redirect

1  to the same line.  And then you have about 1.8 million for

2  2017?

3  A.  Yes.

4  Q.  Then 3.5 million?  Is my math right?

5  A.  Yes.

6  Q.  '16.  Go to Major.  We've got 447.  Do you see?

7  A.  Yes.  That's the basis for the 4 million I was referencing.

8            MR. BROWN:  Your Honor, should we keep going?

9            THE COURT:  You can go another five or ten minutes.

10  Q.  Let's talk a little bit about some of the employee

11  departures that Mr. Dahan asked you about.  Let's start with

12  Mr. Alper.  Do you understand that Mr. Alper was fired?

13  A.  Yes.

14  Q.  Who fired him?

15  A.  Technically I'm the one that was on the phone to make the

16  termination call, but at the directive of Mr. Horowitz and

17  Mr. Wiederman.

18  Q.  Do you recall Mr. Horowitz and Mr. Wiederman asking you,

19  Spark, to write a letter to Mr. Alper that said Spark?

20            THE COURT:  Did you finish your question?

21            MR. BROWN:  No.  Let's pull up DX 559.

22  Q.  This is an e-mail thread.

23            MR. BROWN:  James, scroll down to the next page.  And

24  keep going.  OK.  Second page.

25  Q.  So this is Mr. Horowitz sending an e-mail to Mr. Melman on

1    April 27, 2017, copying Mr. Wiederman, correct?

2    A.  Yes.

3    Q.  Mr. Melman was general counsel of Spark at the time.

4    A.  Yes.

5    Q.  And the subject is Dan Alper.

6    A.  Yes.

7    Q.  And Mr. Horowitz is writing to Mr. Melman, and he's giving

8    him proposed draft language for Mr. Alper's termination.  Did

9    you understand that at the time?

10   A.  Slight nuance.  He's giving language to provide comfort to

11   Gil and I that, you know, requesting that we terminate Dan.

12   But I don't believe any of this language was ever designed to

13   go into a letter to Dan.

14   Q.  Right.  That's where I'm going.  So Mr. Horowitz sends

15   this.

16          MR. BROWN:  You can close that, not the whole

17   document, just the box.  And then if we go up a little bit.

18   Q.  Mr. Melman responds and says, "Saul, this doesn't work for

19   me.  That being said, I hear your concerns so I've reworked

20   what I wrote to be significantly more palatable to you.  Accept

21   the changes and put it in an e-mail and we are done."  Do you

22   see that?

23   A.  Yes.

24   Q.  And then if we go to the last page of the document, it's

25   the letter that actually gets sent to Mr. Alper.  We can blow

1   that up.

2   A.  I don't believe this letter goes to Alper.  That's what I'm

3   correcting.  I think this is an internal letter --

4   Q.  Yes, right.

5   A.  -- from Mr. Horowitz and Mr. Wiederman to myself.

6   Q.  Correct.

7           MR. BROWN:  And blow that up.  I misspoke.

8   Q.  So this is a letter that Mr. Horowitz and Mr. Wiederman

9   sent to you on April 27 that now says, "On behalf of the Major

10  companies, we," Mr. Horowitz and Mr. Wiederman, "are requesting

11  that Spark terminate the employment of Dan Alper immediately."

12  Do you see that?

13  A.  Yes.

14  Q.  So Mr. Horowitz and Mr. Wiederman are asking Spark, you, to

15  terminate Mr. Alper.

16  A.  Yes.

17  Q.  And Mr. Wiederman and Mr. Horowitz tell you, "As per our

18  prior communication, we mutually agree that this course of

19  action is in the best interest of Spark Energy and the Major

20  companies because Dan's skill set is not necessary going

21  forward."  Do you see that?

22  A.  Yes.

23  Q.  And this is less than three months after Mr. Alper was paid

24  over $2 million for his severance?

25  A.  Correct, and rehired to be the CEO of Major Energy.

1    Q.  And Mr. Horowitz and Mr. Wiederman also confirmed that

2    Mr. Horowitz has consulted with the previous members of the

3    Major companies in making the decision.  Do you see that?

4    A.  I see that.

5    Q.  Did you have an understanding who he was referring to?

6    A.  I assume that was the other shareholders.

7    Q.  And then you see that, in the second paragraph,

8    Mr. Horowitz and Mr. Wiederman saying, "We also agree that the

9    sellers will not allege or make any claim under the MIPA, the

10   earnout agreement, or otherwise that taking this action reduces

11   or jeopardizes the earnout under the MIPA or restricts the

12   Major companies from operating in accordance with Section 2.7

13   of the earnout agreement or otherwise interferes with the

14   operation of the Major business."  Did I read that correctly?

15   A.  Yes.

16   Q.  And what they also wrote to you, at the end, is, "Any costs

17   of this decision, such as legal fees or other expenses, will be

18   a reduction to the adjusted EBITDA of the Major companies for

19   purposes of calculating earnouts and installments under the

20   MIPA?"  See that?

21   A.  Yes.

22   Q.  And did you receive this letter?

23   A.  I received this letter.

24   Q.  So let's turn to DX 734.  DX 734 is an e-mail exchange

25   you're having with Mr. Moeller in July of to 18.  Do you see

K33AHOR4ps                      Kroeker - Redirect

1    that?

2    A.  Yes.

3    Q.  And Mr. Dahan asked you some questions about Mr. Moeller

4    leaving the company as a key employee.  Correct?  Do you recall

5    those questions?

6    A.  Yes.

7    Q.  Do you recall when Mr. Moeller actually left the company?

8              MR. DAHAN:  Objection, your Honor.  I did not ask

9    about -- it was Esther Moeller, not Levi Moeller.

10             THE COURT:  OK.

11             MR. DAHAN:  That's not the person -- we're not

12   alleging Mr. Levi Moeller's departure was due to Spark.  Nor

13   are we alleging that Dan Alper's firing was due to Spark.  So I

14   don't know what the point is, but we'll listen to it.

15             MR. BROWN:  I believe the document that Mr. Dahan

16   showed, so long Moeller and Alper, and he described them as key

17   employees.

18             MR. DAHAN:  No.  That was their exercise of their

19   determination rights after the dropdown, not rehired and

20   leaving a year later.  That's two different issues.

21             THE COURT:  OK.

22   BY MR. BROWN:

23   Q.  Do you recall when Mr. Moeller left Major?

24   A.  Yes.  I believe he left in the middle of 2018 for the

25   second time.

