K34AHOR1ps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

SAUL HOROWITZ,

                    Plaintiff,

             v.                          17-cv-7742 (JPO)

NATIONAL GAS & ELECTRIC, LLC, et al.,

                    Defendants.          Trial

------------------------------------x

                                         New York, N.Y.
                                         March 4, 2020
                                         9:00 a.m.

Before:

                    HON. J. PAUL OETKEN

                                         District Judge

                         APPEARANCES

KING & SPALDING LLP
     Attorneys for Plaintiff
BY:  RICHARD T. MAROONEY, JR., ESQ.
     ISRAEL DAHAN, ESQ.
     CHELSEA J. COREY, ESQ.
     RYAN GABAY, ESQ.

MORGAN, LEWIS & BOCKIUS LLP
     Attorneys for Defendants
BY:  TROY S. BROWN, ESQ.
     MICHELLE PECTOR, ESQ.
     DANA E. BECKER, ESQ.
     JARED WILKERSON, ESQ.
     SU JIN KIM, ESQ.

K34AHOR1ps

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.

3          COUNSEL:  Good morning.

4          THE COURT:  Ms. Pector?

5          MS. PECTOR:  Yes, your Honor.  Mr. Brown would like to

6     introduce the witness.

7          MR. BROWN:  Actually, your Honor, there are two

8     housekeeping matters, one, the witness order that Mr. Dahan and

9     I discussed.  Should I just review it?

10         MR. DAHAN:  That's fine.

11         MR. BROWN:  We certainly made best efforts to try to

12    streamline.  We are unable to finish Mr. Wiederman as well as

13    all three witnesses today.  It was unrealistic.  So we're going

14    to go ahead with Mr. Wiederman and then Mr. Lane will go next;

15    he needs to be off today.  Tomorrow the witness order will be

16    Keith Maxwell first, Todd Gibson second, and then we will be

17    calling, as our cross, Mr. Josefovic, out of order because of

18    his availability, then Mr. Benisti, and then Mr. Wolbrom will

19    be called.  So those will be the five witnesses for tomorrow.

20         THE COURT:  How do you spell --

21         MR. BROWN:  Josefovic is J-o-s-e-f-o-v-i-c.

22         THE COURT:  And Benisti.

23         MR. BROWN:  B-e-n-i-s-t-i.

24         THE COURT:  And then Wolbrom.

25         MR. BROWN:  W-o-l-b-r-o-m.

1              THE COURT:  Got it.  OK.

2              MR. BROWN:  And then the second housekeeping issue is,

3      Ms. Pector will hand up a demonstrative exhibit that we are

4      prepared to use with Mr. Wiederman's cross, and I understand

5      Mr. Marooney wants to be heard because we discussed the matter

6      and have not been able to resolve objections, and I'll wait to

7      respond.

8              THE COURT:  OK.

9              MS. PECTOR:  Your Honor, can I hand up the exhibits?

10             THE COURT:  Yes.

11             MR. MAROONEY:  Your Honor, may I remain seated so I

12     can speak into the mike?

13             THE COURT:  Sure.

14             MR. MAROONEY:  So I hate to start the day with dealing

15     with an objection on a demonstrative, but just so that we're

16     heard, or our objection is heard, as you will see, your Honor,

17     this demonstrative, which we got late last night, about two

18     hours after we had agreed to exchange them -- in fairness,

19     defendants had technical difficulties -- the demonstrative

20     itself, as you will see, is much like a summation.  It is 32

21     pages.  It is argumentative.  From our perspective it distorts

22     the evidence, it's improper, on and on and on.

23             Mr. Wiederman is a fact witness.  It's not our job to

24     tell him how to cross a witness.  But to be able to use a

25     32-page demonstrative and have a tutorial to do a summation on

K34AHOR1ps

 1    2.2, which is what this 32-page exhibit purports to do, I

 2    argue, is not proper.

 3           Now, this is a bench trial.  Obviously if this was a

 4    jury trial our objection would be more vociferous, and you know

 5    of course, and you can take this for whatever it's worth, but

 6    we just wanted to make that record and point that out to your

 7    Honor, because it is improper on multiple issues.

 8           THE COURT:  Mr. Brown.

 9           MR. BROWN:  Your Honor, thank you, just to complete

10    the record, with respect to the timing issue, so the record is

11    clear -- and I appreciate Mr. Marooney's comments about what we

12    were dealing with -- the parties agreed to exchange

13    demonstratives, except we had a --

14           (Pause)

15           MR. BROWN:  Mr. Dahan and I discussed the issue last

16    night.  There was the timeliness issue, but there were other

17    issues that were raised in this case on plaintiff's side

18    because professionalism courtesy suggest we don't raise them

19    after.

20           With respect to the substance, your Honor, because

21    these are written directs and Mr. Wiederman is the longest

22    combined regular direct in this case, 90 pages, 340 paragraphs,

23    his demonstrative, which is comprised of almost trial evidence,

24    with headings, in our last demonstrative no. 1, we had a

25    meet-and-confer.  Plaintiffs took issue with the headings,

K34AHOR1ps

suggesting that some of them were argumentative, and we agreed

to change them.  I asked Mr. Marooney this morning, if there

were in particular any language that he wanted us to adjust, we

would be happy to discuss it.  He said, we'll just raise it

with the Court.  So we didn't have any additional e-mail,

meet-and-confer before trial on the headings.

        There is nothing misleading or confusing to your

Honor, I believe, and like all of the witness statements that

contain extensive objections on evidentiary issues, while we'll

lay a foundation as we cross Mr. Wiederman, to the extent your

Honor, when issuing findings of fact and conclusions of law,

decides to ignore or disregard certain portions of the

demonstratives, I presume the Court will do so similar to how

it's handling witness statements.

        THE COURT:  It does look like the kind of thing that

would typically be used in summation.  If it were a jury trial

I probably wouldn't allow it.  But I will allow it for what

it's worth to use in your cross of Mr. Wiederman.  So I will

not exclude it.

        MR. BROWN:  Thank you, your Honor.

        THE COURT:  There may be things that I say, stop

talking about that because it's misleading or something.

        And what else?  You wanted to introduce --

        MR. MAROONEY:  I think we'll introduce them and then

we'll turn it over to Ms. Pector.

K34AHOR1ps                    Wiederman - Direct

1              THE COURT:  OK.

2              MR. MAROONEY:  We'll call Mark Wiederman.

3              THE COURT:  All right.  Is Mr. Wiederman here?

4              MR. MAROONEY:  He is.

5              THE COURT:  All right.  Sir, if you would please come

6    up to the top of the stair of the witness box, and if you raise

7    your hand you will be sworn.

8    MARK WIEDERMAN,

9         called as a witness by the plaintiff,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. MAROONEY:

13   Q.  Good morning, Mr. Wiederman.

14   A.  Good morning.

15   Q.  Briefly just introduce yourself to the Court, please.

16   A.  Mark Wiederman.  My real name is Moshe Wiederman.  I go by

17   Mark Wiederman.

18             MR. MAROONEY:  I'm just going to give the judge a

19   moment.

20             THE COURT:  All right.

21   Q.  Mr. Wiederman, you prepared a witness statement to be your

22   direct testimony in this case, correct?

23   A.  Yes.

24   Q.  And you also prepared a rebuttal witness statement in this

25   case, correct?

1  A.  Yes.

2  Q.  And both the direct and the rebuttal statements are in

3  front of you, actually to your right.  Do you see those, sir?

4  A.  Yes.

5  Q.  Do you adopt these two witness statements as your own

6  testimony in this case?

7  A.  I'm sorry?

8  Q.  Do you adopt these two witness statements --

9  A.  Yes.

10  Q.  OK.  And as your witness statement --

11          MR. MAROONEY:  I'm not sure how your Honor would like

12  to do this.

13  Q.  But in your witness statement you cite several exhibits.

14          MR. MAROONEY:  We would like to move the admission of

15  those exhibits, along with accompanying the witness statements.

16          THE COURT:  Any objection?

17          MS. PECTOR:  Your Honor, the only objection we would

18  make:  Mr. Marooney asked for courtesy to be able to introduce

19  Mr. Wiederman.  For timing and efficiency, we didn't do the

20  same with our witnesses.  As long as we're entitled to the same

21  extension of the right to introduce all the exhibits through

22  Mr. Kroeker's testimony and Mr. Lancaster's testimony in their

23  direct, we don't have a problem with it.

24          THE COURT:  Any objection?

25          MR. MAROONEY:  No objection.

1              THE COURT:  OK.  That's fine.  So do you have the list

2      of exhibits?  I just want the record to be clear what's in.

3      Well, I guess maybe -- they're actually attached to the witness

4      statement, right?

5              MR. MAROONEY:  Right.

6              MR. BROWN:  Yes.  And that's the same for Mr. Kroeker

7      and Mr. Lancaster.  So if it's easier for the Court versus

8      taking it down, we can submit at the end of the day a list of

9      everything from the first three witnesses' direct so your Honor

10     has a complete list.

11             THE COURT:  That's fine.

12             And now cross.

13             MS. PECTOR:  Thank you, your Honor.

14             THE COURT:  Ms. Pector.

15             MS. PECTOR:  Thank you.

16     CROSS-EXAMINATION

17     BY MS. PECTOR:

18     Q.  Good morning, Mr. Wiederman.  How are you?

19     A.  Good morning.  I'm good.  I'm well.  How are you?

20     Q.  I'm good.  Thank you.

21             Mr. Wiederman, we've had an opportunity to meet

22     before, haven't we?

23     A.  Yes.

24     Q.  We were at your deposition together, correct?

25     A.  Yes, we were.

K34AHOR1ps                    Wiederman - Cross

1   Q.  And, Mr. Wiederman, you understand that you are here now to

2   testify in the trial in this matter?

3   A.  Yes, ma'am.

4   Q.  And as Mr. Marooney indicated, you submitted a written

5   direct statement that is in one of the many binders there in

6   front of you, so you'll have access to that throughout your

7   deposition, I mean your testimony, should you need it.

8        Is it correct, Mr. Wiederman, that your written direct

9   statements in this case has 270 paragraphs?

10  A.  If you don't mind, I can check.

11  Q.  OK.

12  A.  Yes, it does.

13  Q.  And you also submitted a -- and just to be clear,

14  Mr. Wiederman, you submitted your written direct statement to

15  this Court on December 13, 2019, correct?

16  A.  Yes.

17  Q.  And you submitted a rebuttal statement to this Court on

18  January 3, 2020; is that correct?

19  A.  Yes.

20  Q.  And lastly, Mr. Wiederman, we had, I believe, close to a

21  seven-hour deposition of you back on May 1, 2019, right?

22  A.  I think it was a bit longer, but, yeah, give or take a

23  couple hours.

24  Q.  And if I were to tell you that your deposition was

25  approximately 434 pages, does that sound about right to you?

1    A.  Normally a deposition would be, but it was long.

2    Q.  Did you have an opportunity, Mr. Wiederman, to review your

3    deposition before trial?

4    A.  I glanced over it, yes.

5    Q.  And did you also have an opportunity to review your witness

6    statement and your rebuttal statement before trial?

7    A.  I did glance through them, yes.

8    Q.  Now, Mr. Wiederman, just to orient the Court as to the role

9    that you played in this case, you were the former president of

10   Major Energy, right?

11   A.  Correct.

12   Q.  And you held that role throughout the entire earnout

13   period, correct?

14   A.  Yes.

15   Q.  And prior to the acquisition of Major Energy by National

16   Gas & Electric, you were also president of Major Energy, right?

17   A.  Yes.

18   Q.  Dan Alper was the chief executive officer of Major Energy

19   prior to acquisition, right?

20   A.  Correct.

21   Q.  And he was the CEO of Major Energy post acquisition,

22   correct?

23   A.  Correct.

24   Q.  And up until the time of Mr. Alper's termination, you

25   reported directly to him, correct?

K34AHOR1ps                    Wiederman - Cross

1    A.  Yes.

2    Q.  And so that would mean that you reported directly to

3    Mr. Alper through year one and part of year two of the earnout

4    period, correct?

5    A.  That is correct.

6    Q.  And you were ultimately terminated from Major Energy with

7    cause after the earnout period, correct?

8    A.  I was terminated by Major Energy after the earnout period.

9    Q.  And, Mr. Wiederman, you received a notice from Major Energy

10   on March 28, 2019 notifying you that Major Energy believed you

11   were being terminated for cause, correct?

12   A.  I believe that was the date, correct.

13   Q.  And after you received that notice, you had an opportunity

14   to speak with the VP of HR about Major Energy's belief as to

15   the actions that you engaged in that led to their decision?

16   A.  No, I don't recall that.

17   Q.  You don't recall having any discussions with Greg Griffin

18   after you received the notice of termination?

19   A.  After the notice of termination?  No.

20   Q.  So you don't recall making any efforts to return company

21   confidential data to Mr. Griffin after you were terminated for

22   cause?

23   A.  I do recall returning confidential information.  I don't

24   recall having a conversation about the reason for termination.

25   Q.  Well, whom do you recall returning confidential information

K34AHOR1ps                    Wiederman - Cross

1   to?

2   A.  To the IT department at Major Energy.  They had access to

3   my computers and everything that was in my office, and I left

4   it all there for them to -- to take.

5   Q.  Yes, but whom specifically do you recall returning

6   confidential information to after you were terminated for cause

7   from Major Energy?

8   A.  I no longer had access to my office and no longer had

9   access to any information that was in my office in files or any

10  documents, so it was, I guess, a de facto release of documents

11  by just leaving everything in my office.

12  Q.  So when you just testified a moment ago that you returned

13  confidential information to Major Energy after you were

14  terminated, that's not true, right?

15  A.  No, but --

16          MR. MAROONEY:  Objection, Judge.

17  A.  -- it was returned.

18          THE COURT:  Sustained.

19  Q.  Now, Mr. Wiederman, after you were terminated, you retained

20  a personal computer, correct?

21  A.  I had a personal computer, yes.

22  Q.  And that personal computer had Major Energy confidential

23  data on it, correct?

24  A.  It has some e-mails which I turned over to my attorneys.

25  Q.  And instead of returning those e-mails to Major Energy, you

1    retained that and decided to provide it to your counsel,

2    correct?

3    A.   Again, that's what I was advised to do by counsel.

4            MR. MAROONEY:  Your Honor, I'm sorry.  Before we move

5    on.  They're welcome to spend their time how they would like,

6    but we're rehashing an issue that's, one, not in his witness

7    statement, and, two, you've already dealt with.

8            MS. PECTOR:  Your Honor, this witness had a fiduciary

9    duty to Major Energy and he was president throughout the whole

10   earnout period.  The sellers claim that the reason why Major

11   Energy did not perform is because of some alleged interference

12   with NGE or Spark.  We believe this cross-examination is going

13   to show this Court that one of the reasons, and the primary

14   reason, why Major Energy didn't perform was because of how

15   Mr. Wiederman ran the company, including conduct post running

16   the company that was to the detriment of the client.

17           MR. MAROONEY:  I'm not sure what any of what she just

18   said has to do with the termination of Mr. Wiederman in 2019

19   relating to the document issue that you've already addressed.

20           THE COURT:  You're not talking about the issues of --

21           MS. PECTOR:  I'm not talking about the issue, your

22   Honor --

23           THE COURT:  Hold on.  You're not talking about the

24   spoliation issue, right?

25           MS. PECTOR:  Correct.

K34AHOR1ps                    Wiederman - Cross

1            THE COURT:  So you're saying that the witness violated

2       fiduciary duties to Major Energy?

3            MS. PECTOR:  This witness had an employment agreement

4       with Major Energy that he was paid $460,000 a year for, and in

5       his deposition the witness testified that one of his

6       obligations was to maintain confidentiality and return

7       confidential information.  Mr. Brown previewed in the opening

8       that one of the issues that was occurring even while

9       Mr. Wiederman was the president is that there was diversion of

10      some employees and vendors to Alpha, which Mr. Wiederman is now

11      the president of.  So just to establish a little bit of

12      foundation that when he left Major Energy, he also took

13      confidential information.

14           MR. MAROONEY:  And of course this is the subject of a

15      separate employment litigation that Mr. Wiederman has brought

16      against the defendants for improper termination of him.  It's

17      beyond the scope of what brings us here today.

18           MS. PECTOR:  And, your Honor, I don't intend to go

19      much further into this.  I'm just laying a foundation.

20           THE COURT:  OK.  I'm going to let you spend a few

21      minutes on it.  I don't know whether it's relevant or not.

22      There may be some probative value to it depending on where you

23      go with it, but go ahead.

24           MS. PECTOR:  Yes, your Honor.

25      Q.  So, Mr. Wiederman, just to finish that question, when you

1    left Major Energy, you had a personal computer with some Major

2    Energy confidential data on it, and you did not return that

3    data to Major Energy, correct?

4    A.  We were currently in litigation.  I was not sure what to do

5    with that laptop, so I, at the advice of the client, I was told

6    to get it out of my possession and give it to counsel.

7    Q.  You did not return that data to Major Energy, correct?

8    A.  Like I said, we were apparently in litigation and I

9    returned -- I gave that personal laptop to counsel.

10   Q.  Mr. Wiederman, I understand your explanation.  I'm just

11   asking you if, at any point in time from that point to now, did

12   you ever return that confidential data to Major Energy?  Yes or

13   no, sir.

14   A.  I don't know where, counsel, it is, but I don't have it.

15   It's not in my possession.

16   Q.  But you personally didn't return it, correct?

17   A.  I gave it to counsel.

18   Q.  I'll take that as a yes, Mr. Wiederman.

19            MR. MAROONEY:  Objection, argumentative.  Move to

20   strike.

21            THE COURT:  Stricken.

22   BY MS. PECTOR:

23   Q.  Now, Mr. Wiederman, you are currently the president of

24   Alpha Gas and Electric, correct?

25   A.  Alpha.

K34AHOR1ps                  Wiederman - Cross

1    Q.   Alpha is a direct competitor of Major Energy, correct?

2    A.   We're in the same industry.

3    Q.   And when you're in the same industry, it means you sell the

4    same type of commodity, correct?

5    A.   We do it a little bit differently, but we're in the same

6    industry.

7    Q.   So Alpha sells electricity and gas, correct?

8    A.   That's one of the things we do, yes.

9    Q.   Major Energy sells electricity and gas, correct?

10   A.   I believe so, yes.

11   Q.   Now, currently at Alpha, Mr. Wiederman, you have several

12   former Major Energy employees reporting to you, correct?

13   A.   Yes.

14   Q.   You have Levi Moeller, who was the COO of Major Energy.

15   He's now your COO at Alpha, correct?

16   A.   Yes.  He was there prior to me joining Alpha.

17   Q.   And Alpha, by the way, is owned by your cousin, Harvey

18   Klein; is that correct?

19   A.   That's confidential information to the shareholders of

20   Alpha.

21   Q.   Well, don't you recall testifying in your deposition that

22   Harvey Klein owns Alpha?

23   A.   If I testified to that in my deposition, then -- prior to

24   when I was at Major Energy, he owned Hiko and he owned Alpha.

25   That was very clear.  And I was one of the major introductions

K34AHOR1ps                    Wiederman - Cross

1    to Spark to buy Hiko and/or Alpha, and they chose to just buy

2    Hiko.

3    Q.  So Harvey Klein is an owner of Alpha Gas and Electric,

4    correct?

5    A.  That assumption can be made, yes.

6    Q.  Now, Elliott Wolbrom, who is going to be testifying in this

7    trial, he is your chief marketing officer at Major Energy,

8    correct?

9    A.  He was.

10   Q.  He was your chief operating --

11   A.  Chief marketing --

12   Q.  -- marketing officer.  Thank you.  -- at Major Energy.  Is

13   that right?

14   A.  Yes.

15   Q.  And Elliott Wolbrom is your chief marketing officer at

16   Alpha, correct?

17   A.  Yes.

18   Q.  Who else is currently working for you at Alpha who

19   previously worked for you at Major Energy?

20   A.  Jennifer Bodner, B-o-d-n-e-r.

21   Q.  What was Ms. Bodner's role?

22   A.  She is an accountant, is an accountant.

23   Q.  She reported to David Sobel, the prior CFO of Major Energy?

24   A.  That is correct.

25   Q.  And there is a vendor in this case who will be testifying,

1    Sunil Gadtaula.  Are you familiar with him?

2    A.  Yes.

3    Q.  Is he currently a vendor for Alpha?

4    A.  I cannot share that information.

5    Q.  Well, are you aware that he submitted a witness statement

6    in this case saying that he was a vendor for Alpha?

7    A.  A vendor?  You can speak to him about that.  I would not

8    share who our vendors are.  I have a fiduciary responsibility

9    to Alpha.

10   Q.  OK.  What about Nechemia Schorr?

11   A.  What about --

12   Q.  Do you know who that is?

13   A.  I do know, yes.

14   Q.  Did Nechemia Schorr start working for Alpha after he

15   resigned from Major Energy?

16   A.  I'm is not sure.

17   Q.  You're not sure?

18   A.  He had not worked for Alpha when I was there.

19   Q.  So it's your testimony under oath that you did not know

20   that Nechemia Schorr went to go work for Alpha after leaving

21   Major Energy?

22   A.  I'm not sure, but I don't recall where he went.

23   Q.  Mr. Wiederman, you had an adequate opportunity to make any

24   changes to your witness statement or deposition testimony if

25   you didn't think it was correct, right?

K34AHOR1ps                    Wiederman - Cross

1    A.  Yes.

2    Q.  And other than the errata sheet that you issued for your

3    deposition, you've made no other changes to your witness

4    statements since they were submitted, right?

5    A.  Correct.

6    Q.  Now I want to talk to you just briefly about Major Energy.

7    Is it correct, Mr. Wiederman, that there is nothing sexy about

8    Major Energy's business according to your own words?

9    A.  That's incorrect.

10   Q.  Well, isn't it true that you testified in your deposition

11   that Major Energy only sells commodities?

12   A.  That the industry is -- there's nothing sexy about the

13   industry.

14   Q.  And Major Energy only sold a commodity, correct?

15   A.  Major Energy sold a commodity, but what was unique about

16   Major Energy is, we made it sexy.

17   Q.  And how you made Major Energy sexy was by three things: it

18   was the employees.  Correct?

19   A.  That's one way, OK.

20   Q.  The vendors, correct?

21   A.  OK.  That's not the key way we made it sexy.  If you'd like

22   to really know what we did, I'd like to have an opportunity to

23   explain a little bit more about Major Energy, your Honor.

24   Q.  Mr. Wiederman, let me just take a moment here.  After your

25   cross-examination, Mr. Marooney is going to have the

K34AHOR1ps                         Wiederman - Cross

1    opportunity to redirect you and give you all the time to

2    provide these explanations, but right now I'm just asking you

3    short factual questions.  If you don't understand, then you can

4    ask for clarification, but we'll be here a very long time --

5    A.  You asked me how Major Energy is sexy, so --

6    Q.  No, I asked you whether or not vendors were one of the

7    reasons.  That was the question, Mr. Wiederman.

8    A.  They weren't the key way.  But they were one of the ways

9    that we acquired customers.

10   Q.  Do you not recall, Mr. Wiederman, testifying to me in your

11   deposition that the three things that made Major Energy unique

12   were its employees, its vendors, and its IT systems?  Yes or

13   no, sir.

14   A.  Those were three very important parts of Major Energy.

15   Q.  And when you sold, you and the other sellers, sold Major

16   Energy to NGE, you essentially gave up your right to those

17   assets and that good will, correct?

18           MR. MAROONEY:  Objection, argumentative.

19   Q.  That was in your deposition, Mr. Wiederman.  We could read

20   from your deposition if you'd like.

21   A.  I don't have that deposition in front of me.

22           THE COURT:  Overruled.

23   Q.  Well, do you not remember telling me that?

24   A.  That those three things?  I'm sorry.  Could you repeat the

25   question.  The three things were?

K34AHOR1ps                    Wiederman - Cross

1    Q.  Do you not remember telling me in your deposition that you

2    gave up your right to the good will and assets of Major Energy

3    when you sold it to National Gas & Electric?

4    A.  Yes.  We sold the entire company.

5    Q.  And when you sold the entire company, all the sellers

6    received 40 million in cash for that sale, right?

7    A.  Yes.

8    Q.  And there was $5 million litigation credit, right?

9    A.  Yes.

10   Q.  And there was $35 million in contingent payments, right?

11   A.  Yes.

12   Q.  And those contingent payments were not a guarantee, right?

13   A.  That's correct.

14   Q.  It was a contingency based upon performance of Major Energy

15   post acquisition, correct?

16   A.  That is correct.

17   Q.  And there were two components to the contingent payment,

18   right?

19   A.  Yes.

20   Q.  One was cash and settlement, correct?

21   A.  Yes.

22   Q.  The other was earnout, correct?

23   A.  That is correct.

24   Q.  And the earnout had two components that made up the

25   targets, right?

K34AHOR1ps                    Wiederman - Cross

1    A.  Yes.

2    Q.  The first component was adjusted EBITDA, correct?

3    A.  Yes.

4    Q.  The second component was customer count, correct?

5    A.  That is correct.

6    Q.  And if Major Energy did not achieve those targets, that

7    would impact its ability to recover contingent payments,

8    correct?

9    A.  Yes.

10   Q.  And that was both on the cash installment side and the

11   earnout side, right?

12   A.  Yes.

13   Q.  So as it --

14   A.  I'm sorry.  The cash installment side, just to clarify, it

15   was strictly an EBITDA calculation, not the customer count

16   calculation.  So then I got penalized for customers counts on

17   the cash installment side --

18   Q.  You don't recall, Mr. Wiederman, there being a

19   dollar-for-dollar -- well, let me just make sure I understand.

20   Do you recall there being a dollar-for-dollar deduction in

21   Section 2.2 of the MIPA if Major Energy did not achieve a

22   suggested EBITDA target?

23   A.  On the earnout portion, not on the cash installment

24   portion.

25   Q.  Your testimony is there was no dollar-for-dollar deduction

K34AHOR1ps                      Wiederman – Cross

1   in the cash installment section of the MIPA?

2   A.  That is what I believe is correct, yes.

3           MS. PECTOR:  OK.  James, could you pull up DX 2.

4   Q.  And specifically, Mr. Wiederman, what we're showing you

5   here is the asset purchase -- I'm sorry -- the membership

6   interest purchase agreement between National Gas & Electric and

7   Major Energy dated March 18, 2016.  Do you see that?

8   A.  I do.

9   Q.  Is it correct, Mr. Wiederman, that this is the

10  transactional document that resulted in the sale of Major

11  Energy to National Gas & Electric?

12  A.  Yes.

13  Q.  And you were a signator to this agreement; is that correct?

14  A.  I believe so, yes.

15  Q.  You had the opportunity to review it and make any changes

16  to it before you executed it?

17  A.  I did glaze over it.

18  Q.  You were represented by counsel in this acquisition

19  process, correct?

20  A.  Yes.

21  Q.  That counsel was Larry Studnicky?

22  A.  Yes.

23  Q.  And Mr. Studnicky is a seasoned transactional lawyer,

24  right?

25  A.  I have no idea.

1  Q.  Did you meet him?

2  A.  Did I meet him?  Yes.

3  Q.  Did you look up his bio at all before you agreed to retain

4  him, to see what his expertise was?

5  A.  No.  I trusted my partner, who knew him on a personal

6  basis, and he highly recommended him.

7  Q.  And when you say "partner," you refer to Saul Horowitz?

8  A.  No, I refer to Dan Alper.

9  Q.  So Dan Alper was the individual who recommended

10  Mr. Studnicky?

11  A.  Yes.

12  Q.  You were also represented by Mr. Horowitz, as sellers'

13  representative, correct?

14  A.  Yes.

15  Q.  And Mr. Horowitz is a lawyer, correct?

16  A.  Yes.

17  Q.  You were represented, or I guess you had the benefit of Dan

18  Alper's guidance as well, and he was a lawyer?

19  A.  That is correct.

20  Q.  Now, Mr. Wiederman, if we can turn your attention --

21        MS. PECTOR:  James, if we can go to 2.2(a), which is

22  going to be the first paragraph on page 21.

23  Q.  All right, Mr. Wiederman.  Just to orient you, and feel

24  free to read along, this is Section 2.2 of the MIPA, which

25  addresses the formula for calculating the cash installment

K34AHOR1ps                    Wiederman - Cross

1   payments.  Are you familiar that the formula for calculating

2   the cash installment payment is found in the MIPA?

3   A.  Yes.

4   Q.  Had you read 2.2 previously?

5   A.  Like I said, I glazed over the MIPA.  I was more focused on

6   the earnout, which -- the earnout agreement, and the

7   spreadsheet that was associated with that.  That was my

8   primary -- that was my primary goal, as you would say, during

9   the negotiations.  I am not a lawyer.  I'm a businessman.  And

10  spreadsheets is more my cup of tea.

11  Q.  OK.  Well, we don't want to spend too much time here,

12  Mr. Wiederman.  Let me just ask a question.  Who is the person

13  with the most knowledge on the sellers' side of the cash

14  installment payment calculation?

15  A.  I would be.

16  Q.  You would be.

17  A.  Yes.

18  Q.  OK.  So you're the person that we need to discuss this

19  provision with, correct?

20  A.  Yes.

21  Q.  All right.  So now let's look at the provision, and

22  specifically, this provision reads, at the top, Mr. Wiederman,

23  "the cash installments shall be payable on or before March 31,

24  2017; March 31, 2018; and March 31, 2019."  Do you see that?

25  A.  Yes.

K34AHOR1ps                    Wiederman - Cross

1    Q.  OK.  So if I could just stop here for a moment.  Is that

2    sentence referring to the fact that, for each target year in

3    the earnout agreement, the cash installment would be paid on

4    March 31st the following year?

5    A.  Yes.

6    Q.  And the earnout payment would also be made at that time?

7    A.  Yes.

8    Q.  All right.  So for year one, which we'll refer to as --

9    A.  2016.

10   Q.  -- 2016, the 2016 cash installment payment would be due on

11   March 31, 2017, correct?

12   A.  That's correct.

13   Q.  And if we continue reading, Mr. Wiederman, so "the cash

14   installment shall never exceed the face amount of cash

15   installment in respect of just-ended calendar year, and can be

16   subject to potential reduction (and any such reduction shall be

17   subject to potential makeup in the future calendar years, if

18   and to the extent that the adjusted EBITDA for a target year

19   exceeds the adjusted EBITDA plan for said target year)."  Stop

20   there for a moment.  So, Mr. Wiederman, do you recall that

21   there was a mechanism in the cash installment provision that

22   would allow for a potential reduction if the cash installment

23   targets were not achieved?

24   A.  If the EBITDA was not achieved.

25   Q.  Thank you, Mr. Wiederman.  If the adjusted EBITDA targets

1   were not achieved.  Correct?

2   A.  Correct.  But not a customer count reduction.

3   Q.  And if the adjusted EBITDA targets were not achieved, then

4   there would be a dollar-for-dollar deduction for each dollar

5   that was not achieved, correct?

6   A.  Under 20 million.

7   Q.  So if we keep reading, Mr. Wiederman -- and as to this

8   makeup, potential makeup in the future, that would only be

9   triggered if you outperformed in year two, there could be a

10  makeup on what you did not perform in year one, correct?

11  A.  And vice versa, I believe.

12  Q.  So if we now go to the first -- the little line -- this is

13  the first step of the cash installment formula, correct?

14  A.  Yes.

15  Q.  All right.  So the first step is, "If the adjusted EBITDA

16  for the target year exceeds 20 million but is less than the

17  adjusted EBITDA plan for said target year, then the cash

18  installment shall be multiplied by a fraction, the numerator of

19  which is the actual dollar amount of adjusted EBITDA achieved

20  in such target year and the denominator of which is the dollar

21  amount of the adjusted EBITDA plan for such target year."  Did

22  I read that correctly, Mr. Wiederman?

23  A.  You did.

24  Q.  Now, for ease of reference for the Court, some of us have

25  been referring during this trial to that as the achievement

1   ratio.  Is that the same formula that you see in the earnout

2   agreement in Section 2.2(a), if you recall?

3   A.  I'm not sure what you're referring to.

4   Q.  OK.  Well, are you familiar with this formula, the

5   multiplication of a fraction, the numerator of which is the

6   actual dollar amount of adjusted EBITDA over plan?

7   A.  Yeah.  It's all played out in Exhibit B, on the spreadsheet

8   that spends days if not weeks.

9   Q.  Well, actually, Mr. Wiederman, Exhibit B doesn't have

10  anything at all to do with the cash installment.  Isn't that

11  right?

12           MR. MAROONEY:  Objection.  Argumentative.

13  A.  Whatever --

14           THE COURT:  Overruled.

15  A.  -- that is, that is the spreadsheet.  That's where they had

16  the earnout and cash installment component put.

17  Q.  Mr. Wiederman, before we move to the earnout agreement,

18  let's stick here for a moment.

19  A.  Sure.

20  Q.  The second part of the cash installment provision says that

21  if the adjust -- and you'll agree with me this is second step.

22  Right?

23  A.  Yes.

24  Q.  The second step, "If the adjusted EBITDA for such target

25  year is less than 20 million, then the cash installment shall

K34AHOR1ps                        Wiederman - Cross

1    be further reduced on a dollar-for-dollar basis for every

2    dollar less than 20 million."  Did I read that correctly?

3    A.  Yes, you did.

4    Q.  So for every dollar for which the target is not achieved,

5    that becomes a subtraction to your cash installment formula.

6    Correct?

7    A.  Under 20 million.

8    Q.  So if we just take as an example, in year one, if the plan

9    was 20.47 million, I believe.

10   A.  74.

11   Q.  74 thank you for that correction.  If it was 20.74 million

12   and the adjusted EBITDA was 19 million 171 and change, you

13   would take that 20.74 million and deduct the 19.171 million to

14   get the delta, correct?

15   A.  No.  Only under 20 million do you deduct dollar for dollar.

16   Q.  But that would be under 20 million.  If your adjusted

17   EBITDA is 19.171 million, then that is under 20 million,

18   correct?

19   A.  That is under 20 million.  But 20 million, and then below

20   that is where you deduct dollar for dollar.  So if it's 19.1,

21   you would deduct $900,000.  And like I said, it's all in the

22   spreadsheet.

23   Q.  So you're saying 20 million, you would deduct 19.171

24   million, and this delta is your dollar-for-dollar credit that

25   you're taking off the cash installment, correct?

K34AHOR1ps                        Wiederman - Cross

1   A.   That would be the deduction, yes.

2   Q.   And in no event in any single year of the earnout period

3   would the cash installment be more than $500, correct?

4   A.   Correct.

5           MS. PECTOR:  We can take that down, James.

6   Q.   Now, Mr. Wiederman, just to get back to where we were, you

7   recall, while you were at Major Energy, that you were retained

8   as the president to continue running the business post closing,

9   correct?

10  A.   Yes.

11  Q.   And your role in that capacity was to grow the business,

12  right?

13  A.   Continue growing the business.

14  Q.   And you also had a role that involved helping to retain

15  employees and keep up employee morale, correct?

16  A.   To do my best to grow the business, as I had done ten years

17  prior to that.

18  Q.   I'm sorry?

19  A.   To do my best growing the business, as I'd done ten years

20  prior, leading up to the sales.

21  Q.   One of those things that doing your best would involve is

22  retaining employees, since that is one of the assets that you

23  said Major Energy was selling to National Gas & Electric,

24  correct?

25  A.   Yes.

1    Q.  And another one of your roles would be helping to retain

2    vendor relationships, which was a second asset that you said

3    you were selling in the term sheet, correct?

4    A.  Yes.

5    Q.  And a third item that you said you sold to Major Energy was

6    its systems, IT systems.  That was something else that you

7    would have a responsibility to help keep up to date, correct?

8    A.  Yes.

9    Q.  Now, Mr. Wiederman, you were paid $460,000 annually to be

10   president of Major Energy post closing; is that right?

11   A.  Yes.

12   Q.  You also, I believe, testified earlier you understood you

13   had a fiduciary duty to Major Energy?

14   A.  Absolutely.

15   Q.  You also understood you had a duty of confidentiality to

16   Major Energy?

17   A.  Absolutely.

18   Q.  You had a duty to spend your time during working hours to

19   benefit Major Energy's interests?

20   A.  I had an employment contract, and it explicitly spelled out

21   that I worked for Major Energy.  And I worked for Major Energy.

22   There were no working hours as the president of the company.

23   You're working 24/6.  And I was involved in other charitable

24   organizations and other things that are explicitly stated in my

25   employment contract that I can be involved with as well.

K34AHOR1ps                   Wiederman - Cross

```
1    Q.  Setting aside, Mr. Wiederman, what you just said for a
2    moment, you will agree with me that your focus during working
3    hours should have been on the business of Major Energy first.
4    Correct?
5    A.  My focus was Major Energy.
6    Q.  And so your working hours should not have been filled with
7    running personal business ventures out of Major Energy's
8    offices, correct?
9    A.  Like I said, my employment contract explicitly states that
10   I am entitled to run the business as I've been running it for
11   the last ten years.  If something comes up during business
12   hours that I need to attend to, and I would work for Major
13   Energy on Sundays or nights, I would do that.  Major Energy was
14   my primary responsibility, and I would venture to say I spent
15   more time on Major Energy during the earnout period than I did
16   prior to that.
17   Q.  Well, we'll get into that today, Mr. Wiederman.  But right
18   now I just want to stay at a high level with you and ask you
19   the question: would you agree that you should not have been
20   engaging in personal business activities during working hours
21   that interfered with Major Energy?
22           MR. MAROONEY:  Objection, asked and answered.
23           THE COURT:  Overruled.
24   A.  I have -- I don't recall ever doing anything that would
25   interfere with Major Energy.
```

K34AHOR1ps                         Wiederman - Cross

1   Q.  And I'm not asking you right now, Mr. Wiederman, if you
2   recall doing anything that interfered.  I'm just asking you, as
3   a threshold question, will you agree with me, sir, that you
4   should not have been engaging in any personal -- or personal
5   business activity during working hours that would have
6   interfered with the business of Major Energy?  Yes or no, sir.
7   A.  As I said, Major Energy was my primary focus.  There was an
8   earnout here.  There was only a finite amount of time for me to
9   maximize all the work that I put into this company.  And I
10  wanted to make sure that we hit those numbers.  And I did
11  everything and anything possible to do that.  So I would not,
12  it wouldn't have been in my best interests, or the sellers'
13  best interests, to do anything that would interfere with that.
14  Q.  OK.  So are you agreeing with me, Mr. Wiederman, that you
15  should not have been doing anything, during working hours, of a
16  personal or personal business nature that would have interfered
17  with the business of Major Energy?  Yes or no.
18  A.  I think I answered that question.  I have done everything
19  and anything to run the company and maximize that earnout.  I
20  only had a finite amount of time to maximize what I put so much
21  work into building.
22          THE COURT:  I think, counsel, your question is
23  confusing because you're saying "should not."  You're trying to
24  get at what he understood his duty was, as opposed to what he
25  did.  And he's answering what he did.

K34AHOR1ps                    Wiederman - Cross

1   BY MS. PECTOR:

2   Q.  So, Mr. Wiederman, is it your testimony under oath that you

3   did not engage in any personal business activities during

4   working hours that interfered with Major Energy?

5   A.  I don't recall doing anything during business hours that

6   would have interfered with the success of Major Energy.

7   Q.  Are you aware, sir, that one of the sellers' allegations in

8   this case is that our clients, National Gas & Electric and

9   Spark Energy Inc., allegedly interfered with Major Energy's

10  vendor relationships, specifically PTM.  Are you familiar with

11  that allegation?

12  A.  I am.

13  Q.  And the allegation is, somehow they did something that made

14  Major Energy use the benefit of that relationship.  Are you

15  familiar with that?

16  A.  Yes.

17  Q.  And actually, Mr. Wiederman, do you recall that while you

18  were the president of Major Energy, you were trying to start up

19  a healthcare business with Sunil Gadtaula, who was the

20  president of PTM?

21  A.  No, I'm not aware of that.

22  Q.  You're not aware of that.

23  A.  No.

24  Q.  And you're not aware of Mr. Sobel doing that; is that

25  correct?

K34AHOR1ps                    Wiederman - Cross

1    A.  I know towards the end of 2018 that they were having

2    conversations about something to that effect.  But I was not a

3    party to that.

4    Q.  And as the president of Major Energy, did you do anything

5    to prevent your CFO at that time with distracting what you have

6    referred to as Major Energy's lead vendor to engage in another

7    business, not Major Energy?

8    A.  Yes.  I told him that, you know, make sure this does not

9    interfere with your job responsibilities and fiduciary

10   responsibilities.  And, again, this was towards the end of

11   2018.  By that time, most of his functions were taken over by

12   Spark and Houston.  There wasn't really a lot for him to do at

13   that time.  So I told him, you know, he's been a hardworking

14   employee for me for the last ten-plus years.  On average he

15   would be at the office till 11 o'clock.  And if he did

16   something -- again, he's an accountant, so it wasn't

17   necessarily time sensitive when he booked journal entries.

18   Q.  So is it your testimony that, as the president of Major

19   Energy, you allowed the CFO of Major Energy, while he was being

20   paid by Major Energy, to engage in discussions with the lead

21   vendor that you say has been interfered with to start up

22   another business?

23            MR. MAROONEY:  Objection.

24   A.  Like I said, this was at the end of 2018.  And this was at

25   a time that he was no longer the lead vendor of Major Energy.

K34AHOR1ps                    Wiederman - Cross

He actually wasn't doing much work for Major Energy, if any

work for Major Energy, at all.

Q.  Your testimony is that Sunil Gadtaula was not doing any

work for Major Energy during that period?

A.  No.  I didn't say that.  I said at the end of 2018 --

Q.  And that is because you and Mr. Horowitz didn't want to

spend on customer acquisition costs because you wanted to

increase your adjusted EBITDA, correct?

A.  No.  That is absolutely not true.  To the contrary.  We

would actually have loved to spend money on our customer

acquisition costs because that's how you build the company and

that's how you drive up your adjusted EBITDA.  And we were,

during 2016, 2017, 2018, we were looking for vendors that want

to come sell for us.  However, we weren't the Major Energy of

old, and many vendors no longer wanted to sell for us, and it

was very difficult.  And we were told, by Spark, throughout the

years, either slow down on customer acquisition costs or stop

completely any marketing.

         In the ten years prior to leading up to the sale,

never have I once told one of our marketers to slow down,

because that is a huge no-no in this industry, because they can

go anywhere and sell for anybody, and it's very hard to get

door-to-door vendors.  So if you tell them that you want them

to slow down, they're not going to be happy.  These people live

paycheck to paycheck, and they would go to another company.

1          So the first time you tell a vendor to slow down and

2   we don't want you to market, that is very hard to recover from.

3   Q.  And is it your testimony under oath here today, sir, that

4   Mr. Horowitz, as a sellers' representative, and you in

5   agreement, did not want to stop spending on customer

6   acquisition spend in 2018.  Yes or no, sir?

7   A.  OK.  So in 2018, I had a discussion with Mr. Kroeker.  They

8   were coming off -- they just got hit very hard on their

9   commercial --

10  Q.  Mr. Wiederman, before you get into a discussion, I just

11  want to know, yes or no.

12  A.  Yes, but this concept --

13          THE COURT:  Let him finish his answer.

14  A.  In 2018 I had a discussion with Mr. Kroeker.  They just

15  came off a really difficult commercial year where they lost

16  about 30, 40 million dollars, and he said to cut customer

17  acquisition costs and it would be in the best interests of the

18  seller at that point, and he was right, because at that point

19  we were so behind customer count because of all the damage that

20  was inflicted two years prior, so at that point it would be in

21  the best interest of the sellers as well as the best interests

22  of Spark to drive up adjusted EBITDA.  And the way you would do

23  that is by customer acquisition costs.

24          Now, it would technically have hurt us by a reduction

25  of customer count because we're not driving customers, but we

K34AHOR1ps                    Wiederman - Cross

1    were just way behind the eight ball at that point, that even

2    had we picked up 30, 40, 50 thousand customers, it wouldn't

3    have moved the needle.

4          So that was the discussion with Mr. Kroeker.  And

5    that's why we agreed to not continue marketing, continue

6    customer acquisition costs.

7    Q.  So, Mr. Wiederman, if I could just unpack that for a

8    moment.

9    A.  Sure.

10   Q.  I think we are in agreement, based upon what you just

11   testified, that sellers' representative, Saul Horowitz and you,

12   wanted to stop CAC, customer acquisition spend, in 2018.

13   Correct?

14   A.  No.  We were asked to stop customer acquisition costs by

15   Spark, and we agreed to do that because, like I said, at that

16   point, it wouldn't have moved the needle had we anyway

17   continued with our customer acquisition costs.

18         MS. PECTOR:  James, let's bring up DX 736.

19   Q.  All right, Mr. Wiederman.  Let me orient you with this

20   document.  This is a July 31, 2018 e-mail from Saul Horowitz to

21   Nathan Kroeker on July 31, 2018.  Do you see that, sir?

22   A.  Yes.

23   Q.  And do you see that you're copied on it?

24   A.  Yes.

25   Q.  And do you see that the subject is mass marketing?

1   A.  Yes.

2   Q.  And do you see that lead counsel for the sellers, Israel

3   Dahan, is also copied in this e-mail?

4   A.  Yes.

5   Q.  And Mr. Dahan is representing the interests of you and

6   Mr. Horowitz during this time period?

7   A.  Yes.

8   Q.  Now, Mr. Wiederman, before we get into this e-mail, let me

9   ask you just a business question.

10  A.  Sure.

11  Q.  Would you agree that mass marketing is necessary to grow

12  the customer base of Major Energy?

13  A.  Absolutely.

14  Q.  And you would also agree that Major Energy, the foundation

15  of what it was built on to get its customers, is mass

16  marketing, correct?

17  A.  Yes.

18  Q.  And when you refer to mass marketing, that is door-to-door

19  vendors, right?

20  A.  That's one of -- mass marketing would include door-to-door

21  marketing, but, yes, door-to-door was important.

22  Q.  And just for simplicity's sake, door-to-door vendors is

23  when you have a campaign where you hire a vendor and you've got

24  a group of agents that literally go knock on potential customer

25  doors to try and get sales, correct?

K34AHOR1ps                    Wiederman - Cross

1    A.   That's correct.

2    Q.   And then the telemarketing that you referred to, that is a

3    different base of agents that are trying to contact potential

4    customers by phone versus in person, correct?

5    A.   That's correct.

6    Q.   And so it was those two forms of marketing that Major

7    Energy used to grow its customer base, correct?

8    A.   There were other forms as well.

9    Q.   There was a broker form as well, correct?

10   A.   And others as well.

11   Q.   Major Energy never had multi-level marketing, correct?

12   A.   No, that's not correct.  We did.

13   Q.   When did you stop?

14   A.   I don't recall the exact date.

15   Q.   All right.  But mass marketing is the lifeblood of growing

16   customers in the industry.

17   A.   It's definitely very important.

18   Q.   OK.  So let's look at this e-mail now.  On July 31, you

19   indicated, I believe, that Mr. Horowitz asked for CAC spend

20   stop.  So this is an e-mail from Mr. Horowitz to Mr. Kroeker,

21   who testified yesterday.  "Nathan, hi.  Hope your summer is

22   going well.  Yesterday four out of five sellers (including

23   myself) became aware of the fact that Major energy reinitiated

24   mass marketing toward the end of May 2018 at Spark's request."

25   Do you see that?

K34AHOR1ps                    Wiederman - Cross

1  A.  I do.

2  Q.  Now, would you agree with me, Mr. Wiederman, at this point

3  in time Spark is encouraging Major Energy to use vendors and

4  mass marketing to grow the customer base, right?

5  A.  Yes.

6  Q.  And the next sentence says, "Prior to this happening, Spark

7  and major had agreed to halt mass marketing because it would

8  not be beneficial to Major's adjusted EBITDA given the totality

9  of the circumstances where we find ourselves."  Did I read that

10  correctly.

11  A.  You did.

12  Q.  Now, what that's referring to is, if CAC spend is high,

13  that is an expense that has to be deducted from adjusted

14  EBITDA, correct?

15  A.  Yes.

16  Q.  So if CAC spend is low, adjusted EBITDA is higher, correct?

17  A.  Yes.

18  Q.  And if adjusted EBITDA is higher, the sellers have a better

19  shot at achieving one out of the two components of the earnout

20  to receive the contingent payment, right?

21  A.  I think, you know, upon --

22  Q.  Can you answer that question first, and then if you want to

23  explain that's OK.

24  A.  Yes, I will.

25  Q.  But can you answer the question first.

K34AHOR1ps                      Wiederman - Cross

1    A.  I will -- the answer will be in there.

2            The timing here is very important.  This is the final

3    year of the earnout agreement, at the end of 2018.  When you

4    purchase a customer, you pay up front for a customer.  You

5    profit from that customer six months later.  So when we were

6    told, in the beginning of 2018, to stop customer acquisition

7    costs, OK, because benefit adjusted EBITDA from Spark, so that

8    made sense.  It didn't make sense for Major Energy, had we been

9    hitting the numbers in 2016 and 2017, because we still would

10   have profited from those customers in the latter part of 2018.

11   This e-mail here, in August, which goes back to -- which refers

12   to in May, to reengage and start an engine that's very

13   difficult to start up again once it's been stopped, so to

14   restart mass marketing and pay for these customers would have

15   only benefited Major Energy in 2019.  So this would not have

16   helped the sellers at all.

17   Q.  But you were the president of Major Energy during this time

18   period, correct?

19   A.  Yes, I was.

20   Q.  It would have helped Major Energy to engage in mass

21   marketing efforts to grow the business in the second half of

22   2018, correct?

23   A.  It would have helped Major Energy but not the sellers.  I

24   was wearing two hats.  And that's why I agreed and went forward

25   with it, because, as the president of Major Energy, it was my

1    fiduciary responsibility to do what's best for Major Energy.

2    That's what I did. and it helped Major Energy in 2019.  It did

3    not help the sellers.

4    Q.  Mr. Wiederman, you are aware that the spend on customer

5    acquisitions second half of 2018 was lower than it had ever

6    been in Major Energy's history, correct?

7    A.  Like I said, it is extremely difficult to start marketing

8    when you told all your vendors to stop marketing and there is

9    30 other companies that they can go to and market for.  Why

10   would they come back to a company that made -- and then they

11   recruit a hundred people who are knocking on doors and then any

12   day they can get a phone call from me and say, OK, guys, this

13   month please stop.

14          THE COURT:  That didn't answer the question.  The

15   question is, you are aware that the spend on customer

16   acquisition second half of 2018 was lower than it had ever been

17   in Major Energy's history.  Yes or no?

18          THE WITNESS:  If that was the case, yes.  And the

19   reason for that is because it's very difficult to find vendors

20   once you tell vendors to please don't market for us anymore.

21   Q.  Now, Mr. Wiederman --

22   A.  Yes.

23   Q.  -- vendors make money for every sale they make, correct?

24   A.  Yes.

25   Q.  Vendors want to be in the business of selling, correct?

1    A.  Yes.

2    Q.  They want marketing campaign opportunities, correct?

3    A.  Yes.

4    Q.  Because if they have marketing campaign opportunities, an

5    agent selling, that vendor is making money, right?

6    A.  Yes.

7    Q.  So at any given time, there is a mass marketing vendor that

8    is looking for new customers like Major Energy, correct?

9    A.  In this industry -- that is correct.  In this industry the

10   vendors have the leverage.

11   Q.  Now, I want to continue on with this e-mail if we could,

12   Mr. Wiederman.  The next sentence -- so just to be clear, the

13   sellers did not want at this point in time to continue with CAC

14   spend.  And I'm just going to refer to that as a short cite for

15   customer acquisition spend, because the sellers were focused on

16   increasing adjusted EBITDA, right?

17   A.  As a seller, yes.

18   Q.  And you were on board with this e-mail, correct?

19   A.  I'm sorry?

20   Q.  You were on board with that in this e-mail, correct?

21   A.  I was on this e-mail.  I, however, like it clearly states,

22   is that we reinitiate a mass marketing because I was president

23   of Major Energy, and one hat I was wearing was an employee and

24   president of Major Energy, and that's why it was reinitiated

25   because I had to do what was best for Major Energy even though

K34AHOR1ps                    Wiederman - Cross

1   it would only benefit Major Energy in 2019.

2   Q.  Isn't it true that the only reason why Major Energy

3   reinitiated mass marketing efforts after this e-mail is because

4   Spark pointed out to Major Energy that it didn't have a

5   contractual right to stop CAC spend because that would harm the

6   company?

7   A.  I'm not sure what you're referring to.  I'm sorry.

8   Q.  All right.  You don't recall receiving an e-mail from

9   Mr. Melman, who was the general counsel of Spark at this time,

10  expressing concern about why wouldn't Major Energy want to

11  spend on mass marketing, which is necessary to grow the

12  business, if the whole goal is to make Major Energy successful?

13  You don't remember receiving a letter where he expressed

14  concern that the sellers were trying to do something that

15  wasn't in the contract?

16  A.  I believe that was in response to Mr. Horowitz's e-mail.

17  As we said earlier, I was wearing two hats.  As a seller it

18  wasn't beneficial.  As an employee I needed to do what was best

19  for Major Energy.  And that's why I reinitiated mass marketing.

20          My allegiance was to Major Energy.  And I didn't just

21  throw up my hands.  I was doing what was best for the company

22  and I worked my tail off to do what was best, and it was

23  extremely difficult to get vendors to consult for us again.

24  Q.  Do you recall, Mr. Wiederman, sending any objection to this

25  e-mail, letting Mr. Kroeker or anybody else from Spark know you

1    disagreed with Mr. Horowitz's position in this e-mail?

2    A.  I don't recall sending any response to this.

3    Q.  Can we just continue on with this e-mail so we can finish

4    it up, Mr. Wiederman.

5    A.  Sure.

6    Q.  So Mr. Horowitz goes on to say, "The sellers are still of

7    that opinion.  The earnout agreement signed between Major and

8    NG&E clearly puts these types of business decisions in our

9    province.  The sellers are in unanimous agreement to now halt

10   the mass marketing, and unless we hear a compelling reason from

11   you why we should not, we will make this change effective

12   tomorrow, August 1, 2018 at the end of the business day."  Did

13   I read that correctly?

14   A.  You did.

15   Q.  So now at this point in time we have Saul Horowitz, who is

16   sellers' representative, correct?

17   A.  Yes.

18   Q.  But at this time he's also a senior advisor to Major

19   Energy, which was an executive role, correct?

20   A.  Yes.

21   Q.  And Mr. Horowitz was one of the members of the senior

22   management team, right?

23   A.  Yes.

24   Q.  He is being paid more than $250,000 a year to engage in

25   activity for the benefit of Major Energy, right?

K34AHOR1ps                    Wiederman - Cross

1     A.  Yes.

2     Q.  But in this e-mail, he is clearly putting the interest of

3     the sellers before the Major Energy business, right?

4     A.  You need to discuss that with Mr. Horowitz.

5     Q.  OK.  Well, do you recall receiving an e-mail from

6     Mr. Melman a few days later expressing concern about the

7     position Major Energy was taking?

8     A.  If you have it I would like to see it.

9             MS. PECTOR:  James, we'll pull up DX 738.

10    Q.  OK.  So Mr. Wiederman, just to orient you, this is

11    Mr. Melman, August 2, 2018, e-mail to Saul Horowitz.  And do

12    you see again you're copied there, MWiederman@MajorEnergy.com?

13    A.  Yes.

14    Q.  And this is a response to the prior e-mail we just looked

15    at, right, Mr. Wiederman?

16    A.  Yes.

17    Q.  And let me just stop for a moment and ask you, now, at any

18    time between when Mr. Horowitz sends the July 31st e-mail and

19    when this response came from Mr. Melman, did you call

20    Mr. Kroeker or anybody at Spark and say, don't worry about

21    this, I got it, we're going to reinitiate mass marketing?

22    A.  We reinitiated mass marketing.

23    Q.  Your testimony is that you reinitiated mass marketing

24    between July 31st and this August 2nd letter?

25    A.  I believe if we go back to that first e-mail, Mr. Horowitz

1   stated that we reinitiated mass marketing, and he's saying

2   we're going to halt it.  So I did, as a employee and president

3   of Major Energy, what I was supposed to do.  As a seller, it

4   was a very difficult balancing act.  Because I had a partner

5   that weren't happy with this decision, but yet at the same

6   time, I was the president and employee of Major Energy and

7   needed to do what was best for Major Energy, not necessarily

8   thinking about time frames.  So the first e-mail did say we

9   reinitiated mass marketing.

10          THE COURT:  I think you're talking past each other.

11  You might need to rephrase the question.

12          MS. PECTOR:  Yes, your Honor.  Let me rephrase it.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K347HOR2                         Weiderman - cross

1    BY MS. PECTOR:

2    Q.  So what Mr. Horowitz was trying to do was stop the

3    reinitiation mass marketing, correct?

4    A.  Correct.

5    Q.  And between the time when Mr. Horowitz sent the e-mail on

6    July 31 saying mass marketing was going to stop and when

7    Mr. Melman responded on August 2, you didn't call anyone from

8    Spark and say, I agree with you guys we should not stop mass

9    marketing, correct?

10   A.  I'm not sure, but we did not stop mass marketing.

11   Q.  James, if you could pull up the last paragraph.

12          So the last paragraph of this, Mr. Melman is

13   explaining as an initial matter Major Energy's resumed mass

14   marketing efforts are a component of a growth strategy intended

15   to drive sales, and that was agreed to by and developed by

16   Major Energy, right?

17   A.  Yes.

18   Q.  And, Mr. Wiederman, when Major Energy sold its business to

19   National Gas & Electric, it had a business plan that talked

20   about how CAC spend was going to increase year over year to

21   increase the business?

22   A.  Yes.

23   Q.  And Mr. Melman is reminding you and Mr. Horowitz of that

24   here, correct?

25   A.  Yes.

K347HOR2                          Weiderman - cross

Q.  And then he says, it goes without saying that sales growth
would benefit all parties including sellers, correct?

A.  That's what it says.

Q.  And that it would be a benefit to sellers because the
second component of the earnout calculation is customer count,
right?

A.  I'm sorry.  Can you repeat that?

Q.  It would be beneficial to sellers because the second
component of the earnout calculation is customer count, right?

A.  Again, time in this context matters.  At the end or the
latter part of 2018 it would not have been beneficial to
sellers, because we were way behind the eight ball and, as I
said, had we even picked up another 25, 30,000 customers, or
even 50,000 customers, it wouldn't have moved the needle, so it
would not have been beneficial to the sellers.

          THE COURT:  To resume mass marketing.

          THE WITNESS:  To resume mass marketing, correct, your
Honor.

Q.  So you're saying it wouldn't have been beneficial to the
sellers even though half the component of the earnout
calculation is customer count.

A.  By the latter part of 2018 we were so far behind the eight
ball at that point that to resume mass marketing would not have
been beneficial to the sellers, because had we picked up best
case scenario 50,000 customers it wouldn't have moved the

K347HOR2                        Weiderman - cross

1    needle.

2    Q.   And you will agree, Mr. Wiederman, that if mass marketing

3    efforts did not resume, then that would mean growth coul not

4    occur for Major Energy, which would impact the business in

5    2019, after the earnout period, correct?

6    A.   That's correct, yes.

7    Q.   And the sellers didn't care about that because the earnout

8    period would be over, so they were just focused on maximizing

9    their profits in 2018, correct?

10   A.   Again, as I said, from the sellers you are correct, but we

11   reinstated mass marketing because I was the president and it

12   was a very tough balancing act, but I have to do what was

13   right, and I had to do what my employment contract said as

14   president of Major Energy.  So we did reinstate mass marketing

15   although it did not benefit the seller; it did benefit Major

16   Energy.

17   Q.   And how was mass marketing reinstated?  Who was the vendor

18   that was reinstated?

19   A.   We reached out to as many vendors as we possibly can.

20   Q.   Was PTM one of those vendors?

21   A.   We reached out to him.  I don't recall.  I think he may

22   have been trickling in some customers, but he definitely was

23   not our primary vendor at the time.

24   Q.   Mr. Wiederman, you know for a fact that PTM remained a

25   vendor of Major Energy throughout the entire earnout period,

K347HOR2                        Weiderman – cross

1   correct?

2   A.   Like I said, he was trickling in accounts, but he was

3   selling for other companies when he was our exclusive vendor

4   leading up to the sale.

5   Q.   He was selling for other companies because you agreed to

6   release the exclusivity provision in his contract, correct?

7   A.   No, he was selling for other companies because in 2016 we

8   told him to slow down one month and, like I said, that's

9   detrimental in this industry to tell a door-to-door company,

10  you know, you have 100 agents knocking on doors and we only

11  want 50 of them knocking on doors, they get a bad name, bad rap

12  in the industry, and they will go elsewhere.

13  Q.   Isn't it true, Mr. Wiederman, that during the earnout

14  period Major Energy spent $9 million on PTM?  At least $9

15  million.  It's actually probably more.

16  A.   I don't have the numbers in front of me.

17  Q.   Can pull up 944A, James.

18         So, Mr. Wiederman, if we can go look at PTM, please.

19         All right.  So, Mr. Wiederman, here we're looking at a

20  summary of Major Energy's spend with PTM.  And if we can look

21  at the top column labels, do you see that it's going month by

22  month starting from it looks like September 2016 and continuing

23  sequentially through '17 and '18?

24  A.   OK.

25  Q.   All right.  So if we just start, we can see that in

K347HOR2                         Weiderman - cross

1   November of 2016 that is a reflection that Major Energy is

2   using PTM as its door-to-door vendor, correct?

3   A.  I guess.  If they're getting paid, yes.

4   Q.  And do you see that month over month PTM is remaining

5   steady from '16, through '17, increasing -- if we look at

6   December 2016 the spend is 317.  We see that spike in August of

7   2017 to 553, spike again September 17 to 718,000.  Do you see

8   that?

9   A.  I see these numbers, yes.

10  Q.  OK.  And we see it spike again in November of 2017 to

11  $790,000, correct?

12  A.  I see that.

13  Q.  And do you see that in fact PTM never stopped marketing

14  during the earnout period, because if we were to continue and

15  look at every column there are dollars that are being spent

16  with PTM?

17  A.  Like I said, they trickled out.

18  Q.  But there was never a directive where you ever told PTM to

19  stop marketing during the earnout period, correct?

20  A.  I never told them to stop -- I'm sorry, let me rephrase

21  that.  In the beginning of 2018 we did tell them stop

22  marketing.  But, you know, accounts do trickle in even when you

23  tell a company to start marketing.  And we did tell them at

24  times to slow down.

25  Q.  And if we just look at the snapshot --

K347HOR2                    Weiderman – cross

1           James, can you put up the '18 time period.

2           If we look at the snapshot here of 2018, Mr.

3  Wiederman, you will agree that Major Energy paid PTM every

4  single month in 2018 for services, correct?

5  A.  Yeah, but minimal.  Some months were extremely minimal and

6  in the context.  Their invoices prior to the sale would average

7  150 to $200 a week.

8  Q.  So we can agree that at minimum, according to you, by July

9  31 of 2018 Spark was saying to Major Energy it's perfectly fine

10 to increase CAC spend, right?

11          Your testimony is you as the president did that,

12 correct?

13 A.  I did my best, yes.

14 Q.  And your testimony is also that Saul Horowitz as sales

15 representative did not want you to do it, correct?

16 A.  That's what he said in his e-mail.

17 Q.  And the other minority sellers were unhappy with increasing

18 the CAC spend because they didn't want the adjusted EBITDA to

19 be impacted, correct?

20 A.  That is correct.

21 Q.  And even though you had the authority as the president of

22 Major Energy to continue a CAC spend, in 2018 if we look at the

23 spend with PTM towards the last couple of quarters it's

24 decreasing, correct?

25 A.  Yes.  I tried my best to increase it as much as possible.

K347HOR2                          Weiderman - cross

1   Q.  Now I understand in your witness statement -- and this also

2   came up in your deposition -- that Sunil Gadtaula is someone

3   who likes to feel like a millionaire.  Is that a fair

4   statement?

5   A.  That is a fair statement.

6   Q.  And I understood from your testimony that what you're

7   saying there is he is someone who likes to be wined and dined,

8   a lot of entertainment.  Is that fair to say?

9   A.  That is fair to say.

10  Q.  Is it fair to say that he is someone who likes you to take

11  him to Vegas frequently?

12  A.  Not frequently.  But we would rather put incentives in

13  place, performance incentives in place, for him that if he hits

14  certain targets that will take him on a trip to Vegas than pay

15  him an extra million dollars, that would make business sense.

16  Q.  You routinely took Mr. Gadtaula on trips, correct?

17  A.  Not routine, no.

18  Q.  So your testimony under oath is that if we were to pull out

19  your credit card statements now and go through all your credit

20  cart statements, we're not going to see instances when you were

21  paying for trips with Mr. Gadtaula on Major Energy's company

22  credit card?

23  A.  I said not routinely.  We have taken him on trips, yes.

24  Q.  And those trips involved a couple trips to Vegas, right?

25  A.  I don't know.  There was definitely a trip to Vegas.  We

K347HOR2                    Weiderman - cross

1    had a commercial relationship trip to Vegas; it could be he was

2    invited along to that.  I don't recall if he was.  But, yeah,

3    Major Energy was built on relationships, and that was something

4    that was very important to us.

5    Q.  James, could you pull up DX803.

6         Mr. Wiederman, is that Mr. Gadtaula?

7         MR. MAROONEY:  Objection, your Honor.

8         THE COURT:  What is the representation about the

9    relevance of this?

10        MS. PECTOR:  So, your Honor, Mr. Gadtaula is someone

11   who is going to be testifying.  Mr. Wiederman has now laid a

12   foundation that towards the second half of 2018 PTM allegedly

13   stopped working as hard for Major Energy, but Mr. Wiederman's

14   credit card is showing he is still taking Mr. Gadtaula on

15   trips, and this is one of the pieces of evidence that we found

16   in the case during discovery that shows a trip that Mr.

17   Wiederman went on with Mr. Gadtaula where we believe Major

18   Energy dollars were being spend, and I'm just asking him to

19   confirm that this is Mr. Gadtaula.

20        MR. MAROONEY:  Objection.  There is no foundation.

21   This is irrelevant and highly prejudicial.

22        THE COURT:  Is it somehow connected to the witness?

23        MS. PECTOR:  I believe the witness is on the trip.

24        MR. MAROONEY:  This is not the witness.  I don't even

25   understand what this is.

1           THE COURT:  I'm not going to admit the document.  You

2    can use it to question him if you want.

3    Q.  Mr. Wiederman, is that Mr. Gadtaula in the picture?

4    A.  Yes.

5    Q.  And did you go on trips with Mr. Gadtaula to Vegas?

6    A.  I have gone on a trip with him to Vegas, yes.

7    Q.  Only one?

8    A.  Like I said, there was another commercial trip that

9    Mr. Kroeker was on as well to Vegas, so I don't recall if Mr.

10   Gadtaula was there.  Maybe Mr. Kroeker recalls if he was there

11   or not, but there were a lot -- it was more of a commercial

12   centric trip.

13   Q.  Do you recall taking Mr. Gadtaula to London?

14   A.  Yes, that was something that was paid for by Madison Square

15   Garden, and that was something that was part of our Madison

16   Square Garden marketing arrangement.

17   Q.  And do you recall that you didn't disclose to Spark that

18   you were going on the London trip?

19   A.  I wasn't aware that I had to disclose every move that I

20   made.  This was in our -- I believe I shared with Mr. Kroeker

21   our deal with Madison Square Garden, and in that deal I believe

22   was the road trip with the team, with the New York Knicks, to

23   London.

24   Q.  And one of the activities you took Mr. Gadtaula on on that

25   trip was to a Playboy party, correct?

K347HOR2                        Weiderman - cross

1    A.   What?

2    Q.   One of the events you took Mr. Gadtaula to on that trip was

3    a Playboy party, correct?

4              MR. MAROONEY:   Note the objection.

5              THE COURT:   Sustained.   It's not relevant.

6    Q.   Mr. Wiederman, have you had a chance to review your expense

7    reports prior to coming to trial?

8    A.   No, I have not.

9    Q.   And you and I were at your deposition, and we had a

10   discussion about how sometimes you put expenses on your credit

11   card that were not always company related, correct?

12   A.   It may have happened at most twice, and when it did it was

13   by accident, and I then instructed my CFO to take the money out

14   of my personal account and pay the credit card.

15   Q.   One of the times that you used your credit card for

16   personal purposes was when you went on a cruise, correct?

17   A.   Yes.   I was not able to get off the cruise, and my personal

18   credit card was maxed out, so I had no choice.   And the day I

19   got back, I instructed Mr. Sobel, our CFO, to take that money

20   out of my personal account.

21   Q.   Well, you never checked to see if that money was actually

22   taken back, correct, Mr. Wiederman?

23   A.   I assumed and I trusted -- because I know he did the first

24   time I asked him, which was probably a year prior when there

25   was a flight that was put on by a family member of mine -- it

1    wasn't even mine; it was just they used my United account and

2    it defaulted to that credit card and accidentally it was used,

3    and I know at that time he did it, so I assumed that he did it

4    as well.

5    Q.   So, Mr. Wiederman, I just want to make sure I'm clear with

6    your testimony.  Your testimony is that other than those two

7    instances, you didn't spend any of Major Energy's dollars

8    during the earnout period towards activities unrelated to the

9    business of Major Energy?

10             MR. MAROONEY:  Objection.  Mischaracterizes the

11   evidence.

12             THE COURT:  You can ask the question.

13   A.   Those are the two I recall off the top of my head.

14   Q.   So there could be others.

15   A.   Like I said, those are the two I recall.  I don't think

16   there were others.  You know, mistakes might have happened, but

17   if there were others it was an insignificant amount and, like I

18   said, I don't believe there were others.

19   Q.   Mr. Wiederman, would you agree with me it was important for

20   you to be productive on company time?

21   A.   It was important for me to be productive.  Company time for

22   me was 24/6.

23   Q.   But 24/6 doesn't mean you are working for Major Energy

24   24/6, right?

25   A.   That means I'm always working for Major.  I was always on

K347HOR2                          Weiderman - cross

1    call for Major Energy 24/6.

2    Q.  So your testimony to this court is that a hundred percent

3    of your devotion and time is to Major Energy?

4    A.  I am on call for Major Energy 24/6.

5    Q.  You will agree it's important to follow company policies,

6    correct?

7    A.  Absolutely.

8    Q.  And you will also agree that employees of Major Energy

9    can't work for a competitor while they're working for Major

10   Energy?

11   A.  Absolutely.

12   Q.  And you will also agree that employees of Major Energy

13   should not be diverting employee relationships away from Major

14   Energy?

15   A.  That is correct.

16   Q.  You will also agree employees of Major Energy should not

17   divert vendor relationships away from Major Energy?

18   A.  That's correct.

19   Q.  You will also agree employees of Major Energy should not

20   divert business opportunities with customers away from Major

21   Energy?

22   A.  That is correct.

23   Q.  And did you take any disciplinary action when you were the

24   president of Major Energy for employees who were working under

25   you who did that?

K347HOR2                         Weiderman - cross

A.   The only one that I found out later on -- which was
probably a week or two prior to my termination -- was I found
out that one of our IT guys was doing some hardware work for a
competitor.

Q.   You talked about Tzvi Spitz?

        THE COURT:  Can you spell that.

Q.   S-p-i-t-z.

A.   Last name, yes.

Q.   And Tzvi is S-t-v-i?

A.   T-z-v-i.

Q.   So, Mr. Spitz, who was one of the IT guys for Major Energy
while you were the president of Major Energy, that's who you
are referring to?

A.   He was our hardware guy, yes.

Q.   And Mr. Spitz was the individual who you had authorized to
back up the entire server of Major Energy at his home, correct?

A.   This was in the early stages of Major Energy, way before
the sale, and it was very important for us to have a disaster
recovery and backup plan, so absolutely I wanted the servers to
be backed up offsite, yes.

Q.   And the competitor you found out that Mr. Spitz was working
for was Alpha, correct?

A.   Like I said, I found that out about two weeks prior to my
termination.

Q.   And when you found out that Mr. Spitz was working for Alpha

K347HOR2                       Weiderman - cross

1    while he was working for Major Energy, you didn't terminate

2    him, right?

3    A.  I was in the process of doing some investigation and seeing

4    what the truth was and what was going on, and I would have made

5    a decision.  I did not have the opportunity.

6    Q.  Mr. Wiederman, just yes or no, you didn't terminate Mr.

7    Spitz, correct?

8    A.  Had I found out that somebody was actually doing work for a

9    competitor, that is rights for termination.

10   Q.  You in fact went to work for that competitor immediately

11   after you were terminated on March 28, 2020, correct?

12   A.  Yeah, I needed a job.

13   Q.  Well, you were engaged in negotiations to be the president

14   of Alpha the next day or two after you were terminated,

15   correct?

16   A.  A couple of days after I was terminated I reached out to

17   friends and family I know that can help me get a job.  I think

18   that's the natural thing to do.

19   Q.  So let's move forward, Mr. Wiederman, to some of the issues

20   in this case that are in dispute between the parties, so let me

21   just structure a little bit.  Would you agree that there was an

22   earnout period for 33 months that's at issue in this case?

23   A.  Yes.

24   Q.  And would you agree with me, sir, that the reason Major

25   Energy did not hit its targets is that Major Energy's

K347HOR2                          Weiderman – cross

1    operations were burdened by significant regulatory

2    restrictions?

3    A.  No, absolutely not.

4    Q.  James, can you play an audio DX494D.

5              MR. MAROONEY:  I'm sorry, your Honor.  Before we play

6    the audio I would like to understand what the audio is.

7              MS. PECTOR:  The audio is Mr. Wiederman's statements,

8    your Honor.  He had sent a voice text to one of the silent

9    shareholders, and he is talking about what he thinks is the

10   impact that's causing harm to Major Energy.

11             MR. MAROONEY:  So this is an audio of Mr. Wiederman.

12             THE COURT:  And what's the date?

13             MS. PECTOR:  Yes.  The date of it, your Honor, is June

14   9, 2017.

15             THE COURT:  OK.

16             MS. PECTOR:  James, can you cue the audio.

17             (Audio played)

18             MR. DAHAN:  Your Honor, this is Mr. Horowitz speaking.

19             MS. PECTOR:  Apologies, your Honor.  494D, as in dog.

20             (Audio played)

21   Q.  That was your voice on the recording, correct?

22   A.  Yes.  And I would like to --

23   Q.  We'll get there in a minute.  I just want to lay a little

24   foundation to make sure that's you and who you're talking to.

25   A.  That was me.

K347HOR2                          Weiderman - cross

1    Q.  OK.  And you said that you were talking to Ushy, correct?

2    A.  I'm not sure who I was talking to at the time.

3    Q.  I'm sorry.

4           THE COURT:  Would you mind spelling that for the court

5    reporter?

6           MS. PECTOR:  U-s-h-y.

7    Q.  Let me step back.  Ushy, so the Court knows, is Asher

8    Fried, correct, Mr. Wiederman?

9    A.  Yes.

10   Q.  And he is one of the minority selling shareholders who has

11   an interest in the outcome of this case?

12   A.  Yes.

13   Q.  And the other one -- who actually, just to clear the

14   record, the recording was sent to -- was Mark Josefovic?

15   J-o-s-e-f-o-v-i-c.

16   A.  Yes.

17   Q.  I feel like I'm in a spelling bee, your Honor.

18          So Mr. Josefovic, just for the Court's orientation, is

19   also a minority selling shareholder, correct?

20   A.  Yes.

21   Q.  And Mr. Josefovic I believe will be testifying tomorrow.

22          So in this context it's a June 9, 2017 voice recording

23   that you sent to Mr. Josefovic following a call with Fried.

24   Does that sound right?

25   A.  I don't know if it was following a call.  It was a WhatsApp

K347HOR2                        Weiderman - cross

1    voice note, so let's take this in context.  This was a WhatsApp

2    voice note I sent to him and was explaining to him how

3    difficult it is to be part of a public company and there are a

4    lot of regulations being part of a public company.  And further

5    in that conversation his response to that was, is there

6    anything we can do to go after Spark.  So he took it the way I

7    meant it.

8           So, you know, this was a WhatsApp conversation, and

9    they were absolutely no regulatory restrictions from the Public

10   Service Commission, from the Attorney General, from -- in fact

11   I challenge to say any restriction that was given by the

12   Attorney General or Public Service Commission during that time

13   period.  There were none.

14   Q.  Wait a minute, Mr. Wiederman.  You had already been

15   found -- and when I say you, Major Energy -- had already been

16   found by this point in time to be responsible by the

17   Pennsylvania Public Utility Commission, and there was a

18   settlement reached that was in excess of $5 million in

19   significant marketing restrictions that Major Energy was

20   subject to during this time period, correct?

21   A.  We were not found guilty of anything.

22   Q.  Wait.  Mr. Wiederman, are you testifying under oath to this

23   court that there was not a settlement that was entered into by

24   Major Energy under your leadership where $5 million in payments

25   needed to be made by Major Energy to consumers in Pennsylvania?

1   A.  That's not what I said.  I said that there was a settlement

2   but we were not found guilty of anything.

3   Q.  But you agree with me, sir, that that settlement resulted

4   in restrictions to Major Energy's marketing practices, correct?

5   A.  There were no restrictions that held us back from doing any

6   marketing whatsoever.

7   Q.  So your testimony to this court is that there were no

8   restrictions in Pennsylvania that in any way impacted Major

9   Energy's marketing efforts; is that right?

10  A.  That impacted our marketing efforts?  Not that I recall.

11  Q.  James, can we pull up 1059.

12          All right, Mr. Wiederman, just to orient us in timing,

13  the voice recording we just heard was June 9, 2017, correct?

14  A.  OK.

15  Q.  And this is an August 11, 2016 press release, correct?

16  A.  Yes.

17  Q.  And this press release you will agree with me that from a

18  time standpoint occurred before your voice recording, correct?

19  A.  Yes.

20  Q.  And this press release is as of August 11, 2016, announcing

21  that the PUC orders $5.2 million in refunds and penalties

22  against Respond Power, accused of deceptive polar vortex

23  marketing and billing practices, correct?

24  A.  Yes.

25  Q.  And Respond Power is one of the three Major Energy

1    entities, correct?

2    A.  Yes.

3    Q.  And Respond Power is one of the entities that you and the

4    other sellers sold to National Gas & Electric that was later

5    dropped down to Spark, correct?

6    A.  Yes.

7    Q.  All right.  Now, Respond Power was part of Major Energy's

8    growth plan, right?

9    A.  Absolutely.

10   Q.  So if Respond Power was impacted by restrictions from the

11   Pennsylvania PUC to market in Pennsylvania the way that you

12   originally planned, that could have an impact on customer

13   count, correct?

14   A.  I'm not sure what restrictions you're referring to that

15   were put in place, and Respond Power -- we weren't just

16   licensed in the state of Pennsylvania.  We were licensed in

17   many, many different states, and we could have just pivoted to

18   another state and marketed in another state.

19        The polar vortex was an industry-wide thing.  This was

20   something that many, many companies went through and many

21   companies settled with, and this is something that, you know,

22   that was behind us and we were actually at the time of this

23   press release we were in growth mode, we were growing at the

24   time.

25   Q.  So, Mr. Wiederman, the reason why we're here now talking in

K347HOR2                         Weiderman - cross

1    this moment -- the moment I'm questioning you about, this PUC

2    ordered and settlement is that you just told the Court that

3    there were no restrictions on Major Energy's marketing at the

4    time when you sent your voice recording.  So we're now looking

5    at the restrictions.

6            James, if you can put up DX290.

7            what I'm showing you here, Mr. Wiederman, is the

8    settlement that was submitted for approval by Respond Power to

9    the Commonwealth of Pennsylvania Office of Consumer Advocate on

10   April 22, 2016.  Do you see that?

11   A.  I see that.

12   Q.  Now, you were the president of Respond Power at this time,

13   correct?

14   A.  Yes.

15   Q.  You were involved in this settlement, right?

16   A.  Yes.

17   Q.  In fact you testified in this proceeding, correct?

18   A.  I don't believe I did.

19   Q.  Do you recall Mr. Horowitz testifying in this proceeding?

20   A.  I'm not sure.

21   Q.  You do know that there were executives of Major Energy that

22   were required to testify before the PUC?

23   A.  I believe so.  I don't recall who testified at the meeting.

24   Q.  James, if we can go to page 21 and scroll down to

25   subsection C, paragraph 72, which is business modifications.

1              So just to speed it up here a little bit, Mr.

2    Wiederman, this is the business modification section of the

3    settlement agreement, and it we look at 72(a), you see there is

4    first restriction as to product offering, and it says Respond

5    Power will offer only fixed price contracts for a period of two

6    years beginning September 1, 2015.  Did I read that correctly?

7    A.  You did.

8    Q.  It says this restriction will not apply to Respond Power's

9    contracts with existing customers, correct?

10   A.  That is correct.

11   Q.  So what it impacted was future customers that Respond Power

12   could potentially market to, correct?

13   A.  Not at all.  In fact, we would have voluntarily been

14   selling fixed prices had they not put this in place.

15   Q.  Well, isn't it true, Mr. Wiederman, that when you put out

16   the presentation to potential buyers of Major Energy, one of

17   the things that that presentation featured was that Major

18   Energy's business was heavily weighted on the variable rate

19   book versus fixed rate book?

20   A.  The variable rate book was referring to the residential

21   accounts versus the commercial rate book, which is more fixed.

22   Q.  So let's just stick with residential for a moment.  You

23   will agree with me that variable rate residential contracts are

24   more profitable for Major Energy than fixed rate contracts,

25   correct?

K347HOR2                        Weiderman - cross

1    A.  Absolutely not.

2    Q.  You're saying absolutely not?

3    A.  Absolutely not, not at all.  On the contrary, I would beg

4    to differ.  When you can lock in your margins -- whatever

5    margins you want to set -- when you can lock that in and offer

6    it to that customer on a fixed rated contract, that customer is

7    less likely to leave and you locked in your margin, whatever

8    margin you want that to be.  So, like I said, had this

9    restriction not been in place, we would have voluntarily been

10   selling fixed priced contracts regardless.

11   Q.  So your testimony is had this restriction not been in

12   place, Major Energy would not have sold variable rate customers

13   in Pennsylvania?

14   A.  We were selling fixed rates in -- the short answer is yes,

15   but we were selling it in New York as well, and we didn't have

16   this restriction in place and we were selling fixed rate

17   contracts.

18   Q.  Well, Mr. Wiederman, let's go to the next paragraph, 73C,

19   and this is entitled marketing, correct?

20   A.  Yes.

21   Q.  Do you recall the settlement agreement specifically

22   including restrictions on how Major Energy could and could not

23   market in Pennsylvania?

24   A.  I am reading it now.

25   Q.  And specifically do you see -- it's responding, Respond

K347HOR2                          Weiderman - cross

1   Power, that its agents and representatives shall not make
2   misrepresentations to consumers, correct?
3   A.   That's what it says.
4   Q.   And that it shall not make representations either directly
5   or by implication about savings that consumers may realize,
6   correct?
7   A.   Yes.
8   Q.   And do you see D says shall refrain from using terms in
9   their marketing campaign, whether fixed or variable, such as
10  risk free, correct?
11  A.   I am a little lost there but OK.
12  Q.   And if we go through it, there is a lot of dos and don'ts
13  just generally that it has in here for marketing, correct?
14  A.   Nothing of this is prohibitive or onerous.  I mean this is
15  all standard marketing practices.
16  Q.   Well, the Pennsylvania PUC required Major Energy to set up
17  a compliance monitoring function and to appoint a chief
18  compliance officer that Major Energy had not previously had,
19  correct?
20  A.   Yeah, we did have a chief compliance officer; his title was
21  not chief compliance officer.
22  Q.   What was his title?
23  A.   I think he was legal counsel, inhouse counsel.
24  Q.   Are you talking about Trevor Stanley, who was one of Major
25  Energy's junior in-house counsel?

1    A.  Yes.

2    Q.  And he reported to Adam small, general counsel?

3    A.  Yes.

4    Q.  If we briefly, James, go to paragraph 78, and if we could

5    just look quickly at 78A.

6            So 78A required Respond Power to implement training

7    programs described in paragraph 76 and 77 above, and to also

8    create an in-house compliance department and a dedicated

9    door-to-door management team, correct?

10   A.  Yes.

11   Q.  And because of this order, you as the president were

12   involved in the creation of that team, right?

13   A.  Yes.

14   Q.  And that team had added costs that Major Energy had not

15   anticipated prior to this order, correct?

16   A.  No.

17   Q.  Is Heather McGuinness one of the people who was hired as

18   part of this order from the Pennsylvania Public Utility

19   Commission?

20   A.  I don't recall her being hired for this particular reason,

21   no.

22   Q.  Well, she is a witness who is going to be testifying in

23   this case.  Do you recall that she worked in Major Energy's

24   compliance department?

25   A.  I do.  Her name rings a bell.

K347HOR2                        Weiderman - cross

1   Q.   OK.  And just without belaboring the point, if we were to

2   go through this entire settlement agreement, you will agree

3   that there are several steps that Major Energy was required to

4   follow and routinely check back in with the PA Public Utility

5   Commission, correct?

6   A.   Yes, these are things that we would have been doing anyway.

7   I mean this is standard.

8   Q.   Just incidentally, Mr. Wiederman, to just back up in time

9   for a moment, we're obviously here because National Gas &

10  Electric purchased Major Energy, but before that happened the

11  sellers were directly negotiating with Spark on a potential

12  acquisition, correct?

13  A.   That is correct.

14  Q.   And Spark was a publicly traded company at that time,

15  correct?

16  A.   Yes.

17  Q.   There was no objection from any of the sellers to doing a

18  transaction with a publicly traded company at that time, right?

19  A.   That is correct.

20  Q.   And in fact Spark was not the only potential suitor that

21  Major Energy considered during that time period that was

22  publicly traded, correct?

23  A.   Correct.

24  Q.   Major Energy also looked at Prius, another publicly traded

25  company, as a possible suitor?

K347HOR2                    Weiderman – cross

1   A.  Other than Prius, I'm not sure who else you're referring

2   to, but, yes, Prius is one of them.

3   Q.  Prius.  Prius was a publically traded company at the time?

4   A.  Yes.

5   Q.  So there was no objection by you or Mr. Horowitz at that

6   time that we can't do business with a publicly traded company,

7   right?

8   A.  That we can't sell to a publicly traded company.

9   Q.  Thank you, Mr. Wiederman.

10          So, james, if we can now go just to finish out the

11  loop on the recording we just had.  Can you go, James, to

12  DX494.

13          Now, Mr. Wiederman, what we are showing you here, 494,

14  this is your associated chats that this voice recording was

15  sent as a part of.

16          James, if you could go down to Bates number M Sellers

17  8502, and if you could blow up the entry starting at 2:56 p.m.

18  And if we could go down to 3:41 p.m.

19          MR. MAROONEY:  Judge, the objection is that this is

20  not his dialog, from what I can tell from this screen.

21          MS. PECTOR:  Your Honor, this is who he is sending his

22  recordings to and having communications with.

23          THE WITNESS:  Am I on this communication?

24          MS. PECTOR:  Well, this file I can represent to the

25  Court that the audio file that has been transmitted, the first

K347HOR2                     Weiderman - cross

1    entry is what we just played for the Court.

2               MR. MAROONEY:  We can ask him who Mende and who Asher

3    Fried it.

4               MS. PECTOR:  We've already done that.

5               THE COURT:  Who is Mende?

6    Q.  Isn't Mende Mark Josefovic, who we previously talked about?

7               MR. MAROONEY:  In other words what we are looking at

8    here is not a dialog that involves the witness.  That is the

9    point.

10              THE COURT:  Right.  What do you intend to ask?  The

11   context of the recording?

12              MS. PECTOR:  I want to lay a foundation with this

13   witness with this e-mail because he had conversations with the

14   selling shareholders about this specific issue.

15              THE COURT:  I will allow it.

16   Q.  Mr. Wiederman, if I could direct your attention, here we

17   are on June 9, 2:56 p.m.  And if I could, Mr. Wiederman, just

18   orient the Court on the time line.

19              So we had other witnesses in this case, and do you

20   recall that in March of 2017 -- which would have been about

21   three months before this exchange -- the earnout statement was

22   sent from Spark to Major Energy March 27, 2017?  Do you recall

23   that?

24   A.  Yes.

25   Q.  And you recall Mr. Horowitz disagreed and sent back his

K347HOR2                         Weiderman - cross

1   calculation?

2   A.  I recall that, yes.

3   Q.  And you were the person who provided the spreadsheet for

4   Mr. Horowitz to send back to Spark during that timeframe?

5   A.  I vaguely recall that, yes.

6   Q.  And do you recall that during this time period between when

7   the earnout statement was sent in March and this June 9, 2017

8   date, Spark and Major Energy are still having negotiations back

9   and forth about the earnout amount for year one?

10  A.  At this time I don't think we were having conversations

11  about the structure; I think we were having conversations about

12  what the adjusted EBITDA customer count was.

13  Q.  You were having these conversations about the add backs, to

14  try and see if an agreement could be reached on what the

15  earnout amount would be, correct?

16  A.  I recall that, yes.

17  Q.  Those were negotiations that were going back and forth

18  between primarily at the ground level Mr. Sobel your CFO and

19  Tom Holloway your chief accounting officer of Spark, correct?

20  A.  Yes.

21  Q.  All right.  So those negotiations are still going on; this

22  is when this text message is sent.

23        So Asher Fried drops an F bomb to start the

24  conversation, correct?

25        MR. MAROONEY:  I would just also object to counsel

K347HOR2                        Weiderman - cross

1    testifying about this.  She can just ask the witness his

2    understanding.

3               THE COURT:  Fair enough.  Be careful with that.

4    Q.  So, Mr. Wiederman, we see Asher Fried start the

5    conversation, and then he states -- Mende -- who is Mr.

6    Josefovic -- responds, do you want to call Moshe and feel out

7    the situation?

8               Did I read that correctly?

9    A.  That's what it says.

10   Q.  And you're Moshe, correct?

11   A.  Yes.

12   Q.  He says, I feel like we aren't controlling anything here.

13   And then he says, next line, if we are losing $11 million from

14   sales because of diminished customer count, that means we are

15   losing tens of thousands of accounts.  Correct?

16   A.  Again, that's what it says.  This is Asher Fried and

17   Josefovic having a conversation.  I am not on this

18   conversation.

19   Q.  He then goes on to say, we are going to get in a spiral

20   down situation by raising rates to assure our earnout on

21   earnings.  Moshe doesn't care what I have to say.  He just "I

22   know and yes yes" me.  I honestly do not know how we can help

23   at all without a creative way of bringing in significant

24   accounts.  This is very bad.

25              And then Mende responds, do they realize that we are

1   at risk for 11 million out of the remaining 25 million or

2   that's your assessment.

3          Now, during this time period, Mr. Wiederman, you did

4   have conversations with Mark Josefovic, one of the minority

5   shareholders, where he was raising concerns about Major

6   Energy's ability to achieve its earnout targets, correct?

7   A.  Yeah, but I have no idea what this is.  I mean this is a

8   conversation between the two of them that I'm not on.  It's not

9   like in a group chat that I'm on, so I have no idea what this

10  is.

11  Q.  Understood, Mr. Wiederman, but what prompted this group

12  chat was your voice recording that we just listened to,

13  correct?

14  A.  I don't know that.  You need to ask Mende or Asher.

15  Q.  Let me ask you this.  Why did you send a voice recording to

16  Mr. Josefovic on June 9, 2017 telling him what's really, really

17  killing us is regulatory restrictions?

18  A.  Spark's regulatory restrictions on us, yes, indeed.  Sox

19  compliance, the quarterly earnings, the inability to do

20  aggregation, I mean there were so many things that we couldn't

21  do after the sale that we were able to do prior to the sale.

22  Q.  You didn't mention any of those things in your recording to

23  Mr. Josefovic, right?

24  A.  Sorry?

25  Q.  You didn't mention any of those things that you just said

K347HOR2                        Weiderman - cross

1    in your recording to Mr. Josefovic that we just listened to,

2    right?

3    A.   You heard it.  I did not get into back and forth with Mr.

4    Josefovic.

5    Q.   And you know that Spark is not a regulator, right?

6    A.   They have regulations.

7    Q.   Mr. Wiederman, you know that Spark's not a regulator.

8    A.   I'm not a lawyer, I'm a businessman.

9    Q.   Well, wait.  You are a businessman who headed up Major

10   Energy, and you can't testify for this court that Spark was not

11   a regulator in the industry?

12   A.   I think you're splitting hairs here, and you're getting

13   into the definition of what regulations are.  Spark has

14   regulations that we did not have as a private company.

15   Q.   But you were willing to enter into a sale with public

16   companies well before the transaction to NGE, correct?

17   A.   We would sell to anybody that would give us the right

18   amount of money.

19   Q.   So now after these chats, on June 7 at 2:56 p.m. Mr.

20   Josefovic forwarded a communication to you.

21            So, James, can you please pull up DX494F.

22            Now, this is a communication, Mr. Wiederman, that you

23   are on, same date, and in particular it says -- the reference

24   is Texas, because you were in Texas during that time period

25   negotiating or working with Spark, correct?

K347HOR2                          Weiderman - cross

1    A.  I guess I was in Texas at the time, yes.

2    Q.  And your response to the question -- sorry, what is --

3    A.  Any good luck in Texas.

4    Q.  I'm sorry?

5    A.  Any good luck in Texas.

6    Q.  Thank you.  And he is referring to good luck in your

7    discussions with Spark?

8    A.  I'm not really sure what he is referring to, but I assume I

9    didn't go to Texas for a rodeo, so --

10   Q.  It is, however, rodeo time in Texas.

11   A.  I assume so.

12   Q.  So, Mr. Wiederman, you respond back, LOL, no silence,

13   basically we went through 2017 and 2018.  The projections are

14   somewhat ugly, primarily because we are taking an 11 million

15   cut for customer count.

16            Did I read that correctly?

17   A.  That's what it says, yes.

18   Q.  So contemporaneously June 2017 what you were worried about

19   is the customer count being so significant that it would have

20   an 11 million impact on the earnout, right?

21   A.  I'm sorry.  If you don't mind, what was the date of this

22   conversation?

23   Q.  June 9, 2017.

24   A.  OK.

25   Q.  So, is it correct, Mr. Wiederman, that at this particular

1    point in time, June 9, 2017, while you're in negotiations with

2    Spark about the add back, you're privately telling Mr.

3    Josefovic that projections are ugly primarily because we're

4    taking an $11 million cut for customer count?

5    A.   Because that's what they were giving us was an $11 million

6    cut for customer count.  I'm not sure what you're referring to.

7    In 2016 we were still negotiating what the customer count was

8    for 2016.  I'm not sure what your question is.

9    Q.   Your testimony is that what you're referring to here is

10   your negotiations with Spark about customer count, not what is

11   happening in the market?

12   A.   No, let's start over.  Can you rephrase your question.

13   Q.   My question was on June 9, 2017, while you're separately

14   involved in negotiations with Spark over add backs, you're

15   privately telling Mr. Josefovic that you're worried about

16   projections for the coming year, they look somewhat ugly

17   primarily because you're taking an $11 million cut for customer

18   count.  Isn't that right?

19   A.   Yeah, that's absolutely right.  Like I said, we were having

20   a very hard time with the customer acquisition clause, and we

21   were having a very hard time getting vendors and marketers to

22   market for us.

23   Q.   You're saying that in June of 2017, when we just saw the

24   spend that was going on with PTM, that you were having a hard

25   time getting marketers to market for you?

K347HOR2                        Weiderman - cross

1    A.  That spend is not an astronomical spend compared to what we

2    were spending leading up to the sale.

3    Q.  Well, let me just ask you this.  Let's just take another

4    vendor, for example.  Would it be fair to say that one of the

5    vendors -- if we were to go back and look at Major Energy's

6    projections -- that Major Energy was counting on was 5Linx?  Do

7    you recall that vendor?

8    A.  I recall that being a vendor.

9    Q.  And do you recall that if we were to pull up the

10   projections right now, that Major Energy had forecasted out for

11   years during the earnout period that 5Linx would bring a

12   significant number of customers to Major Energy?

13   A.  Yeah, but if I may put that into context.  Major Energy had

14   many vendors that we can turn to.  We had many vendors that

15   have constantly reached out to us to market for us.  Never have

16   the projections or the way we would get to the ultimate end

17   game of the adjusted EBITDA and the customer count panned out

18   through the channels that we said we will, because it's just

19   the nature of the industry that vendors come and go.

20   Telemarketing companies come and go.  So it never ever in the

21   years that I have been in this business panned out with the

22   channels that I said this is how we're going to get there.  But

23   the bottom line is every single year leading up to the sale of

24   the company the customer count -- except for the polar vortex

25   which was an anomaly -- the customer count and the adjusted

K347HOR2                    Weiderman - cross

1   EBITDA we came pretty darn close.  But it might have taken a

2   different route to get there.

3   Q.  My question was about 5Linx, Mr. Wiederman, and 5Linx was

4   part of Major Energy's projected -- a source of projected

5   growth for the earnout period, correct?

6   A.  It was a vendor that we used as a plug that we hoped would

7   perform for us.

8   Q.  And you are aware that the reason why 5Linx couldn't

9   perform for you had nothing to do with NGE or Spark, right?

10  A.  5Linx in particular, yes.

11  Q.  And the reason why is because Major Energy and 5Linx got

12  into litigation with one another before the closing of the

13  transaction, right?

14  A.  No.  The reason was because 5Linx went out of business and

15  the three partners ended up in jail.

16  Q.  Do you not recollect, Mr. Wiederman, that there was

17  litigation between 5Linx and Major Energy where Mr. Dahan

18  represented Major Energy?

19  A.  Yeah, that had nothing to do with the marketing for us.

20  That was because of the loan that we gave them.

21  Q.  Is it your testimony that you were using 5Linx as a

22  marketer while you were in litigation with them?

23  A.  I don't recall the exact timing, but it was during that

24  time period that they went out of business and they were

25  indicted.

K347HOR2                      Weiderman - cross

1    Q.  James, can we pull up DX609.

2           So now just to get us back, we are right in the same

3    time period, here we are June 19, 2017, and do you remember

4    that Mr. Kroeker had sent a memo to Saul Horowitz with a copy

5    to you entitled Major Energy, and this was a discussion where

6    Mr. Kroeker was setting forth the add back responses of Spark

7    in continuation of the negotiation between the parties?

8    A.  OK.

9    Q.  Do you remember that going on?

10   A.  Vaguely.  Again, this is many years ago.

11   Q.  James, if we can go to page 3, specifically if we could go

12   to 5C.

13          Now, just to orient the Court, Mr. Wiederman, here we

14   are having a negotiation over the first year of the earnout

15   period, correct?

16   A.  Yes.

17   Q.  And this was a negotiation that was going back and forth

18   because Major Energy was trying to get certain add backs to

19   adjusted EBITDA, correct?

20   A.  Yes.

21   Q.  And one of the add backs that Major Energy was trying to

22   get specifically pertained to the 5Linx litigation matter,

23   correct?

24   A.  Yes, that's what it states here.

25   Q.  And that was the matter that King & Spalding was

K347HOR2                         Weiderman - cross

1    representing Major Energy on, correct?

2    A.  I believe so.

3    Q.  And so does that refresh your memory that at the time when

4    you're having this discussion, 5Linx was no longer a vendor for

5    Major Energy not because of anything that Spark or NGE did but

6    because Major Energy was in preexisting litigation?

7    A.  Like I said, they were no longer a vendor but it was not

8    because of the litigation; they were no longer in business.

9    Q.  And because they were no longer in business, that portion

10   of Major Energy's projections on its growth plan could not be

11   achieved, correct?

12   A.  No, absolutely not.  There were many other vendors that we

13   could have turned to to fill that gap.  Like I said, the road

14   to achieve the numbers could have taken many different paths

15   had we just been left alone to run the business.

16          THE COURT:  Let me know when you are at a good

17   breaking point.

18          MS. PECTOR:  We can break now.

19          THE COURT:  Let's take a ten minute break, and we will

20   continue.  We will be in recess for about ten minutes, by which

21   I mean 15 minutes.

22          (Recess)

23          (Continued on next page)

24

25

1          MS. PECTOR:  Your Honor, as a housekeeping matter, I

2    am reminded that I neglected to offer the objections to

3    Mr. Wiederman's witness statement at the beginning of this

4    examination, so would I be able to do that now?

5          THE COURT:  Sure.

6    Q.  Mr. Wiederman, are you ready to continue?

7    A.  Yes.

8    Q.  Mr. Wiederman, when we left, we were talking about the

9    tasks between you and the two minority sellers, Mr. Josefovic

10   and Mr. Fried.

11         MS. PECTOR:  And, James, if we can go back to 494, you

12   could pull up page 8577.  494.

13         MR. WATKINS:  Yes.  There is no 8577.

14         MS. PECTOR:  OK.  We'll go on to the next exhibit.

15   Q.  So we're talking about the chats, and those chats continue

16   on, on June 9, 2019 between you and Mister -- I'm sorry, '17, I

17   apologize -- so those chats continue on June 9, 2017.

18         MS. PECTOR:  James, if you could pull up DX 494H --

19   Q.  Which is your continued discussion with Mr. Josefovic.

20         Here we are, Mr. Wiederman.  This is part of the chain

21   of chats that we have just been discussing, same day, same

22   thread, and three hours later, Mr. Josefovic asks you a

23   question.  And specifically, if you go down, James, do you see

24   at 5:26 p.m. he asks you the question, in response to you

25   telling him that "we have a customer count problem and we're

1    going to lose $11 million," he asks the question, "Can we blame

2    any of this on Spark?"  Do you see this at 5:26 p.m.?

3    A.  I do.

4    Q.  And you immediately respond back to him, within seconds,

5    and you respond, "We definitely can, but it will be an uphill

6    battle.  But it may be worth a shot."  Is that right,

7    Mr. Wiederman?

8    A.  Yes.  I'd just like to refresh from before this break, and

9    looking at the next paragraph, if we can.

10   Q.  Well, the next paragraph says, "For a 13-15 million dollar

11   chop, I think it might be worth a million in legal fees and try

12   and settle."  Right?

13   A.  I think the context of this entire conversation that's

14   happening here was, at this time, we were negotiating a

15   possible buyout with Spark, and I think that was a conversation

16   that I was having in Texas at that time.  So when he's saying

17   here, when he's asking, like how did you do over there or

18   whatever it was, so the 13, 15 million was, I believe, the

19   offer that was given at the time.  We had, we had two offers on

20   the table.  I don't remember exactly the timing of that.  One

21   was a $25 million buyout, at some point in 2016, and then there

22   was a $13 million buyout offered sometime in 2017.

23        This might be around that time, of the $13 million

24   buyout of the offer in 2017.  And I think the explanation for

25   that was because we got paid -- this was after we got paid one

1    year.  In 2016 we didn't get paid anything.  At this point we

2    got paid one year already.  So we were entertaining a $13

3    million buyout versus 25, which was the year prior.  And that

4    was the $11 million difference that was referred to earlier.

5           I think I'm --

6    Q.  Mr. Wiederman, do you think you're guessing about the time

7    frame right now?

8    A.  I think I'm understanding now this conversation.

9    Q.  And do you realize, Mr. Wiederman, that on June 9, 2017, in

10   fact what you're doing as we saw from the prior chats is,

11   you're sitting down and having projection discussions with

12   Mr. Kroeker, which is what the prior text did.  Do you see

13   that?

14          MR. MAROONEY:  Objection, argumentative,

15   mischaracterizes the evidence.

16          THE COURT:  You can answer if you understand it.

17          THE WITNESS:  L.

18   A.  I don't understand the question.

19   Q.  Well, Mr. Wiederman, in June of 2017 --

20   A.  Right.

21   Q.  -- you don't have any personal knowledge or a document that

22   you can point to that there were any early buyout discussions

23   going on that you were participating in in June 2017.  Correct?

24   A.  I am saying that --

25   Q.  Just yes or no, Mr. Wiederman.

K34AHOR3ps                    Wiederman - Cross

A.  Do I have something read?  No.  But I recall that sometime
in around 2017, we were discussing a $13 million buyout, and
there are plenty of documents around that.

Q.  Why would you be discussing a $13 million buyout in June of
2017, according to your testimony, when the records in this
case are showing that, in June of 2017, what's happening
between the parties is that they're negotiating about addbacks.
We just looked at a document showing that, didn't we,
Mr. Wiederman?

            MR. MAROONEY:  Objection, argumentative.

            THE COURT:  Sustained.

            MS. PECTOR:  I can move on to another topic.

            THE COURT:  Try not to be argumentative with the long
questions.

            MS. PECTOR:  Yes, your Honor.

Q.  Mr. Wiederman, are you familiar with the fact that there
were some New York regulatory problems in 2017?

A.  Statewide regulatory problems?

Q.  Any New York regulatory problems.

A.  There were some concerns around New York PSC initiatives
that they were taking, yes.

Q.  As the president of Major Energy, Mr. Wiederman, were you
aware that on February 23, 2016, the New York State Public
Service Commission issued a resetting order that sought to put
limitations on variable rate products in New York?

K34AHOR3ps                    Wiederman - Cross

1    A.  I'm sorry.  Your first question said '17.  Now this is '16

2    you're referring to.

3    Q.  Yes.  I'm asking you, are you aware on February 23, 2016 --

4    A.  Yes.

5    Q.  OK.  And you're aware that that order created some

6    regulatory financial risks for Major?

7    A.  Uncertainty is what I recall.

8    Q.  And was it that uncertainty that led to the change in

9    structure of the earnout agreement with National Gas &

10   Electric, correct?

11   A.  Yes.

12   Q.  And the change in earnout structure that happened was,

13   because of the regulatory risk in New York, the amount of the

14   contingent payment portion of the deal became higher and the

15   purchase price cash became lower, correct?

16   A.  Yes.  I'm sure they added the cash at this point.

17   Q.  And that was because NGE felt that if it was going to move

18   forward with the deal with Major Energy, there needed to be a

19   risk sharing between the two parties, correct?

20   A.  They were more concerned about it than we were, so they

21   felt that this is a way to keep and honor the purchase price of

22   $80 million with sharing the risks.

23   Q.  Do you remember personally, Mr. Wiederman, having concerns

24   when the New York resetting order first came out?

25   A.  Concerns, I was -- you know, it's, obviously it's a

K34AHOR3ps                    Wiederman - Cross

1    concern, but I wasn't overly worried about it, no.

2    Q.  OK.

3          MS. PECTOR:  James, can we pull up DX 349.

4    Q.  OK.  Mr. Wiederman, after the resetting order was issued in

5    February of 2016, you remember there being a second order that

6    affected low-income customers on July 18, 2016?

7    A.  Yes.

8    Q.  And in this particular e-mail, it's an article, "Update:

9    New York ESCOs must drop existing low-income customers to

10   default service at end of contract term," correct?

11   A.  That is correct.

12   Q.  And that order had an impact on Major, correct?

13   A.  Very, very minimal.

14   Q.  It did have some impact, correct?

15   A.  It had a very minimal impact.

16   Q.  On July 18, 2016, do you see that Mr. Josefovic is sending

17   you an e-mail communication with a copy to Mr. Horowitz,

18   Mr. Bauman, and Asher Fried?

19   A.  Yes.

20   Q.  And just to orient the Court, is Mr. Bauman the third final

21   minority selling shareholder?

22   A.  Here.

23   Q.  And here Mr. Josefovic is asking the question, "Is this a

24   huge issue?"  Right?

25   A.  Yes.

K34AHOR3ps                       Wiederman - Cross

Q.  And let's scroll down, James.  What is Mr. Horowitz's

response?

        He says a few minutes later, "Potentially."  Right?

A.  Yes.

Q.  And you're copied on that e-mail at this time, correct?

A.  Yes.

Q.  And then if we scroll up, there is a question, back to

Mr. Horowitz, "Have we heard anything from Spark regarding

this?"  Right?

A.  Yes.

Q.  Now, at this point in time -- we're July 18, 2016, and the

dropdown hasn't occurred to Spark, right?

A.  The dropdown per se has not officially occurred, but then

the interference has occurred.

Q.  Well, I'm not asking about the alleged interference,

Mr. Wiederman.  I'm asking about the dropdown.  And you'll

agree with me that, at the time Mr. Horowitz sends this

e-mail -- I'm sorry -- that Mr. Fried sends this e-mail --

A.  OK.

Q.  -- even the selling, the minority selling shareholders,

know that there's going to be a dropdown from Spark, correct?

A.  I don't know.  You have to ask Mr. Horowitz what he meant

by "have we heard anything from Spark regarding this."  But

during this time period we were dealing with Spark people the

entire time, so --

K34AHOR3ps                    Wiederman - Cross

1   Q.  Right.  You were even dealing with Spark people back in

2   February of '16 when they were coming up to help with due

3   diligence, right?

4   A.  No.  I had --

5   Q.  You don't recall this letter coming up to Major Energy's

6   offices?

7   A.  I don't, no.

8   Q.  Well, let's look at what was happening during that same

9   time frame.  Do you remember Mr. Josefovic raising additional

10  concerns to you?

11          Do you remember if Mr. Josefovic raised any additional

12  concerns to you?

13  A.  "Additional" as in additional what?

14  Q.  Concerns about what's going to happen to the Major Energy

15  business in light of --

16  A.  Of the low-income?

17  Q.  Or the New York resetting order.

18  A.  I mean, the low-income order was, I knew right away, a

19  non-issue, because a lot of customers were on fixed rates

20  through mid 2018.

21  Q.  They were on -- sorry.

22  A.  So they were able to ride out the contract.  So it was

23  really minimal.  And when I say "really minimal," I mean not

24  anything of any impact whatsoever.  And I'm not sure what else

25  Mr. Josefovic asked.

1  Q.  Mr. Wiederman, you were aware that Major Energy, by that

2  point, had already changed its business model in New York,

3  moved away from variable rates customers and transitioned to

4  the fixed rate customers in light of the initial resetting

5  order, correct?

6  A.  Right.  And we stand by that decision.

7  Q.  And that wasn't something that you disclosed to NGE before

8  closing, right?

9  A.  That's incorrect.

10  Q.  Mr. Wiederman, let's look at DX 250.  Now, Mr. Wiederman,

11  this is, to reorient you, we're in March 15th, 2016.  You're

12  responding to a communication from Mark Josefovic with a copy

13  to Asher Fried and Michael Bauman.

14       MS. PECTOR:  And, James, if we could go to the 11:18

15  entry on the first page.  And if we could go to the question

16  where before Mr. Wiederman responds.

17  Q.  Mr. Josefovic is asking you a question, "Are you satisfied

18  with these valuations?  I don't see how we don't raise hell on

19  this.  I honestly believe we never structured gas and electric

20  properly all these years and this is just embarrassing.  We

21  can't accept this."  Did I read that right, Mr. Wiederman?

22  A.  You did.

23  Q.  OK.  Now, that is the minority selling shareholders

24  expressing their disagreement or frustration about the

25  valuation of the Major Energy business before sale, correct?

K34AHOR3ps                    Wiederman - Cross

1   A.   No.

2   Q.   The valuation of their portion of the interest in Major

3   Energy, correct?

4   A.   No.   If you see, there is somebody missing off this e-mail,

5   amongst all the sellers, and that's Mr. Horowitz.  And the

6   reason for that is because Major Energy was comprised of an

7   electric company and a gas company, your Honor, and

8   Mr. Horowitz had more shares in the electric company than he

9   did in the gas company.  So obviously the other four sellers

10   wanted it to be more heavily weighed towards the gas company

11   because we have more shares in gas than we did in electric.

12   And Mr. Horowitz wanted it more weighed towards the electric

13   company than the gas company.  So Mr. Josefovic here is asking

14   me if I'm satisfied with the valuations on how we structured

15   it, which I believe ended up being like 64 percent electric,

16   34 -- 64/36, some -- 65/35, somewhere around there.  And if you

17   want to continue, I could just go with my response.

18   Q.   Let's look at your response, what your response,

19   Mr. Wiederman, was to Mr. Josefovic raising that concern.  On

20   March 15, 2016, at 11:18 p.m., you respond, "Am I satisfied?

21   No.  I agree that it was never structured properly from the

22   beginning.  I hate it as much as you do.  However, the numbers

23   really do speak for themselves, especially now with New York

24   potentially killing the gas market completely.  It's

25   sickening."

K34AHOR3ps                    Wiederman – Cross

1        Were those your words, Mr. Wiederman?

2   A.   That's exactly why we did not have an arrangement against

3   Mr. Horowitz on why that company should be weighed more towards

4   the gas side than the electric side.  This has nothing to do

5   with Major Energy as a whole.  This is strictly on how the

6   company should be looked at to -- should it be weighed 50/50 or

7   should it be skewed more to a gas company than an electric

8   company.  That's what this conversation is about.

9   Q.   Mr. Wiederman, my question to you, sir, is about what your

10  state of mind is in relation to what's happening in the New

11  York environment.  OK?

12  A.   OK.

13  Q.   Is it true, Mr. Wiederman, are you making a truthful

14  statement, when you sent this to Mr. Josefovic at 11:18 on

15  March 15, 2016, pre closing, that "it's sickening, especially

16  now with New York potentially killing the gas markets

17  completely"?  That was a truthful statement when you made it,

18  right?

19  A.   The sickening part is not that they're going to kill the

20  gas market.  The sickening part is that we have no leverage

21  against Mr. Horowitz to try to get it to be 50/50.  That's what

22  they wanted, that's what I wanted, and that was the sickening

23  part, that we had no leverage.  That's what's sickening.

24  Q.   Are you telling this Court that all the selling

25  shareholders, the minority selling shareholders and you at this

1   point, were upset with Mr. Horowitz because you felt he was

2   being greedy and taking more of a share?

3   A.  No, we weren't upset.  We wanted a fairer split between the

4   gas and electric.  It's not personal.

5   Q.  Well, let's look at what Mr. Alper said on the same day.

6           MS. PECTOR:  James, let's pull up DX 872.

7   Q.  We're on the exact dame day, Mr. Wiederman.  We're now

8   looking at a communication from Dan Alper.  Again, he's the CEO

9   of Major Energy, correct?

10  A.  Yes.

11  Q.  And here, Mr. Alper is responding later in the day, 10:46

12  p.m.  "This week's negotiations were around three issues:

13  number one, getting the best possible deal with the most

14  upfront amount based upon the horrible New York environment and

15  potential fallout in the other states."  Did I read that

16  correctly, Mr. Wiederman?

17  A.  Yes.

18  Q.  All right.  So you don't deny, Mr. Wiederman, that at this

19  point in time, the selling shareholders were concerned about

20  how the developments in New York might impact performance in an

21  earnout situation, correct?

22  A.  You would need to ask Mr. Alper about this.  Again, my

23  personal opinion is, I wasn't overly concerned about the New

24  York environment at the time.  But this -- he was sending this

25  to the other sellers and explaining to them why -- I mean, you

1    would have to ask him what he's trying to explain.  Could be

2    he -- if this is the same date as you said, then it could be

3    he's dealing with the gas/electric issue.

4    Q.  But you're copied on this communication received from him,

5    correct, Mr. Wiederman?

6    A.  Yes.

7    Q.  All right.  If we just -- let me just step back and ask you

8    a question.  At this point in time, March 15, 2016, you would

9    agree that certainly you knew that Mr. Alper was talking to

10   Spark about potential negotiations at the time, correct?

11   A.  Spark?

12   Q.  Yes.

13   A.  No.  NGE.

14          MS. PECTOR:  James, if we can scroll down to later in

15   the e-mail, to March 15, 2016 at 11 p.m.  7:11 p.m.  I'm sorry.

16   Q.  All right.  So this is earlier in that same exact chain,

17   Mr. Wiederman.  Here we have Dan Alper writing to you and the

18   others, "Will send a more comprehensive e-mail with that later.

19   Going out to dinner now with the Spark guys."  Did I read that

20   correctly?

21   A.  That's what it says.

22   Q.  Now, if you scroll up a little bit, James, this was on a

23   chain that then gets forwarded to you.  Do you see on March 15,

24   2016, Mark Josefovic is responding.  And there you are,

25   Mr. Wiederman, on this e-mail chain.  Correct?

1    A.  Yes.

2    Q.  So you knew, as of March 15, 2016, which was before the

3    closing with NGE, that Mr. Alper was meeting with Spark.

4    Right?

5    A.  Again, that was his e-mail.  I don't know if he met with

6    Spark.  I don't know who he met with.  I, I don't know.

7    Q.  Do you have a recollection, Mr. Wiederman, about why Major

8    Energy decided to move forward with the sale to NGE even though

9    the contingent payment changed and the structure became more

10   weighted to where the contingent payment was higher and the

11   cash payment was lower?

12   A.  Because I felt confident that if we were to continue

13   running the company the way it's been run up until that point

14   we would have hit those numbers and exceeded those numbers.

15   That's why we even put together an executive earnout agreement

16   where, if we exceed those numbers, we'll be rewarded for that.

17   I felt extremely confident of those numbers.

18         And, you know, why would I put together something that

19   is just going to ultimately be shot at?  It's just going to

20   hurt me.

21   Q.  Well, because, Mr. Wiederman, at the time, you were having

22   direct discussions with your investment banker, Cliff Adams,

23   about, are we going to be able to get another deal that's

24   better in the future if we don't take this deal right now based

25   on what's going on in New York?  Correct?

1    A.  I don't know if I was having that deal -- that

2    conversation.  Cliff Adams was a longterm friend of

3    Mr. Horowitz, and this was something that he -- he had been

4    doing this for a few years for us, you know, just had his ear

5    to the ground and looking for opportunity.

6    Q.  Well, do you remember, as selling shareholders'

7    representative, one of Mr. Horowitz's responsibilities was to

8    keep the selling shareholders apprised of the benefits and

9    risks of a potential transaction?

10   A.  That's any, you know, partnership responsibility.

11   Q.  And do you agree that Mr. Horowitz had a duty to you and

12   the other selling shareholders to pass on advice that Mr. Adams

13   was giving to him about the transaction?

14   A.  You could ask Mr. Horowitz that.  I mean --

15   Q.  I'm asking you, sir.

16   A.  It's, it's -- it's an opinion of an investment banker.  I

17   don't know if your -- you --

18   Q.  I'm not asking about the investment banker.  I'm asking

19   you, did you expect Mr. Horowitz, who is your sellers'

20   representative, to disclose to you communications that he was

21   having with Cliff Adams, about should this deal be done or not?

22   A.  If he felt it was important enough, then yes.  Not

23   necessarily.  It's one man's opinion.

24   Q.  You were closely involved in the transaction, correct,

25   Mr. Wiederman?

1    A.  Yes.

2    Q.  You were involved in the negotiations of the agreements,

3    correct?

4    A.  Particularly the earnout agreement, yes.

5    Q.  You read the earnout agreement from front to back before

6    you signed it, correct?

7    A.  No.  I was more focused on the spreadsheet.  Like I said,

8    I'm not a lawyer.

9    Q.  If you had a change you wanted to make to the earnout

10   agreement before you executed it, you could have done that,

11   right, Mr. Wiederman?

12   A.  I had the opportunity to, but like I said, I'm not a

13   lawyer, I was focused on the spreadsheets.

14   Q.  You deferred that to Mr. Horowitz?

15   A.  I had three lawyers in the room that had confidence in it.

16   Q.  Well, let's look at what the state of mind was of the

17   sellers, why this sale happened.

18         MS. PECTOR:  James, if we can pull up DX 612.

19   Q.  All right.  Now, just to orient you, at the top, this is an

20   e-mail that Mr. Horowitz is sending to you, Levy Moeller,

21   and -- it's just you and Levy Moeller on June 19, 2017.  Do you

22   see that?

23   A.  Mm-hmm.

24   Q.  And you see he says, "Remember this, why we sold in the

25   end.  We were all feeling like this back then."  Did I read it

1   correctly?

2   A.   That is what he said.

3   Q.   So now let's look at how you and all the other sellers were

4   feeling back then.  So now the e-mail is from Cliff Adams to

5   Saul Horowitz on March 15, 2016 at 4:02 p.m.  And this is his

6   response to Mr. Horowitz's question of, what do you think of

7   the deal.  Right.  So let's start at the top.  Mr. Adams says,

8   "It's a difficult time to do a deal, and I think it is probably

9   market for now for a cash acquisition of a company with a large

10   footprint in New York, where there is a lot of uncertainty."

11   Let me stop there.  You would agree, Mr. Wiederman, that Major

12   Energy had a large footprint in New York in March of 2016,

13   correct?

14   A.   Yes, we did.

15   Q.   You'll also agree with me that in March of 2016, when this

16   deal was being done, there was uncertainty in the New York

17   market, correct?

18   A.   There was some, yeah.  I wasn't concerned, though.

19   Q.   You'll also agree that at this point in time Major Energy

20   had plans to move into other states but Major Energy was not in

21   all those states that had it plans to move into at that time,

22   correct?

23   A.   We were in approximately, close to ten other states at the

24   time.

25   Q.   And there were other states that Major Energy was planning

1   to go into, like Ohio, Maine, D.C., that Major Energy was not

2   in yet at the time, correct?

3   A.   I don't recall, but I believe we were in Ohio at the time.

4   I'm not -- I may be mistaken.  I don't remember the timing on

5   that.  But we were in plenty of other states at the time.

6   Q.   OK.  We'll continue on in the e-mail, Mr. Wiederman.  So

7   then Mr. Adams goes on to say, "It is still greater than 280

8   per customer guaranteed, which seems fair, especially with a

9   large number of customers in New York.  (If you assume that New

10  York customers have diminished value at $100 per customer, this

11  gets you to over 400 customers for the non New York.)  And

12  upside to that with the earnout."  Did I read that correctly?

13  A.   Yes.

14  Q.   He then goes on to say, if we can go down to the third

15  paragraph starting with "on the downside" -- I'm sorry.  One

16  paragraph above it.  He says, "So I don't think you are giving

17  up too much on the upside, other than it may be more difficult

18  for you to achieve your planned growth with limited

19  opportunities to market in New York."  Did I read that

20  correctly?

21  A.   Yes.  If this were to pass.

22  Q.   The thought process at the time when this deal was being

23  negotiated was that if the regulatory restrictions in New York

24  continued and other states followed suit, that could impact

25  Major Energy's ability to achieve its targets.

1    A.  That is what Cliff Adams was thinking if this were to pass.

2    Q.  He then goes on to say, "On the downside, the deal gives

3    you protection.  A scenario where the business retreats to $15

4    million or less, where a $45 million sale is where you would

5    come out if you were at steady state, is unfortunately possible

6    if the New York State regulators prevail, especially so if

7    their thinking spreads to MA and PA."  Correct?

8    A.  It says what it says.

9    Q.  And we've already obviously looked at the regulatory issues

10   that spread to Pennsylvania, correct?

11   A.  No, I did not anticipate regulatory issues in Pennsylvania.

12   And nothing prevailed in MA or New York.  So the none of this

13   of ever materialized.

14   Q.  He goes on to say, Mr. Wiederman, "If it was up to me, I

15   would probably sell, as it is a material amount of money to

16   each owner at closing even net of capital gains tax, and I

17   don't where the Northeast market might go if New York State

18   prevails.  Things could get a lot of worse, as there is just

19   not enough consumer value created by retail energy today,

20   particularly in these deregulated markets (which is all of your

21   markets).  And if New York can be played profitably or I can

22   successfully shift my marketing spend negatively into other

23   markets, I can still do as well as I might have done without

24   the New York market turmoil."  Did I read that correctly?

25   A.  This is all hypothetical.  Yes, you read it correctly.

K34AHOR3ps                    Wiederman - Cross

1   Q.  But, Mr. Wiederman, what's not hypothetical is that one of

2   Major Energy's plans for growth was Illinois, correct?

3   A.  It was all our states.

4   Q.  But I want to stick with Illinois for a moment.  Is it

5   true, sir, that one of --

6   A.  With a license in Illinois, then Illinois was one of our

7   plans for growth.

8   Q.  And Major Energy planned to grow in that market, correct?

9   A.  Again, it's -- any state that we were licensed in, that's

10  where we would like to grow.  Where we can get vendor, if we

11  can get a vendor in that state, we'll grow in that state.  If

12  we can get a vendor in Massachusetts, we'll grow in

13  Massachusetts.

14  Q.  Mr. Wiederman, isn't it true that, during the course of the

15  earnout period, Major Energy stopped marketing in Illinois

16  because Major Energy became the subject of an investigation by

17  the Illinois AG's Office?

18  A.  We pulled out of Illinois for a few months.  Illinois was a

19  very small state of ours.  I don't think we ever exceeded 7,000

20  customers, so that would maybe be less than 5 percent of our

21  customer base.  And we shifted to another state, just to let

22  the dust settle.  We've done that many times.  Just, you move

23  teams around and take a team from Pennsylvania and move it to

24  New Jersey, or take a team from New Jersey and move it to New

25  York.  Illinois was, was like that adopted child state where

1    there was really -- it's kind of like in the Midwest and there

2    was really nothing around where you could, you know, do

3    anything, so we were like, you know what, it's a -- it's also

4    one of -- a one-commodity state that we were in.

5           What I mean by that, your Honor, is that we've only

6    signed electric there and not gas.  So when you knock on a

7    door, you want to have the opportunity to sell both, gas and

8    electric, so you can maximalize your profits.  So being that it

9    was a one-commodity state, we didn't feel like we were really

10   maximizing our profits, so we just felt that we should go to --

11   move out, shift to a dual-commodity state and then continue

12   marketing.

13   Q.  Mr. Wiederman, when Major Energy stopped marketing in

14   Illinois, that became a state in which Major Energy's

15   projections were not realized, correct?

16   A.  No, not necessarily.  That's not -- the subject wasn't that

17   one state.  Like I said, we were licensed in many states.

18   Q.  Any question was --

19   A.  Major's overall projections is, let's say it's 20 million,

20   it could be -- the projections may say 8 million from one and 3

21   million from the other, and it might turn out to be 7 and 4.

22   It's always a constantly moving target.

23   Q.  Mr. Wiederman, my question to you was, you know that when

24   Major Energy stopped marketing in Illinois, the projections

25   that Major Energy had in Illinois, as part of its growth plan,

K34AHOR3ps                    Wiederman - Cross

1    were not realized.  Correct?

2    A.  In the Illinois P&L specific?

3    Q.  I'm talking about the projections that you had of Illinois

4    customers you were expecting as part of Major Energy's growth.

5    That didn't occur once marketing stopped, correct?

6    A.  In Illinois, right, didn't occur.  But it could have picked

7    up in another state.  We've been doing this for ten years.  It

8    happens all the time.  It's just the nature of the industry.

9    Q.  Well, what happened in Illinois in particular,

10   Mr. Wiederman, was that the Illinois AG's Office started

11   investigating Major Energy, correct?

12   A.  They jumped on the polar vortex bandwagon.

13   Q.  They started investigating Major Energy, correct?

14   A.  Yes.  Like many others in the industry, due to the polar

15   vortex.

16   Q.  Now, Mr. Wiederman, Major Energy received an indemnity

17   demand from NGE in connection with a lawsuit that was filed by

18   the AG's Office against Major Energy, correct?

19   A.  OK.

20        MS. PECTOR:  All right.  We can pull up DX 700,

21   please, Jim.

22   Q.  All right.  So now DX 700 is Major Energy first finding out

23   that a complaint was filed against it.  And if I could

24   specifically turn your attention to the e-mail from Trevor

25   Stanley that was forwarded on to you.  This is an April 9, 2018

1   e-mail.  Do you see that, Mr. Wiederman?

2   A.  It wasn't forwarded to me.

3   Q.  Well, if you look up at the top of the e-mail, do you see

4   you're responding to it because it was forwarded to you from

5   Levi Moeller?  Are you with me?

6   A.  Yes.

7   Q.  Let's look at Mr. Stanley's initial e-mail on April 9,

8   2018.  He says to Levy Moeller -- and just to orient the Court,

9   Levy Moeller was the chief operating officer for Major Energy

10  at the time, correct?

11  A.  Yes.

12  Q.  And he says -- and Trevor Stanley was the junior in-house

13  counsel for Major Energy, right?

14  A.  I think by that time he might have been the chief

15  compliance officer.

16  Q.  OK.  Because of the DH.  Correct?

17  A.  Probably.

18  Q.  All right.  So he says, "Hello Levi:  Not sure if you have

19  seen this yet, but please see the attached complaint filed this

20  morning by the Illinois AG.  This appears to hold some," all

21  caps, "very serious problems for us and Spark.  I was contacted

22  this morning by a reporter seeking comment."  Did I read that

23  correctly?

24  A.  I'm all set.

25  Q.  OK.  So, Mr. Wiederman, does that refresh your memory that

K34AHOR3ps                    Wiederman - Cross

1   as of April 2018, a lawsuit had been filed against Major Energy

2   by the Illinois AG's Office over marketing practices, in

3   particular that the Illinois AG's Office alleged were

4   deceptive?

5   A.  Yes.  We had already settled the Illinois ICC prior to

6   this.  So this is just the --

7   Q.  This was a different issue, right, Mr. Wiederman?

8   A.  No.  It was pretty much the same issue as the ICC,

9   emanating from the polar vortex.

10  Q.  Mr. Wiederman, you knew that the complaint was not filed by

11  the ICC; it was filed by the Illinois AG's Office, correct?

12  A.  I understand.  All I'm saying is that we had already

13  settled with the state, the Illinois ICC.

14  Q.  And do you recall that part of the decision that Major

15  Energy had to make as a result of the filing of this lawsuit

16  was whether Major should continue marketing in Illinois?

17  A.  OK.

18  Q.  And do you recall saying to the other executive members

19  that Major Energy had already stopped marketing in Illinois by

20  that time?

21  A.  I don't know.

22          MS. PECTOR:  If we could bring up DX 715.

23  Q.  All right.  So here, Mr. Wiederman, there is an exchange

24  about the lawsuit, but I just want to focus you on the top

25  communication, which is from you.  This is June 12, 2018, "in

1   response to a question of Mark Wiederman in Illinois."  Do you

2   say that you say, "We pretty much stopped marketing anyway.

3   However, why don't you go back with 350 and not even mention a

4   moratorium on marketing.  If you feel we need to say, then six

5   months."  I did read that correctly?

6   A.  Yes.

7   Q.  Was it truthful, when you sent this response back to Levy

8   Moeller and Mr. Horowitz, that you had pretty much stopped

9   marketing in Illinois?

10  A.  I guess so.

11  Q.  And is it also correct, or do you recall, Mr. Wiederman,

12  that, after the filing of this lawsuit, Major Energy received a

13  demand letter from NGE?

14  A.  I'm not sure.

15          MS. PECTOR:  Let's pull up, James, DX 711.

16  Q.  Now, DX 711 was an e-mail sent -- I'm sorry -- a letter

17  sent by National Gas & Electric to Saul Horowitz on May 30,

18  2018.  Do you see that the title is "Indemnification Notice to

19  Major Energy Electric Services," and the title of the lawsuit

20  was People of the State of Illinois v. Major Energy Electric

21  LLC in the Circuit Court of Cook County, Illinois?

22  A.  I see that.

23  Q.  And you were familiar with the fact that NGE had made a

24  demand for indemnity under the terms of the MIPA, correct?

25  A.  I don't know.  This was sent to Saul Horowitz.

K34AHOR3ps                    Wiederman - Cross

 1   Q.  Well, let's go down to the second paragraph -- or, I'm
 2   sorry, first paragraph, I'll start there, where it says, "NGE
 3   hereby provides written notice of indemnification to formally
 4   demand indemnification from Major from and against the lawsuit
 5   filed against MEES, styled People of the State of Illinois?
 6   Did I read that correctly?
 7   A.  Yes you did.
 8   Q.  Now, you were the president of Major at this time, correct?
 9   A.  Yes, I was.
10   Q.  And as the president of Major Energy, you became aware of
11   this demand, correct?
12   A.  Like I said, this was sent to Mr. Horowitz.  I don't know.
13   I was more focused on growing the company.
14   Q.  You were also focused on escrow money that had been put
15   into escrow based on the terms of the MIPA, correct?
16            MR. DAHAN:  Your Honor, this is one of the things we
17   raised as part of a motion in limine, just to remind the Court.
18   As the Court is aware, there was a separate escrow litigation
19   arbitration to resolve this pending, and the Southern District
20   action relating to the indemnification established the time
21   line of this, when the lawsuit was filed, when they knew about
22   it.  I get that.  But if we're going to go them trying to
23   litigate that indemnity case or relitigate the escrow case in
24   this case, it's a lot to cover on both of those.
25            MS. PECTOR:  Your Honor, I'm laying a foundation for

K34AHOR3ps                    Wiederman - Cross

1    what the president was doing at the time, during the timeout

2    period.  We're litigating the MIPA.  There is an indemnity

3    provision in the MIPA.  And earnout agreement, Section 2.3 of

4    the earnout agreement allows for an offset based on indemnity

5    circumstances.

6              THE COURT:  The general fact of the Illinois AG's

7    matter and how it affected the company during the earnout is

8    certainly relevant.

9              MR. DAHAN:  I have no issue with that.  It sounded

10   like we were getting into escrow and all other --

11             THE COURT:  I understand.  To the extent that's part

12   of the other matters, it may not be relevant, but to the extent

13   it overlaps with issues relating to the earnout, it may be

14   relevant.  So I am allowing it.

15             MS. PECTOR:  Thank you, your Honor.

16   Q.  So, Mr. Wiederman, as the president of Major Energy, you

17   knew during this time period that there was an escrow fund that

18   had been set up pursuant to the terms of the MIPA that would

19   provide for a pool of money in the event lawsuits came up like

20   the Major Energy -- the Illinois matter that the litigation

21   credit didn't cover, correct?

22   A.  There was an escrow fund set up, yes.

23   Q.  And that escrow fund was $2.25 million, correct?

24   A.  I believe so.

25   Q.  And it did come to your attention, didn't, Mr. Wiederman,

1    that ultimately a settlement was reached with the AG's Office

2    in Illinois?

3    A.   Recently, I believe.

4              MS. PECTOR:   James, can we pull up DX 1016.

5    Q.   What we're looking at here, Mr. Wiederman, is a final

6    judgment and consent decree that was entered into with the

7    People of the State of Illinois.   And in particular, if we just

8    jump to page 7 of this document, do you see that Major Energy

9    was ordered to refund $1,950,000 as part of the settlement?

10   A.   Yeah.   It's very easy to spend somebody else's money.   I

11   was not a part of the company at this time.   And neither were

12   any of the sellers.   And this money was sitting in escrow.   So,

13   you know, had I been a part of this company, we -- we settled

14   our first ICC complaint for, I believe it's in the range of

15   $300,000.   You know, being a public company, I'm sure they just

16   wanted to, you know, make this go away.   So it's -- you know,

17   it's easier to just take sellers' money and pay the AG office

18   than to pay somebody that you're in litigation with.

19   Q.   Mr. Wiederman, is it true that the sellers refused to

20   release the escrow funds to cover the settlements in the

21   Illinois lawsuit?

22             MR. MAROONEY:   Objection, your Honor.   Beyond the

23   scope.

24             THE COURT:   Overruled.

25   A.   Could you repeat the question?

K34AHOR3ps                    Wiederman – Cross

1    Q.  Yes.  Is it true that the sellers refused to release the

2    escrow funds to cover the indemnity obligation in the MIPA

3    related to the Illinois action?

4            MR. DAHAN:  Objection, your Honor, just to the phrase,

5    "indemnity obligation."

6    BY MS. PECTOR:

7    Q.  Indemnity provision.

8            THE COURT:  OK.  Fair enough.

9    A.  I wasn't involved in the escrow and what was released.

10   Again, I wasn't sellers' rep.  Really I don't play a role in

11   this at all.  I don't know what was done.

12           THE COURT:  Just so I'm clear, what's the date of the

13   settlement document, Ms. Pector?

14           MS. PECTOR:  Your Honor, the date of the settlement

15   was -- Jim, could you go to the end of the document.

16           THE COURT:  August 13, 2019?

17           MS. PECTOR:  Yes, your Honor.

18           THE COURT:  Thank you.

19           MS. PECTOR:  But I believe on the first page it was --

20   there we go.  If we go to the first page as well, there was a

21   reference that the finding -- the complaint was filed, as you

22   see, your Honor, on April 9, 2018 in the first paragraph.

23           THE COURT:  Yes.

24   BY MS. PECTOR:

25   Q.  And that's consistent with your recollection,

1   Mr. Wiederman?

2   A.  Yes.  And I was never given the opportunity to defend

3   ourselves against this complaint, and this is something that I

4   requested even while I was employed at Major Energy, to be able

5   to be involved in, and I was actually told not to come to the

6   meetings.  So --

7   Q.  Well, wait a minute, Mr. Wiederman.  Hold on.  You selected

8   the counsel that defended Major Energy in this matter, correct?

9   A.  Initially I did, yes.

10  Q.  And you were involved every step of the way in the defense

11  of this matter up until your termination, correct?

12  A.  Incorrect.

13  Q.  OK.  Well, let's look at DX 783.  Now, DX 783 is an e-mail

14  being sent to you by Adam Small, notifying you of an order

15  denying Major Energy's motion to dismiss.  Correct?

16  A.  Yes.

17  Q.  And this is only to you.  There is nobody else in this

18  e-mail.  Correct, Mr. Wiederman?

19  A.  Understood.

20  Q.  At this point in time, Mr. Small is telling you, "The judge

21  kicked us pretty bad.  It doesn't look like he's going to be

22  sympathetic to our side.  We need to talk about strategy

23  forward re settlement."  Does that refresh your memory that you

24  were involved?

25  A.  Like I said, I wasn't involved the entire way.  There was a

1   meeting that happened in the meeting of 2019 while I was still

2   president of Major Energy, and I was told by Spark's in-house

3   counsel -- I don't recall her name -- that there is a meeting

4   with the attorneys in Chicago or the attorney general, and that

5   I was not invited to be at that meeting.

6   Q.  Mr. Wiederman, you do know that a demand was made to Major

7   Energy to release the escrow funds after the settlement was

8   completed, correct?

9   A.  A demand was made to release escrow funds after the

10  settlement was completed, you're saying after August of 2019

11  there was a demand -- a -- not that I'm aware of.  But

12  obviously --

13  Q.  Do you recall as well, Mr. Wiederman, that you and the

14  other selling shareholders were given an opportunity to weigh

15  in on settlement?

16  A.  No.  I don't think we really had an opportunity to weigh

17  in.

18          MR. MAROONEY:  I -- well, I'll listen to the next

19  question.

20  A.  Like I said, you know, if, while I was employed at Major

21  Energy, I didn't have an opportunity to weigh in, I can't

22  imagine how much impact I could have had, or how much my

23  opinion would have mattered if I wasn't when I wasn't employed

24  at Major Energy.

25  Q.  Well, where you did have an opportunity to weigh in,

1    Mr. Wiederman, was whether escrow funds should have been

2    unilaterally withdrawn while you were president of Major

3    Energy, correct?

4              MR. MAROONEY:  Objection, your Honor.  Irrelevant.

5              THE COURT:  Overruled.

6    A.  I, I'm not sure what you're referring to.  If you could

7    rephrase the question?

8    Q.  Well, I'm referring to, you told us here today you were

9    president of Major Energy and had fiduciary duties in the

10   company, correct?

11             THE COURT:  Try and speak a little more slowly for the

12   court reporter.

13   Q.  You had a duty to do what was in the best interests of

14   Major Energy, correct?

15   A.  Yes.

16   Q.  Your first duty was not to extract money to satisfy an

17   indemnity obligation and put that money in your pocket, right?

18   A.  What does the escrow fund have to do with Major Energy?

19   Q.  Well, you were the president of Major Energy when escrow

20   funds were unilaterally withdrawn by Mr. Horowitz, correct?

21             MR. MAROONEY:  Objection.

22   A.  But escrow funds are between the sellers and NGE.  Where

23   does Major Energy fit into this escrow?

24   Q.  Mr. Wiederman, do you -- I'm sure you're aware that Major

25   Energy is now an entity that's owned by Spark pursuant to the

1    dropdown transaction, correct?

2    A.   OK.

3    Q.   And you are fully aware that NGE was the initial acquirer

4    of Major Energy from the sellers, including you, correct?

5    A.   Right.

6    Q.   And one of the promises that the sellers made to NGE as

7    part of that transaction was, if something happens that was on

8    our watch, we'll provide indemnity.  Do you recall that?

9    A.   OK .

10   Q.   And sellers did not fulfill that promise under the terms,

11   correct?

12   A.   I don't know.  Like I said, I don't recall being aware of

13   the indemnity claim.  This is sellers' rep territory.  And I

14   think you should discuss this with him.  I was focused on

15   growing Major Energy.

16   Q.   Do you recall there being an arbitration that you were

17   party to?

18   A.   I recall, yeah, there was an arbitration.

19   Q.   And do you recall that the arbitrator found that the

20   sellers --

21             MR. MAROONEY:  Objection, your Honor.

22   Q.   -- breached their obligation by unilaterally withdrawing

23   escrow funds?

24             MR. MAROONEY:  Objection.

25             THE COURT:  Overruled.

K34AHOR3ps                    Wiederman – Cross

1    A.  Whatever that ruling was, I don't know exactly what it was.

2    Q.  Well, let's look at it.

3            MS. PECTOR:  Can you put up DX 932.

4    Q.  So DX 932 was the final award of the arbitrator, and do you

5    see in the caption, Mr. Wiederman, that you were one of the

6    defendants in that action?

7    A.  Yes.

8    Q.  And do you recall, Mr. Wiederman, that the specific issue

9    that was addressed in the arbitration was in part a breach of

10   contract claim related to an escrow agreement that was

11   contemporaneously signed with the MIPA and earnout agreement

12   that we're litigating in this case?

13   A.  OK.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

K347HOR4                         Wiederman - cross

1    BY MS. PECTOR:

2    Q.  And you recall that then the sellers unilaterally withdrew

3    $2.2 million in escrow funds without notifying NGE or Spark

4    that a demand had been made to you and Mr. Horowitz to return

5    the money before arbitration?

6    A.  Like I said, this was something done by the sellers, and I

7    think you should take this up with the sellers' rep.  I wasn't

8    necessarily involved in this.  I was actually -- when it was

9    done I was traveling for business.  And, you know, this was

10   something done by the sellers' rep; I wasn't focused on escrow.

11   Q.  James, if we could briefly put up 1046.

12           You said this was done by the sellers' rep -- DX946 --

13   you say this was done by the sellers' rep, but you monetarily

14   benefited from the unilateral withdraw of the escrow funds,

15   correct, Mr. Wiederman?

16   A.  Well, by default, I'm the seller.

17   Q.  And so if we look at row 2, that's you Moshe Wiederman,

18   correct?

19   A.  That is me.

20   Q.  And when Mr. Horowitz unilaterally withdrew those escrow

21   funds, despite there being a demand for indemnity, the result

22   to you personally was that you received $279,339.70, correct?

23   A.  That is what it states, yes.

24   Q.  And that was money you accepted while you were the

25   president of Major Energy, right?

K347HOR4                    Wiederman - cross

1  A.  Should I have given it to charity?  What should I have

2  done?

3  Q.  You were ordered to return that money by the arbitrator,

4  weren't you, Mr. Wiederman?

5  A.  I was taking counsel's advice on what needs to be done.

6  I'm not sellers' rep.  I can't return that money.

7  Q.  Mr. Wiederman, did you not return that money pursuant to

8  the arbitrator's order?

9  A.  After we went through the process, the money was returned,

10  absolutely.

11  Q.  All right.  So now whether we went through the process --

12          If we can turn specifically, James, to page 5 of the

13  arbitrator's order, and blow up paragraph C.

14          One of the things in the process was that defendants

15  had argued, similar in this case, that the assignment of the

16  escrow agreements without the respondent's written consent was

17  a breach of the escrow agreement.  Do you recall that?

18  A.  Do I recall what?

19  Q.  That the sellers were suggesting that there was a breach of

20  the escrow agreement -- prior material breach of the escrow

21  agreement based on the dropdown of NGE to Spark?

22          MR. MAROONEY:  Objection.  Relevancy.

23  A.  OK.

24          THE COURT:  Overruled.  I'm going to reserve on the

25  objections relating to --

1   Q.  Now here, Mr. Wiederman, if we can read along, this was the

2   finding of the arbitrator in connection with that same

3   assignment argument that the sellers made then that they are

4   readvancing now -- I agree with claimants -- and you understood

5   that claimants was Spark and NGE in that case, right?

6   A.  Not necessarily, but OK.  Again, this is being handled by

7   sellers rep and counsel.

8   Q.  You were a defendant to this action, right, Mr. Wiederman?

9   A.  Yes.  And --

10  Q.  And if we can just continue on, Mr. Wiederman, the

11  arbitrator's finding was "I agree with claimant's argument that

12  the assignment of the escrow agreements without the

13  respondent's written consent is not a material breach of the

14  escrow agreement.  Respondents have not established by credible

15  evidence that the assignment to Spark harmed or otherwise

16  prejudiced the respondents or adversely affected their rights

17  to the escrow fund.  After the assignment, the respondents

18  continued to treat the escrow agreements as effective,

19  enforceable and not as void."

20          Did I read that correctly, Mr. Wiederman?

21  A.  Yes, you did.

22  Q.  And he goes on to say, "The sellers representative sent the

23  disbursement letter pursuant to the escrow agreement after the

24  assignment.  In addition, section 2.1(d) and section 7.1 in the

25  escrow agreement and section 7.8 in the escrow agreement are

1    not mutually dependent promises."

2              Now, in this case, Mr. Wiederman, the sellers are

3    arguing that the dropdown from NGE to Spark should be void; is

4    that correct?

5    A.   Absolutely.

6    Q.   Same argument that we saw in the arbitration, correct?

7    A.   Completely different arguments.

8    Q.   OK.  Well, let me just ask you this.  If a transaction is

9    void, in your mind does that mean that the seller should not

10   receive any benefit from that transaction?

11             MR. MAROONEY:  Objection, your Honor.

12             THE COURT:  Sustained.

13   Q.   Mr. Wiederman, as we sit here today, is it correct that

14   after the dropdown to Spark you as a seller continued to

15   receive money in terms of earnout payments from Spark?

16   A.   Minimal.

17   Q.   Well, actually the sellers were paid approximately $9

18   million in earnout payments between year one and year two,

19   correct?

20   A.   And three.

21   Q.   How much of the percentage of that pool belongs to you?

22   A.   I have myself, my trust, my kids' trust, my charitable

23   trust.  Approximately 18 percent.

24   Q.   So you have made millions of dollars from the earnout

25   payment, correct?

K347HOR4                     Wiederman - cross

1    A.  OK.

2    Q.  So you have kept that money and haven't returned it to

3    Spark, right, Mr. Wiederman?

4    A.  I worked ten years for that.

5    Q.  Mr. Wiederman, I'm just asking you did you keep the money

6    Spark paid you in connection with the earnout agreement after

7    the dropdown, yes or no, sir?

8    A.  The 9 million?

9    Q.  Your portion of the 9 million.

10   A.  Yeah.

11   Q.  And you still have that money today, correct?

12   A.  I don't know if that's relevant or not.

13   Q.  All right, we will move on, Mr. Wiederman.

14            So, let's talk now about your role as the president of

15   Major Energy.  And just to make one point clear, just to circle

16   back on that CAC point we were talking about, is it just true,

17   just for the record, Mr. Wiederman, that if CAC spending goes

18   down, adjusted EBITDA would have gone up for Major Energy

19   during the earnout period?

20   A.  It depends what you count on -- what you include in CAC,

21   but it depends if it's considered an add back or not.  I'm not

22   an accountant, but my understanding is that, yes, if you don't

23   spend money in our marketing then yes.

24   Q.  Do you remember telling me during your deposition that it

25   helped the sellers to not spend money on mass marketing because

1   that would help increase adjusted EBITDA?

2   A.  That was my understanding based on my conversation, as I

3   mentioned earlier, with Mr. Kroeker about maximizing EBITDA.

4   Q.  Well, you wanted to maximize EBITDA so you could maximize

5   the amount of the earnout that would be paid to the sellers,

6   correct?

7   A.  Well, preferably we would have rather had an opportunity to

8   acquire customers and maximize EBITDA, but being that the

9   customer is no longer relevant, maximizing EBITDA was the focus

10  at this point.

11  Q.  Do you recall us talking at your deposition about whether

12  or not the sellers wanted to continue with selling to customers

13  in 2018 -- continue with marketing efforts?

14  A.  We discussed that before.  Is that what you're referring

15  to?

16  Q.  But do you recall telling me -- well, I'll just read you

17  the question that I asked you in your deposition to refresh

18  your memory.  I asked you:

19  "Q. You didn't want to sell in 2018, correct?

20  "A. We didn't want to sell in the beginning of 2018.

21  "Q. This is an objection in August of 2018 to selling mass

22  marketing, correct"?

23  "A. "You know, at the time when we were making this objection,

24  if we were able to stop mass marketing and not acquire any

25  customers, that would inflate adjusted EBITDA?

K347HOR4                        Wiederman - cross

1    "Q. Correct?

2    "A. For the second time in the second half, yes."

3              Do you remember that?

4              MR. MAROONEY:  Can we just get a page number and

5    lines?

6              MS. PECTOR:  This is page 269, lines 5 through 18.

7    A.  I'm not exactly sure what you're referring to, but as I

8    clearly explained earlier, in the beginning of 2018 it takes

9    six months to profit from a customer, so if you acquire

10   customers in January, you will start making money in June; if

11   you acquired customers in June, you will start making money in

12   January.

13   Q.  Now, Mr. Wiederman, before we move on to entirely a new

14   subject, just to close out the New York regulatory issue, do

15   you recall that as a result of the low income order there was

16   some customer count loss to Major Energy that was reported by

17   Saul Taub?

18   A.  As I said, it was extremely minimal and it was in the last

19   year.  In fact I think it was in May of 2018.

20   Q.  You don't think that any customers were lost in '17?

21   A.  Maybe a few hundred?

22             THE COURT:  You said reported by what?

23             MS. PECTOR:  Saul Taub, T-a-u-b.

24   Q.  James, if we could pull up DX866.

25             All right.  Now, just to reoriented you here, Mr.

1   Wiederman, we are looking at an e-mail that Saul Taub sent --

2   if we start from the bottom -- on March 4, 2019 at 3:52 p.m.,

3   and the title is low income drops.  Do you see there is a chart

4   tracking low income drops for Major Energy?

5   A.  Yes.

6   Q.  Are you familiar with these types of charts?

7   A.  Yes.

8   Q.  If we just look at this chart, it's specific to low income

9   drops.  And do you see that in '17 there were at least 155

10  drops and that in '18 -- you can do the math -- but a couple

11  thousand drops?

12  A.  Yeah, that's exactly what I said, about a couple hundred in

13  2017.

14  Q.  So there was a direct impact based upon the low income

15  order to Major Energy, correct?

16  A.  Extremely minimal.  And if I could just elaborate a minute,

17  because the first quarter -- in this industry the first quarter

18  is your strongest quarter, your Honor, because January,

19  February and March are when it's wintertime and people use the

20  most gas and electric, so up until March, we had to drop these

21  customers, and if you drop a customer in March it takes 30 to

22  60 days for the customer to actually fall off.  So you're

23  talking about maybe 1500, or 1700 customers, 1600 customers,

24  out of when we sold the company 175,000 customers.  So, I would

25  call that very, very minimal to really no impact.

K347HOR4                       Wiederman - cross

1    Q.  But those customer counts directly impacted the earnout

2    calculation, correct?

3    A.  At this point, absolutely not.  Like I said, you know,

4    that's why we agreed to even stop marketing in January of 2018

5    because we were already behind the eight ball.

6    Q.  Let me make sure I'm not losing you, Mr. Wiederman.  Are

7    you suggesting that the customer count component of the earnout

8    calculation did not apply in the third year of the earnout?

9    A.  No, that's not what I said.

10   Q.  It did apply, right?

11   A.  It absolutely applied, but these 6,000 customers that are

12   here in this low income, the same way 50,000 customers wouldn't

13   have moved the needle in 2018, neither would these 6,000 have

14   moved the needle in 2018.

15   Q.  Let's move forward, speed up for the Court.  If we can

16   talk, Mr. Wiederman, about your employment as the president of

17   Major Energy.  Is it correct, Mr. Wiederman, that prior to

18   becoming the president of Major Energy you did not hold any

19   prior roles as president?

20   A.  Correct.

21   Q.  No prior experience as a CFO?

22   A.  Correct.

23   Q.  No prior experience as a CAO, chief accounting officer?

24   A.  Correct.

25   Q.  No accounting background, correct?

1    A.   That's correct.

2    Q.   No college degree, right?

3    A.   Just in computer networking but nothing.

4    Q.   And is it true that the only prior experience you had in

5    the energy industry before going over to Major Energy was

6    working for Saul Horowitz as a billing coordinator at Econergy?

7    A.   Not necessarily.  Part time.  He was there part time, he

8    wasn't there.  But I was working for a company called Econergy.

9    Q.   Right.  But I'm saying the only prior experience up had in

10   the electricity and gas space --

11   A.   -- was working for a company called Econergy.

12   Q.   So, prior to Major Energy, correct?

13   A.   Yes.

14   Q.   All right.  Now, as part of the acquisition, Mr. Wiederman,

15   do you recall entering into an employment agreement with Major

16   Energy?

17   A.   Yes.

18   Q.   And that employment agreement allowed you to remain on as

19   the president of Major Energy post sale to NGE, right?

20   A.   Yes.

21   Q.   And you signed that employment agreement, and in connection

22   with that you received $460,000 in annual salary?

23   A.   I believe so, yes.

24   Q.   James, if we could pull up Exhibit DX265.

25            All right, Mr. Wiederman, we are just looking at your

K347HOR4                         Wiederman - cross

1   employment agreement.  Did you execute it with Major Energy on

2   April 1, 2016?

3   A.  Yes.

4   Q.  And this would have been in between the time of the closing

5   on March 18, 20 -- I'm sorry, the time of the signing of the

6   MIPA on March 18, 2016 and closing on April 15, 2016, correct?

7           MR. DAHAN:  The only comment we would make is just

8   it's the effective date as of April 1.  I don't believe these

9   were signed on April 1, and so to the extent that the

10  foundation is at the signing, I believe these were signed at

11  the closing, just so the record is clear.

12          THE COURT:  OK, thank you.

13  Q.  Mr. Wiederman, do you recall when you signed this

14  employment agreement?

15  A.  Who signed it?

16  Q.  I said you signed it, right?

17  A.  Right.  What was the question?

18  Q.  Do you recall when you signed it?

19  A.  Like right before closing.  It might have been a day or a

20  couple of days before closing.  I don't really recall exactly

21  when.

22  Q.  So the employment agreement was signed pre-closing with

23  NGE, correct?

24  A.  I believe so; I'm not a hundred percent sure.

25  Q.  And, James, if we could go to the end of the agreement to

1    the signatures.

2              Is that your signature, Mr. Wiederman, at the bottom

3    right-hand corner?

4    A.  Yes.

5    Q.  OK.  And countersigned on behalf of Major Energy was Dan

6    Alper, correct?

7    A.  Yes.

8    Q.  And he was the CEO at the time?

9    A.  Yes.

10   Q.  And were you agreeing at this point in time, Mr. Wiederman,

11   that you would comply with all the duties of a president as set

12   forth in your employment agreement?

13   A.  Everything that is set forth in my employment agreement.

14   Q.  And so you also received benefits in connection with the

15   employment agreement:  Life insurance, health insurance,

16   vacation, correct?

17   A.  Everything that's in the agreement.

18   Q.  A monthly automobile lease?

19   A.  Everything that's in the agreement.

20   Q.  Let's go up to the agreement, James, first page.

21             So here we are on the first page, and let's hone in on

22   section 1.1, your duties as president of Major Energy.

23   A.  Yes.

24   Q.  Is it correct that as the president you accept the

25   engagement and you would report directly to the chief executive

K347HOR4                        Wiederman - cross

1    officer of the company?

2    A.  Yes.

3    Q.  And you were fine with that, right, that was reporting to

4    Dan Alper?

5    A.  Yes.

6    Q.  And you promised that you would faithfully perform such

7    duties on behalf of the company that were typically and

8    routinely associated with such title and position; is that

9    right?

10   A.  Yes.

11   Q.  And that to the extent that you and Mr. Alper agreed on

12   other duties, that could be incorporated as well into your

13   responsibilities, right?

14   A.  Yes.

15   Q.  Now let's go to section 1.2.  Now, this is a time and

16   efforts clause that you agreed to, right, Mr. Wiederman?

17   A.  Yes.

18   Q.  And specifically you agreed that executive shall devote his

19   time, attention and reasonable and best efforts during normal

20   working hours to the business of the company.  Did I read that

21   correctly?

22   A.  Yes.

23   Q.  And so you understood that when you signed this employment

24   agreement, that during working hours you really should be

25   devoted to the business of Major Energy, right?

1    A.   Like I said, working hours was 24/6.

2    Q.   The next line goes on to say employee shall perform all

3    duties in a professional, ethical and businesslike manner, and

4    in furtherance of the policies and directions of the company.

5    Did I read that correctly, Mr. Wiederman?

6    A.   Yes.

7    Q.   And that employee shall operate the company's business in

8    the ordinary course of business consistent with historical

9    practices.  Did I read that correctly?

10   A.   Yes.

11   Q.   So you signed this and agreed to abide by all of these

12   terms, right, Mr. Wiederman?

13   A.   Yes.

14   Q.   And as to your reference earlier in today's testimony about

15   how you could have social or charitable activities, that was

16   limited to not interfering with the performance of your

17   executive duties, right?

18   A.   That's what it says.

19   Q.   Now, Mr. Wiederman, during the course of reviewing this

20   agreement you understood that it also had a termination for

21   cause provision?

22   A.   Yes.

23   Q.   James, if you could go to the next page.  Next page.  Next

24   page.  So if we bring up (ii).

25             So, Mr. Wiederman, what I am showing you here is the

K347HOR4                        Wiederman - cross

1    contractual obligation you had in connection with the closing,

2    when you continued on as an employee, that if the company had

3    determined in good faith, following discussions with you, that

4    you engaged in any of the following actions, you could be

5    terminated for cause, right?

6    A.  Yes.

7    Q.  Fraud, correct?

8    A.  Yes.

9    Q.  Gross misconduct?

10   A.  Yes.

11   Q.  Breach of fiduciary duty?

12   A.  Yes.

13   Q.  Misappropriation?

14   A.  Yes.

15   Q.  Stolen or embezzled funds or property from the company?

16   A.  OK.

17            MR. MAROONEY:  Your Honor, I'm sorry.  I mean we have

18   been listening to this for quite a while.  Again objection to

19   relevancy.

20            MS. PECTOR:  Your Honor, I am just setting a

21   foundation for the obligations he had with the company, because

22   the next thing we're going to get into is the other businesses

23   that he was running during working hours while he was working

24   for Major Energy which distracted him from growing the

25   business.

1          THE COURT:  And you're saying that's relevant to the

2     earnout?

3          MS. PECTOR:  It's relevant to the performance of Major

4     Energy.  It's an explanation –– one of the explanations –– of

5     why Major Energy didn't grow the way it was anticipated.

6          THE COURT:  I mean if that's their theory, I can't say

7     it's irrelevant.

8          MR. MAROONEY:  Then we should ask about the theory and

9     not ––

10         THE COURT:  Well, I mean this speaks for itself, so

11    don't spend too much time on it.

12    Q.  So, Mr. Wiederman, let's get ––

13         THE COURT:  We do have a sentencing hearing, so why

14    don't we break now and come back around 1:30 to continue.  But

15    if you please try to make some room on your desks, please.

16         (Recess)

17         (Continued on next page)

18

19

20

21

22

23

24

25

K34AHOR5ps                    Wiederman - Cross

1              A F T E R N O O N   S E S S I O N

2                          1:45 p.m.

3    MARK WIEDERMAN, resumed.

4              THE COURT:  Good afternoon, everyone.  I apologize for

5    the delay.  I had other matters to deal with.

6              Back on track?

7              MS. PECTOR:  Yes, your Honor.

8    CROSS EXAMINATION (Cont'd)

9    BY MS. PECTOR:

10   Q.  Mr. Wiederman, are you ready to continue?

11   A.  Yes.

12   Q.  Thank you.

13             MS. PECTOR:  Thank you, your Honor.

14   Q.  Mr. Wiederman, when we left the record, we were talking

15   about other business interests that you have outside of Major

16   Energy, whether they be personal or just other business

17   ventures.  Can you tell me, Mr. Wiederman, as of the date of

18   closing of the transaction between Major Energy and NGE, April

19   15, 2015, can you give me an estimate of how many businesses

20   you had with financial interest in other than Major Energy.

21   A.  There was some passive real estate investment, but I don't

22   know.  I don't know offhand, you know, sometimes I would invest

23   in a group of nursing homes or a group of apartment buildings.

24   I'm not sure exactly what the question is.

25   Q.  Well, is it your testimony, Mr. Wiederman, other than

1    passive real estate investments, you did not have a financial

2    interest in/other businesses but Major Energy as of the date of

3    closing?

4    A.  An active?

5    Q.  Passive or active, Mr. Wiederman.

6    A.  I had some passive investments and maybe, in real estate,

7    nursing homes, a vitamin company.

8    Q.  Mr. Wiederman, in 2016, after the closing from Major Energy

9    to NGE, did you ask Major Energy employees from time to time

10   during working hours to assist you in other businesses that you

11   had a financial interest in?

12   A.  No.

13   Q.  Let's pull up DX 399, James.  Mr. Wiederman, are you

14   familiar with -- well, let me ask you -- tell you what,

15   Mr. Wiederman, let's look at this e-mail.  It's a

16   communication, if we start from the bottom, from David Sobel on

17   September 7, 2016.  This is, we're in target year one.

18   A.  Mm-hmm.

19   Q.  He sends you an mail, Mark Wiederman, "Please approve wires

20   and confirm."  Do you see that?

21   A.  Yes.

22   Q.  You agree that 2:40 on the Wednesday would be during

23   working hours, correct?

24   A.  Working hours is 24/6.

25   Q.  That would include 2:40 p.m. in the afternoon on a

1   Wednesday, correct?

2   A.  Yes.

3   Q.  Now, if we look at the response from you, do you see it

4   says, "Distribution from MES Solar attached."

5   A.  Yes MES Solar is Major Energy Solar.  It's a company that's

6   been around.  When we started it, I think it was 2013, 2014.

7   All of the members owned it.  It was consistent with the way we

8   were running the business prior to the sale.  We were not

9   active in the business.  It -- a wire was sent, and Mr. Sobel

10  distributes the wire.

11  Q.  Mr. Wiederman, Major Energy Solar was not part of the sale

12  of Major Energy company to NGE, correct?

13  A.  That is correct.

14  Q.  And in this e-mail, the CFO of Major Energy is working with

15  you to approve wires and transfers for a business that was not

16  part of the sale, correct?

17  A.  I said it's consistent with the way the company has been

18  run prior to the sale.  We are not active in Major Energy

19  Solar.  It was a wire that was sent, one wire, giving access to

20  the account from before the account, giving access to the

21  account after the sale, and distributed to the shareholders.

22  Q.  Mr. Wiederman --

23  A.  This is a 30-second transaction.

24  Q.  If there's no activity going on, according to your

25  testimony, why is there a wire transfer that's going out on

K34AHOR5ps                     Wiederman - Cross

1    September 7, 2016?

2    A.   Like I said, so the 30-second transaction, this was

3    consistent with the way this business has been run.  I mean,

4    we're not involved in the Solar company.  It was an investment

5    that -- to hold the companies together.  And we got a wire.

6    Our CFO for the years prior to the sale had access to that

7    account and would distribute the money.  We got a wire after

8    the sale and distributed the money.

9    Q.   Mr. Wiederman, you own a broker company called TLG,

10   correct?

11   A.   No.

12   Q.   It's your testimony under oath, sir, that you don't have

13   any ownership interest or financial interest in a brokerage

14   named TLG?

15   A.   Correct.

16   Q.   And so your testimony under oath, Mr. Wiederman, is that in

17   2015, prior to the closing of Major Energy, you weren't

18   receiving broker funds from Major Energy in connection with

19   TLG?

20   A.   No, my brother's account.

21            MS. PECTOR:  Your Honor, I did not anticipate that

22   Mr. Wiederman would give that answer.  I have looked up TLG --

23            THE COURT:  Did you say "my brother's account"?

24            THE WITNESS:  Yes.

25   Q.   I looked -- what did you say was the name of your brother?

K34AHOR5ps                    Wiederman - Cross

1    A.  Pinchus.

2    Q.  And what is your father's name?

3    A.  Bezalel, B-e-z-a-l-e-l.

4    Q.  And your testimony is you have no financial interest in

5    TLG; is that correct?

6    A.  TLG is the agent code on his accounts.

7    Q.  Do you have a financial interest in TLG Property Holdings?

8    A.  TLG Property Holdings is something else.  That I have --

9    that's owned real estate.

10   Q.  And your testimony is that the TLG brokerage that Major

11   Energy is paying commissions to is your brother's account and

12   you have zero financial interest in it.

13   A.  That's correct.

14   Q.  Is that your testimony?

15   A.  Yes.

16   Q.  Were you aware that TLG was being paid brokerage fees prior

17   to the close of the sale to NGE?

18   A.  Prior to the sale?  Yes.

19   Q.  Yes.

20   A.  Yes.

21   Q.  And you understood, Mr. Wiederman, that Section 4.9 of the

22   MIPA required the disclosure of any entities that you had

23   family members affiliated with.  You understood that that

24   needed to be disclosed so that NGE could conduct due diligence,

25   right?

1    A.  And it has been disclosed.

2    Q.  Your testimony is that TLG was disclosed in the MIPA; is

3    that your testimony?

4    A.  It was -- yeah, the name Pinchus Wiederman is -- yes.

5    Q.  Well, Pinchus Wiederman is not TLG, right, Mr. Wiederman?

6    A.  TLG did not, as far as I recall, did not receive anything

7    after the sale.

8          Additionally, the agent code TLG was sent to NGE to be

9    added as a -- for that exhibit, whatever that was.

10   Q.  Mr. Wiederman, you read Section 4.19, and let's just take a

11   quick look at it, in the MIPA.

12         MS. PECTOR:  James, if you could go to DX 2, just

13   quickly to Section 4.19, which is on page 39.  4.19.

14   Q.  OK.  Mr. Wiederman, looking at Section 4.19, let me read it

15   for you.  "Except as set forth on schedule 4.19, there are no

16   loans, leases, or other continuing transactions between any

17   company, on the one hand, and, on the other hand: any officer,

18   director, member, manager, or employee of the company" and

19   importantly, Mr. Wiederman, "(ii) any family member, or

20   affiliate of such officer, director, member, manager, or

21   employee of seller."  Did I read that correctly?

22   A.  Yes.

23   Q.  Now, Mr. Wiederman, you were aware that TLG was receiving

24   brokerage fees from Major Energy before the sale to NGE,

25   correct?

K34AHOR5ps                    Wiederman - Cross

1    A.  Before the sale, yes.

2              MS. PECTOR:  And, James, if we can pull up the exhibit

3    that defense --

4    Q.  Let me just, before we pull the next exhibit, you knew you

5    had an obligation to disclose that, correct, before the sale?

6    A.  What was disclosed was that, after the sale, my brother

7    was -- TLG, the agent code, was disclosed, as well as my

8    brother was disclosed.

9    Q.  Well, let's see what was disclosed.

10   A.  Or at least it was sent to be disclosed.

11             MS. PECTOR:  James, let's pull up PX 110.

12   Q.  So now, Mr. Wiederman, I'm showing you schedule 4.19, the

13   MIPA.  This was produced by your attorneys.  This was the

14   agreement with affiliates that have been identified.  And do

15   you see that, in 2.a, there is an identification of Pinchus

16   Wiederman, Mark Wiederman's father.

17   A.  Yes.  Clearly a mistake.

18   Q.  And Mr. Wiederman, can you point us to where on this page

19   we see TLG?

20   A.  Like I said, there is a mistake.  When this questionnaire

21   was sent to me, I responded with the name and the agent codes

22   that are seeking permission.  I obviously did not look at it,

23   because Pinchus Wiederman is not my father, it's my brother.

24   So it was an oversight.

25             MS. PECTOR:  James, let's pull up PX 750.  758.

K34AHOR5ps                    Wiederman - Cross

1    Q.  OK.  Mr. Wiederman, what we're pulling up now is another

2    exhibit marked by your counsel.  This is the 1099s for the

3    brokers that were receiving commissions from Major Energy.

4              MS. PECTOR:  And, James, can we go to page 53 to look

5    at TLG.  So page 53, first, let's highlight Pinchus Wiederman,

6    James.

7    Q.  So here is the disclose -- here is Pinchus Wiederman,

8    Mr. Wiederman, who you say is your brother, correct?

9    A.  Yes.

10   Q.  And he has no?  He has a 1099 that he's receiving

11   individually, correct?

12   A.  Correct.

13   Q.  And there was a separate 1099 that was sent to TLG,

14   correct?

15   A.  Right.

16   Q.  OK.  Now here we have TLG receiving a brokerage commission,

17   the last year of the earnout, for $402,360.17.  Correct,

18   Mr. Wiederman?

19   A.  Correct.

20   Q.  And TLG was not disclosed on schedule 4.9, correct?

21   A.  Well, this is Pinchus Wiederman as well.

22   Q.  Pinchus Wiederman is not on this 1099, correct,

23   Mr. Wiederman?

24   A.  He was TLG.

25   Q.  Mr. Wiederman, did you file an application with the New

K34AHOR5ps                    Wiederman - Cross

1    York Secretary of State for TLG Property Holdings?

2    A.  It's been around since 2012, I think.  I don't know.  I'll

3    ask my accountant.  I'm not sure.

4    Q.  You own that company, correct, Mr. Wiederman?

5    A.  Yes.  That's TLG Property Holdings.

6    Q.  All right.  So let's get into the earnout calculation,

7    Mr. Wiederman.

8           Now, I believe that you have testified that you were

9    the person that created the spreadsheets, the counter-

10   spreadsheets, on the sellers' side for the first year; is that

11   correct, Mr. Wiederman?

12   A.  Yeah.

13   Q.  OK.  And in preparing the spreadsheets for year one, would

14   you agree with me, Mr. Wiederman, that your spreadsheets

15   changed formulas?

16   A.  I'm not sure what you're referring to.

17   Q.  You'll agree, sir, that you used more than one spreadsheet

18   in target year one to calculate sellers' position for the

19   earnout agreement, correct?

20   A.  We previewed a spreadsheet, which resulted in an exhibit in

21   the earnout agreement, but after spending many days of work on

22   it, all that was needed to be done was, you put in the agent

23   PIN number, you put in the customer account, and it spits out

24   what did the sellers put in their payment.  So I'm not sure

25   what you're referring to.

1           Afterwards, there was a lot of back-and-forth.

2           MS. PECTOR:  James, let's pull up the first page of

3    the timeline.

4    Q.  OK.  Mr. Wiederman, this is just a timeline to orient us on

5    the spreadsheets that were prepared, the formulas that were

6    prepared by the sellers for target year one earnout

7    calculation.  Right?

8    A.  Yes.

9    Q.  And in the top left corner we see the first formula.  This

10   is DX 1033.  It's an e-mail that's sent from Mr. Horowitz on

11   March 27, 2017 at 2 p.m.

12          MS. PECTOR:  James, can we pull up DX 1033.

13   Q.  Mr. Wiederman, this is the first formula that the sellers

14   have sent over to Spark on March 27, 2017 at 1:59.  Correct?

15   A.  I don't know if it was the first one, but it was, I guess,

16   what it says in the e-mail.

17   Q.  Well, if you didn't receive Spark's earnout statement until

18   March 27, 2017 --

19   A.  OK.

20   Q.  -- would that refresh your recollection that this would be

21   the first spreadsheet that went over to Spark?

22   A.  I think it would.

23   Q.  So in this spreadsheet, Mr. Wiederman, do you see that

24   Mr. Horowitz is sending "subject: correct calculation of

25   earnout payment" to Mr. Melman, Mr. Kroeker, and Mr. Lancaster?

K34AHOR5ps                    Wiederman - Cross

1   A.  OK.

2   Q.  And did you prepare the spreadsheet that Mr. Horowitz sent

3   over on March 27th?

4   A.  I'm not sure.  Maybe if I see it and refresh my memory.

5   Q.  We'll refresh in just one moment.  Let me just set it up.

6   The e-mail communication says, "Gil, Nathan, Gary, hi.  In

7   response to your calculation, please see the correct

8   calculation attached as per the deal we signed."  Did I read

9   that correctly?

10  A.  Yes.

11  Q.  And the last sentence says, "You can double-check with

12  Gary, who would remember for sure."

13  A.  You read that correctly as well.

14  Q.  And do you recall, Mr. Wiederman, referencing this

15  particular e-mail and spreadsheet in your witness statement in

16  paragraph 222?

17  A.  If you say so, I'll take your word.

18  Q.  Well, let's pull up the spreadsheet, James, which is DX

19  1033A.

20       Mr. Wiederman, we're showing you DX 1033A, which was

21  the spreadsheet that was sent over by Mr. Horowitz to Spark on

22  March 27.  Do you recognize this to be your spreadsheet?

23  A.  It looks familiar, yes.

24  Q.  And do you recognize this, Mr. Wiederman, to be the

25  supporting spreadsheet the sellers sent to Spark demanding the

K34AHOR5ps                     Wiederman - Cross

1    payment of $10,213,663 for the target year one contingent

2    payment?

3    A.  That's what it says.

4    Q.  And you'll agree that this was the combination of the cash

5    installment plus the earnout payment, correct?

6    A.  Yes.

7    Q.  Now, in this situation, Mr. Wiederman, if we can look at

8    this $23 million, do you see under the adjusted EBITDA plan

9    column, was that number, 23,619,315, the payment to David

10   Sobel, the CFO?

11   A.  Ultimately, yes.

12   Q.  You didn't calculate that number, correct, Mr. Wiederman?

13   A.  I'm not an accountant.

14   Q.  That was purely a number that Sobel gave you, you plugged

15   into the spreadsheet, right?

16   A.  Well, throughout the year I was following, you know, how we

17   were doing on an adjusted EBITDA basis, and that was the number

18   that, you know, yeah.  But I saw backup and all there, yeah.

19   Q.  This was the number of Mr. Sobel, correct?  This is not

20   your number, correct?

21   A.  Ultimately, yes.

22   Q.  Now, if we look at what you did in the calculation, I'd

23   like to ask you a question, Mr. Wiederman.  When you prepared

24   this spreadsheet, did you go back and look at the earnout

25   agreement to make sure your formula was correct?

K34AHOR5ps                    Wiederman - Cross

1   A.  I just took the spreadsheet that was the exhibit to the

2   earnout agreement and plugged in the numbers.

3   Q.  And the way you plugged in the number, is it correct,

4   Mr. Wiederman, that you simply took the adjusted EBITDA number

5   that Mr. Sobel gave you of $23,619,315, and you multiplied it

6   by the earnout percentage of 272727?

7   A.  That was what that spreadsheet does.  Yes.

8   Q.  And when you do that, it results in, if we look in row G --

9   I'm sorry -- column G49 and we get a number of 6,441,631 -- do

10  you see that?

11  A.  I see that.

12  Q.  That's the result of you calculating Mr. Sobel's adjusted

13  EBITDA number times the earnout percentage of 272727.  Right?

14  A.  Yes.

15  Q.  And then you adjust that because the earnout agreement caps

16  you, in the next column over, at 5,454,000 and change, correct?

17

18  A.  Correct.

19  Q.  So your first formula out of the gate is very simply Sobel

20  actual adjusted EBITDA times earnout percentage, correct?

21  A.  It is a piece -- I don't have a calculator here in front of

22  me.  But --

23  Q.  Would you like a calculator?

24  A.  You know, I took the spreadsheet that we used that was

25  circulated, which ultimately became the final e-mail deal, and

K34AHOR5ps                     Wiederman - Cross

1    plugged in the number.

2              MS. PECTOR:  James, if we could go back to the

3    document.

4    Q.  OK.  So Mr. Wiederman, if we go to the next slide --

5              MR. MAROONEY:  Sorry, your Honor.  Just so your

6    Honor -- I'm not sure your Honor is clear.  This is the --

7              MS. PECTOR:  Demonstrative.

8              MR. MAROONEY:  This is the demonstrative from this

9    morning.

10             THE COURT:  Yes.  Understood.

11   Q.  So this is the demonstrative, Mr. Wiederman, that we

12   created, just trying to get through this testimony easily.

13             So we looked at the Saul Horowitz, March 27, 2017

14   e-mail.

15             MS. PECTOR:  James, next slide.

16   Q.  Now, previously we had put up an earnout formula with

17   Mr. Lancaster to show how the language of 2.2 tracks when you

18   take the words and you put it into the formula.  Now,

19   Mr. Wiederman, when you did your calculation on March 27, did

20   you try and look at the agreement and match up the formula to

21   make sure that your calculation was consistent with Section 2.2

22   of the earnout agreement?

23   A.  The income -- throughout the entire negotiation, I did this

24   work on the spreadsheet.  I was working many hours with Gary

25   Lancaster on that spreadsheet.  That ultimately became the

K34AHOR5ps                      Wiederman - Cross

1    spreadsheet deal.  I was not involved in looking at 2.2 or what

2    it says.  That I left up to the lawyers.  And that I -- I was

3    focused on the spreadsheet.  So I -- that spreadsheet -- and we

4    came to an agreement that you'll plug in the numbers and it

5    will spit out what was owed to you guys.

6    Q.  Well, Mr. Wiederman, we went through the formula just now

7    together on DX 1033A, and you'll agree with me that in no part

8    of your formula is 2.2a, which is take actual adjusted EBITDA,

9    and multiply it by the fraction of actual adjusted EBITDA over

10   adjusted EBITDA plan, correct?

11             MR. MAROONEY:  Objection, foundation.

12             THE COURT:  You can answer if you understand it.

13   A.  I was going to say, I'm confused by your question.

14   Q.  Well, 2.2a has a component in the formula that requires

15   there to be a fraction calculated.  And that fraction, if you

16   look on this page that's lined out, is actual adjusted EBITDA

17   over adjusted EBITDA plan.

18   A.  OK.

19   Q.  And you didn't do that step, correct, Mr. Wiederman?

20             MR. MAROONEY:  Objection.  We have counsel testifying

21   about what it says.  I'd like to ask him if he under --

22   A.  I don't understand --

23   Q.  Let me just ask you, Mr. Wiederman, did you, as part of

24   your initial formula, did you deduct Q1?

25   A.  As part of the initial formula, absolutely, Q1 was

1    excluded.  The way Q1 -- this is -- it's very -- I know there's

2    a lot spoken about Q1, so I want to put some context around it

3    if I may, your Honor.  The way this whole Q1 became an issue

4    was because we had a very important conversation about what do

5    we do about Q1 and how do we calculate to make sure that we had

6    first year 2016 earnout.

7         And in this industry, there are a lot of moving parts,

8    because you have storage gas that you have buy throughout the

9    summer, you still have in the winter.  You have a lot of

10   imbalances because it's not a certain sign of how much they'll

11   buy, the customers.  It takes approximately four months to be

12   able to get real numbers to settle and close out a year.  So

13   that's why every single year we had, in April, PwC come and

14   audit our numbers for the year prior.

15        The reason I'm saying that is because the only other

16   option was to come up with a hard close as of March 31st, which

17   would have been impossible to do until September, and then say,

18   OK, now, year one, you have $14 million as the target.  Instead

19   of getting an auditor to come and audit four months -- the

20   first quarter, four months later, which would have been

21   onerous, expensive, and it would have been four months after

22   the closing, we just decided that we're going to take the

23   entire first year of 2016 and we're going to exclude the first

24   quarter from that, you don't have to hit that first quarter,

25   you have to -- the first -- the next three quarters combined as

1    first quarter, you have that 14 million.

2           And for so many reasons that's the only way to explain

3    it, because (A) otherwise, if you would just punch in the

4    numbers, there would be no way to hit the $80 million mark; (B)

5    otherwise the 2016 number would mean that you have to hit $28

6    million, which, in none of our projections did we even show 28,

7    27, 26, 25, or 24 for 2016; (C) this deal was based on a

8    multiple of 4, if average was industry standard, and I believe

9    it's in one of the e-mails that, you know, you're getting four

10   times EBITDA on this deal.  If that's the case, then the offer

11   should have been $112 million and I would like to renegotiate.

12   But, you know, so clearly 20 million was never contemplated.

13   And if it was ever contemplated by the sellers, then, honestly,

14   to sell the company, it would have made no sense to sell a $28

15   million company for less than three times EBITDA, with such a

16   tremendous contingent payment.

17          So for so many reasons, it wouldn't even have made

18   sense.  It would have needed to hit $28 million.  So the number

19   was 20 million 700 and change, and we did not need to hit that

20   first quarter.  And that's what we mean by deducting the first

21   quarter.

22          Now, I understand it's ambiguous in the way it's

23   written up.  And the lawyers wrote it up.  I'm not a lawyer.

24   But that's why, in the spreadsheet, where it takes out the

25   first quarter, it says 9 of 33, instead of -- that's why you're

1   calling the cap was 5.4 versus 7.2, which is, in 2017 the cap

2   was 7.2, in 2018 the cap was 7.2.  But in 2016 it's 5.2.  So

3   that's where you're not getting your share of the first

4   quarter, the sellers are not getting their share of the first

5   quarter.

6           But to think that we have to hit $28 million in order

7   to get a hundred percent, it just -- I'm sorry.  It made no

8   sense.  And I was very passionate about it, as I am now.  It's

9   personal.  And I spoke to Mr. Kroeker about it many, many

10  times.  And my understanding is, you know, he went back to

11  Mr. Lancaster, who I was very involved with at the time we

12  created the spreadsheet, and Mr. Lancaster, ultimately they

13  came around and they agreed to structure the deal, and then it

14  was just a matter of understanding, you know, what addbacks and

15  what the adjusted EBITDA number was.

16          MS. PECTOR:  Your Honor, I object to all that as non-

17  responsive.  The question was just did he do the fraction

18  calculation.

19  Q.  But let's move on to see what you did with your next

20  formula.  So the next e-mail that went over --

21          MS. PECTOR:  James, if we can pull up PX 743.

22          THE COURT:  I have a clarifying question while you're

23  pulling that up, which is, you referred to putting in those

24  numbers on the spreadsheet that you originally showed.  Was the

25  spreadsheet itself attached to the MIPA and it was attached as

K34AHOR5ps                    Wiederman - Cross

1    an Excel spreadsheet?

2               THE WITNESS:  As an exhibit.

3               THE COURT:  As an exhibit.  Got it.  And then you just

4    plugged in those numbers, and that's how you got the 6.44.

5               THE WITNESS:  And we would just plug in the A PIN

6    number, plug in the customer account, and then that's how you

7    would get the number.

8    BY MS. PECTOR:

9    Q.  Mr. Wiederman, did you just testify that the spreadsheet

10   that we see in DX 1033 was attached to the earnout agreement or

11   the MIPA?

12   A.  I don't know what DX -- there were so many spreadsheets

13   that were going around at that time.  The spreadsheet that was

14   attached to the MIPA was -- if anybody has it, can we look at

15   it?

16   Q.  You can look in your folder at DX 2.

17              MS. PECTOR:  Your Honor, may I approach the witness to

18   help him out?

19              THE COURT:  Yes.

20   Q.  All right.  So go ahead and take a look at the MIPA and let

21   us know if you see your spreadsheet attached as an exhibit.

22   A.  Well, maybe not in the MIPA.  In the earnout agreement.  I

23   apologize.  I misspoke.

24   Q.  You can look at the earnout agreement, which is Exhibit 1,

25   and tell me if you see your spreadsheet attached.

K34AHOR5ps                    Wiederman - Cross

1    A.  OK.  It's in Exhibit B.  This one just, it shows all three

2    years, so it's not exact.  But it shows the calculation.

3    Q.  Mr. Wiederman, Exhibit B is not your spreadsheet that we

4    just looked at in Exhibit 1033, correct?

5    A.  That wasn't calculating the next two years prematurely.

6    Q.  Mr. Wiederman, I just asked you a very specific question:

7    was your spreadsheet, your Excel spreadsheet, attached to the

8    MIPA or the earnout agreement?  It is not, correct?

9    A.  Can we go back to the spreadsheet, please?

10          MS. PECTOR:  Can you pull up 1033A, James.

11   Q.  This spreadsheet, which we showed you, at 1033A,

12   Mr. Wiederman, is not attached to the earnout agreement,

13   correct?

14   A.  Well, it is, without -- but it has other years involved.

15   Q.  We can move on, Mr. Wiederman.

16   A.  It's very --

17   Q.  I think the judge can compare Exhibit B to 1033.

18   A.  It's just not the next three years.  It's sort of a hundred

19   percent between '16, you know, what we get.

20   Q.  Mr. Wiederman, is it correct that you provided a second

21   spreadsheet to Mr. Horowitz, which he transmitted over to Spark

22   on March 27, 2017, a few hours later?

23   A.  Show it to me.

24          MS. PECTOR:  James, let's pull up PX 473.

25   Q.  Now, PX 473 is being sent a few hours later, and do you

1    see, Mr. Wiederman, it's from Mr. Horowitz, March 27,

2    4:11 p.m., to Gil Melman, Nathan Kroeker, and Gary Lancaster;

3    is that right?

4    A.  Mm-hmm.

5    Q.  And what is the subject of this e-mail?

6    A.  "Correct template."

7    Q.  And Mr. Horowitz states, "Gentlemen:  This is Exhibit B of

8    the executed earnout agreement.  Please use the attached

9    template for our discussions tomorrow."  Correct?

10   A.  Yes.

11   Q.  And then he said, "Please also see Gary's e-mail of June

12   27, 2016 confirming such."  Correct?

13   A.  Yes.

14        MS. PECTOR:  Now, James, let's pull up 473A.

15   Q.  And Mr. Wiederman, did you create this spreadsheet as well?

16   A.  Some of it I created and some of it Mr. Lancaster created.

17   Q.  But, nonetheless, this is the spreadsheet that Mr. Horowitz

18   sent over two hours later as a correct template, right?

19   A.  Let's look at the first tab of the MIPA.

20   Q.  Looking at the first tab, can you answer the question, is

21   this the e-mail --

22        THE COURT:  Show him where it's at just so he's

23   familiar with the entire document.

24   A.  So this is the exhibit, yeah.

25   Q.  And Mr. Wiederman, is this entire spreadsheet attached as

1   Exhibit B to the earnout agreement?

2   A.  The entire spreadsheet?

3   Q.  Yes.

4   A.  Not the entire spreadsheet but the main part that says

5   "MIPA master."

6   Q.  Is it correct, Mr. Wiederman, that what we are looking at

7   on the screen is not an exhibit to the MIPA or the earnout

8   agreement, correct?

9   A.  No.  Like I said, the middle part over there that has the

10  main part is an exhibit, I believe, a copy.

11  Q.  Let's look at tab 2, Mr. Wiederman, of the spreadsheet that

12  Mr. Horowitz sent over of the correct template.

13          MS. PECTOR:  And if we can go, James, to cell M34.

14          MR. MAROONEY:  I just object to counsel's

15  mischaracterization, continued mischaracterization of tab 2.

16  Q.  Let me ask you a question.

17          MS. PECTOR:  I'll establish a foundation, your Honor.

18  Q.  Let's go back to the e-mail first.  Then we'll go back to

19  the spreadsheet.

20          MS. PECTOR:  So let's go back to the e-mail, James,

21  473.

22  Q.  And if we look at the e-mail, do you see it says,

23  "Gentlemen:  This is Exhibit B of the executed earnout

24  agreement.  Please use the attached template for discussions

25  tomorrow."  Do you see anything in this e-mail, Mr. Wiederman,

1    that says "only look at tab 1 and not look at tab 2"?  Is that

2    in Mr. Horowitz's e-mail?

3    A.  I'm assuming that he forwarded the initial -- again, you'll

4    have to ask Mr. Horowitz.

5    Q.  I'm not asking for assumptions.  I just want to know, do

6    you see anything in this e-mail that says "don't look at tab

7    2"?

8    A.  Let me see what it says.

9          MS. PECTOR:  James, if you can pull up the whole

10   e-mail so he can see it.

11   Q.  Is there any reference in this e-mail, Mr. Wiederman, that

12   you're copied on, that says tab 1 or tab 2?

13   A.  This e-mail is, on March 27, 2017, referring to an e-mail

14   on June 27, 2016, and I believe that was a date that Mr. Melman

15   created an entire -- I'm sorry, Mr. Lancaster -- created an

16   entire new spreadsheet after the deal.  So I --

17   Q.  Mr. Wiederman --

18   A.  Honestly, I'm confused by that spreadsheet, because that

19   green, I don't recall ever seeing that green prior to June 27,

20   2016.

21   Q.  You don't recall Gary Lancaster being in your office when

22   he prepared that green text?

23   A.  No.  I'm sorry.

24         MS. PECTOR:  Let's go back, James, to PX 473A, and if

25   we can go to tab 2, and let's highlight cell M34.

1    Q.  OK.  Now, in cell M34, Mr. Wiederman, you'll agree that

2    what's happening there is the adjusted EBITDA plan number of

3    $20,749,213 is subtracting out $7,204,498, correct?

4    A.  Yes.  This is not the deal we agreed to.  This was not

5    attached as an exhibit.  And this was never even shown prior to

6    June of 2016, months after the deal closed.  These are new

7    numbers that were made up.  And I believe that this was done

8    during the reason -- the reason this was done was because we

9    were actually having buyout talks, and we were coming to what

10   we ultimately did agree on a $25 million buyout, which never

11   materialized.  However, I believe that's why this work was

12   done.  But this was not the deal.  This is not the spreadsheet

13   that was sent.  And we could pull up the e-mail that was the

14   final deal, in the subject, and look at that spreadsheet and

15   plug in the number, so EBITDA and customer count, and see what

16   it said.

17   Q.  Mr. Wiederman, when Mr. Horowitz sent the e-mail to Spark

18   on March 27, 2017 at 4:11 p.m., which you were copied on, did

19   you write back to anybody and say, I'm sorry, you guys are

20   using the correct spreadsheet, don't use it?

21   A.  I don't know.  I don't recall exactly what happened that

22   day.  But like said, why would I assume that there is a new

23   spreadsheet that was recreated or that there was -- three

24   months after closing, that somebody is going to go ahead and

25   make a new spreadsheet?

K34AHOR5ps                    Wiederman - Cross

1    Q.  Let's move forward, Mr. Wiederman, and look at the next

2    formula that you used.  So let's go to DX 724 -- I'm sorry.  PX

3    524.

4         All right, Mr. Wiederman.  We're now fast-forwarding

5    by three days.  We have Saul Horowitz sending another e-mail to

6    Gary Lancaster and Gil Melman with a copy to you on March 30,

7    2017 at 3:04 p.m.  Do you see that?

8    A.  I do.

9    Q.  And did you provide the spreadsheet attached to this e-mail

10   to Mr. Horowitz?

11   A.  I don't know.

12        MS. PECTOR:  James, could you pull up 524A so

13   Mr. Wiederman can see it.  524A.  PX 524A.

14        MR. WATKINS:  That is PX 524B.

15   Q.  So this is a spreadsheet now that's being sent to Spark

16   three days later, 3:04 p.m.  And do you see that the subject of

17   this one was "payment to sellers due March 31, 2017"?

18   A.  Mm-hmm.

19   Q.  Did you create this spreadsheet, Mr. Wiederman?

20   A.  It does look vaguely familiar.

21   Q.  And let's look at what is happening in this spreadsheet.

22   So if we look at cell A5, do you see that that's the earnout

23   ceiling for target year one, correct?

24   A.  Yeah, 5.4, yes.

25   Q.  And it's being multiplied by the earnout percentage?

1    A.  I see that.

2    Q.  And then there, they're using for adjusted EBITDA the Spark

3    number of $19,171,499, correct?

4    A.  Their assumed EBITDA, yes.

5    Q.  And you'll agree, Mr. Wiederman, that the formula that's

6    being used in this spreadsheet is not the same as the prior two

7    spreadsheets we just saw, correct?

8    A.  It's different.  I did this in haste, I remember.  And it's

9    fairly close.  It was just, you know, a little bit off.  But

10   it's -- I mean, like I said, should have just stuck with the

11   original formula that -- original spreadsheet that was in --

12   that's in the earnout agreement and that we all went by,

13   without trying to recreate the spreadsheets.  But I did that

14   because I was kind of like in panic mode.  I had sellers

15   looking at me and screaming at me to get this right.  So I made

16   an attempt to use Spark's way of doing things and to try to

17   clear it.  But, like I said, this is fairly close, but yeah.

18   Q.  Mr. Wiederman, if we look at row 9, and let's look at what

19   your formula was.  In row 9, you took the earnout ceiling and

20   multiplied it by the achievement ratio, correct?

21   A.  Right.

22   Q.  And that's not something that you had done in the prior

23   spreadsheets, correct?

24   A.  Like I said, it was a mistake, it was an oversight.

25   Q.  And then if we look in the cell H5 for Major's plan

1   adjusted EBITDA per customer?

2   A.   Mm-hmm.

3   Q.   You only included $107.69 there, correct?

4   A.   But I included, I included, like I said, you know, these

5   numbers --

6           THE COURT:  Just try to answer the question.

7   A.   The numbers are what they are on this spreadsheet.  This

8   spreadsheet was recreated in haste when -- there was a

9   spreadsheet that was done.

10          THE COURT:  You don't need to explain everything.

11  Just answer the question on cross.  You'll have redirect.

12          THE WITNESS:  OK.  Sorry.

13  A.   Yeah.  So this is the spreadsheet that you see here.

14  Q.   Mr. Wiederman, you'll agree that, in cell H5, when you used

15  $107.69 per customer to run the customer count reduction, that

16  was not the right number in Exhibit A to the earnout agreement,

17  right?

18  A.   I don't recall what the number in Exhibit A was.

19          MS. PECTOR:  James, could we have Exhibit 1, DX 1, and

20  go to Exhibit A.

21  Q.   We're looking at Exhibit A.  And, Mr. Wiederman, if you

22  could stick with me, in the first column for 2016, do you see

23  that adjusted EBITDA per customer is 116.55?

24  A.   That is a calculation.  So the plan year-end customer count

25  is 178 over 31, and then there's the calculation on how much a

1   customer is worth.

2   Q.  Mr. Wiederman, that's not my question.

3   A.  I see it says 116.55.  But the number can change, is what

4   I'm saying.

5   Q.  The number 116.55 was not used in the spreadsheet that we

6   just looked at, which was your third formula, correct?

7   A.  Correct, because that number can changed depending on the

8   actual number that was hit.

9           MS. PECTOR:  James, let's go back to the e-mail, PX

10  524.

11  Q.  All right.  So we're back on this e-mail, Mr. Wiederman.

12  And specifically, now, by March 30, do you see in the last

13  sentence of the first paragraph that Mr. Horowitz is accusing

14  NG&E and Spark of now clearly acting in bad faith despite your

15  assertion otherwise below and it will not be tolerated?  Did I

16  read that correctly?

17  A.  Yes.

18  Q.  So at this point in time, even though sellers had now given

19  three different formulas to Spark, Mr. Horowitz was accusing

20  Spark of being the one acting in bad faith, right?

21  A.  This was primarily about the structure of the first

22  quarter.

23  Q.  Well, let's look at the end of this e-mail.

24  A.  The other three were not way off.  It was really the

25  structure of the deal which was in question here.

K34AHOR5ps                     Wiederman - Cross

1   Q.  If we look at the end of the e-mail, do you see that says,

2   "With that, I will say that we are cc'ing Israel Dahan, our

3   lawyer at King & Spalding.  I will further advise him that if

4   the sellers do not receive the amount of $7,403,197.97

5   tomorrow, the sellers will commence legal action against NG&E,

6   Spark, and Keith Maxwell"?

7   A.  Yeah, I see it.

8   Q.  That was the threat of litigation, correct?

9   A.  What's what it looks like, yes.

10  Q.  You were copied on it, correct?

11  A.  I believe so, yes.

12  Q.  And you had a different perspective, didn't you,

13  Mr. Wiederman?

14  A.  Different perspective?  I'm not, you know, jumping to file

15  lawsuits, and, you know, legal fees are expensive and, you

16  know, I'd rather work it out amicably.

17        MS. PECTOR:  Let's, James, pull up DX 519.

18  Q.  So, Mr. Wiederman, let's look at what your response was to

19  Mr. Horowitz's threat of litigation.  Here we are March 30,

20  3:46 p.m., shortly after.  And your response is, "Nathan,

21  thanks for the call.  Please see attached.  From my

22  perspective, at this point the body of the e-mail is just

23  background noise."  Right?

24  A.  That's what it says.

25  Q.  And you say, "I'm here to help in any way I can."  Correct?

1         You didn't echo that you thought Spark was acting in

2    bad faith.  Correct?

3    A.  I was having a cordial conversation with Mr. Kroeker over

4    the last few days about the structure of the deal.  I was very

5    involved in it.  And I was under the impression that we'll

6    ultimately get to an amicable resolution.  And we did.  We got

7    to, we agreed to the structure of the deal.  We just didn't

8    agree then to what the EBITDA number was and the customer count

9    was.

10   Q.  Mr. Wiederman, is it your testimony --

11   A.  We ultimately agreed, and, you know, for the most part,

12   that -- even Mr. Lancaster, but he went back and he wrote a

13   whole memo how the way I was calculating it was correct.

14   Q.  Mr. Wiederman, is it your testimony that target year one

15   has already been resolved between the parties and there's no

16   issue for this Court to preside over?

17   A.  No, because then come nine months later or 12 months later,

18   whatever it was, all of a sudden, when we're supposed to get

19   paid for 2017 and 2018, they go back and take the money right

20   out of my pocket.

21   Q.  Mr. Wiederman, you thought that Mr. Horowitz was taking

22   harsh positions in connection with the negotiation of this year

23   one calculation, correct?

24   A.  He was sellers' rep and he was doing what he felt he needed

25   to do.

1    Q.  You felt he was being harsh, correct?

2    A.  Again, he's sellers' rep.  You can talk to him.  He's

3    sellers' rep.  He can resume -- and is trying to work it out.

4    Q.  James, let's pull up DX 540.

5           All right, Mr. Wiederman.  We're now looking, if you

6    look at the 413, you reference Gary's memo and Nathan's e-mail,

7    and here is your response from Mr. Horowitz.

8           MS. PECTOR:  James, if you can go to the e-mail below.

9    Q.  This is April 13, 2017.  "Nathan, thank you for the holiday

10   wishes.  Mark and I totally disagree with your analysis,

11   calculations, and conclusion.  You are erring in a number of

12   areas."  Do you see that?

13   A.  Yes.

14   Q.  Would it be fair to say, Mr. Wiederman, that as of this

15   moment there is no agreement because Mr. Horowitz is saying he

16   doesn't agree with you?  Right?

17   A.  I'm not sure I'm able to review what we were sending.  I

18   would like, I would like -- again, there is the structure of

19   the deal and then there are the numbers.  At some point,

20   Mr. Kroeker and I came to an agreement on the structure of the

21   deal.  And then a year later it was reversed.  But we did come

22   to an agreement.  But then what Mr. Horowitz here may be

23   referring to, when he says "you are erring in any number of

24   areas," he may be referring to the numbers and the EBITDA

25   number and the customer count number.

K34AHOR5ps                    Wiederman - Cross

1                So I'm not sure exactly about the timing.  So --

2    Q.  Mr. Wiederman, let's look at your response to

3    Mr. Horowitz's e-mail.  You forward this on to Dan Alper, same

4    day, "Saul is too much.  Why so harsh," exclamation point.

5    That was truthful when you said that, correct, Mr. Wiederman?

6    A.  I wouldn't lie.

7    Q.  Let's move forward.

8                MS. PECTOR:  James, could we go back to the

9    PowerPoint.

10               THE COURT:  Sorry about the noise.  Apparently they're

11   building another courthouse.

12   Q.  OK.  Mr. Wiederman, we've made it through your first

13   formula.  And we've gone through the second formula.  And we've

14   gone through the third formula.  And the next thing that

15   happens is litigation was filed in October of 2018.  Correct?

16   2017.  I apologize.  2017.  Is that correct?

17   A.  I'll take your word for it.

18   Q.  So litigation was filed by sellers before we were even into

19   a year two calculation.  Correct?

20   A.  Before we're into a?

21   Q.  Year two calculation, correct?

22   A.  Yes, correct.

23   Q.  Because year two wouldn't have been done until March the

24   following year, correct?  So sellers decided to file litigation

25   over the year one earnout calculation because it wasn't

1    resolved.  Right, Mr. Wiederman?

2    A.  I guess so, yes.

3    Q.  And sellers hired an expert in connection with this

4    lawsuit.  Correct?

5    A.  I believe so, yes.

6    Q.  And that expert filed a report on behalf of the sellers on

7    June 21, 2019.  Correct?

8    A.  OK.

9            MS. PECTOR:  James, can you pull up PX 753.

10   Q.  OK, Mr. Wiederman.  This is the report of David Leathers.

11   Are you familiar with Mr. Leathers as the expert that the

12   sellers have hired to help them in this case?

13   A.  He's a nice gentleman.  I don't know.  He's nice.

14   Q.  Are you paying part of his fee?

15   A.  I believe so.

16   Q.  And so he's here on your behalf to provide testimony in

17   this case, right?

18   A.  Yes.

19   Q.  And are you aware that he had previously provided his

20   expert report?  I'm sure you reviewed it, right?

21   A.  Honestly, I haven't -- I glazed over it, yeah.

22   Q.  Well, let's look at what Mr. Leathers said is the formula

23   that sellers should use as of June 21, 2019.

24           MS. PECTOR:  So, James, let's pull up paragraph 187.

25   Q.  Mr. Wiederman, have you talked to Mr. Leathers in

1    connection with the preparation of his expert report?

2    A.  I'm sorry.  I can't hear you.

3    Q.  Have you talked to Mr. Leathers in connection with the

4    preparation of his expert report?

5    A.  I have not had extensive conversations with him.

6    Q.  But you did have some conversations with him, correct?

7    A.  Not detailed conversation.

8    Q.  Are you aware that Mr. Leathers has submitted notes in this

9    case of his conversation with you?

10   A.  I believe he, yeah, has done work for us.  Absolutely.

11   Q.  So you had the opportunity to tell him, as he was preparing

12   his expert report, what you thought was the correct formula for

13   sellers, correct?

14   A.  I did my best explaining.  It's difficult, but I did my

15   best explaining to him, yes.

16   Q.  Why is it difficult to prepare -- why is it difficult to

17   explain what the correct formula is?

18   A.  Because the earnout agreement, the writing of the earnout

19   agreement is ambiguous, and the spreadsheet took days, not

20   weeks, to put together.  So it just -- it's a little complex,

21   not overly complex, but it's a little complex.

22   Q.  Well, here we are in paragraph 187 of Mr. Leathers' expert

23   report, and he says, "In sum, adjusting Major Energy's 2016

24   contingent payment calculation to correct for Spark's improper

25   first quarter 2016 adjustment; Spark's error in the calculation

K34AHOR5ps                    Wiederman - Cross

1    of the customer accounts; and the disputed adjusted EBITDA

2    costs" -- do you see that?

3    A.  I do.

4    Q.  And then you provide the typical number to show the formula

5    he had been using, right?

6              MS. PECTOR:  And then, James, if we could go to

7    Exhibit 2.

8    Q.  So here is Mr. Leathers' exhibit.  And if we look at how he

9    is calculating the earnout payments, do you see that, in the

10   far right column, he comes up with a target year earnout

11   percent ratio of 101.36 percent?  Right?

12   A.  OK.

13   Q.  And then he multiplies that by 20 million.  Correct?

14   A.  Right.

15   Q.  And that 20 million is a collective three-year earnout

16   ceiling, right?

17   A.  OK.

18   Q.  So now he's deviating from your prior formula because now

19   he's using all three years of the target year earnout ceiling

20   instead of just year one.  Correct?

21   A.  You really need to discuss this with him.

22   Q.  So I just want to make sure you understand this.  You hired

23   an expert, who created one formula for his expert report, but

24   you are aware that he switched formulas in his witness

25   statement in this case.  Right, Mr. Wiederman?

K34AHOR5ps                    Wiederman - Cross

1   A.  I'm sorry.  What was your question?

2   Q.  You hired an expert to create an expert report for you in

3   this case.  He provided this formula, which we're looking at

4   right now.  But you are aware that he has now changed his

5   formula and adopted another formula in his witness statement

6   that's been offered for his direct examination in this court.

7   Correct?

8   A.  You need to discuss it with him.  Honestly, this is really,

9   you know, I glazed over this.  I didn't get into it.  You need

10  to discuss this spreadsheet with him.

11  Q.  Well, Mr. Wiederman, your witness statement?

12          MS. PECTOR:  Let's change briefly, to go back to the

13  PowerPoint.

14  Q.  So here was Mister --

15          MS. PECTOR:  Your Honor, I'm just being asked by my

16  counsel if we can take a brief break.

17          MR. BROWN:  I apologize, your Honor.  Could we take a

18  ten-minute break or a five-minute break?

19          THE COURT:  Sure.  Ten minutes.

20          MR. BROWN:  I apologize.

21          (Recess)

22          (Continued on next page)

23

24

25

1          MR. BROWN:  My apologies.  We are just dealing with

2     some emergent witness issues that I wanted to fill Ms. Pector

3     in on.

4          THE COURT:  OK.

5     BY MS. PECTOR:

6     Q.  So, Mr. Wiederman, my apologies, we have another witness

7     I'm trying to get on, so I'm go to streamline this.  Let's go

8     to the end of all of this.  I know you have a flight you're

9     trying to catch as well.

10         So you recall, Mr. Wiederman, that you executed a

11    rebuttal statement in this case?

12    A.  I do.

13    Q.  And that rebuttal statement made modifications to the

14    opinions that you gave in your witness statement that was

15    submitted to the court on December 13, correct?

16    A.  Right.

17    Q.  And specifically if I can turn your attention --

18         James, can you bring up Mr. Wiederman's rebuttal

19    statement, paragraph 9.  And just highlight all of paragraph 9.

20         Now, Mr. Wiederman, in paragraph 9 you provide a new

21    formula that you did not previously use in any of the other

22    spreadsheets that we looked at here today, correct?

23    A.  I don't know that.

24    Q.  You don't know that?  So we have gone through the formulas

25    together with the spreadsheets, and you can't --

K347HOR6                    Wiederman - cross

1   A.  I have to read this paragraph and then look at the spread

2   sheets and see.

3           I see it says here.  I'm not sure.  I don't recall --

4   there were a lot of numbers and spreadsheets before.  I don't

5   exactly recall.

6   Q.  Mr. Wiederman, you cannot deny that this formula that we

7   are looking at in paragraph 9 of your rebuttal statement is

8   different from the spread sheets that I have walked you through

9   here today in cross-examination, correct?

10  A.  I cannot deny that?  Honestly don't remember the

11  spreadsheets you walked me through, but if you say so, I don't

12  know.

13  Q.  You swore to this rebuttal statement under oath, right, Mr.

14  Wiederman?

15  A.  Right.

16  Q.  And you are telling the Court that this is your fourth

17  formula, this is the one that should now be used, correct?

18  A.  This is what I wrote in my rebuttal statement, and this is

19  me trying my best to explain the earnout spreadsheet that

20  became an exhibit, that I have worked on prior to the deal,

21  that we closed the deal on.  This is me trying to put a

22  spreadsheet into words.

23  Q.  OK.  Mr. Wiederman, do you recall in your deposition that

24  we talked about PSE together?

25  A.  Yes.

1   Q.  Do you recall in your deposition you told me about an

2   instance where Major Energy threatened to sue PSE for PSE

3   interfering with Major Energy's attempt to going into

4   Pennsylvania?

5   A.  There was one instance -- and I don't know when that

6   instance is -- there was one instance when we were looking to

7   sell, I didn't necessarily want them to get in the way of the

8   sale.

9   Q.  And as a result of not wanting them to get in the way, the

10  sellers threatened PSE with litigation, correct?

11  A.  OK.

12  Q.  And PSE backed off because of the threat, right?

13  A.  I don't recall what happened, but I know something -- NGE

14  was dealing with PSE, so I know they worked something out.

15  Q.  Mr. Wiederman, that was unrelated to NGE, correct?

16  A.  Why?  It was because of the sale of NGE.  It was included

17  and related.

18  Q.  Mr. Wiederman, I think you are getting confused.  There are

19  two separate instances.  In your deposition, do you recall the

20  two of us talking about an issue that Major Energy had with PSE

21  because Major Energy was trying to go into Pennsylvania?

22          MR. MAROONEY:  I object to counsel's characterization

23  that the witness is getting confused.

24          THE COURT:  Sustained.

25          MS. PECTOR:  I'll withdraw, your Honor.

K347HOR6                          Wiederman - cross

1    A.  I'm sorry.  Can you repeat the question?

2    Q.  Yes.  You remember in your deposition telling me that Major

3    Energy threatened PSE with litigation because PSE was looking

4    to block Major Energy from being able to go into Pennsylvania

5    with another supplier?

6    A.  If I recall correctly, I think this is like in 2009 or

7    2010.

8    Q.  Yes.

9    A.  I don't recall the details of it, but PSE was currently at

10   that time not set up with PJM.

11           PJM, your Honor, is the government clearinghouse for

12   trading in Pennsylvania, Jersey and Maryland.  So, they weren't

13   yet set up, so we went with a different supplier at that time

14   just for Pennsylvania until they were set up, and then we moved

15   to them.  I don't recall the whole back-up work on this,

16   honestly.  Mr. Horowitz was a lot more involved in that than I

17   was.

18   Q.  Mr. Wiederman, I want to talk to you about Shai Fishman.

19   Are you familiar with who he is?

20           THE COURT:  Say again.

21           MS. PECTOR:  Shai Fishman.  S-h-a-i F-i-s-h-m-a-n.

22   A.  Yes.

23   Q.  Who is Shai Fishman, Mr. Wiederman?

24   A.  Mr. Fischman was a door-to-door vendor.

25   Q.  And Mr. Fishman actually was the CEO for DSS, correct?

1   A.  I don't know his title.  He was the owner of DSS.

2   Q.  Owner of DSS.

3   A.  Yes.

4   Q.  And DSS was one of the key vendors of Major Energy,

5   correct?

6   A.  During a certain time period, yes.

7   Q.  And DSS, when we go back and look at Major Energy's

8   projections, is one of the vendors that Major Energy had

9   projections for for the earnout period, correct?

10  A.  That would very well make sense, yes.

11  Q.  And earlier you told me that it would be inappropriate to

12  assist with any diversion of relationships for Major Energy,

13  correct?

14  A.  Absolutely.

15  Q.  But you are aware that Alpha tried to hire Shai Fishman

16  during the earnout period, correct?

17  A.  I am aware that Alpha tried to hire.  It was an accidental

18  e-mail that was sent to me -- I don't recall exactly when that

19  was, but sometime towards the end of the 2018, maybe the

20  beginning 2019 -- that I wasn't supposed to see -- and at that

21  time Mr. Fishman was not doing any work for Major Energy.  And

22  he owns his own company; this is the industry; this is why

23  relationships are so important, and this is exactly one of the

24  key points in this case.

25  Q.  It's correct, Mr. Wiederman, that at this point in time you

K347HOR6                          Wiederman - cross

1   were not engaging in any efforts to retain DSS as a vendor for

2   Major Energy, correct?

3   A.  No, it's not true.

4   Q.  Let's look at the accident e-mail you just referred to.

5            James, please pull up DX800.

6            OK, so let's start below.  We see there is an e-mail

7   from Levi Moeller.

8   A.  Right.

9   Q.  Copied to Harvey Klein, your cousin who owns Alpha,

10  correct?

11  A.  Yes.

12  Q.  To Shai's personal e-mail address, correct?

13  A.  Yes.

14  Q.  And to Shai, what appears to be a business address,

15  correct?

16  A.  Yes.

17  Q.  And the subject is employment agreement attached, correct?

18  A.  Yes.

19  Q.  And the e-mail starts, "Shai, we hope all is well.

20  Attached is the agreement for your review.  Please let us know

21  if you have any questions."  Right?

22  A.  Yes.

23  Q.  And at this point in time Mr. Moeller has just left Major

24  Energy, correct?

25  A.  He left a couple months prior to that.

K347HOR6                        Wiederman - cross

1    Q.  And you didn't try and retain Mr. Moeller, correct?

2    A.  Oh, I absolutely did.

3    Q.  Mr. Moeller went over to become the interim president for

4    Alpha during the earnout period, correct?

5    A.  He did.  I wasn't happy about that.

6    Q.  If we scroll down to the employment agreement.  Stop there.

7         Do you see that there was an agreement and offer being

8    made to hire Shai Fishman as the senior vice president of sales

9    for a period of one year beginning on November 1, 2018?

10   A.  OK.

11   Q.  Correct?

12   A.  Yes.

13   Q.  Now this is still during the earnout period, correct?

14   A.  Yes.

15   Q.  James, let's scroll back to the top of the e-mail.

16        Now, Shai responds on October 26, 2018 at 3:06 p.m.,

17   and he doesn't just accidentally copy you; he also copies

18   Mr. Sobel, correct?

19   A.  No.

20   Q.  Do you see Mr. Sobel's Major Energy e-mail address on this

21   e-mail, Mr. Wiederman?  Yes or no?

22   A.  You completely misunderstand how this works.  When

23   mr. Moeller left the company, any e-mail that would be sent to

24   Mr. Moeller, the IT system would automatically cc myself and

25   David Sobel so we can handle that so nothing slips through the

K347HOR6                    Wiederman - cross

1    cracks.

2           Mr. Fishman sent this e-mail just to Levi Moeller,

3    accidently put LMoeller@MajorEnergy.com.  Therefore our system,

4    our internal IT system, cc'd myself and David Sobel and sent it

5    to us because we get all of Mr. Moeller's e-mail.

6    Q.  So you're telling me that the internal system of Major

7    Energy modified Shai Fishman's October 26, 2018 e-mail, added a

8    line to it that said cc, and included Mark

9    Wiederman@MajorEnergy.com and David Sobel@MajorEnergy.com?  Is

10   that your testimony?

11   A.  Absolutely.  There are hundreds of these.  Anytime an

12   employee left the company -- this was one of our things so

13   things don't fall through the cracks -- anytime an employee

14   left the company, we had it that his e-mail would automatically

15   then be cc'd to somebody else that's in his department.  So,

16   when Mr. Moeller left, all his e-mails automatically cc'd to

17   myself and David Sobel so nothing slipped through the cracks,

18   and that's why if you see subject LMoeller in brackets,

19   Mr. Fishman didn't put that LMoeller in brackets in there.

20   Q.  Mr. Wiederman, you were the president of Major Energy when

21   you received this e-mail, correct, sir?

22   A.  Yes.

23   Q.  Did you do anything to reach out to Mr. Moeller or Mr.

24   Klein and tell them to not interfere with your relationship

25   with Mr. Fishman?

1   A.  Mr. Fishman at that time was not working with us, number

2   one.  Number two, I reached out to I believe it was, I don't

3   remember, either Hector or Javier, or maybe Jason Garrett,

4   somebody at Spark, after I got this e-mail, and I said Mr.

5   Fishman is back in the game, why don't you guys try to recruit

6   him.

7   Q.  You said why don't you try to recruit him?

8   A.  Yes.

9   Q.  You suggested to Alpha why don't they try to recruit him?

10  I didn't hear what your testimony was.

11        MR. DAHAN:  He was referring to Spark.

12  A.  I said I reached out to Spark, either Hector or I don't

13  remember the other one, Mr. Garrett, somebody in the marketing

14  department over there, and I suggested that they try to recruit

15  Mr. Fishman.

16  Q.  And I suppose, Mr. Wiederman --

17  A.  Spark has access to my e-mails, and I'm sure they can find

18  it.

19  Q.  All right, Mr. Wiederman, we will move on.

20  A.  Please.

21  Q.  Was it just reduction of head count, or were there any

22  issues that you recall was the reason for Dan Alper's

23  termination?

24  A.  For Dan Alper's termination?  It was that there was

25  redundancy in the company.  At the time many functions were

1   moved to Houston, and I was having a conversation with

2   Mr. Kroeker, and the decision was made that -- the decisions

3   were made by Mr. Kroeker anyway, so instead of I had a question

4   about marketing, whatever it may be, instead of going to Mr.

5   Alper and then going to Mr. Kroeker, I might as well just have

6   a direct line to Mr. Kroeker and no need for the redundancy.

7   Q.  Was anybody mad at Mr. Alper, that you can recall, at that

8   time?

9   A.  There were a lot of love/hate relationships, but that's

10  normal in a family atmosphere company.

11  Q.  Did anybody dislike Mr. Alper that you can recall?

12  A.  Like I said, there were a lot of love/hate relationships.

13  Q.  At your deposition I asked you these exact same questions.

14  At your deposition you swore to tell me the truth, correct?

15  A.  Yes.

16  Q.  I will read you what your answer was at that time, and this

17  is page 32, lines 24 through 17:

18  "Q. Was it just a reduction of head count, or was there any

19  other issue that you could recall?

20  "A. Simply reduction of head count.

21  "Q. Was anybody mad at Mr. Alper that you can recall?

22  "A. No.

23  "Q. Did anyone dislike Mr. Alper that you can recall?

24  "A. No.

25  "Q. Did anybody think Mr. Alper was dishonest that you can

K347HOR6                        Wiederman - cross

1   recall?

2   "A. No.

3   "Q. Did anyone think that Mr. Alper had breached any of his

4   duties to Major Energy?

5   "A. No.

6   "Q. Did anyone think that Mr. Alper had done anything that

7   interfered with the sellers' right to maximize their earnout

8   potential?

9   "A. No."

10          Do you recall that testimony, Mr. Wiederman?

11  A.   I do.  And I think I'm consistent with that.  You know,

12  having love/hate relationships in a family type atmosphere,

13  happens all the time.  I mean --

14  Q.   Let's look at what was actually happening when Mr. Alper

15  was being terminated, OK, Mr. Wiederman?

16          Pull up DX813, and specifically, James, let's go to

17  page 54.

18          Do you recall, Mr. Wiederman, having communications

19  with Mr. Horowitz and Mr. Sobel and Mr. Moeller to devise a way

20  to get rid of Dan Alper?

21  A.   Devise a way?  I don't recall devising a way.

22          THE COURT:  Can you speak a little closer to the mic.

23  A.   I don't recall devising a way.  Like I said, you know, it

24  became clear that he was redundant and he was no longer needed

25  in the company; and as somebody who had a fiduciary

K347HOR6                        Wiederman - cross

1    responsibility to the company to cut coasts and maximize

2    profits for the sellers and for the company, you know, it was a

3    natural thing to do, you know, as I told Mr. Kroeker.  It's not

4    like there was any objection.  It's not like we hired a CEO

5    after that.

6           MR. MAROONEY:  Sorry, your Honor.  Just to object to

7    this exhibit, because it appears to be an exhibit created by

8    counsel for the defendants where they've pieced together

9    certain WhatsApp messages from long strings to present what is

10   in Exhibit 813.  But we can continue to use it just to move

11   along, but I just wanted to note that.

12          MR. BROWN:  Just for the record, your Honor, we can

13   prove that's actually not what this is.  This is a document

14   that's been in discovery.  It's a trial exhibit, and it's a run

15   from certain dates of WhatsApp messages between various of the

16   seller shareholders and others.  It's a chronological reporting

17   of certain WhatsApp transactions and communications that were

18   produced in discovery and have been in both parties' hands for

19   more than a year.

20          THE COURT:  In other words, it's not necessarily a

21   single contemporaneous conversation.  I will bear that in mind.

22          MR. BROWN:  Correct.  And it shows the dates on which

23   the various -- plaintiffs made certain redactions for relevance

24   because they were chatting about other things than the case.

25          THE COURT:  Understood.

Q.  OK.  So, Mr. Wiederman, I first want to direct you to this
chat that's going on on April 20, 2017.  And just again to
orient you with the time, April 20, 2017 is during the same
timeframe where the parties were going back and forth on the
earnout calculation that you and I went through.  OK?

So now let's look at what is happening.  Let's look at
what is being communicated by Mr. Sobel to you on April 20,
2017.  He says, check your e-mails, Dan giving away controls to
Spark so he looks good to them at all of our expense.

Your response:  Guy cannot be trusted.

Moeller then appears to respond:  We need to all meet
and discuss when he's away next week.

David Sobel:  I have to leave at 3:30 today, so if we
are going to meet, please keep that in mind.  Thanks.

After this text message, Mr. Wiederman, there was a
meeting between you and Mr. Horowitz and Mr. Moeller to devise
a way to get rid of Dan Alper, correct?

MR. MAROONEY:  Your Honor, I would just note that
those are two different chat numbers on the left-hand side; one
is 14 and one is 16.  It kind of goes back to the point of
piecing this together somehow.

THE COURT:  OK.

MS. PECTOR:  Your Honor, this is because there are
multiple people on this chat.  You can see there are four
people on this chat; there's Saul Horowitz, David Sobel, Mark

K347HOR6                        Wiederman - cross

1    Wiederman and Levi Moeller.  They're in a group chat.

2              THE WITNESS:  But it's different groups.  It's pieced

3    together from different groups.

4              MR. MAROONEY:  One has four people, one has three

5    people.

6    Q.  Mr. Wiederman, are you denying that you had these chats

7    with Mr. Horowitz and Mr. Moeller?  Are you somehow contending

8    that this is false evidence?

9    A.  I said they're different groups.

10   Q.  OK.  Let's go on and see what happens.  Do you first of all

11   recall having a meeting with Mr. Moeller, Mr. Horowitz and

12   Mr. Sobel to talk about getting rid of Dan Alper?

13   A.  I don't necessarily recall having the meeting with the four

14   of us.  I think it was more of a conversation with myself and

15   Mr. Horowitz, and then I spoke to Mr. Kroeker, and, you know,

16   we were discussing numbers and different things and, you know,

17   we came to the conclusion that he is no longer needed.

18   Q.  You called Mr. Kroeker and said that you and Mr. Horowitz

19   wanted to have Dan terminated, correct?

20   A.  We were having a discussion about if he is necessary to the

21   company.

22   Q.  Let's look at what you said in the chat.

23              So, James, if we can go to page 55 of the chat, and if

24   you will start with the line that says, "Hi.  You speak to

25   Nathan yet."

1          All right.  So now David Sobel is sending a text
2    message asking have you spoke to Nathan yet, April 5, 2017.
3    Right?  Your response:  No.
4          Moeller says:  Don't break out the champagne yet.
5          Your response:  He said he will call me in about an
6    hour.
7          David Sobel, an explicative with a smiley face.
8          And then your next response:  Done.  With what appears
9    to be two beer glasses or wine glasses cheering.  Right?
10   A.  OK.
11   Q.  And after that, Mr. Wiederman, this chat continued,
12   correct?  You knew that Mr. Alper was going to be terminated;
13   and you, and Mr. Moeller and Mr. Horowitz were planning for his
14   termination on April 28, correct?
15   A.  OK.
16   Q.  James, let's go to page 56.
17          All right, so page 56, if we start in the column
18   called body and we go to the third entry, David Sobel says,
19   should we have a contingency plan in case DA shows up at the
20   office on Friday before Grae talks to him?
21          Who was Grae, Mr. Wiederman?
22   A.  Mr. Griffin, HR at Spark.
23          THE COURT:  Griffin?
24          THE WITNESS:  Griffin.  HR at Spark.
25   Q.  And then David Sobel notes less than 11 hours to

K347HOR6                    Wiederman - cross

1    liquidation.  We then see Levi Moeller respond:  Help.  His

2    door lock is changed.

3              Then David Sobel says another explicative.

4              And then you go on to say:  Hopefully he'll get the

5    call before he gets there.

6              And Mr. Moeller says:  Well, tell him you won't be in

7    until 10:30, your kids birthday and he shouldn't rush.

8              So, you guys were trying to orchestrate Mr. Alper not

9    coming into the office until he had received a termination

10   call, correct?

11   A.  Yes.

12   Q.  And you had asked Mr. Kroeker to make the termination call

13   because you didn't want to do it yourself, right?

14   A.  No.  Like I said earlier, it was a discussion I had with

15   Mr. Kroeker.  Internally we didn't feel he was necessary.  I

16   had the discussion with Mr. Kroeker; he didn't feel it was

17   necessary either to keep him on board.  I couldn't do it

18   because I reported to Mr. Alper, so ...

19   Q.  So, let's be clear, Mr. Wiederman, it was not Spark's

20   suggestion to terminate Mr. Alper, correct?

21   A.  It was a mutual decision.

22   Q.  Well, let me read to you what you said at your deposition

23   when I asked you.

24             James, can you pull up page 39, lines 2 through 21.

25   "Q. Did anybody at Spark Energy, Inc. tell you Dan Alper needed

K347HOR6                    Wiederman - cross

1   to be terminated before you raised the issue to Mr. Kroeker?
2   "A. No.
3   "Q. Did anyone at National Gas & Electric LLC tell you Mr.
4   Alper needed to be terminated before you raised the issue to
5   Mr. Kroeker?
6   "A. No.
7   "Q. Did anyone at Spark Holdco LLC tell you Mr. Alper needed to
8   be terminated before you raised the issue to Mr. Kroeker?
9   "A. No.
10  "Q. Had you not raised the issue with Mr. Kroeker, would Mr.
11  Alper have continued to be the CEO?
12  "A. Yes, had that conversation not been initiated, yes."
13          That was your testimony, right?
14  A.  Because I couldn't fire him; he was my boss.
15  Q.  Let's look at what happened once Mr. Alper came in that
16  day.
17          James, if we can go to page 58.
18          Now, page 58, Mr. Wiederman, do you see there is an
19  entry towards the bottom of the page from Levi Moeller saying:
20  Any update?  Can't stay in hiding all day.
21          You respond:  LOL.  I'm going to call Grae.
22          Levi Moeller says:  I think we should have his door
23  open just in case he shows up.
24          Right?
25  A.  OK.

1    Q.  Let's go to page 59, James.

2             The next thing that happens is you send a note to

3    Mr. Moeller and Mr. Sobel saying I think he is pulling up.

4             The next thing:  Now?  What?  His door is locked?

5             You respond:  Tzvi is opening it.

6             Mr. Wiederman again responds:  Grae is not answering

7    my call, I'm down to 2:20.  May be a false alarm.  Saw his type

8    of car get off the exit.

9             Then you receive confirmation from Levi Moeller he is

10   here, right?

11   A.  OK.

12   Q.  And David Sobel responds:  You serious?

13            Levi Moeller says:  Yes.

14            So, at this point in time you guys are hiding from Mr.

15   Alper, right?

16   A.  It would seem so, OK.

17   Q.  And you were making fun of Mr. Alper behind the scenes,

18   correct?

19   A.  Making fun?  I wouldn't call this making fun.

20   Q.  Do you see going down Mr. Moeller says:  I'm in Taub's

21   office watching the cameras.

22   A.  OK.

23   Q.  You say:  Nathan just called me.  He is going to text him?

24   A.  All right.

25   Q.  Let's see what happens on the next page, page 60.

K347HOR6                          Wiederman - cross

1          Page 60 you say:  Levi, I think you should go to your
2     office.
3          He responds:  Why?  NTF gave me presents, he has for
4     you too Mark.  He wants to go for a walk and catch up.
5          And then if you scroll down, Levi Moeller says:  Bunch
6     of chickens.
7          You respond:  I'm in my office with my vest on.  Levi
8     Moeller says he is telling him everything he is working on and
9     about the people he is bringing on to help him.
10          Did I read that right, Mr. Wiederman?
11    A.   Yes.
12    Q.   Let's look at the final entry on page 61.  Specifically you
13    ask Moeller to come to your office so the two of you can hold
14    hands, right?
15    A.   OK.
16    Q.   And he says:  Probably better I don't unless you want me.
17          You say, OK.  You ask what he is saying.  David Sobel
18    says:  Mark Wiederman, any last wishes?
19          And your response:  Tell my kids I love them.
20          Right?
21    A.   OK.
22    Q.   And Mr. Alper was fired that day because you and Mr.
23    Horowitz made the request, correct?
24    A.   No, he was fired that day because he was no longer needed
25    in the company; he was redundant.

K347HOR6                    Wiederman - cross

1          All of this is just -- I mean, you know, look, could
2     it have been done in a more respectful way?  Absolutely.  Do I
3     regret writing some of these things?  Absolutely.  It wasn't
4     sent to Mr. Alper, it was amongst us, but this is not why he
5     was fired.  It was some people having fun.
6          Yes, I regret it, but, you know, I didn't fire him; I
7     couldn't fire him.  I fired people in the past, and I've done
8     it very respectfully.  This had to be done out of Houston, and
9     it was just a timing thing.  So, it wasn't your typical firing.
10    It turned into this.  Yes, it could have been done with a
11    little more respect, absolutely.
12    Q.  Mr. Wiederman, you signed a letter with Spark -- you and
13    Mr. Horowitz -- asking for Mr. Alper to be terminated, correct?
14    A.  Yes.
15    Q.  James, pull up DX1030.
16          And DX1030 was a communication from Mr. Melman -- a
17    communication from Mr. Melman to you on April 27, 2017 at 3:06,
18    correct?
19    A.  Yes.
20    Q.  And specifically Mr. Melman says, "Mark and Saul, Nathan
21    consulted with me regarding your intention to effectuate the
22    termination as early as tomorrow.  I insisted that we, Spark,
23    NGE, need to get some confirmations and protections as to this
24    decision on your part, which I have included in the attached
25    letter."

1            Do you recall receiving that, Mr. Wiederman?

2    A.  I don't recall the letter, but I'm sure I will see it

3    shortly.

4    Q.  Well, let's take a look at the letter.  This was a letter

5    confirming that you were requesting that Spark Energy terminate

6    the employment of Dan Alper immediately, correct?

7    A.  Was this the one that was signed?

8    Q.  This is the initial letter that Mr. Melman sends back to

9    you, correct?

10   A.  I understand, but was this the one that was signed?

11   Q.  Scroll down.  This is the first draft, right?

12   A.  So, this wasn't signed.

13   Q.  We're going to pull up the signed one.

14   A.  Go ahead.

15   Q.  But I'm setting a foundation, Mr. Wiederman.  This is your

16   blank signature block here, correct?

17   A.  Yes.

18   Q.  And there is a signature block also for Mr. Horowitz,

19   correct?

20   A.  Yes.

21   Q.  And in this particular draft it says, "We confirm that this

22   request is in the best interest of the Major Companies because

23   Dan's skill set is not necessary going forward.  We also

24   confirm that Horowitz has consulted with the previous members

25   of the Major Energy companies in making this decision."

Wiederman - cross

1              Mr. Wiederman, did you or Mr. Horowitz consult with
2      the minority selling shareholders about terminating Mr. Alper
3      before that happened?
4      A.  I'm not sure.  I'm not sure.
5      Q.  You don't recall having any communications with any of the
6      minority sellers?
7      A.  Like I said, I'm not sure, I don't recall if we did or did
8      not.
9      Q.  Did you have communications with Mr. Horowitz about the
10     termination of Mr. Alper?
11     A.  Yes.
12     Q.  And you and Mr. Horowitz agreed to release any claims
13     against Spark or NGE that could arise in connection with Mr.
14     Horowitz filing a suit as a result of his termination, correct?
15     A.  You mean Mr. Alper --
16             MR. MAROONEY:  Mr. Alper.
17     Q.  Sorry.
18     A.  The reason for this protection, for this letter, is because
19     if Mr. Alper got fired, it triggered a breach in mine and Mr.
20     Horowitz's employment contract, so we needed to waive that
21     breach.  That was the reason behind this letter, that's it,
22     nothing more than that.
23     Q.  You ultimately signed the letter, correct, Mr. Wiederman?
24     A.  I signed a letter.
25     Q.  And the letter that you signed released Spark and NGE from

K347HOR6                      Wiederman - cross

1    any claims in connection with Mr. Alper's termination, correct?

2    A.  I'm sure you have it.  I don't recall.  It's been a few

3    years.

4    Q.  James, can we pull DX559.  Can you blow that up, James.

5           Mr. Wiederman, this was the letter that you and Mr.

6    Horowitz signed requesting the termination of Mr. Alper,

7    correct?

8    A.  Yes.

9    Q.  This was signed on April 27, 2017, correct?

10   A.  Yes.

11   Q.  The day before Mr. Alper was terminated, correct?

12   A.  Yes.

13   Q.  And you say, "Nathan, on behalf of the Major companies we

14   are requesting that Spark Energy terminate the employment of

15   Dan Alper immediately."  Correct?

16   A.  That's what it says.

17   Q.  You go on to say, "As per our prior communications, we

18   mutely agreed that this course of action is in the best

19   interest of the Spark Energy and the Major Energy companies

20   because Dan's skill set is not necessary going forward.  We

21   also confirm that Saul Horowitz has consulted with the previous

22   members of Major Energy in making this decision."

23          Did I read this correctly?

24   A.  That's what I said earlier.

25   Q.  You then go on to say, "We also agree that the sellers will

1    not allege or make any claim under the MIPA, the earnout

2    agreement, or otherwise, that taking this action reduces or

3    jeopardizes the earnout under the MIPA, or restricts the Major

4    Energy companies from operating in accordance with section 2.7

5    of the earnout agreement, or otherwise interferes with the

6    operation of the Major business.  Any cost of this decision

7    such as legal fees or other expenses will be a reduction to the

8    adjusted EBITDA of the Major companies for purposes of

9    calculating earnouts and installments under the MIPA."

10            Correct?

11   A.  That's what it says.

12   Q.  Mr. Wiederman, but for this letter being sent to

13   Mr. Kroeker, Mr. Alper would not have been fired as the CEO,

14   correct?

15   A.  Because I can't fire him.

16            MR. MAROONEY:  Objection.  Mischaracterizes.

17            THE COURT:  You can answer.

18   A.  I couldn't fire him.

19            MS. PECTOR:  Pass the witness.  Sorry, we do have some

20   exhibits to enter:  It's a little bit of a longer list, your

21   Honor.

22            DX736, 738, 494D, 1059, 290, 494, 494F, 609, 494H,

23   349, 250, 872, 612, 700, 715, 711, 1016, 783, 932, 946, 265,

24   399, 419.

25            PX110.

K347HOR6                        Wiederman – cross

1           THE COURT:  You said 419?

2           MS. PECTOR:  Yes.  PX110.

3           THE COURT:  DX110?

4           MS. PECTOR:  PX, your Honor.

5           PX758.

6           DX1033, 519, 540, 800, 813, 1030.

7           Your Honor, the last one, we would like to introduce

8    the demonstrative just in the record so we have a reference to

9    it.

10          THE COURT:  And that's number what?  3?

11          MS. PECTOR:  Yes, your Honor, 3.

12          THE COURT:  OK.

13          MR. MAROONEY:  Subject obviously to the objections.

14          THE COURT:  Yes, I am noting that.  I will receive it

15   as a demonstrative for what it's worth, bearing in mind the

16   objection, and as to all of these I will note that there are

17   objections on which I've reserved and I might be allowing them

18   for a limited purpose or in part, but with that clarification,

19   they are received.

20          (Defendant's Exhibits DX736, 738, 494D, 1059, 290,

21   494, 494F received in evidence)

22          (Defendant's Exhibits 609, 494H, 349, 250, 872, 612,

23   700, 715, 711 received in evidence)

24          (Defendant's Exhibits 1016, 783, 932, 946, 265, 399,

25   419 received in evidence)

1          (Defendant's Exhibits DX1033, 519, 540, 800, 813, 1030

2     received in evidence)

3          (Plaintiff's Exhibits 110 and 758 received in

4     evidence)

5          MS. PECTOR:  Thank you, your Honor.

6          THE COURT:  And redirect?

7     REDIRECT EXAMINATION

8     BY MR. MAROONEY:

9     Q.  Why don't we start where we just left off, and let me ask

10    you, Mr. Wiederman, about Mr. Alper's termination.  Tell us,

11    please, why in your view did you feel that Mr. Alper's services

12    as CEO were no longer needed at Major Energy in April 2017.

13    A.  Well, we felt that decisions were being made out of

14    Houston -- CEO-type decisions were being made out of Houston.

15    It started in 2016 that there were a few functions slowly but

16    surely being moved from New York to Houston, and it got to the

17    point by April 2017 that we felt it was no longer necessary to

18    have another CEO that's ultimately going back to Mr. Kroeker

19    and getting his final say.

20    Q.  Was Mr. Alper ever replaced as CEO after he was terminated?

21    A.  No.

22    Q.  Who performed the function of CEO at Major Energy?

23    A.  I guess de facto it was Nathan Kroeker.

24    Q.  You were asked a few questions about PSE.  We have heard a

25    lot about PSE in various snippets.  Tell us again, please, what

K347HOR6                          Wiederman -redirect

1    or who is PSE?

2    A.   PSE is the life line of a company like ours; they provide a

3    credit sleeve and working capital for us to be able to operate,

4    and they also provide some wholesale energy commodity functions

5    for us.

6    Q.   Prior to Major's sale to NGE, could you describe for us the

7    relationship between Major Energy and PSE.

8    A.   It was a phenomenal relationship.  We probably met on

9    average once a quarter.  We were their prized company.

10            Pacific Summit -- PSE as it's been referred to -- is

11   owned by a large Japanese conglomerate called Sumitomo, and

12   they brought us to Japan and introduced us to their parent

13   company as their, you know, prized possession, so to speak, and

14   we had a phenomenal relationship with them.  That's why every

15   time the contract came up for renewal we renewed the contract.

16   Q.   Why did Major, presale to NGE, choose PSE as its supplier?

17   A.   Sorry.  What was the question?

18   Q.   Presale to NGE, why did Major Energy choose PSE as its

19   supplier?

20   A.   Because they allowed flexibility and transparency.  On a

21   flexibility perspective they allowed us to pivot quickly, to

22   price quickly, which in this industry is very important.  If

23   somebody sends you an account, a large commercial account to

24   price out, turn-around time is very, very important, and with

25   PSE we were able to do that.  And that was something why

1    commercial brokers really appreciated our services.

2              And from a flexibility perspective, we were able to do

3    aggregation deals; we were able to enter a stage -- we were

4    able to post collateral without any issue.  We had authority

5    over our own bank accounts.  We were able to wire money as we

6    see fit.  We were in control, so it really gave us a lot of

7    flexibility to run the company.

8    Q.  Did you choose PSE solely based on the price they gave you?

9    A.  Absolutely not.  On the contrary, a few times when their

10   contracts were up for renewal, we met with Shell, and we met

11   with McCory, two very large companies, and they actually had

12   better pricing -- one I believe was close to 50 cents -- and we

13   still chose PSE even though PSE was higher pricing, because

14   like I said transparency, flexibility and service, you can't

15   put a -- well, I mean you could put a price on that but it was

16   worth the price.

17   Q.  Following the sale to NGE, if you had your choice, would

18   you have chosen to keep PSE as your supplier going forward?

19   A.  Absolutely.

20   Q.  Why?

21   A.  As I said, to continue our service to our customers, to our

22   brokers, and to have that flexibility and that transparency.

23   Q.  Did you have that choice?

24   A.  No.

25   Q.  Who made that choice?

K347HOR6                    Wiederman -redirect

1    A.   Spark.

2    Q.   And now in the time period leading up to the sale to NGE,

3    we see some e-mails about a right of first refusal PSE had, and

4    some -- I don't want to say animosity or difficulty --

5    A.   Tension.

6    Q.   Tension may be a better word.  Can you describe that for

7    us, please.

8    A.   Sure.  You know, they have a right of first refusal, so if

9    they wanted to buy us, they could have bought us for the same

10   deal that was offered to us by NGE.  And we needed them to

11   either, you know, step up to the plate and make an offer, or to

12   waive that right of first refusal.

13   Q.   And were you eventually able to work past that issue?

14   A.   Yes.

15   Q.   And did ultimately that tension that you've described

16   adversely impact the nature of the relationship Major had with

17   PSE?

18   A.   No, not at all.  We had a very good relationship with them.

19   Q.   I'd like to show you PX508, please.  PX508 is an e-mail

20   exchange dated February 8, 2017.  It's an exchange by Mr.

21   Horowitz and Mr. Kroeker and you.  Again, this is February 8,

22   2017.  Mr. Horowitz is describing that "Negotiations with PSE

23   did not proceed the way we would have wanted, and we are in

24   agreement to give Spark supply a try as Major's supplier."

25           Do you see that?

1    A.  I do.

2    Q.  Can you describe the nature of the relationship between

3    Major and PSE during this e-mail?

4    A.  Yes.  At that time the relationship has been destroyed.

5    Our counterparties were fired because of it.  Our

6    counterparties at Pacific Summit and PSE were let go because of

7    the breakdown of the relationship.  And they weren't happy with

8    the way they were being strung along with NGE, and the contract

9    at that time was terminated by Spark.  And we have never

10   terminated the PSE contract.

11   Q.  So it was a futile effort at that point in time.

12   A.  Absolutely.

13            MS. PECTOR:  Objection.  Leading, your Honor.

14            THE COURT:  Sustained.  Rephrase it.

15   Q.  OK.  Did you believe it was a futile effort at that point

16   in time to try to revive the relationship with PSE?

17   A.  Absolutely.

18            MS. PECTOR:  Objection.

19            THE COURT:  It's OK.

20   A.  Yes, we actually tried, and it was futile.

21   Q.  You were asked questions about residential vendors.  Remind

22   us, please, what residential vendors are.

23   A.  Residential vendors are companies that hire door-to-door

24   agents to go knocking on doors and soliciting customers.

25   Q.  And prior to Major's sale to NGE, can you describe the

1    nature of Major Energy's relationships with its residential

2    vendors?

3    A.   Major Energy prior to the relationship with NGE was the

4    preferred company for a lot of these vendors.  The reason for

5    that is because Major Energy really wanted -- really built a

6    brand, a trusted brand, a brand that the vendors knew they

7    could trust, a brand that the vendors knew they would always

8    get paid, a brand that the vendors knew will never tell them to

9    slow their marketing or stop marketing.

10           We always treated them with the utmost respect, and to

11   make decisions at Major Energy was very quick.  You know, if

12   somebody walks into my office, I make the decision and we move

13   on.  Things worked very, very quickly.

14           So we actually -- I heard from a lot of vendors on the

15   street that we were the preferred company to work for when it

16   came to these residential vendors.

17   Q.   Did those relationships change after the sale to NGE?

18   A.   Absolutely.

19   Q.   How?

20   A.   Because NGE and/or Spark -- which right after all of a

21   sudden we started finding out who Spark was -- so they were

22   poaching our vendors.  Our vendors no longer wanted to work

23   with us if decisions were going to be made by Spark.  And I

24   tried telling them that, A, we are a stand-alone company; we're

25   going to be left alone.  That worked for a little period of

1    time, but it's a small world out there, and once they saw Spark

2    poaching our vendors and they realized that I'm not making the

3    ultimate decision and I no longer have the final say in the

4    company, things really changed.

5         And the agents amongst these vendors, they jump

6    around, so it's a very small world; they all talk to each

7    other.  So, they know which companies are the preferred

8    companies to work for.

9    Q.  Let me show you PX184.  This is a May 16 -- May 19, 2016

10   e-mail exchange among you, Mr. Wolbrom and Mr. Alper.  Do you

11   see that, sir?

12   A.  Yes.

13   Q.  And if you look down at the bottom e-mail it's an e-mail

14   from Mr. Sam Bensinger to Mr. Wolbrom.  By the way, remind us

15   who Mr. Wolbrom is.

16   A.  He was our chief marketing officer.

17   Q.  And this is after the sale to NGE, correct?

18   A.  That's correct.

19   Q.  And his e-mail says, "I received a call from Sunil today

20   very upset.  He is telling me that his managers and teams are

21   being solicited to join a different marketing group either by

22   "WMS", Emerge, or EGC to sell Spark Energy in NYC.  They are

23   trying to steal all of his NYC Major Energy offices by offering

24   them more money ($80 electric no usage, $80 gas no usage) to

25   sell Spark."

K347HOR6                    Wiederman -redirect

1              Do you see that, sir?

2    A.   Yes.

3    Q.   Can you give us the context of what is happening here?

4    A.   Yeah, basically --

5              MS. PECTOR:  We object.  The document is hearsay.  He

6    hasn't laid a foundation.  Mr. Wiederman is not on these

7    e-mails -- on this e-mail reporting on whatever this is that

8    allegedly that occurs.  Mr. Wiederman doesn't have personal

9    knowledge of this.

10             THE COURT:  Well, establish foundation.

11             MR. MAROONEY:  Sure.  Maybe we can just put the

12   blow-up down so I can see the document.  Thanks.

13   Q.   You see, Mr. Wiederman, if you follow the chain upward,

14   Mr. Wolbrom forwards that e-mail to you, does he not?

15   A.   Yes, he does.

16   Q.   And did Mr. Wolbrom report to you at that time?

17   A.   Yes, he did.

18   Q.   So based upon Mr. Wolbrom forwarding the e-mail to you, did

19   you have an understanding of the situation reflected in the

20   e-mail at the bottom of the chain we just read?

21   A.   Yes.

22   Q.   What was that understanding?

23   A.   That our marketers were -- our vendors were being poached

24   by Spark to go work for them.

25   Q.   OK.  This is one month after the deal closed with NGE,

K347HOR6                         Wiederman -redirect

1   correct?

2   A.  I'm sorry?

3   Q.  This is one month after the deal closed with NGE, correct?

4   A.  Yes.

5   Q.  And it's prior to the dropdown, right?

6   A.  Correct.

7   Q.  Let's take a look at PX221.  PX221 is a May 26, 2016 e-mail

8   --

9   A.  Yes.

10  Q.  -- from Mr. Wolbrom to you and Mr. Alper.  Do you see that,

11  sir?

12  A.  Yes.

13  Q.  And it's referring to a fellow named Javier and something

14  he did.  Do you see that, sir?

15  A.  Yes.

16  Q.  OK.  Describe for us who Javier is and what is the context

17  this and the subject of this e-mail, please.

18          You can put that down so he can see the whole e-mail.

19  No?  Pull up PX221.  Yes.

20  A.  So Javier reports to Jason Garrett.  Javier is their main

21  sales/marketing employee over at Spark, and he was in this case

22  poaching Bill Siveter, one of our vendors at the time.

23  Q.  How, in your view as president of Major Energy, did the

24  relationship change with the vendors impact Major's business

25  and ultimate ability to achieve the earnout?

1    A.  So, Major Energy was a very unique company.  When I started

2    Major Energy I saw an opportunity in the industry to create a

3    brand.  And what I mean by that is -- and Saul Horowitz will

4    probably remember this -- we met somebody that had a close

5    relationship with Richard Branson from Virgin who wanted to get

6    into this space, and he said there is really no brand in this

7    space; there is no Apple Energy; there is no Google Energy;

8    there is no Virgin Energy, you know, it's just a bunch of

9    companies; it's like 30, 40 different companies out there.  But

10   it didn't work out for whatever reason, and what we decided to

11   do is to what I would call imitate the W.B. Mason model.

12   Growing up the two office supply companies were Staples and

13   Office Depot, and then all of a sudden W.B. Mason made a splash

14   on the scene and became a very large company.  The way they did

15   that was they aligned themselves with trusted brands like the

16   New York Yankees and the Boston Red Sox, and that's how they

17   became a well known, trusted company.

18        We did the same.  We aligned ourselves with Madison

19   Square Garden, and we aligned ourselves with Yankee Stadium, we

20   aligned ourselves with Papa John's Pizza.  It was very, very

21   unique in the industry, there were a lot of imitators

22   afterwards, but nobody did it as well as we did.  By doing so

23   we became a trusted brand in the industry, and that's why

24   vendors really enjoyed working with us.

25        Once we were dropped down to Spark, and we were no

1    longer left alone, and decisions were no longer being made by

2    Major Energy, Major Energy was no longer in control of how to

3    spend their money; Major Energy was no longer in control on the

4    vendors to keep marketing and keep selling.  We went from being

5    that trusted brand to a company that has to just follow their

6    quarterly earnings.  That's why I was told, you know, once by

7    Mr. Maxwell, you know, you have to think about the Spark stock.

8    And that was the exact opposite of being Major Energy as a

9    privately held company that had the flexibility to build the

10   company that we built.

11   Q.  How about on the commercial broker side, were those

12   relationships impacted by the sale to NGE?

13   A.  Absolutely.  What is extremely important is two things:

14   Relationships and turn-around time.  And when I say turn-around

15   time I mean getting them pricing in a reasonable time fashion,

16   usually 24 to 48 hours, sometimes a little longer -- but for

17   the most part it was within 48 hours.

18          And also every commercial building or every commercial

19   broker there would be a story around that, and sometimes we had

20   the flexibility at Major Energy to do it at lower margins

21   because we knew if we get this real estate broker this building

22   at a lower margin, and we shown him how great our company is,

23   then we will get future business at higher margins.

24          When we were with Spark there were margin limitations

25   that we had to hit, and that is also a problem for a company

K347HOR6                      Wiederman -redirect

1     that when we were privately held we didn't have those issues.

2     Q.  Let's show PX160, please.  This is a March 3, 2017 e-mail

3     from you to Mr. Alper and Mr. Horowitz.  Take a moment to

4     review it.  My focus is going to be on the first paragraph

5     where you're talking about someone named Cory coming in.

6     A.  Right.

7     Q.  And then in the third line down you say, "This is not about

8     Cory, per se, it's about lots of small series of events and

9     fires that we are constantly trying to contain.  As another

10    example, a larger broker of ours was recently told by Spark

11    that all pricing should go through Spark's matrix, they will be

12    handling the pricing for all companies."

13             Do you see that, sir?

14    A.  I do.  Mr. Kroeker wanted to put this guy Cory just to sit

15    in our office, I guess maybe as oversight.  I'm not sure what

16    he did, but he just felt very strong about having this person

17    Cory in our office.

18             The issue with that is, again, we were a family

19    company, everyone trusted me and Saul, and we were saying for

20    months and months and months, until the end of 2018, we are a

21    stand-alone company, it's business as usual, nothing is going

22    to change.  And then they see new people coming in, you know,

23    and a lot of people got nervous, and it caused some

24    employees -- I'm sure it weighed in the decision when some

25    employees left.

1   Q.  Let's look at PX127.  By the way, before we go there,

2   again, as president of Major Energy, what was your observation

3   in terms of how the change in the commercial broker

4   relationships impacted Major and its ability to achieve the

5   earnout?

6   A.  Well, the brokers are no longer bringing us business.  I

7   mean they slowed down in bringing us business.  We had been

8   told by many brokers that Spark does not have a good name in

9   the industry.  And the pricing was being done out of Houston;

10  our turn-around time was delayed tremendously; and our rates

11  were no longer -- we were somewhat out of the ballpark because

12  we had certain margins we needed to hit.

13  Q.  There was some discussion this morning -- it feels like a

14  long time ago now -- about a January 18 decision to reduce

15  customer acquisition costs and marketing efforts.  I would like

16  to just revisit that.

17          Could you tell us, please, by the end of December 2017

18  and early January 2018, what was the status of Major Energy's

19  business at that time with respect to residential and

20  commercial sales?

21  A.  It was petering out.  At the end of 2017 we had about -- I

22  don't remember what it was -- nowhere near the number that we

23  needed to be at with the customer count, and our vendors were

24  leaving us.

25          More important, we couldn't get any vendors.  Prior to

K347HOR6                        Wiederman -redirect

1    the sale we had vendors knocking on our door that wanted to

2    sell to us.  We were the go-to company because, like I said, we

3    were that brand, that exciting brand that people wanted to sell

4    for.

5          But when it came January 1, 2018, I mean vendors

6    didn't want to sell for us, brokers didn't want to sell for us,

7    and a lot of our key employees left.

8    Q.  And as president of Major Energy, was your view that some

9    kind of regulatory issue or change or law or regulation had

10   anything to do with the status of the business at the time?

11         MS. PECTOR:  Objection, your Honor.  Leading.

12         THE COURT:  Overruled.  You can answer.

13   A.  There were no state or government regulations that were,

14   you know, put into place between 2016 and 2017 that would have

15   hampered our ability to continue the growth of Major Energy

16   that was happening prior to the sale.

17   Q.  What was your observation as to the cause?

18   A.  Like I said earlier, the cause was that we were part of a

19   public company, and we were no longer a brand; we were a

20   company that needed to think quarter to quarter because of a

21   stock -- which I get it, you are a public company -- and

22   because of that we no longer had the ability to go out there

23   and get vendors and be that exciting brand that we always

24   wanted to be, and always grow.  We never once told our

25   marketers to stop marketing or slow down marketing in all the

K347HOR6                    Wiederman -redirect

1    years that we have been in business, and now everything

2    changed.

3    Q.  So in 2017 were there instances where you were told or

4    instructed by someone from Spark to stop spending money on

5    customer acquisition costs?

6    A.  Told to slow down.  Or it could be stop.  I don't recall.

7    But even as early as 2016 I remember Sam Bensinger walked into

8    my office and told me that he was told by somebody at Spark to

9    slow down marketing, because Bensinger worked with Elliot

10   Wolbrom in the sales and marketing department.  He even walked

11   in my office a couple of times and told me that he heard --

12   that word on the street -- and he heard that directly from

13   Javier -- was that Major Energy was being shut down tomorrow.

14   And this was as early as 2016.

15   Q.  From your perspective as president of Major Energy, which

16   company, Major or Spark, had ultimate decision-making authority

17   over the pace and manner of customer acquisition spending after

18   the dropdown?

19   A.  Spark, absolutely.

20   Q.  Which company, Major or Spark, had ultimate decision-making

21   authority over margin requirements with respect to commercial

22   customers?

23          MS. PECTOR:  Objection, your Honor.  Leading, and it

24   seems like he is calling for a legal conclusion.

25          THE COURT:  He can testify to his understanding.

1    A.   Spark.

2    Q.   Which company, Major or Spark, had ultimate decision-making

3    authority over marketing and sales strategies?

4    A.   Spark.

5    Q.   Now, before Major sold itself to NGE, did Major have a risk

6    committee?

7    A.   No.

8    Q.   Did Major have a board of directors?

9    A.   No.

10   Q.   How did Major run its business or govern itself?

11   A.   It was a very close-knit company.  We were about 30 to 35

12   employees running a company doing $250 million worth of revenue

13   a year -- which I remember Mr. Maxwell was very impressed

14   with -- and decisions were made very quickly.  Sales and

15   marketing, you know, anybody just walked into my office, asked

16   me a question, and I would make the decision; there wasn't a

17   lot of overriding, or risk committees, or directors and board

18   of directors.

19   Q.   And you were the president of Major Energy, right?

20   A.   Yes.

21   Q.   Who had ultimate decision-making authority prior to the

22   sale to NGE?

23   A.   I did.

24   Q.   Did Mr. Moeller?

25   A.   No.

K347HOR6                          Wiederman -redirect

1    Q.  So if you and Mr. Moeller disagreed on some kind of

2    marketing strategy or say aggregation deal, out of the two of

3    you who would make the decision?

4    A.  I would.

5    Q.  And describe for us Mr. Moeller's role relative to your

6    role at Major Energy prior to the sale.

7    A.  Mr. Moeller, he is an actuary by trade, he is a numbers

8    guy.  I wouldn't exactly -- well, I should be careful what I

9    say; I work with him now -- you know, he is not necessarily an

10   entrepreneur, but he is good at what he does, and that's really

11   what he is; he is a numbers person.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K34AHOR7ps                    Wiederman - Redirect

1   Q.  You alluded to this before.  What, again, as president,

2   what was your observation after the sale of the impact of the

3   sale to NGE and then the dropdown that Spark had on the

4   employees of Major Energy?

5   A.  An employee, once they saw that I lied to them by saying

6   that everything is going to remain the same, this is business

7   as usual, no need to worry.  Right away it was a huge IT

8   integration program that was put into place.  I don't think a

9   day went by, and I may be wrong, but -- and if I am wrong I may

10  be wrong like a handful, but I don't think a day went by from

11  when the sale, or even the dropdown happened, till the end,

12  till December 31, 2018, where a Major employee didn't speak to

13  a Spark employee or address a Spark employee as a Major

14  employee.  That's how tangled the companies were.  And not by

15  our choice.  And because of that, the employees saw the writing

16  on the wall.  And they saw that supplier functions were taken

17  to Houston.  And they no longer had any trust, and morale was

18  extremely low, and a lot of employees left.

19  Q.  Look at PX 127, please.

20          Sir, this is an e-mail chain, beginning at the bottom,

21  dated June 3rd, 2016?

22  A.  13.

23  Q.  I'm sorry.  June 13, 2016.  The first e-mail is from

24  someone named Misti at Spark Energy, you see that?

25  A.  Yes.

1    Q.  Who is Misti?

2    A.  She was in the accounting department at Spark.

3    Q.  It's an e-mail to Sobel.  As you'll see the e-mail chain

4    above it, it was forwarded to you.  Do you see that?

5    A.  Yes.

6    Q.  Do you have familiarity with the subject matter of this

7    e-mail, sir?

8    A.  I see that it says "Major Energy accounting."

9    Q.  And if you look down at the day's e-mail to Mr. Sobel,

10   would you give us the context, if you're familiar with it, with

11   what's going on.  And if you're not you're not.

12   A.  I'm not completely familiar.  Mr. Sobel can probably answer

13   this better.  But it's them asking me for, you know, a lot of

14   information from Major Energy.

15          MR. MAROONEY:  OK.  We can put that away.

16   Q.  Tell us about the resignations of Moeller, Sobel, and

17   Alper.  When did they occur, and how did that impact the

18   business, if it did?

19   A.  That occurred when the -- shortly after the dropdown to

20   Spark happened.  We all had clauses in our contract that if

21   there was a change of control, that it's a breach of contract

22   and they could call breach, and that would trigger a severance.

23          Mr. Moeller and Mr. Alper and Mr. Sobel did call

24   breach, and it was -- it had a huge impact on the company in

25   the sense, like I said, we all worked very closely together, so

K34AHOR7ps                    Wiederman - Redirect

1    initially everyone in the company thought that it would remain

2    exactly as how we had been.  It took a couple of months to work

3    things out.  They did receive their severance.

4         I did not call breach because I'm not a quitter and I

5    still felt that I could make this happen and make the numbers

6    work and still build Major Energy and continue to build it.  I

7    drank Spark's Kool-Aid, and that was wrong.

8         However, the answer to your question about Mr. Sobel

9    and Mr. Moeller and Mr. Alper, yeah, there was two months of

10   chaos in the office and two months of unknowns and instability

11   that definitely affected the morale and mindset of all the

12   employees.

13   Q.  You were asked many questions about your employment

14   agreement and duties under your employment agreement and time

15   and things like that.  Did you receive the performance reviews

16   from Spark when you were at Major Energy?

17   A.  Every year I would sit with Mr. Kroeker and he would, you

18   know, tell me how he felt about my performance and would

19   discuss, you know, what might follow as to that.

20   Q.  What were your reviews like?

21   A.  They were always stellar.

22   Q.  Did anyone ever criticize you for spending time away with

23   respect to other businesses?

24   A.  No.

25   Q.  Did you receive your bonuses?

1    A.  I received it every year except when I was terminated.

2    Q.  Counsel asked you a question about a company called ME

3    Solar, Major Energy Solar.  Do you remember that, sir?

4    A.  Yes.

5    Q.  How much time did you spend working on or doing anything

6    with respect to Major Energy Solar?

7    A.  In three years, I maybe spent a total of one hour.

8    Q.  Sorry.  Just one minute, Mr. Wiederman.

9         Do you recall counsel asking you questions about a

10   Pennsylvania regulatory settlement?

11   A.  Yes.  I recall that.

12   Q.  To be clear, the date of that settlement was -- well, it's

13   DX 260.  We can pull that back up.  290.  I'm sorry.

14        OK.  So this was from April 22, 2016.  Is that right?

15   A.  Yes.

16   Q.  But this was the settlement of an inquiry that was

17   happening back in 2015, or even before that, right?

18   A.  Right.

19   Q.  And did the settlement in any way impact Major Energy's

20   business or ability to gain customers or in any kind of way?

21   A.  No, not at all.  There was nothing in here that would have

22   hampered our business plan or our business growth.

23   Q.  And if we could look at PX 359, please.  Plaintiff's

24   Exhibit 359 is a January 28, 2016 e-mail, but at the bottom

25   first it's from Cliff Adams of Coady Diemar.  It's to

1    Mr. Hennekes and Mr. Konikowski.  Do you see that, sir?

2    A.  I do.

3    Q.  Remind us who Cliff Adams is?

4    A.  He was our investment banker.

5    Q.  And he's forwarding to -- I'm sorry.  You're a little ahead

6    of me, Eric.  Go back down to the bottom of this e-mail.

7         He's forwarding to Mr. Hennekes and Mr. Konikowski a

8    major management presentation.  Do you see that, sir?

9    A.  Yes, I do.

10   Q.  And let's go up to the top of the page.  And then

11   Mr. Hennekes forwarded that same presentation to Michael Tsang

12   and Todd Gibson and Brandon Hoover.  Do you see that?

13   A.  I do.

14        MR. MAROONEY:  Can we turn to page 45, Eric, of the

15   exhibit, the management presentation.

16   Q.  By the way, what's the purpose of this management

17   presentation?

18   A.  It's an update on Major Energy, the current state of the

19   union, so to speak.

20   Q.  And do you see on slide 43, or page 45, the exhibit, the

21   disclosure the Pennsylvania Respond Power?

22   A.  Yes.

23   Q.  So that was something that was fully disclosed to NGE

24   before it bought Major Energy, right?

25   A.  Absolutely.

K34AHOR7ps                    Wiederman - Redirect

1   Q.  Still, it was willing to pay $8 million?

2   A.  Correct.

3           MS. PECTOR:  Objection, your Honor, to the

4   characterization.

5           THE COURT:  Noted.

6   Q.  Do you recall counsel asking you some questions about an

7   Illinois investigation?

8   A.  Yes.

9   Q.  Leave this up.  First of all, do you see that there was an

10  Illinois investigation or regulatory issue disclosed in this

11  management presentation?

12  A.  Yes.

13  Q.  NGE was fully aware of that?

14  A.  Yes.

15  Q.  And then counsel asked you about something different, I

16  think.  It's DX 700.  This was a lawsuit by the Illinois

17  attorney general.  Do you see that?

18  A.  Yes.

19  Q.  So this was a lawsuit that was brought April 9, 2018 or

20  about that time, sir?

21  A.  Yes.

22  Q.  And at that time, there was -- doing the math -- eight

23  months left in the earnout period.  Do you see that?

24  A.  Yes.

25  Q.  And what was the state of Major Energy's business at that

K34AHOR7ps                    Wiederman - Redirect

1    point in time?

2    A.   To put it mildly, in the dumps.  It was a burden, you know,

3    to get the vendors to do marketing for us.  But, you know, we

4    tried.  But like I said, many times, you know, earlier, at this

5    point there was no way we had our customer count or our

6    adjusted EBITDA.

7    Q.   Do you know whether this was resolved after the earnout

8    period?

9    A.   Yes, it was.

10   Q.   And did this have any impact in Major's ability to achieve

11   the earnout?

12   A.   No.

13   Q.   If you look at DX 250, Defendant's Exhibit 250.  This was a

14   document you were shown earlier today.  And you were drawn to

15   your e-mail on March 15, 2016, halfway down the page.

16   A.   Yes.

17   Q.   Where it says words "potentially killing the gas market

18   completely."  Do you see that?

19   A.   I do.

20   Q.   This was at a time where it was prior to the MIPA and the

21   earnout agreement, right?

22   A.   Yes.

23   Q.   And you were, I think, talking about the potential

24   resetting order?

25   A.   Correct.

1    Q.  And when you used the word "potentially killing the gas

2    market," did the resetting order actually kill the gas market?

3    A.  No.  The resetting order never materialized.

4           MR. MAROONEY:  Put that away.

5    Q.  Look at DX 349.

6           MR. MAROONEY:  We're getting close, your Honor.

7    Q.  You were shown this this morning, where Mr. Josefovic sends

8    you an e-mail, and it's an article about the low-income order,

9    potential low-income order, and asks if this is a huge issue.

10   Do you see that, sir?

11   A.  Yes.

12   Q.  And then right above it, Mr. Horowitz writes,

13   "Potentially."  Do you see that?

14   A.  Yes.

15   Q.  Did it actually have an impact?

16   A.  No, not at all.  Like I mentioned earlier, after the first

17   quarter of 2018, the first quarter being the strongest quarter

18   in the industry, so that's when most of the now thousand

19   customers fell off.  So it had almost no impact at all.

20   Q.  Now, you'll be happy to hear I'm not going to show you any

21   spreadsheets.  Is it fair to say that the best summary of your

22   testimony on the formula as such is set forth in your rebuttal

23   witness statement and your written witness statement?

24   A.  That's correct.

25   Q.  But briefly, walk us through the exhibit B, because you

were the one on the other side working with Mr. Lancaster, and

I just want to make sure we have your description of the

discussions with Mr. Lancaster about that spreadsheet and

Exhibit B.

A.  Absolutely.  So, as I mentioned earlier, you know, it's

ambiguous at best and the -- in the earnout agreement.

However, the -- we couldn't audit and come to our first quarter

MIPA, so we agreed that what we would do is, we would get the

first year of 20.7 million, that that's the number we would

have to hit, and we would then not include the first quarter in

the number that we had to hit.  So whenever that number finally

did settle out and it became 7 million, then the number that we

had then was $14 million.

        And then there was, for the earnout part, there was a

customer count reduction and EBITDA, adjusted EBITDA reduction.

But for the cash installment piece, there was just an adjusted

EBITDA reduction.  And that is the way the spreadsheet shows

it.  And that's the way the deal was structured.

Q.  If you look at DX 540, you were shown this in your

testimony from earlier today.  And you'll notice at the bottom,

it's Mr. Kroeker's e-mail to you and Saul forwarding

Mr. Lancaster's memo.  Do you remember that, sir?

A.  Yes.

Q.  All right.  And you referenced in your testimony earlier

today the agreement you had with Mr. Kroeker.  Do you recall

1    that?

2    A.  Yes.

3    Q.  And if we can look down at the bottom, in the last

4    paragraph of Mr. Kroeker's e-mail, he writes to you, "As you

5    recall from our conversations, we are already in agreement on

6    (a) the calculation of the cash installment, and (b) Mark's

7    calculation of the earnout before the customer count

8    adjustment."  Is that the agreement you were referring to, sir?

9    A.  Yes.

10   Q.  He goes on to say, "The remaining item is the methodology

11   for determining Major's planned adjusted EBITDA per customer in

12   accordance with Exhibit A to the earnout agreement, which is

13   detailed in the attached document."

14        Were you still in disagreement with respect to the

15   customer count and the actual EBITDA number to be used for that

16   year?

17   A.  Yes.

18   Q.  All right.  So what you had agreed upon was the methodology

19   but not the numbers for the EBITDA and the customer.

20   A.  For about nine months, yes.

21        MR. MAROONEY:  May I just have a moment, your Honor?

22        THE COURT:  Sure.

23        MR. MAROONEY:  My boss says I'm done.

24        THE COURT:  Any recross?

25        MS. PECTOR:  Yes, your Honor.

K34AHOR7sp                    Wiederman - Recross

 1              MR. MAROONEY:  Oh, sorry.

 2              THE COURT:  Oh, do you want to move things in?

 3              MR. MAROONEY:  Yes.  PX 508, Plaintiff's Exhibit 508,

 4      Plaintiff's Exhibit 184, Plaintiff's Exhibit 221, Plaintiff's

 5      Exhibit 160, Plaintiff's Exhibit 127.

 6              MR. BROWN:  Your Honor, from what you said, we would

 7      object.  That's the one that Mr. Wiederman said he didn't

 8      recognize, that we could ask Mr. Sobel, and put it down.

 9              MR. MAROONEY:  Thank you.  He's on the e-mail, but --

10              MR. BROWN:  He disavowed any knowledge about it,

11      Mr. Marooney.  He put it down and he said, ask Mr. Sobel.

12              THE COURT:  OK.  So you'll move it in with Mr. Sobel.

13              MR. MAROONEY:  Yes, we'll move it in with another

14      witness, I guess.

15              THE COURT:  OK.  PX 359?

16              MR. MAROONEY:  Sorry.  Plaintiff's Exhibit 359.

17      Defendant's Exhibit 504.  That's already in.

18              THE COURT:  OK.  They are received.

19              (Plaintiff's Exhibits 508, 184, 221, 160, and 359

20      received in evidence)

21              (Defendant's Exhibit 504 received in evidence)

22              THE COURT:  Ms. Pector.

23              MS. PECTOR:  Thank you, your Honor.

24      RECROSS EXAMINATION

25      BY MS. PECTOR:

1   Q.  Mr. Wiederman, I believe I heard you say the PSE

2   relationship was phenomenal.  Was that your word choice?

3   A.  Yes.

4   Q.  Prior to the sale of Major Energy, did you feel that your

5   "lifeline" or your "phenomenal" relationship with PSE tried to

6   extort you?

7   A.  Yes.  Like I said, it was a phenomenal relationship.  There

8   was a ROFR in place.  And they wanted to get paid out for that.

9   I felt that wasn't right.  That doesn't change the phenomenal

10  relationship that we've had with them for over ten years, and I

11  would continue that today.

12         THE COURT:  Just to be clear, you said there was a

13  ROFR in place?

14         THE WITNESS:  ROFR, right of first refusal.

15         THE COURT:  ROFR.

16         THE WITNESS:  Thank you.

17  Q.  You do recall, Mr. Wiederman, there being a period of time

18  where you felt PSE was trying to extort Major Energy itself,

19  correct?

20  A.  Like I said, there was a ROFR in place and they wanted to

21  get it paid out to release the ROFR.  I did not feel that that

22  was right.  We had a stellar relationship with them.

23         MS. PECTOR:  James, let's pull up DX 962.

24  Q.  OK, Mr. Wiederman.  We're looking at a communication

25  between you and Mr. Alper and Mr. Horowitz on March 23, 2016,

K34AHOR7sp                    Wiederman - Recross

1    in response to the ROFR issue you raised.  And just to look at

2    your language at that time, you wrote, "When you read the

3    e-mail below, from PSE, in particular Mark Depew, it connotes

4    that they will waive the ROFR provided that we agreed to their

5    extortion," exclamation point, exclamation point.  Correct,

6    Mr. Wiederman?

7    A.  I think I just responded to that.  Like I said, we had a

8    phenomenal relationship with Pacific Summit.

9    Q.  That wasn't the only e-mail you sent expressing frustration

10   about PSE, correct?

11   A.  I don't know.  What, one in 2009?

12   Q.  Well, let's look at the DX 982.

13             So now, in 982, Mr. Wiederman, this is also in the

14   March 23, 2016 time frame, and if we look at the e-mail below,

15   there is an e-mail coming from Chung at PSE stating, "Sirs,

16   please find attached the letter from Pacific Summit Energy LLC

17   in response to your letter dated March 21, 2016."  Do you

18   recall receiving that letter, Mr. Wiederman?

19   A.  I'd like to see the letter, please.

20   Q.  Yes, please.

21             MS. PECTOR:  Scroll down to the letter.

22   Q.  And in particular, Mr. Wiederman, if I could draw your

23   attention to the second paragraph, you see here that PSE was

24   reiterating to Major Energy and reminding Major Energy of PSE's

25   rights under the current Major Energy agreements with respect

1   to any potential sale of Major Energy entities to third

2   parties, and confirming that PSE had the right of first refusal

3   to purchase the Major Energy entities?

4   A.  No one said that they didn't have a right of first refusal.

5   Q.  But that frustrated you and the other sellers, correct?

6   A.  This is the same issue.

7   Q.  Mr. Wiederman, let's look at the top of your e-mail to

8   Mr. Horowitz, Mr. Alper.  You see your response to receiving

9   this letter.  "Dan, Saul?  What a piece of work.  What do you

10  suggest?  Should we send the MIPA?  Should we state in a letter

11  that we were verbally told that there is no way they will match

12  it?"  Those were your words at the time, correct,

13  Mr. Wiederman?

14  A.  Again, this is all about the same issue.  There was one

15  little issue we had with them about ROFR, on a ten-year stellar

16  relationship with Pacific Summit.

17  Q.  I want to talk to you about the ROFR issue, because it

18  seems to me that you were providing some testimony that somehow

19  Spark or Major Energy interfered with broker relationships.

20  Did I hear that correctly?

21  A.  Yes.

22  Q.  Would you agree that it would be an interference,

23  Mr. Wiederman, of a broker relationship if Major Energy were to

24  offer a price to a broker to go to its customer and then, after

25  providing that price, go direct to the customer with a lower

1  price so that Major Energy could get that sale directly?

2  A.  Could you repeat the question?

3  Q.  Yes.  Would you agree that it is interference with a broker

4  relationship for Major Energy to go direct to a broker's

5  customer?

6  A.  If there was no relationship, if it was strictly a

7  relationship between a broker and a customer and there was no

8  other -- and Major Energy did not have a prior relationship or

9  have a relationship directly with the end consumer, yes.  And

10  that's something --

11  Q.  Mr. Wiederman, you can't identify a specific broker that

12  Major Energy lost a relationship with because of the dropdown,

13  correct?

14  A.  I've had numerous -- I wasn't in the broker department.  I

15  oversaw the broker department, numerous times, and I believe

16  Amir Benisti will testify, will testify to this.  He came to me

17  numerous times and told me that this broker is no longer

18  bringing us business, or this broker has pulled out from this

19  business or will not bring their accounts, or this broker is

20  very frustrated.  So it's been very, very clear in the

21  frustration that the broker department had to deal with.

22  Q.  But Mr. Wiederman, you have no personal knowledge of any

23  brokers that severed their relationship with Major Energy

24  because of the dropdown, correct?

25  A.  They're not restricting themselves.

1    Q.  I take that as a no, Mr. Wiederman, you can't identify a

2    broker, with personal knowledge, who stopped doing business

3    with Major Energy because of the dropdown.

4    A.  Mr. Benisti had given me names.  I don't recall them off

5    the top of my head.

6    Q.  Well, you are familiar with a broker complaint that was

7    made about Major Energy by a broker who was upset that Major

8    Energy went direct to one of its customers, correct?

9    A.  Like I said, that could be.  It happens many times.  If

10   Major Energy knows a customer and a broker is trying to bring

11   in a customer, then Major Energy will deal directly with the

12   end consumer.

13   Q.  Let's take a quick look at DX 1064.  OK.  And James, scroll

14   to the second page.  There's an e-mail from the Hartsgroup.

15   Can you go down.

16          If you stop here, Mr. Wiederman, there is an e-mail

17   from the Hartsgroup to Krissie Roemer at Spark Energy dated

18   March 14, 2018, and the subject is Henry Hartstein.  You're

19   familiar with that, correct?

20   A.  The name sounds familiar, yes.

21   Q.  And let's see what the complaint is.  The complaint is,

22   "Dear Krissie, I am writing to follow up our on our telephone

23   conversation yesterday.  I had mentioned two disturbing

24   incidents that took place in September of 2007 that cross

25   ethical lines, and I want to detail them to you.

1          "In both instances we were shocked to learn that Major

2     had signed these clients, our clients, at rates lower than what

3     Major had quoted to us!  Our supplier undercut us.  You can

4     imagine the impact on our credibility and our reputation."

5          He provides to provide two examples, Smith House

6     Operating LLC and For Lady's Center for Rehabilitation and

7     Healthcare.

8     A.  Our Lady.  Our Lady's Center.

9     Q.  Our Lady's Center for Rehabilitation and Healthcare.

10         And then he says, "I think you would agree that this

11    is an unacceptable breach of ethical business practices.

12    Correct?

13    A.  That's what he says, yes.

14    Q.  He then goes on to talk about what the impact is, which is,

15    "The OE group has worked hard to build its reputation of

16    integrity, service, and competitive pricing.  When we bring a

17    price to a client, he has the right to believe that we have

18    negotiated the best price possible.  What do you suppose our

19    client thinks when the very supplier we are brokering

20    significantly undercuts our bid?  It's not just the optics.

21    This undermines trust and causes real damage to our position in

22    the industry."

23         Now, you specifically received this complaint, right,

24    Mr. Wiederman?

25    A.  Scroll up and see, but I find it interesting that they

K34AHOR7sp                    Wiederman - Recross

1    would send it to Spark, because -- thinking that Spark was

2    doing the pricing.

3    Q.  Well, maybe they were upset with Major Energy for

4    undercutting them?

5              THE COURT:  Well, hold on.  I'm not sure I -- you

6    said --

7              MR. DAHAN:  Yes, put the whole document in.

8              THE COURT:  "I find it interesting that they would

9    send it to Spark because maybe Spark" what?

10             THE WITNESS:  Was doing the pricing.

11             THE COURT:  Was doing the pricing, OK.

12   BY MS. PECTOR:

13   Q.  Now, Mr. Wiederman, before Levy Moeller resigned from Major

14   Energy, he handled all pricing from Major Energy, correct?

15   A.  Sorry, can you repeat that?

16   Q.  Yes.  Before Levy Moeller left Major, he handled all

17   pricing for Major Energy, correct?

18   A.  Yes.

19             MS. PECTOR:  If we could just go to the top, James.

20   Q.  Mr. Wiederman, here's your response when Spark raises its

21   view.  And you're responding to Chris Leonard, who will be

22   testifying in this case.  And you say, "Chris, as you know,

23   Major takes a lot of pride in its success of direct sales as

24   well as its broker relationships.  Very rarely do the two

25   conflict.  However, it does happen.  This is a scenario of a

1    commerce client that we have had a direct relationship with for

2    years, yet the broker feels slighted.  The client ultimately

3    said they want to deal directly with Major.  Like I said, it's

4    rare, but when something like this occurs, we let the client

5    drive the process."

6             Now, Mr. Wiederman, when that broker came to you and

7    asked for the pricing, Major Energy did not disclose to that

8    broker that it allegedly had a prior relationship which this

9    customer, correct?

10   A.  The person that did the pricing was not aware that it was a

11   person that had a prior relationship.

12   Q.  But this was a broker that was currently doing business

13   with you, correct?

14   A.  Like I said, it's very, very rare for this to happen.  But

15   it happens every now and then, and we had a direct relationship

16   with a customer, and Amir Benisti just wasn't aware when he was

17   pricing it out to Henry Hartstein.  It happens.

18             THE COURT:  Who wasn't aware?

19             THE WITNESS:  Amir Benisti.  He's in the broker

20   department.

21   Q.  Mr. Wiederman, you have suggested that somehow there's

22   something wrong with a broker working for Spark and Major

23   Energy at the same time; is that right?

24   A.  A broker or a vendor?

25   Q.  Either.

K34AHOR7sp                     Wiederman - Recross

1   A.  I never said there's something wrong with a broker.

2   Q.  Because in fact you had agreed that you thought it would be

3   appropriate for brokers to enter into universal agreements with

4   not just Major Energy but the whole suite of corporate-related

5   entities under the Spark umbrella, correct?

6   A.  This was a time when we were probably at the 90-yard line

7   of the buyout, and we were contemplating what the universal

8   company would look like.  And that's why we were contemplating

9   creating a universal brand and wanted a contract instead of

10  having a Verde contract, an Oasis contract, a Spark contract, a

11  Major contract.  So that has nothing to do with --

12  Q.  Well, just briefly, Mr. Wiederman, if we could put up DX

13  789.  And if we just look at the first sentence, this was in

14  relation to the universal agreement with vendors, and you said

15  that "I agree with David.  Once they have to sign an agreement,

16  let's make it a universal one."  Correct?

17  A.  Can I see that blown up?

18  Q.  Sure.

19          MS. PECTOR:  James, can we blow it up.

20  A.  Could you make it smaller so I could read from the bottom

21  up.  Thank you.

22  Q.  This is an e-mail from Rob Lane, who actually is about to

23  testify, saying "Historically we have had an agreement that we

24  had moved all other brands onto.  We have not had alignment

25  discussions with Major in order to allow Major to continue

1    operating their business 'as usual,'" meaning Spark wasn't

2    interfering with Major's business.  But as you go up the chain,

3    David Sobel says, "I can't speak for the sellers, but I think

4    at this stage in the game, it would make business sense to have

5    the one all-brands agreement with Major in it, if the only

6    thing holding it back was the 'business as usual.'  Mark, what

7    do you think?"  And you responded, "I agree with David.  Once

8    they have to sign an agreement, let's make it a universal one."

9            MR. MAROONEY:  Your Honor, I'm going to object to the

10   characterization part.

11   A.   Look at the subject.  It says "Hiko vendors" on here.  Hiko

12   was another company that Spark bought.  And Hiko requested that

13   Major advantage that company.  So I don't know the context

14   there, and what would Hiko have to do with this?

15   Q.   The context here, Mr. Wiederman, is that you agreed that it

16   made sense for vendors to be on universal agreements for all

17   the Spark entities, correct?

18   A.   This may happen strictly with Hiko because Major -- Hiko's

19   book, a lot of Hiko's book became Major's customer.  And the

20   subject of "Hiko vendors" -- there's more to what's meeting the

21   eye here.  So I'm sorry.  I cannot answer.

22   Q.   Mr. Wiederman, you brought up the integration of EMS

23   briefly in your redirect with Mr. Marooney.  Do you recall

24   that?

25   A.   Yes, I remember.

K34AHOR7sp                     Wiederman - Recross

1    Q.  And you recall that you had been to an opening kickoff

2    session for the integration of EMS with Mike Kuznar, who is in

3    the project, correct?

4               THE COURT:  Who?

5               MS. PECTOR:  Mike Kuznar, K-u-z-n-a-r.  He'll be a

6    witness testifying in this case.

7    Q.  And Mr. Wiederman, you had positive things to say about

8    that event, correct?

9    A.  Positive things to say about?

10   Q.  The kickoff event of EMS and integration.

11   A.  This, do you remember the date?

12   Q.  All right.  Let's pull it up.  DX 1023.  Do you see on

13   August 4, 2016, at the bottom --

14   A.  Right.

15   Q.  -- you say, "Hi Mike, just wanted to drop a note thanking

16   you for your part in arranging the leadership workshop.

17   Although I was not able to make it the second day, I walked

18   away with a lot of positive insights that I can utilize in our

19   joint goal of creating a better, more efficient company.  Look

20   forward to working with you."  Correct?

21   A.  Yes, I see that.

22   Q.  You didn't tell Mr. Kuznar that you thought that there

23   shouldn't be EMS integration, right?

24   A.  This was at a time when we were told -- we were negotiating

25   the $25 million buyout, if I remember correctly.  We had a

1  handshake on it.  We were just told that it was during a freeze

2  period at Spark and -- or a blackout period, I don't know the

3  exact terminology, of a public company.  And that's why we need

4  to wait.  But because I was under the impression that there was

5  going to be a buyout, and I was told by a few people, Keith

6  Maxwell, Gary Lancaster, that they're going to buy out the

7  sellers, so, yeah, I'm a team player and I was doing what was

8  best for the company.

9  Q.  This e-mail was true when you wrote it, right,

10 Mr. Wiederman?

11 A.  I don't lie.

12 Q.  Mr. Wiederman, you raised Nathan Kroeker -- you raised a

13 topic of performance evaluations that he gave you, correct?

14 A.  Yes.

15 Q.  And you know that he Mr. Kroeker didn't have a office in

16 New York, right?

17 A.  Mr. Kroeker did not office in New York, correct?

18         THE COURT:  Didn't have an office?

19         MS. PECTOR:  Did not office in New York.

20         THE COURT:  Did not office?  "Office" is a verb?

21         MS. PECTOR:  Yes.  He didn't have -- you're right.  My

22 linguistics are challenged today, your Honor.

23 Q.  Mr. Kroeker did not have an office in New York.

24         THE COURT:  I didn't understand it was a verb.  I

25 guess it's a new thing.

1   Q.   Yes.  Is it true he didn't reside in New York?  He resided

2   in Texas, correct?

3   A.   That's correct.

4   Q.   You were the lead executive running the Major Energy

5   day-to-day business once Mr. Alper was terminated, correct?

6   A.   That is correct.

7   Q.   And you would check in from time to time with Mr. Kroeker,

8   but you were the one running the ship, right?

9   A.   No.  We would check in weekly.

10  Q.   But, Mr. Wiederman, you were the one in New York who was

11  the leader of Major Energy business in New York, correct?

12  A.   Yes, and we checked in weekly.

13  Q.   And you had done that before Dan Alper had resigned,

14  correct, or been terminated?

15  A.   Mr. Alper was the one that had, prior to them terminating,

16  was the one that checked in weekly.

17  Q.   Now, Mr. Wiederman, the performance evaluations that you

18  got from Mr. Kroeker, you got those based upon how he would --

19  you would let him know the business was performing, correct?

20  A.   It was based on business performance and it was based on

21  how I did a great job wearing two hats, one --

22  Q.   Mr. Kroeker never had access to your WhatsApp chats,

23  correct?  During the earnout period.

24  A.   I don't know.

25  Q.   Did you give him your WhatsApp chats during the earnout

K34AHOR7sp                    Wiederman - Recross

1    period?

2    A.  I didn't give them to him, no.

3    Q.  And Mr. Kroeker did not have visibility into what you were

4    doing on a daily basis, correct, Mr. Wiederman?

5    A.  We discussed it every week.

6    Q.  Mr. Wiederman, Mr. Kroeker did offer at some point, as we

7    heard yesterday, to come to New York for a holiday party to

8    help with morale of Major Energy employees.  Do you recall

9    that?

10   A.  Pull something up on it.  I don't know.

11   Q.  Well, I'll put up Exhibit 665.

12           THE COURT:  Plaintiff's, Defendant's?

13           MS. PECTOR:  DX 665.

14   Q.  And here do you see you're forwarding an e-mail to

15   Mr. Horowitz letting him know "We're talking with Nathan this

16   morning on our weekly call.  And he asked us to clear the

17   following with you.  Do you see any issues with him coming to

18   the holiday party and giving out gifts to the employees?  Are

19   you OK with it?"

20   A.  Yes.  This shows how integrated Spark was with our company

21   and how Mr. Kroeker wanted to come and give gifts to the

22   employees, as one company.  That's what I see here.  So --

23   Q.  It's true, Mr. Wiederman, that you told Mr. Kroeker not to

24   come to the party after you talked to Mr. Horowitz, because

25   Mr. Horowitz felt that, "what's the point, I don't think it

1    helps our case."  Right?

2    A.  Like said, it was extremely difficult wearing two hats.  As

3    a seller, I understand Mr. Horowitz.  As an employee of Major

4    Energy, that was now being controlled by Spark, I wanted to do

5    the what was best for or our company.

6    Q.  Mr. Wiederman, just a yes-or-no question, you told

7    Mr. Kroeker not to come to the party, correct?

8    A.  I don't know.  This e-mail, I didn't know what happened at

9    first.  If you could pull up that e-mail, then you can pull up

10   that e-mail.  I don't -- I don't know what happened afterward.

11   Q.  Mr. Wiederman, the sellers did not do a counter-calculation

12   of the earnout for year two during the earnout period, correct?

13   A.  We had no insight to any of the numbers.  I think it was at

14   that point transferred to you, and we couldn't even do a count

15   because we had no insight and no transparency.  So there was

16   nothing to say right or wrong.

17   Q.  Mr. Wiederman, the sellers did not prepare a

18   counter-calculation in response to receiving the earnout

19   statement from Spark in the year two, correct?

20   A.  Correct.  We had no way of seeing the numbers.  There was

21   no transparency and it was being handled in Houston.

22   Q.  You had a CFO who had access to the system, correct?

23   A.  I don't know.  You have to ask.

24   Q.  You had a CFO who had access to 4360, correct?

25   A.  I don't know.  You have to ask him.

K34AHOR7sp                    Wiederman - Recross

1  Q.  We'll talk to Mr. Sobel about that.

2          Mr. Wiederman, the sellers did not prepare a

3  counter-calculation for year three after receiving Spark's

4  earnout statement, correct?

5          MR. DAHAN:  Your Honor, that statement was received

6  after Mr. Wiederman was still employed.  There was nobody there

7  who would be able to -- it's one thing to argue whether there

8  was access in 2018.

9          MS. PECTOR:  I just asked him a yes-or-no question if

10 he prepared the counter-calculation.  I was asking for a fact.

11 Q.  Did anyone from the sellers side prepare a

12 counter-calculation?

13 A.  There was nobody there.  No.  There was nobody there.

14 Q.  Last question, Mr. Wiederman.  You had talked about the

15 performance of Major Energy being impacted because of Spark,

16 but isn't it true that, prior to the closing, Major Energy's

17 customers were dropping month over month in the fourth quarter

18 of 2015?

19 A.  Actually, the first quarter of 2016 was extremely robust.

20 Fourth quarter -- the entire 2015, we were bringing in a lot of

21 customers and we had the wind to our backs.  We wanted

22 tremendous momentum and we had tremendous growth ahead of us.

23 All we wanted was to remain private, an old company with no

24 interference.

25 Q.  Let's briefly pull up DX 189.  All right.  So if we look at

K34AHOR7sp                    Wiederman - Recross

1    the e-mail, the e-mail towards the bottom of the screen, it's

2    from David Sobel, CFO, to Cliff Adams on January 18, 2016.  Do

3    you see that?

4    A.  Yes.

5    Q.  And do you see the second line, he says, "the customer

6    count has been decreasing every month since May '15 -- not sure

7    how to present that."

8    A.  Yeah.  So it's a very simple explanation.  This was -- we

9    were bringing in a lot of counts, but they were still at bottom

10   because of the polar vortex.  The polar vortex caused many

11   companies to lose some -- up to 70 percent of their book.  We

12   lost about on that 10 percent of our book.  We were at the

13   company marketing.  We were bringing in a lot of customers.

14   And the further we got away from the polar vortex and now it

15   was closing on the bottom, and that's why our first quarter

16   2016 we started -- we went from 152, I believe it was, when we

17   sold the company, to 165, and we could have kept going.  But

18   then we went from being a brand to a publicly traded company.

19   Q.  Mr. Wiederman, final question.  Do you recall telling me in

20   your deposition, at page 313, lines 2 through 4, that "we've

21   had contentious relationships with PSE many times"?

22   A.  Depends what you mean by "contentious."  Can I see it?

23             MS. PECTOR:  Pull it up, 313, 2 through 4.

24             MR. WATKINS:  Page 313?

25             MS. PECTOR:  Page 313 of the deposition.

K34AHOR7sp

1   Q.  OK.  So there we're talking about line 24, "We really had

2   an intent for PSE to be your only supplier."  Then we go up to

3   say, in lines 2 through 4, "Like I said, we've had a

4   contentious relationship with them many times, up and down."

5   Those were your words, Mr. Wiederman?

6   A.  Yeah.  I wouldn't characterize that as disagreements.  But

7   the relationship we had with them was a stellar relationship.

8   And that's why we renewed with them four times in a row and

9   went elsewhere, maybe for cheaper pricing.

10          MS. PECTOR:  No more questions, your Honor.

11          THE COURT:  Anything further?

12          MR. MAROONEY:  No, thank you, your Honor.

13          MS. PECTOR:  Your Honor, I do have exhibits.  The

14   Exhibits are DX 982, DX 1064, DX 789, DX 1023, DX 189.

15          THE COURT:  They are received.

16          (Defendant's Exhibits 982, 1064, 789, 1023, and 189

17   received in evidence)

18          THE COURT:  Thank you, sir.  You can leave everything

19   there and somebody will pick them up.

20          (Witness excused)

21          THE COURT:  And what's next?

22          MS. PECTOR:  Your Honor, we have a brief witness.  I

23   believe Mr. Dahan only has a handful of questions for him.  He

24   was a former CFO of Spark during the earnout period.  He's

25   outside.

1          THE COURT:  All right.

2          MS. PECTOR:  Your Honor, may we have a five-minute

3     break?

4          THE COURT:  Yes.  We'll take a five-minute break.

5          (Recess)

6          THE COURT:  All right.  You are Mr. Lane?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  All right.  If you please raise your right

9     hand, and you will be sworn in by Mr. Hampton.

10    ROBERT LAWRENCE LANE,

11         called as a witness by the defendants,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MS. PECTOR:

15    Q.  Good afternoon, Mr. Lane.

16    A.  Good afternoon.

17    Q.  Mr. Lane, did you sign a witness statement in this case?

18    A.  Yes, ma'am.

19    Q.  And in front of you, Mr. Lane, there should be a notebook

20    with your witness statement and all your exhibits.  If not, I

21    can approach you with a copy.

22    A.  No, not at this time.

23         MS. PECTOR:  May I approach, your Honor?

24         THE COURT:  Yes.  I think, was I supposed to give

25    those to the witness?

1    MS. PECTOR:  No, your Honor, that was for you.  I just

2    think we didn't put in a witness copy.  So here's a witness

3    statement with the corresponding exhibits.

4    BY MS. PECTOR:

5    Q.  Mr. Lane, is everything true and correct in your witness

6    statements?

7    A.  Yes, ma'am.

8    Q.  Do you still stand by your witness statement today?

9    A.  I do.

10    MS. PECTOR:  I pass the witness, your Honor.

11    THE COURT:  All right.  If you just try to pull up and

12    speak into the microphone, I'd appreciate it.

13    MS. COREY:  And, your Honor, this is a housekeeping

14    matter.  We have objections to the witness statements.

15    THE COURT:  All right.  So we can go till 5:30.  We

16    can go till we finish.

17    MS. COREY:  20 minutes.

18    THE COURT:  All right.  Ms. Corey.

19    CROSS-EXAMINATION

20    BY MS. COREY:

21    Q.  Mr. Lane, you began work for Spark in May 2016, correct?

22    A.  Yes, ma'am.

23    Q.  And other than one month to start, you served as vice

24    president and CFO for Spark Energy and Spark HoldCo until May

25    2019, correct?

K34AHOR7sp                    Lane - Cross

1    A.  Yes, ham.

2    Q.  You don't work there anymore, right?

3    A.  I no longer work at Spark.  Yes, ma'am.

4    Q.  You testified in your witness statement that you were aware

5    that NGE had purchased Major Energy before you took your role

6    as CFO of Spark, right?

7    A.  Yes, ma'am.

8    Q.  And you were involved in Spark's preparation for the

9    dropdown of Major Energy, correct?

10   A.  Yes, ma'am.

11   Q.  Part of your participation involved familiarizing yourself

12   with the terms the money, earnout agreement, and executive

13   earnout agreement, correct?

14   A.  Yes, ma'am.

15   Q.  And you reviewed models that Spark has prepared for

16   calculating the contingent fees, correct?

17   A.  During the course of my employment, I've reviewed a number

18   of models, yes, ma'am.

19   Q.  OK.  Let's look at PX 489.  And if we could look at the

20   final page, first e-mail.  This is a May 17th e-mail from you.

21   Did I read that right at the top?

22   A.  Yes, ma'am.

23   Q.  OK.  And you had just started at Spark at this point.

24   Isn't that right?

25   A.  Yes, ma'am.

K34AHOR7sp                    Lane - Cross

Q.  And if we could just go to the second paragraph of that

e-mail, on the second page -- that's where we are -- you're

asking Andy Davis for a spreadsheet that tracks the purchase

price, escrow, and earnout for the Major Energy acquisition, in

the second line.  Did I read that correctly?

A.  More or less, yes, ma'am.

Q.  And in the next sentence you say, "I am trying to better

understand the valuation and the moving pieces, and any

guidance would be great.  Georganne was kind enough to share

the model you prepared for the banks, on which I have seen the

earnout numbers on the inputs and Notes pages, but I wanted to

see if there was anything that showed the buildup of those that

I could match to the language in Section 2.2 of the MIPA and/or

any flexibility therein."  Did I read that right?

A.  Yes, ma'am.

Q.  Can we go to the next e-mail.

        So Mr. Davis responds to you.  He says, "There's a

structure tab in either the CVM or KFI.  Andrei, the most

recent one of each.  I think it's the CVM."  Did I read that

right?

A.  Yes, ma'am.

Q.  And let's just look at the top e-mail, Eric.  And Andrei

Gregory sends to you, there is an attachment, as we can see up

at the top.  It says "KFI Pigeon 2016 0417 v23."  And it's an

Excel spreadsheet.  See that?

1    A.  Yes, ma'am.

2    Q.  Who is Andrei Gregory?

3    A.  Andrei Gregory was in the financial planning and analysis

4    department.  He reported to Mr. Davis.

5    Q.  Did Mr. Davis report to you?

6    A.  Yes, ma'am.

7    Q.  And he says, "Robert, please reference the 'structure' tab

8    in the attached file.  You will see sections regarding annual

9    metrics for cash installment as well as earnout.  Please review

10   the attached file at your earliest convenience and let me know

11   if you have any additional questions."  Do you see that?

12   A.  I do.

13   Q.  Do you recall reviewing this file when you received it?

14   A.  I do recall that I would review the file, yes.

15           MS. COREY:  Eric, can we look at the attached Excel

16   spreadsheet.  And we could just look at the structure tab that

17   Mr. Gregory referenced here.

18           Do you recognize this tab of the spreadsheet?

19   A.  Yes, ma'am.

20   Q.  And this spreadsheet was created by Spark, correct?

21   A.  I believe so.  I did not know they created the spreadsheet,

22   though, but we could find that out in the meta file

23   information.

24   Q.  Do you understand that this is Spark's key financial

25   indicators model for Major Energy?

K34AHOR7sp                          Lane - Cross

1              MS. PECTOR:  Objection.  Calls for speculation.

2        A.  I don't see it labeled as such.

3              MS. COREY:  Eric, can you just go back to the e-mail

4        cover very quickly -- excuse me, to the attachment.

5        Q.  Does "KFI" stand for "key financial indicators"?

6        A.  In this case, I believe it did.

7        Q.  And "Pigeon," is that Spark's kind of name for the Major

8        Energy acquisition?

9        A.  To my memory, yes.

10       Q.  And the purpose of this tabular model was to be a version

11       of the earnout and cash installment payments that could be

12       viewed in light of Spark's current projection, correct?

13       A.  Yes, ma'am.

14       Q.  And if we go to row 10 of the spreadsheet here, this is

15       Spark's then-current projections for Major Energy, correct?

16       A.  I don't recall the exact numbers, but it would be in line.

17       Q.  OK.  And you understand those to be full-year projections,

18       correct?

19       A.  Yes, ma'am.

20       Q.  Starting at row 13, there are calculations for cash

21       installments, correct?

22       A.  Yes, ma'am.

23       Q.  And then starting at row 23, there are calculations for

24       earnout payments, right?

25       A.  Yes, ma'am.

K34AHOR7sp                    Lane - Cross

Q.  You understand that row 24, titled "Factor," is the
percentage of the adjusted EBITDA that would be paid subject to
the customer delta, to the selling shareholders, part of the
earnout, right?

A.  Yes, ma'am.

Q.  And just looking at 2016, Spark was projecting roughly 18.6
million in adjusted EBITDA for Major Energy, correct?

A.  According to this model, at this time, that would be
correct.

Q.  And then you would agree that row 25 represents the
calculated earnout payment for each year.  Correct?

A.  I would agree that this spreadsheet is labeled as such,
yes.

Q.  And if we look at -- and actually you can see in the
formula at the top that this is multiplying C24 by C10, so that
would be 27.27 percent by 18.6 million.  Is that correct?

A.  Yes.

          MS. COREY:  You can put that down.

Q.  With respect to your involvement with the earnout
statement, you testified that Tom Holloway prepared the
adjusted EBITDA calculation and earnout statement for 2016,
correct?

A.  Yes.

Q.  And you reviewed Holloway's adjusted EBITDA calculation and
earnout statement for 2016, right?

1    A.  Yes, ma'am.

2    Q.  And you maintained that the year one earnout statement sent

3    by Gary Lane on March 30, 2017 is correct, right?

4    A.  What was the number of that amount, please?

5    Q.  Pardon me?

6    A.  What was the resulting number of that, please?

7            MS. PECTOR:  5.1 million.

8    Q.  5.1 million.

9            MS. COREY:  Thank you, counsel.

10   Q.  Yes.

11   A.  Yes, ma'am.  I agree 5.1 million is the correct number.

12   Q.  Sir, I'm going to show you PX 439.  This is a September 19,

13   2016 e-mail from Andy Davis to Tyler Mayo, Tom Holloway,

14   yourself, and then others are cc'd.  Do you see that?

15   A.  Yes, ma'am.

16   Q.  Who is Tyler Mayo?

17   A.  Tyler Mayo was an investment banker, I believe, with

18   Houlihan Lokey, who did a valuation.

19   Q.  And if we go down to the -- I will just read the whole

20   first paragraph.  "Thanks for the call this afternoon.  It was

21   very helpful.  Please see the attached executive earnout (only

22   scan I have), which goes hand in hand with the earnout

23   agreement.  Basically, it states anything over the 20 million

24   cap is to be paid to executives of the company (as opposed to

25   the shareholders, who have the 20 million cap)."  Do you see

K34AHOR7sp                         Lane - Cross

1   that?

2   A.  Yes, ma'am.

3   Q.  In the second sentence, he says, "See Exhibit B-1 for a

4   good example.  In the top case, assuming targets are all met,

5   you can see that 24.8 million is paid out, 20 million (capped)

6   to the shareholders, and 4.8 million to the execs."  Do you see

7   that?

8   A.  Yes, ma'am.

9   Q.  You don't mention Exhibit B-1 in your witness statement, do

10  you?

11  A.  No, ma'am.

12  Q.  If we could, Eric, just let's take a look at the

13  attachment, first page.

14  A.  Sorry.  I don't recall if I did.  But if it's not in there,

15  I'll agree it's not in there.

16  Q.  So this is the first page of this attachment, and he's

17  attached the executive earnout agreement.  Do you see that?

18  A.  Yes.

19  Q.  Eric, could we go to page 18.  And do you recognize this as

20  Exhibit B-1 to the executive earnout agreement?

21  A.  I agree, it says it's executive B-1 of that document, yes.

22  Q.  And if we just look at the first line of the Exhibit B-1

23  that says "assuming all targets are hit exact," and then right

24  underneath that it says "2016 adjusted EBITDA."  Do you see

25  that?

K34AHOR7sp                         Lane - Cross

1   A.  Yes.

2   Q.  And then in the first -- the next cell, just to the right,

3   it says 20,749,213.  Correct?

4   A.  Yes, ma'am.

5   Q.  And you understand that to be the adjusted EBITDA plan for

6   2016.  Correct?

7   A.  To the best of my knowledge, yes.

8   Q.  OK.  And then it says "to Major," 5,658,876.  See that?

9   A.  Yes, ma'am.

10  Q.  And then the shareholder earnout in the next column is 5.4

11  million roughly?

12  A.  Yes, ma'am.

13  Q.  And the executive earnout 204,000, right?

14  A.  Yes, ma'am.

15  Q.  And then if we go down, just as a sum for all three years,

16  right beneath that, it says "to Major," 24,371,384, correct?

17  A.  Yes, ma'am.

18  Q.  And the shareholder earnout is 20 million?  You see that?

19  A.  Yes, ma'am.

20  Q.  And then the executive earnout is roughly 4.87 million.

21  See that?

22  A.  Yes, ma'am.

23        MS. COREY:  Eric, if we can just go back to the cover

24  e-mail.

25  Q.  And if we highlight -- there you go.

K34AHOR7sp                        Lane - Cross

```
 1            In the second paragraph, he says, "Assuming all
 2    targets are met, you can see that 24.8 million is paid out, 20
 3    million (capped) to the shareholders, and 4.8 million to the
 4    execs."  Do you see that?
 5    A.  Yes, ma'am.
 6    Q.  Does that match what we just went over in Exhibit B-1 at
 7    the top?
 8    A.  Those numbers do match what was in that exhibit, yes,
 9    ma'am.
10    Q.  Mr. Lane, you submitted some more testimony that "For
11    negotiations purposes and based on personal knowledge in this
12    court, I provided to Kroeker and Spark throughout this process
13    as an olive branch to bridge the gap.  Spark came back to
14    sellers on April 12, 201 with a draft compromise earnout offer
15    in the amount of $7,553,180."  Correct?
16    A.  I would have to reference the statement.  Assuming that
17    that is what the statement says, I would agree that's what I
18    would have said.
19    Q.  Sure.
20            MS. COREY:  Eric, you can pull up the statement.
21    A.  Thank you.
22            MR. GABAY:  It's page 11, paragraph 32.
23    A.  Yes, ma'am, that is correct.
24    Q.  You call this the "compromise earnout offer."
25    A.  Yes, ma'am.
```

K34AHOR7sp                    Lane - Cross

1    Q.  You've got a footnote there.

2              MS. COREY:  Eric, could we see the footnote.  Footnote

3    10.

4    Q.  You cite DX 537, correct?

5    A.  Yes, ma'am.

6              MS. COREY:  Eric, could you pull up DX 537.

7    Q.  Mr. Lane, can we zoom in to the to/from/cc.

8              This is an e-mail from Nathan Kroeker to Mark

9    Wiederman, Saul Horowitz, Larry Studnicky, Janice Ward, and Gil

10   Melman.  Is that right?

11   A.  Yes, ma'am.

12   Q.  And you're not on this e-mail, Mr. Lane?

13   A.  Correct.

14   Q.  And this is sent on April 12, correct, 2017?

15   A.  Yes, ma'am.

16   Q.  All right.  And then if we could just look, Eric, at the

17   next page.  One more down.  This is the attached memorandum to

18   this e-mail, if you blow up the to/from/cc.  This is to Nathan

19   Kroeker, Gil Melman, and Terry Jones, from Gary Lancaster,

20   correct?

21   A.  Yes, ma'am.

22   Q.  Mr. Lane, you didn't receive this memorandum at the time,

23   correct?

24   A.  I was not a party to the memorandum's "to," "from," or

25   "cc," no, ma'am.

1   Q.  Mr. Labor, do you recall that I asked you about this memo

2   at your deposition?

3   A.  I don't recall, but I'll agree if you did, you did.

4   Q.  And do you recall --

5         MS. COREY:  Well, actually, let's just pull up his

6   deposition page.  It is 117, line 14.

7   Q.  So I asked, "This is a memorandum from Gary Lancaster,

8   Nathan Kroeker, Gil Melman, and Terry Jones.  Do you see that?"

9         You answered, "Yes."

10        And then I said, "And it's dated April 11, 2017.  Do

11  you see that?"

12        You said, "Yes."

13        And then I read the first paragraph.  "It says (as

14  read): 'This memorandum is my analysis of the pertinent

15  contractual provisions pertaining to the methodology to be

16  utilized in the determination of the calculation of earnout and

17  cash installment payable'" --

18        MS. COREY:  Eric, could we go to the next page.

19  Q.  -- "'under the membership interest purchase agreement dated

20  March 18, 2016.'  Do you see that?"

21  A.  Yes, ma'am.

22  Q.  "Yes."

23        And I said:  "and do you recall whether you reviewed

24  this memorandum at the time it was sent?"

25        Your answer was, "Correct."

1              I asked, "Have you ever seen this memorandum?"

2              And you said, "I don't recall."

3              And then I asked you, "Who is Gary Lancaster?"

4              And he says, "One of the lawyers.  He is one of the

5     lawyers for NG&E."

6              And then I asked, "Do you know whether Mr. Lancaster

7     was involved in negotiating the earnout agreement?"

8              And you said, "I do not know."

9              Do you recall that?

10    A.  I do.

11    Q.  Now, Mr. Lane, with respect to your involvement with the

12    earnout statements, you testified that Tom Holloway prepared

13    the adjusted EBITDA calculation and earnout statement for 2017,

14    correct?

15    A.  Yes, ma'am.

16    Q.  And you reviewed Holloway's suggested EBITDA calculation

17    and earnout statement for 2017, right?

18    A.  Yes, ma'am.

19             MS. COREY:  Eric, if we could look at PX 450.

20    Q.  And this is an e-mail from Gil Melman to Saul Horowitz and

21    Larry Studnicky on March 29, 2018, and you're copied on this

22    e-mail.  Do you see that?

23    A.  Yes, ma'am.

24    Q.  And Mr. Melman says, "Please see attached communication

25    regarding Major Energy earnout.  Please note that this document

K34AHOR7sp                    Lane - Cross

1    is also being couriered to you and Mr. Studnicky."  Do you see

2    that?

3    A.  Yes, ma'am.

4    Q.  And attached is the letter to Saul Horowitz, "Major earnout

5    statement 3/29/18."  See that?

6    A.  Yes, ma'am.

7         MS. COREY:  And then if we could look at 6, page 6.

8    Q.  Mr. Lane, do you recognize this to be Spark's 2017

9    calculation of the contingent payment?

10        MS. PECTOR:  Objection, your Honor.  I think that the

11   witness has been shown the entire document.  I believe this is

12   the end of the document.

13        THE COURT:  Is that right?

14        MS. COREY:  There are six pages.  We can page through

15   it on the screen if you like, or we can have the binder and

16   flip through the six pages.

17        THE COURT:  Is that in the binder?

18        MS. PECTOR:  Your Honor, can I approach and help him

19   find the exhibit?

20        MS. COREY:  It's the very same binder.

21        (Continued on next page)

22

23

24

25

K347HOR8                         Lane – cross

1    A.   What's your question, please?

2    Q.   My question was:  Is this Spark's 2017 calculation of the

3    contingent payments?

4    A.   It does appear to be that, yes, ma'am.  I would have to

5    re-perform it to make sure that it's the right numbers.  But as

6    far as this is a complete exhibit then I'll agree that this is

7    what was sent.

8    Q.   All right.  So, if we could just look at this calculation

9    contained in the middle column starting with scenario 1.  It

10   appears that Spark is dividing this top line, roughly 19.76

11   million of actual 2017 adjusted EBITDA, by $25,343,000, the

12   2017 target year adjusted EBITDA, to arrive at the 79.495

13   percent of the 2017 target year adjusted EBITDA ratio.  Is that

14   right?

15   A.   Yes, ma'am.

16   Q.   And then that 79.495 percent is multiplied by $7,272,727,

17   the 2017 target year earnout ceiling.

18   A.   Yes, ma'am.

19   Q.   And we arrive at $5,781,494, correct?

20   A.   Yes, ma'am.

21   Q.   Eric, can we go back one page to page 5.

22        Mr. Lane, this is the 2016 earnout and cash

23   installment calculation, correct?

24   A.   Yes, ma'am.

25   Q.   And let's just look at scenario 1 again, earnout.  So again

K347HOR8                        Lane – cross

1   the 19.171 million of actual 2016 adjusted EBITDA is divided by

2   the 20.749 million in 2016 target year adjusted EBITDA,

3   correct?

4   A.  Yes, ma'am.

5   Q.  And we arrive at roughly 92.39 percent of the 2016 target

6   year adjusted EBITDA ratio, correct?

7   A.  Yes, ma'am.

8   Q.  Now, Mr. Lane, the 92.39 percent roughly of the adjusted

9   EBITDA ratio is not multiplied by the target year earnout

10  ceiling in this calculation, is it?

11  A.  No, ma'am.

12          MS. COREY:  I have nothing further.

13          THE COURT:  Redirect?

14          MS. COREY:  Oh, I'm sorry, can we move in the four

15  exhibits?

16          THE COURT:  Yes.

17          MS. COREY:  It's PX489, PX439, DX537 and PX450.

18          THE COURT:  They are received.  Thank you.

19          (Defendant's Exhibits 537 received in evidence)

20          (Plaintiff's Exhibits 489, 439 and 450 received in

21  evidence)

22          MS. COREY:  Thank you.

23          Ms. Pector.

24          MS. PECTOR:  Thank you, your Honor.

25          Your Honor, we had a demonstrative for this witness

1    that we had provided to the other side.

2              MR. DAHAN:  Your Honor -- if this is a demonstrative

3    we received last night -- I believe it's on a topic that has

4    not been covered.  This is strictly a redirect.  We kept our

5    cross very minimal, and I think it's basically sticking to the

6    redirect of the cross because it's strictly on earnout

7    calculation.

8              MS. PECTOR:  The demonstrative shows CAC spend

9    compared to projection, and CAC spend is one of the line items

10   on the earnout statement, and so the purpose of the

11   demonstrative is to show the projections versus what the actual

12   CAC number is on the earnout statement that counseled the

13   questioned the witness about.

14             MR. DAHAN:  What does that have to do with the

15   calculation?

16             THE COURT:  Well, is this a witness who was on your

17   list?

18             MS. PECTOR:  Yes, your Honor.

19             THE COURT:  So they could call the witness.

20             MR. DAHAN:  Yes, that's what his written statement is,

21   and therefore they need to do redirect on what the cross is.

22             MS. PECTOR:  It's a brief redirect.

23             THE COURT:  Go ahead, you can do it.

24   REDIRECT EXAMINATION

25   BY MS. PECTOR:

1    Q.  OK, Mr. Lane, before we get into the demonstratives, if I

2    can just take you through the exhibits that Ms. Cory questioned

3    you about.  In particular, can we go to Exhibit 489, which is

4    PX489.  You were shown here, Mr. Lane, an e-mail communication

5    chain from Andrei Gregory to Andy Davis and yourself on May 18,

6    2016, correct?

7    A.  Yes, ma'am.

8    Q.  It's fair to say, Mr. Lane, by this point in time the

9    dropdown of Major Energy from NGE to Spark has not yet

10   occurred?

11   A.  That's correct.

12   Q.  And on May 18, 2016 are we approximately ten months before

13   the earnout statement for year one would be due?

14   A.  Yes, ma'am.

15   Q.  And what is in Exhibit 489, is that just merely projections

16   at this point in time?

17   A.  Yes, ma'am.

18   Q.  Did you prepare those projections?

19   A.  I did not.

20   Q.  Did you even have a copy of the earnout agreement at this

21   time?

22   A.  I did not.

23   Q.  I want to turn your attention now, Mr. Lane, to Exhibit

24   439.  This is another e-mail chain that you were copied on

25   where Andy Davis is the author on September 19, 2016?  Do you

K347HOR8                    Lane - redirect

1  recall that?

2  A.  Yes, ma'am.

3  Q.  And, Mr. Lane, at this point in time, this is now I believe

4  just a little over a month since the dropdown from NGE to Spark

5  occurred, correct?

6  A.  Yes, ma'am.

7  Q.  This particular exhibit talks about the executive earnout,

8  right?

9  A.  Yes, ma'am.

10  Q.  Was it your understanding that the executive earnout

11  agreement would not come into play unless the earnout targets

12  were achieved?

13  A.  Unless the earnout targets were fully achieved, yes.

14  Q.  And if the earnout targets were not fully achieved, would

15  there be anything owed under the executive earnout?

16  A.  Not to my understanding, no, ma'am.

17  Q.  Ms. Corey asked you why you didn't mention Exhibit B1 in

18  your witness statement.  Do you recall that question?

19  A.  Yes, ma'am.

20  Q.  Was there any need to mention Exhibit B1 in your witness

21  statement?

22  A.  No, ma'am.

23  Q.  Based upon any of the calculations that you did, was there

24  ever a time period in year one, two, or three where Major

25  Energy triggered the executive earnout?

1    A.  No, ma'am.

2    Q.  Is that because the targets were not achieved in any of the

3    years in the earnout period?

4    A.  They were not.

5    Q.  Now, Mr. Lane, you were asked some questions also by Ms.

6    Corey about the calculations that were provided by Spark to

7    Major Energy.  Do you recall that?

8    A.  Yes, ma'am.

9    Q.  And let's turn, Mr. Lane, if we could, to Plaintiff's

10   Exhibit 450.  And when Ms. Corey went over this e-mail with

11   you, she was showing it to you as this is the earnout statement

12   that was sent for year two of the earnout period; is that

13   right?

14   A.  Yes, ma'am.

15   Q.  Did you check this calculation, Mr. Lane, before it was

16   sent over?

17   A.  I reviewed it, yes, ma'am.

18   Q.  And had you reviewed the earnout agreement at this point in

19   time?

20   A.  Yes, ma'am.

21   Q.  How did you use the earnout agreement to make sure that the

22   calculation you were running was correct?

23   A.  If I understand your question, we went through the letter,

24   the earnout agreement, and performed the calculations based on

25   the letter, the earnout agreement.

K347HOR8                          Lane - redirect

1   Q.  Mr. Lane, counsel showed you pages 5 and 6 of Exhibit 450,

2   but I want to turn your attention to page 4 of that document.

3   Can you tell the Court what this page is.

4   A.  Given Mr. Lancaster's spreadsheet had a number of numbers

5   on it, and we found it at times had more information than we

6   necessarily needed to perform the earnout, we used a simplified

7   version that was based on a step-by-step reading of the MIPA

8   and the earnout in order to calculate the cash installment and

9   the executive -- I'm sorry -- the earnout, not the executive

10  earnout, since it did not come into play -- but the earnout

11  that we used in order to do our own internal projections and

12  forecasting within FP&A -- financial planning and analysis.

13          Apologies for the confusion, sir.

14  Q.  Mr. Lane, if I could turn you to the far right column.  Do

15  you see if you scroll down almost to where there is the second

16  dark box, there is a 2017 entry that says the eligible adjusted

17  EBITDA was 19,877,000?

18  A.  Yes, ma'am.

19  Q.  Was that the eligible adjusted EBITDA?

20  A.  Yes, ma'am.

21  Q.  And to get the earnout pay out for that particular year,

22  was that number multiplied by the earnout percentage of .3636?

23  A.  Yes, ma'am.

24  Q.  And when that math was done, is the resulting number below

25  5,746?  Do you see that?

K347HOR8                              Lane - redirect

1    A.  I'd have to re-perform the math on that again, but --

2    without re-performing the math, I can't tell you what the

3    number is, especially given that it's shaded.

4    Q.  And then, Mr. Lane, you also multiplied it by the

5    achievement ratio; is that right?

6    A.  Yes, ma'am.  You have to multiply it by both numbers, by

7    the achievement ratio and the pay-out factor.

8    Q.  Do you need a calculator?

9    A.  In my head, no, ma'am, it's 80 percent of 7.2 million.

10   Q.  So is the formula that's being used here the eligible

11   adjusted EBITDA times the earnout percentage times the

12   achievement ratio?

13   A.  It should be.  It's blacked out, but it would be -- excuse

14   me -- 80 percent of 7.2 is roughly 5.6, $5.7 million, so I --

15   Q.  Can I approach and given you a calculator?

16   A.  I will stand by the fact that it's roughly $5.7 million.

17   Q.  OK, Mr. Lane.

18   A.  I see a gray box, but I guess as accountants we're known to

19   be black box people, so ...

20   Q.  So, Mr. Lane, based upon the math that you just

21   impressively did in your mind up there, is the amount of

22   5,746,000 the earnout payment pre the customer count reduction?

23   A.  That should pencil out, yes, ma'am.

24   Q.  And was there a customer count reduction of 6 million --

25   was there a customer count reduction in this spreadsheet?

1   A.   There was, to your point, a customer count reduction in

2   excess of that pay-out.

3   Q.   What was the impact of the customer count reduction?

4   A.   To the extent that the customer count -- to the extent that

5   there was a customer delta, it would decrease the pay-out

6   amount up to zero.  So, I don't believe we went -- yeah, it

7   reduces it down to zero.

8   Q.   And, Mr. Lane, in the two sheets -- the one Ms. Corey

9   showed you and this sheet -- is the cash installment amount the

10  same?

11  A.   Between this sheet and the other sheet?

12  Q.   Yes.  On page 6 the cash installment is the same?

13  A.   Yes, ma'am.

14  Q.   So, on pages 4 and 6, Mr. Lane, of the earnout calculation

15  is it correct that the only payment is the cash installment

16  payment?

17  A.   Yes, ma'am.

18  Q.   Was any earnout payment due?

19  A.   For 2017, no, ma'am.

20  Q.   Why not?

21  A.   They did not achieve the target because they fell short

22  both on adjusted EBITDA and on customer count.

23  Q.   Now let me just move you quickly to --

24          Your Honor, I have about five more minutes of

25  questions, and I know you need to stop at 5:30.  Do you want to

```
1    just --
2                 THE COURT:  Do you want to continue tomorrow?
3                 MS. PECTOR:  Well, the witness is flying back today,
4    so...
5                 THE COURT:  Is there going to be any more redirect or
6    recross?
7                 MR. DAHAN:  I don't think so.
8    Q.  Mr. Lane, do you recall that in January of 2017 you had a
9    phone conversation with Gil Melman, Nathan Kroeker, Dan Alper,
10   Saul Horowitz and Mark Wiederman after Mr. Sobel, Mr. Moeller
11   and Mr. Alper had tendered their resignations from Major
12   Energy?
13   A.  Yes, ma'am.
14   Q.  Did Mr. Wiederman, Mr. Horowitz or Mr. Alper inform you
15   that they were recording that call?
16   A.  No, ma'am.
17   Q.  Do you recall during that conversation discussing the need
18   for Sox accounting and cash controls at Major Energy?
19   A.  In most conversations we did discuss that, and certainly at
20   that time after they left I know we did.
21   Q.  Were those services being provided free to Major?
22   A.  Yes, ma'am.
23   Q.  And did anybody on the Major side of the call agree that
24   these -- did the individuals on the Major side of the call
25   agree that the controls could be implemented?
```

1   A.  Yes, ma'am, I believe Mr. Horowitz did.  I know that Mr.

2   Wiederman had said so on a number of occasions, as did Mr.

3   Alper, but that was one of the few times I had ever been on a

4   call with Mr. Horowitz.

5   Q.  Do you also recall that being reaffirmed in writing later

6   by Mr. Horowitz?

7   A.  I believe so, yes, ma'am.

8   Q.  If we could just briefly pull up Exhibit 449.  I'm sorry,

9   DX449.  And if we could go just to the second page on 3B.

10          So, Mr. Lane, in 3B there was an action item for all

11  approvals, cash disbursements.  Accounting and financial

12  reporting will be done for Spark's Sox compliant process

13  effective immediately.  Do you see that?

14  A.  Yes, ma'am.

15  Q.  And was it your recollection that Mr. Horowitz had approved

16  it in this communication?

17  A.  Yes, ma'am.

18  Q.  And if we move up the screen to Mr. Horowitz's answer to 3A

19  and 3B, do you see there where he says, fine, OK?

20  A.  Yes, ma'am.

21  Q.  Now, Mr. Lane, you worked for Mr. Kroeker when you were at

22  Major -- at Spark?

23  A.  Yes, ma'am.

24  Q.  Was he a good CEO for you?

25  A.  He was.

1    Q.   Would you work for him again?

2    A.   Absolutely.

3    Q.   Now briefly we have provided you a demonstrative, and this

4    demonstrative tracks customer count spending that Major Energy

5    did during the earnout period.  Was that a line item that you

6    tracked in earnout statements?

7    A.   Yes, ma'am.

8    Q.   Now, is it true, Mr. Lane, that customers need to --

9    customers don't just materialize; there needs to be some CAC

10   spend for growth?

11   A.   Yes, ma'am.

12   Q.   And the more customers you have, assuming you're making a

13   margin, the higher your adjusted EBITDA will be?

14   A.   Yes, ma'am.

15   Q.   And is acquiring customer costs money a way that you can

16   invest and grow the business?

17   A.   Absolutely.

18   Q.   Now, if we could just briefly show Mr. Lane DX509 to see

19   what Major Energy's actual projections for CAC were in 2016.

20   This is DX509, page 2.

21        Can you see the CAC spend on page 2, Mr. Lane?

22   A.   Yes, ma'am.

23   Q.   And what are you showing there?

24   A.   For 2016 I'm showing a projected CAC spend of $14 million.

25   Q.   And what was actual?

K347HOR8                    Lane – redirect

1   A.  $9.4 million.

2   Q.  And if we look at the demonstrative we have, what

3   percentage drop is that in projection versus actual?

4   A.  The demonstrative says 66 percent, which looks correct.

5   Q.  If we could go to DX1037.

6          That 1037, Mr. Lane, is year two of the earnout

7   calculation.  If we go to page 2, can you see what the

8   projected CAC spend was?

9   A.  Projected spend was 15.9; actual spend is a little over

10  half that at 8.8.

11  Q.  And, is that a drop of roughly 55.7 percent?

12  A.  Yes, ma'am.

13  Q.  And lastly, Mr. Lane, if we can turn to DX907.  And 907 is

14  the earnout statement for year three, right?

15  A.  Yes, ma'am.

16  Q.  And what was the projected CAC spend for year three?

17  A.  16.25 versus an actual that was about 1/8 of that at 2.3

18  million.

19  Q.  So only about 14 percent of CAC spend was made in year

20  three?

21  A.  Yes.

22  Q.  Last question.  Mr. Lane, you are aware of the sellers'

23  allegations in this case?

24  A.  Yes, ma'am.

25  Q.  And can you tell the Court -- based upon your interaction

1   with them and your knowledge of the allegations -- why you felt

2   it was important to come and testify here today.

3   A.   As you know, I am a disinterested party, I am no longer an

4   employee at Spark, but I have worked closely with a number of

5   the folks at Major, and I've certainly worked with the Spark

6   team; and every time we would work with them and try to work

7   with them, they would either tell us one thing and act in a

8   different manner, or do things that we felt ultimately were

9   destructive to their business and to the business as a whole.

10          If I can say this, I felt that their actions were

11   immoral and unethical, and I had to come here today.  When I

12   was asked, I was more than happy to do it, because if there is

13   one piece of justice that we can bring and I can be a part of,

14   I want to be a part of it.

15   Q.   And did you describe in your witness statement what it was

16   that they did to make you feel that way.

17   A.   There are a number of things in my witness statement, but I

18   will say that agreeing to do things that were already agreed to

19   prior, turning their back on it; doing things that seemed to

20   benefit their own self interest; doing things away from the

21   company; taking customers; from what actions I had seen and

22   what was revealed subsequent, saying where they had been trying

23   to build a business on the side; self dealing with giving

24   themselves zero energy rates, including one executive right

25   before he ended up leaving the company; it ended up being where

1   I would say that it was lying, it was cheating, it was

2   stealing, and it was not something that I felt was becoming of

3   a proper person.

4   Q.  Based upon what you saw, Mr. Lane, did you see anyone from

5   Spark or Major Energy interfere with Major Energy's ability to

6   grow?

7   A.  I did see Major Energy do things that may have prohibited

8   their ability to grow, but no one at Spark did.  In fact, Spark

9   went out of its way to help Major Energy to succeed, including

10  providing a sleeve that was cheaper than the PSE sleeve.  And I

11  might add that the PSE sleeve had a collateral deficiency

12  during the bond cycle.  So, if they had stuck with the PSE,

13  they would have been in a whole new space.  Meanwhile, we did

14  as much as we could to make sure and facilitate their business.

15          We attempted to work with them, and in many cases it

16  felt like they would just be working against us.

17          So, no, I felt we went out of our way, offering free

18  accounting services, offering --

19          When David left and resigned, we said we will take

20  over all of that function for no charge.  And that was not

21  something that they had wanted to do.  We acquired customers.

22  We gave them their customers and were allowing those customers

23  to be towards their customer count, that they would take care

24  of them.

25          We went out of our way to make them succeed, because

1    the better they did -- if we were still paying them for this

2    earnout because they had achieved the numbers they had wanted

3    in the earnout -- it would have accrued to us, and it would

4    have accrued to Spark's shareholders.  So, it was only in our

5    best interest to help them succeed.

6              MS. PECTOR:  Thank you, Mr. Lane.

7              No further questions, your Honor.

8              THE COURT:  Thank you.  Anything further?

9              MS. COREY:  Nothing further.

10             MS. PECTOR:  We just have a few exhibits just quickly

11   to enter into the record.  DX449, 509, 1037, 907, and the

12   fourth demonstrative.

13             THE COURT:  Demonstrative 4.  They are received.

14             (Defendant's Exhibits 449, 509, 1037, 907 received in

15   evidence)

16             Thank you, sir, you may step down.  Have a good trip

17   back.

18             THE WITNESS:  Thank you, sir.

19             THE COURT:  And that ends our day.  I do have an event

20   in the courtroom tonight with a group, sort of an educational

21   event, so we're not going to be really using the tables, but

22   we're going to be turning the chairs from the second table back

23   towards the audience and having some people in the audience for

24   kind of a CLE program.  So,if you could move the things from

25   the table, that would be great.  You are welcome to leave

K347HOR8                         Lane – redirect

1    things in the courtroom.  I will be here and make sure no one

2    bothers your stuff, but if you can try to clear the tables and

3    clear the courtroom as soon as you can, I would appreciate.

4           Tomorrow morning?

5           MR. DAHAN:  You tell us.

6           THE COURT:  Is Mr. Maxwell first?

7           MR. BROWN:  Yes.

8           THE COURT:  All right.  How is 9:15?

9           MR. DAHAN:  Sure, thank you.

10          THE COURT:  OK, great.  Thanks, everybody.

11          (Adjourned to March 5, 2020 at 9:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          INDEX OF EXAMINATION

Examination of:                                    Page

MARK WIEDERMAN

Direct By Mr. Marooney . . . . . . . . . . . 456

Cross By Ms. Pector  . . . . . . . . . . . . 458

Cross By Ms. Pector  . . . . . . . . . . . . 586

Redirect By Mr. Marooney . . . . . . . . . . 647

Recross By Ms. Pector  . . . . . . . . . . . 674

ROBERT LAWRENCE LANE

Direct By Ms. Pector . . . . . . . . . . . . 693

Cross By Ms. Corey . . . . . . . . . . . . . 694

Redirect By Ms. Pector . . . . . . . . . . . 710

                          PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 110 and 758  . . . . . . . . . . . . . . . 647
 508, 184, 221, 160, and 359  . . . . . . . 674
 489, 439 and 450 . . . . . . . . . . . . . 709

                          DEFENDANT EXHIBITS

Exhibit No.                                    Received

 DX736, 738, 494D, 1059, 290, 494, 494F . . . 646
 609, 494H, 349, 250, 872, 612, 700, . . . . 646
       715, 711
 1016, 783, 932, 946, 265, 399, 419 . . . . . 646
 DX1033, 519, 540, 800, 813, 1030 . . . . . . 647
 504  . . . . . . . . . . . . . . . . . . . . 674
 982, 1064, 789, 1023, and 189  . . . . . . . 692
 537  . . . . . . . . . . . . . . . . . . . . 709
 449, 509, 1037, 907  . . . . . . . . . . . . 723
```