K357HOR1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x

3    SAUL HOROWITZ,

4                  Plaintiff,

5            v.                          17-cv-7742 (JPO)

6    NATIONAL GAS & ELECTRIC, LLC, et al.,

7                  Defendants.           Trial

8    ------------------------------------x

9                                        New York, N.Y.
                                         March 5, 2020
10                                       9:15 a.m.

11
     Before:
12
                         HON. J. PAUL OETKEN
13
                                         District Judge
14

15                       APPEARANCES

16   KING & SPALDING LLP
          Attorneys for Plaintiff
17   BY:  RICHARD T. MAROONEY, JR., ESQ.
          ISRAEL DAHAN, ESQ.
18        RYAN GABAY, ESQ.

19   MORGAN, LEWIS & BOCKIUS LLP
          Attorneys for Defendants
20   BY:  TROY S. BROWN, ESQ.
          MICHELLE PECTOR, ESQ.
21        DANA E. BECKER, ESQ.
          JARED WILKERSON, ESQ.
22        SU JIN KIM, ESQ.

23

24

25

K357HOR1

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.  Any preliminary

3     matters?

4          MR. DAHAN:  Yes, your Honor.  So, since yesterday

5     there has been a little shift in the witness order; we're also

6     trying to streamline for the Court.

7          So, the first witness plaintiff intended to call was

8     Keith Maxwell.  We have decided to just allow his witness name

9     to be adopted, and we're going to waive any cross; it will just

10    be admitted in, and we can move from that witness.

11         We were then going to start with Todd Gibson, who had

12    some flight issues, so he will be able to be here in the

13    afternoon, so...

14         THE COURT:  So,we will take the morning off?

15         MR. DAHAN:  And we will start with Eliott Wolbrom,

16    then Mark Josefovic, and then Amir Benisti and then Todd

17    Gibson.

18         And then just a reminder for tomorrow the plan is to

19    have Dan Alper, the former CEO of Major Energy, followed by

20    James Chung, former employee of PSE.  We believe that -- if

21    your Honor recalls, we asked if we could finish by 3 o'clock

22    Friday, given some observances.

23         THE COURT:  Yes.

24         MR. DAHAN:  We think that will take us -- it's hard to

25    predict, but it's going to be hard for them to show up with a

K357HOR1                    Wolbrom - direct

1    another witness, so we might a little off, we might finish a

2    little before three.  I just hope the Court can understand.

3              THE COURT:  OK.

4              MR. DAHAN:  And we will again over the weekend try to

5    figure out for next week, and we will try to get this done by

6    Wednesday, Thursday the latest.

7              THE COURT:  OK.  So is Mr. Maxwell here?

8              MR. DAHAN:  No.

9              MR. BROWN:  What we discussed was because we submitted

10   a sworn statement and there will be no further testimony

11   elicited, the sworn statement will go in and there's no further

12   need to swear the witness.

13             THE COURT:  That's fine.  OK.

14             MS. COREY:  Plaintiff would like to call Eliott

15   Wolbrom.

16             THE COURT:  All right.  Mr. Wolbrom.

17   ELIOTT WOLBROM,

18        called as a witness by the plaintiff,

19        having been duly sworn, testified as follows:

20             THE COURT:  How do you want to do the witness

21   statement?  Do you want to start?

22             MS. COREY:  Sure.

23   DIRECT EXAMINATION

24   BY MS. COREY:

25   Q.  Mr. Wolbrom, do you adopt your witness statement?

K357HOR1                    Wolbrom - cross

1    Actually, do you have your witness statement in front of you?

2    A.  Yes.

3    Q.  Do you recognize that as your witness statement that you

4    signed under oath?

5    A.  Yes.

6    Q.  Do you adopt this witness statement today?

7    A.  Yes.

8            MS. COREY:  We will offer that into evidence, and then

9    I think we have a list of exhibits that we will give you at the

10   end that are cited in the witness statement.

11           MR. BROWN:  Mr. Wilkerson will be handling

12   Mr. Wolbrom's cross-examination.

13           THE COURT:  OK.  Mr. Wilkerson.

14           MR. WILKERSON:  Your Honor, we have already

15   distributed defendant's objections to Eliott Wolbrom's witness

16   statement, as well as the cross binder for Mr. Wolbrom.

17           THE COURT:  Thank you.

18   CROSS EXAMINATION

19   BY MR. WILKERSON:

20   Q.  Good morning, Mr. Wolbrom.  How are you?

21   A.  Wonderful.

22   Q.  Let's start with your background.  You joined Major Energy

23   in 2012?

24   A.  Yes.

25   Q.  As the director of marketing, right?

K357HOR1                        Wolbrom - cross

1    A.  Yes.

2    Q.  And in 2015 you asked Mr. Wiederman if he would change your

3    title to chief marketing officer; is that right?

4    A.  Yes.

5    Q.  And you thought that title was stronger in the marketplace,

6    right?

7    A.  Well, through the course of my work I interacted with a lot

8    of chief marketing officers via certain partnerships we had,

9    and sitting around the conference table with other chief

10   marketing officers, I thought Major Energy would be better

11   represented if the title was changed.  The job didn't change,

12   but it's more just the title.

13   Q.  You thought that title would be stronger in the

14   marketplace, right?

15   A.  I thought it would be on par with everybody else at the

16   table I was at.

17   Q.  You are aware as part of the sale of Major Energy to NGE,

18   that certain executives at Major Energy received additional

19   potential compensation through an executive earnout agreement,

20   right?

21   A.  I wasn't aware of anybody else's compensation.

22   Q.  Have you ever heard of the executive earnout agreement?

23   A.  I heard the term.  I don't know any of the details or who

24   was included in it.

25   Q.  OK.  You know you were not included in that agreement,

1  right?

2  A.  Correct.

3  Q.  And you are aware that some of the other managers at Major

4  Energy received employment contracts with severance rights that

5  could be triggered upon a change of control.

6  A.  I don't know anything about the employment agreements of

7  anybody else other than myself.

8  Q.  OK.  You got a new employment agreement from Spark in 2016?

9  A.  I believe so, yes.

10  Q.  And in connection with that employment agreement you

11  received a signing bonus of $60,000, right?

12  A.  Yes.

13  Q.  Is it fair to say that was the only additional compensation

14  you received as a result of the sale of Major Energy?

15  A.  I don't believe that $60,000 was a result of the sale.  The

16  $60,000 was a bonus for me signing an agreement with Spark that

17  came with certain restrictions regarding noncompetes, etcetera,

18  etcetera.  It had nothing to do with what Major Energy had

19  done.

20  Q.  It had to do with the sale of Major Energy to NGE and then

21  Spark, right?

22  A.  No, that was an employment agreement between Spark and

23  myself, for me to continue working there under a new set of

24  policies or procedures, whatever.

25  Q.  And had the dropdown had not occurred, you would not have

1    signed the agreement with Spark, true?

2    A.   Pardon me?

3    Q.   You know what the dropdown is, right, sir?

4    A.   Yes.

5    Q.   Had the dropdown not occurred, you would not have signed an

6    agreement with Spark, true?

7    A.   I don't know what would have happened.

8    Q.   OK.  So it's possible that maybe you would have gone to

9    work for Spark even if Major Energy had not been sold.

10   A.   My intention was to stay with Major Energy indefinitely.

11   Q.   Let's talk about your personal knowledge for a second.  You

12   left Major Energy in what month of 2016?

13   A.   I believe it was October of 2016.

14   Q.   OK.  And you went to a totally different industry, right?

15   A.   Correct.

16   Q.   So you had no personal knowledge about Major Energy's

17   operations, or activities or performance after October 2016,

18   right?

19   A.   Correct.

20   Q.   You don't know, for example, if Major Energy's customer

21   acquisition costs increased or decreased after you left?

22   A.   After I left, I left.  I don't know anything that happened

23   after that.

24   Q.   OK.  You did stay in contact with Mr. Sobel after you left,

25   right?

K357HOR1                         Wolbrom - cross

1    A.   Sure.

2    Q.   You used WhatsApp to chat with Mr. Sobel on occasion?

3    A.   I used WhatsApp to chat with a lot of people.

4    Q.   Including Mr. Sobel.

5    A.   Yes.

6    Q.   You mention in your witness statement a press release from

7    May 4, 2016.  Do you remember that press release?

8    A.   I'd like to refer to it, but I do remember a press release.

9    Q.   Sure, we will bring it up on the screen so it will be

10   easily accessible for you.

11           Let's pull up PX253, James.

12           Is this the press release that you issued on May 4,

13   2016?

14   A.   Would it be possible to see the whole document at once?

15   Because there were a number of drafts, and I want to make sure

16   I can distinguish between a draft and what did go out.

17   Q.   Yes.

18   A.   OK, I reviewed it.

19   Q.   This is the press release you released on May 4, 2016,

20   right?

21   A.   This looks like a press release that was -- yeah, that was

22   either on our website perhaps, or maybe this was the official

23   one that went out, yeah.

24   Q.   Can you click to the next page, James.

25   A.   What was the date on the other one?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.   There is one document with two pages.

2    A.   Sorry.  Thank you.

3    Q.   All May 4, 2016.  And you see there at the top there is a

4    continuation of the prior page, it says Major Energy, Eliott

5    Wolbrom, chief marketing officer, right?

6    A.   Yes.

7    Q.   Let's go back to the first page. and let's focus on the

8    last paragraph before the bold "About National".

9              So in this press release Mr. Alper says, "We see the

10   acquisition by Spark Energy and their financial integration as

11   a win-win for our customers, employees, vendors and marketing

12   partners.  While we continue to run our business as usual, the

13   financial integration with Spark brings us additional

14   opportunities to bring enhanced value to the customer

15   marketplace as part of a much larger platform."

16             Did I read that correctly?

17   A.   Yes.

18   Q.   Now, this press release was approved by Dan Alper -- who

19   was the CEO of Major Energy -- before it went out, right?

20   A.   Presumably, yes.

21   Q.   And it was approved by the president Mr. Wiederman, right?

22   A.   I don't know if it was both of them or one or the other.  I

23   don't remember who approved it, but someone approved it.  One

24   or both of them approved it.

25   Q.   I'm sorry?

1    A.  I said one or both of them approved it.  I don't recall

2    which one it was.

3    Q.  OK, let's look at DX302.  DX302 is an e-mail from you to

4    Mr. Wiederman, Mr. Alper and Mr. Horowitz.  The subject is

5    PR -- short for press release, right?

6    A.  Yes.

7    Q.  And you see this is on May 4, 2016, right?

8    A.  Yes.  I'm sorry.

9    Q.  The same day you sent out this press release, true?

10   A.  Yeah.

11   Q.  And you say, "Please see updated PR attached, and upon your

12   approval I will get this in the market wired queue for a 5:30

13   p.m. release pending the final approval near the release time."

14          Do you see that?

15   A.  Yes.

16   Q.  Did you get the approval of Mr. Alper and Mr. Wiederman and

17   Mr. Horowitz to send out the press release?

18   A.  I don't remember the specific e-mail.  If you have one, I

19   can perhaps verify it.  But it stands to reason I wouldn't send

20   out a press release of this nature without supervisor approval.

21   Q.  That's not something you ever did, is it?

22   A.  I have absolutely sent out press releases throughout the

23   course of my work, but something like this regarding a sale,

24   dropdown, whatever this was about, that would have been

25   approved by a superior of mine.

K357HOR1                        Wolbrom - cross

1   Q.  And let me ask a more specific question.  I apologize for

2   not being clear.

3           You would not have sent out a press release after

4   asking approval of your superiors until you got their approval,

5   right?

6   A.  Most likely, yes.

7   Q.  Staying on the topic of Mr. Alper for a second, you

8   mentioned in your witness statement at paragraph 82 that in

9   your view Spark and Mr. Alper were one in the same.  Do you

10  recall that?

11  A.  Can I --

12  Q.  Sure, you've got it there.  Just open it up, go to

13  paragraph 82 and refresh the recollection of your testimony.

14  A.  Thank you.

15          Yes.  Did you ask me?

16  Q.  I'll ask it again.

17  A.  Thank you.

18  Q.  So in your witness statement at paragraph 82 you say that

19  in your view Spark and Mr. Alper were essentially one in the

20  same, right?

21  A.  After the sale and dropdown, that was my perception over

22  time.

23  Q.  That would have been after August 2016, right?

24  A.  Whatever the date was.

25  Q.  Mr. Alper was hired by Mr. Horowitz and the other sellers

K357HOR1                          Wolbrom - cross

1    before the sale to NGE, right?

2    A.   I don't know anything about who hired him or the date.  I

3    wasn't involved.

4    Q.   You were an employee at Major Energy in 2015, right?

5    A.   Yes.

6    Q.   And you remember that Dan Alper became CEO of Major Energy

7    in 2015?

8    A.   Yes.

9    Q.   And you remember that Major Energy was not sold to NGE

10   until 2016, right?

11   A.   Yes.

12   Q.   Do you have any -- do you have any evidence that Spark was

13   involved in the hiring of Mr. Alper at Major Energy?

14   A.   I don't have evidence regarding the hiring of anybody

15   unless I hired them.  I wasn't involved in that; I don't know.

16   Q.   As far as you know, Spark had nothing to do with the

17   decision of Major Energy to hire Dan Alper as CEO, right?

18   A.   One more time.

19   Q.   As far as you know, Spark had nothing to do with the hiring

20   of Dan Alper --

21   A.   I don't know.  I don't know who was involved.

22   Q.   Let me just get the question out.  As far as you know,

23   Spark Energy had nothing to do with the hiring of Mr. Alper at

24   Major Energy as CEO.

25   A.   I don't know anything about who hired, or why he was hired

1    or who brought him.  I just don't know.

2    Q.  Let's switch topics and talk about corporate sponsorships

3    for a minute.  You remember in your witness statement talking

4    about corporate sponsorships, right?

5    A.  Yes.

6    Q.  And those corporate sponsorships were with the Yankees,

7    Madison Square Garden, the Knicks, the Rangers, maybe some

8    others I'm missing, right?

9    A.  Yeah, there are a bunch.

10   Q.  And the purpose of those sponsorships was not merely for

11   you and the other Major Energy employees to enjoy games and

12   concerts, right?

13   A.  The purpose of those sponsorships were to drive revenue and

14   grow Major Energy and the Major Energy brand.

15   Q.  So they were meant to publicize the Major Energy brand,

16   right?

17   A.  They were meant to a number of things; it wasn't specific

18   things.  It was meant to ultimately grow the revenue and value

19   of Major Energy.

20   Q.  And to build relationships with vendors and with brokers as

21   well, correct?

22   A.  Yes.

23   Q.  And when did those sponsorships begin?

24   A.  Which ones are you referring to?

25   Q.  Let's go with the first significant one that you can

K357HOR1                          Wolbrom - cross

1    remember.

2    A.   We started discussions with Madison –– I started

3    discussions with Madison Square Garden I believe February 15,

4    2013, and I believe we –– and I believe it was August of 2013

5    that we signed our marketing partnership with them.

6    Q.   So fair to say that the sponsorships commenced years before

7    the sale of Major Energy to NGE, right?

8    A.   I believe that the deal with the Knicks and Madison Square

9    Garden was some point in August 2013, which would be before the

10   sale.

11          THE COURT:  Can you just clarify for me, when you say

12   marketing partnership, was that providing energy to those

13   entities, or was that just doing some marketing together?

14          THE WITNESS:  So that particular deal in that year did

15   not have a supply deal; we weren't supplying Madison Square

16   Garden; they were already with someone; but it included IP

17   rights, the ability to use their logos.  We had advertisements

18   on TV, we had hospitality at the games and a slew of stuff on

19   digital, Internet, social media.  It was a multi-faceted deal;

20   it touched a lot of different parts of our business.

21          THE COURT:  Thank you.

22   Q.   So notwithstanding the sponsorships starting in 2013, Major

23   Energy's' customer count decreased from 2013 to 2014.  Are you

24   aware of that?

25   A.   I don't have the numbers in front of me.

1    Q.  Could we pull up DX213, let's just skip to slide 19 first.

2                Do you see, Mr. Wolbrom, in this presentation that

3    the customers on the electric side decreased from 2013 to 2015?

4    A.  In 2013 to 2015 it looks like it went up.

5    Q.  If you look at the bottom there is a legend.  Black is

6    customers and light gray is RCE.  Do you see that?

7    A.  I see RCEs went up from 2013 to 2015.

8    Q.  And the question is do you see customers decreased from

9    2013 to 2014 and then again from 2014 to 2015?

10   A.  It's hard to distinguish between 2014 and 2015, but it

11   looks like a very small -- I'm sorry -- yeah, I mean -- now I

12   don't have the numbers on the left.  But from 2014 to 2015 it

13   looks like the customer count went down, and it looks like the

14   RCE total went up, which would show our commercial business was

15   improving.  I'm sorry, the screens are moving; give me one

16   second.  It looks like a very, very small dip from 2013 to

17   2015.

18               I am not familiar with this document -- I don't know

19   where this is from -- I didn't make this.  But just reading a

20   typical graph, it looks like RCE count went up from 2013 to

21   2015, which would show that Madison Square Garden partnership

22   was doing its thing, as well as our other partnerships, and

23   perhaps customer count -- which obviously is less important --

24   it's all about the RCEs -- maybe dipped very, very slightly.

25   Q.  You're aware, Mr. Wolbrom, that the earnout about which

K357HOR1                        Wolbrom - cross

1    we're all here in court is based in part on customer count,
2    right?
3    A.   I don't know anything about the earnout or the details
4    involving it.
5    Q.   Can you skip to page 1, James.  Let's orient Mr. Wolbrom
6    with this document a little more.  Sorry, all the way to page 1
7    of the pdf.
8             Do you know who Cliff Adams is, Mr. Wolbrom?
9    A.   Who?
10   Q.   Cliff Adams?
11   A.   No.
12   Q.   Did you ever meet Dave Hennekes or Paul Konikowski?
13   A.   The name Cliff Adams is a familiar name; I don't know who
14   it is.  Dave and Paul I believe I met and obviously spoke to in
15   a very limited capacity though.  I'm familiar with the names.
16   Q.   You would have met them from NGE during the due diligence
17   period when NGE was considering purchasing Major Energy, right?
18   A.   I don't know when it was -- or I don't know what was going
19   on.  I'm familiar with the names.  I may have exchanged
20   e-mails.  I don't know at what point during this big
21   transaction I met them, but I am familiar with those names.
22   Q.   And Dan Alper obviously you know.
23   A.   Yes.
24   Q.   Did you ever assist Mr. Alper or anybody else at Major
25   Energy with the creation of these management presentations that

K357HOR1                        Wolbrom - cross

1    were to be made to NGE?

2    A.   Which management presentation?

3    Q.   Well, you can skip down to the next page, James.

4            Does this look familiar to you, sir?

5    A.   No.

6    Q.   Do you recall providing marketing information to Mr. Alper

7    or anybody else at Major Energy in late 2015 or early 2016 for

8    the purpose of creating management presentations?

9    A.   I did a lot of reporting from pretty much the time I got

10   there to when I left.  What people did with that information

11   once I left -- well, I should say once a superior of mine --

12   what they did with that information -- unless they specifically

13   told me -- I wouldn't know.  I'm not aware of this management

14   presentation document.  It's possible that somebody asked me

15   for a specific about a vendor, or a partner, and I would have

16   answered, not without knowing where it was going, but gave it

17   to my boss.

18           THE COURT:  Did you say a lot of reporting or a lot of

19   recording?

20           THE WITNESS:  No, reporting.

21           THE COURT:  Reporting.

22           THE WITNESS:  Yes, sorry.

23   Q.   Is there any reason that you have to think that this

24   management presentation sent to Mr. Alper, Mr. Hennekes and Mr.

25   Konikowski would be incorrect?

1    A.  I don't know anything about it.  I would imagine if

2    somebody from Major Energy sent a document that it's a correct

3    document, but I don't recall formulating this or specifically

4    providing information.  It's possible; I just don't remember.

5    Q.  The information that you sent to management whenever they

6    requested it, it was accurate, right?

7    A.  To the best of my ability, yes.

8    Q.  Let's skip to page 21, slide 21, James.

9            Do you see here, sir, in 2013 ending customers for

10   2013 is over 178,000 customers?

11   A.  2013?  The highlighted?

12   Q.  Yes.

13   A.  I see a number there, yes.

14   Q.  And it drops to 168 in 2014, right?

15   A.  Yes.

16   Q.  And then customer count drops to 151 in 2015, correct?

17   A.  That's what it says here.

18   Q.  Talking a little bit more about these corporate marketing

19   sponsorships, other ESCOs also have similar sponsorships,

20   right?

21   A.  Similar to what?

22   Q.  Similar to Major Energy?

23   A.  Which sponsorships are you referring to?

24   Q.  You mention in your witness statement that Major Energy was

25   one of the first players in this area to actually start

K357HOR1                        Wolbrom - cross

1   sponsorships with big entities, right?

2   A.  Big entities?

3   Q.  Yeah, like Madison Square Garden, the Knicks.

4   A.  This is what you're trying to ask.  To my knowledge I was

5   unaware of any major -- no pun intended -- major partnership or

6   sponsorship deal between an ESCO and a sports team.  I was

7   unaware.  Perhaps a utility and a sports team.  But an ESCO and

8   a sports team I was unaware.  Whether or not another energy

9   company had a big partnership with someone else, that I don't

10  know.  I would hope so, but...

11  Q.  Well, you are aware that other energy companies have

12  sponsorship deals with -- I mean in the marketplace, right?

13  A.  No, I don't know what you're referring to.

14  Q.  OK.  So in your witness statement you don't recall

15  mentioning that other ESCOs tried to follow Major's lead in

16  this card regard?

17  A.  In regards to an ESCO doing a sponsorship deal with a

18  sports team, I was unaware at the time in 2013 of anyone ever

19  having done that.  After we did the deal, other ESCOs followed

20  suit.

21  Q.  That's all I'm trying to do.  It took me a long time to get

22  there.  I apologize.

23  A.  No, I just want to answer accurately.

24  Q.  OK.  So other ESCOs sort of followed Major into this

25  sponsorship space; is that fair?

1    A.  It certainly appeared that way to me, yes.

2    Q.  OK.  In your written witness statement, you don't attempt

3    to calculate the return on investment of the corporate

4    sponsorships, right?

5    A.  I don't believe I put figures vis-a-vis a specific deal in

6    my testimony.

7    Q.  Or the conglomeration of all of the deals, right?

8    A.  I don't think there are any figures in my testimony.

9    Q.  As far as you know, after you left Major Energy, Major

10   employees continued using the sponsorships throughout the

11   earnout period to entertain brokers and vendors, right?

12   A.  I don't know what Major Energy did after I left.  I left

13   the industry and I went to a totally different industry, and

14   don't know what they did.

15   Q.  Let's talk about vendors and churn.

16           THE COURT:  C-h-u-r-n, churn?

17           MR. WILKERSON:  Like churning butter, yes.

18   Q.  Do you recall in the second half of 2015 that Major Energy

19   decreased its customer acquisition costs?

20   A.  Decreased what?

21   Q.  You know what customer acquisition cost is, right?

22   A.  I sure do, yes.

23   Q.  And sometimes people refer to that as CAC?

24   A.  Yeah.

25   Q.  Do you remember in the second half of 2015 Major Energy cut

1    its CAC?

2    A.  We had various -- overall -- I wouldn't be aware of an

3    overall number.  We had a number of verticals with which we

4    brought in RCEs, so I wouldn't be aware of all of them and what

5    the general costs per acquisition would be, so I can't point to

6    a specific number to say yes.  Certain vendors our costs went

7    down, and I'm sure certain vendors our costs went up.

8    Q.  OK.  I'm talking about the CAC spend for Major Energy as a

9    whole, not on a particular vendor.

10   A.  As a whole I wouldn't know.  If we spent X amount of

11   dollars to bring in certain commercial business which I wasn't

12   involved in, and that number either went up, the CAC either

13   went up or down, I would not know.

14   Q.  James, can we turn to DX213 again.  Let's go to slide 29.

15         You see this is titled "Door-to-door sales, resumed

16   significant campaign from January 2016."  Right?

17   A.  Yes.

18   Q.  And if you go down to the chart you can see that in May

19   2015 there is a drop in customer acquisition spend, right, as

20   compared to April 2015?

21   A.  This doesn't look like spend; this looks like accounts.

22   Q.  Oh, you're right, you're right.  So let me back up.

23         This customer account chart demonstrates that in May

24   of 2015 the customer count of Major Energy decreased relative

25   to April 2015, right?

1   A.  I don't know that this is customer count.  It looks like

2   the amount of -- I don't know what this is.  This doesn't look

3   like total customer count.  I believe Major Energy had more

4   than 14,000 customers at any point on this graph.

5   Q.  Correct.  It says door-to-door sales, right, at the top?

6   A.  Yeah.

7   Q.  OK.  So is it your understanding that this chart

8   demonstrates that Major Energy's door-to-door sales decreased

9   month to month from April to May of 2015?

10  A.  Yes, door-to-door sales in a given month.

11  Q.  And door-to-door sales were the main channel for Major

12  Energy to acquire residential customers, true?

13  A.  Yes.

14  Q.  And do you see that this decrease continues from May to

15  June --

16  A.  I should say up until I left.  I don't know how Major

17  Energy acquired residential customers after I left.  While I

18  was there, door-to-door would be the number one sales channel.

19  Q.  Right.  And I am not going to try to hold you to anything

20  after you left, but thank you for that clarification.

21          Do you see the door-to-door sales decrease again from

22  May to June of 2015, right?

23  A.  Yes.

24  Q.  And then they stay relatively low relative to the prior

25  periods from May 15 until December 15, right?

K357HOR1                          Wolbrom - cross

1    A.  Well, I see from July to August it goes up, from August to

2    September it tails a little, September to October it shoots

3    back up -- goes back up.  November goes down a bit.  December

4    it goes down, and in January it shoots up significantly, almost

5    doubles.

6    Q.  Correct.  So this period from May 2015 to December 2015,

7    every single one of those months is lower than every month

8    between January '14 and April '15, according to this chart,

9    right?

10   A.  Yeah.  Just ask you to repeat the question one more time.

11   Q.  Sure.  This period of May '15 to December '15, every one of

12   those months is lower in door-to-door sales than the months of

13   January '14 to April '15, right?

14   A.  No, that's incorrect.  Well, the first subset is to

15   December '15?  Or are you going into January already?  Not

16   going into January.  Well, January it shoots back up.  If you

17   wants to just stop at December, then it would appear that, yes

18   -- it would appear that from May until December of '15 the

19   sales were lower than from January until April of '15, correct.

20   Yeah.

21   Q.  And, as you recall, we looked at slide 19 and slide 21 of

22   this same presentation and saw that customer count hit its peak

23   at Major Energy in 2013.  Do you recall that?

24   A.  I would need to see it one more time.

25   Q.  Can we go to slide 21.

K357HOR1                          Wolbrom - cross

1           Do you see the customer count peaks at 178 in 2013?

2    A.  The ending customer count is higher in 2013 than in the two

3    years prior or after.

4    Q.  And as you mentioned, customer acquisition through

5    door-to-door sales started to bounce back up in January of

6    2016, right?

7    A.  If we can go back to it, yeah.  January 2016, I recall from

8    that slide, yeah.

9    Q.  Let's go back to slide 29.

10   A.  It went up.

11   Q.  Do you see it bounces back up in January 2016?

12   A.  I do.

13   Q.  And you as chief marketing officer, you were aware of the

14   marketing activities at Major Energy at this time period,

15   right?

16   A.  Yes.

17   Q.  And you were aware that in January of 2016 Major Energy

18   started to spend quite a bit more with its door-to-door

19   vendors, right?

20   A.  More?

21   Q.  More money?

22   A.  I don't know what Major spent totally; that wasn't my lane,

23   so to speak.

24   Q.  Sorry, keep going.

25   A.  No, I don't know what Major's total spend in January '16

K357HOR1                        Wolbrom - cross

1   versus December '15 were.  I do see that we brought in nearly

2   8,000 accounts in January.  And in December -- which, you know,

3   I mean there are reasons for 2015, and we haven't gone there --

4   but, yeah, January '16 we spent -- we more than doubled the

5   prior month.

6   Q.  And you recall that in January of 2016 the vendors for

7   Major Energy were ramping up their activity on Major Energy's

8   behalf, right?

9   A.  It would appear so.  There were other things going on.  It

10  wouldn't just be that a vendor was ramping up, but a lot of

11  this is seasonal; it's very hot in the summer and very cold in

12  December.  It's possible we signed up a new vendor or a vendor

13  got a new team or grew.  There could be just a number of

14  reasons why it shot up in January '16.

15  Q.  Door-to-door vendors are paid per sale, right?

16  A.  From my recollection, every vendor had their own deal; it

17  wasn't as simple as being paid for sale.

18  Q.  Some of them were a little more complicated with a residual

19  as well?

20  A.  I wouldn't say complicated, it's just different.

21  Q.  Is it fair to say some vendors would simply receive an

22  upfront payment --

23  A.  Yes, vendors would be paid per sale, some vendors would be

24  paid per time spent, some vendors would be paid in a hybrid

25  model of residual and upfront.  I don't believe any two were

K357HOR1                          Wolbrom - cross

1    exactly the same.  That's the nature of the business.

2    Q.  PTM in particular, you discuss PTM quite a bit in your

3    written statement, right?

4    A.  Yes.

5    Q.  PTM in particular had a hybrid, I think is the word you

6    used, where they got an upfront payment for every customer they

7    brought in, right?

8    A.  I believe we had at least two different agreements with

9    PTM, to my knowledge.  I am happy to look at documents and

10   refer to them.

11        I believe the first one was just paid per meter, and

12   it had certain restrictions.  Usage was tied to it; we paid on

13   a usage tier, if I recall.  And subsequent deals with PTM --

14   and again I'm speculating; I would like to see it in front of

15   me -- it would be likely we combined a residual model, thus

16   creating a hybrid.

17   Q.  By residual model you mean an upfront payment, and then as

18   the customer remains on flow with Major Energy and creates

19   revenues for Major Energy, Major Energy gives a residual

20   payment?

21   A.  PTM would bring us the customer.  After a designated period

22   of time, we would then pay PTM, provided they were still with

23   us, and then after a certain period of time a residual would

24   kick in for PTM as long as they stayed with us.  And that was

25   based on usage.

K357HOR1                      Wolbrom - cross

1    Q.  James, let's go to DX213 at slide 27, please.

2             This is the same document, Mr. Wolbrom.  Do you see

3    this slide is called "capitalized customer acquisition and

4    providers"?

5    A.  Yes.

6    Q.  And if you look at PTM, it's one of the highlighted rows,

7    it was making $90.5 for customer acquired, right?

8    A.  I am not familiar with this document.  I never saw it

9    before, and I didn't make it.

10   Q.  Do you have any reason to think that was inaccurate back in

11   January of '16?

12   A.  No.  If Major Energy provided it, then I don't believe it's

13   inaccurate.  I'm just not familiar with it.

14   Q.  And that's higher than every other vendor on this sheet

15   other than DSS, right?

16   A.  Well, DSS and PTM would seemingly be our two largest

17   vendors, and PTM would be not the highest customer.  I mean

18   90.5 is less than 91.4.

19   Q.  Right.  So the answer to my question is, yes, PTM is --

20   A.  -- would seem to be the second highest.

21            THE COURT:  Before you answer, please let him finish

22   the question.

23   Q.  The dollars per customer acquire is higher for PTM than any

24   other vendor except DSS, true?

25   A.  Yes.

K357HOR1                         Wolbrom - cross

1    Q.   Now, if you scroll to the bottom of this slide, please,

2    James, let's look at the notes.

3            Do you see that first note there, "Door-to-door

4    customer acquisition costs have increased over the past several

5    months, with current charges ranging from $100 to $125."

6            Do you see that?

7    A.   Yes.

8    Q.   Major was capable of paying market prices for its customer

9    acquisitions, right?

10   A.   I believe Major paid below market price for their

11   customers -- through PTM specifically.

12   Q.   Major was capable of paying market prices for customer

13   acquisitions, right?

14   A.   Yes.

15   Q.   And when you resigned from Major Energy, do you recall how

16   many hundreds of thousands of dollars per month PTM was making

17   on average?

18   A.   I don't know.

19   Q.   PTM was still actively marketing for Major Energy when you

20   resigned, right?

21   A.   I'm trying to recall.  I believe we were still working with

22   them.  It was not under the same quality of relationship, I'll

23   say, but I don't believe we terminated an agreement with them

24   while I was still there.

25   Q.   Is it your recollection based on that answer you just gave

1  that PTM was receiving less revenue from Major Energy as time

2  went on in 2016?

3  A.  After I left?

4  Q.  Throughout 2016.  What was the trend of revenue from Major

5  to PTM?

6  A.  I don't have -- I don't recall.  I would need to see it and

7  possibly verify.  But from my recollection in 2016 we were

8  growing as that last graph on that other slide showed.  And I

9  believe we had a very strong January and February, the first

10 couple of months.  I just don't have the numbers in front of

11 me.  I don't know what happened after I left.  The relationship

12 certainly deteriorated -- that I can tell you -- while I was

13 there.

14 Q.  When you say relationship, what are you referring to?

15 A.  Well, I had a very strong relationship with the owners and

16 a lot of the managers at PTM.  After the sale and the dropdown

17 there was a narrative and a vibe of distrust between what I was

18 saying and what PTM was perhaps seeing.  So, the moment

19 distrust becomes a variable in a relationship it starts to

20 unwind, I would say.

21 Q.  Were you aware that PTM made more money from Major Energy

22 in 2016 than 2015?

23 A.  No, I don't know what PTM made.

24 Q.  And did you know that PTM remained the largest vendor for

25 Major Energy throughout the entire earnout period?

K357HOR1                        Wolbrom - cross

1    A.  It could be they were the largest, but it doesn't mean

2    their numbers didn't dwindle down and the others were even

3    smaller.  I don't know.  I am not aware of anything that

4    happened after I left.

5    Q.  You knew Bruce Shipper, right?

6    A.  Who?

7    Q.  Bruce Shipper?

8    A.  Yes.

9    Q.  He ran the broker department at Major Energy?

10   A.  Yes.

11   Q.  In your witness statement you mention brokers a few times;

12   is that fair to say?

13   A.  Yes.

14   Q.  And you don't name any brokers who supposedly severed their

15   relationship with Major Energy in 2016, right?

16   A.  I don't believe I named anybody in my testimony.

17   Q.  Let's talk for a minute about Pennsylvania.  Do you recall

18   in August of 2016 Major Energy entered into a settlement

19   agreement that was approved by the PUC?

20   A.  I don't recall the dates, but I know there was a

21   settlement.

22   Q.  And a settlement was actually with the PUC, right -- the

23   Public Utilities Commission of Pennsylvania?

24   A.  I know there were a few different entities involved.

25   That's not my lane.  I don't remember the name of the entity,

K357HOR1                    Wolbrom - cross

1   but I know there was a settlement.

2   Q.  But you kept up with the regulatory restrictions on Major

3   Energy's marketing activities, did you not?

4   A.  I'm not aware of any restrictions on Major Energy's

5   marketing.

6   Q.  Let's turn to -- let's first turn to DX1059 to see the

7   press release regarding the approval of the settlement.

8            Just to make sure we're on the same page, you see this

9   press release says "PUC Orders $5.2 million in refunds and

10  penalties against Respond Power, accused of deceptive polar

11  vortex marketing and billing practices."  Did I read that

12  correctly?

13  A.  Yes.

14  Q.  And this is August 11, 2016, right?

15  A.  Yes.

16  Q.  And it is your recollection as well that there was a

17  settlement approved in August of 2016 with the PUC, right?

18  A.  That's what it would appear, yeah.  I don't know the

19  details of the settlement offhand.

20  Q.  All I'm asking is that you recall the settlement being

21  approved in August of 2016, right?

22  A.  That sounds familiar.

23  Q.  So, in addition to this $5.2 million payment, this

24  settlement also required Major to implement certain business

25  and sales practices, right?

K357HOR1                    Wolbrom - cross

1    A.   I don't recall what those would have been or what they were

2    offhand.

3    Q.   Do you recall being engaged in conversations at Major

4    Energy in order to implement certain business and sales

5    practices as a result of this settlement?

6    A.   I don't recall -- I don't recall having -- in connection

7    with what happened in Pennsylvania, I don't remember

8    specifically marketing practices that we changed.  We were

9    constantly changing our marketing strategies for a number of

10   different reasons.  I cannot point to something specific,

11   unless you wanted to show me, that we changed because of this

12   settlement.

13   Q.   Sure.  It's not a memory test.  I will show you the

14   documentation.

15   A.   Thank you.

16   Q.   Let me first show you DX359.  That's Defendant's 359.  You

17   see -- you are not on this e-mail.  This is an e-mail from Adam

18   small to Dan Alper.  And if you go to the bottom of the next

19   page -- sorry -- the bottom of the last page.  Do you see the

20   "P.S"

21   A.   I see the PS, but if it's OK with you, I would like to read

22   the whole e-mail so I have context.  I have never seen this

23   before.

24   Q.   The PS is the only thing I'm going to be asking you about,

25   but feel free to read the whole thing if you like.

1   A.  I will read it quickly.

2              THE COURT:  If you would rather read the paper

3   version, you can also do that.  It's up to you.

4              THE WITNESS:  Which binder is it?

5              THE COURT:  You have a couple of binders there?

6              THE WITNESS:  I have a cross.

7              THE COURT:  It should be in there.

8              Is it in that binder?

9              MR. WILKERSON:  It is.

10             THE COURT:  So if you look for DX359 you should find

11  it.  It might be easier that way.

12             MR. WILKERSON:  May I approach?

13             THE COURT:  Yes.

14             THE WITNESS:  Thank you.

15  Q.  Do you see in the PS -- I will just focus on the first

16  sentence -- it says -- Adam small says -- remind us who that

17  was?

18  A.  General counsel of Major Energy.

19  Q.  He says, "P.S - I would really like two hours of yours and

20  Eliott's time to review the PA settlement and how we are going

21  to carry out our obligations."  Right?

22  A.  Yes.

23  Q.  So let me ask you.  Now, again, after having read this, do

24  you recall being involved in the process of implementing the

25  obligations imposed by the PA settlement?

K357HOR1                    Wolbrom - cross

1   A.  I don't.  And I don't know what those obligations are.  I

2   don't know if he is talking about financial obligations or

3   customers.  I just don't know what those were.  And I don't

4   recall having a two hour meeting with I think it was Dan and

5   Adam about this specifically.

6   Q.  Let's turn to DX290, James.

7            Let's go to page 40.  Do you see there at subheading B

8   it says "Respond Power shall increase internal quality control

9   efforts to include at least the following..." and then it has a

10  list?

11  A.  Yes.

12  Q.  And just to take a few examples, it says that "Respond

13  Power shall record all communications between customers and

14  Respond Power's customer service representatives."  Right?

15  A.  Yeah, we were doing that before.

16  Q.  And in (ii) it says "Respond Power shall require its

17  telemarketers to record all communications with customers that

18  result in a sale."  Right?

19  A.  We did that before even if it wasn't a sale.  We did that

20  before.

21  Q.  OK.  And if you go to (iv), it says "Respond Power shall

22  implement a provision in its contracts with telemarketers that

23  no commissions shall be paid for any enrollment unless a

24  recording of the entire sales presentation to that customer is

25  supplied to Respond Power within three days of the sale."

1    Right?

2    A.  That also I also believe we had.  And it's very possible we

3    didn't bring -- or at least I didn't bring on any new

4    telemarketers from the date this came out.  So, yeah, I mean

5    that's my comment on it.

6    Q.  And if we look at (v, (v) says "Respond Power shall on a

7    weekly basis review a statistically valid sample of calls

8    recorded pursuant to the prior paragraph from each of Respond

9    Power's agents and third-party contractors in order to evaluate

10   the sales practices employed."

11   A.  That was also something we did before.  I don't know what

12   they're calling "statistically valid" quote unquote, but we

13   more than spot checked the quality control sales of every

14   vendor before this.

15   Q.  Did Major Energy have a chief compliance officer before

16   this?

17   A.  I don't know if that was the title of the person.  I do

18   recall a chief compliance officer, the title.  I don't know

19   when that title was created.  Did we have an employee or

20   employees in the company doing compliance work?  Absolutely.

21   Q.  And who were those employees?

22   A.  Well, Adam Small would be one.  I think there was someone

23   Trevor, Trevor Stanley was somebody else there as well.  There

24   was also some cross work between my department and Adam's

25   department.  We had sort of a liaison quality control person

K357HOR1                    Wolbrom - cross

1  who was involved in most meetings between Adam and I, so that

2  she would ultimately execute a lot of these checks.  So

3  somebody who would be reviewing a sample of calls would be

4  someone who may not be in Adam's department necessarily -- it

5  could be either it was my department or a nondepartment -- we

6  weren't very corporate in a sense -- but there were a number of

7  people engaged in compliance-related work on an ongoing basis

8  every single day with every vendor.

9  Q.  And were you aware of a door-to-door management team within

10  Major Energy in 2016?

11  A.  A door-to-door management team?

12  Q.  Yes, sir.

13  A.  Well, while I was there, the door-to-door vendors -- and

14  all of our sales vendors on the residential side certainly --

15  were under my purview, and so that may be me, that may be

16  someone that worked for me, maybe multiple people.  I don't

17  remember there being an official department or whatever the

18  term you just used.

19  Q.  And if that door-to-door management team was implemented at

20  Major Energy after you left, you wouldn't know about it, right?

21  A.  Right.

22  Q.  Do you recall the creation of that door-to-door management

23  team being a requirement of this settlement agreement?

24  A.  I'm not aware of the details of the settlement requirement,

25  but it seems like from the description of it at least we

K357HOR1                         Wolbrom - cross

1    already had that.

2    Q.  You didn't have a door-to-door management team, did you,

3    sir?

4    A.  We had a group of people who managed the door-to-door

5    vendors and every vendor.  We didn't give titles to tasks.  We

6    also weren't overstaffed, so the management of the door-to-door

7    teams and every vendor was under my control.  So by proxy we

8    had a door-to-door management team.  We didn't have plaques on

9    our doors that said that, but that's what we did from day one.

10   Q.  Did you ever meet somebody named Heather McGuinness?

11   A.  No.  I don't believe so.

12   Q.  You mentioned earlier that you had WhatsApp communications

13   with Mr. Sobel, right?

14   A.  Yes.

15   Q.  Let's turn to 813, James, and let's go to page 39.

16             THE COURT:  DX813?

17             MR. WILKERSON:  DX813.

18   Q.  Mr. Wolbrom, I recognize the format of these WhatsApp

19   communications are not what you would see on your cell phone,

20   but if you turn to the body, that's what we are going to be

21   focusing on between you and Mr. Sobel.

22             So if we start at the top, you can see at the very far

23   right this is 10/31/16.  Can and you see that the from is

24   from --

25   A.  I'm sorry.  Would you mind getting rid of that blow-up

K357HOR1                         Wolbrom - cross

1    screen?  I can read it fine, but I would just like to see more

2    context.

3    Q.  Sure.  You can see the from is from David Sobel.  Just so

4    we don't have to do this every time, the participants column

5    shows who are the participants of the chat.  The from shows who

6    it is from and, and then the body of the content of the

7    message.

8    A.  What is the column all the way on the left?

9    Q.  That is the chat number.  It's just a serial number for

10   each individual chat, as I understand it.  That's my

11   understanding.

12           So in the body Mr. Sobel says, "If we're going to

13   gossip, rather keep it just between us.  Hope that's OK."

14           And he continues talking.  "You talking about Moeller?

15   What did he want?  He's coming around about Dan and all

16   slowly."

17           And you say "LOL.  Sorry."

18           Do you see that?

19   A.  I do see that.  You're reading it with a certain tone that

20   I don't know that that was the tone.  I mean these are WhatsApp

21   conversations, bar talk, if you want to call it slang, so I'm

22   just saying the emotion with which you're reading it is not

23   necessarily accurate.

24           (Continued on next page)

25

K35AHOR2ps                         Wolbrom - Cross

1    Q.  Would you like to read it instead?

2    A.  No, I would not, no.  I'm just saying, stating that.

3    Q.  I'll try it without too much emotion in there.

4    A.  Can you have all this before this, or this would be the

5    first message?  They seem out of context.

6    Q.  So this is -- you can see at the very top, this is David

7    Sobel saying, "If we're going to gossip, rather keep it between

8    just us."  Right?

9    A.  Right.

10   Q.  That's a creation of a new chat?

11   A.  I don't believe it created a new chat, no.

12   Q.  OK, but that's what he said.

13   A.  I'm having a -- I've never seen this.  This isn't the -- a

14   format I'm familiar with.  But it just looks like David sent me

15   a message.

16   Q.  Do you recall having communications with David Sobel in

17   October 2016 via WhatsApp?

18   A.  Right.  I don't remember any specific conversations, but

19   I'm reading it.  I'll try and provide the, you know, whatever

20   narrative I can on this.  But this is quite a long time ago.

21   Q.  OK.  So picking up where we left off, David Sobel says,

22   "Not to defend Levy, because he was an asshole for quite a

23   number of months" --

24   A.  Hold, just one thing.  I see the message before, where I

25   say, "LOL sorry," seems to be numbered 357145.  Now we jump to

K35AHOR2ps                     Wolbrom - Cross

1   357152.  So it looks like there's several messages missing

2   there.

3   Q.  That's correct.

4   A.  OK.  Well, it looks like this is pieced together.  It would

5   be hard to comment if you're cutting out certain messages.

6   Q.  If you would like your attorneys to enter in additional

7   messages, they can certainly do that.

8   A.  And I'll try and answer to the best of my ability.  It just

9   looks like this is pieced together and missing stuff.

10  Q.  OK.  So Mr. Sobel tells you, "Not to defend Levy, because

11  he was an asshole for a number of months, but I think he is

12  starting to come around."

13          He continues, "There was a good couple of weeks where

14  I really didn't talk to him.  I started up the past 1-2 weeks

15  and he's beginning to see things differently, or, rather, in a

16  new way, and through some people."

17          And then you say, "Even pre-Dan, he wouldn't wish

18  someone well.  It's odd."  Dan is Dan Alper?

19  A.  Presumably.

20  Q.  And then you continue, "Man, you should hear and see the

21  shit people in the company are saying about Dan Alper."  "DA,"

22  that's Dan Alper, right?

23  A.  "DA" would be Dan Alper, yeah.  I'm just trying to follow

24  who's saying what.

25  Q.  I'll try not to go too fast.  If I go too fast just let me

1    know.

2    A.   Because it's saying people in the company, and it seems

3    that date is 10/31.  I believe I was already gone at 10/31, so

4    it's saying people in the company -- I just want to make sure

5    this is me talking and not David.  The format is very confusing

6    for me to read -- comment on, I should say.

7    Q.   You maintained communications with certain Major employees

8    after you quit, right?

9    A.   Yes.

10    Q.   Your next chat is, "I'm stunned."

11         And then Mr. Sobel responds, "Pre-Dan, he was just

12    socially awkward Levy, bit like MW" -- that's Mark Wiederman,

13    right?

14    A.   Yeah, presumably.

15    Q.   -- "who never says GM to any of the cubicle people when he

16    passes by every a.m.  Post-Dan he became cocky arrogant Levy.

17    Also very, very confused Levy IMO."  Is "IMO" in your opinion?

18    A.   I didn't write this because it's David.  Not this -- I

19    believe IMO is "in my opinion," but I could be wrong.  David

20    was an accountant, so I don't take anything for granted, or is

21    an accountant.

22    Q.   That's fair.  And when he says "GM," do you take that to

23    mean "good morning"?

24    A.   Where it says "good morning"?  That's what he's saying.  I

25    didn't experience that, but that's what he's saying.

K35AHOR2ps                    Wolbrom - Cross

1   Q.  And then he continues, "Not to give MW a pass, he's become

2   an asshole of sorts.  Very sad, as he as the consummate nice

3   guy."  Do you see that?

4   A.  Yeah.

5   Q.  And then he says, "Dollar sign changes people."  Right?

6   A.  Yeah.

7   Q.  Is it fair to say, based on this message, that there were

8   some interpersonal conflicts at Major Energy related to its COO

9   in October of 2016?

10  A.  No.  I wouldn't say that.  It, again, I'm happy to talk

11  about the environment of Major Energy pre sale, post sale.  But

12  it's very hard to extrapolate what somebody was feeling off of

13  a pieced-together WhatsApp conversation, especially, I don't

14  remember the exact date I left, but we're talking days, maybe

15  one or two weeks.  I don't know what was going on.  Maybe --

16  it's very hard for me to tell, to comment on what someone else

17  was feeling about a third person through this pieced-together

18  WhatsApp.

19  Q.  OK.  We just have the words on the page, right?

20  A.  We have the words that were put on this page, yeah.

21  Q.  And if you go down to the second-to-the-last chat on this

22  page, this is from Mr. Sobel to you.  He says, "Back to our

23  favorite CEO, I know the cube guys can't stand him as well as

24  CTO and counsel.  That pretty much covers everyone."  Do you

25  see that?

1    A.  Is this something I said?

2    Q.  No.

3    A.  "Our favorite CEO," "cube guys," "can't stand the CTO and

4    counsel."  Again, this is, David seems to be speaking for other

5    people to me right after I left.  I don't know the context of

6    it or what was going on in his -- in his mind.

7    Q.  And then turn to the next page.

8    A.  What's that?

9    Q.  Turn to the next page.

10        Before we start reading here, do you recall that there

11   were some interpersonal conflicts regarding Dan Alper at Major

12   Energy, right?

13   A.  But between -- between whom and whom?

14   Q.  Between Dan Alper and others at Major Energy?

15   A.  I can only speak to my relationship with Dan, that that has

16   essentially two parts, pre sale and post sale.  What other

17   people were feeling about anybody else would be, would be --

18   would be -- I wouldn't know.  Would be completely speculation,

19   and you'd be asking me to go back for four years.  I don't know

20   what was going on between other people and them.  I can only

21   talk about myself.

22        MR. WILKERSON:  Let's go to the top of this page,

23   James.  And we'll go about two thirds of the way down.  You can

24   put up the whole page so that Mr. Sobel and Mr. Wolbrom can see

25   it.

K35AHOR2ps                    Wolbrom - Cross

1  A.  Thank you.

2  Q.  Let's just start at the top.  This is you to Mr. Sobel,

3  "Yup, and people downstairs, both sides of the wall."

4  Mr. Sobel responds, "Meaning CTO and counsel can't stand him,

5  not that they can't stand CEO and CTO.  Oops."

6          Then David Sobel said, "It is a problem.  I'm aware of

7  it and so is Levy."  That's Levy Moeller?

8  A.  Presumably.

9  Q.  "Not sure what we can do."  He continues, "Can't be a CEO

10  and run it like a salesman.  People see through your bullshit

11  after the second time."

12          And you respond, "If the end game was selling and

13  hitting numbers for three years or having Spark buy out the

14  earnout, then who cares from his perspective?"

15          David then responds, "Not sure what you mean."

16          And you continue, "Meaning Dan doesn't need to be a

17  CEO type if the goals were to just sell the company and figure

18  out a way to hit the earnout.  Not like he needs to grow the

19  company, innovate, build culture, and all the CEO-type things."

20          David then responds, "OK, but then he's going to piss,

21  or rather is, people off one by one, and that will make hitting

22  the numbers that much harder."

23          And you say, "All he has to do is not fuck up and piss

24  people off."

25          David then responds, "We don't hit the earnout without

1    new ideas.  You know the door-to-door model as it stands is not

2    working, definitely not growing, perhaps just replacing churn."

3    Do you see that?

4    A.  Yes.  I'm with you.

5    Q.  OK.  And then he continues, "Well, as you know, he is

6    pissing people off.  So it's not working, whatever he's doing."

7            And you said, "Believe me, I know.  Flawed model,

8    flawed industry.  50 percent why I left was Dan Alper."  Do you

9    see that?

10   A.  Yeah.

11   Q.  Was that a truthful statement when you made it at the time?

12   A.  Well, it's more than a yes-or-no question -- yes or no

13   answer, rather.  So I -- if it's OK, I would give some context

14   to it.

15           Dan Alper, as I mentioned before, as I alluded to

16   before, my perception of Dan has two stages.  There was Dan

17   Alper pre sale, when he came to the company.  I believe it was

18   around Thanksgiving time of 2015, maybe a little bit before.

19   And then there was post sale.

20           My relationship with Dan, in the beginning, was fine.

21   It was even good.  Obviously a new, a new CEO coming in to what

22   I felt was an incredible team is always going to have its

23   challenges, with different personalities.  But for the most

24   part Dan and I did quite well.  In fact, Dan and I went away

25   for a couple days, out of his office, to bond and connect, and

we had all -- we actually had a lot of, back in the office,

personal discussions about personal growth and things like

that.

       Dan and I got along just fine, the way a C -- the way

a superior and, you know, an employee would be expected to

have.  That was up until the sale.  After the sale, in my view,

Dan changed dramatically.  So there's two Dan Alpers.  Here,

when I say fif -- well, when I say "50 percent why I left was

Dan Alper," on 10/31/2016, mind you, a week or two, whatever

the date was, after not only leaving the company that I helped

build, loved, I mean really loved, to leave a completely

different industry, so you have to just take, again, the

WhatsApp conversation in context.  Dan Alper, after the sale,

to me was Spark.  Dan was Spark.  To me, Dan was Spark's

representative in New York.  When Dan would travel and he would

come back, he would report from Spark: Spark said this, Spark

said that.  So I equated Dan as the Spark face for our company.

       So, yes, I am saying here 50 percent why I left was

Dan Alper.  What I am largely alluding to here, a week or two

after I left, on a WhatsApp conversation with, obviously, you

know, not a colleague but a former colleague who is going

through some, in that moment, difficult times, that's the

context behind when I say 50 percent why I left was Dan Alper.

That's referring to the Spark culture that he brought, or that

he was passing on, I should say, and fusing our, you know,

1    well-oiled company with.  So I equated the acquisition and the

2    new world we lived in as being Dan Alper, because he was the

3    one executing it.  That's what I'm referring to when I say "50

4    percent why I left was Dan Alper."

5    Q.  When you said "50 percent why I left was Dan Alper," was

6    that a truthful statement?

7    A.  I didn't sit down with an actuary and a psychologist to

8    discuss my feelings and 50 percent was what we came out with.

9    I was very frustrated when I left Major Energy due to Spark's

10   involvement.  As I said before, Spark's involvement was largely

11   executed by Dan.  Dan was the face of Spark to me in Major

12   after the sale.  And so when I say "50 percent why I left was

13   Dan Alper," I'm referring to the Spark involvement, which was

14   actualized to me by Dan.  Whether it was truly 50 percent, I,

15   like I said, I have not run an analysis with an actuary and a

16   psychologist of how I was feeling.  And keep in mind this was

17   one or two weeks after I left the company that I gave my heart

18   and soul to.  So this was -- that's the context.

19   Q.  That was a few years before you wrote your witness

20   statement, right?

21   A.  Pardon me?

22   Q.  This was a few years before you wrote your witness

23   statement in this case.

24   A.  10/31.  My statement was 10/19, I believe.

25   Q.  When you said that the door-to-door model is flawed, you

1    intended that to be a truthful statement when you wrote it,

2    right?

3    A.   I said the door-to-door model is flawed?  Where did I say

4    that?

5    Q.   That is in row 357183.  You say, "Believe me I know, flawed

6    model, flawed industry."  Do you see that?

7    A.   Well, David had the previous comment.  "Flawed model"

8    doesn't necessarily refer specifically to door-to-door.  Again,

9    the context of this off-of-cuff WhatsApp conversation two weeks

10   after I left the industry that I -- which is all I knew for the

11   last four years, is probably referring to more than just the

12   door-to-door model, and that was a truthful statement back

13   then, and I think it's a truthful statement today.

14        And that was one of our, our goals at Major Energy

15   before the sale, was to try and change that and create a

16   different environment, a different experience for our

17   customers.  And quite frankly, through the work that our entire

18   group did, we, you know, we did that.  We created a different

19   kind of a culture.  We created a brand.  And it's still flawed.

20   I mean, there's issues.  You know, I went from there into the

21   healthcare world for a couple years.  And the healthcare world

22   has got its flaws.  So saying that something is flawed, yeah,

23   it's true.  It is still flawed.  And to this day, I'm trying to

24   work with those conditions and trying to change it.

25   Q.   And Major's business had been built mostly on the

1   door-to-door model, right?

2   A.   No.   Major Energy, I don't know the split between

3   commercial, residential as a whole, so I wouldn't be able to

4   say largely.   Major Energy had different verticals.   Our

5   commercial business, which was a big part of our business, to

6   my knowledge, was not built on the door-to-door model.   That

7   was built on relationships, sponsorships, and good pricing, and

8   relationships above all.   Our residential book was built

9   largely through door-to-door.

10  Q.   Is it fair to say that most customers that Major Energy had

11  in 2016 came to the door-to-door model?

12  A.   I mean, I just commented on that.   I don't, if you take a

13  look at all of Major Energy's customers and RCEs, I don't know,

14  I couldn't tell you a breakdown of where they came from

15  offhand.

16  Q.   There are presentations to show, but we don't have time to

17  get into it.

18          Were you being truthful when you said that the

19  industry was flawed?

20  A.   I felt, on 10/31/2016, a week or so after leaving the

21  industry that I lived those fewer years, that there were flaws

22  in the industry.   And I still feel that way today.

23  Q.   Let's turn the page.   Well, before we turn the page, you

24  mentioned Dan, kind of going back to your comment of Dan being

25  one and the same with Spark.   Dan remained the CEO of Major

1    after the sale of Major to NGE, right?

2    A.  After the sale of NGE, he was the CEO of Major Energy, yes.

3    Q.  As far as you know, he was not a Spark employee, was he?

4    A.  I really do not know the dynamic of any employee, unless

5    they reported to me, between them and Major versus them and

6    NGE, them and Spark.  That's just not something I have any

7    knowledge about.

8    Q.  And you don't mention the word "Spark" in your WhatsApp

9    communications on this page, do you?

10   A.  I have -- there are literally tens of thousands of messages

11   before and after between David Sobel and a million people.  I'm

12   sure that the name Spark comes up a number of times.  This

13   sheet that you're showing me, that, again, was pieced together,

14   because clearly you're missing messages here, I didn't -- I

15   mean, you can do control-Find.  I didn't -- my eyes didn't

16   catch the word "Spark," but it's possible I did if you go down

17   a little bit.  I don't know.

18   Q.  So if you look on the left-hand side, you can see the

19   numbers sequentially from 72, 73, 74, 75, and so on through the

20   last message that we read, which was 184.  Right?  Are there

21   any numbers missing?

22   A.  In these 14 messages out of what's probably 20,000, I don't

23   see the word -- actually I do see the word "spark" in the body.

24   It's highlighted about, I don't know, a third down.  I don't

25   know if that was me or David, but I do see the word "Spark," if

1      that's what you're asking.

2      Q.   Referencing the Spark buyout, right?

3      A.   Yeah.

4      Q.   And that's the only reference to Spark on this page, right?

5      A.   In these 13 messages --

6      Q.   In these 13 messages.  I apologize.

7      A.   -- I think that's the only place that I see Spark.

8      Q.   Let's turn to the next page, page 41.  This one I think

9      will go a bit quicker, Mr. Wolbrom.  It starts out with David

10     saying -- and this is 12/4/2016, David saying "Nechemia quit

11     every two weeks.  Finally.  Couple of weeks ago it was for

12     good.  Silly of him, if you ask me, as he doesn't have anything

13     lined up.  But he was never a rational one."  Who is Nechemia?

14     A.   If it's the person I think he's referring to, Nechemia,

15     what was the last name?  I think Schorr maybe.  If this is who

16     he's referring to, I believe Nechemia worked on the supply

17     team.

18     Q.   Worked with Levy Moeller?

19     A.   He worked for Levy Moeller for the sale, possibly after.  I

20     think that's how -- the reporting structure.

21     Q.   And then you respond, "Oh, boy."  And you keep going, "He

22     literally left and hasn't been there?  That's so crazy.  I

23     think MW will take people from MES or NUD if they lose their

24     jobs."  That's "nud" or "nude"?

25     A.   I think it's "nude."  I that's what it is.  If I

K35AHOR2ps                    Wolbrom - Cross

1    understand, I believe that's some other business that he had.

2    Q.  And then you continue, "Sam, Amir.... may be a bad read but

3    I wonder."  And Sobel responds, "For NUD?"  And you say, "Yeah,

4    why not?"  And Sobel says, "What's NUD?"  And you say, "You're

5    joking."  And he says, "Not today.  Oh, the vitamins."  And you

6    say, "Yes, Suite 220.  Not thriving?"  And he says, "LOL, who

7    knows."

8              Is it fair to say that Mr. Wiederman had another

9    business in the same building as Major Energy?

10   A.  I honestly have no idea of the ownership, management.  I

11   don't know anything about this company.  I knew that there was

12   a company called what I think is NUD.  Who owned it, where it

13   was, again, this is already four months after I left.  I just

14   don't know the context of it.  I have no idea what prompted

15   David to message this to me in '12.  But what Mark had, I have

16   no idea.  I'm sure Mark had and hopefully does many business

17   interests.  I just don't know anything about it.

18   Q.  When you say "Suite 220," you're referring to Suite 220 in

19   Major Energy's building, right?

20   A.  Probably.  I would imagine so.

21   Q.  That's where Nutrition was based, right?

22   A.  I don't know where it was based.  I don't know -- could be

23   this was Mark's office.  I think Mark -- maybe Dan's office or

24   Saul Horowitz's office.  I really don't remember the context of

25   this.

1           MR. WILKERSON:  Let's go to page 42, James.  And we'll

2      start at entry 358242.  It's toward the bottom of the page,

3      James.  358242.

4      Q.  Mr. Wolbrom, do you see that?

5      A.  On the bottom.  Yeah.  I'm just going to read -- I can't

6      read the message before because you cut out 11 of them, it

7      seems.  I don't know what -- again, this is totally out of

8      context, but, OK, I see what you highlighted there.

9      Q.  So you say, "I actually texted Mark Wiederman.  He blocked

10     me on WA."  Is "WA" WhatsApp?

11     A.  Yeah.

12     Q.  "Before RH."  Is that Rosh Hashanah?

13     A.  Yeah.  Very good.

14     Q.  I try.

15     A.  Yeah.  That's it.

16     Q.  "But no response," sad face.  Do you see that?

17     A.  I do.

18     Q.  And David Sobel said, "Don't know what's going on with him.

19     Sometimes I feel bad for him, with all that's going on with

20     him.  And other times I resent him.  And this is between me and

21     you, of course."  And you say, "Of course."  You see that?

22     A.  Yeah.

23     Q.  Sometimes after 2017, did you reconcile with Mr. Wiederman?

24     A.  What do you mean "reconcile"?

25     Q.  It was true that he had blocked you on WhatsApp, right?

1   A.  I don't -- I had sent a message to Mark before the Jewish

2   New Year wishing him, and it didn't go through.  I don't know

3   what that was about.  I didn't randomly message him.  There

4   must have been a reason.  When you say "reconcile," I don't

5   know that there was a need to reconcile.  I didn't have a great

6   falling out, nor I did read anything indicating of a falling

7   out.  If there's something you'd like to show me indicating

8   otherwise, I'll have to see it.  But all I said here is that

9   I -- again, we're missing 11 messages before that, went from

10  230 -- we're on September 25th.  You have 358231, and then you

11  cut out 11, and then it says "I actually," so I'm responding to

12  something, but you cut it out.  So I can't comment.  I don't

13  know what's missing here.

14  Q.  The only question is, did he block you on WhatsApp?

15  A.  I don't know what he did.  My messages didn't go through,

16  so perhaps I was telling him that my message didn't go through.

17  Q.  You were telling Mr. Sobel, your words were, "He blocked me

18  on WhatsApp."

19  A.  I wouldn't know what Mark did or did not do on his phone.

20  So I can't comment on it.  And this isn't sworn testimony.

21  This is me talking with him on WhatsApp presumably around the

22  Jewish New Year or maybe right after that.

23          Again, you have to show me what I wrote before that to

24  give you a proper answer.  I don't know.

25  Q.  All I'm asking is, did you use the words "he blocked me on

K35AHOR2ps                    Wolbrom - Cross

1    WhatsApp"?

2    A.  I typed the words "he blocked me on WhatsApp," yes I did.

3    Q.  And then you also said you had texted Mark Wiederman for RH

4    but no response.  Those were your words right?

5    A.  Not all.  I said, "I actually texted Mark Wiederman (he

6    blocked me on WhatsApp before Rosh Hashanah) but no response."

7    Q.  Those were your words?

8    A.  Yeah.  There were a lot of people I texted on Rosh Hashanah

9    that didn't respond.

10   Q.  Are you testifying that you did not have a falling out with

11   Mr. Wiederman around the time that you quit from Major Energy?

12   A.  Can you define what "falling out" means, please.

13   Q.  A disruption in a relationship.

14   A.  I had a disruption in a relationship with a lot of people I

15   work with, as a result of Spark getting into the picture.  I

16   wouldn't call it a falling out.  I felt that I needed to leave

17   because the interference between Spark and what we did have

18   was, was too much for me to handle.  It wasn't what I was told

19   was going to happen.  Mark was my boss and so -- again, I

20   wouldn't call it a falling out.  I didn't feel it was in my

21   best interests to stay there under Spark's regime anymore.

22           MR. WILKERSON:  Can you please turn, James, to page

23   45.  And we will read the bottom of 45 and the top of 46.  And

24   we'll start at message 358629.  And here you tell Mr. Sobel,

25   "Just read the entire lawsuit.  Nechemia gets an honorable

1   mention but I don't," question mark, exclamation point.  Sobel

2   says, "LOL, I just read it for the first time as well.  Scary

3   stuff.  Nechemia by name is not here.  And you left because of

4   Alper," exclamation point.

5          And turn the page.  You respond, "I left because I

6   didn't trust Alper or think he had MES's best interests in mind

7   and because he was divisive, home wrecker, was dramatically

8   hurt by Mark Wiederman, that my only thank you for the $80

9   million sale was in the form of a pathetic $60,000 gross

10  signing bonus, which locked me out of leaving to competitor,

11  from Spark.  Did not like the working environment of a public

12  company and the BS reporting, and didn't have faith that the

13  industry would last."  Did I read that correctly?

14  A.  Yes.

15  Q.  Those are your words, right?

16  A.  Yeah, seems that way.  Yes.

17  Q.  And you wrote that in October of 2017, right?

18  A.  Yes.

19          MR. WILKERSON:  No further questions for Mr. Wolbrom.

20          THE COURT:  All right.  Thank you.

21          Redirect?

22          Do you have any exhibits you wanted to offer?

23          MR. WILKERSON:  Yes, your Honor.  Defendants would

24  offer Plaintiff's 253, Defendant's 302, Defendant's 213, and

25  Defendant's 359.

K35AHOR2ps                  Wolbrom - Redirect

1              MR. BROWN:  And, your Honor, just briefly.  Perhaps

2    this matter, I think it came up even yesterday or the day

3    before, but I want to make sure the record is clear.  The use

4    of the WhatsApp messages in the presentation form, it has the

5    "redacted for relevance" boxes not there on the screen, so

6    there are redactions for relevance on various of the WhatsApp

7    records.

8              THE COURT:  OK.

9              MR. MAROONEY:  And just so we're clear, if this was a

10   jury trial, we would be having a huge fight over this, but

11   we're just letting it go because --

12             THE COURT:  Understood.  I appreciate that and will

13   take it into account.

14             Those exhibits mentioned by Mr. Wilkerson are received

15   in evidence.

16             (Plaintiff's Exhibit 253 received in evidence)

17             (Defendant's Exhibits 302, 213, and 359 received in

18   evidence)

19             THE COURT:  And Ms. Corey.

20             MS. COREY:  Thank you.

21   REDIRECT EXAMINATION

22   BY MS. COREY:

23   Q.  Mr. Wolbrom, you were asked today about certain regulatory

24   issues.  Do you recall that?

25   A.  Yeah.

K35AHOR2ps                    Wolbrom - Redirect

1    Q.  As the chief marketing officer, what was your role in

2    managing and maintaining Major's regulatory compliance?

3    A.  So Major Energy, one of the great things about Major Energy

4    is that we worked as a cohesive group.  It wasn't just the

5    marketing department.  It was sales.  It was marketing.  It was

6    customer service.  And it was compliance with LIPA.  And so

7    whether it was starting with a new vendor, Adam and I -- Adam

8    is, as I said, our counsel -- would work on scripting strategy,

9    advertisements we had.  It would go through a regulatory look.

10   He would look at it and make sure that I was doing my job from

11   a compliance perspective.  I'm marketing it up, you know,

12   putting the marketing lingo and whatnot, send it back to him,

13   and then we would execute it.  It went like that for trainings

14   we did with our vendors, training we did with our

15   telemarketers, our customer service reps.  Everything we did

16   had the DNA of marketing sales and compliance in it.  We worked

17   as a people to make sure that those out in the field doing the

18   selling were compliant, and if they weren't, we had a process

19   for either retraining, terminations, suspension, and that sort

20   of a thing.  So my involvement in regulatory was effectively

21   taking what I was told the rules are, packaging it in a

22   marketing way so that we can get customers, and then showing it

23   to Adam, making sure everything was good, and then going live.

24   Q.  And, Mr. Wolbrom, in your experience, are regulatory

25   actions common in the energy industry?

1   A.  Yes.

2   Q.  I believe in the WhatsApp chat -- I don't know if I can

3   recall the exact quote, but you said "flawed model, flawed

4   industry."  Do you recall that?

5   A.  Yes.

6   Q.  And I think you said that you still believe that to be

7   true.

8   A.  Yeah, I do.

9   Q.  OK.  Does that mean it can't be -- it's not profitable --

10  A.  No.  No.  Conversely, it's very profitable, if you know

11  what you're doing.  I think every -- I think every industry --

12  and I'm not in every industry, but I think every industry has

13  its problems.  There's really nothing perfect.  Maybe a school

14  teacher.  But every industry has its issues, and if you're

15  great at your job, you work within the confines that are, you

16  know, presented to you, you deal with it.  And that's what we

17  did.

18  Q.  Mr. Wolbrom, counsel asked you about Major Energy's vendor

19  and broker relationships.  Do you recall that?

20  A.  Yes.

21  Q.  And I think you referenced a deteriorating relationship

22  with certain vendors?

23  A.  Yes.

24  Q.  I'd like to show you PX 166.  This is an e-mail from you --

25  no, from Mark Wiederman.  Well, I will go to the second one.

1    From you to Dan Alper, copying Mark Wiederman, sent on

2    September 14, 2016.  Do you recall that?

3    A.  Yes.

4    Q.  And you say, "Couldn't connect with Javier but I did get

5    the attached from Sunil.  Kind of hard to decipher, but Javier

6    clearly went after Sunil, which is wrong, considering he never

7    knew who Sunil was until I told him, because I had to."  Do you

8    see that?

9    A.  Yes.

10   Q.  Do you recall sending this e-mail?

11   A.  Yes.

12   Q.  Could you just give us some context.

13   A.  Yes, absolutely.  Absolutely.  So after the sale, Javier

14   Garcia, I believe, who represented himself as being one of the

15   salespeople for -- or one of the channel managers, or the

16   channel manager for Spark -- came down to our offices, or came

17   up to our offices in New York, and sat me down and wanted the

18   lay of the land, how, how, you know, Eliott Wolbrom's team

19   interacted with the vendors.  He wanted to know who those

20   vendors were.  He had never -- he had never heard of PTM.  I

21   recall that.  He asked me who he was or where he lived.  He was

22   asking for details about how much we were paying, where did we

23   market, how was he successful.  And then he asked me for

24   contact information for him.

25            I remember at that time I, I wasn't, you know, suspect

K35AHOR2ps                    Wolbrom - Redirect

of anything, but it sort of landed in a negative light.  I was
trying to figure out why Spark's channel manager is asking the
chief marketing officer and also the head of sales of Major
Energy, who has to hit numbers, for information about their
vendors.  It's not only information about their vendors,
information about my most prized vendor, on a personal and
professional and presumably profitable level.

Q.  And I think the first line says, "Couldn't connect with
Javier but I did get the attached from Sunil."  Did you ever
connect with Javier on this issue before this e-mail?

A.  I don't believe so.  I can't recall.  If you show me a
document otherwise.  I don't remember getting in touch with
him.  I remember him wanting all this information from me.

Q.  I'd like to show you PX 184.

        MS. COREY:  Eric, if we could look at the bottom
e-mail, the early side of the e-mail.  Might be on the second
page, I think.  Well, start -- yes, thank you.

Q.  OK.  So this is an e-mail from Sam Bensinger to you, sent
on May 19, 2016.  Do you see that?

A.  Yes.

Q.  Who is Sam Bensinger?

A.  Sam Bensinger worked for me at Major Energy.  He was sort
of Javier's counterpart, if I can call it.  He was our channel
manager.  He was the day-to-day contact between Major Energy
and our vendors.

1   Q.  And Sam says, "I received a call from Sunil today very

2   upset.  He's telling me that his managers and teams are being

3   solicited to join a different marketing group by either 'WMS',

4   'Immerge,' or 'EGC' to sell Spark enjoy in NYC.  They are

5   trying to steal all his NYC Major Energy offices by offering

6   them more money (80 percent electric no usage, 80 percent gas

7   no usage) to sell Spark."

8           In the second paragraph it says, "Please let me know

9   if there's something we can do to help since we are all on one

10  team now.  As a general rule Major Energy teams should be off

11  limits by all marketers selling for Spark.  Let them target

12  other ESCOs teams like Starion Energy, who is selling against

13  us in NYC."  Do you see that?

14  A.  Yes.

15          MS. COREY:  Can we go to the next e-mail.

16  Q.  So, Mr. Wolbrom, you sent this e-mail to Mark Wiederman and

17  Dan Alper, and it looks to me like you sent it on --

18          MS. COREY:  Could we expand this so we can see the

19  to/from on the prior e-mail.  Thank you.

20  Q.  You sent it on the same day, and in the same minute.  Do

21  you see that?

22  A.  Yeah.

23  Q.  Why did you forward that to Mark Wiederman and Dan Alper?

24  A.  Because this is the -- this is the most troubling e-mail I

25  could have -- I could have ever received.  And mind you, this

1   is not literally but right when things were happening with --

2   right when they started -- right when the acquisition happened.

3   Here you have my most prized marketer, somebody I had a

4   personal relationship with, someone we had a professional

5   relationship with, I meet with, and I'm basically getting a

6   call -- I'm getting an e-mail from Sam, whose job is to report

7   to me, telling me that Spark -- that, that, that vendors

8   selling for Spark went to PTM, which is Sunil's company, and

9   are offering them more money than we were paying them,

10  essentially trying to not only -- not only pull away our most

11  prized vendor but by paying them more money.  So he put us in

12  an impossible spot.  This was a personal attack, I took it, and

13  certainly on a -- on a business level.  And so this was like

14  red alarm, red alarm, 911.  And I got an e-mail, presumably

15  flipped out, and forwarded it to my bosses.

16  Q.  OK.  And then in the next e-mail Mark Wiederman responds to

17  you and Dan Alper.  He says, "Agreed.  The rule you suggested

18  is still in place and no one should be targeting our reps.

19  Sunil needs to do whatever needs to get done to keep his reps

20  regardless if Spark or anyone else poaching them."  Do you see

21  that?

22  A.  Yes.

23          MS. COREY:  Eric, could we go to the top e-mail.

24  Q.  And then you write back to Mr. Wiederman, "That's already

25  implied but Sunil was asking us to intervene with Spark since

1   he's under the assumption we're all under the same roof now."

2   Do you see that?

3   A.  Yes.

4   Q.  Do you recall what if anything happened after this e-mail

5   exchange with --

6   A.  Well, yeah.  I mean, what this is is, it's not just -- it's

7   not just Spark, who was supposed to be letting us do what I --

8   you know, what we do and continue to grow, and not interfere by

9   stealing him away and -- by paying him more money.  But what

10  it's also clearly doing, since -- just based on what I'm saying

11  here, since he's under the impression -- under the assumption,

12  that it's confusing the heck out of him.

13          And so, having been in this industry for a while, the

14  worst thing is a worried vendor, because vendors need

15  door-to-door marketers and residential marketers, they need

16  consistency, they need assurances.  It's not an easy field to

17  play in.  The second they start getting mixed messages -- and

18  mind you, they were not fans of Spark's name in the industry.

19  The second they start hearing that maybe what I'm saying is

20  different than -- or maybe that what Spark is doing to him is

21  different than what I said originally, I start losing trust

22  with him, Sam starts losing trust.  He didn't know who to

23  believe.  Is Spark in charge?  Are we under the same roof?  Are

24  we not?  It's just confusion.  Reps need and vendors need

25  consistency.  They need assurance.  They need to know that,

1    that, that they're -- the energy company is going to be there

2    for them that day.

3              And what we were so great at, you know, it wasn't just

4    sending them invoices, paying them, and getting customers.  We

5    had, I mean, we were literally speaking with them five, ten

6    times a day, on the phone, e-mail, WhatsApp.  And so the second

7    there's like a mistrust -- Sunil knew that we were purchased by

8    whatever, a public company, especially as far as he thought.

9    This was confusion for him.  And that's the worst thing,

10   because when you're confused, you panic.  When you panic, you

11   leave.  And there's plenty of other energy companies he could

12   have sold for.

13             So this e-mail here has a little bit of everything:

14   confusion, our new owner competing with us, and ruining a

15   personal and professional relationship.

16   Q.  OK.  After the sale of Major Energy, did you have any

17   contact with either MGE or Spark's marketing department?

18   A.  I recall communicating with somebody there, yeah.

19   Q.  I'd like to show you PX 193.  And if we could go to the

20   early e-mail, that's page 3 and page 4.  This is an e-mail from

21   Lindsey Margiotta to you and copying Eric Melchor.  Do you see

22   that?

23   A.  Yes.

24   Q.  And this is sent on August 16, 2016?

25   A.  Yes.

K35AHOR2ps                  Wolbrom - Redirect

1  Q.  And Lindsey says, "I want to introduce you to Eric Melchor,
2  who leads our marketing team here at Spark.  After our
3  requirements meeting, he had a few questions that Saul
4  defaulted to you," smiley face.  Do you see that?
5  A.  Yes.
6          MS. COREY:  And if we could go to the next e-mail,
7  Eric.
8  Q.  And then this is your response, and quickly, you say,
9  "Great to meet you, Eric, how can I be of help?"  Do you see
10 that?
11 A.  Yes.
12 Q.  Next e-mail.  And Eric writes back to you, and he says,
13 "Nice to meet you.  I noticed some of the interesting campaigns
14 you set up at Major.  I was wondering if I could chat with you
15 to learn more and hear about some other ideas you have around
16 acquiring customers in the New York market, which is a tough
17 code to crack in my experience.  Do you have any availability
18 this Friday morning or afternoon?"  Do you see that?
19 A.  Yes.
20 Q.  Next e-mail.  You write back, "I'm fortunate to be part of
21 a great group of teammates here, who all share a goal of taking
22 a highly visionary, strategic, and creative approach to the way
23 we brand and market ourselves.  It has been very special, to
24 say the least."
25          And then you say you'll be traveling and that "there

1    is a wealth of information we can share with each other."  And

2    then you ask if there's something you can answer.  Do you see

3    that?

4    A.  Yeah.

5    Q.  OK.  The next e-mail.  And then he asks you, "Yes, let's

6    touch base when you're here in Texas if you are planning a trip

7    down here."

8            And then he asks one question, "Which campaign for

9    major that you executed generated great results?  Feel free to

10   share whatever elements you -- about it you'd like."  Did I

11   read that correctly?

12   A.  Yeah.  Yeah.

13   Q.  And then if we go to the top one.  You forward this on to

14   Dan Alper and Mark Wiederman.  Do you see that?

15   A.  Yes.

16   Q.  Why did you forward this to Dan Alper and Mark Wiederman?

17   A.  So this was my, you know, my initial fear, when a company

18   buys you, realized.  Here you had somebody making an

19   introduction between Spark's marketing personnel and myself,

20   perhaps my counterpart, somebody who may be a competitor, one

21   may say, in a merger.  And this person basically says, I love

22   what you've done, can you tell me all about it.  Now, if this

23   was a reporter doing a story on me or a biography, OK, that

24   feels nice and maybe I'd talk, you know, assuming I was allowed

25   to.  But this is somebody who is potentially coming after my

1   job, saying "I love what you did, can you tell me how you did

2   it." So I sort of blew him off and said, you know, I'm

3   traveling -- I presumably was traveling, but I wanted to just

4   kind of kick it down and see what happens, because I felt

5   threatened, not only personally, which is obvious, but I

6   felt -- I felt Major Energy was threatened.

7           We were, we were great at what we did before Spark's

8   interference because of our proprietary ability to get

9   customers and brand and do things that other ESCOs never did.

10  And here I have somebody who can potentially take my job,

11  because he works for the mother ship, so to speak, asking me

12  for like the secret recipe.

13          So I tell him, we'll talk about it. And then he

14  responds saying, OK, but can you just give me one of your

15  ideas. That's like, what -- if that's not personal

16  interference and, and threatening Major Energy's ability to hit

17  earnout, I don't know what is. I, I was stunned at how blatant

18  they would do that. And so, like the other e-mail, I thought

19  it was something super-concerning that Dan and Mark, my two

20  bosses, needed to know about, so I forwarded it on.

21  Q.  OK. Mr. Wolbrom, you were asked some questions about

22  whether you quantify the return on investment with respect to

23  the sponsorship, those questions. Do you recall that?

24  A.  Yes.

25  Q.  In your opinion, did Major's sponsorship relationships with

K35AHOR2ps                    Wolbrom - Redirect

1    any of the sponsorships you had, MSG, the Knicks, or the

2    Yankees, create value for Major Energy?

3    A.   Oh, absolutely.  Absolutely, a hundred percent.  We didn't

4    just buy a sponsorship deal.  A lot of companies did that after

5    we did and flopped, because anybody can write a check to -- if

6    you have the money -- to a, you know, an entity that's willing

7    to take it.  What we were so great at, my department was so

8    great at, my assets, my teammates, was taking that and then

9    making something of it.  We didn't just have logos, you know,

10   on the corner of MSG, although we did.  There was a reason for

11   that.  Our commercial customers would come in and, or our

12   potential customers would come in, our brokers would come in;

13   they would see "Major Energy" in lights on the corner of the

14   world's most famous arena, and, yeah, they were very impressed.

15   We actually lit up the lights of Madison Square Garden.  So

16   this was extremely impressive.  We had a slew of hospitality

17   and experiential things that we did that really money can't

18   buy, although it did buy it.  It wouldn't have happened if not

19   for myself and my team putting together trips on the Knicks

20   team plane, the Rangers plane.  We went to London with clients.

21   I mean, we took the sponsorship and effectively became -- and I

22   think I had this in my testimony -- it truly became the nucleus

23   of what Major Energy did.  This wasn't just Madison Square

24   Garden, the Knicks, and the New York Rangers.  It was the New

25   York Yankees.  It was our sponsorship deals.  We were excellent

K35AHOR2ps                    Wolbrom - Redirect

at taking it and then shooting it out into all verticals of the

business, even the residential side of the business.  You know,

it was -- did a customer -- we had hundreds of sales reps out

in the field selling door to door.  It wasn't, you know, they

weren't just doing what everybody else does.  No, they had the

Knicks logo and the Rangers logo and the Madison Square Garden

logo and the Yankees logo on their shirts knocking on doors --

you know, not that I just sort of opened the door.  That goes

back to the flaw part.  But if I'm looking for people and

somebody's knocking and I see, you know, the Knicks logo and

then "official energy supplier," that's credibility.  That

makes us different than any other person who's going to come

after or who came before.  It's built into telemarketing,

"Hi" -- and just as an example, "Hi, this is Eliott, I'm

calling from Major Energy, the official energy partner of the

New York Knicks, is Chelsea there."  Every element of our

business, we took these sponsorships that we paid a lot of

money for and infused those -- we infused those channels and

those verticals with our sponsorship deal, whether it was

tickets, whether it was signage, whether it was IT rights,

whether it was, you know, just verbally discussing it, whether

it was having the ability to sit around the table with my

counterparts at Chase, at Delta, at Ikea, at Lexus, at

Enterprise and ETS, that made Major Energy different than any

other ESCO, whether they were bigger than us or smaller than

K35AHOR2ps                    Wolbrom - Redirect

```
 1    us.

 2              And quite frankly that's partially why Spark bought

 3    us.  One time I spoke with Nathan because he was here in our

 4    office.  That was literally the only thing he said to me:  I

 5    love the sponsorships you did.  So I may not have had a number

 6    in my testimony.  I'm not an accountant.  I'm the furthest

 7    thing from it.  but to say the sponsorship deal didn't make

 8    Major Energy what it was, in every single element, would be a

 9    total lie.  It would have be absolutely different.  That's what

10    made Major Energy, Major Energy.  We were a brand.  We weren't

11    just a supplier.  Very few ESCOs are brands the way Coke -- I'm

12    not saying we were Coke.  I wish.  But that's what we did.

13    That was the goal, was to take boring energy, electricity, gas,

14    that has no tangible feel, and make it different than everybody

15    else.  And that is why we were different.  And our team made

16    that happen.  All parts of our team.

17              And that is what got ruined when Spark interfered.  It

18    would have been fine if they bought us and let us do our thing.

19    If I was Spark, I would have bought us too.  Just let the

20    experts do what they do.  They came in right away and

21    interfered with these things.  And that's where we are today.

22    Q.  Mr. Wolbrom, you were asked today about your relationship

23    with Mark Wiederman.  Do you recall that?

24    A.  Yes.

25    Q.  How long have you and Mr. Wiederman known each other?
```

K35AHOR2ps                    Wolbrom - Redirect

A.   I believe I met Mr. Wiederman in 1999, or 2000.  So 20

years.

Q.   And how would you describe the relationship?

A.   My relationship with Mark is great.  I mean, I don't know

too many people -- I don't -- I don't have too many friends or

good relationships that are 20 years, you know, or more.  We

had some ups and downs, if you want to call it, I would call it

a falling out, and that's just because we spent a whole lot of

time with each other.  I don't know, I'll speak for myself, we

have that with our spouses, we have it with our kids, it

happens.  You know, again, going back to the culture of Major

Energy before the sale, we spent a lot of time with one

another.  We were in the office weekends, nights.  You know, we

lived and breathed the brand.  And so, you know, we may have

had some -- certain disagreements on things.  That's super

healthy.  If you don't have that, you're not human.

          So my relationship was and is fantastic with him.

He's one of my closest friends and certainly the -- my favorite

person to work for, which is why I work for him now again.

Q.   And, Mr. Wolbrom, you were asked about your relationship

with Dan Alper.  Do you recall that?

A.   Yes.

Q.   Did you leave Major Energy because of Mr. Alper?

A.   I think partially because of Mr. Alper.  But the context

around that is, you know, super important.  Dan Alper before

1    the sale and Dan Alper after the sale were two different people

2    as far as any relationship with him.  As I mentioned before, I

3    went out with him out of the office.  We went to, I think,

4    Massachusetts once to have some team building one-on-one.  I

5    spent a ton of time with him in his office discussing personal

6    growth and philosophy and things like that.  I don't have that

7    with everybody, you know, certainly not somebody I wouldn't

8    like to open up like that.  We had a really good relationship.

9            After the sale, it just became different.  This was,

10   this is the result of the situation.  You know, Dan, I can't

11   speak for him, but Dan is now reporting to a publicly traded

12   company with earnings and presumably getting a whole lot of

13   pressure to hit those earnings and to hit those quarterly

14   reports, again, things that are just not my, my lane.  So Dan

15   became different.  And, you know, I didn't leave Major Energy

16   in November or December or January of 2015 or January of 2016.

17   I was fine there.  I, my -- I would still be there today, you

18   know, if nothing happened, I think.

19           My, my falling out, if you want to call it, it would

20   have more applied to Dan, was only after the sale.  So that's

21   my relationship with him.

22   Q.  I'd like to show you PX 225.  Do you recall writing this

23   letter, Mr. Wolbrom?

24   A.  Yes.

25   Q.  And if we could, in the second paragraph, it says,

1    "Although the ambition and drive to create and be a part of

2    something bigger than any one person existed four years ago, I

3    could not have scripted how I thought things would play out

4    back in 2012 on my first day.  Always a victim -- for better or

5    for worse -- to personal reflection and sentimentality, when I

6    sit and think about this four-year journey, where I've been so

7    blessed to lead the marketing and sales for one of the most

8    well-run and rapidly-expanding energy companies in the country,

9    I am infused and overwhelmed with a plethora of humility and

10   gratefulness.  It's 'only' four years but it feels as if it's

11   both yesterday and a lifetime ago all at the same time.  It's

12   hard, often impossible, to remember what life before Major

13   Energy even looked like or felt like for me."  Did I read that

14   right?

15   A.  Oh, yes.

16   Q.  And then if we could go on to page 2, Eric, the middle

17   paragraph.  It says, "Here at Major Energy, we very much know

18   what we do and why we do it.  We have always sought to break

19   the status quo and change the way people think about and

20   interact with their energy consumption and their energy

21   company.  Creating great added value beyond the mundane, normal

22   gas and electricity proposition is in our DNA, and we've got

23   big plans and ideas in the pipeline to achieve and further

24   perpetuate those goals."  Did I read that right?

25   A.  Yes.

1              MS. COREY:  Eric, could we just go back to the first

2    page.

3    Q.  And at the top it says "published April 18, 2016."  Do you

4    see that?

5    A.  Yeah.

6    Q.  So this is a few days after the sale of Major Energy to

7    NGE.  Correct?

8    A.  I don't remember the exact date, but it could -- it was

9    more -- this is my anniversary.

10   Q.  Right.

11   A.  That's why I wrote that.

12   Q.  Of the four years of working at --

13   A.  Of my first four years, yeah.

14   Q.  So what prompted you to write this letter, Mr. Wolbrom?

15   A.  I am a sentimental guy.  I don't know how else to say it.

16   I worked -- I worked really, really hard at building Major

17   Energy.  Like I said, hours and hours.  It wasn't just me.  It

18   was a fantastic team.  But we really worked hard.  Whether it

19   was marketing or branding, the sales, the crunching the

20   numbers, the weathering the storm, when there had been a polar

21   vortex, dealing with customer service, employees, I gave it my

22   all.  And I, I, I knew it was a hard industry to, you know, to

23   operate in, just -- it's not like selling, you know, a

24   Mercedes.  It's a difficult -- it's just a difficult industry.

25   And we worked our tail off.

K35AHOR2ps                    Wolbrom - Redirect

1               And I just felt, you know, I made all these great, you

2        know, relationships or, or -- personal relationships with

3        companies that -- for me to think that I'd ever be sitting --

4        you know, in 2016 I was 36, but even before that, to be sitting

5        at a conference table, at Madison Square Garden, with a CMO of

6        Chase, I mean, I'm nothing, who am I?  And it's just like this

7        reflection of being able to take this little ESCO in New York

8        and, and make us, you know, at least to the public, this

9        massive company that's like cool almost, in the most uncool

10       industry ever, was just -- I don't know.  I mean, I, you know,

11       I'm a marketing guy, and I don't know if I were an accountant I

12       would write this, but I am an emotional guy and this was -- I

13       started, I believe, April 15th or 16th 2012.  And nobody told

14       me to write this.  This is on my own personal LinkedIn.  I just

15       felt -- I was just really, really feeling grateful.  And then

16       I, I -- sometimes I show that in my writing.  And this, this is

17       what I was, I mean, to be honest with you.  This is, this is

18       something that I felt with sweat and tears literally.

19              And, you know, the sale happened.  I know that that's

20       one of the goals in this industry.  But I was told that it

21       wasn't going to change and it was just going to be opportunity

22       for us.  More utilities maybe, more backing, more money.  I

23       don't know what.  But, you know, my, my, my hope was that this

24       was going to still be around.  Maybe we have a brand.  Maybe

25       I'm the CMO of Spark.  I had no idea.  But right here in this

1   moment, it's just me and my computer and I'm, I'm grateful, I'm

2   grateful for the friends I made, my colleagues.  So I wrote it.

3   I don't know.  This was --

4   Q.  And just to be clear, Dan Alper was the CEO of Major Energy

5   at this time.

6   A.  Absolutely, for at least six months.

7   Q.  And you left only six months later.

8   A.  Yes.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K357HOR3                           Wilbrom - recross

1                 MS. COREY:  I think we did PX166, PX184, PX193 and

2      PX225.

3                 THE COURT:  They are received.  Thank you.

4                 Is there recross?

5                 MR. WILKERSON:  If I may, a few questions.

6                 THE COURT:  How long, do you think?

7                 MR. WILKERSON:  Maybe five minutes I'm thinking, but

8      it depends on the answers obviously.

9                 THE COURT:  OK.

10     RECROSS EXAMINATION

11     BY MR. WILKERSON:

12     Q.  Mr. Wilbrom, you were just asked by your counsel about some

13     troubling e-mails -- your words -- in the summer of 2016

14     regarding PTM.  Do you recall those e-mails?

15     A.  Can you just bring them up?  If you're going to refer to

16     them, I would like to see them in front of me.

17     Q.  It was Plaintiff's 166 and Plaintiff's 184.  Do you recall

18     those e-mails, sir?

19     A.  Yes.

20     Q.  And do you recall discussing those e-mails with your

21     counsel a few minutes ago?

22     A.  Yes.

23     Q.  Are you aware that the money paid to PTM by Major Energy

24     increased in 2016 versus 2015?

25     A.  I don't know the total dollar amount.  I said that before.

1   Q.  And I may have asked you this before -- if so, I apologize.

2   When you left Major Energy in October 2016, PTM was still

3   actively marketing for Major Energy, right?

4   A.  I'm going to answer the same way.  I don't believe we

5   terminated the agreement.  I don't remember -- I don't remember

6   exactly where they were or what they were doing.  I believe

7   they were still marketing when I left.

8   Q.  You also talked with your counsel about the sponsorship

9   deals again.  Do you recall that?

10  A.  Yes.

11  Q.  And you said that the sponsorship deals definitely created

12  value for Major Energy, right?

13  A.  Yes.

14  Q.  We already saw in Major Energy's presentation the customer

15  count dropped after the sponsorships began in 2013, right?

16  A.  I would need to see the figures again.

17  Q.  Sure.

18  A.  And just to add on to that, customers leaving would yield

19  what that net number is.  If we weren't pouring in customers at

20  the rate he we were, those numbers would be significantly

21  worse, and mind you we went through a polar vortex which just

22  impacted every energy company.

23        So, looking at the net number of customers is not a

24  good indication of whether or not a sponsorship was working.  I

25  would argue if we didn't have that, that number would be way,

1    way, way lower.  So, the bottom is opening up, the customers

2    are coming out, and if you're not pouring in at an equal rate

3    almost -- which we did via our sponsorships -- I'm saying that

4    looking at the net number is indicative of customers leaving

5    and customers going in.

6    Q.  In the interests of time, I won't look back at the document

7    we looked at before; I will just ask you one last question.

8            As far as you know, Spark never terminated any of the

9    sponsorship deals during the earnout period, did it?

10   A.  I don't know.  I don't know what happened after I left.

11   Q.  And when you left, they were still in place, those

12   sponsorship deals.

13   A.  Yes, I believe so.

14           MR. WILKERSON:  No further questions, your Honor.

15           THE COURT:  All right.  Anything further?

16           MS. COREY:  Nothing.

17           THE COURT:  OK, thank you.  You may be seated, sir.

18   Thank you.  We will take a ten minute break.  Is ten minutes

19   long enough?

20           MR. DAHAN:  Yes.

21           THE COURT:  And you will be ready with the next

22   witness then?

23           MR. DAHAN:  I believe so.

24           (Recess)

25           THE COURT:  Ms. Becker?

K357HOR3                    Josefovic – cross

1            MS. BECKER:  Thank you, your Honor.  The defendants
2       call Mark Josefovic.
3            THE COURT:  All right.  Good morning, sir.  Please
4       come up to the witness stand and come up to the top step here.
5            MR. DAHAN:  Your Honor, would it be all right if he
6       affirms?
7            THE COURT:  Yes, just say affirm instead of swear.
8        MARK JOSEFOVIC,
9          called as a witness by the plaintiff,
10         having duly affirmed, testified as follows:
11      CROSS EXAMINATION
12      BY MS. BECKER:
13      Q.  Good morning, Mr. Josefovic.  You are one of the sellers of
14      Major Energy, correct?
15      A.  Correct.
16           THE COURT:  Is it M-A-R-K or C?
17           THE WITNESS:  K.
18      Q.  And you own approximately 20 percent of Major Energy both
19      individually and through your trusts?
20      A.  Correct.
21      Q.  Your initial investment in Major Energy was in the order of
22      350 to $375,000?
23      A.  Something to that effect.
24      Q.  And following that initial investment, Mr. Josefovic, you
25      didn't make any subsequent investments into the business,

K357HOR3                         Josefovic - cross

1   correct?

2   A.   No.

3   Q.   You were one of the nonmanagement silent sellers?

4   A.   Correct.

5   Q.   You along with Mr. Bauman and Mr. Fried?

6   A.   Correct.

7   Q.   Mr. Bauman was your business partner?

8   A.   Is, yes.

9           THE COURT:  Would you mind pulling the mic a little

10  closer and moving up, if you could.

11          THE WITNESS:  Sure.

12          THE COURT:  Thank you.

13  Q.   Mr. Bauman is your business partner.

14  A.   Yes.

15  Q.   And Mr. Fried is somebody you have known since high school?

16  A.   Correct.

17  Q.   You were never involved in the operation of Major Energy,

18  right?

19  A.   No.

20  Q.   You just got involved in Major Energy for an investment.

21  A.   Yes.

22  Q.   And that's outside of your work in the healthcare industry?

23  A.   Correct.

24  Q.   You don't have firsthand knowledge of Major Energy's

25  operations prior to the sale to NGE; is that fair?

K357HOR3                      Josefovic - cross

1   A.  Yes.

2   Q.  And you also don't have firsthand knowledge of Major

3   Energy's operations during the earnout period, fair?

4   A.  Correct.

5   Q.  You relied on Mr. Horowitz and Mr. Wiederman to keep you

6   apprised of Major Energy's business?

7   A.  Yes.

8   Q.  You weren't involved in negotiating the transactional

9   documents related to the sale of the membership interests in

10  Major Energy to NGE, were you?

11  A.  No, not direct.  I didn't have direct involvement, but I

12  obviously had conversations about it.

13  Q.  And that was with Mr. Horowitz and Mr. Wiederman?

14  A.  Correct.

15  Q.  Based on your ownership percentage of Major Energy, you

16  received approximately 20 percent of the cash purchase price of

17  Major Energy?

18  A.  Yes.

19  Q.  And so that's roughly $8 million?

20  A.  Yes.

21  Q.  Based on the $9 million that Spark HoldCo has paid to

22  sellers in connection with the earnout in the form of

23  contingent payments, you received another roughly 1.8 million?

24  A.  Yes.

25  Q.  So in total you have received about $9.8 million as of

K357HOR3                              Josefovic - cross

1   today.

2   A.  Yes.

3   Q.  And you would expect, sir, if any additional monies were

4   paid to Major Energy in connection with this lawsuit, that you

5   would receive 20 percent of that amount?

6   A.  Correct.

7   Q.  During the 33 month earnout period following the sale of

8   Major Energy, you weren't involved in preparing the earnout

9   calculation, were you, sir?

10   A.  No.

11   Q.  From your perspective, a sale of Major Energy was always

12   the exit strategy for the sellers, right?

13   A.  I don't know about the word always, but it was definitely a

14   consideration.

15   Q.  You didn't care who bought Major Energy just as long as the

16   dollars and cents were acceptable to you?

17   A.  Correct.

18   Q.  You were aware that back in 2014 Major Energy was involved

19   in discussions with Spark Energy, Inc. about a potential

20   acquisition?

21   A.  I recall the name at the time but nothing of real

22   relevance.

23   Q.  Is it fair to say you weren't involved in those

24   negotiations then in 2014?

25   A.  Correct.

K357HOR3                    Josefovic - cross

1    Q.  Major Energy's sellers were also involved in discussions

2    with an entity called Crius -- which is a public company --

3    sometime around the 2014, 2015 period?

4    A.  Crius?

5    Q.  Crius.

6    A.  I remember the name.

7              THE COURT:  How do you spell Crius?

8              THE WITNESS:  I think it's Crius, C-r-i-u-s.

9    Q.  Do you recall Major Energy was involved in some discussions

10   about a potential sale of the business to Crius?

11   A.  I remember the name also.  The same way I remember Spark at

12   the time, Crius was also a name.

13   Q.  And you weren't involved directly in those negotiations?

14   A.  No.

15   Q.  OK.  When Major Energy -- when the sellers ultimately sold

16   their membership interest in Major Energy to NGE, NGE's offer

17   was the best offer on the table at that time, right?

18   A.  It was an offer that was acceptable based on the terms of

19   the agreement.

20   Q.  And so it was the best offer on the table?

21   A.  To my knowledge, at that time I don't know if there was any

22   other offer on the table.

23   Q.  Fair enough.  In mid-January 2016 you -- let me take a step

24   back.  Mr. Josefovic, you are aware that the discussions

25   between NGE and Major Energy about a potential sale occurred in

1   the late 2015, early 2016 timeframe?

2   A.   Yeah, I think we closed in the first quarter, beginning of

3   the second quarter of '16, so it probably started around that

4   time.

5   Q.   And in mid-January 2016 you received from Mr. Horowitz a

6   LOI -- or a letter of intent -- from NGE to purchase the

7   sellers' membership interest in Major Energy?

8   A.   I don't recall the exact date, but I am assuming at some

9   point we got an LOI.

10  Q.   Why don't we pull up DX180, James.

11          And just to orient you to this document, Mr.

12  Josefovic --

13          why don't we go, if you could, James, to Bates No.

14  1196.   That's the initial e-mail in this thread.

15          That's an e-mail from Dave Hennekes to Dan Alper at

16  Major Energy.   Do you see that?

17  A.   Yes.

18  Q.   On January 14, 2016?

19  A.   Yes.

20  Q.   And the subject is "non-binding LOI".

21  A.   OK.

22  Q.   Do you understand LOI to be letter of intent?

23  A.   Yes.

24  Q.   OK.  Mr. Hennekes writes to Mr. Alper, "Dan:  We are

25  pleased to present this indication of interest for

K357HOR3                        Josefovic - cross

1    consideration by the shareholders of Major Energy and its

2    affiliates.  If acceptable, please sign and return to me."

3              Now, if we can take a step back, James, and there is

4    an attachment to this document at the next page, 1197.  Can you

5    pull that up.

6              Mr. Josefovic, this January 14 letter has a subject

7    line "non-binding proposal to purchase equity of Major Energy

8    services."  Do you see that?

9    A.  Yes.

10   Q.  Do you recall seeing this letter back in January of 2016?

11   A.  No, I don't recall.  My screen just shut off.

12             THE COURT:  It will come back in a second.

13   A.  But I don't recall.

14   Q.  OK.

15   A.  I got it.

16   Q.  Great.  James, if you could take a step back and just go to

17   the first paragraph of this letter, just to provide some

18   context.

19             Mr. Josefovic, the first line of this non-binding

20   proposal to purchase equity of Major Energy's services reads:

21   "National Gas & Electric is pleased to provide this nonbinding

22   indication of interest to Major Energy Services LLC.  This

23   letter summarizes the principal terms of a proposal by NG&E or

24   one or more of its affiliates or subsidiaries regarding the

25   possible acquisition of all of the issued and outstanding

1   capital stock, membership interest or other ownership interest

2   in Major."  And it continues.

3          Did I read that correctly?

4   A.  Yes.

5   Q.  OK.  Now taking a step back, if we can go back to the

6   document, James.

7          This letter contains a number of paragraphs that have

8   key terms of the acquisition.  Do you see that, Mr. Josefovic?

9   A.  Yes.

10  Q.  And you recall the initial offer from NGE to Major Energy.

11  Do you remember, for example, the purchase price?

12  A.  I recall it being 60 million up front and I think it was 20

13  million in earnout.

14  Q.  And when you say $20 million in earnout, that's contingent

15  payments sometime that Major Energy -- that Major Energy could

16  earn sometime in the future after the sale?

17  A.  Correct.

18  Q.  OK.  And why don't we take a look actually on the next page

19  or paragraph 1D.  And paragraph 1D, there was a $20 million

20  earnout contemplated over a two year period.  Do you see that?

21  A.  I see it now, yes.

22  Q.  And do you recall, Mr. Josefovic, that there were certain

23  drivers of the earnout?

24  A.  Yes.  I don't recall what they were but yes.

25  Q.  Well, taking a look at 1D that's before you, you see that

K357HOR3                          Josefovic - cross

1   the adjusted EBITDA is a factor in the earnout?

2   A.  Yes.

3   Q.  And do you see that customer count is a factor in the

4   earnout?

5   A.  Yes.

6   Q.  So if we can go back to the e-mail, James.

7            So, Mr. Alper at the bottom of this first page of

8   DX180 forwards this non-binding LOI from NGE to Mr. Horowitz

9   and Mr. Wiederman, and you see that Mr. Horowitz in turn

10  forwards that along to you.

11  A.  Yes.

12  Q.  So on January 14 Mr. Horowitz shared this non-binding LOI

13  with all of the sellers of Major Energy, correct?

14  A.  Yes.

15  Q.  And in response to Mr. Horowitz's message, you responded

16  just to Mr. Fried, right?

17  A.  Yes.

18  Q.  And just for the record and for clarity, Ushy Fried, that's

19  Asher Fried?

20  A.  Yes.

21  Q.  OK.  When you forwarded Mr. Horowitz's message to Mr.

22  Fried, you wrote, "The earnout is scary with our account

23  numbers dropping month over month:"

24  A.  OK.

25  Q.  Do you see that?

K357HOR3                    Josefovic - cross

1   A.   Yes.

2   Q.   And as of mid-January 2016, a couple months before signing

3   the transactional documents on March 18, you thought that the

4   earnout component was scary because you already knew that Major

5   Energy's accounts were dropping month over month?

6   A.   And between January 14th and April 18th I got comfortable

7   with the terms of the agreement.

8   Q.   OK.   But when you received this letter of intent, you were

9   concerned, and your first reaction to your childhood friend was

10  to express that you thought the earnout was scary given what

11  was going on with Major Energy's customer accounts.

12  A.   I'm a passive investor, not involved in the day-to-day

13  operations of the company.   I'm reading the terms of an

14  agreement and asking a question.   I got comfortable with the

15  terms of the agreement and moved forward.   I am not involved in

16  the company.

17  Q.   So I'm clear, when you say you are asking a question, is

18  that your statement that the earnout is scary with our accounts

19  dropping month over month?

20  A.   I said something based on what was going on at the time,

21  but obviously we were getting comfortable with the agreement,

22  and I believe in the first quarter of '16 our customer count

23  went up I think the largest it went up from the time we started

24  the company.   So, I don't think it was an issue at the end of

25  the day.

K357HOR3                         Josefovic - cross

1   Q.  After the first sentence of your e-mail to Mr. Fried, you

2   continue "Because even if we kill with RCEs and overall profit,

3   the customer count can really hurt us."  Do you see that?

4   A.  OK.

5   Q.  And the reason that the customer count could really hurt

6   you was because customer count was one of the two drivers of

7   the earnout, right?

8   A.  Again, I'm a passive investor making a reaction to seeing

9   terms of an agreement, and then asking another party about the

10  terms of the agreement on something that might be a concern or

11  not a concern.  It didn't play out to be a factor at all.  At

12  the time I was asking a question.  And, again, I am not

13  involved in the day-to-day operation of the company; I didn't

14  know if it was an issue or wouldn't be an issue.

15          THE COURT:  You are sort of arguing with the lawyer.

16  You need to answer the question if you can, and the question

17  was:  And the reason the customer count could really hurt us --

18  you -- was because the customer count was one of the two

19  drivers of the earnout, right?

20          THE WITNESS:  Correct.

21  Q.  James, you can take that down.

22          The terms of the sale of sellers' membership interest

23  to NGE evolved after that letter of intent that we saw that was

24  dated in January of 2016, right?

25  A.  Again, I'm not sure what you're saying.

K357HOR3                          Josefovic - cross

1   Q.  Sure.  The structure of the proposal by NGE to purchase the

2   sellers' membership interest in Major Energy, that changed

3   before the deal that was finally signed?

4   A.  Yes.

5   Q.  OK.  And the aggregate purchase price, that did not change,

6   correct?

7   A.  Correct.

8   Q.  But the upfront cash purchase price did change.

9   A.  Correct.

10  Q.  That went from 60 to 45, correct?

11  A.  Correct.

12  Q.  And the contingent payment increased.

13  A.  Correct.

14  Q.  OK.  And the earnout period also changed; it went from 24

15  months to 33 months.  Do you recall that?

16  A.  Yeah.

17  Q.  You recall that the portion of the purchase price that

18  would deferred in the form of contingent payments was changed

19  because of certain regulatory issues that affected NGE's

20  business?

21  A.  I remember there was a proposal that came out from New York

22  State that caused concern from the buyer, thus the terms of the

23  agreement were changed, but to my understanding it did not

24  affect the outcome of NGE's business.

25  Q.  You understand that a deal structure that includes a

K357HOR3                    Josefovic - cross

1    contingent earnout portion of sales price is a mechanism for

2    the buyer and the seller to share risk?

3    A.  Correct.

4    Q.  Prior to the sale to NGE, sellers sought a valuation of the

5    different parts of Major Energy's business, in particular the

6    gas side of the business and the electric side of the business.

7    Do you recall that?

8    A.  I recall, yes.

9    Q.  OK.  James, can you pull up DX250.

10         Some of the sellers' shares in Major Energy were more

11   heavily skewed to the electric side of the business; other

12   sellers' shares were more skewed towards gas?

13   A.  Right.

14   Q.  And so the purpose of getting a valuation was to understand

15   how the extra proceeds of any sale would be divided?

16   A.  Correct.

17   Q.  Actually if we can go to the next page of this document --

18   actually a little further down, if we could.  Thank you.

19         So, on March 15th of 2016 you wrote, and then on the

20   next page you highlighted a few pieces of information that your

21   attorneys must review prior to closing.  Do you see that?

22   A.  Yes.

23   Q.  And one of them was the allocation breakdown?

24   A.  Yes.

25   Q.  And that's this allocation between gas and electric that we

K357HOR3                    Josefovic - cross

1   were discussing?

2   A.   Correct.

3   Q.   Now, if we go back to the e-mail, Mr. Alper -- and Mr.

4   Alper was the CEO of Major Energy?

5   A.   Yes.

6   Q.   And that was both before the sale to NGE and after?

7   A.   I believe his title was CEO prior to the sale.

8   Q.   And is it your understanding that he remained the CEO of

9   Major Energy after the sale to NGE?

10  A.   I understood that he was still involved; I don't know for

11  how long.  I understand he is not involved today.

12  Q.   And you don't have an understanding whether he was

13  continued on as CEO?

14  A.   I believe he did.

15  Q.   The same day, March 15, Mr. Alper responds, and he provides

16  feed-back on a number of things.  The first item is "Attached

17  is an allocation breakdown ..."  Do you see that?

18  A.   Yes.

19  Q.   And that was the allocation breakdown as between the gas

20  side and the electric side of the business?

21  A.   I believe so.

22  Q.   OK.  So why don't we go back to the e-mail.  And you

23  respond -- you forward that along to Mr. Wiederman, right?

24  A.   Yes.

25  Q.   And you are copying Mr. Fried and Mr. Bauman?

K357HOR3                         Josefovic - cross

1    A.  Correct.

2    Q.  And you say -- you write to Mr. Wiederman, "You're

3    satisfied with these valuations?  I don't see how we don't

4    raise hell on this.  I honestly believe we never structured gas

5    and electric properly all these years, and this is just

6    embarrassing.  We can't accept this."

7              Do you see that?

8    A.  Yes.

9    Q.  And Mr. Wiederman in response, he agreed.  He says, "I hate

10   it as much as you do.  However, the numbers really do speak for

11   themselves.  Especially now with New York potentially killing

12   the gas market completely.  It's sickening."

13             Do you see that?

14   A.  Yes.

15   Q.  You were concerned about the allocation disproportionately

16   favoring the electric side of the business as opposed to the

17   gas side of the business?

18   A.  Correct, because I owned a larger share on the gas side.

19   Q.  Understood.  So the allocation of gas and electric was

20   significant because it would dictate your share from the

21   proceeds of any sale?

22   A.  Correct.

23   Q.  And the concern about New York potentially killing the gas

24   market completely didn't give you much leverage to argue for a

25   larger allocation for the gas side of the business.

K357HOR3                    Josefovic - cross

1    A.  I don't recall the argument at the time, but again like I

2    said before we obviously got comfortable with how we allocated

3    and we moved forward.  But at the time it was a conversation

4    based on how it would be allocated because it affected

5    adversely or negatively ultimately in the play-out.

6    Q.  Sure.  And so for somebody who holds a larger portion of

7    the gas side of the business than the electric side of the

8    business, a concern that the New York market would potentially

9    be killing the gas market completely would undermine your

10   ability to get a larger allocation, or would undermine your

11   ability to share in the bulk of the proceeds from the sale.

12   A.  Again, those were words from Mark Wiederman about killing

13   the gas markets, so you would have to ask him exactly what he

14   meant by it, but ultimately, yeah, my concern was how are we

15   allocated the dollars and is the gas allocation getting the

16   proper value, because I owned a larger share on the gas side

17   than on the electric side.

18   Q.  Beyond the effect of New York potentially killing the gas

19   market completely, beyond the impact on the allocations, you

20   would agree with me, sir, that if New York potentially killed

21   the gas market completely, that would negatively affect all of

22   Major Energy's gas business in New York.

23        MR. DAHAN:  Objection.  Calls for speculation,

24   especially for a person who says he was not even involved in

25   the industry.

1          THE COURT:  Sustained.

2          If you want to rephrase it as his understanding, you

3    may.

4    Q.  Mr. Josefovic, do you have an understanding that if there

5    was a concern about New York potentially killing the gas

6    market, that could affect Major Energy's business going

7    forward?

8    A.  Again, I don't know what percentage exactly New York was.

9    We did service the New York area.  There was a proposal on the

10   table, and that's why we were renegotiating the terms of the

11   agreement with the buyer.  But again it didn't play out to have

12   any effect whatsoever.  But the buyer felt comfortable to move

13   forward with their proposed regulations based on the new terms

14   of the agreement, and the seller decided to move forward as

15   well.

16   Q.  Mr. Josefovic, New York was the market where Major Energy

17   was founded, right?

18   A.  I believe so, but I really don't recall.

19   Q.  Why don't we fast forward a few months later into July of

20   2016.  This is after the sale of Major Energy to NGE.

21   A.  OK.

22   Q.  So that's about three months after closing mid-July of

23   2016?

24   A.  Correct.

25   Q.  So in July of 2016 you learned about another regulatory

K357HOR3                          Josefovic - cross

1    risk that was developing in the New York market.  Do you recall

2    that?

3    A.   I don't.

4    Q.   OK.  Well, why don't we bring up DX349.

5            So if we take a look at the e-mail, at the bottom of

6    DX349 we have on July 18, 2016 Mr. Wiederman writing what looks

7    to be forwarding a news article titled "Update:  New York ESCOs

8    must drop existing low-income customers to default service at

9    the end of contract term."  July 18, 2016 is the date of the

10   story.  Do you see that?

11   A.   Yes.

12   Q.   The first line of this article that Mr. Wiederman forwarded

13   reads, "The New York PSC has issued a written order imposing a

14   moratorium on ESCO service to low-income customers which

15   explains how treatment of existing low-income ESCO customers,

16   or ESCO customers who later become eligible for low-income

17   protections, are to be treated."

18   A.   OK.

19   Q.   Did you have an understanding that this order required

20   ESCOs like Major Energy to drop existing low-income customers?

21   A.   I didn't have much of an understanding.

22   Q.   OK.  And so what you did when you received Mr. Wiederman's

23   e-mail was you asked a question.  You asked Mr. Wiederman, "is

24   this a huge issue?"

25   A.   Correct.

K357HOR3                          Josefovic - cross

1    Q.  And let's take a look at the response.  So, Mr. Horowitz

2    responds to your question on July 18, and he says

3    "Potentially."

4    A.  OK.

5    Q.  You are aware, Mr. Wiederman, that the low-income --

6    A.  Mr. Josefovic.

7    Q.  I apologize, thank you.  Mr. Josefovic, are you aware that

8    the low income order did eventually come to pass in New York

9    during the earnout period?

10   A.  I have no clue.

11   Q.  You don't know one way or the other.

12   A.  No.

13   Q.  We can take that document down.

14          During the earnout period, you periodically sought

15   updates about Major Energy's business from Mr. Horowitz and Mr.

16   Wiederman?

17   A.  Most probably.

18   Q.  And in June of 2017, did you understand that Mr. Wiederman

19   was in Texas meeting with Spark executives?

20   A.  I don't recall.

21   Q.  Well, why don't we take a look at DX494.

22          James, if you could go to page 8502.  OK.  If I can

23   focus you, James, on what is starting on June 9.

24          All right.  So this is a WhatsApp thread between you

25   and Mr. Fried.

K357HOR3                    Josefovic - cross

1    A.  OK.

2    Q.  You use WhatsApp?

3    A.  Yes.

4    Q.  And the name Mendy, that's you?

5    A.  Yes.

6    Q.  So the first WhatsApp exchange on June 9, 2017 is from you,

7    and it appears to be that you are attaching a JPEG file.

8    A.  OK.

9    Q.  And, James, if you could bring up DX494F.

10        OK.  And this, I will represent -- this JPEG file I

11   will represent is the file that you sent to Mr. Fried at 2:56

12   on June 9, 2017.

13   A.  If you say so.

14   Q.  OK.  And this is an exchange that you had with Mr.

15   Wiederman?

16   A.  Yes.

17   Q.  You asked first "Any Hatzlocha?"

18   A.  Hatzlocha.  It means good luck.

19   Q.  Fair enough.  Now, Mr. Wiederman responds to your question

20   about whether there was any luck in Texas by saying "LOL, no

21   silence.  Basically we went through the 2017 and 2018.  The

22   projections are somewhat ugly, primarily because we are taking

23   an 11 million cut for customer count."

24        Now, turning back to your WhatsApp exchange with Mr.

25   Fried, in response to your sending this JPEG file Mr. Fried

1    responds with an explicative, right?

2    A.  Yes.

3    Q.  OK.  And he then continues at 3:37, "If we are losing 11

4    million from sale because of diminished customer count that

5    means we are losing 10's of thousands of accounts.  We are

6    going to get into a spiral down situation by raising rates to

7    assure our earnout on earnings.  Moshe doesn't care what I have

8    to say."

9            Now, he continues on.  "He just 'I know and yes yes'

10   me.  I honestly do not know how we can help the situation at

11   all without a creative way of bringing in significant

12   accounts."  Then he continues and says "This is very bad."

13           Do you see that?

14   A.  Yes.

15   Q.  And you respond -- and if we can take a look at your -- why

16   don't we skip to the 3:41 message.  At 3:41 you respond and you

17   are attaching an opus file.  That's an audio file.

18   A.  OK.

19   Q.  I will represent that the audio file that's at DX494D is

20   what you sent to Mr. Fried at 3:41 p.m.

21           James, can you bring up 494D?

22           (Audio played)

23   Q.  That was Mr. Wiederman's voice?

24   A.  Yes.

25   Q.  So as of June 2017 you understood from Mr. Wiederman that

K357HOR3                          Josefovic - cross

1    customer count -- the thing that you had been concerned about a
2    year and a half ago -- was still an issue?
3    A.   I believe it was some Spark regulations that they couldn't
4    do certain kinds of sales events, but I recall the whole thing.
5    Q.   You understood from that audio file that Mr. Wiederman sent
6    you that customer count was an issue for Major Energy as of
7    June 2017.
8    A.   Correct.
9    Q.   And that was the same issue that you raised to Mr. Fried
10   prior to the sale to NGE.  Do you recall that?
11   A.   Yeah, but I don't believe one had to do with the other.
12   Q.   OK.  And in fact it was -- what Mr. Wiederman said was that
13   customer count was really, really hurting Major Energy.
14   A.   OK.
15   Q.   Why don't we go back to -- actually the next entry in this
16   WhatsApp exchange between you and Mr. Fried is you sending a
17   JPEG.
18            James, actually if we could take the next two JPEGs
19   that Mr. Josefovic sent to Mr. Fried.  They are a continuation
20   of the same message.
21            I will represent to you they are DX494G and 494H.
22            Maybe if you could, James, put 494G up on the left and
23   494H on the right.
24            So, taking a look at what is on the right side of the
25   screen, there is a message that says, "Seriously that bad?  But

K357HOR3                         Josefovic - cross

1    if customer count is 11, how much more from EBITDA?"  Mr.

2    Wiederman responds "A couple."

3             You respond, "Yikes.  Any other escrow besides that 3

4    million?"

5    A.  OK.

6    Q.  And he says, "That's it."

7             Now, you respond, "Can we blame any of this on Spark?"

8    A.  OK.

9    Q.  And Mr. Wiederman's response to your suggestion or your

10   inquiry is, "We definitely can but it will be an uphill battle.

11   But it may be worth a shot."

12   A.  Yes.

13   Q.  And you ultimately agree that you thought it was a shot to

14   blame this on Spark.

15   A.  It's definitely been an uphill battle the last few years

16   with expenses, which is what we were trying to avoid

17   ultimately -- by necessity.

18   Q.  And you and Mr. Wiederman wanted to see if you could find a

19   way to blame this on Spark?

20   A.  No, not find a way to blame this on Spark.  Ultimately to

21   do what was right and coming to us and certain things that

22   Spark had done wrong to us.

23   Q.  Now, in your text message to Mr. Wiederman, you didn't say

24   that in what has been marked as Defendant's Exhibit 494H.  You

25   just said can we blame any of this on Spark?

K357HOR3                         Josefovic - cross

1    A.  I am sure that wasn't the end of the conversation.  We

2    filed a lawsuit.

3    Q.  It wasn't the end of the conversation, because Mr.

4    Wiederman responded, "We definitely can but it will be an

5    uphill battle."

6    A.  OK.

7    Q.  And you ultimately replied, "For a 13 to 15 million chop, I

8    think it would be worth a million in legal fees and try to

9    settle, especially if we have ground to stand on."

10           Do you see that?

11   A.  Yes.

12           MS. BECKER:  We pass the witness.

13           MR. DAHAN:  Give me a moment, your Honor.

14           THE COURT:  There is no witness statement for this

15   witness; is there?

16           MR. DAHAN:  Correct.

17           THE COURT:  Did you want do move in exhibits?

18           MS. BECKER:  Yes, thank you.  It's just DX180 and

19   DX494G.  The others are already in.

20           THE COURT:  They are received.

21           MS. BECKER:  Thank you, your Honor.

22           (Defendant's Exhibits 180 and 494G received in

23   evidence)

24           THE COURT:  Mr. Dahan, redirect?

25           MR. DAHAN:  Just one second.  I have no redirect, your

K357HOR3                          Josefovic — cross

1    Honor.

2              THE COURT:  OK.  All right, sir, you may step down.

3              (Witness excused)

4              MR. DAHAN:  Can we break for lunch now and start the

5    witness after?  That witness will clearly carry over, so should

6    we break for lunch now?

7              THE COURT:  I would rather start.

8              MR. DAHAN:  That's OK.

9              THE COURT:  We can take a brief break, five minutes.

10             MR. DAHAN:  I underestimated some of the timing.

11             THE COURT:  Your next one will be who?

12             MR. DAHAN:  Amir Benisti.

13             THE COURT:  All right.  The reason is I have a lunch

14   at one o'clock, so I would like to take lunch from one to two

15   if possible, so if we could start.  But we can take five

16   minutes.

17             MR. DAHAN:  Thank you.

18             (Recess)

19             (Continued on next page)

20

21

22

23

24

25

1          THE COURT:  Mr. Hampton will swear you in.  Please

2     raise your right hand.

3     LARRY TODD GIBSON,

4          called as a witness by the defendants,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MR. BROWN:

8     Q.  Good morning, Mr. Gibson.  Up in front of you you'll have a

9     couple binders, one of which contains the witness statements as

10    well as the exhibits, with the statements on top of that

11    binder.  Do you recall submitting a witness statement in this

12    case sometime in December?

13    A.  Yes.  I see that.

14    Q.  And do you recall preparing a statement, signing it, and

15    submitting it to the Court in this case?

16    A.  Yes, I do.

17    Q.  And you stand by everything you said in that witness

18    statement as of today?

19    A.  I do.

20          MR. BROWN:  Great.  Go ahead.

21          MR. GABAY:  Your Honor, just as a housekeeping matter,

22    we have objections we would like to hand up.

23          THE COURT:  OK.  Thank you.

24    CROSS-EXAMINATION

25    BY MR. GABAY:

K35AHOR4ps                          Cross - Gibson

1    Q.  Good afternoon, Mr. Gibson.

2    A.  Good afternoon.

3    Q.  You have worked for several companies owned by Keith

4    Maxwell since 1999, correct?

5    A.  That's correct.

6    Q.  And you are currently the CFO of NGE, right?

7    A.  Yes, sir.

8    Q.  You have served as CFO of NGE from 2015 through the

9    present, correct?

10   A.  Yes.

11   Q.  As CFO of NGE, one of your responsibilities has been to

12   sign contracts on behalf of NGE, right?

13   A.  Yes.

14   Q.  You're aware that NGE and the sellers entered into a

15   membership interest purchase agreement, or MIPA, dated March

16   18, 2016, right?

17   A.  I don't remember the date exactly, but I do remember

18   entering into the agreement, yes.

19   Q.  You were not involved in negotiating the MIPA with the

20   sellers, correct?

21   A.  No.

22   Q.  Just for clarity for the record, you were not involved?

23   A.  No.

24   Q.  You are also aware that NGE and the sellers entered into an

25   earnout agreement, correct?

1    A.  Yes.

2    Q.  And you were also not involved in negotiating the terms of

3    the earnout agreement, correct?

4    A.  No, I was not.

5    Q.  Mr. Gibson, do you know who the CFO of Major Energy was in

6    2016?

7    A.  I think it was David Sobel.

8    Q.  Let's take a look at paragraph 48 of your witness statement

9    on the screen, please.  There you state, "That same day, I

10   executed an omnibus assignment and assumption agreement on

11   behalf of NGE with both Spark HoldCo and Spark Energy Inc."

12   Correct?

13   A.  I'm sorry.  You lost me.  What day are we talking about?

14   Q.  Oh, I'm sorry.  So this is on the day of the dropdown,

15   correct?

16   A.  In, in August?

17   Q.  August 2016.

18   A.  OK.

19   Q.  And here in your witness statement you say that you

20   executed an omnibus assignment and assumption agreement on

21   behalf of NGE with both Spark HoldCo and SEI, which is Spark

22   Energy Inc.  Correct?

23   A.  Yes, I did.

24   Q.  You also executed that same omnibus assignment and

25   assumption agreement on behalf of Major Energy, correct?

K35AHOR4ps                        Cross - Gibson

1   A.  Yes, I did.

2           MR. GABAY:  Eric, if we could please pull up PX 656.

3   Q.  Sir, this is the omnibus assignment and assumption

4   agreement between NGE and Spark, correct?

5   A.  This is just a portion of it.  It's highlighted, and just

6   the first two paragraphs are here.

7   Q.  We have a binder in front of you with the exhibits.  If

8   you'd like to look at the full agreement, it's PX 656.

9   A.  OK.  I recognize it.

10  Q.  OK.  And if we turn to page 5, that's your signature for

11  NGE and the three Major Energy entities, correct?

12  A.  Yes, it is.

13  Q.  And underneath your signature for Major Energy, it says

14  that you were the CFO of Major Energy, correct?

15  A.  Yes.

16  Q.  Were you the CFO of Major Energy at this time?

17  A.  This is after NGE -- I'm sorry.  I'm not understanding the

18  question.  This is in August?

19  Q.  Correct.

20  A.  Yes.  Yes.  I would have been as a subsidiary of NG&E.

21  Q.  And when did you become the CFO of Major Energy?

22  A.  It would have been upon our acquisition of Major Energy,

23  back in April.

24  Q.  When you became the CFO of Major Energy, did you get a pay

25  increase?

K35AHOR4ps                    Cross - Gibson

1    A.  Did I get a pay increase?  No.

2    Q.  How much time did you spend being the CFO of Major Energy,

3    in comparison to the time you spent performing your role as CFO

4    of NGE?

5    A.  Not as much time.  Do you want to make that percentages

6    or --

7    Q.  No.  Is it fair to say it was significantly less time that

8    you spent on Major Energy business as opposed to NGE business?

9    A.  Well, at that time, the bulk of National Gas & Electric was

10   Major Energy.  So that -- we had just gone through the

11   acquisition, and so the majority of our business was Major and

12   its subsidiaries.  So I would say less but, you know, it was

13   still -- it was still quite significant.

14   Q.  And what did you do as the CFO of Major Energy?

15   A.  We would monitor like balances, monitor their receipts and

16   collections, the receivable balances, typical stuff that I

17   would do as a chief financial officer.

18   Q.  Now, when NGE acquired Major Energy in April 2016, Major

19   Energy's supplier was Pacific Summit Energy, or PSE, correct?

20   A.  That's correct.

21   Q.  In March 2016, PSE offered to extend the existing supply

22   relationship with Major through the end of the earnout period.

23   Correct?

24   A.  I don't recall what they -- but they did offer to extend

25   it.  I don't recall what they were offering to extend it

1    through, but I think it was for like two years, through 2017.

2            MR. GABAY:  Eric, if you could please pull up PX 374

3    and turn to page 2.

4    Q.  Sir, this is a March 16, 2016 e-mail, from Mark Depew to

5    Mr. Wiederman and Mr. Alper, copying James Chung.  Do you see

6    that?

7    A.  Yes, I do.

8    Q.  Mr. Depew and Mr. Chung were PSE employees at the time,

9    correct?

10   A.  Yes.

11   Q.  In the third paragraph of this e-mail, Mr. Depew writes,

12   "As you are aware, PSE would like to extend our existing supply

13   agreement with the Major entities, and it is our hope to, at a

14   minimum, support you through the entire earnout period with

15   NuDevCo."  Do you see that?

16   A.  Yes, I do.

17   Q.  What is NuDevCo's relationship to NGE?

18   A.  NuDevCo was the parent company.

19   Q.  Mr. Depew continues, "Hence we would like to propose

20   extending our existing supply agreements through the end of the

21   earnout period, which would take us to around January 2019."

22   Correct?

23   A.  OK.  I don't recall that, but I -- I just recall when we

24   ultimately did extend it through.  But I wasn't a party to this

25   e-mail, so I'm seeing it maybe for the first time.

1    Q.  If you would flip to page 1 just quickly, you'll see that

2    this was in fact forwarded to you and you were copied on this

3    e-mail, correct?

4    A.  OK.

5    Q.  Can we turn back to page 2, please.  And looking back at

6    that paragraph we were just looking at, Mr. Depew continued,

7    "In order to make this a win-win for Major, PSE would be

8    willing to reduce our credit fee on the power sales from $1 per

9    megawatt hour to 85 cents per megawatt hour effective upon

10   closing of your sale."  Correct?  Do you see that?

11   A.  Yes, I see that.

12   Q.  Now, if you flip to page 1, again you can see that

13   Mr. Hennekes added you to this e-mail chain on March 21, 2016,

14   right?

15   A.  Yes.

16   Q.  And in the third paragraph, Mr. Hennekes writes, "National

17   is building a brand across most deregulated markets as a

18   vehicle to acquire, operate, and de-risk other retail energy

19   brands and books of customers.  We have a number of

20   transactions in the pipeline now, including Major, and we look

21   forward to continuing this relationship."

22           "This relationship," in the sentence I just read to

23   you, refers to PSE, correct?

24   A.  I'm going to take a second to read the body of the e-mail

25   if that's fine?

K35AHOR4ps                              Cross - Gibson

1    Q.  Sure.

2    A.  OK.  I'm sorry.  Would you repeat your question?

3    Q.  The words "this relationship" in the sentence I just read

4    to you refers to PSE, correct?

5    A.  I believe so.  I believe it does, yes.

6    Q.  And it's true that, at the time this e-mail was sent, NGE

7    had a number of transactions in the pipeline aside from Major,

8    correct?

9    A.  I don't recall.

10   Q.  Now, at the bottom of this e-mail, Mr. Hennekes writes, "I

11   have copied Todd Gibson, and he is available to meet with the

12   folks at PSE to talk further."  Correct?

13   A.  Yes.

14   Q.  Now, despite this offer from PSE, which is for 85 cents per

15   megawatt hour, you still thought at the time that you could

16   force PSE's hand to no longer serve as Major Energy's supplier

17   by the end of the contract that Major had in place at the time

18   with PSE, correct?

19           MR. BROWN:  Objection, argumentative.

20           THE COURT:  Overruled.  If you understand the question

21   you can answer.

22   A.  Would you ask the question again, sir?

23   Q.  Yes.  Despite this offer from PSE for 85 cents per megawatt

24   hour, you still thought at the time that you could force PSE's

25   hand to no longer serve as Major's supplier by the end of the

1    contract Major had with PSE at the time for supply, correct?

2          MR. BROWN:  Objection, mischaracterization of document

3    and argumentative.

4          THE COURT:  Overruled.

5    A.  I wouldn't phrase this being able to force their hand.  I

6    think we were just trying to lower their gas and electricity

7    purchase costs through a more an affiliated arrangement with

8    our sister company, Spark Energy.

9          MR. GABAY:  If we could please pull up PX 3.  We can

10   start at page 2.

11         THE COURT:  You said PX 3?

12         MR. GABAY:  380.

13   Q.  You can see, Mr. Gibson, this is the same March 16th e-mail

14   that we were looking at earlier, correct?

15   A.  Yes.

16   Q.  Again, Mr. Depew is offering 85 cents per megawatt hour in

17   this e-mail?

18   A.  OK.  I see that, yes.

19   Q.  And if we flip to page 1, Mr. Hennekes forwards this e-mail

20   chain to you the next day, correct?

21   A.  OK.  Yes.

22   Q.  And Mr. Hennekes copies Mr. Maxwell, right?

23   A.  Yes.  I see that.

24   Q.  And who Mr. Maxwell?

25   A.  He is the CEO of National Gas & Electric.

1   Q.  And did he have a position at Spark as well?

2   A.  I think he was chairman -- he's chairman of the board.

3   Q.  Mr. Hennekes writes, "Todd, per our conversation re Pac

4   Summit."  Do you see that?

5   A.  Yes.

6   Q.  Further down, Mr. Hennekes states, "Seems like their offer

7   is about as cheap as any credit sleeve we have seen, so it

8   might be worth a breakeven analysis (recognizing the inherent

9   problem with having two liens on a dropdown)."  Did I read that

10  correctly?

11  A.  Yes.  I see that.  Yes.  That reads correctly.

12  Q.  And he then says, "As we discussed, we still think we can

13  force their hand, but want to make sure we shouldn't entertain

14  this or some counter."  Did I read that correctly?

15  A.  Yes.

16  Q.  And Mr. Hennekes is describing a discussion he had with

17  you, correct?

18  A.  I don't recall that discussion.  I mean, I see that's what

19  he says, but today I don't recall that discussion.

20  Q.  You don't see any Major Energy employees included on this

21  March 17th e-mail from Mr. Hennekes, do you?

22  A.  Not on the document in front of me, no.

23  Q.  The MIPA between the sellers and NGE was signed the next

24  day, correct?

25  A.  Can I -- can I look at the documents?

K35AHOR4ps                        Cross - Gibson

1    Q.  Yes.

2    A.  OK.  I don't recall them.

3    Q.  You can look at paragraph 24 of your witness statement just

4    to orient you.

5    A.  OK.  I see that, yes.

6    Q.  And on April 15, 2016, NGE closed the deal with the

7    sellers, correct?  You can see that in the next paragraph down.

8    A.  Yes.  Yes.

9              MR. GABAY:  Eric, let's pull up PX 376.

10   Q.  Now, this is almost a week later, on April 21, 2016.

11   Correct?

12   A.  Yes.

13   Q.  And Mr. Hennekes states, "Todd, if you have a few minutes,

14   can you please call to discuss the plans for the Pac Summit

15   situation at dropdown?"  Correct?

16   A.  Yes.

17   Q.  And there were no Major Energy employees included on this

18   e-mail from Mr. Hennekes, were there?

19   A.  I don't see any, no.

20   Q.  Let's take a look at PX 680.  This is also dated April 21,

21   2016, correct?

22   A.  Yes.

23   Q.  And Mr. Maxwell sends this message to you, Mr. Konikowski,

24   and Mr. Hennekes, correct?

25   A.  Yes.

1    Q.  Mr. Maxwell writes, "Hey, what is the latest on PSE

2    termination timing," with two question marks.  Correct?

3    A.  Yes.

4    Q.  And there were also no Major Energy employees included on

5    this e-mail from Mr. Maxwell, correct?

6    A.  No.

7    Q.  Let's pull up PX 361.  This is an e-mail from Mr. Hennekes

8    to you dated April 29, 2016, with the subject line "PSE,"

9    right?

10   A.  Yes.

11   Q.  Mr. Hennekes writes, "Todd, just confirming I spoke with

12   Dan Alper and let him know about the termination notice and

13   asked him to communicate to Mark and Saul."  You don't discuss

14   this April 29th e-mail in your witness statement, do you, sir?

15   A.  I'm sorry.  What was your question?

16   Q.  You don't discuss this April 29th e-mail in your witness

17   statement, do you?

18   A.  I don't recall.

19   Q.  Feel free, sir, to open up your witness statement and just

20   turn to the PSE section, which begins on page 11, paragraph 49.

21   Just take a moment.  Do you see any reference in your witness

22   statement to this e-mail?

23   A.  No.  I don't see a reference to this e-mail.

24   Q.  Now, around the time of this e-mail, you called PSE to

25   discuss terminating the PSE relationship.  Correct?

1    A.  I may have visited them in person.  It was either a call or

2    an in-person visit where I went to their office.

3    Q.  Do you recall actually calling them as well before

4    visiting?

5    A.  Yes.

6    Q.  And there were no Major Energy employees on that phone

7    call, were there?

8    A.  On the call?

9    Q.  Correct.

10   A.  I don't think there were.

11   Q.  And when you went down to visit PSE, who did you meet with?

12   A.  I'm sorry?

13   Q.  Which PSE employees did you meet with?

14   A.  I met with Mark Depew and James Chung.

15   Q.  And were there any Major Energy employees at that meeting?

16   A.  I don't think so, no.

17             MR. GABAY:  Your Honor, we'll pass the witness.

18             MR. DAHAN:  One second.

19             MR. GABAY:  Sorry, just a couple more questions.

20             MR. BROWN:  No takebacks, your Honor.

21             MR. GABAY:  My apologies.

22             THE COURT:  No problem.

23   BY MR. GABAY:

24   Q.  We will just quickly showed you one document.

25             MR. GABAY:  I'm being told we'll pass the witness.  My

 1   apologies.

 2              MR. BROWN:  No takebacks, your Honor.

 3              THE COURT:  Do you want to move any of those documents

 4   or are they already in?

 5              MR. GABAY:  Yes.  Thank you.

 6              The first one is PX 656.  PX 374, PX 380, PX 376, PX

 7   680, and PX 361.

 8              THE COURT:  They are received.  Thank you.

 9              (Plaintiff's Exhibits 656, 374, 380, 376, 680, and 361

10   received in evidence)

11              THE COURT:  Redirect, Mr. Brown.

12              MR. BROWN:  Thank you, your Honor.

13              I'll try to be quick, your Honor, in light of the

14   lunch hour coming up.

15   REDIRECT EXAMINATION

16   BY MR. BROWN:

17   Q.  Mr. Gibson, let me just see if I can clean up the record on

18   one issue right out of the gate.

19              MR. BROWN:  Can we pull up DX 263.

20   Q.  DX 263, Mr. Gibson, do you see, is an e-mail at the top

21   from Mr. Wiederman to several folks on the date of closing of

22   the transaction between NGE and the sellers?

23   A.  Yes, I see it.

24   Q.  And do you see that you're copied in the cc line, second

25   line?

1   A.  Yes.

2   Q.  Along with Mr. Horowitz, Mr. Alper, various other folks,

3   including deal counsel at sellers.

4   A.  Yes, I see that.

5   Q.  And it says, "Gentleman, please see attached executed docs.

6   Thanks again for all the effort that was put in.  Have a great

7   weekend.  Mark."  See that?

8   A.  Yes, I do.

9   Q.  And if you read down -- keep the whole first page on the

10  screen.  Mr. Lancaster in the e-mail that gets forwarded is

11  forwarding various documents.  And if we look down at the

12  second paragraph, it says, "Attached please find a guaranty

13  executed by Todd for all three entities that includes the

14  executive earnout agreement with Larry's changes."  Do you see

15  that?

16  A.  Yes, I do.

17  Q.  And if we turn to the document that is half a page, line

18  660.  James is ahead of me.  Good job.

19          That's the guaranty that was signed.  Do you see that?

20  A.  I do see that, yes.

21  Q.  And if we move over to the signature page, page 6, we'll

22  see that you signed this guaranty on behalf of the three LLCs

23  Major Energy entities that are being sold to NGE in connection

24  with the transaction.  Do you see that?

25  A.  Yes, I do.

1    Q.  And then Mr. Horowitz signs at the bottom after you sign on

2    behalf of those three Major Energy LLCs.  You see that?

3    A.  Yes, I do.

4    Q.  And as we continue to the next page -- that would be the

5    next attachment that's forwarded in this thread -- you

6    recognize that this is one of the three LLC written consents

7    that needed to be signed in connection with the closing of the

8    transaction?

9            MR. BROWN:  James, just leave up the whole picture of

10   it on the screen.

11   Q.  And it's also, Mr. Gibson, I believe --

12           MR. BROWN:  Is it in the binder?

13           OK.  Just keep the big screen up.

14   Q.  You see this is page 1 of a written consent of managing

15   members of Major Energy electric services LLC?

16   A.  Yes.

17   Q.  And you recall there was one to be signed for each of the

18   three LLCs that were being acquired by NGE?

19   A.  Yes.

20   Q.  If we turn to the signature page of this first one, before

21   we have the signature page, this written consent, on the day of

22   closing, identifies various positions that are going to be

23   appointed for various individuals in connection with the

24   closing of the sale of Major Energy, correct?

25   A.  Yes.

1          MR. BROWN:  Your Honor, I know that I'm leading.  I'm

2     doing it just for time.

3     Q.  You see Mr. Alper is identified as the CEO at the closing?

4     A.  Yes.

5     Q.  And who is identified as the chairman of Major Energy's

6     first LLC as of the date of the closing?

7     A.  The chairman?

8     Q.  Yes.

9     A.  Is W. Keith Maxwell III.

10    Q.  And that's Mr. Maxwell we've been talking about?

11    A.  Yes.

12    Q.  And then you were appointed as of the day of closing as

13    executive vice president and treasurer, not CEO, executive vice

14    president and treasurer.  Do you see that?

15    A.  Yes, I do.

16    Q.  And Mr. Gabay asked you certain questions on cross where he

17    showed that you had your title listed in the document as

18    executive vice president and CFO.  Do you recall those

19    questions?

20    A.  Yes, I recall the questions.

21    Q.  Does this refresh your recollection that you were in fact

22    the treasurer of the Major Energy entities, not CFO?

23    A.  OK.  Yes.

24    Q.  And you were executive vice president and CFO for lots of

25    other related Spark family of company entities; is that fair?

1    A.  Yes.

2    Q.  And that was your ordinary signature line and title; is

3    that fair?  For those entities?

4    A.  Yes.

5    Q.  Looking back at at least this first document --

6            MR. BROWN:  James, let's go to the signature page to

7    see who signed this document.

8    Q.  So the managing members who sign this to appoint you as

9    executive vice president and treasurer as of the closing were

10   Mr. Horowitz and Mr. Wiederman as managing members, as well as

11   Mr. Horowitz as a seller representative.  Correct?

12   A.  Yes, I see that.

13   Q.  And I won't belabor the point; in this document are serial

14   consents for the two other LLCs appointing you as executive

15   vice president and treasurer for each of those three entities,

16   which Mr. Horowitz and Mr. Wiederman signed off on.  Do you

17   generally recall that, sir, from the time of closing?

18   A.  Yes.

19   Q.  All right.  Let's put that aside.

20           Mr. Gabay showed you a couple documents with respect

21   to your communications with PSE both prior to the closing of

22   the transaction with NGE and after the closing.  Do you recall

23   that?  Do you recall those questions generally that Mr. Gabay

24   asked you?

25   A.  Yes.

1   Q.  You address those communications that you were having in

2   your witness statement at paragraphs 54 through 57.  Is that

3   right?  Is that where you summarize it?

4   A.  In my witness -- you mean fifty --

5   Q.  Paragraph 54 on page 13.  You talk about the communications

6   in connection with PSE on March 22nd?

7   A.  Yes.

8   Q.  Let's pull up, you can turn to your binder if you like or

9   look at it on the screen, it's DX 995.

10          And so at the top of the first page of this thread,

11  this is another version of one of the e-mail communications

12  with a different trial exhibit number that Mr. Gabay was asking

13  you about, and it's the communication thread across March 21st

14  and 22nd pre closing about communications with PSE.  Do you see

15  that?

16  A.  Yes.

17  Q.  And there are a variety of Major Energy folks on this pre-

18  closing document, right, Mr. Horowitz, Mr. Wiederman?

19  A.  Yes.

20  Q.  And as Mr. Alper is communicating to the group in that

21  e-mail at 2:55 a.m. -- I don't know what time zone that was --

22  he says, he says to the group, "Our view is that every month

23  that PSE continues to serve Major will benefit PSE and that

24  keeping them focused on the positive aspects of a continued

25  relationship, which may be through the end of the existing

K35AHOR4ps

1    contract, will hopefully bring PSE around to signing off

2    peacefully."  Do you see that?

3    A.  Yes, I do.

4    Q.  When you received this at the time, did you have an

5    understanding that what Mr. Alper was referring to when he said

6    "which may be through the end of the existing contract," that

7    he was referring to the March 2017 expiration of the existing

8    three-year contract between Major Energy and PSE?

9    A.  Yes.

10              MR. BROWN:  I have nothing further, your Honor.

11              THE COURT:  All right.  Is there any recross,

12   Mr. Gabay?

13              MR. GABAY:  Your Honor, no.

14              THE COURT:  OK.  Thank you.

15              Sir, you may step down.

16              (Witness excused)

17              THE COURT:  Did you need to move either of those

18   exhibits in or no?

19              MR. BROWN:  Just DX 263, your Honor.

20              THE COURT:  DX 263 received.

21              MR. BROWN:  Oh, I'm sorry.  And one more.  And DX 995.

22              THE COURT:  And DX 995 is received.

23              (Defendant's Exhibits 263 and 995 received in

24   evidence)

25              THE COURT:  All right.  We'll break for lunch until 2

K35AHOR4ps

1    o'clock?

2            MR. BROWN:  Thank you, your Honor.

3            THE COURT:  All right.  Thank you.

4            (Luncheon recess)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  A F T E R N O O N   S E S S I O N

2                            2:00 p.m.

3              THE COURT:  Good afternoon, folks.

4              Mr. Dahan?

5              MR. DAHAN:  Thank you, your Honor.  Plaintiffs call

6    Amir Benisti to the stand.

7              THE COURT:  Sir, if you would please come on up, Mr.

8    Benisti.

9     AMIR BENISTI,

10         called as a witness by the plaintiff,

11         having been duly sworn, testified as follows:

12             MR. DAHAN:  Your Honor, we're just going to hand out

13   the binders.

14             THE COURT:  OK.

15             MR. DAHAN:  Just to remind the Court, there is no

16   written direct for this one.

17   DIRECT EXAMINATION

18   BY MR. DAHAN:

19   Q.  Good afternoon, Mr. Benisti.

20   A.  Good afternoon.

21   Q.  Thank you for coming to court today.  I know it's your

22   wedding anniversary, and I'm sure you have plenty of other

23   places you would rather be, and we'll try to get you in and out

24   soon.

25   A.  Thank you.

K357HOR5                      Benisti - direct

1   Q.  Were you employed at Major Energy?

2   A.  Yes.

3   Q.  When did you start working at Major Energy?

4   A.  May of 2012.

5   Q.  Are you still presently working at Major Energy?

6   A.  No.

7   Q.  When did you leave Major Energy?

8   A.  I left in December of 2019.

9   Q.  So a couple months ago?

10  A.  Yeah.

11  Q.  Were you fired?

12  A.  No.

13  Q.  You left on your own choice?

14  A.  Yes.

15  Q.  So you worked at Major Energy for about seven years; is

16  that correct?

17  A.  Yes, seven and a half.

18  Q.  I want to focus on the 2015 to the 2019 period.  What was

19  your position at Major Energy?

20  A.  It was director of business development.

21  Q.  And what did that job entail being director of business

22  development?

23  A.  It was in the broker network and bringing in commercial and

24  a little bit of residential brokers into the mix of the

25  network, and entertaining them and making sure that they --

1    trying to get them to bring business through Major Energy.

2    Q.  You mentioned a broker network.  Did you primarily work on

3    the broker network side of the business?

4    A.  Yes.

5    Q.  And you mentioned two components.  You mentioned

6    residential and commercial.  Does the broker network have both?

7    A.  We focused mostly on commercial, and we did have some

8    residential brokers as well.  They were different than

9    marketers; they don't get paid up front.  They get paid the

10   same way a commercial broker would get paid.

11   Q.  So are you referring to they would not be through customer

12   acquisition costs or --

13   A.  Correct.

14   Q.  And can you quantify what percentage might be in the broker

15   network that's commercial and what portion would be the

16   residential?

17   A.  I don't know exactly, but probably 25 percent residential,

18   I would say.  Again, these are also residential deals that came

19   in not like one by one; there were a large amount of

20   residential.

21   Q.  Who did you report to during that period of time?

22   A.  Mostly Levi Moeller.  Maybe at time it could have come up

23   to eventually reporting to Mark Wiederman.

24   Q.  And when Mr. Moeller letter left sometime in I believe it

25   was end of '18, who did you report to?

K357HOR5                        Benisti - direct

1    A.  I reported to Mark Wiederman.

2    Q.  And after Mr. Wiederman left in April or March of 2019,

3    until you left, who did you report to?

4    A.  I think it was Nathan Kroeker may have told me that he was

5    going to be there more often, I may have been reporting to him.

6    It wasn't very clear, and then eventually it turned to a

7    hundred percent.

8    Q.  After you first started in the broker department, can you

9    give me a sense of the size of that department or how many

10   people were in it.

11   A.  Sure.  When I first started in the broker department it was

12   Bruce Shipper who was in the department, and I was the second

13   person in that department.

14   Q.  And what was Bruce Shipper's title or role at that point?

15   A.  I believe he was director of broker network or something.

16   Director of broker network I believe it was.

17   Q.  OK.  And moving forward to let's say the 2016-2017 period,

18   did that grow?  Was it still just you and Bruce?

19   A.  No, we grew.  We had brought some people from within, from

20   customer service, brought them up.  One of them had

21   specifically had stayed up until the end of -- towards the end

22   of 2019.  But we had brought other people into the department.

23   The department was growing year over year.

24   Q.  Can you briefly describe to the Court sort of how the

25   broker division or network of Major Energy would go out and try

1    to grow that division and get customers.

2    A.   Sure.  So, in the broker network and in this industry, in

3    the commercial space it's standard for energy brokers to have

4    the relationship in most cases with the customer and then we

5    would go out there and we would build the relationship with the

6    broker, get him to bring us the business to the supplier.  And

7    at the end of the day it was very much dependent on what the

8    broker wanted to do, so a lot of it depended on price, and a

9    lot of it depended on trust.  There was a big trust factor, and

10   at the end of the day we were enrolling his customer, and he

11   wanted to make sure that everything we were doing was correct

12   and also that we're paying a commission on time and all that

13   kind of stuff, so it was a big trust relationship that was

14   there as well.

15   Q.   Now, you've heard the phrase RFP?

16   A.   Yes.

17   Q.   Can you explain to the Court what that is and how that

18   relates to the broker division.

19   A.   Sure.  An RFP is a request for price, so the brokers would

20   send out like an e-mail to us, Major, saying this is the

21   account, here are some bills, not bills, just account numbers,

22   whatever it was, but whatever we would need in order to cost

23   and price the account, and that was the RFP process, and

24   typically it would take two or three days to turn around the

25   price to the broker, and at that point the broker would go and,

1    you know, sell it to the customer.

2    Q.   Thank you.  Now, around the 2015 time, how many RFPs would

3    the broker department at Major Energy handle on an average day?

4    A.   I would say we were pricing anywhere between 30 and 40

5    accounts a day -- or different RFPs per day.

6    Q.   And in 2016 that number was it higher or lower?

7    A.   I would say it continued going up.

8    Q.   OK.  Now, was there a time that you recall Major Energy

9    became focused on growing their commercial business?

10   A.   Yes.

11   Q.   And to the best of your recollection, when do you think

12   that began?

13   A.   I would say around 2014, maybe the beginning of 2014.

14   Q.   What do you recall about that effort of Major Energy to

15   grow the commercial business?

16   A.   We had just gotten into some one or maybe multiple states.

17   Mark Wiederman and Saul Horowitz -- maybe it wasn't Saul; maybe

18   it was Eliott Wolbrom -- but they had called us into the

19   conference room -- I believe it was just Bruce Shipper and

20   myself -- and they put a lot of emphasis on wanting to grow the

21   commercial department.  He had told us, you know, we should go

22   out to Massachusetts or the specific state that we were

23   referring to, that he wants us to go out there and bring on

24   brokers, meet them face to face, build that relationship with

25   them, build that trust factor with them and start growing in

K357HOR5                         Benisti - direct

1    that space.

2    Q.  Again, that was around the 2014 period?

3    A.  I believe so.

4    Q.  OK.  I want to show a document.  If we could pull up

5    Plaintiff's Exhibit 414.

6            Now, it will come up on the screen but there is also a

7    book next to you, tabs, or you will see there is one 414 if

8    that's easier to look at.  It's your choice.

9            THE COURT:  Do you have the binder or not?  You're

10   welcome to use the screen, but if you want to look at the

11   paper, it's in the binder.

12   Q.  Why don't we turn to 30 of this document.  So that would be

13   for you, Mr. Benisti, that would be the slide -- well, we will

14   have the 30 on the bottom, or you can look at slide 29.

15   A.  OK.

16   Q.  So, this is from a November 2014 Major Energy management

17   presentation, and this slide talks about agent sales, and it

18   says Major works with 182 agents/brokers.  Do you see that?

19   A.  Yes.

20   Q.  And it says 115 of these have brought in accounts in 2014.

21           And you were in the broker department during that time

22   period?

23   A.  Yes.

24   Q.  And does that look consistent with your recollection of

25   about how many agents and brokers Major Energy had at the time?

K357HOR5                         Benisti - direct

1    A.  Yes.

2    Q.  And then it says the total RCEs acquired in 2014 is 25,204

3    through September 2014.  Do you see that?

4    A.  Yes.

5    Q.  Does that seem consistent with your recollection?

6    A.  Yes.

7    Q.  And the third bullet says 65 percent of sales are to

8    commercial accounts.  Do you see that?

9    A.  Yes.

10   Q.  OK.  Can you just -- there is -- on the first bullet it

11   says averaging 2800 RCEs per month.  Maybe if you could from

12   the commercial perspective -- we have heard some on the

13   residential perspective -- can you explain the difference

14   between an account and an RCE.

15   A.  OK.  An RCE is what the industry would refer to as like the

16   equivalent to a standard home.  So where one RCE would let's

17   say be an average of 10,000 kilowatt hours, one commercial

18   account, let' say a 1 million kilowatt hours for a commercial

19   account could mean 1,000 RCEs, so one commercial account can

20   easily pick up let's say 1,000 RCEs.

21   Q.  So if I understand your testimony -- and if I'm incorrect,

22   let me know -- you could have something listed as one account

23   on the commercial end but it's producing the equivalent of

24   1,000 RCEs?

25   A.  Yes.

1           THE COURT:  A commercial account is, for example, one
2     home that's getting the energy.
3           THE WITNESS:  Correct.  So a commercial account could
4     be let's say this building.
5           THE COURT:  A commercial.  I was thinking residential.
6     But a commercial account would be like a company.
7           THE WITNESS:  Yeah, exactly.  Like an office building
8     could have one meter, that's one account number, but it's
9     equivalent to let's say 1,000 homes.
10    Q.  So I want to pull up now another document.  And maybe we
11    could, Eric, move this to the side so we can do a comparison.
12          OK.  Let's pull up PX359.  And if we go to the next
13    page.  So this now is a January 2016 presentation.  OK?  And if
14    we could go to I think it's 32, Eric.
15          Similar type of page.  So we are now, you know, at the
16    beginning of 2016.  So, from your recollection you talked
17    earlier before about the effort sometime in 2014 to grow the
18    commercial business.  Before we discuss this slide, did you get
19    a sense that those efforts were paying off and the commercial
20    business was growing at Major Energy?
21    A.  Yes, very much.
22    Q.  So in the prior slide it talked about 182 agents, and 115
23    of them bringing in accounts in 2014.  Do you see that?
24    A.  Yes.
25    Q.  The first bullet says 215 agents brought in accounts in

K357HOR5                           Benisti - direct

1   2015 year to date.  Do you see that?

2   A.  Yes.

3   Q.  That's about 100 more agents?

4   A.  Yep.

5   Q.  And it says largely relationship driven.  Do you see that?

6   A.  Yes.

7   Q.  And no upfront acquisition cost - paid commissions during

8   period of service.  Do you see that?

9   A.  Yes.

10  Q.  Then it says at this point in time total of 71,560 RCEs

11  acquired in 2015.  Do you see that?

12  A.  Yes.

13  Q.  OK.  And before we saw averaging 2800 RCEs per month, and

14  this one is saying representing 5,963 RCEs per month.  Do you

15  see that?

16  A.  Yes.

17  Q.  Is this consistent with your recollection of the growth at

18  this point between '14 and '15?

19  A.  Yes.

20  Q.  You talked earlier before about relationships -- the

21  importance of relationships in the broker division and growing

22  the broker division.  Can you describe what things Major Energy

23  did to try to establish relationships with the brokers?

24  A.  Sorry.  Can you repeat the question?

25  Q.  Sure.  Can you describe what types of things Major Energy

K357HOR5                          Benisti - direct

did to develop -- establish the relationship with the brokers.

A.   Yeah.  So Major was very much relationship driven.  We
always put the broker first.  And one of the ways -- there were
multiple different things we have done, but one of them was
let's say, you know, always making sure that we got back to
them on time, we turned things around, we had answers for them,
we got things done for their customer.  Because again they're
giving us their customer technically, and they want to make
sure that we're handling their customer, you know, properly --
and even more than properly, making sure that their customers
are handled the best, because that's their name on the line.
So, we always make sure that everything -- all our processes
run quick and smoothly.

            We would take them out, show appreciation.  There was
a huge trust factor that we always tried to get with every
single one of our brokers.  We would take them out for dinners
and even go above and beyond just to show that we really care
for them.

            We had sponsorships that we would be able to take them
to games and sometimes let their families go, or let people in
their brokerage -- you know, if it's a bigger brokerage and we
wanted to send employees, we were very into -- you know, it's
all about them.

Q.   So is it fair to say the game plan -- to use that
analogy -- was to get the business, right?

1    A.   Yes.

2    Q.   You mentioned sponsorships.  Do you recall what

3    sponsorships Major Energy had at the time?

4    A.   Yeah, it started with I believe MSG and Knicks, and Rangers

5    and Yankees.

6    Q.   And did you from your experience feel that the sponsorships

7    assisted in developing and growing the commercial business?

8    A.   Yes, because it really gave us a lot of credibility in the

9    market that some people don't have.

10   Q.   Now, you mentioned I think before -- strike that.

11          Now, are there different types of -- or volumes of --

12   commercial deals?

13   A.   Yes.

14   Q.   Can you briefly describe that to the Court.

15   A.   Sure.  So there would be, let's say, larger deals -- well,

16   let's start with a smaller deal.

17          A small commercial account could be like a pizza shop,

18   and then, you know, that can go up to like, you know, a small

19   office building.  So let's say anything up to a couple hundred

20   kilowatt hours, 200 or 300 RCEs.  Then a medium size can go up

21   to let's say like a million kilowatt hours.

22          Personally, I considered anything from 750,000

23   kilowatt hours to like 2 million -- I would say anything above

24   2 million was like a large deal.  Anything from 750 to 2

25   million was probably like a medium size but a good healthy

K357HOR5                          Benisti - direct

1    deal.

2    Q.  OK.  And would Major Energy have one set price for whether

3    it's a large deal, medium size or a small deal?

4    A.  No, these prices were based on like how large the account

5    was typically.  When they are customed priced or matrixed, they

6    would be like different margins in order to be more competitive

7    on the larger deals.

8    Q.  So, did Major Energy have a set margin policy?

9    A.  Nothing set like in stone but, you know, we wanted to make

10   money obviously but there was nothing set in stone.  We went

11   and like let's get that deal done, because it also showed the

12   broker we got this deal, it gets the broker in the rhythm of

13   sending us deals.

14   Q.  Now, would Major Energy ever be flexible on its margins?

15   A.  Yes.

16   Q.  Now, you described the difference between small, medium and

17   large.  Did you feel it was important in trying to develop

18   business and growing the department to have this type of

19   diverse portfolio?

20   A.  Yes.

21   Q.  And why was that?

22   A.  Because you'll never always win large accounts, or you'll

23   never always within small accounts.  Also typically the brokers

24   that are bringing the large accounts and those smaller accounts

25   are also different types of brokers.

1              If you just narrow your department down to only

2     catering to one type of broker, you're hurting yourself in the

3     future.  So we always had a policy where we would be very open

4     to every single deal, Some were large, regular or small.  We

5     were open to every deal.  It was just let's explore it, let's

6     make money and let's make as many deals as possible.

7     Q.  And did you feel that that approach and being diverse

8     helped the growth?

9     A.  Yes.

10    Q.  Now, did there come a point in time where you became aware

11    that Major Energy was selling itself to a company called

12    National Gas & Electric?

13    A.  Yes.

14    Q.  Do you recall when that was?

15    A.  It was at the beginning of 2016.

16    Q.  And just so we're clear, were you involved in those sale

17    negotiations?

18    A.  No.

19    Q.  Were you involved in the due diligence?

20    A.  No.  Maybe I was asked for some copies of contracts or

21    stuff but nothing serious.

22    Q.  And do you recall meeting with anyone from NGE during those

23    negotiations?

24    A.  No.

25    Q.  Do you recall meeting with anyone from a company called

K357HOR5                          Benisti - direct

1    Spark at that time?

2    A.  No.

3    Q.  Had you even heard of Spark or NGE at that time?

4    A.  I don't think so.

5    Q.  So how do you recall learning that Major Energy was selling

6    itself?

7    A.  If I remember correctly, Mark Wiederman and Saul Horowitz

8    had brought us all into the conference room and told us that,

9    you know, that they sold the company and that was nothing to

10   worry about and we should continue doing what we're doing and

11   continue to grow.

12   Q.  How did you feel about hearing the news that the company

13   was selling itself?

14   A.  It was interesting.  It definitely had me a little

15   concerned.  You know, I wasn't sure who these people were, I

16   wasn't sure what the future really held, but I was told nothing

17   to worry about, everything is good, just continue doing what

18   we're doing.

19   Q.  Now, do you recall after the announcement that the company

20   was selling itself having to talk to brokers to let them know

21   that Major Energy had sold itself?

22   A.  Yeah.

23   Q.  What do you recall telling the brokers at the time?

24   A.  Business as usual, nothing changes, just behind the scenes,

25   you know, we're here, we're not going anywhere, and keep doing

1    what you're doing, we'll keep doing what we're doing.

2    Q.  OK.  I want to show a document -- again it's in your binder

3    as well if you want, but it's not a large document, so it might

4    be easier on the screen -- it's Defendant's Exhibit 312.

5           So on the bottom e-mail it says May 6, 2016.  I think

6    the record establishes this is a couple days after Major Energy

7    issued a press release announcing the sale.  And this is an

8    e-mail from Bruce Shipper to Bruce Shipper and you are cc'd on

9    it.  Do you see that?

10   A.  Yes.

11   Q.  And FAQs regarding the Spark Energy acquisition.  Do you

12   see that?

13   A.  Yes.

14   Q.  It says, "With the Spark Energy acquisition of Major

15   Energy, many of our brokers have reached out to us to find out

16   if there will be any changes to operations."

17          Do you see that?

18   A.  Yes.

19   Q.  Is that consistent with your recollection that many brokers

20   started to reach out to find out if there was going to be any

21   changes?

22   A.  Yes.

23   Q.  And he writes, "In short, there will be NO changes to our

24   broker operations and will continue to be business as usual."

25   Do you see that?

1    A.  Yes.

2    Q.  Is that your recollection of what the message was to tell

3    to brokers?

4    A.  Yes.

5    Q.  All right.  Now, do you recall receiving any response to

6    this message from brokers?

7    A.  Yes.

8    Q.  What do you recall?

9    A.  A lot of the brokers were very concerned in general.  I

10   would say a lot of them also were concerned.  They had previous

11   interaction with Spark, and they were not very excited about

12   the sale, and were concerned that Major was eventually just

13   going to become Spark.

14   Q.  And so what did you tell them?

15   A.  I said, you know, they're not going to get involved in our

16   business; you don't have to worry about it; pricing will still

17   be the same; the rates are still going to be good rates; we are

18   still going to be able to do whatever we do on our side;

19   nothing will change.

20   Q.  If I could show you another document.  This will be

21   Plaintiff's Exhibit 567.

22          If we could go to the earliest chain of the e-mail,

23   Eric.

24          So, here is the e-mail -- again this is May 4, which

25   we can establish which was the day that Major Energy issued the

1    press release about the sale -- May 4, 2016.  And Mr. Shipper

2    is again sending an e-mail to himself, you're cc'd on it.  It

3    says "Important Major Energy update."  Did you see that?

4    A.  Yes.

5    Q.  It's informing the valued partners of this transaction,

6    right?  Do you see that?

7    A.  Yes.

8    Q.  And if I could turn your attention to the next e-mail of

9    the chain.  So, this is Chris Martin of Phoenix Intel to

10   Mr. Shipper, and you are cc'd.  Do you see that?

11   A.  Yes.

12   Q.  He says, "Congrats guys.  Question, can I still go through

13   you?  Or will I need to go through the Spark group?"

14          Do you see that?

15   A.  Yes.

16   Q.  And was that a broker?

17   A.  Yes.

18   Q.  And if you go up to the next e-mail.  So Bruce responds,

19   and you are on this e-mail.  "Thanks, Chris.  It's business as

20   usual with Major.  No need to go through Spark."

21          Do you see that?

22   A.  Yes.

23   Q.  And then if we go to the front page, it's Chris Martin

24   responding, and you are on this e-mail.  He says, "I'm glad

25   because their process is time consuming and slow."

K357HOR5                         Benisti - direct

1              Do you see that?

2    A.  Yes.

3    Q.  Is that consistent with -- let me rephrase that.

4              Did you hear that from any other brokers at the time?

5    A.  Yes.

6              MS. PECTOR:  Your Honor, I'm going to object to this

7    document as hearsay and object to the witness speculating.

8              MR. DAHAN:  I just asked him if he heard that from

9    other brokers.

10             MS. PECTOR:  Objection, hearsay.

11             THE COURT:  Why isn't it hearsay?

12             MR. DAHAN:  Again, I'm not going to introduce it for

13   the truth of the matter, just his state of mind at the time,

14   your Honor.

15             MS. PECTOR:  Your Honor, he is trying to introduce it

16   for the truth of the matter asserted, to get in an alleged

17   opinion by a broker of what they thought, and that broker is

18   not here for cross-examination, and we don't know if what Mr.

19   Benisti is testifying is actually what the broker thought, nor

20   has any broker been identified here.

21             THE COURT:  Well, if the statements of other brokers

22   go to the broker's perception, then that's not really for the

23   truth of what they're saying, so I'm going to allow it for that

24   limited purpose.

25             MR. DAHAN:  Thank you, your Honor.

K357HOR5                         Benisti - direct

1    BY MR. DAHAN:

2    Q.  What did you tell brokers when you heard this concern they

3    had with Spark?

4    A.  I told them that we shouldn't see any changes, and that's

5    what they're telling us.  I also didn't want to come across to

6    them as maybe there will be, because I didn't want them to not

7    send us business anymore.

8            Clearly, from some of the other brokers and the way

9    people were telling me things, it was very concerning.  I

10   didn't want them to believe that anything would change, and I

11   tried to make it very clear to them that nothing will change,

12   don't worry at all.

13   Q.  OK.  So we saw in those documents that the message was to

14   tell the brokers it will be business as usual, right?

15   A.  Yes.

16   Q.  So, you stayed on from this time period.  And let's focus

17   between this time period and the end of 2018, OK?

18   A.  OK.

19   Q.  Was it business as usual, as you remember, at Major Energy

20   before this sale?

21   A.  No.

22   Q.  Can you explain to the Court some of the changes or things

23   that made it not business as usual in the commercial part of

24   the Major Energy business.

25   A.  Sure.  At times there was -- I can't recall exactly when it

1  was, but I would say maybe, you know, six months a year after,

2  we had started seeing increases in pricing, we were not

3  competitive anymore.  It was very difficult to be able to win

4  that kind of business and go down on our margins.  At times it

5  was like, you know, this is the margin, that we're here and we

6  can't go down, or whatever it was.  That obviously made a very

7  bad appearance to the brokers that we just told there is no

8  changes.

9  Q.  Now, you talked before about presale, I believe, or part of

10  the growth mode, that diverse portfolio that the commercial

11  group had, the small, medium, large.  Did the focus of the

12  types of accounts change?

13  A.  At a point I remember having a conversation with Nathan

14  Kroeker, and he had told me that he wanted to see more smaller

15  commercial/larger margin.

16  Q.  Now, what's wrong with just focusing on smaller/larger

17  margins?

18  A.  So, first of all, you have to be able to be competitive

19  across the board when giving pricing to these brokers.  Again,

20  these brokers are the ones that hold the relationship with

21  their customer.  We're not talking to their customer.  So, if

22  the broker is going to get the price, and we just come in high,

23  eventually the broker is not going to look at us as a

24  consistently competitive supplier.  What that does is it can

25  actually do a couple things.  It can ruin that relationship the

1    broker has with the supplier.

2    Q.  Now, do you recall at any point in that time period that

3    I'm discussing -- that I focused on before -- there being any

4    sort of change or any construction of a policy on margin?

5    A.  There was a point -- again, I don't recall exactly when --

6    but the number 6.3 mils is sticking with me for some reason,

7    somewhere around there -- and then that was like I think the

8    target for like the smaller commercial, and then at a point

9    maybe we had brought it down to four and a half.  I'm not sure

10   actually what.  But there was a point where, you know, that was

11   the goal target.

12              THE COURT:  When you say 6.3 mils?

13   Q.  If you can explain to the Court and us what that exactly

14   means, a mil in this context.

15   A.  Sure.  Sorry.  So an energy rate would be say seven and a

16   half cents, right?  So that's the price of let's say power and

17   some other ancillary costs and capacity, whatever is in that

18   seven and a half cent rate.  In that rate would be your margin,

19   so let's say in that seven and a half rate, all of your costs

20   would come up to be seven cents flat, so the .5 on top of the

21   seven would mean five mils, so it's half a penny.  Or one mil

22   is a tenth of a penny, so the margin would be let's say five

23   mils in that case.

24              THE COURT:  So when you say margin, it's essentially

25   the profit margin for the company?

1           THE WITNESS:  Correct.

2     Q.  So again what do you recall -- and do you recall there

3     being that similar margin levels presale?

4     A.  Not like a policy or not like a strict pay 6.3.  If we

5     decided to mark it up -- which we didn't really do too often --

6     again, you don't want to come to your brokers with a higher

7     rate, because it's very important that the broker views you as

8     a consistently competitive supplier, otherwise the broker

9     doesn't want to do work for no reason if you're high.  They

10    will skip it and move on.  There are other suppliers out there

11    who are competitive, so it's important to constantly be

12    competitive.

13    Q.  Now, did you ever hear of a company called -- did Major

14    Energy deal with a company called Arcadia?

15    A.  Yes.

16    Q.  Can you explain who that is.

17    A.  Sure.  Arcadia, they consider themselves a forward-thinking

18    technology and into green space kind of company, and they have

19    probably around 300,000 customers, and those customers -- in

20    the states that are deregulated -- Arcadia has a power of

21    attorney over those customers where they can sign up their

22    homes with third-party suppliers like Major, for example, as

23    long as the rate was within a certain threshold that was to the

24    benefit of the customer.

25    Q.  And presale did Major Energy have a relationship with

 1    Arcadia?

 2    A.   Yes.  Arcadia, actually part of the executive team there,

 3    he was at a different company with someone else, who they kind

 4    of all came together and formed Arcadia, so I have known them

 5    from their previous company.  But, yeah, Arcadia, I believe --

 6    maybe in 2017.  But I have known the guys for a while, and then

 7    when Arcadia came on board, I believe '16, '17 -- I don't

 8    recall exactly -- but, yeah, we did deals with them.

 9    Q.   OK.  And did any of these changes in the margin impact that

10    relationship in any way?

11    A.   Yeah.  So, the way we -- I want the Judge to understand the

12    way we did deals with Arcadia, since they're residential.

13    Right?  So they would aggregate a lot of deals that they had a

14    power of attorney over, so they would send us say 1,000

15    accounts, and we would price those thousand accounts as if it's

16    a commercial account, and then give it with a commercial sized

17    margin.  Because, again, there is no cost for acquisition on

18    this deal, and the deal is let's say like a 10 million kilowatt

19    deal -- the deal could have been a 10 million kilowatt hour

20    deal, and the transaction could have been the same as a

21    commercial deal.  So, we treated it like a commercial deal,

22    since the margin -- you know, the dollar amount that you can

23    make on a deal like that was still very profitable even with

24    the commercial margin.

25    Q.   And were you able to close as many deals with Arcadia under

1   the new margin requirements?

2   A.  So, I actually recall that we were in the middle of trying

3   to close up a deal, and then when we refreshed the prices -- I

4   want to explain what refresh means.

5            So, every day the market changes, so if you priced it

6   on let's say February 15 it would give you a price of seven and

7   a half cents, but let's say on February 25 it could be a rate

8   of, you know, 7.6 cents because the market changes.

9            So, we refreshed it.  We wanted to close that deal

10  that day, especially since they were also only working with me

11  at the time as we had a very close relationship, so they were

12  sending all their RFP deals to us, and I got back to them with

13  a rate that was way higher, so --

14           THE COURT:  Hold on one second.  They were sending all

15  what deals?

16           THE WITNESS:  They were sending all of their deals,

17  their RFP deals, all of their residential accounts, they were

18  coming all to Major Energy.

19           THE COURT:  Sorry I interrupted.  Go ahead.

20  A.  So, basically pricing went up when we refreshed it.  And I

21  remember going to Levi Moeller and he had said, well, you know,

22  Spark put in new rules where there is 1.1 pennies, I think it

23  was, which was 11 mils or 12 mils margin, and I said what's the

24  point of that?  I mean you're turning down money, like money on

25  the table.  Literally we have done these deals before, these

K357HOR5                        Benisti – direct

1   are clean deals.  Like why raise the margin?  And that really

2   threw us off, where they were not able to execute those deals

3   because their power of attorney only put them into a position

4   where they can close a deal if it's within a certain strike

5   zone.

6   Q.  So, if I understand your testimony, therefore you lost

7   those deals.

8   A.  Those deals I believe were not able to get contracted, yes.

9   Q.  Now, I think you talked earlier about response time being

10  important in relationships, correct?

11  A.  Yes.

12  Q.  Did you see any change in the response time pre-sale to

13  post-sale?

14  A.  There were times where we had to get different RFPs priced

15  down in Houston, and that was a nightmare.  It would take them

16  weeks literally to get back to them.

17            (Continued on next page)

18

19

20

21

22

23

24

25

K35AHOR6ps                    Benisti - Direct

1    Q.  So I want to show you a document that's Plaintiff's Exhibit

2    750.  If we can go to the earliest e-mail.

3            So here's the e-mail from you.  This is August 3,

4    2016, to a William Palacios.  Hopefully that's how you say it.

5    Who is he?

6    A.  He was someone who I was put in touch with to, I guess,

7    price certain accounts.

8    Q.  OK.  And you say, "Hi, William, can you please price the

9    following account for Mark W."  Is that Mark Wiederman?

10   A.  Yes.

11   Q.  You say, "Attached HU in case you want to use it."  What is

12   HU?

13   A.  HU is historic usage.  So I want to explain why historic

14   usage is important.

15   Q.  Sure.

16   A.  OK.  So on a commercial deal, since margins are slimmer,

17   you also want to make sure that you are pricing the account

18   correctly.  The way to price an account is, you need to know

19   what type of usage the customer has, because the price of power

20   or the price of gas, the cost is a different cost, depending on

21   the month and time they use it, so there's different costs that

22   would come up with that.

23           So now that you have historical usage, you can price

24   the account different.  A manufacturing plan that would use

25   gas, let's say, pretty consistent over 12 months would be

1    different than, let's say, someone like a home or a different,

2    you know, account that only uses gas for, let's say, heating,

3    that only uses their gas during the peak time, so it would be

4    more expensive as opposed to a specific account that would use

5    gas throughout the year.  That's why this historical usage is

6    used to price the account.

7    Q.  And this was, I guess, for the Daughters of Jacob account

8    and for a September 2016 start.  Do you see that?

9    A.  Yes.

10   Q.  OK.  So that was sent on August 3rd, right?

11   A.  Yes.

12   Q.  So now, if you go up the e-mail, we're now August 5th.

13   Right?

14   A.  Mm-hmm.

15   Q.  And you sent an e-mail to William saying, "Do you by any

16   chance have the pricing for the account below?"  Do you see

17   that?

18   A.  Yes.

19   Q.  It's two days later and you still did not get the pricing,

20   right?

21   A.  Correct.

22   Q.  So obviously you couldn't get back to them on the pricing,

23   correct?

24   A.  Correct.

25           Typically, the -- like typically we would get back to

1    the customer direct.

2    Q.  OK.  So now let's go to the e-mail.  The next e-mail is

3    August 10th.  Right?  So that's seven days after your prior

4    e-mail.  Right?

5    A.  Yes.

6    Q.  You say, "Hi William, I just called you, left a voicemail

7    on your machine.  I wanted to discuss this attached RFP that I

8    sent you, was wondering if the pricing came back yet.  Our guy

9    is ready to sign this account.  We just need some competitive

10   pricing.  Would you please be able to help me out here?"  Do

11   you see that?

12   A.  Yes.

13   Q.  So that's seven days later, from your first e-mail.

14   Correct?

15   A.  Yes.

16   Q.  All right.  Let's go to the top e-mail.  So you had cc'd

17   Mr. Wiederman on the prior e-mail.  So Mr. Wiederman responds,

18   to Mr. Alper, "The lack of response from these guys is

19   extremely frustrating.  This is a very large gas accounts that

20   I have a very close personal relationship with."  Do you see

21   that?

22   A.  Yes.

23   Q.  OK.  And then it talks about, "Due to PSE gas constraints,

24   we have never been able to get gas accounts from this client.

25   However, we have over 25 million kilowatts from him.  He called

1   me that he would like to give us the gas business but due to

2   the lack of response from Spark, he's going to take his

3   business elsewhere."  Do you see that?

4   A.  Yes.

5          THE COURT:  Quick question that I have.  When you were

6   there in this time period, say summer of 2016, did you have to

7   get approval for every single RFP from the Spark main office,

8   or how did it work?  Or was it only deals above a certain

9   amount for pricing, or what?

10         THE WITNESS:  So the pricing got their information

11   from wherever they got their information.  I was getting it,

12   let's say, from the pricing scheme.  So in some cases, in most

13   cases I think we would get our pricing from the New York office

14   and in some cases we would, I'm not sure why, but we were told

15   to get -- maybe it was a gas deal, but we were told to get

16   pricing from historic.

17   Q.  Now, did this -- you talked before about changes in

18   margins.  You talked about some of the response time issues.

19   Did this in any way impact your relationship with the brokers?

20   A.  I'm sorry.  I missed the question?

21   Q.  Sure.  You talked before about the changes in the margin.

22   You talked now about some response time issues.  And then my

23   question to you is, did that in any way impact your, you know,

24   relationship, your specific relationship with the brokers?

25   A.  Yes.  My relationship personally, I was telling these guys,

K35AHOR6ps                    Benisti - Direct

1    look, nothing is going to change.  But a lot of them came in
2    with a bad vibe, and then I was there saying, don't worry,
3    nothing is going to change.  All of a sudden, oh, see, isn't it
4    changing?  No, no, no, nothing is changing.  But they would
5    say, you know, this had never happened before.  And I would
6    say, oh, it's all right, you know, stuff like that.  Which
7    events, at the end of the day, the brokers wanted to make sure
8    that their accounts are being looked at, looked at.  They were
9    going to bring in an accountant 2016.  I think like your
10   average deal is probably around 24 months at the, you know, off
11   the top of my head.  So that would mean, you know, two years
12   in.  And they don't know who they're dealing with now for that
13   renewal.  So that's something that worried the brokers a lot.
14   They did not want to be stuck working with someone else and,
15   you know, that they don't know, especially knowing that the
16   company had a bad reputation of not being responsive and just
17   not being, you know, good to brokers.
18   Q.  Now, from what you saw, being on the scene there, did you
19   see -- we saw the quarter earlier, the growth in '14, right?
20         Sorry.  Yes.  It was from the end of '14 to the
21   beginning of '16.  Did you see that continued growth in '17 and
22   '18?
23   A.  No.  It was -- it just wasn't people -- the brokers
24   weren't.  And they just -- it wasn't as good.  It wasn't as
25   bad, but it was before, the years before were growth was --

K35AHOR6ps                    Benisti - Direct

1   growth was bad.

2          (Pause)

3   A.  The years before the growth was there, so we were winning

4   deals.

5   Q.  Now, have you ever heard of a company called Emex?

6   A.  Yes.

7   Q.  And did Major Energy have a relationship with Emex of about

8   the sale?

9   A.  Yes.

10  Q.  Was Emex -- you talked about small, medium, large.  Where

11  did Emex fit into that?

12  A.  I would say Emex was like the large, good.

13  Q.  OK.  There was have you ever heard of a company called

14  Quest?

15  A.  Yes.

16  Q.  Who were they?

17  A.  They were a broker that I picked up in, I think it was

18  2014, in Massachusetts.  They were, I would say, medium sized.

19  Q.  You were describing Quest?

20         (Pause)

21  A.  OK.  So Quest was, I would say, I would consider them a

22  medium-size broker.  And they, they were good nationally.  So

23  they were actually using tremendously.

24  Q.  Was Quest one of those that you brought in, from

25  Massachusetts?

K35AHOR6ps                          Benisti - Direct

1    A.  Yes.

2    Q.  Now, I want to show a document that's been marked as

3    Plaintiff's Exhibit 758.  This is a 1099 form, or document that

4    has different 1099s made out in different years by Major

5    Energy.  If we could look at, I guess on the bottom --

6              MR. DAHAN:  May I have a moment, your Honor, so I get

7    the right cites?

8              THE COURT:  Sure.

9              MR. DAHAN:  All right.  There we go.  Thank you.

10   Q.  So this would be 38.  So on the bottom, the bottom 1099, if

11   you blow that up, Eric, so here is a 1099 for the calendar year

12   2015.  OK?  And Major Energy services.  And you see Quest

13   Energy Solutions.  Is that the Quest entity you were

14   describing?

15   A.  Yes.

16   Q.  From Auburn, Massachusetts?

17   A.  Yes.

18   Q.  And you see the compensation there paid to them in this

19   1099 is $138,995?  Do you see that?

20   A.  Yes.

21   Q.  If we could go to, I guess, on --

22             MS. PECTOR:  Is there a page number?

23             MR. DAHAN:  I'm sorry.  That was 38, I think.

24             This would be 58870.  Yes.

25   Q.  So there you see Quest on the bottom.  So now we are, the

1   1099 for 2018.  Do you see that?

2   A.  Yes.

3   Q.  And now it's $64,413.  Do you see that?

4   A.  Yes.

5   Q.  That's about a, you know, at least half?

6   A.  Yeah, mm-hmm.

7   Q.  Is that consistent with your recollection of the size of

8   the dip in the bids?

9            MS. PECTOR:  Objection, your Honor, leading.

10            THE COURT:  Sustained.  Rephrase, please.

11            MR. DAHAN:  Sure.

12   Q.  Are the two numbers you saw consistent with your

13   recollection as to how the relationship of the business was

14   with Quest between those two years?

15   A.  Yes.

16            THE COURT:  Can I ask another question.  With these

17   brokers' relationships, was there a standard percentage that

18   they took, or is it something that fluctuated broker by broker?

19            THE WITNESS:  It fluctuated broker by broker.

20            THE COURT:  OK.  And what's the ballpark of what the

21   broker's percentage was?

22            THE WITNESS:  It wasn't like a percentage.  It was

23   what they cut them a deal.  So maybe like an average of -- it

24   really differed, you know, broker by broker.  So some were, you

25   know, strictly like 2 1/2 million, some were 3, some were 4, 5

K35AHOR6ps                    Benisti - Direct

1    and then you had some that were more, like a lot.

2                  THE COURT:  Thanks.

3    Q.  You talked before about Emex, and you described them, as I

4    think, call it in the larger commercial deal range?

5    A.  Yes.

6    Q.  Let's look at, in this document, let's go to, on the bottom

7    of the Spark NGE space 58663.  There we go.  That's 14.  OK.

8                  So here is Emex LLC.  So the Emex entity?

9    A.  Yes.

10   Q.  So here is the 1099 for Emex 2015, right?

11   A.  Yes.

12   Q.  And the payment to them for that year was $440,811.  Do you

13   see that?

14   A.  Yes.

15   Q.  Is that consistent with a large account?

16   A.  Yes.

17   Q.  OK.  Let's look at 2016 calendar year, what Emex was

18   getting paid.  So that is on 73, 073.  So here is the following

19   year.  They're getting now paid $484,688.  Do you see that?

20   A.  Yes.

21   Q.  So between those two years, that's an average of about

22   $460,000?

23   A.  Yes.

24   Q.  Let's see what they got paid in 2018.  So this is on page

25   191 of this document.  Same Emex entity, calendar year 2018,

1    right?

2    A.   Yes.

3    Q.   $153,908, right?

4    A.   Yes.

5    Q.   That's over $300,000 less than they got paid last time?

6    A.   Yes.

7    Q.   About a quarter, right?

8    A.   I'm not a math -- somewhere there, yeah.

9    Q.   Does that surprise you, from what you saw on the scene?

10   A.   No.

11   Q.   Now, I was focusing before on the up to 2018, right?  You

12   stayed on in 2019, right?

13   A.   Yes.

14   Q.   You left pretty much at the end of 2019, right?

15   A.   Yes.

16   Q.   Did you see the commercial department get better in 2019

17   than it was in 2018?

18   A.   No.

19        I voiced my opinion as an agent broker multiple times

20   and told them how I think that this was done super fast, and he

21   said OK, and he just, I hear you, looking to make it better.

22   It was not good.

23        MR. DAHAN:  Your Honor, I will pass the witness.  I

24   just want for someone to give me the exhibits to move in.

25        So Plaintiff's Exhibit 414, Plaintiff's Exhibit 359.

K35AHOR6ps                    Benisti

1    Defendant's Exhibit 312.  Plaintiff's Exhibit 567, Plaintiff's

2    Exhibit 750, Plaintiff's Exhibit 758.  Thank you, your Honor.

3                THE COURT:  They are received.

4                (Plaintiff's Exhibits 414, 359, 567, 750, and 758

5    received in evidence)

6                (Defendant's Exhibit 414 received in evidence)

7                THE COURT:  Cross-examination?

8                MS. PECTOR:  Yes, your Honor.  I have a binder to pass

9    up.

10               THE COURT:  All right.  I have to handle another

11   matter, but I can do it in the robing room, if that's easier,

12   so you guys can just take a ten-minute break.  Yes.  We'll take

13   about ten minutes.  And if you want to step down.

14               MR. DAHAN:  Thank you, your Honor.

15               (Recess)

16               THE COURT:  I apologize for the delay, folks.  I wish

17   you could have seen what happened in that robing room.  High

18   drama.

19               MR. MAROONEY:  Your Honor, before Ms. Pector gets

20   started with her cross, I'd like to take up a matter with one

21   of the exhibits we see in the binder.  Sorry to start this way.

22               And may I sit down so I can talk in the mike?

23               THE COURT:  Sure.

24               MR. MAROONEY:  We previewed in our opening, you've

25   seen snippets of evidence out of context and defendants'

K35AHOR6ps                     Benisti

continued attempts to embarrass and assassinate, try to

assassinate the characters of our witnesses.  And DX 1079

epitomizes that very effort.  It's an over-400-page exhibit, as

you see in your binder.  And defendants added it to their

exhibit list about two and a half weeks ago or so.  When we

first saw it, we thought it was horrible.

          THE COURT:  Is this DX 1079?

          MR. MAROONEY:  Yes.  And we actually thought it was an

attempt to intimidate Mr. Benisti from coming to testify.

          When Mr. Benisti left, they took his phone, Spark took

his phone, his personal phone, and they copied it.  And

apparently they have now rifled through it.  And they have

created DX 1079, which is, apparently, a chart.  The first 123

pages are a chart of some sort of messages organized in groups

by correspondent, and there's no real consistency in the time

periods for the messages, and there are different

correspondents.  You can even see that on the first page, where

there are messages from some person named David Tauber and Adam

Westbreich.

          THE COURT:  David?

          MR. MAROONEY:  David Tauber, T-a-u-b-e-r, and Adam

Westbreich from random days in February, March, and April.  And

then you see from pages 124 and 149 charts showing different

types of messages and chats, obviously cobbled together at

counsel's selection.  The remainder, candidly, are lewd and

K35AHOR6ps                    Benisti

 1    improper photos and internet memes and, you know, they're

 2    really off color.

 3         And as I said we were thinking about, we didn't

 4    actually know that they would have the audacity to try to use

 5    this, assumed that they wouldn't, but apparently they are.  So

 6    we object to that exhibit.  It's inadmissible on multiple

 7    grounds, 901, 806, 802, 803, relevance, prejudice.

 8         THE COURT:  Form.

 9         MR. MAROONEY:  Forum, right.  Form, sorry.  And

10    improper impeachment.

11         So I didn't want to interrupt the exam.  So I just

12    wanted to raise it now so we can just clear it.

13         THE COURT:  OK.  Do you want to respond?

14         MS. PECTOR:  Yes.  I'd be happy to respond, your

15    Honor.  Exhibit 1079 is a series of WhatsApp chats between

16    Mr. Benisti and various other individuals, some of whom will

17    testify in this case, including David Sobel, the CFO.  I

18    believe that Mr. Marooney's primary concern is that there are

19    certainly some salacious pictures that are in the file.  The

20    reason why that was there, your Honor, is, there have been

21    allegations in this case by sellers that they were kept so busy

22    during the earnout period that they couldn't do anything except

23    what Spark asked them to do.  And that activity that you see in

24    the WhatsApp demonstrates otherwise.  For purposes of this

25    witness, I have no intention, your Honor, to go into any of

K35AHOR6ps                    Benisti

1   those salacious pictures.  In fact we've already instructed our

2   trial graphics consultant to redact out all of that, so none of

3   that is going to be shown.  But, your Honor, the information

4   that you're going to see in DX 1079 is extraordinarily relevant

5   to this witness's testimony.  And I believe that the plaintiffs

6   don't want this Court to see it.  It is directly relevant to

7   the question of, are these brokers really leaving because of

8   Spark, or are there other reasons.  And if you'll allow me to

9   lay some foundation.

10          THE COURT:  I'm not going to look at any of those

11   memes or anything.  That's not relevant.

12          MS. PECTOR:  We're not putting up any of that.

13   Everything that we're using for this cross-examination is

14   purely substantive facts of what happened, not the jokes.  It's

15   not pictures.  It's not memes.  It's actually activity and

16   conversations that are going on about business plans unrelated

17   to Major Energy while these individuals are working for Major

18   Energy.  And honestly, there is evidence of diversion of

19   customers that are ongoing during the earnout period that is

20   going to be relevant to why adjusted EBITDA wasn't achieved,

21   why customer count is down.

22          THE COURT:  OK.  Well, I'll allow you to cue this up

23   if it's relevant, but I'm not going to allow anything that's

24   prejudice, of a personal nature.

25          MS. PECTOR:  I agree, your Honor.  We're not getting

K35AHOR6ps                    Benisti – Cross

1   into any of that.

2   CROSS-EXAMINATION

3   BY MS. PECTOR:

4   Q.  Good afternoon, Mr. Benisti.

5   A.  Good afternoon.

6   Q.  Mr. Benisti, just to step back for a moment so I understand

7   your role at Major Energy, I believe you testified to Mr. Dahan

8   that you were the director of business development.  Did I hear

9   that correctly?

10  A.  Yes.  Actually, in one of the e-mails I saw, it just said,

11  on the bottom of the e-mail, commercial broker networker, so

12  commercial development.

13          (Pause)

14  A.  So I noticed in one of the e-mails that it says just

15  commercial broker networker on the bottom of my e-mail.  The

16  title is something that we didn't walk around.  This is my

17  title.  That is my title.  I'm not other people.  But so I

18  guess, yes, I was -- I referencing the relationships between

19  the brokers at Major Energy.

20  Q.  So your actual title at Major Energy was commercial broker

21  networker.  Is that what you're saying?

22  A.  How about -- I don't know exactly what it was on paper, the

23  exact words, but I know what my job was supposed to be.

24  Q.  OK.  It's fair to say at that your job was to work on the

25  broker side of the house, not the door-to-door vendor side of

K35AHOR6ps                    Benisti - Cross

1    the house?

2    A.  Yes.  I wasn't really tasked with anything door to door.

3    It wasn't my job.

4    Q.  And the door-to-door side of the house primarily focuses on

5    residential customers, correct?

6    A.  I don't think that was like the crux.  I mean, in most -- I

7    would say most suppliers out there, in their broker network, it

8    just means that it's the broker network.  Naturally, brokers

9    would go after commercial business.  That's money that will

10   make up their time.  But brokers were also big on the potential

11   account.

12   Q.  Mr. Benisti --

13   A.  Brokers means residential and commercial, but probably

14   mostly commercial.

15   Q.  I think you misunderstood my question.  My question was on

16   the door-to-door-vendor side of the house.  That's primarily

17   residential, as contrasted to the broker side of the house,

18   which is primarily commercial.  Correct?

19   A.  I would say so.

20   Q.  And your role, on the commercial broker side of the house,

21   was to help develop business with brokers with commercial

22   accounts, right?

23   A.  I'm sorry, I missed the -- help develop?

24   Q.  Help develop broker relationships to bring in commercial

25   accounts.  Right?

K35AHOR6ps                      Benisti - Cross

```
 1   A.  Correct.

 2   Q.  And when commercial accounts are brought in, commercial

 3   accounts are measured by RCEs correct?

 4   A.  Yes, you can measure by RCEs.

 5   Q.  And whereas on a residential account, you would actually

 6   count every single customer as a customer, correct?

 7   A.  I wasn't on the door-to-door side, so I wasn't familiar

 8   exactly how they were measured.

 9   Q.  But you know on the brokers side that the measure on the

10   commercial side is RCE, right?

11   A.  I really, me personally?  I did not consider it all the

12   time by RCE.  I look at it like this is a 1 million kilowatt

13   hour deal.

14           THE COURT:  One million kilowatt hour deal.

15           THE WITNESS:  Correct.  Yes.  There are people that

16   would be incented at 1,000 RCEs.  But, yes, personally I would

17   like to use it as 1 million kilowatt hour deal.

18   Q.  Now I just want to talk to you briefly about the structure

19   of what is it that brokers do for Major Energy.  So as I

20   understand it, based upon your testimony, a broker is a

21   middleman that is bringing a relationship they have to Major

22   Energy to try and sell electricity or gas.  Correct?

23   A.  Yeah.  They would broker it out to multiple different --

24   Q.  And when they broker it out, they are adding a margin for

25   themselves into the price, which ended up being their residual,
```

K35AHOR6ps                    Benisti - Cross

1    correct?

2    A.  Yes.

3    Q.  And the difference between a residual and a commission is

4    that the residual is paid on the back end, correct?

5    A.  I don't understand the question.

6    Q.  Are you familiar with what the difference between a

7    residual is and a commission?

8    A.  A commission is -- a residual is a form of commission.

9    Q.  And a residual is the type of commission that would be used

10   for a broker, meaning you pay the broker on the back end once

11   the customer comes in the door.  Correct?

12   A.  I really don't understand your question.

13   Q.  Let me make it more simple for you.  At what point in time

14   is a broker paid by Major Energy?

15   A.  So a broker would bring us, let's say a 1 million kilowatt

16   hour deal.  We would give it to him at whatever margin we

17   decide to give it to him at.  He would mark it up.  Whatever

18   the broker marks it up at makes the deal difference to Major

19   Energy, because we had already decided what we're putting in as

20   our market.  We have a max.  We would max them out.  And at

21   some point we would allow them to go over that cap.  And at

22   that point there would be a split between the broker and the

23   supplier.

24              (Continued on next page)

25

1   Q.  Now, between 2016 and 2018, what was the cap that a

2   residential -- I'm sorry.  What was the cap that a commercial

3   broker could go up to?

4   A.  It was one penny, I believe.

5   Q.  One penny is ten mils, correct?

6   A.  That would be ten mils, correct.  And anything above that

7   typically we would split between the supplier and Major and the

8   broker.  And in some cases we would also actually allow the

9   broker to keep the whole thing based on the relationship that

10  we had with the broker.

11  Q.  So you're saying that in some instances you would allow the

12  broker to keep the entire profit margin and Major Energy would

13  make no money off the deal?

14  A.  No.

15  Q.  What did you mean when you said we would allow the broker

16  to keep the whole thing?

17  A.  Like I said before like 20 seconds ago, so Major would give

18  a price -- a transfer price -- over to the broker, and that

19  broker would then take that price and add his margin onto the

20  deal.  So, Major's margin was in there, that was never going

21  away no matter what the broker put on the deal.

22  Q.  Will you agree, Mr. Benisti, that what is most important to

23  these brokers is getting the lowest price possible, because the

24  lower the price, the more margin they could build into the

25  price that the customer would accept, right?

K357HOR7                              Benisti - cross

A.   Some brokers would probably work that way.  I would say

those are not brokers that are thriving in this industry.  They

typically, you know, have a couple of accounts, and they are

looking to maximize the most money as possible on these small

amount of accounts that they have.

          These standard brokers that we would work with --

again, there are exceptions obviously on some deals and stuff

like that -- but the standard brokers that we work with, they

would just try to add a healthy margin so that they can make

money on a deal and also have more of a volume that a brokerage

house has, a bigger volume as opposed to smaller accounts with

higher margin.

Q.   You certainly did see some of those brokers though come to

Major Energy and try to work with Major Energy between 2016 and

2018, correct?

A.   I certainly what?

Q.   You certainly saw some brokers come to Major Energy between

2016 and 2018 and try and get the lowest possible price so they

could bill the biggest margin for themselves, correct?

A.   I don't know if that's a hundred percent correct.  I mean

that's what brokers did, they went around to 20 different

suppliers, you know, tried to get the best deal for themselves

typically.  Sometimes the best deal would mean working with the

supplier who is flexible on certain contract terms.  Sometimes

the best deal would mean the best price.  But it's not

something that was always it's a guaranteed we need the
cheapest.  I would say it's a very big push for the broker to
obviously always be getting consistently competitive rates.  I
would say there was definitely a push, but I don't think every
broker was pushed by the lowest deal.

          I remember having times where we went down on our
margins just to get the deal even if we weren't matching or
beating the price that he had, but it's a relationship and he
wanted to do business with us, so he would give it to us.
Q.  So sometimes you would bring in very low margin work to be
able to continue a relationship with a broker; is that what
you're saying?
A.  Yes, because at the end of the day the work you are doing
on that account is the same work that you would be doing on any
of the pricing accounts or the account pricing.  The more
work -- the only work you're doing after that would be so now
we have to sign a contract and the process of signing that
contract.  So of course you want that deal.

          I had also mentioned you want the brokers to know that
you're consistently competitive, and you want the brokers to
continue doing business with you and getting used to doing
business with you.  So, we would always do something where
let's just get that deal because that means that we're in the
door with the broker, the broker is now receiving commissions
from us, now it's a way deeper relationship than just, yeah,

1    we're sending him RFPs.

2    Q.  There is no exclusivity with any of the brokers at Major

3    Energy, correct?

4    A.  I don't think -- no, I don't think that we had any

5    exclusive.

6    Q.  Those brokers can go anywhere anytime to any other

7    supplier, right?

8    A.  Yes.

9    Q.  And the brokers, if they decide to move their business to

10   another supplier, there is nothing that Major Energy could do

11   to stop them, correct?

12   A.  There is nothing that those suppliers can do, but the norm

13   of the business in this industry -- I just want the judge to

14   understand -- in this industry it's very different than the

15   residential part of the business.

16         The residential part of the business is something that

17   a supplier would look to build as many residential accounts.

18   Obviously, that's the goal on the commercial and the broker

19   network as well, however, it's understood on all fronts that

20   when a broker gives you a 12 month deal, that's the deal that

21   you got, 12 months.  If the broker resigned that customer for

22   another 12 months, that's another 12 month deal, and you can

23   almost consider that as a new deal because that's a new

24   contract that you're getting.  Originally it's just a 12-month

25   deal, that's just the nature of the business.

K357HOR7                    Benisti - cross

1    Q.  Now, Mr. Benisti, anybody could be a broker, correct?

2    A.  I think it's hard for anyone to be a broker.  I mean there

3    are certain states that you have to be licensed in.  Then also

4    you also have to know what you're saying; you can't just go,

5    you know, and sign some guy up.  Anyone can connect with people

6    like this and make a deal, but to be a real broker I think you

7    have to know a little more than just, you know.

8    Q.  What I mean by that, Mr. Benisti, is anybody at any time

9    could decide that they want to open a brokerage business and

10   then just start bringing customers to Major Energy, correct?

11   A.  I guess if someone wanted to get into that business, they

12   can do it, yeah.

13   Q.  Now, Mr. Benisti, all brokers are not created equally from

14   a timing standpoint.  What I mean by that is you would agree

15   that some brokers do the business part time, correct?

16   A.  I'm sure there are some brokers that do business part time,

17   yeah.

18   Q.  And some brokers it's their full-time, all-in, that's what

19   they do, correct?

20   A.  It's like every business, I guess, yeah.

21   Q.  Now, Major Energy had the -- the brokers that Major Energy

22   had were on a sliding scale in terms of whether they spent

23   their full time going after business or only part time, right?

24   A.  I'm not sure like what each one was doing at a certain

25   time, but...

K357HOR7                          Benisti - cross

1   Q.  Is it fair to say, Mr. Benisti, that from 2016 to 2018

2   Major Energy had approximately 400 broker relationships?

3   A.  Like, yeah, in our system I would say we probably had

4   somewhere around 4000.  A lot of those, agent codes I would

5   consider them, and some of them were let's say you can sign

6   someone up or sign a broker up, and then you don't necessarily

7   get the business from him for whatever reason -- you know, he's

8   out of business, or he found someone to sleeve his deals

9   through.  I'm not sure that every single one of those 400 were

10  actively active brokers.

11  Q.  In fact, Mr. Benisti, typically in a three month period --

12  which is how Major Energy would track their brokers -- it was

13  really on about 40 to 50 brokers would be active during the

14  three month period, correct?

15  A.  I don't know.

16  Q.  Do you know Mr. Shipper?

17  A.  Sure.

18  Q.  Is Mr. Shipper somebody that works with you in parallel in

19  the broker side of the house for Major Energy?

20  A.  Yeah, me and Bruce have worked together.

21  Q.  Do you report to Mr. Shipper?

22  A.  I don't know if I ever reported to him.  Maybe there was a

23  time a long time ago when I had first started, maybe like in

24  2012 or 2013.  I don't recall exactly if I reported to him.

25  Possibly.

1   Q.  Is it fair to say that you were handling some of the

2   relationships on the brokerage side of the house, and

3   Mr. Shipper -- who was also handling some relationships -- was

4   responsible for the administrative side of the broker house?

5   A.  Yeah, I would say, you know, that's kind of how we worked

6   pretty well together.  I held some relationships with some of

7   the people.  He also held a decent amount of relationships.

8   Q.  You were just testifying a moment ago that there are a

9   variety of reasons why a broker might not be selling for Major

10  Energy at any given time.  Would you agree that one reason is

11  customer fires the broker?

12  A.  Who?

13  Q.  If a customer fires their broker, you would agree that

14  might be a reason a broker might not be selling to Major

15  Energy, correct?

16  A.  I don't understand.

17  Q.  If a customer fires their broker, takes away the authority

18  for that broker to work on their behalf, that would be a reason

19  why that broker could no longer bring that customer to Major

20  Energy, correct?

21  A.  The other broker could bring that business to Major Energy.

22  Q.  I'm just asking you to stick with this hypothetical.  Let's

23  say you, Mr. Benisti, is the broker for me, and I decide I

24  don't want to use you anymore as a broker, you would agree that

25  that would be a reason why you might not be able to bring in my

K357HOR7                        Benisti - cross

1    business anymore to Major Energy, correct?

2    A.   That's a difficult question to answer, but it's a

3    possibility.  At the end of the day that business may come

4    through -- or to Major Energy through a different channel.

5    Being that we worked with I would say a pretty significant

6    amount of brokers in the Tri-state area, if it wasn't going

7    through one broker because he lost the deal for whatever reason

8    directly with a customer, I would say there was a good chance

9    that maybe we would have seen that price come again through

10   another broker.

11   Q.   OK.  So if you lose one broker, it's really not that big of

12   a deal because you might get that business through another

13   broker, right?

14            MR. DAHAN:  Objection.

15   A.   No.

16            THE COURT:  Overruled.

17   Q.   No?

18   A.   I'm sorry?

19   Q.   I'm sorry.  I just thought I heard you testify that if you

20   lost a particular broker it might not be that big of a deal

21   because you may get that same business from another broker.

22   A.   No, I'm not saying no as in the answer to your question.  I

23   mean just because we lost that broker doesn't mean that we

24   shouldn't get it from another supplier -- I mean from another

25   broker.

K357HOR7                      Benisti - cross

1   Q.  Mr. Benisti, another reason why a broker might stop doing

2   business with Major Energy or their revenue may decline is

3   because the broker goes out of business, right?

4   A.  It's a possibility.

5   Q.  Another possibility could be that a broker decided that

6   they wanted to change their focus and put their time and energy

7   into another industry like healthcare instead of electricity

8   and gas, right?

9   A.  It's a possibility.

10  Q.  Another reason why a broker might leave is if they decide

11  they want to take their business or they're encouraged to take

12  their business to another competitor supplier, right?

13  A.  Possibility.

14  Q.  And another reason why we might see a decline in broker

15  prices is because they're getting a better price somewhere else

16  and maybe they don't want to come to Major Energy because of

17  that, right?

18  A.  Possibility.  Along with other stuff also.  Because if they

19  were -- because if they were not going to send us the

20  business -- I mean it's a possibility.

21  Q.  We might also see a decline in revenue for a broker based

22  upon the fact if a broker signs up one of their customers for a

23  two-year time period, or a year-time period, that eliminates

24  that particular contact, and the broker has to go out and find

25  other contacts, correct?

1    A.  I didn't understand that question.

2    Q.  All right.  You would agree that there are a variety of

3    reasons why we might see a decline in the revenue of a

4    particular broker, correct?

5    A.  I'm sure there are plenty of reasons.

6    Q.  And in looking at the exhibit that Mr. Dahan provided to

7    you --

8              If we can put up, James, PX758.

9              Mr. Dahan went through a couple of examples for you in

10   this exhibit, and let's just orient each other with what we're

11   looking at here.  This is a compilation of 1099s for Major

12   Energy, correct?

13   A.  Yes.

14   Q.  Prior to coming to court, did you spend time looking at

15   this exhibit?

16   A.  I looked at it.

17   Q.  Did you do any statistical analysis to see what the

18   deviation was of the ups and downs of the brokers?

19   A.  No.

20   Q.  Did you look through it to see if some of the brokers

21   actually increased in business over the 2016 to 2018 time

22   period?

23   A.  No.

24   Q.  So the only thing you did was you just looked at some of

25   the numbers for what?

K357HOR7                         Benisti - cross

1    A.   What I did was I had mentioned about different brokers I

2    had called, had stoped sending us business for different

3    reasons.

4    Q.   Now, in all of the examples you gave, Mr. Benisti, those

5    brokers didn't leave Major Energy, right?  You continued to do

6    business with them throughout the 2016 through 2018 time

7    period, correct?

8    A.   It's not like a standard thing to leave.  No one is forcing

9    them to stay.  It's not like they have to -- no one is forcing

10   them to leave.

11   Q.   In fact, Mr. Benisti, you can't identify a single broker

12   that left Major Energy because of the dropdown with Spark,

13   right?

14   A.   Like I said, brokers don't just leave and say we're ripping

15   up the contract, but internally they make decisions as to where

16   they want the account to go.

17   Q.   But as you sit here today, you can't identify a single

18   broker that left Major Energy because of the dropdown to Spark,

19   correct?

20   A.   I can't answer yes or no, because, like I said, brokers

21   typically are not saying, hey, Amir, I'm out, adios.  I mean

22   it's just internally they will voice their opinion to me and

23   different frustrations that they've gone through, and then they

24   will slowly just say, listen, I wish I could send your

25   business.  I've heard this from multiple brokers, I want to

1    give to you, I just can't.

2    Q.  But you can't identify a single broker that stopped giving

3    you business because of the dropdown to Spark, correct?

4    A.  I mean I think I just answered the question.  It's not a

5    yes or no question.  I mean it's -- it's hard for me to say yes

6    or no.  I have to look through all the papers to see if there

7    is something that I can identify or even think about it.  You

8    mentioned there are 400 brokers.  I was in there busting my ass

9    every single day for a very long time talking to these people.

10   How many different brokerages I see every single day?  It's not

11   something off the top of my head I can say I remember him.

12          This is something where I'm recalling there were

13   brokers that were extremely frustrated with the changes that

14   happened, and I recall, and based on just what they told me and

15   things they said, yeah, I wish I could send you this business

16   but I can't and their numbers declined.  Again, it doesn't mean

17   they're walking away.

18   Q.  I'm just asking you, Mr. Benisti, just a simple question.

19   As we sit here today you cannot identify a specific broker who

20   came to you and said, Amir, I am leaving Major Energy, I'm not

21   doing business with you anymore because of the dropdown to

22   Spark, correct?

23   A.  Do you want me to go through every broker and every agency

24   to see if I can wrack my brain?  I don't know.

25   Q.  Let's look at some of the data in PX758 where there is

K357HOR7                        Benisti - cross

1    actually an increase in the activity of a broker.  So are you

2    familiar with TR Group?  Is that a broker you are familiar

3    with?

4    A.  Where are they?

5    Q.  I'm just asking you -- I'm asking you just the question, TR

6    Group, is that a broker you are familiar with?

7    A.  Do you know what their agent code is?

8    Q.  TR Group.

9    A.  No, agent code.

10   Q.  Well, let's look together.

11          James, if you can pull up 49 of this exhibit, and

12   specifically let's look up TR Group, which is TR Group LLC.

13   There we go.

14          So here is an example of a broker, TR Group LLC.  In

15   2015 their total 1099 value was $740.67.  Do you see that?

16   A.  Yes.

17   Q.  And is that a broker you are familiar with?

18   A.  No.

19   Q.  Would it be fair to say, Mr. Benisti, that not all the

20   brokers that are in Exhibit 758 are your personal broker

21   relationships?

22   A.  We had active a couple hundred brokers, so it's not -- I

23   don't -- I mean maybe I'm not as good as I thought I was, but

24   it's very difficult.  I held relationships with the people I

25   saw potential in and with the ones I personally connected in.

K357HOR7                          Benisti - cross

1    So, if there was a personal relationship, a personal

2    connection, it was easier way to go and generate business that

3    way.

4    Q.  What is the ballpark of the personal relationships that you

5    say you had between 2016 and 2018 for Major Energy?

6    A.  Between when?

7    Q.  Between 2016 and 2018?

8    A.  The personal relationships?

9    Q.  Yeah, what's your ballpark.

10   A.  Ballpark?  I guess personal where like I was really close

11   to them and like on a personal level?

12   Q.  Sure?

13   A.  I would say maybe 40, 50, you know, where I can just call

14   and say, hey, what's up, and just chat.

15   Q.  All right.  So we're looking at TR Group, and we see that

16   in 2015 their total revenue was -- the total amount they

17   received was $740.67.  Now let's see what happened to them in

18   2018.

19             James, can you go to P236.

20             All right.  So here we are now looking at what was TR

21   Group's performance in 2018?  And do you see, Mr. Benisti, that

22   they jumped from $740 to $93,073.85?

23   A.  Yeah.

24   Q.  Let's try another example.  Let's go to Power 7 Group.

25   A.  TR Group, right, do you know what the name of the broker

1    is?  That's an LLC.  There are plenty of LLCs that they did

2    business with us through a, you know, a name.  I'm not

3    remembering the name that was signed on the broker agreement.

4    If you can give me the guy's name, I can --

5    Q.  Mr. Benisti, do you have any reason to believe that this is

6    not true and correct information on the 1099s in terms of what

7    these brokers were earning on an annual basis?

8    A.  All I'm saying is if you're asking me to recall certain

9    things, this is an LLC name.

10   Q.  I'm just using the exact same document that Mr. Dahan used

11   when he went over Quest and Emex with you.

12   A.  Yeah, those are broker dealers names that I can remember.

13   Emex is, you know, a name that's the name of their actual agent

14   code.  Quest, their agent code was Quest.

15   Q.  I'm working off the document Mr. Dahan worked off with you,

16   so let's just continue.  If we can go to page 37, Power 7

17   Group, and see what their performance was in 2016.

18        And there, Mr. Benisti, we are showing a performance

19   of $165,646.30.  Do you see that?

20   A.  Yes.

21   Q.  Let's now pan to what they did in 2018.

22        James, if you can go to page 220.

23        And in 220 they jump to $261,421.71.  Correct?

24   A.  Yes.

25   Q.  You will agree that was an increase, right, Mr. Benisti?

1   A.  Yes, this is Abe Farkus, and this happened -- I have a very

2   close relationship with Abe.  This was strictly because of the

3   relationship that I had with him and him literally, you know,

4   just sending me business knowing that, you know, that Major

5   Energy was a company that was eventually going to come down.

6   Q.  Well, he certainly didn't stop doing business with you

7   because of the dropdown with Spark, right?

8   A.  I would say -- I mean he increased it, yeah.

9   Q.  So, Mr. Benisti, just to be clear, you were paid an annual

10  salary by Major Energy every year to go out and enhance the

11  broker network, correct?

12  A.  Correct.

13  Q.  And your annual salary I believe was $137,500; is that

14  correct?

15  A.  The salary was at 100, I believe, and I would get a bonus.

16  Q.  When you factored in your bonus, was it about $137,500?

17  A.  Makes sense.

18  Q.  And you were paid to do the job of taking care of the

19  broker network, right?

20  A.  Yep.

21  Q.  OK.  Let's look at another example, Synergy Healthcare.

22          James, if --

23          well, let me just take another example.  If we can

24  look at Upstate Utility Consultants, which is on page 50 and

25  let's look at what happened to them on 2015.  In 2015 they

K357HOR7                      Benisti - cross

1    generated $119,395.62, right?

2    A.  Correct.

3    Q.  And if we look at 18 -- page 237, James -- in 2018 we are

4    seeing them jump up to $153,308.90, correct?

5    A.  Correct.

6    Q.  You will agree, Mr. Benisti, that that's an increase?

7    A.  It's an increase of around -- yeah.

8    Q.  Let's take another example.

9            James, if we can go to Energy Auction House on page

10   15.

11           Now, in 2015, Mr. Benisti, this exhibit is showing us

12   that Energy Auction House generated $13,209.51.  Did I read

13   that correctly?

14   A.  Yes.

15   Q.  Let's see what they did in 2018.

16           James, if you could go to page 192.

17           And there we're seeing quite a large jump from 13,000

18   to $282,407.16, right, Mr. Benisti?

19   A.  Right.

20   Q.  You will agree that was an increase.

21   A.  Yes.

22   Q.  Let's do just one more example.  Let's try Lightstar Energy

23   Group -- on page 27, James.  And there we see in 2015 they were

24   at $51,096.80, correct?

25   A.  Correct.

1    Q.  And if we see what they did in 2018 -- let's go to page

2    208.  And there we're seeing them jump from 51,000 to

3    $166,970.86, correct?

4    A.  Correct.  I want to point something out, that this is a

5    relationship of -- very very close -- probably one of my

6    closest relationships with a broker.  The increase there was

7    very much driven by me really, you know, trying to go like and

8    take everything and kind of, you know -- she also never worked

9    with Spark previously, so she didn't know, you know, about the

10   Spark.  And then also some of changes I was really able to, you

11   know, give her a little bit of -- navigate a little better,

12   which was a lot more work for me, but that was --

13   Q.  So this increase was due to you doing your job for Major

14   Energy, correct?

15   A.  Correct.

16   Q.  So you didn't have any problem enhancing that relationship

17   during the earnout period from a monetary standpoint, correct?

18   A.  Sorry?

19   Q.  You didn't have a problem increasing the revenue from that

20   broker during the 2016 to 2018 time period, correct?

21   A.  I'm sure it was a little hard at times with the changes of

22   rate, and if there were no changes at all that number probably

23   would have been a lot higher.

24   Q.  Let's talk about rates, because up until the time when Levi

25   Moeller left in August of 2018 he was the individual at Major

K357HOR7                         Benisti - cross

1    Energy that was handling pricing, correct?

2    A.  He oversaw the suppliers, yes.

3    Q.  So when you had a broker who needed pricing, he was the

4    person you would get that pricing?

5    A.  Sure.

6    Q.  And that remained the case through all of 2016 -- from 2016

7    all the way until he resigned in August of 2018, correct?

8    A.  Not in every single case.  Some cases we were told to get

9    pricing from Spark.

10   Q.  Well, in those cases there were instances where Major

11   Energy was not operating in a particular territory but they

12   were still trying to sell some business so they could get

13   pricing from Spark to sell Spark Energy in that territory,

14   right?

15   A.  It's possible.  That's one of the things we told the

16   brokers that we would be able to do.

17   Q.  OK.  Mr. Benisti, without going through all of Exhibit 758,

18   would you agree with me that if we were to go over it in

19   granularity we would see several brokers -- in fact a large

20   number of brokers in Exhibit 758 -- whose revenue or

21   commissions increased between 2016 to 2018?  Correct?

22   A.  The ones you showed me had increased, yes.

23   Q.  Now, Mr. Benisti, it wasn't just those brokers that had an

24   increase.  You also had your own personal brokerage, correct?

25   A.  No.

K357HOR7                         Benisti - cross

1    Q.  Your wife did not have a broker that you were supporting?

2    A.  My wife worked part time for the broker.

3    Q.  And what was the name of your wife's broker?

4    A.  She worked for a company called Meretz Energy.

5    Q.  And Meretz Energy is a broker company that you helped your

6    wife bring in deals for while you were working at Major Energy,

7    correct?

8    A.  If she needed assistance, I would assist her like I would

9    assist anyone else.

10   Q.  Is it your testimony before this court that all you did was

11   provide your wife some assistance from time to time with

12   Meretz?

13   A.  If there was something I was able to help her with, I

14   helped her with it, yeah, the same way I would help other

15   brokers that I do relationships with.

16   Q.  And is it your testimony that your wife was the one leading

17   the charge in and making the decision about Meretz and not you?

18   A.  Sorry?

19   Q.  Is it your testimony that your wife was the one leading the

20   charge and making the decisions about Meretz, not you?

21   A.  She was the -- no, she wasn't a hard decision maker on

22   certain things.

23           Here is the story.  I mean the person who started

24   Meretz Energy actually passed away and died, so we were at the

25   stage where it was actually my best friend's father and I was

K357HOR7                        Benisti - cross

1   very close to him, and I took it as my responsibility to, you

2   know, if they needed help on something, I was there; the same

3   way you would help someone who just lost a father.

4   Q.   When did you take over ownership of Meretz?

5            MR. DAHAN:  Objection.

6   A.   I don't own it.

7   Q.   Well, when did you take over responsibility?  I thought you

8   were saying you opened it.

9   A.   No, I did not.

10  Q.   You say you took over responsibility for it?

11  A.   I did not take over any responsibility of Meretz.

12  Q.   So when did you step in and start taking better care of

13  Meretz?

14  A.   There was no better care.  If any other of the brokers out

15  there needed help with whatever it was, if I could help them, I

16  would help them.

17  Q.   OK.  Mr. Benisti, you will agree with me that your role at

18  Major Energy was to focus on the broker relationships for Major

19  Energy, correct?

20  A.   Yeah.

21  Q.   Your role was not to create your own brokerage account and

22  try and bring in business through your own broker account to

23  Major Energy, correct?

24            MR. DAHAN:  Objection to form.

25            THE COURT:  Overruled.

1   A.  I'm sorry.  What's the question?

2   Q.  Your role for Major Energy was to focus your time and

3   effort on handling the broker relationships for Major Energy,

4   correct?

5   A.  Correct.

6   Q.  Your role was not to spend your time and energy developing

7   business for other brokers like Meretz, correct?

8   A.  It was to spend -- yeah, you know, in order to enhance and

9   bring in business.

10          The question was again?  Ask the question again.

11  Q.  Your role was not to work for brokers while you were

12  working for Major Energy, correct?

13  A.  Correct.

14  Q.  And your role was not to spend your time and attention

15  looking for opportunities for brokers with other suppliers

16  while you were working for Major Energy, correct?

17  A.  Correct.

18  Q.  All right.  Now, you are familiar with Meretz, so let's see

19  what the performance of Meretz was during the same time period.

20          James, if we can see the same exhibit, let's look at

21  2016 and see what Meretz did on page 91.

22          All right.  So there, Mr. Benisti, Meretz Energy

23  Group -- that's the company we're talking about, correct?

24  A.  Yes.

25  Q.  That's the company your wife is involved in, correct?

K357HOR7                         Benisti - cross

1    A.  Yes.

2    Q.  And that's the company you provided support to, correct?

3    A.  Like every other broker, yes.

4    Q.  So your testimony is that the way that you supported Meretz

5    is exactly the same as you would support any other broker?

6    A.  Like Life Star, the other broker you mentioned, the owner

7    of that company also passed away when the person doing who was

8    doing all the sales for that company, she turned to me as well.

9    That's the kind of person I am.

10   Q.  What was the name of that company?

11   A.  Life Star.

12   Q.  Did you have another broker named MBA?

13   A.  That was an agent code that I used to track different

14   accounts that would come off of a fixed rate, because we

15   wouldn't want them to get, you know, stop paying a variable

16   rate, so it was a way to get the e-mails if this account has an

17   expiration date.  I was not getting paid on those accounts.

18   Q.  Did you or your wife get commissions from Meretz?

19   A.  My wife was -- Meretz was getting the Major Energy

20   commissions.

21   Q.  And those commissions were coming from Meretz to your wife,

22   correct?

23        MR. DAHAN:  Object to the form.

24   A.  I have no idea.

25        MR. DAHAN:  She is an employee, your Honor.  She is

1    being paid as an employee.

2              THE COURT:  Well, was she paid as an employee or

3    commission?

4              THE WITNESS:  As an employee.

5    Q.  Is your testimony that she was working as an employee of

6    Meretz who was a broker for Major Energy that you were taking

7    care of?

8    A.  She was a part time employee.  She also did some sales, it

9    happens to be.  The truth is on those sales that she had done,

10   she did get commissions on those.

11   Q.  Now, let's look at what Meretz did in 2018.

12             James, can you go to page 211.

13             Meretz increased from 2016, it was only $3,225 up to

14   $80,3330, correct, Mr. Benisti?

15   A.  Yes.

16   Q.  And did you personally -- well, you personally monetarily

17   benefited from that amount, right?

18   A.  From this 80,000?  I mean that went to Meretz which

19   eventually was being used to pay for my wife's salary.

20   Q.  OK.  Are you familiar, Mr. Benisti, with TLG?

21   A.  Yes.

22   Q.  TLG is a broker that Mark Wiederman had, correct?

23   A.  I believe it was his brother.

24   Q.  Your testimony is that TLG was Mark Wiederman's brother's

25   brokerage?

K357HOR7                         Benisti - cross

1    A.  I believe it was his brother, and Mark I believe was the

2    one who he sometimes -- or like a lot of times he would deal

3    with the actual customer, but Mark's brother I think did some

4    service to the nursing home industry, so he would either refer

5    them and this was his way of I guess, you know, his brother

6    making money on those deals.

7    Q.  TLGC was also a broker for Mark Wiederman, correct?

8             MR. DAHAN:  Objection.  To the form.

9    Q.  Yes, TLGC was a broker of Mark Wiederman, correct?

10            THE COURT:  What do you mean by a broker of Mark

11   Wiederman?

12            MS. PECTOR:  Meaning it's his brokerage account.

13            MR. DAHAN:  No foundation for that, your Honor.

14            THE COURT:  You can answer if you know.

15   A.  I don't know if he owned it.  I don't know if he owned it.

16   I don't think he owned it.

17   Q.  Do you know if Mr. -- well, do you know that Mr. Wiederman

18   was responsible for the TLEDC broker relationship?

19   A.  I'm not sure.

20   Q.  So, Mr. Benisti, isn't it true that over a five year time

21   period you spent your time and effort helping Mr. Wiederman

22   manage the TLG accounts?

23   A.  I would look after them, you know, just the way we wouldn't

24   want these accounts to fall into variable, for example, so,

25   yeah, I would look after those accounts, same way people in the

K357HOR7                         Benisti - cross

1   organization were also getting e-mails to make sure those

2   accounts don't fall onto a variable rate.

3          In this industry it's unfortunate, but once the

4   account comes off that fixed rate, a lot of suppliers will

5   double the rate, and that will ruin a lot of relationships with

6   the customer.

7          So it was very important to make sure -- it was very

8   important to make sure that these accounts, no matter whose

9   account it was, was tracked after and made sure that they

10  weren't falling on variable rates.

11  Q.  Were you told by Mr. Wiederman to give the TLG accounts

12  special treatment?

13  A.  I don't think special treatment.

14  Q.  Didn't you spend a lot of your time working for those TLG

15  accounts to help maintain their relationships?

16  A.  I spent time on those accounts.  I wouldn't say a lot of

17  time.  I don't think there were unusual relationships there.

18  Q.  Mr. Benisti, are you close to David Sobel, who was the CFO

19  of Major Energy?

20  A.  Yes.

21  Q.  And did you and Mr. Sobel exchange WhatsApps routinely?

22  A.  I would say so.

23  Q.  And did you sometimes send voice recordings to Mr. Sobel

24  with things that were on your mind?

25  A.  I would -- yeah, I would just, you know, voice my -- it all

K357HOR7                          Benisti - cross

1    depended on where I was, how I was feeling, or how I was

2    feeling towards certain people at times.

3    Q.  After Mr. Wiederman was terminated from Major Energy, you

4    knew he went to go work for Alpha almost immediately, correct?

5    A.  Yeah, I think I saw him on LinkedIn.

6    Q.  You also knew that Mr. Moeller had gone to work for Alpha

7    immediately after he resigned from Major Energy, correct?

8    A.  I didn't know that.

9    Q.  And you yourself were considering possibly going to work

10   for Alpha if you could get an ownership interest, correct?

11              MR. DAHAN:  Objection.  Form.  Lack of foundation.

12              THE COURT:  Overruled.

13   A.  What's the question?

14   Q.  You yourself were considering potentially going to Alpha if

15   you could get an ownership interest, correct?

16   A.  It may have been like something in the back of my mind.  It

17   wasn't a -- it wasn't something that I wanted.

18   Q.  Well, during the earnout period, you and Mr. Wiederman had

19   a falling out, correct?

20   A.  Had a who?

21   Q.  A falling out.  You had a disagreement?

22   A.  When, when?

23   Q.  In 2018.

24   A.  I had a fallout with him; it was something that I thought

25   he did, and later on I found out it wasn't him.

1    Q.  And the thing that you thought he did was he hired away

2    Chana Daskal who was one of the lead employees for Meretz.

3    A.  I had a suspicion which later turned out it wasn't him.

4    Q.  And you felt that when she was hired away, that directly

5    hurt Meretz in a negative way, correct?

6    A.  My wife had just given birth, and she was working for this

7    company Meretz, and she was instructed to hire someone so that

8    when she is on maternity leave there would be someone in the

9    office.

10   Q.  Go ahead.  Sorry.

11          Do you recall feeling like you took care of Mr.

12   Wiederman's TLG accounts for five years so because of that you

13   probably had leverage to get a 35 percent interest in Alpha?

14   A.  I don't recall off the top of my head, but --

15   Q.  James, if you can play the audio recording for Mr. Benisti,

16   which is B46-O.

17          (Audio played)

18   Q.  Mr. Benisti, does that refresh your memory that you helped

19   service the TLG accounts for Mr. Wiederman for a five year

20   period?

21          THE WITNESS:  Can I ask you a question off the record?

22          (Discussion held with the judge off the record)

23          THE COURT:  Well, the witness is upset that this is a

24   conversation apparently with his wife.

25          MR. DAHAN:  Your Honor, can I elaborate on that?  At

1   least what we have been told from this witness when we first

2   met him was -- and then we got this -- we didn't know to ask

3   him if he had anything on his phone.  My understanding -- and

4   if you want I can proffer and put him under oath so that he can

5   testify to what he is saying.

6          He is saying that sometime in 2018 they asked all

7   employees to hand over their phones, and they asked him to hand

8   over his phone; he said it's my wife's phone; I don't think

9   there are any work e-mails on this phone; and, you know, it's

10  my wife's phone, it's not a work phone.  They said, well, did

11  you ever make a phone call from this phone that was for work?

12  Well, you must give it, it's unlawful, and you must give it

13  over.  He asked his wife what to do, she said, no, don't give

14  it over.  They're threatening me -- my understanding is that

15  one employee got turned over for not turning over a phone -- so

16  he gave it over.  So he never thought in a million years one

17  day there would be a litigation six months from now and they

18  will have gone through the phones, whatever that means, and the

19  pictures and conversations with his wife.  And the WhatsApp for

20  his wife is called "My love," whatever.  And they're looking

21  through his WhatsApps for phones.  If that's what we have

22  stooped to in this case, I don't know.

23          THE COURT:  Have you objected to this document?

24          MR. DAHAN:  So we objected before trial.  We didn't

25  know if they were using it, maybe to scare him.  Because if

K357HOR7                        Benisti - cross

1    they really wanted to just use the important stuff, they could

2    have redacted -- I think they know the capability of redacting

3    naked pictures, or whatever else was on there.  Maybe they

4    thought your Honor would see them and have an impression.  They

5    could have redacted and kept what they truly wanted to use and

6    said we're redacting on relevance.  But they didn't do that.

7    They produced a 400 page document making sure we saw all 300 40

8    pages of dirty pictures, jokes.

9              There's a privilege between a spouse

10             MS. PECTOR:  Your Honor, with all due respect I can

11   show the Court this is not a communication to his wife.  This

12   was a voice recording that he sent to David Sobel, the CFO of

13   Major Energy.  And I understand why the plaintiffs want to keep

14   out the evidence that's about to come in, because it shows

15   diversion of business by --

16             THE COURT:  Hold on.  If this is a voice recording of

17   Mr. Sobel, it' not the same concern.

18             I'm not going to look at anything with your spouse.

19   That's another issue.  That's another issue.  That's a separate

20   issue.

21             But to the extent that there is something that's

22   relevant that you would have sent to David Sobel, I think

23   that's fair game.

24             MS. PECTOR:  And I can show your Honor -- we can pull

25   it up so everyone can see it.  I will show you the exact entry

K357HOR7                        Benisti - cross

1    on page 69, the audio file that I just called out is right to

2    the right, and you see it's an outgoing message to David Sobel

3    on the left, and it's in response to David Sobel asking about

4    Chana Daskal, which what was the beginning of the voice

5    recording was about.  "Did he go big on gifts?"  Referring to

6    Mark Wiederman.  "In his mind, he probably still wants to work

7    with him as you can do his work for him."

8            And that's the reference to the five years about TLG

9    and Mr. Benisti providing that support.

10           THE COURT:  Well, I'm not going to allow any spousal

11   communication or anything like that, but to the extent that

12   there is communication on whosever phone that is relevant and

13   admissible in the case, then --

14           MR. DAHAN:  I could see that if they had rightful

15   access to a phone.  Part of our objection is that they didn't

16   have rightful access to a phone.  This is not from David

17   Sobel's phone.  The question here is did they have rightful

18   access to the phone to access these messages from.  And that's

19   a threshold question to begin with.  If they didn't have

20   rightful access -- this is not from David Sobel's phone; it

21   from his phone.  So, the question is did they have rightful

22   access to his phone.  And then, B, you know then we have

23   relevance and other objections.

24           But I think what the witness is complaining here is

25   that they honestly didn't have rightful access to his personal

K357HOR7                         Benisti - cross

1   phone just because they threatened and told him you must turn

2   it over to us -- obviously he didn't know at the time they were

3   going to go through it and produce in litigation.

4          THE COURT:  In most litigation you have to turn over

5   business records from your personal phone.  I was head of

6   litigation in a media company.

7          MR. DAHAN:  He was not a custodian in this case.  We

8   named him as a witness, and then they went and looked at his

9   stuff.

10         MS. PECTOR:  Your Honor, with all due respect, in any

11  case we issue a litigation hold.  Litigation hold is necessary

12  for both sides.  There was specific communication from counsel

13  for both sides about cell phone collection, and we were told if

14  we don't properly preserve the data -- we didn't want there to

15  be a spoliation issue on our side of the house, but Mr. Benisti

16  is an employee, and his phone was paid for by the business,

17  subject to a policy.

18         MR. DAHAN:  No, it was not.  Let's get him under oath

19  and it was.

20         THE WITNESS:  No, I had a work phone, which I

21  offered --

22         MR. BROWN:  Could I add something since we are

23  creating a lengthy record?  Just to clarify the way this played

24  out.  He is a current employee through 2019.  He is never

25  identified by plaintiff on a Rule 26 disclosures as a witness

K357HOR7                        Benisti - cross

1    who might have information relevant to the claims and defenses.

2    We don't know that he is even going to be a trial witness in

3    the case until we get not a direct witness statement from him,

4    but we're told they're calling him to do a live direct, and

5    they've obviously worked with him, because Mr. Benisti has

6    referenced he told Mr. Dahan certain things in preparing for

7    his testimony.

8            As soon as we find out he is going to be a witness at

9    trial -- after having not been a Rule 26 witness -- we then

10   figure out does he need to be a custodian, and does he have

11   relevant information that we might need to cross him at trial,

12   at which point we find the documents, we produced them to the

13   other side and we ask him a question, as Ms. Pector has, about

14   his communications with Mr. Sobel.  That's the build-up to all

15   of this that Mr. Dahan and Marooney are trying to bring up, and

16   all we have done is play one Sobel-related message.

17           MR. MAROONEY:  I'm sorry, we have talking heads here

18   popping up and talking.  One, they didn't run the e-discovery

19   search protocol through it.  They went through the phone that

20   they shouldn't have had and hand selected what they wanted to

21   use.

22           THE COURT:  When did defendants get this phone?

23           MR. BROWN:  December 2019.

24           MS. PECTOR:  No, your Honor.

25           MR. DAHAN:  No.

1              MS. PECTOR:  Let me explain.  There was a litigation

2       hold that was issued.  Once the litigation was issued, as part

3       of a uniform process, cell phones were collected, imaged,

4       retained.  Mr. Benisti during the course of this case was not a

5       witness identified --

6              THE COURT:  I know.  I understand all that.  I just

7       asked when the phone was taken.

8              THE WITNESS:  I believe it was in April 2019.  I was

9       still working there.  I had no intentions to do anything.  I

10      was still working there.

11             THE COURT:  In any event, is this part of the motions

12      in limine?

13             MR. DAHAN:  Your Honor, we didn't get this stuff until

14      after motions in limine.

15             THE COURT:  OK.  But it's not been the subject of a

16      motion, as far as I know.

17             MR. DAHAN:  We put it on our objection list.  We

18      didn't know if they were going to use it.  We have a bench

19      motion we are happy to submit that we prepared.

20             THE COURT:  Look, I'm going to reserve on the

21      objection, but as far as I can tell there is -- being in

22      litigation is ugly, and all your personal devices that have

23      substantive communications on them get turned over, so sorry.

24             MR. MAROONEY:  I think this is being kind of taken in

25      a direction that it wasn't supposed to go.  Here is the point:

K357HOR7                           Benisti - cross

1   Putting aside whether they should have had the phone, not had

2   the phone, if they found a voice mail between him and Mr. Sobel

3   that they thought was relevant to the issues in the case, I get

4   that.  What they did with this is bury it in a 400 page exhibit

5   filled with things that are utterly inadmissible.

6            THE COURT:  I understand you're upset about that.

7            MR. MAROONEY:  That is really the crux.

8            THE COURT:  I understand, but let's just move on.

9            MR. DAHAN:  The only other point I would make is there

10  is no evidence or any certification from them that we've gotten

11  everything.  So we don't know what is on there.

12  Hypothetically -- because they didn't run it through a search

13  protocol that is helpful to us or makes -- we have no idea.

14           THE COURT:  Well, that's because they learned about

15  this witness late in the process.

16           MR. DAHAN:  I understand, so then you turn over

17  everything.  We can tell that we've gotten piecemeals.  So we

18  don't know what's on here also that we could have used or not.

19  So it's an incomplete document.

20           THE COURT:  OK.

21           (Discussion held off the record)

22           THE COURT:  I just explained to the witness that

23  communications with his wife I'm going to assume are protected

24  because I think those are protected under the law, and only

25  business-related communications that I determine are relevant

K357HOR7                        Benisti - cross

1   are going to be admissible.

2            MR. BROWN:  Could we discuss side bar and not in the

3   presence of the witness?

4            THE COURT:  OK.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (At the side bar)
 2                MR. BROWN:  The issues we wanted to quickly preview at
 3    side bar is one of the pieces of evidence we would be using
 4    with Mr. Benisti is a communication between him and his wife
 5    working for a broker, discussing what we believe evidences a
 6    diversion of business from Major to another company.  That's
 7    evidence that directly goes to some of the core issues in the
 8    case.  And I am unaware of a spousal privilege that would apply
 9    in a civil case to evidence concerning the diversion of
10    business from Major Energy -- his employer -- and plaintiff's
11    suit in this case to another company.  It's direct evidence.
12    This isn't a criminal proceeding.  To my knowledge there should
13    be no spousal privilege that would apply under those
14    circumstances that would prevent us from showing that evidence
15    in direct diversion of business in a case about why business
16    was diverted.
17                MR. DAHAN:  I don't see why they can't lay a
18    foundation for that, first of all.  And again I don't know what
19    he is talking about, so I can't comment on it.
20                MR. MAROONEY:  I think.
21                MS. PECTOR:  Let me just say, your Honor -- because
22    I'm the one asking the questions, and I can tell you where it's
23    going.  I did lay a foundation already with this witness.  I
24    asked him about Meretz.  Meretz is a company that basically he
25    and his wife run.
```

1              MR. DAHAN:  No.

2              MS. PECTOR:  Meretz is a company that he and his wife

3      are running together.  The communications that I intended to

4      get into are him and his wife talking about customer

5      opportunities and where should she send them.  He tells her

6      don't send them to Major Energy; we're going to send them to

7      another supplier; because he is helping her with the Meretz

8      business.  She is a broker in Meretz Energy, so when he is

9      having communications with his wife about what Meretz is doing,

10     that's a business relationship that Major Energy -- that he is

11     essentially helping his wife use to divert business away from

12     Major Energy to another competitor.  And this is during the

13     earnout period.

14             THE COURT:  Well, I mean it seems like it would

15     otherwise be relevant absent spousal privilege, right.

16             MR. DAHAN:  Absent spousal privilege.  It's a

17     distortion to -- I know what she is talking about and that's a

18     distortion.  I know the answer to that.  I mean you want to

19     step into the mud on those questions, that's fine, because we

20     will answer it and you are not going to like the answers, but

21     that's -- because we obviously saw that message.

22             MS. PECTOR:  The fact that you already know what the

23     answers are means you did preview it and you did look at it.

24             THE COURT:  Hold on.  So I mean I haven't dealt with

25     spousal privilege actually.  I don't know -- I don't think it's

1    limited to the criminal context.

2             MR. DAHAN:  Again it's his wife's phone.  They are

3    having a communication.  His wife pays for that phone.  If you

4    want I will ask him under oath.  It's his wife's phone and --

5             THE COURT:  But he uses the phone.

6             MR. DAHAN:  It's like my kids, I have an account with

7    Verizon, I buy my kids a phone, but it's his wife's phone, she

8    pays for phone.

9             THE COURT:  That's not the test.

10            MR. DAHAN:  It's not e-mail from Major Energy and this

11   is a communication he is having with his wife.  OK?  So I mean.

12            THE COURT:  Are you saying spousal privilege applies?

13            MR. DAHAN:  I don't know, what is the communication

14   with his wife?  His wife doesn't work for Major Energy.  I

15   don't understand.  Why can't he assume he is having a private

16   conversion with his wife?

17            THE COURT:  Because it's about a business matter

18   relevant to the case.

19            MR. DAHAN:  All right, listen, your Honor, we will

20   reserve our motion objection, we will make our motion.

21            THE COURT:  Is he coming back tomorrow?

22            MR. DAHAN:  No.  He can't.  He is going out of town.

23            MR. BROWN:  We feel like we're getting the clock run

24   out of with this witness.  It's a lengthy direct; it was over

25   an hour.  We had the break for your Honor.  That's an issue

that happens.  But it took 42 minutes to get a yes or no answer

to a yes or no question and now we started to make some

progress, and now he we have this spousal issue.  The witness

is talking to you at side bar about what he is upset about with

the phone.  I feel like Ms. Pector has to finish her

examination.  They talked to him about the commercial business

which is where this 2.7 case seems to have meandered by day

four.  We have to have a full examination.

          MR. DAHAN:  I'm not saying you can't have a full

examination with him.  He is going out of town.  He is going

away.  They are going away.  He came in for Thursday.  We

allowed Mr. Gibson to go first.  He was supposed to be the

third witness because I knew he was going away.

          MR. BROWN:  I don't control it.

          THE COURT:  I mean I'm going -- we will do some quick

research on spousal privilege.  How soon are you going getting

to that one?

          MS. PECTOR:  I mean I was planning to get on it

relatively soon, but I have other questions with this witness.

          MR. DAHAN:  You want to ask the questions, and we

reserve on it, and your Honor can strike it from the record.

          MR. BROWN:  If the Court would like to look at it --

          THE COURT:  No, you have represented what it is.  We

are going to go through it.

          MR. DAHAN:  We will proceed.  If your Honor wants to

1    strike it, you can strike.

2              MR. MAROONEY:  Let's do it that way.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ms. Pector.

3    BY MS. PECTOR:

4    Q.  Thank you.  Mr. Benisti, when we left the record you we

5    were you talking about your support of Mr. Wiederman for five

6    years of the TLG relationship.

7    A.  Did I what?

8    Q.  Do you recall us talking when we left the record about your

9    support of Mr. Wiederman with respect to the TLG relationship

10   for a five year period which we heard about?

11   A.  Yeah.

12   Q.  So now, James, if we could pull up Exhibit 758 again.

13          And let's look, Mr. Benisti, at the performance of TLG

14   in terms of commissions that TLG was receiving during the

15   earnout period and how it increased.  So if we can look at page

16   48 first, let's look at 2015 and see what TLG Holdings was

17   doing.  Do you see there it's $116,588.64?

18   A.  Yes.

19   Q.  And if we can go, James, to 216 -- sorry -- page 110.

20          Do you see that in 2016, page 110 --

21          Sorry.  Do you see that in 2016 TLG Holdings increased

22   to $135,704?

23   A.  Yes.

24   Q.  And if we could go to page 235, James.

25          And in 235, do you see how TLGC went up to $402,360?

K357HOR7                        Benisti - cross

1   A.  Yes.

2   Q.  And these are significant commissions, right, Mr. Benisti?

3   A.  That TLGC is a different entity from what was before.

4   Q.  And let's look at page 234.  Don't they have the same

5   address, Mr. Benisti?

6   A.  They do.  They're different LLCs.

7   Q.  Exact same address, correct?

8   A.  Yes, but they look to be the same.

9   Q.  Did you ever recall having communications with Mr. Sobel --

10  actually let me ask you this question.  Do you ever recall

11  having communications with Mr. Shipper about whether or not you

12  were going to be giving TLG gifts?

13  A.  Could be.  It was the standard that during specifically

14  Jewish holiday we would send -- if we were sending out, so we

15  would send to some of the different brokers and then, yes, that

16  was probably a discussion I had with him.

17  Q.  James, if you will pull up Exhibit 1079, page 123, pull up

18  that page.

19          This is a chat that you're having on the 3 Amigos chat

20  sight.  Just to set foundation, is it correct that your 3

21  Amigos group chat was with David Sobel -- CFO of Major

22  Energy -- and Bruce Shipper who was your colleague in the

23  broker department?

24  A.  Yeah.

25  Q.  And in this particular exchange do you see that on December

1   3, 2018 Bruce asks you a question:  "Amir, you giving TLG, MMW,

2   EFWD?"

3          And actually this is in context -- if we go up to the

4   page just prior to this, James,

5          He is asking the question about whether or not you're

6   going to finalize your holidays gifts.

7          So if you go, Mr. Benisti, to the sixth from the

8   bottom line, do you see he is asking you the question:  "Did

9   you ever finalize holidays gifts?"

10  A.  I'm just going to read the beginning of that, this whole

11  thing, because I want to read from the beginning.

12          OK.  Yes.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K35AHOR8ps                         Benisti - Cross

Q.  OK.  We will go to the next page.

        So now that you have the context, Mr. Benisti, do you

see that Mr. Shipper is asking you, "Amir, you giving TLG, MMW,

EFWD," holidays, right?

A.  Yes.

Q.  And "TLG," that's referring to the Mark Wiederman-related

broker, right?

A.  I believe it's a brother, yeah.

Q.  And when you say it's his brother, who are you referring

to?

A.  He had a brother that's in the business.

Q.  What's the brother's name?

A.  I'm not sure.

Q.  Did you ever ask who's his broker when taking care of a TLG

account?

A.  An e-mail.

Q.  Your communications about taking care of the TLG account

was with Mr. Wiederman, correct?

A.  Not -- like I said, his brother had e-mail, different, you

know, hey, this is the guy I spoke to, you know, bumped into

him.

Q.  But you can't tell this Court what his brother's name is?

A.  If his -- I don't know if this was in the building,

nickname, Pinky, I'm not sure, whether it is Pinky or something

like that.

1   Q.  But you'll agree, Mr. Benisti, that he had several

2   communications with Mr. Wiederman about the TLG relationship

3   over a five-year period, correct?

4   A.  Sure.

5   Q.  Now he asked then, "Are you giving a gift to MMW?"  That's

6   a separate broker account that Mark Wiederman had?

7   A.  That is a joke.  It's a joke.  What's going on here, this

8   is a chat between Bruce Shipper, David Sobel, and myself.  We

9   worked very hard together, and we liked to also have a good

10  time.  So we had a chat.  And a lot of the chat is just simple

11  back-and-forth on WhatsApp.  This is not like I'm sitting here

12  brainstorming, where I'm sitting on WhatsApp.

13  Q.  What does EFW relate to?  Is that Mr. Wiederman's wife?

14  A.  No.

15  Q.  What does that relate to?

16  A.  I have no idea.

17  Q.  What do you mean when you say, "Doesn't TLG get a baby

18  gift?"  Is that referring to another entity that's been spun

19  off from TLG?

20  A.  I have no idea what that means.

21  Q.  Those are your words, correct, Mister --

22  A.  I don't know what is "TLG get a baby gift?"  It would be a

23  joke.  A baby gift?  I'm not sure what a baby gift could have

24  been to TLG.

25  Q.  OK.  Well then, let's toggle up, James, if we could, to

1    page 119.  And just hold on before we put it up here.  Let me

2    lay a little foundation.

3              Mr. Benisti, isn't it true that while you were working

4    for Major Energy during the earnout period, you were having

5    communications with Mr. Sobel and Mr. Shipper about trying to

6    start up a competing ESCO?

7    A.  It was a thought.  It was a thought.

8    Q.  And this was more than a thought.  You actually went out

9    and looked for investors, didn't you?

10   A.  Investors actually have always come my way from the

11   beginning.  Actually why I got a job at Major Energy was I

12   pitched Sofar with an idea, and he said, I like you, why don't

13   you come work for me.  So I've always been an entrepreneur from

14   day one, and I think everyone should always being looking out

15   for themselves and trying to build the business best as

16   possible, so that's -- yeah.

17   Q.  Mr. Benisti, in August of 2018, while you had full

18   responsibility for supporting the broker channel, you were in

19   parallel working on setting up a business that would compete

20   with Major Energy, with Mr. Sobel and Mr. Shipper, correct?

21   A.  It was an idea.  It was a thought.  And I don't think,

22   especially if you ask the people behind you how they feel about

23   the industry and the regulations and where it's going, I don't

24   think it's -- the industry, the way it is right now, if you

25   were to not be forward-thinking, I don't think that -- opening

1    an ESCO is not the brightest of ideas at this point.  You're

2    just going to be another Major Energy.

3    Q.  And that's because the regulations make it really difficult

4    right now to be able to grow business in this industry, right?

5    A.  I'm not sure if that's accurate.

6    Q.  All right.  Well, let's look at your text message and see

7    if it is.  Can you go to 119, James, and if we can look at the

8    bottom where it says "Amir."  Let's just blow up the four on

9    the bottom.

10         So what we're looking at here, Mr. Benisti, is the

11   start of your Three Amigos chat.  This is on August 28, 2018.

12   Do you remember having a chat about starting an ESCO with

13   Mr. Sobel and Mr. Shipper during this time period?

14   A.  Yes.

15   Q.  And specifically, you started off, and you say, "Bruce, how

16   many kilowatt hours do you think we can bring in monthly just

17   from broker network channels?"

18         Now, there, Mr. Benisti, you're not talking about

19   Major Energy; you're talking about this other business you're

20   trying to start up.  Correct?

21   A.  I'm asking in the broker network how many kilowatt hours

22   monthly would we be able to bring in.

23   Q.  Then he goes on to say, "Key response depends on how LDC we

24   go into and depends on how competitive pricing is.  Not saying

25   we need to be cheapest but close.  If we stay in core New York,

K35AHOR8ps                    Benisti - Cross

1    New Jersey area, maybe 2,000 RCE."  And just to stop there for
2    a moment, is it true, Mr. Benisti, that when he refers to "core
3    New York and New Jersey areas," those are areas where Major
4    Energy does business?
5    A.   Those are, I think, two of like the key United States
6    vendors.
7    Q.   And in fact those are two of Major Energy's largest
8    markets, correct, Mr. Benisti?
9    A.   I also believe, when he said "core" there, it also depends
10   on the context, so I just want the judge to also understand
11   that if he was, if I had to guess, probably referring to only
12   focusing on specific, like utilities, where there was like
13   really concentrated, you know, like certain people that he kind
14   of built up.  That's probably what I would assume you're
15   looking at here, as opposed to not whole New York.  I don't
16   think this is what this meant.
17   Q.   Mr. Benisti, you know, from your tenure with Major Energy
18   over a seven-year period, as Mr. Dahan established, you know
19   that the largest market that Major Energy had was New York,
20   correct?
21   A.   It is definitely a big part of our business.
22   Q.   And in this instance you're now looking at creating
23   competing business to compete with Major Energy in New York,
24   correct?
25   A.   We created a WhatsApp chat and our e-mail chain.  I just

1    want to, again, this was a WhatsApp chat.  Hey, this is an

2    idea.

3    Q.  Do you think that because it's a WhatsApp chat, it's any

4    different than if it's an e-mail?  Is that the distinction

5    you're trying to make?

6    A.  No.  I'm trying to say this is like an idea.  I'm an idea

7    person.  I have even told him ideas when he was in the office.

8    I'm an ideas guy.  I like to give ideas.  And I decided to have

9    this chat and say, hey, it was cool.  It was an idea.  It never

10   got anywhere.  It never got there.

11            MS. PECTOR:  James, let's go to page 120.  You can

12   blow everything up until the questions part.  Just blow up the

13   top.

14   Q.  OK.  Now, here, Mr. Benisti, we're having a continuation of

15   the discussion.  And the response from the prior question --

16   and let me just give you the context.  Mr. Shipper says, "If we

17   stay in core New York, New Jersey area, maybe 2,000 RCE."  And

18   then he responds, "Without TLG accounts," smiley face.

19            Now, in that context, that's referring to the

20   Wiederman account that we've been talking about, right?

21   A.  Possibly.

22   Q.  And you didn't want Mark Wiederman to be a part of the new

23   business, correct?

24   A.  I don't know if I did not want.  Yeah, probably not.  I

25   don't know.  It wasn't like anything was posed to him, and,

1   hey, why not.  It's an idea.

2   Q.  Then Mr. Shipper says, "Low-income ruling took away many

3   residential RCEs," right?

4   A.  Mm-hmm.

5   Q.  And you are familiar that that happened and there was an

6   impact to Major Energy, right?

7   A.  Yeah, I remember it happening.

8   Q.  He then goes -- you go on to say, "OK, sounds good."  David

9   Sobel responds, "So 20 million kilowatt hours per month, that's

10  good."  And then he responds again, "Means we need to be in

11  NYISO and PJM."  Right?

12  A.  OK.

13  Q.  And again, those are two markets that Major Energy is in,

14  right?

15  A.  PJM covers, like, I think that -- it's -- OK.  This was

16  very, like general, but, yeah.

17  Q.  You then ask, "Bruce, now you're talking margins, you say,

18  Bruce, can we get that at 8 millions margins."  And actually 8

19  million margins is higher than what you -- you priced out many

20  of the broker deals when you were working for Major Energy

21  during the earnout period, correct?

22  A.  Yeah.  In hindsight, you said, is it higher than what we

23  had priced out.  So I believe our rack rates, I believe, had, I

24  think, I'm not sure exactly, but rack rates for custom price.

25  I was referring to a custom price, not a rack rate.

1    Q.  Then you respond back, I mean I think on the rack rates we
2    can."  Right.  That's you.  And then Mr. Sobel says, "Can we
3    average 8 mils on 2,000 RCE or is it a lower number?"
4            And then if we look down, you say, "I'm setting up my
5    hookah and laptop soon.  I'm ready to start putting topics of
6    discussions for tomorrow meeting."
7            And here, Mr. Benisti, you're getting ready to prepare
8    a business plan.  Right?
9    A.  But that would normally be the paper probably.  I don't --
10   Q.  Mr. Shipper responds, "Remember, it takes time to build up
11   to that level.  Because of the relationships we have, I believe
12   we can get there, but not immediately.  Brokers will be weary
13   of a new supplier and will go slowly with us.  That's why it's
14   important to nail down operations so no mistakes happen."  Did
15   I read that correctly?
16   A.  Yes.
17   Q.  Now, at this point in time, Mr. Benisti, the plan of you,
18   Mr. Shipper, and Mr. Sobel is, once this company is up and
19   running, to take the broker relationship that you have from
20   Major Energy and use those for your new business.  Correct?
21   A.  It -- I mean, if I would bill a new job somewhere else,
22   this is an ESCO, it's something that I believe even my
23   employment agreement allows me to -- definitely, if I went and
24   opened an ESCO or decided to go work for an ESCO, I was able to
25   do the exact same thing that I was able to do at Major Energy.

1    That was in my employment agreement, per my understanding.

2    Q.  Is it your testimony that you had an employment agreement

3    with Major Energy?

4    A.  I had -- I believe I had one, yes.

5    Q.  Did you know that you had a fiduciary duty to Major Energy?

6    A.  Yes.  I think so.  I didn't read through the whole entire

7    thing.  And yeah, I remember when we were discussing the IT

8    changes, whatever changes he did, I told him I have those

9    changes in mind.

10   Q.  Did you understand that you had a duty not to interfere

11   with Major Energy's relationships?

12   A.  At what point?

13   Q.  At any point.

14   A.  I don't know.

15   Q.  Did you understand, Mr. Benisti, that you have a duty not

16   to interfere with Major Energy's business relationships?

17   A.  Meaning after I leave?

18   Q.  Any time.  While you're an employee, after you leave, did

19   you understand that you had a duty not to use their

20   confidential information or their relationships to interfere

21   with their business?

22   A.  I think so.

23   Q.  I'm sorry?

24   A.  Yeah, I think so.

25   Q.  OK.  So in this particular instance, what you're doing is,

K35AHOR8ps                              Benisti - Cross

1   you're planning, with the knowledge you have of the brokers

2   that Major Energy has and the relationships they have, the

3   money that they're spending, you're at this point planning to

4   divert those broker relationships to a company that you're

5   thinking about starting up.  Correct?

6   A.  It was both, yeah.  Definitely.  It was, again, a -- I

7   don't know.  I mean, it was -- again, this was -- I don't think

8   we're out a few weeks.  We just chatted back and forth about

9   it.

10  Q.  Well, it goes on to say, you may, "I agree.  But I feel

11  like they trust us and if we tell them we have it pat down, we

12  are ready to rumble.  The more I think about it, the more I

13  think that having an IT guy build a system makes more sense

14  than outsourcing the system."  Mr. Shipper then says, "Well, to

15  start off, I would think closer to 500 to 750 RCE months, 1-4,

16  5-8, we should be able to get 1,000 RCEs.  Probably closer to

17  year's end we should be able to get to 2,000 RCE."

18         And then he goes on to say, "Believe we will likely

19  average 5-6 millions or small to mud size commercial.  Large

20  commercial is probably 3-4 million if you want to win that

21  business."

22         He says, "I need to understand the supply part of it

23  some more.  Levy was so secretive about it.  Need to understand

24  the risk part.  We also need to pass through the regulatory

25  changes so we don't lose significant money."  Did I read that

1    correctly?

2    A.  Yes.

3    Q.  And you respond, "We will always reserve that right."

4    A.  Yes.

5    Q.  OK.  Now, this chat continues on for a while, Mr. Benisti.

6    But if we just jump forward --

7          MS. PECTOR:  James, will you go to page 121.

8    Q.  On page 121, James, if we blow up the bottom half of this,

9    do you recall, Mr. Benisti, you're talking back and forth about

10   the specific brokers, but if we look at your entry at 7:32

11   p.m., you say -- there's a question of, "Do we have funding

12   yet?"  And your answer is, "We definitely have the right people

13   interested, so now we need a business plan and I believe we're

14   good from there in regards to funding."  Bruce Shipper then

15   responds, "We need good answers to how we are going to be

16   different than the others?  Got to work on that answer."  And

17   he says, "My answer is that there are so many suppliers being

18   brought out and consolidated into other companies, brokers need

19   a broker-friendly company, and with our over 400 broker

20   relationships, we can step in and make huge waves in the

21   industry."  Did I read that correctly, Mr. Benisti?

22   A.  I think so.

23   Q.  And if we toggle down, your response to this, to what

24   Mr. Shipper is saying, is, "That's a key response."  Right?

25   A.  Yes.

K35AHOR8ps                          Benisti - Cross

1    Q.  So you're not -- at no time in this time are you saying,

2    hey, Bruce, it's wrong that we are doing this to Major Energy,

3    we shouldn't be thinking about the diverting away the 400

4    broker relationships.  Instead, you continue on with the

5    conversation and spend time and energy trying to make plans to

6    set up a business.  Correct?

7    A.  Right.  I just want to point out, like I mentioned, earlier

8    I think it was -- brokers don't just terminate an agreement.  I

9    don't think any broker would have terminated an energy

10   agreement with me.  It's just that Major Energy had gotten, at

11   that point thus far, had totally destroyed the relationships

12   that the brokers had with Major Energy and Spark had destroyed

13   a lot of what we had done the work to build.  This is my idea

14   of saying, let's go back out there and do something where the

15   brokers want to and, you know, grow the business.

16   Q.  Mr. Benisti, how could you say that Spark destroyed what

17   Major Energy built when you were able to keep your

18   relationships with over 400 brokers during the earnout period

19   after the dropdown?

20   A.  Like I mentioned before, when I say out there, that there's

21   400 broker relationships, we would consider 400, like we would

22   say 400 relationships as in the broker codes in our system, and

23   we have like probably at midpoint 450.  So actually that's what

24   we call a 4A relationship.  It wasn't a first relationship like

25   I had mentioned before where, you know, I had a personal

1    relationship with like 30, 40, that I could call up and say hey
2    what's up.
3    Q.  Well, Mr. Benisti, this wasn't the only business that you
4    tried to start up during the earnout period while you were
5    working for Major Energy, correct?
6    A.  At least, I mean, may -- again, my thoughts are a little --
7    it could be.  I just wanted to --
8    Q.  Well, you also tried to start up a car leasing business
9    with Sunil Gadtaula, who is the lead vendor in this case that
10   sellers are claiming Spark interfered with.  Isn't that true?
11   A.  Yeah.  Actually, I thought it was a pretty cool idea to be
12   able to couple together a couple different options and that
13   would, you know, give a lot of value to him.  He'd be able to
14   sell different rights, I guess like the energy contract, and
15   also different things like signing an energy contract and also
16   like a car lease contract.  But that never went anywhere.  And
17   it was, again, just a thought and an idea.
18   Q.  Well, Sunil Gadtaula was not the only one involved in that
19   thought and idea.  Sam Bensinger was as well, correct?
20   A.  Correct.
21   Q.  And Sam Bensinger was an employee working for Major Energy
22   during the earnout period, correct?
23   A.  Yes.
24   Q.  And Sam Bensinger was responsible for marketing efforts and
25   bringing in business for Major Energy to help growth, correct?

1    A.  I'm not sure what his specific responsibility was, but --

2    Q.  Well, you will agree that when Mr. Bensinger was spending

3    time either helping you with your car leasing idea or helping

4    Meretz bring in business, he wasn't working for Major Energy

5    during that time period, correct?

6    A.  I just want to, since we're all engaged here, these are

7    ideas, and this happened at 7:32 p.m. and late at night.

8    Again, these are off the top of my head.  I get ideas.  And,

9    like I told you, I even mention ideas when he was in the

10   office.  I'm an ideas kind of guy.  I don't see that I, you

11   know, if this was -- ideas that I've spoken to with people who

12   I worked with.  I got very close to people that I worked with.

13   I had relationships with people that I worked with.

14          MS. PECTOR:  James, let's turn to, the same exhibit,

15   page 97.  And if we could blow up the last ten lines, page 97.

16   Yes, that's good.

17   Q.  So now, here is a series of chats between you and Sam

18   Bensinger.  Do you see that, Mr. Benisti?

19   A.  Yes.

20   Q.  And these chats are -- I want to start with the one at

21   5/11/2017.  Do you see that one?

22   A.  Yes.

23   Q.  And you agree, Mr. Benisti, that this is during the earnout

24   period.  This is in fact year two of the earnout period May 11,

25   2017.  Right?

1   A.  Yes.

2   Q.  You're having a communication with Sam Bensinger, who is

3   working for Major Energy at the time.  "When are we web-opening

4   our LLC?"  Did I read that correctly?

5   A.  I'm not sure what "web-opening" is, but yeah.  You read it

6   correctly.  I don't know what --

7   Q.  That's your message to Sam, right?

8   A.  Yes.

9           THE COURT:  It probably meant "when are we opening our

10  LLC"?

11          THE WITNESS:  Oh, OK.

12  Q.  You say, "We also need to reach out to some car dealers.

13  SAS.  Leasing.  Let's work on it."

14          Sam responds, "Should be cheap.  Depending on the

15  corporation.  LLC is more expensive.  We'll research."

16          And then you say, "Tomorrow after Mincha, we'll ride

17  out to a meeting with Pinky.  I have a meeting tomorrow.  One

18  sec."

19          MS. PECTOR:  Can we go to the next page, James.

20  Q.  And then there is a series of exchanges about meetings.

21  And then it culminates in, if I can continue on, "Want to hit

22  up the bar?  Did you get enough drinking?  Passing out.  Try

23  MW."  Is that referring to Mark Wiederman?

24  A.  Probably.

25  Q.  "LOL.  I'm sure he's going to be asleep.  I'm so tired.

1    Wanted to check out of the hotel.  I'll go for a quick walk

2    around.  Snap.  Hells no.  You here."

3            Is this an example, Mr. Benisti, of a time when you're

4    on a trip with Mark Wiederman and Sam Bensinger that was one of

5    the trips that were taken from time to time with brokers on

6    Major Energy company funds?

7    A.  I don't recall any of this.  I see it, obviously, but I

8    don't know like where is this.  I guess, it says "hotel," yes.

9    Q.  Well, it is true, sir, isn't it, that you had traveled with

10   Sam Bensinger and Mark Wiederman and David Sobel for trips paid

11   by Major Energy under the auspice that you were entertaining

12   brokers, correct?

13   A.  I think most of the brokers came with us.  Maybe he came

14   with a few.  I don't know.  But for the most part, this broker,

15   it was probably just me or Bruce Shipper.  Maybe later on he

16   accompanied me.  But there were some trips where they would

17   take me and one or two brokers.  I don't recall.

18   Q.  So are you saying there wouldn't be a business reason for

19   you to be going on a trip with Mark Wiederman and David Sobel

20   for business-related purposes that were being expensed to a

21   company credit card?

22   A.  So like I said, sometimes if they were going to go

23   somewhere, I would think that, if they were going, I would take

24   one or two brokers with me, sometimes.

25   Q.  Well, let's just scroll forward.

1          MS. PECTOR:  James, if we can go to the bottom of this

2     e-mail, the last 15 lines.

3     Q.  Now, here we're still talking about the same thing, but I

4     just want to fast-forward because you can see that Sunil is

5     involved in this business venture.  Do you see towards the

6     bottom, "Amir, please give Megan the two Knicks draft tickets

7     to leave up front.  Sunil is sending someone to pick it up at

8     11.  Thanks.  OK.  Yo, can you talk tonight?"

9          And then he responds, "Tomorrow, traveling.  Be in the

10    office.  We are waiting time."

11         And then he responds, "Sealed Sunil today.  Can you

12    talk to Sunil about using the PTM name?  No.  He will love it,

13    and it's already branded, selling for us.  We'll make another

14    name."

15         So now let me stop there for a moment, Mr. Benisti,

16    because here, you and Mr. Bensinger have already gone and

17    talked to Sunil about working with you guys as a partner in

18    this car leasing business, correct?

19    A.  I don't think I ever went to talk to him about it.  Maybe

20    Sam had and I also -- you know, I don't know if you ever met

21    Sam.  He -- this is the way he talks.  He's a very, you know,

22    sarcastic, quick on -- you know, I don't even know what "sealed

23    Sunil today" would mean.

24    Q.  Well, you agree that in this text message what you and he

25    are discussing is, well, we'll bring Sunil in, but since the

1   PTM name is already being used by Major Energy, we'll have

2   Sunil set up another company name and we can use that to help

3   our new business.  Right?

4   A.  I don't think that's what it means, no.  Like I mentioned

5   earlier, this was an idea and I've had plenty of different

6   ideas that I thought would have made Major Energy, you know,

7   like kind of had -- dealer unique than other ESCOs.  So this

8   was one of my ideas where I had mentioned to him where he can

9   sell a Major Energy contract or whatever he was selling as, you

10  know, a residential, you know, contract, and also, you know,

11  because they're in this mix of, hey, we have an energy contact,

12  you can also get like a car lease.  I mean, I never even spoke

13  up.  I don't recall ever calling any car leases.  Again, this

14  was an idea.

15  Q.  Mr. Benisti you knew that at some point in time, PTM had an

16  exclusive relationship with Major Energy, correct?

17  A.  I didn't know.

18  Q.  You did not know that.

19  A.  I did not know that.  I don't think so.

20  Q.  Let's go to page -- you will agree, though, Mr. Benisti,

21  that by creating other opportunities for Sunil to work in and

22  spend his time when he was working on time with your business

23  venture, he's not working on sales for Major Energy, correct?

24        MR. DAHAN:  Objection to form.  How could he know what

25  Sunil's time management is?

 1              THE COURT:  You can answer if you know.

 2   A.  Sunil was not out there on the road.  I don't think it

 3   would -- yes.  I don't think it was any different at all.

 4   Q.  Let's just move forward, Mr. Benisti, and see how much you

 5   offered Sunil in terms of an ownership interest.

 6              MS. PECTOR:  So, James, we'll go to page 99.  And if

 7   we can blow up the text starting at 9:06 p.m.  Just blow that

 8   up all the way down to the end if you could.

 9   Q.  All right.  So now, Mr. Benisti, fast-forward.  You're

10   still having discussions about the same topic, in July of 2017.

11   And you would agree that it's still during the earnout period.

12   Right?

13   A.  Mm-hmm.

14   Q.  OK.  And if I could turn your attention to the entry

15   starting at 9:06 p.m. at the top, this is now a message from

16   you.  "Been thinking.  I think we should tell Sunil we will

17   give him 10 percent plus sales and 15 percent to use the TPM

18   brand name.  He already has a following and a brand name.  We

19   can discuss on Wednesday."

20              And then you respond, "I made some more calls getting

21   a bunch of information.  We are going to kill it.  It's going

22   to be huge.  We need to take a day off next week and call each

23   of these dealers again and make deals with them."  Do you see

24   that, Mr. Benisti?

25   A.  Yes.

K35AHOR8ps                          Benisti - Cross

1    Q.  Does that refresh your memory that in fact you were making

2    an offer to Sunil to give him 10 percent of all sales and 15

3    percent to use his PTM name for your new business?

4    A.  That's what it says there.  Again, this is off the top of

5    my head.

6    Q.  And this was something that you kept a secret from Spark

7    and NGE, correct?

8    A.  This is an -- I think you're taking it in a very

9    interesting way.  This is -- we don't know each other

10   personally at all, and if we did, we would not be reading these

11   text messages like this.  And I think if I -- people who know

12   me would put that and say, oh, Amir, this is another business

13   you want to start?  Just, you know, stick to what you're doing,

14   you're -- you know.  I've always wanted to start businesses.

15   I -- something that I always wanted to do.  So, again, you

16   don't know me, right, so you're looking at a bunch of letters.

17   And this is literally like ideas that went nowhere.

18   Q.  Would you agree, Mr. Benisti, that Mr. Bensinger was

19   somewhat of a handler for Mr. Gadtaula?

20            MR. DAHAN:  Objection to form.

21   Q.  He was taking care of that relationship.

22   A.  They were very close, yeah.

23   Q.  I'm sorry?

24   A.  They were very close, I believe.  And he definitely had

25   that relationship, especially when he already left, I think.

K35AHOR8ps                         Benisti - Cross

Q.  And if we look at his entry at 4:50 p.m., do you see where
he says to you, "Stop blowing up our partner, LOL, keep what
you see between us, no one from the office.  Thank you."  And
then you say, "100 percent.  I don't share anything," with a
thumbs up.  Did I read that correctly?

A.  Yeah.

Q.  So is it fair to say that you kept this from everybody in
the office, correct?

A.  That was probably -- again, you -- Sam, I could tell you,
just looked at it the way he was writing it, "stop blowing up
our partner."  I mean, he's not a partner.  He was not my
partner and never has been my partner.  This was an idea of
potentially being able to have PTM sell other products, right,
that eventually would have, you know, made a deal.

Q.  Mr. Benisti, I want to talk to you again about Meretz.  And
specifically what I want to talk to you about Meretz about, do
you remember Meretz taking advances from Major Energy before
commissions were in fact received?

A.  There was a time where I believe it got an advance.  I
don't know what you mean by "before commission was received."

Q.  Well, what I mean by that -- and thank you for asking me to
clarify.  What I mean by that, was there a point in time when
you were talking to Mr. Sobel about finding a way where you
could get money from the company as an advance through Meretz,
even though Meretz had not generated the money yet to get those

K35AHOR8ps                    Benisti - Cross

1   commissions, generated sufficient money to get those

2   commissions?

3   A.   That's not accurate.  Meretz had commissions coming in,

4   being paid out monthly.  So I don't know what you mean by

5   saying that they -- this is up front, before they made a

6   commission?  I don't understand that.

7   Q.   OK.  Well, first what I want to do, Mr. Benisti, is take

8   you to --

9            MS. PECTOR:  James, page 55.

10           THE COURT:  Just for the court reporter, Meretz is

11  M-e-r-e-t-z, is that right?

12           THE WITNESS:  Yes.

13           MS. PECTOR:  OK, so page 55.

14           Your Honor, just so the Court is aware, this is what I

15  said for the Court earlier is redacted images, so that's the

16  only reason why I said it was redacted.

17  Q.   Now, here you're having a discussion with Mr. Sobel, and

18  this is on July 20, 2018.  Do you see that, Mr. Benisti?

19  A.   Yeah.

20  Q.   And again this is during the earnout period, correct?

21  A.   Yeah.

22  Q.   And do you see that there is an entry at 2:15, p.m., that

23  is an incoming message from Mr. Sobel in response to a voice

24  recording that you sent him, right?

25  A.   Yes.

K35AHOR8ps                          Benisti - Cross

1              MS. PECTOR:  James, could you play Mr. Benisti his

2       voice recording, which is 69F3.

3              (Audio recording played)

4       Q.  All right.  So in that voice recording, Mr. Benisti, you

5       were asking Mr. Sobel, who was the CFO of Major Energy at the

6       time, if he could help you set up an arrangement where you

7       could essentially get a loan out of Major Energy, under the

8       pretense that Meretz, the company I think you testified here

9       you weren't involved in, could get an advance.  Is that right?

10      A.  Let me just explain to the judge after -- everything that

11      you just said was very much out of the context, OK?  When we

12      were buying our house, which was in 2018 around noontime, the

13      mortgage broker had told us that if I was able to come up with,

14      I think another $10,000, I was able to take out something

15      called -- basically it was like a PMI meeting, which is like a

16      fee that you would pay if you're buying -- if you take a

17      mortgage which was less than 20 percent of the house value.  So

18      I wasn't sure, you know, what to do.  And I had spoken to, you

19      know -- well, actually, I think me and Nicole had spoken to

20      Meretz a week in advance, I want to see if maybe Meretz was --

21      will lend Nicole, you know, $12,000.

22             THE COURT:  Nicole is your wife.

23             THE WITNESS:  Yes.

24             THE COURT:  And this is asking about Meretz lending

25      Nicole.

1    THE WITNESS:  Yeah.  So I always and regularly spoke

2    to David Sobel about finances.  I'm not a finance guy.  And I

3    wanted to understand if, you know, that money was advanced from

4    Major Energy into Meretz and Meretz is going to lend me that

5    loan, it was not a Major Energy loan.  That was Meretz loaning

6    it to me.  Right.  So that's where it is.  I don't know.  It's

7    totally out of context.  I'm sorry.

8    Q.  Did you sign a loan agreement with Major Energy setting

9    forth the terms on which you would pay back the loan,

10   Mr. Benisti?

11   A.  No.

12   Q.  This was just a side deal that you and Mr. Sobel had?

13   A.  I didn't take any money from Major.

14   Q.  Let's look at Mr. Sobel's response to you.

15       MS. PECTOR:  James, if we could go to the response at

16   2:15.

17   Q.  Do you see, David Sobel responds, "That, I believe, is what

18   I was suggesting first, but then you had the better idea of

19   just of taking just the $9600 now.  You can take the 12K now

20   and then next month, if Meretz earns 4K but only gets 3K,

21   you'll get 80 percent of 4K equals 3200, but then pay back the

22   1K to Meretz so you end up with 2200 and Meretz has the other

23   800.  Makes sense?"

24       Did I read that correctly, Mr. Benisti?

25   A.  That -- this was, again, me asking David Sobel, right, that

1    if I were going to get money, that Meretz was going to loan to

2    us, I would -- I had to, I think it was like one, 20 percent of

3    it or something, so this way he was going to give it up front

4    money, right.  And then I would pay 20 percent.  So instead

5    of -- I was trying to figure out how to get that money back to

6    Meretz, with them keeping the 20 percent.

7             So, again, I was going to get money from Meretz alone

8    and they were getting -- they were holding on to 20 percent of

9    it.

10   Q.  Well, in the end, at 2:27 p.m. on that same string,

11   Mr. Sobel responds, "The 12K might make more sense, and that

12   was my first thought, as that is what you wanted to borrow, so

13   why leave money in Meretz.  However, that's your call," smiley

14   face.

15            And you responded to him, "I hear you."  He says,

16   "That's your call."  And you said, "I hear you."  Right?

17   A.  Again, I asked him for like the -- as the person who was

18   going to stand by.

19   Q.  Now, Mr. Benisti, you've taken the position in this case

20   that you were not affiliated with Meretz, is that correct?

21   A.  My wife was working at Meretz.

22   Q.  Only your wife, correct?

23   A.  And I was working -- and needed help.  And if there was

24   anything I could help her with, I would help her with it, yeah.

25   Q.  Do you remember hiring somebody on the IT side to help make

1    you feel secure that you would work on a Meretz computer while

2    you were at Major Energy without anybody being able to see that

3    you were accessing Major Energy's Wi-Fi on a Meretz computer?

4    A.  I don't recall that.

5           MS. PECTOR:  All right, James.  If you could go to

6    page 74.

7           THE COURT:  By the way, what exhibit is this again?

8           MS. PECTOR:  I'm sorry, your Honor.  This is Exhibit

9    1079.

10          THE COURT:  1079.

11          MS. PECTOR:  Yes, your Honor.

12          THE COURT:  This is all on 1079.

13          MS. PECTOR:  Yes, your Honor.

14          If we could go to page 74, and, James, if you could

15   take it all down.  Very good.

16   Q.  OK.  Now, here, Mr. Benisti, you're talking to Moshe Cohen.

17   Who's that?

18   A.  Moshe Cohen.  Let me see.  High school --

19   Q.  Do you see at 12:25 p.m. you send an outgoing message,

20   Amir@MeretzEnergy.com, correct?

21   A.  Right.

22   Q.  And again you're working for Major Energy during this time

23   period?

24   A.  Yes.  Just, again, this is a lot of out of context stuff

25   here.

K35AHOR8ps                          Benisti - Cross

1              THE COURT:  Just do your best to answer the question.

2              THE WITNESS:  OK.

3    A.  I mean, this is -- yes, between me and Moshe.

4    Q.  Well, you're not talking to your wife in this?

5    A.  Yes.

6    Q.  Let's go on to see what your concern was that you're

7    expressing, because then we fast-forward to July of 2017, again

8    in the earnout period.  Do you have having discussions with

9    Moshe Levine?

10   A.  Mm-hmm, yes.

11   Q.  Who is Moshe Levine?

12   A.  Somebody I was in school with.

13   Q.  And does Moshe Levine have an IT background?

14   A.  He is a -- he is software developer right now.  He's in

15   software.

16   Q.  So he's somebody that you were going to for the subject

17   matter that we see.  Right?

18   A.  As a friend, yeah, I asked him a question.

19   Q.  Let's look at the question you ask him.  11:35, you ask

20   him, "If I'm going to connect to Major Energy Wi-Fi using my

21   Meretz computer, can they see anything?"

22              His response, "Assuming your firewall is on and you

23   only go onto secure web pages, you should be fine."  He says,

24   "by secure, I mean if you're using Chrome, is doing the HTTPS,"

25   and then he provides you with the rest of a website, it looks

K35AHOR8ps                       Benisti - Cross

1   like, right?

2   A.   Mm-hmm, yes.

3   Q.   And you respond -- you want more clarification.  "No.   I

4   mean, can my work see that I am using a laptop and using

5   Outlook that is a Meretz Outlook?"  Did I read that correctly,

6   Mr. Benisti?

7   A.   Yeah.

8   Q.   And he responds, "No, they can't."  And you say, "OK,

9   cool."  That's a message that you sent on July 7, 2017 during

10  the earnout period, correct?

11  A.   Correct.

12  Q.   And that's because you were working for Meretz while you

13  were at Major Energy and you wanted to be sure that people

14  couldn't see what you were doing in Major Energy's offices on a

15  separate computer, right?

16  A.   Can I -- can I explain what's behind?  Again, there's a lot

17  of context that's not here.

18          THE COURT:  Well, does it mean what it says or not?

19          THE WITNESS:  It's -- yeah.  I mean, I guess it means

20  it was -- I guess it can be what it says.

21          THE COURT:  OK.

22  Q.   All right.  Well, do you remember, Mr. Benisti,

23  specifically having opportunities where you were talking to

24  people who could have been sending potential customers to Major

25  Energy, and you were directing them away from Major Energy to

1   Meretz so that you could outsource them to another supplier?

2   A.  So I had an agreement with previous management that if

3   there was a client that I had -- which was not a lot, it was

4   only a handful of clients -- that I couldn't sell them to Major

5   Energy without -- it was too high a risk that client saying,

6   oh, I know he's too high, don't give it, or, you know, lose

7   credibility with his -- with the other account, then we would

8   price that account through Meretz so that this way we know that

9   the customer is getting the cheapest rates across the board.

10  They wouldn't question us with the accounts that are, you know,

11  maybe weren't the cheapest if they weren't with -- if they were

12  with Major.

13  Q.  So you're saying that actually Major Energy, during the

14  earnout period, knew that you were using Meretz to take

15  customers and price them more cheaply with other suppliers?  Is

16  that what you just said?

17          MR. DAHAN:  Objection to form.  That's not what he

18  testified.

19          THE COURT:  You can answer to the extent you want to

20  explain.

21  A.  Can you ask --

22  Q.  Yes.  I believe you just testified that somebody definitely

23  knew about this, right?

24  A.  There was one that I had spoke to.

25  Q.  And that one that you spoke to was Mark Wiederman, correct?

K35AHOR8ps                         Benisti - Cross

1   A.  I'm not sure if it was either him or someone else, but --

2   Q.  Mr. Benisti, isn't it true that when Mark Wiederman found

3   out that you were working with Meretz, that he wanted in on it

4   and he was looking at buying Meretz?

5   A.  I think he even -- he even spoke about it.  He wanted to

6   have a brokerage in-house, like I explained before.  And my

7   original testimony was that when a customer or a client or some

8   of the smaller brokers, if they can't get back to their

9   customer with a good, competitive, cheap rate, it loses

10  credibility with the customer.  We had to be able to offer them

11  a cheaper rate at a time where, if Major wasn't -- if we

12  were -- if we were going to give them a Major rate where it

13  wasn't the cheapest, again, it loses credibility.  We were

14  trying to avoid that.

15  Q.  Well, the person who was in control of giving a cheaper

16  rate was Mark Wiederman, who was the president of the Major

17  Energy during the earnout period, correct?

18  A.  In control of what?

19  Q.  If Mark Wiederman, as the president of Major Energy, wanted

20  to give a lower rate to a broker to be able to, as you say,

21  maintain credibility in the relationship, he could have done

22  that, right, Mr. Benisti?

23  A.  I don't think so, because there was, you know, that -- we

24  know that was something that you couldn't do.  That was

25  something that we spoke about because that was something that

1   Spark would not allow us anymore.  We previously had done that.

2   But now that we weren't able to no more go out there, if a

3   customer has ten accounts that you're not the cheapest on, if

4   he now realizes you're not the cheapest, he's going to start

5   second-guessing you on all your other accounts.  You need to be

6   prepared to give him pricing at the cheapest in case he's, you

7   know, looking into that price right now.  And if you don't give

8   him the rate that's the cheapest, you risk losing his other

9   business.

10  Q.  OK.  Well, let's look at some examples of you getting

11  opportunities for business and not booking those opportunities

12  with Major Energy, OK?  Do you recall that happening?

13  A.  Possible.  Why not?  I don't think I was doing that.  But

14  maybe, you know, on a case-by-case basis.

15  Q.  Well, let's look at page 72, same document, and let's look

16  at the communications with Evan Gervis, if you could just blow

17  up the bottom here, James.

18          Now, who was Evan Gervis?

19  A.  He's also a friend of mine.

20  Q.  He's a friend of yours who would bring you business

21  opportunities in terms of customers that were looking for

22  electricity and gas supply, right?

23  A.  No.  I think -- he just -- he owns some of those different

24  properties.

25  Q.  Let's see what he's asking you.  This is on August 2, 2017.

1    Again, we're in the earnout period, correct?

2    A.  Mm-hmm.

3    Q.  And he said, "Hey Amir, any update re electric rates?"  And

4    your response is, "Shoots, I was supposed to call you.  When

5    can we talk?"  He says "I'm available for the next 20 minutes."

6             "OK, call a few."  "OK."

7             "And then you say, "Hi Evan, you're in contract for

8    0829 and they are adding 0515, which brings us up to .08805."

9             Did I read that correctly?

10   A.  Yes.

11   Q.  And so you're specifically talking to him about the

12   contract he's in and the pricing, right?

13   A.  That was, I think, the contract.

14            MS. PECTOR:  And if we can go to the next page.  I'm

15   sorry, James, page 72.

16   Q.  Was he a broker for Major at the time?

17   A.  No.

18            MS. PECTOR:  If we go to the top of 73, James.  And

19   let's just blow up the first ten lines.

20   Q.  And then you are responding providing the pricing, correct?

21   And you tell him, "Evan, I can get you as follows."  You give

22   him a 12-month rate, an 18-month rate, and a 24-month rate,

23   right?

24   A.  Yes.

25   Q.  And you say, "And I can start the rate in September,"

K35AHOR8ps                    Benisti - Cross

1    correct?

2    A.  Yes.

3    Q.  His question back to you, "With Major?"  And he says,

4    "Let's do 24 months as I can always cancel," smiley face.

5            And your response, Mr. Benisti, "LOL, this one isn't

6    with Major.  Ha ha.  This one we would need to stick to."

7            Is that an example, Mr. Benisti, of you having

8    somebody come to you for electricity and gas pricing, while

9    you're working with Major Energy during the earnout period, and

10   you're offering him alternative pricing for another supplier?

11   A.  So as I mentioned just before, Evan had multiple different

12   properties.  I'm not sure which property this one is referring

13   to.  But if I were not going to get him the cheapest price,

14   that, again, opens up the risk of him looking into the other

15   properties that we currently have and possibly losing that.

16   Q.  So this is an example, Mr. Benisti, of an opportunity you

17   steered away from Major Energy, correct?

18           MR. DAHAN:  Mischaracterizes the testimony, your

19   Honor.

20           THE COURT:  You can move on.

21           MS. PECTOR:  OK.

22   Q.  Now, Mr. Benisti, it wasn't just the discussion with

23   Mr. Gervis where you looked at diverting opportunities away

24   from Major Energy, correct?

25   A.  I'm sorry?

1    Q.  This wasn't the only time that you looked at sending

2    customers to a supplier other than Major Energy while you were

3    employed by Major Energy, correct?

4    A.  Possible.

5    Q.  All right.  Do you remember having discussions with your

6    wife about that while she was working for Meretz?

7              THE COURT:  Well, with respect to marital

8    communication, the research we've done, although I initially

9    thought a spousal privilege would apply, actually, under New

10   York law -- since this is a diversity case, the privilege is

11   governed by New York law.  And the law is, as indicated by the

12   case *G-Fours v. Miele*, 496 F. Supp. 809, that there's an

13   ordinary business matters exception to the marital

14   communications privilege.  So that to the extent that

15   communications that are spousal communications are familial

16   business matters, there's an exemption for marital privilege.

17   So if there's a truly a business, then there's an exception to

18   the marital privilege; it can come in.  However, I'm going to

19   allow the testimony subject to the plaintiffs's objection and

20   I'll consider a motion to exclude this.  But I'm going to allow

21   the testimony provisionally.

22             MS. PECTOR:  Thank you, your Honor.

23             James, if we can pull up page 77.  And if you'll start

24   off, first, with the bottom 20 lines.

25   Q.  Now, Mr. Benisti, I want to turn your attention to the

1    communication that you're having, and it says "Nicole, my

2    love."  That's your wife, Nicole Benisti, correct?

3    A.  Yes.

4    Q.  And she was working for Major Energy -- I mean Meretz, at

5    the time, correct?

6    A.  Yes.

7    Q.  And Meretz was a broker of Major Energy at this time,

8    correct?

9    A.  Yes.

10   Q.  And Major Energy was paying Meretz a brokerage fee for the

11   work that she was doing, correct?

12   A.  Yes.

13   Q.  And the work that she has been doing involved finding

14   pricing for customers and putting them with certain suppliers,

15   and in exchange, if she could place those customers, a

16   commission would be given to her, right?

17   A.  I'm not understanding the question.

18   Q.  If your wife could place customers with the supplier, she

19   would get a commission, correct?

20   A.  I believe that's -- there is --

21   Q.  Let me give an example of her reaching out to you.  Here we

22   are looking at August 8, 2017, 10:55 a.m.  And she asks you,

23   "Sending Simchis RFP to Major?"  And you respond, "We will get

24   you a new one.  Simchi don't send to Major," thumbs up.  Did I

25   read that correctly?

1   A.  Yes, because an RFP is a request for price, which is what I

2   explained earlier.  All these deals -- not all, but the deals

3   that I personally was working on, those are my better clients.

4   I was pressing it internally with Major.  I didn't see a point

5   to have her send it in.

6   Q.  Well, you don't say that here.

7   A.  Well, you also don't mention that there is -- I went

8   through this, and there's stuff in here that I told my wife,

9   "send it to Major," and you didn't put that in there either.

10  Q.  Well, let's look at another communication, Mr. Benisti.

11  Let's look at page 79.

12          MS. PECTOR:  And, James, you can just blow up the

13  first 25 lines.

14  Q.  OK.  So here we're talking about the entry starts with

15  "Rockefeller -- start date?"  Which is an incoming message from

16  her to you.  "Did December start, sent to everyone on the list

17  besides Major and" -- was that Agara?  "Well request a refresh

18  tomorrow or Thursday."

19          And then you respond, "I understand your frustration.

20  It's very hard for me to be the sales guy and at the same time

21  work at Major.  I am working on getting Sunil to get his stuff

22  together so we can start work" -- what are you referring to

23  there?  The other business that Sunil was starting up?

24  A.  I have no idea what I was referring to.

25  Q.  And then you say, "By the way, can you send out the Danza

1    lesser gas today?"

2              And then you follow up with, "Don't send to Major."

3    Do you see that?

4    A.  Yeah.  We were pricing that deal.  I was pricing that deal

5    directly at Major.  And for that matter, yes, I don't even know

6    if that might have been my deal.  That might have been one of

7    other salespeople I have no idea.

8    Q.  All right.  Well, what we see in this communication is you

9    telling her not to send that deal to Major, right?

10   A.  Yeah.  Like I said --

11   Q.  Now let's look at another example.  87.  If we could look

12   at page 87, the bottom of the page, just blow up the last five

13   lines, James.

14             Now, this is an outgoing message from you on November

15   2, 2018.  You'll agree, Mr. Benisti, this is still during the

16   earnout period, correct?

17   A.  I believe so, yeah.

18   Q.  And you're telling her, "Just finished up.  Closing down

19   a.m."  And you send a message, "Did Channa send Windsor Gardens

20   to Major to price?"  And Channa was the employee that was

21   working for your wife at Major Energy, correct?

22   A.  Correct.

23             MR. DAHAN:  She said "wife at Major Energy"?

24             MS. PECTOR:  I'm sorry.  Thank you, Mr. Dahan.

25   Q.  I meant at Meretz.

1    A.   Yeah.

2    Q.   And the incoming message from her is, "No idea.  I'll ask."

3              And your response is, "Don't send any Windsor stuff to

4    Major."

5              And she said, "OK.  No problem."

6              Did I read that correctly, Mr. Benisti?

7    A.   Yes.  For that matter, Windsor actually signed directly

8    with Major Energy.  So I appreciate your using that as -- isn't

9    that a great case there.  She's taking him out of context.

10   Which is why, when I discuss things with my wife, I talk with

11   my wife and she takes it out of context to try to make it as if

12   I'm doing something bad over here.  I just wanted the judge to

13   understand that.  This is after a six-month deal with a very

14   high margin.

15   Q.   Mr. Benisti, did you ever disclose to anybody -- well, let

16   me ask you, wouldn't you agree that there was a time period

17   when you were worried about Mr. Wiederman finding out about you

18   working for Meretz?

19   A.   Possibly.  I'm not sure.

20   Q.   Just take a look.  If we can go to page 77.  And if we

21   could, on page 77, if we could start at the 7:26 entry and blow

22   up the next 15 lines.  OK.  Now, this is during the earnout

23   period, Mr. Benisti.  Do you see we're at July 26, 2017?

24   A.   Yes.

25   Q.   And you're sending an outgoing message to your wife.

K35AHOR8ps                    Benisti - Cross

You're saying, "I'm swamped here.  Something fell through the
cracks and Mark noticed."  She responds, "I'm so sorry.  I'm
sure that's rough."

        You respond "Ya, I haven't been so focused.  It's no
good but I want Meretz to pick up.  Mark totally saw my laptop
today."

        Her response:  "Oh, my God, you need to be more
careful.  Did you comment?  It shouldn't be out ever.  You
should only use in the car."

        And you respond, "I think he saw for sure.  I'll make
a comment one day about it."

        And she says -- she sends you a -- some type of meme.

        THE COURT:  Those are emojis.

        MS. PECTOR:  Emojis, I'm sorry.

        I stand corrected by everybody in the courtroom.
Emojis.  Thank you.

Q.  Apologies for that, Mr. Benisti.

        And you respond, "I know.  It sucks."

        So did that refresh your memory that you were worried
about Mark finding out that you were working for Meretz while
you were working for Major Energy?

A.  If that's what's being -- I don't read full -- where's
that?

        So, yes, I don't recall this even happened, but if
it's a message to my wife, I guess it happened.  So, yes, there

1    were times where, if it was just, you know, again, easier for

2    those few clients to be able to just see what the pricing is,

3    and we actually used this for our advantage a lot also.  They

4    would call me and they would call me that had relationships

5    with Meretz Energy, very good relationships.  I'm saying that

6    you just keep that relationship, it's a good relationship, we

7    can get pricing from other buyers, we know where other buyers

8    are at.

9    Q.  Do you tell to Mr. Meretz and Mr. Leonard when you spoke to

10   him that I'm helping my wife with Meretz and actually Mark

11   Wiederman wants to buy into Meretz?

12   A.  I, I don't think I was helping my wife with Meretz.  It was

13   a deal.  I was dealing with my deals, my direct clients, that I

14   didn't want to lose the relationship with because of the

15   pricing with Major Energy.  Major's pricing had just gone

16   totally out of whack, where I didn't have a choice.  It was --

17   at the end of the day we had clients that were turning to me

18   for competitive pricing.  If I wasn't able to do that, then

19   Nicole would help me out.

20   Q.  Mr. Benisti, during the earnout period, you had a Meretz

21   e-mail address, right?

22   A.  Correct.

23   Q.  During the earnout period you had a Meretz computer,

24   correct?

25   A.  I don't think it was a Meretz computer.  I know exactly

K35AHOR8ps                          Benisti - Cross

1    what you're referring to.  It was a tablet.

2    Q.  OK.  You had a tablet that you used to access your Meretz

3    e-mail on the Outlook at Major Energy, correct?

4    A.  Yes.

5    Q.  And you would --

6    A.  Not -- I want to get it out there.  I don't even recall the

7    incident, that incident happening.  So I just want to let you

8    know that it was clearly not an often occurrence, but if I knew

9    that there was a deal that, you know, a customer wanted to

10   sign, I wanted to make sure that I was getting them.

11   Q.  During the earnout period during working hours, you would

12   check your Meretz tablet while you were on Major Energy Wi-Fi,

13   correct?

14   A.  I don't believe I used the Wi-Fi.  I asked about it.  I

15   don't believe I ever used the Wi-Fi.

16   Q.  You do recall that Mark Wiederman saw you using your

17   computer to check Meretz' e-mail, during working hours,

18   correct?

19   A.  Yeah.  He may have seen a tablet on a desk or something.

20   Q.  And do you remember having a conversation with

21   Mr. Wiederman about that during the earnout period?

22   A.  I, I had a conversation with him about Meretz.  I don't

23   remember if it was before this or after this.

24   Q.  Let's look at --

25                THE COURT:  How much longer do you think you have?

 1   It's getting pretty late.

 2              MS. PECTOR:  Yes.

 3              THE WITNESS:  I was supposed to travel to Canada

 4   tonight.  And I just want to understand, you're sitting here

 5   drilling me.  I think that -- also, let's set some context.

 6              THE COURT:  Hold on.  Wait till the question.  Your

 7   lawyers will get a chance to do redirect.  I know it's a weird

 8   context, and that's how trials are, but you just have to try to

 9   focus on the questions, and then your lawyers will be able to

10   give you another chance if they think it's appropriate.

11              MS. PECTOR:  Your Honor, I'll tell you there is more

12   with this witness that's not cumulative.  I apologize.  I

13   didn't realize what the time of day is.  And I do recognize

14   it's late.  I don't know if you want this witness to come back

15   tomorrow and we'll finish up with him or how you'd like to --

16              THE COURT:  Well, how much more do you think you have?

17              MR. DAHAN:  Your Honor, we -- OK, how much more do you

18   have?  You could answer that.

19              MS. PECTOR:  Well, could I just have a one-minute

20   moment to look at my notes?  Maybe 30 minutes.  I could try and

21   be quick.

22              THE COURT:  I don't think we can go that late.  I

23   didn't even know the court reporters were going till 6.  And

24   it's almost 6.

25              MR. DAHAN:  Your Honor, we previewed with other

1   counsel.  And maybe we argued for five minutes or ten minutes

2   on the WhatsApp.  So that I don't want to hear that as an

3   excuse.  I previewed, how long are you going to have on cross

4   on this witness, so I could figure out time.  We certainly had

5   other witnesses going today.  So we could have even had

6   Mr. Gibson first in light of that.  So, you know, this witness

7   is traveling, and for a party who is not party to this case,

8   having him come out twice, this -- you know, I had previewed in

9   advance around how long so we could factor this in.  This

10  cross-examination has gone way beyond that previous testimony.

11  Now you're at another half hour on top of that.

12          THE COURT:  Yes.  I mean, I can give you another five

13  or ten minutes.

14          MS. PECTOR:  OK.

15          THE COURT:  So just focus on what you really need.

16          MS. PECTOR:  OK.  I'm just going to finish up and then

17  I'll do the rest.

18          James, would you pull up the bottom of 79, top of 80.

19  Q.  Mr. Benisti, if you look at the last five lines of page 79

20  and the first five lines of page 80, do you see, here you are

21  on March 7, 2018, still during the earnout period.  You say,

22  "I'm about to sit down with Mark."  That's Mark Wiederman,

23  correct?

24  A.  I believe so.

25  Q.  And your wife said, "OK, great, so call me later."  You

1    say, "OK, will do."  And you say, "He's for sure going to want
2    to speak about Meretz also, so in case I call, I start off with
3    Meretz, you know I'm with him."
4           And if we go on to the next page, you say, at 2:16
5    p.m., "Just had a long meeting with Mark.  Went well, spoke
6    about a lot of stuff.  He's dead serious about buying Meretz,
7    by the way, and he's serious about Monticello.  LOL.  Great.
8    Can I call you?"
9           Did I read that correctly, Mr. Benisti?
10   A.  Yes.
11   Q.  Does that refresh your memory that once Mr. Wiederman, who
12   was the president of Major Energy at the time, found out about
13   this, instead of disciplining you and telling you you shouldn't
14   be working for Meretz while working for Major Energy, he
15   actually said, "I want in and I want to buy Major Energy."  Is
16   that right?
17          THE COURT:  Meretz.
18   A.  Again, just to put it in context, he and even, I believe, I
19   think he spoke to Nathan about this also.  He wanted to have a
20   way of double -- of, you know, having the best price and having
21   that consistently competitive price at all times, having the
22   broker who could accomplish that.  I, you know, yes, so that's
23   that.  So if he want to buy it he had thought of it and he said
24   he was going to ask Nathan, and I believe Nathan said no.
25   Q.  Mr. Benisti, let's just look briefly at DX 557, which

K35AHOR8ps                          Benisti - Cross

1    Mr. Dahan went over with you.

2    A.   That's who?

3    Q.   PX 567.

4            This is a communication that Mr. Dahan went over with

5    you.  Do you remember him asking you about Chris Martin sending

6    you an e-mail saying, "I'm glad you're going to continue with

7    Major because their" -- referring to Spark's process was time-

8    consuming and slow?  Do you see that?

9    A.   Yes.

10   Q.   That broker continued to stay with you after the dropdown

11   with Spark, correct?

12   A.   I believe -- when you say "continued," I'm not sure what

13   you mean "continued."  Again, it's not like -- these brokers

14   don't cancel their agreement.  So I believe he continued.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MS. PECTOR:

2   Q.  And you will agree, Mr. Benisti, that if Chris Martin knew

3   about Spark Energy's processes, it's because he was already a

4   broker for them, right?

5   A.  As far as -- I would assume so, yeah.

6   Q.  Let's go to PX750.  PX750 is another document Mr. Dahan

7   went over with you from Mark Wiederman.  And this was the one

8   where he was expressing frustration about not getting pricing

9   fast enough.  Do you see that?

10  A.  Yes.

11  Q.  If you look at the date of this e-mail, this is August 10,

12  2016, and just to orient you, Mr. Benisti, the dropdown didn't

13  occur until August 23 of 2018 -- sorry.  '16.  So you will

14  agree with me just so you know during this time period do you

15  know that Major Energy had not yet been dropped down to Spark?

16  A.  I mean I wasn't involved in the nitty gritty.  All I know,

17  if I remember correctly, from the beginning I think once it was

18  out there, I believe people -- yeah, I am not sure what the

19  nitty gritty happened behind the scenes.

20  Q.  Okay.  At the top of this e-mail, Mr. Wiederman says "This

21  is a very large gas account that I have a very close personal

22  relationship with."  And here is the important part, Mr.

23  Benisti.  He says, "Due to PSE gas constraints, we have never

24  been able to get gas accounts from this client."  Did I read

25  that correctly?

1  A.  Yes.

2  Q.  Do you recall that prior to the dropdown to Spark there

3  were -- Major Energy did not have the ability in certain

4  markets to price gas accounts through PSE?

5  A.  I think our pricing for gas wasn't as competitive as the

6  electric was.  I think that's what he was trying to get at.

7  Q.  Well, in fact PSE was not in certain gas markets; isn't

8  that right?

9  A.  I don't know.  I am not there.

10  Q.  In any event, this customer that we see in this e-mail was

11  not a gas account customer that Major Energy had previously had

12  before the dropdown, correct?

13  A.  Ask your question again.  What's the question?

14  Q.  This gas customer was not a customer that Major Energy had

15  previously had before the dropdown, correct?

16  A.  I don't know if that's correct or not.  I'm not sure.

17  Q.  Mr. Benisti, do you recall that after Mark Wiederman was

18  terminated, you had concerns that he was going after Major

19  Energy's customers?

20  A.  I possibly could have had concern.

21  Q.  Do you remember specifically talking to Mr. Sobel about the

22  need to shut down access to the system because you thought Mark

23  Wiederman was going into the system?

24  A.  I think I was doing the responsible thing that every

25  employee should have done, you know, and let them know, hey,

1    these are log-ins that we had access to, change the passwords,

2    which is exactly what I did.  I told them these are passwords

3    that were there, and we changed all those passwords.

4    Q.  If I could briefly pull up page 70.

5              THE COURT:  This is after the earnout.

6              MS. PECTOR:  Yes, your Honor.

7    Q.  Page 70, last three lines, this is April 3, 2019.  Mr.

8    Benisti, that was just a few days after Mr. Wiederman was

9    terminated, right?

10   A.  I believe so.

11   Q.  And you send a message to David Sobel:  "We need to change

12   the ConEd retail access user number and password.  Mark is for

13   sure using that list of our customers and going after them."

14             Did I read that?

15   A.  Yes.  I also want to let you know that there was

16   probably -- there was a two or three month period that I was

17   frustrated at Mark.  You know, I had suspected him of doing

18   something, which I had later found out that he did not do.  So

19   I have no backing, or I didn't hear from anyone that Mark is

20   using these things, but this was -- like I again was invested

21   in the company, and I wanted to make sure that we were changing

22   passwords like what we should do, and that was all it is.

23   You're taking it out of context.

24   Q.  Mr. Benisti, in the interest of time, the last question

25   that I have for you:  Was there a point in time when Saul

1   Horowitz asked you to set up a party for him and his family on

2   Major Energy's company credit card that you felt uncomfortable

3   with?

4   A.   There was one time I think where we used this company for

5   like our holiday parties, so, yeah, we set up some sort of --

6   it was like a few platters or something.

7   Q.   But in particular Saul Horowitz came to you and asked you

8   to use a Major Energy credit card to get food and other items

9   for him to host a party for his wife's family, correct?

10  A.   I don't know who it was for or what, but again there was a

11  company we used, and I think I put an order -- I don't know if

12  I did -- I'm not sure exactly how it went down.

13  Q.   Let us briefly pull up page 63 -- last question -- and if

14  we can just start with the two things above the redaction

15  image, the fifth entry, James, just blow it up.  No, you have

16  to go where it says two things.

17          So just quickly, Mr. Benisti, the context of this is

18  "Two things."  You're sending this message to David Sobel.

19  "One of them is really odd, but I'm just following orders from

20  Saul H."  Is that Saul Horowitz?

21  A.   I believe.

22  Q.   And he said, "You can discuss with him, LOL, to call to

23  discuss with me first.  The second thing is to become the

24  driving experience for David Gotlieb in LA."

25          Now if we can go to bottom of this image, Mr. James,

1    and blow up the rest of that below.

2             Do you see at 10:42 you sent another message to David

3    Sobel that says:  "Saul orders comes out to be in the 900 range

4    somehow.  I sent him a pic asking if it's OK."

5             Sobel asked what he is ordering.

6             You respond:  "His important party.  He is hosting his

7    wife's family."

8             And David Sobel said:  "In the house?  Cheap ass."

9             You respond:  "I just found it odd that he came to me.

10   Why didn't he go to Mark?  He strange.  Or straight to you.  So

11   odd."

12            Did I read that correctly?

13   A.  Yes.

14   Q.  And so was that an example of Mr. Horowitz coming to you to

15   use Major Energy funds for a family party?

16            THE COURT:  Were you going to point out the date?

17   March 2018.

18            MS. PECTOR:  In the interests of time, we have no

19   further questions.

20            THE COURT:  Thank you.

21            THE COURT:  Did you want to move anything else into

22   evidence?

23            MS. PECTOR:  Exhibit 1079?

24            THE COURT:  Well, I think what I will do is, subject

25   to the objections, I will consider admission of the portions

K357HOR9                        Benisti - cross

1   that you went through and exclude everything that you didn't?

2   Is that fair?

3           MS. PECTOR:  Well, your Honor, the only item I would

4   just note for the record is to the extent we would have had

5   more time with this witness, there are other activities that

6   are going on during that period that were evidence of

7   interference.

8           THE COURT:  We are where we are.  Part of it is

9   mechanics of trial, but I'm going to have someone just remove

10  the parties that we didn't go over, so I am not even going to

11  look at them and consider the parts that we went through,

12  subject to any objection.

13          MR. MAROONEY:  Or what they could just do is just make

14  a new exhibit with the parts they actually think are relevant,

15  right, and then we could deal with that.  We will still have

16  objections to that because it's not a party, it's hearsay.

17          THE COURT:  That's fine.

18          MS. PECTOR:  We will be happy to do that.

19          THE COURT:  OK.  So 1079 will be admitted subject to a

20  revised version.

21          MS. PECTOR:  Yes, your Honor.  Thank you.

22          MR. DAHAN:  I would keep my redirect under five

23  minutes.

24          THE COURT:  And you have no other exhibits?

25          MS. PECTOR:  I guess not, your Honor

1    REDIRECT EXAMINATION

2    BY MR. DAHAN:

3    Q.  You were shown some WhatsApp message in August 2018, which

4    is four months, regarding setting up an ESCO that you were

5    thinking about.  Did you open that ESCO?

6    A.  No.

7    Q.  OK.  And that was about 30 months into the earnout?

8    A.  Yes.  Something like that.

9    Q.  And, by the way, those messages happened at nighttime?

10   A.  Yes.

11   Q.  I think you were shown some messages about opening up a car

12   leasing business.  Were you planning to sell energy from the

13   car leasing business?

14   A.  I had planned to tell Sunil he should do this and have an

15   easer time to sell those contracts.  I just thought it was an

16   idea, a good idea.

17   Q.  And did that car leasing business take off?

18   A.  No.

19   Q.  Did it prevent you from doing your job?

20   A.  No.

21   Q.  In fact, I think you were shown earlier about how different

22   relationships you actually grew relationships in 2018.

23   A.  Correct.

24   Q.  And I think we went through an exhibit of certain examples

25   that showed that there was increase in some vendors between

1    brokers between '16 and '18.  I think Ms. Pector showed you,

2    right?

3    A.  Yes, I was committed and worked hard to get there.

4    Q.  By the way, Bruce Shipper was on some of those messages

5    with respect to the ESCO, right?

6    A.  Correct.

7    Q.  Has he been fired?

8    A.  No.  He also has his own energy brokerage that Nathan knows

9    about.  And Peter Whitney also has his own energy brokerage

10   that Nathan knows about and Chris knows about.  My wife works

11   for an energy brokerage that I do not own and my wife does not

12   own.

13   Q.  How many employees does Meretz have?

14   A.  There is two employees:  One half time and one full-time.

15   Q.  Did you steer away $12 million in revenue from Major Energy

16   to Meretz?

17   A.  No.

18   Q.  OK.  Did you steer 110,000 customers from Major Energy to

19   Meretz?

20   A.  No.

21   Q.  In the morning -- sorry -- in the afternoon during your

22   direct you gave an explanation to the Court -- to the Judge --

23   about how the commercial brokerage business ran before and

24   after.  Is there anything in your testimony that you believe

25   was inaccurate?

1    A.  I don't think so.

2    Q.  You talked about a couple examples that were shown to you

3    where your wife said -- or you told your wife don't bid that to

4    Major.  Can you explain why you were telling your wife not to

5    propose a particular RFP to Major Energy?

6    A.  Yes, because the way the RFP process works if there is two

7    people trying to bid one RFP, it gets blocked in the system.

8    They only allow one person to price each RFP.  Since I was

9    currently the one in some of these cases where I was dealing

10   with the customer, I was pricing it directly with Major Energy.

11   Her sending it over would have done nothing, so it was simply

12   don't send it to Major.

13   Q.  Were you actually trying to benefit Major Energy or harm

14   Major in that request?

15   A.  It was a benefit.  There is no point of sending it to them;

16   it's just nonsense, stupid.  I was taking care of it.

17   Q.  Were you trying to steer away that business from Major

18   Energy?

19   A.  No.

20   Q.  In one of your examples you actually said you closed that

21   account for Major Energy; is that correct?

22   A.  Yes, in one case that she had mentioned, that account ended

23   up closing with Major Energy, directly with Major Energy, and I

24   also recall that there was a very high margin on that account.

25           MR. DAHAN:  Nothing further, your Honor.

1      THE COURT:  Thank you.  May I release this witness?

2      MR. DAHAN:  Yes.

3      MS. PECTOR:  Your Honor, just one brief redirect

4  question -- recross question.

5  RECROSS EXAMINATION

6  BY MS. PECTOR:

7  Q.  Mr. Benisti, you came here today to testify voluntarily

8  because the sellers asked you to, correct?

9  A.  Correct.

10      MS. PECTOR:  No further questions.

11  A.  Actually it wasn't the sellers.  Mr. Dahan asked me.  The

12  sellers did not ask me.

13  Q.  To be clear, Mr. Benisti, you came here to testify

14  voluntarily because the sellers' counsel asked you to come and

15  testify about this case?

16      MR. DAHAN:  I subpoenaed him.

17      MS. PECTOR:  If a subpoena was issued, we never saw a

18  copy of it.

19      THE COURT:  Was there a subpoena?

20      THE WITNESS:  I got a subpoena.

21      THE COURT:  All right.  Thank you very much.  You are

22  done.  You are free.  Happy anniversary and have a good trip.

23      OK, folks, I think tomorrow you said you were going

24  to do Mr. Alper and Mr. Chung, is that right?

25      MR. DAHAN:  That's right.

1          THE COURT:  And then are you going to have witnesses?

2      Or no?

3          MR. BROWN:  Plaintiff still has five witnesses.

4          MR. DAHAN:  We are trying.  We hope over the weekend,

5      your Honor -- unless we start cutting witnesses and they're

6      going to say they're calling the witness anyhow.  Then

7      obviously -- but we are going to try to work over the weekend

8      to see, based on the evidence that came in, to see what we can

9      eliminate and get closer to our expert and let them put their

10     case on.

11         THE COURT:  By the time we get to this Friday --

12         MR. DAHAN:  No, through Friday.  I meant through

13     tomorrow.

14         THE COURT:  So can we get to a third witness tomorrow?

15         MR. DAHAN:  So, given that we have to finish by 3

16     tomorrow, your Honor, if you recall, tomorrow, and what I'm

17     again being told as a projection for how long -- they're

18     starting cross -- so what I am being told as a projection for

19     their cross time plus my redirect time on the first witness

20     will be the longer witness.  And the second witness is a direct

21     and cross.

22         THE COURT:  So you think it will fill most of the day.

23         MR. BROWN:  It could fill to 2 o'clock or 2:30.  I

24     don't think it will go to three.  And we discussed it.

25         THE COURT:  So do you want to start?  What time do you

K357HOR9                          Benisti - recross

1   want to start?

2                MR. BROWN:  I'm hoping to be under three hours with

3   Mr. Alper.  He is the former CEO.  And I do talk fast, so I am

4   hoping for 2:30.

5                MR. DAHAN:  If your Honor wants to start at nine --

6                THE COURT:  Let's go for 9:15.  Thanks everybody.

7   Have a good night.

8                (Adjourned to March 6, 2020 at 9:15 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2      Examination of:                              Page

3      ELIOTT WOLBROM

4      Direct By Ms. Corey  . . . . . . . . . . . . 729

5      Cross By Mr. Wilkerson . . . . . . . . . . . 730

6      Redirect By Ms. Corey  . . . . . . . . . . . 783

7      Recross By Mr. Wilkerson . . . . . . . . . . 804

8       MARK JOSEFOVIC

9      Cross By Ms. Becker  . . . . . . . . . . . . 807

10     LARRY TODD GIBSON

11     Direct By Mr. Brown  . . . . . . . . . . . . 832

12     Cross By Mr. Gabay . . . . . . . . . . . . . 832

13     Redirect By Mr. Brown  . . . . . . . . . . . 845

14      AMIR BENISTI

15     Direct By Mr. Dahan  . . . . . . . . . . . . 853

16     Cross By Ms. Pector  . . . . . . . . . . . . 893

17     Redirect By Mr. Dahan  . . . . . . . . . . . 992

18     Recross By Ms. Pector  . . . . . . . . . . . 995

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                        PLAINTIFF EXHIBITS

 2     Exhibit No.                                  Received

 3      253   . . . . . . . . . . . . . . . . 783
        656, 374, 380, 376, 680, and 361 . . . . . . 845
 4      414, 359, 567, 750, and 758   . . . . . . . 889

 5                        DEFENDANT EXHIBITS

 6     Exhibit No.                                  Received

 7      302, 213, and 359   . . . . . . . . . . . . 783
        180 and 494G . . . . . . . . . . . . . . . 830
 8      263 and 995   . . . . . . . . . . . . . . 851
        414   . . . . . . . . . . . . . . . . . . 889
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```