K3B7HOR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   SAUL HOROWITZ,

4                   Plaintiff,

5           v.                              17-cv-7742 (JPO)

6   NATIONAL GAS & ELECTRIC, LLC, et al.,

7                   Defendants.             Trial

8   ------------------------------------x

9                                          New York, N.Y.
                                           March 11, 2020
10                                         9:15 a.m.

11

    Before:
12
                         HON. J. PAUL OETKEN
13
                                           District Judge
14

15                           APPEARANCES

16   KING & SPALDING LLP
          Attorneys for Plaintiff
17   BY:  RICHARD T. MAROONEY, JR., ESQ.
          ISRAEL DAHAN, ESQ.
18        RYAN GABAY, ESQ.
          CHELSEA J. COREY, ESQ.
19        KEVIN O'BRIEN

20

21   MORGAN, LEWIS & BOCKIUS LLP
          Attorneys for Defendants
22   BY:  TROY S. BROWN, ESQ.
          MICHELLE PECTOR, ESQ.
23        DANA E. BECKER, ESQ.
          JARED WILKERSON, ESQ.
24        SU JIN KIM, ESQ.

25

1          (Trial resumed)

2                THE COURT:  Good morning, everyone.

3                We're continuing with the testimony of Mr. Leathers.

4                You were sworn yesterday.  You remain under oath.

5     Ms. Pector, you may proceed.

6                MS. PECTOR:  Thank you, your Honor.

7      DAVID LEATHERS, resumed.

8     CROSS EXAMINATION (Continued)

9     BY MS. PECTOR:

10    Q.  Good morning, Mr. Leathers.

11    A.  Good morning.

12    Q.  When we left the record yesterday we were talking about

13    your opinions with respect to the alleged impact to the

14    residential vendor relationships.  Do you recall that?

15    A.  Yes.

16    Q.  Mr. Leathers, it's correct as we sit here today that you

17    can't identify any residential vendors that stopped doing

18    business with Major Energy during the earnout because of the

19    dropdown to Spark, correct?

20    A.  Incorrect.

21    Q.  Who is the residential vendor that stopped doing business

22    with Major Energy because of the dropdown to Spark?

23    A.  Platinum.

24    Q.  And where is your evidence supporting that, Mr. Leathers?

25    A.  My interview with the seller.

K3B7HOR1                          Leathers - cross

1   Q.  Which seller?

2   A.  Mr. Wiederman, Mr. Horowitz, Mr. Sobel, those were the

3   primary ones.

4   Q.  If we look in the record, Mr. Leathers, can you identify a

5   single document in the record evidence in this case that shows

6   an e-mail from Platinum that says we have stopped doing

7   business with Major Energy because of the dropdown to Spark?

8   A.  No.

9   Q.  And can you identify a single document anywhere in this

10  record that indicates that Platinum stopped doing business with

11  Major Energy because of anything NGE did?

12  A.  I'm hesitating because I've seen a couple e-mails with

13  regards to Platinum and Platinum's interaction with Spark and

14  Major Energy.  I'm not sure if NGE is on those e-mails or not.

15  Q.  You understand, Mr. Leathers, that Platinum was not selling

16  for Major Energy before closing, correct?

17  A.  I'd have to go back and look.  I'm not sure that I believe

18  that that is correct.

19  Q.  Well, can you point to a document in the record or in your

20  expert report that demonstrates otherwise, sir?

21  A.  So, yes.  You can look at -- probably the best reference

22  would be to look at the general ledger detail that includes the

23  customer acquisition cost.  You can take that information and

24  you can divide it generally by approximately $100 for Platinum

25  to get a sense of what sort of volume Platinum was doing before

1  the sale.

2  Q.  Well, Mr. Leathers, if we just simply look at table 13 of

3  your own expert report, isn't it true that you don't report any

4  sales by Platinum for 2015?

5  A.  Let me take a look back at that and see.  What table were

6  you talking about?

7  Q.  Table 13, James, of Mr. Leathers's expert report.  That's

8  not it, James.Mr. Leathers, I am showing you what has been

9  marked as your table 13 in your witness statement.  I apologize

10 for the incorrect reference to your expert report.  Do you see

11 the channel 4 which we previously discussed yesterday is

12 referencing Platinum, and do you see a dash where you have an

13 identification of nothing for Platinum for 12/31/2015?

14 A.  Yes, that's correct.  I am sorry, I must have misunderstood

15 your question.  I thought you said just before the sale.

16 Q.  Now, Mr. Leathers, you did not take into consideration the

17 fact -- well, let me back up for a moment.

18         You will agree with me, Mr. Leathers, that PTM

19 remained a residential for Major Energy throughout the entire

20 earnout period, correct?

21 A.  Yes.

22 Q.  And you heard evidence in this case as you have been

23 sitting here watching this trial that at least $9 million was

24 paid to PTM during the course of the earnout period, correct?

25 A.  Yes.

1  Q.  And when you rendered your opinions with respect to the

2  alleged impact on residential vendors, did you take into

3  consideration Mr. Sobel and Mr. Wolbrom's perspective about how

4  the door-to-door marketing model was working?

5  A.  Yes.

6  Q.  So, let's look at DX813.

7        James, let's go to page 40.  And if we can blow up the

8  middle section, James, of page 40.

9        Now, Mr. Leathers, just to orient you, this is a

10 communication between David Sobel the CFO of Major Energy and

11 Eliott Wolbrom the chief marketing officer of Major Energy, and

12 specifically I want to refer you to their communications.

13 These are occurring first year of the earnout period, October

14 31, 2016.

15        And if we go down, James, do you see where it says

16 "and we won't hit the earnout?"  Right there, if you can blow

17 up that line.  "And we won't hit the earnout without new

18 ideas."  Blow up those next two sentences.

19        All right.  So, Mr. Leathers, this was

20 contemporaneously what the perspective was of the chief

21 marketing officer and the chief financial officer of Major

22 Energy in the first year of the earnout.  Do you see it says

23 "And we won't hit the earnout without new ideas.  You know the

24 D2D model as it stands isn't working.  Definitely not growing,

25 perhaps just replacing churn."

1    Did I read that correctly, Mr. Leathers?

2    A.   You did.

3    Q.   And you understand that what churn refers to is the loss of

4    customers during a particular year, correct?

5    A.   It doesn't have to be with regards to a particular year,

6    but there is churn on a monthly basis, yes.

7    Q.   OK.  And so for purposes of your opinions, you have made

8    the determination on your own that the dropdown caused Major

9    Energy to lose business with its residential vendors, correct?

10   A.   No, I don't think it's on my own.  I think we talked about

11   that the other day.  I mean a part of that is, you know, an

12   assumption and relying on the sellers, but it's not something

13   that I took blindly.  I did a significant amount of analysis

14   around that including, for example, in this case, the churn and

15   how churn changed both before and after the sale and during the

16   earnout period.

17   Q.   When you rendered the specific opinion about residential

18   vendors, you did not rely on Mr. Sobel's comment and

19   Mr. Wolbrom's comment, "You know the door-to-door model as it

20   stands isn't working."  Correct?

21   A.   I relied upon all of the information that I reviewed.  I do

22   recall reviewing some WhatsApp chats.  I don't know that I

23   specifically reviewed this language or not but, you know, I

24   reviewed all the information.

25   Q.   And you certainly in your review saw that there was a

1    significant amount of churn with respect to PTM's efforts to

2    bring in customers, correct?

3    A.   During which point in time?

4    Q.   During the earnout period.  Did you review PTM's churn data

5    during the earnout period?

6    A.   Yes.

7    Q.   And you saw that there was a high level of churn, correct?

8    A.   At what point in time?

9    Q.   Let's talk about year one.  2016 you saw that PTM had a

10   high level of churn, correct?

11   A.   Well, what I saw with PTM in terms of the churn, as I

12   recall, was the churn was actually quite a bit lower than what

13   the projection was in the early part of 2016.  And then you see

14   the churn going significantly like I think up to about 7 or 8

15   percent, maybe beginning in and around the sale actually and

16   into the fall, and remaining at that level, and then as we get

17   into 2018 the churn starts to kind of go back down.

18   Q.   Mr. Leathers, did you review Ms. McGuinness's witness

19   statement in this case?

20   A.   I don't believe I did.

21   Q.   So you didn't review the witness statement in this case

22   that specifically goes through PTM's business model and talks

23   about inappropriate marketing conduct that was occurring that

24   was resulting in bad sales?

25   A.   Well, I don't recall specifically what Ms. McGuinness has

1    said or not said.

2    Q.  And I assume you didn't look at the exhibit that she

3    attached to her witness statement which shows that 265 agents

4    of PTM were terminated during the earnout period?

5            MR. MAROONEY:  I'm sorry, your Honor.  I just object

6    to the continued characterization of other evidence in the case

7    by counsel in her questions.

8            THE COURT:  I mean I am allowing the questions, but

9    I'm not accepting the premises of the questions.

10           MS. PECTOR:  Thank you.

11   Q.  Mr. Leathers, just sticking with Exhibit 813 for a moment,

12   let's go to page 43.

13           James, if you could blow up the middle of page 43.

14           All right.  Just to orient you, Mr. Leathers, what

15   we're now looking at is another communication between Mr. Sobel

16   and Mr. Wolbrom.  This is now in year two of the earnout

17   period, September 27, 2017.  Do you see where Mr. Wolbrom -- or

18   Mr. Sobel comments to Mr. Wolbrom, "I like all those guys and

19   feel bad.  But on the flip side, I definitely understand the

20   sellers' perspective.  Industry sucks.  They need to get

21   whatever money they can from Spark and get the hell away."

22           Did I read that correctly, Mr. Leathers?

23   A.  You did.

24   Q.  Did you take into consideration when you rendered your

25   opinions that the sellers' perspective was that as of 2017 the

1   industry sucked?

2           MR. MAROONEY:   Objection to the characterization of

3   sellers.

4           THE COURT:   Sustained.

5   Q.  Did you take into consideration that the CFO of Major

6   Energy, his perspective in the year two of the earnout period

7   was that the industry sucked?

8   A.  I don't know that I specifically focused on what may or may

9   not have been his opinion with regards to the industry or that

10  it sucked or not, but I certainly took into consideration the

11  opinions of each of the executives at Major Energy as well as

12  those at Spark.

13  Q.  Now, Mr. Leathers, you know from the record that during the

14  earnout period -- and we see this specifically in year three --

15  that the seller executives started to become checked out of the

16  business?

17  A.  I think I have been sitting here the last week and a half,

18  and there has been evidence that suggests -- or claims to that

19  suggestion.

20  Q.  Well, let's take a quick look at page 48 of DX813.  James,

21  if we can pull up -- there you go.

22          And now we're into year three of the earnout period,

23  Mr. Leathers, and here is another communication from the CFO

24  David Sobel to Eliott Wolbrom.  Do you see where he says, "I

25  don't give much of a damn anymore.  Don't really think he does

K3B7HOR1                              Leathers - cross

1    either."  And I will represent to you that this chat he is

2    talking about communications that he is having with Mark

3    Wiederman.  Did you take that into consideration when

4    developing your opinions?

5    A.  It's hard to say that without reading the full context of

6    this chat.

7    Q.  OK.  You can zoom out, James, so Mr. Leathers can see it.

8            Just for purposes of your opinions, really,

9    Mr. Leathers, the high level question is:  Did you take into

10   consideration that the seller executives who were responsible

11   for growing the business were not in fact focused on doing

12   that?

13   A.  Well, certainly you're making a claim and a conclusion that

14   the sellers -- in this reference I assume you're suggesting Mr.

15   Wiederman -- is not involved in growing the business.  I don't

16   see an indication of that, and I have not concluded that that's

17   the case.

18   Q.  Mr. Leathers, do you recall being made aware during this

19   case of the fact that the sellers did not want to spend CAC in

20   2018?

21   A.  I think there is a dispute over that.  Certainly I have

22   seen some evidence with regards to that and heard some

23   testimony about that during last week.

24   Q.  Well, you will agree with me, sir, that CAC spending is

25   critical to growth efforts, right?

K3B7HOR1                          Leathers - cross

1    A.  Not necessarily.

2    Q.  OK.  So you think that you could spend zero in CAC and

3    still grow the business?  Is that your testimony?

4    A.  I don't know that you would -- it would depend on what your

5    strategy is.  Certainly we know, for example, in 2016 that

6    residential customer accounts grew fairly well from residential

7    customers or residential customer accounts coming through the

8    commercial brokerage unit.

9    Q.  Let's look at year three, since we were just there a moment

10   ago.

11            James, can you pull up DX736.

12            Mr. Leathers, just to orient you, Exhibit 736 --

13   DX736 -- is a July 31, 2018 communication from Saul Horowitz

14   with a copy to Mark Wiederman, Mark Josefovic, Michael Bauman,

15   Asher Fried and Israel Dahan.  And it's titled mass marketing.

16   Do you see that?

17   A.  Yes, I do.

18   Q.  And in this communication Mr. Horowitz is sending a

19   communication to Mr. Kroeker.  And without going through the

20   whole communication, which this Court has already seen,

21   Mr. Leathers, I want to focus you in on the last sentence.  Do

22   you see where it says, "The sellers are in unanimous agreement

23   to now halt the mass marketing, and unless we hear a compelling

24   reason from you why we should not - we will make this change

25   effective tomorrow - August 1, 2018 at the end of the business

1   day."

2           Did I read that correctly?

3   A.  Yes, you did.

4   Q.  Does that refresh your memory that the sellers as of July

5   2018 did not want to proceed anymore with CAC spending in 2018?

6   A.  No.

7   Q.  OK.  Well, Mr. Leathers, you knew -- and you certainly

8   understand that if CAC spending goes down, adjusted EBITDA goes

9   up, correct?

10  A.  In a vacuum and in the short term.

11  Q.  All right.  Now, just sticking one moment with your

12  opinions as to the alleged impact on residential vendors.  I

13  assume, Mr. Leathers, that you didn't take into consideration

14  the fact that there was diversion of Sunil Gadtaula's time

15  during the earnout period to other business ventures by members

16  of the sellers' executive team?

17          MR. MAROONEY:  Objection.

18          THE COURT:  Overruled.

19          You can answer.

20  A.  Yes, I certainly considered all the claims that were made

21  available to me in the documents that include allegations

22  associated with Mr. Gadtaula being involved in some other

23  business.

24  Q.  And you were in fact in court when Mr. Benisti testified

25  that one of the businesses they were trying to get Mr.

1    Gadtaula's time for during the earnout period was the car

2    leasing business, correct?

3    A.  Yes.  And as I recall it was going to be tied to the sale

4    of electricity as well.

5    Q.  And you also saw in Exhibit 813 that Mr. Sobel and Mr.

6    Bensinger were working with Sunil Gadtaula to start a cancer

7    swabbing business, correct?

8    A.  There is no way that I can remember exactly what was in

9    whatever exhibit you just mentioned.

10          THE COURT:  You said a what business?

11          MS. PECTOR:  Cancer swabbing business.

12   Q.  Let's just take a quick look back at Exhibit 813.

13          And specifically let's look at page 6, James, at the

14   top.

15          And this is just to refresh your memory, Mr. Leathers.

16   We are still in the earnout period.  Do you see we're on July

17   12, 2018, right-hand column?

18   A.  Yes, I do.

19   Q.  And you see that Mr. Sobel CFO of Major Energy is sending a

20   communication to Sunil Gadtaula?

21   A.  I do.

22   Q.  And he says, "Sunil, please use my g-mail for the cancer

23   stuff, DavidSobel34@gmail.com.  Thank you."

24   A.  OK, yes, I see that.

25   Q.  And then do you see Sammy Boy –– who is Sam Bensinger,

K3B7HOR1                        Leathers - cross

1   director of sales and marketing follows up with, "Yeah, Sunil,
2   use our g-mail accounts.  You know my g-mail
3   Sambensinger@g-mail.com.  Uh, don't send it to Major Energy
4   anymore."  Do you see that?
5   A.  Yes, I see that.
6   Q.  And this is a very long communication going back and forth.
7   For interest of time we won't go through all the communications
8   establishing and going through the efforts that they were
9   engaging in to set up a cancer business and other healthcare
10  businesses.  But did you review these communications,
11  Mr. Leathers, as part of rendering your opinions in connection
12  with the alleged interference on the residential vendor side?
13  A.  I don't know if I reviewed every one of these, but I
14  certainly reviewed a good chunk of them and was familiar with
15  these claims and evaluated these claims along with other
16  claims, as well as the time period of the various claims during
17  the earnout period.
18  Q.  And if we just, James, go to page 11 of this document, and
19  if you could pull up the bottom of page 11 and the top of page
20  12.
21          All right.  So just to reorient you a little bit more,
22  Mr. Leathers.  Do you see at the top of page 12 Mr. Gadtaula is
23  telling Mr. Sobel and Mr. Bensinger, "I will get you in on this
24  deal if you want.  I'm not greedy."  Do you see that reference
25  on July 16, 2018?

1  A.  I do, yes.

2  Q.  And do you see, if we go down, he says, "I want us all to

3  win.  I need help!!  I will go all over.  Bring all the guys in

4  the world.  I don't care."  And Sobel responds, "There could be

5  a shit load of money coming in, so yes we will help.  At first

6  I will need to get a good handle on the ins and outs so we can

7  talk to Mark Wiederman accordingly."  Do did you see that?

8  A.  Yes, I see that.

9  Q.  And did you take into consideration the amount of time that

10  Mr. Bensinger, Mr. Gadtaula, Mr. Sobel and Mr. Wiederman were

11  spending on these other healthcare venture set-ups rather than

12  spending their time growing Major Energy?

13  A.  I considered it, yes.  But I'm not necessarily agreeing

14  with your conclusion, but I certainly considered the

15  allegations with regards to -- and the evidence with regards to

16  the times that they spent or did not spend --

17  Q.  And there is nothing in your expert report or witness

18  statement where I saw where you did an analysis of time spent

19  by executives and vendors on other businesses unrelated to

20  Major Energy and what the economic impact of that lost time

21  was, correct?

22  A.  Correct.

23  Q.  Now, Mr. Leathers, you also didn't consider the fact that

24  Mr. Wiederman testified that Mr. Gadtaula was someone who liked

25  to be treated like a millionaire, and as a result Major Energy

K3B7HOR1                        Leathers - cross

1   had to spend more money entertaining him, that impacted

2   adjusted EBITDA?

3   A.  I'm sorry, I lost you at the very beginning of your

4   question when you said I also did not consider, which is

5   incorrect.

6   Q.  Let me rephrase.  Did you make any deductions in your

7   alleged damage model based upon the fact that Mr. Wiederman

8   testified Sunil Gadtaula liked to be treated like a

9   millionaire?

10  A.  No.

11  Q.  Did you do any analysis of the credit card statements to

12  see how much money was going out the door spending on

13  entertaining Mr. Gadtaula so that he would feel like a

14  millionaire?

15  A.  I didn't put a pen to paper on the numbers with regards to

16  credit card spend, but I certainly investigated, evaluated the

17  entertainment activities -- that's probably a bad choice of

18  words -- but the marketing efforts that Major Energy was

19  involved in, including entertaining its residential and

20  commercial vendors and brokers.

21  Q.  And you will agree, Mr. Leathers, that for all the money

22  spent on entertainment, that is an impact to adjusted EBITDA,

23  meaning the more you spend on entertainment, the lower your

24  adjusted, correct?

25  A.  If you assume that -- let me -- there is a timing aspect to

1   that.  Right?  I mean you spend money on entertainment so you

2   can sustain your business.  So if you want to give me an

3   example of, here, I paid this credit card bill in the month of

4   March but in April I got a lot more business.  In the month of

5   March there's a downward impact, and the month of April there's

6   an upward impact.

7   Q.  You did no analysis to determine what the correlation was

8   between the amount of money Major Energy was spending on Sunil

9   Gadtaula versus the amount of business he brought in, correct?

10  A.  Again, I think I just answered that.  Certainly that is

11  something I considered, and particularly considered because I

12  understood it was -- as I evolved in the case I recognized it

13  was a claim in the case, but I don't think you're going to find

14  an exhibit in my report that summarizes some sort of

15  correlation between those two amounts.

16  Q.  And also, Mr. Leathers, you didn't do a detailed analysis

17  at all of the credit card spending by the Major Energy

18  executives during the earnout period, correct?

19  A.  Correct.

20  Q.  And if we could specifically, James, just briefly pull up

21  DX855.

22          OK.  So what we're looking at, Mr. Leathers, in DX855

23  is the corporate credit card statement for Mark Wiederman and

24  David Sobel for the last year -- sorry -- the last month of the

25  earnout period, this would be December of 2018.  Do you see the

K3B7HOR1                        Leathers - cross

1   closing date at the top?

2   A.  Yes, I do.

3   Q.  And do you see that the balance of the amount that was

4   charged was $93,109.30?

5   A.  Well, that's the balance.  Yeah, I mean that's the ending

6   balance as of January 12, 2019.  No, that's when it's paid.

7   Q.  Let's look at the top.  You see where it says new charges.

8   A.  Yes.

9   Q.  And it says $93,411.67, right?

10  A.  Yes.

11  Q.  So did you do any analysis of the fact that this was the

12  highest amount of any credit card charges during the entire

13  earnout period occurring on the last month of the earnout while

14  CAC spend was down?

15  A.  No.

16  Q.  Now, Mr. Leathers, in terms of your residential vendor

17  impact analysis, did you quantify what the impact was of the

18  restrictions in the Pennsylvania settlement on Major Energy's

19  ability to market during the earnout period?

20          And if we could pull up, James, Exhibit 290.  You can

21  go to the next page, James.

22          Did you put any type of economic quantification,

23  Mr. Leathers, on what the impact would be from a monetary

24  standpoint of the Pennsylvania restrictions with respect to

25  Major Energy marketing during the earnout period?

1  A.  Yes.

2  Q.  What was the deduction that you made from your analysis

3  based upon the restrictions in Pennsylvania?

4  A.  Well, again I don't have an exhibit that has all the pluses

5  and minuses, but Pennsylvania as well as the other regulatory

6  issues, there is a very good summary of them I think in the

7  January 2016 marketing presentation.

8       I considered this, recognized the parties' knowledge

9  of this, recognized the hold-back that was included in the

10  transaction, looked at the projections compared to the actual,

11  looked at e-mail correspondence surrounding this, so it was

12  probably more of a qualitative analysis, but that qualitative

13  analysis led to and was considered as part of my analysis.

14  Q.  Fair to say you can't identify a number in your expert

15  report that was a deduction that you used for the amount of

16  lost business associated with the Pennsylvania restrictions for

17  Major Energy during the earnout period, correct?

18  A.  I don't believe -- I did not conclude that there was

19  evidence of a specific loss associated with any previous

20  actions associated with Pennsylvania.

21  Q.  You didn't do that analysis, correct?

22  A.  I'm sorry, I think I just told you that I did do that

23  analysis.

24  Q.  Well, you didn't do a customer-by-customer analysis in

25  Pennsylvania to determine whether or not there was a loss due

1    to regulatory restrictions, correct?

2    A.   When you say customer, are you talking about customer

3    accounts?  Or vendor by vendor?  I'm not sure how to answer

4    that question.

5    Q.   Well, if there is a table that you can point to in your

6    expert report where you did that analysis.

7    A.   I wouldn't have a table, because when I reviewed the

8    evidence I didn't see any evidence or any indication of a loss.

9    Q.   Let's move on, Mr. Leathers, to Exhibit DX1016.  Did you

10   quantify what the economic loss was for Major Energy as a

11   result of the settlement that was reached with the Illinois

12   AG's office in connection with their investigation of Major

13   Energy's marketing efforts?

14   A.   Can you first -- is this the settlement that was in 2015?

15   Q.   No.  You are aware, Mr. Leathers, that there were two

16   separate proceedings, correct?

17   A.   I'm not sure what you're speaking to.  My recollection is

18   there was a proceeding in I thought prior to 2016 and a

19   settlement with regard to Illinois, and then there was another

20   Illinois matter that started in late or mid-2018.

21   Q.   That's this matter, yes.  The first matter that you're

22   referring to was the Illinois ICC matter, correct?

23   A.   Generally -- well, I don't remember specifically ICC or

24   not.  I just remember a matter in Illinois prior to 2016.  I am

25   just trying to orientate myself between this and the one that

K3B7HOR1                         Leathers – cross

1    was in '18.

2    Q.  So this is the '18 one.

3    A.  OK.

4    Q.  You understood that the '18 one was an entirely separate

5    matter with the Illinois AG's office, correct?

6    A.  I don't know that I concluded that one way or another.

7    Q.  Mr. Leathers, did you make any economic deduction in your

8    damages analysis for lost customers in Illinois due to Major

9    Energy's decision to stop marketing there?

10   A.  Didn't need to.  No.

11   Q.  And let's just briefly pull up DX715.

12          So, looking briefly, Mr. Leathers, at DX715.  Do you

13   see at the top we're at June 12, 2018, still in year three of

14   the earnout period, and Mr. Wiederman is reporting we pretty

15   much stopped marketing anyways in Illinois?

16   A.  Yes, I see that.  And I have seen this before.

17   Q.  You would agree, Mr. Leathers, that the decision to stop

18   marketing in Illinois in the third year of the earnout period

19   obviously impacted growth in the Illinois market, correct?

20   A.  No.

21   Q.  You don't concede that?  Is that your testimony?

22   A.  I don't see it?

23   Q.  No.  You do not concede that if there is no marketing in

24   Illinois, that is going to impact growth in Illinois in year

25   three?

1    A.  OK, now you're asking me a separate question.

2    Q.  Well, can you answer that question?

3    A.  Are you asking me a hypothetical?

4    Q.  Well, I'm asking you would you agree, Mr. Leathers, that if

5    Major Energy pretty much stopped marketing anyways -- as Mr.

6    Wiederman is reporting in this exhibit -- that impacts growth

7    for Major Energy in the Illinois market in year three of the

8    earnout period?

9    A.  I don't see any specific evidence of that.  Certainly if

10   there is -- yeah, I've read this, and I've read the information

11   around that, and I did not conclude that there was any material

12   impact as a result of this.

13   Q.  And there is no table in your expert report or your witness

14   statement, sir, that analyzes the impact of Major Energy

15   stopping marketing in Illinois in year three, correct?

16   A.  I don't think you will find a table that specifically does

17   that.  I think you will find quite a bit of discussion in both

18   my witness statement as well as in my report with regards to

19   regulatory issues during the entire earnout time period.

20   Q.  But I am talking specifically about Illinois, Mr. Leathers.

21   A.  And in 2018.

22   Q.  Yes.

23   A.  Again, I don't know how to answer that any more.  I don't

24   think you will see a specific table that would analyze what the

25   then projections were specific to Illinois and how they may or

1  may not have been impacted and how they may or may not have

2  been mitigated by growth in other areas.

3  Q.  Mr. Leathers, you will agree with me that vendors are

4  notoriously fickle, correct?

5  A.  I don't know that I would agree with that one way or

6  another.  I certainly understand the vendor relationship and

7  some of the sensitivities around the need to manage and

8  continue to manage vendors.

9  Q.  James, let's pull up paragraph 307 of Mr. Leathers' witness

10  statement.

11        All right.  These are your words, Mr. Leathers, in

12  terms of you talking about the alleged impairment to

13  residential vendor relationships.  And do you see that your

14  last sentence says, "Those vendors, however, are notoriously

15  fickle, and maintaining good relationships with them requires

16  significant relationship management by ESCOs."

17        Did I read that correctly?

18  A.  You read it correctly.

19  Q.  And that's consistent with what Mr. Alper was referring to

20  when he testified that vendors are like girlfriends; it just

21  depends on what the flavor of the month is.  Correct?

22  A.  I don't know if I recall that.  Was that in his deposition

23  testimony?

24  Q.  You didn't hear that testimony here in court, sir?

25  A.  I was here with Mr. Alper, but I don't remember that

1    specific testimony.

2    Q.  OK.  Do you remember Mr. Wiederman's testimony that vendors

3    come and go?

4    A.  I'm trying to answer this.  I generally understand the

5    high-level issue you're discussing and your raising.

6    Q.  Mr. Leathers, I was just asking if you remember Mr.

7    Wiederman's testimony that vendors come and go.  Yes or no,

8    sir?

9    A.  I don't remember that specific language.

10   Q.  Let's move on to another topic.  Now you, Mr. Leathers,

11   attempt to opine in your witness statement that Major Energy's

12   projections were reasonable and achievable.  Do I have that

13   correctly?

14   A.  You do.

15   Q.  And again you're not an industry expert in the retail

16   energy space, correct?

17   A.  Right, certainly not from an operations side.

18   Q.  And you didn't consider all the evidence when making this

19   conclusion, correct?

20   A.  No, I considered all the evidence that I had available to

21   me as well as the evidence that I gathered independently of

22   this proceeding.

23   Q.  Now, when you were analyzing the projections to make that

24   determination, you understood that those projections were

25   prepared by David Sobel, correct?

K3B7HOR1                          Leathers - cross

1   A.  Not limited to David Sobel.

2   Q.  I'm sorry?

3   A.  They were not limited to David Sobel.

4   Q.  But you understood that as a CFO he was the person who was

5   generating the projections.  Other people may have had a hand

6   in it, but he was generating them, correct?

7   A.  I don't know how you're defining generating.  I'm happy to

8   explain the process as I understood.

9   Q.  I don't need you to explain the process, Mr. Leathers.  I

10  just need to know from you, did you know that David Sobel was

11  involved in preparing projections, yes or no?

12  A.  Oh, yes, I do know that.

13  Q.  And did you know that David Sobel admitted to embellishing

14  the numbers?

15           MR. MAROONEY:  Objection again to the

16  characterization.

17           THE COURT:  Sustained.

18  Q.  Let's look at the evidence specifically.  We can pull up

19  DX353:

20           So we're looking in --

21           I'm, sorry.  DX170, James.

22           So, Mr. Leathers, DX170 was a communication --

23           And, James, if you can just blow up the top e-mail.

24           This is a communication preclosing between David Sobel

25  CFO of Major Energy and Cliff Adams.  Do you see that the date

K3B7HOR1                          Leathers - cross

1   is January 5, 2016?

2   A.  Yes, I have seen this document.

3   Q.  So you are familiar with this e-mail.

4   A.  Yes, ma'am.

5   Q.  And if we can look at the top, do you see Mr. Sobel says to

6   Mr. Adams, "Hi, as per our phone call, I have updated the

7   workbook somewhat.  I have now embellished a bit on the number

8   of accounts workbook to show that indeed we are adding 129,900

9   customers each year through CAC.  However, the churn is eating

10  up a lot of accounts and just leaving us with net adds of

11  26,000 per year.  Not sure if we want to show them such detail

12  or else leave it summarized as I had it before."

13          Did I read that correctly, Mr. Leathers?

14  A.  Yes, you did.

15  Q.  Would you agree that it is atypical or it is not

16  appropriate for a CFO to embellish their numbers?

17  A.  You know, I think it depends on the circumstances.  I think

18  it would be inappropriate for somebody to make a

19  misrepresentation.  I don't know how else to answer that.

20  Q.  OK.  Did you also know, Mr. Leathers -- when you say that

21  the projections were reasonable, achievable, you were aware,

22  based upon David Sobel's communications with Cliff Adams, that

23  in 2015 customer counts were dropping month over month from May

24  2015 to the end of the year?

25  A.  I don't know that I specifically recall.  I have a vague

1    recollection of that.  I have some e-mail correspondence around

2    that.  But I did see some of that myself in my own analysis.

3    Q.  Well, let's briefly, Mr. Leathers, look at DX206.

4           And if we could go to the second page, James, the last

5    e-mail.  If you could blow the last e-mail up for Mr. Leathers.

6           So just to orient you, Mr. Leathers, we are now

7    looking at January 18, 2016; again this is preclosing.  Do you

8    see it's a communication from Mr. Sobel to Mr. Adams with a

9    copy to Dan Alper CEO of Major Energy?

10   A.  I see that, yes.

11   Q.  And if we look at the second line, Mr. Leathers, do you see

12   that Mr. Sobel is confirming "The customer count has been

13   decreasing every month since May 2015 - not sure how to present

14   that."

15   A.  I see what he is saying, yes.

16   Q.  So does that refresh your memory that in fact what was

17   actually occurring with Major Energy's performance in 2015 was

18   that customer count was decreasing every month through the end

19   of the year?

20   A.  It doesn't -- I mean I didn't -- my recollection didn't

21   need to be refreshed.  I analyzed customer account and customer

22   account growth during all of 2015, both on a residential and

23   commercial basis.

24   Q.  Did you also analyze the fact, Mr. Leathers, that Major

25   Energy had underspent in CAC in 2015?

K3B7HOR1                          Leathers - cross

```
 1              MR. MAROONEY:  Objection to the characterization of
 2     underspent.
 3     Q.  Well, let's just go up to the next e-mail, James, in this
 4     chain.
 5              So this is a continued communication, Mr. Leathers,
 6     from Mr. Sobel to Mr. Adams.  And do you see that his last --
 7     he says  -- Mr. Adams is asking Mr. Sobel, "Can we get the
 8     figures that exclude the adds that churned within the payment
 9     timeframe?  I believe that is what we have been showing them
10     (and everyone else) historically."  And do you see Mr. Sobel's
11     response?
12              I'm sorry.  Do you see Mr. Adams' last sentence, "I
13     don't have a big problem with the shape here - they have an
14     understanding that we underspent last year on customer
15     acquisition."
16              Did I read that correctly?
17     A.  You read it correctly.
18     Q.  Is that something you took into consideration when
19     analyzing that the projections in your mind were allegedly
20     reasonable?
21     A.  Absolutely.
22     Q.  Now, did you also take into consideration that Mr. Sobel
23     changed numbers from time to time?
24     A.  I'm not sure how to answer that.  If you want to point me
25     to something where he may have changed some numbers.  I know,
```

K3B7HOR1                          Leathers - cross

```
  1   for example, adjustments that were made between the channel
  2   model and the final model, if that's what you're addressing.
  3   Q.  We can stay in that same exhibit.
  4           James, if you will just stay in that same exhibit.
  5           And if we go to the very top line, do you see that
  6   here Mr. Adams and Mr. Sobel are talking about customer count,
  7   and do you see that Mr. Sobel asks Mr. Adams, "Would you be
  8   able to change the 12/31/14 figure to about 167K so that the
  9   12/31/15 figure is then in line?  If need be change the 12/31
 10   figure as I also gave you 2014 add/drop data."
 11           Did I read that correctly?
 12   A.  I believe -- can I take just a moment to read this?
 13   Q.  Sure.
 14   A.  OK, I've read this now.  Sorry.
 15   Q.  So you will agree, Mr. Leathers, that it's certainly
 16   inappropriate to go back and change historical performance data
 17   to benefit future needs, correct?
 18   A.  Are you asking me a hypothetical?
 19   Q.  Sure.  Do you think it's inappropriate for a CFO to change
 20   historical financial data to suit their future needs?
 21   A.  Well, I think that's a difficult question to answer without
 22   understanding the context of it.  I mean people restate numbers
 23   all the time because they change the methodology or obtain
 24   additional information, and that's not necessarily wrong.  I
 25   think for a CFO to change something to try to misrepresent
```

1    something would be something that you would want to look at and

2    question.  But obviously that's not what you see here.

3    Q.  Well, we will be back to this document in a moment when we

4    talk about customer count.

5          So, can we briefly pull up PX14.

6          So, Mr. Leathers, what PX14 was was the projection

7    numbers that had been developed by Major Energy for 2015 on a

8    state-by-state basis.  Were these projections that you

9    considered?

10   A.  I'm sure that I did.  I am just trying to --

11         Is this the -- can you go to the --

12   Q.  Go back to the cover e-mail, James, so Mr. Leathers can

13   see.

14   A.  Well, the cover e-mail is not going to do that much for me.

15   Q.  Well, to orient you, do you see where Mr. Sobel says on

16   April 28, 2016, "The attached is the model from where I believe

17   they are getting the 2016/2018 EBITDA target numbers.  The 2015

18   numbers in this model have obviously changed."

19   A.  If you could just take me back to -- if you just give me a

20   minute to look at the numbers, I can orient myself, and I think

21   I can answer your question.

22         OK, yes, this is the -- this comes from what I call

23   the final projection model.

24   Q.  OK.  And specifically if we could just isolate,

25   Mr. Leathers, for 2016, 2017 and 2018, would you agree with me

K3B7HOR1                          Leathers - cross

 1   that where Major Energy was anticipating its most growth was in

 2   Illinois, New York and Pennsylvania?

 3          And, James, if we can highlight the adds in 2016 for

 4   Illinois of 23,000, New York of 25,000, and Pennsylvania of

 5   18,706.

 6          Do you see that, Mr. Leathers?

 7   A.  I do.

 8   Q.  You will agree those were the top three markets that Major

 9   Energy anticipated growing in?

10   A.  Yes.

11   Q.  And without going through each of the columns --

12   A.  At least based on the numbers here.

13   Q.  Without going through each of the columns in '17 and '18,

14   if you just scroll over to '17 and '18, you see that those

15   projections are repeating for each of those years in those

16   states?

17          And, James, would you do the same thing then for the

18   adds in '18.

19          Do you see that, Mr. Leathers?

20   A.  I do, yes.

21   Q.  So the total of that if you do the math is about 67,808

22   customers, which represents about 58.7 percent of Major

23   Energy's projected growth during the earnout period.  Do you

24   generally agree with those numbers?

25   A.  I haven't done that math, but the math seems to be

K3B7HOR1                          Leathers - cross

 1   approximately correct.

 2   Q.  OK.  And when that was done, you will agree that these

 3   projections were not later modified by you to account for the

 4   regulatory restrictions and regulatory actions in each of these

 5   three states, correct?

 6   A.  Correct.

 7   Q.  All right.  And if we look at the gas market just below --

 8   A.  Assuming there were regulatory restrictions that impacted

 9   the numbers.

