UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAUL HOROWITZ, as Sellers'
Representative,

                                    Plaintiff,

-v-

NATIONAL GAS & ELECTRIC, LLC
and SPARK ENERGY, INC.,
                                    Defendants.

17-CV-7742 (JPO)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

J. PAUL OETKEN, District Judge:

This case arises out of the sale of the corporate entities collectively known as "Major

Energy."  Defendant National Gas & Electric, LLC purchased Major Energy and then

effectuated a dropdown of Major to Spark Holdco, Inc., a non-party affiliate of Defendant Spark

Energy Inc. ("SEI").  Plaintiff Saul Horowitz, a former owner of Major Energy suing as Sellers'

Representative, claims that the dropdown and related conduct violated the transaction

agreements governing the sale and deprived the Sellers of the benefit of certain contingent,

performance-based payments to which they were entitled.  He brings suit for breach of contract

against National Gas & Electric and breach of contract and tortious interference with contract

against SEI.[1]

A bench trial was held from March 2 to March 11, 2020.[2]  The Court now issues its

findings of fact and conclusions of law.

---

[1] The operative complaint also alleged a claim for fraudulent inducement, but this Court
dismissed that claim as duplicative of the breach-of-contract theory on September 24, 2018.  *See
Horowitz v. Nat'l Gas & Elec.*, No. 17 Civ. 7742, 2018 WL 4572244 (S.D.N.Y. Sept. 24, 2018).

[2] All parties waived their right to a jury trial on March 13, 2018.  (*See* Dkt. No. 35.)  The
bench trial was interrupted by the Covid-19 pandemic and the subsequent closure of the
courthouse.  Rather than resume the trial, the parties agreed to forego cross-examination of the

## I.    Findings of Fact

By way of summary, the Sellers' theory of the case is as follows.  In 2016, Defendant National Gas & Electric, LLC ("NGE") purchased the entities collectively known as Major Energy ("Major").  A significant component of the Sellers' compensation for the sale was paid in the form of performance-based incentives: Under the agreed-to scheme, the Sellers would receive payments determined by a pre-set formula that measured Major's success against preset EBITDA and customer-account benchmarks during a 33-month "earnout period."  NGE committed under the relevant contracts not to interfere with Major Energy's operations during the earnout period in a manner that might prejudice Major's ability to meet the benchmarks.

In spite of those obligations, according to Sellers, NGE assigned the relevant contractual rights and obligations to another entity, Spark Holdco, in August 2016.  The Sellers contend, among other things, that that putative assignment was void and undermined the Sellers' ability to continue to conduct business as usual.  Both NGE and the assignees, the Sellers claim, hamstrung Major Energy, undermined its performance, and in effect deprived the Sellers of their full performance-based contingent payments.  The Sellers also claim that after the dropdown, SEI — the other named Defendant, and a corporate affiliate of Spark Holdco — miscalculated the contingent payments under the contractually prescribed formula.

The Court finds the following facts by a preponderance of the evidence based on the written direct testimony, trial testimony, and documents admitted into evidence.

---

final two witnesses, whose testimony was received in written format subject to written objections.  (Dkt. No. 223.)

A.       **The Parties**

Defendant NGE is an operating energy services company ("ESCO") founded in 2015 and

wholly owned by William Keith Maxwell III.  (PX-298 at 7; PX-756 at 3; Tr. 263:19–20.)[3]

ESCOs act as for-profit alternatives to utilities, buying wholesale electricity and gas for retail

sale to residential and commercial customers.  (*See, e.g.*, Dkt. No. 166 ("Kroeker Witness

Stmt.") ¶¶ 14, 20.)  NGE is a private limited liability company.  (Tr. 1318:22–1319:5; Dkt. No.

151 ("Moeller Witness Stmt.") ¶ 65.)

Spark Energy Inc. ("SEI") is a publicly traded holding company.  (PX-298 at 7; DX-112

at 5; Kroeker Witness Stmt. ¶ 15.)  SEI's controlling shareholder is Maxwell.  (PX-756 at 3.)

SEI is the sole managing member of Spark Holdco, LLC ("Spark Holdco").  (PX-251 at 23; Tr.

261:5–7.)  And SEI's sole material asset is its equity interest in Spark Holdco.  (DX-112 at 35;

Kroeker Witness Stmt. (ECF No. 166) ¶ 12.)

Major Energy[4] is an ESCO that supplies electricity, natural gas, and other related

products and services to residential and commercial consumers in several U.S. states.  (PX-55 at

4; Dkt. No. 149 ("Wiederman Witness Stmt.") ¶ 9.)  Plaintiff Saul Horowitz is a former owner of

Major Energy, and he brings this suit as Sellers' Representative, on behalf of himself, Mark

Wiederman, Mark Josefovic, Asher Fried, Michael Bauman and their respective trusts and

related entities.  (DX-2 § 1.1.)

---

[3] "Tr." refers to the trial transcript.  "PX" refers to Plaintiff's exhibits.  Plaintiff's exhibits
were paginated for trial; each is marked using the following convention: PX-[Exhibit
Number].[Page Number].  The pincites used herein refer to those non-native page numbers, but
do not preserve that formatting convention.

"DX" refers to Defendants' exhibits.  Defendants retained their exhibits' native
pagination.  The pincites used herein therefore refer to the documents' native pagination.

[4] "Major Energy" or "Major" refers collectively to Major Energy Services, LLC, Major
Energy Electric Services, LLC, and Respond Power, LLC.  (*See* DX-1–DX-5.)

### B.      The Sale of Major Energy

Throughout late 2015 and early 2016, the Sellers negotiated a sale of Major Energy to

NGE, and on March 14, 2016, the Sellers accepted an offer to sell their 100% membership

interest in Major Energy.  (PX-106; DX-244; Wiederman Witness Statement ¶ 66.)  At the heart

of this litigation are three of the main agreements executed in connection with that sale: the

Membership Interest Purchase Agreement ("MIPA"), the Earnout Agreement, and the Executive

Earnout Agreement.

#### 1.      The MIPA[5]

The MIPA governed the sale of the Sellers' collective 100% membership interest in

Major Energy.  Its terms set forth the purchase price for Major Energy and detailed the structure

of NGE's payment to the Sellers.  Under those terms, NGE agreed to pay the Sellers $45 million

in cash, less a "Litigation Credit" of $5 million, plus three annual cash installments of up to $5

million, plus the working capital of Major Energy, net of a $2.225 escrow amount.  (MIPA

§ 2.2(a).)  In addition to those payments, Section 2.2(c) of the MIPA entitles the Sellers to

certain earnout payments, but does not define how those payments will be calculated, instead

stating that they are governed by the terms of the Earnout Agreement.  (MIPA § 2.2(c).)

Section 6.3 of the MIPA contains a representation and warranty by NGE that the

acquisition was "solely for [NGE's] own account for investment purposes and not with a view to,

or for the offer or sale in connection with, any distribution thereof."  (MIPA § 6.3.)  Consistent

with that representation, the MIPA contains a non-assignment provision in Section 11.7 that

provides, in relevant part:

---

[5] Both sides entered the MIPA as an exhibit, and citations to the "MIPA" therefore refer
alternatively to PX-632 or DX-980.

No assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly . . . , without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void.

(MIPA § 11.7.)

The MIPA does not have a prevailing party attorney's fees provision.

## 2.    The Earnout Agreement[6]

The Earnout Agreement sets forth the formula for the Sellers' earnout payments referenced in the MIPA.  Under Sections 2.1 and 2.2 of the Earnout Agreement, the earnout payments are calculated based on Major's performance during the 33 months following the sale, as measured by Major's EBITDA and customer accounts.  If Major met or exceeded each performance target during the earnout period, the Sellers would receive certain amounts in earnout payments.

Because a significant portion of the purchase price was therefore dependent on Major's performance during the earnout period, the Sellers bargained for certain limitations on NGE's operation of the company subsequent to the sale.  Specifically, Section 2.7 of the Earnout Agreement provided that NGE's "discretion to operate" Major Energy as it "deem[ed] appropriate" during the Earnout Period was subject to the following restrictions:

> [NGE] agrees, for the benefit of the Sellers, that: (i) [NGE] has a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities; (ii) [NGE] accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the

---

[6] Both Plaintiff and Defendants entered the Earnout Agreement as an exhibit, and citations to the "Earnout Agmt." therefore refer alternatively to PX-634 or DX-1.

operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies; and (iii) [NGE] shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to the Sellers hereunder. In furtherance of the foregoing (and not by way of limitation), [NGE] during the Target Years shall not unilaterally, directly or indirectly, and whether in one transaction or series of related transactions of any kind, make fundamental changes to the operating overhead or otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party.

(Earnout Agmt. § 2.7.)  Unlike the MIPA, which could not be assigned without the written consent of the Sellers, the Earnout Agreement was freely assignable to any NGE affiliate without the written consent of the Sellers.  (Earnout Agmt. § 3.1.)  Also unlike the MIPA, the Earnout Agreement allows a prevailing party in a suit thereunder — defined as a party who has "established that it was underpaid by at least fifteen percent" — to "recover from the other party all reasonable attorneys' fees incurred and all disbursements incurred by such prevailing party in connection with such action or proceeding."  (Earnout Agmt. § 3.7.)

3.    **The Executive Earnout Agreement**[7]

The Executive Earnout Agreement also sets forth how Major Energy was to be operated subsequent to the sale and the terms under which certain Major Energy managers could participate in the upside if Major Energy achieved or exceeded the performance targets.  (*See* Exec. Earnout Agmt. §§ 2.1–2.2.)

---

[7] Both sides entered the Executive Earnout Agreement as an exhibit, and citations to the "Exec. Earnout Agmt." therefore refer alternatively to PX-658 or DX-5.

Section 2.7 of the Executive Earnout Agreement is similar to Section 2.7 of the Earnout

Agreement, but also imposed a reciprocal duty of good faith and fair dealing on Major Energy:

> Buyer shall have the discretion to operate the Business of the Companies as Buyer deems appropriate . . . while the details of the day-to-day management of the operations of each of the Companies are delegated to the Senior Management Team . . . ; provided that Buyer agrees, for the benefit of the Companies, the Sellers, and the Senior Management Team, that: (i) Buyer and the Senior Management team jointly and severally have a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management team suggests operating the Companies going forward to adapt to new opportunities; (ii) Buyer accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before Closing or proposes to operate the Companies; (iii) Buyer shall not take or omit to take . . . any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to Sellers under the Earnout Agreement and/or to Managers under this Executive Earnout Agreement; and (iv) during the Target Years, Buyer shall not take or omit to take (or permit any of its Affiliates to take or omit to take), unilaterally, directly or indirectly, and whether in one transaction or a series of related transactions of any kind, any act that would (A) make fundamental changes to the operating overhead in a negative manner or (B) otherwise materially negatively impact the profitability of the Companies for the benefit of any related or unrelated party.

(Exec. Earnout Agmt. § 2.7.)  The Executive Earnout Agreement contained the same attorney's

fee provision as the Earnout Agreement.  (*See* Exec. Earnout Agmt. § 3.7.)

## II.    The Dropdown

Plaintiffs presented evidence that on May 3, 2016, NGE, Spark Holdco, SEI (as a

guarantor for Spark Holdco) and RetailCo LLC (as guarantor for NGE) executed the "Spark

MIPA."  (PX-750; Wiederman Rebuttal Stmt. ¶ 63.)  Pursuant to Section 2.1 of the Spark MIPA,

NGE agreed to sell, assign, or otherwise transfer its 100% membership interest in Major Energy,

along with all of its other rights and obligations under the MIPA and other transaction

documents, including the obligation to pay the potential earnout payments, to Spark Holdco. (PX-650, § 2.1.)

Section 8.2(y)(iii) of the Spark MIPA provides that "Buyer [Spark Holdco] shall have assumed all rights and obligations of Seller [NGE] pursuant to the Assignment."  (PX-650, § 8.2(c)(iii).)  "Assignment" is defined as the "Omnibus Assignment and Assumption Agreement" to be separately executed between NGE and Spark Holdco.  (PX-650, § 1.1.)  SEI assumed no express responsibilities to Sellers in the Spark MIPA and did not purport to take an ownership interest in Major Energy as a result of the Spark MIPA's written terms.  (DX-980.)

NGE executed the Omnibus Assignment and Assumption Agreement with Spark Holdco on August 23, 2016.  (DX-378; Gibson Witness Stmt. (ECF No. 162) ¶¶ 40–42; Lancaster Witness Stmt. (ECF No. 159) ¶ 103; Kroeker Witness Stmt. (ECF No. 166) ¶¶ 109, 117–121; Tr. at 332:1–12 (Kroeker Testimony).)  The Omnibus Assignment and Assumption Agreement provided in pertinent part:

> NGE has agreed to sell, assign, transfer, and convey the Major Interests and the rights and obligations of [NGE] under the [MIPA], the Escrow Agreement, the Escrow Disbursement Agreement, the Earnout Agreement, and the Executive Earnout Agreement (collectively, the "**_Conveyed Interests_**") to [Spark Holdco], and [Spark Holdco] desires to accept such sale, assignment, transfer, and conveyance of the Conveyed Interests.

(DX-999.)  The Omnibus Assignment and Assumption Agreement provided further that Spark Holdco "assum[ed] the burdens, obligations, and liabilities of [NGE] under the Prior MIPA, the Current MIPA, and the Transaction Documents."  (_Id._)  Major Energy was not a party to either the Spark MIPA or the Omnibus Assignment and Assumption Agreement and did not provide its written consent to the putative assignment of the transaction agreements.

The so-called "Dropdown" of Major Energy from NGE to Spark Holdco closed on August 23, 2016.  (Kroeker Witness Stmt. (ECF No. 166) ¶ 116.)

8

### III.    Major Energy's Post-Sale Performance

During the earnout period following NGE's acquisition of Major, Major underperformed the Earnout Agreement's benchmarks.