K33AHOR4ps                    Kroeker - Redirect

1   Q.  So in the third -- towards the end of the third year.

2   A.  Yes.

3   Q.  And does this e-mail reflect some communications you were

4   having with Mr. Moeller in July of 2018 in an effort to try to

5   keep him with the Major business?

6   A.  Yes.

7   Q.  And the discussions you're having in July 2018 with

8   Mr. Moeller, who was the chief operating officer of the

9   business, to keep him with the business, is, if my math is

10  right, about nine months after this lawsuit was filed?

11  A.  Yes.  That sounds about right.

12  Q.  So you're still negotiating with Mr. Moeller and the COO to

13  keep him with the Major Energy business months after sellers

14  sued.

15  A.  Yes.

16          THE COURT:  It's almost 3:30.  Why don't we break for

17  my hearing.

18          As I said, if you could just try to clear some space

19  on your desks.  I anticipate this could take a half hour or so.

20  So feel free to, I don't know, go down to the cafeteria, or I

21  don't know if you have a place to go.  We'll start back

22  hopefully around 4 o'clock.

23          MR. BROWN:  Thank you, your Honor.

24          (Recess)

25          (Continued on next page)

1          THE COURT:  Ok, done with sentencing, back to
2    spreadsheets.
3          All right, Mr. Brown.
4          MR. BROWN:  Thank you, your Honor.
5    NATHAN KROEKER, resumed.
6    REDIRECT EXAMINATION (Continued)
7    BY MR. BROWN:
8    Q.  We were talking about some of the employees who left the
9    company, and there is one more I want to discuss with you that
10   Mr. Dahan asked you about.  Mr. Dahan asked you about Wolbrom
11   leaving the company.  Do you recall that question?
12   A.  Yes.
13   Q.  And he was the chief marketing officer of Major?
14   A.  Yes.
15   Q.  And do you recall Mr. Dahan said, without discussing why,
16   did you know that Mr. Wolbrom left after the dropdown?
17   A.  Yes.
18   Q.  And you said without discussing why for several others.
19   Let's look at DX 813.
20         MR. DAHAN:  Your Honor, they are going to be
21   introducing a WhatsApp message.
22         MR. BROWN:  Wrong document.
23         MR. DAHAN:  Then I stand corrected.
24         MR. BROWN:  It's the one shown in opening, DX 813.
25         MR. DAHAN:  This is a WhatsApp message which the

K337HOR5                          Kroeker - redirect

1    witness is not on, and he can obviously speculate and try to

2    decipher what the two speakers are stating.  And just to say do

3    you see the person said this and said that, I'm not sure what

4    that accomplishes.  Mr. Wolbrom will be here at trial.  They

5    are welcome to ask him about that.  I don't know the point of

6    it.

7              MR. BROWN:  I haven't asked the question yet.  I would

8    like to ask the questions, and if you don't believe they are

9    evidentially proper, then I'm sure you'll sustain the

10   objection, but --

11             THE COURT:  But the WhatsApp message itself, this

12   witness can't authenticate it or provide a foundation.

13             MR. BROWN:  But I'm going to show it to him, and I'm

14   going to ask him if he knows certain things about why Mr.

15   Wolbrom did or didn't leave, and he will answer those

16   questions.

17             MR. MAROONEY:  He can ask it him without the WhatsApp

18   message.

19             THE COURT:  If you're going to connect it up with

20   another witness, I'm fine with your just reading him the text.

21             MR. BROWN:  But both authors are going to be here, and

22   we're going to talk to Mr. Sobel and talk to Mr. Wolbrom, and

23   I'm going to ask the CEO because he was asked on cross whether

24   he knows if Mr. Wolbrom left -- without discussing why -- after

25   the transaction.

K337HOR5                        Kroeker - redirect

1            MR. DAHAN:  And the reason I didn't asked is because I

2       recognized I would be asking him to speculate.  I try to avoid

3       asking witnesses to speculate.

4            MR. BROWN:  Well, one of the core issues in the case,

5       I believe, if I've read their complaint correctly, is that

6       Spark and NGE interfered and caused harm to the company post

7       the dropdown, so I'm simply going to ask the CEO if he knows

8       why Mr. Wolbrom left, and then we will talk to Mr. Wolbrom and

9       Sobel after.

10           THE COURT:  OK, you can ask him that.  You don't need

11      the WhatsApp message for that.

12           MR. BROWN:  So does your Honor not want me to show the

13      witness?  Because he has seen the WhatsApp message in

14      connection with discovery, which I will establish through the

15      question.

16           THE COURT:  I don't see there is any proper basis to

17      use it now.

18      Q.  You were aware Mr. Wolbrom left the company?

19      A.  Yes.

20      Q.  And were you aware at the time -- strike that.  Were you

21      told by anyone at Major at the time why Mr. Wolbrom left the

22      company?

23      A.  What I learned -- I don't remember when I learned, but what

24      I understand is that he was frustrated with Major's CEO Dan

25      Alper, and he didn't believe in the business plan, business

1    strategy and the direction the business and the industry was

2    headed.

3              THE COURT:  Did you say Wolbrom?  How do you spell

4    that?

5              MR. BROWN:  W-o-l-b-r-o-m.

6              THE COURT:  I know I've seen it but I forgot how to

7    spell it.  OK.

8    A.  But every conversation I had with Mr. Wolbrom was positive,

9    cordial, and I have no reason to believe that it had anything

10   to do with myself or with Spark Energy.

11   Q.  And I take it outside the discovery in this case have you

12   ever seen any communications between Mr. Wolbrom and Mr. Sobel

13   in 2017?

14   A.  Not that I recall.

15   Q.  Let's look at PX 458.  You will recognize this,

16   Mr. Kroeker, as the July 6, 2017 message forwarding a risk

17   management policy updated June 2016 that Mr. Dahan asked you

18   about?

19   A.  Yes.

20   Q.  And just a quick question.  I want to go to page 2 of the

21   document Mr. Dahan asked about.  There we go, it's dated June

22   2016.

23   A.  Yes.

24   Q.  Was that before or after the MIPA between Spark and NGE was

25   signed?

1    A.  After.

2    Q.  How many aggregation deals, to your knowledge -- or do you

3    recall -- did Major Energy propose to either NGE or Spark in

4    target year 2016?