10   Q.  Well, you know for sure that there were regulatory

11   restrictions that impacted it, because we saw the Pennsylvania

12   settlement that had the regulatory restrictions in it specific

13   as to Major Energy, right?

14             MR. MAROONEY:  Objection.

15   A.  Not correct.

16   Q.  So you didn't analyze Exhibit 290 as part of your work,

17   Mr. Leathers?

18   A.  I don't recall what Exhibit 290 is.  If you show me, I will

19   be able to tell you if I did or I didn't.

20   Q.  It was the exhibit we looked at just a few moments ago

21   which was the Pennsylvania settlement.  And just in the

22   interest of time with the Court, I didn't go through all the

23   restrictions with you, but is that something you reviewed in

24   detail to see all the specific restrictions that were imposed

25   on Major Energy during the earnout period?

1   A.  Yes, ma'am, I did.  And I think we also went through them

2   last week here in court.

3        MR. MAROONEY:  I'm sorry, I don't mean to interrupt

4   you, Ms. Pector.  There is a mistake in the transcript where he

5   answered a question "incorrect" although it says "correct".

6        THE COURT:  OK.  Where is that?

7        MR. MAROONEY:  It's after my objection.

8        THE COURT:  OK.  You said "incorrect" after the --

9        MS. PECTOR:  Are trying to change the witness's

10  testimony here?

11       THE COURT:  Hold on.  The question was, she said,

12  "Well, You know for sure that there were regulatory

13  restrictions that impacted because we saw the Pennsylvania

14  settlement that had the regulatory restrictions in it specific

15  as to Major Energy?  Right?

16       "Objection."

17       Do you remember what you said?

18       THE WITNESS:  "Incorrect."

19       THE COURT:  OK, you said "incorrect" in response to

20  the question, just to clarify the record.

21       MS. PECTOR:  I'm sorry, can you read that question

22  back one more time.  I apologize, Judge.

23       THE COURT:  "Do you know for sure that there were

24  regulatory restrictions that impacted because we saw the

25  Pennsylvania settlement that had the regulatory restrictions in

K3B7HOR1                         Leathers - cross

it specific to Major Energy?"  And then he said "incorrect."

Q.  OK.  So are you suggesting, Mr. Leathers, that there were

no restrictions on Major Energy in the Pennsylvania settlement

in Exhibit 290?

A.  In my answer I wasn't stating one way or another.  All I

was doing was clarifying the fact that I considered that.

Q.  You considered those restrictions in Exhibit 290?

A.  Number one, I considered the language in Exhibit 290.  I

don't fully agree with your interpretation that those are

restrictions and something new and different and, therefore,

would have had an impact on the residential vendors for Major

at the time.

Q.  Mr. Leathers, did you take into consideration the fact that

the data from the U.S. Energy Information Administration showed

that between 2014 and 2018 customer count just across the board

was dropping every year in the industry for New York and

Illinois?

          MR. MAROONEY:  Just again objection to the continued

characterization.

          THE COURT:  Well, I'm not going to assume it's a fact,

but if he adopts it, then it's testimony; if he doesn't, it's

not.

Q.  Let me make it a little easier for you, Mr. Leathers.

          Can we pull up, James, Exhibit 8 of Mr. Dudney's

report -- witness statement.

1           It's Exhibit 8.

2           THE COURT:  This is Exhibit 8 of Mr. Leathers' witness

3   statement?

4           MS. PECTOR:  To Mr. Dudney's witness statement who is

5   the counter expert.

6           THE COURT:  Got it.

7   Q.  OK.  And, Mr. Leathers, what I'm showing you is an exhibit

8   that's in Mr. Dudney's report, and this is just tracking

9   statistical information that came from the U.S. Energy

10  Information Administration.  The blue bar is New York activity.

11  The orange bar is Illinois activity.  And this is just showing

12  the number of residential customers of energy in these markets

13  during this time period.

14          And do you see, Mr. Leathers, that if we look at the

15  2014 to 2018 period, the number of residential customers in

16  each market was declining year over year?

17  A.  Yes, I see that.

18  Q.  And was that data that you incorporated into your expert

19  report or witness statement?

20  A.  Yes.

21  Q.  So, you will agree, Mr. Leathers, that when the number of

22  residential customers decline in a market, that does impact

23  growth opportunities, correct?

24  A.  Excluding all other factors, yes.

25  Q.  You will also agree, Mr. Leathers, that weather is a factor

K3B7HOR1                          Leathers - cross

1  that could impact growth in a market?

2  A.  Yes.

3  Q.  And you will agree that entry of new competitors into a

4  market could impact growth?

5  A.  Yes.

6  Q.  And you will agree that regulatory restrictions could

7  impact growth?

8  A.  Yes.

9  Q.  Customer preferences could impact growth?

10  A.  Yes.

11  Q.  And generally, Mr. Leathers, do you recall that in Mr.

12  Wiederman's testimony he specifically testified that what's

13  really, really hurting customer count was regulatory

14  restrictions?

15          MR. MAROONEY:  Objection.  Yet again mischaracterizes

16  the evidence.

17  Q.  Do you want me to replay for you the Mr. Wiederman

18  recording on that point?

19          THE COURT:  You can ask him the point, and ask him if

20  he remembers as to why.  That's fine.

21  A.  I'm familiar with the testimony, I am familiar with the

22  context of it, and I am familiar with Mr. Wiederman's response

23  to that.  So, I have considered all of that.

24  Q.  Mr. Leathers, did you back out of your damage model the

25  number of low-income customers that Major Energy actually lost

1   as a result of the low-income order?

2   A.   Yes.

3   Q.   Now I want to talk to you about customer count.  If we move

4   forward to that topic.  You have rendered an opinion in this

5   case, Mr. Leathers, if I understand it correctly, that customer

6   count should be determined by adding pending active customers

7   to the number, correct?

8   A.   Yes.

9   Q.   And if I were to boil down the debate between your and the

10  sellers' view, it is that you believe Spark's number is

11  allegedly wrong because it doesn't include pending active

12  customers; is that right?

13  A.   That's correct.

14  Q.   And pending active customers, you will agree with me,

15  Mr. Leathers, are not actual customers that are on flow from

16  Major Energy, correct?

17  A.   Yes, pending active would be a customer that is active not

18  flowing.

19  Q.   So a pending active customer is not yet receiving

20  electricity or gas from Major Energy, correct?

21  A.   That's correct.

22  Q.   And a pending active customer is not yet paying for

23  electricity or gas from Major Energy, correct?

24  A.   Correct.

25  Q.   They are in this zone of pending, not yet on flow, and they

1    could still cancel being a customer, correct?

2    A.   I'm not -- I don't know that I -- I guess technically they

3    could cancel before they come on flow.  I think it depends on

4    the utility and the area that they're in in terms of the

5    ability to cancel and that sort of thing.

6    Q.   Well, you know a customer can cancel their energy choice at

7    any time, right, Mr. Leathers?

8    A.   Yeah, I understand it.  All I was trying to do is clarify

9    that in different areas my recollection is that there is

10   differences with regards to the ability to cancel and how long

11   it takes, in other words, if you go through a full cycle or

12   not.

13   Q.   So your customer count of 173,901, which is an increase

14   over Spark's customer count of 164,000 and change, the

15   difference between those two numbers is you adding in pending

16   active, correct?

17   A.   Yes, that's correct.

18   Q.   And the pending active --

19   A.   Or not deducting pending active is probably a better

20   characterization of that.

21   Q.   Well, you're giving Major Energy credit for the pending

22   active, correct?

23   A.   Yes.

24   Q.   So basically the position that you are adopting is that

25   Major Energy should be given credit to its customer count of

1    customers who are not yet flowing for energy and not yet paying

2    for energy, correct?

3    A.   That's correct.

4    Q.   And I want to now look with you at the definition of what

5    year end customer count is in the earnout agree.  You will

6    agree with me, sir, that that is where the language comes from

7    as to how to calculate customer count?

8    A.   Yes.

9    Q.   OK.  So, James, if we could move to DX1, page 4, and if you

10   could blow up for Mr. Leathers the definition year end customer

11   accounts.

12        And so just to orient us, Mr. Leathers, we're talking

13   about the dispute between the parties as to how to calculate

14   customer count, and you and I are in agreement that -- well,

15   are you in agreement that this would be the definition that you

16   look to to determine how to count it?

17   A.   Yes.  Let me just take a quick read of this here.  OK.

18   Q.   And, Mr. Leathers, can you point to the Court where in this

19   definition it says pending active customers should be counted.

20   A.   Well, the Court, you won't see the language pending active,

21   but the procedures, practices and methodologies used by the

22   companies is when you then go and say, how did they do it, how

23   did they calculate it, that's where you will see that they

24   included pending active customers.

25   Q.   So, Mr. Leathers, you will agree that the language pending

K3B7HOR1                     Leathers - cross

1    active is not in the definition of this term, correct?

2    A.  Yes.

3    Q.  All right.  Now let's go look at how Mr. Sobel was treating

4    this during the earnout period.

5              And specifically, James, if we can go back to DX206.

6              Now actually this is going to be a document from

7    preclosing, Mr. Leathers.  We already previously looked at

8    this, but now we're going to look at it for customer account

9    context.

10             So, james, if you could go to the bottom -- the first

11   e-mail at the bottom.

12             So to orient you, Mr. Leathers, do you see that

13   Mr. Sobel says, "Cliff:  See attached for add/drops for 2014,

14   2015, both by number of accounts as well as RCE count.  Please

15   note that I took out all add/drops that were with us for 15 or

16   less days."

17             Do you see that?

18   A.  Yes.

19   Q.  Now, in your methodology, Mr. Leathers, when you add

20   pending active, you did not take out all add/drops that were

21   with Major Energy for 15 days or less, correct?

22   A.  I hesitate, because I don't know -- I specifically did not

23   do that, however, the methodology that is used and that I

24   understood was used for purposes of preparing the projections

25   and that Major Energy used in the past related to when the EDI

K3B7HOR1                              Leathers - cross

1    was received.  And there is a process in terms of when the

2    customer comes in the door and the customers are due

3    diligenced, and then you get EDI.  So, some of that may be

4    included in this adjustment that Mr. Sobel is discussing, but I

5    did not specifically quantify this 15 days or less number that

6    you're speaking of.

7    Q.  So the only thing you did to determine your customer count

8    is you took Spark's number and added pending active, correct?

9    A.  Well, the math is there.  I looked at the earnout

10   statement, which I can show you how I did it.  So the math,

11   yes, that's the adjustment, but that's not the only thing I

12   did.  I mean there is quite a bit of other work that I did to

13   get to the conclusion that that was the appropriate customer

14   account.

15   Q.  You didn't do this step that Mr. Sobel is talking about in

16   his e-mail as part of your methodology, correct?

17   A.  Correct, recognizing what I answered before as well.

18   Q.  Now, let's go up and see what the impact of Mr. Sobel's

19   deductions are as he is describing it to Mr. Adams.

20            If we can go up, James, to the next page.  Oh,

21   actually, James, we will just blow up this whole page.  That's

22   fine.

23            All right.  So this is sequentially, Mr. Leathers, we

24   are now going up in the communication.  And do you see that

25   Mr. Adams responds to Mr. Sobel on January 24, 2016, and he

K3B7HOR1                     Leathers - cross

1    writes, "If I roll this forward from end of 2014 customer

2    accounts of 163,414, I get to 146,526 at the end of 2015."

3             Do you see that?

4    A.  I do.

5    Q.  So you see the customer account number is dropping when

6    Mr. Adams applies Mr. Sobel's methodology of taking out the add

7    drops for the 15 day churn period, correct?

8    A.  I don't see that.

9             (Continued on next page)

BY MS. PECTOR:

Q.  Mr. Leathers, do you also see that at the top of this
document -- or you're familiar with the fact that there was not
one uniform way in which customers were counted at Major
Energy, would that be fair to say?

A.  I think it depends on the circumstance.  I could certainly
explain for you, if you like.

Q.  Well, specifically, you knew that Mr. Sobel and
Mr. Wiederman had different approaches to calculating customer
count; correct?

A.  I would not characterize it that way.

Q.  Well, let's look at how Mr. Sobel characterized it at the
top of this document.

        Do you see that he says to Cliff Adams, first
sentence:  I probably did not give you that 163K figure at
December 31st, 2014.  Could it be it came from Wiederman, who
tracks accounts a bit differently?

        Did I read that correctly, Mr. Leathers?

A.  You did.

Q.  Okay.  And you know that Mr. Wiederman provided a different
number to Spark for the customer count number during
negotiations; correct?

A.  Yes, I'm familiar with the number that Mr. Wiederman
provided.

Q.  And you disregarded Mr. Wiederman's number; correct?

K3BVHOR2                          Leathers - cross

```
 1   A.  No.
 2   Q.  Well, Mr. Wiederman's number that he provided of 167,000 is
 3   approximately 6,000 customers less than what you calculated;
 4   correct?
 5   A.  Correct.
 6   Q.  So for purposes of your opinions, you disregarded the
 7   number that Mr. Wiederman provided to Spark; correct?
 8   A.  Incorrect.
 9   Q.  Okay, Mr. Leathers.
10         Now, as far as customer count goes, you'll agree with
11   me, Mr. Leathers, that if the parties wanted to include pending
12   active in the definition of year-end customer counts, the
13   sellers had an opportunity to do that; correct?
14   A.  Can you repeat the question?
15   Q.  You'll agree with me that the sellers had an opportunity to
16   put additional language into the definition of year-end
17   customer count if they wanted to include pending active;
18   correct?
19   A.  I don't know the answer to that one way or another.
20         MR. MAROONEY:  Object.  Just object to counsel's
21   characterization of what the contract says.
22   Q.  Well, let's look, Mr. Leathers, at DX-1049.  And we talked
23   previously about Mr. Sobel modifying some numbers.
24         Do you see that DX-1049, the bottom email is the same
25   as what we were discussing:  Cliff, please see attached for
```

1    add/drops '14 and '15, both by number of accounts as well as

2    RCE.  Please note I took out all add/drops that were with us

3    for 15 days or less.

4            That's the same methodology we were just discussing,

5    right, Mr. Leathers?

6    A.  Yeah, we have referenced this a little while ago.

7    Q.  Now, let's look at the top response, which is a different

8    response now, from Mr. Sobel to Mr. Adams.

9            Do you see here this is now January 24th, 2016.

10   Mr. Sobel says:  Our 12/31/15 number of accounts equals

11   151,974.  If I just stop there for a moment.

12           Mr. Leathers, you understand that that's what he's

13   saying the customer account was for 2015; correct?

14   A.  Yes.

15   Q.  And you know that the customer account that Spark

16   calculated for 2016 was 164,000; correct?

17   A.  Yes.

18   Q.  And he says:  The 24-month add/drops I gave you the other

19   day show a net loss of 26,943 over the 24-month period.

20           Do you see that?

21   A.  Yes.

22   Q.  And then he does 151,974 plus 26,943 equals 178,917

23   customers.  Did I read that right?

24   A.  Yes.

25   Q.  And then he goes on to say:  Pretty damn good (& lucky!).

K3BVHOR2                        Leathers - cross

1                Did I read that correctly?

2    A.  You did.

3    Q.  Now, Mr. Leathers, did you take into consideration in your

4    opinions the fact that Major Energy had had some issues with

5    the Better Business Bureau?

6    A.  I recall -- I have a vague recollection of either some

7    discussion or documentation around that.

8    Q.  Okay.

9         MS. PECTOR:  Let's just briefly pull up DX-1079 and

10   look at page 48.  And if we can -- are you on page 48, James?

11   Yes.  If you'll start at the "Yo, I'm sitting with the hotel

12   owner" in the middle of the page.  That's good, James.

13   Q.  All right.  So just to orient you, Mr. Leathers, here we

14   are in --

15        MR. MAROONEY:  I'm sorry, Ms. Pector, I just want to

16   make sure this is the new slightly improved version of DX-1079.

17        MS. PECTOR:  It is, Ms. Marooney.  Your Honor just

18   substituted in to take out all the salacious content of Exhibit

19   1079, and what's left is the substantive comments.

20        THE COURT:  Okay.  Thank you.

21        MR. MAROONEY:  To which we have continued objections

22   on hearsay, relevancy, foundation, on and on and on.  But that

23   said, please.

24        THE COURT:  Okay.

25   BY MS. PECTOR:

1   Q.   Okay.  So, Mr. Leathers, we're now looking at

2   communications during the earnout period.  Just to orient you

3   in timing, this is at the top of the second year of the earnout

4   period, February 8th, 2017.

5         Do you see this is a message from Sam Bensinger.  Sam

6   Bensinger, just to orient you, is the director of sales and

7   marketing for Major Energy.

8         And he says on February 8th:  Yo, I'm sitting with the

9   hotel owner, and he wants to give us business, but our BBB

10  rating is shit and he's worried.  We gotta take care of this

11  ASAP please.  And it's all residential stuff, but we can't have

12  it ruin the commercial side of the business.  Thanks for your

13  input.  Not a joke.  So take care of it.  I have nothing to do

14  with residential.  We're lucky enough to have had A-plus for

15  five years.  I was able to pay off someone.  True.  To move it.

16  Gotcha.

17        Do you see that, Mr. Leathers?

18  A.   I do.

19  Q.   Did you take into consideration that Major Energy had to

20  pay off someone to get their BBB rating up to an A-plus for

21  five years to be able to enhance their business?

22        MR. MAROONEY:  Objection.

23  A.   No.

24  Q.   Did you take into consideration customer complaints that

25  Major Energy had from customers who were concerned about

K3BVHOR2                           Leathers - cross

1    marketing agents reporting that they had switched over to be

2    customers of Major Energy, when they had not approved that

3    switch?

4    A.  I don't recall seeing evidence of that.

5    Q.  Well --

6    A.  So no.

7    Q.  Okay.  Because you didn't consider the witness statement of

8    Heather McGuinness, right?  You just didn't consider the

9    witness statement of Heather McGuinness at all, right?

10   A.  I did not review the witness statement of Ms. McGuinness.

11   Q.  And you didn't review the exhibits to her witness statement

12   which are records in this case; correct?

13   A.  The fact that they are records in the case would tell me

14   that it's likely that I reviewed those documents, but I --

15   without reading her witness statement, I can't tie between

16   whatever exhibits were to her witness statement to the

17   documents in the case.

18   Q.  Mr. Leathers, I want to briefly move with you to

19   aggregation deals.

20           Did you take into consideration in your opinion that

21   Major Energy did not have Green-e certification when it was

22   trying to consider the aggregation deal that Mr. Moeller

23   testified about?

24   A.  You're speaking of the May '17 aggregation deal?

25   Q.  Yes, the aggregation deal that Mr. Moeller testified about

1    that he advised against.  Did you consider the fact that Major

2    Energy lacked Green-e certification at that time?

3    A.  Are you referencing the May '17 aggregation deal.

4    Q.  I don't know if it's the May 17th aggregation deal, I don't

5    have that date memorized.  I'm talking about the one that

6    Mr. Moeller specifically testified about in court.

7    A.  So I may be wrong, but my recollection is is the one that

8    Mr. Moeller was talking about was one in May of 2017.  And I do

9    recall the testimony around the green certification and not

10   having that certification.

11   Q.  Did you just assume for purposes of your opinions that

12   Major Energy would have won that aggregation bid regardless of

13   all the other companies that would have been competing for it?

14   A.  No, I didn't assume that one way or another.

15   Q.  Now, Mr. Leathers, with respect to your PSE consideration,

16   did you consider the fact that PSE and Major Energy had had

17   some historical tensions?

18   A.  Yes.

19   Q.  And did you specifically --

20          MS. PECTOR:  Let's look at DX-431, James.

21   Q.  Did you take into consideration David Sobel's comments

22   during the first year of the earnout period on November 21st,

23   2016, that:  PSE screws us plenty on other parts of the

24   business?

25   A.  Yes.

K3BVHOR2                          Leathers - cross

1    Q.  Did you take into consideration the cost savings that Major

2    Energy had because Spark became the supplier versus PSE?

3    A.  One, that's assuming that there were cost savings.  Two, I

4    did consider the factors around -- whether it be the alleged

5    cost savings and the various pricing proposals that went back

6    and forth during that time period.

7    Q.  Did you have an opportunity, Mr. Leathers, to consider

8    Mr. Leonard's witness statement in this case?

9    A.  I don't believe that I reviewed Mr. Leonard's witness

10   statement.

11   Q.  So you didn't review his quantification of the cost savings

12   that Major Energy received from Spark being a supplier versus

13   Major Energy?

14   A.  Let me correct that.  Maybe I -- I do recall reviewing the

15   cost savings.  It may have been that I reviewed it in

16   Mr. Kroeker's witness statement, but I do have some

17   recollection of a quantification that was made.

18   Q.  Okay.  Mr. Leathers, when you were doing your adjusted

19   EBITDA analysis, did you consider the impact of customer spend

20   decreasing on adjusted EBITDA?

21   A.  Are you asking me did I consider customer -- changes in

22   customer acquisition cost?

23   Q.  Did you consider the decline in customer acquisition

24   spending as being a way to mask that EBITDA was missed in 2015?

25   A.  I'm trying to think about the best way to answer that.

1          I'm familiar with the testimony/documents in and

2    around that time period with regards to customer acquisition

3    cost.  Separate from that, I analyzed in very great detail the

4    customer acquisition cost around that time period.

5    Q.  Okay.

6    A.  So I considered it.  I'm not necessarily adopting your

7    conclusion.

8    Q.  Okay.  Let's look at Exhibit 353, which was another David

9    Sobel email.

10          MS. PECTOR:  And if we could just blow up the top

11   email, James.

12   Q.  So again just to orient you on timing, Mr. Leathers, we're

13   in year one of the earnout period.  This is July 26, 2016;

14   email from David Sobel to Saul Horowitz, Dan Alper, Mark

15   Wiederman, Levi Moeller.  The subject is financials May of '16.

16          Did I read that correctly?

17   A.  Yes, you did.

18   Q.  And if I could just drop you to the bottom of this -- the

19   last two paragraphs.  Do you see where Mr. Sobel is saying:

20   Taking the month of May by itself, our EBITDA number was

21   approximately 500K under projections.  However, our CAC spend

22   for the month was also 500K under projections, thereby allowing

23   us to hit our adjusted EBITDA figure for the month.  However,

24   by having a reduced CAC now, that doesn't bode well for future

25   months.  One of the major things saving us in terms of adjusted

1   EBITDA year-to-date has been our CAC spend of 3.5 million

2   versus six million projected.  That is hiding the miss in

3   EBITDA for now.  Do you see that?

4   A.  I do.

5   Q.  So you understood, Mr. Leathers, that based upon what

6   Mr. Sobel was reporting to the other executives of Major

7   Energy, that the miss on EBITDA was being hidden by the fact

8   that they were spending less on CAC than what was projected;

9   correct?

10  A.  No.

11  Q.  Did you consider this email as part of -- well, I will take

12  it that you didn't rely on this email in respect to your

13  opinions in this case; correct?

14  A.  Incorrect.

15  Q.  You did rely on this email?

16  A.  Yes.

17  Q.  And where is it in your report that you relied on this

18  email?

19  A.  I believe -- I'm not sure if I footnoted this in my report

20  or not.  We can certainly look.  But I have reviewed this

21  email, along with a number of other emails around this time

22  period.  We've talked about it, I think, maybe 25 times in the

23  last week or so here.  So it's something I considered, was

24  familiar with it, understand the concept associated with CAC

25  spend.

K3BVHOR2                         Leathers - cross

1    Q.  Mr. Leathers, in doing your work in this case, did you

2    consider the expense at all that was associated with Major

3    Energy having to develop a brand-new compliance department as a

4    result of the restrictions advanced by the Pennsylvania Public

5    Utility Commission?

6    A.  I considered the -- I don't know that I would call them

7    restrictions, but I considered the terms around the

8    Pennsylvania settlement; and I have considered the testimony,

9    including the testimony in court, around the compliance

10   function at Major Energy.

11   Q.  And for your consider account work that you did in this

12   case, did you consider the fact that the utility can reject a

13   customer such that they never, ever come on flow?

14   A.  Yes, I understand the process.

15   Q.  Mr. Leathers, let me just ask you quickly on the earnout

16   calculation, just as a hypothetical, okay?

17   A.  Okay.

18   Q.  So hypothetical, you're in year one.  Under the methodology

19   that you advance in this case, would it be correct that

20   hypothetically, had Major Energy achieved -- had this crazy Q1

21   quarter, and achieved the entire adjusted EBITDA plan in Q1

22   only -- not taking into consideration what happened in Q2, 3,

23   and 4 -- under your methodology, they would be entitled to the

24   max earnout?

25   A.  I mean, I think you're asking me a hypothetical that maybe

1    was in Mr. Dudney's report.  What you're saying to me is if

2    they had achieved in the first quarter $20 million in adjusted

3    EBITDA --

4    Q.  And customer account had hit the target.

5    A.  And consider account had hit -- and then, after the first

6    quarter, everything fell to zero.

7    Q.  Everything just stayed flat.

8    A.  Okay.  Well, if everything stayed flat, you mean you did

9    another 20 million in the next three-quarters?

10   Q.  Well, let's take your example.  If everything was zero in

11   Q2, 3, and 4, and you hit the entire amount of your adjusted

12   EBITDA target in Q1, and you hit your customer account target

13   in Q1, under your methodology, Major Energy would be entitled

14   to the max earnout for that year one period; correct?

15   A.  The math is correct.

16   Q.  Okay.  Now, Mr. Leathers, just briefly on the loss of key

17   employees, fair to say you didn't quantify damages associated

18   with loss of alleged employees from Major Energy?

19   A.  Not correct.

20   Q.  Well, you didn't quantify the alleged loss of Nechemia

21   Schorr leaving Major Energy; correct?

22   A.  Yes, I didn't quantify out-of-pocket costs associated

23   with -- with her.

24   Q.  And you also didn't consider the alternative reasons why

25   any of the employees that left Major Energy decided to leave;

K3BVHOR2                          Leathers - cross

1  correct?

2  A.  Oh, no, certainly I considered that.

3  Q.  Did you consider the alternative reason that Ms. Schorr --

4  Mr. Schorr wanted an employment contract for Mr. Wiederman, and

5  Mr. Wiederman did not provide an employment contract before he

6  resigned?

7  A.  I don't -- to be honest with you, I didn't consider that or

8  have knowledge of that when I did my report.  But I -- I heard

9  testimony of that in trial, and so -- I don't think it would

10  have changed my opinion.

11  Q.  And you also didn't factor in the departure of Mr. Alper as

12  anything that supports your damage model; correct?

13  A.  I don't understand the question.

14  Q.  You didn't -- you did not factor in the departure of

15  Mr. Alper as a reason why Major Energy did not achieve its

16  adjusted EBITDA customer account targets; correct?

17  A.  No, I considered Mr. Alper -- the factors surrounding

18  Mr. Alper during the entire earnout period as part of may

19  analysis.

20  Q.  So does Mr. Alper leaving Major Energy during the earnout

21  period help support your damage model in your mind?

22  A.  Not one way or another, no.

23  Q.  It was not something you excluded?

24  A.  No.  I think I just said -- just testified that it's --

25  that I considered Mr. Alper's position, his retention, and his

departure, and how it relates throughout the entire earnout

period.

Q.  Well, you saw in this trial, Mr. Leathers, that Mr. Alper

was terminated because of the recommendation of Mark Wiederman

and Saul Horowitz; correct?

A.  No.

Q.  Okay.

        MS. PECTOR:  Well, let's pull up DX-559.

        Can you go to the last page.

        You can just blow up the letter.

Q.  So Mr. Leathers, what I'm showing you is the letter that

was signed by Mr. Wiederman and Mr. Horowitz, both calling for

the termination of Mr. Alper on April 27, 2017.

        Do you see that?

A.  Yes.  Let me just take a quick look at this.

Q.  Sure.

        (Pause)

A.  Okay.  So I'm familiar with this letter.

Q.  And specifically, I just want to highlight the second

paragraph.  Do you see there, Mr. Leathers, that Mr. Horowitz

and Mr. Wiederman specifically agreed:  We also agree that the

sellers will not allege or make any claim under the MIPA, the

earnout agreement, or otherwise, that taking this action

reduces or jeopardizes the earnout under the MIPA or restricts

the Major companies from operating in accordance with Section

K3BVHOR2                          Leathers - cross

```
 1   2.7 of the earnout agreement, or otherwise interferes with the
 2   operation of the Major business.  Did I read that correctly?
 3   A.  Yes.
 4   Q.  So even though the sellers represented to Spark that they
 5   would not factor in Dan Alper's departure at all as a reason
 6   why there should be any damages down the road, you considered
 7   Mr. Alper's departure as part of your damage model; is that
 8   right?
 9   A.  I'm trying the best to answer that.  No.
10   Q.  Mr. Leathers, did you take into consideration in your
11   damage model the fact that executives of Major Energy were
12   taking free energy from Major Energy and charging back a
13   commission for themselves?
14   A.  I'm familiar with those allegations, and it's something I
15   considered.
16   Q.  And specifically --
17           MS. PECTOR:  James, if you'll pull up 813A, B, and C
18   and just play them sequentially for Mr. Leathers.
19           813A, B, and C.
20           (Audio played)
21   Q.  Mr. Leathers, that was Mr. Wiederman's commentary on
22   locking himself into a two-year contract for essentially free
23   energy on the last day of the earnout period.
24           Did you make a deduction for that in your damage
25   model?
```

K3BVHOR2                              Leathers - redirect

```
 1   A.  It's something I considered, and did not make a specific
 2   mathematical deduction for that.
 3              MS. PECTOR:  Pass the witness, your Honor.
 4              THE COURT:  All right.
 5              Let's take a five-minute break.  Okay.
 6              (Recess)
 7              MS. PECTOR:  Your Honor, I apologize.  I didn't
 8   introduce in the exhibits.
 9              THE COURT:  Okay.
10              MS. PECTOR:  It's DX-170.
11              THE COURT:  Yes.
12              MS. PECTOR:  PX-14, DX-1049, DX-431, DX-813A, DX-813B,
13   and DX-813C.
14              THE COURT:  All right.  They are received.
15              (Plaintiff's Exhibit 14 received in evidence)
16              (Defendants' Exhibits 170, 431, 813A, 813B, 813C, 1049
17   received in evidence)
18              MS. PECTOR:  Thank you, your Honor.
19              THE COURT:  And Mr. O'Brien, redirect.
20              MR. O'BRIEN:  Thank you.
21   REDIRECT EXAMINATION
22   BY MR. O'BRIEN:
23   Q.  Good morning, Mr. Leathers.
24              What is your opinion as to the amount of the sellers'
25   damages in this case?
```

K3BVHOR2                        Leathers - redirect

1   A.  $26,000,000.

2   Q.  How did you arrive at that opinion?

3   A.  That -- the math there is that the sellers, if they had

4   not -- if they had been able to run their business as they had

5   prior to the dropdown, they would have likely achieved the full

6   contingent payment, plus potentially an executive earnout.  So

7   that's the $35 million, less the $9 million that they've been

8   paid is the approximate $26,000,000.

9   Q.  How did you determine that the sellers would have earned

10  the full earnout?

11  A.  Could you repeat the question?  I couldn't hear you.

12  Q.  How did you determine that the sellers would have earned

13  the full earnout -- or the full contingent payments?

14  A.  I think the easiest way to describe it is I performed a

15  top-down analysis; that is, the evaluation of the projections

16  and the conclusion that those projections were reasonable and

17  achievable.

18         And then I also did a bottom-up analysis that

19  essentially does an analysis of the various claims in this case

20  and calculates individual damage amounts proposed, and

21  reconcile the difference between those two numbers.

22  Q.  Where in your testimony, your written statement, sir, do

23  you lay out that bottom-up opinion?

24  A.  I have a table in my witness statement towards the back.  I

25  can't recall the exact table, maybe table 25 or something to

K3BVHOR2                     Leathers - redirect

1    that.  It summarizes the bottoms-up approach.

2             MR. O'BRIEN:  Eric, could you pull up table 25 from

3    Mr. Leather's written statement.

4    Q.  Is this the table, sir?

5    A.  Yes, sir, it is.

6    Q.  And would you tell us -- I see maybe a few different sets

7    of numbers.  Can you tell us where to look for your opinion on

8    the damages in this case?

9    A.  Yes.  So I think the simplest way, just zooming in on

10   Exhibit B, you can kind of summarize that.  There you go.

11   Q.  Okay.  This reflects your opinion as to damages?

12   A.  Well, this summarizes the, kind of, my bottoms-up approach,

13   where I have quantified the impacts associated with the various

14   claims in this case.  The math kind of gets you back to it; but

15   that's, to some extent, coincidence.

16   Q.  Could you explain for us how to read this table?

17   A.  Sure.  So what you see at the top, the actual earnout

18   payments, that's the $9 million of what the sellers were

19   actually paid.

20             Then what you see is the methodology and calculation

21   errors.  Those are -- those relate to the methodology

22   associated with calculating the earnout, the customer account

23   adjustments and some of the EBITDA adjustments.

24             Then the bottom section relates to the post dropdown,

25   where I have included an analysis of the residential vendor --

1    the impairment of residential vendors and commercial brokers.

2              And so what you see in two columns here is the

3    left-hand column is the resulting amounts, for example,

4    residential vendors of 19.3 million.  That's if you just

5    assume -- what's the impact of the residential vendor's

6    component to that.

7              The column to the right of that, it gets you to 12.9

8    million, takes into consideration that in calculating that 19.3

9    million, there is some methodological and calculation errors

10   that are included in that number.  So I'm just showing, kind

11   of, the incremental impact of each of these items.

12             And so this then totals to 34.7 million.  And the

13   purpose of that is that this is kind of the reconciliation

14   between -- I have conclusion of the projections were reasonable

15   and achievable and so, therefore, they get the 35 million, all

16   right.  So now I go back and look at it on a more granular

17   basis to see do I get kind of close to that and is that

18   supportive of that.

19   Q.  So your damages amount is that bottom but-for payment,

20   minus what's already been paid?

21   A.  Well, no.  My damage analysis is $35 million, less $9

22   million, which is $26 million.

23   Q.  Thank you.

24   A.  There's some executive earnout calculations in my witness

25   statement as well.

1   Q.  Focusing first on the methodology and calculation portion

2   of your opinion, Mr. Leathers, you were asked about a number of

3   formulas used to calculate the earnout payments.

4            Do you recall that?

5   A.  Yes.

6   Q.  And you've prepared a slide for us that lays out the

7   formulas that have been discussed in this case, right?

8   A.  I did, yes.

9            MR. O'BRIEN:  Eric, would you put the slide up please.

10  Q.  This is the slide you prepared, sir?

11  A.  Yes.

12  Q.  And it shows three formulas for -- and to be clear, these

13  are 2016-specific formulas; is that right?

14  A.  Yes, right.  Example is that -- and I can certainly show

15  you how it would be different for each year.

16  Q.  Could you just give us a brief overview of each one of

17  these formulas.

18  A.  Sure.  So the top is what you see in Exhibit B, which is

19  plan times the achievement percentage.  The middle one is the

20  defendant's formula.  In this particular calculation it has the

21  actual minus the first quarter, because the example here is

22  2016.

23           And the bottom one references the Lancaster memo.

24  This is the April 2017 memo and the formula that I describe in

25  my witness statement as the defendants' pre-litigation formula.

K3BVHOR2                    Leathers - redirect

1   Q.  Looking at these competing formulas, the components under

2   the headings B, C, and D at the top, those are all the same; is

3   that right?

4   A.  Yes, that's correct.  This is -- this is -- I kind of

5   simplified this really to illustrate that where the dispute

6   lies here is should plan be multiplied times the achievement

7   percentage, should actually be multiplied by the achievement

8   percentage, or should the total $20 million earnout cap be

9   multiplied by the achievement percentage.

10  Q.  And that's your understanding of the dispute over the

11  calculation in this case?

12  A.  Yes.

13  Q.  In your opinion, which is the proper formula to calculate

14  the earnout payment?

15  A.  Exhibit B is the proper formula.

16  Q.  Why?

17  A.  It is the only one that takes into consideration the

18  economics of the transaction.

19  Q.  Will you explain what you mean by that, sir?

20  A.  Sure.  So in short, it's the only formula that allows the

21  sellers to achieve the earnout and executive earnout if they

22  meet the targeted earnout and customer account numbers.

23  Q.  The other two formulas do not do that?

24  A.  That's correct.

25  Q.  Will you explain to us why that is?

K3BVHOR2                           Leathers - redirect

A.  Well, so the defendants' formula, you know, multiplying an

actual times an actual to me is -- is -- from an economic

perspective, is -- is nonsensical.  Your actual is what you

achieve.  So there is not a way -- it doesn't fit the economics

of a typical earnout transaction.

        What I've described is a Lancaster memo.  Candidly,

that is what you would normally see in an earnout transaction.

You have a target to be met.  And if you reach your target,

then you -- the formula allows you to obtain that targeted

earnout.  The challenge with the -- the problem with the

Lancaster memo or the Lancaster formula is that it does not

allow or account for the sellers to achieve or to receive an

executive earnout -- not really the sellers, I'm sorry, it's

really the managers that it's describing -- an executive

earnout if the targets are hit.  So it doesn't comply with

the -- what the parties bargained for.

Q.  Ms. Pector asked you about a calculation reflected in

Exhibit 10.2 of the report that you submitted in June.

        Do you recall that?

A.  Yes.

        MR. O'BRIEN:  Eric, could you put the slide to the

left and bring up Exhibit 10.2 of Mr. Leathers' report.

Q.  Looking at Exhibit 10.2, Mr. Leathers, which formula is

this an example of?

A.  This -- really it's just the top piece of 10.2, which is

K3BVHOR2                         Leathers - redirect

1    representative of the Lancaster formula or what I've described

2    in my witness statement as the defendants' pre-litigation

3    formula.