Whether and to what extent that underperformance was attributable to the Dropdown, NGE and/or SEI's conduct during the post-sale period, and calculation errors were among the major factual issues addressed by the parties at trial.  The Sellers claimed that the Dropdown violated the MIPA's non-assignment provision, that Defendants' conduct violated the Earnout Agreement's and Executive Earnout Agreement's requirements regarding Major's operation, and that those deviations from Major's modus operandi caused the business (and therefore the earnout payments) to suffer.  Sellers specifically presented evidence of several discrete episodes and decisions both pre-dating and post-dating the Dropdown that allegedly violated the Earnout and Executive Earnout Agreements.

As explained below, the Court concludes that following the Dropdown, neither NGE nor SEI was bound by the contractual provisions that Horowitz invokes under the Earnout Agreement and Executive Earnout Agreements.  Accordingly, Plaintiff's claims as to post-Dropdown conduct fail on grounds unrelated to the claims' factual underpinnings.  The Court also finds, however, that Plaintiff has failed to establish liability for breach of contract, causation, and damages as to Defendants' conduct even if those provisions did continue to apply.

### A.    The Breakdown of Major Energy's Supply Relationship with PSE

A decade before the sale, Major Energy had entered into a long-term credit and supply agreement with Pacific Summit Energy ("PSE"), which was consistently renewed upon expiration in the intervening years.  (PX-55 at 37; PX-51 at CDP00030835 (referring to a Base Contract for Sale and Purchase of Natural Gas dated November 16, 2006 between PSE and Major Energy); Horowitz Witness Stmt. ¶ 70; Wiederman Witness Stmt. ¶ 10.)  When NGE

acquired Major Energy from the Sellers in April 2016, the supply agreement between Major Energy and PSE was set to expire in March 2017.   (Alper Witness Stmt. ¶ 117; Wiederman Witness Stmt. ¶ 52; Moeller Witness Stmt. ¶ 85.)

Major Energy's senior management testified that notwithstanding occasional disagreements with PSE, they anticipated renewing the contract in order to extend the PSE supply relationship through the Earnout Period.   (Tr. 649:17–650:1; Wiederman Witness Stmt. ¶ 113; Horowitz Witness Stmt. ¶ 127; Alper Witness Stmt. ¶ 99; Moeller Witness Stmt. ¶ 22.) NGE, however, intended to terminate the PSE–Major supply relationship shortly after closing and to substitute Spark Holdco for PSE as Major Energy's supplier.   (Tr. 333:8–10; Tr. 841:13– 842:6; Tr. 1148:21–1150:17; PX-680; Horowitz Witness Stmt. ¶¶ 127–128; Alper Witness Stmt. ¶¶ 99, 176.)   To that end, only weeks after the closing, NGE directly communicated to PSE its intent to terminate the relationship at the expiration of the then-current contract term.   (PX-361; Tr. 1048:25–1049:12; Alper Witness Stmt. ¶ 118; Tr. 1042:7–10; Tr. 1042:19–1043:2; Tr. 1567:9–1568:4.)

According to the Sellers, that disclosure irreparably tainted the relationship between Major and PSE, and, eventually, despite attempts to negotiate a new PSE-Major Energy supply contract, the relationship terminated.   Major Energy later agreed to instead use Spark Holdco as their supplier.   The parties dispute whether the terms of the Spark Holdco agreement were more or less favorable to Major Energy than those offered by PSE in its negotiations.   (*See* DX-1008; Tr. 1899:21–1900:07, 1921:14–1923:13.)

The parties dispute whether NGE's notice to PSE was undertaken with Major Energy's consent or knowledge.   As on most issues, the Court found NGE's witnesses more credible on this issue and finds that Major Energy's senior management was aware of and involved in the

decision to replace PSE as supplier.  (*See, e.g.*, Kroeker Witness Stmt. (ECF No. 166) ¶¶ 200-219; DX 483.)  Moreover, there was clear evidence of ambivalence on the part of Major's management regarding its relationship with PSE, including what Wiederman called a threat of "extortion" by PSE.  (DX-962; *see also* DX-962.)  Indeed, PSE's final offer to renew its supply agreement with Major proposed worse pricing.  And Horowitz "agree[d]" to switch to Spark as its supplier.  (DX-483.)  The Court finds that nothing about Defendants' conduct with respect to PSE constituted a breach of contract.  And in fact, the Court finds that the termination of the PSE contract in favor of Spark resulted in cost savings for Major Energy.

## B.   The EMS Integration Project

When NGE acquired Major Energy, the Sellers touted their IT System, EMS, as a key selling point and asset that the Maxwell family of companies could use after the acquisition of Major Energy:

> Sellers tried to capitalize on a quick dropdown by creating a new selling point to incentivize NGE and the Spark companies to acquire Major Energy: Sellers advocated that they had built an efficient customer management system called EMS, which Major Energy could offer to the Spark family of companies as an efficiency and cost-saving device as soon as Major Energy was dropped down.

(Dkt. No. 157 ("Konikowski Witness Stmt.") ¶ 19.)

The Spark entities decided to pursue the integration, and by June 2016, Major Energy employees had engaged in extensive planning discussions concerning a Spark EMS integration, though some employees viewed the project as a distraction from their core work for Major Energy.  (Dkt. No. 150 ("Alper Witness Stmt.") ¶ 110; PX-169; PX-181; PX-613 at 17; PX-129; Tr. 1797:19–1800:3; PX-384 at 7.)  Over time, the EMS project created distraction and complaints within Major Energy.  (Tr. 1127:15–1128:2; Tr. 1296:12–1297:18; Tr. 1523:20–

1524:12; PX-169; PX-181; PX-135; PX-142; Alper Witness Stmt. ¶ 107; Moeller Witness Stmt.

¶¶ 53, 56–64.)

After months of planning meetings, tasks, and discussions, Major Energy began

integrating EMS into Spark during the first week of August 2016.  Within a month of the

kickoff, however, Dan Alper, Major Energy's then-CEO and lead on the EMS integration,

expressed to Nathan Kroeker, the then-CEO of SEI and Spark Holdco, that he believed the EMS

integration was a distraction for Major Energy's employees.  (See DX-400; Dkt. No. 161

("Kuznar Witness Stmt.") ¶¶ 30–32; Tr. at 1821:17–1822:23.)  On September 13, 2016, the

project co-lead on the Spark entities' side terminated the project.  (DX-403.)

The evidence at trial established that Major's senior management actively encouraged

and touted the EMS integration project — from before the Buyout Agreement up to and through

its implementation.  The idea that the project breached the contract, or that it somehow reflected

"bad faith" on the part of Defendants, is entirely unsupported.  In any event, when Alper and the

Sellers complained that the project was creating a "distraction" at Major Energy, Spark promptly

terminated the project.  (DX-403; Tr. 1824.)  And if that was not enough, Spark Holdco gave the

Sellers a $250,000 addback in connection with the EMS project.  The Court finds that there was

no breach of contract and no damages attributable to the EMS integration project.

C.      **Major Energy's Relationship with Residential Marketing Vendors and
        Commercial Brokers**

According to Major's senior leadership, residential marketing vendors were critical to the

success of the company's business, because Major did not employ internal sales staff and instead

relied on external residential marketing vendors to generate residential customer growth.