5    A.  One.  I'm sorry.  Year 2016?  I don't recall the target

6    year but during the entire earnout period it was one.

7    Q.  And is the one the Illinois aggregation deal from 2017 that

8    Mr. Dahan asked you about?

9    A.  Yes.

10   Q.  And do you recall having discussions with Mr. Moeller about

11   that potential aggregation deal in Illinois?

12   A.  I recall the risk committee meeting very clearly.  I

13   remember a series of e-mail communications leading up to that

14   risk committee meeting as well.

15   Q.  And during the risk committee meeting, what did Mr. Moeller

16   tell you and others on the risk committee about whether or not

17   he as COO would or would not do a deal with aggregation?

18   A.  So, he had a couple PowerPoint slides, and the slides laid

19   out the potential benefit to the company of doing the deal both

20   in terms of margin and in terms of customer count.  He laid out

21   some of the risks of the deal.  When we then had a follow-up

22   discussion to understand those risks and how we would mitigate

23   those risks, the deal seemed overly risky to me for three or

24   four reasons, so I turned the question back to Mr. Moeller and

25   I said, why would you want to do this deal?  Like the way

1    you're presenting it doesn't sound like you really want to do

2    it.  I mean why would you want to do this deal?  And he said

3    well, truth is if it was up to me, I would not want to do this

4    deal because of these risks but I felt like I had an obligation

5    to bring it to the risk committee.

6    Q.  And can we pull up DX 577.  This is an e-mail thread

7    between you and Mr. Moeller that begins -- it actually starts

8    down with Mr. -- keep going:  OK, there we go.

9            So, Wednesday, May 17 Mr. Moeller is sending Mr. Rao

10   and Mr. Leonard a PowerPoint presentation on the potential

11   Illinois aggregation load deal; is that correct?

12   A.  Yes.

13   Q.  And then as we scroll up it is forwarded by Mr. Leonard to

14   you that same day, May 17, correct?

15   A.  Yes.

16   Q.  And then if we continue to scroll up, you write back to

17   Mr. Levi late that night, and with respect to this one

18   aggregation deal in May 2017 you write to Mr. Moeller and say

19   "Thanks for the write-up which does a good job of highlighting

20   both the risks and opportunity.  Spark does not have experience

21   serving aggregations, so in advance of the risk committee

22   meeting, can you send me info on any prior aggregations Major

23   has served including" -- and you ask him for a bunch of

24   information about Major's past aggregations they have served,

25   correct?

K337HOR5                    Kroeker - redirect

1    A.  Correct.

2    Q.  And then let's scroll up and look at Mr. Moeller's

3    response.

4         Mr. Moeller's first line -- which is the next

5    morning -- says "Major hasn't really been that active with

6    large aggregation deals."  Is that right?

7    A.  Yes.

8    Q.  And then he in the last sentence says with respect to the

9    aggregation load deal in Illinois, "This would be Major's first

10   time to the rodeo."  Then he says in parentheses "I can't say

11   that for myself anymore" smiley face "on this type of

12   aggregation."  Did I read that correctly?

13   A.  Yes.  The other pertinent sentence is sentence number two,

14   where he said we purchased a small ESCO.  A purchase of a small

15   ESCO is not an aggregation deal, and so he is basically

16   confirming three times they've never done aggregations.

17   Q.  And then the Spark risk committee meeting we talked about a

18   moment ago was after this presentation was provided to you, and

19   you talked about this presentation; is that fair?

20   A.  Yes.

21        THE COURT:  Aggregation deals, again remind me what

22   that is.

23        THE WITNESS:  So an aggregation deal you bid on a

24   block of customers.  When I say bid, you're not bidding for a

25   purchase price or any form of upfront payment; you're bidding

1    on how low of a price are you willing to provide or how low of
2    a margin you are willing to take in order to serve that block
3    of customers.  And so they tend to be very low-margin deals
4    because there's a highly competitive bidding processes with a
5    lot of retailers, which is why Spark never participated in
6    that.
7    Q.  And on that same subject, can you explain to the Court the
8    difference in your view between an aggregation deal and the
9    acquisition of a book of business.
10   A.  Yes.  So Spark has done several acquisitions of books of
11   business.  Major I believe has done one, which Moeller is
12   referencing here.  When you're buying a book of customers,
13   you're typically buying those from another retailer, and you're
14   paying some form of an up-front purchase price in order to
15   acquire those customer contacts, and you would keep those
16   customer contracts into perpetuity.  Whereas on an aggregation
17   deal you're bidding on lowering your price, on price only, and
18   when those contracts expire those customers revert back to
19   either the utility, the municipality, or to another aggregation
20   deal.
21   Q.  James, can we put up DX 580, please.
22           So, then after -- and this is kind of a thread between
23   Mr. Moeller and Mr. Rao, but it closes at the top with Mr. Rao
24   sending Mr. Moeller and Mr. Wiederman at Major an e-mail, and
25   he copies you and Mr. Leonard and Mr. Lane, and it's about

K337HOR5                          Kroeker - redirect

1   aggregation, on May 22.  Do you see that?

2   A.  Yes.

3   Q.  And this is after the risk committee meeting that happened

4   earlier that afternoon?  Do you see that first sentence?

5   A.  Yes.

6   Q.  And you see that Mr. Rao tells Mr. Wiederman and

7   Mr. Moeller "As discussed, the risk committee would be happy to

8   look at the aggregation deals that are a part of the ongoing

9   business with the customer count of 5,000 or less with no green

10  fee certification requirement."  Do you see that?

11  A.  Yes.

12  Q.  From May 22, 2017 through the close of the earnout at the

13  end of 2018, did Major present any other aggregation deals for

14  consideration?

15  A.  I don't believe so.

16  Q.  Could you put up DX 539.

17          I know Mr. Dahan asked you some questions about the

18  April 11th memo that Mr. Lancaster prepared that you then

19  forwarded to Mr. Wiederman and Mr. Horowitz on April 12, 2017.

20  And I only have a couple questions here.

21          In the second large paragraph of your e-mail there is

22  a reference in here to the use of Major's year-end customer

23  count of 167,152, which we now agree is correct and consistent

24  with the way Major has always counted its customers.  Do you

25  see that?

K337HOR5                        Kroeker - redirect

A.   Yes.

Q.   And when you wrote this to Mr. Wiederman and Mr. Horowitz
on April 12, 2017 about this customer count, what were you
intending to communicate?