4    Q.   Why did you include this in your report, Mr. Leathers?

5    A.   Why did I include this calculation in my report?

6    Q.   Yes.

7    A.   Because the analysis that I had gone through and the

8    chronology of the negotiations between the parties, I was able

9    to conclude that the parties had come to an agreement, or

10   essentially the -- certainly that Spark had come to an

11   agreement on this amount.  And so it was representative to me

12   to be a minimum amount of what the earnout should be.

13   Q.   Do you opine in your report that this is the correct

14   formula?

15   A.   I do not state that it's the correct formula in my report.

16   Q.   Do you give an opinion as to the correct formula in your

17   report?

18   A.   Yes, I do.

19   Q.   Which formula do you say is the correct formula in your

20   report?

21   A.   I summarize Exhibit B, and include a chart associated with

22   Exhibit B, along with some language around the earnout

23   agreement.

24            MR. O'BRIEN:  Eric, would you pull up page 63 of

25   Mr. Leathers' report, paragraph 146.

1    Q.  Mr. Leathers, is this your opinion as to the correct

2    formula for the earnout payments?

3    A.  Yes.

4    Q.  And you say in paragraph 146:  Exhibit B to the earnout

5    agreement is shown below.  This exhibit illustrates examples of

6    the parties' intended earnout payment and cash installments

7    under various adjusted EBITDA scenarios for each target year.

8    And then you paste in a copy of Exhibit B itself.

9    A.  Yes, that's correct.

10   Q.  Is this still your opinion?

11   A.  Pardon me?

12   Q.  Is this still your opinion?

13   A.  Yes, sir.

14   Q.  Ms. Pector asked if the Exhibit B formula, as you've

15   written out on the slide to the left and in your witness

16   statement, is shown in Exhibit B.  Is it?

17   A.  Yes.

18   Q.  Can you explain how it is?

19   A.  Yes.  So what you see is you see percentages that are

20   there.  Those percentages are essentially the inverse of the

21   achievement percentage.

22          So, for example, if you look at the, kind of, second

23   block where it says "assuming targets are under by five

24   percent," okay, what is embedded in that formula that gets you

25   to the 19.7 is the plan amount, which is 20 million 749, times

K3BVHOR2                         Leathers - redirect

1    an achievement percentage, which is nineteen seven eleven

2    divided by 20 million 748, which is 95 percent, it essentially

3    results in the 19.7 is really the actual number.

4              THE COURT:  And just to be clear, the twenty seven

5    four nine is the plan or target that's actually in the

6    agreement, or is that something else?

7              THE WITNESS:  Yes, your Honor, it is.  And the reason

8    I just referenced it there is you can see in the top it says

9    that there's -- it's zero, that means it's 100 percent, so you

10   reach the plan.

11             THE COURT:  Got it.

12             THE WITNESS:  So those are plan numbers that are

13   there.

14             THE COURT:  Got it.

15   BY MR. O'BRIEN:

16   Q.  Ms. Pector asked if you relied on the evidence in the

17   record in this case to reach your opinion as to the correct

18   formula.  Do you recall that?

19   A.  Yes.

20             MR. O'BRIEN:  Eric, would you pull up PX-357.

21   Q.  At the bottom, this is an email from Mr. Kroeker to

22   Mr. Konikowski and Mr. Hennekes at NGE sent on September 6,

23   2016.  Do you see that?

24   A.  Yes.

25   Q.  Mr. Kroeker asks:  Can one of you send me the three-year

K3BVHOR2                         Leathers - redirect

model that supports the full $35 million payout on the earnout?

           And then above, Mr. Hennekes responds:  Here is the

earnout model.  He attaches a spreadsheet.

           Is this a document that you reviewed in forming your

opinion?

A.  Yes.

Q.  Let's take a look at the attachment, I think it's A.

           MR. O'BRIEN:  And would you scroll out a little bit,

Eric.

Q.  And you've seen this spreadsheet, the attachment?

A.  Yes.

Q.  What's reflected on the gray boxes, starting on row 48?

A.  Well, this is the earnout formula that is contained in

Exhibit B.  The only difference is is that Exhibit B includes a

minus five percent and minus 20 percent; whereas here, there's

a scenario of if they exceed by -- exceed the plan by 20

percent or fall below the plan by 20 percent.  Again, it's just

the inverse of an achievement percentage which would be if you

fell below by 20 percent, it would be 80 percent.

Q.  Were there any green box formulas on this spreadsheet?

A.  No, there are not.

           THE COURT:  What exhibit is this again?  I missed

that.

           MR. O'BRIEN:  It's PX-357, and the attachment is A.

           THE COURT:  Thank you.

1              MR. O'BRIEN:  Let's take a look at PX-641 please,

2    Eric.

3    Q.  Now, this is an email from Mr. Kroeker sent on April 8,

4    2016.  Do you see that?

5    A.  Yes, sir, I do.

6    Q.  Mr. Kroeker writes:  Here is the interactive model to show

7    how the earnout works.  He attaches a spreadsheet.

8              Is this another document that reviewed in forming your

9    opinion?

10   A.  Yes.

11             MR. O'BRIEN:  Let's take a look at the attachment

12   please, Eric.  Let's scroll over and scroll out please.  Can we

13   zoom out just a bit.

14   Q.  Are you familiar with this spreadsheet?

15   A.  I am.

16   Q.  And we see green boxes -- I mean, sorry, gray boxes

17   starting at row 52?

18   A.  Yes.

19   Q.  What's reflected in those gray boxes?

20   A.  Well, the gray area here, kind of the first five or six

21   columns, I mean that's the same formula and calculation that

22   you see in Exhibit B, as well as the prior spreadsheet.  The

23   only difference is is kind of the right column L, that's

24   different.  Exhibit B has a summary of explanation of the

25   calculation.  But here, again, this is just a plus or minus 35

1    percent, again, 65 percent achievement.

2    Q.  Are there any green box formulas in this spreadsheet?

3    A.  Not that I see, no.

4    Q.  Now, in addition to the formula itself, do the parties

5    dispute how to determine any of the components that you plug

6    into the formula?

7    A.  Yes.

8    Q.  Which components are in dispute, as you understand it?

9    A.  There's a dispute over the year-end customer accounts.  And

10   there's a dispute over the actual calculation of actual

11   adjusted EBITDA.

12   Q.  Okay.  Starting with customer accounts, you were asked a

13   number of questions about the proper way to count customers.

14   Do you recall that?

15   A.  Yes.

16   Q.  In your opinion, Mr. Leathers, what is the proper way to

17   count customers for purposes of the earnout agreement?

18   A.  It is the -- as of year-end, it is the actual active

19   customers, plus those customers that are pending active or are

20   pending but not -- or active but not flowing, less those

21   pending dropped or are dropped, still flowing.

22   Q.  So pending drop -- sorry.  Pending drop or drop not flowing

23   are not counted as customers?

24   A.  That's correct, yes.  Deducted from that amount.

25   Q.  Are those customers still receiving electricity or natural

K3BVHOR2                              Leathers - redirect

1   gas?

2   A.  Yes, they are.

3   Q.  Are they paying for that electricity and natural gas?

4   A.  Yes.

5   Q.  How were you able to determine that the correct way to

6   count customers is to include active and active pending

7   customers, but not pending drop customers?

8   A.  Well, the first step I did was to go and look at the final

9   projection model to understand where the December 31st, 2015

10  number come from.

11          I found a file, a data dump, from the -- what I now

12  understand was the EMS system.  Went and interviewed the

13  sellers to understand the background of that, and essentially

14  perform the same calculation.  And as a result of that, I get

15  to the 151 by excluding those pending dropped customers.  I

16  also looked at email correspondence, as well as, I believe,

17  Mr. Wiederman's testimony.  His deposition has some discussion

18  about that also being the correct formula.

19  Q.  Is that how the defendants calculated Major Energy's

20  customer count for 2016?

21  A.  No.

22  Q.  What did they do?

23  A.  The defendants deducted those active, but not flowing,

24  customers.

25  Q.  How do you know that?

1    A.  You can look at the 2016 earnout statement that was

2    provided to the defendants in the March 2017 time period.

3            MR. O'BRIEN:  Eric, let's take a look at that.  It's

4    PX-483.  And let's go to page 4 please.

5    Q.  Do you recognize this document, Mr. Leathers?

6    A.  Yes, sir, I do.

7    Q.  What is it?

8    A.  This is the second page, as I recall, of the earnout

9    statement that was provided by Spark to the sellers.

10   Q.  Where is the customer count calculation on this document?

11   A.  So if you look at the bottom section of that, yes, right

12   there.

13   Q.  Would you walk us through the customer count that's

14   reflected here?

15   A.  Sure.  So you see the EMS count, that's the total number of

16   customers.  And then there are two adjustments that were made

17   by Spark, the first being to remove the pending active

18   customers; those are the active not flowing customers.  And

19   then also to deduct those pending drop customers, those are

20   canceled and flowing customers, to get to a net EMS count of

21   164,719.

22   Q.  What is your opinion as to the correct 2016 customer count?

23   A.  So my opinion is, number one, the pending active customer

24   should not be deducted, they should be included.  So

25   essentially when you remove that -- those 9,000 customers, it

K3BVHOR2                        Leathers - redirect

1   gets you back to 173,900 approximate customers, which is my

2   conclusion as to what I believe is the appropriate customer

3   count.

4   Q.  You were asked a number of questions about an email that

5   Mr. Sobel sent to Mr. Adams referencing the customer count.  Do

6   you recall that?

7   A.  Yes, in January of '16, I think, maybe.

8   Q.  It was DX-206 and DX-1049.

9        Does your methodology -- does the methodology that you

10  believe is correct change in any way based on information that

11  you saw in those emails?

12  A.  No.

13  Q.  Is it your opinion that it's reasonable to rely on the

14  counts reported by Spark in applying the methodology that you

15  believe is correct?

16  A.  Yes.

17  Q.  And tell us, Mr. Leathers, why do you include the pending

18  active customers in your count of the 2016 customers or of any

19  of the customers during the earnout period?

20  A.  Because that is the methodology that the -- that Major

21  Energy utilized prior to this transaction.

22        MR. O'BRIEN:  Eric, would you pull up the slide again.

23  Q.  So I know we just talked about the correct formula; and

24  it's your opinion that Exhibit B is the correct formula.  And

25  then you told us there was a dispute as to how to count

1    customers.  That's relevant to the customer account adjustment

2    under heading D.

3              Before we move on to how to -- how to calculate

4    adjusted EBITDA, I'd like to go back quickly to the formula,

5    under the defendant's formula.

6              Would you tell us in 2016 what their -- how they're

7    saying that the component under heading A should be -- for the

8    defendants' formula.  That was a bad question.

9    A.   Under D or A?

10   Q.   Under A, the defendants' formula.

11   A.   So the defendants' formula under A, they take the actual

12   adjusted EBITDA and exclude the first quarter of 2016.

13   Q.   Is it your opinion that it's correct to exclude the first

14   quarter in 2016?

15   A.   No.

16   Q.   Why?

17   A.   Because at the highest level, it doesn't meet the economics

18   of the transaction; and it does not enable the defendants to

19   receive the full earnout for that year if they achieve the

20   targeted EBITDA and customer account amounts.  And if you

21   achieve -- the whole purpose of an earnout is to set a target.

22   And if you achieve the target, you get paid for it.  If you

23   achieve 50 percent of the target, you should get paid 50

24   percent of the earning.

25   Q.   For the Exhibit B formula that you say is the correct

K3BVHOR2                          Leathers - redirect

1   formula, how is the fact that 2016 was not a full calendar year

2   accounted for?

3   A.   It's accounted for -- you can actually see it in column C

4   that accounts 9/33rds as approximately 27 percent.  And it's my

5   opinion that that accounts for the removal of -- or accounts

6   for the fact that the first quarter was preclosing.

7   Q.   Okay.  Now, let's talk quickly about the calculation of the

8   adjusted EBITDA.

9            What's your understanding of the parties' dispute with

10  respect to how to calculate adjusted EBITDA?

11  A.   There's a dispute over the amounts, certain amounts, as

12  well as what addbacks should and should not be included in the

13  determination of the number.

14  Q.   Will you tell us what an addback is?

15  A.   So an addback is -- it's really not necessarily a term of

16  art, but is essentially an adjusting entry to normalize an

17  EBITDA amount; to adjust for, for example, the customer

18  acquisition costs.  They are capitalized when they are

19  incurred.  But you're actually paying cash.

20           So you want to go and make an adjustment to deduct the

21  customer acquisition costs so that the reader can see, Oh,

22  okay, well, while in my financial statement I'm not deducting

23  customer acquisition costs, I'm really incurring that cost, so

24  I get a sense of really what's going on.

25           There's other reasons, as certainly in this particular

1   case.  And you see in most earnout agreements whereby you want

2   to adjust for maybe extraordinary compensation or you want to

3   remove executive -- a certain portion of executive

4   compensation.  But generally, extraordinary events.  Because

5   you want -- the economics of the deal is to say I'm paying on a

6   normalized basis.

7   Q.  What's your understanding, Mr. Leathers, of the categories

8   of expenses that should be added back to adjust EBITDA under

9   the earnout agreement?

10  A.  I think it is -- at a high level it is based on the -- you

11  know, how Major calculated it in the past.  But the two primary

12  ones are executive compensation and extraordinary legal costs.

13          MR. O'BRIEN:  Let's pull up PX-377A please, Eric.

14  Let's look at tab 1, the annual summary tab.

15  Q.  Do you recognize this document, Mr. Leathers?

16  A.  Yes.  This is the summary from the final -- what I call the

17  final projection model that ties into the targeted adjusted

18  EBITDA numbers.  They were agreed upon between the parties.

19  Q.  And we see -- we see years '16 through '18.  Is that the

20  calculation of the -- of the earnout targets?

21  A.  Yes.

22  Q.  And what's reflected in the year '15 column?  Are those

23  actual numbers?

24  A.  Can you repeat the question?

25  Q.  Are those actual numbers under the year '15 column?

K3BVHOR2                       Leathers - redirect

1    A.  Yes.

2    Q.  And at the bottom I see pro forma adjustments.

3    A.  Yes.

4    Q.  Are pro forma adjustments, is that the same as addbacks?

5    A.  Conceptually it is, yes.

6    Q.  And what pro forma adjustments are included here?

7    A.  Well, as you can see, in 2015 would be all of the actual

8    adjustments that were made in 2015, some of which are -- if you

9    actually look back in time, you would see consistent

10   adjustments on a year-by-year basis for executive compensation

11   and extraordinary legal.

12        There were other adjustments in here that are kind of

13   one-time extraordinary items.  They are also added back so that

14   you get to a normalized, you know, adjusted number at the

15   bottom, which is the 7.7 million.

16        When you look at '16 through '18 -- I just noticed

17   that the column there is '17 twice, but it should be '18 --

18   these are the addbacks that were agreed to between the parties

19   as part of calculating the adjusted EBITDA targets.

20        So, in other words, it's important to realize here

21   that when you're doing an addback, it's not making a number

22   smaller, okay.  You have an EBITDA number, and then you're

23   adding back; that means that target is higher.

24        So if you then -- from an actual standpoint, you're

25   not adding back those same numbers or whatever the number

1  actually is, okay, conceptually the same, then you're changing

2  the economics of what both the buyer and the seller bargained

3  for.

4  Q.  If you don't add back the same category when you have the

5  actual numbers, then you're not matching the projected number,

6  is that what you're saying?

7  A.  You wouldn't hit the target.  So, for example, if you

8  have -- let's just assume that the numbers are exactly the same

9  and you exactly hit your target.  But in the projections, you

10 added back executive compensation, and in the actual you didn't

11 add back executive compensation.  You wouldn't meet your

12 target.

13 Q.  Let's take a look at Table 7 of your witness statement.

14         MR. O'BRIEN:  That's on page 46, Eric.

15 Q.  Will you tell us what's reflected here, Mr. Leathers?

16 A.  This just summarizes the analysis that I performed and my

17 conclusions with regards to the addbacks.

18         At the top, the 19.171 is a number that the Court has

19 seen; that's the actual adjusted EBITDA that was put forward by

20 the -- by Spark.  And then I have made some certain adjustments

21 that -- of a number that were disputed between the parties to

22 conclude that an additional $1.8 million should be added back

23 that had been -- has a resulting adjusted EBITDA of $21

24 million.

25 Q.  And quickly, could you just go through the addbacks that

1   you opine should be included?

2   A.   Yes.   So executive compensation and bonuses, that is

3   consistent with the 973, essentially that we saw in the

4   projection.   The EMS addbacks, that's a $250,000 credit that

5   Spark gave to the sellers.   It's my belief that when looking at

6   adding back costs, that cost should really be accounted for in

7   a profits or a lost profits.   So, in other words, if you

8   incurred a whole bunch of costs, staffing costs, but it didn't

9   impact your profits, well, then, you really weren't harmed,

10  number one.   Number two, when I looked at the correspondence

11  between the parties with regards to that 250,000, everything

12  that was added into that far and exceeded 250,000.   So I just

13  said let's exclude that.

14       Because I excluded that, I then included accounting

15  fees and travel expenses, because those were part of what was

16  going to be included in that $250,000.   And then I added back

17  some consulting fees -- they are not consulting fees, but

18  basically they were settlement fees that were paid to DSS,

19  which is one of Major's vendors.

20       THE COURT:   Okay.   We're going to have to take a quick

21  break because I have an 11:30 call, which should be very brief,

22  which I'll do in the robing room.   I do not need the court

23  reporter for this.   So we'll just take probably five or ten

24  minutes.

25       (Recess)

1           THE COURT:  All right.  Mr. O'Brien.

2           MR. O'BRIEN:  Thank you.

3           You can take that down, Eric.

4    BY MR. O'BRIEN:

5    Q.  Mr. Leathers, we had just talked about your opinion on the

6    methodology calculations, that is, how to calculate the earnout

7    payment.  But you've also noted that it's your opinion that

8    when applying that calculation, Major Energy would have

9    achieved the earnout targets during the earnout period but for

10   the post dropdown interference events you discussed?

11   A.  Yes.

12   Q.  What is the basis for that opinion?

13   A.  The analysis that I performed as it relates to the

14   reasonableness and achievability of the earnout -- or the

15   projections that are included in the projection model, as well

16   as the -- what I described as the bottom-up analysis of each of

17   the various claims associated with -- or I don't know if it's

18   interference claims, but claims associated with PSE, EMS,

19   impaired vendors, impaired commercial customers.  So

20   reconciliation between those two that form the basis of the

21   opinion.

22   Q.  So the first thing is that the targets were reasonable and

23   achievable.  Will you explain to us what you did to arrive at

24   that conclusion?

25   A.  Yes.  I characterize it or summarize it into three

1    different components.

2              One is Major's historical performance; its ability to

3    with stand, for example, the polar vortex and turn its business

4    around.  It's the due diligence and various valuation analysis

5    that was prepared at the time by the parties.  It's what was

6    going on in the industry at the time.  And in the model itself,

7    I mean I found the model to be very comprehensive and rigorous.

8    And from seeing a lot of models and forecast models, it helped

9    me understand and illustrate that -- illustrate that the

10   results coming from the model can be relied upon.

11   Q.  Let's break that down a bit.

12             The first thing I think you said was you looked at

13   Major Energy's own historical growth.  What specifically did

14   you look at, sir?

15   A.  So I looked at, on a longer term basis, from 2008 till

16   2015, what you see in Major's key statistics, such as gross

17   margin, the adjusted EBITDA.  The growth is 45, 40-plus

18   percent; projections are 14, 15 percent.  I looked on a

19   shorter-term basis, and you see similar growth from, say, 2010

20   to 2015.

21   Q.  Did you compare that to industry reports?

22   A.  Yes, I did.  For example, there is a couple of reports that

23   I cite in my report that has projected growth in and around

24   2015 of around 14 percent.

25   Q.  And you mentioned that you looked at the parties' own

K3BVHOR2                              Leathers - redirect

1    diligence in entering into the transaction.

2    A.  That's correct.

3    Q.  What specifically were you looking at there?

4    A.  So I'm looking at the analysis that was performed by Spark;

5    I'm looking at -- and there's a variety of different projection

6    models that are there; there are some projection models that

7    were provided to investment bankers.

8              Houlihan Lokey was hired to do evaluation.  Their

9    model includes a projection, a company called ERC, Evaluation

10   Research Corp.  And then Stifel also -- not Stifel, but Stout

11   Risius Ross, which is another evaluation firm, performed some

12   evaluation work in and around the time the projection report

13   was prepared.

14   Q.  Were the projections in those other models exactly the same

15   as what was in the earnout targets?

16   A.  No.

17   Q.  Then why would those support your conclusion about the

18   reasonableness of the projections?

19   A.  Well, because you can see the different things that are

20   being analyzed, the conclusions that are reached.  Generally,

21   for me, I saw in those presentations a consistent growth year

22   over year.  I saw customer account numbers that were consistent

23   with what were in the final projection model, things to that

24   nature.

25   Q.  And then you said, finally, you considered the model

K3BVHOR2                        Leathers - redirect

1   itself.

2   A.  Yes.

3   Q.  What did you look at in looking at the model itself?

4   A.  So I looked at how it was set up.  I looked at how it

5   flowed.  I can make adjustments to the model, and the results

6   from the model would come back to what I had anticipated the

7   result to be.  In other words, this was just -- this was not a

8   projection model that said, Oh, let me look at what I've done

9   for the last three or four months or last year and just simply

10  project it out.  It's very detailed, comprehensive.

11  Q.  Ms. Pector showed you an email just a little bit ago in

12  which Mr. Sobel, writing about the projections, uses the word

13  "embellished."  Do you recall that?

14  A.  Yes.

15  Q.  In forming your opinion, did you rely on Mr. Sobel's

16  deposition testimony from this case?

17  A.  Yes.

18          MR. O'BRIEN:  Eric, would you pull up Mr. Sobel's

19  deposition, page 88.

20          MS. PECTOR:  Your Honor, we object to this.

21          Mr. Sobel has been stricken as a witness in this case.

22  His witness statement has been withdrawn.  We've had no

23  opportunity to cross-examine Mr. Sobel.  So now relying on

24  deposition testimony of Mr. Sobel would be the same as his

25  witness statement, and we object to that.

1           MR. BROWN:  To complete the thought as well,

2   Mr. Sobel's deposition testimony is also not designated for

3   this case because there was a witness statement that has now

4   been stricken.  So this witness can't rely on deposition

5   designation -- deposition testimony when the witness had been

6   stricken and did not testify.

7           THE COURT:  I think that's right.  It's one thing to

8   use emails or chats from him, but I don't think we can use

9   testimony.

10          MR. O'BRIEN:  Your Honor, just to respond to that,

11  it's not true that Mr. Leathers is precluded from relying on

12  those portions of the record to form his opinions.

13          So Ms. Pector asked Mr. Leathers whether he relied on

14  specific documents, and she put them on the screen.

15  Mr. Leathers also relied on the deposition that's part of the

16  record of the case, and it's one of the things that he

17  considered in forming his opinion.  And that's what he would

18  explain now.

19          MR. BROWN:  Your Honor, that's incorrect under the

20  law.  The trial exhibits can be relied upon.  The deposition

21  testimony cannot be relied upon when, A, it's not designated as

22  trial evidence for purposes of the opinion that Mr. Leathers is

23  offering at trial; and B, the witness has been stricken and is

24  not testifying at trial for strategic purposes by plaintiffs.

25          They made that decision.  They are subject to the down

1   sides -- as well as the up sides -- of avoiding him being

2   cross-examined.  Mr. Leathers cannot now testify that he relied

3   on deposition testimony that we have not introduced in our

4   cross-examination of Mr. Leathers.

5          Mr. O'Brien can show trial exhibits and evidence that

6   is being taken into the record for your Honor's consideration

7   to rule on objections later, but not undesignated deposition

8   testimony from a stricken witness.

9          THE COURT:  Right.  But if he actually relied on -- I

10  don't know that there's a rule precluding an expert witness

11  from relying on deposition testimony.  And if he or she does

12  rely on such testimony, I don't know why they can't ask about

13  it on redirect.

14         MS. PECTOR:  Your Honor, we would point out -- I'm

15  looking at Mr. Leathers' expert report right now.  This is what

16  Mr. Leathers submitted in June of '16.  He has an Exhibit 2,

17  documents relied on.  He has a list of the depositions he

18  relied on.  And Mr. Sobel is not a deposition in his list.  He

19  has one, two, three, four, five, six, seven, eight, nine

20  depositions that he relied on.  Mr. Sobel is not one of them.

21         As the Court may recall, we have moved to -- we had a

22  motion *in limine* to strike Mr. Leathers' new opinions in this

23  case that we've seen for the first time in his witness

24  statement that deviated from the expert report.  But if we're

25  just strictly looking at what Mr. Leathers relied on before

K3BVHOR2                        Leathers - redirect

1    introducing any new opinions that are untimely, the deposition

2    of Mr. Sobel was not something he relied on by Exhibit 2 of his

3    report.

4              MR. O'BRIEN:  I could respond, your Honor.

5              THE COURT:  Yes.

6              MR. O'BRIEN:  The defendants took Mr. Sobel's

7    deposition just before Mr. Leathers' expert report was due and,

8    therefore, he did not have the transcript at the time he

9    submitted the report.  But in his written statement that's

10   before the Court, he does cite Mr. Sobel's deposition because

11   it was available to him by that time.  It didn't change his

12   opinions in any way, but was further support for his opinion

13   and he cited it.

14             THE COURT:  I'm going to allow you to question about

15   the specific part of the deposition testimony that he may have

16   relied on.  And I'm going to reserve on the objection and take

17   it under advisement.

18             MR. BROWN:  Thank you.

19             MR. O'BRIEN:  Eric, would you pull up page 88 of

20   Mr. Sobel's deposition, and let's focus on lines 9 to 22.  I

21   may have the wrong page.  One second.  Page 89, I'm sorry, your

22   Honor.

23   Q.  So we have Mr. Sobel's deposition.  He was asked by the

24   defendants --

25             MR. BROWN:  Your Honor, if I can just make an

K3BVHOR2                          Leathers - redirect

1    objection for the record.  I think counsel has to establish a

2    foundation first, show the Court where Mr. Leathers cited to

3    this portion of the deposition transcript in his witness

4    statement, and then he can ask him how he did, if at all, rely

5    on it.  He can't read uncited deposition testimony into the

6    record that Mr. Leathers, I don't believe, has cited to in his

7    witness statement.  So I think a foundation is necessary.

8                THE COURT:  I think some foundation is appropriate.

9                MR. O'BRIEN:  Sure.

10   BY MR. O'BRIEN:

11   Q.  Mr. Leathers, you had the opportunity to review Mr. Sobel's

12   deposition?

13   A.  Yes.

14   Q.  And did you consider -- what portions of the deposition did

15   you consider in evaluate -- in reaching your opinion or with

16   respect to your opinion?

17   A.  Well, I considered the entire deposition.  There was not --

18   without going back and look at it, I can't really say where I

19   put weight one way or another.

20   Q.  You read the entire deposition?

21   A.  That's correct, yes.

22   Q.  Did you read page 89 of the deposition?

23   A.  Yes, I did.  For example, what you have on the screen here,

24   I recall this from the deposition testimony.

25               MS. PECTOR:  Your Honor, we would just object that

1   this is an improper foundation.  We're looking at Mr. Leathers'

2   witness statement right now.  He's only made two references to

3   Mr. Sobel's deposition in his witness statement at footnote 76

4   and footnote 66 of his witness statement, and neither of those

5   footnotes reference this page, Mr. Sobel's exhibit.

6           MR. O'BRIEN:  Your Honor, I don't think that

7   Mr. Leathers was required to anticipate every exhibit that

8   Ms. Pector would show him on the stand in submitting his

9   written statement.

10          THE COURT:  Look, I mean I'll let you question about

11  it.  I'm not going to consider this as evidence in the case.

12  I'm not going to consider this as an explanation for what was

13  in the email.  I'm going to consider it only insofar as it

14  might go to what Mr. Leathers considered as an expert.

15          MR. O'BRIEN:  That's all we're showing it for, your

16  Honor.

17  BY MR. O'BRIEN:

18  Q.  So Mr. Sobel was asked:  These projections that you

19  created, that you informed Mr. Adams you were embellishing a

20  bit on the number of accounts; is that correct?

21          And Mr. Sobel responds:  Yes, I have used the word

22  "embellished" incorrectly sometimes over the years, as

23  Mr. Wolbrom pointed out to me.  But that being said, it looks

24  like we had a phone call and they -- as per the phone call,

25  there must have been some discussion on the phone call where

K3BVHOR2                        Leathers - redirect

1    they wanted to change around some numbers.

2            Mr. Leathers, you considered this testimony in your

3    opinion?

4    A.  Yes.

5    Q.  Thank you.

6            MR. O'BRIEN:  Thank you, Eric.

7    Q.  Mr. Leathers, what, if anything, did you do to analyze

8    other potential factors that might have had an effect on Major

9    Energy's performance during the earnout period?

10   A.  I reviewed the evidence of the case.  I prepared a pretty

11   extensive analysis of the documentation in kind of a

12   chronological way.

13           I independently looked at information from the market;

14   looked at what Wall Street was saying, what other industry

15   experts were saying during the entire time period to be able to

16   assess to the extent, for example, that the New York resetting

17   order or low-income order or other regulatory issues that have

18   been discussed in this case had an impact on Major Energy's

19   ability to achieve its earnout projections.

20   Q.  So did you see any evidence of increased regulatory risk

21   for ESCOs in Major's three markets?

22   A.  I did not see an increase in risk; I saw generally a

23   consistent risk throughout -- before, during, and after the

24   time period.  But it's important to separate between risk and

25   actual impact.

K3BVHOR2                          Leathers - redirect

1  Q.  And on the industry factors you looked at, did you look at

2  the M&A activity in the industry?

3  A.  Yes.

4  Q.  What did you observe?

5  A.  It was a data point for me to see, essentially, were

6  investors paying less for retail electric and gas companies as

7  we went further out in time.  It could potentially be an

8  indicator that the market is not sustaining, there may be an

9  issue in the market, things of that nature.  And I did not find

10 that to be the issue or the case.

11 Q.  Now, Ms. Pector asked you about other business ventures

12 that Mr. Sobel may have been pursuing.

13 A.  Yes.

14 Q.  Was that a factor that you considered in your analysis?

15 A.  Yes.

16 Q.  Let's quickly take a look at Mr. Sobel's deposition again.

17            MR. O'BRIEN:  Page 412 please, Eric.

18            MR. BROWN:  Same objection as to the record, your

19 Honor.

20            THE COURT:  Noted.

21            MR. O'BRIEN:  Let's actually scan pages 412 to 413.

22 If we could get line 24 from 412 down to 18 on 413.

23 Q.  And Mr. Sobel is asked:  Between sometime in the second

24 half of 2018 and January, you had discussions with Sunil about

25 some venture that never materialized?

1        MR. BROWN:  Objection.  Hearsay.

2   Q.  (Reading) Let me ask you a question.  In total, or maybe on

3   average a month, of those six or seven months that you spent

4   with Sunil on this venture that never materialized.

5        Mr. Sobel says:  Right.  I would say, on average, it

6   was about six to seven hours a month.

7        This is something that you read, Mr. Leathers, in

8   forming your opinion?

9        MS. PECTOR:  Objection again, your Honor, as hearsay.

10        THE COURT:  Hold on.  I think it is hearsay.

11        MR. O'BRIEN:  We're not offering it for the truth, and

12   we're not offering it as substantive evidence, your Honor.

13   We're offering it as something that Mr. Leathers relied on in

14   forming his opinion.

15        MR. BROWN:  Your Honor, once again, just -- I

16   apologize.  I don't want to belabor the point, but to make a

17   record.

18        I believe I've heard the reference "sword/shield" in

19   this case previously.  Well, if there is a sword/shield issue

20   that is developing, it is based on the pivot mid trial of

21   plaintiffs to make certain decisions about their witnesses; and

22   to withdraw and strike Mr. Sobel as a witness statement, as

23   well as Mr. Gadtaula as a witness statement, for whatever

24   strategic reasons, defendants have their views, including to

25   avoid them being cross-examined live in this Court.

1          But then to, with their expert, try to present

2     deposition testimony not designated as evidence, with Mr. Sobel

3     and Mr. Gadtaula allegedly talking about something out of

4     court, I think is completely improper.  It is difficult for

5     your Honor, I think, to then exercise the ability to eliminate

6     it from consideration later because of what type of a record is

7     being developed here.

8          So I think it is completely improper, and I think

9     there are consequences of the pivot the plaintiffs have made,

10    and this is one.

11         MR. MAROONEY:  May I respond to this pivot comment and

12    strategic comment and so forth?

13         THE COURT:  Yes.

14         MR. MAROONEY:  First, we have every right to put on

15    our case how we like to put on our case; and we have every

16    right to call whatever witnesses we'd like to call.

17         Second, I don't think any of us anticipated

18    cross-examinations of witnesses that lasted hours on end that

19    put this case as lengthy as it now is.  And we reassessed our

20    own evidence over the weekend and Monday to make sure we can do

21    it as efficiently as possible, and concluded that both

22    Mr. Sobel and Mr. Gadtaula were cumulative and, therefore,

23    unnecessary.

24         So the suggestion that we're trying to hide some sort

25    of strategy, that's just untoward and is uncalled for.

1          An expert, as your Honor noted, may rely on deposition

2    testimony to form the basis of the opinion, first.

3          And then second, when counsel themselves, who took

4    that deposition, stand up in court and mischaracterize the heck

5    out of exhibits used at that deposition with that own witness,

6    we have every right then to show our expert the deposition

7    itself that he himself relied upon.

8          MR. BROWN:  Your Honor, Mr. Marooney, from my

9    perspective, might have a point, had this not been a bench

10   trial with agreed submissions of extensive witness statements

11   three months prior to this trial starting, with plaintiffs

12   carrying the burden putting in their case, including other

13   witnesses relying on other witnesses' statements and commentary

14   and expectations, and then pivoting mid trial and withdrawing

15   the CFO's comprehensive witness statement submitted months ago.

16   So that pivot is what I'm referring to.  And that's what we

17   believe has happened.

18          (Continued on next page)

19

20

21

22

23

24

25

1    THE COURT:  OK, I understand the objection.  I'm not

2    allowing it for the truth.  I'm not allowing it to rebut the

3    substantive evidence that's come in in the form of e-mails.

4    Ms. Pector used several e-mails involving Mr. Sobel and asked

5    the expert questions about whether he considered this, and that

6    and the other thing.  And to the extent that he considered

7    deposition transcripts, I'm going to allow some questioning

8    about it, and I have no trouble separating that out in my mind

9    as the fact finder from substantive testimony to the same

10   effect.

11        Subject to that, I will allow the question.  However,

12   not this minute, because we have another quick call that I have

13   to take, and this one I actually do need the court reporter to

14   come back.  I believe it will only be another five or ten

15   minutes.  And I apologize for the break.

16        (Recess)

17   DAVID LEATHERS, resumed.

18   REDIRECT EXAMINATION (Continued

19   BY MR. O'BRIEN:

20   Q.  Mr. Leathers, we had just looked at this portion of

21   Mr. Sobel's deposition, and I only have one question about it,

22   and i honestly don't recall if I asked it or not.

23        Did you rely on this when you formed your opinion?

24   A.  Yes.

25   Q.  So, Mr. Leathers, what has your analysis of the projections

K3B7HOR3                        Leathers - redirect

1    and the other factors that you discussed allowed you to

2    conclude?

3    A.   That the sellers -- or Major Energy and the sellers --

4    would have achieved the earnout targets and received the full

5    contingent payment.

6    Q.   Let's try to unpack that a little.  Why would they have

7    achieved the contingent payment?

8             MS. PECTOR:  Objection, your Honor.  Calls for

9    speculation.

10   Q.   In your opinion, why would they have achieved the full

11   contention payments?

12   A.   Because the projections were, based on my opinion,

13   reasonably achievable, and there were no other material factors

14   that impacted their ability to achieve those projections.

15   Q.   And what are the specific factors that you considered as to

16   what caused Major Energy not to achieve its earnout targets?

17   A.   So, I evaluated the claims of the case and identified a

18   number of factors that include items such as the EMS

19   integration, the cancellation of the PSE contract, employee

20   turn-over, the impact and impairment on residential vendors and

21   commercial brokers, and the inability of Major Energy to

22   utilize aggregation deals to assist in mitigating its damages.

23   Q.   Now, how did you quantify damages for those events?

24   A.   So, in short, most of those -- or all of those events or

25   those factors, if you will, the profits of that -- or they flow

into the profits that result from residential and commercial

vendors and brokers, and so I quantified that as part of that

analysis.  In other words, I could go and calculate an

out-of-pocket cost associated with the EMS conversion, but

essentially what that impact results in is an impact on profits

of the company, and so I would essentially be double dipping if

I did it in both buckets.

Q.  So that's why you did not have a specific quantification

for EMS integration?  Is that what you said?

A.  Yes.

Q.  And you were asked about not having a quantification for

the PSE termination.

A.  Yes.  And let me just clarify my last answer.  The other

reason is that some of those factors are they're intangible

sorts of impacts that collectively may impact profits, and so

it's a little more difficult to calculate that.  So that's a

consideration that's discussed in my report as well.  I'm

sorry, I didn't mean to interrupt you.

Q.  That's fine.  And you are talking about EMS integration.

Are you also talking about the PSE termination?

A.  Well, the PSE termination is similar but yet different.  It

would be difficult to quantify that kind of looking back in

time.  We heard that from Mr. Moeller the other day.

Q.  And just quickly on PSE, Ms. Pector show you DX431.

        Could you pull that up, please, Eric.

1          Do you recall being shown this e-mail just a minutes

2     ago?