(Wiederman Witness Stmt. ¶ 22; Alper Witness Stmt. ¶ 177; Tr. 339:20–23, 341:6–11, 470:10–

14.)

Residential marketing vendors can refer new customers to many different ESCOs, and therefore fostering and developing strong relationships with vendors is crucial to an ESCO's business.  (Tr. 653:5–8; Tr. 494:9–10.)  During the pre-Dropdown period, Major Energy received several complaints from its existing residential marketing vendors and commercial brokers about the Spark family of companies.  (*See, e.g.*, PX-215; PX-567; PX-184; PX-185.)  Some existing marketing vendors perceived Spark as having a poor reputation in the business and expressed concern about any Spark control over Major.

Several times during the pre-Dropdown period, Major perceived individuals affiliated with Spark to be interfering with its relationships with residential vendors.  For example, in May 2016, Major personnel were informed by PTM, an important Major vendor, that its sales representatives were being solicited to sell for Spark in New York City and that PTM's representatives were being offered higher commissions to sell for Spark than for Major.  As a result, PTM attempted to renegotiate PTM's agreement with Major Energy to match the higher commissions being offered by Spark.  (PX-215; Wiederman Witness Statement ¶¶ 126–127; Wolbrom Witness Statement ¶¶ 68–73; Tr. 653:9-657:10; Tr. 786:15–790:15; Tr. 1570:25–1572:20.)  Similarly, in May 2016, Spark attempted to poach Bill Siveter of Platinum Advertising LLC, another of Major Energy's vendors at the time.  (PX-221; Tr. 655:16-22.)

On the commercial side, Major Energy relied on commercial brokers to identify and refer new commercial customer relationships to Major Energy.  (Tr. 855:24-856:14; Horowitz Witness Statement ¶ 64; Wolbrom Witness Statement ¶ 25.)  Major believed that its relationships with commercial brokers and its turnaround time in providing pricing to its brokers were important factors in Major Energy's ability to expand its commercial business.  (Tr. 657:11-658:1; Wiederman Witness Statement ¶¶ 27, 29.)  Beginning as early as May 2016, commercial brokers

started contacting Major Energy's internal broker team, including Amir Benisti and Bruce Shipper, requesting assurances that they would continue to be dealing with Major Energy and not Spark given Spark's poor reputation in the commercial space. (Wiederman Witness Statement ¶¶ 128-129; Moeller Witness Statement ¶¶ 82-84; PX-567.) Benisti, who worked directly with Major Energy's commercial brokers, testified that "[a] lot of the brokers were very concerned" and that those brokers "had previous interaction with Spark, and they were not very excited about the sale, and were concerned that Major was eventually just going to become Spark." (Tr. 867:2-868:13.)

Despite anecdotal and speculative testimony by Plaintiff's witnesses, Plaintiff failed to prove that any broker actually stopped doing business with Major Energy as a result of Defendants' conduct or the Dropdown. In fact, the evidence showed that Major had more brokers at the end of the Earnout Period than at the beginning. (Tr. 1902; PX-758.) Major's commercial customer count also grew during the period, peaking in May 2018. (DX-914a.) Moreover, Major Energy retained its autonomy to set prices offered to brokers and customers during the period.

The Court finds that Plaintiff failed to establish any breach of contract on the part of Defendants with respect to vendor and broker relationships. The Court also finds that neither the evidence at trial nor Leathers' testimony established, with reasonable certainty, that the Sellers suffered any damages caused by Defendants with respect to Major Energy's broker and vendor relationships.

### D.    Other Alleged Breaches

Plaintiff contends that Defendants breached Section 2.7 in certain other respects through conduct that played out after the Dropdown.

First, Plaintiff challenges SEI's rejection of the single aggregation deal proposed by Major Energy's executive team. An aggregation deal is a bidding process in which retail energy companies bid to service an entire block of customers (*e.g.*, all customers in a township) at a low retail price, with no upfront cost to the retail energy company. Major Energy had never won an aggregation deal prior to the sale to NGE. Moreover, Major Energy's own management believed that the aggregation deal was too risky for the company. (Tr. 1279 (Moeller); Leonard Witness Stmt. ¶ 48.) Defendants' conduct was not a breach of Section 2.7 because aggregation deals were not "business as usual" for Major Energy. Nor did Plaintiff establish by a preponderance of the evidence that Major would have won the deal or that there were any non-speculative damages.

Second, Plaintiff argues that Defendants breached Section 2.7 by interfering with Major Energy's mass marketing vendor relationships (with, for example, PTM, Platinum, 5Linx, and DSS). However, the evidence at trial failed to establish any conduct by Defendants amounting to such interference. As Wiederman testified, "it's just the nature of the business that vendors come and go." (Tr. 532.) There was simply no non-speculative evidence of bad faith or other contract-violative conduct by Defendants showing causation or damages with respect to changes in mass marketing vendors.

Third, Plaintiff has alleged that Defendants interfered with Major Energy's relationships with its own employees. At trial, however, there was no credible evidence of such interference. The only evidence of Major employees who departed during this period involved Elliot Wolbrom, Nechemia Schorr, and Esther Moeller. None of these individuals were "Key Employees" or "Senior Management." The Court finds that none of these employees departed due to any improper conduct by Defendants. They left voluntarily, and Major Energy's

management made little or no effort to retain them.  The evidence shows by a preponderance that (1) Wolbrom left largely due to dissatisfaction with Alper and other internal issues; (2) Schorr left in part because he was unhappy with his salary; and (3) Esther Moeller voluntarily left for her own reasons, not for any reasons causally attributable to Defendants or the Dropdown.  Nor was there evidence showing any quantifiable damages attributable to these employees' departures.

## IV.    Conclusions of Law

### A.    Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Horowitz is a citizen of New York, NGE is a citizen of Texas (as its sole member is a citizen of Texas), and SEI is a citizen of Texas and Delaware.  The amount in controversy exceeds $75,000.  (*See* Dkt. No. 22 ("Am. Compl.") at ¶¶ 8, 10–11, 13; Dkt. No. 117 ("First Am. Answer") ¶¶ 8, 10–11.)

### B.    Choice of Law

The parties agree that New York law governs the legal issues discussed herein.  *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (the fact that "the parties agree that New York law controls . . . is sufficient to establish choice of law").

### C.    Breach of Contract

Horowitz asserts several breach-of-contract claims against both Defendants.  The Court concludes that the assignment of the MIPA to Spark Holdco constituted a breach of the MIPA, but that the Sellers are not entitled to rescissory damages; that the contract claims against SEI fail because it was not a party to any of the agreements at issue; and that the remaining breach-of-contract claims fail because Plaintiff has not proven breach, causation, or non-speculative damages by a preponderance of the evidence.

16

### 1.    Section 11.7 of the MIPA

#### a.    Breach

Under the MIPA, the Sellers agreed to sell their membership interests in Major Energy in exchange for certain payments from NGE.  Neither Spark Holdco nor SEI was a party to that agreement.  Defendants claim that the Dropdown — which purported to transfer NGE's interest in Major to Spark Holdco — violated the MIPA's non-assignment provision, which states:

> No assignment of this Agreement or of any rights or obligations hereunder may be made by any Company, any Seller or Buyer, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void.