A.   So, there was a lot of confusion around how Major had been
counting their customers.  If you look at the MIPA or the
earnout agreement -- I don't recall which one -- it says actual
customer count, a defined term, but it doesn't actually specify
how to calculate that customer count; it just says in
accordance with past practices and methodologies.

        As we were getting into this first year earnout
calculation, you will see -- it's all been produced in the
evidence -- lots of e-mail communications and lots of
discussion around how to properly account for customer count.
There is different ways of doing it across the industry.  What
we saw in the evidence is that even within Major and within
Major's management team they have different methodologies for
counting customer counts.

        We had put together the original earnout calculation
using what we believed to be the best approach for actual
customer count with the way the industry defines those customer
counts because we did not understand how Major's past practices
and methodology were applied.  We knew there were differences,
we knew there were inconsistencies, but we couldn't get to a
straight answer on what that was.  So, we just used the

1   industry approach, which was to count those customers that are

2   on flow as of December 31.

3   Q.  And when you say on flow, do you mean actually taking --

4   A.  Receiving electricity or natural gas from Major Energy.

5   Q.  Does the phrase "pending active" mean something to you in

6   the industry?

7   A.  Yes.  In the industry you get electronic transactions from

8   the utility that notify you that you will be receiving a

9   customer at some future date.  You get the same thing when a

10  customer leaves; you get an electronic transaction from the

11  market that says you will be losing a customer at some future

12  date.  And so what Spark has always done, what I believe most

13  industry participants do, is they count customers when they're

14  actually on flow.

15          What Major has stated in a lot of this evidence is

16  that they count the customer from the time they receive that

17  market transaction.

18          There is another piece of evidence in this case from

19  Sobel that says, OK, we take the market transaction but then we

20  back out 15 days of attrition.  And we know from historical

21  data that Major loses 14 or 15 percent of their customers in

22  that first 15 days.

23          So, you can see there are three or four different ways

24  that Major was themselves doing the customer count at year-end

25  2016.  The 164 that we used in the earnout calculation was

1    using industry standard, on flow, which is actual customers.

2    This -- you know, after days of confusion around customer

3    count, I had Mark Wiederman provide me with his view of

4    customer count, which is this 167,152.  And rather than debate

5    that, because it's very close to the other methods we had, we

6    said, fine, we will take that.

7            What we have seen as part of the discovery in this

8    case is, again, that wasn't done consistently with how they had

9    done it historically.  It doesn't back out 15 days worth of

10   attrition, and I think there is still some confusion about what

11   exactly that 167,152 is.

12   Q.  This April 12 communication is after the wiring of the $7.4

13   million under the reservation of rights?

14   A.  Yes.

15   Q.  And Mr. Dahan asked, and I think you told him, you had many

16   communications with both the sellers and internally between

17   March 30 and when you sent this e-mail April 12?  Is that fair?

18   A.  Yes, we had a lot of conversations, conference calls, in

19   that two week window.

20   Q.  And do you recall having discussions in that two week

21   interim period with the sellers about customer count disputes?

22   A.  Yes.

23   Q.  And do you recall having discussions with the sellers in

24   that two week time period about whether or not 2.2(b) should or

25   shouldn't be applied?

A.  Yes.  At this point we said, fine, we'll exclude 2.2(b),
we'll take Mark's number for customer count; let's see if we
can do the calculation correctly.

Q.  Prior to signing the dropdown MIPA with NGE on May 3, 2016,
as CEO of Spark HoldCo, did you know that Major Energy counted
customers differently internally?

A.  No.

Q.  Can we look at DX 703.  Mr. Dahan asked you some questions
about Spark agreeing to transfer some customers for Major
Energy's benefit during target year 2018.  Do you recall those
questions?

A.  Yes.

Q.  And is this an e-mail communication that he sent to Mr.
Wiederman communicating the view you had about the deal points
on that transfer?

A.  Yes.

Q.  So, James, can we go to the start of the thread.  I guess
it's page 3.

        So page 2, the thread starts with Mr. Wiederman,
Mr. Horowitz and Mr. Moeller internally discussing things.  It
eventually gets forwarded to you.

        So Mr. Wiederman says to Mr. Horowitz, "Saul, as per
our conversation, during our call with Nathan, Levi and I
suggested that due to the New York resetting order we felt it's
an opportune time to switch HIKO and some of the other Spark

1   family of companies customers to Major as well as bringing over

2   the 3 HIKO employees to the Orangeburg office.  In turn for

3   this, Major will be credited for the HIKO customers and 100K

4   will be added to Major's 2018 EBITDA.  Levi and I believe this

5   is a win win situation.  Please let us know."

6           Did I read that correctly?

7   A.  Yes.

8   Q.  So this is Mr. Wiederman purposing this to Mr. Horowitz,

9   and he describes it as a win win.  This is April 10, 2018,

10  correct?

11  A.  Yes.

12  Q.  This is give or take five months after the sellers sued

13  Spark and NGE, correct?

14  A.  Correct.

15  Q.  The next e-mail, this is Mr. Horowitz responding to Mr.

16  Wiederman and Mr. Moeller, and Mr. Horowitz in hear says "If

17  you and Levi feel this would be advantageous to our company

18  then go ahead."  Then Mr. Horowitz seems to communicate to Mr.

19  Wiederman and Mr. Moeller that in his view they are in

20  litigation, there is interference, we don't trust them, so just

21  be careful.

22          Is that a fair encapsulation?  I see Mr. Dahan shaking

23  his head so I think we all agree.

24  A.  Yes.

25  Q.  OK.  So then Mr. Wiederman, to continue on the thread,

1    said -- he forwards that to you, so he forwards his and Mr.

2    Moeller's, and he also forwards Mr. Horwitz's views to you and

3    says, "Nathan, please see below and let me if you have a few

4    minutes to discuss."  Do you see that?