3     A.  I do, yes.

4     Q.  And let's look at that top e-mail, e-mail from Mr. Sobel

5     from November 29, 2016.  And I think you were asked to look at

6     the first sentence of that e-mail, but what you weren't asked

7     was about the last sentence of that e-mail.  And that reads,

8     "On the flip side, it's been a very good and extremely

9     important relationship for us as well, so guess you can call it

10    a win-win."

11         Is that right?

12    A.  Yes.

13    Q.  Did you consider that when you were considering this e-mail

14    as part of your opinion?

15    A.  Yes.

16    Q.  So, we just talked about quantifying damages for the EMS

17    integration project, PSE termination.  You also mentioned

18    employee turnover.  Would you explain why there is no

19    particular damages number associated with that.

20    A.  So again the impact of that flows into the profits or

21    impact on profitability associated with the impaired

22    residential vendors and commercial brokers.

23    Q.  I'd like to take a look again at the bottom-up damages

24    analysis you performed in table 25 of your statement.

25         Eric, could you pull that up again.  It was in

1    paragraph 419.

2            And you looked at that earlier.  I think you told us

3    to focus on the Exhibit B side.

4    A.  Yes.

5    Q.  Is that because the Exhibit B side is where you're

6    calculating damages using the Exhibit B formula that you have

7    opined is the correct formula?

8    A.  Yes, that's correct.

9    Q.  And you explained to us how to read this.  So if we focus

10   on the post-dropdown portion -- and this is where we see the

11   post-dropdown interference events for which you did calculate

12   specific damages amounts.

13   A.  Yes, that's correct.

14   Q.  OK.  And the first thing I see is "loss of residential

15   vendors" having an independent impact of $19.3 million and an

16   incremental impact of $12.9 million.

17   A.  Correct.

18   Q.  How did you calculate that number?

19   A.  So, that number, based on an analysis of the evidence in

20   the case, including information with regard to residential

21   customer account additions, customer account -- customer

22   acquisition costs where I could derive various historical

23   amounts of customer additions on a channel-by-channel basis.

24   Based on the evidence in the case, I made some adjustments and

25   essentially ran that through the channel model controlling for

K3B7HOR3                         Leathers - redirect

other factors, in other words, to be able to account for

exactly as a result of the impact or the impairment of the

vendors, what was that amount.  Let me exclude margin, price

and things like that.  Just purely as it related to the impact

of those lost vendors.  And that's what results in that number.

          The thing that I will add to that is part of the

reason -- I think we discussed earlier -- that you have an

incremental impact is because when you run that model, you're

correcting for the methodological errors, so you have an

incremental impact.  The results of that include the

methodological and calculation errors, and that's why you have

the incremental piece to that.

Q.  And that model, is it detailed in your written witness

statement?

A.  Yes.  Yes.  Essentially what I did, and what is discuss in

the my witness statement, is I utilized the channel model.

It's very interactive, very detailed in terms of the ability to

change assumptions and control for other factors.  So, it's

actually a fortunate thing in this case that we have that

detailed of a model to be able to do these sorts of

quantifications.

Q.  The next post-dropdown interference event that I see is the

loss of commercial brokers, and for that it looks like you

opined that the independent impact was $12.6 million with an

incremental impact of $3.7 million.

1    A.   That's correct.

2    Q.   How did you calculate those numbers?

3    A.   So the same way with regards to the residential vendors.  I

4    had less information with regards to the commercial brokers, so

5    essentially I added back in the growth that was anticipated for

6    those commercial brokers to result in that impact there.

7              The reason you see a relatively small number of 3.7

8    million is that there is a thing on which one you adjust in the

9    model first, it enables you to reach your earnout.  So you

10   could you flip those and have a larger amount of commercial and

11   a smaller amount of residential vendors.  The incremental

12   impact is aa function of which one you do first.

13   Q.   Which calculation in the channel model you perform first?

14   A.   Yes.

15   Q.   Now, the last item on the list of post-dropdown

16   interference events is aggregation deals, and for that you have

17   opined that there is an incremental impact of $2.8 million.  Is

18   that right?

19   A.   Yes.

20   Q.   How did you determine that amount?

21   A.   So that is taking the examples of the May 2017 example that

22   was in Illinois, as well as the 7,000 customer account example

23   that Mr. Alper had -- we saw some e-mail correspondence on

24   that -- and essentially applying the customer account

25   adjustment for that, so it doesn't account for any incremental

1    gross profit.  But just the customer account adjustment to give

2    us the data point in the core data point of what are we talking

3    about on these aggregations.  Is it a million?  Is it 10

4    million?

5    Q.  So the dollar effect that those additional customers would

6    have had on the customer count adjustment?

7    A.  That's correct, yes.

8    Q.  Did you consider in this number the impact of those

9    additional customers on adjusted EBITDA?

10   A.  No.

11   Q.  So this is a more conservative number?

12   A.  Yes.

13   Q.  And so when we add up these numbers on the incremental

14   impact side, starting with what the sellers had already been

15   paid, that totals $34.7 or nearly $35 million in contingent

16   payments?

17   A.  That's correct.

18   Q.  That's your opinion, sir?

19   A.  Yes.

20   Q.  And remind us what's your final opinion on the amount of

21   sellers' damages in the case.

22   A.  It is approximately $26 million.

23            MR. O'BRIEN:  Thank you.

24            THE COURT:  All right.  Recross?

25            MS. PECTOR:  Yes, your Honor.

K3B7HOR3                          Leathers - recross

1        THE COURT:  Did you want to put in exhibits?

2        MR. MAROONEY:  Yes.

3        MR. O'BRIEN:  Sorry about that.  So we have our

4   demonstrative, which was the slide.

5        THE COURT:  OK.  Can you hand up a physical copy?  You

6   can do it later.

7        MR. O'BRIEN:  We will get it for you.  Then we used

8   PX357, 641, 483, 377.

9        THE COURT:  Thank you.  They are received.

10       (Plaintiff's Exhibits P357, 641, 483, 377 received in

11   evidence)

12  RECROSS EXAMINATION

13  Q.  Mr. Leathers, I believe I just heard you testify when

14  Mr. O'Brien asked you the question of what is your ultimate

15  damage opinion and you testified 26 million.  Is that correct?

16  A.  Yes.

17  Q.  That was not your opinion when you submitted your expert

18  report in June of 2016, correct?

19  A.  Not correct.

20  Q.  In fact, your total amount in June of 2016 was only 20

21  million, correct?

22  A.  No, in my --

23  Q.  2019.  I apologize.

24  A.  I believe that that amount was representative of the impact

25  associated with the residential vendors alone.  There is also a

conclusion in there, kind of the lead conclusion there, that

with regards to -- you can certainly read it.  I think it's the

exact same language that's in the witness statement.

Q.  Well, let's just break that down as far as the commercial

broker piece goes.  You did not have any quantification of an

alleged impact for the commercial broker piece in your expert

report -- it was zero -- but now you're telling this Court in

your witness statement it's 3.7 million, correct?

A.  Not entirely correct.  In my report I clearly discussed the

impact of commercial brokers, but following, for example,

Mr. Dudney's report, it led me to conclude that I needed to put

some math in there.  Candidly I thought I was going to get some

more documents after my report, and so as a result that's why I

added essentially the math in there to come to that number.

Anybody could have done it based on my expert report.

Q.  Mr. Leathers, you never got any additional documents -- you

make this point in your witness statement -- so you don't have

hard numbers to support your speculative number that you

reached, correct?

A.  Incorrect.

Q.  Well, what hard documents did you get after the June expert

report that allowed you to quantify the $3.7 million for

alleged broker interference?

A.  The calculation is not based on any new documents; it's

based on the same documents and models that I had as of the

K3B7HOR3                          Leathers - recross

1    date of my expert report.

2    Q.  So there was nothing new, correct?

3    A.  Well, that's a separate question.  I mean I have received

4    and seen -- we saw on the board here the other day -- some of

5    the 1099s that came from the commercial brokers that

6    illustrated some of the impact on those relationships.

7    Q.  Mr. Leathers, I want to pull up PX641 that you went over

8    with Mr. O'Brien.  PX641 was dated April 8, 2016, correct?

9    A.  Yes.

10   Q.  PX641 is an e-mail that was drafted before closing of the

11   transaction between Major Energy and NGE, correct?

12   A.  Yes.

13   Q.  And this e-mail also occurred before the dropdown, correct?

14   A.  Yes.

15   Q.  Now, Mr. Leathers, I want to briefly pull up what you are

16   now sponsoring as your demonstrative to this court.

17          James, if you can pull up Mr. Leathers' demonstrative

18   and juxtapose it next to Exhibit B of the earnout agreement.

19          All right.  Mr. Leathers, in looking at the formula

20   that you sponsor in the first row on your demonstrative, that

21   graphical formula that you sponsor is not -- that same exact

22   graphic is not seen in Exhibit B, correct?

23   A.  Correct.

24   Q.  And it's also correct that your formula is now -- your

25   first step is taking adjusted EBITDA plan target, correct?

1   A.  The Exhibit B, yes, the first step is the plan.

2   Q.  And you will agree, Mr. Leathers, that when we look at

3   Exhibit B -- specifically when we look at the row for 5 percent

4   and we see the 19,711,752 in column 1 -- that's a scenario

5   reflecting actual performance, not a plan, correct?

6   A.  That is the result of taking the plan number times an

7   achievement percentage of approximately 95 percent.

8   Q.  Well, when we look at the earnout agreement and we stay

9   within the four corners of what the earnout agreement

10   contemplated, you will agree, Mr. Leathers, that there was no

11   adjusted EBITDA plan for 5 percent, correct?  For performing at

12   5 percent.

13   A.  I don't understand your question.

14   Q.  When you look at the definitions in the earnout agreement,

15   you will agree that there was a definition for the adjusted

16   EBITDA plan, correct?

17   A.  Yes.

18   Q.  And that definition found that year one the target number

19   for year one was 20,749,213, correct?

20   A.  Correct.

21   Q.  And there was nothing in that definition that accounted for

22   what would 95 percent of plan be and what would 20 percent of

23   plan be, correct?

24   A.  I'm not sure that I agree with you.  The earnout agreement

25   clearly talks about an achievement percentage.

1   Q.  OK.  Let's pull up the definition.

2           James, if you will go to Exhibit 1 and pull up the

3   definition of adjusted EBITDA plan.

4           Mr. Leathers, we are looking now at what the

5   definition of adjusted EBITDA plan is in the earnout agreement.

6   Can you point the Court to where is there any part of this

7   definition that says what a 95 percent plan target would be.

8   A.  It's not in this definition.

9   Q.  And is there anything in this definition that shows what a

10  20 percent of plan target would be?

11  A.  No.

12  Q.  Now, one more question, Mr. Leathers.  If we go back to

13  your comparison of Exhibit B to the demonstrative.  The title

14  of Exhibit B was comparison of earnout payments to cash

15  installment example.  Correct?

16  A.  I don't -- yeah, there you go, yes.

17  Q.  So you understood that that was an example, right?  You see

18  that in the title?

19  A.  Yes.

20  Q.  OK.  And you don't note that in your demonstrative,

21  correct?

22  A.  Correct.

23  Q.  I want to talk to you about customer count, Mr. Leathers.

24  I just want to make sure that I get this correctly.  So just so

25  the Court understands the impact, you're basically advocating

1   that 9,182 pending active customers -- OK, you're advocating

2   that 9,182 pending active customers should be added to the

3   customer count number for Major Energy for year one, correct?

4   A.  Well, it's not entirely clear.  It should be added to the

5   active number of customer accounts, or if you're starting point

6   is the total customer accounts, it should remain in that count.

7   Q.  So just so the Court can follow your math, when you look at

8   the difference between Spark's calculation and your

9   calculation, the difference is you're adding 9,182 customers to

10  Spark's calculation, correct?

11  A.  Yes.

12  Q.  OK.  And the economic impact of that, we saw in Exhibit A

13  that each customer is worth $116.55, right?

14  A.  Yes.

15  Q.  And if we do the math of 9,182 times $116.55, we get

16  $1,070,162.10.  Does that look about right to you?

17  A.  Yes.

18  Q.  So your opinion is advocating that even though pending

19  active customers are not on flow, and are not paying Major

20  Energy a dollar, and don't show up in the definition of year

21  end customer accounts, you're telling the Court that over a

22  million dollars should be added to the earnout calculation in

23  favor of sellers; is that right?

24          MR. O'BRIEN:  Just an objection as to the

25  characterization of the definition of the customer count in the

K3B7HOR3                         Leathers - recross

1     earnout agreement.

2                 THE COURT:  OK, noted.

3     Q.  Is that right, Mr. Leathers?

4     A.  The math is correct.

5     Q.  Now, you will agree with me, Mr. Leathers, that if a

6     customer is a pending drop before as opposed to after -- so

7     before December 31, 2016 -- you understand that that customer

8     is in fact dropped as of December 31, 2016, right?

9     A.  Right.  Whoa, take a step back.  Can you ask me the

10    question again, please.

11    Q.  Yeah.  You understand that a customer that would be a

12    pending drop before 12/31/16 is a customer that is actually a

13    dropped customer as of December 31, 2016, correct?

14    A.  No, I don't believe that's correct.

15    Q.  So your testimony is that if a customer is a pending drop

16    before 12/31/2016, they're not a dropped customer as of

17    12/31/2016?

18    A.  Depends on when the termination date is.

19    Q.  Did you look at that, Mr. Leathers?

20    A.  Yes.

21    Q.  And where is your analysis in your expert report that shows

22    your detailed analysis of the termination dates of each

23    customers for pending drops?

24    A.  So, if you look at the -- we looked at the footnote.  The

25    best place to look would be to look at the footnote to the

1     exhibit that is cited for the 151,000 customers at the end of

2     December 2015.  And what you would see in that file is you

3     would see a number of pending dropped customers that were, for

4     example, after December 31, 2015, so therefore they are active

5     customers.

6     Q.  So, Mr. Leathers, the pending drops -- the customers that

7     are pending drops after December 31, 2016 of 5,731, you did not

8     deduct those pending drops from your calculation, correct?

9     A.  That's right.

10    Q.  Now, Mr. Leathers, I want to briefly pull up PX377A, which

11    you said you relied on for purposes of your add backs

12    calculation.  PX377A.  All right.  This was the document you

13    said you relied on for purposes of your add back calculations,

14    correct, Mr. Leathers?

15    A.  Yes.

16    Q.  You will agree, Mr. Leathers, that this was not an exhibit

17    to the earnout agreement, correct?

18    A.  Correct.

19    Q.  There was not an exhibit to the executive earnout

20    agreement, correct?

21    A.  Correct.

22    Q.  And this was not an exhibit to the MIPA, correct?

23    A.  Correct.

24    Q.  I want to talk to you about what you rely on for purposes

25    of your add backs.  Is it correct that when you added back

1    executive compensation of $1.2 million, that included salaries

2    of executives in connection with their new employment

3    agreements?

4    A.  When you speak to the new employment agreements, you mean

5    as of the transaction date.

6    Q.  Yes.

7    A.  Yes.

8    Q.  So in your add back number that you're advancing of adds

9    that should be added back to adjusted EBITDA, it does include

10   the salaries of executives' new employment agreements, correct?

11   A.  Yes.

12   Q.  Now, when you made your add back analysis, did you go back

13   an look at the MIPA?

14   A.  Yes.

15   Q.  And did you specifically look at section 7.1(d) of the

16   MIPA?

17   A.  Yes.

18   Q.  James, let's look at 7.1(d) of Exhibit 2.  All right.  If

19   you could just blow up 7.1(d), James.

20        OK, Mr. Leathers, I specifically want to take you to

21   the middle of this paragraph.  Do you see where it says "Any

22   payments of salary under the new employment agreements shall be

23   the responsibility of the companies and shall be deducted in

24   the calculation of adjusted EBITDA for purposes of the

25   calculation of the earnout."  Did I read that correctly?

1  A.  Yes, you did.

2  Q.  And you did not deduct it.  Instead, you're advocating an

3  add back despite the language of section 7.1(d), correct?

4  A.  Correct.

5  Q.  Now let's also look, James, at section 2.2(c) of the

6  executive earnout agreement which is Exhibit 5.  And we're

7  going to be looking at the second page, James.

8          OK.  Now, you understood, Mr. Leathers, that the

9  executive earnout agreement stated something very similar.  And

10 if I could direct you to subpart A.  Do you see where it says

11 "Base salary paid under the new employment agreements and

12 discretionary bonus payments paid under the E-STIP shall be

13 deducted from EBITDA in the determination of adjusted EBITDA

14 for purposes of the earnout agreement and this executive

15 earnout agreement."  Did I read that correctly?

16 A.  You did.

17 Q.  And even though the executive earnout agreement states

18 that, you are still advocating that they should be added back,

19 correct?

20 A.  That's correct.

21 Q.  Now, Mr. Leathers, you also don't have anything in the you

22 don't have any citations in the MIPA or the earnout agreement

23 that support your position in disregarding the $250,000 add

24 back that Spark generously provided to Major Energy, correct?

25 A.  Incorrect.

1   Q.  What provision in the MIPA or the earnout agreement do you

2   cite for your support?

3   A.  Well, I don't know that I have a cite to support the

4   $250,000.  I can point you back to some language that was part

5   of my consideration, but you're correct I don't know that I

6   footnote the $250,000 add back.

7   Q.  All right.  Did you review Mr. Horowitz's witness statement

8   in connection with your work in this case?

9   A.  Yes.

10  Q.  And did you see in paragraph 244 of Mr. Horowitz's witness

11  statement he tried to get around the language of -- the express

12  language of 7.1(d) and the executive earnout by merely claiming

13  it was a drafting error?

14          MR. O'BRIEN:  Objection, your Honor, to the

15  mischaracterization of Mr. Horowitz's witness statement.

16  Q.  Did you read that paragraph?

17  A.  I have a general recollection of his earnout statement.  I

18  mean you can put it up for me.

19  Q.  James, let's pull up paragraph 244 of Mr. Horowitz's

20  witness statement.

21          Does this refresh your memory, Mr. Leathers --

22  A.  It's moving around.  I can't --

23  Q.  Do you see there, Mr. Leathers -- have you had a chance to

24  read that?

25  A.  No, I'm sorry, I can't read it.  If we could stop moving

K3B7HOR3                    Leathers - recross

1    it.

2    Q.   You see that Mr. Horowitz was explaining the way that,

3    however, in drafting the adjusted EBITDA clause, the drafter of

4    the language mixed up the two terms, senior management and key

5    employees, and mistakenly did not follow the definitions in the

6    same section of the MIPA.   In addition, the intention during

7    negotiations was to consider all bonuses as an add back to

8    EBITDA.   Thus, the true mutual intent between NGE and Major was

9    for base salaries of Dan, Saul and Mark to be added back, as

10   well as bonuses of Dan, Saul, Mark, Levi and David.   Did I read

11   that correctly?

12   A.   Yes, you did.

13   Q.   So even though the language of section 7.1(d) and 2.2(c) of

14   the executive earnout says the opposite, you and Mr. Horowitz

15   are disregarding that express language, correct?

16   A.   Not correct.

17   Q.   All right.   Well, you also have an add back that you're

18   advancing of 225,000 for DSS; is that correct?

19   A.   Yes.

20   Q.   And did you look at the MIPA before you took that position?

21   A.   Yes.

22   Q.   All right.   Did you look specifically at the definition of

23   sellers' transaction expense?

24   A.   Yes.

25   Q.   All right.   James, let's go back to the MIPA, which is

1    Exhibit 2.  If we could go to page 16.

2              All right.  So if we look at the definition of

3    sellers' transactional expenses, are you familiar with that,

4    Mr. Leathers?

5    A.  Yes, ma'am, I am.

6    Q.  And in looking at that definition, you see that the

7    definition says that "it will include as a sellers' expense all

8    costs, fees, and expenses incurred in connection with or in

9    anticipation of the negotiation, execution and delivery of this

10   agreement" and then it goes on in (i) to say "it also includes

11   all fees and expenses payable to Coadie Demar Partners LLC, DSS

12   and any and all other brokerage fees, commissions, finders'

13   fees or financial advisory fees so incurred."

14             Do you see that?

15   A.  Yes.

16   Q.  So even though the MIPA made clear that that was a sellers'

17   expense, you advocate that as an add back; is that right?

18   A.  Yes.

19   Q.  Now, Mr. Leathers, based upon the add backs that you're

20   advancing, you will agree that you have now sponsored a new

21   adjusted EBITDA number for the sellers that not a single fact

22   witness in this case sponsors, correct?

23   A.  There are two parts to that question.  Number one, it's not

24   a new opinion.  Number two, I do not recall a fact witness that

25   has come to the exact same amount or conclusion to an amount

1    that I have.

2    Q.  Mr. Wiederman doesn't support that number, correct?

3    A.  I don't believe.  We can go back and look at Mr.

4    Wiederman's testimony.  I don't think Mr. Wiederman supports

5    the number one way or the other.

6    Q.  And Mr. Horowitz doesn't support the number, correct?

7    A.  Mr. Horowitz has his own number.

8    Q.  And Mr. Sobel has a different number as well, correct?

9    A.  Yes, he also has his own number.

10   Q.  So you are on your own island with your adjusted EBITDA

11   number that no fact witnesses in this case have proved up,

12   correct?

13   A.  I wouldn't describe it as an island.  I would describe it

14   as my independent assessment.

15   Q.  Mr. Leathers, if I understand you correctly, you're

16   basically treating -- for purposes of your alleged $26 million

17   damage model, you're treating the contingent payment amount as

18   though the full amount would have been achieved but for the

19   dropdown and the alleged activities of Spark and NGE, correct?

20   A.  Yes.

21   Q.  So you are essentially treating that as a guarantee to have

22   happen.  You assume that the full amount of the contingent

23   payment would have been triggered, correct?

24   A.  No, I'm not assuming that.  That's the result of my

25   analysis.  Certainly, stepping back from the underlying

analysis that we talked about yesterday, there is some

underlying assumptions, but there is not an assumption to the

result.

Q.  You knew that section 2.4 of the earnout agreement had a

clause that specifically addressed contingent payment rights,

correct?

A.  I don't recall.  You can show me that.

Q.  James, let's pull up Exhibit 1, section 2.4.

        And you knew, Mr. Leathers, based upon section 2.4,

that what the parties had bargained for is that each seller

shall only have a contingent right and not an absolute right to

receive a contingent cash payment upon occurrence of certain

performance criteria, correct?

A.  Yes.

Q.  And your damage analysis does not rely on what actually

happened.  Your damage analysis relies on a projection of what

you think should have happened, correct?

A.  Yes.

Q.  Now, just briefly, you talked about Mr. Sobel and some

deposition testimony you purportedly relied on as part of your

expert opinions.  And when I asked you about did you know that

Mr. Sobel had embellished numbers, and said he had embellished

a number, you didn't recall that, correct?

A.  I don't remember my specific answer.  If my answer was I

did not recall, I'm not disputing that.

K3B7HOR3                        Leathers - recross

1    Q.  But when Mr. O'Brien asked you about it, you suddenly

2    remembered that you relied on that testimony as part of your

3    opinion, correct?

4    A.  Not correct.

5    Q.  All right.  Well, if we look at what you actually did in

6    your witness statement --

7            And, James, if we can pull up footnote 66 and 76 of

8    Mr. Leathers' witness statement.

9            First, Mr. Leathers, this is footnote 66 to your

10   witness statement.  And I will represent to you, Mr. Leathers,

11   that we ran a search for Mr. Sobel's deposition and your

12   witness statement; we only saw two references.  Are you aware

13   of any reference besides these two?

14   A.  I mean I will take your representation.  I haven't looked

15   and endeavored to count how many.

16   Q.  Now, Mr. O'Brien went over a couple of pages with you.  The

17   first page that he went over with you was page 89 of

18   Mr. Sobel's deposition.  Do you see that in this footnote, sir?

19   A.  No, I do not.

20   Q.  He then went over page 137 with you.  Do you see that in

21   this footnote?

22   A.  No, I do not.

23   Q.  He went over pages 412 and 413 with you.  Do you see that

24   in this footnote.

25   A.  No, I do not.

K3B7HOR3                          Leathers - recross

1   Q.  And then he went over pages 412 to 418 with you.  Do you

2   see that in this footnote?

3   A.  I do not.

4   Q.  Let's look at your other reference to Mr. Sobel's

5   deposition on footnote 76 of your witness statement.

6          Once again, Mr. Leathers, do you see any reference to

7   page 89 or page 137 there?

8   A.  To Mr. Sobel's deposition?

9   Q.  Yes.

10  A.  No, I do not.

11  Q.  And do you see any reference there to pages 412 through 418

12  of Mr. Sobel's deposition?

13  A.  I do not.

14  Q.  Mr. Leathers, you didn't make any deductions in your damage

15  model for the time that the sellers' executives were working on

16  this case during the earnout period during working hours,

17  correct?

18  A.  Correct.

19  Q.  And you didn't make any deductions to your damage model for

20  the other business ventures that seller executives were working

21  on during the earnout period, correct?

22  A.  Correct.

23  Q.  And you say that your opinion is there has been no other

24  material impact that interfered with the ability to achieve

25  projections, correct?

K3B7HOR3                          Leathers - recross

1   A.   Correct.

2   Q.   But you will agree that if the seller executives did not

3   perform their duties in growing the company, that would be a

4   material impact on the business, correct?

5   A.   Depends.

6              MS. PECTOR:  No further questions, your Honor.

7              THE COURT:  All right.  Thank you.

8              Is there any re-redirect?

9              MR. O'BRIEN:  No, your Honor.

10             THE COURT:  All right, thank you, sir.  You may step

11   down.

12             You can leave everything there and somebody will pick

13   it up.

14             (Witness excused)

15             THE COURT:  Should we go ahead and break for lunch?

16   It's ten minutes to one.  Is that all right with everybody?

17   All right.  We will break for about an hour for lunch, and then

18   when we come back is Kuznar next?  OK, great.  Have a good

19   lunch everybody.

20             (Luncheon recess)

21             (Continued on next page)

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N

 2                         2:00 P.M.

 3            THE COURT:  Good afternoon.

 4            MR. MAROONEY:  We just have a preliminary matter or

 5      two before we rest, and Mr. O'Brien will handle it.

 6            THE COURT:  Okay.

 7            MR. O'BRIEN:  Just a couple of really quick

 8      housekeeping items.

 9            Last week the defendant submitted a written witness

10      statement for Keith Maxwell.  And we have our written

11      objections that we hadn't handed up at that time.

12            You asked, your Honor, for a the printout of the

13      slides that we showed Mr. Leathers.  We have that ready for

14      you.

15            The exhibits that are cited in plaintiff's written

16      statements, you asked for at the beginning of the case a list

17      at the end, and we prepared that list.  We can submit that to

18      you in paper now or email it to you, whatever you'd like.

19            THE COURT:  So wait.  This is the list of?

20            MR. O'BRIEN:  Of exhibits that are cited in the

21      written statements.