(MIPA § 11.7.)

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992).  Thus, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).  Extrinsic evidence of the parties' intent "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 580 (N.Y. 1969)); *see also Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).  These well-settled rules of contract construction apply with equal force in interpreting and enforcing an unambiguous anti-assignment provision.  *See, e.g., Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 467 (S.D.N.Y. 2018).

Section 11.7 of the MIPA plainly and unambiguously prohibited any assignment to Spark Holdco of the rights and obligations under the MIPA without the Sellers' written consent.  The evidence at trial showed that Sellers never provided their written consent to the assignment, but Defendants proceeded and effectuated it anyway through the Spark MIPA and the Omnibus Assignment and Assumption Agreement.

In the face of that plain language, and those virtually uncontroverted facts, Defendants respond that the *Earnout Agreement* permitted assignments, without consent, to certain "Affiliates."  But the Earnout Agreement neither modified Section 11.7 of the MIPA nor constituted consent under it.  The Earnout Agreement's provision permitting assignments without the Sellers' consent applies solely to "This Agreement" — that is, the Earnout Agreement, not the MIPA.  Likewise, the MIPA's assignment provision applies only to "this Agreement" — that is, the MIPA, not the Earnout Agreement.  Because the two agreements allocated different rights and duties — the Earnout Agreement pertained to the operation of Major Energy and the calculation of contingent payments therefor, whereas the MIPA pertained to the ownership of the company — the two assignment provisions do not conflict and can both be given effect.  *See, e.g.*, *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) ("General canons of contract construction require that 'where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect.'  'This [doctrine] applies with equal force . . . where one [document] incorporates the terms of the other.'" (quoting *Proyecfin de Venez., S.A. v. Banco Indus. de Venez., S.A.*, 760 F.2d 390, 395–96 (2d Cir. 1985) (first alteration in original)).  There is no basis on which to conclude that the assignment provision of the Earnout Agreement displaces or supersedes the MIPA's unambiguous non-assignment provision.

b.       **Affirmative Defenses**

Defendants raise the affirmative defenses of ratification, waiver, and estoppel in response to Horowitz's claim for breach of Section 11.7, contending that Horowitz and the Sellers accepted benefits and accommodations from SEI during the Earnout Period, and, consequently, ratified or waived any objection to the assignment.

Those defenses, however, are unavailable as a matter of law.  A party may not assert equitable defenses as a means of overcoming a breach of a non-assignment provision that expressly declares the assignment *void* (as distinguished from one that merely creates a covenant not to assign).  *See* 6A N.Y. Jur. 2d Assignments § 42 (2d ed. 2019) ("[A] void assignment may not be subsequently ratified." (citing *Knight v. Knight*, 182 A.D.2d 342, 345 (3d Dep't 1992)); *see also Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001) ("[E]quitable defenses are unavailable when the rights being pressed by a party are based upon a void document.");  *Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99 Civ. 2638, 1999 WL 1277243, at *4-5 (S.D.N.Y. Dec. 30, 1999).  Assignments "made in contravention of a prohibition clause in a contract are void if the contract contains clear, definite and appropriate language declaring the invalidity of such assignments," *LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*, 287 F.R.D. 230, 235 (S.D.N.Y. 2012) (quoting *Macklowe v. 42nd St. Dev. Corp.*, 566 N.Y.S.2d 606, 606 (1st Dep't 1991)), like the phrase "shall be void."  *Allhusen v. Caristo Constr. Corp.*, 103 N.E.2d 891, 893 (N.Y. 1952).  Here, the non-assignment provision unambiguously stated that any "assignment without the required consents shall be void," and expressed a clear intention to render void any non-consensual assignment.  The Dropdown to Spark Holdco, in violation of Section 11.7, therefore created an incurable legal nullity to which Defendants' affirmative defenses do not apply.

       c.       **Remedy**

The Sellers falter, however, in maintaining that rescissory damages are the appropriate

remedy for NGE's breach of MIPA Section 11.7.  The claim for rescissory damages reflects a

misunderstanding of the significance of the determination that the assignment is void and a

mismatch between their claimed damages theory and the breach shown.

First, in arguing for rescissory damages, the Sellers elide the difference between a *void*

obligation and a *voidable* obligation.  "'Voidable' contracts are subject to rescission, but

otherwise create legal obligations," whereas "'[v]oid' contracts produce no legal obligation" at

all.  *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005) (alterations, quotation marks, and citation

omitted); *see also Whipple v. Brown Bros. Co.*, 225 N.Y. 237, 243 (1919) ("'[I]f the order was

voidable merely . . . defendant had his election to rescind . . . ; but if, under the finding of the

jury, the order was void, rescission was unnecessary to defeat plaintiff's claim.") (quoting

*Jewelry Co. v. Darnell*, 113 N.W. 344, 344 (Iowa 1907)).  Rescission — and, accordingly,

rescissory damages, which are a substitute for rescission, *see MBIA Ins. Corp. v Countrywide

Home Loans, Inc.*, 936 N.Y.S.2d 513, 523 (Sup. Ct. 2012); *Syncora Guar. Inc. v. Countrywide

Home Loans, Inc.*, 935 N.Y.S.2d 858, 869 (Sup. Ct. 2012) — is not a remedy for a void contract,

because irrespective of whether the contract is rescinded, it has no legal effect.  The assignment

of the MIPA to Spark is a nullity, even without the Court's remedial intervention.

Second, the thing Sellers claim should be rescinded — the assignment of the MIPA's

rights and obligations to Spark Holdco — is not a contract to which Sellers are a party.  They

therefore have no right to seek its rescission or to collect damages as a substitute for its

rescission.  Of course, as already explained, the attempted assignment *is* a breach of Section 11.7

of the MIPA, to which the Sellers are parties, and in theory the Sellers may have suffered

recoverable damages flowing from that breach.  But the damages for any such breach are not

*rescissory* damages, because they are not designed to serve as a substitute for the rescission of any contract between Sellers and NGE and to restore the Sellers to the position they would have inhabited had Sellers not entered into that contract. Instead, the damages to which the Sellers would be entitled would be regular contract damages — say, the expectation damages necessary to put the Sellers in the position they would have inhabited had the MIPA been performed without that breach. But the Sellers have not advanced any damages theory — tied to the Dropdown — that fits that bill.

Horowitz cites *Richard A. Hutchens CC, L.L.C. v. State of New York*, 872 N.Y.S.2d 734 (3d Dep't 2009), for the proposition that rescission is the "usual remedy for a void assignment." (Dkt. No. 226 ¶ 498.) But that case holds no such thing. In *Richard A. Hutchens*, a party who breached a non-assignment clause argued that "the exclusive remedy for [that] breach . . . was the nullification of [the assignment,] as opposed to rescission of the entire [underlying] agreement." 872 N.Y.S.2d at 739. The Court rejected that contention based on an analysis of the contract's specific terms and awarded rescissory damages *on the underlying contract that contained the non-assignment provision. See id.* At most, *Richard A. Hutchens* stands for the proposition that a plaintiff suing for a breach of a non-assignment provision may be entitled to both recision of (or rescissory damages on) the *underlying* contract *and* a determination that the assignment agreement is void. But here, the Sellers are not seeking rescissory damages on the underlying, breached contract (the MIPA), as in *Richard A. Hutchens*, but rather on the (void) assignment agreement to which they are not a party. The case is therefore inapposite to Sellers' claimed theory. Moreover, the *Richard A. Hutchens* court awarded rescissory damages on the underlying agreement based on the specific finding that the breach of the anti-assignment provision was a material breach of that contract. *See id.* Here, in contrast, Horowitz has neither

argued nor shown that the breach of the MIPA's anti-assignment provision was a material breach for which rescission was an available and justified remedy.  Accordingly, the Court cannot award rescissory damages.