5    A.  Yes.

6    Q.  And then you respond with the document that we were looking

7    at.  And did you in your response to Mr. Wiederman and

8    Mr. Moeller engage with Mr. Horowitz on his accusations against

9    Spark?

10   A.  No.

11   Q.  What did you try to communicate in this e-mail back to Mr.

12   Wiederman and Mr. Moeller about what you were trying to do for

13   Major's and Spark's benefit in April 2018 post-litigation?

14   A.  I mean we're trying to run a business, and I have an

15   obligation to talk through changes like this with management in

16   good faith and how do we get to a resolution that's good for

17   Major, good for Spark, makes business sense.  So what I'm

18   trying to do is lay out very clearly so there is no confusion

19   exactly what we had talked about on the phone earlier that day

20   or the day prior, and that is, you know, whatever gross margin

21   they get from those customers, plus the customer count, plus

22   $100,000 just to cover any time and expenses they may have

23   incurred in taking this over.  Keep in mind, they're not having

24   to pay for the three employees; they're not having to go

25   anywhere or do anything.  Mark and Levi assured me that this is

1   something they could oversee with virtually no disruption to

2   the business, and so that's why we decided collectively this

3   was a good move going forward.

4   Q.  The win win that Mr. Wiederman described.

5   A.  Yes.

6   Q.  So let's go up to the last e-mail which is Mr. Wiederman's

7   response to you and says, "Nathan, Levi and I agree with the

8   points outlined in your e-mail."  And that was the deal that

9   was reached; is that fair to say?

10  A.  Yes.

11  Q.  Let's go to DX 1045.  DX 1045 is an e-mail that starts

12  between you and someone named Cory Byzewski copying Dan Alper

13  from March 15, 2017.  Do you see that?

14  A.  Yes.

15  Q.  And then you see at the top Mr. Alper responds to you later

16  that day and says "Things have been going well with Cory.  I am

17  really glad he is here."

18          Do you see that?

19  A.  Yes.

20  Q.  And he says "Good call"?

21  A.  Yeah.

22  Q.  Do you recall what this was referring to?

23  A.  Absolutely.

24  Q.  What was it referring to?

25  A.  In late 2016 I had three senior executives at Major Energy

1  trigger their termination provisions within their employment

2  contracts.  We all remember that.

3          I have three senior executives leave.  I was going

4  through a process of trying to figure out if I could rehire

5  them.  I had two other sellers that are still executives that I

6  don't know if I'm going to stay or leave.  I mean I've got a

7  very large asset that I've just paid a lot of money for where

8  I've got five senior executives either out the door, maybe out

9  the door, or at risk in some way, shape or form.  I briefed my

10  board on that.  My board said you've got to find a way to

11  de-risk that asset; I don't care if you have to go up to New

12  York, or you find somebody from your team to go up to New York,

13  but you need to de-risk that in case those guys leave.

14          And I knew, given their status of the relationship at

15  that point, it wouldn't be welcomed if I put somebody from

16  Houston there.  Cory Byzewski is a gentleman I have known for

17  15 years, extremely knowledgeable of this industry, has been in

18  this industry for a long time, plus he had the personality and

19  the demeanor that I thought he would blend in well with the

20  team in New York.  He currently lives in Florida.  I paid for

21  Cory to commute up to New York every week, paid for his time,

22  his flights, his accommodations, to go to New York, to work

23  directly for Dan Alper and basically do anything and everything

24  that Dan saw as appropriate for him as a member of Dan's team.

25  I never asked Cory to report back to me.  I never wanted him to

K337HOR5                         Kroeker - redirect

1    be viewed negatively by Major.

2              What Dan related to me was that the sellers felt that

3    Cory was a spy, so I took great pains to never have

4    conversations with Cory other than to say are you showing up

5    for work, OK, great.  Otherwise all my communications went

6    through Dan.

7              All I was doing was trying to make sure that if Dan,

8    Levi, Sobel, anyone else left, I had some knowledge of this

9    business, its systems, its operations, its vendors, something

10   to protect the value of our investment in this case.  So that's

11   the background on Cory Byzenski.

12   Q.  And so Mr. Byzenski then provides services to Major Energy

13   that Spark pays for?

14   A.  Absolutely.  I don't have visibility into exactly what he

15   was doing -- he was under Dan's direction that entire time --

16   but Spark paid for it.

17   Q.  And can we look at DX 926 and it's a native.  DX 926A, do

18   you recognize this as a summation of invoices that Mr. Byzenski

19   sent and that Spark paid totaling $178,000?

20   A.  That looks correct.

21   Q.  Sorry, Mr. Kroeker.  That totals $178,139.79?

22   A.  Yes.

23   Q.  That was for the services he provided to Major that Spark

24   paid for?

25   A.  Yes.

1   Q.  Just a couple more questions, sir.

2              PX 476, if you go to -- so this is -- yeah, so this is

3   communication between you and Mr. Horowitz and Mr. Wiederman

4   about add backs in connection to the 2016 net adjusted EBITDA,

5   correct?

6   A.  Yes.

7   Q.  And this is part of what you talked about with Mr. Dahan as

8   the communication that continued until a period of time where

9   Mr. Horowitz said we're at a stalemate?

10  A.  Correct.

11  Q.  And one of the add backs in this document relates to the

12  $250,000 add back for the EMS integration; is that correct?

13  A.  Yes.

14  Q.  And so, James, if you can forward us to the next page.

15  Keep going.

16  A.  I think paragraph 7 is what you're looking for.

17  Q.  Thank you.  So in paragraph 7 this is a response from you;

18  is that correct?

19  A.  Yes.

20  Q.  And you say to Mr. Horowitz, "Spark agreed to add back a

21  portion of these travel expenses which has already been

22  factored into the $250,000 add back."Do you see that?

23  A.  Yes.

24  Q.  And that add back for $250,000 related to Spark paying

25  essentially Major an add back in connection with the EMS

1    integration project that stopped in September 2016?

2    A.  Correct.  Can I clarify?  That was a component of it, but

3    the way it was characterized was it was incremental costs that

4    were strictly as a result of Spark acquiring the business, so

5    there were some fees associated.  PWC had the issue of consent

6    letter, I believe, a couple other nits and gnats like that, but

7    the primary issue was this EMS project.

8                MR. BROWN:  Give me one second.

9                THE COURT:  Sure.

10   Q.  Do you recall, Mr. Kroeker, at the end of 2017 asking Mr.

11   Wiederman if you could attend the Major Energy holiday party?

12   A.  Yes.

13   Q.  To give gifts to some of the Major Energy folks?

14   A.  Yes.

15   Q.  And did Mr. Wiederman tell you whether you could attend or

16   not?