22            THE COURT:  Okay.  Perfect.

23            MR. O'BRIEN:  And the last thing on our list, your

24      Honor, is we understand your rule to be that we need to submit

25      to you an updated exhibit list.  We submitted a list with the
```

K3BVHOR4

1    defendants with the joint pretrial order.  It was slightly

2    updated before the trial began.  And we have that and we can

3    email that to chambers, if you like.

4              THE COURT:  Okay.  That would be fine.

5              You mean a list of exhibits that have been admitted or

6    the full list?

7              MR. O'BRIEN:  The full list.

8              THE COURT:  Okay.  That's fine.  You can just email

9    that to our chambers.

10             MR. O'BRIEN:  We'll do that.  Thank you.

11             MR. BROWN:  And, your Honor, final issue, just witness

12   order.  We're just swapping Ms. McGuinness is going to go

13   second, Mr. Leonard third, because Ms. McGuinness had

14   (inaudible).

15             THE COURT:  Okay.  That's fine.

16             MR. MAROONEY:  With that, the plaintiffs rest.

17             And we are now in defendants' case.

18             THE COURT:  All right.

19             MR. BROWN:  And, your Honor, under ordinary

20   circumstances we would likely make a bench motion for a

21   directed verdict.  In light of the process here that the

22   parties agreed to and your Honor's commentary, we're not making

23   a directed verdict motion at this time.

24             THE COURT:  Okay.  Understood.

25             So what's next?

K3BVHOR6                          Kuznar – direct

1          MR. BROWN:  So Mr. Wilkerson will handle the next

2     witness.

3          MR. WILKERSON:  Defendants will call Michael Kuznar.

4          THE COURT:  All right.  Mr. Kuznar, if you'd please

5     come up to the witness box.

6     MICHAEL KUZNAR,

7          called as a witness by the Defendants,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. WILKERSON:

11    Q.  Mr. Kuznar, you have before you a witness statement with

12    your name on it.  Do you see that?

13    A.  I do.

14    Q.  And is that the witness statement that you signed and

15    submitted in this case?

16    A.  It is, yes.

17    Q.  Do you adopt that witness statement as your written direct

18    testimony in this case?

19    A.  That is correct.

20         MR. WILKERSON:  Your Honor, at this time we would

21    offer the written direct testimony of Mr. Kuznar, along with

22    all exhibits cited therein.

23         THE COURT:  They are received in evidence.  Thank you.

24         Cross-examination, Mr. Gabay.

25         MR. GABAY:  Your Honor, we have objections we'd like

K3BVHOR6                          Kuznar – cross

1    to hand up.

2              THE COURT:  Yes.

3    CROSS-EXAMINATION

4    BY MR. GABAY:

5    Q.  Good afternoon, Mr. Kuznar.

6    A.  Good afternoon.

7    Q.  You became the president of RetailCo Services LLC in

8    January 2016; correct?

9    A.  Correct.

10   Q.  RetailCo is an affiliate of Spark Energy, Inc.; correct?

11   A.  Correct.

12   Q.  RetailCo provided customer operations and IT services to

13   Spark; correct?

14   A.  Correct.

15   Q.  Now, when you began as president of RetailCo, you reported

16   directly to Keith Maxwell; correct?

17   A.  That is correct.

18   Q.  In April 2016, NGE acquired Major Energy; correct?

19   A.  Correct.

20   Q.  As president of RetailCo, you were aware that there was an

21   earnout associated with the acquisition of Major Energy;

22   correct?

23   A.  I was aware that there was an earnout associated with Major

24   Energy and Spark.  I couldn't speak to the components of the

25   earnout, but, yes, generally aware there was an earnout.

1  Q.  You understood that Spark should not integrate Major Energy

2  into Spark during the earnout period; correct?

3  A.  That's correct.  It was Major Energy operating their

4  business as they decided to operate it, without RetailCo

5  integrating any of Major Energy's operations into RetailCo.

6  Q.  And you also understood during the earnout period that

7  Spark should not be disruptive to Major Energy's business;

8  correct?

9  A.  That's my understanding.

10  Q.  Now, within days of NGE's acquisition of Major Energy, you

11  had a call with Dan Alper to discuss operations and IT;

12  correct?

13  A.  It was to share information about RetailCo, our operations;

14  also for Dan to share about Major Energy's EMS application and

15  their operation, that is correct.

16  Q.  "EMS" that stands for Energy Management System, right?

17  A.  That is correct.

18  Q.  EMS was a custom transaction management billing system

19  developed by Major Energy, right?

20  A.  Correct.

21  Q.  When NGE acquired Major Energy in April 2016, Major already

22  had the EMS platform set up and running for its own operations;

23  correct?

24  A.  Correct.  For the markets it was operating in, that's

25  correct.

1    Q.   Now, it's your position that in or around April or May

2    2016, Mr. Alper suggested potentially using EMS as a growth

3    platform for the Spark family of companies; correct?

4    A.   He did.

5    Q.   You're not aware one way or the other, sir, whether

6    Mr. Konikowski had a conversation with Mr. Alper outside your

7    presence asking him to integrate EMS into Spark; correct?

8    A.   I'm unaware of a conversation.

9    Q.   And you're not aware one way or the other whether

10   Mr. Maxwell had a conversation with Mr. Alper outside of your

11   presence asking him to integrate EMS into Spark's operations;

12   correct?

13   A.   That is correct.

14   Q.   And you didn't travel down to Florida in May 2016 to attend

15   an industry conference with Mr. Maxwell, did you?

16   A.   I did not.

17   Q.   During the time when you were delivering services to Spark

18   as president of RetailCo, you met with Mr. Maxwell in person

19   approximately once per month; correct?

20   A.   Periodically, every several weeks to a month, that's

21   correct.

22   Q.   And you would give Mr. Maxwell headlines on how RetailCo is

23   doing in providing services to Spark; correct?

24   A.   I would.

25   Q.   And you discussed Mr.  -- excuse me.  You discussed Major

1   Energy's EMS platform with Mr. Maxwell; correct?

2   A.  I didn't discuss anything specific regarding the EMS

3   platform with Mr. Maxwell.  I did discuss -- we had

4   conversations about Major Energy's cost to serve, how RetailCo

5   is doing.  And it would have been inside that context, not

6   specific conversations with Mr. Maxwell about EMS and how EMS

7   operates or EMS performance relative to RetailCo.

8   Q.  Well, Mr. Maxwell told you that he found the EMS platform

9   attractive as part of the acquisition of Major Energy, right?

10  A.  That is incorrect in that the word "attractive" used is my

11  word.  And I understand that it was attractive in regards to

12  the appearance of it operating properly, being that it was

13  billing Major Energy customers as it would appeared to have

14  been intended.

15          And so my use of the word in the conversation with

16  Mr. Maxwell -- and if Mr. Maxwell repeated it, fair enough --

17  but it was in not picking up a system inside a company or

18  there's not an acquisition of a company that's got a billing

19  system that appears to have an issue.  That's the context of

20  the word "attractive."

21  Q.  When NGE acquired Major Energy in April 2016, Spark had

22  numerous billing and transaction management systems at that

23  time; correct?

24  A.  Yes.

25  Q.  You would agree that Spark had various legacy systems in

1    April 2016; correct?

2    A.  Correct.

3    Q.  And it also had many other systems that it had acquired as

4    part of other acquisitions; correct?

5    A.  Correct.

6            MR. GABAY:  Eric, if we could pull up paragraph 13 of

7    Mr. Kuznar's witness statement.

8    Q.  So there you state:  Around this same period of time,

9    RetailCo already had a project in progress to consolidate

10   billing systems via a third-party provider.  However, in

11   reliance on the enthusiasm the sellers exhibited for the

12   integration of EMS into the Spark family of companies, that

13   effort was halted in or around May 2016.

14           Do you see that?

15   A.  I do.

16   Q.  And that effort to consolidate systems via a third-party

17   provider was halted by you; correct?

18   A.  It was.

19   Q.  It wasn't halted by Major Energy management, was it?

20   A.  It was not.

21   Q.  Now, prior to halting that consolidation effort, you had

22   already conducted due diligence on Major Energy's customer

23   operations and IT; correct?

24   A.  I'm sorry, ask again.

25   Q.  Prior to halting the consolidation efforts with the

1   third-party provider, you, yourself had already conducted due

2   diligence on Major Energy's customer operations and IT;

3   correct?

4   A.  That's correct.

5   Q.  And in April 2016, you signed a due diligence memo relating

6   to Major Energy's customer operations and IT; correct?

7   A.  Correct.

8           MR. GABAY:  Eric, if we could pull up PX-162.  And

9   blow up the email at the bottom of page 1.

10  Q.  So this is an email from Brian Hoogendam at Spark Energy on

11  June 8th, 2016.  Who is Mr. Hoogendam?

12  A.  Mr. Hoogendam reported to me.  He was the chief information

13  officer.

14  Q.  And that's of Spark?

15  A.  Of RetailCo.

16          MR. GABAY:  If we pull out of this email for a second

17  and look at the one above it.

18  Q.  We can see that you received this email --

19          MR. GABAY:  Oh, and can we just blow up the to/from,

20  as well.

21  Q.  We can see that you received this email as part of the

22  RetailCo Services employees list; correct?

23  A.  Correct.

24  Q.  Now, if we go back to the email that we were just looking

25  at in paragraph 2, Mr. Hoogendam wrote:  At the heart of

K3BVHOR6                          Kuznar - cross

1    Major's operation is a customer application built by Major IT

2    called Energy Management System, EMS, and a core team

3    responsible for managing and developing it.  Do you see that?

4    A.  Yes, sir.

5    Q.  And he continues:  As we look to achieve IT and operational

6    scale for Spark and its affiliates, the team believes EMS can

7    be a key enabler not only from a technology perspective, but

8    also how we run our day-to-day operations.

9              Now, at this time, when you halted the consolidation

10   project with the third-party vendor -- provider, I should

11   say -- you believed that EMS could be a key enabler in Spark's

12   efforts to achieve IT and operational skill; correct?

13   A.  I did.

14   Q.  And you also believed at this time that EMS could be a key

15   enabler for Spark not only from a technology perspective, but

16   also in terms of how Spark ran its day-to-day operations;

17   correct?

18   A.  Correct.  There's more color to be had there, but it was,

19   as an application, something that would enable operations to

20   perform efficiently with the build-out of EMS as Dan and I

21   co-sponsored the project for which to make that happen.

22   Q.  And you also believed that if all of Spark's different

23   systems at the time would have gone away and Spark could

24   instead use one system, that being EMS, then Spark's

25   operational and IT environment would have become less complex;

K3BVHOR6                          Kuznar - cross

1    correct?

2    A.  By its nature, that's correct.  And be it whether it was

3    EMS or whether it was some other single application, by its

4    nature, having the consolidation into a single application

5    makes the environment less complex.

6    Q.  You would agree with me, sir, that at the time of NGE's

7    acquisition of Major Energy, there were certain Major Energy

8    employees who were the single source of skills and knowledge

9    with respect to EMS; correct?

10   A.  I understand that Levi Moeller had knowledge about EMS,

11   yes, so this is -- this is true, yes.

12   Q.  And those Major Energy employees were the only ones who had

13   knowledge and skills concerning the design and technical

14   operation of EMS; correct?

15   A.  As it currently existed.  It's not correct, if the question

16   is related to could have RetailCo built out the application

17   itself with technical folks that we had or we could have

18   engaged.

19   Q.  RetailCo did not, in fact, do that, did they?

20   A.  No, RetailCo, starting with myself, and co-sponsoring with

21   Dan, we co-sponsored the EMS project to build out EMS

22   capabilities that were going to benefit Spark, RetailCo, and

23   Major.

24   Q.  Now, for weeks after NGE's acquisition, members of Spark,

25   RetailCo, and Major Energy met with one another to discuss how

K3BVHOR6                      Kuznar - cross

1    EMS might be integrated into Spark; correct?

2    A.  I'm sorry, sir, ask me again.

3    Q.  For weeks after the acquisition, there were members of

4    Spark, RetailCo, and Major Energy who met to discuss how EMS

5    might be integrated into Spark; correct?

6    A.  Weeks after the acquisition.  We kicked off a project -- if

7    this answers your question, we kicked off a project in the

8    first part of August.

9    Q.  I'm sorry.  So my question was geared towards if you think

10   about the August 2016 acquisition date, right?  For weeks after

11   that acquisition date, members of Spark, RetailCo, and Major

12   Energy met with one another to discuss how EMS might be

13   integrated into Spark in the future; correct?

14           MR. WILKERSON:  Objection.  Vague as to the time

15   period.  I believe the question referred to August 2016.

16           THE COURT:  Could you clarify?  Is that what you

17   meant?

18   Q.  So the question relates to the weeks after the April

19   acquisition.  And my question is whether in those weeks after

20   the acquisition, members of Spark, RetailCo, or Major Energy

21   met to discuss how EMS might be integrated into Spark one day?

22   A.  So to clarify the time frame so I'm answering correctly,

23   the period of time you're talking about is after the -- after

24   the April -- after the April period of time?

25   Q.  Correct.

K3BVHOR6                          Kuznar - cross

A.   So there was a two-and-a-half-day agenda at some point in
time during June where there was information sharing about how
we operated as RetailCo and how Major operated that consisted
of largely RetailCo and a few Major Energy folks.

Q.   If we look back at PX-162, at the bottom of page 1,
stretching into page 2, Mr. Hoogendam continues.  This is the
email we were looking at previously:  In the coming weeks, the
plan is to finalize a steering committee and project team,
while laying out key tasks and project timelines.  Also
strategy sessions will be held with many key stakeholders to
begin the process of integrating EMS into our core operations.

          Do you see that?

A.   I do.

Q.   And, in fact, after this email was sent in June 2016, Spark
created a steering committee for the EMS integration project;
correct?

A.   Dan and I co-sponsored the project.  And if you think about
the hierarchy, Dan and I were co-sponsors of the project.
There was a steering committee that reported to Dan and I; the
Major folks reported to Dan; the RetailCo folks reported to
myself.  And then underneath that was the design of a core
project.

Q.   Dan Alper and Mark Wiederman were part of that steering
committee; correct?

A.   Yes.

K3BVHOR6                         Kuznar - cross

1   Q.  And Spark also created a project team for the EMS

2   integration project; correct?

3   A.  Are you asking Spark Energy or RetailCo?

4   Q.  Spark and/or RetailCo.

5   A.  So to give you the structure, I imagine that it's in an

6   exhibit.  And so if it is, it might be best to go there so I

7   don't tell you wrong, but let me give you the headlines on

8   that.

9          Dan and I co-sponsored a project, EMS buildout.

10  Underneath that was the steering committee.  The steering

11  committee had folks on it from RetailCo, Major, and Spark.  And

12  the names will be in the exhibit.

13         And then below the steering committee would have been

14  names of core project team members that would have been part of

15  the buildout of the -- of the application.

16  Q.  And you recall that Raphi Levine, Saul Taub, and Levi

17  Moeller were also involved in these efforts?

18  A.  They were identified as part of the core team, yes.

19  Q.  And do you recall Mr. Levine's role on that core team?

20  A.  Raphi Levine was, in part, leading the project at Dan's

21  desire.  We collaborated together, let's be clear.

22         Dan hired Raphi Levine.  Apparently there was some

23  past experience there either Dan or other folks at Major had.

24  And he -- he hired him in part to lead the effort, the project

25  team effort, along with other IT work that was happening at

K3BVHOR6                           Kuznar - cross

Major Energy.

Q.   During the week of June 27th, 2016, Major Energy and Spark

employees met in Houston to discuss the implementation of the

EMS integration project; correct?

A.   There was a meeting -- if I could ask back, if you don't

mind, is this the two-and-a-half-day agenda that you're

referencing?

Q.   Yes.  So it's -- right.  It's in your witness statement.

This is a meeting you -- a series of meetings you referenced in

Houston in late June?

A.   Yes, that is correct.

Q.   And those meetings took place in Houston over the course of

three days; correct?

A.   Yeah.  It was a Monday evening dinner.  And then there were

Tuesday and Wednesday meetings with an agenda on those days

that put structure to the discussions and who we were needing

to be involved in what time periods or time blocks of those

discussions.

          MR. GABAY:  Eric, could we please pull up PX-129.

Q.   This is a June 24th, 2016 email from Mr. Moeller to

Mr. Alper and Mr. Wiederman; correct?

A.   Correct.

Q.   Mr. Moeller states:  Attached is the schedule for next week

that was sent over to us by Spark.  Right?

A.   He does say that, yes.

K3BVHOR6                    Kuznar - cross

1    Q.  If we take a look at the schedule on page 2, it shows

2    meetings on Monday from 1 to 6 p.m.; correct?

3    A.  That is correct.

4    Q.  And if we look at pages 2 to 3, there are additional

5    meetings on Tuesday from 8:30 a.m. to 5 p.m.; correct?

6    A.  Correct.

7    Q.  And additional meetings on Wednesday, from 8 a.m. to 5

8    p.m.; correct?

9    A.  That is correct.

10           MR. GABAY:  And if we flip back to the prior page,

11   Eric.

12   Q.  Mr. Kuznar, do you see any meetings where Major Energy team

13   members are not listed in this schedule?

14   A.  Is it okay for me to go through it --

15   Q.  Sure.

16   A.  -- agenda item by agenda item?

17           If we could go back up to the start of Monday please.

18   Yes.  So the Major -- the Major team on Monday afternoon,

19   although described generally, I do see that there's involvement

20   there also from 8:30 to 9.  In fact, this is when Dan and I

21   would have come into the discussion with Brian and Lindsay on 9

22   to 10, that's correct.  10 to 11, it looks specific to having

23   Levi in the meeting; the others are RetailCo employees.  11 to

24   12, Levi's there; the others are RetailCo employees.  9 to 1,

25   Saul and Raphi are there; the others are RetailCo employees.  1

1   to 2, Saul and Raphi are there, Brian and Dell are RetailCo

2   employees.  Same with Jason.  On the separate 1 to 2 section at

3   the bottom of the page, it shows Levi being there.  The names

4   of the other folks are RetailCo employees.

5           THE COURT:  By the way, the dates seem to indicate May

6   27th, 28th, or 29th.  Is it May or June this happened?  Do you

7   know?  Sir, do you know?

8           THE WITNESS:  Your Honor, this represents -- this

9   being in the May period.

10          THE COURT:  Okay.

11  A.  Continuing on.  The 2 to 3 period has got Levi.  Ruth is a

12  Spark employee.  The 3 to 4 has Levi.  And then, of course,

13  Lindsay is a RetailCo employee.  The 2 to 4 has Saul and Raphi.

14  Major.  And the other folks there are RetailCo.  The wrap-up

15  that Dan and I participated in, that has a combination of Major

16  and RetailCo.

17          When we go to Wednesday, the 8 to 9, Major team is

18  generally shown there.  The 9 to 10:30, Levi and Mark are Major

19  employees.  And the rest of the names are RetailCo, with the

20  exception of Kiera and Deborah, who are Spark employees.

21          The 10:30 to 12, Kiera, Susan, Pam are Spark

22  employees.  Of course, Levi is Major, and the others are

23  RetailCo.  The 12 to 2, Brian and Lindsay are RetailCo or

24  generally Major team.  11 to 2, Saul, Raphi, Major, Brian,

25  Christina, Jim and Zoe are RetailCo.  2 to 3 wrap-up, similar

K3BVHOR6                          Kuznar - cross

1    to my earlier comments on the wrap-up.  And then the 3 to 5,

2    Chris and John and Kiera are Spark, RetailCo for Lindsay, Major

3    for Levi.

4    Q.  Thank you, sir.

5            MR. GABAY:  And Eric, if you could please pull up

6    PX-384.

7    Q.  This is a July 1st, 2016 email from Mr. Alper to

8    Mr. Maxwell, attaching a Major Energy weekly report.

9            Do you see that?

10   A.  I do.

11           MR. GABAY:  Can we turn to the last page of this

12   report.  It's page 7.

13           MR. WILKERSON:  Object to the lack of foundation as to

14   this witness.

15           THE COURT:  Can I look at the document?

16           MR. GABAY:  I'm sorry, your Honor, I misheard you.

17           THE COURT:  I just wanted to look at the document.

18           MR. GABAY:  Oh.

19           THE COURT:  Is this a management presentation?

20           MR. GABAY:  It's a weekly management report sent to

21   Mr. Maxwell from Dan Alper.

22           THE COURT:  And what did you intend to ask this

23   witness about it?

24           MR. GABAY:  Just going to ask his understanding of the

25   different bullets in this presentation, to see if it jogs his

K3BVHOR6                          Kuznar - cross

 1   memory on certain things.

 2              MR. WILKERSON:  The email on page 1 indicates that

 3   he's not a recipient of this.

 4              THE COURT:  Okay.  I'll allow the question and then

 5   I'll possibly allow the answer.

 6   BY MR. GABAY:

 7   Q.  At the top of the slide it says:  Energy Management System

 8   Migration Update.  Do you see that?

 9   A.  I do.

10   Q.  It says:  Week of 6/30/16, Levi, Saul, Raphi, along with

11   Dan and Mark, spent the week in Houston to work on the EMS

12   integration.  Correct?

13   A.  It says that.  If I could tell you, sir, I didn't receive

14   copies of any weekly status reports that Dan Alper would have

15   been provided.

16   Q.  Do you recall -- I'm sorry, are you finished?

17   A.  That's fine.

18   Q.  Do you recall generally that this group of Major Energy

19   employees visited Houston to work on the EMS integration

20   project during the week of June 30th, 2016?

21   A.  I would say that the term "EMS integration" is one that's

22   misused.

23   Q.  Do you recall those employees traveling down to Houston to

24   discuss concepts relating to the EMS integration project that

25   would begin to occur in the future?

K3BVHOR6                          Kuznar - cross

1    A.  I recall having conversations with Dan Alper along the way

2    from the time that we elected to co-sponsor the project, going

3    back to the April/May time frame, and whether that was over the

4    phone or in email or in person.

5    Q.  Further down in the slide it says:  Major has one full-time

6    programmer already working on the nonPOR markets so that stage

7    2 of the integration happens on time as well.

8            At the time, were you aware that Major Energy hired a

9    full-time programmer to work on this task I just read to you?

10   A.  I was not.

11           MR. GABAY:  Eric, if we could pull up PX-135 please.

12   Q.  On the bottom of the first page there's a July 24th, 2016

13   email from Mr. Hoogendam to Mr. Levine, Mr. Taub, Mr. Moeller,

14   and Ms. Margiotta of Spark, with the subject line "Project

15   EMS"; correct?

16   A.  Correct.

17   Q.  Mr. Hoogendam lists several key milestones, do you see

18   that?

19   A.  I do.

20   Q.  And he lists four key milestones to be completed by August

21   1st, right?

22   A.  He does, yes.

23   Q.  And two more by August 5th?

24   A.  He does.

25   Q.  And three more by August 19th?

K3BVHOR6                        Kuznar - cross

1    A.  I see that.

2    Q.  And then six more by September 1st?

3    A.  Yes.

4    Q.  So that's 15 or so key milestones to be completed between

5    July 24th, the date of this email, and September 1st, 2016;

6    correct?

7    A.  That's what -- that's what's represented here.

8            The reality is the shutting down of Project Bega had

9    work that was already prepared so that we weren't starting from

10   a blank sheet of paper with the Major Energy folks.  And some

11   of that would have played into these milestones.  I will say

12   that the must-haves for phase I of the project were never

13   defined of the EMS buildout, and never got defined by the time

14   that the project was shut down.

15           So it strikes me curious as to what a programmer might

16   have been doing on behalf of the project that Dan and I

17   co-sponsored.  I do understand that Major had an interest in

18   building out EMS for themselves at some point, because the

19   markets that they were in were limited.  And so a nonPOR market

20   is one of the capabilities that they were hoping to -- or

21   wanting to build out of EMS.

22           MR. GABAY:  Your Honor, I'll move to strike that.  I

23   simply asked, you know, whether there were 15 key milestones

24   listed on this page.

25           THE COURT:  Well, I'm going to allow the testimony

K3BVHOR6                           Kuznar - cross

1     because he's explained the context.

2                But you can ask him your next question.

3     BY MR. GABAY:

4     Q.  So by September 1st, the last date that we just went over

5     on this page, you had not stopped the EMS integration project,

6     had you?

7     A.  By September 1st?

8     Q.  Correct.

9     A.  That's correct.

10    Q.  You stopped the project on September 13th; correct?

11    A.  I did.

12    Q.  Let's look at PX-138.  This is a July 27th, 2016 email from

13    you to Mr. Alper, Mr. Levine, Mr. Moeller, Mr. Wiederman,

14    Mr. Taub, and several others at Spark; correct?

15    A.  That's correct.

16    Q.  And the subject line is "Inform EMS Charter Steering

17    Committee Member Update," right?

18    A.  Correct.

19    Q.  And in the second paragraph you state:  Collectively, we

20    have a unique and neat opportunity ahead of us to create value

21    for the overall good of the company by transforming our

22    existing systems architecture and how we operate, which will

23    happen through us being willing to make trade-offs and tough

24    decisions and doing so quickly, operating as company owner, and

25    in doing so, being willing to change and work together towards

1    what's best for the overall good, which at times will conflict

2    with what's ideal for a single entity.

3            Did I read that correctly?

4    A.  You did read that correctly.

5    Q.  And when you wrote this email, you were confident that

6    working on the EMS integration project would necessarily

7    conflict with what's ideal for a single entity at times;

8    correct?

9    A.  I believe that is -- that is true.  And that's the nature

10   of these types of projects, whether it was an EMS project, or

11   whether it was some other third-party application, or an

12   internal built system that we were pursuing.

13           And the use of the word "entity," so that that's

14   understood with clarity also, is not specific to any one

15   company; it was an entity that could be an individual, could be

16   a group, it could be a department, it could be a facility.

17           And so my point in specifically using that word is

18   there could be some redundancy in roles, mine being one of

19   them, chief information officer, chief technical officer.

20           We had operations in Houston and, of course, Major was

21   operating out of New York.  At some point in time down the

22   road, there were going to be tough, tough trade-offs to make.

23   The overall good of the company, for clarity, is that for the

24   rising tied all boats will rise.  This was not for the

25   detriment of any one company.

K3BVHOR6                          Kuznar – cross

1   Q.  Now, as of late 2016, the actual integration of EMS into

2   Spark had not yet begun; correct?

3   A.  Ask me again.  I'm sorry.

4   Q.  As of late July 2016, the actual physical integration of

5   EMS into Spark had not yet begun; correct?

6   A.  Not only not then, but never.

7   Q.  From April 2016 to July 2016, Major Energy and Spark

8   employees had been participating in what you call in your

9   witness statement the information gathering and planning stages

10  of a potential integration of EMS into Spark; correct?

11  A.  Correct.

12  Q.  The actual integration of EMS into Spark began the first

13  week of August 2016, with the kick-off of the leadership

14  workshop; correct?

15  A.  I'm going to make sure that in the answer the use of the

16  word "integration" is used in a proper context, because it's

17  such a broad term.

18         There were lots of what people may call integration

19  activities going on.  As an example, Spark had previously

20  acquired Oasis and Censtar.  And so RetailCo was integrating

21  some of the operations there.

22         As it relates specifically to EMS, there was no

23  integration at all that occurred into RetailCo or Spark's

24  operation or technical environment.  The information sharing

25  discussed in meetings that I referenced were for knowledge

K3BVHOR6                          Kuznar - cross

1    sharing and to begin to define what the capabilities were

2    either needed or wanted in buildout of EMS by Major, by Spark,

3    and by RetailCo.

4              MR. GABAY:  Eric, could we pull up paragraph 33,

5    please, of Mr. Kuznar's witness statement.  It's on page 11.

6    Q.  And there you wrote -- you testified, rather:  For the

7    avoidance of all doubt on the status of the integration

8    project, on September 13th, 2016, exactly seven weeks after its

9    kick-off at the leadership workshop, and then you go on.

10             Did I read that correctly?

11   A.  Yes, sir.

12   Q.  Were you referring to some other integration project there?

13   A.  No, this was specific to the work that was taking place on

14   the EMS project.

15   Q.  So you do recall, sir, that the EMS integration continued

16   for seven weeks; correct?

17   A.  From the time that we kicked off the workshop in the first

18   part of August, until that date of September 13, yes, that --

19   there was -- the project was in place for that period of time.

20   There was -- there were communications from Raphi where he had

21   other priorities that wouldn't allow him to make progress on

22   the EMS milestones that you represented earlier.  But for all

23   practical purposes, in the start, official start and official

24   end of the project, the kick-off, to where this communication

25   went, seven weeks.

K3BVHOR6                          Kuznar – cross

1   Q.  I'll show you one last document.

2           MR. GABAY:  If we could pull up PX-139 please.

3   Q.  This is an August 9th, 2016 email from Mr. Levine to

4   various Major Energy and Spark employees, including you;

5   correct?

6   A.  Correct.

7   Q.  Mr. Levine writes:  Attached please find the finalized

8   project plan which maps out the steps which will enable us to

9   track the success of the focus nonPOR migration into EMS by end

10  of year.  Correct?

11  A.  That's correct.

12          MR. GABAY:  And Eric, if we could please turn to page

13  3.

14  Q.  This is the attached schedule.

15          MR. GABAY:  If we can just blow up the bottom left

16  portion of the plan so we can see the number of rows on this

17  page, please.

18  Q.  Mr. Kuznar, how many rows are listed on this project plan?

19  A.  101 is shown there.

20  Q.  I won't take you through all of these, but if we zoom out

21  so we can see all the tasks on the page, you're not surprised,

22  sir, by the number of tasks that are on this page for a project

23  like the EMS integration project to get accomplished, are you?

24  A.  I'm not surprised by the amount of tasks.  What strikes me

25  about the work plan that's shown here is how much of it's

1   relying on RetailCo, one; and two, how little was accomplished.

2              MR. GABAY:  Your Honor, we will pass the witness.

3              THE COURT:  All right.  Thank you.

4              MR. GABAY:  I'd just like to move some exhibits.

5              THE COURT:  Yes.

6              MR. GABAY:  We have PX-162, PX-129, PX-384, PX-135,

7   PX-138, and PX-139.

8              THE COURT:  384 and 135 are already in, because those

9   are the two documents that he was not on; and I don't know that

10  he authenticated them or anything.

11             MR. BROWN:  I believe they are in, your Honor.  There

12  are several documents that you'll ultimately see that are

13  identical, with a PX and a DX.

14             THE COURT:  Do you object to their being received?

15             MR. BROWN:  We don't object, your Honor.  I think they

16  may be in under other designations, but we don't object.

17             THE COURT:  Okay.  Those documents mentioned by

18  Mr. Gabay are received in evidence.

19             (Plaintiff's Exhibits 162, 129, 384, 135, 138, 139

20  received in evidence)

21             THE COURT:  Thank you, sir.

22             And redirect.  Mr. Wilkerson.

23  REDIRECT EXAMINATION

24  BY MR. WILKERSON:

25  Q.  Good afternoon, Mr. Kuznar.

1   A.  Good afternoon.

2   Q.  I'm going to take this in two phases.  We just heard a lot

3   of questions from plaintiff's counsel.  I have some questions

4   regarding what he just went over.  I also have some questions

5   regarding your witness statement and a rebuttal statement that

6   was submitted after your witness statement.

7        Do you recall that Mr. Alper submitted a rebuttal

8   statement in this case that mentions your written testimony?

9   A.  I do.

10  Q.  And have you reviewed Mr. Alper's rebuttal statement?

11  A.  I have.

12  Q.  In that statement, Mr. Alper says he only participated in

13  the EMS project because Keith Maxwell asked him to.  Do you

14  recall his testimony in that regard?

15  A.  I do.

16  Q.  In 2016, as Mr. Gabay mentioned, you were the president of

17  RetailCo?

18  A.  I was.

19  Q.  And that was a company ultimately owned by Mr. Maxwell?

20  A.  Correct.

21  Q.  And as we heard already, you had fairly regular meetings

22  with Mr. Maxwell, is that fair?

23  A.  Correct.

24  Q.  And you were also in close communication with Mr. Alper

25  from the May period until the August period, is that fair?

1     A.  Yes, frequent.

2     Q.  Are aware of Mr. Maxwell ever telling Mr. Alper to

3     participate in the EMS project?

4     A.  I am not.

5     Q.  Are you aware of Mr. Maxwell putting pressure on you or

6     anyone else to participate in the EMS project?

7     A.  I am not.  And for certain he did not put any pressure on

8     me as it related to the EMS project.  And in that regard, he

9     allowed me to run RetailCo for what was best for the company.

10    And EMS, in going down the project, was a sample of it.

11    Q.  Now, just to be clear, Mr. Alper was CEO of Major at the

12    time; is that correct?

13    A.  That's correct.

14    Q.  Were you able to tell him what he could and could not do

15    with Major or Major employees?

16    A.  No.  He had accountability for Major; I had accountability

17    for RetailCo.

18    Q.  What was Mr. Alper's attitude towards the project from the

19    moment you first met him in New York in May 2016?

20    A.  Yeah, he -- he was enthusiastic, as I was.  And we were

21    looking forward to building something out that I genuinely

22    believed was -- that was going to be good for all the

23    companies.

24    Q.  Okay.  First time you met Mr. Alper in person, was that in

25    May 2016?

K3BVHOR6                          Kuznar - redirect

1   A.   That's my recollection.

2   Q.   And would that have been the meeting in New York that we've

3   heard about today?

4   A.   Yes, that's correct.

5            MR. WILKERSON:   James, let's pull up DX-1025.

6   Q.   And while that's coming up, Mr. Kuznar, what was your

7   understanding of the purpose of the meeting that you held on

8   May 19th, 2016, in Orangeburg, with the management of Major

9   Energy?

10  A.   The primary purpose was for the folks at Major Energy to

11  demonstrate, with their pride, the application.  And won't use

12  the word "tout," but to tout the application.  And they did so

13  while I was there.  I also walked the facilities and saw the

14  call center and the facility in itself.  But the primary

15  purpose of the visit was for Major to demonstrate to us EMS.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

K3B7HOR5                    Kuznar - redirect

BY MR. WILKERSON:

Q.  Mr. Alper was in on the presentation?

A.  He was.

Q.  And was Mr. Horowitz there as well at least for part of it?

A.  He was there in part of it.  I recall that he mentioned he

had a personal matter and so he couldn't fully participate but,

yes, he was there in part.

Q.  Mr. Wiederman, was Mr. Wiederman there?

A.  In part.

Q.  Now, these Major executives in the room during the

demonstration, did they express excitement about starting the

project, the potential EMS project?

A.  They did.  Not only there, but along the way.  It was all

the way up until the time that I felt the need to shut it down,

there was what appeared to me to be sincere excitement about

the path that we were heading down.

Q.  Now, Mr. Gabay asked you whether you were aware that an

earnout was in place with regard to Major Energy.  I think you

answered yes.  Is that accurate?

A.  Generally, yes.  The specifics of the earnout I couldn't

speak to, but yes.

Q.  During this meeting on May 19, 2016, did you mention

anything with regard to the earnout to the executives at Major

Energy?

A.  I did.  With the folks in the room I mentioned there was

1    two considerations.  One of them, if we went down this path it

2    cannot interfere with Major's business operations.  Major had

3    their business to run, and we were not going to interfere with

4    that.  The other is we were on a path to build out a

5    third-party system, and the implications of stopping that to

6    take this EMS path was one that I needed to give consideration

7    to.  So those were the two points.

8    Q.  On that second point, is that Project Vega that you

9    mentioned earlier?

10   A.  That is, yes.

11   Q.  When you made these two points, was Mr. Horowitz in the

12   room?

13   A.  He was.

14   Q.  Was Mr. Alper in the room?

15   A.  He was.

16   Q.  Now, that evening did Mr. Alper and you go to dinner?

17   A.  We did.

18   Q.  Let's turn to this Exhibit DX1025 and let's read what Mr.

19   Alper writes to you after that dinner.  He says, "Very excited

20   by the possibilities we will be creating.  Thanks for dinner

21   and the open dialog.  Speak soon."  Do you see that?

22   A.  I do.

23   Q.  Do you remember receiving this e-mail?

24   A.  I do, yes.  Yes, I do.

25   Q.  And then you respond and you say, "Thanks for the note Dan.

1   My pleasure - and looking forward to the path ahead together."

2   Is that an accurate statement of how you felt at the time?

3   A.   It was.

4   Q.   And did Mr. Alper convey to you that he was indeed very

5   excited by the possibilities you would be creating?

6   A.   Yeah, not only in that note but all along.  And not only

7   with Dan but with the other folks also.  I took the sincerity

8   that they were interested and excited to go down this path of

9   building out EMS, and it was going to benefit all the

10  companies.  EMS had limited capabilities and it was going to

11  allow Major -- to help Major grow.  There was limitations on

12  billing.  There was limitations if any capabilities on

13  segmentation, on interfaces with fulfillment providers.  So

14  there was great interest there by all parties.

15  Q.   Now, a couple of weeks later do you recall receiving an

16  e-mail from Mr. Alper attaching a PowerPoint presentation?

17  A.   This is the PowerPoint presentation that spoke about

18  integration -- I'm asking the question -- which included

19  turning RetailCo perhaps into a profit center and taking the

20  operation to the Northeast?  Is that the question that you're

21  asking me?

22  Q.   Let's pull it up, James.  Let's look at DX1042.

23          June 6 Mr. Alper writes to you with the subject

24  "Integration approach and proposal" and attachment called

25  project systems integration.  And he says, "Call me to

1    discuss."  Do you recall that?

2    A.  I do.

3    Q.  And if we could turn to 1042A, James.

4            Do you recall viewing this presentation back in June

5    of 2016?

6    A.  I do.

7    Q.  Let's turn to the first page, James.  I guess the next

8    page.

9            He says, "Opportunity".  Mr. Alper's first bullet

10   point says "RetailCo and Major teams have come together and

11   identified integrating and developing Major's existing energy

12   management system as an immediate opportunity for

13   cross-platform value creation."

14           You have mentioned a couple of times to me and as well

15   to Mr. Gabay that may Major Energy as well as Spark and

16   RetailCo was planning to benefit from the EMS project.  Do you

17   remember that?

18   A.  Yes, sir.

19   Q.  Is this what you're referring to?

20   A.  It is.

21   Q.  Could we turn to the last page -- the last slide of this

22   presentation, James.

23           Mr. Alper on the last slide has proposed

24   recommendations.  And just to be clear so I don't have to ask

25   the question over and over, are these Mr. Alper's

1   recommendations or yours?

2   A.  These are Dan's recommendations that came to me

3   unsolicited.

4   Q.  Let's go through them very briefly.  He has two main bullet

5   points.  The first bullet point is "Establishing Major's

6   offices as Northeast operations center."  Under that he has

7   three sub bullets.  Are you with me?

8   A.  I am.

9   Q.  First sub bullet he says, "Assign all intellectual property

10  of Major Energy's management system to RetailCo."

11              Is that something you ever suggested?

12  A.  No.

13  Q.  His second sub bullet is "Assign certain major key employee

14  employment agreements to RetailCo and use such employees to

15  co-lead and drive integration and value creation."

16              Did you ever suggest that employment agreements from

17  Major Energy should be assigned to RetailCo?

18  A.  No, never a discussion on it.

19  Q.  His last sub bullet point on the first main bullet is

20  "Assign Major's IT department to RetailCo.

21              Did you ever ask Dan to assign Major's IT department

22  to RetailCo?

23  A.  No.

24  Q.  Had you ever raised that issue at all?

25  A.  No.  If I could, this goes back to at some point in time in

1    the future when EMS is built out there were trade-offs that

2    would have to be made.  We didn't discuss what those trade-offs

3    were.  I had no interest in Major's IT department coming to

4    RetailCo.  Major's business was for Dan to have accountability.

5    Q.  His next bullet is "Create ownership opportunities in

6    RetailCo for certain employees."  And the sole sub bullet there

7    is "Goal is to turn RetailCo into a profit center with

8    potential to eventually merge back into Spark at premium

9    valuation."

10           Did you ever discuss with Dan that RetailCo should

11   become a profit center?

12   A.  I did not.  And I had no interest in that happening and

13   then trying to sell it back to Spark at some multiple, at some

14   premium valuation.  I had no self interest in ownership

15   capability or possibility there.

16           Our mission in RetailCo when we set it up was to

17   provide customer operations and IT services that were

18   customer-centric and cross-competitive through a high

19   performing team on a scalable platform that enabled Spark to

20   grow.  That was our mission.

21   Q.  OK.

22   A.  And last one, if I may.  Dan asked for a pro forma at about

23   the same period of time, which I declined at the time -- well,

24   not only at the time -- but I declined to provide to him.

25   Q.  Is it fair to say that Mr. Alper was proposing here in this

1    PowerPoint presentation integration activities far beyond what

2    you were contemplating?

3    A.   Yeah, this is much, much bigger than a build-out of an

4    application.

5    Q.   And did you make clear to Mr. Alper that you were not

6    interested in all of this?

7    A.   That's correct.

8    Q.   And ultimately you and Mr. Alper became, as we heard

9    before, cosponsors of the EMS project only.  Is that accurate?

10   A.   That's correct.

11   Q.   Now, did Mr. Alper make clear to you that he was the one

12   deciding the extent of Major's participation in the EMS

13   project?

14   A.   It was clear to me that he was.

15   Q.   Did he ever express hesitation in being a cosponsor?

16   A.   He did not.  He was excited about it and so was I.  And

17   along those lines, Keith Maxwell didn't have a role in the

18   charter.  Dan and I cosponsored it.

19   Q.   Now, based on the demonstration to you of EMS and the

20   continuing suggestions of Mr. Alper, did you shut down Project

21   Vega?

22   A.   Ultimately I did.

23   Q.   And it sounded like from your conversation earlier with

24   Mr. Gabay some of that work was able to be transported into the

25   EMS project.  Is that fair?

A.   That is correct.  Some of what would have already been

defined in requirements around non-POR markets, along with the

strategy of what markets get converted and when, that work

would have taken place as part of Project Vega.  That was then

helpful to the start of the short-lived EMS project.

Q.   You mentioned earlier a kick-off meeting in early August of

2016.  Who paid for that kick-off meeting?

A.   RetailCo.

Q.   How much did it cost?

A.   It was $17,000 for the two days for the workshop, and a few

thousand extra for the facility.  It was $20,000.

Q.   Did you ask for an add back from Major Energy for half of

that amount?

A.   I did not.

Q.   Now, after the EMS project began with this kick-off, it

ended -- I think we heard earlier the date was September 13,

2016?  Is that accurate?

A.   That's correct.

Q.   And between the time of the kick off and the termination,

did you continue to have positive communications from Mr.

Alper?

A.   I did, yes.

Q.   Did you have positive communications from other executives

at Major Energy with regard to the EMS project?

A.   I did.  And every communication that was taking place with

K3B7HOR5                          Kuznar - redirect

1   Mark Wiederman -- although with Mark there was only literally

2   three e-mails with Levi, with Saul, with Raffy.  When I say

3   Saul, I mean Saul Taub.  There was one communication with Saul

4   Horowitz from the May trip, nice to meet you.  Every

5   communication with all of them was they were looking forward to

6   heading down this path together.

7   Q.  Now, without spending time to go through all of those

8   communications, you cite some of those communications in your

9   witness statement; is that fair?

10  A.  Yes.

11  Q.  OK.  Did any of those communications that you received from

12  Major management -- whether it was Mr. Alper, Mr. Wiederman or

13  otherwise -- did any of those communications suggest that the

14  positive comments were because Mr. Maxwell wanted positive

15  comments?

16  A.  No.

17  Q.  Now, you first heard something negative from Major

18  management with regard to the EMS project in late August?

19  A.  That's correct.

20  Q.  And that was from Mr. Alper?

21  A.  I received from Mr. Alper what was a surprise to me that

22  showed while he said these are not all EMS-related costs, here

23  is some costs that need to be incurred that showed time of some

24  of the Major Energy folks.

25  Q.  OK.  Was Mr. Alper seeking EBITDA add backs from RetailCo

K3B7HOR5                          Kuznar - redirect

1  or Spark?

2  A.  He was.

3  Q.  Was this out of the blue for you, or was this something

4  expected?

5  A.  It was out of the blue.

6  Q.  When you heard this from Mr. Alper, did you follow up

7  internally to try to discover what might be the cause of his

8  shift in attitude?

9  A.  I did.  I had a conversation with the folks in my

10  organization.  I had a brief conversation with Nathan Kroeker.

11  Q.  And what did you learn from that follow-up?

12  A.  In the follow-up, I learned that the likelihood of the

13  buy-out early of the earnout was unlikely to happen.  If I need

14  to restate that, it was unlikely that there was going to be an

15  early buy-out of Major's earnout.

16  Q.  And did you learn that the buy-out had become unlikely just

17  a few days before you received this communication from Mr.

18  Alper asking for add backs?

19  A.  It was right around that time.

20  Q.  How did this color your thinking as to Dan's motivation to

21  seek add backs?

22  A.  My intuition was raised that there was a different plan

23  here than the sincerity that I understood it to be.

24  Q.  And did you still try, nonetheless, to keep EMS going for a

25  week or so?

1    A.  Yes.  Yes, for that short period of time.

2    Q.  James, if you could bring up DX400.  Sorry, Defendant's

3    400.  Sorry, James.

4            Mr. Kuznar, you are copied on this e-mail from

5    Mr. Kroeker.  And without reading the whole thing, Mr. Kroeker

6    begins with "Dan/Mark, per our conversation last week, your

7    proposed adjustments to adjusted EBITDA include costs that you

8    feel are attributable to Spark/RetailCo."  Do you see that?

9    A.  I do.

10   Q.  Do you remember receiving this e-mail?

11   A.  I do.

12   Q.  And do you remember that in early -- sorry -- early

13   September 2016 both Mr. Wiederman and Mr. Alper were now

14   seeking add backs for the EMS project?

15   A.  Yes, that is correct.

16   Q.  And did you know at that point that you needed to shut it

17   down?

18   A.  I did.

19   Q.  This decision to shut it down, easy or difficult?

20   A.  This was a difficult decision for me.

21   Q.  Why?

22   A.  Well, I can answer it two ways.  It was difficult in one

23   hand because my decision making was about to be questioned.  I

24   just shut down Project Vega, and now I am shutting down the EMS

25   build-out.  But at the same time it was an easy decision for me

1   to make because it was the right decision for the company.

2   Q.  Let's turn to DX403, James.

3         The Judge has seen this already at least once, so we

4   won't read the whole thing.  But go to the e-mail from Mike

5   Kuznar and blow that up.

6         Mr. Kuznar, I will draw your attention to one sentence

7   in the middle of the first paragraph toward the right side.  It

8   says, "We want to reiterate that the achievement of Major's

9   business objectives should be the priority of all Major

10  personnel."  This word "reiterate," did you use that

11  intentionally?

12  A.  I did.

13  Q.  Why?

14  A.  From the first conversation we had I made that clear.

15  Q.  And this is the shut-down e-mail?

16  A.  This is the shut-down e-mail.

17  Q.  So from this point forward no more work by RetailCo, Spark

18  or Major on the EMS project; is that fair?

19  A.  That is fair.  That is correct.

20  Q.  After this, did you learn that Mr. Kroeker had agreed with

21  Mr. Alper to a $250,000 add back with regard to the EMS

22  project?

23  A.  I did.

24  Q.  Did you agree or disagree with that amount?

25  A.  I disagreed with the amount of $250,000.

K3B7HOR5                         Kuznar - redirect

1    Q.  What amount did you think would have been fair?

2    A.  Zero.

3    Q.  And why zero?

4    A.  I saw nothing from the work that Major Energy allegedly had

5    done on the project.  Zero.

6    Q.  And had Major Energy participated voluntarily the entire

7    time?

8    A.  All the way.  Dan and I cosponsored.  He was responsible

9    for Major Energy; I was responsible for RetailCo.  There were

10   opportunities all along the way for Dan and the Major folks to

11   raise that this may be getting in the way of Major's business,

12   and they never did.  It was asked for by me in status reports

13   what is the risk and what are the issues.  Never happened.

14   Never happened in an e-mail, a conversation and a text.  And

15   lastly I will be quick to say this, the quick-off workshop

16   covered topics like integrity and rackets -- r-a-c-k-e-t-s.

17   Q.  Like a tennis racket?