> ### 2.   The Earnout Agreement and Executive Earnout Agreement

Next, Horowitz asserts claims against NGE and SEI under the Earnout Agreement and the Executive Earnout Agreement, arguing that NGE and SEI improperly calculated the contingent payments due to the Sellers and failed to comply with the contracts' obligations regarding Major's management.  With the exception of the pre-Dropdown claims against NGE, however, these claims fail for one basic reason:  neither SEI nor NGE was bound by the relevant contracts.

> #### a.   SEI's Relationship to the Earnout Agreement and Executive Earnout Agreement.

As to SEI, it is undisputed that it was not a signatory to the original transaction agreements or to the substantive terms of the Spark MIPA, which assigned NGE's obligations under the Earnout Agreement and the Executive Earnout Agreement to Spark Holdco.  (*See* Spark MIPA § 8.2(c)(iii).)  Instead, SEI signed the Spark MIPA only in its capacity as Spark Holdco's parent and *for the limited purpose of serving as guarantor of Spark Holdco's obligations to NGE.  (See* DX-980, § 7.17; *see also id.* at SPRK-NGE0050444 ("As signatory for the limited purposes of agreeing to issue the Shares and to grant registration rights as set forth in Section 8.2(c) and Section 2.2(c), if applicable, and agreeing to issue the SEI Guaranty pursuant to Section 7.17").)  Horowitz therefore faces an uphill climb in demonstrating SEI's liability, given the foundational rule that, "[i]n general, if an entity is not a party to a contract, no valid breach of contract claim exists against that entity." *Hotel Aquarius B.V. v. PRT Corp.*, No. 92 Civ. 4498, 1992 WL 391264, at *6 (S.D.N.Y. Dec. 22, 1992); *see also Ferring B.V. v. Allergan,*

*Inc.*, 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract.").

Because SEI was not by the contract's terms a party to the relevant obligations, Horowitz resorts to arguing that notwithstanding the written terms, SEI is in privity with the Sellers because it manifested an intent to be bound by the Spark MIPA. New York courts have indeed sometimes found parent corporations liable on their subsidiaries' contracts where the parent "manifest[ed] an intent to be bound." *See Horsehead Indus. v. Metallgesellschaft AG*, 239 A.D.2d 171, 172 (1st Dep't 1997). "The best evidence of what parties to a written agreement intend," however, "is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (quoting *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992)). And unlike the contracts at issue in the manifest-intent cases that Plaintiff cites, the contract at issue here *expressly cabined SEI's obligations to its role as guarantor*. It is therefore distinguished from cases in which a contract is merely *silent* as to a parent corporation's obligations. Moreover, though a "manifest intent to be bound" may be inferred "from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes," *Horsehead Indus.*, 239 A.D.2d at 172, the touchstone of this inquiry is the "totality of its expressed words and deeds." *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009). In the face of the contract's express limitation of SEI's liability, the Court cannot discern an implicit, countervailing "manifest intent to be bound" from the totality of the circumstances.

Plaintiff has not established the requirements for veil-piercing or treating SEI as an alter ego of Spark Holdco under New York law. *See, e.g., Cary Oil Co. v. MG Refining & Marketing,*

*Inc.*, 230 F. Supp. 2d 439, 458 (S.D.N.Y. 2002).  The evidence at trial did not prove by a preponderance that SEI exercised "complete domination and control" over Spark Holdco, that such domination was used to commit a fraud or wrong, or that SEI in any way abused the corporate form.

The Court also concludes that Defendants did not waive or forfeit this point in their Amended Answer.  Rather, the Amended Answer put Plaintiff on notice that he "lacks standing to sue [SEI] for breach of contract because [SEI] did not enter into a contract with Plaintiff . . . ." (Dkt. No. 117.)

For these reasons, the Court concludes that SEI cannot be held liable for the asserted breaches of the Earnout and Executive Earnout Agreements.

> **b.**   **NGE's Liability for Breaches of the Earnout Agreement and Executive Earnout Agreement**

Similarly, NGE cannot be held liable for asserted breaches arising out of its *post*-Dropdown conduct, because it was not bound by the Earnout Agreement's and Executive Earnout Agreement's terms after the (valid) assignment of those agreements to Spark Holdco. Horowitz does not dispute that the claims with respect to the post-Dropdown conduct arise out of the Earnout Agreement and the Executive Earnout Agreement, that the assignment of those contracts was valid, and that the effect of the assignment was to terminate any obligations NGE had thereunder.[8]

---

[8] It bears noting that on this front that Horowitz may concede too much.  It is hornbook contract law that "when rights are assigned, the assignor's interest in the rights assigned comes to an end, but [w]hen duties are delegated, . . . the delegant's obligation does not end." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977). Defendants, invoking Judge Rakoff's observation that "an assignee or successor will not be bound to the terms of a contract absent an affirmative assumption of the duties under the contract," *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 494 (S.D.N.Y. 2011), miss the point: an obligor may validly delegate her duties, but ordinarily, even with such a delegation, she remains liable for any breach of those duties.  In other words, under a traditional understanding

In any event, even if NGE continued to be bound by the Earnout Agreement and Executive Earnout Agreement after the Dropdown, the Court concludes — based on the findings above and further conclusions below — that Plaintiff has failed to establish a breach, causation, or non-speculative damages.

Again, the Earnout Agreement provided that NGE "shall have the discretion to operate the Business of the Companies as [NGE] deems appropriate" — subject to the following limitations:

> (i) Buyer has a duty of good faith and fair dealing nonetheless to operate the Business of the Companies, in all material respects, throughout the Target Years such that the Companies are operated consistently with how the Senior Management Team operated the Companies before the Closing and/or how the Senior Management Team suggests operating the Companies going forward to adapt to new opportunities; (ii) Buyer accordingly shall, in good faith, consult in advance and collaborate with the Senior Management Team in respect of any Buyer-proposed change or modification to the operations of any Company which would be materially inconsistent with how the Senior Management Team operated such Companies before the Closing or proposes to operate the Companies; and (iii) Buyer shall not take or omit to take (or permit any of its Affiliates to take or omit to take), directly or indirectly, any actions in bad faith that have the purpose of avoiding or reducing, or that would be reasonably likely to have the inevitable effect of avoiding or reducing, any of the payments becoming due to the Sellers hereunder. In furtherance of the foregoing (and not by way of limitation), Buyer during the Target Years shall not unilaterally, directly or indirectly, and whether in one transaction or

---

of the applicable contract-law principles, even if there were a valid delegation to Spark Holdco, NGE would have remained obligated on its duties under the agreements. Typically, only a *novation*, which requires the consent of the obligee, may extinguish an obligor-delegator's duties under a contract. *See, e.g., Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 490 (S.D.N.Y. 2002). Yet Defendants have asserted in their written submissions no fewer than three times — first in their motion for summary judgment, then in their pretrial memorandum of law, and then in their post-trial memorandum of law — that NGE's duties terminated when it effectuated a valid delegation to Spark Holdco. (See Dkt. No. 190 at 31; Dkt. No. 227 at 98–99; Dkt. No. 228 ¶ 35). Not once has Plaintiff disputed that understanding of the assignment's effect, despite the voluminous briefing in the matter, ample notice that it was at issue, and its centrality to the Sellers' recovery. Accordingly, Horowitz has forfeited any contrary argument.