17   A.  Mr. Wiederman told me I would not be welcome to attend the

18   holiday party; it's a small company; they have a small company

19   culture; it would be awkward if I were there; and he asked me

20   not to attend.  Though what I did in lieu of that is I flew up

21   there a day or two early, ordered in lunch for the entire

22   employees and handed out the cash gifts at that point that I

23   had intended to do at the holiday party.

24   Q.  Could we pull up DX 665.

25               DX 665 is Mr. Wiederman's e-mail to Mr. Horowitz on

1   November 21, 2017 saying, "Levi and I were talking with Nathan

2   this morning on a weekly call and he asked us to clear the

3   following with you.  Do you see any issues with him coming to

4   the holiday party and giving out gifts to the employees?  Are

5   you OK with it?" and Mr. Horowitz responds "What's the point of

6   that?  I don't think it helps our case."

7            Do you see that?  Do you see that?

8   A.  I see that.

9   Q.  Did Mr. Wiederman tell you during your conversation about

10  the holiday party that Mr. Horowitz didn't think you attending

11  the holiday party would help the case they had filed against

12  Spark and NGE?

13           MR. DAHAN:  Objection.

14           THE COURT:  You can answer if you understand the

15  question.

16  A.  I don't believe that's what he said.  He wasn't that

17  specific.

18           MR. BROWN:  I pass the witness.  Can I move in any

19  exhibits?

20           THE COURT:  Sure.

21           MR. BROWN:  DX 944, along with A, DX 1021, DX 866

22  along with A, DX 70, DX 483, DX 470, DX 607.

23           THE COURT:  Hold on.  You have 470.  OK, what was

24  after 470?

25           MR. BROWN:  Oh, I'm sorry, it was PX 470.

K337HOR5                          Kroeker – redirect

1              DX 607, DX 981, DX 923, along with A, DX 559, DX 734,

2     DX 813, PX 458.

3              THE COURT:  Hold on one second.  I think I lost you.

4     You said DX 813?

5              MR. BROWN:  Yes.  I'm sorry, that's the Wolbrom chat.

6     Strike it.  DX 813 is not in evidence.

7              THE COURT:  OK.  Next one.

8              MR. BROWN:  Sorry.  PX 458.  DX 577, DX 580, DX 539,

9     DX 703, DX 1045, DX 926 and A, DX 476.

10             THE COURT:  Was that PX 476?

11             Let me ask my scribner.  PX.  And finally DX 665.

12             THE COURT:  OK, they're received.

13             MR. BROWN:  Thank you.

14             (Defendant's Exhibits DX 944, DX 944A, DX 1021, DX

15    866, DX 866A, DX 70, DX 483, DX 607 received in evidence)

16             (Defendant's Exhibits DX 981, DX 923, DX 923A, DX 559,

17    DX 734 received in evidence)

18             (Defendant's Exhibits DX 577, DX 580, DX 539, DX 703,

19    DX 1045, DX 926, DX 926A received in evidence)

20             (Plaintiff's Exhibits PX 470, PX 458, PX 476 received

21    in evidence)

22             (Continued on next page)

23

24

25

33AHOR6ps                          Kroeker - Recross

1               THE COURT:  Any recross?  Mr. Dahan?

2               MR. DAHAN:  I'll be brief.

3     RECROSS EXAMINATION

4     BY MR. DAHAN:

5     Q.  Mr. Kroeker, you were talking earlier about due diligence

6     that Spark would have done in connection with the dropdown.

7     A.  Yes.

8     Q.  Let me just make sure I understand your testimony.  Is it

9     your testimony that before the dropdown, Spark didn't do any

10    due diligence with respect to the projections that were

11    received from Major?

12    A.  No.  That's not my testimony.  We would have done the due

13    diligence before signing the MIPA on May the 3rd.

14    Q.  That's right.  And in fact, in the 14C -- let me go through

15    it again -- you discussed this considerable due diligence that

16    Spark did.  Isn't that correct?

17    A.  Sorry.  You're referencing 14C?

18    Q.  Yes.  The 14C filing, filed on August 3, 2016?  Remember

19    that little filing --

20    A.  Yes.

21    Q.  -- telling shareholders about the potential dropdown?

22    A.  Yes.

23    Q.  Remember the background of the transaction section had a

24    lot of diligence discussions in there?

25    A.  Yes.

```
 1   Q.  In fact, the Spark independent committee hired out the

 2   financial advisor, correct?

 3   A.  Yes.

 4   Q.  You talked about the way the customer --

 5   A.  I'm sorry.  I didn't hear the question.  I was agreeing on

 6   following your question.  I don't feel like I answered your

 7   question.

 8   Q.  Did they hire a special financial advisor?

 9   A.  The special committee?

10   Q.  Yes.

11   A.  Yes, they hired a financial advisor.

12   Q.  You talked earlier about customer spend and how Spark does

13   its customer spend versus how you understand Major Energy does

14   its customer spend.  Right?

15   A.  Yes.

16   Q.  You reviewed the earnout agreement, right?

17   A.  Yes.

18   Q.  You've seen Section 2.7?

19   A.  Yes.

20   Q.  And you recall the provision in 2.7 that says that buyer

21   has a duty of good faith and fair dealing nonetheless to

22   operate the business of the companies in all material respects

23   throughout the target years such that the companies are

24   operated consistently with how the senior management team

25   operated the companies before closing?
```

1  A.  Yes.  I'm very familiar with that.

2  Q.  And in fact also how the senior management team suggests to

3  operate the companies going forward to adapt to new

4  opportunities.  Correct?

5  A.  Yes.

6  Q.  So, for instance, if aggregation was a new opportunity,

7  that also would potentially fall into 2.7, correct?

8  A.  Yes.  And I believe I followed the letter of 2.7.  It was

9  duty of good faith.  We listened to the opportunity.  I took

10  the recommendation of Major's COO.  And that was the decision.

11  Q.  So, again, did the management of Major Energy tell Spark to

12  impose a 5,000 cap?

13  A.  No.  I think you're making a very big deal out of the 5,000

14  cap.  That was an e-mail discussion.  That was a guideline.

15  But they never came to me and said, hey, we've got almost 5500,

16  would you consider.  I mean, they never, ever brought any

17  additional aggregation deals forward.

18  Q.  You talked before about the --

19  A.  The 5,000 wasn't part of the risk committee meeting.  We

20  said smaller deals that are less risky.

21  Q.  We can pull up that e-mail again, the language.

22  A.  I know what it said.  I'm relaying what the discussion was

23  in the risk committee meeting.