18   A.  No, a racket like a persistent complaint that's happening

19   in the background that's getting in the way of a person or an

20   organization from performing their best.  And we talked about

21   that in the workshop, and we talked about it in the workshop at

22   the end of day one so people understand that to build a high

23   performing team on the topics of integrity, I am talking now

24   specific to rackets, you have to let them go, you have to clean

25   them up.  They can't be operating in the background and think

K3B7HOR5                        Kuznar - redirect

that you're going to operate at your best -- or the

organization is -- while in the background you're undermining

yourself and others.  And so the start of day two there was an

opportunity for people to come forward and talk about what

rackets they were living in.  And folks shared with me

personally they had a racket on.  Folks that were reporting to

me, I was focusing on the .8 of customers that weren't billed

timely.  People were pleased -- and I get why coming from where

we started -- to get to 99.2 percent billing timeliness.

Great.  I want to know what is happening with the .8 percent,

how many customers, how long have they not been billed.

         So, there was a racket that I just could never be

satisfied with.  And that was a perfect time for the Major

Energy folks to recognize they had a racket going on.  They had

a racket; they had this racket of complaining going on in the

background that never came forward.  And I'm imagining they

didn't bring it forward because I would have addressed it.

Q.  And when it came forward in late August of 2016, the

project was shut down within two weeks, fair?

A.  It was.  And that's a decision I had to make.

Q.  Now, let me ask you, Mr. Kuznar, about a couple of the

things you discussed with Mr. Gabay.  One of his first

questions was about your statement to that Mr. Alper had

suggested the EMS project initially.  Do you remember that line

of questioning?

K3B7HOR5                         Kuznar - redirect

1   A.   Yes.

2   Q.   Is it accurate to say that the first that you heard of the

3   potential EMS project came from Mr. Alper?

4   A.   Yes.

5   Q.   You were asked some questions about integration of Major

6   into Spark or maybe the Spark family of companies.  I wasn't

7   totally sure about what entities were being discussed.

8           As far as you know, did Major operate its business

9   with its own management team through the earnout period?

10  A.   When you asked me as far as I know, here is what I know:

11  RetailCo didn't integrate any of Major Energy's operations,

12  none, not front office, not back office, zero.

13          I will also add, if I may, on the he said/she said did

14  anybody hear don't let this get in the way of Major Energy's

15  business, the facts are Dan had accountability for Major

16  Energy; I had accountability for RetailCo.  I wasn't going to

17  allow myself to make an excuse out of Major any more than Major

18  out of RetailCo.  Those are the facts.

19          The facts are known or should be known.  There wasn't

20  a single issue raised to me about this potentially getting in

21  the way of Major's business in every request made, in every

22  communication.  I looked at all of them; I wanted to make sure

23  I didn't miss something.  There wasn't a single seed of

24  complaint about this project interfering with Major's business.

25  Q.   Until late August of 2016.

K3B7HOR5                    Kuznar - redirect

A.   Until Dan sent me a "here's charges."  That struck me
curious.  And I did some follow-up and then I talked with
Dan -- this was late August, early September -- and he alluded
to it.  And I had an employee that worked for me that said
that's the one time in all that we've handled that she ever saw
me have some temper.

Q.   Just a few more questions, Mr. Kuznar.  You saw PX129 when
Mr. Gabay was questioning you.  And this is an agenda of some
kind.  Again you're not on the e-mail.  But on the agenda, you
went through the agenda row by row.  And without going back
again row by row, is it fair to say that most of the people on
here are either RetailCo or Spark employees?

A.   That is correct.

Q.   Let's take a brief look at PX135 again.  Again, are you
anywhere on this e-mail?

A.   It does not appear.

Q.   And Mr. Gabay asked you some questions about the 15 or so
bullet points under the key milestone heading that are listed
in this chart.  Do you remember that?

A.   I do.

Q.   Does this chart represent the reality of what actually
occurred in August and September of 2016?

A.   Actually occurred in terms of the work?  Are you asking was
this work done in August and September?  No.

          MR. WILKERSON:  I pass the witness, your Honor.

1          THE COURT:  Thank you.  Anything additional?

2          MR. GABAY:  Yes.

3          THE COURT:  Did you have any exhibits, Mr. Wilkerson?

4          MR. WILKERSON:  Just one.  DX400.

5          THE COURT:  It's received.

6          (Defendant's Exhibit 400 received in evidence)

7   RECROSS EXAMINATION

8   BY MR. GABAY:

9   Q.  Mr. Kuznar, you mentioned during your redirect limitations

10  with EMS, correct?

11  A.  Yes.

12  Q.  And you also mentioned on your cross that you stopped

13  Project Vega to pursue EMS, correct?

14  A.  Yes.

15  Q.  And what were some of the positive aspects of the EMS

16  platform that you observed?

17  A.  Well, it appeared to be working well for Major in the

18  markets that Major was operating in.  It was the potential for

19  us to build out a system that wasn't reliant on a third party.

20  Q.  And we saw some e-mails where -- Mr. Wilkerson showed you

21  some e-mails where Mr. Alper expressed enthusiasm for the

22  project.  Do you recall that?

23  A.  Correct.

24  Q.  Those e-mails were at the beginning of the project.  Do you

25  remember that?

1    A.  Well, the ones that were demonstrated here may have been at

2    the beginning of the project, but I'll tell you there are other

3    communications, and Dan and I had positive communications all

4    the way up until the point in time that I stopped the project.

5    And Dan -- as I was -- we were looking forward to it.  And

6    sitting here saying this, I genuinely had liked working with

7    Dan through the project -- and the other folks.  But he was

8    excited not just at the beginning.  He was excited throughout,

9    as we all were.

10   Q.  You are aware that his view changed towards the end of the

11   project, correct?

12   A.  His view changed in terms of his excitement?  Is that your

13   question?

14   Q.  Not only in terms of his excitement but in terms of what

15   was actually occurring with respect to the project, correct?

16   A.  I won't speak for Dan whether his excitement changed.  It

17   struck me curious that there were charge-backs that were coming

18   to us that didn't align with what I would have expected.  And

19   the alluding to this getting in the way of Major's business at

20   the same time that I'm hearing that the earnout may not happen

21   early raised my antenna.  I won't speak to Dan about what his

22   excitement was or was not at that point in time.  I knew the

23   best decision was to stop the project.

24   Q.  You are aware generally though that Mr. Alper's view did

25   change in the late July 2016 timeframe, correct?

A.  I'm not clear on the question.  If you don't mind asking it

again.  His view changed how?  Say more there please.  Because

he was certainly excited at the kick-off.  We kicked it off in

August.  He helped deliver the kick-off message.  He helped

close it out.

Q.  So the project did kick off the first week of August,

correct?

A.  Yeah.  So to be clear, on the project kick-off it was not a

project kick-off that you might think traditionally for a

project to speak to milestones, deliverables, activities,

resource loading.

        This kick-off was about high performing teams and what

makes a high performing teams.  It had nothing to did with

project planning.  It was about how people come together to

perform as themselves as best as possible and in working with

one another.  And on the topic of integrity, there was a deep

dive there.  And on the topic of rackets -- which is a

persistent complaint that's operating in the background that's

in the way of people producing the best results, and how to

turn a complaint into a request.  What's simply under that

complaint is a request.  You can use it with your kids.  I

don't like asparagus.  What's your request?  Can we have corn

for dinner?  I like that request.  Make the request.  Get out

of the complaint.

        And what I come to find out regrettably was there were

1  complaints going on in the background using this project that

2  Dan and I cosponsored as an excuse.  And people benefit from

3  being in a racket because they can make others wrong while

4  they're right.  They can be a victim and be OK with it.  That's

5  what the workshop was about.  It wasn't about project planning.

6  It wasn't about market migration.

7  Q.  Sir, that wasn't my question.  I'm just asking you the

8  project kicked off the first week of August 2016, correct?

9  A.  That's correct.

10  Q.  And it concluded September 13, seven weeks later, right?

11  A.  That is correct.

12  Q.  Were you present at Major Energy in New York during those

13  seven weeks?

14  A.  I was not present there for the seven weeks.  Might I have

15  been there for a trip during that period of time?  Possibly,

16  but I don't recall that sitting here.

17  Q.  You testified with Mr. Wilkerson earlier about your

18  communications with Mr. Horowitz.  Do you recall that?

19  A.  Yes.

20  Q.  You also testified about Mr. Horowitz's communications with

21  Mr. Maxwell in the May to August timeframe.  Do you recall

22  that?

23  A.  Mr. Horowitz's communications --

24          MR. WILKERSON:  Objection.  Mischaracterizes the

25  testimony.

1      THE COURT:  I'm not sure what the testimony was about

2  Horowitz's communications with Maxwell.

3  Q.  I'll rephrase.  Sir, do you have any personal knowledge of

4  Mr. Horowitz's communications with Mr. Maxwell in the May to

5  August 2016 timeframe?

6  A.  I do not.

7  Q.  Do you have any personal knowledge of Mr. Alper's

8  communications with Mr. Maxwell in May 2016?

9  A.  I do not.

10      MR. GABAY:  No further questions.

11      MR. WILKERSON:  No further questions.

12      THE COURT:  Thank you, sir.  You may step down.

13      (Witness excused)

14      MS. PECTOR:  We have our next witness Heather

15  McGuinness outside.  Can we take a brief break?

16      THE COURT:  We will take five minutes, and then we

17  will continue with Ms. McGuinness.

18      MS. PECTOR:  It will be a short one, your Honor.

19      (Recess)

20   HEATHER MCGUINNESS,

21      called as a witness by the defendant,

22      having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MS. PECTOR:

25  Q.  Good afternoon, Ms. McGuinness.  Thank you for coming in to

1    testify today.  You have before you a copy of your witness

2    statement there, and I supplement to your witness statement.

3    Do you see that?

4    A.  Yes.

5    Q.  And, Ms. McGuinness, is this the witness statement or

6    supplement that you submitted in this case?

7    A.  Yes.

8    Q.  Those documents have your signature on them?

9    A.  Yes.

10   Q.  Are they true and correct?

11   A.  They are.

12   Q.  And do you stand by your witness statement here today?

13   A.  I do.

14        MS. PECTOR:  We move in Ms. McGuinness' witness

15   statement and the corresponding exhibits.

16        THE COURT:  They are received.  Cross-examination, Ms.

17   Corey.

18        MS. COREY:  Yes, your Honor, we have objections.

19        THE COURT:  Yes.

20   CROSS EXAMINATION

21   BY MS. COREY:

22   Q.  Ms. McGuinness you joined Major Energy in 2017; is that

23   right?

24   A.  Yes.

25   Q.  And you have no personal knowledge of how Major Energy

1  operated before that time, right?

2  A.  No.

3  Q.  You state in paragraph 26 of your witness statement that

4  while you were working at Major Energy, from what you observed,

5  Mr. Wiederman, Mr. Sobel, Mr. Alper and Mr. Moeller ran the

6  daily operations of Major Energy and were in charge, right?

7  A.  That is correct.

8  Q.  And you would agree that they seemed to be engaged in

9  trying their best to run the business of Major Energy?

10  A.  I don't know how they were practicing.  I just saw them in

11  the office.

12  Q.  Ms. McGuinness, you said in your witness statement that you

13  noticed there was a company on the second floor of Major

14  Energy's building which Saul Horowitz seemed to be working with

15  when he was affiliated with Major Energy; is that right?

16  A.  Yes.

17  Q.  Ms. McGuinness, you never personally saw Mr. Horowitz

18  working for another company, did you?

19  A.  I didn't see him working in there.

20  Q.  And you don't name the other company that Mr. Horowitz

21  appeared to be working with, do you?

22  A.  It was GEM Enrollments.

23  Q.  You were aware that Mr. Horowitz was part-time, correct?

24  A.  I was not.

25  Q.  And you don't have any personal knowledge about what Mr.

1   Horowitz was working on on a daily basis, do you?

2   A.  I do not.

3   Q.  And, Ms. McGuinness, are you currently an employee of Spark

4   Energy LLC?

5   A.  Yes.

6   Q.  And you testified you were given the opportunity to move to

7   Houston and work with Spark in 2019, right?

8   A.  Correct.

9   Q.  To be precise, you started working at Spark in August of

10  2019, correct?

11  A.  Correct.

12  Q.  Before that time, you were a quality control analyst at

13  Major Energy; is that right?

14  A.  Yes.

15  Q.  And in your role as I quality control analyst your primary

16  function was to perform audit work?

17  A.  Yes.

18  Q.  And employees at Major Energy trained you on how to audit

19  accounts that came through marketing vendors?

20  A.  Yes.

21  Q.  And that training would have complied with Major Energy's

22  protocol for quality control, correct?

23  A.  Yes.

24  Q.  Quality control is a function that all ESCOs have, correct?

25  A.  I don't know.

1    Q.  But Major Energy had a quality control function?

2    A.  Yes.

3    Q.  And Spark Energy has a quality control function?

4    A.  I don't know.  I don't work in that department anymore.

5    Q.  Quality control functions are common in the industry

6    because of residential vendors, they check the sales, correct?

7    A.  Yes.

8    Q.  And the industry has a term for this.  It's called

9    short-term return, correct?

10   A.  I didn't know that was how they called it.

11   Q.  Eric, can you pull up paragraph 18 of Ms. McGuinness'

12   witness statement.

13          The last sentence here you say, "These bad sales are

14   related to what the industry refers to as short-term churn."

15   A.  Yes.

16   Q.  And that's why ESCOs like Major Energy have quality control

17   departments, to help catch these bad sales, right?

18   A.  Yes.

19   Q.  And that's what you were doing.

20   A.  Yes.

21   Q.  And as a quality control analyst for Major Energy you make

22   QC calls?

23   A.  Correct.

24   Q.  And a QC call is a quality control telephone call, correct?

25   A.  Correct.

K3B7HOR5                      McGuinness – cross

1    Q.  And to perform a QC call you would call the new customer to

2    confirm that in fact they were the one that signed up with

3    Major Energy, right?

4    A.  We would call to confirm and validate the enrollment.

5    Q.  In your written direct statement you testified that

6    representative samples of sales reported by PTM were audited

7    for purposes of confirming whether Major Energy was paying for

8    sales to real consenting customers, correct?

9    A.  Can you repeat that?  I'm sorry, I couldn't hear you.

10   Q.  Sure.  It's paragraph 13 of your statement you say that

11   representative samples of sales reported by PTM were thus

12   audited for purposes of confirming whether Major Energy was

13   paying for sales to real consenting customers.  Is that right?

14   A.  Correct.

15   Q.  Now, Ms. McGuinness, those representative samples were not

16   total random samplings of accounts; is that right?

17   A.  They were.

18   Q.  It's your position that those representative samples were

19   completely random?

20   A.  When we chose them from the enrollment sheet, we chose them

21   at random.

22   Q.  Did you personally choose the samples to call?

23   A.  It was done between myself and my coworker at the time.  So

24   from 2017 I was still learning, and he would choose those calls

25   for me, and then after he was no longer with the company I was

K3B7HOR5                          McGuinness - redirect

1    pulling those sales -- or those calls.

2    Q.  So the sampling that you chose was completely random and

3    had nothing to do with potential red flags or questionable

4    sales.

5    A.  With the exception of PA, which there were rules that we

6    had to pull certain amount of calls per agent.

7    Q.  And when you say PA, do you mean Pennsylvania?

8    A.  Yes.

9    Q.  McGuinness, you testified that you were shocked at the

10   number of bad PTM sales; is that correct?

11   A.  That is correct.

12   Q.  But you are aware that Spark has worked with PTM, correct?

13   A.  As far as what?  I'm not really sure what you're asking.

14   Q.  Spark used PTM in its retail marketing channel?

15   A.  I wouldn't have had any experience with that because it was

16   just Major.

17              MS. COREY:  Thank you.  Pass the witness.

18              THE COURT:  All right.  Ms. Pector, redirect.

19   REDIRECT EXAMINATION

20   BY MS. PECTOR:

21   Q.  Ms. McGuinness, thank you for being here.  McGuinness, when

22   did you start with Major Energy?

23   A.  February 2017.

24   Q.  And in February of 2017 when you started with Major Energy,

25   was your understanding that you were coming into a door-to-door

K3B7HOR5                    McGuinness - redirect

1    management department that Major Energy was required to set up

2    from the Pennsylvania Public Utility Commission?

3    A.  Yes.

4    Q.  And in that department, how many people were there?

5    A.  It was just one -- well, I had one coworker and then a

6    supervisor Cassie.

7    Q.  Can you briefly describe to the Court what your job was in

8    that department.

9    A.  My job was to take the enrollments that were given.  So, it

10   doesn't start with enrollments, but we would take and audit the

11   sales that would come in.  So a broker like PTM or a vendor

12   like PTM would e-mail us their enrollment -- their applications

13   that were eligible for enrollment.  We would then take those

14   applications, review them, the paper applications.  We were

15   ensuring that the customers signed, that the agents filled out

16   correctly.  And then for the actual enrollment process we went

17   through to validate that after all those things were OK, that

18   we started to set them up to be enrolled with Major Energy.

19   Q.  You mentioned when Ms. Corey was asking you questions that

20   there were some requirements that the state of Pennsylvania

21   required when you were auditing sales in Pennsylvania.  Can you

22   tell the Judge about what those requirements were.

23   A.  Yes.  So for the state of Pennsylvania it didn't matter how

24   many agents were actively selling in Pennsylvania.  We were

25   expected to pull no less than three sales per agent.

1   Q.   And based upon what you observed during the 2017 and 2018

2   timeframe, were the sales activity in Pennsylvania lower than

3   other states?

4   A.   They were.

5   Q.   And is part of that because it was more work to audit the

6   sales in Pennsylvania, there was more restrictions on the

7   marketing?

8   A.   I can't speculate on that.

9   Q.   McGuinness, can you tell the Court how much of your time

10  you spent auditing PTM.

11  A.   That was my whole day.

12  Q.   And your whole day for how long?

13  A.   Eight hours a day, so five days a week.

14  Q.   And for how many years?

15  A.   From 2017 to 2018.

16  Q.   Did you find, McGuinness, in your work at Major Energy was

17  PTM was Major Energy's largest vendor?

18  A.   Yes.

19  Q.   And can you describe for the Court when you were auditing

20  the work of PTM and their marketing agents, what did you see in

21  terms of bad sales activity?

22  A.   It kind of varies.  There were agents that would falsify

23  applications.  They would sign applications on behalf of the

24  customer.  They would lie to customers, telling them that they

25  were from the utility or that they could save the customer

K3B7HOR5                          McGuinness - redirect

1   money.  Just from their door-to-door campaign that's what we

2   saw.

3   Q.  And based upon the audit work that you did, once the

4   customer would find out that a PTM agent had switched them

5   without their authorization, what would happen?

6   A.  They were asked to cancel the enrollment.

7   Q.  And when the enrollment was canceled, would that person who

8   PTM had reported as being a customer in fact not be a customer

9   of Major Energy?

10  A.  I'm sorry, can you repeat that.

11  Q.  Yes.  When the enrollment would be canceled, would that

12  mean that someone that a PTM agent had identified as a customer

13  was in fact not a customer of Major Energy?

14  A.  So they weren't a true customer of Major Energy.  But if

15  the customer was already enrolled, it could take a certain

16  amount of time for them to be unenrolled with the utility,

17  because the enrollment period changes based on what the meter

18  reads are.

19  Q.  So there is a churn period that you referenced as a

20  short-term churn period that Ms. Corey asked you about.  Can

21  you explain to the Court what's happening during a short-term

22  churn period, why sometimes it takes a customer a period of

23  time before they cancel.

24  A.  Yeah.  So if a customer were to have signed up say March 1

25  with one of our door-to-door representatives, it would then go

K3B7HOR5                         McGuinness - redirect

1    into our process of enrollment.  And after we did that process,

2    we did them once a week, so if we signed them up on a Monday,

3    hypothetically March 1, that enrollment actually wouldn't

4    happen until probably the 9th of March if it passed the QC

5    process and we didn't audit that call.  And then if their meter

6    read date say was the beginning of March, there is a good

7    chance that we would miss that part.  So, the customer is

8    thinking that they might already be enrolled with us, but that

9    wasn't necessarily the case.  It would pick up in April, which

10   is when Major would become that customer's sole, you know,

11   provider of electricity.

12           And then the customer wouldn't get their bill until

13   May, which would then show that that customer has been with

14   Major for 30 to 60 days depending on when that meter read was.

15   Q.  And were there times, McGuinness, when you saw that

16   customers would be signed up by PTM agents even though they

17   never provided authorization to be switched?

18   A.  Yes.

19   Q.  And would you see those types of customers fall off during

20   the churn period?

21   A.  Yes.

22   Q.  How did you catch bad sales by PTM agents?

23   A.  For door-to-door we caught them based on doing quality

24   control calls and reviewing the applications.  Those were the

25   biggest ways of us figuring out if the customer signed up or

K3B7HOR5                         McGuinness – redirect

1   not.

2   Q.  And with respect to the efforts that you would make to call

3   certain customers, when you would reach out to individuals that

4   PTM agents had reported wanted to switch with Major Energy and

5   you would talk to those people on the phone, what percentage of

6   those individuals would verify to you that they had actually

7   authorized a switch?

8   A.  I believe it was about 10 percent.

9   Q.  Does that mean about 90 percent of the customers that you

10  called had not authorized a switch to be moved over to Major

11  Energy?

12  A.  Yes.

13  Q.  But PTM had recorded those individuals as sales?

14  A.  Yes.

15  Q.  Now, McGuinness, aside from just the door-to-door vendor

16  side, did Major Energy also use PTM for retail marketing?

17  A.  They did.

18  Q.  Can you explain to the Court what that is.

19  A.  So, the difference between the retail and the door-to-door

20  is that door-to-door required a TPB or a third-party call to be

21  made to verify that the sale is legit.  But for retail Major

22  Energy would set up a booth and sign up customers via a tablet,

23  and that's how we would get those sales.  They would take a

24  picture of the photo ID, and the customer would sign on the

25  tablet, and it would all be transmitted back to Major.

K3B7HOR5                        McGuinness - redirect

1   Q.  And who provided those tablets?

2   A.  Major Energy did.

3   Q.  To your knowledge, McGuinness, was PTM a vendor of Major

4   Energy through the entire time you worked for Major Energy in

5   2017 and 2018?

6   A.  Yes.

7   Q.  And did PTM have to fire certain agents because of the bad

8   sales activity that you discovered?

9   A.  Yes.

10  Q.  Do you recall, McGuinness, as part of your witness

11  statement in this case pulling together a list of the PTM

12  agents that were terminated?

13  A.  Yes.

14  Q.  James, if we could pull up DX1006A.

15           Ms. McGuinness, we're looking now at what has been

16  marked as an exhibit to your witness statement, which is

17  DX1006A.  Can you tell the Court what this document is and what

18  it's showing.

19  A.  Those were our terminated agents for PTM.

20  Q.  Why would an agent be terminated -- a PTM agent be

21  terminated?

22  A.  So I know that the largest offense was for slamming a

23  customer or meaning that they signed up a customer falsely

24  under false pretenses or whatever it was.  And this was pretty

25  much it, the agent wasn't accurately making a good sale.

K3B7HOR5                         McGuinness - redirect

1    Q.  And when a PTM agent is terminated, does that mean they're

2    no longer allowed to sell for Major Energy?

3    A.  They are no longer able to sell for Major Energy.

4    Q.  And if we scroll to the bottom of this list, James.

5          McGuinness, can you tell the Court how many entries do

6    we see for PTM terminations?

7    A.  266.

8    Q.  Is that a lot of terminations?

9    A.  Yes.

10   Q.  McGuinness, from what you observed in 2017 and 2018, did

11   Major Energy have the same type of processes in place in 2016

12   that were developed in '17 and '18, or were you a part of

13   helping to create new processes?

14   A.  I helped create those processes in 2017 to ensure that

15   those were the correct processes.

16   Q.  So were the processes less robust than 2016, from what you

17   could tell?

18   A.  From an observation, I would say yes, but I wasn't there.

19   Q.  And do you believe that bad sales slipped through in 2016?

20   A.  Yes.

21   Q.  What leads you to believe that?

22   A.  Only after me being there a year I realized how many bad

23   sales were actually coming through, and I was more confident in

24   knowing the difference between a good sale and a bad sale.

25   Q.  And those bad sales that slipped through, which vendor

1    would that have been from?

2    A.   PTM.

3    Q.   And in 2017 and 2018, even though you were working all day

4    every day to audit PTM, do you believe that there still could

5    have been some bad sales that slipped through the cracks?

6    A.   Absolutely.

7    Q.   Why is that, McGuinness?

8    A.   We did have a lot of sales that came through, and I was the

9    only person after March of 2017 doing it myself.

10   Q.   Now, there was another document that you attached to your

11   witness statement, DX1007.

12            If we could pull that up, James.

13            And can you tell the Court, McGuinness, generally this

14   document was the 30 to 90 day churn report for PTM.  Can you

15   explain to the Court what this document is showing.

16   A.   So, this document shows the accounts that were enrolled and

17   were canceled, and the churn date is based on that cancel, so

18   the 30, 60 and 90.

19   Q.   And in some instances we're seeing customers cancel within

20   three days of being sold; sometimes it's longer.  Was that

21   typical for what you saw in your work?

22   A.   That was typical usually based off of the quality control

23   process.

24   Q.   And did Major Energy -- well, if we could scroll down to

25   the bottom of this, James, to see how many churn entries there

1    are.

2              And this, Ms. McGuinness, is for the 2017 and 2018

3    time period.  We see a churn of 39,634 in our last row.  Do you

4    see that?

5    A.  Yes.

6    Q.  Can you describe to the Court whether or not that was a

7    large number of customers churning in your mind?

8    A.  Yes, it was.

9    Q.  And why is that?

10   A.  That's a lot of customers that we don't have -- or that

11   were not accurate or true customers.

12   Q.  And those are customers that PTM had initially reported

13   were customers that signed up with PTM that actually did not

14   want to be Major Energy customers?

15   A.  Correct.

16   Q.  Ms McGuinness, in your experience, if PTM was going to make

17   a good sale, what would be the duration that a customer would

18   stay with Major Energy that was considered a good sale?

19   A.  I'd say at minimum six months.

20   Q.  And in your work with Major Energy, were there a lower

21   amount of customers that stayed for six months than you would

22   have expected?

23   A.  Yes.

24   Q.  Did you get more effective over time as you would do the

25   auditing and finding more bad sales?

K3B7HOR5                          McGuinness – redirect

1   A.  I did.

2   Q.  And as you would find more bad sales, what would you do to

3   report them once you discovered them?

4   A.  So when we discovered the bad sale, the process was that I

5   would notify Cassie who was my supervisor and Adam Small who

6   was our counsel that we found a fraudulent sale, and we would

7   have to send them an e-mail and talk about it.

8   Q.  And when you would send that e-mail to PTM, is that what

9   would result in the termination of PTM agents?

10  A.  Yes.

11  Q.  McGuinness, had you been working for Major Energy in 2016,

12  do you expect you would have caught bad sales?

13  A.  Yes.

14  Q.  And just generally can you tell the Court about in the

15  day-to-day work that you did at Major Energy why was that work

16  important to you.

17  A.  Coming from a customer service background, I saw it as a

18  twofold kind of benefit not only for Major but for the

19  customer, because I think that customer retention is very

20  important for the company, and we're also making sure that our

21  company are within the parameters of whatever law for each

22  state or regulation for each state, so that's why it was

23  important to me that we did a good job.

24  Q.  Were you proud of the work you did at Major Energy?

25  A.  Very much.

K3B7HOR5                         McGuinness - redirect

1   Q.  McGuinness, when you worked for Major Energy, did you see

2   anybody at Spark interfere with Major Energy management's

3   ability to run the day-to-day business?

4   A.  I did not see that, no.

5   Q.  Did you see anyone from Spark at Major Energy's offices in

6   New York?

7   A.  No.

8   Q.  You were asked some questions earlier about Saul Horowitz

9   working on the first floor, and you had mentioned a company GEM

10  Enrollments.

11  A.  Yes.

12  Q.  What is your understanding as to who owns GEM Enrollments?

13  A.  I was under the impression that it was Saul who owned it,

14  but I'm not sure.

15  Q.  And did Saul -- based upon where you sat in the office, did

16  Saul sit next to Levi Moeller at the office?

17  A.  I never saw him in the office.  I always saw him on the

18  second floor, and he would be coming in and out of that door.

19  Q.  And that second floor location you saw him at was not a

20  part of Major Energy's office; is that right?

21  A.  Not that office, no.  Our IT was on the second floor.

22  Q.  So, you know where Levi Moeller's office was in the Major

23  Energy office?

24  A.  Yes.

25  Q.  Did Mr. Horowitz office next to him?

K3B7HOR5                         McGuinness - recross

1    A.  I don't recall seeing him in an office there, no.

2           MS. PECTOR:  No further questions, your Honor.

3           THE COURT:  All right.  Ms. Corey?

4           MS. COREY:  Just briefly.

5           MS. PECTOR:  Just as far as introduction of exhibits,

6    I believe this is DX1006A and DX1007A.

7           THE COURT:  1006A and 1007A are received.

8           (Defendant's Exhibits 1006 and 1007A received in

9    evidence)

10          MS. PECTOR:  Thank you, your Honor.

11          And recross, Ms. Corey.

12   RECROSS EXAMINATION

13   BY MS. COREY:

14   Q.  Eric, could you pull up DX1006A.

15          McGuinness, did you actually create this spreadsheet?

16   A.  This was in place before me.  The data shows the time

17   during my enrollment -- During my employment with Major.

18   Q.  But did you collect this information?  Do you know where

19   this spreadsheet came from?

20   A.  Yes, I know where it came from.

21   Q.  Where did it from come?

22   A.  From our compliance folder at Major Energy.

23   Q.  And it appears exactly this way in your compliance folder?

24   A.  Yes, ma'am.

25   Q.  Do you know why each of these agents was terminated or

K3B7HOR5                          McGuinness - recross

 1  suspended?

 2  A.  I don't know all of them, no.

 3  Q.  Were you aware that PTM has thousands of agents?

 4  A.  I don't know how many --

 5          MS. PECTOR:  Your Honor, that mischaracterizes the

 6  evidence.  And lack of foundation.

 7          THE COURT:  OK.

 8          MS. COREY:  I was just asking whether she was aware.

 9          THE COURT:  OK, you can answer the question if you

10  know.

11  A.  I can't speak to how many agents they have.  I don't know

12  that.

13  Q.  So you can't speak to how many agents they have, but to you

14  this is a large number of terminations.

15  A.  Yes.

16  Q.  Would you agree that in quantifying how large or small

17  something is, it's important to know the original pool?

18  A.  I'm not going to speculate that.

19  Q.  You are aware that PTM was a vendor before you came to

20  Major Energy, correct?

21  A.  Yes.

22  Q.  You also testified that PTM had a large churn rate.

23  A.  Yes.

24  Q.  Large in comparison to what?

25  A.  We also had other vendors.

K3B7HOR5                         McGuinness - recross

1  Q.  But you also testified I believe that you only QC'd PTM,

2  correct?

3  A.  For most of my time there, yes, because we didn't have

4  other vendors after a certain amount of time.

5  Q.  OK.  So your personal knowledge is based primarily on PTM,

6  correct?

7  A.  Yes.

8  Q.  I just want to clarify a couple things about the QC process

9  generally.  Major Energy implemented a QC process because it

10  wanted to root out bad sales, correct?

11  A.  I don't know why they created it.  I was just asked to join

12  their team.

13  Q.  You're unsure of why you were working there?

14  A.  No, I know why I was working there, yes, but the creation I

15  wasn't a part of.

16          MS. COREY:  Nothing further.

17          THE COURT:  All right.  Thank you.

18          MS. PECTOR:  Nothing further.

19          THE COURT:  All right.  Thank you.  You may step down.

20  You can just leave that on the side.

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you very much.

23          (Witness excused)

24          MS. PECTOR:  Your Honor, we have Chris Leonard

25  outside.

K3B7HOR5                              Leonard - direct

 1   CHRISTOPHER LEONARD,

 2        called as a witness by the defendant,

 3        having been duly sworn, testified as follows:

 4             THE COURT:  Defense counsel, do you want to start with

 5   the witness statement?

 6             MR. WILKERSON:  Yes.  There are two typos in Mr.

 7   Leonard's statement.  DX104 should be DX1004.

 8             THE COURT:  Where is that?

 9             MR. WILKERSON:  The page?

10             THE COURT:  Do you know where that is?

11             MR. WILKERSON:  I didn't write it down.

12             THE COURT:  You said DX104?

13             MR. WILKERSON:  Yes, should be 1004.

14             THE COURT:  All right.

15             MR. WILKERSON:  And the other typo was that DX762

16   should be DX761.

17             THE COURT:  All right.

18   DIRECT EXAMINATION

19   BY MR. WILKERSON:

20   Q.  Mr. Leonard, do you have the witness statement before you?

21   A.  I do.

22   Q.  Is this the witness statement that you signed in this case?

23   A.  Say that again.

24   Q.  Is this the witness statement that you signed in this case?

25   A.  It is.

K3B7HOR5                          Leonard – cross

1   Q.  And do you adopt this along with its accompanying exhibits

2   as your direct testimony in this case?

3   A.  I do.

4          MR. WILKERSON:  Your Honor, we will offer that witness

5   statement with the exhibits.

6          THE COURT:  Received.

7          MR. MAROONEY:  And we have objections.

8          THE COURT:  Yes.  I have received the objections from

9   plaintiff's counsel, and Mr. Marooney you may proceed with

10  cross-examination.

11  CROSS EXAMINATION

12  BY MR. MAROONEY:

13  Q.  Mr. Leonard, you are the vice president of structuring and

14  supply for Spark; is that correct?

15  A.  That's correct.

16  Q.  And what were your duties -- what are your duties and

17  responsibilities as VP of structuring and supply?

18  A.  My duties entail procurement of our supply, basically our

19  cost of goods sold for the Spark family of companies.

20  Q.  Who do you report to?

21  A.  I report to Nathan Kroeker.

22  Q.  And how big is the supply group at Spark?

23  A.  I have 17 people.

24  Q.  Are they all located in Houston?

25  A.  On my supply team they are.

1   Q.  And are you located in Houston, sir?

2   A.  I am.

3   Q.  And tell us about the role of a supplier, that it plays in

4   the operations of an ESCO.  What does a supplier do for an

5   ESCO, and why is it important?

6   A.  Can you rephrase the question.

7   Q.  Sure.  I'd like you to tell us a little bit about what the

8   role of a supplier is relative to an ESCO.

9   A.  OK.  So a supply is as an organization within an ESCO.

10  ESCO is a retail electric provider, a retail energy provider,

11  they do both -- they sell products in deregulated markets.

12  They compete against the incumbent utility and/or in the case

13  of some markets like Texas where they compete against other

14  reps for customers.

15  Q.  And tell us what the supply function does for an ESCO.

16  A.  So the supply function does all of the pricing, the actual

17  cost of goods sold, as well as the procurement of those costs

18  when deals get signed.

19  Q.  So meaning an ESCO generally speaking does not own

20  generation facilities, correct?

21  A.  That is correct.

22  Q.  And it does not own generation facilities for electricity

23  or natural gas, right?

24  A.  That is correct.

25  Q.  So, an ESCO has to have a supplier to go out and buy the

K3B7HOR5                    Leonard - cross

1    natural gas and electricity for the ESCO to resell to

2    businesses and residences.  Is that fair?

3    A.  So, not necessarily a supplier.  They transact with

4    counterparties most ESCOs.  Either that or they have a credit

5    facility or a sleeve agreement in place.

6    Q.  And so as a credit facility or a sleeve agreement, does the

7    party providing the credit facility or sleeve agreement charge

8    fees for its services?

9    A.  Yes.

10   Q.  And does the supplier or the provider of the credit sleeve

11   determine ultimately the price that the ESCO pays for the

12   electricity or gas that the ESCO needs?

13   A.  Well, the underlying commodity is a commodity.  The market

14   dictates that price.  Now the supplier, if you're buying from a

15   counterparty, they will have their fees or their margin that

16   they associate on top of that wholesale price that is market

17   driven.

18   Q.  But is there a skill involved on believe of a supplier to

19   go out and try to get the best price that it can in the

20   wholesale market?

21   A.  Absolutely.  It deals with the counterparties that you have

22   relationships with.

23   Q.  And so the supplier will negotiate out in the market to try

24   to get the best price that it can?

25   A.  The commodity is a commodity.  Natural gas, you can go look

K3B7HOR5                        Leonard - cross

1   on the futures market today and see exactly what a molecule of

2   natural gas is trading for this very minute.

3   Q.   Does the supplier perform hedging services for the ESCO?

4   A.   The supplier?  Are you talking about a counterparty, or are

5   you talking about a supplier?  Can you rephrase the question.

6   Q.   I'm talking about the supply function.  And I realize now

7   within Spark that you are the supply function.

8   A.   That is correct, my team is the procurement; that is the

9   supply.  So we transact with counterparties to procure load

10  that our sales and marketing groups have sold.

11  Q.   And as the supplier, do you perform hedging functions as

12  well?

13  A.   Absolutely.  We will go out and see the load, and then we

14  will go out and procure that in order to maximize and lock in

15  our profitability.

16  Q.   As a supplier, do you generate reports?

17  A.   Absolutely.

18  Q.   And what reports do you generate?

19  A.   We have all sorts of different reports.  So as a

20  supplier -- rephrase your question.  What specifically is your

21  question?

22  Q.   For the benefit of the retail side of the business, the

23  ESCO is selling -- the parts of the business of Spark that are

24  selling out to businesses and to residents, what reports does

25  the supply function provide for them?

A.   I don't provide any to the sales teams themselves other
than give them market knowledge about what is going on with
commodities in certain aspects.

        We have a regulatory team that gives us the regulatory
stuff that's going on, and then we have a different portfolio
management group that gives us different information about what
the utilities are offering, what's a competitive price, retail
price, the end-use price of the customer, where that lands.

Q.   So currently in your role you provide a supply function for
Major Energy; is that correct?

A.   That is correct.

Q.   All right.  So explain to us, if Major Energy needs
something, it needs electricity or gas to resell, what do you
do for it?

A.   So again it's complicated.  So Major Energy is a marketing
brand.  They will go out, and they will sell on the street a
retail contract.  So they will come to you as an individual,
would you like to get a price, and you compare it on your bill.
Then they will come to my desk, and they will say what is the
cost to serve you as an individual.

Q.   And so in that relationship, is turn-around time important,
meaning the time you as a supplier get the price and are able
to communicate back?

A.   Absolutely.

Q.   And why is that important?

K3B7HOR5                         Leonard - cross

A.   Because it's a commodity and it moves with the market.

Q.   And how does that help the ESCO on the retail business side

sell that commodity?

A.   Rephrase your question.

Q.   Yeah.  How does you as a supplier in having a fast

turnaround time assist the ESCO making sales out into the

market?

A.   So, what we do is we download prices, the wholesale curves,

every day.  All the utilities have their own different

ancillaries that get added on -- transmission, distribution --

and we come up with an overall cost of goods sold that is then

turned around and given to the salespeople or the sales

organization to add margin to and thus contract under, knowing

that that is the cost of goods sold for that day.

Q.   So, for the ESCO who is making sales to businesses and

homes, it's important for that ESCO to understand what the

price is in order to be able to bid or sell or make a sale to a

customer; is that fair?

A.   That is correct.

Q.   And is it fair to say -- have you ever heard the term that

a supplier is really the life line of an ESCO?

A.   A supply is a core competency of any ESCO.

Q.   And why is that?

A.   Because of market knowledge of everything that I just

talked about.

K3B7HOR5                          Leonard - cross

1  Q.  Now, you are aware that -- or are you aware that in or

2  around 2006 Major Energy signed a long-term credit and supply

3  agreement with Pacific Summit Energy or PSE?

4  A.  I'm not sure of the exact date of the original contract,

5  but I knew that PSE was their supplier.

6  Q.  And you knew it was their supplier for a long time, but for

7  many years prior to the time NGE acquired Major?  You are aware

8  of that?

9  A.  I am.

10  Q.  And are you aware that Major Energy and PSE continuously

11  renewed their supply relationship through the time that NGE

12  bought Major?

13  A.  I am.

14  Q.  Let's take a look at PX 380.  PX 380 is an e-mail you are

15  not on.  I want to show you page 2 of this document.  If you

16  look down at the e-mail, it's an e-mail from a person named

17  Mark Depew to Mark Wiederman and Dan Alper with a cc to James

18  Chung.  Do you see that, sir?

19  A.  I do.

20  Q.  And looking at the first paragraph, you will see Mr. Depew

21  writes, "Thank you both for reaching out to us today to provide

22  an update on the status of your potential transaction with

23  NuDevCo."  Do you see that, sir?

24  A.  I do.

25  Q.  OK.  You see the date of this e-mail is March 16, 2016?

K3B7HOR5                         Leonard - cross

1    A.  I do.

2    Q.  Do you have an understanding as to who NuDevCo is?

3    A.  I do.

4    Q.  Who is that?

5    A.  It is the owner of NGE.

6    Q.  And if I can draw your attention down to the third

7    paragraph, it reads, "As you are aware, PSE would like to

8    extend our existing supply agreement with the Major entities,

9    and it is our hope to, at a minimum, support you through the

10   entire earnout period with NuDevCo."

11          Do you see that, sir?  Did I read that correctly?

12   A.  I was actually reading the paragraph above it.

13          THE COURT:  You can also see it on your screen if

14   that's easier, whichever you like.

15   A.  OK.

16   Q.  All right.  And Mr. Depew goes on to say, "Hence, we would

17   like to propose extending our existing supply agreements

18   through the end of the earnout period which would take us to

19   around January, 2019 based on projected timing for sale closing

20   (we can fine-tune the new end date once your sale closes).  In

21   order to make this a win-win for Major, PSE would be willing to

22   reduce our credit fee on the power sales from $1 per megawatt

23   hour to 85 cents per megawatt hour effective upon closing of

24   your sale.  Lastly, given the new ownership structure, PSE

25   would like to add a clause whereby we could audit the new

1   entity on a quarterly base and retain a unilateral right to

2   terminate our supply agreement with 90 days' notice.  Do you

3   see that?

4   A.  I see that.

5   Q.  And were you made aware of this offer around the time it

6   was made on March 16, 2016?

7   A.  Not that I recall.

8   Q.  Is this the first time you're seeing this, sir?

9   A.  It is.

10  Q.  You don't mention this in your witness statement.

11  A.  I've never seen it.  Not that I recall.

12  Q.  And if you turn over to page 1, you see that Mr. Alper

13  forwards the e-mail to Mr. Hennekes, and then Mr. Hennekes

14  forwards it to Todd Gibson.  Do you see that?

15  A.  I do.

16  Q.  And Mr. Gibson's office was in Houston, right?

17  A.  It is.

18  Q.  Does he sit on the same floor as you?

19  A.  He does not.

20  Q.  OK.  And did Mr. Gibson share this information with you

21  that's reflected here on this e-mail?

22  A.  Did not.

23  Q.  If we look at Mr. Hennekes' e-mail, at the top he writes

24  down on the third line, "Seems like their offer is about as

25  cheap as any credit sleeve we have seen, so it might be worth a

K3B7HOR5                         Leonard - cross

1    break even analysis (recognizing the inherent problem with

2    having two liens on a dropdown).  As we discussed, we still

3    think we can force their hand, but want to make sure we

4    shouldn't entertain this or some counter."

5            Do you see that?

6    A.  Yes.

7    Q.  And this is the first time you're seeing this e-mail?

8    A.  Yes.

9    Q.  Now, do you know whether or not NGE informed Major Energy

10   that this offer should be rejected?

11   A.  I can't speak to that.

12   Q.  All right.  You do know that this offer that we just went

13   over was not accepted though.

14   A.  OK.

15   Q.  And you have no knowledge as to why, correct?

16   A.  This is the first I'm seeing this e-mail.

17   Q.  OK.  Just excuse me one second.

18           You will agree with me that it was Spark's intention

19   as of March and April 2016 that it was going to replace PSE as

20   Major's supplier, correct?

21   A.  That is correct.

22   Q.  And let me show you Plaintiff's Exhibit 680.  Now, you're

23   not on this e-mail either.  I just want to ask you, this is an

24   e-mail from Mr. Maxwell to Mr. Gibson, Mr. Hennekes and Mr.

25   Konikowski dated April 21, 2016, and he says, "Hey what is the

K3B7HOR5                          Leonard - cross

1    latest on PSE termination timing?"

2              Do you see that?

3    A.  I see that.

4    Q.  Were you aware on or about April 21, 2016 that Mr. Maxwell

5    was asking about the latest on PSE termination timing?

6    A.  I was not.

7    Q.  Do you have an understanding as to why Mr. Maxwell was

8    posing this question?

9    A.  I was not.

10   Q.  Are you aware that as of April 21, 2016 NGE and not Spark

11   owned Major Energy?

12   A.  I am.

13   Q.  We can put that away.

14              Plaintiff's Exhibit 472, please.

15   A.  472?

16   Q.  Yes.  And it will be up on your screen, but feel free to

17   read through it in hard copy as well, whatever is easiest.

18              PX472 is an e-mail dated April 22, 2016.  And the

19   bottom e-mail, as you will see, is from Andrei Gregory to

20   Mr. Kroeker attaching two documents.  One is called a "due

21   diligence overview deck" and the other is called "Sign-off

22   memos".  Do you see that, sir?

23   A.  I do.

24   Q.  And if we look at the second page of this exhibit we see a

25   title page called "Spark Energy, Major Energy due diligence

K3B7HOR5                          Leonard - cross

1  overview".  Do you see that?

2  A.  I do.

3  Q.  Do you see the date at the bottom left-hand corner says

4  April 25, 2016, correct?

5  A.  I do.

6  Q.  And what is this document, sir?

7  A.  It's a tracking document of the different components

8  throughout the organization on due diligence of Major being

9  dropped down to Spark.

10 Q.  And at this time Spark was conducting due diligence in

11 advance of the dropdown, is; that fair?

12 A.  That is fair.

13 Q.  All right.  And this document, does it reflect the current

14 status of Spark's due diligence efforts relating to the

15 dropdown?

16 A.  At that time, yes, I would imagine.

17 Q.  And if we look at page 7, it's a page entitled "Supply and

18 risk management overview".  Do you see that, sir?

19 A.  I do.

20 Q.  And if we look at the first bullet point, it says "existing

21 Pacific Summit contract".  Do you see that?

22 A.  I do.

23 Q.  Underneath that it says, "Will replace with Spark supply

24 and hold Major constant with charges, $1 megawatt per hour and

25 12 and a half cents 25 dekatherm upon dropdown."  Do you see

K3B7HOR5                          Leonard – cross

1    that, sir?

2    A.  That is correct.

3    Q.  And was it your understanding -- strike that.  I think you

4    have answered it already.  Well, I will ask it anyway.  Was it

5    your understanding that as of April 22, 2016 that Spark

6    intended to replace PSE after the dropdown occurred?

7    A.  Yes.

8    Q.  If we go over to page 13 we see something called a due

9    diligence sign-off memorandum.  Do you see that?

10   A.  I do.

11   Q.  What is that?

12   A.  This was the sign-off specifically for my supply

13   organization.

14   Q.  And what is the purpose of this sign-off memorandum?

15   A.  Well, if you think of a large acquisition as a bunch of

16   moving pieces, this was a control document about each of the

17   individual respective parts and what you knew as of that point

18   in time.

19   Q.  And you are listed as the owner of the scope of work done

20   around the supply function?

21   A.  That is correct.

22   Q.  If we look over on the next page, DX472-OOO14, you will see

23   at the top it says "From a supply perspective upon dropdown

24   Spark will replace PacSummit to Major."  Do you see that, sir?

25   A.  I do.

K3B7HOR5                          Leonard - cross