> series of related transactions of any kind, make fundamental changes
> to the operating overhead or otherwise materially negatively impact
> the profitability of the Companies for the benefit of any related or
> unrelated party.

(Earnout Agmt. § 2.7.)

An initial question is whether the operative language of the Earnout Agreement is "complete, clear and unambiguous on its face," in which case it "must be enforced according to the plain meaning of its terms." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) (citation omitted) (applying New York law). If the contract is ambiguous, extrinsic evidence may be considered "to ascertain the correct and intended meaning" of its terms. *Id.* at 179. Ambiguity exists where a contract term "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (citation omitted) (applying New York law).

Section 2.7 is a classic case of ambiguous language in a contract — and a recipe for protracted litigation. Plaintiff, of course, emphasizes the language requiring NGE to "operate the Business . . . in all material respects, consistently with how the Senior Management Team operated [it] before the Closing and/or how the Senior Management Team suggests operating [it]" — framing this provision as a "business as usual" duty. Defendants, on the other hand, highlight Section 2.7's multiple references to the duty of "good faith" and language prohibiting actions that are in "bad faith." Because this language is ambiguous, the Court considers extrinsic evidence in applying its terms to the parties' dispute. The evidence at trial did not establish with any real clarity exactly how the parties mutually understood Section 2.7 — that is, precisely what

matters are "material"; what aspects of the business must be operated "consistently" after the closing; which "suggest[ions]" of Major management NGE had to follow; and, of course, how all of this coexists with the provision that NGE "shall have the discretion to operate the Business of the Companies as [NGE] deems appropriate."

Based on the contractual language and all the extrinsic evidence, the Court finds and concludes (1) that Section 2.7 imposed a generalized duty on the part of NGE not to make major changes to the way Major Energy had been operated in significant respects without consulting with senior management of Major, (2) that this duty was cabined by the traditional notions of good faith and fair dealing, and (3) that NGE had a particular duty not to take actions intended to unreasonably reduce the earnout payments due to the Sellers during the Earnout Period.

As a general matter, based on this understanding of Section 2.7, the Court finds and concludes that Defendants did not breach the parties' agreement.  The evidence at trial established that Defendants acted professionally, reasonably, and in good faith in dealing with the Sellers.  The evidence did not show that Defendants took action that was intended to or had the effect of unreasonably or unfairly reducing the earnout payments — and Plaintiff certainly did not establish such conduct in a way that proved causation or damages with reasonable certainty.

The Court now turns to the specific allegations of breach by Plaintiff.

*Pre-Dropdown.*  Horowitz contends that Section 2.7 of the Earnout Agreement was violated by NGE's pre-Dropdown conduct in several respects: (a) Spark's EMS integration project sapped Major's resources by distracting employees and did not serve Major's interests as it was Spark, not Major, that stood to gain from the integration; (b) NGE's affiliation with Spark harmed Major's relationship with residential marketing vendors because of Spark's poor

reputation and untoward conduct with vendors; (c) commercial brokers that Major had previously worked with began expressing concern about the ties to Spark; (d) NGE sullied Major's decade-long relationship with PSE, stymieing Major's ability to renegotiate a more favorable credit and supply agreement; and (e) Spark's decision not to pursue an aggregation deal harmed Major Energy.

As set forth in the Court's findings above, Plaintiff did not establish by a preponderance of the evidence that Defendant breached the agreements in any of these respects.

In any event, even if Plaintiffs had shown that Defendants had breached the agreements, the Court still cannot conclude that Horowitz has carried his burden on his claims.  A party asserting a breach of contract claim must prove each element — including damages — by a preponderance of the evidence.  *Republic Corp. v. Procedyne Corp.*, 401 F. Supp. 1061, 1068 (S.D.N.Y. 1975).  Under New York law, causation is an essential element of damages in a breach of contract action.  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52–53 (2d Cir. 2011) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."); *accord Bank of Am., N.A. v. Bear Stearns Asset Management*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013).  General damages "are the natural and probable consequence of the breach" of a contract.  *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 22 N.Y.3d 799, 805–06 (2014).

To prove general damages under New York law, the plaintiff must show (i) the fact or existence of damages to a "reasonable certainty" and, if the fact or existence of damages is proven, (ii) "a 'stable foundation for a reasonable estimate' [of damages] incurred as a result of the breach."  *Holland Loader Co., LLC v. FLSmidth A/S*, 769 F. App'x. 40, 42 (2d Cir. 2019).

"The first prong concerns causation, while the second prong speaks to the amount of damages."
*Id.*  In other words, "damages may not be merely speculative, possible or imaginary, but must be
reasonably certain and directly traceable to the breach, not remote or the result of other
intervening causes."  *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986).

      Horowitz's general theory of damages and causation is that NGE's conduct harmed
Major's EBITDA and customer accounts performance during the earnout period, decreasing
Sellers' eventual earnouts.  But Plaintiff has failed to adduce any evidence that would permit the
Court to conclude that NGE's conduct catalogued above affected the Sellers' bottom line.

      Regarding the EMS integration project, David Leathers, Horowitz's damages expert, did
not attempt to quantify or even opine specifically on damages attributable to the project.  The
seven-week EMS integration project caused some disruption, as any such project does, but it was
not a breach of contract, and did not lead to any recoverable damages, because (1) Major
Energy's managers, including certainly Alper, encouraged and supported the project, (2) Spark
provided the Sellers with a $250,000 addback to Adjusted EBITDA to account for any disruption
from the project.

      As to the loss of residential vendors, Leathers' opinions did not distinguish between the
effects of NGE's alleged pre-Dropdown interference and Spark's alleged pre- and post-
Dropdown interference.  Indeed, this omission is particularly problematic because the evidence
adduced at trial even arguably suggesting negative effects on residential vendor relationships
pertained overwhelmingly —seemingly exclusively — to Spark, not NGE.  Horowitz's main
theory as to how *NGE* deleteriously affected residential vendor relationships was that NGE's
affiliation with the Spark family of companies caused early concern among vendors because of
Spark's reputation. Horowitz also has not persuasively explained how the mere fact of NGE's

affiliation with the Spark family of companies — which Sellers were fully aware of before the acquisition — could constitute a breach by NGE of the relevant agreements' provisions regarding management of Major.  Given both the complete absence of evidence specifically showing damages from NGE's alleged interference with vendor relationships, and the de minimis role NGE played in any interference, Plaintiff has failed to carry his burden of showing either the fact or amount of damages flowing from NGE's alleged disruptions to vendor relationships.