24  Q.  OK.  You were shown the Houlihan projections.  Remember

25  that?

33AHOR6ps                          Kroeker - Recross

1   A.  Yes.

2   Q.  And that's DX 541?

3           MR. DAHAN:  Can we pull that up.  And if you could go

4   to, I guess, would it be HL145.

5   Q.  I think you testified that Houlihan reviewed or relied upon

6   the Major Energy projections in performing this analysis,

7   correct?

8   A.  I believe that's the case.

9   Q.  But that's not all it reviewed.  Isn't that true?

10          Right?  There's more than one bullet on this page.

11  Right?

12  A.  Correct.

13  Q.  If we could go to DX 8666.  So this was an e-mail you were

14  shown earlier about Major Energy's determination of potential

15  customer drops relating to the low-income order?

16          MR. BROWN:  Objection, mischaracterization.

17          MR. DAHAN:  Why don't we just look at what this e-mail

18  was, right.

19          So let's go to the next page.

20  Q.  And you were shown low-income drops, and I think your

21  counsel suggested that, adding it up, there was about 6900.  Do

22  you remember that?

23  A.  Yes.

24  Q.  OK.  Do you see any drops for 2016?

25  A.  I don't see in here.

33AHOR6ps                          Kroeker - Recross

1    Q.  Right.  And can you total how many customers drops there

2    were for 2017?  It's 155?

3    A.  Yes.  It's 155.

4    Q.  And do you recall from paragraph 244 of your witness

5    statement what was the missed in customer from projected to

6    actual for 2017?

7    A.  I don't remember the exact number, counsel.  I'd have to go

8    look.  You said 244?

9    Q.  Yes.  So you projected -- it's 209, actual 159.

10   A.  Correct.

11   Q.  Is that about 50,000?

12   A.  That's about 50,000.

13   Q.  Now, some of this has 2019 in there, right?  The bottom

14   three?

15   A.  Yes.

16   Q.  And I'm a lawyer so I'm definitely not doing that, but

17   that's --

18   A.  A couple million.

19   Q.  Yes, something over a thousand, right?  Or close to 2,000.

20           So if you deduct that, so maybe it's about --

21           MR. BROWN:  Objection, characterization.  The 7,000

22   approximate number that I represented is for the earnout period

23   for 12/2018, didn't include the three --

24           MR. DAHAN:  Then I apologize.

25   Q.  So let's assume it's 6900.  Looking back at your paragraph

1    244, do you recall how much was missed between projected and

2    actual for 2018?

3    A.  About 111,000.

4    Q.  You were shown DX 70.  Can we pull that up.  So just so

5    we're clear, you were shown the e-mail that talked about a

6    dropdown, correct?

7    A.  Yes.

8    Q.  And this was during a negotiation that Spark was doing in

9    2015, February 2015 around this time, correct?

10   A.  Yes.

11   Q.  And just so we're clear, that was not the transaction that

12   occurred between November 2015 and April 2015; isn't that true?

13   A.  I mean, the transaction --

14   Q.  Sorry.

15   A.  Can you restate the question?

16   Q.  That was not the transaction that closed in 2016, correct?

17   A.  Correct.

18   Q.  And since Georgian Hodges was not involved in that, in the

19   negotiations of the NGE seller transaction, correct?

20   A.  Correct.

21   Q.  And --

22   A.  Well, hang on.  So let me restate.  Is it the same

23   transaction?  I'm -- potentially.  Right.  I mean, the dropdown

24   structure would have looked very similar to what ultimately

25   played out in 2016.  The difference is we had different people

33AHOR6ps                    Kroeker - Recross

having the conversations in '15.  Had we gone forward with the

dropdown transaction, it would have included NG&E, but the

Pennsylvania order came out and everything stopped.

Q.  And by the way, that Pennsylvania order that we've already

established, you saw that January 2016 presentation, right?

A.  Yes.

Q.  And at that time, that was being resolved, in fact there

was a litigation hold specific for that, correct?

A.  Sorry.  You said in January of?

Q.  2016.  You saw that January 2016 presentation, you

remember?

A.  Yes.

Q.  And again at that point in time, of the January 2016

presentation, NGE was willing to pay $16 million cash at

closing, correct?

A.  Correct.

        The New York order was not yet known at that point in

time, and the Illinois AG matter were not yet known at that

time.  And if you look at Major's projections and their

existing business, they had a high concentration in New York,

and their projections had a high concentration in Illinois.

So.

Q.  That --

A.  So when -- can I finish my answer?

Q.  Sure.

33AHOR6ps                        Kroeker - Recross

1    A.   So when you had a significant adverse regulatory action in

2    your primary action and another significant adverse regulatory

3    action in your primary growth market, there is going to be a

4    material change to the business.

5    Q.   Right.  And just so we're clear, again, those regulatory

6    issues in New York were the resetting order and the low-income

7    order, correct?

8    A.   In New York, yes, both of which prompted action on the part

9    of management during the earnout period.

10   Q.   Now, we talked about PSE, and you were shown documents

11   about different pricing.

12   A.   Yes.

13   Q.   Between what PSE was offering versus -- just out of

14   curiosity, is it your understanding that when an ESCO chooses a

15   supplier, it's just about price?

16   A.   No.

17   Q.   Right?

18            Now, you talked about the notices that were sent by

19   Major Energy in September of 2016, by PSE of the exercise of

20   the termination right, right?

21   A.   Correct.

22   Q.   Do you recall who sign those notices?

23   A.   I don't recall.  It's in the evidence.  Let's look and see

24   who did.

25   Q.   PX 675.  It's Major Energy.  You see that?

1    A.  Yes.

2    Q.  Can you read the signature line.

3    A.  Yes.  That's my signature.

4    Q.  Let's look at the next page.  Who signed that one?

5    A.  Is this the second one?

6    Q.  Yes.

7    A.  OK.  That's me.

8    Q.  Look at the next one.  Who signed that one?

9    A.  That's me.

10   Q.  Talked about the customer account.  Right?

11   A.  Yes.

12   Q.  We again established you reviewed the earnout agreement,

13   right?

14   A.  Sorry, can you say that again?

15   Q.  You reviewed the earnout agreement, correct?

16   A.  Yes.

17   Q.  Let's look at PX 634.  And if you go to 04, you see there's

18   a definition for year-end customer accounts.  See that?

19   A.  Yes.

20   Q.  Can you read that definition, please.

21   A.  Yes.  This is what I was paraphrasing earlier.

22   Q.  But just I'd like you to read it without the paraphrasing.

23   A.  OK.  "'year end customer accounts' means the actual number

24   of customer accounts calculated as of the end of each target

25   year.  The actual number of customer accounts shall be computed

33AHOR6ps                    Kroeker - Redirect

1  in a manner consistent with the procedures, practices,

2  methodologies, and standards used by the companies in

3  calculating their customer accounts before closing."

4  Q.  OK.  And now my question to you is, one thing we can agree

5  on, it doesn't say, to be computed in a manner consistent with

6  how the industry does it.  Correct?

7  A.  No.  It says "actual number of customers."

8  Q.  It doesn't say it should be in a manner consistent with how

9  Spark does it, does it?

10  A.  No.  As I said, we did our best to try to figure out what

11  was the procedures, practices, and methodologies, and standards

12  used by Major.  And what we found out was, there was no

13  consistent approach, prior to the transaction closing.

14          MR. DAHAN:  I have nothing further, your Honor.

15          THE COURT:  All right.  Thank you.

16          Any re-redirect?

17          MR. BROWN:  One question, your Honor.

18  REDIRECT EXAMINATION

19  BY MR. BROWN:

20  Q.  Mr. Kroeker, Mr. Dahan just asked you again about the New

21  York resetting order and the low-income order in New York.  Do

22  you recall that there was a third issue in New York that was

23  impacting Major Energy's business in connection with an

24  investigation by the New York AG's office for fraudulent

25  marketing practices?

33AHOR6ps

```
1    A.   Yes.

2    Q.   And what do you recall about that issue?

3    A.   I believe that's, you know, was a significant matter that

4    was dragging on for years, had to do with sales and marketing

5    practices.  I don't remember the specifics of it, but I do know

6    that matter was and is a point of contention in this

7    transaction.

8              MR. BROWN:  Nothing further, your Honor.

9              THE COURT:  All right.  Did you mean to move in any

10   new exhibit?  Was PX 675 new, Mr. Dahan?  Or is that already

11   in?

12             MR. MAROONEY:  Yes.  Sorry.  I'd like to move that in,

13   your Honor, the termination letters.  Thank you for --

14             THE COURT:  PX 675 is received.

15             (Plaintiff's Exhibit 675 received in evidence)

16             THE COURT:  I think the other ones were already in

17   evidence?

18             MR. DAHAN:  Yes.

19             THE COURT:  All right.  Nothing further for this

20   witness?

21             MR. DAHAN:  No.

22             THE COURT:  Thank you, sir.  You may step down.  You

23   can leave everything there.

24             (Witness excused)

25             THE COURT:  And shall we break for the day?
```

33AHOR6ps

 1            MR. DAHAN:  Yes.

 2            THE COURT:  So what's next?

 3            MR. DAHAN:  So, tomorrow, we'll be starting with

 4   Mr. Wiederman, so I guess defendants will start their cross.

 5            MR. BROWN:  And I guess one question, your Honor, that

 6   Mr. Dahan and I were discussing during the sentencing here was,

 7   Mr. Wiederman will be a longer witness, after which the rest

 8   will be shorter witnesses in this case.  And we have three

 9   witnesses we need to finish on Wednesday which are shorter

10   witnesses.  Would your Honor be willing to start any earlier

11   than 9:30?  I don't know your schedule for tomorrow.  We could

12   try to get Wiederman done and then shotgun the last three

13   witnesses, colloquially speaking.

14            THE COURT:  The last three witnesses in plaintiff's

15   case?

16            MR. BROWN:  The last witnesses for the day Wednesday.

17            MR. DAHAN:  Unless your Honor is ready to rule.

18            It would be Mr. Maxwell.

19            THE COURT:  So Maxwell is next.

20            MR. DAHAN:  That was the plan.  And then the other two

21   that we need to get on are Robert Lane, and it was actually in

22   the defendant's case but we were going ahead, and it was Todd

23   Gibson.

24            THE COURT:  So that would be the order next.

25            MR. BROWN:  Yes.

33AHOR6ps

1              THE COURT:  So you're proposing we start at, say, 9?

2              MR. BROWN:  Works for us.

3              THE COURT:  Yes.  We can start at 9 tomorrow.  Sure.

4              Tomorrow, the only other matter I have is another

5    sentencing at 12:30.  So we can take our lunch break from 12:30

6    to 1:30 or so.  And other than that, we should be able to go

7    straight through pretty much other than a bathroom break here

8    or there.  All right?

9              MR. DAHAN:  Thank you, your Honor.

10             THE COURT:  OK.  Have a good night.

11             (Adjourned to 9:00 a.m., March 4, 2020)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 GARY LANCASTER

Redirect By Ms. Pector . . . . . . . . . . . 241

Recross By Mr. Marooney  . . . . . . . . . . 245

 NATHAN KROEKER

Direct By Mr. Dahan  . . . . . . . . . . . . 257

Cross By Mr. Dahan . . . . . . . . . . . . . 257

Redirect By Mr. Brown  . . . . . . . . . . . 367

Recross By Mr. Dahan . . . . . . . . . . . . 436

Redirect By Mr. Brown  . . . . . . . . . . . 445

                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 PX 161 and PX 524  . . . . . . . . . . . . . 245

 PX 196   . . . . . . . . . . . . . . . . . . 256

 251, 457, 756, 655, 256, 257, 316, 312, . . 367

          314, 299, 313, 481, 359, 650,

            651, 656, 458, 641, and 641A

 PX 470, PX 458, PX 476 . . . . . . . . . . . 435

 675  . . . . . . . . . . . . . . . . . . . . 446

                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

 DX 1, DX 272, DX 298, DX 390, DX 503, . . . . 245

          DX 516

 DX 518, DX 698, DX 962, DX 1033, DX 408  . . 245

```
 1    2, 1028, 1028A, 541, 998, 395, 395A,  . . . . 367

 2              and 539

 3    DX 944, DX 944A, DX 1021, DX 866, DX  . . . . 435

 4              866A, DX 70, DX 483, DX 607

 5    DX 981, DX 923, DX 923A, DX 559, DX 734   . . 435

 6    DX 577, DX 580, DX 539, DX 703, DX  . . . . . 435

 7              1045, DX 926, DX 926A

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```