```
 1  Q.  And then about four lines down it says, "Instead of paying

 2  PacSummit, Major will pay Spark."  Do you see that, sir?

 3  A.  That is correct.

 4  Q.  And your name is at the bottom part of this?

 5  A.  That is correct.

 6  Q.  Let's go to 472.0006.  Page 6.

 7         Now, this is a page labeled "current customer

 8  portfolio".  Do you see that, sir?

 9  A.  I do.

10  Q.  And if you look at the bottom right-hand side -- and what

11  do you understand this page to be?

12  A.  This was the overview of the markets and the customer

13  accounts or RCEs at that particular constant.

14  Q.  For Major Energy?

15  A.  For Major Energy.

16  Q.  All right.  And you will see a date at the bottom and it

17  says April 7, 2016.  Do you see that?

18  A.  I do.

19  Q.  It actually says as of April 7, 2016.  Do you see it?

20  A.  I do.

21  Q.  And above that it says about 161,000 total customers.  Do

22  you see that?

23  A.  I do.

24  Q.  Do you know what Major's total customer count was at the

25  end of 2015?
```

K3B7HOR5                          Leonard - cross

1    A.  I do not.

2    Q.  OK.  And do you know one way or the other if the customer

3    count reflected on this page is greater or lower than the

4    customer count at the end of 2015?

5    A.  I can't speak to that.

6    Q.  OK.

7              Take that down.

8              Are you aware one way or the other as to whether Todd

9    Gibson called PSE on or about April 29, 2016?

10   A.  I'm not sure of the exact date.

11   Q.  Are you aware that he called PSE sometime in the late April

12   timeframe?

13   A.  I am not.  I am aware of some point that Todd contacted

14   PSE.  Whether it was a phone call or not, I can't speak to

15   that.

16   Q.  What do you understand -- do you have an understanding

17   whether or not Mr. Gibson met with PSE?

18   A.  I do not.

19   Q.  What do you understand about that phone call that you're

20   describing?

21   A.  Just that, not that a phone call.  Like I said, I knew them

22   as owners of NGE had had contact with PSE.

23   Q.  But you don't know -- you are unaware of the substance of

24   any of those communications; is that fair?

25   A.  That is correct.

K3B7HOR5                           Leonard - cross

1   Q.  All right.  Now, you testified in your witness statement at
2   paragraph 12 about the September 26, 2016 termination letters
3   to PSE.  Is that right, sir?
4   A.  That is correct.
5   Q.  And one of documents you cite is DX412.  Let's look at
6   Defendant's Exhibit 412.  Now, there is an e-mail at the bottom
7   of page 1 from Mr. Kroeker to Mr. Alper.  Do you see that, sir?
8   A.  I do.
9   Q.  And it carries over onto page 2, and I would like to read
10  some of that e-mail.
11          Mr. Kroeker writes -- and this is dated again
12  September 26, 2016 -- "Dan, as you and I discussed, it's not
13  practical to draft a term sheet at this stage, however, you
14  have my assurance that Major Energy will not be disadvantaged
15  if we replace PSE with Spark's energy supply function in 2017.
16  The total cost (i.e. interest, credit, structuring sleeve, etc)
17  will be equal to or lower than Major could obtain from other
18  third parties, and the list of counterparty options is
19  substantially the same as we currently do business with all of
20  them."  Do you see that, sir?
21  A.  I do.
22  Q.  And you are on this e-mail.  You are in the "to" line.  Do
23  you see that?
24  A.  I do.
25  Q.  Now, you also cite to DX414.

1            And let's pull DX414 up, please.

2            Now, DX414 is an e-mail that annexes the termination

3    letters that were sent to PSE.  Do you see that, sir?

4    A.  I do.

5    Q.  And there are three termination letters, right, sir?

6    A.  That is correct.

7    Q.  It's one for each Major entity, right?

8    A.  Correct.

9    Q.  And if we look over at the second page of this exhibit,

10   each one of these letters has a Major Energy logo at the top of

11   the page, right?

12   A.  Correct.

13   Q.  And each one of them is signed by Mr. Kroeker, correct?

14   A.  Correct.

15   Q.  As the executive vice president for Major Energy?

16   A.  That's what it says.

17   Q.  You can put that down.  You also testified that -- I think

18   it's at paragraph 13 -- that you found out during this lawsuit

19   that Mark Wiederman and Saul Horowitz in your view had been

20   trying to sabotage this -- in your words -- favorable deal, the

21   new deal with Spark, and pressuring Alper to not even talk

22   about it because they wanted to extract a buy-out.

23            Do you see that, sir, in paragraph 13 of your

24   statement?

25   A.  I do.

K3B7HOR5                        Leonard - cross

1   Q.   Now you have no personal knowledge of any discussions that
2   Mr. Horowitz had with Mr. Maxwell in May of 2016 about the
3   status of Major Energy's business, do you?
4   A.   Not at that -- no, I don't.
5   Q.   And you have no personal knowledge of any discussions that
6   Mr. Horowitz had -- or communications Mr. Horowitz had with
7   Mr. Maxwell, do you?
8   A.   No.  As I said in my statement, I found out during this
9   lawsuit.
10  Q.   And how did you find that out?
11  A.   Through the lawsuit, through all the appendixes, through
12  all this correspondence.
13  Q.   And you weren't part of any of those discussions though,
14  right, sir?
15  A.   I was not.
16  Q.   And you have no personal knowledge at all of any
17  discussions between the sellers -- the plaintiffs in this
18  case -- and NGE and Spark regarding their views of Spark's
19  interference in the business or anything along those lines, do
20  you, sir?
21  A.   I do not.
22  Q.   And you don't know one way or the other whether Mr. Maxwell
23  was the first person to actually raise the concept of an early
24  buyer to the sellers or not.  You have knowledge of that one
25  way or the other, do you?

K3B7HOR5                                    Leonard - cross

1   A.   What?  Say that one more time.

2   Q.   You have no knowledge one way or the other whether it was

3   Mr. Maxwell who first raised to the sellers the concept of an

4   early buy-out of the earnout payment.

5   A.   That is correct.

6   Q.   All right.  And you don't know one way or the other whether

7   it was Mr. Horowitz's, Mr. Wiederman and Mr. Alper's first

8   choice to run Major Energy without any interference from Spark,

9   do you?

10  A.   I can't speak to that.

11  Q.   All right.  And you have never communicated with any of

12  them directly about that subject, have you?

13  A.   I have not.

14  Q.   In your witness statement you talk about in your view how

15  beneficial this transition to Spark was for Major Energy,

16  right?

17  A.   That's correct.

18  Q.   And you are aware that Major Energy has a very different

19  opinion on that, are you not?

20  A.   I am now.

21  Q.   All right.  And you understand that the -- well, strike

22  that.

23          And let's look at Defendant's Exhibit 1018.  Now, this

24  is a February 2, 2018 e-mail exchange between you and Mr.

25  Moeller, and I'd like it start on page 3 of the document down

K3B7HOR5                         Leonard – cross

1     at the bottom because there is an e-mail from Melmiah Walker.

2     Who is Melmiah Walker?

3     A.  He is on the accounting team.

4     Q.  All right.  And Mr. Walker on February 2, 2018 is writing

5     to Mr. Moeller and he says, "Hi guys.  Please see the MEG WASP

6     review for January attached.  We used the final FOS volumes

7     that have been tied out by supply.  The WASP rates for the

8     January estimate were calculated by taking the average WASP of

9     the last three months (October through December).  We then

10    compare those to the actual rates we see coming through for

11    December per our billing grids.  Let us know if you would like

12    us to make any changes to our estimated January WASP rates

13    below."

14              Did I read that correctly, sir?

15    A.  You did.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

K3BVHOR6                          Leonard   - cross

1  BY MR. MAROONEY:

2  Q.  Can you describe for us what the context is for this email?

3  A.  Again, the context of this is because Major had their own

4  billing system, if they had made any rate changes during that

5  month, they wouldn't be reflective in a historical loss, that

6  gets rolled forward for the end-of-month estimate that we do

7  our close.

8  Q.  Now, at this point in time Spark is the supplier and PSE

9  has been replaced, right?

10 A.  Correct.

11 Q.  All right.  And so if we go up -- pardon me -- to the next

12 email in the chain, you will see that it's an email from

13 Mr. Moeller, and it's -- and he takes the other folks off the

14 email chain and he writes directly to you.  Do you see that?

15 A.  I do.

16 Q.  All right.  And he says:  Chris, just you on this email.

17 He says:  As you know, the team in Houston has been handling

18 all of Major's gas book.  This includes norms and purchases.

19 In fact, the past two months I didn't even get a FOM pricing

20 spreadsheet from anyone on the team.  Never mind asking for any

21 input.  I have zero view as to what is being purchased or

22 flowed for Major until after the fact.  Do you see that, sir?

23 A.  I do.

24 Q.  Okay.  He also writes:  When I then receive costs for

25 Keyspan's higher than I have seen in probably a decade, since

K3BVHOR6                    Leonard  - cross

1    NYMEX itself settled above a dollar, including the polar vortex

2    itself, and BGE, where we have storage at close to $10, I have

3    some concerns that perhaps things are not being done correctly.

4             Do you see that, sir?

5    A.  I do.

6    Q.  He also writes:  The point of my email is for you and I to

7    review what happened here and see what we can do differently.

8    I, as have you, been flowing to these utilities for almost two

9    decades and know the constraints, etc.  I don't think that we

10   should have been left paying such high prices for gas.  Don't

11   take my email the wrong way.  It's not at all to question or

12   point fingers, but for us to see how we can work together, to

13   make sure that we are more profitable.  I would like to

14   brainstorm with you on this without bringing other members of

15   the supply team into this just yet?

16           Did I read that correctly, sir?

17   A.  You did.

18   Q.  And you remember receiving this email from Mr. Moeller,

19   right, sir?

20   A.  I do.

21   Q.  All right.  And then following up the chain, you respond to

22   Mr. Moeller and say:  I don't disagree with any of that.  Do

23   you not received the bid week numbers from Chris M. or Greg?  I

24   thought you were added to that distribution list months ago,

25   but will reconfirm.

K3BVHOR6                        Leonard   - cross

1          And then below you describe -- or you, I think --

2    well, you can tell us, you provide an explanation for the price

3    that Mr. Moeller was describing when you described the loads.

4    Do you see that, sir?

5    A.  I do.

6    Q.  All right.

7          And then he then responds to you in the next email --

8    A.  Hold on.  Hold on.  Go back.

9    Q.  Oh, sure.

10   A.  You need to read that last sentence there for the Court.

11   Q.  Sure.  Which one, the one at the bottom, "I'm not sure"?

12   A.  In part, yes.

13   Q.  Sure.  It says:  I'm not sure what you are looking at

14   specifically, but will have Jordan and Greg send you the latest

15   FOS, unless you logged into Citrix and pulled it yourself.

16         Okay?

17   A.  Thank you.

18   Q.  Okay.  Mr. Moeller responds to you -- and tell us the

19   relevance of that sentence to you.  Explain -- the sentence I

20   just read that you wanted me to read, why is that --

21   A.  It was.  Levi was absolutely part of our team.  He had full

22   access to my team.  All he had to do was pick up a phone and

23   call if he had a question about anything, and anyone and

24   everyone would have been more than happy to respond.  He had

25   complete access to see what was done on every single day in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

gas world.  Whatever my team did on any given day, he had

complete access to see and view in real time.

Q.  And is that why he felt the need to write to you

personally?

A.  I can't speak to why he felt the need.

Q.  All right.  And then he responds to you and says:  I get

the email from Chris M.  I used to receive the buys from Greg,

and initially we would discuss Major's game plan.  That hasn't

happened for months.  In January and February, Major almost

always bought much more FOM than needed, and pulled less from

storage or, if needed, like this year, were okay with having

the extra to burn.  There has to be a strategy in place so that

on cold winters we are not left buying gas on the open market

or at least limited amounts.

          Did I read that correctly?

A.  You did.

Q.  He also says:  I have the FOS from files sent today.

Honestly, I am unfamiliar with the systems and where and how to

pull everything.  Do you see that, sir?

A.  I do.

Q.  All right.

          Now, you respond -- we are almost done.  You say:

Sounds good.  Keep in mind, bid week for Jan was before all

this weather hit and got bad.  Load provided from utilities was

before the weather turned south.  As we go forward, if we want

K3BVHOR6                         Leonard  - cross

1  a specific strategy to go long by a certain percentage, then we

2  need to know that ahead of time.  Do you see that, sir?

3  A.  I do.

4  Q.  You also say:  Also, the FOS is still be reviewed for

5  accuracy across-the-board brands, so the numbers are not yet

6  finalized.  I'm still waiting to see information from

7  accounting.  Do you see that, sir?

8  A.  I do.

9  Q.  All right.

10         And then finally he responds back to you and says:

11  Okay.  Thanks.  Again, the point of my email is really for you

12  and I to work together and seeing if there are ways for us to

13  improve profits.  Right?

14  A.  I do.

15  Q.  All right.  And down in his last paragraph, he says:  Also,

16  in BGE I see now that only 15K was purchased.  EMS had us

17  purchasing 25K.  As I said, I never saw the purchases, just the

18  forecasted volumes, so wasn't able to really comment.

19         Do you see that, sir?

20  A.  I do.

21  Q.  All right.  Let me look at DX-1014.  This is a June 1, 2008

22  email string.  I want to start over on page 3 toward the

23  bottom.  You'll see an email from you to Mr. Moeller.

24         You see that, sir?

25  A.  I do.

K3BVHOR6                         Leonard   - cross

1   Q.  Okay.  And it reads:  Risk is riding me while I type this

2   email.  Can we cover up some of your summer PJM, not that

3   anyone LZ is really open, but in aggregate it adds up July and

4   August.  Do you see that, sir?

5   A.  I do.

6   Q.  And then he responds to you in the email above:  I

7   understand risks request, but right now the market is up.  So

8   covering it will be at a price that I feel we aren't doing the

9   best we can.  Do you see that, sir?

10  A.  I do.

11  Q.  All right.  Then if you follow the chain up, eventually

12  Mr. Moeller says:  Okay.  Let's cover.  We'll do what you

13  suggest.  And then you went ahead and covered and hedged,

14  right?

15  A.  At his request, that's correct.

16  Q.  All right.  Now, on page 3 --

17          THE COURT:  You said "at his request," right?

18          THE WITNESS:  At his request.

19          THE COURT:  At his request.

20          Please try to speak into the mic.  The court reporter

21  can't hear everything.

22          THE WITNESS:  I'm sorry.

23  Q.  In your email that we started with here, when you say "risk

24  is riding me," what do you mean by "risk"?

25  A.  We have what's called risk limits out there and the amount

1    of open volume that can be our hedged, unhedged.  So we have

2    what's called volume metric limits out there with our working

3    capital facility and our risk control group that kind of

4    basically prevents traders from overbuying or underbuying

5    taking speculative positions.

6    Q.  And was risk at this point in time more stringent with you

7    and your group than it had been in the past?

8    A.  Not at all.

9    Q.  All right.  And at the end of 2017, your group -- there was

10   a big loss in your group, do you remember that, sir?

11   A.  It was a loss at the company; and it has to do with a five

12   standard deviation, weather that came through New England

13   during the month of January 2018.

14   Q.  Sorry.  Was that related to a future start date contract?

15   A.  It has nothing to do with a contract; it has to do with it

16   being colder than normal to an extreme.

17   Q.  And Spark incurred a $30 million loss, thereabouts?

18   A.  I don't know what the exact number was.

19   Q.  Is that in the ballpark?

20   A.  I don't think it was 30 million.

21   Q.  All right.  Is your testimony that that loss had no impact

22   on how risk viewed you and your supply group?

23   A.  I'm saying our risk limits did not change from that.  It

24   has to do with -- in the 30 million, if you're talking

25   year-over-year, we did print down a larger -- $30 million less

K3BVHOR6                          Leonard  - cross

1    in 2018.

2              What is your question?  Is it attributable to supply?

3    It's attributable to weather.

4    Q.  But your group does the hedging, right?

5    A.  My group does the hedging.

6    Q.  So it was your group that set the hedge that resulted in

7    the loss?

8    A.  My group sets the hedge.  And we hedged to normal weather.

9    And we have what's called a bid week meeting to determine if we

10   want to go long or short, depending on what the forecasts say

11   for that month.  And then this went above and beyond any

12   forecasts that were out there.  And it was, again, a five

13   standard deviation event called a bomb cyclone.

14   Q.  All right.  Let me show you PX-500.  So this is an email

15   chain dated May 10, 2017.  And let's look at page 3.  You'll

16   see an email -- pardon me -- from Mr. Moeller to you at the

17   bottom of the page.  Do you see that, sir?

18   A.  I do.

19   Q.  And there he is reporting about a potential aggregation

20   deal in Illinois.  And according to his email, it's roughly

21   200,000 customers.  Do you see that?

22   A.  I do.

23   Q.  And he is asking:  Please confirm that supply and credit

24   facility can handle this.  Do you see that, sir?

25   A.  I do.

K3BVHOR6                        Leonard   - cross

1   Q.  All right.  And again, at this point in time, Spark is now

2   the supplier, not PSE, right?

3   A.  That is correct.

4   Q.  And why is he sending this email to you as the head of

5   supply?

6           MR. WILKERSON:  Objection.  Calls for speculation.

7           THE COURT:  Sustained.

8   Q.  What is your understanding as to why Mr. Moeller was

9   sending this email to you?

10  A.  He had a large amount of customers come on flow at any

11  given point.  So you have economics that say you're going to

12  make X margin, you want to make sure you hedge that at the time

13  of closure.

14  Q.  And you understood that he's not going to go out and make a

15  bid unless he understands that his supply can supply the

16  energy, right?

17  A.  That is correct.

18  Q.  And you respond to him and say:  No issues on our end.

19          Do you see that?

20  A.  I do.

21  Q.  Large enough we need to hedge when signed.  Correct?

22  A.  This is all about the volume associated with those 200,000

23  customers.

24  Q.  All right.  And then -- I won't read every email here, but

25  if we go up to the first page --

K3BVHOR6                        Leonard  – cross

1    A.  Yup.

2    Q.  -- there's an email at the bottom of the page from Murthy

3    Rao?

4    A.  Murthy Rao.

5    Q.  And who is Murthy Rao?

6    A.  He was our chief risk officer.

7    Q.  And Murthy Rao states:  I believe that this deal should go

8    through the risk committee to be consistent with our processes

9    for all other entities.  Given the earnout and standalone

10   status of Major, not sure how you want me to handle.  Once I

11   get your feedback, I can reach out to Levi, asking him to put

12   more details into an email and request an approval.

13            Do you see that?

14   A.  I do.

15   Q.  What is the risk committee?

16   A.  So the risk committee is if the dealer is larger than X

17   size, then it needs to go and -- the risk committee is made up

18   of the chief risk officer, financial officer, and the CEO, to

19   make sure that it's something we want to pursue.

20   Q.  That's Spark's risk committee?

21   A.  That is correct.

22   Q.  And who was on the risk committee from Spark at this time?

23   A.  I just said that.

24   Q.  Well, you gave me the positions.  Could you give me the

25   names?

K3BVHOR6                        Leonard   - cross

1   A.  Murthy Rao, Rob Lane, and Nathan Kroeker.

2   Q.  Mr. Kroeker in the email above says:  Absolutely needs risk

3   committee discussion, as it's a change in strategy.

4           Do you see that?

5   A.  I do.

6   Q.  And Spark's risk committee, in fact, considered this

7   aggregation deal; correct?

8   A.  We did.  We looked at it.

9   Q.  And Major Energy as being owned by Spark fell under Spark's

10  corporate risk guidelines applicable to Spark's family of

11  companies, right?

12  A.  Correct.  Now, most of the guidelines were waived for them,

13  whether it comes to risk limits and so forth.  But I still had

14  to manage our overall -- so really I needed to know -- and a

15  lot of times what they were doing in order to how -- how to

16  react on my side.

17  Q.  They weren't waived in this case, were they, sir?

18  A.  No, they just went to the risk committee.

19  Q.  And looking at PX-585, this is an email dated May 22nd from

20  Murthy Rao to Levi Moeller, you, Mr. Wiederman, Mr. Kroeker,

21  and Mr. Lane.  Do you see that, sir?

22  A.  I do.

23  Q.  And the punchline is down at the bottom of the paragraph.

24  He says:  As discussed, the risk committee would be happy to

25  look at the aggregation deals that are part of your ongoing

1    business with a customer count of 5,000 or less and with no

2    Green-e certification requirement.  We would not like to enter

3    a new line of business with a large aggregation deal such as

4    this.  As such, the risk committee does not authorize this

5    aggregation deal.  Did I read that correctly?

6    A.   Correct.

7    Q.   That's consistent with your understanding of what the risk

8    committee decided at that time?

9    A.   To my knowledge, I don't think Major Energy had ever done

10   an aggregation before that or even looked at them.

11   Q.   Now, you believe this was the correct decision, right?

12   A.   I do.

13   Q.   All right.  And you believe there were certain risks

14   associated with this deal that justified not doing it?

15   A.   Yeah, well, you need to go back and put that screen back up

16   for a minute.  Because what you'll see on that is one of the

17   requirements was a Green-e certification, which we couldn't do.

18   Q.   All right.  And so you don't think that Spark could have

19   done or Major could have done a Green-e certification; is that

20   right?

21   A.   At this point we didn't have a Green-e certification in

22   time to even fulfill the requirement.

23   Q.   And according to you, it would have been impossible to go

24   out and get one, right?

25   A.   No, we could have gone down that path, but not before the

K3BVHOR6                    Leonard   - cross

1    RFP was due.

2    Q.  So, in fact, you could have obtained a Green-e

3    certification, right?

4    A.  I haven't been attempted to do one in order to answer that.

5    Q.  Right.  You didn't even attempt to, right?

6    A.  The Green-e -- was Major -- I don't know if Major attempted

7    to get a Green-e certification or not.

8    Q.  All right.  But whatever Spark and its risk committee

9    thought about the merits of this proposed transaction, do you

10   agree that the decision to do it or not should have been made

11   by Mr. Wiederman, Mr. Horowitz, and Mr. Alper alone?

12              MR. WILKERSON:  Objection.  Lack of foundation.

13              THE COURT:  Sustained.

14   Q.  Whose decision was it to determine whether to go forward

15   with this aggregation deal?

16   A.  I can't speak to that.

17   Q.  You don't know?

18   A.  No, I can't speak to it.  I wasn't --

19   Q.  Did you understand that Spark's risk committee had the

20   final say?

21   A.  For the Spark stuff, absolutely.  But as I mentioned

22   before, many of those things were waived as it dealt with Major

23   in the earnout.

24   Q.  So you have no view on whether this decision on this deal

25   should have rested solely with Mr. Wiederman, Mr. Horowitz, and

K3BVHOR6                    Leonard   – cross

1     Mr. Alper?

2                  MR. WILKERSON:  Objection.  Lack of foundation.

3                  THE COURT:  Sustained.

4     Q.  All right.  Now, terminating PSE and making Spark act as

5     Major's supplier had economic benefits for Spark, right?

6     A.  What is your question?

7     Q.  What are the economic benefits to Spark of acting as the

8     supplier for Major Energy?

9     A.  There were none actually.  So the benefit is that the

10    family of companies as a whole reduces the cost associated with

11    having a third-party balance sheet effectively utilizing for

12    collateral purposes with the ISOs.

13    Q.  Did Spark charge fees to Major Energy?

14    A.  We did.

15    Q.  Okay.  And how much money in fees did Major Energy pay to

16    Spark in 2017?

17    A.  I'd have to go back and look at the exact number.

18    Q.  What do you think it is?

19    A.  It's the 80 cents times their volume.

20    Q.  Could you give us a ballpark?

21    A.  Again, off the top of my head, I do -- there's a -- I don't

22    remember what the exact number is.

23    Q.  How about a ballpark?

24    A.  I don't remember what the exact number is.  But the 80

25    cents times the volume was literally there for the sole purpose

K3BVHOR6                        Leonard   - cross

1    of keeping things consistent with the way Major did business

2    before having a sleeve arrangement in place.

3    Q.  Was it $3 million?  Does that sound right?

4    A.  It was probably a large number.

5    Q.  Four million?

6            MR. WILKERSON:  Objection.  Calls for speculation.

7            Asked and answered multiple times.

8            THE COURT:  Sustained.

9    A.  The financials for the public company are reported on a

10   consolidated basis, so it's in one, out the other.  But, again,

11   the purpose of the fees associated with it was to be consistent

12   with how Major wanted to do business with the PSE agreement

13   that was previously in place.

14   Q.  Those fees that you're describing were also paid from Major

15   to Spark in 2018; correct?

16   A.  They were.

17   Q.  Right.  And if PSE had remained in place, the fees you're

18   describing would not have been paid to Spark?

19   A.  They would have been paid outside the family of companies

20   to PSE.

21   Q.  Right.  And in addition to those fees, what other economic

22   benefits are there for Spark?

23           MR. WILKERSON:  Objection.  Asked and answered.

24           THE COURT:  Overruled.

25   A.  Other economic benefits, I can't think of any.  Volume.

1             MR. MAROONEY:  Can I have the exhibit list?  Then I'll
2    pass the witness.
3             Plaintiffs move PX-380, Plaintiff's Exhibit 680,
4    Plaintiff's Exhibit 472, Defendants' Exhibit 412, Defendants'
5    Exhibit 414, Defendants' Exhibit 1018, Defendants' Exhibit
6    1014, Plaintiff's Exhibit 500, Plaintiff's Exhibit 585.
7             THE COURT:  Received.
8             (Plaintiff's Exhibits 380, 472, 500, 585, 680 received
9    in evidence)
10            (Defendants' Exhibits 412, 414, 1014, 1018 received in
11   evidence)
12            THE COURT:  Mr. Wilkerson, redirect?
13            How long do you think you'll be on redirect?
14            MR. WILKERSON:  That depends, your Honor.  What time
15   do you say we're going to leave today?
16            THE COURT:  He can't come back tomorrow?
17            MR. WILKERSON:  I think he has a flight this evening.
18            THE COURT:  You have a flight this evening?
19            THE WITNESS:  I do.
20            THE COURT:  All right.
21            Well, how much time do you want?
22            MR. WILKERSON:  I think I can do it in 45 minutes.
23            THE COURT:  I wasn't going to stay that long.
24            How about a half hour?
25            MR. WILKERSON:  Let's do a half hour.

1          THE COURT:  All right.

2          MR. WILKERSON:  Always ask high.

3          THE COURT:  Okay.  Twenty minutes.

4    REDIRECT EXAMINATION

5    BY MR. WILKERSON:

6    Q.  Mr. Leonard, I'm going to speak fairly quickly because we

7    do not have much time.  Let's first go through some of the

8    issues that Mr. Marooney went over with you.

9          First with regard to sales of retail versus purchases

10   wholesale, are those two separate concepts?

11   A.  They are.

12   Q.  What you deal with and what you've dealt with when --

13   during the earnout period with regard to the sleeve fee that

14   Major Energy was charged by Spark, was that on the retail side

15   or the wholesale side?

16   A.  It was on the wholesale side.

17   Q.  Okay.  Who priced retail for Major Energy during the

18   earnout period?

19   A.  Major Energy.

20   Q.  The role of Spark, when it took over from PSE, was as a

21   credit sleeve provider?

22   A.  That is correct.

23   Q.  And that's all?

24   A.  That is correct.  We were -- we were basically their

25   balance sheet.

K3BVHOR6                        Leonard - redirect

1   Q.  Okay.  All of the supply decisions resided with who as to

2   Major Energy?

3   A.  Levi Moeller.

4   Q.  The strategic decisions with regard to supply were taken by

5   Mr. Moeller?

6   A.  They were.

7   Q.  Not by you?

8   A.  Correct.

9   Q.  You acted as a resource to Mr. Moeller?

10  A.  I did.

11  Q.  Okay.

12          MR. WILKERSON:  Let's turn to DX-1018 very quickly,

13  James.  Turn to the next page please.

14  Q.  Mr. Leonard, you mentioned that on your email here you've

15  asked Mr. Marooney to read in the last sentence.  Do you

16  remember that?

17  A.  I do.

18  Q.  And it says:  I'm not sure what you are looking at

19  specifically, but will have Jordan/Greg send you the latest

20  FOS, unless you logged into Citrix and pulled it yourself.

21  A.  That is correct.

22  Q.  What is Citrix?

23  A.  Citrix is -- it's like being able to log -- Citrix allows

24  you to log into a desktop, basically.  But it also allows you

25  to access our risk system, which captures all of the activity

K3BVHOR6                          Leonard - redirect

1   that happened on any given day, all the buying and selling and

2   balancing.

3   Q.  The buying, selling, and balancing that occurs on any given

4   day for that day?

5   A.  That is correct.

6   Q.  Okay.  Does it also include -- that's what is called as --

7   that's what's called daily balancing?

8   A.  Correct.

9   Q.  Or daily scheduling?

10  A.  Correct.

11  Q.  Now, if you back up, each month you have something called

12  bid week?

13  A.  That is correct.

14  Q.  And bid week is where Spark purchases what may be needed

15  for the upcoming month, is that accurate?

16  A.  That is correct.  We purchase all the physical that is

17  requested by either the utilities or our low forecast to

18  deliver to any particular city.

19  Q.  And you had bid week meetings?

20  A.  I have them every month.

21  Q.  Was Mr. Moeller always invited to those meetings?

22  A.  He was always invited to these meetings.

23  Q.  As far as you knew?

24  A.  No, I invited him.

25  Q.  You invited him to those meetings.

K3BVHOR6                    Leonard - redirect

1          Did he always attend those meetings?

2   A.  He very frequently attended those meetings.

3   Q.  Sorry, very frequently or infrequently?

4   A.  Infrequent.

5   Q.  Infrequently.

6          And when he did not attend the meeting, did you go

7   ahead and purchase for Major anyway?

8   A.  We did.

9   Q.  And did you inform Mr. Moeller of the purchases?

10  A.  We did.

11  Q.  And were those purchases always available to him in real

12  time if he had bothered to log into Citrix?

13  A.  That is correct.

14  Q.  Back up one more step.

15         The first step in the supply purchasing is purchasing

16  forwards, futures, hedging; is that accurate?

17  A.  That is correct.

18  Q.  Who took care of that for Major Energy?

19  A.  Levi.

20  Q.  Did you ever touch that role for Major Energy during the

21  earnout period?

22  A.  We did not.

23  Q.  And is that where the bulk of the gas is purchased for

24  Major Energy?

25  A.  It is.

K3BVHOR6                         Leonard - redirect

1    Q.  Is that phase I?

2    A.  It is.

3    Q.  Okay.  And just to be clear, to work backwards, after phase

4    I comes bid week to make up for any shortfalls that you have

5    from your forwards and futures and hedging?

6    A.  That is correct.

7    Q.  And then on a daily basis you have the daily nominations

8    scheduling?

9    A.  The balancing.

10   Q.  Balancing.

11   A.  Anything that happens due to weather, anomalies, or

12   anything else.

13   Q.  Okay.  How many times did Levi Moeller log into Citrix and

14   go into the risk system?

15   A.  Zero.

16   Q.  Did you go back and look at the audit trail?

17   A.  We did.

18   Q.  How many times did David Sobel log into Citrix and look at

19   the risk system?

20   A.  Zero.

21   Q.  Did you look at that audit trail as well?

22   A.  We did.

23   Q.  David Sobel had access to it?

24   A.  They both had full access.

25   Q.  The email that we just spoke about -- let me just ask you,

K3BVHOR6                    Leonard - redirect

with regard to the aggregation deals, is that risk that's being

contemplated by the risk committee the same type of risk that

you contemplate on the supply side?

A.  Similar.

Q.  And on the supply side, I think you mentioned you had a

450,000 megawatt hour risk limit?

A.  That is correct.

Q.  And did Mr. Moeller ever take positions that jeopardized

that limit?

A.  He absolutely did.

Q.  Did you require Mr. Moeller to then change his hedging

position in order to get back within limit?

A.  I did not.

Q.  Did you have conversations with him, as we saw in DX-1014,

with regard to risk limits?

A.  Frequently.

Q.  And it was always his decision?

A.  It was.

        MR. WILKERSON:  And if we can turn to DX-1014 quickly,

James.  Go back a page please.  And one more please.

Q.  All right.  You see here, Mr. Marooney covered with you the

first email at June 1, 2018, 11:09 a.m., where you say:  Risk

is riding me while I type this email.  Can you cover up some of

your summer PJM, not that anyone LZ is really open, but in

aggregate, it adds up.  July/August.

1          MR. WILKERSON:  Let's go to the next email, James.  2.

2     Q.  And in this email, do you see that Levi Moeller is asking:

3     What do you guys think?  Braxton, where do you see the pricing

4     for RTC in JCPL, PSEG, PPL, and PECO.  Who's Braxton?

5     A.  Braxton is my term trader; so he's the one always dealing

6     with that phase I on the power side for, at this time, the

7     nonMajor entity.

8     Q.  Okay.  You mentioned the power side.  Let's be very clear

9     about this.  Who made the purchases on the power side for Major

10    Energy during the entire earnout period?

11    A.  Levi.

12    Q.  On the gas side, this is what we're talking about here?

13    A.  No, this is power.

14    Q.  Okay.  This is power.  On the gas side, that's where your

15    team assisted?

16    A.  That is correct.

17    Q.  Okay.  But Levi had a third party through which he made all

18    of his electricity purchases?

19    A.  That is correct.

20    Q.  Okay.

21         MR. WILKERSON:  Turn to the next email, James.

22    Q.  And here, Braxton responds to Mr. Moeller.  And he says:

23    Market has been climbing recently, but not by much, maybe four

24    percent since mid March.  All RTCs would be low to mid

25    thirties, so risk reward profile still favors covering.

1        MR. WILKERSON:  Go to the next email please.

2   Q.  And it's only at that point that Mr. Moeller says:  Okay.

3   Let's cover.  What would you suggest?

4        MR. WILKERSON:  Now go to the last email please.

5   Q.  They continue talking about pricing, what price he wants to

6   get.

7        MR. WILKERSON:  The very top, all the way to the top,

8   James.

9   Q.  Mr. Moeller concludes by saying:  I trust you, smiley face.

10  Whatever is the best price you can get.  Thanks.

11       Do you remember this email exchange?

12  A.  I do.

13  Q.  Does this confirm in your mind, again, that you never

14  forced Mr. Moeller to change his hedging strategy at Major?

15  A.  It does.

16  Q.  Let's be very clear about how you dealt with Mr. Moeller's

17  hedging position when he was getting too risky.  If you didn't

18  force him, what did you do?

19  A.  I ended up putting -- most of the time he was going shorter

20  than our risk limits allow, pushing us over the limit of that

21  450.  So then we would, in turn, go out and buy additional

22  commodity and put it into our other brands.

23  Q.  Did you ever charge Major Energy for those purchases?

24  A.  We did not.

25  Q.  This was a free service to Major Energy?

K3BVHOR6                         Leonard - redirect

 1   A.  It was.

 2   Q.  Okay.  Let's talk for a moment about DX-1008A.  This is a

 3   spreadsheet.  Did that show up on your screen, Chris?

 4   A.  It did.

 5   Q.  Is this your spreadsheet?

 6   A.  It is.

 7   Q.  Where did the underlying data come from?

 8   A.  This is for electricity, so this would have come from the

 9   ISO statements for Major Energy.

10   Q.  And does this spreadsheet show the monthly quantities of

11   electricity that Major bought wholesale?

12   A.  It does.

13   Q.  And it shows from a period of April 2016 through the end of

14   2018; is that right?

15   A.  It does.

16   Q.  And go to the very far right at the bottom.  Do you see

17   where it says:  Total 21 months.  And then it has a, sort of,

18   simple formula, subtraction.  And then total 21 months, with a

19   slightly different formula?

20   A.  I do.

21   Q.  Can you explain to the judge what those mean?

22   A.  Yeah.  So the total is -- 21 months is the difference

23   between the $2.50, which is the last term sheet that I had seen

24   at the time when PSE was coming up for renewal, versus the 80

25   cents that we charged them for that period of April 2017

K3BVHOR6                          Leonard – redirect

1 through the end of the earnout.

2 Q.  So is what you're saying in this spreadsheet that the delta

3 between the amount that PSE had been charging Major Energy at a

4 dollar, and the 80 cents that Spark charged, added up, during

5 the 21 months that Spark was the supplier for Major, to a

6 savings of $543,000 and change?

7 A.  That is correct.

8 Q.  And had Major Energy moved forward with PSE's $2.50 per

9 megawatt hour sleeve fee, the savings would have been $4.6

10 million?

11 A.  That is correct.

12 Q.  But, at minimum, 543?

13 A.  Correct.

14 Q.  Okay.  Now, in addition to sleeve fees, did Major Energy

15 charge -- or, I'm sorry, did PSE charge Major Energy collateral

16 posting interest?

17 A.  They did.

18 Q.  And in your role at supplies, are you aware of how much

19 roughly on average Major Energy was paying in those interest

20 fees to PSE on a monthly basis?

21 A.  Yeah, around 10,000 a month.

22 Q.  And 10,000 times 21 is?

23 A.  210.

24 Q.  Is that an additional savings that Major Energy acquired

25 when it shifted to Spark rather than PSE supply?

K3BVHOR6                        Leonard - redirect

1    A.  It is.

2    Q.  Let's look briefly at DX-1046A.  That spreadsheet that we

3    just looked at, that was the electricity side?

4    A.  Correct.

5    Q.  Okay.  Let's look just for a moment at the gas side.

6            Is this your spreadsheet?

7    A.  It is.

8    Q.  Can you explain in 15 seconds or less what this is showing?

9    A.  Yes.  This is the gas volumes or gas actuals for the period

10   2016 through 2018.  Beginning in April of 2016, total revenue

11   for the gas book, the gross margin for the gas book, the volume

12   of the gas book.  Total revenue, margin, volume.  And then the

13   next three lines is the average revenue rate, the gross unit

14   margin, gross margin per unit.  And then gross margin as a

15   percentage of revenue, overall revenue.

16           So this is the high-level statistics around the

17   overall financial health of the gas book.

18           THE COURT:  Gas book.

19           THE WITNESS:  Book.  Gas portfolio versus electric

20   portfolio.

21   Q.  Okay.  You're aware that Mr. Moeller says that Major Energy

22   somehow got worse gas pricing from Spark because it didn't have

23   as big a trading desk as PSE?

24   A.  Correct.

25   Q.  Does this spreadsheet show any decrease in the gross margin

1   per unit after Spark took over supply?

2   A.  It does not.

3   Q.  Does it show any decrease in gross margin as proportion of

4   revenue after Spark took over supply?

5   A.  It does not.

6   Q.  And just to talk about the size of the trading desk for a

7   moment, does the size of the trading desk affect the price of a

8   commodity?

9   A.  It doesn't.

10  Q.  In fact, you've worked on large trading desks?

11  A.  I have.

12  Q.  Where did you do that?

13  A.  At Shell.

14  Q.  And at Shell, if you were buying 1,000 dekatherms at one

15  moment, and a small trading desk was buying 1,000 dekatherms at

16  the same moment, what price would you both get?

17  A.  You would both get the same.  It's a commodity.

18  Q.  Let's talk about commercial brokers for just a minute.

19          Has Major's broker department reported to you since

20  the earnout ended?

21  A.  It has.

22  Q.  And you've reviewed the 1099s to brokers produced in this

23  case?

24  A.  I have.

25          MR. WILKERSON:  James, could you pull up PX-758, not

K3BVHOR6                          Leonard - redirect

1   that we're going to go through them all, but just to refresh

2   everyone's memory about what this document is.

3   Q.  How many brokers, if you recall, did Major pay in the last

4   year before the earnout, which was 2015?

5   A.  217.

6   Q.  And how many brokers did Major Energy pay in the last year

7   of the earnout, which was 2018?

8   A.  272.

9   Q.  And what's the delta?

10  A.  54.

11  Q.  And in terms of percentages, what's the growth?

12  A.  24.7.  25 percent.

13  Q.  25 percent growth in the number of brokers with whom Major

14  Energy did business from 2015 to 2018?

15  A.  That is correct.

16  Q.  Let's talk about PSE for a minute and what happened in

17  January/February 2017.

18          Now, as we've talked about already today, you're aware

19  that PSE's last offer to Major was $2.50 per megawatt hour

20  sleeve fee?

21  A.  Correct.

22  Q.  Remember that?  And you understand now, after the fact,

23  that that offer was given to Major Energy in early 2017?

24  A.  Correct.

25  Q.  When did you find that out?

K3BVHOR6                          Leonard - redirect

1    A.   During the course of this litigation.

2    Q.   Okay.  The last year or so maybe?

3    A.   Yeah.

4    Q.   After the earnout period?

5    A.   Correct.

6    Q.   But did Mr. Moeller tell you in 2017, when negotiations

7    were going on with regard to whether Spark was going to take

8    over PSE's role and at what terms, did he tell you at that time

9    that he could get 80 cents per megawatt hour from PSE?

10   A.   That is correct.

11   Q.   And do you realize now that that was an untrue statement?

12   A.   I do.

13   Q.   Let me ask you a different question.  In 2018, did you

14   discover that there were at least two other energy service

15   companies that had contracts up for renewal with PSE in early

16   2017?

17   A.   Correct.

18   Q.   Same time period that Major Energy had a contract up for

19   renewal with PSE?

20   A.   Correct.

21   Q.   And what was the pricing they received?

22   A.   $2.50, $3.

23   Q.   And you found that out in when?

24   A.   I found that out -- well, Pacific Summit was exiting the

25   business, so they were trying to exit the retail business.  So

1    they were jacking up the rates on all of their sleeve

2    agreements across the board.

3    Q.   When did you find that out?

4    A.   Rumor had it during that same period, 2017.  But PSE, they

5    are not even actively doing sleeve agreements anymore.  I found

6    that out in 2018.

7    Q.   Okay.  So fair to say that you found out during the earnout

8    period that Levi might not have been truthful with you?

9    A.   Correct.

10   Q.   Despite that fact, did you and Mr. Kroeker and whoever else

11   was making this decision at Spark decide to keep the 80 cents

12   in place?

13   A.   We did.

14   Q.   Why?

15   A.   Because that's what we agreed to.

16   Q.   Now, Mr. Moeller in his -- you've read Mr. Moeller's

17   rebuttal statement?

18   A.   I have.

19   Q.   And you've not yet had a chance to respond to what he said

20   in that statement?

21   A.   I have not.

22   Q.   Let's go through some of his contentions in his rebuttal

23   statement.

24   A.   Of course.

25   Q.   So first, Mr. Moeller says that when you visited him in

K3BVHOR6                              Leonard - redirect

1   February of 2016 -- you remember this visit?

2   A.  I do.

3   Q.  You visited him in New York?

4   A.  I did.

5   Q.  He says that during that visit, you and he did not discuss

6   the dropdown and the possible replacement of Major's sleeving

7   arrangement.  Is Mr. Moeller correct?

8   A.  He is not.

9   Q.  Could you describe for us the conversation that you had in

10  this regard with Mr. Moeller in February 2016 in New York?

11  A.  I can.  Came up to the Orangeburg office with some other

12  folks.  And it was right before lunch.  Him and I broke away

13  and went into his office.  I had sent him up an agenda prior to

14  that of all the specific things that I wanted to talk about,

15  mainly around the PSE agreement, what the terms of it were,

16  what the termination fees, what the length of it, and all the

17  other attributes of it that I needed to know.  And we went

18  through that agenda.

19  Q.  And as you were going through the agenda, did he ask you a

20  question about prior acquisitions of Spark?

21  A.  He did.

22          MR. MAROONEY:  Your Honor, I would just object.  It's

23  all hearsay.

24          MR. WILKERSON:  It's a party admission by Levi

25  Moeller.

K3BVHOR6                          Leonard - redirect

1           MR. MAROONEY:  He's not a party.

2           THE COURT:  I think effectively he is a party for

3    hearsay purposes, so overruled.

4    Q.  At some point did Mr. Moeller ask you a question about how

5    supply agreements had been treated in prior acquisitions by

6    Spark?

7    A.  He did.

8    Q.  And what was your response?

9    A.  I told him typically on dropdown, when Spark acquires a

10   company, one of the first things we get rid of is the supply

11   agreement because we roll it into our working capital facility,

12   and there's no point in paying these fees to third parties.

13          MR. WILKERSON:  And let's pull up, James, DX-958.

14   Q.  Let's look at the agenda that you and Mr. Moeller were

15   going through.  And do you see in your email to Mr. Moeller on

16   February 17th, 2016, number 1C is termination fees?

17   A.  It is.

18   Q.  And when that came up, termination fees in the context of

19   your discussion with Mr. Moeller, did you and he discuss how

20   termination fees may or may not affect when, if ever, Spark

21   would take over PSE's role?

22   A.  As long as -- as long as the term -- as long as it came to

23   fruition, you didn't have termination fees.  But if you ended

24   at any time before that, then there would be some termination

25   fees.  And we discussed exactly just that.

K3BVHOR6                        Leonard - redirect

1    Q.  Next Mr. Moeller says that PSE was not merely a sleeve

2    provider; he says that it also provided nominations on the

3    pipelines, purchases, helped reconciling invoices, breakdowns

4    of pipeline invoices by capacity release, and future outlooks

5    on the market.  Very simple question for you:  Did Spark do

6    those same things?

7    A.  We provided the exact same services that PSE provided, plus

8    more.  Because he had 24/7 access to eight dedicated people on

9    my team around natural gas.

10   Q.  Are you aware of any service that PSE provided that Spark

11   did not for a cheaper rate?

12   A.  I am not.

13   Q.  Third, Mr. Moeller alleges that you provided him with

14   incorrect or incomplete information in early February 2017,

15   when comparing Spark and PSE to wholesale pricing.

16              Do you remember that?

17   A.  I do.

18   Q.  Let's go through this very quickly.

19              MR. WILKERSON:  Let's go to DX-476, James.

20   Q.  This is the email that Mr. Moeller cites at paragraph 7 of

21   his witness -- rebuttal statement.

22              And you say at the top email to Mr. Kroeker:  Just

23   FYI.  In February, it appears we would have had cheaper supply

24   by about 40K for Major in a side-by-side we have been doing

25   with Levi for gas.  Tuck that in your back pocket.  Smiley

1    face.  Do you see that?

2    A.  I do.

3    Q.  Explain very briefly what the side-by-side that you had

4    been doing with Levi for gas was?

5    A.  So we started in the fourth quarter of 2016 trying to get

6    him comfortable with everything.  So as things came across my

7    desk versus the settlement statements that we got from PSE, we

8    would mirror and mimic everything in our own system at FOS and

9    do a comparison of pretty much all of this type of activity.

10   So when we came to close, the accounting close process, we went

11   through a side-by-side comparison, and that's where this popped

12   out.

13   Q.  Okay.  So basically you were getting to the point where

14   everyone was comfortable that at the end of the earnout period,

15   we would have a spreadsheet like DX-1046 that we just saw,

16   showing no decrease in margin of gas?

17   A.  That is correct.

18   Q.  Okay.  Understand.

19         Now, let's look at DX-1004.  This is a little

20   complicated, but we'll go through it quickly.  This is your

21   lead email to Mr. Moeller attaching two separate emails with

22   the same name.  Do you see that?

23   A.  I do.

24   Q.  Re:  Transition planning?

25   A.  Yup.

K3BVHOR6                        Leonard – redirect

1  Q.  Let's look at the attachments.

2          Mr. Moeller had various questions for you at the

3  bottom of this email, do you see that?

4  A.  I do.

5  Q.  And this is regarding the same thing, is it not?

6  A.  It is.

7  Q.  And then you respond at the top.  We don't need to read the

8  response.  Fair to say you responded?

9  A.  It is.

10  Q.  Okay.  Let's look at the next one, the other attachment,

11  which is at page 605.  Same thing.  Do you see how Mr. Moeller

12  is asking you questions on the same email thread?

13  A.  I am.

14  Q.  Just with starting new branch?

15  A.  I do.

16  Q.  Okay.  And you're responding in this dark text?

17  A.  It is.

18  Q.  Okay.

19          MR. WILKERSON:  Now, go back to the first page please,

20  James.

21  Q.  And you ask Mr. Moeller:  Any additional questions?  My

22  answers make sense?  How do we look on the PSE term sheet?

23  A.  That's correct.

24  Q.  Did Mr. Moeller respond to this email?

25  A.  He did not.

K3BVHOR6                        Leonard - redirect

1   Q.  Did you answer all of his questions?

2   A.  I did.

3   Q.  Did you provide him incomplete information?

4   A.  No.

5   Q.  Let's look what happened the next day.  Let's turn to

6   DX-483.  Do you see at the bottom email, Mr. Horowitz says to

7   Mr. Kroeker, copying you:  Yes, the PSE negotiations did not

8   proceed the way we would have wanted; and we are in agreement

9   to give Spark supply a try as Major's supplier.

10          Do you remember that?

11  A.  I do.

12          MR. WILKERSON:  Let's go to the top email please.

13  Q.  There's an email from Mr. Moeller to, among others, you.

14  And he says:  I have asked Trevor to start reaching out to the

15  utilities, informing them that Major's capacity releases and

16  wholesale supply will move from PSE to Spark on April 1, 2017.

17  And then in the last sentence of that paragraph he says:

18  Chris, please confirm that your team over there will handle the

19  various ISOs, etc.  Do you remember this email?

20  A.  I do.

21  Q.  So fair to say that by the next day, after you had asked

22  your questions back to Mr. Moeller, Major Energy was on board

23  switching Spark into PSE's role?

24  A.  That's correct.

25  Q.  Fourth, Mr. Moeller says:  Spark did not provide breakdowns

K3BVHOR6                        Leonard – redirect

1   of pipeline invoices, daily nominations based on capacity

2   releases, costs, and daily purchases for gas.

3            Do you remember him making that allegation?

4   A.  I do.

5   Q.  Now, as we discussed before, Mr. Moeller always had access

6   to Citrix?

7   A.  He did.

8   Q.  And the risk system was within Citrix?

9   A.  It was.

10  Q.  And he never accessed it?

11  A.  That is correct.

12  Q.  Same for Mr. Sobel?

13  A.  That is correct.

14  Q.  And that provided realtime access to all of the information

15  he's talking about here?

16  A.  That is correct.

17  Q.  Okay.  All right.  One more topic for you, Mr. Leonard.

18           Mr. Moeller says that Spark at some point imposed

19  margin floors under which Major could not sell retail energy

20  without Spark's permission.

21           Do you remember him making that allegation?

22  A.  I do.

23  Q.  Is that allegation true?

24  A.  It is not.

25  Q.  During the earnout period, did you ever impose a margin

1    floor on Major's deals with Major's customers?

2    A.  We did not.

3    Q.  Did Mr. Moeller ever come to you, even one time, for

4    permission to price a deal below a margin floor?

5    A.  He did not.

6    Q.  Are you aware of him going to anyone else at Spark at any

7    time during the earnout period to ask for permission to price a

8    deal under an earnout floor?

9    A.  I am not.

10           MR. WILKERSON:  Let's turn briefly to DX-1065.  And

11   turn to the next page please.  One more.

12   Q.  Do you see this email from Bruce Shipper to, among others,

13   you?

14   A.  I do.

15   Q.  And at point 3 he says:  Requests -- well, first, who's

16   Bruce Shipper?

17   A.  He's one of our BDMs, business development manager.  He

18   manages and directs sales.  He was the office manager after the

19   earnout period ended for the New York office.

20   Q.  As of March 13th, 2018, what did he do for Major?

21   A.  He was a sales guy.

22   Q.  At point 3 he says:  Requests for any margin reduction,

23   swing increases above 25 percent, or any request that may

24   present extra risk to Major should be sent to

25   risk@majorenergy.com.  And please cc me, Bruce Shipper, as

K3BVHOR6                        Leonard - redirect

1   well.  Do you see that?

2   A.  I do.

3   Q.  Is that consistent with your understanding?

4   A.  It is.

5   Q.  That Spark did not impose any floors on the margins of

6   Major Energy?

7   A.  That is correct.

8   Q.  Okay.  Is that true both as to residential customers as,

9   well as brokered commercial customers?

10  A.  Yes.  No floors at all.

11  Q.  Okay.

12          MR. WILKERSON:  James, please go to DX-1017A.

13          And just for the record, we have highlighted some of

14  the rows in DX-1017A, and hidden some of the columns so that

15  it's more manageable on the screen.

16  Q.  Do you recognize this document?

17  A.  I do.

18  Q.  This is a monthly record pulled from Spark's systems

19  regarding energy prices charged to homes and properties of

20  Mr. Horowitz, Wiederman, Sobel, and Moeller?

21  A.  It is.

22  Q.  Can you give the judge a rough estimate of the cost of

23  goods sold for a single kilowatt hour?

24  A.  Roughly, it's around $6, so -- I'm sorry, for a kilowatt

25  hour?

K3BVHOR6                           Leonard – redirect

1   Q.  A kilowatt hour.

2   A.  Yeah, so call it six cents.

3   Q.  Six cents?  And you can see in column C, it says:  Utility

4   shortening O&R.  Is that Orange and Rockland?

5   A.  It is.

6   Q.  Okay.  So roughly six cents in Orange and Rockland?

7   A.  Correct.

8   Q.  And can you give the judge a rough estimate of the cost of

9   goods sold for one-third?

10  A.  Roughly, call it around 50 cents.

11  Q.  Fifty cents.  Okay.  So six cents and 50 cents.

12          Now, go over to the column fee unit price.  How much

13  was David Sobel paying?

14  A.  A tenth of a penny.

15  Q.  A tenth of a penny.

16          And if you go to column D, you can see the commodity

17  is what?

18  A.  That's for electric.

19  Q.  That's an electric contract, and he's paying a tenth of a

20  penny, also known as a mil?

21  A.  That is correct.

22  Q.  He's paying one mil per kilowatt hour for his electricity

23  at his home?

24  A.  He was actually –– yeah, that is correct.

25  Q.  Now, go to the next line.  Do you see that he was paying

1    one cent per therm for his gas?

2    A.  I do.

3    Q.  And if you look at the invoice amount for those two

4    contracts, you see it's $1.59 for the month of January '16?

5    A.  I do.

6    Q.  And $3.08 for the month of January '16?

7    A.  That is correct.

8    Q.  Okay.  Let's just scroll down to get a sense of the other

9    properties involved here.

10            You could see that Levi Moeller was also receiving

11   prices at one mil and one cent respectively, do you see that?

12   A.  Basically all receiving free power.

13   Q.  Sorry, I didn't hear that.

14   A.  They were basically all receiving free electricity, free

15   gas.

16   Q.  Just to be clear, they were receiving electricity and gas

17   far below the cost of goods sold for Major?

18   A.  That is correct.

19   Q.  Now, let me ask you this, Mr. Leonard:  If Spark had

20   actually imposed margin floors at Major Energy, would it have

21   been possible for these executives to have given themselves

22   contracts at negative margin?

23   A.  No.

24            MR. WILKERSON:  I'll pass the witness.

25            THE COURT:  All right.  Anything further?

K3BVHOR6                    Leonard - recross

1                    MR. MAROONEY:  Sorry, just five minutes or less.

2                    THE COURT:  Okay.

3                    Did you have any exhibits to move in, Mr. Wilkerson?

4                    MR. WILKERSON:  Yes, sir.  DX-1008A, DX --

5                    THE COURT:  Hold on.  Let me wait for Mr. Hampton.

6              1008A, DX.

7                    MR. WILKERSON:  Next one is DX-1046A, DX-958, DX-476,

8       DX-1004, DX-1065, and DX-1017A.

9                    THE COURT:  Those exhibits are received in evidence.

10                   (Defendants' Exhibits 476, 958, 1004, 1008A, 1017A,

11      1046A, 1065 received in evidence)

12                   THE COURT:  And Mr. Marooney.

13      RECROSS EXAMINATION

14      BY MR. MAROONEY:

15      Q.  You were shown a spreadsheet, DX-1008A, where there was a

16      comparison, I think, between -- the delta between what Spark

17      charges versus what, I guess, $2.50, what you're saying PSE's

18      offer was.  Do you see that, sir?

19      A.  I do.

20      Q.  All right.  So this spreadsheet does not reflect the offer

21      that PSE made to Major in March of 2016 and the price of that

22      offer, does it, sir?

23      A.  I just saw that for the first time today.

24      Q.  And that's because you were not aware of that offer, right,

25      sir?

K3BVHOR6                          Leonard - recross

1   A.  Correct.

2   Q.  And you were asked a series of questions about the number

3   of brokers that Major sold to, do you remember that?

4   A.  I did.

5   Q.  You said it was a difference of 54 or something like that?

6   A.  Correct.

7   Q.  All right.  Now, that number, of course, does not tell us

8   anything about whether there was a corresponding growth in

9   customers, does it, sir?

10  A.  It does not.

11  Q.  And it does not tell us what the quality of those customers

12  were, does it, sir?

13  A.  It just speaks in a number of 1099s.

14  Q.  In fact, it could actually suggest the opposite of what you

15  might have been inferring, that there had to be a lot more

16  brokers because the existing ones weren't driving the

17  customers, right?

18           MR. WILKERSON:  Objection.  Argumentative.

19           THE COURT:  Sustained.

20  Q.  Were you one of the negotiators of the MIPA and the earnout

21  agreement?

22  A.  I was not.

23  Q.  Okay.  Was Mr. Moeller, as far as you know?

24  A.  I don't know.

25  Q.  You don't know one way or the other?

1          You talked about a discussion you had with Mr. Moeller

2    where you learned about termination fees associated with

3    Major's existing PSE contract.  Do you remember that?

4    A.  I do.

5    Q.  What did you learn about those termination fees?

6    A.  That they were high.

7    Q.  All right.  And did that factor into Spark's own thinking

8    in terms of the timing of sending the termination letters to

9    PSE?

10   A.  Rephrase the question again.

11   Q.  Did these high termination fees that would have been paid

12   had the PSE contract with Major been terminated early, did that

13   factor into Spark's decision in terms of the timing of when the

14   PSE contract was going to be terminated?

15   A.  Of course.  We terminated the contract as required by the

16   contract with 180-day notice.

17   Q.  I'm sorry, I didn't hear your answer.

18   A.  The contract required 180-day notice; contract was set to

19   expire March of '17.  So we -- the termination went out

20   September of '16.

21   Q.  Here's my point, I guess:  If the termination fees weren't

22   as high as you learned, Spark would have terminated that

23   immediately, right?

24          MR. WILKERSON:  Objection.  Calls for speculation.

25          THE COURT:  Overruled.  You can answer if you

K3BVHOR6                        Leonard - recross

1   understand.

2   A.   Say the question again.

3   Q.   Yeah.  If those termination fees you are describing were

4   not as high as you learned them to be, isn't it true that the

5   PSE contract would have been taken out right away by Spark?

6   A.   I don't know the answer to that.

7   Q.   You have no idea?

8   A.   I don't know the answer to the question.

9            Look, at the end of the day, we wanted Major to be

10  successful.  Do we want to pay funds to a third party, when it

11  can stay in the family of companies?  Of course we want success

12  for all.

13  Q.   And again, whose decision was it, in terms of who the

14  supplier should be for Major?  Was that Major's decision to

15  make?

16  A.   It was.

17  Q.   It's your testimony that it was Major's decision to make,

18  not Spark's, as to who the supplier should be?  Is that your

19  testimony?

20  A.   I think we just saw an email where we saw Horowitz made

21  that decision.

22  Q.   I'm not asking you to interpret an email.

23           Let me back up then.

24           You have no knowledge at all of what Mr. Gibson said

25  to PSE back in late April; we covered that on your cross,

K3BVHOR6                          Leonard - redirect

```
 1   right?
 2   A.  We did.
 3   Q.  And you have no knowledge at all, therefore, as to the
 4   status of the relationship actually between PSE and Major
 5   thereafter, do you, sir?
 6   A.  I can't speak to that.
 7   Q.  All right.  And -- all right.
 8           MR. MAROONEY:  I'm done, your Honor.  Thank you.
 9           THE COURT:  Okay.  Thank you.
10           MR. WILKERSON:  May I have one minute?
11           THE COURT:  Yes.
12   REDIRECT EXAMINATION
13   BY MR. WILKERSON:
14   Q.  Mr. Leonard, in Exhibit 380, PX-380, you were shown for the
15   first time today an email with regard to PSE and Major Energy
16   in March of 2016.  Do you remember that?
17   A.  That is correct.
18           MR. WILKERSON:  On the next page, James.  If you could
19   blow that up, that email up.
20   Q.  Let's be clear so that we're comparing apples to apples.
21           PSE was charging Major Energy a sleeve fee of a
22   dollar?
23   A.  That is correct.
24   Q.  And they were offering here to lower it to 85 cents?
25   A.  That is correct.
```

K3BVHOR6                        Leonard - redirect

```
 1   Q.  And in the second paragraph they are saying that they also

 2   want novation fees of 50 cents per megawatt hour for all

 3   forward power hedges or five cents per MMBTU for all forward

 4   natural gas hedges.  Do you see that?

 5   A.  I do.

 6   Q.  That's an additional fee?

 7   A.  That is.

 8   Q.  Okay.  Did they also charge interest on purchases whenever

 9   Major Energy did not pay within 30 days?

10   A.  They did.

11   Q.  And are you aware that Major Energy, in fact, incurred

12   interest charges because they did not regularly pay within 30

13   days?

14   A.  I am.

15   Q.  That's another fee.

16          Are you aware also that Major Energy was charged by

17   PSE interest on collateral postings as we discussed before?

18   A.  Correct.

19   Q.  And that's the $210,000 delta that we talked about?

20   A.  That is correct.

21   Q.  That's another fee, right?

22   A.  Correct.

23   Q.  And are you also aware that in this email, in the last

24   large paragraph, PSE is asking for an extension through 2019?

25   A.  I see that.
```

K3BVHOR6

1   Q.  So if we were to compare apples to apples, the 85 cents

2   that PSE was offering here, plus all of the other fees that

3   they were charging Major Energy and were proposing with

4   novations, are you aware of how much they would actually be

5   charging to Major Energy?

6   A.  Well, if you look at this, I mean, it's quite a bit.

7   Q.  Certainly more than 85 cents?

8   A.  Certainly more than 80 cents or 85 cents.

9   Q.  Right.  80 or 85 cents.

10          But to be clear, Spark only charged Major Energy a

11  single fee the entire earnout period, and that was the sleeve

12  fee?

13  A.  That is correct.

14          MR. WILKERSON:  No further questions.

15          THE COURT:  All right.  Okay.

16          Thank you, sir.  You're done.

17          You may catch your flight.

18          (Witness excused)

19          THE COURT:  We're done for the day.

20          Tomorrow, am I correct that we have Konikowski and

21  Dudney?

22          MR. BROWN:  Yes, your Honor.

23          We were thinking there are three other witnesses we

24  wanted to add late.  No, I'm kidding.

25          THE COURT:  Nice.  Nice.

K3BVHOR6

1           MR. BROWN:  I apologize.

2           It's been a long eight days here.

3           THE COURT:  Not fair.

4           All right.  So what's your estimate of time for those?

5    How long do you think you're going to be with those two

6    witnesses?

7           MR. MAROONEY:  We think we're going to be quite short,

8    your Honor.  We have to kind of reconvene back -- but we think

9    it's going to be short.

10          MR. BROWN:  I can't imagine we will not be done by the

11   lunch break.

12          MR. MAROONEY:  I think that's fair.

13          THE COURT:  Okay.  Do you want to start at 9:30?

14          MR. BROWN:  Sure.

15          THE COURT:  Do you want to start at 10?

16          MR. BROWN:  Whatever your Honor prefers.

17          MR. MAROONEY:  Whatever you'd like.

18          MR. BROWN:  The less time you give us, the closer we

19   will end at lunch.

20          THE COURT:  We'll start at 9:30.  That works.

21          All right.  Have a good night, everybody.

22          (Adjourned to March 12, 2020 at 9:30 a.m.)

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     DAVID LEATHERS

 4    Cross By Ms. Pector  . . . . . . . . . . . .1665

 5    Redirect By Mr. O'Brien  . . . . . . . . . .1721

 6    Redirect By Mr. O'Brien  . . . . . . . . . .1757

 7    Recross Q. . . . . . . . . . . . . . . . . .1765

 8    MICHAEL KUZNAR

 9    Direct By Mr. Wilkerson  . . . . . . . . . .1785

10    Cross By Mr. Gabay . . . . . . . . . . . . .1786

11    Redirect By Mr. Wilkerson  . . . . . . . . .1809

12    Recross By Mr. Gabay . . . . . . . . . . . .1829

13     HEATHER MCGUINNESS

14    Direct By Ms. Pector . . . . . . . . . . . .1833

15    Cross By Ms. Corey . . . . . . . . . . . . .1834

16    Redirect By Ms. Pector . . . . . . . . . . .1839

17    Recross By Ms. Corey . . . . . . . . . . . .1851

18     CHRISTOPHER LEONARD

19    Direct By Mr. Wilkerson  . . . . . . . . . .1854

20    Cross By Mr. Marooney  . . . . . . . . . . .1855

21    Redirect By Mr. Wilkerson  . . . . . . . . .1891

22    Recross By Mr. Marooney  . . . . . . . . . .1917

23    Redirect By Mr. Wilkerson  . . . . . . . . .1921

24

25
```

```
 1                      PLAINTIFF EXHIBITS

 2     Exhibit No.                              Received

 3      14    . . . . . . . . . . . . . . . . .1721

 4     P357, 641, 483, 377   . . . . . . . . . .1765

 5     162, 129, 384, 135, 138, 139  . . . . . .1809

 6     380, 472, 500, 585, 680   . . . . . . . .1890

 7

 8

 9                      DEFENDANT EXHIBITS

10     Exhibit No.                              Received

11      170, 431, 813A, 813B, 813C, 1049 . . . . .1721

12      400   . . . . . . . . . . . . . . . . .1829

13      1006 and 1007A . . . . . . . . . . . . .1851

14      412, 414, 1014, 1018  . . . . . . . . . .1890

15      476, 958, 1004, 1008A, 1017A, 1046A,  . . . .1917

16             1065

17

18

19

20

21

22

23

24

25
```