For similar reasons, Horowitz has failed to carry his burden as to causation and damages flowing from NGE's purported interference with commercial brokers.  As to commercial brokers, Leathers opined that "Major Energy's relationships with its vendors were significantly affected by the change in ownership to *Spark*," because of Spark's "poor industry reputation" and because "Spark only exacerbated that hesitation by intruding into certain vendor relationships and forcing certain vendors to deal with Spark personnel instead of the Major Energy employees who had managed the relationships."  (Leathers Witness Stmt. ¶¶185–186.) His opinion does not address at all, however, how *NGE*'s conduct contributed to the damages caused by the deterioration of the commercial broker relationships, nor what damages are attributable thereto.  Moreover, again, any alleged "reputational damage" tied to the Spark family of companies does not give rise to a breach of these agreements because the Sellers voluntarily chose to join that family in agreeing to sell Major to NGE.

With respect to the PSE relationship, the Court finds, as explained above, that Plaintiff has failed to establish a breach of contract, and he has certainly failed to establish causation and damages.  Plaintiff has not proven any harm flowing from Major Energy's transition from PSE's to Spark Holdco's credit support arrangement; to the contrary, Major saved money.  Plaintiff's

expert, Leathers, did not quantify any specific damages relating to the change in the PSE relationship.  His conclusions about "general disruption" failed to establish causation or damages in a reliable, non-speculative way.

With respect to the aggregation deal, as found above, this was not something Major Energy had done previously, it was deemed to be risky by Major Energy's own management, and the decision not to bid on it was not a breach of contract.  Moreover, neither the evidence at trial nor Leathers established (1) that Major would in fact have won the aggregation deal at issue or (2) that the deal would have made business sense at the time.  Any damages on this issue are speculative.

*Post-Dropdown.*  Plaintiff also sought to show that after the Dropdown, Defendants breached Section 2.7 by (1) interfering with Major Energy's mass marketing vendor relationships and (2) interfering with Major Energy's relationships with its own employees.

With respect to mass marketing vendors, as noted above, Plaintiff failed to establish by a preponderance of the evidence that Defendants "interfered" with such relationships, as opposed to offering evidence of vendors that "come and go" in the normal course of business.  Moreover, neither the evidence at trial nor Leathers' testimony established reliably that lower customer counts in 2016-2018 were *caused* by Defendants' conduct or by the Dropdown.  Among other problems, the lower customer counts during this period were likely attributable in significant part to other factors including (1) deterioration in the market for retail energy providers in Major Energy's geographic areas, and (2) regulatory issues faced by Major Energy during the period. Furthermore, as noted, a significant reason that customer count targets were not met during the Earnout Period was that the targets were overly aggressive.  Supposed damages on this issue are speculative and not established with reasonable certainty.

Plaintiff's argument about alleged "interference" with Major's own employees is even more speculative. In addition to there being no credible evidence at trial of any interference by Defendants, there was no reliable proof of causation or damages.

### 3.    Section 2.2 of the MIPA

As explained above, the Earnout Agreement and Executive Earnout Agreement — unlike the MIPA — were assignable. But because NGE assigned those agreements to Spark Holdco, Plaintiff has sued the wrong party in naming SEI. As a result, Plaintiff's claim based on alleged miscalculation of the earnout payments — brought under Section 2.2 of the Earnout Agreement against SEI — fails as a matter of law. Nor has Plaintiff properly pursued this theory against NGE, given its rescissory damages theory and the related issues addressed above. (*See supra* pp. 24-25 & note 8.)

But what about Section 2.2 of the *MIPA*? That provision also addressed the earnout payments due to the Sellers in connection with the purchase price. Although Section 2.2 did not include the detailed formula for calculating the earnout payments, it effectively incorporated that formula by referencing the Earnout Agreement. And because the MIPA was *not* assignable, one could argue that any miscalculation of the earnout payments would constitute damages suffered by the Sellers flowing from NGE's improper assignment of the MIPA — and thus damages the Sellers could recover from NGE under 2.2 of the MIPA. For reasons explained earlier, the Court does not find Plaintiff to have pursued this damages theory against NGE.

Even if Plaintiff had pursued this theory, however, the Court concludes that Spark Holdco's calculation of the earnout payments was correct. First, Section 2.2(c) of the MIPA incorporates the relevant portions of the Earnout Agreement, providing that the earnout terms and conditions "are more fully set forth in the Earnout Agreement." Section 2.2(b) of the

Earnout Agreement, in turn, is clear and unambiguous, requiring the exclusion of the first quarter of 2016 Adjusted EBITDA from the calculation of the earnout component of the Contingent Payment for Target Year 2016.  This is consistent with the context and the other credible evidence, as the Sellers had received the benefit of the first quarter of 2016 before closing.  (Tr. 177.)  The Court agrees with Defendants and credits the testimony of Lancaster, Holloway, and Lane regarding the proper calculation of the earnout payments under the plain language of Section 2.2.  (DDX-1.)  Plaintiff's calculations of the proper earnout methodology shifted over time, and Leathers' final calculation reflects a methodology that the Sellers never used in 2016.

Plaintiff's argument that Exhibit B to the Earnout Agreement controls the earnout calculation is unpersuasive.  First, Exhibit B (unlike Exhibit A) is not expressly incorporated in the agreement.  Second, Exhibit B does not take account of the clear language of Section 2.2(b).  And third, relying on Exhibit B as the guide for the earnout would lead to absurd results.  (Dudney Witness Stmt. ¶ 69; Tr. 1717.)  Finally, Spark Holdco's overpayment to the Sellers in Target Year 2016 occurred in the context of threatened litigation, and in any event it does not overcome the plain language of the agreement.

### D.  Tortious Interference

Under New York law, tortious interference requires "the existence of a valid contract . . . , [defendant's] knowledge of that contract, and [defendant's] intentional procurement of [the third party's] breach of the contract without justification, actual breach of the contract, and [] damages resulting from the breach."  *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 594, 973 N.E.2d 735, 742 (2012).  A plaintiff must prove the elements of a tortious interference with contract claim by a preponderance of the evidence.  *Universe Antiques, Inc. v. Vareika*, 826 F. Supp. 2d 595, 607 (S.D.N.Y. 2011), *decision clarified*, No. 10 Civ. 3629, 2011 WL 5925012 (S.D.N.Y. Nov. 16, 2011), and *aff'd*, 510 F. App'x 74 (2d Cir. 2013).

33

Because the Court has found that there was no underlying breach of contract and no proven damages, Plaintiff has not established a tortious interference claim.

*     *     *

Plaintiff has not proven a breach of contract or damages resulting from any breach. Therefore, Plaintiff has no basis for recovering punitive damages.

Finally, as Plaintiff has not established a breach of the Earnout Agreement or Executive Earnout Agreement, his claim for attorney's fees is also dismissed.

## V.     Conclusion

Based on the foregoing findings of fact and conclusions of law, the Court finds in favor of Defendants on all claims.

The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated:  September 30, 2021
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge